## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BLINK HOLDINGS, INC., *et al.*,[1] | Case No. 24-11686 (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF STEVEN SHENKER, CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Steven Shenker, hereby declare under penalty of perjury that the following is true and correct:

1.     I am the Chief Restructuring Officer of Blink Holdings, Inc. ("**Blink**") and certain of its subsidiaries and affiliates that have filed voluntary petitions before this Court (each a "**Debtor**" and, collectively, the "**Debtors**" or the "**Company**").  I was appointed to this role concurrently with the filing of the Chapter 11 Cases (as defined below).  I have over 10 years of experience serving in a variety of roles, including in management positions and as a financial advisor and investment banker.  I joined Triple P RTS, LLC ("**Portage Point**") in June 2020, and have served as a Managing Director since January 2024.  Prior to joining Portage Point, I held a variety of roles, including founding member and Vice President at private equity firm, Periphas Capital, LP, from 2018 to 2020; Associate at the Carlyle Group Inc. from 2016 to 2018; and Investment Banking Analyst at Moelis & Company LLC ("**Moelis**") from 2014 to 2016.  In 2014,

---

[1]     The last four digits of Blink Holdings, Inc.'s federal tax identification number are 6354.  The mailing address for Blink Holdings, Inc. is 45 West 45th Street, 10th Floor, New York, New York 10036.  Due to the large number of debtors in these chapter 11 cases, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/BlinkFitness, or by contacting the proposed undersigned counsel for the Debtors.

I received a B.S. in Business & Management with a concentration in Finance from the Sy Syms School of Business at Yeshiva University.  Prior to becoming CRO, I advised the Debtors in my capacity as a Managing Director of Portage Point.  Portage Point has advised the Debtors since June 12, 2024.

2.      Portage Point has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to the Debtors' chapter 11 cases.  I have personally been involved in recent comparable chapter 11 reorganizations such as *In re Center for Autism and Related Disorders, LLC*, No. 23-90709 (CML) (Bankr. S.D. Tex June 12, 2023), where I served as Chief Restructuring Officer, *In re Bouchard Trans., Co., Inc.*, No. 20 34682 (DRJ) (Bankr. S.D. Tex. October 22, 2020), where I served as Deputy Chief Restructuring Officer; *In re Teligent, Inc.*, No. 21-11332 (BLS) (Bankr. D. Del. October 14, 2021), in which I served as a financial advisor to the company; *In re IEH Auto Parts Holding LLC (Auto Plus)*, No. 23-90054 (CML) (Bankr. S.D. Tex. Jan. 31, 2023); and *In re Hornbeck Offshore Servs., LLC*, No. 20 32685 (DRJ) (Bankr. S.D. Tex. May 19, 2020).  I specialize in advising senior executives, boards of directors, and creditors in distressed situations.

3.      On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions with the Court (collectively, the "**Chapter 11 Cases**") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**").  The Debtors intend to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.      Each of the Debtors are indirect subsidiaries of Equinox Group LLC ("**Equinox Group**").  The Debtors comprise four holding companies and 134 operating entities,

which each either manage an individual fitness center or were created for such purpose.  Blink is the borrower under the Prepetition Credit Agreement (as defined herein) and its assets, along with each of its subsidiaries' assets and Blink Company Intermediate Holdco Inc.'s equity ownership in Blink, have been pledged as collateral to the Prepetition Lenders pursuant to the Prepetition Credit Agreement (as such terms are defined below).  Equinox Group is not a debtor in these cases, and it is not anticipated that it, or any of its affiliates other than the Debtors, will be filing bankruptcy petitions.

5.    I submit this declaration (this "**Declaration**") to assist the Court and parties-in-interest in gaining an understanding of the circumstances that led to the commencement of the Chapter 11 Cases, and in support of the Debtors' petitions and pleadings requesting various forms of "first day" relief (collectively, the "**First Day Motions**"), which have been filed to minimize the adverse effects of filing for chapter 11 protection and enhance the Debtors' ability to maximize value for the benefit of their estates and creditors.

6.    I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors.  If called as a witness, I could and would competently testify to the matters set forth herein.  In my capacity with the Debtors, I am familiar with the Debtors' day-to-day operations, business affairs, financial condition, and books and records.  The facts set forth in this Declaration are based on my service with the Debtors, my review of the Debtors' books and records and other relevant documents, and my review of information compiled and communicated to me by other employees of the Debtors and the Debtors' professional advisors.

7.    Prior to the commencement of the Chapter 11 Cases I, among other things, (i) reviewed and discussed the Debtors' strategy regarding the development of potential restructuring and sale alternatives; (ii) supervised the preparation of the documentation needed to

implement the restructuring initiatives contemplated during the Chapter 11 Cases; and (iii) consulted on a regular basis with the Debtors' other senior management members and outside advisors with respect to the foregoing.

8. This Declaration provides an overview of the Company's business and corporate history, as well as a discussion of the events that compelled the commencement of the Chapter 11 Cases, a description of the Company's capital structure, its strategy to maximize the value of the business, and its efforts to obtain debtor-in-possession financing. The Declaration also affirms and incorporates the facts that support the relief requested in the First Day Motions.

## I. Introduction

9. As explained in detail below, the Debtors are a leading provider of fitness services in the high value, low price fitness category. The Debtors deliver a premium fitness experience, emphasizing inclusivity and positive messaging, using a simplified club infrastructure, which has enabled the Debtors to scale their business model.

