## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BLINK HOLDINGS, INC., *et al.*,[1] | Case No. 24-11686 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date**: <br> **September 10, 2024 at 1:00 p.m. (ET)** |
| | **Objection Deadline**: <br> **August 30, 2024 at 4:00 p.m. (ET)** |

**DEBTORS' MOTION FOR ENTRY OF ORDERS (I) (A) APPROVING CERTAIN BIDDING PROCEDURES AND THE FORM AND MANNER OF NOTICE THEREOF, (B) SCHEDULING AN AUCTION AND A HEARING ON THE APPROVAL OF THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (C) ESTABLISHING CERTAIN ASSUMPTION AND ASSIGNMENT PROCEDURES AND APPROVING MANNER OF NOTICE THEREOF, AND (D) GRANTING RELATED RELIEF; AND (II) (A) AUTHORIZING AND APPROVING THE DEBTORS' ENTRY INTO AN ASSET PURCHASE AGREEMENT, (B) AUTHORIZING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS, AND (D) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") hereby submit this motion (this "**Motion**"), for entry of:

    (i)    an order (the "**Bidding Procedures Order**"), substantially in the form attached hereto as Exhibit A:

        (a)    approving proposed auction and bidding procedures (the "**Bidding Procedures**") in connection with the sale (or series of sales) (collectively, the "**Sale**") of all or substantially all of the Debtors'

---

[1] The last four digits of Blink Holdings, Inc.'s federal tax identification number are 6354. The mailing address for Blink Holdings, Inc. is 45 West 45th Street, 10th Floor, New York, New York 10036. Due to the large number of debtors in these chapter 11 cases, which the Debtors have requested be jointly administered, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/BlinkFitness, or by contacting the proposed undersigned counsel for the Debtors.

assets (the "**Assets**") in the form attached to the Bidding Procedures Order as <u>Exhibit 1</u>, and approving the form and manner of notice thereof in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u>,

(b)     if applicable, and subject to final Court (as defined below) approval, authorizing, but not directing, the Debtors to designate a stalking horse bidder (the "**Stalking Horse Bidder**") in accordance with the Bidding Procedures,

(c)     subject to final Court approval at the Sale Hearing (as defined below), authorizing and approving the Debtors to enter into and perform under an asset purchase agreement consistent with the Bidding Procedures (the "**Purchase Agreement**"),

(d)     scheduling an auction (the "**Auction**") and a sale hearing (the "**Sale Hearing**") in connection with the Sale, and

(e)     establishing procedures for the assumption and assignment (the "**Assumption and Assignment Procedures**") of certain executory contracts and unexpired leases (each, an "**Assumed Contract**," and collectively, the "**Assumed Contracts**") and the form and manner of notice thereof in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u>; and

(ii)     an order (the "**Sale Order**"):

(a)     authorizing and approving the Debtors' entry into the Purchase Agreement with the Successful Bidder(s) (as defined below) or Next-Highest Bidder(s) (as defined below), as applicable,

(b)     authorizing the Sale of the Assets to the party or parties that are the Successful Bidder(s) at the Auction, free and clear of all liens, claims and encumbrances (the "**Encumbrances**"), except for certain assumed liabilities,

(c)     authorizing and approving the assumption and assignment of the Assumed Contracts in connection with the Sale, including proposed cure amounts (if any), and

(d)     granting related relief.

The facts and circumstances supporting this Motion are set forth in the *Declaration of Steven Shenker in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 2]

(the "**First Day Declaration**").[2]  In further support of this Motion, the Debtors respectfully state as follows:

**JURISDICTION AND VENUE**

1.     The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors confirm their consent to the entry of a final order or judgment by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.     Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief requested herein are sections 105, 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), rules 2002, 6004, 6006, and 9006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rules 2002-1 and 6004-1.

**PRELIMINARY STATEMENT**

3.     The Debtors commenced the Chapter 11 Cases (as defined below) to preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders.  The Debtors determined, in consultation with their advisors, that a public and court-supervised sale

---

[2]     Capitalized terms used but otherwise not defined herein shall have the meanings set forth in the First Day Declaration or Bidding Procedures, as applicable.

process under chapter 11 of the Bankruptcy Code provides the best path forward under the circumstances to consummate a value-maximizing transaction for the Assets. For the reasons set forth herein, a marketing and sale process under section 363 of the Bankruptcy Code provides the Debtors and potential bidders with certain advantages that were not available to the Debtors outside of chapter 11, which the Debtors believe will illicit substantial interest in the Debtors' assets. Furthermore, the Debtors have already identified certain parties that have expressed an interest in pursuing an acquisition of the Debtors or their assets either in whole or part through a court-supervised process in chapter 11.

4.     Specifically, prior to the Petition Date, the Debtors engaged Moelis & Company LLC ("**Moelis**") to actively market the Assets to a targeted group of potential purchasers by distributing confidentiality agreements (each, a "**Confidentiality Agreement**"), a confidential information memorandum, a high-level financial model, and an overview of certain operating performance. To further support these parties in advancing their diligence efforts, the Debtors provided parties with access to a virtual data room (the "**Data Room**") populated with information regarding, among other things, the Debtors' operations, lease portfolio, and revenue statistics, ensuring potential purchasers had access to the information needed for informed decision-making. This approach has successfully attracted substantial interest, resulting in several non-binding indications of interest from multiple credible bidders.

5.     Accordingly, the Debtors file this Motion to approve the proposed Bidding Procedures while they work to identify interested bidders, including a Stalking Horse Bidder, for the Sale of the Assets. Selecting a Stalking Horse Bidder would permit the Debtors to secure a bid that will serve as a floor for all other potential bids. The ultimate aim of establishing the Bidding Procedures is to allow the Debtors to expand their marketing outreach to a wide array of potential

bidders to facilitate a competitive and productive Auction, where interested parties will have an opportunity to bid on substantially all of the Debtors' assets (the "**Assets**").  The Bidding Procedures will ensure that the Debtors' postpetition marketing and sale process expands upon the prepetition process in a fair, open manner that encourages bidders to submit proposals in a manner that maximizes asset value.

6.      Accordingly, as the Debtors continue to advance indications of interest and work to obtain binding purchase agreements, the Debtors seek, by this Motion, entry of the Bidding Procedures Order, which will provide the Debtors with approval to, among other things, (a) conduct the marketing and Sale process in accordance with the Bidding Procedures; (b) identify a Stalking Horse Bidder in advance of an Auction; and (c) following the completion of the postpetition marketing and sale process, obtain entry of the Sale Order.

## BACKGROUND

### I.      General

7.      On August 12, 2024 (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Debtors are authorized to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      No official committee has been appointed in the Chapter 11 Cases, and no request has been made for the appointment of a trustee or an examiner.

9.      Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in the First Day Declaration.

