**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BLINK HOLDINGS, INC., *et al.*,[1] | Case No. 24-11686 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 8, 63** |
| | **Hearing Date: September 10, 2024 at 1:00 p.m.**<br>**Objection Deadline: September 6, 2024 at 10:00 a.m.[2]** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING AND USE
CASH COLLATERAL; (II) GRANTING LIENS, SUPER-PRIORITY CLAIMS, AND
ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY;
(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the

chapter 11 bankruptcy cases of the above-captioned debtors and debtors-in-possession

(collectively, the "Debtors"), by and through its proposed undersigned counsel, hereby files this

objection (the "Objection") to the *Debtors' Motion for Interim and Final Orders (I) Authorizing*

*Debtors to Obtain Postpetition Financing and Use Cash Collateral; (II) Granting Liens, Super-*

*Priority Claims, and Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling a*

---

[1]     The last four digits of Blink Holdings, Inc.'s federal tax identification number are 6354. The mailing address for Blink Holdings, Inc. is 45 West 45th Street, 10th Floor, New York, New York 10036. Due to the large number of debtors in these chapter 11 cases, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/BlinkFitness, or by contacting the proposed counsel for the Debtors.

[2]     Extended as to the Committee with the Debtors' consent.

*Final Hearing; and (V) Granting Related Relief* (the "DIP Motion").[3]  In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT[4]

1.      The Debtors seek to approve a DIP Facility that provides $21 million in new money loans and rolls up $52.5 million of Prepetition Debt.  The Committee agrees that the Debtors need funding to run a competitive sale process and wind-down the Debtors' estates.  The DIP Facility, however, improperly allows the Lenders to maximize the value of their collateral at the expense of the Debtors' unsecured creditors.  The DIP Facility has to be fair to all of the Debtors' creditors, not simply a tool for the Lenders to foreclose on their collateral and extract value from these estates.

2.      The Committee understands the Debtors have to make concessions to obtain DIP financing.  In this regard, the Committee does not oppose the roll up of $17.5 million approved in the Interim Order, and it is willing to agree to a standard package of protections for the Lenders. The DIP Facility, however, goes too far, and several areas of overreach must be corrected.

3.      Among other things:

- The Debtors' request to roll-up an additional $35.1 million is excessive compared to the amount of new money provided under the DIP Facility (each dollar of new financing rolls-up 2.5 dollars of Prepetition Secured Debt).

- The Budget must cover all administrative expenses through the Sale and subsequent wind-down.

---

[3]      Docket No. 13.  Capitalized terms used but not otherwise defined in this Objection have the meanings ascribed to them in the DIP Motion.

[4]      Capitalized terms used but not otherwise defined in the Preliminary Statement have the definitions ascribed to them further below.

16925977/1

- Other than to secure the new money portion of the DIP Facility, unencumbered assets must be preserved for unsecured creditors.

- The Debtors should not be allowed to grant advance waivers of sections 506(c) and 552(b) of the Bankruptcy Code when the Budget is insufficient.

- The Committee's budget is currently less than 3% of that provided to the Debtors' professionals. The Budget should provide sufficient resources to the Committee to fulfill its fiduciary obligations.

4.     The Committee has raised its issues with the Debtors and the Lenders and hopes to resolve, or at least narrow them substantially, before the Final Hearing.

## BACKGROUND

### I.     Procedural Background

5.     On August 12, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court. Since the Petition Date, the Debtors have remained in possession of their assets and continued to operate and manage their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.     On the Petition Date, the Debtors filed the DIP Motion, and the Court entered an Order approving the DIP Motion an interim basis (the "Interim Order") on August 13, 2024.[5] Among other things, the Interim Order authorized the Debtors to (i) borrow $10.5 million of new money and (ii) roll-up $17.4 million of prepetition secured debt.[6]

7.     On August 16, 2024, the Debtors filed a motion to establish procedures (the "Bidding Procedures Motion") to sell substantially all of their assets pursuant to an auction process

---

[5]     Docket No. 63.

