# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BLINK HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-11686 (JKS)<br><br>(Jointly Administered)<br><br>**Ref. Docket Nos. 13, 14, 63, 171** |

**DEBTORS' REPLY IN SUPPORT OF DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING AND UTILIZE CASH COLLATERAL; (II) GRANTING LIENS, SUPER-PRIORITY CLAIMS, AND ADEQUATE PROTECTION; (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this reply (the "Reply") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing and Use Cash Collateral; (II) Granting Liens, Super-Priority Claims, and Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 13] (the "DIP Motion")[2] and in response to the *Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing and Use Cash Collateral; (II) Granting Liens, Super-Priority Claims, and Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and*

---

[1] The last four digits of Blink Holdings, Inc.'s federal tax identification number are 6354. The mailing address for Blink Holdings, Inc. is 45 West 45th Street, 10th Floor, New York, New York 10036. Due to the large number of debtors in these chapter 11 cases, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/BlinkFitness, or by contacting the undersigned counsel for the Debtors.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the First Day Declaration (as defined herein) or the DIP Motion.

32055309.3

*(V) Granting Related Relief* [Docket No. 171] (the "Objection")[3] filed by the official committee of unsecured creditors (the "Committee"). In further support of the DIP Motion and this Reply, the Debtors state as follows:

## Preliminary Statement

1. Over the course of several weeks leading up to the commencement of the Chapter 11 Cases, the Debtors, with the assistance of their advisors, negotiated at arm's length with the DIP Agent regarding the terms by which the DIP Lenders would be willing to continue to fund the Debtors' operations. The result of these negotiations – the provision of both bridge and postpetition financing necessary for the Debtors to continue operations, preserve key commercial relationships, and run a robust sale process – provides the Debtors with the best opportunity to maximize value for the benefit of creditors and stakeholders. To be clear, the relief contemplated in the Final Order constitutes a bundle of carefully-negotiated resolutions reached between the Debtors on one hand, and the DIP Lenders and Prepetition Secured Parties on the other. With this backdrop, the Court should not lose sight of two fundamental points in its consideration of the Objection: (a) the Debtors unquestionably require access to the DIP Facility to fund administrative costs, maximize estate value, and bring these Chapter 11 Cases to an orderly, cost-efficient conclusion; and (b) the proposed DIP Facility is the only financing option currently available that would allow the Debtors to accomplish these goals.[4] Approval of the Final Order is thus appropriate and necessary.

---

[3] In addition to the Objection, the Debtors received informal responses to the DIP Motion from certain parties in interest and one formal objection filed by certain Texas taxing authorities. These matters have been resolved through inclusion of additional language in a revised proposed form of Final Order, which is being filed contemporaneously herewith.

[4] *See* Swift Decl. ¶ 3 ("(i) the Debtors are currently unable to borrow funds on an unsecured or junior basis, or solely secured by the Debtors' unencumbered assets, if any, in amounts sufficient to fund the Chapter 11 Cases; (ii) the proposed DIP Facility, (a) is the product of an arm's-length, good-faith negotiation process, and (b) is the only currently available postpetition financing option identified for the Debtors under the circumstances; and (iii) the terms of the proposed DIP Facility, taken as a whole, are fair and reasonable under the circumstances.").

2. The DIP Lenders offered the DIP Facility to ensure that the Debtors' estates can run a thorough, value-maximizing marketing process while remaining administratively solvent, preserving estate value, maintaining operations and key relationships with members, employees, landlords, vendors and other counterparties, and providing a mechanism to appropriately wind down the cases within a timeline that the Debtors believe to be sufficient. The Committee does not in any way question the Debtors' business judgment in deciding to preserve their businesses as a going concern,[5] nor could they credibly do so.

3. To navigate this process, however, the Debtors require the financing offered under the terms of the DIP Facility. As a *quid pro quo* for the extension of postpetition credit to fund the administrative costs of the Chapter 11 Cases and agreeing to the Carve-Out, the DIP Lenders required the various customary terms and concessions that the Committee complains about in the Objection. As further described herein, based on the facts and circumstances of the Chapter 11 Cases, and as more fully described herein, the Debtors believe that agreeing to such terms and providing such concessions is necessary to secure sufficient funding to preserve value and cover the administrative costs of the Chapter 11 Cases, and that such agreement is a sound exercise of the Debtors' business judgment.

