**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BLINK HOLDINGS, INC., *et al.*,[1] | Case No. 24-11686 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. 16, 17, 73, 74, 75, 97, 131 & 136** |

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF MOTIONS FOR ORDERS
(I) APPROVING (A) KEY EMPLOYEE INCENTIVE PLAN, AND (B) KEY
EMPLOYEE RETENTION PLAN; AND (II) ESTABLISHING, AMONG
OTHER THINGS, BAR DATES FOR FILING PROOFS OF CLAIM**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") hereby submit this reply (this "**Reply**") in support of the (i) *Debtors' Motion for an Order (I) Approving (A) Key Employee Incentive Plan, and (B) Key Employee Retention Plan; and (II) Granting Related Relief* [Docket No. 16 (sealed); Docket No. 75 (redacted)] (the "**KEIP/KERP Motion**")[2] and (ii) *Debtors' Motion for Entry of an Order (I) Establishing Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9) of the Bankruptcy Code, (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9) of the Bankruptcy Code, and (IV) Approving Form and Manner of Notice Thereof* [Docket No. 97] (the "**Bar Date Motion**," and together with the KEIP/KERP

---

[1]     The last four digits of Blink Holdings, Inc.'s federal tax identification number are 6354.  The mailing address for Blink Holdings, Inc. is 45 West 45th Street, 10th Floor, New York, New York 10036.  Due to the large number of debtors in these chapter 11 cases, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/BlinkFitness, or by contacting the undersigned counsel for the Debtors.

[2]     Capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motions, as applicable.

Motion, the "**Motions**"), and in response to the objections to the Motions [Docket Nos. 131 & 136] (the "**U.S. Trustee Objections**") filed by the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") and the objection [Docket No. 185] (collectively with the U.S. Trustee Objections, the "**Objections**") filed by the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "**Committee**").  In support of this Reply, the Debtors rely on the *Declaration of Steven Shenker, Debtors' Chief Restructuring Officer, in Support of Debtors' Motion for an Order (I) Approving (A) Key Employee Incentive Plan, and (B) Key Employee Retention Plan; and (II) Granting Related Relief* [Docket No. 17] (the "**Shenker Declaration**").  In further support of this Reply, the Debtors respectfully state as follows:

**PRELIMINARY STATEMENT**

## I.    The KEIP/KERP Motion

1.    The Debtors commenced the Chapter 11 Cases to preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders.  The Debtors determined, in consultation with their advisors, that a public and court-supervised sale process under chapter 11 of the Bankruptcy Code (the "**Sale Process**") provided the best path forward under the circumstances to consummate a value-maximizing transaction for substantially all of the Debtors' assets (collectively, the "**Assets**").  A critical factor in the success of the Sale Process is providing narrowly tailored incentives to certain of the Debtors' key management personnel to encourage the extraordinary work (over and above their everyday responsibilities) necessary to make a direct impact on the Sale Process, including engaging a going-concern buyer to ensure that value is maximized for the Debtors, their estates, and their stakeholders.

2.    As described in the KEIP/KERP Motion, the KEIP is a true incentive plan, specifically designed to incentivize a select group of four senior executives (the "**KEIP**

**Participants**") to maximize recoveries to creditors.   The KEIP was the product of extensive planning and analysis, which began in July 2024 and continued over the course of several weeks in connection with the Debtors' negotiations to, among other things, secure postpetition funding. The KEIP is based upon extensive precedent and was designed to directly incentivize the KEIP Participants to support and maximize the value to be received through the Sale Process.  In fact, unlike retention plans, which are designed to keep the target employees at their jobs for a designated period of time, the KEIP only vests upon the closing of a Court-approved Sale of the Assets.   As of the date the KEIP was approved by the Debtors, the commencement of the Chapter 11 Cases, the filing of the KEIP/KERP Motion, and the filing of the Objections, there was no executable agreement for a Sale of the Assets.