10. The Debtors launched their brand in 2011 with only three locations in New York and New Jersey. By 2019, the Debtors had expanded to 92 corporate-owned locations and 10 franchised locations in New York, New Jersey, Massachusetts, Texas, Illinois, and California, and had just launched a proprietary mobile application to enhance member experience. At the height of the COVID-19 pandemic, all of the Debtors' clubs were forced to temporarily close as a result of regulatory mandates. The COVID-19 pandemic put a temporary, but immediate, halt to the Debtors' business, leaving the Debtors without revenue to fund operations.

11. Nevertheless, the Debtors' business model proved resilient. After pandemic restrictions subsided, the Debtors re-opened their clubs and announced new strategic initiatives to improve performance, enhance member satisfaction and experience, and expand club offerings to include updated equipment and personal training programs.

31926814.1

12.     Notwithstanding the Debtors' efforts to invest in member experience and infrastructure, which has resulted in increased membership (directly correlating to increased revenue), the Debtors have suffered from liquidity constraints resulting from, among other things, the effects of the pandemic, including burdensome lease deferral obligations incurred when the Debtors' clubs temporarily closed, substantial funded debt obligations, and a subset of underperforming clubs that contributed a significant negative impact on EBITDA in the twelve-month period leading up to the Petition Date.

13.     The Debtors, therefore, have been in close communications and discussions with their major stakeholders, including the Prepetition Lenders (as defined below), regarding business strategies and plans.  Leading up to the Petition Date and in consultation with the Prepetition Lenders, the Debtors retained the services of Moelis, Portage Point, and Young Conaway Stargatt & Taylor, LLP (collectively, the "**Restructuring Professionals**") to assess strategic alternatives, including financing and sale alternatives.  In addition, the Debtors have taken necessary actions to right-size their balance sheet and reassess their real estate and club footprint as part of their overall strategic plan.

14.     The Debtors intend to utilize the chapter 11 process to enhance liquidity through debtor-in-possession financing to allow for a value-maximizing sale process.  In addition, the Debtors anticipate using the tools of the Bankruptcy Code to (i) restructure their balance sheet, a process that is necessary to place the company on strong footing, and (ii) negotiate certain of their leases with landlords to further position the Debtors for future success.  As the national focus on exercise and overall healthy lifestyles continue to bolster the health club industry, the Company believes that it is well positioned to benefit from these dynamics as an operator with a recognized brand name, leading regional market shares, and an established operating history.

31926814.1

## II.      Overview of the Company

15.      As summarized above, the Company is a leading owner and operator of fitness clubs in the United States, specifically in the Northeast region, California, Illinois, and Texas, and maintains its headquarters in New York, New York.[2]  As of the Petition Date, the Company, or its franchisors, operated 101 fitness clubs[3] under the Blink Fitness brand name, collectively serving approximately 443,000 members as of June 2024.

16.      As of the Petition Date, the Debtors employed, in the aggregate, approximately 2,074 employees.  Approximately 2,005 employees work on an hourly basis, while the remainder work on a salaried basis.  The Debtors' employees are not covered by a collective bargaining agreement.

17.      Since launching in 2011, the Company has developed and refined its club formats, which has allowed the Company to cost-effectively construct and efficiently operate fitness clubs, optimizing the Debtors' ability to scale its model.  The Company's club locations— in suburban and urban areas—coupled with the Company's brand ethos of inclusivity and positive messaging has positioned the Company to attract a diverse customer base, led by the "Generation Z" population.  As of the Petition Date, more than 65% of the Company's membership is younger than 35 years old.

---

[2]      A chart detailing the organizational structure of the Debtors as of the Petition Date is attached hereto as Exhibit A.

[3]      Comprising 94 corporate-owned clubs and 7 franchised clubs.



18.    The Company seeks to provide a broad array of high-quality exercise programs and equipment that are popular and effective, promoting a quality exercise experience for members.  Clubs typically have an open fitness area to accommodate cardiovascular and strength-training equipment, as well as special purpose rooms for group fitness classes and other exercise programs.  The Company offers members electronic check-in and scheduling, on-demand fitness classes, and lifestyle tips through its proprietary mobile application.



19.     Members have the option to choose an annual or monthly membership plan, with three tiers of service available, ranging in price from $15 to $45 per month, as of the Petition Date.   In addition, the Company charges an annual maintenance fee.   Revenue is primarily generated from membership fees, but the Company also generates revenue from the sale of personal training services, partnership fees, retail merchandise, vending, and royalties.

20.     In early 2024, as part of its efforts to increase membership, bolster its brand, and improve membership experience, the Company announced a reinvestment in thirty (30) of its most popular fitness clubs, in furtherance of which the Company purchased more than 1,700 pieces of strength and cardiovascular equipment, updated club interiors, and partnered with wellness brands to offer supplemental fitness recovery options, which efforts have resulted in (a) increased membership satisfaction; (b) a 164% increase in total marketing impressions (i.e., advertising "views"); (c) a 57% increase in total market coverage; and (d) a 224% increase in Estimated Media Value, in each case based on a preliminary year over year analysis.   During the same period, total revenue has increased by more than 5% and the average revenue per member has increased by more than 10%.   The Company anticipates that recent trends will persist with continued investment in its brand and clubs.