**II.      Prepetition Sale Efforts**

10.      As set forth in greater detail in the First Day Declaration, the Debtors are a leading provider of fitness services in the high value, low price fitness category.  In the months prior to the Petition Date, the Debtors faced increasingly tight liquidity, necessitating the commencement of the Chapter 11 Cases and the sale of the Debtors' assets on the timeline contemplated by the Bidding Procedures.

11.      Among other efforts the Debtors made to address the challenges facing their business, the Debtors retained Moelis in May 2024.  As detailed above, Moelis has assisted the Debtors in evaluating potential sources of additional debt financing and commenced a marketing process for a sale of the Assets.  As part of this process, the Debtors and Moelis have engaged a targeted group of potential bidders and held several first round diligence meetings in July and August 2024, which led to the receipt of several indications of interest with credible potential bidders.  While the Debtors received significant interest, the Debtors, in consultation with Moelis, determined it was not feasible to transact quickly enough with any of these parties to avoid the Chapter 11 Cases.

12.      The Debtors' prepetition marketing efforts have laid the foundation for the Debtors to efficiently negotiate and consummate a value-maximizing transaction within the Chapter 11 Cases for the benefit of their creditors and all stakeholders.

**III.      Need for an Expedited Process**

13.      Time is of the essence for the Debtors, who simply cannot afford a longer process than the one contemplated by these Bidding Procedures.  Any delay in consummation of a sale jeopardizes the Debtors' ability to conduct the Chapter 11 Cases and operate their businesses in an efficient manner for the benefit of all creditors, particularly because the Debtors have

dwindling liquidity and have forecasted their postpetition financing needs based on the timing of the contemplated sale process.  Any delays would result in additional incremental funding requirements, which funding may not be available, and will only disadvantage the Debtors and their stakeholders.  The Bidding Procedures balance the Debtors' need to efficiently consummate a sale of their business while providing parties in interest with substantial time to participate in the marketing process, evaluate the Assets, and submit bids, particularly given that the Debtors commenced the Chapter 11 Cases fully prepared with marketing and other business materials that can immediately be made available to assist potential bidders with their diligence inquiries.

14.      Under the proposed Bidding Procedures, in the event the Debtors receive a Qualified Bid other than a Stalking Horse Bid, they will conduct an Auction to yield the most value-maximizing sale of the Assets.  If the Debtors do not receive any competing bids other than a Stalking Horse Bidder, they will immediately seek approval of such Stalking Horse Bid.  These proposed procedures balance the needs for an efficient and structured process while also providing parties in interest with an opportunity to evaluate a proposed transaction within a customary time period that is consistent with the applicable rules.  The Debtors' proposed sale timeline has been constructed to make the most effective use of the Debtors' limited resources given that the Debtors have already marketed the Assets to a targeted group of potential strategic buyers and financial investors, and a substantial amount of information regarding the Debtors' business has been, or will be, available to potential bidders throughout the prepetition and subsequent postpetition marketing process.  In light of these circumstances, a longer in-court process than that set forth in the proposed Bidding Procedures is unnecessary.

15.      Accordingly, the Debtors have determined that the Bidding Procedures are in the best interests of their estates and creditors, as they will establish a uniform process in which

interested bidders can participate in a competitive auction, and facilitate one or more value-maximizing sales of the Assets on a timeline that balances the need for a swift transaction with the need to provide all potential bidders sufficient opportunity to participate.

### THE PROPOSED BIDDING PROCEDURES

16.     The Debtors request approval of the Bidding Procedures, which provide, among other things, (i) the Debtors' assets available for sale; (ii) the manner in which bids become "qualified;" (iii) the coordination of diligence efforts among the bidders and the Debtors; (iv) the receipt and negotiation of bids received; (v) the conduct of any Auction; (vi) the selection and approval of the Successful Bidder and the selection of the Next-Highest Bidder (as defined below); and (vii) the designation and approval of the Stalking Horse Bidder, Stalking Horse APA, and Bid Protections, if a Stalking Horse Bidder is designated.  The Bidding Procedures reflect the Debtors' objective of conducting the Sale process in a controlled, but fair and open, manner while ensuring that the highest or otherwise best bid is generated for the Assets.   Importantly, the Bidding Procedures also recognize the Debtors' fiduciary obligations to maximize sale value and, as such, do not impair the Debtors' ability to consider all qualified bid proposals and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate.  As required by Local Rule 6004-1, the following is a summary of the proposed Bidding Procedures.[3]

17.     <u>Confidentiality Agreement</u>.  Unless otherwise ordered by the Court for cause shown, to participate in the Bidding Process, each person or entity must enter into (unless previously entered into) with the Debtors, on or before the Bid Deadline, a Confidentiality

---

[3]     Any summary of the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bidding Procedures attached as <u>Exhibit 1</u> to the Bidding Procedures Order.  To the extent that there is any conflict between the summary contained herein and the actual terms and conditions of the Bidding Procedures reflected in <u>Exhibit 1</u> to the Bidding Procedures Order, the terms and conditions of the Bidding Procedures shall control in all respects.

Agreement in form and substance satisfactory to the Debtors. Each person that enters into a Confidentiality Agreement with the Debtors in contemplation of participating in the Sale process on or before the Bid Deadline is hereinafter referred to as a "**Potential Bidder**." After a Potential Bidder enters into a Confidentiality Agreement with the Debtors and demonstrates the financial wherewithal to potentially consummate a sale transaction, the Debtors shall deliver or make available (unless previously delivered or made available) to each Potential Bidder certain designated information (including, if applicable, financial data) with respect to the Assets.

18.    <u>Designation of the Stalking Horse Bidder</u>. The Bidding Procedures contemplate that the Debtors will continue their prepetition efforts to identify a stalking horse bid. As such, the Debtors may, at any time prior to the Auction, in consultation with counsel to any statutory committee appointed in the Chapter 11 Cases, if any (each a "**Committee**"), the Prepetition Agent and DIP Agent and their counsel (so long as the Prepetition Agent and DIP Agent are not actively participating[4] in the Bidding Process as a Potential Bidder[5]), and any other party that the Debtors deem appropriate (collectively, the "**Consultation Parties**"), designate a Stalking Horse Bidder, whose Qualified Bid shall serve as the stalking horse bid (the "**Stalking Horse Bid**"), and any asset purchase agreement memorializing the proposed transaction set forth in the Stalking Horse Bid (the "**Stalking Horse APA**") will be binding on the Stalking Horse Bidder and set the floor for all Qualified Bids, subject to higher or otherwise better offers at the Auction. If the Stalking Horse Bid is not selected as the Successful Bid, the Stalking Horse Bidder may still serve as the Next-Highest Bidder (as defined below). Notwithstanding any of the

---

[4]    "Actively participating" in the Bidding Process shall mean the party has submitted an asset purchase agreement to acquire the Assets.