[6]     *Id.* ¶¶ 3, 9.

16925977/1

(the "Sale").[7]  Pursuant to the Bid Procedures Motion, the Debtors also seek authority to designate a Stalking Horse Bidder and to conduct an Auction on October 28, 2024.[8]

8.    On August 23, 2024, the U.S. Trustee appointed a five-member Committee consisting of:  (i) Johnson Health Tech NA, Inc.; (ii) Motionsoft, Inc.; (iii) FW IL-Riverside/Rivers Edge, LLC; (iv) 96 N. 10th Street Holdings LLC; and (v) GS FIT ILL-1 LLC.[9]  The Committee selected Kelley Drye & Warren LLP as its proposed lead counsel and Morris James LLP as its proposed Delaware co-counsel.  The Committee also selected Dundon Advisers LLC as its proposed financial advisor.

## II.    Company Background and Events Leading to Bankruptcy

9.    Equinox Group (together with EHI (defined below), "Equinox") is the ultimate parent of each Debtor.  Equinox founded the Debtors in 2011 to operate in the high-value, low-price fitness category.[10]

10.    As of the Petition Date, the Debtors operated 101 fitness clubs (including 7 franchised locations), serving approximately 443,000 members.[11]  Since the Petition Date, the Debtors closed 23 locations,[12] with 78 locations currently open and operating.

11.    The Debtors generate revenue from membership fees, personal training services, partnership fees, retail merchandise, vending/concessions, and royalties.[13]

---

[7]    Docket No. 81.

[8]    *Id.*

[9]    Docket No. 109.

[10]    Docket No. 2, at ¶ 10.

[11]    *Id.* at ¶ 15.

[12]    *See* Docket Nos. 15, 130.

[13]    Docket No. 2, at ¶ 19.

12.     In 2016, the Company entered into a Transition Services Agreement (the "TSA") with a non-Debtor Equinox affiliate, Equinox Holdings, Inc. ("EHI").[14]  Pursuant to the TSA, Equinox provides management and back-office services to the Debtors, along with various shared benefits programs.[15]  The Company pays Equinox an annual fee for the Shared Services, which is subject to adjustment and payable weekly in arrears in cash.[16]  Shortly before the Petition Date, the Debtors agreed to increase Equinox's fees in response to the bankruptcy filing.[17]

13.     The Debtors' operations suffered significant disruption during the COVID-19 pandemic.  To confront their COVID-related challenges, the Debtors implemented various cost-saving measures and secured additional sources of funding.[18]  Although the Debtors managed to survive, they became significantly overleveraged.[19]

14.     In early 2022, the Debtors pursued out-of-court options to address their overleveraged balance sheet, including engaging an investment banker and real estate advisor to pursue a sale effort and lease renegotiations.[20]  The Debtors did not receive sufficient interest for an out-of-court transaction, and improved lease terms were insufficient to meaningfully improve the Debtors' liquidity issues.[21]

---

[14]     *Id.* at ¶ 22.

[15]     *Id.*

[16]     *Id.*

[17]     *Id.*

[18]     *Id.* at ¶ 32.

[19]     *Id.* at ¶ 33.

[20]     *Id.* at ¶ 34.

[21]     *Id.*

-5-

### III.    **Prepetition Debt**

15.    As of the Petition Date, the Debtors had approximately $161.4 million of outstanding secured debt under the Prepetition Credit Agreement, consisting of (i) $155 million under a senior secured credit facility (the "Prepetition Facility," and the lenders thereunder, the "Prepetition Lenders"),[22] and (ii) $6.9 million in bridge financing advances the Prepetition Lenders made to the Debtors in July 2024 (the "Prepetition Protective Advances," and together with amounts due under the Prepetition Facility, the "Prepetition Secured Debt").[23]