4. For the reasons set forth herein, the Objections should be overruled and the DIP Motion should be approved.

---

[5] *See* Objection at ¶1 ("The Committee agrees that the Debtors need funding to run a competitive sale process and wind-down the Debtors' estates.")

**Reply**

I. **The Debtors' Entry into the DIP Facility Represents a Sound and Prudent Exercise of Their Business Judgment.**

5. The Debtors have entered into the DIP Facility (and have agreed to the terms in the proposed Final Order) based upon a sound and prudent exercise of their own business judgment. The Debtors have determined that the DIP Facility, in the context of these Chapter 11 Cases, is reasonable and provides significant benefits to the Debtors' estates. *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility that "reflect[ed] sound and prudent business judgment"); *see Quality Inns Intern., Inc. v. L.B.H. Assoc. Ltd. P'ship*, 1990 WL 116761 at *7 (4th Cir. July 26, 1990) ("[C]ourts defer to corporate officers' decisions on matters entrusted to their business judgment absent a showing of bad faith or gross abuse of that judgment, and this rule extends to bankruptcy proceedings.").

6. Considering the Debtors' substantial efforts to solicit postpetition financing on the best available terms, and in light of the lack of any alternative options to the proposed DIP Facility, it is without question that the business judgment standard is satisfied here. Notably, the Committee does not suggest otherwise; rather, they pick out terms of the DIP Facility which, in isolation, they find objectionable or unfavorable to their own interests. Each term of the DIP Facility that the Objecting Parties challenge was the subject of vigorous negotiations between the Debtors and the DIP Lenders and was integrated as part of a "package deal" that was required for the DIP Lenders to provide debtor-in-possession financing.

7. When viewed as a whole, and in light of the particular circumstances of these Chapter 11 Cases, the terms of the DIP Facility are reasonable. *See, e.g., In re Farmland Indus., Inc.*, 294

B.R. 855, 879–92 (Bankr. W.D. Mo. 2003) (finding that terms of postpetition financing transaction were reasonable when "taken in context, and considering the relative circumstances of the parties," even those that "might appear to be extreme or even unreasonable in isolation."). The Court should not substitute the Debtors' sound and prudent business judgment to enter into the DIP Facility with that of the Objecting Parties. *See In re Spansion, Inc.*, 426 B.R. 114, 140 (Bankr. D. Del. 2010) ("It is not appropriate to substitute the judgment of the objecting creditors over the business judgment of the Debtors.").

II.     **The Terms of the Final Order Are Customary and Appropriate.**

8.      There can be no doubt that, absent the additional funding provided by the DIP Facility, the Debtors would be unable to administer the Chapter 11 Cases, fund ongoing expenses and critical business functions, or successfully navigate a value-maximizing marketing and sale process. The alternative, a liquidation, would have an extremely detrimental impact not only to the estates, but to the roughly 2,000 employees who would otherwise be put out of work, to the landlords whose properties would otherwise be shuttered, to trade vendors who would otherwise lose a business partner, and to creditors generally who would be faced with reduced recoveries resulting from the sale of the Debtors' assets on a piecemeal basis. Nonetheless, the Debtors respond below to a number of the specific complaints that the Objection raises.

    A.      *The Roll-up Is Appropriate and Provides Value.*

9.      The Roll-Up is reasonable, appropriate, and should be approved. This is especially so given that the Final Order contains appropriate safeguards for the Committee with respect to the Roll-Up, in that it preserves the Court's ability to "unwind" the Roll-Up or grant other appropriate relief in the event of a successful Challenge and provides the Committee with an appropriate investigation budget to evaluate such a possibility.