3.       The KEIP has already proven to be incentivizing.  Since the inception of the Chapter 11 Cases, the KEIP Participants have aggressively pursued value creation for the estates and all stakeholders, and achieved strong results.  Since the filing of the Chapter 11 Cases, the Debtors, through the leadership of KEIP Participants, have engaged in numerous discussions designed to secure a stalking horse agreement, having conducted weeks of significant negotiations and diligence processes, including more than forty (40) site visits (which were hosted by certain of the KEIP Participants over the course of several weeks), all while supporting operations and delivering favorable month-end financial results.  Considering the substantial work completed by the KEIP Participants to date and all that remains to be done during the Chapter 11 Cases to actually close a going-concern Sale, there should be no doubt that the KEIP has motivated, and will continue to motivate, the KEIP Participants as they take all action necessary to maximize the value of the Debtors' estates.

32007828.7

4.      As detailed in the Motion and the Shenker Declaration, the KEIP Participants are the individuals most critical to the success of the Sale Process, and the Chapter 11 Cases.  The KEIP is a limited program, involving a discrete number of select individuals.  The Debtors structured the KEIP to align the KEIP Participants' goals with the estates' goals of securing the highest and best going-concern price for the Assets by expressly conditioning any award on the closing of the Sale of the Assets and including potential upside incentives that are triggered by achieving increased Sale value.  As set forth in the Shenker Declaration, such Sale values were determined by considering, among other things, comparisons of KEIP programs in other similarly situated cases and evaluating likely Sale values given market conditions and performance metrics.

5.      While the U.S. Trustee has argued otherwise, the prompt closing of the Sale of the Assets is an appropriate incentivizing metric where the closing of a Sale is not a foregone conclusion.  The Debtors filed the Chapter 11 Cases without a stalking horse bidder or any other Sale commitment, and have been working tirelessly to market the Assets and secure a stalking horse bidder to establish a baseline bid, promote a competitive auction process, and ensure that the benefits of a going-concern Sale are realized for employees, members, and unsecured creditors (through, among other things, assumption of leases and contracts, maintenance of a go-forward business partner/employer, and assumption of certain liabilities and member programs.  The KEIP Participants' support has been crucial when responding to myriad questions from bidders regarding the business and its operations/infrastructure, conducting management presentations, providing tours of the Debtors' facilities, managing diligence requests, and leading the Debtors' advisors in all aspects of the Sale Process, all while the KEIP Participants continue to operate the Debtors' business during a time of substantial disruption and challenges.

6.    The Debtors' lenders—the parties with the largest stake in these proceedings, who hold all of the secured debt and likely the largest unsecured claim in these cases—have agreed to the terms of the KEIP, are supportive of the Debtors' efforts to incentivize the KEIP Participants as structured under the KEIP, and have agreed to have the KEIP funded from Sale proceeds and reduce any unsecured deficiency claim remaining following consummation of a Sale by the amount of Sale proceeds paid with respect to the KEIP.[3]

7.    As the facts and circumstances of the Chapter 11 Cases adequately support approval of the KEIP, which was proposed and adopted in the Debtors' sound business judgment in satisfaction of sections 363(b) and 503(c)(3) of the Bankruptcy Code, the KEIP objections should be overruled.

## II.    The Bar Date Motion

8.    The establishment of a claims bar date serves one of the principal purposes of bankruptcy law:  the prompt and efficient administration of claims in a debtor's estate.  The Debtors have sought approval of a standard procedures motion—filed in a form that is identical to forms routinely approved by this Court—to establish an orderly and efficient process for filing proofs of claim in the Chapter 11 Cases.  Pursuant to that process, the Debtors seek to provide parties in interest with (i) clear and unambiguous instructions on how to file proofs of claim, (ii) convenient access to the documents and information necessary to file proofs of claim, and (iii) notice of various material deadlines in the Chapter 11 Cases.  Nothing about the Debtors' proposed process is special or unique.  The U.S. Trustee erroneously seeks to impose on the

---

[3]    For demonstrative purposes, assume the lenders have a claim of $160,000,000, the Sale proceeds are $90,000,000, and the KEIP payments total $1,200,000.  Without the concession by the lenders, their unsecured deficiency claim would be $71,200,000 (assuming no encumbered Assets remain following the Sale).  However, the lenders have agreed that the payment of the KEIP will be neutral to the Debtors and their estates, so that the $1,200,000 will be deducted from their deficiency claim and, under the aforementioned assumptions, would hold a deficiency claim of $70,000,000.  To be clear, the lender concession will apply only if, in fact, there is a deficiency claim.