## III.     Franchised Fitness Clubs

21.     Blink Fitness Franchising, Inc. ("**BFF**") is a wholly owned subsidiary of Blink.   BFF grants franchise rights to counterparties to develop and operate health and fitness centers that provide cardiovascular and strength training equipment and related products and services.   Franchised clubs operate under mandatory and suggested specifications, standards, operating procedures and rules, as specified by the Company.   As of the Petition Date, BFF has seven (7) franchised club locations, and has sold but not opened several locations in connection with twelve (12) development rights agreements.

IV.    **Transition Services Agreement**

22.    In an effort to achieve greater cost savings and efficiencies with respect to certain back office, human resources, software, and other support services, the Company entered into that certain *Transition Services Agreement*, dated December 1, 2016 (as subsequently amended, the "**TSA**"), with non-Debtor affiliate, Equinox Holdings, Inc. ("**EHI**"), pursuant to which EHI provides, among other things, services and personnel to the Debtors that are essential to the Debtors' operations (the "**Shared Services**").    Specifically, in the ordinary course of business and pursuant to the TSA, EHI incurs the cost of the Shared Services, including certain personnel and legal expenses, and procures certain shared benefits programs and contracts, such as certain of the Company's insurance policies, along with the Company's medical, dental, and vision plans, which are then offered to the Company's workforce, as applicable.    The contracts associated with such programs are negotiated by EHI, taking advantage of EHI's size and number of fitness brands, reputation, and business relationships, on terms that are likely more favorable than Company could otherwise independently obtain, which permits the Company to achieve operational efficiencies, including a reduced workforce and reduced technology and other infrastructure and overhead costs.    The Company and EHI negotiate an annual fee for the Shared Services, which is subject to adjustment and payable weekly in arrears in cash, on pricing terms that the Company believes is at or better than pricing that would be provided in an arm's-length transaction.    In August 2024, the Company and EHI entered into an amendment of the TSA to reflect the increase in services provided by EHI to support the Debtors' chapter 11 preparation and administration, and the terms by which such services would be compensated.    The Shared Services provide the Company with valuable services that enhance the Company's enterprise value, and the Shared Services (and the transactions necessitated thereby) are essential to the Company's operations.

## V.        The Prepetition Capital Structure

23.     As of the Petition Date, the Debtors' capital structure consists of outstanding funded secured debt, funded unsecured debt, and trade and other miscellaneous debt, in the aggregate amount of $280.8 million, as illustrated in the following table and described in detail below.

| Outstanding Obligation | Amount |
|---|---|
| Secured Funded Debt | $161.4 million |
| Unsecured Funded Debt | $103.5 million |
| Trade and Other Obligations | $15.9 million |
| **Total:** | **$280.8 million** |

### A.     *Secured Funded Debt Obligations*

24.     On November 8, 2018, Blink, as borrower, and the other Debtors, as guarantors, entered into that certain *Credit and Guaranty Agreement* with Varagon Capital Partners Agent, LLC (the "**Prepetition Agent**"), as administrative agent, and the other participating lenders thereunder (collectively with the Prepetition Agent, the "**Prepetition Lenders**" and such agreement, as amended, modified, supplemented, and including all of the ancillary documents related thereto, the "**Prepetition Credit Agreement**").  The Prepetition Credit Agreement provided the Debtors with a $145 million senior secured credit facility (the "**Senior Credit Facility**").  The Senior Credit Facility consisted of a $70 million term loan facility, drawn at closing (the "**Term Loan Facility**"), $50 million of delayed-draw term loans, and a $25 million revolving loan facility, which increased by $5 million in 2019 (the "**Revolving Loan Facility**").  The borrowings under the Senior Credit Facility are guaranteed and secured by assets and pledges of capital stock by Blink, Blink Company Intermediate Holdco Inc., and the wholly owned subsidiaries of Blink.

25.     Subsequently, the Company and the Prepetition Lenders entered into a series of amendments to the Prepetition Credit Agreement, which, among other things, provided for (a) an additional $30 million of delayed-draw term loans; (b) deferred certain interest payments; and (c) waived principal payments, events of default, and various covenants. With respect to that certain amendment executed on November 15, 2022, the Company and the Prepetition Lenders amended the Prepetition Credit Agreement to eliminate and replace the net leverage financial covenant with a minimum consolidated adjusted EBITDA covenant. As consideration for such amendment, the Company repaid $35 million of the Senior Credit Facility with funds received from a subordinated note facility provided by Equinox Group, as detailed below. Such funds were used to retire the Revolving Loan Facility and pay down $5 million of the Term Loan Facility. The Senior Credit Facility matures on November 8, 2024.

26.     Leading up to the Petition Date, on July 17, 2024 and July 30, 2024, the Debtors and the Prepetition Lenders further amended the Prepetition Credit Agreement (collectively, the "**Protective Advance Amendments**") to, among other things, provide for approximately $6.9 million in protective advances (collectively, the "**Prepetition Protective Advances**") that served as bridge financing in support of the Debtors' prepetition sale and marketing process and to provide the Debtors with sufficient runway to file the Chapter 11 Cases. Pursuant to the Protective Advance Amendments and as a condition to funding the Prepetition Protective Advances, the Debtors agreed that the obligations associated with the Prepetition Protective Advances would be "rolled up" into a postpetition credit facility to be funded by the Prepetition Lenders in connection with the Chapter 11 Cases, as discussed more fully below.