[5]    Provided that, nothing in the Bid Procedures or in this Motion precludes the Prepetition Secured Parties or DIP Secured Parties from exercising their rights with respect to any collateral.

foregoing, the Debtors are not obligated to select a Stalking Horse Bidder and may proceed to the Auction without one. The Debtors may also designate multiple Stalking Horse Bidders, as necessary, for different asset categories.

19. <u>Timing of the Designation of the Stalking Horse Bidder</u>. In the event that the Debtors designate a Stalking Horse Bidder(s) and enter into the Stalking Horse APA on or prior to September 20, 2024, at 4:00 p.m. (prevailing Eastern Time) (the "**Stalking Horse Supplement Deadline**"), the Debtors shall file a supplement to the Motion (the "**Stalking Horse Supplement**") seeking approval of the same, with no less than three (3) business days' notice of the objection deadline (the "**Stalking Horse Objection Deadline**") to the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), the Consultation Parties, and those parties who have filed the appropriate notice pursuant to Bankruptcy Rule 2002 requesting notice of all pleadings filed in the Chapter 11 Cases (collectively, the "**Stalking Horse Notice Parties**") with no further notice being required, provided that the Stalking Horse Supplement (a) sets forth the identity of the Stalking Horse Bidder(s) (and if any Stalking Horse Bidder is a newly formed entity, then the Stalking Horse Bidder's parent company or sponsor); (b) describes the Assets proposed to be sold under the Stalking Horse Bid; (c) sets forth the amount of the Stalking Horse Bid and what portion (if any) is cash; (d) states whether the Stalking Horse Bidder has any connection to the Debtors other than those that arise from the Stalking Horse Bid; (e) specifies any proposed bid protections, including any breakup fee and/or expense reimbursement (the "**Bid Protections**"); (f) attaches the Stalking Horse APA; and (g) sets forth the deadline to object to the Stalking Horse Bidder designation and Bid Protections. The Stalking Horse Supplement shall also include any evidence the Debtors would like the Court to consider in connection with any request

to approve any Bid Protections as an administrative expense under section 503(b) of the Bankruptcy Code.

20.    In the event the Debtors designate a Stalking Horse Bidder after the occurrence of the Stalking Horse Supplement Deadline, but prior to the Auction, the Debtors may seek Court approval on an expedited basis of the Stalking Horse Bidder and Stalking Horse APA, including the Bid Protections, and reserve their rights to file such a motion at any time after the Stalking Horse Supplement Deadline and prior to the Auction.  Prior to the filing of any such proposed motion, the Debtors will consult with the Consultation Parties with respect to the designation of the Stalking Horse Bidder and Stalking Horse APA.

21.    Objections to the designation of a Stalking Horse Bidder or any of the terms of a Stalking Horse Bid (the "**Stalking Horse Objection**") shall (a) be in writing; (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules; (c) state, with specificity, the legal and factual bases thereof; and (d) be filed with the Court and served on the Debtors and the Stalking Horse Notice Parties within three (3) business days after the service of the Stalking Horse Supplement.

22.    If a timely Stalking Horse Objection is filed, the Debtors will schedule a hearing regarding such Stalking Horse Objection as soon as reasonably practicable seeking approval of such Stalking Horse Bid on or before September 25, 2024 (but in no event fewer than three (3) business days after the service of the Stalking Horse Supplement).  If no timely Stalking Horse Objection is filed and served with respect to the Stalking Horse Bid, upon the expiration of the Stalking Horse Objection Deadline, the Debtors are authorized to submit an order under certification of counsel approving the designation of the Stalking Horse Bidder and Stalking Horse

APA (the "**Stalking Horse Approval Order**"), which may be entered by the Court without a hearing, including with respect to any Bid Protections set forth in the Stalking Horse Supplement.

23.     Upon entry of an order approving the Stalking Horse Bidder and the Bid Protections, the Debtors' obligation to pay the Bid Protections shall constitute, pursuant to section 503(b) of the Bankruptcy Code, an administrative expense claim against the Debtors' bankruptcy estate.  In such case, the Bid Protections shall be payable by the Debtors to the Stalking Horse Bidder on the terms and conditions set forth in the Stalking Horse APA.  For the avoidance of doubt, this Motion is not seeking authorization to grant the Bid Protections superpriority expense treatment pursuant to sections 364(c)(1) or 507(b) of the Bankruptcy Code, but the Debtors reserve their rights to do so by filing a separate motion with the Court.

24.     <u>Determination by the Debtors</u>.    Following consultation with the Consultation Parties, the Debtors shall (a) coordinate with Potential Bidders regarding the conduct of their respective due diligence; (b) evaluate Bids from Potential Bidders on any subset of the Assets or all of the Assets; (c) negotiate any bid made to acquire any or all of the Assets; and (d) make such other determinations as are provided in the Bidding Procedures.

25.     <u>Due Diligence</u>.  The Debtors established the Data Room into which the Debtors have deposited substantial information about the Debtors and their business.  Except to the extent a Confidentiality Agreement, the Bidding Procedures, or other agreement provides otherwise, all Potential Bidders and the Consultation Parties will be granted access to the Data Room.  The Debtors, with the assistance of Moelis, will coordinate all reasonable requests for additional information and due diligence access from Potential Bidders and the Consultation Parties.  If any such due diligence material is prepared by the Debtors in written form and has not previously been provided to any other Potential Bidder, the Debtors will simultaneously provide

access to such materials to all Potential Bidders and the Consultation Parties. The Debtors will provide a form asset purchase agreement for the sale of the Assets (the "**Form APA**") and will grant each Potential Bidder or the Consultation Parties, as applicable, access to such in the Data Room. Notwithstanding the above, the Debtors shall be entitled to restrict any Potential Bidder's access to information if the Debtors determine, in their business judgment, that providing a Potential Bidder access to the Data Room, or any information contained therein, would harm the Sale process or compromise or otherwise impair the Debtors' business or the value of the Assets.

26. <u>Bid Deadline</u>. On or before October 21, 2024, at 12:00 p.m. (prevailing Eastern Time) (the "**Bid Deadline**"), a Potential Bidder that desires to make a bid for the Assets (a "**Bid**") is required to deliver written copies of its Bid in both Portable Document Format (.pdf) and Microsoft Word (.doc/.docx) format to the following: (a) the Debtors, Attn: Steven Shenker (sshenker@pppllc.com) and Scott Canna (scanna@pppllc.com); (b) the Debtors' investment banker, Moelis & Company, LLC, Attn: Andrew Swift (andrew.swift@moelis.com) and Jeremy Burke (jeremy.burke@moelis.com); and (c) Young Conaway Stargatt & Taylor, LLP, Attn: Michael Nestor (mnestor@ycst.com), Sean Greecher (sgreecher@ycst.com), and Allison Mielke (amielke@ycst.com). As soon as reasonably practicable following the Bid Deadline, the Debtors will provide to the Consultation Parties copies of all Qualified Bids (with such distribution permissible by electronic means).