16.    The Prepetition Secured Debt is secured by first priority liens on substantially all of the Debtors' assets.[24]  As a condition to receiving the Prepetition Protective Advances, the Debtors agreed that the Prepetition Protective Advances would be "rolled" into debtor-in-possession financing the Prepetition Lenders would provide in these chapter 11 cases.[25]

17.    In addition to the Prepetition Secured Debt, the Debtors owe approximately $103.5 million to Equinox on account of various loans Equinox made to the Debtors in 2020 and 2022.  The Debtors also estimate that they owe general unsecured creditors approximately $15.9 million as of the Petition Date, excluding lease rejection damages.[26]

### IV.    **The DIP Motion and Requested Relief**

18.    The DIP Facility consists of $21 million in new money and a roll-up of $52.5 million of the Prepetition Secured Debt.  Pursuant to the Interim Order, the Debtors have

---

[22]    DIP Motion at ¶¶ 6, 8.

[23]    *Id.* at ¶ 9.

[24]    *Id.* at ¶ 7.  The Committee will investigate the Prepetition Lenders' liens and claims against the Debtors during the Challenge Period.

[25]    DIP Motion at ¶ 9.

[26]    *Id.* at ¶ 14.

borrowed $10.5 million of the committed new money and rolled-up $17.4 million of the Prepetition Secured Debt (including the Prepetition Protective Advances).[27]

19.     The Debtors' ability to use borrowings under DIP Facility is limited to the amounts and uses set forth in the Budget.[28]

20.     In exchange for providing the DIP Facility, the DIP Lenders will receive a litany of protections, including:

    a.    A roll-up of $52.5 million of Prepetition Secured Debt;[29]

    b.    New liens on previously unencumbered assets;[30]

    c.    Waivers of protections afforded the estates and creditors under sections 506(c) and 552 of the Bankruptcy Code and the equitable remedy of marshaling;[31]

    d.    Immediate, priority payment of the Prepetition Secured Debt out of the Sale proceeds, regardless of the pendency of any Challenge and outside of a chapter 11 plan;[32]

    e.    Payment of professional fees and expenses associated with the Prepetition Secured Debt, which is undersecured;

    f.    Postpetition accrual of default-rate PIK interest on the undersecured Prepetition Secured Debt;[33] and

    g.    The right to pull the plug on the DIP Financing if the Committee (or any other party in interest) initiates a viable Challenge or challenges the Lenders' preferred allocation of Sale proceeds.[34]

---

[27]     *See* Interim DIP Order ¶¶ 3, 9.

[28]     Interim Order ¶ 4.

[29]     *Id.* ¶ 9.

[30]     *Id.* ¶ 7.

[31]     *Id.* ¶¶ 17, 34, 35.

[32]     *Id.* ¶ 15(l).

[33]     *Id.* ¶ 8(d).

[34]     *Id.* ¶ 14.

21.     As discussed below, the DIP Facility fails to ensure the Committee can fulfill its fiduciary duties.  Among other things, (i) it is an Event of Default if the Committee initiates a Challenge or opposes the DIP Lenders' allocation of Sale proceeds, (ii) the DIP Lenders and Prepetition Lenders (collectively, the "Lenders") will step back into any lien the Committee may avoid pursuant to a Challenge, including the Lenders' liens, and (iii) the Committee will be limited to a budget of $250,000 (versus over $10 million for the Debtors' professionals and $1.6 million for the Lenders' professionals) and only $50,000 to investigate any Challenge.[35]

## OBJECTION

22.     To obtain postpetition financing under the Bankruptcy Code, a debtor must prove:  (i) it is unable to obtain unsecured credit; (ii) the proposed credit is necessary to preserve the assets of the estate; and (iii) the terms of the financing are fair, reasonable and adequate.[36] Financing provisions that "tilt the conduct of the bankruptcy case" or "prejudice, at the early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors" are disfavored.[37]  The Debtors cannot carry their burden to approve the DIP Facility on business judgment alone.  They must demonstrate the DIP Facility is in the best interest of all creditors, not just the Lenders.[38]

23.     The Committee acknowledges the Debtors require financing to pursue a sale in chapter 11.  The sale process, however, is being run for the Lenders' benefit as they will reap the enhanced value the Debtors will obtain by selling their business as a going concern.  In these

---

[35]     *Id.* ¶ 27.