10. The DIP Facility provides $21 million in new-money funding to the Debtors. Access to this additional funding is of immeasurable value to the Debtors' efforts in these Chapter 11 Cases. The Roll-Up was a condition to obtaining the DIP Facility, and this was one of the most heavily-negotiated and hard-fought points related to the terms of the DIP Facility. And although the lenders initially sought a more aggressive roll-up, they ultimately agreed to the Roll-Up proposed in the Motion following extensive discussions between the parties and their advisors. Additionally, this is not a case in which the majority of the prepetition secured claims are being rolled into the DIP Facility. To the contrary, more than $100 million of prepetition secured debt is excluded from the Roll-Up, which reflects the efforts by the Debtors to procure the best possible DIP Facility. In any event, the Debtors have no currently available alternative funding source. The Debtors, in the exercise of their business judgment, submit that the DIP Facility could not have been obtained without the Roll-Up.

11. Given the appropriate safeguards in the Final Order preserving the Committee's right to investigate and challenge the Roll-Up, there is no prejudice to the Committee in the Court approving the Roll-Up, so that the Debtors are ensured access to the funds necessary to properly administer the Chapter 11 Cases.

    B.    *<u>The Budget Was Carefully Negotiated to Cover Administrative Expenses</u>*.

12. The Debtors, through their advisors (most notably Portage Point), carefully analyzed the Debtors' cash needs through the Chapter 11 Cases and believe that the DIP Facility provides the Debtors with sufficient liquidity to fund the working capital and other administrative expenses of the Chapter 11 Cases, as provided in the Approved Budget. The Approved Budget was thoroughly negotiated and thoughtfully sized to fund a solvent chapter 11 process. In addition, an appropriate wind-down budget was a critical element of the Approved Budget. The Debtors insisted upon, and the DIP Lenders ultimately agreed to fund the orderly wind-down of these estates through a chapter

11 plan, assuming no defaults under the DIP Facility and that the sale process is appropriately completed. Accordingly, the Debtors believe that the DIP Facility is appropriately sized to satisfy the Debtors' postpetition obligations.

      C.     *The Section 506(c) Waiver is Appropriate*.

13.     The Committee objects to the Debtors' waiver of their section 506(c) surcharge rights, which the Debtors have assented to as a *quid pro quo* for the DIP Lenders' agreement to extend postpetition financing to fund administrative costs of the Chapter 11 Cases and for the DIP Lenders' agreement to the Carve-Out.[6] Section 506(c) of the Bankruptcy Code provides a debtor the right to "recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of" such property. 11 U.S.C. § 506(c). Section 506(c) claims are available to, and are an asset of, the Debtors, and not any other party in interest. See *In re Smart World Techs., LLC,* 423 F.3d 166, 181–82 (2d Cir. 2005) ("Section 506(c) . . . allows only the 'trustee,' or debtor-in-possession, to take advantage of this exception . . . § 1109(b) does not entitle parties in interest, such as [the debtor]'s creditors, to usurp the debtor-in-possession's role as legal representative of the estate.").

14.     As an initial matter, the Debtors' section 506(c) rights are limited. *See, e.g.*, *In re Towne, Inc.* 536 Fed.Appx. 265, 268 (3d Cir. 2013) ("In general, [administrative] fees and expenses are not chargeable against secured collateral . . . However, section 506(c) . . . provides a limited exception to this rule . . .") (citations omitted). It is unclear if the Debtors would ever be able to exercise such surcharge even if they tried to do so.

---

[6]    *In re Velocity Express Corp.*, No. 09-13294 (MFW) (Bankr. D. Del.), Hr'g Tr. 62:2¬–3, Oct. 16, 2009 ("I agree with the lenders that the carve out is consideration for the 506(c) waiver").

32055309.3

15. In contrast, waiving the Debtors' surcharge rights under section 506(c) of the Bankruptcy Code does not provide the DIP Lenders with a windfall or otherwise create a risk that the costs of the Debtors' estates will be borne by unsecured creditors. The DIP Lenders hold valid, perfected liens on substantially all of the Debtors' assets,[7] are providing incremental financing and allowing the Debtors' consensual use of Cash Collateral for working capital and general corporate purposes, and are funding the conduct of the Chapter 11 Cases, including an open and value-maximizing sale process. The financing needs, as reflected in the Approved Budget, have been fully vetted and approved by the Debtors and their management, and, critically, the Committee has not challenged any of the Debtors' anticipated financial needs (other than for their own professional fees). These benefits to the estates thereby provide the means of preserving the value of any collateral without any need to exercise surcharge rights. It is precisely the DIP Facility that will ensure that the estates remain administratively solvent throughout the Chapter 11 Cases.