Debtors a requirement to establish the non-existence of claims in the Chapter 11 Cases and argues, without any basis in fact or law, that the Debtors are somehow impairing the rights of parties by establishing a bar date, which will facilitate the Debtors' and all other parties' assessment of the claims pool in the Chapter 11 Cases for purposes of establishing and prosecuting a chapter 11 plan and claims reconciliation—two fundamental tenets of the chapter 11 process that are not only supported by established precedent, but are *contemplated* by the Bankruptcy Rules.  The Court should not be persuaded by the U.S. Trustee's unnecessary and unfair characterizations.  As the U.S. Trustee's positions are wholly unsupported by the law, they should be rejected, and the Bar Date Motion should be approved.

## APPROVAL OF THE KEIP

### I.    The Court Should Consider Approval of the KEIP Under Section 503(c)(3) of the Bankruptcy Code Because the Debtors Have Established That the KEIP Is Properly Incentivizing

9.    Section 503(c)(1) of the Bankruptcy Code "requires the Court to apply specific standards if a bankruptcy court is asked to authorize payments to insiders for the purpose of inducing insiders to remain in a debtor's employ."  *In re Global Home Prods., LLC*, 369 B.R. 778, 787 (Bankr. D. Del. 2007).  At issue is whether the Debtors' proposed KEIP is such a "pay to stay" compensation plan or whether the KEIP is in fact a "pay for value" compensation plan "intended to create incentive[s] for management," in which case section 503(c)(1) does not apply.  The test is whether the plan is primarily motivated to retain personnel and not to incentivize them to achieve specific results.  *Global Home Prods.*, 369 B.R. at 785 ("The entire analysis changes if a bonus plan is not primarily motivated to retain personnel."); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) ("[T]he Court reads section 503(c)(1) to mean 'a transfer made to ... an insider of the debtor for the *[primary]* purpose of inducing such person to remain with the debtor's business.'" (alterations

in original)).  Indeed, "[a]ny payment to an employee, including regular wages, has at least a partial

purpose of retaining the employee.  Therefore, if the Court did not apply a materiality standard, all

payments to insiders would be subject to 503(c)(1), which would be an absurd result."  *Nellson

Nutraceutical*, 369 B.R. at 802; *Global Home Prods.*, 369 B.R. at 786.

10.     Applying this primary-purpose test, courts hold that a compensation plan is

incentivizing, and therefore section 503(c)(1) is not applicable, where the "Debtors' primary goal

[is] to create value by motivating performance," *Global Home Prods.*, 369 B.R. at 786, and where

the plan's proposed benchmarks "are difficult targets" rather than "lay-ups." *In re Dana Corp.*,

358 B.R. 567, 582 (Bankr. S.D.N.Y. 2006).  That a plan requires participants to be employed by

the debtor to obtain payments does not make the plan primarily retentive.  *See, e.g.*, *Global Home

Prods.*, 369 B.R. at 781, 786 (approving incentive plan that required employees to be employed

by the debtors to be eligible for payments); *In re Synagro Techs., Inc.*, Case No. 13-11041 (BLS)

(Bankr. D. Del. May 13, 2013) [Docket No. 132] (same); *In re The PMI Grp., Inc.*, Case No. 11-

13730 (BLS) (Bankr. D. Del. Feb. 23, 2012) [Docket No. 186] (same).

11.     Targeted incentive plans that employ metrics based on achieving certain

sale values have been recognized by courts in this District as creating value by motivating

performance.  *See e.g.*, *In re Williams Indus. Servs. Grp. Inc., et al.,* Case No. 23-10961 (BLS)

(Bankr. D. Del. Sept. 13, 2023) [Docket No. 327] (approving key employee incentive plan where

incentive payments would be paid only upon the consummation of a sale of substantially all of the

debtors' assets); *In re Clovis Oncology, Inc., et al.*, Case No. 22-11292 (JKS) (Bankr. D. Del. Mar.