27.     As of the Petition Date, the outstanding balance owed to the Prepetition Lenders under the Prepetition Credit Agreement, including the obligations associated with the

Prepetition Protective Advances, is approximately $161.4 million, inclusive of accrued and unpaid interest (all such amounts, the "**Prepetition Loan Obligations**").

    *B.     Unsecured Funded Debt Obligations*

    28.    On September 30, 2020, Equinox Group and the Company entered into that certain *Subordinated Unsecured Revolving Promissory Note* (the "**Subordinated Note**"), by and between Blink and Equinox Group, whereby Equinox Group agreed to provide the Company with a $12.5 million subordinated loan (the "**Note Payable**"), the funding of which was a condition under that certain *Waiver and Seventh Amendment to Credit Agreement*, by and among the Company and the Prepetition Lenders, in connection with the Prepetition Lenders' waiver of an event of default under the Prepetition Credit Agreement. As of the Petition Date, the outstanding balance, including interest, of the Note Payable is approximately $20.6 million.

    29.    On November 15, 2022, Equinox Group provided funding to Blink in connection with a subsequent amendment of the Prepetition Credit Agreement, where, in connection with the amendment of the Prepetition Credit Agreement, Blink and Equinox Group entered into that certain *Subordinated Unsecured Revolving Promissory Note* whereby Equinox Group agreed to fund a $55 million line of credit (the "**Line of Credit**"), which was later increased to $67.5 million and has been fully drawn. As of the Petition Date, the outstanding balance, including interest, of the Line of Credit is $82.9 million.

    30.    The obligations under the Note Payable and Line of Credit accrue interest on a quarterly basis that is paid-in-kind (PIK) at a rate of 13% per annum and mature on May 8, 2025.

    *C.     Trade and Other Obligations*

    31.    As a fitness club operator, the Debtors have certain obligations to trade creditors in respect of their ordinary course operations, equipment, and leased facilities.

Specifically, the Company finances fitness equipment from third-party lenders through the issuance of notes payable, which require monthly payments and accrue interest at varying rates. In addition, the Company has incurred various rent obligations, including those associated with COVID pandemic rent deferral agreements, and is a party to certain pending litigation matters involving personal injury allegations, wage and employment claims, and breach of contract claims of the type typically associated with an operator in the fitness club industry.  As of the Petition Date, the Debtors estimate that they have approximately $15.9 million in outstanding trade liabilities and other miscellaneous unsecured obligations.

## VI.     Circumstances Leading to the Commencement of the Chapter 11 Cases

### A.     *The COVID-19 Pandemic*

32.     In early 2020, state and local governments exercised emergency executive authority to combat the spread of the COVID-19 pandemic and required the Company to temporarily close its fitness clubs.  Consequently, substantially all of the Company's operations were suspended, significantly impacting membership revenues for a period of nine (9) months.

33.     As the Debtors' operations ceased and membership revenues were suspended, the Company took immediate steps to reduce operating costs, conserve cash, and secure additional sources of funding, including negotiating waivers of certain events of default under the Senior Credit Facility, obtaining funds pursuant to the Subordinated Note, and engaging with landlords for rent concessions and related relief.  These efforts supported the Company through the closure of its clubs, but left the Company significantly overleveraged.

34.     Beginning in early 2022, the Company engaged a multinational investment and financial services company to assess strategic alternatives for an out-of-court transaction; however, that process did not yield indications of interest at values that the Company determined would be actionable.  Concurrently, the Company retained a commercial real estate advisory firm

(the "**Real Estate Broker**") to approach the Company's landlords in an effort to renegotiate and amend leases with lower rents or negotiate lease terminations where appropriate. Ultimately, the Real Estate Broker reached agreements on improved terms for a number of locations. However, such efforts were insufficient to meaningfully impact long-term liquidity issues.

B.     *Recent Prepetition Sale and Restructuring Efforts*

35.     Given the Company's liquidity challenges, as well as the impending maturity of the Prepetition Loan Obligations, the Company engaged the Restructuring Professionals to solicit interest in, and consult regarding, a refinancing of the Company's secured indebtedness or a sale of substantially all of the Company's assets in either an in-court or out-of-court transaction. In support thereof, the Company and the Restructuring Professionals constructed detailed cash forecasts and analyses, compiled and analyzed substantial diligence materials for use in a sale process, drafted marketing and communications materials, and coordinated with stakeholders and parties in interest, including the Prepetition Lenders and Equinox Group, regarding potential financing proposals.

36.     In July 2024, the Company began actively marketing its assets to a targeted group of potential purchasers by distributing non-disclosure agreements (each, an "**NDA**"), a confidential information memorandum, a high-level financial model, and an overview of specific gym-level performance. To further support these parties in advancing their diligence efforts, the Company provided tailored ad hoc diligence information, ensuring purchasers had access to specific information needed for informed decision-making. This approach has successfully attracted substantial interest, resulting in several non-binding indications of interest from multiple credible bidders. The Debtors' advisors continue to engage actively with these interested parties, underscoring the robust participation and competitive nature of the sale process for nearly all of the Company's assets.