27. <u>Bid Requirements</u>.[6] All Bids must comply with the following Bid Requirements:

(i) be accompanied by a letter or email:

---

[6] The Debtors will also consider proposals to acquire any and all of the Assets through a plan of reorganization. Should any such proposal be received prior to the Bid Deadline that the Debtors, in consultation with the Consultation Parties, conclude is in the best interest of the estates and stakeholders, then the Debtors reserve the right to postpone the Auction and proceed toward the confirmation of a plan.

(a)     fully disclosing the identity of the Potential Bidder and providing the contact information of the specific person(s) whom the Debtors or their advisors should contact (including any equity holder or other financial backer if the Potential Bidder is an entity formed for the purpose of consummating the proposed Sale) in the event that the Debtors have any questions or wish to discuss the Bid submitted by the Potential Bidder;

(b)     setting forth the purchase price to be paid by such Potential Bidder and forms of consideration the Potential Bidder intends to use to pay such purchase price;

(c)     stating with specificity the Assets (including the specific executory contracts and unexpired leases) such Potential Bidder wishes to bid on and the liabilities and obligations (including applicable cure costs) to be assumed by the Potential Bidder in the Sale;

(d)     providing, other than as may be exclusively applicable to the Stalking Horse Bidder, if designated, that the Bid is not subject to any bidding, break-up fee, termination fee, transaction fee, expense reimbursement or any similar type of reimbursement, and including an express waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Assets; provided that, in the event a Stalking Horse Bidder is designated, all bids (either viewed individually or in the aggregate) must provide consideration to the Debtors of at least the sum of (i) the Stalking Horse Bid, (ii) any Bid Protections, (iii) and a reasonable minimum overbid amount equal to or greater than $500,000 or such other amount determined by the Debtors in consultation with the Consultation Parties ("**Incremental Overbid**") over the Starting Bid (as defined below) or the Leading Bid (as defined in the Bidding Procedures);

(e)     agreeing that the Potential Bidder's offer is binding, unconditional, and irrevocable until two (2) business days after the closing of the Sale;

(f)     containing a commitment to close the contemplated transaction(s) by a Closing Date (as defined below) of no later than November 27, 2024;

(g)    providing that such Bid is not subject to contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

(h)    containing an acknowledgment that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Assets, has relied solely upon its own independent review and investigation and/or inspection of any documents and any other information in making the Bid; and

(i)    setting forth (i) a statement or evidence that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings and (ii) any regulatory and third-party approval required for the Potential Bidder to close the contemplated transactions, and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five (5) days following execution and delivery of such Potential Bidder's Purchase Agreement, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); provided that a Potential Bidder agrees that its legal counsel will coordinate in good faith with Debtors' legal counsel to discuss and explain Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable; provided, further, that the offer contains a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; and

(j)    providing that the Potential Bidder agrees to serve as a backup bidder (the "**Next-Highest Bidder**") if the Potential Bidder's Qualified Bid (as defined below) is the highest or best bid after the Successful Bid (as defined below) (the "**Next-Highest Bid**") with respect to the relevant Assets through the Closing Date;

(ii)    be accompanied by (a) an executed purchase agreement in form and substance reasonably satisfactory to the Debtors (a "**Qualified Bid Purchase Agreement**"), and (b) a redline of the executed Qualified Bid Purchase Agreement compared to the

Stalking Horse APA, or, if none, the Form APA, to reflect any proposed amendments and modifications to the Stalking Horse APA or the Form APA, as applicable, and the schedules and exhibits thereto;

(iii)    be accompanied by adequate assurance of future performance information (the "**Adequate Assurance Information**"), which may include (a) information about the Potential Bidder's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements, (b) information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capacity to consummate the proposed Sale, (c) evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid, and (d) such additional information regarding the Potential Bidder as the Potential Bidder may elect to include.   By submitting a Bid, Potential Bidders agree that the Debtors may disseminate their Adequate Assurance Information to affected counterparties to any contracts or leases potentially being assumed and assigned in connection with the Sale and the Consultation Parties in the event that the Debtors determine such bid to be a Qualified Bid (as defined below); and

(iv)    be accompanied by (a) a deposit made by wire transfer to the Debtors, in the amount of ten percent (10%) of the cash consideration of the Bid, which funds will be deposited, prior to the Bid Deadline, into an escrow account to be identified and established by the Debtors (a "**Good Faith Deposit**"), and (b) written evidence, documented to the Debtors' satisfaction, that demonstrates the Potential Bidder has available cash, a commitment for financing if selected as the Successful Bidder (as defined below) with respect to the relevant Assets (provided, however, that the closing of a Sale shall not be contingent in any way on the Successful Bidder's financing) and such other evidence of ability to consummate the transaction(s) as the Debtors may request, including proof that any such funding or other financing commitments are not subject to any internal approvals, syndication requirements, diligence or credit committee approvals (provided further that such commitments may have covenants and conditions acceptable to the Debtors). The Debtors reserve the right to increase the Good Faith Deposit for one or more Qualified Bidders (as defined below) in their sole discretion after consulting with the Consultation Parties. Notwithstanding the foregoing, any party submitting a Credit Bid shall not be required to provide a Good Faith Deposit.

16

28.     A Bid received from a Potential Bidder for any portion of the Assets that is determined by the Debtors, in consultation with the Consultation Parties, to meet the above requirements will be considered a "**Qualified Bid**" and each Potential Bidder that submits such a Qualified Bid will be considered a "**Qualified Bidder**."  For the avoidance of doubt, any Stalking Horse Bid or bid submitted under section 363(k) or any other applicable provision of the Bankruptcy Code (a "**Credit Bid**") will be deemed a Qualified Bid and each of the Stalking Horse Bidder and any bidder that submits a Credit Bid will be deemed a Qualified Bidder, for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that a Potential Bidder must satisfy to be a Qualified Bidder.  To the extent applicable, the Debtors shall inform the Stalking Horse Bidder of the Qualified Bids received and shall provide copies of the Qualified Bid(s) to Qualified Bidders prior to the commencement of the Auction.

29.     Starting Bid(s).  If at least two Qualified Bids are received by the Bid Deadline with regard to any particular Assets, the Debtors will conduct the Auction with respect to such Assets and shall determine, after consultation with the Consultation Parties, which Qualified Bid is the highest or otherwise best Qualified Bid for purposes of constituting the opening bid at the Auction for the relevant Assets (the "**Starting Bid(s)**").  In the event a Stalking Horse Bidder is selected, the Starting Bid shall include the amount provided for in the Stalking Horse Bid, plus the amount of any Bid Protections.  The Starting Bid(s) will be communicated to Qualified Bidders prior to the commencement of the Auction.