[36]     *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990).

[37]     *Id.*

[38]     *Id.* at 40.

circumstances, bankruptcy courts routinely require a secured lender to "pay the freight" associated with the chapter 11 process.[39]

24.     The Debtors' suppliers, landlords and other vendors should not bear any risk, or be forced to finance, these cases.  The Lenders should not be allowed to extract excessive value and enhanced protections they could not obtain outside of bankruptcy.  The DIP Facility must be fair to the Debtors' estates and unsecured creditors.  Without the modifications discussed below, the DIP Facility does not satisfy the governing standards, and the DIP Motion should be denied.

## I.     The Roll-Up Is Inappropriate

25.     Courts are generally reluctant to approve postpetition financing that converts prepetition debt into postpetition obligations, because such conversions go against "the general bankruptcy principle favoring equal treatment of similarly situated creditors and disfavoring payment of prepetition debt outside of a reorganization plan."[40]  Therefore, a debtor must meet a high burden to justify a roll-up.

26.     Here, the Debtors have failed to justify their request to roll-up $52.5 million of the Prepetition Secured Debt.  The Committee does not oppose the roll-up of $17.4 million approved under the Interim Order.  The Court should, however, deny the request to roll-up an additional $35.1 million (the "Additional Roll-Up") pursuant to the Final Order.  The Additional

---

[39]     *See Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) ("[S]ection 506(c) is designed to prevent a windfall to the secured creditor . . . ."); *In re TerreStar Networks, Inc.*, 457 B.R. 254, 270 (Bankr. S.D.N.Y. 2011) ("'[Section 552(b)] is intended to prevent secured creditors from receiving windfalls and to allow bankruptcy courts broad discretion in balancing the interests of secured creditors against the general policy of the Bankruptcy Code, which favors giving debtors a 'fresh start.'") (quoting *In re Patio & Porch Sys. Inc.*, 194 B.R. 569, 575 (Bankr. D. Md. 1996)).

[40]     *See, e.g.*, *Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co*., 322 B.R. 560, 569 n.4 (M.D. Pa. 2005) (noting that roll-up provisions "have the effect of improving the priority of a prepetition creditor"); *In re Tenney Vill. Co.*, 104 B.R. 562, 570 (Bankr. D.N.H. 1989) (holding that Bankruptcy Code section 364 does not authorize the granting of administrative expense priority for prepetition debt; *see also* 3 COLLIER ON BANKRUPTCY ¶ 364.06[2].

Roll-Up is excessive when compared to the amount of new money provided under the DIP Facility (each dollar of new financing rolls-up 2.5 dollars of Prepetition Secured Debt), and the Debtors' general unsecured creditors will be harmed if the Lenders further increase their collateral position against the Debtors' unencumbered assets.

II.    <u>**Unencumbered Assets Belong to Unsecured Creditors**</u>

27.    The Debtors have not yet filed schedules of their assets and liabilities or statements of their financial affairs, and the Committee's investigation into the Prepetition Lenders' liens and claims and potentially unencumbered assets is in its infancy.  Nonetheless, without knowing the value of what they are giving away, the Debtors are granting the Lenders new liens on potentially valuable unencumbered assets, including Avoidance Action Proceeds and commercial tort claims that may exist against Equinox and others.  Such a grant is inappropriate and should be denied.