16. Additionally, a section 506(c) waiver is particularly appropriate where, as here, a secured creditor has agreed to pay, from its collateral, estate administrative costs and subordinate its liens to the carve out for professional fees and other administrative expenses, as the DIP Lenders have done here. *See, e.g.*, *In re Mineral Park, Inc.*, No. 14-11996 (KJC) (Bankr. D. Del.), Hr'g Tr. 43:10–12, Sept. 23, 2014 (overruling the committee's objection and stating "given what [the secured lenders are] funding, I think [they've] paid for a 506(c) waiver and I would be willing to grant it");

---

[7] The Committee Objection objects to the Final Order's treatment of potentially unencumbered assets and Avoidance Action Proceeds. While the Committee will be entitled to pursue Challenges under the Final Order, the Debtors do not believe that there are any unencumbered assets available aside from Avoidance Action Proceeds. Moreover, it is beyond dispute that Section 364(c) permits the grant of liens on unencumbered assets and does not mandate that certain categories of assets remain unencumbered. Likewise, nothing in the Bankruptcy Code mandates that the lenders look to certain categories of assets or claims prior to others to satisfy their claims. Thus, the DIP Liens (and Adequate Protection Liens, as described below) appropriately attach to these assets as set forth in the proposed Final Order.

*In re MPM Silicones, LLC*, No. 14-22503 (RDD) (Bankr. S.D.N.Y.), Hr'g Tr. 58:11–12; 93:12–20, May 23, 2014 (where a carve-out is provided, a 506(c) waiver is often an "acceptable trade-off").

17. Further, it is well-established that the right to waive the 506(c) surcharge is within a debtor's discretion. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (holding that only a trustee or a debtor in possession may seek recovery under section 506(c)). The Debtors have the sole authority and discretion to waive such rights, and the Debtors believe that such waiver is unambiguously justified in light of the facts and circumstances of the Chapter 11 Cases. The Debtors do not believe that the DIP Lenders would have consented to the Debtors' continued use of Cash Collateral without a section 506(c) waiver, and the Debtors determined, in their business judgment, that such a waiver was reasonable and appropriate in light of the considerable benefits arising from the DIP Facility and consensual use of Cash Collateral.

    D.    *The 552(b) Waiver Is Reasonable and Appropriate*.

18. The Committee objects to the Debtors' agreement to waive the "equities of the case" exception under section 552(b) of the Bankruptcy Code. *See* Objection ¶ 28. The Debtors believe that such waiver is reasonable and appropriate in light of the circumstances of the Chapter 11 Cases. Section 552(b) of the Bankruptcy Code generally ensures that an entity's prepetition security interest in the proceeds of collateral extends to such proceeds acquired postpetition, subject to a limited exception from this general rule to the extent that the "equities of the case" so require. *See* 11 U.S.C. § 552(b)(1).

19. A waiver of this exception here is justified. Similar to the 506(c) waiver, the 552(b) waiver is appropriate where, as here, the DIP Lenders and the Prepetition Secured Parties have assented to the Debtors' use of Cash Collateral and have agreed to a carve out from their collateral to fund the Debtors' operations and fees and expenses of other parties—such as U.S. Trustee fees and the Committee's professional fees. *See, e.g.*, *In re Abitibibowater, Inc.*, No. 09-11296 (Bankr.

D. Del.), Hr'g Tr. 35:5–18, Jun. 4, 2009 (finding that such waivers are usually granted "in cases in which it looks like . . . the lenders are doing the right thing in terms of . . . providing for payment of administrative expenses.") The Debtors believe that a waiver of the "equities of the case" exception is justified as a *quid pro quo* for the DIP Lenders willingness to provide a DIP Facility that will enable the Debtors to achieve their value-maximizing goals through these chapter 11 cases. Additionally, the "equities of the case" exception is generally applicable only in circumstances wholly different from these, where an oversecured creditor should be prevented from "reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of the estate (which normally would go to general creditors) to cause the appreciated value." *In re Muma Services, Inc.*, 322 B.R. 558-59 (Bankr. D. Del. 2005) (internal citations and quotations omitted) (finding 552(b) exception not appropriate where the lenders' liens encumbered substantially all assets and "it was only through the use of the [lenders'] cash collateral (and the financing provided . . .) that the estate was able to continue to operate and maintain the value of the assets"). Similarly, here, no equitable argument exists that would justify the DIP Lenders not receiving these customary protections in exchange for the DIP Facility.