16, 2023) [Docket No. 480] (approving key employee incentive plan where incentive payments

would be paid only upon the closing of one or more sales of the debtors' assets); *In re Legacy EJY

Inc., et al.*, Case No. 22-10580 (JKS) (Bankr. D. Del. Sept. 22, 2022) [Docket No. 454] (approving

key employee incentive plan where an incentive payment would be paid only upon the consummation of a sale of all of the debtors' U.S. assets); *In re Real Industry, Inc.*, Case. No. 17-12464 (KJC) (Bankr. D. Del. Jan. 17, 2018) (approving an incentive plan based on three independent performance metrics:  value of assets sold, targets relating to net cash flow, and EBITDA targets).

12.     The unrebutted evidence demonstrates that the KEIP presents challenging goals that will be achieved, if at all, only through the persistent, critical efforts of the KEIP Participants.  The KEIP is therefore solely incentivizing and must be evaluated under section 503(c)(3) of the Bankruptcy Code.

13.     Under the terms of the KEIP, each KEIP Participant is eligible to receive one (1) lump-sum KEIP payment (each, a "**Fixed Payment**"), based upon a reasonable percentage of each KEIP Participant's annual salary and annual target bonus, upon the closing of a Court-approved Sale, or shortly thereafter.  The Debtors approved the KEIP and commenced the Chapter 11 Cases without a stalking horse bidder for the Assets.  Accordingly, there is no guarantee that a Court-approved Sale will close, and in the absence of a Sale, the KEIP Participants will not receive any KEIP Payment.  To ensure that a value-maximizing transaction or series of transactions is possible, the KEIP Participants, who play critical roles in supporting the Sale Process, including meeting with prospective bidders, engaging with all parties regarding the Assets, responding to substantial requests for diligence, communicating with stakeholders, and leading the Debtors' advisors through the Sale Process, have expended and will be required to continue to expend tremendous effort, all while juggling the demands of the Chapter 11 Cases and the day-to-day administration of the Debtors' business affairs (including, as of the Petition Date, 101 locations, 2,074 employees, and 443,000 members).

14.     Additionally, two (2) of the KEIP Participants are eligible to receive an additional KEIP payment (each, an "**Upside Payment**," and collectively with the Fixed Payments, the "**KEIP Payments**") if the value of a Sale meets or exceeds target thresholds, which are based on total enterprise value, and either (i) the successful purchaser of the Assets is a party other than the Debtors' prepetition lenders; or (ii) the successful bid for the Assets is an overbid submitted by the Debtors' prepetition lenders.  The Sale-target thresholds are market based and correlate to multiples of EBITDA, which is a recognized valuation metric, and such thresholds are set at levels intended to reflect Sale valuations that would require KEIP Participants to contribute significant efforts to support a Sale.  Contrary to the U.S. Trustee's and the Committee's objections, which lack any relevant precedent, the amount of the Debtors' outstanding funded debt is not a relevant metric in determining the value of the KEIP under the circumstances given that the Debtors were substantially overleveraged and the Debtors determined, with the assistance of their advisors, that the market value of the Assets would in all likelihood be substantially less than the Debtors' debt obligations, rendering the use of such metric impractical.  Moreover, consideration of the amount of debt in the context of Court approval of a KEIP is completely outside of the control of the KEIP Participants (a primary consideration of any KEIP program) and ignores the myriad of substantial benefits of closing a going-concern Sale of the Assets and business(es), including the preservation of jobs, the assumption of leases and contracts (and payment of cure amounts), the assumption of liabilities, and the existence of a future business partner—all of which benefit of the Debtors' unsecured creditors.