37.     In addition, to support the Company's prepetition marketing efforts, the Prepetition Lenders agreed to provide bridge financing in the form of the Prepetition Protective Advances, as discussed above, to ensure that the Company could continue to satisfy ongoing obligations, thus maintaining operational status quo and preserving the value of the Company's assets, while the Company simultaneously engaged in marketing outreach and prepared the documents and pleadings necessary to commence the Chapter 11 Cases.

38.     To further support the Company's restructuring efforts and in consultation with the Restructuring Professionals and the Company's stakeholders, the Company created a special restructuring committee for each of its boards of directors (the "**Restructuring Committee**"), effective as of June 23, 2024, and delegated to the Restructuring Committee the right, responsibility, and power to manage all matters and make all final decisions regarding a potential restructuring.  In connection therewith, the Company retained and appointed Emanuel Pearlman as an independent director to serve as the sole member of the Restructuring Committee.

## VII.    Debtor in Possession Financing

39.     As further described in the *Declaration of Andrew Swift in Support of Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing and Use Cash Collateral; (II) Granting Liens, Super-Priority Claims, and Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief*, filed concurrently herewith, the Debtors secured a superpriority senior secured multiple draw term loan credit facility (the "**DIP Facility**"), pursuant to that certain *Senior Secured Priming and Superpriority Debtor-in-Possession Credit and Guaranty Agreement* (including any exhibits, amendments, and ancillary documents related thereto, the "**DIP Credit Agreement**," the lenders party thereto, the "**DIP Lenders**," and the obligations thereunder,

the "**DIP Obligations**") in the aggregate principal amount of $73.5 million (the "**Maximum Commitment**"), consisting of (a) new money term loan commitments in the maximum aggregate principal amount of $21 million (the "**New Money DIP Loans**", and the portion of such Maximum Commitment attributable to the New Money DIP Loans, the "**New Money Maximum Commitment**"), of which (1) upon entry of an interim order approving the DIP Facility (the "**Interim DIP Order**"), up to $10.5 million in principal amount of such New Money DIP Loans shall be made available to be drawn prior to entry of a final order approving the DIP Facility (the "**Final DIP Order**" and together with the Interim DIP Order, the "**DIP Orders**"), subject to satisfaction of the other applicable conditions set forth in the Interim DIP Order and the DIP Credit Agreement, and (2) upon entry of the Final DIP Order, up to the full New Money Maximum Commitment (net of such commitment already drawn), shall be made available to be drawn subject to the satisfaction of the other applicable conditions set forth in the DIP Credit Agreement and the DIP Orders; and (b) a roll-up, upon entry of the Interim DIP Order, of the obligations in respect of the Prepetition Protective Advances and certain Prepetition Obligations in the aggregate amount of approximately $17.4 million into DIP Obligations *pari passu* with the New Money DIP Loans and, upon entry of the Final DIP Order, approximately $35 million, consisting of a portion of the obligations due under the Prepetition Credit Agreement (other than Protective Advances and interest thereon) held by the Prepetition Lenders who are also DIP Lenders, shall be rolled up and converted into DIP Loans on a pro rata basis.

40.    The DIP Facility provides the Debtors with an essential cash infusion and time to pursue a value maximizing sale transaction in the Chapter 11 Cases in accordance with the milestones set forth in the DIP Facility.  However, the Debtors believe that lingering in the chapter 11 process for too long could erode value.  Accordingly, the milestones provided for in the DIP

Facility balance the desire for additional marketing with the need for a quick and efficient chapter 11 process.

41.     The Debtors believe that certain parties identified during their prepetition marketing efforts as well as new parties will have interest in pursuing an acquisition of the Debtors or their assets either in whole or part.  The Debtors also believe that the runway provided by the DIP Facility and the framework provided by a sale process, including the ability to convey assets free and clear to a potential acquirer, is likely to lead to a successful transaction and resolution of the Chapter 11 Cases.

42.     In determining the amount of financing that the Debtors require, the Debtors worked with the Restructuring Professionals, under the oversight of the Restructuring Committee and in consultation with the Prepetition Lenders and other stakeholders, to evaluate the Debtors' cash requirements for their business.  As part of this evaluation, I, along with my colleagues, have worked diligently to familiarize ourselves with the Debtors' day-to-day operations, business affairs, financial performance, books and records, and restructuring efforts.  As part of the Debtors' evaluation of their liquidity position, I, along with my team at Portage Point, worked closely with the Debtors' management and other advisors to review, analyze, and assist in the development of the Debtors' 13-week cash flow forecasts and to prepare a DIP sizing analysis (the "**Initial DIP Budget**"), and engaged in negotiations with the DIP Lenders concerning the Initial DIP Budget. These forecasts consider anticipated cash receipts and disbursements during the projection period and consider a number of factors, including, but not limited to, the effect of the chapter 11 filing on the operations of the business, fees and interest associated with postpetition financing, professional fees, customer and vendor obligations, as well as the expected operational performance of the Debtors' business and the cost of the DIP Facility.  Therefore, I believe that

the Initial DIP Budget, attached as Exhibit A to the proposed Interim DIP Order, would provide an appropriate amount of postpetition financing to allow the Debtors to administer the Chapter 11 Cases and contemplated sale process.  I believe that the Initial DIP Budget and the amounts and projections set forth therein are reasonable under the facts and circumstances of the Chapter 11 Cases and provide an accurate reflection of the Debtors' funding requirements over the identified period.