30.     The determination of which Qualified Bid constitutes the Starting Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors (in consultation with the Consultation Parties) reasonably deem relevant, including, among other things, the following: (i) the amount and nature of the consideration, including any obligations to

be assumed; (ii) the executory contracts and unexpired leases of the Debtors, if any, for which assumption and assignment or rejection is required, and the costs and delay associated with any litigation concerning executory contracts and unexpired leases necessitated by such bid; (iii) the number, type and nature of any changes to the Stalking Horse APA, as applicable, requested by each Qualified Bidder; (iv) the extent to which such modifications are likely to delay closing of the sale of the Assets and the cost to the Debtors of such modifications or delay; (v) the likelihood of the Qualified Bidder being able to close the proposed transaction (including obtaining any required regulatory approvals) and the timing thereof; (vi) the net benefit to the Debtors' estates (including after taking account of the Bid Protections); (vii) the tax consequences of such Qualified Bid; and (viii) the impact on employees and members and the proposed treatment of employee and member obligations.

31.    <u>Auction</u>.  The Auction, if required, will be conducted on October 28, 2024, starting at 10:00 a.m. (prevailing Eastern Time) at the office of Moelis & Company LLC, 399 Park Avenue, 4th Floor, New York, New York 10022.  Professionals and principals for the Debtors, each Qualified Bidder (including, its representative(s), if any), each of the Consultation Parties, and any other parties the Debtors deem appropriate shall be permitted to attend and observe the Auction.  In addition, any of the Debtors' creditors who are not Qualified Bidders shall provide three (3) business days' written notice to counsel to the Debtors of their intent to attend the Auction; <u>provided</u>, <u>however</u>, that the Debtors reserve the right to retract their permission at any point during the Auction if such creditor party who is not a Qualified Bidder does not act in good faith and in orderly fashion during the Auction.  For the avoidance of doubt, only Qualified Bidders will be entitled to make any Bids at the Auction.  Each Qualified Bidder participating in the Auction will be required to confirm, in writing, and on the record at the Auction, that (a) it has not

engaged in any collusion with respect to the Bidding Process, and (b) its Qualified Bid is a good faith *bona fide* offer that it intends to consummate if selected as the Successful Bidder.

32.     At the Auction, participants will be permitted to increase their Bids and improve their terms in accordance with the Bidding Procedures; <u>provided</u> that any such increased or improved bid must be a Qualified Bid (except that the Bid Deadline will not apply).  Bidding for any part or all of the Assets will start at the applicable Starting Bid(s) and will continue, in one or more rounds of bidding, so long as during each round at least one Subsequent Bid is submitted by a Qualified Bidder.  Following consultation with the Consultation Parties, the Debtors may at any time adopt rules for the Auction that the Debtors reasonably determine to be appropriate to promote the goals of the Bidding Process and not in conflict with the Bidding Procedures, the Bankruptcy Code, or applicable orders of the Court.

33.     Prior to the conclusion of the Auction, the Debtors will: (a) review and evaluate each Bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale transaction; (b) in the exercise of their good faith business judgment and consistent with the Bidding Procedures, identify the highest or otherwise best offer or collection of offers in respect of the Assets (the "**Successful Bid(s)**"); (c) inform and consult with the Consultation Parties regarding the foregoing, so long as the Consultation Party is not also actively participating in the Sale process; and (d) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the successful bidder or bidders (the "**Successful Bidder(s)**") and the amount and other material terms of the Successful Bid(s).

34.     After determining the Successful Bid(s) for the Assets, if a Stalking Horse Bid is not designated, the Debtors may determine, in their reasonable business judgment, in

consultation with the Consultation Parties, which Qualified Bid(s) are the Next-Highest Bid(s) for the Assets.

35.     <u>Acceptance of Qualified Bids</u>.  The Debtors' selection and submission to the Court of the selected Bid as the Successful Bid will not constitute the Debtors' acceptance of the Bid.  The Debtors will be deemed to have accepted a Qualified Bid only when such Qualified Bid has been approved by the Court at the Sale Hearing.  If the Successful Bidder does not close the Sale by the date agreed upon by the Debtors and the Successful Bidder and a Stalking Horse Bid was not designated, then the Debtors shall be authorized, but not required, to close with the Next-Highest Bidder pursuant to further order of the Court.

36.     <u>Modification of Bidding Procedures</u>.  Following consultation with the Consultation Parties, the Debtors may amend the Bidding Procedures or the Bidding Process at any time and from time to time in any manner that they determine in good faith will best promote the goals of the process, including extending or modifying any of the dates described herein.

37.     <u>Return of Good Faith Deposit</u>.  The Good Faith Deposits of all Qualified Bidders will be held in escrow and while held in escrow will not become property of the Debtors' bankruptcy estates unless released from escrow pursuant to terms of the applicable escrow agreement or pursuant to further order of the Court.  At the closing of a sale transaction contemplated by a Successful Bid, the applicable Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit to the extent such a deposit was provided.  The Good Faith Deposits of any Next-Highest Bidder shall be retained until three (3) business days after the applicable Closing Date.  The Good Faith Deposits of any other Qualified Bidders will be returned as soon as practicable but no later than ten (10) business days following the Auction.

## NOTICE PROCEDURES FOR THE SALE,
## BIDDING PROCEDURES, AUCTION, AND SALE HEARING

38.    The Debtors also request approval of the notice of the Auction, Sale Hearing, and Bidding Procedures (the "**Sale Notice**"), substantially in the form attached to the Bidding Procedures Order as Exhibit 2.

39.    As soon as practicable after the entry of the Bidding Procedures Order, the Debtors will cause the Sale Notice to be served by regular mail and/or email upon the following: (i) the U.S. Trustee; (ii) the holders of the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis); (iii) counsel to the Committee; (iv) the United States Department of Justice; (v) all state attorneys' general and consumer protection agencies in jurisdictions in which the Assets are located; (vi) counsel to the Prepetition Agent and DIP Agent; (vii) counsel to Equinox Holdings, Inc.; (viii) all parties who are known by the Debtors to assert liens against the Assets, if any; (ix) all non-Debtor parties to the Assumed Contracts; (x) any party known or reasonably believed to have expressed an interest in acquiring some or all or substantially all of the Debtors' assets within six (6) months prior to the Petition Date, which service may be sent electronically if a mailing address for any such parties is unknown; (xi) all non-Debtor parties to Assumed Contracts; and (xii) all parties who, as of the filing of this Motion, have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.

40.    The Debtors will also cause the Sale Notice to be published in The New York Times, or another publication with similar national circulation, and post the Sale Notice and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent, Epiq Corporate Restructuring, LLC.  The Sale Notice will include, among other things, the date, time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested in the Sale Motion once they are set by the Court.