28.    To add insult to injury, the Interim Order requires Professionals be paid first from unencumbered assets before they can access the Carve-Out.  The Debtors filed for bankruptcy to maximize value for the Lenders pursuant to a going concern sale.  The Lenders should not be allowed to charge the costs of disposing of their collateral to unencumbered assets.  As discussed below, it is the Lenders who must bear any surcharge.

III.    <u>**Rights Under Sections 506(c) and 552(b) Should Be Preserved**</u>

29.    Until the payment of all administrative expenses is ensured under the Budget, the estates' rights under sections 506(c) and 552(b) of the Bankruptcy Code must be preserved.  Section 506(c) of the Bankruptcy Code allows a debtor to charge the costs of preserving

or disposing of a secured lender's collateral to the collateral itself.[41]  This provision ensures that

the cost of preserving a lender's collateral is not paid from unsecured creditor recoveries.[42]

Similarly, the "equities of the case" exception in section 552(b) of the Bankruptcy Code allows a

debtor, committee or other party-in-interest to exclude postpetition proceeds from prepetition

collateral on equitable grounds, including to avoid having unencumbered assets fund the cost of a

lender's foreclosure.[43]  It is intended to ensure that a secured creditor "does not receive a windfall

benefit when a trustee uses assets of the estate."[44]

        30.    Given the insufficiencies and inequities discussed in this Objection, the

waiver of the estates' rights under sections 506(c) and 552(b) is inappropriate.  The Committee is

not presently seeking to surcharge the Lenders' collateral, but until the Budget is rationalized to

fully satisfy the cost of these proceedings, the estates' rights must be preserved.

## IV.   <u>Adequate Protection Should Be Limited</u>

        31.    The Lenders request excessive adequate protection to protect their interest

in collateral notwithstanding the protections they are receiving from the chapter 11 process.

Section 363(e) of the Bankruptcy Code provides that on request of a party with an interest in

---

[41]    *See* 11 U.S.C. § 506(c); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 12 (2000); 4 COLLIER ON BANKRUPTCY ¶ 506.05 ("In general, a secured creditor receives a 'benefit' within the meaning of section 506(c) if the relevant expense preserved or increased the value of its collateral.").

[42]    *See In re Visual Indus., Inc.*, 57 F.3d at 325 ("[Section 506(c)] understandably shifts to the secured party, who has benefitted from the claimant's expenditure, the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate, providing that such unencumbered assets exist.  Failing that, the costs of preserving the security for the secured party's benefit would otherwise fall on the warehouseman, auctioneer, appraiser, etc.").

[43]    *See* 11 U.S.C. § 552(b); *In re TerreStar Networks, Inc.*, 457 B.R. at 270 ("'[Section 552(b)] is intended to prevent secured creditors from receiving windfalls and to allow bankruptcy courts broad discretion in balancing the interests of secured creditors against the general policy of the Bankruptcy Code, which favors giving debtors a 'fresh start.'"") (quoting *In re Patio & Porch Sys. Inc.*, 194 B.R. at 575).

[44]    *In re Barbara K. Enterprises, Inc.*, No. 08–11474, 2008 WL 2439649, *11 (Bankr. S.D.N.Y. June 16, 2008); *see In re Photo Promotion Assocs.*, 61 B.R. 936, 939–40 (Bankr. S.D.N.Y. 1986) (recognizing the court has significant discretion to apply pre-petition security interests to post-petition proceeds of property under the equities of the case, and ruling that creditor's security interest did not extend to proceeds from the sale of inventory that required the trustee to expend post-petition funds to prepare for sale).

property that is to be used by the debtor, the court shall prohibit or condition such use as is necessary to provide adequate protection of such interest.[45]

32.    Adequate protection is designed to preserve, not enhance, a secured creditor's position following the commencement of a case.[46]  Adequate protection is designed to "protect a secured creditor against a decrease in the value of its collateral due to the debtor's use, sale or lease of that collateral during the stay."[47]  A secured creditor must "prove this decline in value – or the threat of a decline – in order to establish a prima facie case."[48]

33.    The Lenders' proposed adequate protection includes: (i) broad stipulations as to the validity of their prepetition liens and claims; (ii) new liens on all previously unencumbered assets; (iii) claims granted on account of Diminution in Value of the prepetition collateral, with "Diminution in Value" defined not as provided in the Bankruptcy Code, but rather to include diminution for practically every dollar spent in these cases; (iv) adequate protection payments for the Prepetition Lenders' prepetition and post-petition costs and expenses; and (v) monthly default rate interest on the outstanding Prepetition Secured Debt, which is undersecured.