      E.      *The Adequate Protection Provisions of the Final Order Are Appropriate*.

20. Sections 363(c)(2) and 363(e) of the Bankruptcy Code are clear that secured claimants with an interest in cash collateral are entitled to adequate protection against such projected diminution in value. Secured creditors are "entitled to adequate protection as a matter of right, not merely as a matter of discretion, when the entity is stayed from enforcing its interest, when the estate proposes to use, sell or lease property in which the entity has an interest, and when the property on which the entity has a lien is to be used as collateral for a loan." 3 Collier on Bankruptcy ¶ 361.02 (16th ed. 2020). Here, the Prepetition Secured Parties are consenting to financing that benefits all stakeholders of the Debtors' estates to facilitate a sale transaction and thus are entitled to adequate protection.

21. With respect to the Adequate Protection Payments, the proposed Final Order is clear that the Prepetition Secured Parties are entitled to these amounts solely to the extent of any Diminution in Value. Moreover, the grant of a replacement lien is an appropriate means of providing such adequate protection. *See* 11 U.S.C. §§ 361–363. The Debtors commenced the Chapter 11 Cases with a budget and a timeline that accounted for the liquidity that the Debtors required to continue to operate the business and to continue the prepetition marketing process. While the Debtors are hopeful that they will receive competing bids such that they can hold a competitive auction that will result in significant value to the Debtors' estates, the Debtors' cash balance is projected to decrease over the course of the Chapter 11 Cases and the Debtors will continue to use the Prepetition Lenders' collateral. The Debtors have incurred obligations under the DIP Facility that are secured by substantially the same assets and property that constitutes Prepetition Collateral, in particular as cash is used to fund the Chapter 11 Cases. Moreover, the Prepetition Lenders already have liens on substantially all of the Debtors' assets; as such, the Adequate Protection Liens (which include Avoidance Action Proceeds, as likely the only unencumbered assets of the Debtors' estates) are the only assets available to secure the Prepetition Secured Lender's diminution claim (if, of course, such claim were ever to arise, subject to it being proven in the first place that any Diminution in Value actually occurs). *See In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 565-67 (3d Cir. 1994) (holding that the adequate protection was insufficient where a debtor provided a secured creditor with nothing more than it was entitled to receive).

22. Again, the terms of the Adequate Protection Liens were negotiated at arm's length among the Debtors and the DIP Lenders as a necessary inducement to provide the DIP Facility and consent to the use of Cash Collateral, as applicable. The Court should give effect to the negotiated agreement struck by the Debtors in their business judgment and overrule the Committee's objection.

F.   *The Committee Has Adequate Means to Fulfill Its Fiduciary Duties*.

23.   The Debtors' and DIP Lenders' representatives have spent substantial time working with the Committee's advisors to bring them up to speed as quickly as possible, and will continue to move forward collaboratively to provide the Committee with necessary information and insight. The Committee will also be receiving all the reporting under the DIP Facility to ensure it is well informed. The Debtors believe that given the relatively straightforward organizational and capital structure of the Debtors and their businesses and the Committee's retention of able professional advisors, the Committee should be able to discharge its investigatory and other fiduciary duties effectively and efficiently.