15.     While the U.S. Trustee and Committee argue that the KEIP Payments are mere retention payments, the KEIP Payments are not payable upon the occurrence of an arbitrary end date that requires a participant to do nothing but remain employed.  Here, the KEIP Participants

are not awarded KEIP Payments unless the primary goal of the Chapter 11 Cases is achieved—the closing of a Sale.  The U.S. Trustee argues that the fact that the KERP Payments also require the closing of a Sale somehow means that the KEIP Payments are retentive.  While typical retention payments vest upon the passing of a date certain, the Debtors' lenders would only approve the KERP Payments if a Sale is consummated, thus increasing the bar for the KERP Participants. While the KEIP requires the closing of a Sale (when no Sale existed at the time it was approved by the Debtors, the Chapter 11 Cases were filed, and the KEIP/KERP Motion and Objections were filed), the fact that the same condition was also required by the lenders for the KERP Participants does not render the conditionality retentive.  As such, the U.S. Trustee's argument that there is no distinction between the KERP payments and the KEIP Payments falls flat where, as here, (i) the Debtors have imposed on KERP Participants an incentivizing metric that would not typically be required in a standard retention plan, and (ii) participants in the Debtors' retention plan have no obligation to support a Sale, whereas KEIP Participants must actively support the Sale.   Said otherwise, the fact that the KERP has more exacting requirements than many other KERPs that this Court regularly approves is not reason enough to deem consummation of a Sale a retentive metric.  The U.S. Trustee has no basis and should be overruled.

16.    The Committee's irresponsible and baseless commentary that the KEIP Participants could do nothing to support the Sale and essentially skate by while the Debtors' investment banker markets the Assets is unsubstantiated (to the contrary, various bidders have required significant time and commitment from the KEIP Participants themselves, and not just Moelis, to advance their diligence and evaluation of the terms by which they would be willing to provide a bid), ignores the amount of work required of the KEIP Participants to close a Sale and is insulting to the commitment employed by the KEIP Participants to date.  *See* Committee Obj.

at ¶ 4.[4]  It also goes against the weight of authority in this District that successfully completing a sale transaction, in and of itself, is incentivizing.  *See, e.g.*, *In re Orexigen Therapeutics, Inc.*, Case No. 18-10518 (KG) (Bankr. D. Del. Apr. 23, 2018) (approving, over the objection of the unsecured creditors' committee, an insider incentive plan tied to sale proceeds that were to be paid at closing and supported by the debtors' postpetition lender); *In re CST Indus. Holdings Inc.*, Case No. 17-11292 (BLS) (Bankr. D. Del. Oct. 13, 2017) (approving, over the objection of the unsecured creditors' committee, an insider incentive plan tied to sale proceeds); *In re RadioShack Corp.*, Case No. 15-10197 (KJC) (Bankr. D. Del. Mar. 4, 2015) (approving, over the objection of the U.S. Trustee, an insider incentive plan tied to sale proceeds).  Courts in this District have recognized that even when the only remaining responsibility of those who stand to benefit from a key employee incentive plan is to ensure that a stalking horse bid closes, such a plan should still be approved as a permissible incentive plan.  *See* Tr. of Hr'g before the Honorable Christopher S. Sontchi at 89:5–23 (*In re Diamond Glass, Inc.*, Case No. 08-10601 (CSS)) (Bankr. D. Del. May 8, 2008) ("even if the only thing management has to do and the covered employees have to do is hold this company together for the stalking horse bidder to close, [the Court doesn't] find that in and of itself primarily retentive . . . . Stalking horse cases, stalking horse bidders walk away.  There are material adverse changes that occur . . . [and] I don't find that just getting to a plan or just getting to a closing by a stalking horse bidder in and of itself is retentive.  I think there's a lot that can go wrong.").

17.    The Court has recently rejected the U.S. Trustee's and Committee's arguments.  *See In re Proterra Inc.*, Case No. 23-11120 (BLS) (Bankr. D. Del. Aug. 7, 2023)

---

[4]    The Debtors' advisors have had numerous meetings with the Committee's professionals in an attempt to resolve their issues and have provided detailed information regarding the extensive efforts of management and significant precedent to support the KEIP.  The Committee has provided no information to support its assertions in its objection and provided absolutely no precedent in support of any of its allegations.