43.    Based on my and my team's analysis of the Debtors' current cash position and needs, I believe that, even assuming the Debtors have unrestricted access to cash collateral, they require an immediate capital infusion in the form of the DIP Facility to preserve the Debtors' estates for the benefit of all stakeholders.  As illustrated by the Initial DIP Budget, the Debtors are unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover their operating and capital costs, working capital needs, and the projected costs of the Chapter 11 Cases absent immediate funding.

44.    The DIP Facility will provide the Debtors with immediate access to liquidity, which will permit the Debtors to:  (a) preserve their member relationships for a potential buyer during these Chapter 11 Cases; (b) provide working capital for their business; (c) fund payments to their workforce; (d) pay and continue to maintain relationships with their vendors and suppliers at the planned level of operating activity; (e) fund other general corporate purposes; (f) fund the payments authorized by the Court pursuant to the First Day Motions; (g) operate the Debtors' cash management system; and (h) satisfy administrative costs and expenses of the Debtors incurred in these Chapter 11 Cases, each of which is essential to the Debtors' continued viability and to maximizing the value of the Debtors' estates through the planned sale process. Additionally, the need for access to the DIP Facility is further underscored by the fact that I do not

believe it would be prudent, or even possible, to administer the Chapter 11 Cases solely on a "cash collateral" basis with no access to additional capital.  I believe that all such expenses are critical to the Debtors' business and that the Debtors' failure to make such payments will result in immediate and irreparable harm to the Debtors and their estates.

45.     Accordingly, I believe that absent immediate access to the DIP Facility, the Debtors could be forced to file liquidating proceedings without the opportunity to run a value-maximizing sale process in court.  To avoid those outcomes, it is imperative that the Debtors have access to the DIP Facility from the outset of the Chapter 11 Cases to signal to the Debtors' stakeholders, including their employees, potential bidders, and customers, that they have the liquidity necessary to operate in the ordinary course of business while conducting a competitive sale process.  For all these reasons, I believe that access to the proposed DIP financing is a necessity.

## VIII.   Chapter 11 Objectives

46.     As noted above, over the past several years the Company has spent considerable time considering a range of strategic options to revitalize its operations. Unfortunately, due to the challenges discussed herein, the Company has been unable to service its senior secured debt obligations in the ordinary course of business and is facing imminent liquidity and maturity issues that will require an influx of capital to maintain operations.  To address these challenges, and in an effort to maximize value for the benefit of their creditors and other stakeholders, the Company, in consultation with the Restructuring Professionals, the Prepetition Lenders, and other stakeholders, and after considering all available strategic options, determined that the best course to maximize value was to initiate the Chapter 11 Cases with the goal of (i) preserving the Company's assets through the consummation of an asset-maximizing transaction and (ii) minimizing estate obligations to the extent possible.

31926814.1

47.    Given the Company's substantial funded debt obligations, it will be critical for the Company to use the public chapter 11 sale process to expand on the Company's targeted prepetition marketing efforts to ensure that the Company is able to achieve the highest possible value for its assets.  Accordingly, the Company will engage with all interested and credible parties that execute an NDA and will provide such parties with the diligence information necessary to adequately assess the Company's assets and participate in a competitive auction process.

48.    In addition to negotiating the DIP Facility to provide a source of critical operating funds, to avoid incurring any unnecessary administrative expenses with respect to certain facilities where the Debtors are no longer operating and retain no assets of value, the Debtors have sought to reject such leases effective to the Petition Date.  The Debtors will also continue to analyze their asset portfolio and available disposition alternatives with respect to all available assets to preserve and maximize estate value.

**IX.    Support for Relief Requested in the First Day Motions**

49.    Concurrently with the filing of their chapter 11 petitions, the Debtors filed the First Day Motions seeking relief that is necessary to enable the Debtors to maximize the value of their estates while the Chapter 11 Cases are pending.  The facts set forth in the First Day Motions are incorporated herein in their entirety.

50.    I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe that the relief sought in each First Day Motion:  (i) will enable the Debtors to transition into chapter 11; (ii) is critical to the Debtors' efforts to maximize value through the Chapter 11 Cases and minimize expense; and (iii) best serves the interests of the Debtors' creditors and other stakeholders.  It is my further belief that the relief sought in the First Day Motions is, in each case, narrowly tailored and necessary to achieve the goals identified above.

31926814.1

51. The Debtors are seeking approval of the First Day Motions to ensure that value is preserved during the transition into chapter 11.