41.     As soon as possible following the Auction, but no later than twenty-four (24) hours following the conclusion of the Auction, the Debtors will file a notice on the Court's docket identifying the Successful Bidder(s) for the Assets (or subset thereof) and any applicable Next-Highest Bidder(s) (the "**Notice of Successful Bidder**").  Objections related solely to the conduct of the Auction, the identity of the Successful Bidder, and adequate assurance of future performance by the Successful Bidder (other than a Stalking Horse Bidder) must be in writing, state the basis of such objection with specificity, and be filed with the Court and served so as to be received on the following parties (collectively, the "**Notice Parties**") on or before October 30, 2024 at 4:00 p.m. (ET):  (i) proposed counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 N. King Street, Wilmington, Delaware 19801, Attn: Michael R. Nestor (mnestor@ycst.com), Sean T. Greecher (sgreecher@ycst.com), and Allison S. Mielke (amielke@ycst.com), (ii) counsel to the Prepetition Agent and the DIP Agent, (a) Katten Muchin Rosenman LLP, 525 W. Monroe Street, Chicago, Illinois 60661, Attn: Peter P. Knight (peter.knight@katten.com) and Allison E. Yager (allison.yager@katten.com), and (b) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, P.O. Box 1347, Wilmington, Delaware 19899, Attn: Curtis S. Miller (cmiller@morrisnichols.com); (iii) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 North King Street, Suite 2207, Wilmington, Delaware 19801, Attn: Benjamin A. Hackman (benjamin.a.hackman@usdoj.gov); and (iv) counsel to any Committee.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

42.     To facilitate the Sale, the Debtors seek authority to assume and assign to any Successful Bidder(s), the Assumed Contracts in accordance with the Assumption and Assignment Procedures provided herein and the form and manner of notice thereof substantially

in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u> (the "**Assumption and Assignment Notice**").

43.     By no later than September 16, 2024, the Debtors will file a schedule of cure obligations (the "**Cure Schedule**") for the Assumed Contracts.  The Cure Schedule will include a description of each Assumed Contract potentially to be assumed and assigned by a potential buyer and the amount, if any, the Debtors believe is necessary to cure any monetary defaults under such agreements pursuant to section 365 of the Bankruptcy Code (the "**Cure Costs**").  A copy of the Cure Schedule, together with the Assumption and Assignment Notice, will be served on each of the non-Debtor parties listed on the Cure Schedule by first class mail and/or email, as applicable.

44.     The Debtors propose that any objections to the assumption and assignment of any executory contract or unexpired lease identified on the Cure Schedule, including, but not limited to, the Cure Costs set forth on such schedule, must be in writing, filed with the Court no later than 4:00 p.m. (prevailing Eastern Time) on the date that is fourteen (14) calendar days from date of the service of the Cure Schedule, and served on the Notice Parties.  Any such objections shall set forth a specific default by the Debtors in any Assumed Contracts and claim a specific monetary amount that differs from the amount (if any) specified by the Debtors in the Cure Schedule, and attach any applicable documentation in support of such amount.

45.     If no objection is timely and properly received with respect to an Assumed Contract, then (i) the Cure Costs set forth in the Cure Schedule will be binding upon the non-Debtor party to such Assumed Contract for all purposes in the Chapter 11 Cases and will constitute a final determination of the total Cure Costs required to be paid by the Successful Bidder in connection with the assumption and assignment of the Assumed Contract; and (ii) the counterparty to the

Assumed Contract will (a) be forever barred from asserting any additional cure or other amounts with respect to the Assumed Contract, and the Debtors and the Successful Bidder will be entitled to rely solely upon the Cure Costs set forth in the Assumption and Assignment Notice, (b) be deemed to have consented to the assumption and assignment to the Successful Bidder of such Assumed Contract, and (c) be forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed Contract or that there is any objection or defense to the assumption and assignment of such Assumed Contract.

46.    To the extent the Debtors, at any time after service of the Cure Schedule (i) identify additional Assumed Contracts to be assumed and assigned to the Stalking Horse Bidder or other Successful Bidder (the "**Additional Assumed Contracts**"); (ii) remove Assumed Contracts from the list of executory contracts and leases proposed to be assumed and assigned in connection with a Sale; (iii) and/or modify the previously stated Cure Costs associated with any Assumed Contracts, the Debtors will promptly file with this Court and serve by first-class mail or email, as applicable, a supplemental notice of contract assumption (a "**Supplemental Assumption Notice**") on each of the counterparties to such Additional Assumed Contracts and their counsel of record, if any.   Counterparties to Additional Assumed Contracts or that otherwise receive a Supplemental Assumption Notice shall have until 4:00 p.m. (prevailing Eastern Time) on the date that is fourteen (14) days after the service of the Supplemental Assumption Notice to file a Cure Objection (as defined below).

47.    Where a non-Debtor counterparty to an Assumed Contract timely files an objection (a "**Cure Objection**") asserting a cure amount higher or different than the proposed Cure Costs (the "**Disputed Cure Amount**"), then (y) to the extent that the parties are able to

consensually resolve the Disputed Cure Amount, the Cure Amount shall be as agreed between the parties, or (z) to the extent the parties are unable to consensually resolve the dispute, the amount to be paid under section 365 of the Bankruptcy Code with respect to such Disputed Cure Amount will be determined at the Sale Hearing or such other hearing date as the parties may agree to be scheduled by the Court. All other objections to the proposed assumption and assignment of the Assumed Contracts will be heard at the Sale Hearing, unless adjourned by agreement of the parties. The Debtors intend to reasonably cooperate with counterparties to Assumed Contracts to attempt to reconcile any differences with respect to a particular cure amount.

## **KEY SALE PROCESS DATES**

48.    The following is a summary of the proposed key dates for the sale process:

| **Date** | **Deadline/Event** |
|---|---|
| September 10, 2024 at 1:00 p.m. (ET) | Bidding Procedures Hearing |
| September 16, 2024 | Deadline for Debtors to file the Assumption and Assignment Notice and Cure Schedule |
| September 20, 2024 at 4:00 p.m. (ET) | Stalking Horse Supplement Deadline |
| September 30, 2024 at 4:00 p.m. (ET) | Deadline to object to the Debtors' proposed assumption and assignment of the Assumed Contracts and related Cure Costs |
| October 14, 2024 at 4:00 p.m. (ET) | Deadline to object to the Sale[7] of the Assets |
| October 21, 2024 at 4:00 p.m. (ET) | Bid Deadline |
| October 22, 2024 at 4:00 p.m. (ET) | Deadline for Debtors to notify Potential Bidders of whether their Bids are Qualified Bids |
| October 28, 2024 at 10:00 a.m. (ET) | Auction (if necessary) |
| October 28, 2024 at 11:59 p.m. (ET) | Deadline to file and serve Notice of Successful Bidder(s) |

---

[7]    This objection deadline applies to all objections to this Motion and the Sale of the Assets to a Successful Bidder, with the exception of objections related solely to conduct of the Auction, identity of the Successful Bidder(s), and adequate assurance of future performance by the Successful Bidder(s).