34.    These protections are excessive—the Lenders should not receive postpetition payment of professional fees and expenses with respect to the Prepetition Secured Debt, or accrue postpetition interest on the Prepetition Secured Debt, at all, let alone at the default

---

[45]    11 U.S.C. § 363(e).

[46]    *See In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 824 (Bankr. S.D.N.Y. 1982) ("Neither the legislative history nor the [Bankruptcy] Code indicate that Congress intended the concept of adequate protection to go beyond the scope of protecting the secured claim holder from a diminution in the value of the collateral.").

[47]    *See In re Timbers of Inwood Forest Assocs., Ltd.,* 793 F.2d 1380 (5th Cir. 1986), *aff'd sub nom. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365 (1988) (the adequate protection provisions suggests that they were intended to protect a secured creditor against a decrease in the value of its collateral due to the debtor's use, sale or lease of that collateral during the stay); *see also In re Cont'l Airlines, Inc.,* 146 B.R. 536, 539 (Bankr. D. Del. 1992) ("Post-*Timbers* courts have uniformly required a movant seeking adequate protection to show a decline in value of its collateral.").

[48]    *In re Gunnison Ctr. Apts., LP,* 320 B.R. 391, 396 (Bankr. D. Colo. 2005).

rate.  The Committee is willing to support a reasonable adequate assurance package based on the facts of this case, but the protections requested in the DIP Motion go too far.

**V.      The DIP Facility Inappropriately Limits the Committee**

35.      The Committee has a fiduciary duty to investigate, *inter alia*, the Debtors, their assets, liabilities and financial affairs, including the amount of the Prepetition Secured Debt and the validity and extent of the liens securing it.[49]  The Final Order imposes significant roadblocks to the Committee's ability to fulfill its fiduciary duty.

36.      The Budget is woefully insufficient and operates to insulate the Prepetition Secured Debt from meaningful scrutiny.  The Committee's professionals are allocated only $250,000 to advise the Committee on all matters regarding these chapter 11 Cases, including just $50,000 to investigate the Prepetition Secured Debt.  These amounts stand in sharp contrast to the $10 million allocated to the Debtors' professionals and more than $5 million allocated to the Debtors' counsel and financial advisor under the Budget.[50]

37.      The Committee is entitled to retain professionals to represent it, and the Budget must provide a reasonable amount to allow the Committee to discharge its statutory mandate.[51]  If the parties cannot agree on the Budget, the Court should disregard the professional

---

[49]      *See* 11 U.S.C. § 1103(c)(2).

[50]      The Budget amounts exclude more than $10 million in prepetition fees the Debtors' professionals incurred to get up to speed and prepare for the chapter 11 cases.  *See* Docket No. 98.  *See e.g.*, *In re Bowflex, Inc., et al.*, Case No. 24-12364 (ABA) (Docket No. 172) (Bankr. D.N.J. March 28, 2024) (Budget allocated 39% of the amount allocated to Debtors' professionals).