24.   The DIP Lenders have increased the pre-Carve-Out Trigger Notice Committee budget to $600,000, which will allow the Committee to discharge its obligations. The Budget also includes an investigation budget that has increased from $50,000 to $100,000 since its appointment. Additionally, the DIP Lenders have increased the Post-Carve Out Trigger Notice Cap to $300,000. The Committee does not explain how such amounts are insufficient to allow the Committee to fulfill its fiduciary duties, within the bounds of an acceptable DIP Facility. The Debtors have reasonably estimated the professional costs associated with running a competitive sale process, prosecuting the Chapter 11 Cases, complying with the requirements of Debtors as part of the Chapter 11 process and negotiated an amount that it believes should be sufficient. The funding included in the Approved Budget for the Debtors' professionals is necessary to permit the Debtors to fulfill their responsibilities to complete an estate-value-maximizing chapter 11 process. For that reason, the Debtors object to the Committee's suggestion in the Objection that the Budget amounts agreed to for the Debtors' professionals should be disregarded if the Committee is unsatisfied with the funds that would be allocated after the Court's consideration of this aspect of the Objection.

G. *The Events of Default Included in the Final Order Are Conditions to Obtaining the DIP Facility and Should Be Approved*.

25. Again, the Events of Default referenced in paragraphs 38 and 39 of the Objection were provisions that the Debtors negotiated as a component of the DIP Facility and represent the terms on which the DIP Lenders are prepared to continue financing the Debtors. The Events of Default related to Challenges are based on a premise that the DIP Lenders are willing to lend <u>or</u> to litigate Challenges, but the DIP Lenders have held fast to their view that they should not be forced to <u>both</u> lend <u>and</u> litigate Challenges.[8] The Committee's position that the commencement of an action by the Committee should not represent an Event of Default is not credible, and seeks to force the DIP Lenders to continue funding the Debtors (and Committee professional fees) while being sued by the Committee. Given the illogic of that position and the immeasurable benefits to all unsecured creditors (which in all likelihood will include the Prepetition Lenders) that would result from a successful sale process made possible through the DIP Facility, the Debtors submit that these Events of Default, which the DIP Lenders have steadfastly maintained as essential provisions, are appropriate in the overall context of the DIP Facility.

H. *Other Committee Comments Have Been Incorporated in the Proposed Final Order.*

26. The Debtors and the DIP Lenders have already incorporated in the proposed Final Order the remaining changes requested by the Committee. Specifically, (a) the provision requiring that professionals be paid first from unencumbered assets has been removed; (b) the definition of "Diminution in Value" has been clarified to provide that it must be established in accordance with the Bankruptcy Code; (c) it has been clarified that any failure to timely deliver a Variance Report or Compliance Certificate is subject to a five-day cure period notwithstanding any provisions in the DIP

---

[8] As for the reporting Events of Default, the Debtors believe that the existing documents already provide for a five-day grace period in connection with delivery of a Variance Report.

32055309.3

Credit Agreement to the contrary; (d) the Committee is entitled to reporting information and notices to be received by the DIP Agent; (e) the intercreditor provisions have been clarified to provide that any subrogation or setoff rights of Equinox have not been approved; (f) the release provisions have been clarified to release the DIP Secured Parties and Prepetition Secured Parties, solely in their capacities as such; and (g) the Remedies Notice Period has been increased to five business days.

27. The Debtors remain hopeful that they and the DIP Lenders can continue to work together with the Committee to resolve its concerns with the DIP Facility and proposed Final Order to the greatest extent possible. However, in the absence of an agreement or additional concessions from the DIP Lenders, the Court should defer to the Debtors' business judgment that the DIP Facility offers them postpetition financing on the best available terms and is in the best interests of all stakeholders in the Chapter 11 Cases, and should accordingly overrule the Objection for all of the foregoing reasons and the reasons set forth in the DIP Motion.

*[Remainder of page intentionally left blank]*


WHEREFORE, for the reasons discussed herein, the Debtors respectfully request that the Court approve the DIP Facility as set forth in the Final Order.

| Dated: Wilmington, Delaware<br>September 9, 2024 | **YOUNG CONAWAY STARGATT & TAYLOR, LLP**<br><br>*/s/ Sean T. Greecher*<br>Michael R. Nestor (No. 3526)<br>Sean T. Greecher (No. 4484)<br>Allison S. Mielke (No. 5934)<br>Timothy R. Powell (No. 6894)<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 571-6600<br>Facsimile: (302) 571-1253<br>Email: mnestor@ycst.com<br>        sgreecher@ycst.com<br>        amielke@ycst.com<br>        tpowell@ycst.com<br><br>*Counsel to the Debtors and Debtors in Possession* |
|---|---|