[Docket Nos. 230, 284, 300, 343 & 346].  In *Proterra*, the debtors proposed a key employee incentive plan with a tiered payout structure based, in part, on proceeds realized from their postpetition sale process where the debtors had not secured a stalking horse bid in advance of commencing the cases.  *See id.* at Docket Nos. 230 & 300.  The U.S. Trustee objected on the basis that the Debtors had not provided sufficient evidence that the award amounts were difficult to achieve.  *See id.* at Docket No. 284.  In approving the key employee incentive plan over the U.S. Trustee's objection, the Court stated:

> I do not agree with the United States Trustee that there's effectively no meaningful target or no beneficial target for purposes of an incentive program, and, again, in so ruling, I follow the mechanics of the program as it's been laid out and I do note that there will be no payments in the absence of a transaction that is not in prospect today, not in hand, not presented, not documented, but that there would be no payment in the absence of a closing of a transaction that provides significant and material value to the estate.
>
> . . .
>
> As I mentioned, a lot of these are very easy. If you've got a stalking horse and it just says, Improve the number, you'll get a piece, not every case presents that. This case emphatically does not present that, and so we need a structure, and the debtor has determined, with the advice and guidance of its professionals, that it needs to develop that program and that it has done so in a way that is both, consistent with the marketplace and long experience, but also responsive to the particular considerations of the executives who are to be covered by the program.

*Id.* at Docket No. 343, Hr'g Tr. at 60:4–12; 61:21–62:5.

18.    Here, as in *Proterra*, the Debtors have not yet secured a stalking horse bid, and require the substantial efforts of the KEIP Participants to preserve and maximize value and, ultimately, secure a binding agreement for the purchase of the Assets.  The Sale of the Assets is not a foregone conclusion, and there remains substantial risk that a Sale can be secured and executed.  Moreover, the target thresholds were reasonably calculated to further incentivize certain of the KEIP Participants who would be expected to expend extraordinary efforts to achieve a value-

maximizing result for the estates.  Accordingly, the KEIP is reasonable, market-based, and consistent with established precedent.

19.     In sum, the KEIP Payments adequately incentivize the applicable KEIP Participants to support a value-maximizing Sale Process and achieve the closing of a Sale for the benefit of the Debtors' estates and stakeholders.

## II.     The Facts and Circumstances of the Chapter 11 Cases Justify Approval of the KEIP Pursuant to Section 503(c)(3) of the Bankruptcy Code

20.     It is well established that the business judgment rule is the applicable standard for approval of the KEIP, whether approval is sought under section 363(b)(1) of the Bankruptcy Code or under the "facts and circumstances" test of section 503(c)(3) of the Bankruptcy Code, which courts have concluded is "nothing more than a reiteration of the standard under 363." *See In re Nobex Corp.*, Case No. 05-20050 (MFW) (Bankr. D. Del. Jan. 12, 2006) [Docket No. 194] Hr'g. Tr. at 86:23–24.

21.     Numerous courts have concluded that performance-based incentive compensation programs like the KEIP do not constitute primarily retention-based plans and thus are not subject to the limitations of section 503(c)(1) of the Bankruptcy Code.  *See, e.g.*, *In re Glob. Home Prods., LLC*, 369 B.R. 778, 785 (Bankr. D. Del. 2007); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007).  Any retentive effect that the KEIP may have is collateral to its primary incentivizing purpose and does not render the KEIP a retention plan subject to the strictures of section 503(c)(1) of the Bankruptcy Code.  *See In re Glob. Home Prods.*, 369 B.R. at 786 ("The fact, as Debtors pointed out, that all compensation has a retention element does not reduce the Court's conviction that Debtors' primary goal [is] to create value by motivating performance.  All companies seek to retain employees they value by fairly compensating them."); Hr'g Tr. 124:12–19, *In re Pac. Sunwear of Cal., Inc.*, Case No. 16-10882 (LSS) (Bankr. D. Del.