52. To this end, the Debtors have filed the following First Day Motions:

i. *Debtors' Motion for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases;*

ii. *Debtors' Application for an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent, Effective as of the Petition Date;*

iii. *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Operating Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Affiliate Transactions, (II) Authorizing Debtors' Continued Use of Corporate Credit Cards and Granting Administrative Expense Status to Postpetition Credit Card Obligations; (III) Waiving Certain U.S. Trustee Guidelines; and (IV) Granting Related Relief;*

iv. *Debtors' Motion for Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Granting Related Relief;*

v. *Debtors' Motion for Interim and Final Orders, (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations, (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Granting Related Relief;*

vi. *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Accrued Prepetition Employee Wages, Salaries, and Other Compensation; (B) Honor Commission and Bonus Obligations to Non-Insider Employees in the Ordinary Course of Business; (C) Pay Prepetition Employee Business Expenses; (D) Contribute to Prepetition Employee Benefit Programs and Continue Such Programs in the Ordinary Course of Business; (E) Pay Workers' Compensation Obligations; (F) Remit Payments for Which Prepetition Payroll Deductions Were Made; and (G) Pay the Costs and Expenses Incident to the Foregoing Payments and Contributions; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief;*

31926814.1

vii.  *Debtors' Motion for Interim and Final Orders (I) Authorizing (A) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance and Surety Programs, Including Payment of Policy Premiums, Broker Fees, and Claims Administrator Fees, and (B) Continuation of Insurance Premium Financing Program; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief;*

viii.  *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief;*

ix.  *Debtors' Motion for Entry of Interim And Final Orders (I) Authorizing the Debtors to Maintain and Honor Certain Prepetition Customer Programs; (II) Authorizing the Debtors to Serve Customers Certain Pleadings Filed in the Chapter 11 Cases By Electronic Means; (III) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (IV) Granting Related Relief; and*

x.  *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing and Use Cash Collateral; (II) Granting Liens, Superpriority Claims, and Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief.*

53.  I have reviewed each of the First Day Motions, and the facts stated therein are true and correct to the best of my belief with appropriate reliance on corporate officers and advisors and are incorporated herein by reference.  It is my belief that the relief sought in each of the First Day Motions constitutes a critical element in the successful implementation of the Debtors' efforts to maximize creditor recoveries, is necessary for a smooth transition into Chapter 11 and will help to preserve the value of the Debtors' estates.  It is my further belief that, with respect to those First Day Motions, requesting the authority to pay specific prepetition claims or continue selected prepetition programs, *i.e.*, the First Day Motions seeking relief related to the Debtors' obligations to their employees, taxing authorities, vendors, service providers, customers,

banks, and insurers, the relief requested is necessary to avoid immediate and irreparable harm to the Debtors' estates.

54.    The success of the Chapter 11 Cases depends upon the Debtors' ability to successfully implement the value-maximizing transactions described herein.  The relief requested in the First Day Motions is a critical component of maintaining business operations and the confidence of key constituencies necessary to implement a successful chapter 11 process.

## **CONCLUSION**

55.    I believe approval of the relief requested in the First Day Motions is in the best interests of all stakeholders and respectfully request that the Court grant all relief requested in the First Day Motions and such other relief as may be just.

Dated:  August 12, 2024                        */s/ Steven Shenker*

                                                                Steven Shenker
                                                                Chief Restructuring Officer