| **Date** | **Deadline/Event** |
|---|---|
| October 30, 2024 at 4:00 p.m. (ET) | Deadline to object to (i) conduct of the Auction; (ii) the proposed Sale to the Successful Bidder(s); and (iii) ability of the Successful Bidder to provide adequate assurance of future performance, or the proposed form of adequate assurance of future performance |
| November 6, 2024 at (time to be determined) | Sale Hearing |
| November 27, 2024 | Closing |

49.     The Debtors respectfully submit that the timeline set forth above is reasonable and necessary under the circumstances of the Chapter 11 Cases.  This timeline will allow the Debtors to complete the marketing process that was initiated prepetition by the Debtors' investment banker, Moelis, and provide Potential Bidders sufficient time to formulate bids for the Assets.  In addition to the Debtors' prepetition marketing efforts, the Debtors will actively market the Assets postpetition, including by contacting potential purchasers that may be interested in only certain business segments or assets instead of a going concern sale.  Moreover, relevant information regarding the Debtors' business has been made available in the Data Room, which will allow Potential Bidders (subject to the execution of a confidentiality agreement) to immediately conduct due diligence on the Assets.

**THE PROPOSED SALE ORDER**

50.     The Debtors anticipates that the Sale Order will contain certain provisions that require disclosure under Local Rule 6004-1.  At this time, the Debtors makes the following statements:

(a)     Local Rule 6004-1(b)(iv)(A).  To the extent a proposed purchaser is an insider (within the meaning of section 101(31) of the Bankruptcy Code), the Debtors will make the necessary disclosures to the Court and take measures to ensure the fairness of the sale process and the proposed transaction.

(b)     <u>Local Rule 6004-1(b)(iv)(B)</u>.   The Debtors do not presently have any agreement between any interested bidder and the Debtors' management or key employees.  If any agreements are reached, the Debtors will make the necessary disclosures.

(c)     <u>Local Rule 6004-1(b)(iv)(C)</u>.  To the extent that the Sale Order includes a release in favor of any entity, the Debtors will make the necessary disclosures.

(d)     <u>Local Rule 6004-1(b)(iv)(D).</u>  The Debtors are permitted to respond to any inquires or offers to purchase any or all of the Assets in accordance with the terms of the Bidding Procedures.

(e)     <u>Local Rule 6004-1(b)(iv)(E)</u>.  The contemplated Closing Date for the Sale is November 27, 2024.

(f)     <u>Local Rule 6004-1(b)(iv)(F)</u>.   The Debtors are requiring Qualified Bids (other than any Credit Bids) to include a good faith deposit constituting ten percent (10%) of the total cash consideration of the bid.

(g)     <u>Local Rule 6004-1(b)(iv)(G)</u>.   The Debtors do not currently have any interim management or other agreement with any party.  If any agreements are reached, the Debtors will make the necessary disclosures.

(h)     <u>Local Rule 6004-1(b)(iv)(H)</u>.  The Debtors intend to request in the Sale Order that net proceeds from the sale of the DIP Secured Parties' and/or Prepetition Secured Parties' collateral be released to such parties as may be required under the DIP Order.

(i)     <u>Local Rule 6004-1(b)(iv)(I)</u>.  The Debtors are not seeking to have the Sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code pursuant to this Motion.

(j)     <u>Local Rule 6004-1(b)(iv)(J)</u>.  The Debtors will retain necessary books and records, copies thereof, or include as part of the Purchase Agreement appropriate access to such information, to enable them to administer the Chapter 11 Cases following any Sale.

(k)     <u>Local Rule 6004-1(b)(iv)(K)</u>.  The Assets available for acquisition shall include all claims and causes of action arising under sections 502(d) and 544 through 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or any analogous state law.

(l)     <u>Local Rule 6004-1(b)(iv)(L)</u>.  The Debtors anticipate that any Purchase Agreement will provide that the Successful Bidder shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Assets, including successor or vicarious liabilities of any kind or character, including any theory of antitrust, environmental,

successor, or transferee liability, labor law, de facto merger, or substantial continuity.

(m)     <u>Local Rule 6004-1(b)(iv)(M)</u>.  The Debtors are seeking to sell the Assets free and clear of all Encumbrances to the fullest extent permitted by sections 363 and 365 of the Bankruptcy Code.

(n)     <u>Local Rule 6004-1(b)(iv)(N)</u>.  Any party's right to submit a Credit Bid pursuant to section 363(k) or any other applicable provision of the Bankruptcy Code is preserved.

(o)     <u>Local Rule 6004-1(b)(iv)(O)</u>.  The Debtors are seeking relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) for any Sale, as further described below.

<u>**RELIEF REQUESTED**</u>

51.     By this Motion, the Debtors seek entry of (i) the Bidding Procedures Order, (a) scheduling a date for the Auction and Sale Hearing, (b) approving the Bidding Procedures and the form and manner of notice of the Bidding Procedures, (c) subject to the Stalking Horse Approval Order, authorizing, but not directing, the Debtors to designate the Stalking Horse Bidder and enter into the Stalking Horse APA in accordance with the Bidding Procedures, (d) subject to final Court approval at the Sale Hearing, authorizing and approving the Debtors to enter into and perform under the Purchase Agreement, as applicable, subject to higher or otherwise better offers submitted in accordance with the Bidding Procedures, (e) establishing the Assumption and Assignment Procedures and manner and notice thereof; and (f) granting related relief; and (ii) the Sale Order, (a) authorizing and approving the Debtors' entry into the Purchase Agreement with the Successful Bidder(s) or Next-Highest Bidder(s), as applicable, (b) approving the Sale, free and clear of all Encumbrances, (c) authorizing and approving the assumption and assignment of the Assumed Contracts, and (d) granting related relief.

**BASIS FOR RELIEF REQUESTED**

**I.     Approval of the Sale Is Warranted Under Section 363(b) of the Bankruptcy Code**

52.     Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Debtors must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  *See, e.g.*, *In re Martin*, 91 F.3d 389 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

53.     Courts typically consider the following factors in determining whether a proposed sale meets this standard:

(a)     whether a sound business justification exists for the sale;

(b)     whether adequate and reasonable notice of the sale was given to interested parties;

(c)     whether the sale will produce a fair and reasonable price for the property; and

(d)     whether the parties have acted in good faith.

*In re Decora Indus., Inc.*, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).

54.     When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11) (citations omitted).

55.     The Debtors submit that their decision to pursue a Sale on the terms set forth in this Motion represents a reasonable exercise of the Debtors' business judgment and, accordingly, the Sale should be approved under section 363(b) of the Bankruptcy Code.  The Debtors will continue to conduct an extensive and fulsome process to market the Assets.  The open and fair Auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receives the highest or best value available for the Assets by allowing the market to dictate the value of the Assets, and will provide a greater recovery than would be provided by any other available alternative.  Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Successful Bidder(s), and establish that the Debtors and the Successful Bidder(s) proceeded in good faith.