[51]      *See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007) (unsecured creditors' committees have a fiduciary duty to maximize unsecured creditor recoveries for the debtor's estate); *Value Prop. Trust v. Zim Co. (In re Mortg. & Realty Trust)*, 212 B.R. 649, 653 (Bankr. C.D. Cal. 1997) (noting that the committee has many functions . . . "it investigates, it appears, it negotiates, it may litigate, and it is at all times intimately involved in the reorganization").

allocations in the Budget and require all estate professionals to share pro rata in the aggregate amount designated to pay estate professionals.[52]

## VI.    DIP Events of Default Should Be Modified

38.    If the Court grants the DIP Motion, the Committee requests the Court modify Events of Default under the DIP Credit Agreement that allow the DIP Lenders to pull the plug on these cases if the Committee (i) initiates a Challenge, or (ii) opposes the DIP Lenders' preferred allocation of Sale proceeds (even in the face of a Challenge).    Coupled with the Committee's artificially low Budget (discussed above), these two Events of Default eviscerate the Committee's Challenge rights.    Transparency and Committee oversight are hallmarks of chapter 11.    The Lenders should not be allowed to weaponize the Budget and heavy-handed Events of Default to avoid meaningful investigation while they simultaneously reap all the benefits of chapter 11.

39.    Certain reporting Events of Default must also be modified.    Pursuant to section 9.01(b) of the DIP Credit Agreement, it is an automatic Event of Default if the Debtors fail to deliver, among other reporting, a monthly report or Variance Report on time more than once. Section 9.01(p)(29) provides a five-day cure period for the failure to timely deliver a Variance Report.    The Final Order should provide that section 9.01(p)(29) governs, and the delivery of monthly reports (not just Variance Reports) should be subject to that section.

## VII.    Other Objectionable Provisions

40.    In addition to the foregoing, the following provisions of the Final DIP Order are objectionable for the reasons stated below:

---

[52]    *See In re Evergreen Solar, Inc.*, Case No. 11-12590 (MFW), Hr'g Tr. (Docket No. 189) at 42-51 (Bankr. D. Del. Sept. 6, 2011) (declining to apply the debtor's proposed caps and instead, substituted a general pool for all professionals from which debtor and committee professionals could recover fees on a pro rata basis). Excerpts from the transcript are attached hereto as Exhibit A.

- <u>Committee Notices</u>: The Final Order must require the Debtors to provide copies to the Committee of all notices and reports the Debtors deliver to the DIP Agent under the Final Order or DIP Credit Agreement.

- <u>Subordination Agreement</u>:  The Final Order must not approve any right of subrogation that Equinox may have under the Subordination Agreement.

- <u>Post Carve-Out Trigger Amount</u>:  If a Termination Event occurs, the Post Carve-Out Trigger Amount should be $500,000.

- <u>Releases</u>:  Releases should be limited to the Lenders/Agents and solely (i) in their capacity as such, and (ii) with respect to claims or causes of action regarding the DIP Facility or the Prepetition Secured Debt.

- <u>No Marshaling</u>: The equitable doctrine of marshalling should not be waived.

- <u>Remedies Notice Period</u>:  The Remedies Notice Period should be at least five business days.

[*Remainder of page intentionally left blank*]

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court (i) deny the DIP

Motion unless the DIP Facility and Final Order are modified as set forth herein; and (ii) grant such

other and further relief as the Court deems just and proper.

Dated: September 6, 2024

**MORRIS JAMES LLP**

*/s/ Siena B. Cerra*
Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
Siena B. Cerra (DE Bar No. 7290)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: emonzo@morrisjames.com
        bkeilson@morrisjames.com
        scerra@morrisjames.com
-and-

**KELLEY DRYE & WARREN LLP**
Eric R. Wilson, Esq. (admitted *pro hac vice*)
Kristin S. Elliott, Esq. (admitted *pro hac vice*)
Andres Barajas, Esq. (admitted *pro hac vice*)
3 World Trade Center
New York, NY 10007
Telephone: (212) 808-7800
Facsimile: (212) 808-7897
E-mail: ewilson@kelleydrye.com
        kelliott@kelleydrye.com
        abarajas@kelleydrye.com

*Proposed Counsel to the Official Committee of*
*Unsecured Creditors*