32007828.7

May 10, 2016) ("All compensation has a retentive aspect to it. So the question is whether the plan, as proposed, is primarily one that incentivizes management to bring about a positive result for the debtors and the parties."). As discussed above, the KEIP is primarily one that incentivizes and motivates the KEIP Participants to achieve a Sale closing. Under these circumstances, section 503(c)(1) of the Bankruptcy Code does not apply to the KEIP.

22.    Rather, the KEIP falls squarely under section 503(c)(3) of the Bankruptcy Code. Courts in this district, and others, routinely apply a standard of review akin to the business judgment standard in conducting an analysis under section 503(c)(3) of the Bankruptcy Code. *See In re Bumble Bee Parent, Inc.*, Case No. 19-12502 (LSS) (Bankr. D. Del. Jan. 13, 2020) ("Most courts state that this test [under section 503(c)(3) of the Bankruptcy Code] is the same as the business judgment test."); *In re Patriot Coal Corp.*, 492 B.R. 518, 531 (Bankr. E.D. Mo. 2013) ("[J]ustified by the facts and circumstances of the case . . . means that the business judgment standard of Section 363(b) applies"); *see also* 4 Collier on Bankruptcy ¶ 503.17[1] (16th ed. 2019) (noting that the "business judgment test" applies to section 503(c)(3) of the Bankruptcy Code). Critical questions regarding which strategic goals should be prioritized, who should be tasked with achieving those goals, and how such individuals are directed or incentivized to achieve such goals, sit at the heart of the Debtors' business judgment. *See In re Glob. Home Prods.*, 369 B.R. at 784 ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment.").

23.    In tailoring the KEIP to maximize the value of their estates, the Debtors considered all information reasonably available, including their advisors' understanding of the market for the Debtors' business and Assets, the roles of each KEIP Participant in the Sale Process, and the difficulty in attracting bidders and closing a transaction. In addition, the Debtors, their

32007828.7

14

advisors, and various parties in interest, including the Debtors' lenders, negotiated the KEIP at arms' length for at least a month to determine the appropriate structure of the KEIP under the circumstances of the Chapter 11 Cases. The KEIP was ultimately approved by such parties and the Debtors' independent director, whom all recognized the merit in incentivizing the KEIP Participants to preserve and create value. Ultimately, in their sound business judgment, the Debtors determined that tying the KEIP Payments to the closing of a Court-approved Sale and to increasing Sale target thresholds based on total enterprise value best positioned them to maximize value for their estates. As set forth herein, the KEIP satisfies the applicable standards and should be approved.

## APPROVAL OF THE BAR DATE MOTION

24.    The establishment of a claims bar date serves one of the principal purposes of bankruptcy law: "to secure within a limited period the prompt and effectual administration and settlement of the debtor's estate." *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995); *see also In re Energy Future Holdings Corp.*, 522 B.R. 520, 538 (Bankr. D. Del. 2015). Furthermore, "[t]he objectives of finality and fixing the universe of claims permeate the law of bankruptcy, and in achieving those ends, the setting of a bar date is no more unfair, assuming reasonable notice, than is a statute of limitations, a finality concept firmly embedded in our legal system generally." *Energy Future Holdings*, 522 B.R. at 527 (citing *In re Eagle-Picher Indus., Inc.*, 137 B.R. 679, 682 (Bankr. S. D. Ohio 1992). The fixing of a bar date allows the Debtors and parties in interest to expeditiously determine and evaluate the liabilities of the Debtors' estates, which establishes the framework for a plan and claims process that is expressly contemplated by the Bankruptcy Rules. The absence of such a deadline, in contrast, prolongs creditor uncertainty,

32007828.7

increases the costs and expenses incurred by the Debtors in connection with the claims reconciliation process, and may delay or even derail the claims reconciliation process.

25.     The Debtors have sought approval of a standard bar date process that has been approved by this Court on countless occasions.  The Debtors' proposed proof of claim form is in substantially the same form as Official Form 410, and the Debtors have proposed to send all known parties in interest, including actual creditors, members, contract counterparties, and other parties with whom the Debtors have conducted business, the same notice, informing such parties of the deadline by which any party in interest must submit a proof of claim, and providing detailed instructions on how to submit a proof of claim form, access case information, and providing information about material deadlines in the Chapter 11 Cases.  The Debtors have sought bar dates that are consistent with the Bankruptcy Rules and established precedent in this jurisdiction.  In sum, the Debtors' proposed bar date procedures are routine, supported by established law and precedent, and should be approved.