# EXHIBIT A

**Corporate Organizational Chart**

31926814.1



# Ownership Structure of Blink Holdings, Inc., et al.

1

Exhibit 21.1 - Blink - DS 2 of 3 - 4820-1225-1294v2014

# Direct Subsidiaries of Blink Holdings, Inc.

| Blink Holdings, Inc. (DE) |
|---|

100%

1. 692 Broadway Fitness Club, Inc. (NY)
2. Bergen Town Center Fitness Club, Inc (NJ)
3. Blink 101 W 87th Street Inc. (IL)*
4. Blink 1060 W Alameda, Inc. (CA)
5. Blink 1065 6th Avenue, Inc. (NY)
6. Blink 108-14 Roosevelt, Inc. (NY)
7. Blink 1134 Fulton, Inc. (NY)
8. Blink 116th Street, Inc. (NY)
9. Blink 12201 Victory Blvd Inc. (CA)*
10. Blink 125 Park, Inc. (NY)
11. Blink 125th Street, Inc. (NY)
12. Blink 130 W.G. Street, Inc. (CA)
13. Blink 16th Street, Inc. (NY)*
14. Blink 16123 Bellflower Blvd., Inc. (CA)
15. Blink 18th Avenue, Inc. (NY)*
16. Blink 19500 Plummer, Inc. (CA)*
17. Blink 2192 Texas Parkway, Inc. (TX)
18. Blink 229 E. Foothill Boulevard, Inc. (CA)*
19. Blink 2374 Grand Concourse, Inc. (NY)
20. Blink 2465 Jerome Inc. (NY)
21. Blink 2862 Fulton Street, Inc. (NY)*
22. Blink 287 Broadway, Inc. (NY)
23. Blink 2883 3rd Avenue, Inc. (NY)
24. Blink 3779 Nostrand, Inc. (NY)
25. Blink 56-02 Roosevelt, Inc. (NY)
26. Blink 600 Third Avenue, Inc. (NY)
27. Blink 69th Street Inc. (PA)*
28. Blink 78-14 Roosevelt, Inc. (NY)
29. Blink 79th Holdings Inc. (FL)*
30. Blink 8201 Broadway Inc. (TX)
31. Blink 833 Flatbush, Inc. (NY)
32. Blink 88th Street, Inc. (NY) - f/k/a Blink Hylan Boulevard, Inc. (NY)*
33. Blink 886 Broadway, Inc. (NY)
34. Blink 97-01 Northern Blvd., Inc. (NY)
35. Blink 9901 S. Alameda, Inc. (CA)
36. Blink 98th Street, Inc. (NY) - f/k/a Blink 25 Broadway, Inc.
37. Blink Abrams Road Inc. (TX)*
38. Blink Airline Drive, Inc. (TX)
39. Blink Amboy Road Inc. (NY) f/k/a Blink 1239 Fulton, Inc.*
40. Blink Ashland Inc. (IL)
41. Blink Ashland Avenue, Inc. (IL)
42. Blink Atlantic Avenue, Inc. (NY)
43. Blink Atlantic Ave LB Inc. (CA)
44. Blink Avenue A, Inc. (NY)
45. Blink Baldwin, Inc. (NY)
46. Blink Beach Street, Inc. (TX)
47. Blink Bedford, Inc. (TX)*
48. Blink Belleville Inc. (NJ)*
49. Blink Bissonnet, Inc. (TX)
50. Blink Braddock Avenue Inc. (NY)
51. Blink Brentwood, Inc. (NY)
52. Blink Broadway Marketplace, Inc. (NY)
53. Blink Brookhurst, Inc. (CA)
54. Blink Clifton, Inc. (NJ)
55. Blink Commercial Boulevard, Inc. (FL)*
56. Blink Compton & Central Avenue, Inc. (CA)*
57. Blink Concourse Holdings, Inc. (NY)
58. Blink Courtesy Plaza Inc. (IL)
59. Blink Deerwood Inc. (FL)*
60. Blink Diversey, Inc. (IL)*
61. Blink East 54th Street, Inc. (NY)
62. Blink East Orange, Inc. (NJ) - f/k/a Blink Bellville, Inc.
63. Blink East Tremont Avenue, Inc. (NY)
64. Blink Eighth Avenue, Inc. (NY)
65. Blink Farmers Boulevard Inc. (NY)
66. Blink Fitness Franchising, Inc. (DE)
67. Blink Fitness Rialto Inc. (CA)
68. Blink Flatlands Avenue, Inc. (NY)
69. Blink Fourth Avenue, Inc. (NY)
70. Blink Frankford Avenue, Inc. (PA)
71. Blink Fulton Street, Inc. (NY)
72. Blink Gates, Inc. (NY)
73. Blink Georgetown Inc. (NY)*
74. Blink Hawthorne, Inc. (NJ)*
75. Blink Hicksville, Inc. (NY)
76. Blink Highway 249, Inc. (TX)
77. Blink Irvington Inc. (NJ)*
78. Blink Islandia, Inc. (NY)
79. Blink Jamaica Avenue, Inc. (NY)
80. Blink Jerome Avenue, Inc. (NY)
81. Blink Journal Square, Inc. (NJ)
82. Blink Keller, Inc. (TX)
83. Blink Kendall Market Place Inc. (FL)*
84. Blink Kenwood, Inc. (IL)
85. Blink Knickerbocker, Inc. (NY)
86. Blink KWT Holdco LLC (DE)
87. Blink Linden, Inc. (NJ)
88. Blink Liberty Avenue, Inc. (NY)
89. Blink Lodi, Inc. (NJ)
90. Blink Long Point, Inc. (TX)
91. Blink Macombs Road, Inc. (NY)
92. Blink Melville, Inc. (NY)
93. Blink Metropolitan Avenue, Inc. (NY)
94. Blink Miramar Parkway Inc. (FL)
95. Blink Myrtle Avenue, Inc. (NY) - f/k/a Blink 3780 Broadway, Inc.
96. Blink Nassau Street, Inc. (NY)
97. Blink Newark, Inc. (NJ)
98. Blink Normandie Avenue, Inc. (CA)
99. Blink North 10th Street Corp. (NY)*
100. Blink Nostrand Avenue, Inc. (NY)
101. Blink NRH, Inc. (TX)
102. Blink Nutley, Inc. (NJ)
103. Blink Pacific Boulevard, Inc. (CA)
104. Blink Parsippany, Inc. (NJ)
105. Blink Passaic, Inc. (NJ)
106. Blink Paterson, Inc. (NJ)
107. Blink Perth Amboy, Inc. (NJ)
108. Blink Plainfield, Inc. (NJ)
109. Blink Richmond Road, Inc. (NY)*
110. Blink Ridgeland Ave., Inc. (IL)
111. Blink Riverdale, Inc. (NY)
112. Blink Selden, Inc. (NY)*
113. Blink South Orange, Inc. (NJ)
114. Blink Southern Boulevard, Inc. (NY)
115. Blink St. Ann's Avenue, Inc. (NY)*
116. Blink Steinway Street, Inc. (NY)
117. Blink Stonebrook, Inc. (IL)
118. Blink Sunset Park, Inc. (NY)
119. Blink Union, Inc. (NJ)
120. Blink Utica Avenue, Inc. (NY)
121. Blink Valley Stream, Inc. (NY)
122. Blink Webster Avenue, Inc. (NY) - f/k/a Blink Boston Post Road, Inc.
123. Blink West 8th Street, Inc. (NY)
124. Blink West 31st Street, Inc. (NY)*
125. Blink West Islip, Inc. (NY)
126. Blink Westchase, Inc. (TX)
127. Blink White Plains, Inc. (NY)*
128. Blink Whitman, Inc. (PA)
129. Blink Williamsbridge, Inc. (NY)
130. Blink Willingboro, Inc. (NJ)
131. Blink Wissinoming, Inc. (PA)
132. Cross County Fitness Club, Inc. (NY)

# Direct Subsidiaries of Blink Holdings, Inc.