56.     Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances.  Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections.  The Debtors believe that the proposed notice procedures fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Sale, the Auction, and the Sale Hearing to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

57.     The Sale, conducted in accordance with the Bidding Procedures, will generate maximum value for the Debtors' estates, and represents the best path forward for maximizing recoveries.  The Debtors submit that ample business justification exists for the consummation of the Sale, and therefore request that the Court approve such Sale.

II.     **The Sale of the Assets Free and Clear of All Encumbrances Is Authorized Under Section 363(f) of the Bankruptcy Code**

58.     The Debtors request approval to sell the Assets free and clear of any and all liens, claims, interests and encumbrances in accordance with section 363(f) of the Bankruptcy Code.  Pursuant to section 363(f), a debtor in possession may sell estate property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(a)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (because section 363(f) is written in the disjunctive, a court may approve a "free and clear" sale even if only one of the subsections is met).

59.     Furthermore, it is well established that a bankruptcy court has the power, pursuant to section 363(f) of the Bankruptcy Code, to approve the sale of a debtor's assets free and clear of any claims against the debtors.  *In re TWA Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of section 363(f)); *United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co.* (*In re Leckie Smokeless Coal Co.*), 99 F.3d 573 (4th Cir. 1996) (same).

60.     The Debtors submit that the Sale of the Assets free and clear of the Encumbrances will satisfy the requirements of section 363(f) of the Bankruptcy Code.  The

Debtors also believe that the service of the Stalking Horse Supplement and Sale Notice in accordance with the terms set forth in this Motion will afford creditors sufficient notice of the Stalking Horse Bidder and Stalking Horse APA, if designated, and the Sale and therefore provides additional justification for approval of the Sale free and clear of all Encumbrances.

**III.    The Sale Should Be Subject to the Protections of Section 363(m) of the Bankruptcy Code**

61.    Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.    *See* 11 U.S.C. § 363(m).

62.    In approving the Sale free and clear of Encumbrances, the Debtors request that the Court find and hold that all purchasers of the Assets purchased in accordance with the Bidding Procedures are entitled to the protections afforded by section 363(m) of the Bankruptcy Code. Such relief is appropriate in that the selection of the Successful Bidder will be the result of a competitive Bidding Process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction.    *See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where notice is provided to lienholders).

**IV.    The Court Should Approve the Bidding Procedures**

63.    The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate.    *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that Debtors "had a fiduciary duty to protect and maximize the estate's assets");

*Official Comm.*, 330 F.3d at 573 (same).  Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the Debtors' assets").

64.     The Debtors and their professional advisors have designed the Bidding Procedures to promote a competitive and fair Bidding Process and, thus, to maximize value for the Debtors' estates and stakeholders.  Having the option to enter into a Stalking Horse APA with a Stalking Horse Bidder ensures that the Debtors retain flexibility to set the floor from which other potential bidders can submit higher or better offers.  As a baseline bid, the Stalking Horse Bid fosters competitive bidding, increasing the likelihood that the purchase price of the Assets will increase, allowing the Debtors to maximize value for the benefit of all stakeholders.

65.     The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the Assets.   Furthermore, the Bidding Procedures provide an appropriate framework for the Debtors and their independent fiduciaries and professional advisors to review, analyze, and compare any Bids received to determine which Bids are in the best interests of the Debtors' estates and their stakeholders.

66.     The Debtors submit that the Bidding Procedures are necessary and transparent and will derive the highest or best Bids for the Assets.  Therefore, the Debtors request that the Court approve the Bidding Procedures.

**V.    The Assumption and Assignment of the Assumed Contracts Satisfies Section 365 of the Bankruptcy Code**

67.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the Debtors."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the Debtors' reasonable business judgment supports assumption or rejection.  *See, e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice); *see also In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

68.    The business judgment test "requires only that the trustee [or Debtors in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co.,* (*In re Wheeling-Pittsburgh Steel Corp.*), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).   Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten a court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the Debtors will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

69.     Under section 365(f) of the Bankruptcy Code, a debtor, after assuming a contract, may assign its rights under the contract to a third party.  11 U.S.C. § 365(f); *see also In re Rickel Home Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the Debtors' estates."); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist the trustee in realizing the full value of the debtors' assets).  Section 365(f)(2)(B) requires that the non-Debtor contract counterparty be given adequate assurance of future performance by an assignee.  11 U.S.C. § 365(f)(2)(B).  The purpose of the adequate assurance requirement is to protect the interests of the non-Debtor party to an assigned contract, as section 365(k) of the Bankruptcy Code relieves a debtor from liability for any breach of a contract that may occur after an assignment.  *Cinicola v. Scharffeberger*, 248 F.3d 110, 120 (3d Cir. 2001).  Adequate assurance of future performance is not required for every term of an executory contract or unexpired lease, but only such terms that are "material and economically" significant.  *In re Fleming Cos., Inc.*, 499 F.3d 300, 305 (3d Cir. 2007).

70.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  *In re DBSI, Inc.,* 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment.").  Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from a debtor have financial

resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

71.     The assumption and assignment of certain executory contracts and unexpired leases is an appropriate exercise of the Debtors' business judgment.  Additionally, the Debtors submit that the notice provisions and the objection deadline for counterparties to raise objections to the assumption and assignment of the Assumed Contracts as proposed in this Motion are adequate to protect the rights of counterparties to the Debtors' contracts and leases. Furthermore, the Debtors will demonstrate adequate assurance of future performance at the Sale Hearing.

## WAIVER OF RULES 6004(h) AND 6006(d)

72.     The Debtors request that, upon entry of the Sale Order, the Court waive the 14-day stay requirements of Bankruptcy Rules 6004(h) and 6006(d).  The waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) is necessary to permit the Sale to close expeditiously.  The Debtors respectfully request that the Court waive the 14-day stay requirements contained in Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

73.     Notice of this Motion will be given to:  (i) the U.S. Trustee; (ii) the holders of the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis); (iii) counsel to the Committee, if any; (iv) counsel to the Prepetition Agent and DIP Agent; (v) counsel to Equinox Holdings, Inc.; and (vi) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors request the entry of the Bidding Procedure Order and the Sale Order granting the relief requested herein and such other and further relief as is just and proper.

Dated: Wilmington, Delaware
      August 16, 2024

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Allison S. Mielke*
Michael R. Nestor (No. 3526)
Sean T. Greecher (No. 4484)
Allison S. Mielke (No. 5934)
Timothy R. Powell (No. 6894)
Rebecca L. Lamb (No. 7223)
Benjamin C. Carver (No. 7176)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:  mnestor@ycst.com
      sgreecher@ycst.com
      amielke@ycst.com
      tpowell@ycst.com
      rlamb@ycst.com
      bcarver@ycst.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*