26.     The U.S. Trustee's objection ignores the legitimate functions of a claims bar date and incorrectly asserts that the Debtors' customers are prejudiced by the requirement that they file proofs of claim, all without reference to any precedent in support of the U.S. Trustee's position.  Moreover, the U.S. Trustee unjustifiably presumes that the Debtors will improperly file Schedules that will erroneously omit claims of the Debtors' members, without regard to whether the Debtors' books and records actually reflect such claims, and notwithstanding the facts and

32007828.7

circumstances of the Chapter 11 Cases.[5]    The U.S. Trustee's reliance on H.R. Rep. 95-595 is misplaced and conflates the requirement to file a proof of claim, which is never mentioned in H.R. Rep. 95-595, with Congress's desire to elevate the priority of certain claims to enhance consumer bargaining power.  *See* H.R. Rep. 95-595, at *188 (Sept. 8, 1977) ("Because of his ignorance and his inability to bargain with a retail merchant, [t]he [individual consumer] is unable to do a credit investigation or obtain special terms from the merchant, as a true creditor may do. [. . .] In order to remedy this problem and to reorganize the position of consumer creditors as different from that of business creditors, the bill provides a priority for consumer creditors of a bankrupt business.")).  In fact, Congress's concern that consumers may lack awareness of their rights and the circumstances of the Chapter 11 Cases weighs in favor of Debtors' proposed procedures.  The Debtors are proposing to send known parties in interest, including members, with actual notice of the proposed bar date procedures and have clearly and unambiguously described the process for filing proofs of claim, while providing such parties with the forms and information necessary to easily file proofs of claim, if applicable.   This approach not only provides parties with substantial notice, but it is the standard in this jurisdiction, and consistent with recent chapter 11 cases filed in this Court involving fitness clubs.  *See, e.g.*, *In re Town Sports Int'l, LLC, et al.*, ECF 367, Case No. 20-12168 (CSS) (Oct. 29, 2020) (approving standard bar date procedures and not exempting members from the requirement to file a proof of claim); *In re 24 Hour Fitness WorldWide, Inc., et al.*, ECF 785, Case No. 20-11556 (KBO) (Aug. 24, 2020) (same).  Accordingly, the Debtors submit

---

[5]    The Debtors anticipate scheduling the claims that exist in the Debtors' books and records as of the Petition Date, including various litigation claims (for example, claims or demands related to allegations of personal injury that have been submitted to the Debtors or otherwise brought to the Debtors' attention).  As of the Petition Date, the Debtors are unaware of any outstanding claims for pre-paid membership fees.  To the extent any such fees were owed upon closure of any clubs, they have been refunded, and the Debtors anticipate that members' pre-paid membership fees will continue to be honored in the ordinary course of business.  To the extent that the circumstances change, the Debtors reserve the right to amend their Schedules and provide any affected parties with a supplemental bar date, as necessary.

32007828.7

that the proposed procedures set forth in the Bar Date Motion are entirely consistent with

applicable law and precedent and should be approved.

Dated: Wilmington, Delaware  **YOUNG CONAWAY STARGATT & TAYLOR, LLP**
      September 9, 2024

*/s/ Allison S. Mielke*
Michael R. Nestor (No. 3526)
Sean T. Greecher (No. 4484)
Allison S. Mielke (No. 5934)
Timothy R. Powell (No. 6894)
Rebecca L. Lamb (No. 7223)
Benjamin C. Carver (No. 7176)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:  mnestor@ycst.com
        sgreecher@ycst.com
        amielke@ycst.com
        tpowell@ycst.com
        rlamb@ycst.com
        bcarver@ycst.com

*Counsel to the Debtors*
*and Debtors in Possession*

32007828.7