**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>BLINK HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-11686 (JKS)<br><br>(Jointly Administered)<br><br>**Ref. Docket Nos. 81, 348**<br><br>**Objection Deadline:**<br>**September 13, 2024 at 4:00 p.m. (ET)** |

**NOTICE OF FILING OF STALKING HORSE SUPPLEMENT**

        **PLEASE TAKE NOTICE** that on August 16, 2024, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed the *Debtors' Motion for Entry of Orders (I) (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets, (C) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof, and (D) Granting Related Relief; and (II) (A) Authorizing and Approving the Debtors' Entry into an Asset Purchase Agreement, (B) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (C) Approving the Assumption and Assignment of the Assumed Contracts, and (D) Granting Related Relief* [Docket No. 81] (the "**Bidding Procedures Motion**")[2] with the United States Bankruptcy Court for the District of Delaware (the "**Court**").  On September 10, 2024, the Court entered an order  approving the relief requested in the Bidding Procedures Motion and establishing certain procedures for the designation and approval of a stalking horse bidder for the Debtors' assets [Docket No. 348] (the "**Bidding Procedures Order**").

        **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures Order, the Debtors are authorized, in consultation with the Consultation Parties, to designate a stalking horse bidder (the "**Stalking Horse Bidder**"), whose Qualified Bid shall serve as the stalking horse bid (the "**Stalking Horse Bid**").

---

[1]    The last four digits of Blink Holdings, Inc.'s federal tax identification number are 6354.  The mailing address for Blink Holdings, Inc. is 45 West 45th Street, 10th Floor, New York, New York 10036. Due to the large number of debtors in these chapter 11 cases, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/BlinkFitness, or by contacting the undersigned counsel for the Debtors.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Bidding Procedures Motion or the Bidding Procedures Order, as applicable.

**PLEASE TAKE FURTHER NOTICE** that on September 10, 2024, the Purchaser (defined below) has executed and delivered a copy of that certain *Asset Purchase Agreement* (as amended, supplemented, or otherwise modified by the parties thereto, and including the exhibits, schedules or attachments thereto, the "**Stalking Horse APA**") by and among Debtor Blink Holdings, Inc., its debtor affiliates, and Pinnacle US Holdings LLC, a Delaware limited liability company (d/b/a PureGym, the "**Purchaser**") to the Debtors.  The Purchaser is a wholly owned subsidiary of PureGym Ltd., whose investors include Leonard Green & Partners and KKR.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures Order, in the event that the Debtors designate a Stalking Horse Bidder and seek to enter into a Stalking Horse APA on or prior to September 20, 2024, at 4:00 p.m. (prevailing Eastern Time) (the "**Stalking Horse Supplement Deadline**"), the Debtors shall file a supplement to the Bidding Procedures Motion (this "**Stalking Horse Supplement**") seeking approval of the same, including any bid protections that may be granted to the Purchaser in connection with the Stalking Horse APA (the "**Bid Protections**").

**PLEASE TAKE FURTHER NOTICE** that a summary of material terms of the Stalking Horse APA, including the Stalking Horse Supplement provisions required pursuant to the Bidding Procedures Order, is attached hereto as <u>Exhibit A</u>, and the Stalking Horse APA is attached hereto as <u>Exhibit B</u>.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will file the proposed form of the Sale Order agreed to by the Purchaser on or before 4:00 p.m. (prevailing Eastern Time) on October 4, 2024.

**PLEASE TAKE FURTHER NOTICE** that objections to the designation of a Stalking Horse Bidder or any of the terms of a Stalking Horse Bid, including the Bid Protections (the "**Stalking Horse Objection**") shall (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Court and served on the Stalking Horse Notice Parties **no later than 4:00 p.m. (prevailing Eastern Time) on September 13, 2024** (the "**Stalking Horse Objection Deadline**").

**PLEASE TAKE FURTHER NOTICE** that if a Stalking Horse Objection is timely filed, the Debtors will schedule a hearing regarding such Stalking Horse Objection as soon as reasonably practicable.  If no Stalking Horse Objection is timely filed, upon the expiration of the Stalking Horse Objection Deadline, the Debtors will submit to the Court, under certification of counsel, the order attached hereto as <u>Exhibit C</u> (the "**Stalking Horse Approval Order**"), approving the designation of the Stalking Horse Bidder and Bid Protections, which order may be entered by the Court without a hearing.  A declaration in support of the Stalking Horse Approval Order (the "**Stalking Horse Declaration**") is attached hereto as <u>Exhibit D</u>.

Dated: Wilmington, Delaware
September 10, 2024

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Sean T. Greecher*
Michael R. Nestor (No. 3526)
Sean T. Greecher (No. 4484)
Allison S. Mielke (No. 5934)
Timothy R. Powell (No. 6894)
Rebecca L. Lamb (No. 7223)
Benjamin C. Carver (No. 7176)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email: mnestor@ycst.com
        sgreecher@ycst.com
        amielke@ycst.com
        tpowell@ycst.com
        rlamb@ycst.com
        bcarver@ycst.com

*Counsel to the Debtors and Debtors in Possession*

**EXHIBIT A**

**Material Terms of Stalking Horse APA**

| SUMMARY OF STALKING HORSE APA[1] | |
|---|---|
| **Parties** | The Stalking Horse APA is entered into by and among Blink Holdings, Inc., a Delaware corporation (the "Company"), the subsidiaries of the Company listed on Annex 1 (together with the Company, the "Sellers"), and Pinnacle US Holdings LLC, a Delaware limited liability company (d/b/a Pure Gym, the "Purchaser").  Purchaser is an unrelated third party that has no connections to the Company. |
| **Purchase Price**<br><br>(Stalking Horse APA, Section 2.3) | The purchase price for the Purchased Assets shall be (i) (A) US $105,000,000 (the "Base Purchase Price") in cash, *less* (B) the Seller Property Tax Amount as determined pursuant to Section 2.3(c) of the Stalking Horse APA, *less* (C) the aggregate amount of the Deferred Rent Adjustment for all Assumed Leases as of the Closing (the "Total Deferred Rent Adjustment"), *less* (D) the excess, if any, of (x) the Closing PTO Amount as determined pursuant to Section 2.3(c) of the Stalking Horse APA *over* (y) an amount equal to one hundred five percent (105%) of the sum of the aggregate PTO amounts with respect to the Offer Employees as set forth in Section 3.17(f)(ii)(B) of the Disclosure Schedule (the "Closing PTO Adjustment"), *less* (E) the excess, if any, of the Actual Customer Credits as determined pursuant to Section 2.3(c) of the Stalking Horse APA *over* an amount equal to one hundred five percent (105%) of the Customer Credits amount with respect to the Acquired Gym Locations as set forth in Section 3.17(f)(i)(B) of the Disclosure Schedule (the "Customer Credit Adjustment"), *plus* (F) an amount equal to fifty percent (50%) of the amount (if any) by which the aggregate Buyer Cure Costs arising out of Assumed Contracts as of the Closing Date are less than Two Million Dollars ($2,000,000) (the "Buyer Cure Cost Adjustment" and the resulting amount in this clause (i) (after giving effect to any reductions pursuant to the preceding clauses (B)-(E) and any increase pursuant to the preceding clause (F)), the "Closing Cash Payment") and (ii) assumption of the Assumed Liabilities, including Buyer Cure Costs (clauses (i) and (ii), collectively, the "Purchase Price"); provided, however, that Buyer reserves the right to increase the Purchase Price, subject to the Bidding Procedures Order and applicable Law and to the extent the amount of the Purchase Price payable in cash is increased, the Base Purchase Price shall refer to such increased cash amount. |
| **Acquired Assets**<br><br>(Stalking Horse APA, Section 2.1) | As more fully detailed in the Stalking Horse APA attached hereto, the Acquired Assets consist of the following assets, properties and rights of Seller and its Subsidiaries:<br>(a)  all Business Intellectual Property, including, but not limited to, (i) all intellectual property rights arising from or relating to: the names "Blink" and "Blink Fitness or any derivations thereof, all algorithms, application programming interfaces, designs, net lists, data, databases, |

---

[1]  Capitalized terms used but not defined in this summary have the meanings assigned to them in the Stalking Horse APA.

| | |
|---|---|
| **SUMMARY OF STALKING HORSE APA**[1] | |

| | |
|---|---|
| | data collections, diagrams, inventions (whether or not patentable), know how, methods, processes, proprietary information, protocols, schematics, specifications, tools, systems, software, software code (in any form, including source code and executable or object code), subroutines, techniques, user interfaces, uniform resource locators, web sites, social media sites and accounts, mobile applications, works of authorship, and other similar materials, (ii) all documentation related to any of the foregoing, including instruction manuals, laboratory notebooks, prototypes, samples, studies, and summaries, whether or not embodied in any tangible form and whether or not specifically listed herein, and (iii) all related technology, that are used in, incorporated in, embodied in, displayed by, or relate to, or are used in connection with the foregoing; |
| (b) | all tangible assets owned or leased by Sellers used by, held for use in or relating to the Business or Acquired Gym Locations, including all gym and exercise equipment and machinery, fixtures, trade fixtures, chairs, supplies, shelving, refrigeration equipment, computers, point-of-sale systems, other computer systems and servers, hardware, inventory management equipment, branding, signs, and signage located at the Acquired Gym Locations, any warehouse, or any real property leased by Sellers pursuant to a Lease; |
| (c) | all Assumed Leases, together with (to the extent of the Sellers' interest therein) the buildings, fixtures and improvements located on or attached to the underlying real property, and all rights arising thereunder, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto, subject to the rights of the applicable landlord (including rights to ownership or use of such property) under such Assumed Leases; |
| (d) | all Assumed Contracts and any rights thereunder; |
| (e) | all Inventory and Merchandise to the extent relating to the Business, whether at any Acquired Gym Locations, any warehouse, or in transit to the Acquired Gym Locations; |
| (f) | all memberships and member, customer, and end-user data and information, including information related to memberships, customer purchases, or services provided to members or customers at the Acquired Gym Locations, in each case, to the extent permitted to be assigned, used, or provided by Sellers under applicable Laws; |
| (g) | all credit card receivables relating to the Business; |
| (h) | all trade receivables, whether current or non-current, and all other accounts receivable, including payment processor receivables, for sales made prior to the Closing relating to the Business; |
| (i) | any Permit used by, held for use in or relating to the Business, to the extent transferable; |
| (j) | any and all books, records, and other data used by, held for use in or relating to the Business, including customer lists, customer and end-user |

| SUMMARY OF STALKING HORSE APA[1] | |
|---|---|
| | information and data, supplier lists, mailing lists, accounting records, documentation or records, catalogs, and printed materials relating thereto to the extent available (subject to <u>Section 5.6</u> of the Stalking Horse APA); |
| | (k)  all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including any such item relating to the payment of Taxes other than the Excluded Tax Assets) used by, held for use in or relating to the Business; |
| | (l)  any promotional materials, displays, media content, and other property or equipment owned or leased to Sellers and used by, held for use in or relating to the Business; |
| | (m)  to the extent transferable, all Intellectual Property Licenses, including the licenses set forth on Section 3.13(f) of the Disclosure Schedule; |
| | (n)  financial, marketing, and business data, pricing and cost information, business and marketing plans, and other information, files, correspondence, records, data, plans, reports, and recorded knowledge, historical trademark files, prosecution files of Sellers in whatever media retained or stored, including computer programs and disks, including files in the possession of Sellers and used by, held for use in or relating to the Business, and all rights and privileges of the Sellers in respect thereof; |
| | (o)  all goodwill associated with the Business or the Acquired Assets; |
| | (p)  product designs, product names, trade names, design rights, tech packs, artwork, archival materials, and advertising materials, copy, commercials, images, and artwork used by, held for use in or relating to the Business; |
| | (q)  royalty payments and licensing receivables generated by the Business; |
| | (r)  all Business Systems and Sellers' telephone, facsimile numbers, and email addresses used by, held for use in, or relating to the Business; |
| | (s)  all Purchased Actions; |
| | (t)  all of Sellers' rights under warranties, indemnities, and all similar rights against third parties to the extent transferable and related to any Acquired Assets; |
| | (u)  the Gym Locations Cash Amount; and |
| | (v)  any insurance claims, and related proceeds, related to an Acquired Asset, an Assumed Liability or the Business. |
| | Notwithstanding the foregoing, the transfer of the Acquired Assets pursuant to the Stalking Horse APA shall not include the assumption of any Liability related to the Business or any of the Acquired Assets unless Purchaser expressly assumes that Liability pursuant to <u>Section 2.2</u> of the Stalking Horse APA. |
| **Excluded Assets** | Nothing in the Stalking Horse APA shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and the Sellers shall retain all |

| | |
|---|---|
| **SUMMARY OF STALKING HORSE APA[1]** | |
| (Stalking Horse APA, Section 1.1) | right, title and interest to, in and under the Excluded Assets.  "Excluded Assets" shall mean each of the Sellers' assets that is not an Acquired Asset, including: |

<table>
<tr><td>(a)</td><td>all files, books, records and documents prepared in connection with this Agreement or the transactions contemplated hereby or primarily relating to the Bankruptcy Cases, all minute books, corporate records (such as stock registers), and organizational documents of Sellers, Tax Returns, other Tax work papers, and all other documents not related to the Business, the Acquired Gym Locations, the Acquired Assets, the Assumed Liabilities, or the Covered Employees;</td></tr>
<tr><td>(b)</td><td>all files, books, records, and documents that are subject to Sellers' attorney-client privilege or the work-product immunity doctrine except to the extent such documents or communications are related to Buyer's continued conduct of the Business after the Closing or any Acquired Assets or Assumed Liabilities;</td></tr>
<tr><td>(c)</td><td>all files, books, records, and documents not related to the Business, the Acquired Gym Locations, the Acquired Assets, the Assumed Liabilities, or the Covered Employees or the disclosure or transfer of which is prohibited by applicable Laws;</td></tr>
<tr><td>(d)</td><td>any Contract that is not an Assumed Agreement (including any franchise agreement or other Contract with a franchisee of the Business);</td></tr>
<tr><td>(e)</td><td>any Lease that is not an Assumed Lease;</td></tr>
<tr><td>(f)</td><td>any Excluded Tax Assets;</td></tr>
<tr><td>(g)</td><td>any prepaid insurance listed on Schedule A of the Stalking Horse APA;</td></tr>
<tr><td>(h)</td><td>all avoidance actions under chapter 5 of the Bankruptcy Code or any Causes of Action that are not an Acquired Asset;</td></tr>
<tr><td>(i)</td><td>any security deposits or pre-paid expenses paid prior to the Closing Date and not related to the Business, the Acquired Gym Locations, the Acquired Assets, the Assumed Liabilities, or the Covered Employees;</td></tr>
<tr><td>(j)</td><td>except as set forth in clause (v) of the definition of "Acquired Assets" within the Stalking Horse APA, all insurance policies and binders, all claims, refunds, and credits from insurance claims, insurance policies, or binders due or to become due with respect to such policies or binders and all rights to proceeds thereof;</td></tr>
<tr><td>(k)</td><td>all equipment, tools, or other tangible assets to the extent constituting the property of any employees or independent contractors of Sellers;</td></tr>
<tr><td>(l)</td><td>all shares of capital stock or other equity interests of any Seller and all securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller or any other Person;</td></tr>
<tr><td>(m)</td><td>all Company Benefit Plans (including all assets, trusts, insurance policies and administration service contracts related thereto); and</td></tr>
<tr><td>(n)</td><td>all assets, properties, rights, interests, and Claims that (i) are not, and that do not relate to, any Acquired Assets or (ii) are described on</td></tr>
</table>

| SUMMARY OF STALKING HORSE APA[1] | |
|---|---|
| | Schedule A of the Stalking Horse APA (which may be supplemented to add additional assets, properties, rights, interests and Claims in the sole discretion of Buyer at any time prior to Closing). |
| **Assumed Liabilities**<br><br>(Stalking Horse APA, Section 2.2) | Purchaser shall assume no liability or obligation of the Sellers, or of any predecessor or any Affiliate of any of the Sellers, except the liabilities and obligations expressly set forth in <u>Section 2.2</u> of the Stalking Horse APA (collectively, the "<u>Assumed Liabilities</u>"), which Purchaser or its permitted assignee, as the case may be, shall on the terms and subject to the conditions of the Stalking Horse APA, assume at the Closing, and thereafter pay, perform and discharge in accordance with their respective terms, subject to all defenses or counterclaims with respect thereto:<br><br>(a) all Liabilities to the extent arising under the Assumed Agreements to the extent such Liabilities arise from and after the Closing Date, including, without limitation, any deferred rental amounts payable pursuant to the terms of any Assumed Leases;<br><br>(b) all Liabilities to the extent related to payments for goods or services ordered, prior to the Closing in the Ordinary Course of Business, but that are not delivered or performed until after the Closing; provided that in no event shall the aggregate amount of Pre-Closing Payable constituting Assumed Liabilities pursuant to this clause (b) exceed One Hundred Thousand Dollars ($100,000), without the prior written consent of Buyer;<br><br>(c) all Customer Credits;<br><br>(d) all PTO of the Transferred Employees as of the Employee Transfer Date; and<br><br>(e) all Buyer Cure Costs. |
| **Excluded Liabilities**<br><br>(Stalking Horse APA, Section 1.1) | Except as specifically set forth in <u>Section 2.2</u> of the Stalking Horse APA, Purchaser will not assume or be liable for any Liabilities or other obligations of the Sellers, or any predecessor or Affiliate of the Sellers, of any nature whatsoever, whether presently in existence or arising after the date of the Stalking Horse APA, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated or otherwise (other than the Assumed Liabilities), including without limitation the following (other than the Assumed Liabilities) (collectively, the "<u>Excluded Liabilities</u>"):<br><br>(a) any Liability not relating to or arising out of the Business or the Acquired Assets, including any Liability relating to or arising out of the Excluded Assets;<br><br>(b) any Liability (i) of Sellers for Taxes (except as provided for in <u>Section 6.4</u> of the Stalking Horse APA), including any Liability of Sellers for the Taxes of any other Person under Treasury Regulation section 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee or successor, by Contract or otherwise, and (ii) for Taxes imposed on the Acquired Assets or the Business for a Pre-Closing Tax Period, including Property Taxes allocated to Sellers pursuant to <u>Section 6.5</u> of the Stalking Horse APA; |

| SUMMARY OF STALKING HORSE APA[1] |
|---|

|  | (c) | all Liabilities of Sellers under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby; |
|  | (d) | any Liability associated with any and all indebtedness, including any guarantees of third party obligations, and reimbursement obligations to guarantors of Sellers' obligations or under letters of credit of any Seller, and including any guarantee obligations or imputed Liability through veil piercing incurred in connection with any Seller or its Subsidiaries; |
|  | (e) | any Liabilities in respect of any Contracts or Leases that are not Assumed Agreements, respectively, including any Liabilities arising out of the rejection of any such Contracts or Leases pursuant to Section 365 of the Bankruptcy Code; |
|  | (f) | all Liabilities for fees, costs, and expenses that have been incurred or that are incurred or owed by Sellers in connection with this Agreement or the administration of the Bankruptcy Cases (including all fees and expenses of professionals engaged by Sellers) and administrative expenses and priority claims accrued through the Closing Date and specified post-closing administrative wind-down expenses of the bankrupt estates pursuant to the Bankruptcy Code, and all costs and expenses incurred in connection with (i) the negotiation, execution, and consummation of the transactions contemplated under this Agreement and each of the other documents delivered in connection herewith, and (ii) the consummation of the transactions contemplated by this Agreement, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of Sellers payable as a result of the consummation of the transactions contemplated by this Agreement and the documents delivered in connection herewith; |
|  | (g) | all Liabilities (i) related to the WARN Act, to the extent applicable, with respect to the termination of any of Sellers' employees, (ii) Company Severance Payments, and (iii) Company PTO Payments; |
|  | (h) | all Liabilities relating to claims for workers compensation for acts that occurred prior to the Closing Date, including any claims under outstanding letters of credit; |
|  | (i) | all Liabilities with respect to the termination of employment of any Blink "insiders" (as such term is defined under the Bankruptcy Code); |
|  | (j) | all Company Benefit Plans (including all assets, trusts, insurance policies and administration service contracts related thereto); |
|  | (k) | other than as expressly provided in the ELA, all Liabilities with respect to any terminated employees (which for the avoidance of doubt, includes any Covered Employees terminated prior to the Closing Date) with respect to COBRA (including on account of being "M&A qualified beneficiaries" (as such term is defined in U.S. Treasury Regulation Section 54.4980B-9)); |
|  | (l) | all Liabilities of Sellers to Sellers' equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments, or otherwise, and, except for any Liabilities under the TSA, any Liability of Sellers pursuant to any Affiliate Agreement; |

| SUMMARY OF STALKING HORSE APA[1] | |
|---|---|
| | (m) all Liabilities arising out of or relating to any business or property formerly owned or operated by any Sellers, any Affiliate, or predecessor thereof, but not presently owned and operated by any Sellers; <br> (n) all Liabilities relating to Litigation, Causes of Action, claims, actions, suits, arbitrations, litigation matters, proceedings, or investigations (in each case whether involving private parties, Governmental Authorities, or otherwise) involving, against, or affecting any Acquired Asset, the Business, Blink, or any assets or properties of Sellers, whether commenced, filed, initiated, or threatened before, at or following the Closing, that relate to facts, events, or circumstances arising or occurring before the Closing; <br> (o) all Liabilities arising under Environmental Laws relating to facts, events, or circumstances arising or occurring before the Closing; <br> (p) all Liabilities to or in respect of any employees arising on or prior to the Employee Transfer Date, except for the Assumed PTO or as set forth in the ELA; <br> (q) all Liabilities of Sellers or Sellers' predecessors arising out of any contract, agreement, Permit, franchise, or claim that is not transferred to Buyer as part of the Acquired Assets or is not transferred to Buyer because of any failure to obtain any third-party or governmental consent required for such transfer; <br> (r) other than as expressly provided for in clause (b) of the definition of "Assumed Liabilities" within the Stalking Horse APA, all Liabilities to the extent related to payments for goods or services ordered prior to the Closing; <br> (s) other than as expressly provided for in clause (c) of the definition of "Assumed Liabilities" within the Stalking Horse APA, all (i) gym or customer credits, sales promotions, rebates, coupons, gift cards and certificates and (ii) returns of Merchandise, customer prepayments and overpayments, customer refunds, credits, reimbursements, and related adjustments with respect to Merchandise; and <br> (t) other than the Buyer Cure Costs, all Cure Costs. |
| **Bid Protections** <br><br> (Stalking Horse APA, Section 5.3) | The bid protections consist of (i) a break-up fee in the amount of to Three Million Two Hundred Fifty Thousand Dollars ($3,250,000), and (ii) reimbursement of the Purchaser for all reasonable and documented out of pocket costs and expenses incurred by Buyer or any of its Affiliates in connection with the negotiation, preparation, and execution of the Stalking Horse APA, the Related Agreements, the consummation of the transactions contemplated thereby, and the Bankruptcy Cases and all other judicial and regulatory proceedings related to this Stalking Horse APA or the Related Agreements, including all fees and disbursements and other charges of counsel to Buyer in an amount not to exceed Two Million Dollars ($2,000,000). |
| **Termination Events** | The Stalking Horse APA may be terminated prior to the Closing as follows: <br> (a) by the mutual written consent of the Parties; <br> (b) by any Party by giving written notice to the other Parties if: |

| | |
|---|---|
| **SUMMARY OF STALKING HORSE APA[1]** | |
| (Stalking Horse APA, Section 8.1) | (i) any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; provided, however, that the right to terminate the Stalking Horse APA under Section 8.1(b)(i) of the Stalking Horse APA shall not be available to a Party if such action by a Governmental Authority was primarily caused by the failure of such Party to have fulfilled in any material respect any of its obligations under this Agreement; or<br><br>(ii) the Closing shall not have occurred prior to the Termination Date; provided, however, that if the Closing not having occurred on or before the Termination Date was primarily caused by a material breach of any representations, warranties, covenants or agreements contained in the Stalking Horse APA by Buyer or Sellers, then such breaching Party may not terminate this Agreement pursuant to Section 8.1(b)(ii) of the Stalking Horse APA.  The "Termination Date" shall be December 2, 2024, unless the Parties mutually agree to a later Closing Date pursuant to Section 2.4 of the Stalking Horse APA, upon which the Business Day following such later date shall be the Termination Date;<br><br>(c) by Buyer by giving written notice to Sellers if there has been a breach by any Seller of any representation, warranty, covenant, or agreement contained in the Stalking Horse APA that would give rise to the failure to be satisfied of any of the conditions to the obligations of Buyer at the Closing set forth in Section 7.1(a) and Section 7.1(b) of the Stalking Horse APA, and such breach has not been waived by Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (i) ten (10) days after receipt of Buyer's notice of intent to terminate and (ii) the Termination Date; provided, that Buyer shall not have a right of termination pursuant to Section 8.1(c) of the Stalking Horse APA if Sellers could, at such time, terminate the Stalking Horse APA pursuant to Section 8.1(d) of the Stalking Horse APA;<br><br>(d) by Sellers by giving written notice to Buyer if there has been a breach by Buyers of any representation, warranty, covenant, or agreement contained in the Stalking Horse APA that would give rise to the failure to be satisfied of any of the conditions to the obligations of Sellers at the Closing set forth in Section 7.2(a) and Section 7.2(b) of the Stalking Horse APA, and such breach has not been waived by such Seller, or, if such breach is curable, cured by Buyer prior to the earlier to occur of (i) ten (10) days after receipt of such Seller's notice of intent to terminate and (ii) the Termination Date; provided, that Sellers shall not have a right of termination pursuant to Section 8.1(d) of the Stalking Horse APA if Buyer could, at such time, terminate the Stalking Horse APA pursuant to Section 8.1(c) of the Stalking Horse APA; |

| | SUMMARY OF STALKING HORSE APA[1] |
|---|---|
| | (e) by Sellers or Buyer, if (i) (x) Sellers enter into a definitive agreement with respect to a Competing Bid, (y) the Bankruptcy Court enters an order approving a Competing Bid, and (z) the Person making the Competing Bid consummates the Competing Bid or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in the Stalking Horse APA; |
| | (f) by Buyer, by written notice to Sellers, if any creditor of any Seller or its Affiliates obtains relief from the stay to foreclose on, or otherwise take possession of, a material portion of the Acquired Assets; |
| | (g) by Buyer, by giving written notice to Sellers, if any Seller (x) files a motion (without Buyer's consent) to have the Bankruptcy Court enter an order dismissing or converting the Bankruptcy Cases into cases under Chapter 7 of the Bankruptcy Code or appointing a trustee in the Bankruptcy Cases or appointing an examiner with enlarged power related to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or the occurrence of any of the foregoing, or (y) announces its intention to, or files a motion to, pursue or enter into any Alternative Transaction (unless Buyer is the Back-Up Bidder) that would make the consummation of the transactions contemplated by this Agreement or the satisfaction of any conditions herein impossible; or |
| | (h) by Buyer, by written notice to Sellers, if, (i) the Stalking Horse Order is not entered by the Bankruptcy Court within fifteen (15) days after the date hereof, or such order does not become a Final Order within fifteen days after its entry by the Bankruptcy Court, or (ii) after their respective entry, one or more of the Bidding Procedures Order, Stalking Horse Order, or Sale Order, or any provisions set forth therein the absence of which would materially and adversely affect Buyer, cease to be in full force and effect; provided, however, that Buyer's right to terminate the Stalking Horse APA pursuant to the foregoing clause (i) shall not be exercisable after entry of the Stalking Horse Order. |

**EXHIBIT B**

**Stalking Horse APA**

*EXECUTION VERSION*

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**BLINK HOLDINGS, INC.,**

**THE OTHER SELLERS PARTY HERETO,**

**AND**

**PINNACLE US HOLDINGS LLC**

Dated:

**September 10, 2024**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ........................................................................................................... 1

    Section 1.1        Definitions........................................................................................ 1
    Section 1.2        Interpretations ................................................................................ 19

ARTICLE II PURCHASE AND SALE ....................................................................................... 20

    Section 2.1        Purchase and Sale of Assets........................................................ 20
    Section 2.2        Assumed Liabilities ..................................................................... 20
    Section 2.3        Consideration; Deposit; Pre-Closing Statement ............................... 20
    Section 2.4        Closing ......................................................................................... 22
    Section 2.5        Closing Payments and Deliveries ............................................... 23
    Section 2.6        Treatment of Certain Contracts and Leases ................................ 23
    Section 2.7        Allocation.................................................................................... 27
    Section 2.8        Withholding ................................................................................. 27

ARTICLE III SELLERS' REPRESENTATIONS AND WARRANTIES ............................... 27

    Section 3.1        Organization of Sellers; Good Standing ..................................... 27
    Section 3.2        Authorization of Transaction ...................................................... 28
    Section 3.3        Noncontravention; Government Filings ...................................... 28
    Section 3.4        Title to Assets; Sufficiency of Assets ......................................... 28
    Section 3.5        Contracts and Leases.................................................................... 29
    Section 3.6        Real Property ............................................................................... 30
    Section 3.7        Litigation; Decrees ...................................................................... 31
    Section 3.8        Labor Relations............................................................................ 31
    Section 3.9        Brokers' Fees ............................................................................... 33
    Section 3.10      Taxes ........................................................................................... 33
    Section 3.11      Data Privacy ................................................................................ 34
    Section 3.12      Employee Benefits ....................................................................... 35
    Section 3.13      Intellectual Property.................................................................... 36
    Section 3.14      Compliance with Laws; Permits ................................................. 37
    Section 3.15      Environmental Matters................................................................. 38
    Section 3.16      Related Party Transactions .......................................................... 38
    Section 3.17      Financial Statements; No Undisclosed Liabilities; Absence of
                         Certain Changes ......................................................................... 38
    Section 3.18      Inventory ..................................................................................... 40
    Section 3.19      Memberships................................................................................ 40

ARTICLE IV BUYER'S REPRESENTATIONS AND WARRANTIES ................................. 40

    Section 4.1        Organization of Buyer; Good Standing ....................................... 40
    Section 4.2        Authorization of Transaction ...................................................... 41
    Section 4.3        Noncontravention......................................................................... 41
    Section 4.4        Litigation; Decrees....................................................................... 41
    Section 4.5        Brokers' Fees ............................................................................... 41
    Section 4.6        Sufficient Funds; Adequate Assurances ...................................... 41
    Section 4.7        Certain Acknowledgments............................................................ 42

## TABLE OF CONTENTS

ARTICLE V PRE-CLOSING COVENANTS......................................................................... 43

    Section 5.1        Efforts; Cooperation............................................................ 43
    Section 5.2        Conduct of the Business Pending the Closing ................... 43
    Section 5.3        Bankruptcy Court Matters.................................................. 45
    Section 5.4        Notices and Consents ......................................................... 48
    Section 5.5        Notice of Developments ..................................................... 49
    Section 5.6        Access ................................................................................. 49
    Section 5.7        Bulk Transfer Laws............................................................ 50
    Section 5.8        Governmental Approvals and Consents.............................. 50

ARTICLE VI OTHER COVENANTS ................................................................................. 51

    Section 6.1        Further Assurances............................................................. 51
    Section 6.2        Access; Enforcement; Record Retention ........................... 52
    Section 6.3        Covered Employees ........................................................... 53
    Section 6.4        Transfer Taxes ................................................................... 54
    Section 6.5        Property Taxes. ................................................................... 54
    Section 6.6        Press Releases and Public Announcements ....................... 55
    Section 6.7        Restrictive Covenants. ....................................................... 55
    Section 6.8        No Successor Liability ........................................................ 56
    Section 6.9        Acquired Avoidance Actions ............................................. 56
    Section 6.10      Transition License .............................................................. 56
    Section 6.11      TSA .................................................................................... 57
    Section 6.12      Memberships ...................................................................... 57

ARTICLE VII CONDITIONS TO OBLIGATION TO CLOSE ........................................... 57

    Section 7.1        Conditions to Buyer's Obligations.................................... 57
    Section 7.2        Conditions to Sellers' Obligations .................................... 58
    Section 7.3        No Frustration of Closing Conditions ............................... 59

ARTICLE VIII TERMINATION ......................................................................................... 59

    Section 8.1        Termination of Agreement................................................. 59
    Section 8.2        Effect of Termination......................................................... 60

ARTICLE IX MISCELLANEOUS ...................................................................................... 61

    Section 9.1        Survival ............................................................................. 61
    Section 9.2        Expenses ............................................................................ 62
    Section 9.3        Entire Agreement ............................................................... 62
    Section 9.4        Incorporation of Exhibits and Disclosure Schedule.......... 62
    Section 9.5        Amendments and Waivers ................................................. 62
    Section 9.6        Succession and Assignment ............................................... 62
    Section 9.7        Notices ............................................................................... 63
    Section 9.8        Governing Law .................................................................. 64
    Section 9.9        Submission to Jurisdiction; Service of Process ................. 64
    Section 9.10      Waiver of Jury Trial .......................................................... 64

## TABLE OF CONTENTS

**Page**

Section 9.11       Specific Performance .......................................................... 64
Section 9.12       Severability ....................................................................... 64
Section 9.13       No Third Party Beneficiaries ............................................. 65
Section 9.14       Non-Recourse ................................................................... 65
Section 9.15       Mutual Drafting ................................................................ 65
Section 9.16       Disclosure Schedule .......................................................... 65
Section 9.17       Headings; Table of Contents .............................................. 66
Section 9.18       Counterparts; Facsimile and Electronic Signatures ............ 66


Exhibit A – Form of Bill of Sale and Assignment and Assumption Agreement
Exhibit B – Form of Intellectual Property Assumption and Assignment Agreement
Exhibit C – Form of Employee Leasing Agreement
Exhibit D – Form of Transition Services Agreement
Exhibit E – Closure Costs


Schedule A – Other Excluded Assets

iv

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of September 10, 2024 by and among Blink Holdings, Inc., a Delaware corporation ("Blink"), and the direct and indirect Subsidiaries or Affiliates of Blink identified on the signature pages hereto (together with Blink, each a "Seller" and, collectively, "Sellers"), and Pinnacle US Holdings LLC, a Delaware limited liability company ("Buyer"). Sellers and Buyer are referred to collectively herein as the "Parties" and each, individually, as a "Party".

## WITNESSETH

WHEREAS, on August 12, 2024 (the "Petition Date"), Blink and certain of its Affiliates and Subsidiaries (collectively, the "Debtors") voluntarily commenced cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), jointly administered under the caption *In re Blink Holdings, Inc., et al.*, Case No. 24-11686 (JKS) (the "Bankruptcy Cases");

WHEREAS, Sellers engage in the ownership and operation of health club and fitness businesses, including the Blink Fitness health club and fitness business, located in the States of New York and New Jersey (the "Territory" and such businesses conducted within the Territory being referred to herein, collectively, as the "Business"); and

WHEREAS, Sellers and Buyer desire to enter into this Agreement to provide for the applicable Seller to sell, transfer, deliver and assign to Buyer, and Buyer to purchase, acquire, and assume from the applicable Seller, all of the Acquired Assets (as defined herein) and Assumed Liabilities (as defined herein), all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363, 365, and other applicable provisions of the Bankruptcy Code, and Rules 4001, 6004, 6006, and other applicable provisions of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Definitions.  For purposes of this Agreement:

"Acquired Assets" means, all of Sellers' right, title, and interest, free and clear of all Liens (other than Permitted Post-Closing Liens), in and to all of the properties, rights, interests, and other tangible and intangible assets of Sellers used by, held for use in or relating to the Business (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP), including any properties, rights, interests, and other tangible and intangible assets acquired by Sellers after the date hereof but prior to the Closing; provided, however, that the Acquired Assets shall not include any Excluded Assets. Without limiting the

generality of the foregoing, the Acquired Assets shall include the following (except to the extent listed or otherwise included as an Excluded Asset):

(a)    all Business Intellectual Property, including, but not limited to, (i) all intellectual property rights arising from or relating to: the names "Blink" and "Blink Fitness or any derivations thereof, all algorithms, application programming interfaces, designs, net lists, data, databases, data collections, diagrams, inventions (whether or not patentable), know how, methods, processes, proprietary information, protocols, schematics, specifications, tools, systems, software, software code (in any form, including source code and executable or object code), subroutines, techniques, user interfaces, uniform resource locators, web sites, social media sites and accounts, mobile applications, works of authorship, and other similar materials, (ii) all documentation related to any of the foregoing, including instruction manuals, laboratory notebooks, prototypes, samples, studies, and summaries, whether or not embodied in any tangible form and whether or not specifically listed herein, and (iii) all related technology, that are used in, incorporated in, embodied in, displayed by, or relate to, or are used in connection with the foregoing;

(b)    all tangible assets owned or leased by Sellers used by, held for use in or relating to the Business or Acquired Gym Locations, including all gym and exercise equipment and machinery, fixtures, trade fixtures, chairs, supplies, shelving, refrigeration equipment, computers, point-of-sale systems, other computer systems and servers, hardware, inventory management equipment, branding, signs, and signage located at the Acquired Gym Locations, any warehouse, or any real property leased by Sellers pursuant to a Lease;

(c)    all Assumed Leases, together with (to the extent of the Sellers' interest therein) the buildings, fixtures and improvements located on or attached to the underlying real property, and all rights arising thereunder, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto, subject to the rights of the applicable landlord (including rights to ownership or use of such property) under such Assumed Leases;

(d)    all Assumed Contracts and any rights thereunder;

(e)    all Inventory and Merchandise to the extent relating to the Business, whether at any Acquired Gym Locations, any warehouse, or in transit to the Acquired Gym Locations;

(f)    all memberships and member, customer, and end-user data and information, including information related to memberships, customer purchases, or services provided to members or customers at the Acquired Gym Locations, in each case, to the extent permitted to be assigned, used, or provided by Sellers under applicable Laws;

(g)    all credit card receivables relating to the Business;

2

(h)     all trade receivables, whether current or non-current, and all other accounts receivable, including payment processor receivables, for sales made prior to the Closing relating to the Business;

(i)     any Permit used by, held for use in or relating to the Business, to the extent transferable;

(j)     any and all books, records, and other data used by, held for use in or relating to the Business, including customer lists, customer and end-user information and data, supplier lists, mailing lists, accounting records, documentation or records, catalogs, and printed materials relating thereto to the extent available (subject to Section 5.6);

(k)     all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including any such item relating to the payment of Taxes other than the Excluded Tax Assets) used by, held for use in or relating to the Business;

(l)     any promotional materials, displays, media content, and other property or equipment owned or leased to Sellers and used by, held for use in or relating to the Business;

(m)     to the extent transferable, all Intellectual Property Licenses, including the licenses set forth on Section 3.13(f) of the Disclosure Schedule;

(n)     financial, marketing, and business data, pricing and cost information, business and marketing plans, and other information, files, correspondence, records, data, plans, reports, and recorded knowledge, historical trademark files, prosecution files of Sellers in whatever media retained or stored, including computer programs and disks, including files in the possession of Sellers and used by, held for use in or relating to the Business, and all rights and privileges of the Sellers in respect thereof;

(o)     all goodwill associated with the Business or the Acquired Assets;

(p)     product designs, product names, trade names, design rights, tech packs, artwork, archival materials, and advertising materials, copy, commercials, images, and artwork used by, held for use in or relating to the Business;

(q)     royalty payments and licensing receivables generated by the Business;

(r)     all Business Systems and Sellers' telephone, facsimile numbers, and email addresses used by, held for use in, or relating to the Business;

(s)     all Purchased Actions;

(t)     all of Sellers' rights under warranties, indemnities, and all similar rights against third parties to the extent transferable and related to any Acquired Assets;

(u)     the Gym Locations Cash Amount; and

3

(v)    any insurance claims, and related proceeds, related to an Acquired Asset, an Assumed Liability or the Business.

"Acquired Avoidance Actions" means avoidance actions under chapter 5 of the Bankruptcy Code or similar Causes of Action that are Purchased Actions.

"Acquired Gym Location" means a Gym Location relating to an Assumed Lease.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

"Affiliate Agreement" has the meaning set forth in Section 3.16.

"Agreement" has the meaning set forth in the preamble.

"Alternative Transaction" means (i) other than the financing provided to the Sellers under the DIP Order, any investment in, financing of, capital contribution or loan to or restructuring or recapitalization of Sellers or any of their respective direct or indirect Subsidiaries (including any exchange of all or a substantial portion of Sellers' or any of their respective Affiliates' outstanding debt obligations for equity securities of Sellers or any of their respective Affiliates), (ii) any merger, consolidation, share exchange or other similar transaction to which Sellers or any of their respective Affiliates is a party that has the effect of transferring, directly or indirectly, any material portion of the assets of, or any issuance, sale, or transfer of equity interests in, Sellers, the Acquired Assets, or the Business, (iii) any direct or indirect sale of any portion of the Acquired Assets (other than sales of Inventory in the Ordinary Course of Business), or any issuance, sale or transfer of equity interests in Sellers, the Acquired Assets or the Business, or (iv) any other transaction, including a plan of liquidation or agreement with a liquidation firm (or consortium) for the orderly liquidation of the Sellers, all or any portion of the Acquired Assets or the Business (other than any wind-down or similar plan or transaction or dismissal with respect to the sale of Excluded Assets), or reorganization (in any jurisdiction, whether domestic, foreign, or international), in each instance that transfers or vests ownership of, economic rights to, or benefits in any portion of the Acquired Assets or the Business to any Person other than Buyer or its Affiliate(s).

"Assumed Agreements" has the meaning set forth in Section 2.6(b).

"Assumed Contracts" means any Contract that is an Assumed Agreement.

"Assumed Leases" means any Lease that is an Assumed Agreement.

"Assumed Liabilities" means only the following Liabilities of the applicable Seller to the extent incurred exclusively in the operation of the Business and existing as of the Closing (to the extent not paid prior to the Closing) to the extent set forth in the following clauses:

(a)    all Liabilities to the extent arising under the Assumed Agreements to the extent such Liabilities arise from and after the Closing Date, including, without limitation,

any deferred rental amounts payable pursuant to the terms of any Assumed Leases (such deferred rental amounts payable being referred to herein as "Deferred Rent");

(b)      all Liabilities to the extent related to payments for goods or services ordered, prior to the Closing in the Ordinary Course of Business, but that are not delivered or performed until after the Closing (collectively, "Pre-Closing Payables"); provided that in no event shall the aggregate amount of Pre-Closing Payables constituting Assumed Liabilities pursuant to this clause (b) exceed One Hundred Thousand Dollars ($100,000), without the prior written consent of Buyer;

(c)      all Customer Credits;

(d)      all PTO of the Transferred Employees as of the Employee Transfer Date (the "Assumed PTO"); and

(e)      all Buyer Cure Costs.

provided, however, that notwithstanding anything to the contrary set forth in this definition, the Assumed Liabilities shall not include any Excluded Liabilities.

"Auction" has the meaning set forth in the Bidding Procedures Order.

"Back-up Bidder" means the Person designated at the Auction as having submitted the next highest offer to the offer submitted by the Prevailing Bidder.

"Bankruptcy Cases" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bid Deadline" has the meaning set forth in the Bidding Procedures Order.

"Bidding Procedures Order" means an order to be entered by the Bankruptcy Court authorizing and approving the bidding, auction, and sale procedures regarding the Acquired Assets, and other related relief.

"Bill of Sale and Assignment" has the meaning set forth in Section 2.5.

"Break-Up Fee" has the meaning set forth in Section 5.3(a).

"Business" has the meaning set forth in the recitals.

"Business Day" means any day, other than a Saturday, Sunday and any day that is a legal holiday under the laws of the State of Delaware or is a day on which banking institutions located in the State of Delaware are authorized or required by Law or other governmental action to close.

"Business Intellectual Property" means all Intellectual Property that are owned, purported to be owned, held for use or used by (i) Blink and its Subsidiaries or (ii) any other Seller in the conduct of the Business.

"Business Systems" means the computer software and hardware (whether general purpose or special purpose), firmware, servers, routers, networks, peripherals and other information technology and telecommunication assets and equipment that are owned by (i) Blink and its Subsidiaries or (ii) any other Seller in the conduct of the Business.

"Buyer" has the meaning set forth in the preamble.

"Buyer Cure Costs" means all Cure Costs, as determined by a Final Order of the Bankruptcy Court or as agreed by Buyer and the applicable counterparty to an Assumed Lease or Assumed Contract, arising out of the assumption by the applicable Sellers and assignment to Buyer of the Assumed Agreements designated by Buyer for assumption and assignment pursuant to Section 2.6; provided that (i) Buyer Cure Costs shall not include (and Sellers shall pay) any Liabilities arising under or with respect to any Assumed Agreement accruing or payable (or relating to the period) on or after the Petition Date and before the Closing and (ii) in no event shall the Buyer Cure Cost associated with any Assumed Agreement exceed for each applicable Assumed Agreement, the greater of (x) Five Thousand Dollars ($5,000) more than the Sellers' Proposed Cure Cost for such Agreement and (y) one hundred twenty percent (120%) of the Proposed Cure Cost of such Assumed Agreement (it being understood that the Sellers shall pay any Cure Costs that do not constitute Buyer Cure Costs as a result of the application of this clause (ii)).

"Buyer Default Termination" has the meaning set forth in Section 2.3(b).

"Cause of Action" means any claim, Claim, action, cause of action (including any avoidance action or similar cause of action under chapter 5 of the Bankruptcy Code), complaint, charge, suit, arbitration, mediation, lawsuit, judgment, refund, right of recovery, right of setoff, counterclaim, defense, demand, remedy, warranty claim, right to indemnification, contribution, advance of expenses, or reimbursement, or similar right (whether choate or inchoate, known or unknown, contingent or noncontingent, direct or derivative), whether at law or in equity.

"Claim" means any claim within the meaning of section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.4.

"Closing Cash Payment" has the meaning set forth in Section 2.3(a).

"Closing Date" has the meaning set forth in Section 2.4.

"Closure Costs" means the closure costs associated with each Specified Lease and in the applicable amount as set forth on Exhibit E.

"COBRA" means sections 601 through 608 of ERISA and section 4980B of the IRC.

"Company Benefit Plan" has the meaning set forth in Section 3.12(a).

6

"Company PTO Payments" means all amounts payable for vacation, sick leave, parental leave, and other paid time accrued by Sellers' employees who are not Transferred Employees.

"Company Severance Payments" means any amount payable in connection with, or arising out of any action resulting from, Sellers' employees' separation of employment.

"Competing Bid" has the meaning set forth in Section 5.3(d).

"Contract" means any agreement, contract, license, arrangement, commitment, promise, obligation, right, instrument, document, or other similar understanding, which in each case is in writing and signed by parties intending to be bound thereby (other than any Leases).

"Covered Employee" means an employee of Blink or any of its Subsidiaries as of any date whose duties relate primarily to the operation of the Business.

"Cure Costs" means all monetary Liabilities that must be paid or otherwise satisfied in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption of executory Contracts and Leases.

"Customer Credits" means, with respect to the Business, all (i) gym or customer credits (excluding, for the avoidance of doubt, ordinary course deferred revenue), sales promotions, rebates, coupons, gift cards and certificates and (ii) returns of Merchandise, customer prepayments and overpayments, customer refunds, credits, reimbursements, and related adjustments with respect to Merchandise, in each case of clauses (i) and (ii), to the extent specifically related to the Acquired Gym Locations and incurred in the Ordinary Course of Business prior to the Closing.

"Data Partners" has the meaning set forth in Section 3.11.

"Decree" means any judgment, decision, decree, consent decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order, settlement determination, subpoena, stipulation or any other order entered into with or of any Governmental Authority.

"Deferred Rent Adjustment" means, with respect to each Assumed Lease as of the Closing, an amount equal to the excess, if any, of (a) the Actual Deferred Rent for such Lease as determined pursuant to Section 2.3(c) *over* (b) the Deferred Rent amount for such Lease set forth on Section 3.17(f)(iii) of the Disclosure Schedule.

"Deposit" has the meaning set forth in Section 2.3(b).

"Designation Counterparty" has the meaning set forth in Section 2.6(c).

"Designation Rights Period" means, with respect to any Contracts or Leases to be assumed and assigned or rejected pursuant to Section 2.6(c), the period from the Closing Date through and including the 90th day after the Closing Date; provided that such date may be extended with respect to any Reserved Agreement with the consent of Buyer, Sellers and the applicable Designation Counterparty.

"DIP Order" means that certain Final Order (I) Authorizing the Debtors To (A) Obtain Postpetition Financing, And (B) Utilize Cash Collateral; (II) Granting Senior Secured Priming Liens And Superpriority Administrative Expense Claims; (III) Granting Adequate Protection To The Prepetition Secured Parties; (IV) Modifying The Automatic Stay; And (V) Granting Related Relief, to be entered by the Bankruptcy Court, as such order has been or may be amended or modified from time to time.

"Disclosure Schedule" has the meaning set forth in Article III.

"Display Merchandise" means those items of inventory used in the ordinary course of business as displays or floor models at the Acquired Gym Locations, including inventory that has been removed from its original packaging for the purpose of putting such item on display, which goods are not otherwise damaged or defective.  For the avoidance of doubt, Merchandise created for display and not saleable in the ordinary course of business shall not constitute Display Merchandise.

"Encumbrances" means any claim, community or other marital property interest, condition, equitable interest, right of way, encroachment, servitude, right of first refusal, or similar restriction, including any restriction on use, voting (in the case of any security or equity interest), transfer, receipt of income, or exercise of any other attribute of ownership.

"ELA" means an Employee Leasing Agreement to be entered into by Buyer or one of its Affiliates and Blink, substantially in the form attached hereto as Exhibit C.

"Environmental Law" means all applicable Laws concerning (i) pollution or the protection of the environment, or work health and safety (relating to exposure to Hazardous Substances), or (ii) the manufacture, processing, distribution, use, treatment, storage, disposal, transport, handling, Release or threatened Release of Hazardous Substances..

"Equinox" means Equinox Holdings, Inc., a Delaware corporation.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any Person that, at any relevant time, is or was treated as a single employer with any Seller for purposes of IRC § 414.

"Escrow" has the meaning set forth in Section 2.3(b).

"Escrow Holder" has the meaning set forth in Section 2.3(b).

"Excluded Agreements" means all Contracts or Leases other than Assumed Agreements or Reserved Agreements.

"Excluded Assets" means the following assets of Sellers as of the Closing, and only the following assets:

(a)     all files, books, records and documents prepared in connection with this Agreement or the transactions contemplated hereby or primarily relating to the Bankruptcy

8

Cases, all minute books, corporate records (such as stock registers), and organizational documents of Sellers, Tax Returns, other Tax work papers, and all other documents not related to the Business, the Acquired Gym Locations, the Acquired Assets, the Assumed Liabilities, or the Covered Employees;

(b)    all files, books, records, and documents that are subject to Sellers' attorney-client privilege or the work-product immunity doctrine except to the extent such documents or communications are related to Buyer's continued conduct of the Business  after the Closing or any Acquired Assets or Assumed Liabilities;

(c)    all files, books, records, and documents not related to the Business, the Acquired Gym Locations, the Acquired Assets, the Assumed Liabilities, or the Covered Employees or the disclosure or transfer of which is prohibited by applicable Laws;

(d)    any Contract that is not an Assumed Agreement (including any franchise agreement or other Contract with a franchisee of the Business);

(e)    any Lease that is not an Assumed Lease;

(f)    any Excluded Tax Assets;

(g)    any prepaid insurance listed on Schedule A;

(h)    all avoidance actions under chapter 5 of the Bankruptcy Code or any Causes of Action that are not an Acquired Asset;

(i)    any security deposits or pre-paid expenses paid prior to the Closing Date and not related to the Business, the Acquired Gym Locations, the Acquired Assets, the Assumed Liabilities, or the Covered Employees;

(j)    except as set forth in clause (v) of the definition of "Acquired Assets", all insurance policies and binders, all claims, refunds, and credits from insurance claims, insurance policies, or binders due or to become due with respect to such policies or binders and all rights to proceeds thereof;

(k)    all equipment, tools, or other tangible assets to the extent constituting the property of any employees or independent contractors of Sellers;

(l)    all shares of capital stock or other equity interests of any Seller and all securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller or any other Person;

(m)    all Company Benefit Plans (including all assets, trusts, insurance policies and administration service contracts related thereto); and

(n)    all assets, properties, rights, interests, and Claims that (i) are not, and that do not relate to, any Acquired Assets or (ii) are described on Schedule A (which Schedule

9

A may be supplemented to add additional assets, properties, rights, interests and Claims in the sole discretion of Buyer at any time prior to Closing).

"Excluded Liabilities" means any Liabilities of Sellers, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities.  Without limiting the foregoing, Buyer shall not be obligated to assume, and does not assume, and hereby disclaims all the Excluded Liabilities, including the following Liabilities (which shall also be considered Excluded Liabilities) of any of Sellers or of any predecessor of any of Sellers, whether incurred or accrued before or after the Closing:

(a)    any Liability not relating to or arising out of the Business or the Acquired Assets, including any Liability relating to or arising out of the Excluded Assets;

(b)    any Liability (i) of Sellers for Taxes (except as provided for in Section 6.4), including any Liability of Sellers for the Taxes of any other Person under Treasury Regulation section 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee or successor, by Contract or otherwise, and (ii) for Taxes imposed on the Acquired Assets or the Business for a Pre-Closing Tax Period, including Property Taxes allocated to Sellers pursuant to Section 6.5;

(c)    all Liabilities of Sellers under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby;

(d)    any Liability associated with any and all indebtedness, including any guarantees of third party obligations, and reimbursement obligations to guarantors of Sellers' obligations or under letters of credit of any Seller, and including any guarantee obligations or imputed Liability through veil piercing incurred in connection with any Seller or its Subsidiaries;

(e)    any Liabilities in respect of any Contracts or Leases that are not Assumed Agreements, respectively, including any Liabilities arising out of the rejection of any such Contracts or Leases pursuant to Section 365 of the Bankruptcy Code;

(f)    all Liabilities for fees, costs, and expenses that have been incurred or that are incurred or owed by Sellers in connection with this Agreement or the administration of the Bankruptcy Cases (including all fees and expenses of professionals engaged by Sellers) and administrative expenses and priority claims accrued through the Closing Date and specified post-closing administrative wind-down expenses of the bankrupt estates pursuant to the Bankruptcy Code, and all costs and expenses incurred in connection with (i) the negotiation, execution, and consummation of the transactions contemplated under this Agreement and each of the other documents delivered in connection herewith, and (ii) the consummation of the transactions contemplated by this Agreement, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of Sellers payable as a result of the consummation of the transactions contemplated by this Agreement and the documents delivered in connection herewith;

10

(g)    all Liabilities (i) related to the WARN Act, to the extent applicable, with respect to the termination of any of Sellers' employees, (ii) Company Severance Payments, and (iii) Company PTO Payments;

(h)    all Liabilities relating to claims for workers compensation for acts that occurred prior to the Closing Date, including any claims under outstanding letters of credit;

(i)    all Liabilities with respect to the termination of employment of any Blink "insiders" (as such term is defined under the Bankruptcy Code);

(j)    all Company Benefit Plans (including all assets, trusts, insurance policies and administration service contracts related thereto);

(k)    other than as expressly provided in the ELA, all Liabilities with respect to any terminated employees (which for the avoidance of doubt, includes any Covered Employees terminated prior to the Closing Date) with respect to COBRA (including on account of being "M&A qualified beneficiaries" (as such term is defined in U.S. Treasury Regulation Section 54.4980B-9));

(l)    all Liabilities of Sellers to Sellers' equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments, or otherwise, and, except for any Liabilities under the TSA, any Liability of Sellers pursuant to any Affiliate Agreement;

(m)    all Liabilities arising out of or relating to any business or property formerly owned or operated by any Sellers, any Affiliate, or predecessor thereof, but not presently owned and operated by any Sellers;

(n)    all Liabilities relating to Litigation, Causes of Action, claims, actions, suits, arbitrations, litigation matters, proceedings, or investigations (in each case whether involving private parties, Governmental Authorities, or otherwise) involving, against, or affecting any Acquired Asset, the Business, Blink, or any assets or properties of Sellers, whether commenced, filed, initiated, or threatened before, at or following the Closing, that relate to facts, events, or circumstances arising or occurring before the Closing;

(o)    all Liabilities arising under Environmental Laws relating to facts, events, or circumstances arising or occurring before the Closing;

(p)    all Liabilities to or in respect of any employees arising on or prior to the Employee Transfer Date, except for the Assumed PTO or as set forth in the ELA;

(q)    all Liabilities of Sellers or Sellers' predecessors arising out of any contract, agreement, Permit, franchise, or claim that is not transferred to Buyer as part of the Acquired Assets or is not transferred to Buyer because of any failure to obtain any third-party or governmental consent required for such transfer;

11

(r)      other than as expressly provided for in clause (b) of the definition of "Assumed Liabilities", all Liabilities to the extent related to payments for goods or services ordered prior to the Closing;

(s)      other than as expressly provided for in clause (c) of the definition of "Assumed Liabilities", all (i) gym or customer credits, sales promotions, rebates, coupons, gift cards and certificates and (ii) returns of Merchandise, customer prepayments and overpayments, customer refunds, credits, reimbursements, and related adjustments with respect to Merchandise; and

(t)      other than the Buyer Cure Costs, all Cure Costs.

"Excluded Tax Assets" means any Tax refunds or credits of Sellers and the owners of the Sellers attributable to Taxes that are Excluded Liabilities.

"Existing TSA" shall mean that certain Transition Services Agreement between Equinox and Blink, dated as of December 1, 2016 (as amended by an amendment entered into in February 2024 and effective as of December 31, 2019, and as further amended by an amendment entered into as of August 2, 2024 and as may be further amended from time to time).

"Expense Reimbursement" has the meaning set forth in Section 5.3(a).

"Final Lease Specification Time" means the later to occur of (x) one Business Day following the date the Sellers provide notice to Buyer that the Bid Deadline has passed and no Auction will occur and (y) if an Auction will occur, the conclusion of the Auction.

"Final Order" means an order, judgment or other decree of the Bankruptcy Court or any other Governmental Authority of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect and is no longer subject to appeal.

"GAAP" means United States generally accepted accounting principles consistently applied.

"Governmental Authority" means any international, multinational, federal, state, local, municipal or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, division, instrumentality, organization, unit or other governmental entity including any court, arbitral body or other tribunal.

"Gym Locations Cash Amount" means Sellers' cash located at the Acquired Gym Locations as of the Closing Date.

"Gym Locations" has the meaning set forth in Section 3.6.

"Hazardous Substances" means any toxic or hazardous material, substance or waste as to which liability or standards or conduct may be imposed, or that is the subject of regulatory action or could otherwise give rise to liabilities or obligations under, any Environmental Laws, including petroleum product or by-product, asbestos-containing material, lead-containing paint or plumbing,

12

polychlorinated biphenyls, per- and polyfluoroalkyl substances, radioactive material, toxic molds, and radon.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended.

"Intellectual Property" means any and all intellectual property and other similar proprietary rights, in any jurisdiction in the world (whether arising under statutory or common law, contract, or otherwise), that includes rights pertaining to or arising from: (i) inventions, discoveries, processes, designs, techniques, developments, and related improvements whether or not patentable; (ii) patents, patent applications, industrial design registrations and applications therefor, divisions, divisionals, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, re-examinations, extensions and any provisional applications, or any such patents or patent applications, and any foreign or international equivalent of any of the foregoing; (iii) trademarks (whether registered, unregistered, or pending), trade dress, service marks, service names, trade names, brand names, product names, logos, domain names, internet rights (including IP addresses and AS numbers), corporate names, fictitious names, other names, symbols (including business symbols), slogans, translations of any of the foregoing, and any foreign or international equivalent of any of the foregoing and all goodwill associated therewith and (to the extent transferable by law but subject to Section 6.1(d)) any applications or registrations in connection with the foregoing and all advertising and marketing collateral including any of the foregoing; (iv) work specifications, databases, and artwork; (v) technical, scientific, and other know-how and information (including promotional material and tech packs and blocks), trade secrets, confidential information, methods, processes, practices, formulas, designs, patterns, assembly procedures, specifications; (vi) rights associated with works of authorship including copyrights, moral rights, design rights, rights in databases, copyright applications, copyright registrations, rights existing under any copyright laws, and rights to prepare derivative works; (vii) work for hire; (viii) the names "Blink" and "Blink Fitness" or any derivations thereof, (ix) customer lists and databases, websites, social media sites and accounts (including the content contained therein, user names, and passwords), diagrams, drawings, and all advertising and marketing materials (including all physical, digital, or electronic imagery and design files), samples, product catalogs, product designs and specifications (including tech specifications), and vendor and Merchandise supplier data and information, (x) computer software and firmware, including data files, source code, object code, and software-related specifications and documentation, (xi) all books and records, files, data, reports, computer codes and sourcing data, advertiser and supplier lists, cost and pricing information, business plans, and manuals, blueprints, research and development files, and other records; (xii) financial, marketing and business data, pricing, and cost information, business and marketing plans and other information, files, correspondence, records, data, plans, reports, recorded knowledge, historical trademark files, and prosecution files in whatever media retained or stored, including computer programs and disks, (xiii) the right to sue for past, present and future infringement, misappropriation, or other violation and other remedies against infringement, misappropriation or other violation of any of the foregoing, and (xiv) rights to protection of interests in the foregoing under the laws of all jurisdictions.

"Intellectual Property Assignment Agreement" has the meaning set forth in Section 2.5(a).

13

"Intellectual Property Licenses" means (i) any grant to a third Person of any right to use any Owned Intellectual Property and (ii) any grant to Sellers of a right to use a third Person's Intellectual Property.

"Inventory" means all of Sellers' inventory and goods now owned or hereinafter acquired, wherever located, relating to the Business, including all inventory and goods that (i) are held by Sellers for sale or lease or to be furnished by Sellers under a Contract of service or (ii) consist of raw materials, work in process, finished goods, supplies, or material used or consumed in connection with the Business maintained or held by, stored by or on behalf of, or in transit to, any of Sellers.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

 "Knowledge" of Sellers or Blink (and other words of similar import) means the actual knowledge, after reasonable inquiry, of Guy Harkless, Benjamin Balick, and Carissa Ganelli.

"Law" means any applicable federal, state, municipal or local or foreign law, Decree (judicial or administrative), statute, code, constitutions, regulation, ordinance, decree, common law principle, rule, treaty, collective agreements, judgment or other requirement issued, enacted, adopted, promulgated, implemented or otherwise with similar effect of any Governmental Authority.

"Leased Real Property" means the real property and interest in real property leased, licensed or otherwise possessed, occupied or used under a Lease.

"Leases" means all leases, subleases, licenses, concessions, contracts, easements, reciprocal easements, and other agreements (written or oral), any amendments, modifications or supplements to the foregoing existing as of the date hereof, and recorded memoranda of any of the foregoing, pursuant to which any Seller holds any leasehold or subleasehold estates and other rights to possess, occupy or use real property, in each case, used by, held for use in or relating to the Business.

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due) regardless of when arising.

"Lien" means any lien (statutory or otherwise), Claim, Encumbrance, deed of trust, right of first offer, easement, servitude, transfer restriction under any shareholder or similar agreement, mortgage, pledge, lien, charge, security interest, option, right of first refusal, easement, security agreement, or other encumbrance or restriction on the use or transfer of any property, hypothecation, license (other than licenses of Intellectual Property granted in the ordinary course of business), preference, priority, covenant, right of recovery, order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any

assignment or deposit arrangement in the nature of a security device, and (iii) any leasehold interest, license, or other right, in favor of a third party or a Seller, to use any portion of the Acquired Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Litigation" means any action, cause of action, suit, claim, investigation, audit, demand, hearing, or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity, and whether before any Governmental Authority.

"Material Adverse Effect" means any effect, condition, fact, circumstance, or change that, individually or in the aggregate, (a) has had, or could reasonably be expected to have, a material adverse effect on the condition of the Acquired Assets, Assumed Liabilities or the condition of the Business, taken as a whole, or (b) prevents, materially impedes or materially delays or would reasonably be expected to prevent, materially impede or materially delay, the consummation by the Sellers of the transactions contemplated by this Agreement; provided, that solely with respect to clause (a), no effect, condition, fact, circumstance, or change to the extent arising out of or resulting from the following, shall constitute or be taken into account, in determining whether there has been a Material Adverse Effect: (i) general business or economic conditions in any of the geographical areas in which the Gym Locations operate; (ii) any condition or occurrence affecting gyms and health clubs or the fitness and health industry generally in any of the geographical areas in which the Gym Locations operate; (iii) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (iv) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (v) the occurrence of any act of God or other calamity or force majeure events (whether or not declared as such), including any strike, labor dispute, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event; (vi) changes in Law or GAAP; (vii) the taking of any action expressly required by this Agreement or taken (or omitted to be taken) with the prior written consent of Buyer (other than any action taken pursuant to Section 5.2(a)); (viii) any effects or changes as a result of the announcement, pendency, or completion of the purchase and sale of the Acquired Assets or the assumption of the Assumed Liabilities, in each case as contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors, or others having relationships with Sellers; (ix) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code; (x) the closing of any gyms other than the Gym Locations or the sale of any other assets or gyms (other than the Acquired Assets) to any third parties by any Seller or any of its Affiliates; (xi) any effects or changes arising from or related to the breach of the Agreement by Buyers; or (xii) any effect resulting from the filing or pendency of the Bankruptcy Cases, except in the case of each of clauses (i), (ii), (iii), (iv), (v) or (vi), to the extent that the Acquired Assets, the Assumed Liabilities or the Business, taken as a whole, are disproportionately affected thereby as compared with other participants in the industries in which the Business operates.

"Merchandise" shall mean (i) all finished goods inventory that is owned by Sellers and located at the Acquired Gym Locations as of the Closing Date, (ii) any Merchandise located at a distribution center or warehouse, and (iii) the Display Merchandise.

15

"<u>Ordinary Course of Business</u>" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice, taking into account the commencement and pendency of the Bankruptcy Cases.

"<u>Outside Back-up Date</u>" has the meaning set forth in <u>Section 5.3(c)</u>.

"<u>Owned Intellectual Property</u>" means all Intellectual Property owned or purported to be owned by Sellers.

"<u>Parties</u>" has the meaning set forth in the preamble.

"<u>Payor</u>" has the meaning set forth in <u>Section 2.8</u>.

"<u>Permit</u>" means any franchise, approval, permit, license, order, registration, certificate, variance, or similar right obtained from any Governmental Authority.

"<u>Permitted Lien</u>" means, in each case solely to the extent applicable to the Acquired Assets: (i) Liens for Taxes not yet due and payable or that are being contested in good faith by appropriate proceedings and arising or incurred in the Ordinary Course of Business; (ii) mechanic's, workmen's, repairmen's, warehousemen's, carrier's, or other similar Liens, including all statutory liens, arising, or incurred in the Ordinary Course of Business for amounts that are not delinquent and that are not, individually or in the aggregate, material to the Business; (iii) with respect to leased or licensed real or personal property, the terms and conditions of the lease, license, sublease, or other occupancy agreement applicable thereto that are customary; (iv) with respect to any Leased Real Property, usual, and customary zoning, building codes, and other land use laws regulating the use or occupancy of such Leased Real Property or the activities conducted thereon that are imposed by any Governmental Authority having jurisdiction over such Leased Real Property; and (v) with respect to any Leased Real Property, usual and customary easements, covenants, conditions, restrictions, and other similar matters affecting title to the underlying fee interest real property and other encroachments and title and survey defects provided that they do not materially detract from the value of the leasehold interest in such Leased Real Property or the use of such Leased Real Property in the Business.

"<u>Permitted Post-Closing Lien</u>" means Liens described in clauses (iii), (iv) and (v) of the definition of "Permitted Liens".

"<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

"<u>Personal Information</u>" has the meaning set forth in <u>Section 3.11</u>.

"<u>Petition Date</u>" has the meaning set forth in the recitals.

"<u>Post-Closing Tax Period</u>" means any Tax period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and that portion of any Straddle Period ending on the Closing Date.

"Prevailing Bidder" has the meaning set forth in Section 5.3(c).

"Privacy Requirements" has the meaning set forth in Section 3.11.

"Property Taxes" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"Proposed Cure Costs" has the meaning set forth in Section 2.6(a).

"PTO" means accrued but unused vacation and sick time.

"Purchase Price" has the meaning set forth in Section 2.3(a).

"Purchased Actions" means all Causes of Action (including all Acquired Avoidance Actions) available to Sellers or their estates as of the time of Closing (i) against (A) Buyer or any of its Affiliates (other than Claims related to Seller's right to enforce this Agreement or any Related Agreement), (B) any Transferred Employee, (C) the Persons serving as directors of Blink during the Bankruptcy Cases, (D) any customer, supplier, manufacturer, distributor, broker, or vendor of any Seller or any other Person with whom any Seller has an ordinary course commercial relationship(including, for the avoidance of doubt, Equinox and any of its Affiliates  (including their respective directors, officers, employees and other personnel), or (ii) otherwise arising out of or in connection with the Business, the Acquired Assets, or the Assumed Liabilities.

"Related Agreements" means the Bill of Sale and Assignment, the TSA, the ELA, the Intellectual Property Assignment Agreement and any other agreement or certificate required to be executed and delivered in connection with Closing.

"Release" means any release, spill, emission, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, disposal, dumping, dispersing, leaching or migrating in, into, onto or through the indoor or outdoor environment.

"Representative" means, when used with respect to a Person, the Person's controlled and controlling Affiliates (including Subsidiaries) and such Person's and any of the foregoing Person's respective officers, directors, managers, members, stockholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

"Requesting Party" has the meaning set forth in Section 6.2.

"Sale Hearing" means the hearing for approval of, among other things, this Agreement and the transactions contemplated herein.

"Sale Motion" means the motion, in form and substance reasonably acceptable to Buyer, filed by Sellers with the Bankruptcy Court seeking authority to sell the Acquired Assets which such motion may be made and included as a part of the Bidding Procedures Motion.

"Sale Order" means one or more orders, in form and substance acceptable to Buyer, authorizing the sale of the Acquired Assets in accordance with this Agreement.

"Security Incident" has the meaning set forth in Section 3.11.

"Seller Property Tax Amount" has the meaning set forth in Section 6.5(b).

"Sellers" has the meaning set forth in the preamble.

"Specified Leases" has the meaning set forth in Section 2.6(b)(i).

"Stalking Horse Order" means an order of the Bankruptcy Court, which shall be in form and substance reasonably acceptable to Buyer: (a) approving the Break-Up Fee and the Expense Reimbursement, and (b) confirming the Prepetition Secured Parties and DIP Secured Parties' (as defined in the DIP Order) agreement (i) notwithstanding anything to the contrary in the DIP Order, not to submit any credit or other bid competing with the bid reflected in this Agreement, including an Incremental Bid (as defined in the Bidding Procedures Order) and (ii) to support the effectiveness of this Agreement, the TSA, and the transactions contemplated hereby (subject to higher and better offers), which order shall be in form and substance reasonably acceptable to Buyer.

"Straddle Period" means any Tax period beginning before or on and ending after the Closing Date.

"Subsidiary" means, with respect to any Person, on any date, any Person (a) the accounts of which would be consolidated with and into those of the applicable Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date or (b) of which securities or other ownership interests representing more than fifty percent of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests or more than fifty percent of the profits or losses of which are, as of such date, owned, controlled, or held by the applicable Person or one or more subsidiaries of such Person.

"Successful Bidder" has the meaning set forth in the Bidding Procedures Order.

"Tax" or "Taxes" means any United States federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, escheat, unclaimed property, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary, or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto and any amendment, thereof.

"Termination Date" has the meaning set forth in Section 8.1(b)(ii).

"Transfer Tax" has the meaning set forth in Section 6.4.

"Transferred Employee" has the meaning set forth in Section 6.3(a).

"Transferred Intellectual Property" has the meaning set forth in Section 6.10.

"TSA" means a Transition Services Agreement to be entered into by Buyer and Equinox, substantially in the form attached hereto as Exhibit D, as mutually agreed by Buyer and Equinox prior to the Closing.

"WARN Act" means, collectively, the Worker Adjustment and Retraining Notification Act of 1988 and any similar state or local Law.

Section 1.2    Interpretations.  Unless otherwise indicated herein to the contrary:

(a)    When a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause, or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause, or subclause of this Agreement.

(b)    The words "include", "includes", or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof", "herein", and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(e)    The use of "or" herein is not intended to be exclusive.

(f)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine, or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(g)    All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

(h)    References herein to a Person are also to such Person's successors and permitted assigns.  Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto.

(i)    Any reference herein to "Dollars" or "$" shall mean United States dollars.

19

(j)     Buyer acknowledges and agrees that the specification of any dollar amount in the representations, warranties, or covenants contained in this Agreement is not intended to imply that such amounts or higher or lower amounts are or are not material, and Buyer shall not use the fact of the setting of such amounts in any dispute or controversy between the Parties as to whether any obligation, item, or matter is or is not material.

(k)     References in this Agreement to materials or information "furnished to Buyer" and other phrases of similar import include all materials or information made available to Buyer or Buyer's Representatives in the data room prepared by Sellers prior to the date of this Agreement or provided to Buyer or Buyer's Representatives prior to the date of this Agreement in response to requests for materials or information.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1     Purchase and Sale of Assets.     On the terms and subject to the conditions set forth in this Agreement, effective as of the Closing Date, Buyer will purchase and acquire from Sellers, and Sellers will sell, transfer, assign, convey, and deliver to Buyer, at the Closing, all of the Acquired Assets.  As set forth herein, such sale is free and clear of all Liens (other than Permitted Post-Closing Liens).

Section 2.2     Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, Buyer will assume and become responsible for the Assumed Liabilities at the Closing.  Buyer agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored, and discharged, all Assumed Liabilities, including paying all Buyer Cure Costs.

Section 2.3     Consideration; Deposit; Pre-Closing Statement.

(a)     The consideration for the Acquired Assets shall be the sum of:  (i) a payment in cash in an amount equal to (A) One Hundred Five Million Dollars ($105,000,000) (the "Base Purchase Price"), less (B) the Seller Property Tax Amount as determined pursuant to Section 2.3(c), less (C) the aggregate amount of the Deferred Rent Adjustment for all Assumed Leases as of the Closing (the "Total Deferred Rent Adjustment"), less (D) the excess, if any, of (x) the Closing PTO Amount as determined pursuant to Section 2.3(c) over (y) an amount equal to one hundred five percent (105%) of the sum of the aggregate PTO amounts with respect to the Offer Employees as set forth in Section 3.17(f)(ii)(B) of the Disclosure Schedule (the "Closing PTO Adjustment"), less (E) the excess, if any, of the Actual Customer Credits as determined pursuant to Section 2.3(c) over an amount equal to one hundred five percent (105%) of the Customer Credits amount with respect to the Acquired Gym Locations as set forth in Section 3.17(f)(i)(B) of the Disclosure Schedule (the "Customer Credit Adjustment"), plus (F) an amount equal to fifty percent (50%) of the amount (if any) by which the aggregate Buyer Cure Costs arising out of Assumed Contracts as of the Closing Date are less than Two MillionDollars ($2,000,000) (the "Buyer Cure Cost Adjustment" and the resulting amount in this clause (i) (after giving effect to any reductions pursuant to the preceding clauses (B)-(E) and any increase pursuant to the preceding clause (F)), the "Closing Cash Payment") and (ii) assumption of the Assumed

20

Liabilities, including Buyer Cure Costs (clauses (i) and (ii), collectively, the "Purchase Price"); provided, however, that Buyer reserves the right to increase the Purchase Price, subject to the Bidding Procedures Order and applicable Law and to the extent the amount of the Purchase Price payable in cash is increased, the Base Purchase Price shall refer to such increased cash amount.

(b)    No later than three (3) Business Days following Buyer's execution and delivery of this Agreement, Buyer shall deliver into a segregated account (the "Deposit Account") maintained by Epiq Corporate Restructuring, LLC (the "Deposit Holder") the sum of Ten Million Five Hundred Thousand Dollars ($10,500,000) (the "Deposit") in immediately available funds. Upon receipt of the Deposit, the Deposit Holder shall immediately place the Deposit into a non-interest-bearing account. The Deposit shall not be subject to any Lien, attachment, trustee process, or any other judicial process of any creditor of any of the Sellers or the Buyer and shall be released (together with all accrued investment income thereon, if any), and Buyer and Sellers shall deliver any written instructions to the Deposit Holder to effect the distribution of the Deposit, solely as follows:

(i)    The Deposit shall become nonrefundable upon Sellers' termination of the transaction contemplated by this Agreement in accordance with Section 8.1(d) (a "Buyer Default Termination"). In the event the Deposit becomes non-refundable by reason of a Buyer Default Termination and Sellers are not then in default of this Agreement, Deposit Holder shall immediately disburse the Deposit to Sellers to be retained by Sellers for Sellers' own account as liquidated damages.

(ii)    At the Closing, the Deposit shall be delivered to Sellers and credited toward payment of the Cash Payment payable by Buyer to Sellers under Section 2.5(a).

(iii)    If this Agreement is terminated in accordance with Section 8.1 for any reason other than a Buyer Default Termination, the Deposit Holder shall return the Deposit to Buyer within two (2) Business Days after the termination of this Agreement, provided, however, that if Buyer is designated as the Back-up Bidder, then the Deposit Holder shall return the Deposit to Buyer concurrently with the closing of any alternative transaction in connection with a Competing Bid.

(c)    At least ten (10) Business Days prior to the Closing Date, Sellers shall prepare and deliver to Buyer a statement (the "Pre-Closing Statement") setting forth, together with reasonable supporting detail, (x) Sellers' proposed calculations of (i) the Seller Property Tax Amount, (ii) (1) the Deferred Rent with respect to each Assumed Lease as of the Closing (the "Actual Deferred Rent") and the resulting Deferred Rent Adjustment for such Lease, and (2) the resulting Total Deferred Rent Adjustment, (iii) the aggregate amount of PTO outstanding as of the Closing with respect to the Offer Employees (the "Closing PTO Amount") and the resulting Closing PTO Adjustment, (iv) the aggregate amount of Customer Credits outstanding as of the Closing (the "Actual Customer Credits") and the resulting Customer Credit Adjustment; and (y) Sellers' calculation of the Closing Cash Payment on the basis of the foregoing (including the Base Purchase Price and the Buyer Cure Cost Adjustment pursuant to Section 2.3(a)). Sellers shall make their relevant

books and records and personnel and other representatives available to Buyer and its accountants and other representatives prior to the Closing at reasonable times for purposes of review and confirmation of the Pre-Closing Statement. Sellers shall consider in good faith Buyer's comments, if any, to the Pre-Closing Statement or any of the components thereof or calculations therein and Buyer and Sellers shall negotiate in good faith to resolve any such disagreements and implement any agreed changes; provided, that in no event shall the Closing or the Closing Date be delayed, extended or postponed pursuant to this sentence or the immediately preceding sentence.  In the event that, at or prior to the Closing, Buyer and Sellers mutually agree in writing upon one or more of the Seller Property Tax Amount, the Actual Deferred Rent, the Closing PTO Amount and the Actual Customer Credits, such amount shall be the Seller Property Tax Amount, the Actual Deferred Rent, the Closing PTO Amount or the Actual Customer Credits, as applicable, for purposes of Section 2.3(a). In the event that, at the Closing, Buyer and Sellers have not mutually agreed in writing upon one or more of the Seller Property Tax Amount, the Actual Deferred Rent (including the resulting Total Deferred Rent Adjustment), the Closing PTO Amount (including the resulting Closing PTO Adjustment) and the Actual Customer Credits (including the resulting Customer Credit Adjustment) (any such amount for which Buyer and the Sellers have not agreed, a "Disputed Adjustment"), (A) Sellers' latest calculation of such Disputed Adjustment shall be the Seller Property Tax Amount, the Actual Deferred Rent (including the resulting Total Deferred Rent Adjustment), the Closing PTO Amount (including the resulting Closing PTO Adjustment) or the Actual Customer Credits (including the resulting Customer Credit Adjustment), as applicable, for purposes of Section 2.3(a), (B) the sum of the difference between Sellers' latest calculation and Buyer's latest calculation of such Disputed Adjustment aggregated for all Disputed Adjustments (such sum, the "Total Disputed Amount") shall be deducted from the Closing Cash Payment amount required to be paid in cash by Buyer to Sellers at Closing pursuant to Section 2.5(b) and deposited by Buyer in a separate escrow account with the Deposit Holder (or another third-party escrow agent that is reasonably agreeable to each of Buyer and Sellers), (C) Buyer and Sellers shall submit the Disputed Adjustment to the Bankruptcy Courts for final determination, and shall cooperate in good faith with each other and the Bankruptcy Courts, to resolve any outstanding disputes related thereto in accordance with the terms of (and definitions set forth in) this Agreement as promptly as reasonably practicable following the Closing and (D) thereafter, Buyer and Sellers shall deliver joint written instructions to the Deposit Holder (or such escrow agent) to release the Disputed Amount to one or more of Buyer and Sellers in such amount as is ultimately determined by the Bankruptcy Courts.  Any payments determined and made pursuant to clauses (C) and (D) of the foregoing sentence shall be treated as an adjustment to the Purchase Price by the Parties for Tax purposes, unless otherwise required by Law.

Section 2.4    Closing.    The closing of the transactions contemplated by this Agreement (the "Closing") shall take place by electronic exchange of documents (or, if the Parties agree in writing to hold a physical closing, at the offices of Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801), or such other location as shall be mutually agreed upon by Sellers and Buyer, commencing at 10:00 AM local time on November 29, 2024, subject to the prior or simultaneous satisfaction or waiver all of the conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated

hereby set forth in <u>Article VII</u>, or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto.  The date on which the Closing is to occur shall be referred to herein as the "<u>Closing Date</u>".

Section 2.5    <u>Closing Payments and Deliveries</u>.

(a)    At the Closing, each Seller will deliver to Buyer: (i) a duly executed Bill of Sale and Assignment and Assumption Agreement, substantially in the form of <u>Exhibit A</u> (the "<u>Bill of Sale and Assignment</u>"); (ii) a duly executed Intellectual Property Assumption and Assignment Agreement, substantially in the form of <u>Exhibit B</u> (the "<u>Intellectual Property Assignment Agreement</u>"); (iii) a TSA duly executed by  Equinox; (iv) duly executed written instructions to the Deposit Holder directing the Deposit Holder to deliver the Deposit to Sellers; (v) a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in <u>Section 7.1(a)</u>, <u>Section 7.1(b)</u> and <u>Section 7.1(h)</u> is satisfied; (vi) an ELA duly executed by each of the Sellers or their Affiliates party thereto; and (vii) a properly completed and duly executed IRS Form W-9 from each Seller.

(b)    At the Closing, Buyer will deliver to Sellers: (i) an amount in cash, by wire transfer of immediately available funds to an account designated in writing by the Sellers to Buyer no later than two (2) Business Days prior to the Closing Date, equal to (A) the Closing Cash Payment *less* (B) the Deposit *less* (C) the Adjustment Escrow Amount, (ii) the Bill of Sale and Assignment duly executed by Buyer; (iii) the Intellectual Property Assignment Agreement duly executed by Buyer or its designated Affiliate; (iv) the TSA duly executed by Buyer or its designated Affiliate; (v) the ELA duly executed by Buyer or its designated Affiliate; (vi) duly executed written instructions to the Deposit Holder directing the Deposit Holder to deliver the Deposit to Sellers; and (vii) a duly executed certificate from an officer of Buyer to the effect that each of the conditions specified in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> are satisfied.

(c)    With respect to each Assumed Agreement, Buyer shall satisfy the Buyer Cure Costs and Sellers shall satisfy all Cure Costs, if any, that do not constitute Buyer Cure Costs.

Section 2.6    <u>Treatment of Certain Contracts and Leases</u>.

(a)    <u>Schedule 2.6(a)</u> sets forth a list or reference, as of the date hereof, of all executory Contracts and unexpired Leases related to the Business to which any Seller is a party and which sets forth the Sellers' good faith estimate of the Cure Costs associated with each such Contract and unexpired Lease set forth thereon as of the date hereof (the "<u>Proposed Cure Costs</u>").  Upon written request by Buyer, Sellers shall provide to Buyer as promptly as practicable an updated <u>Schedule 2.6(a)</u>, setting forth, to the knowledge of Sellers, the Proposed Cure Costs as of the date of such request with respect to any Contracts or Leases specifically identified by Buyer in such written request.  Prior to and during the Designation Rights Period, Sellers shall not reject, terminate, amend, supplement, modify, waive any rights under, or create any adverse interest with respect to any Contract or Lease, or take any affirmative action not required thereby without Buyer's prior written consent unless (i) Buyer expressly designates such Contract or Lease an Excluded Agreement by

written notice to Sellers, (ii) such Lease is deemed an Excluded Agreement as of the Final Lease Specification Time pursuant to Section 2.5(b)(i) or (iii) such Contract or Lease is deemed an Excluded Agreement at Closing pursuant to Section 2.5(b)(iii); provided, however, that Sellers shall not be obligated to renew or extend any expiring Contract or Lease during the Designation Rights Period unless Buyer agrees to designate any such renewed or extended Contract or Lease as an Assumed Agreement; provided, further, that Sellers shall provide Buyer with reasonable notice prior to the renewal or extension deadline, if any, or termination or expiration of any such Contract or Lease.

(b)    Treatment of Contracts and Leases at Closing.

(i)    Schedule 2.6(b)(i) (the "Specified Leases List") sets forth a complete list of all Leases that Buyer may seek (without obligation) to have assumed and assigned by Sellers to Buyer or its designee prior to the expiration of the Designation Rights Period (such Leases, the "Specified Leases").  Buyer may supplement, amend, or otherwise modify the Specified Leases List at any time prior to the Final Lease Specification Time to remove a Specified Lease without penalty. After the Final Lease Specification Time, any Lease not listed on the Specified Leases List shall be automatically deemed an Excluded Agreement. For any Specified Lease designated as an Excluded Agreement after the Final Lease Specification Time (x) by Buyer or (b) otherwise deemed to be an Excluded Agreement in accordance with this Section 2.6, Buyer shall pay to Sellers the Closure Cost thereof as set forth on Exhibit E with respect to such Specified Lease within (1) Business Day after such Specified Lease is designated as, or deemed to be, an Excluded Agreement.  For the avoidance of doubt, Buyer shall not be obligated to pay any Closure Costs for any Specified Lease that is designated as or deemed to be an Excluded Agreement at or prior to the Final Lease Specification Time.

(ii)    Prior to Closing, Buyer will deliver a complete list of all Contracts and Specified Leases that will be assumed and assigned by Sellers to Buyer at Closing (such Contracts and Specified Leases, together with any other Contracts and Specified Leases assumed by any Seller and assigned to Buyer or its designee under this Agreement, the "Assumed Agreements"), which list will be annexed hereto as Schedule 2.6(b)(ii) (the "Assumed Agreements List"). Buyer may supplement, amend, or otherwise modify the Assumed Agreements List at any time after delivery thereof until Closing to add or remove any Contracts or Specified Leases.  Upon and effective as of Closing, the Sellers will assume and assign to Buyer all Assumed Agreements listed on the Assumed Agreements List.

(iii)    Prior to Closing, Buyer will deliver to Sellers a complete list of all Contracts and Specified Leases with respect to which Buyer's right to designate as an Assumed Agreement will be reserved during the Designation Rights Period (such Contracts and Leases, the "Reserved Agreements"), which list will be annexed hereto as Schedule 2.6(b)(iii) (the "Reserved Agreements List"). Subject to Buyer's obligations with respect to the payment of Closure Costs for any Specified Leases removed after the Final Lease Specification Time, Buyer may

24

supplement, amend, or otherwise modify the Reserved Agreements List at any time after delivery thereof until the Closing to add or remove any Contracts or Specified Leases.

(iv)    After Closing, any Contract or Lease listed on Schedule 2.6(a) that is not an Assumed Agreement or a Reserved Agreement shall be automatically deemed an Excluded Agreement, which Sellers shall be permitted to reject in accordance with the Assumption and Assignment Order without Buyer's consent. For the avoidance of doubt, this clause (iii) shall not apply to any Contract or Lease not previously listed on Schedule 2.6(a).

(v)    Buyer's determination to not assume any Contracts or Specified Leases shall not reduce the Base Purchase Price.

(c)    Treatment of Reserved Agreements after Closing.

(i)    During the Designation Rights Period, Buyer shall have the right to provide written notice (a "Designation Notice") to Sellers of Buyer's election to designate any Reserved Agreement as (x) an Assumed Agreement or (y) an Excluded Agreement.  Any Reserved Agreements not designated as Assumed Agreements prior to the expiration of the Designation Rights Period shall be deemed to be Excluded Agreements.

(ii)    For any Reserved Agreement designated as an Assumed Agreement, within one (1) Business Day after receipt of the applicable Designation Notice, Sellers shall promptly notify in writing the counterparty to such Assumed Agreement (the "Designation Counterparty") that such Assumed Agreement will be assumed and assigned by Sellers to Buyer, and the assumption and assignment of such Assumed Agreement shall become effective seven (7) calendar days following Sellers' service of notice on the Designation Counterparty.

(iii)    Buyer will be responsible for payment (which payment shall be remitted as promptly as practicable following Buyer's receipt of an invoice or other appropriate documentation in respect of such Liabilities) of any and all  Liabilities of Sellers that become due and payable under the Reserved Agreements in the ordinary course and constitute administrative expenses pursuant to section 503(b) of the Bankruptcy Code during the Designation Rights Period; provided that, with respect to any Reserved Agreement designated by Buyer as an Excluded Agreement in accordance herewith, Buyer's responsibility shall be limited to payment of Liabilities accruing during the period from the Closing Date until the earlier of the end of the Designation Rights Period or seven (7) calendar days following Sellers' receipt of a Designation Notice designating such Reserved Agreement as an Excluded Agreement; provided, further that, notwithstanding anything to the contrary herein, Buyer shall not be responsible for any payment Liabilities under any Reserved Agreement that are attributable to Sellers' actual fraud, gross negligence, willful misconduct, or any act or omission otherwise made in bad faith. .

(d)    Buyer will pay the Buyer Cure Costs associated with the Assumed Agreements and the Liabilities arising under the Reserved Agreements in accordance with Section 2.5(c)(iii).  For the avoidance of doubt, Sellers shall be responsible for, and pay upon the effectiveness of the assumption and assignment thereof, all other Liabilities arising under any Contract or Lease attributable to, arising during, or related to any pre-Closing period.

(e)    During the Designation Rights Period, Sellers shall provide unrestricted access to all properties governed by any Reserved Agreement that is a Specified Lease to allow the Buyer, its Representatives, and the Covered Employees to operate the Business during the period from and after Closing through the effective date of the applicable Lease's assumption and assignment to Buyer or designation of such Lease as an Excluded Agreement. Buyer shall indemnify, defend, and hold harmless Sellers for any claims for out-of-pocket damages payable by them to third parties to the extent such damages are caused by Buyer's or Buyer's Representatives' operation of the Business at any Gym Location operated pursuant to a Reserved Agreement that is a Specified Lease during the Designation Rights Period.

(f)    Sellers shall take all actions reasonably required to assume and assign the Assumed Agreements to Buyer (including payment of the Cure Costs other than the Buyer Cure Costs), including to obtain an order of the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Contracts or Leases to the Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(g)    Buyer shall take all actions reasonably required for Sellers to assume and assign the Assumed Agreements to Buyer (including the payment of the Buyer Cure Costs), including taking all actions reasonably necessary to obtain an order of the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Contracts or Leases to Buyers satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(h)    Subject to and in accordance with Section 5.6, after the date of this Agreement, Sellers shall provide Buyer and its Representatives with reasonable access to all Contract and Lease counterparties requested by Buyer to discuss and negotiate Cure Costs and any other provisions.  Buyer and Seller shall cooperate and coordinate in a reasonable manner in connection with the foregoing.

(i)    For as long as the assumption and assignment of any Assumed Agreement remains pending on or after the Closing Date, Sellers shall (i) continue to take all actions reasonably required to assume and assign such Assumed Agreement to Buyer, and (ii) continue to perform its obligations under the terms of such Assumed Agreement unless and until directed otherwise by Buyer.

(j)    From and after the Closing, if Sellers become aware of any Contract or Lease to which a Seller is a party not previously listed on Schedule 2.6(a), Sellers shall promptly notify Buyer and shall, as soon as reasonably practicable thereafter, if requested by Buyer after a reasonable review period, take all actions reasonably required for Sellers

to assume and assign such Contract or Lease. Buyer shall not be responsible for any Liabilities arising under such Contract or Lease other than any Buyer Cure Costs.

Section 2.7    Allocation.  Buyer shall prepare and deliver to Blink the allocation of the Purchase Price, together with any other items that are treated as consideration for U.S. federal income tax purposes (including any Assumed Liabilities), among the Acquired Assets in accordance with section 1060 of the IRC and the Treasury Regulations promulgated thereunder consistent with Schedule 2.7 (the "Purchase Price Allocation") within forty-five (45) days following the Closing (or the final determination of any Disputed Adjustments pursuant to Section 2.3(c), if applicable).  Buyer shall consider in good faith any reasonable comments provided by Blink to the Purchase Price Allocation (provided such comments are consistent with Schedule 2.7), and the Parties agree to use commercially reasonable efforts to reach an agreement on any and all disputed items in the draft Purchase Price Allocation within fifteen (15) days after receipt by Blink of such draft Purchase Price Allocation, after which the Purchase Price Allocation shall be conclusive and binding on the Parties. If the sum of the Purchase Price and any other amounts that are treated as consideration for U.S. federal income tax purposes is adjusted following the finalization of the Purchase Price Allocation, a revised Purchase Price Allocation shall be prepared and finalized in accordance with the procedures set forth in this Section 2.7. None of the Parties will take any position inconsistent with the Purchase Price Allocation as finalized pursuant to this Section 2.7 on any Tax Return (including IRS Form 8594) or in any audit or Tax proceeding, unless otherwise required by a final "determination" within the meaning of section 1313 of the IRC (or comparable provision of state, local, or foreign Tax Law).  Notwithstanding the foregoing, the Parties recognize that certain allocations may be necessary prior to the above time schedule, such as in the case of any Transfer Tax filings, and agree to reasonably cooperate in determining the appropriate allocation consistent with Schedule 2.7 in a timely manner.

Section 2.8    Withholding.  Buyer, its Affiliates, and any other Person making a payment hereunder (in each case, a "Payor"), shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any Seller or any other Person such amounts as such Payor is required to deduct and withhold under the IRC, or any applicable Law, with respect to the making of such payment.  To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.  Buyer shall use commercially reasonable efforts to inform Sellers of any anticipated required withholding no later than five (5) Business Days prior to Closing.

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers represent and warrant to Buyer that the statements contained in this Article III are true and correct as of the date of this Agreement and as of the Closing Date, except as set forth in the corresponding Section or subsection, as applicable, of the disclosure schedule accompanying this Agreement (the "Disclosure Schedule").

Section 3.1    Organization of Sellers; Good Standing.  Each Seller is either a corporation duly organized or a limited liability company duly formed, validly existing, and in good standing under the laws of the state of such Seller's incorporation or formation and has,

27

subject to entry of the Sale Order, all requisite corporate or limited liability company power and authority to own, lease, and operate such Seller's assets and to carry on such Seller's business as now being conducted, except where the failure to be so organized or formed, existing, or in good standing or have such power and authority would not reasonably be expected to, individually or in the aggregate, a Material Adverse Effect.

Section 3.2    <u>Authorization of Transaction</u>.    Subject to entry of the Sale Order, each Seller and each of its Affiliates party thereto has full power and authority (including full corporate or limited liability company power and authority) to execute, deliver and perform this Agreement, the Related Agreements and all other agreements contemplated hereby to which such Seller or such Affiliate is a party and to perform such Seller's or such Affiliate's obligations hereunder and thereunder.    The execution, delivery, and performance of this Agreement, the Related Agreements and all other agreements contemplated hereby to which a Seller or an Affiliate thereof is a party have been duly authorized by such Seller and such Affiliate.    Upon due execution hereof by each Seller and its applicable Affiliate(s) party thereto, this Agreement, the Related Agreements and all other agreements contemplated hereby (assuming due authorization and delivery by Buyer) shall constitute, subject to entry of the Sale Order, the valid and legally binding obligation of such Seller and any such Affiliate, enforceable against such Seller or such Affiliate in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

Section 3.3    <u>Noncontravention; Government Filings</u>.    Neither the execution, delivery or performance of this Agreement or the Related Agreements nor the consummation of the transactions contemplated hereby or thereby (including the assignments and assumptions referred to in <u>Article II</u>), will (a) conflict with or result in a breach of the organizational documents of any Seller, (b) subject to the entry of the Sale Order, violate any Law or Decree to which any Seller is subject in respect of the Business, the Acquired Assets or the Assumed Liabilities, (c) subject to the entry of the Sale Order, result in a breach of, constitute a default under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel, or require any notice under any Lease or material Contract to which any Seller is a party or to which any of the Acquired Assets is subject, except, in the case of clause (c), for such conflicts, violations, breaches, defaults, accelerations, rights, or failures to give notice as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole, or (d) result in the creation of, or require the creation of, any Lien (other than Permitted Post-Closing Liens) upon any Acquired Assets.    Other than as required by, or pursuant to, the Bankruptcy Code, the Bidding Procedures Order, or the Sale Order, or such filings as may be required under the HSR Act, no Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file, or obtain such authorization, consent, or approval would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole.

Section 3.4    <u>Title to Assets; Sufficiency of Assets</u>.

(a)    Sellers have good and valid title to, or, in the case of leased or subleased Acquired Assets, the valid and subsisting leasehold interests in, all Acquired Assets, free and clear of all Liens (other than Permitted Liens). Pursuant to the Sale Order, Sellers will convey such title to or rights to use, all of the Acquired Assets, free and clear of all Liens (other than Permitted Post-Closing Liens).

(b)    All tangible Acquired Assets are (i) in good working order and condition in all material respects, ordinary wear and tear excepted, (ii) have been reasonably maintained, (iii) are suitable in all material respects for the uses for which they are being utilized in the Business as conducted by the Sellers as of the date hereof, (iv) do not require more than regularly scheduled maintenance in the Ordinary Course of Business and the established maintenance policies of Sellers, as applicable, in order to keep them in good operating condition, and (v) comply in all material respects with all requirements under any Laws and any licenses which govern the use and operation thereof. Except as set forth on Section 3.4(b) to the Disclosure Schedule, no tangible Acquired Assets consisting of equipment is subject to any lease agreement.

(c)    Except as set forth on Section 3.4(c) of the Disclosure Schedule, other than the services provided by Equinox pursuant to the terms of the TSA and the services provided by the applicable Seller(s) pursuant to the terms of the ELA, the Acquired Assets constitute all the Contracts, properties, assets, and rights reasonably necessary, and are sufficient in all material respects, for the conduct of the Business as currently conducted by Sellers.

Section 3.5    Contracts and Leases.

(a)    Schedule 2.6(a) sets forth a true and complete list, as of the date hereof, of all executory Contracts and unexpired Leases related to the Business to which any Seller is a party and the Sellers' good faith estimate of the Proposed Cure Costs.  True and complete copies of all Contracts and Leases set forth on Schedule 2.6(a) have been made available to Buyer in the data room prepared by Sellers.

(b)    Other than as a result of (i) rejection by the Sellers in the Bankruptcy Cases, (ii) the automatic stay under the Bankruptcy Code or (iii) any consequence of any of the foregoing, (A) except as set forth in Section 3.5(b) of the Disclosure Schedule, there does not exist under any Contract or Lease required to be set forth on Schedule 2.6(a) any material breach, material violation, or material default on the part of a Seller or, to the Knowledge of Sellers, any other party to such Contract or Lease, (B) to the Knowledge of Sellers, there does not exist any event, including the consummation of the transactions contemplated in this Agreement or any Related Agreement, that would (with or without notice, passage of time, or both) constitute a breach, violation or default thereunder on the part of a Seller or result in the acceleration of any obligation under such Contract, which breach, violation, acceleration or default has, or would reasonably be expected to, individually or in the aggregate, be material to the Business, taken as a whole, (C) the Sellers have not received any written notice of any default, notice of termination or intent to terminate, or notice regarding payment delinquency, and (D) to the Knowledge of Sellers, there has not been an event that with notice or lapse of time or both would constitute

a default by Sellers under any Contract or Lease required to be set forth on Schedule 2.6(a), except for defaults that would not be reasonably likely to be material to the Business, taken as a whole.

Section 3.6    Real Property.  Sellers do not have and have never had any fee title interest in any real property. Section 3.6 of the Disclosure Schedule sets forth (x) the location of each of the operating gyms and health clubs of the Business within the Territory (each, a "Gym Location", and collectively, the "Gym Locations"), each of which is leased to a Seller by a third party, and each other leased real property used by, held for use in or relating to the Business (collectively, with the Gym Locations, the "Leased Real Property"), and (y) a list of all Leases and their respective locations. Sellers have made available to Buyer a true and complete copy of each Lease.  With respect to each Lease, (a) the Seller party thereto has good and valid title to the leasehold estate in the Leased Real Property, free and clear of all Liens other than Permitted Liens; (b) such Lease constitutes the valid and legally binding obligation of the Seller party thereto and, to Sellers' Knowledge, the counterparty thereto, enforceable against such Seller and, to Sellers' Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity; (c) neither such Seller nor, to Sellers' Knowledge, the counterparty thereto is in breach or default under such Lease, and no event has occurred which, with notice or lapse of time, or both would constitute a breach or default or permit termination, modification or acceleration thereunder, except (i) for those defaults that will be cured in accordance with the Sale Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Leases) or (ii) to the extent such breach or default would not reasonably be expected to have a Material Adverse Effect; (d) no party to such Lease has repudiated any provision thereof; (e) there are no disputes, oral agreements or, except as specifically set forth in such Leases, forbearance programs in effect as to such Lease; (f) the Seller party to such Lease has not assigned, transferred, conveyed, mortgaged or encumbered any interest in the Leased Real Property that is subject to such Lease; (g) the Leased Real Property under such Lease has received all approvals of Governmental Authorities (including licenses and permits) required in connection with the operation thereof and has been operated and maintained in accordance with, and is not in violation of, applicable Laws; (h) there are no pending or, to the knowledge of Seller, threatened condemnation proceedings, lawsuits, or administrative actions relating to the related Leased Real Property or other matters affecting and adversely impairing the current use, occupancy, or value thereof; (i) any covenants, easements, rights-of-way and other similar encumbrances affecting the related Leased Real Property do not, materially impair the ability to use such Leased Real Property in the operation of the Business as presently conducted and the Seller party thereto is not in violation of any material terms, conditions and provisions thereof; (j) except as set forth in Section 3.6(j) of the Disclosure Schedule, there are no subleases, licenses, concessions, or other agreements, written or oral, granting to any third party or parties the right of use or occupancy of any portion of the related Leased Real Property; (k) all facilities located on the related Leased Real Property are supplied with utilities and other services necessary for the operation of such facilities, including gas, electricity, ventilating, water, telephone, sanitary sewer, and storm sewer, all of which are adequate under applicable Laws; (l) to the Knowledge of the Sellers, all mechanical, structural systems and improvements located on the related Leased Real Property are in good working order subject to normal wear and tear; and (m) to the

30

Knowledge of Sellers and except as set forth in <u>Section 3.6(m)</u> of the Disclosure Schedule, the roof, basement and foundation walls of the buildings and improvements located on the related Leased Real Property are in good condition subject to normal wear and tear and are free of leaks and other structure or material defects, including, without limitation, the effects of flooding, subsidence, wet or dry rot, or any infestation.

Section 3.7    <u>Litigation; Decrees</u>.    Except as set forth in <u>Section 3.7</u> of the Disclosure Schedule and other than the Bankruptcy Cases, (a) there is no material Litigation (measured with respect to the Business, the Acquired Assets or the Assumed Liabilities, taken as a whole) and (b) there is no Litigation challenging the validity or enforceability of this Agreement or the Related Agreements or that seeks to enjoin or prohibit the consummation of the transactions contemplated hereby or thereby, in each case, pending or threatened in writing against the Sellers, jointly or individually.  Other than the Bankruptcy Cases, no Seller is subject to any outstanding Decree that would (x) reasonably be expected to be material to the Business, taken as a whole, or (y) prevent or materially delay such Seller's ability to consummate the transactions contemplated hereby or by the Related Agreements or perform in any material respect its obligations hereunder.

Section 3.8    <u>Labor Relations</u>.    Except as set forth in <u>Section 3.8</u> of the Disclosure Schedule:

(a)    No Seller is a party to or bound by any collective bargaining agreement, contract or other agreement or understanding (including all addenda, side letters, memoranda of understanding, and ancillary agreements thereto) with a trade or labor union, works council, employee association, labor organization, or other bargaining unit representative (each, a "<u>Union</u>," and such an agreement or arrangement with a Union, a "<u>Labor Agreement</u>"), nor are there any negotiations or discussions currently pending or occurring between the Sellers and any Union regarding any Labor Agreement or any other work rules or polices. There are no Unions representing or purporting to represent any employee of the Sellers nor are there any Labor Agreements that pertain to any employee of the Sellers. To Sellers' Knowledge, there are, and in the past three (3) years there has been no (i) organizational efforts or activities for the purpose of the formation of a Union or (ii) demands for recognition or any representation proceedings or petition seeking certification of a Union.

(b)    There are no, and the Sellers have not, within the last three (3) years, experienced any strikes, picketing, lockouts, slowdowns, handbilling, work stoppages, or other labor disputes by Sellers' employees, nor are any of the foregoing threatened. There are no unfair labor practice charges, labor disputes, grievances, labor arbitrations or other proceedings or Cause of Actions pending or, to the Knowledge of Sellers, threatened against the Sellers in any forum by or on behalf of any present or former employee of Sellers or any applicant for employment or classes of the foregoing.

(c)    Sellers have made available to Buyer a true, correct, and complete list, as of the date of this Agreement, of (i) all Covered Employees of Sellers that identifies the name or identification number, job title, work location (including city and state), date of hire, exempt or non-exempt status, part-time or full-time status, paid time off accrued as of the date of this Agreement, annual base salary or regular hourly wage rate, and bonus

commission, or other incentive-based compensation payment entitlement for each such employee, employment entity, as well as whether such employee is on leave (including the date of the start of such leave, type of leave, and anticipated date of return) and (ii) all independent contractors (other than those employed or retained by third party corporate entities), consultants, and all other individuals who provide services to the Sellers, either personally or through a single member corporate entity, and receive a Form 1099 from the Sellers that identifies the name or identification number, function, or scope of services, location (city and state), date of retention, hourly rate, or other basis of compensation, including commission, bonus, or other incentive based compensation, the average number of hours worked per month for Sellers.

(d)      No Decree, ruling, assessment, fine, citation, decision, or award imposes continuing obligations or otherwise limits, interferes, conflicts, or affects the Sellers ability to manage its employees, service providers, or job applicants. To the Knowledge of Sellers , no employee, manager, executive, director, or officer of the Sellers is subject to any Decree, contract, covenant, commitment, or other agreement that would interfere with such individual's obligations to the Sellers.

(e)      Except as set forth in Section 3.8(e) of the Disclosure Schedule, to the Knowledge of Sellers, there is no, and for the past eighteen (18) months there has been no, legal, administrative, or arbitral Cause of Action, charge or complaint, lawsuit, governmental investigation or audit, or other similar proceeding pending or threatened against any Seller by, on behalf of, or relating to any employees of Sellers nor are there (i) any internal investigations pending or threatened or (ii) any circumstances that exist that could give rise to any such Cause of Action or internal investigation in connection with or related to the employment or termination of employment of any employee or applicant to become an employee of a Seller, or other service provider who performs or performed services for a Seller alleging breach of any express or implied employment contract, violation of any Law governing labor, employment, or terms and conditions of employment.

(f)      Sellers are and have been in material compliance with all applicable Laws regarding labor, employment and employment practices, including Laws regarding terms and conditions of employment, hiring, background checks, worker classification, collective bargaining, disability rights or benefits, accommodations, privacy, identity, and employment eligibility verification, immigration and authorization to work, occupational health and safety, child labor, reductions in force, plant closings, mass layoffs, termination of employment, group terminations, wages, compensation, hours and benefits, payment, working time, overtime, meal and rest breaks, harassment, employment discrimination, retaliation, pay equity, equal opportunity, pay transparency, affirmative action, record retention, notice, leaves of absence, workers' compensation, unemployment compensation, and the collection and payment of withholding or payroll Taxes and similar Taxes.

(g)      In the past three (3) years, no allegations of sexual harassment, sexual assault, or sexual misconduct have been made or threatened by or against any current or former officer, director, manager, executive or employee of or other individual service provider of the Sellers, and the Sellers have not entered into any settlement agreements

32

related to allegations or claims of sexual harassment, sexual assault, or sexual misconduct by or against any employee, manager, director, executive, officer or other individual service provider. The Sellers have promptly, thoroughly, and impartially investigated all allegations of sexual harassment or discriminatory harassment of which the Sellers are or were aware and has taken all reasonable and necessary corrective actions with respect to such allegations that is reasonably calculated to prevent further discrimination and harassment with respect to each allegation with potential merit.

(h)    In the past six (6) months, the Sellers have not implemented or effectuated any furlough, layoff or material reduction in hours.  In the past ninety (90) days, the Sellers have not implemented or effectuated any "employment loss" (as that term is defined in an applicable WARN Act).

Section 3.9    <u>Brokers' Fees</u>.  Except as set forth in <u>Section 3.9</u> of the Disclosure Schedule, no Seller has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay.

Section 3.10    <u>Taxes</u>.  Except as set forth in <u>Section 3.10</u> of the Disclosure Schedule:

(a)    Sellers have timely filed all Tax Returns required to be filed (taking into account any extension of time to file properly and timely requested by Sellers).  All such Tax Returns are complete and accurate in all material respects.  All Taxes owed by Sellers (whether or not shown on any Tax Return) have been paid.  No claim has ever been made by an authority in a jurisdiction in which a Seller does not file a Tax Return that a Seller is or may be subject to taxation by that jurisdiction in respect of Taxes that would be covered by or the subject of such Tax Return that has not been resolved.

(b)    There is no pending or, to the Knowledge of Sellers, threatened Litigation for or relating to any Liability for Taxes of a Seller or relating to the Acquired Assets or the Business. No Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(c)    There are no Liens on any Acquired Asset or the Business for Taxes (other than for current Taxes not yet due and payable).

(d)    No Acquired Asset (i) is property required to be treated as owned by another person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately prior to the enactment of the Tax Reform Act of 1986, (ii) constitutes "tax-exempt use property" within the meaning of Section 168(h) of the IRC, (iii) is "tax-exempt bond financed property" within the meaning of Section 168(g) of the IRC, (iv) secures any debt the interest of which is tax-exempt under Section 103(a) of the IRC or (v) is subject to a 467 rental agreement as defined in Section 467 of the IRC.

(e)    No Acquired Asset represents an interest in a partnership or other entity for any applicable Tax purpose.

(f)    Sellers are not foreign persons within the meaning of section 1445 of the IRC.

Section 3.11  <u>Data Privacy.</u>  In connection with its collection, storage, transfer (including transfer across national borders) and use of any information that identifies, relates to, describes, is capable of being associated with, or could be linked, directly or indirectly, or used to contact or locate a natural Person, and information that is "protected health information," "personally identifiable information," "personal information," "personal data," or similar term under one or more applicable Privacy Requirements from any individuals, including any members, customers, prospective members or customers, employees, and other third parties (collectively "<u>Personal Information</u>") each Seller, and to the Knowledge of Sellers, all affiliates and third parties processing Personal Information on behalf of each Seller ("<u>Data Partners</u>"), is and, during the last three (3) years, has been in compliance in all material respects with applicable Laws regarding protection of Personal Information, website and mobile application privacy policies and practices, wiretapping, the interception of electronic communications, the tracking or monitoring of online activity, and email, text message, or telephone communications, and each Seller's privacy policy, notices, written statements in relevant jurisdictions, and contractual obligations applicable to each Seller (collectively, the "<u>Privacy Requirements</u>").  Each Seller has all necessary right, title, or other interest in the Personal Information (i) to use such Personal Information as such Seller currently does in such Seller's operations; (ii) to transfer such Personal Information to Buyer; and (iii) to permit Buyer to use such Personal Information. Neither the execution, delivery, or performance of this Agreement, nor the consummation of any of the transactions contemplated under this Agreement will violate any of Sellers' written privacy policy or applicable Law or will require the consent of or provision of notice to any Person concerning such Person's Personal Information. Each Seller has, and has required its Data Partners to have, commercially reasonable physical, technical, organizational, and administrative security measures in place to protect all Personal Information collected by such Seller or on such Seller's behalf from and against Security Incidents and to identify and address internal and external risks to the privacy and security of Personal Information.  Each Seller, and to the Knowledge of Sellers, each Data Partner, is and, during the last three (3) years, has been in compliance in all material respects with all Laws relating to data loss, theft, and breach of security notification obligations. (i) There has been no material loss, theft, accidental or unauthorized access, use, disclosure, or other processing of Personal Information in the possession or control of each Seller, or to the Knowledge of Sellers, any of its Data Partners with regard to any Personal Information obtained from or on behalf of each Seller and (ii) there has not been any unauthorized intrusions or breaches of security or occurrence that jeopardizes or impacts the confidentiality, integrity, or availability of the systems used in the operation of the Business or any Personal Information stored or otherwise processed therein (each of (i) and (ii), a "<u>Security Incident</u>").  Each Seller is, and during the last three (3) years, has been in compliance with the PCI Security Standards Council's Payment Card Industry Data Security Standard (PCI-DSS) and all other applicable security rules and requirements as promulgated by the PCI Security Standards Council, by any member thereof, or by any entity that functions as a card brand, card association, card network, payment processor, acquiring bank, merchant bank, or issuing bank, including all merchant- and service provider-

specific requirements, the Payment Application Data Security Standards (PA-DSS) and all audit, scanning, and filing requirements. Each Seller has not in relation to any Security Incident, Privacy Requirements, or any Laws relating to data loss, theft, and breach of security notification obligations: (i) notified or been required to notify any Person; (ii) received any notice, inquiry, request, claim, complaint, correspondence or other communication from, or been the subject of any investigation or enforcement action by, any Person, and there are no facts or circumstances that could give rise to the occurrence of either of the foregoing.

Section 3.12 <u>Employee Benefits</u>.

(a)     <u>Section 3.12(a)</u> of the Disclosure Schedule lists all "employee benefit plans," as defined in section 3(3) of ERISA (whether or not subject to ERISA), including any multiemployer plans as defined in section 3(37) of ERISA, and all other employee benefit or compensation plans or arrangements (other than governmental plans and statutorily required benefit arrangements), including employment agreements, individual consulting agreements, bonus or incentive plans, equity and equity-based incentive plans, retention, change-in-control and transaction bonus plans or agreements, pension plans, retirement plans, deferred compensation arrangements, severance or termination pay, sick leave, vacation pay, disability, medical insurance and life insurance and other fringe benefits maintained or contributed to by Sellers with respect to Covered Employees (the "<u>Company Benefit Plans</u>").

(b)     Sellers have delivered or made available to Buyer true, correct, and complete copies of the following documents with respect to each Company Benefit Plan, as applicable: (i) each Company Benefit Plan (and all amendments thereto), and in the case of an unwritten Company Benefit Plan, a written description thereof, and any trust agreement, investment management contract, custodial agreement or insurance contract relating to such plan, (ii) the most recent summary plan description and all summaries of material modifications thereto, (iii) the most recently filed annual reports on Form 5500 and all Schedules thereto, (iv) the most recent favorable determination or advisory opinion letter, (v) nondiscrimination testing for the most recently complete plan year, and (vi) any material non-routine written correspondence with a Governmental Authority in the past year.

(c)     Each of the Company Benefit Plans sponsored by Sellers that is intended to qualify under section 401 of the IRC has been determined by the IRS to be so qualified, and, except as disclosed on <u>Section 3.12(c)</u> of the Disclosure Schedule, to the Knowledge of Sellers, nothing has occurred with respect to the operation of any such plan which could reasonably be expected to result in the revocation of such favorable determination.

(d)     Each of the Company Benefit Plans has been maintained, in all material respects, in accordance with its terms and all provisions of applicable Law.

(e)     No Company Benefit Plan is a "multiemployer plan" (as defined in section 3(37) of ERISA) ("<u>Multiemployer Plan</u>") or other pension plan that is subject to Title IV or Section 302 of ERISA or Section 412 of the Code and neither Sellers nor any of Sellers' ERISA Affiliates has sponsored or contributed to or been required to contribute to a

35

Multiemployer Plan or other pension plan subject to Title IV or Section 302 of ERISA or Section 412 of the Code at any time within the previous six years. Neither Sellers nor any of Sellers' ERISA Affiliates has any liability (contingent or otherwise) relating to the withdrawal or partial withdrawal from a Multiemployer Plan.

(f)    No Company Benefit Plan provides benefits, including death or medical benefits, beyond termination of service or retirement other than (i) coverage mandated by Law, including but not limited to COBRA coverage, or (ii) death or retirement benefits under a Company Benefit Plan qualified under Section 401(a) of the Code, and neither Blink nor any of its ERISA Affiliates has made a written or oral representation promising the same.

(g)    Other than routine claims for benefits or other similar claims, there is no material claim or material Cause of Action pending or, to Sellers' Knowledge, threatened, against or arising out of a Company Benefit Plan. No Company Benefit Plan has in the past year been the subject of an examination or audit by any Governmental Authority.

(h)    Except as set forth in Section 3.12(h) of the Disclosure Schedule, no Company Benefit Plan (i) provides for increased payments or benefits, or accelerates the time of vesting or payment of any amount in connection with the transactions contemplated by this Agreement (whether alone or together with any other event), or (ii) provides or would be reasonably expected to provide (whether alone or together with any other event) any "excess parachute payments" (within the meaning of Section 280G of the Code and the Treasury Regulations thereunder) in connection with the transactions contemplated by this Agreement. No Covered Employee is entitled to any "gross up" or similar payment for Taxes imposed by Sections 409A and 4999 of the Code.

Section 3.13   Intellectual Property.

(a)    Section 3.13(a) of the Disclosure Schedule sets forth a complete and correct list of all foreign and domestic issuances and registrations of, and applications for, Business Intellectual Property owned or purported to be owned by any Seller, specifying for each such item, as applicable, the recorded owner (and beneficial owner, if different), registration or application number, registration or application date, jurisdiction and, for domain names, registrar, and all such Intellectual Property is subsisting, and to the Knowledge of the Sellers, valid and enforceable.

(b)    Blink or another Seller owns or possesses sufficient legal rights to all Business Intellectual Property without any past or present conflict with, or infringement of, the rights of others, including prior or current employees or consultants, with which any of them may be affiliated now or may have been affiliated in the past. None of the Sellers have received (i) any written notice, including unsolicited offers to license any third party's Intellectual Property to avoid or settle alleged or actual infringement, or claim that such Seller or the operation of the Business is violating, misappropriating or infringing upon the Intellectual Property of other Persons or (ii) any written claims, or, to the Knowledge of the Sellers, threatened against the Sellers contesting the validity, ownership, use, or enforceability of any of the Owned Intellectual Property.

(c)     Blink or another Seller is the sole and unrestricted legal and beneficial owner of all Owned Intellectual Property, and no Owned Intellectual Property will at the Closing be subject to any Liens, adverse claims, any requirement of any past (if outstanding), present, or future royalty payments or otherwise encumbered or restricted by any rights of any third party, other than Permitted Post-Closing Liens.  The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated thereby will not result in the loss, forfeiture, termination, license or impairment of, or give rise to any obligation to transfer or to create, change, or abolish, or limit, terminate, or consent to the continued use of any Business Intellectual Property.

(d)     None of the Sellers have made any written claim of any violation, misappropriation, or infringement by other Persons of any Owned Intellectual Property.

(e)     Sellers have taken commercially reasonable and appropriate steps to protect, maintain and preserve the confidentiality of any confidential information or trade secrets included in the Business Intellectual Property.

(f)     Section 3.13(f) of the Disclosure Schedule sets forth a complete and correct list of all Intellectual Property Licenses (other than off-the-shelf software for which Sellers pay less than twenty-five thousand Dollars ($25,000) in licensing or other fees per annum).

(g)     Sellers have taken commercially reasonable and appropriate steps to protect the Business Systems and the information stored therein from any unauthorized access, interruption or modification by any third party and the Business Systems are free from any virus, malware, or malicious code and are sufficient for the operation of the Business.  There have been no (i) breakdowns or outages of the Business Systems that have caused any material disruption in the operation of the Business that have not been remediated in all material respects, or (ii) material security breaches of, or other material unauthorized access to, any Business Systems.

Section 3.14   Compliance with Laws; Permits.

(a)     Sellers are in compliance in all material respects with all Laws applicable to the Business, except as set forth in Section 3.14 of the Disclosure Schedule or as resulting from the filing and pendency of the Bankruptcy Cases.  Sellers have not received any written notice of or been charged with any material violation of any Laws applicable to the Business.

(b)     Sellers have all Permits that are required for the operation of the Business as presently conducted, except where such failure to have such Permit would not be reasonably be expected to be material to the Business taken as a whole.  Sellers are not in default or violation (and no event has occurred which, with or without notice or the lapse of time or both, would constitute a default or violation) of any term, condition, or provision of any Permit to which Sellers are parties, except where such default or violation would not be reasonably expected to be material to the Business taken as a whole.

Section 3.15  <u>Environmental Matters</u>.  Except as would not be reasonably likely to be material to the Business, taken as a whole:

(a)    the operations of Sellers are in compliance with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with all Permits issued pursuant to Environmental Laws necessary to operate the Business;

(b)    no Seller is the subject of, or received written notice of any threat of, any Litigation with any Governmental Authority with respect to Environmental Laws;

(c)    no Seller is the subject of any pending, or to the Knowledge of Sellers, threatened Litigation alleging that Sellers may (i) be in violation of any Environmental Law or any Permit issued pursuant to Environmental Law or (ii) have any liability under any Environmental Law;

(d)    to the Knowledge of Sellers, there are no pending or threatened investigations of Sellers, or currently or previously owned, operated, or leased property of Sellers that would reasonably be expected to result in Sellers incurring liability pursuant to any Environmental Law;

(e)    there has been no Release of a Hazardous Substance (x) at, on, about, under or from the Gym Locations or any corporate office or any other real property currently or formerly owned, leased or operated by any Seller or (y) arising from or relating to the operations of the Business; and

(f)    no Seller has manufactured, distributed, treated, stored, arranged for or permitted the disposal of, transported, handled, released, or exposed any Person to, any Hazardous Substance.

Section 3.16  <u>Related Party Transactions</u>.  Except as set forth on <u>Schedule 3.16</u> of the Disclosure Schedule and other than the Company Benefit Plans, no officer, director, or executive committee member of any Seller or any member of their immediate family or any Affiliate of Blink or such Seller (a) is a party to any Contract or Lease required to be set forth on <u>Schedule 2.6(a)</u> of the Disclosure Schedule or has any material business arrangement with, or has any material financial obligations to or is owed any financial obligations from, Blink or vendor or licensor of Blink (each such Contract, Lease, or business arrangement, an "<u>Affiliate Agreement</u>"), (b) to the Knowledge of Sellers, none of the foregoing Persons have any cause of action or other claim whatsoever against or related to the Business or the Acquired Assets, and (c) to the Knowledge of Sellers, no Seller has any direct or indirect business arrangement with or financial obligation to the foregoing Persons.

Section 3.17  <u>Financial Statements; No Undisclosed Liabilities; Absence of Certain Changes</u>.

(a)    True, correct and complete copies of (i) the consolidated balance sheets and statements of operations and comprehensive income, stockholders' equity, and cash flow of Sellers as of and for the years ended December 31, 2023, and December 31, 2022 (the

"Yearly Financial Statements") and (ii) an unaudited consolidated balance sheet and statements of operations and comprehensive loss, cash flow, and stockholders' equity of Blink as of and for the six-month period ended June 30, 2024 (the "Interim Balance Sheet Date"; such statements, the "Interim Financial Statements" and, together with Yearly Financial Statements, the "Financial Statements"), have been provided to Buyer.  The Financial Statements present fairly, in all material respects, the financial position, results of operations and cash flows of Sellers as of the dates and for the periods indicated in such Financial Statements, have been prepared in accordance with the books of account and other financial records of Sellers and have been prepared in conformity with GAAP (except, in the case of the Interim Financial Statements, for the absence of footnotes and other presentation items and for normal year-end adjustments that are not material individually or in the aggregate).

(b)    The financial books and records of Sellers (or their applicable Affiliates) have been maintained in accordance with customary business practices and, taken together, fairly and accurately reflect on a basis consistent with past periods and throughout the periods involved, the financial position of Sellers. Sellers (or their applicable Affiliates) maintain a system of internal accounting controls designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for the Business, including, that (x) transactions are executed in accordance with management's general or specific authorizations and (y) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP. No Seller has received any advice or notification from any independent accountants that any Seller has used any improper accounting practice that would have the effect of not reflecting or incorrectly reflecting in the books and records of Sellers any properties, assets, Liabilities, revenues, expenses, equity accounts or other accounts. There have been no instances of fraud, whether or not material, that occurred during any period covered by the Financial Statements.

(c)    Except (i) as reflected in the Financial Statements, (ii) as set forth in Section 3.17(c) of the Disclosure Schedule, (iii) for Liabilities that may have arisen since the Interim Balance Sheet Date in the Ordinary Course of Business and are not material to the Business, taken as a whole, (iv) Liabilities arising under the executory portion of a Contract (excluding in each case Liabilities for breach, non-performance or default), and (v) the Excluded Liabilities, Sellers do not have any Liabilities required to be set forth on a balance sheet of Sellers prepared in accordance with GAAP.

(d)    Other than as a result of the Bankruptcy Cases, including Indebtedness incurred in accordance with the DIP Order, and protective advances made under Sellers' existing pre-petition credit facility, since the Interim Balance Sheet Date, Sellers have conducted the Business in the Ordinary Course of Business, and, except as set forth in Section 3.17(d) of the Disclosure Schedule, none of the Sellers or any of their respective Subsidiaries have taken any action that, if taken after the date of this Agreement without Buyer's consent, would constitute a breach of the covenants set forth in Sections 5.2(b)(vi), (vii), (viii), (xiii), (xviii), (xix) or (xx) (solely with respect to the foregoing Sections 5.2(b)(vi), (vii), (viii), (xiii), (xviii) or (xix)).

39

(e)    Other than as a result of the Bankruptcy Cases, since the Interim Balance Sheet Date, there has not been any event, circumstance, or development that, individually or together with all other events, circumstances, or developments, has had, or would reasonably be expected to have, a Material Adverse Effect.

(f)    As of August 31, 2024, the Sellers' good faith estimate of (i)(A) the total amount of Customer Credits relating to the Specified Leases is as set forth in <u>Section 3.17(f)(i)(A)</u> of the Disclosure Schedule and (ii)(A) with respect to each Specified Lease, the total amount of PTO for Covered Employees located in the property subject to such Specified Lease is as set forth opposite the name of such property in <u>Section 3.17(f)(ii)(A)</u> of the Disclosure Schedule.  Assuming the Closing occurs on the date set forth in <u>Section 2.4</u>, Sellers' good faith estimate of (i)(B) the total amount of Customer Credits expected to be outstanding as of the Closing relating to the Specified Leases is as set forth in <u>Section 3.17(f)(i)(B)</u> of the Disclosure Schedule and (ii)(B) with respect to each Specified Lease, the total amount of PTO expected to be outstanding as of the Closing for Covered Employees located in the property subject to such Specified Lease is as set forth opposite the name of such property in <u>Section 3.17(f)(ii)(B)</u> of the Disclosure Schedule.  The estimated Deferred Rent with respect to each Lease is set forth opposite the address or name of the Leased Real Property subject to such Lease in <u>Section 3.17(f)(iii)</u> of the Disclosure Schedule.

Section 3.18    <u>Inventory</u>.  The Inventory as a whole is of a quantity and quality historically useable or saleable in the conduct of the Business since the filing of the Bankruptcy Cases, except in respect to Inventory that would have been discarded in normal course after the date upon which the Gym Locations ceased operations.  All Inventory is free from defects in materials and workmanship (normal wear and tear excepted), except as would not reasonably be expected to be material to the Business, taken as a whole.

Section 3.19    <u>Memberships</u>.  As of August 31, 2024, the total number of members of each Gym Location is set forth opposite such Gym Location in <u>Section 3.19</u> of the Disclosure Schedule.

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to each Seller that the statements contained in this <u>Article IV</u> are true and correct as of the date of this Agreement and as of the Closing Date.

Section 4.1    <u>Organization of Buyer; Good Standing</u>.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Buyer's organization and has all requisite corporate power and authority to own, lease, and operate Buyer's assets and to carry on Buyer's business as now being conducted, in each case, except as would not reasonably be expected to, individually or in the aggregate, materially impair or materially delay the ability of Buyer to perform their obligations under this Agreement or under the Related Agreements and to consummate the transactions contemplated hereby or thereby (a "<u>Buyer Material Adverse Effect</u>").

Section 4.2    <u>Authorization of Transaction</u>.  Buyer has full power and authority (including full company power and authority) to execute and deliver this Agreement, the Related Agreements and all other agreements contemplated hereby to which Buyer is a party and to perform Buyer's obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement, the Related Agreements and all other agreements contemplated hereby to which Buyer is or will be a party have been duly authorized by Buyer.  Upon due execution hereof by Buyer, this Agreement, the Related Agreements and all other agreements contemplated hereby (assuming due authorization and delivery by Sellers or their applicable Affiliates party thereto) constitutes or will constitute, subject to the Bankruptcy Court's entry of the Sale Order, the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

Section 4.3    <u>Noncontravention</u>.  Neither the execution, delivery or performance of this Agreement or the Related Agreements, nor the consummation of the transactions contemplated hereby or thereby (including the assignments and assumptions referred to in <u>Article II</u>) will (a) conflict with or result in a breach of the certificate of incorporation or bylaws, certificate of formation or operating agreement, or other organizational documents, as applicable, of Buyer, (b) violate any Law or Decree to which Buyer is, or Buyer's assets or properties are, subject or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract or Lease to which Buyer is a party or by which Buyer is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights, or failures to give notice as would not, individually or in the aggregate, have a Buyer Material Adverse Effect.  Except for such filings as may be required under the HSR Act, Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, have a Buyer Material Adverse Effect.

Section 4.4    <u>Litigation; Decrees</u>.  There is no Litigation pending or, to Buyer's knowledge, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  Buyer is not subject to any outstanding Decree that would prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform Buyer's obligations hereunder on a timely basis.

Section 4.5    <u>Brokers' Fees</u>.  Buyer has not entered into any contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Sellers or any of Sellers' Affiliates could become liable or obligated to pay.

Section 4.6    <u>Sufficient Funds; Adequate Assurances</u>.  Buyer has access to and will have at the Closing immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including the payment of the Purchase Price, the Cure Costs, and all fees, expenses of, and other amounts required to be paid by Buyer in connection

with the transactions contemplated hereby. Buyer is capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts and Assumed Leases and the related Assumed Liabilities.

Section 4.7  Certain    Acknowledgments.    BUYER    HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE III ABOVE, THE RELATED AGREEMENTS OR ANY CERTIFICATE DELIVERED IN CONNECTION HEREWITH, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS INCLUDING EXPENSES TO BE INCURRED IN CONNECTION WITH THE ACQUIRED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY COMPRISING A PART OF THE ACQUIRED ASSETS OR THAT IS THE SUBJECT OF ANY OTHER ASSUMED LEASE OR ASSUMED CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY LEASED REAL PROPERTY OR IMPROVEMENTS THAT ARE  THE SUBJECT OF ANY REAL PROPERTY LEASE TO BE ASSUMED BY BUYER AT THE CLOSING, THE ZONING OF ANY SUCH LEASED REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE ACQUIRED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF PROPERTY, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE ACQUIRED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE ACQUIRED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE III ABOVE, THE RELATED AGREEMENTS OR ANY CERTIFICATE DELIVERED IN CONNECTION HEREWITH, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ACQUIRED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH BUYER'S ACQUISITION OF THE ACQUIRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE III, ANY RELATED AGREEMENT OR ANY CERTIFICATE DELIVERED IN CONNECTION HEREWITH, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, SUBJECT TO THE FOREGOING, BUYER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."  BUYER HEREBY EXPRESSLY ACKNOWLEDGES THAT THE ASSIGNMENT AND ASSUMPTION OF THE ASSUMED LEASES AND ASSUMED CONTRACTS FORMING PART OF THE ACQUIRED ASSETS WILL BE CONSUMMATED IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT NOTWITHSTANDING ANY AND ALL OUTSTANDING DEFAULTS AND OTHER CLAIMS FOR FAILURES TO COMPLY WITH THE PROVISIONS OF SUCH

ASSUMED LEASES AND ASSUMED CONTRACTS, CERTAIN OF WHICH DEFAULTS OR CLAIMS MAY NOT BE SUBJECT TO CURE OR WAIVER.

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1    Efforts; Cooperation.  From and after the date hereof until the earlier of the Closing and the termination of this Agreement in accordance with its terms, upon the terms and subject to the conditions set forth in this Agreement (including Section 5.4(a)), each of the Parties shall use such Party's commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things reasonably necessary, proper or advisable to consummate and make effective, the transactions contemplated hereby, except as otherwise specifically provided in Section 5.4. Without limiting the generality of the foregoing, (i) each Seller shall use such Seller's commercially reasonable efforts to cause the conditions set forth in Section 7.1 that are within such Seller's control or influence to be satisfied or fulfilled and (ii) each Buyer shall use Buyer's commercially reasonable efforts to cause the conditions set forth in Section 7.2 that are within Buyer's control or influence to be satisfied or fulfilled (provided, that in no event shall any Party be required to waive any conditions set forth in Section 7.1 or Section 7.2 in such Party's favor, as applicable).

Section 5.2    Conduct of the Business Pending the Closing.

(a)    During the period prior to the Closing, Sellers shall, except as otherwise required, authorized, or restricted by applicable Law, pursuant to the Bankruptcy Code or pursuant to a Decree of the Bankruptcy Court, operate the Business in the Ordinary Course of Business.  Sellers shall use commercially reasonable efforts to, except as related to or the result of the filing or pendency of the Bankruptcy Cases, (i) preserve intact Sellers' respective business organizations, (ii) maintain the Business and the Acquired Assets (normal wear and tear excepted), (iii) keep available the services of Sellers' respective officers and Covered Employees, (iv) maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, vendors, and others having business relationships with Sellers in connection with the operation of the Business (other than payment of pre-petition claims), and (v) continue to operate the Business and Acquired Assets in all material respects in compliance with all Laws applicable to the Business and Sellers consistent with past practice in place immediately prior to the Petition Date.

(b)    Except (i) as required by applicable Law or by Decree of the Bankruptcy Court, (ii) as otherwise expressly required by this Agreement (excluding the requirements of Section 5.2(a) above), or (iii) with the prior written consent of Buyer, no Seller shall, solely as it relates to the Business:

(i)    (A) increase the compensation of any Covered Employee, (B) increase or decrease the coverage or benefits available under any or create any new, adopt, modify, amend or terminate any Company Benefit Plan, (C) enter into or amend any existing offer letter or employment agreement with a Covered Employee (or individual who, if hired, would be a Covered Employee) that provides severance or other termination payments or benefits upon a termination of employment or (C) enter into any retention, change in control or transaction bonus arrangement with any Covered Employee;

(ii)    subject any of the Acquired Assets to any Lien, except for Permitted Liens and any Lien securing any debtor-in-possession loan facility or granted in an order authorizing use of cash collateral;

(iii)    terminate, amend, or fail to renew, obtain, or preserve any material Permit;

(iv)    make any loans or material advances;

(v)    enter into any Contract or Lease, including purchase orders, other than Contracts (but not Leases) with a value that do not exceed $25,000 individually or $100,000 in the aggregate;

(vi)    enter into, amend, modify or terminate any Contract or Lease that limits or restricts the conduct or operations of the Business or Buyer following the Closing;

(vii)    incur, create, assume, guarantee, or become liable for any funded indebtedness (for the avoidance of doubt, Sellers shall not be preclude from incurring ordinary trade payables in a manner consistent with prior practice and the operating budget of the Sellers made available to Buyer prior to the date of this Agreement and otherwise in the Ordinary Course of Business);

(viii)    modify, amend or supplement in any manner adverse to the Business, or terminate any Contract or Lease set forth on Schedule 2.6(a) that has not otherwise been designated as or deemed to be an Excluded Agreement;

(ix)    fail to maintain in full force and effect any filings necessary to maintain the Owned Intellectual Property;

(x)    write up, write down, or write off the book value of any assets other than in the Ordinary Course of Business;

(xi)    engage any new employee whose annual base salary would exceed eighty thousand Dollars ($80,000);

(xii)    reject any Contracts or Leases set forth on Schedule 2.7(a);

(xiii)    seek to accelerate the receipt of any royalty payments or licensing receivables generated by the Business, by way of discount or otherwise;

(xiv)    terminate any Covered Employee unless such termination is for "cause";

(xv)    modify, negotiate, amend, extend, terminate or enter into any Labor Agreement or (ii) recognize or certify any Union as the bargaining representative for any Covered Employee;

(xvi)    enter into any new or additional Lease or open any new, additional gym and health club in the Territory;

(xvii)    make, change or revoke any Tax election; change an annual accounting period; adopt or change any accounting method with respect to Taxes; file any amended Tax Return; enter into any closing agreement; settle or compromise any Tax claim or assessment; or consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to Taxes; in each case to the extent such action could be reasonably expected to increase the amount of Taxes attributable to the Acquired Assets or the Business in a Post-Closing Tax Period;

(xviii)    (1) alter, change or otherwise modify the membership or pricing structure in existence as of the Petition Date at any Gym Location, including but not limited to, the launch of any customer promotions, sales or discounted pricing programs, or (2) terminate, change, amend or modify the Sellers' contractual arrangements or relationship with   its existing customer payment services provider (or enter into any contractual arrangements or relationship with any new customer payment services provider);

(xix)    other than acquisitions or dispositions of Inventory in the Ordinary Course of Business to Persons that are not Affiliates of any Seller, acquire, dispose of or transfer any material assets or material property (including any transfer of material assets from an Acquired Gym Location to any other Gym Location); or

(xx)    agree to do anything prohibited by this <u>Section 5.2</u>.

Section 5.3    <u>Bankruptcy Court Matters</u>.

(a)    Subject to entry of the Stalking Horse Order, if this Agreement is terminated by any Party for any reason pursuant to <u>Section 8.1</u>, other than a termination by the Parties pursuant to <u>Section 8.1(a)</u> or by Sellers pursuant to <u>Section 8.1(d)</u>, Buyer shall be entitled to be paid, and Sellers shall pay to Buyer in accordance with the terms of this Agreement, all reasonable and documented out of pocket costs and expenses incurred by Buyer or any of its Affiliates in connection with the negotiation, preparation, and execution of this Agreement, the Related Agreements, the consummation of the transactions contemplated hereby and hereby, and the Bankruptcy Cases and all other judicial and regulatory proceedings related to this Agreement or the Related Agreements, including all fees and disbursements and other charges of counsel to Buyer in an amount not to exceed Two Million Dollars ($2,000,000) (the "<u>Expense Reimbursement</u>"), which reimbursement shall be made promptly (and in any event no later than two (2) Business Days following such

termination) by wire transfer of immediately available funds to one or more bank accounts of Buyer (or any of its Affiliates) designed in writing by Buyer to Sellers. In addition to any Expense Reimbursement payable pursuant to the immediately preceding sentence, if this Agreement is terminated by (A) any Party pursuant to Section 8.1(b)(ii) at a time when Buyer would have been permitted to terminate this Agreement pursuant to Section 8.1(c), Section 8.1(e), Section 8.1(f), Section 8.1(g) or Section 8.1(h), or (B) by Buyer pursuant to Section 8.1(c), Section 8.1(e), Section 8.1(f), Section 8.1(g) or Section 8.1(h), Buyer shall be entitled to be paid, and Sellers shall pay to Buyer in accordance with the terms of this Agreement, an amount equal to Three Million Two Hundred Fifty Thousand Dollars ($3,250,000) as a fair and reasonable break-up fee (the "Break-Up Fee"), which payment shall be made directly out of the proceeds of (and in any event no later than two (2) Business Days following) the closing of any Competing Bid or other Alternative Transaction by wire transfer of immediately available funds to one or more bank accounts of Buyer (or any of its Affiliates) designated in writing by Buyer to Sellers. The obligations of Sellers to pay either or both the Break-Up Fee and the Expense Reimbursement (i) shall be entitled to administrative expense claim status under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code, (ii) shall be paid directly from proceeds of any Competing Bid or other Alternative Transaction (and the consummation of any Competing Bid or other Alternative Transaction shall be conditioned on the payment thereof), (iii) shall not be subordinate to any other administrative expense claim against Sellers, other than the "Carve Out" as provided in the DIP Order, and (iv) shall survive the termination of this Agreement in accordance with Section 8.2.

(b)    The Buyer's receipt of the Expense Reimbursement and the Break-Up Fee, as applicable, shall constitute liquidated damages (and not a penalty) in a reasonable amount that will compensate Buyer in the circumstances of the termination of this Agreement as set forth in Section 5.3(a), which amount would otherwise be impossible to calculate with precision, and be the sole and exclusive remedy (whether at law, in equity, in contract, in tort, or otherwise) of Buyer against Sellers, and any of Seller's former, current, or future stockholders, managers, members, directors, officers, Affiliates, or agents for any loss suffered as a result of any breach of any covenant, representation, warranty, or agreement in this Agreement by Sellers or the failure of the transactions contemplated hereby to be consummated, and upon payment of such amounts, none of Buyer nor any of Buyer's former, current, or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates, or agents shall have any further Liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby. In no event shall Sellers' Liability under this Agreement exceed an amount equal to the sum of the maximum Expense Reimbursement payable hereunder and the Break-Up Fee, as applicable.

(c)    This Agreement and the transactions contemplated hereby are subject to Sellers' right and ability to consider higher or better competing bids with respect to the Business and any material portion of the Acquired Assets pursuant to the Bidding Procedures Order and the Stalking Horse Order (each a "Competing Bid").

(d)    From the date hereof until entry of the Stalking Horse Order, Sellers shall not, and shall cause their Representatives and Affiliates not to, directly or indirectly, (i)

initiate contact with, pursue, knowingly facilitate, solicit or encourage submission of, or discuss, negotiate, or assist with, any inquiries, proposals, or offers by any Person (other than Buyer and its Affiliates and Representatives) with respect to (x) serving as a "stalking horse" bidder for the Business or Acquired Assets, or (y) bid protections, including any break-up fee or expense reimbursement, in connection with an offer to purchase the Business or Acquired Assets, or (ii) discuss, negotiate, or enter into, any transaction documentation with respect to a Competing Bid or other Alternative Transaction with any Person (other than Buyer and its Affiliates and Representatives). Each Seller shall, and shall cause its Affiliates and Representatives to: (A) immediately cease and cause to be terminated any and all contacts, discussions, and negotiations with any Person other than the Buyer and its Affiliates and Representatives regarding the foregoing, in each case until the date the Bankruptcy Court enters the Stalking Horse Order; (B) until entry of the Stalking Horse Order, promptly notify Buyer if any offer to serve as a "stalking horse" bidder for the Business or Acquired Assets, or any inquiry or contact with any Person with respect thereto, that has been made as of the date of this Agreement or is subsequently made, and the details of such contact (including the identity of the third party or third parties and copies of any proposals and the specific terms and conditions discussed or proposed); and (C) keep the Buyer fully informed with respect to the status of the foregoing. Sellers shall not, without the prior consent of the Buyer, release any Person from, or waive any provision of, any standstill agreement or confidentiality agreement to which any Seller is a party.

(e)    If there is an Auction and Buyer is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Prevailing Bidder") but is designated as the Back-up Bidder, then Buyer shall keep Buyer's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) open and irrevocable until the date of closing of a Competing Bid with the Prevailing Bidder (the "Outside Back-up Date"). Following the Sale Hearing and prior to the Outside Back-up Date, if the Prevailing Bidder fails to consummate the applicable Competing Bid as a result of a breach or failure to perform on the part of such Prevailing Bidder, then Buyer, as Back-up Bidder, will be deemed to have the new prevailing bid, and Sellers will be authorized, without further order of the Bankruptcy Court, to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) with Buyer.

(f)    Sellers shall promptly serve true and correct copies of the Sale Motion and all related pleadings in accordance with the Bidding Procedures Order, the Stalking Horse Order, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, and any other applicable order of the Bankruptcy Court. To the extent reasonably practicable, the Sellers shall provide to the Buyer (or its Representatives) copies of all notices and pleadings related to or affecting this Agreement, any Related Agreement, or the transactions contemplated thereby, not less than two (2) Business Days prior to filing such documents.

47

(g)     Sellers shall seek entry of the Sale Order by the Bankruptcy Court within five (5) Business Days after conclusion of the Auction or the Auction is cancelled in accordance with the Bidding Procedures Order or the earliest date thereafter that the Bankruptcy Court is available to conduct a hearing to consider the Sale Order.  The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement, (B) the sale of the Acquired Assets to Buyer on the terms set forth herein and free and clear of all Liens (other than Liens included in the Assumed Liabilities and Permitted Post-Closing Liens), and (C) the performance by Sellers of Sellers' respective obligations under this Agreement; (ii) authorize and empower Sellers to assume and assign to Buyers the Assumed Contracts; (iii) find that each Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to any Seller and grant Buyer the protections of Section 363(m) of the Bankruptcy Code, (iv) authorize Buyer to rebrand the Acquired Gym Locations; and (v) provide that such order shall survive any subsequent order of the Bankruptcy Court, and shall require that any subsequent order (including any order approving a chapter 11 plan, dismissing the Bankruptcy Cases, or converting the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code), shall provide for satisfaction of all post-closing obligations of Sellers under this Agreement and any Related Agreement.  Buyer shall promptly take such actions as are reasonably requested by Sellers to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (a) demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (b) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.  In the event that the Bankruptcy Court's approval of the Sale Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

(h)     Unless otherwise provided in the Bidding Procedures Order or the Stalking Horse Order, the Bidding Procedures Order shall apply to the sale of the Business hereunder.

(i)     Each Seller acknowledges and agrees that such Seller shall be jointly and severally liable for the entire Break-Up Fee and the Expense Reimbursement payable by Sellers pursuant to this Agreement.

Section 5.4   <u>Notices and Consents</u>.   Prior to the Closing and as necessary following the Closing:

(a)     To the extent that the Sale Order does not eliminate the requirement to obtain the prior consent of or notification to any one or more counterparties to a Assumed Contract or Assumed Lease, Sellers will give, or will cause to be given, any notices to third parties (provided, that Sellers shall first provide Buyer with a draft of any such notices and the reasonable opportunity to comment thereon), and each of the Parties will use such Party's commercially reasonable efforts to obtain any third party consents as are otherwise necessary and appropriate to consummate the transactions contemplated hereby;

(b)     Subject to Section 5.8, each of the Parties will give any notices to, make any filings with, and use such Party's commercially reasonable efforts to obtain any authorizations, consents, and approvals of Governmental Authorities necessary and appropriate to consummate the transactions contemplated hereby; and

(c)     The Parties shall work together in good faith to transition the Business' existing customer payments service provider to such provider as the Buyer determines in an orderly manner so as to not materially disrupt the continuity of the operation of the Business (which transition may not occur until following the Closing); provided, however, that, after the Closing, Sellers shall not be required to pay, and Buyer shall be responsible for, any out-of-pocket expenses, fees, or costs payable in connection with such transition.

Section 5.5    Notice of Developments.  Each Seller and Buyer will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which such Party has Knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in Article VII not to be satisfied as of a reasonably foreseeable Closing Date or (b) the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 5.5 shall not be deemed to amend or supplement this Agreement (or cure any breach of a representation, warranty or covenant in this Agreement) and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.

Section 5.6    Access.  Sellers will provide Buyer and Buyer's Representatives access to all (a) books and records and Assumed Contracts and Assumed Leases included in the Acquired Assets via an electronic data room and (b) appropriate personnel and properties subject to Specified Leases upon reasonable advance notice and in a manner reasonably acceptable to Sellers; provided, however, that, for avoidance of doubt, the foregoing shall not require any Person to waive, or take any action with the effect of waiving, such Party's attorney-client privilege with respect thereto.  Buyer shall, upon reasonable notice to Sellers, be permitted to contact (x) after the date of this Agreement, landlords and contractual counterparties of the Business as described in Section 2.6(h) and (y) after the Final Designation Time, customers and members and other vendors, licensors and licensees of the Business.  For purposes of the access to landlords under this Section 5.6 and Section 2.6(h): (x) any initial outreach communication by Buyer with landlords under Leases shall be made in conjunction with a mutually agreed Representative of Sellers (which communication may be made by including such Representative on copy with respect to an initial email communication) and (y) a mutually agreed Representative of Sellers shall be copied on all material written communications from Buyer to landlords and shall be permitted to attend any meetings or participate in any calls conducted by Buyer with landlords under Leases to the extent initiated by Buyer or requested by landlord in writing in advance of such meeting or call; provided that, in each case of clauses (x) and (y), Buyer's obligations shall be deemed satisfied if Buyer provides to Sellers, to the extent reasonably practicable, reasonable notice of, and opportunity to participate in, the applicable communication, meeting, or call, whether or not Sellers actually consent to such communication or participate in such meeting or call.  Sellers will provide copies of or otherwise make available to Buyer and Buyer's Representatives: (i) all Tax Returns filed by Sellers for the last six (6) taxable years; and

49

(ii) such Tax work papers and other Tax information related to the Business or the Acquired Assets as reasonably requested by Buyer and Buyer's Representatives; provided, that if Sellers liquidate, dissolve, or otherwise wind down prior to making such Tax Returns, Tax work papers and other Tax information related to the Business or the Acquired Assets available to Buyer or Buyer's Representatives, copies of such Tax Returns, Tax work papers, and other Tax information shall be transferred to Buyer or Buyer's Representatives.

Section 5.7    Bulk Transfer Laws.    Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer Laws or similar Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, including the United Nations Convention on the Sale of Goods, and hereby waives all claims related to the non-compliance therewith.

Section 5.8    Governmental Approvals and Consents.

(a)    Each Party will, as promptly as possible and, in any event, within five (5) Business Days after the entry of the Sale Order with respect to any Notification and Report Form if (and only if) required under the HSR Act, (i) make, or cause to be made, all filings and submissions required under any Law applicable to such Party or any of such Party's Affiliates and (ii) use commercially reasonable efforts to obtain, or cause to be obtained, all consents, authorizations, orders, and approvals from all Governmental Authorities that, in either case, may be or become necessary for such Party's execution and delivery of this Agreement and the performance of such Party's obligations pursuant to this Agreement and the Related Agreements.    Each Party will use commercially reasonable efforts to cooperate with the other Parties and the other Parties' respective Affiliates in promptly seeking to obtain all such consents, authorizations, orders, and approvals.    The parties hereto will not willfully take any action that would reasonably be expected to have the effect of materially delaying, materially impairing, or materially impeding the receipt of any required consents, authorizations, orders, and approvals.    If any filing is required under the HSR Act, the filing fee with respect to such filing shall be borne one-half by Buyer and one-half by Sellers.

(b)    All analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals made by or on behalf of either party before any Governmental Authority or the staff or regulators of any Governmental Authority, in connection with the transactions contemplated hereunder (but, for the avoidance of doubt, not including any interactions between Sellers with Governmental Authorities in the ordinary course of business, any disclosure which is not permitted by Law or any disclosure containing confidential information) shall be disclosed to the other party hereunder in advance of any filing, submission or attendance, it being the intent that the parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals. Each party shall give notice to the other party with respect to any meeting, discussion, appearance or contact with any Governmental Authority or the staff or regulators of any Governmental Authority, with such notice being sufficient to provide the other party with the opportunity to attend and participate in such meeting, discussion, appearance, or contact.

(c)     Notwithstanding anything to the contrary set forth in Section 5.8(a) or otherwise in this Agreement, none of Buyer and its Affiliates shall be required to (i) offer to sell or otherwise dispose of, or hold separate and agree to sell or otherwise dispose of any Acquired Assets or any other assets, businesses or properties of Buyer or any of its Affiliates; (ii) offer to terminate (or actually terminate) any existing relationships and contractual rights and obligations of the Business or any of Buyer or its Affiliates' businesses; (iii) offer to amend or terminate (or actually amend or terminate) any Contracts or Leases and enter into any new Contracts or Leases in each case with respect to the Business or any of Buyer or its Affiliates' businesses; (iv) agree to take or take any actions or make any behavioral commitments, whether or not they limit or modify their rights of ownership in, or ability to conduct, from and after the Closing, the Business or any of the Acquired Assets.

## ARTICLE VI
## OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing:

Section 6.1    Further Assurances.

(a)     Subject to clauses (b) through (d) below, in case at any time after the Closing any further action is necessary to carry out a Party's obligations under this Agreement, such Party will, at the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request which actions shall be reasonably necessary to transfer, convey, or assign to the applicable Buyer all of the Acquired Assets to be acquired by Buyer in accordance with Section 2.1 or to confirm Buyer's assumption of the Assumed Liabilities to be assumed by Buyer in accordance with Section 2.2 or Sellers' retention of the Excluded Liabilities, as the case may be.

(b)     If, following the Closing, Buyer or any Seller becomes aware that Buyer or any of Buyer's Affiliates owns or is in possession of any asset or rights that is an Excluded Asset, such Party shall promptly inform the other Party of that fact. Thereafter, at the request of any Seller, Buyer shall execute, or cause the relevant Affiliate of Buyer to execute, such documents as may be reasonably necessary to cause the transfer of and Buyer shall thereafter transfer any such asset or right to such Seller or such other entities nominated by such Seller for no consideration and such Seller shall do all such things as are reasonably necessary to facilitate such transfer. If, following the Closing, Buyer receives any payments in respect of an Excluded Asset, Buyer shall promptly remit such payments to the applicable Seller or other entity nominated by such Seller.

(c)     If, following the Closing, Buyer or any Seller becomes aware that a Seller or any of Sellers' Affiliates owns any asset or rights that is an Acquired Asset, such Party shall promptly inform the other Party of that fact. Thereafter, at the request of Buyer, the applicable Seller shall execute or cause the relevant Affiliate of such Seller to execute such documents as may be reasonably necessary to cause the transfer of and such Seller shall

thereafter transfer any such asset or right to Buyer or any other entities nominated by Buyer for no consideration and Buyer shall do all such things as are reasonably necessary to facilitate such transfer.  If, following the Closing, a Seller or such Seller's Affiliates receive any payments in respect of the Acquired Assets, such Seller shall promptly remit such payments to Buyer or other entity nominated by Buyer.

(d)    Except as expressly provided pursuant to the terms of the TSA or the ELA, as applicable, with respect to any Acquired Asset (and any asset that is not an Acquired Asset solely as a result of a restriction on transfer or assignment) for which consent or approval is required for transfer or assignment but is not obtained prior to the Closing, Sellers shall reasonably cooperate with Buyer for up to ninety (90) days after the Closing in any reasonable arrangement that Buyer may request to provide Buyer with all of the benefits of, or under, the applicable Acquired Assets (or assets that are not Acquired Assets solely as a result of a restriction on transfer or assignment), including taking actions reasonably required to enforce, for the benefit of Buyer, any and all rights of Sellers against any party to the applicable Acquired Asset.

Section 6.2    Access; Enforcement; Record Retention.    From and after the Closing, upon request by any Party (the "Requesting Party"), the other Parties will permit such Requesting Party and such Requesting Party's Representatives to have reasonable access during normal business hours, at the sole expense of such Requesting Party and in a manner so as not to interfere unreasonably with the normal business operations of the other Party, to all premises, properties, personnel, books and records, and Contracts or Leases of such Party for the purposes of (a) preparing Tax Returns, (b) monitoring or enforcing rights or obligations under this Agreement or any of the Related Agreements, (c) defending third-party lawsuits or complying with the requirements of any Governmental Authority or (d) otherwise providing such reasonable assistance and cooperation as may be requested by Buyer from time to time to reasonably facilitate the transition of the Business; provided, however, that, for avoidance of doubt, the foregoing shall not require a Party to take any such action if (i) such action would reasonably be expected to result in a waiver or breach of any attorney-client privilege, (ii) such action would reasonably be expected to result in violation of applicable Law, or (iii) providing such access or information would be reasonably expected to be materially disruptive to a Party's normal business operations.  Buyer agrees to maintain the files or records that are contemplated by the first sentence of this Section 6.2 in a manner consistent in all material respects with Buyer's document retention and destruction policies, as in effect from time to time, for six (6) years following the Closing or such earlier period as in accordance with Buyer's or its Affiliates' *bona fide* internal document retention policies and to give Sellers reasonable access to such files and records for purposes of administration of Sellers' respective Bankruptcy Cases; provided, however, that, for avoidance of doubt, the foregoing shall not require Buyer to provide such access if (i) such action would reasonably be expected to result in a waiver or breach of any attorney-client privilege, (ii) such action would reasonably be expected to result in violation of applicable Law, or (iii) providing such access or information would be reasonably expected to be materially disruptive to Buyer's or its applicable Affiliate's normal business operations.

Section 6.3    <u>Covered Employees</u>.

(a)        For the period beginning on the Closing Date and ending on the 90th day thereafter (the "<u>ELA Period</u>"), Sellers shall retain all Covered Employees who (i) perform corporate services and are set forth on <u>Section 6.3(a)</u> of the Disclosure Schedule (as determined by mutual agreement between the Parties and as updated from time to time upon request of Buyer) or (ii) perform services at any Acquired Gym Location or other premises that is the subject of an Assumed Lease (or Lease that is a Reserved Agreement to the extent such Lease becomes an Assumed Lease) other than, in each case, any such employees who have been furloughed or are on short-term disability, long-term disability, or any other approved leave of absence as of the Closing (collectively, the "<u>Offer Employees</u>") under the terms of the ELA. Prior to the end of the ELA Period, Buyer or one of its Affiliates shall offer employment to all of the Offer Employees who remain actively employed by a Seller as of the expiration of the ELA Period (the "<u>Employee Transfer Date</u>"). Any such offer of employment will be effective as of the Employee Transfer Date. Each Offer Employee who accepts such offer of employment and commences employment with Buyer or one of its Affiliates shall be deemed a "Transferred Employee". Each offer of employment will provide that the Offer Employee will be eligible to receive (i) such Offer Employee's then-current salary and (ii) benefits as determined by Buyer in its sole discretion. Sellers will reasonably cooperate with any reasonable requests by Buyer in order to facilitate the offers of employment and the delivery of such offers.

(b)        Buyer shall use commercially reasonable efforts to provide each Transferred Employee with credit for all service with Sellers under any employee benefit plans or arrangements of Buyer and Buyer's Affiliates maintained by Buyer or Buyer's Affiliates in which such Transferred Employees participate following the Closing Date, for purposes of eligibility, vesting, and entitlement to benefits (excluding severance benefits), including for vacation entitlement and for accrual of defined contribution pension benefits <u>provided</u>, <u>however</u>, that such service crediting shall be permitted and consistent any Buyer defined contribution retirement plan. Notwithstanding the foregoing, nothing in this <u>Section 6.3(b)</u> shall be construed to require crediting of service that would result in a duplication of benefits.

(c)        Without limiting the generality of this <u>Section 6.3</u>, no provision of this Agreement shall create any third party beneficiary rights in any current or former employee or service provider of any Seller, any Covered Employee, or any Transferred Employee (including any beneficiary or dependent thereof) in respect of continued employment by Sellers or Seller's Affiliates or Buyer or Buyer's Affiliates or otherwise. Nothing herein shall (i) guarantee employment for any period of time or preclude the ability of Buyer or Buyer's Affiliates to terminate any Transferred Employee for any reason, (ii) require any Buyer or any of Buyer's Affiliates to continue any Company Benefit Plans, employee benefit plans, or arrangements, or prevent the amendment, modification, or termination thereof after the Closing, or (iii) constitute an amendment to any Company Benefit Plan, employee benefit plans, or arrangements.

(d)        Effective as soon as practicable following the Employee Transfer Date, Sellers, or any applicable Affiliate, shall use commercially reasonable efforts to effect a

transfer of assets and liabilities from the defined contribution retirement plan that Sellers maintain, to the defined contribution retirement plan maintained by Buyer, with respect to Transferred Employees, in connection with the transactions contemplated by this Agreement. Any such transfer shall be in an amount sufficient to satisfy Section 414(l) of the IRC.

(e)     Except for any Assumed Liabilities and subject to the terms of the ELA, Sellers will have the sole and absolute responsibility for any financial or other commitments to Sellers' employees for the period ending on Employee Transfer Date, including any and all claims or obligations for severance pay and any and all claims and obligations arising under any collective bargaining agreement, employee benefit plan (including, any withdrawal liability), or any local, state, or federal law, rule, or regulation. Other than as set forth in Section 6.3(a) or the ELA, Buyer and any of Buyer's Affiliates shall not have any contractual or other obligation with respect to hiring, offering to hire, or employing any Covered Employee or any of Sellers' other employees.  Except as set forth in Section 6.3(a) and the ELA, in no event shall Buyer be obligated to commit to any particular usage of employees or to any particular benefits or wage rates.  Nothing contained herein shall be deemed an admission that Sellers have any financial obligation to employees or that obligations, if any, are entitled to a particular treatment or priority under the Bankruptcy Code.

Section 6.4     Transfer Taxes.  Buyers shall pay any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or other similar Tax (each a "Transfer Tax") imposed under applicable Law in connection with the transactions contemplated hereby. The Party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes described in the immediately preceding sentence shall prepare and timely file such Tax Returns. The Parties hereto shall cooperate to permit the filing Party to prepare and timely file any such Tax Returns.

Section 6.5     Property Taxes.

(a)     Sellers shall be responsible for and shall promptly pay when due all Property Taxes levied with respect to the Acquired Assets attributable to the Pre-Closing Tax Period, in accordance with applicable Law.  All Property Taxes levied with respect to the Acquired Assets for the Straddle Period shall be apportioned between Buyer and Sellers based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period.  Sellers shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period.

(b)     Sellers shall deliver to Buyer, in accordance with Section 2.3(c), Sellers' good faith calculation of any unpaid Property Taxes, including all records and information used in calculating such unpaid Property Taxes, that are known or reasonably capable of estimation on or before such date and that are allocable to Sellers in accordance with Section 6.5(a) (the "Seller Property Tax Amount"). Buyer shall remit or cause to be

remitted, on behalf of the Sellers, the Seller Property Tax Amount to the applicable Tax authorities or landlords.

Section 6.6    <u>Press Releases and Public Announcements</u>.  No Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of Buyer and Blink, unless a press release or public announcement is required by applicable Law or Decree, including of the Bankruptcy Court or such press release or public announcement is consistent with press releases or public statements previously made in accordance with this <u>Section 6.6</u>.  If any such announcement or other disclosure is required, the disclosing Party shall give the non-disclosing Parties prior notice of, and an opportunity to comment on, the proposed disclosure.  The Parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order.

Section 6.7    <u>Restrictive Covenants</u>.

(a)    <u>Non-Disclosure</u>.  No Sellers (the "<u>Restricted Parties</u>") shall, directly or indirectly, disclose or use at any time (and shall cause their respective Affiliates and Representatives not to use or disclose) any Confidential Information (whether or not such information is or was developed by any of the Restricted Parties), except to the extent that such disclosure or use is required by applicable Law, any rule of the Bankruptcy Court or any Decree or expressly required to comply with such Restricted Party's obligations under this Agreement or any Related Agreement.  The Restricted Parties each further agrees to take commercially reasonable steps, to the extent within such Restricted Party's control, to safeguard such Confidential Information and to protect it against disclosure, misuse, loss, and theft.  In the event any of the Restricted Parties is required by applicable Law, any rule of the Bankruptcy Court or any Decree to disclose any Confidential Information, such Restricted Party shall promptly notify Buyer in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall cooperate with the Buyer's reasonable requests to preserve the confidentiality of such Confidential Information consistent with applicable Law.  For purposes of this Agreement, "<u>Confidential Information</u>" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, that relates to the Business, Blink, any other Seller, or their respective suppliers, distributors, customers, independent contractors, or other business relations.  Confidential Information includes the following as they relate to Blink, any other Seller, or the Business and, in each case, to the extent Blink, any other Seller, or the Business obtains a commercial benefit from the secret nature of such information: internal business information (including information relating to strategic and staffing plans and practices, business, training, marketing, promotional and sales plans and practices, cost, rate, and pricing structures, accounting and business methods, and potential acquisition candidates); identities of, individual requirements of, and specific contractual arrangements with, Blink's or any other Seller's suppliers, distributors, customers, independent contractors, or other business relations and their confidential information; trade secrets, know-how, compilations of data and analyses, techniques, systems, formulae, research, records, reports, manuals, documentation, models, data and data bases relating thereto; and inventions, innovations, improvements, developments, methods, designs, analyses, drawings, and reports.

(b)      Non-Disparagement.  Sellers shall not, and shall cause their respective Affiliates and Representatives not to, directly or indirectly, make (or cause to be made) any disparaging, derogatory or other negative or false statement about the Business (including any product or service thereof), the Acquired Assets, the Assumed Liabilities or the Transferred Employees.

(c)      Each Restricted Party acknowledges and agrees that in the event of a breach or violation by any Restricted Party of any of the provisions of this Section 6.7, Buyer would suffer irreparable harm, no adequate remedy at law would exist for Buyer, and damages would be difficult to determine.  Consequently, in the event of any such breach or violation, Buyer or Buyer's successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of law or equity of competent jurisdiction for specific performance or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof, in each case without the requirement of posting a bond or proving actual damages; provided that any such specific performance or injunctive relief shall be limited to restraining or prohibiting such breach or threatened and not the cessation of operations or forced divestiture of the applicable business.

Section 6.8    No Successor Liability.  The Parties intend that upon the Closing, each Buyer and its Affiliates shall not and shall not be deemed to: (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to Sellers, including a "successor employer" for the purposes of the IRC, ERISA, or other applicable Laws; (b) have any responsibility or liability for any obligations of Sellers, or any affiliate of Sellers, based on any theory of successor or similar theories of liability; (c) have, de facto or otherwise, merged with or into any of Sellers; (d) be an alter ego or a mere continuation or substantial continuation of any of Sellers (and there is no continuity of enterprise between Buyer and any Seller), including within the meaning of any foreign, federal, state, or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including filing requirements under any such Laws, rules, or regulations), or under any products liability law or doctrine with respect to Sellers' liability under such law, rule or regulation or doctrine; or (e) be holding itself out to the public as a continuation of any of Sellers or Sellers' respective estates.

Section 6.9    Acquired Avoidance Actions.  Buyer shall not at any time following the Closing pursue, prosecute, sell, or transfer any of the Acquired Avoidance Actions.

Section 6.10  Transition License. Effective as of the Closing Date, Buyer hereby grants to the Sellers a non-exclusive, limited, royalty-free, fully paid-up, non-transferable, non-sublicensable license (except as set forth in clause (c) below) to use the Business Intellectual Property to the extent included as an Acquired Asset (the "Transferred Intellectual Property") solely (a) as former corporate names for legal and notice purposes in connection with the Bankruptcy Cases to the extent such Transferred Intellectual Property are used in such corporate names as of the date of this Agreement, (b) in connection with the filing of Tax Returns and for the wind down process of the Sellers and (c) for use by any purchaser of Excluded Assets, including, without limitation, the sale of any gyms that are not included in the Acquired Assets, for a period not to exceed ninety (90) days after the closing on such sale for transition purposes, including the removal of all Transferred Intellectual Property from all purchased public facing assets; provided that, (i) the Sellers shall, and shall cause any such purchasers of Excluded Assets,

as applicable, to cease all such use reasonably promptly, including by either changing such corporate names to names that do not use any Transferred Intellectual Property or any names confusingly similar thereto or ceasing such use as a result of the wind down or dissolution of the Sellers and (ii) in no event shall the term any license granted to Sellers or to purchasers of Excluded Assets pursuant to this <u>Section 6.10</u> exceed one hundred eighty (180) days after the Closing; <u>provided</u>, further, that any license granted to Sellers to use the Business Intellectual Property in connection with clause (c) shall be sublicensable. Any and all such use of the Transferred Intellectual Property shall be materially consistent with the manner in which such Transferred Intellectual Property is used as of the date of this Agreement, and any and all goods and services sold under the Transferred Intellectual Property shall materially comply with the quality control and quality standards in effect as of the date of this Agreement.

Section 6.11   <u>TSA</u>.  Sellers shall (a) at the Closing, assume the Existing TSA and satisfy all Cure Costs associated therewith (provided, that no such Cure Costs shall constitute Buyer Cure Costs, and the Existing TSA shall not constitute an Assumed Agreement), and (b) take all other actions reasonably necessary to satisfy the conditions to effectiveness set forth in <u>Section 7.2(b)</u> and <u>Section 7.2(c)</u> of the TSA.

Section 6.12   <u>Memberships</u>.  Five (5) Business Days prior to the Closing, Sellers shall deliver to Buyer a true and correct schedule of the Acquired Gym Locations and the aggregate number of members of each such Gym Location as of such date.

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSE

Section 7.1   <u>Conditions to Buyer's Obligations</u>.   Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver by Buyer of the following conditions:

(a)   (i) The representations and warranties of Sellers set forth in <u>Section 3.1</u>, <u>Section 3.2</u>, <u>Section 3.3(a)</u>, <u>Section 3.4(a)</u>, and <u>Section 3.9</u> shall be true and correct in all respects as of the date hereof and as of the Closing Date, as though made at and as of the Closing Date, except to the extent any such representations and warranties expressly relate to an earlier time (in which case such representations and warranties shall be true and correct in all respects at and as of such earlier time), and (ii) all other representations and warranties of the Sellers in this Agreement (other than those listed in the foregoing clause (i)) shall be true and correct, without regard to any qualifications as to "material", "materiality", or "Material Adverse Effect" (or any correlative terms), as of the date hereof and as of the Closing Date, as though made at and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier time (in which case such representations and warranties shall be true and correct at and as of such earlier time), except where the failure of such representations and warranties to be true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)   Sellers shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)     the Bankruptcy Court shall have entered the Bidding Procedures Order pursuant to the terms and conditions of <u>Section 5.3</u> herein;

(d)     the Bankruptcy Court shall have entered the Sale Order, no Decree staying, reversing, modifying, or amending the Sale Order shall be in effect, and such order shall be a Final Order, on the Closing Date;

(e)     no Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement;

(f)     the applicable waiting period under the HSR Act shall have expired or been earlier terminated without action by the U.S. Department of Justice or the U.S. Federal Trade Commission to prevent consummation of the transactions contemplated by this Agreement;

(g)     each delivery contemplated by <u>Section 2.5(a)</u> to be delivered to a Buyer shall have been delivered;

(h)     since the date of this Agreement, there shall not have occurred any effect, condition, fact, circumstance, or change that, individually or in the aggregate, has had, or would reasonably be expected to have, a Material Adverse Effect; and

(i)     the conditions to effectiveness set forth in Section 7.2(b) and Section 7.2(c) of the TSA shall have been satisfied.

Section 7.2   <u>Conditions to Sellers' Obligations</u>.   Sellers' obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)     the representations and warranties set forth in <u>Article IV</u> shall have been true and correct on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a Buyer Material Adverse Effect;

(b)     Buyer shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)     the Bankruptcy Court shall have entered the Sale Order, and no Decree staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date;

(d)     no Decree shall be in effect that prohibits consummation of any of the transactions contemplated by this Agreement;

(e)     the applicable waiting period under the HSR Act shall have expired or been earlier terminated without action by the U.S. Department of Justice or the U.S. Federal

Trade Commission to prevent consummation of the transactions contemplated by this Agreement; and

(f)     each delivery contemplated by <u>Section 2.5(b)</u> (other than the payment described in <u>Section 2.5(b)(i)</u>) to be delivered to Sellers shall have been delivered.

Section 7.3   <u>No Frustration of Closing Conditions</u>.   Neither Buyer nor Sellers may rely on the failure of any condition to Buyer's or Sellers' respective obligations to consummate the transactions contemplated hereby set forth in <u>Section 7.1</u> or <u>Section 7.2</u>, as the case may be, to be satisfied if such failure was caused by such Party's or such Party's Affiliates' material breach of a representation, warranty, or covenant hereunder.

## ARTICLE VIII
## TERMINATION

Section 8.1   <u>Termination of Agreement</u>.   The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(a)     by the mutual written consent of the Parties;

(b)     by any Party by giving written notice to the other Parties if:

(i)     any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 8.1(b)(i)</u> shall not be available to a Party if such action by a Governmental Authority was primarily caused by the failure of such Party to have fulfilled in any material respect any of its obligations under this Agreement; or

(ii)     the Closing shall not have occurred prior to the Termination Date; <u>provided</u>, <u>however</u>, that if the Closing not having occurred on or before the Termination Date was primarily caused by a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or Sellers, then such breaching Party may not terminate this Agreement pursuant to this <u>Section 8.1(b)(ii)</u>.  The "<u>Termination Date</u>" shall be December 2, 2024, unless the Parties mutually agree to a later Closing Date pursuant to <u>Section 2.4</u>, upon which the Business Day following such later date shall be the Termination Date;

(c)     by Buyer by giving written notice to Sellers if there has been a breach by any Seller of any representation, warranty, covenant, or agreement contained in this Agreement that would give rise to the failure to be satisfied of any of the conditions to the obligations of Buyer at the Closing set forth in <u>Section 7.1(a)</u> and <u>Section 7.1(b)</u>, and such breach has not been waived by Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (i) ten (10) days after receipt of Buyer's notice of intent to terminate and (ii) the Termination Date; <u>provided</u>, that Buyer shall not have a right of

termination pursuant to this <u>Section 8.1(c)</u> if Sellers could, at such time, terminate this Agreement pursuant to <u>Section 8.1(d)</u>;

(d)      by Sellers by giving written notice to Buyer if there has been a breach by Buyers of any representation, warranty, covenant, or agreement contained in this Agreement that would give rise to the failure to be satisfied of any of the conditions to the obligations of Sellers at the Closing set forth in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u>, and such breach has not been waived by such Seller, or, if such breach is curable, cured by Buyer prior to the earlier to occur of (i) ten (10) days after receipt of such Seller's notice of intent to terminate and (ii) the Termination Date; <u>provided,</u> that Sellers shall not have a right of termination pursuant to this <u>Section 8.1(d)</u> if Buyer could, at such time, terminate this Agreement pursuant to <u>Section 8.1(c)</u>;

(e)      by Sellers or Buyer, if (i) (x) Sellers enter into a definitive agreement with respect to a Competing Bid, (y) the Bankruptcy Court enters an order approving a Competing Bid, and (z) the Person making the Competing Bid consummates the Competing Bid or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement;

(f)      by Buyer, by written notice to Sellers, if any creditor of any Seller or its Affiliates obtains relief from the stay to foreclose on, or otherwise take possession of, a material portion of the Acquired Assets;

(g)      by Buyer, by giving written notice to Sellers, if any Seller (x) files a motion (without Buyer's consent) to have the Bankruptcy Court enter an order dismissing or converting the Bankruptcy Cases into cases under Chapter 7 of the Bankruptcy Code or appointing a trustee in the Bankruptcy Cases or appointing an examiner with enlarged power related to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or the occurrence of any of the foregoing, or (y) announces its intention to, or files a motion to, pursue or enter into any Alternative Transaction (unless Buyer is the Back-Up Bidder) that would make the consummation of the transactions contemplated by this Agreement or the satisfaction of any conditions herein impossible; or

(h)      by Buyer, by written notice to Sellers, if, (i) the Stalking Horse Order is not entered by the Bankruptcy Court within fifteen (15) days after the date hereof, or such order does not become a Final Order within fifteen days after its entry by the Bankruptcy Court or (ii) after their respective entry, one or more of the Bidding Procedures Order, Stalking Horse Order, or Sale Order, or any provisions set forth therein the absence of which would materially and adversely affect Buyer, cease to be in full force and effect; provided, however, that Buyer's right to terminate this Agreement pursuant to the foregoing clause (i) shall not be exercisable after entry of the Stalking Horse Order.

Section 8.2      <u>Effect of Termination</u>.

(a)     If any Party terminates this Agreement pursuant to <u>Section 8.1</u>, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that <u>Article I</u>,  <u>Article IX</u>, and this <u>Section 8.2</u> shall survive any such termination) and, except as set forth in <u>Section 5.3</u> and this <u>Section 8.2</u>, no Party shall have any Liability to the other Parties hereunder; <u>provided</u>, that nothing in this <u>Section 8.2</u> shall relieve any Party from Liability for any willful material breach occurring prior to any such termination set forth in this Agreement; <u>provided</u>, <u>further</u>, that in the event this Agreement is terminated pursuant to <u>Section 8.1(d)</u> and Sellers are not then in breach of Sellers' obligations hereunder, Sellers shall be entitled to retain the Deposit as set forth in <u>Section 2.3(b)</u> and the maximum Liability of Buyer under this Agreement shall be equal to the Deposit to the extent payable to Sellers.  In the event of termination of this Agreement for any reason other than pursuant to <u>Section 8.1(d)</u> and Buyer is not then in breach of Buyer's obligations hereunder, the Deposit shall be promptly returned to Buyer as set forth in <u>Section 2.3(b)</u>.

(b)     If this Agreement terminates and the Break-Up Fee and the Expense Reimbursement are payable pursuant to <u>Section 5.3(a)</u>, then, in addition to the obligation of Sellers to cause the release of the Deposit to Buyer in accordance with <u>Section 2.3(b)</u>, Sellers shall pay to Buyer the Expense Reimbursement and Break-Up Fee by wire transfer of immediately available funds at such time as required in accordance with <u>Section 5.3(a)</u>.

(c)     The Sellers' receipt of the Deposit shall constitute liquidated damages (and not a penalty) in a reasonable amount that will compensate Sellers in the circumstances in which this Agreement is terminated pursuant to <u>Section 8.1(d)</u>, which amount would otherwise be impossible to calculate with precision, and be the sole and exclusive remedy (whether at law, in equity, in contract, in tort or otherwise) of Sellers against Buyer, and any of its former, current, or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates or agents for any loss suffered as a result of any breach of any covenant, representation, warranty or agreement in this Agreement by Buyer or the failure of the transactions contemplated hereby to be consummated, and upon payment of such amounts, except with respect to Buyer's indemnification obligations in <u>Section 2.6(e)</u>, none of Buyer nor any of its former, current, or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates or agents shall have any further Liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby. Except with respect to Buyer's indemnification obligations in <u>Section 2.6(e)</u>, In no event shall Buyer's Liability under this Agreement exceed an amount equal to the Deposit.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1   <u>Survival</u>.  Except for any covenant that by such covenant's terms is to be performed (in whole or in part) by any Party following the Closing, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to <u>Section 2.5(a)</u> or <u>Section 2.5(b)</u> shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing.  Any obligations to be performed post-Closing shall survive until completion in accordance with its terms.

Section 9.2    <u>Expenses</u>.    Except for as provided by orders of the Bankruptcy Court or as otherwise expressly provided in this Agreement, each Party will bear such Party's own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts, and consultants.  For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Acquired Assets.

Section 9.3    <u>Entire Agreement</u>.    This Agreement and the Related Agreements constitute the entire agreement among the Parties and supersede any prior understandings, agreements, or representations (whether written or oral) by or among the Parties to the extent they relate in any way to the subject matter hereof.

Section 9.4    <u>Incorporation of Exhibits and Disclosure Schedule</u>.  The Exhibits to this Agreement and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

Section 9.5    <u>Amendments and Waivers</u>.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and each Seller. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation, or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding, or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 9.5</u> except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof.

Section 9.6    <u>Succession and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and the Parties' respective successors and permitted assigns, including, in the case of the Sellers, any trustee or similar party in the Bankruptcy Cases or in any subsequent chapter 7 case.  No Party may assign either this Agreement or any of such Party's rights, interests, or obligations hereunder without the prior written consent of the other Parties. Notwithstanding the foregoing, Buyer may assign (in whole or in part) either this Agreement or any of Buyer's rights, interests, or obligations hereunder to an Affiliate of Buyer without the prior written consent of the other Parties; <u>provided</u> that such assignment shall not relieve Buyer of Buyer's obligations hereunder. In furtherance of the foregoing, Buyer may, without the consent of Sellers, designate, in accordance with the terms of this paragraph and effective as of the Closing, one or more Persons to acquire all, or any portion of, the Acquired Assets and assume all or any portion of the Assumed Liabilities or pay all or any portion of the Purchase Price. The above designation may be made by Buyer by written notice to Sellers at any time prior to the Closing Date.  The Parties agree to modify any Closing deliverables in accordance with the foregoing designation.

Section 9.7    <u>Notices</u>.    All notices, requests, demands, claims, and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) on the day such communication was sent by e-mail; or (d) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Seller:    Blink Holdings, Inc.
c/o Portage Point Partners
640 Fifth Avenue, 10th Floor
New York, NY 10019
Attention: Steven Shenker
E-mail:    sshenker@pppllc.com

With a copy (shall not constitute notice to Sellers) to:

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 N King Street
Wilmington, DE 19801
Attention:  Sean T. Greecher, Esq.
                     Craig D. Grear, Esq.
Email:        sgreecher@ycst.com
                     cgrear@ycst.com


If to Buyer:    Pinnacle US Holdings LLC
c/o PureGym
Town Centre House
Merrion Centre
Leeds, UK LS2 8LY
Attention:  Alex Wood
E-mail:    alex.wood@puregym.com

With a copy (that shall not constitute notice to Buyer) to:

Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Attention: Ted Dillman; Sean Denvir
E-mail: ted.dillman@lw.com; sean.denvir@lw.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this <u>Section 9.7</u>.

Section 9.8    <u>Governing Law</u>.    This Agreement shall be governed by and construed in accordance with the internal Laws of the State of Delaware (without giving effect to the principles of conflict of laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

Section 9.9    <u>Submission to Jurisdiction; Service of Process</u>.    Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court.    Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court.    Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.    Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in <u>Section 9.7</u>; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 9.9</u> shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity. Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity.    The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

Section 9.10    <u>Waiver of Jury Trial</u>.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 9.11    <u>Specific Performance</u>.    From and after the Closing, the Parties shall be entitled to an injunction or injunctions to enforce specifically the Parties' respective covenants and agreements under this Agreement that survive the Closing, without the requirement of posting a bond or other security.

Section 9.12    <u>Severability</u>.    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.    In the event that any of the provisions of this Agreement shall be held by any Governmental Authority to be illegal, invalid, or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 9.13   <u>No Third Party Beneficiaries</u>.   This Agreement shall not confer any rights or remedies upon any Person other than Buyer, each Seller, and their respective successors and permitted assigns.

Section 9.14   <u>Non-Recourse</u>.   All claims, obligations, liabilities, or causes of action that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, the negotiation, execution, or performance of this Agreement or the Related Agreements (including any representation or warranty made in connection with or as an inducement to this Agreement or the Related Agreements) or the transactions contemplated hereby may be made only against (and are those solely of) the Persons that are expressly identified as parties to this Agreement or the applicable Related Agreement (each, with respect to the applicable agreement, a "<u>Contracting Party</u>").   No other Person, including any Contracting Party's Affiliates, directors, officers, employees, incorporators, members, partners, managers, stockholders, agents, attorneys, or representatives of, or any financial advisors or lenders to any of the foregoing (each, a "<u>Non-Party Affiliate</u>"), shall have any liabilities for any claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or a Related Agreement (unless party thereto) or based on, in respect of, or by reason of this Agreement or a Related Agreement (unless party thereto) or its negotiation, execution, performance, or breach.   To the maximum extent permitted by Law, each Contracting Party hereby knowingly and voluntarily waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates. Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby knowingly and voluntarily waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements.

Section 9.15   <u>Mutual Drafting</u>.   The Parties have participated jointly in the negotiation and drafting of this Agreement.   In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.16   <u>Disclosure Schedule</u>.   All capitalized terms not defined in the Disclosure Schedule shall have the meaning ascribed to such terms in this Agreement.   The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule.   The listing of any matter shall expressly not be deemed to constitute an admission by Sellers.   No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.   In no event shall the listing of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties, or covenants

set forth in this Agreement. All attachments to the Disclosure Schedule are incorporated by reference into the applicable section of the Disclosure Schedule in which they are directly or indirectly referenced. Any matter disclosed in any Section or subsection of the Disclosure Schedule shall be considered disclosed with respect to each other Section or subsection of such Disclosure Schedule solely to which it is reasonably apparent on the face of such disclosure that such matter would pertain, without reference to any document referenced in such disclosure.

Section 9.17   <u>Headings; Table of Contents</u>.  The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.18   <u>Counterparts; Facsimile and Electronic Signatures</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies, delivered by electronic communications by portable document format (.pdf), or any other means of electronic execution, including by DocuSign, each of which shall be deemed an original.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

<u>Sellers</u>:

BLINK HOLDINGS, INC.

By: *Guy Harkless*  _____

    Name: Guy Harkless
    Title:   President and CEO


692 BROADWAY FITNESS CLUB, INC.
BERGEN TOWN CENTER FITNESS CLUB, INC.
BLINK 1065 6TH AVENUE, INC.
BLINK 108-14 ROOSEVELT, INC.
BLINK 1134 FULTON, INC.
BLINK 116TH STREET, INC.
BLINK 125 PARK, INC.
BLINK 125TH STREET, INC.
BLINK 2374 GRAND CONCOURSE, INC.
BLINK 2465 JEROME INC.
BLINK 287 BROADWAY, INC.
BLINK 2883 3RD AVENUE, INC.
BLINK 3779 NOSTRAND, INC.
BLINK 56-02 ROOSEVELT, INC.
BLINK 600 THIRD AVENUE, INC
BLINK 78-14 ROOSEVELT, INC.
BLINK 833 FLATBUSH, INC.
BLINK 886 BROADWAY, INC.
BLINK 98TH STREET, INC.
BLINK ATLANTIC AVENUE, INC.
BLINK AVENUE A, INC.
BLINK BALDWIN, INC.
BLINK BRADDOCK AVENUE INC.
BLINK BRENTWOOD, INC.
BLINK BROADWAY MARKETPLACE, INC.
BLINK CLIFTON, INC.
BLINK CONCOURSE HOLDINGS, INC.
BLINK EAST 54TH STREET, INC.
BLINK EAST ORANGE, INC.
BLINK EAST TREMONT AVENUE, INC.
BLINK EIGHTH AVENUE, INC.
BLINK FARMERS BOULEVARD INC.
BLINK FLATLANDS AVENUE, INC.

*Signature Page to Asset Purchase Agreement*

BLINK FOURTH AVENUE, INC.
BLINK FULTON STREET, INC.
BLINK GATES, INC.
BLINK HICKSVILLE, INC.
BLINK IRVINGTON INC.
BLINK JAMAICA AVENUE, INC.
BLINK JEROME AVENUE, INC.
BLINK JOURNAL SQUARE, INC.
BLINK KNICKERBOCKER, INC.
BLINK LIBERTY AVENUE, INC.
BLINK LINDEN, INC.
BLINK LODI, INC.
BLINK MACOMBS ROAD, INC.
BLINK MELVILLE, INC.
BLINK METROPOLITAN AVENUE, INC.
BLINK MYRTLE AVENUE, INC.
BLINK NASSAU STREET, INC.
BLINK NEWARK, INC.
BLINK NOSTRAND AVENUE, INC.
BLINK NUTLEY, INC.
BLINK PASSAIC, INC.
BLINK PERTH AMBOY, INC.
BLINK PLAINFIELD, INC.
BLINK RIVERDALE, INC.
BLINK SOUTH ORANGE, INC.
BLINK SOUTHERN BOULEVARD, INC.
BLINK STEINWAY STREET, INC.
BLINK SUNSET PARK, INC.
BLINK UTICA AVENUE, INC.
BLINK VALLEY STREAM, INC.
BLINK WEST 8TH STREET, INC.
BLINK WEST ISLIP, INC.
BLINK WILLIAMSBRIDGE, INC.
CROSS COUNTY FITNESS CLUB, INC.

By: *Guy Harkless*

    Name: Guy Harkless
    Title:   President and CEO as to each

*Signature Page to Asset Purchase Agreement*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

<u>Buyer</u>:

PINNACLE US HOLDINGS LLC

By: _____
Name: Humphrey Cobbold
Title:   Chief Executive Officer

## EXHIBIT C

**Stalking Horse Approval Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BLINK HOLDINGS, INC., *et al.*,[1] | Case No. 24-11686 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. 81, 348** |

## ORDER APPROVING THE STALKING HORSE BID PROTECTIONS

Upon the *Notice of Filing of Stalking Horse Supplement* (the "**Notice**")[2] of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), filed in accordance with paragraph 6 of the Bidding Procedures Order, seeking entry of an order (this "**Order**") approving the Bid Protections; and this Court having jurisdiction to consider the Notice and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Notice and the requested relief being a core proceeding pursuant to 28 U. S. C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having scheduled a hearing to consider the Notice in accordance with the Bid Procedures Order; and this Court having reviewed the Notice and any and all evidence submitted in support of the Bid Protections; and this Court having held a hearing to consider the relief requested in the Notice; and all objections, if any, to the Bid Protections having been withdrawn, resolved, or overruled; and this Court having determined that the legal and factual bases set forth in the Notice and applicable

---

[1] The last four digits of Blink Holdings, Inc.'s federal tax identification number are 6354. The mailing address for Blink Holdings, Inc. is 45 West 45th Street, 10th Floor, New York, New York 10036. Due to the large number of debtors in these chapter 11 cases, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/BlinkFitness, or by contacting the undersigned counsel for the Debtors.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning given to such terms in the Notice.

evidence submitted in connection therewith establish just cause for the relief granted herein; and it appearing that the Bid Protections are warranted and should be awarded as being in the best interest of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Bid Protections set forth in the Stalking Horse APA are approved as set forth herein.

2.      The Debtors' obligations to pay the Bid Protections to the Stalking Horse Bidder, as set forth in and to the extent payable under the Stalking Horse APA, is (a) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of section 503(b)(1)(A) of the Bankruptcy Code, (b) of substantial benefit to the Debtors' estates, (c) reasonable and appropriate, and (d) necessary to ensure that the Stalking Horse Bidder will continue to pursue its proposed acquisition of the Acquired Assets.  The Bid Protections shall be payable in accordance with the terms of section 5.3(a) of the Stalking Horse APA, which are incorporated herein by reference, without further action or order by the Court.

3.      Notwithstanding anything to the contrary in the final order approving the Debtors' postpetition financing (the "**Final DIP Order**"), the Prepetition Secured Parties and the DIP Secured Parties (each as defined in the Final DIP Order) agree (a) not to submit any credit bid or other bid competing with the bid reflected in the Stalking Horse APA, including an Incremental Bid (as defined in the Bidding Procedures Order), and (b) to support (subject to higher and better offers) the effectiveness of the Stalking Horse APA, the TSA (as defined in the Stalking Horse APA), and the transactions contemplated thereby, provided that the Prepetition Secured Parties and

DIP Secured Parties reserve the right to submit a credit bid or other bid in the event that (a) the Stalking Horse APA is terminated in accordance with its terms or (b) the Stalking Horse APA or the bid contemplated thereby is amended or modified in a manner materially adverse to the Prepetition Secured Parties and DIP Secured Parties (without the consent of the DIP Agent or Prepetition Agent, as applicable).

4. Notwithstanding Bankruptcy Rule 6004(h) or any applicable provisions of the Local Rules or otherwise, this Order shall be immediately effective and enforceable upon its entry, and no automatic stay of execution shall apply to this Order.

5. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

## **EXHIBIT D**

### **Stalking Horse Declaration**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BLINK HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-11686 (JKS)<br><br>(Jointly Administered) |

### DECLARATION OF ANDREW SWIFT IN SUPPORT OF DEBTORS'
### DESIGNATION OF A STALKING HORSE PURCHASER

I, Andrew Swift, hereby declare as follows under penalty of perjury:

1.       I am a managing director at Moelis & Company LLC ("**Moelis**"), which

maintains its principal office at 399 Park Avenue, 4th Floor, New York, New York 10022.  Moelis

has been retained as the investment banker to the above-captioned debtors and debtors in

possession (collectively, the "**Debtors**") in the Debtors' chapter 11 cases (collectively,

the "**Chapter 11 Cases**").

2.       I submit this declaration (this "**Declaration**") on behalf of the Debtors in

support of the *Debtors' Motion for Entry of Orders (I) (A) Approving Certain Bidding Procedures*

*and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the*

*Approval of the Sale of All or Substantially All of the Debtors' Assets, (C) Establishing Certain*

*Assumption and Assignment Procedures and Approving the Manner of Notice Thereof, and*

*(D) Granting Related Relief; and (II) (A) Authorizing and Approving the Debtors' Entry into an*

*Asset Purchase Agreement, (B) Authorizing the Sale of All or Substantially All of the Debtors'*

---

[1]       The last four digits of Blink Holdings, Inc.'s federal tax identification number are 6354.  The mailing address for Blink Holdings, Inc. is 45 West 45th Street, 10th Floor, New York, New York 10036. Due to the large number of debtors in these chapter 11 cases, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/BlinkFitness, or by contacting the counsel for the Debtors.

*Assets Free and Clear of All Encumbrances, (C) Approving the Assumption and Assignment of the Assumed Contracts, and (D) Granting Related Relief* [Docket No. 81] (the "**Bidding Procedures Motion**"), the relief granted by the Court with respect to the Bidding Procedures Motion (the "**Bidding Procedures Order**"), the supplement to the Bidding Procedures Motion (the "**Stalking Horse Supplement**") and the relief granted by the Court with respect to the Stalking Horse Supplement (the "**Stalking Horse Approval Order**").[2]

3.    Unless otherwise stated herein, all statements set forth in this Declaration are based upon (i) my and Moelis's experiences in other similar chapter 11 cases; (ii) Moelis's analyses regarding the proposed bidding procedures in these and other chapter 11 cases; (iii) discussions with certain other professionals at Moelis and with the Debtors' other advisors; and/or (vi) my opinions based upon my experience and knowledge.

4.    I am over the age of eighteen (18) and authorized to submit this Declaration on behalf of the Debtors.  I am not being specifically compensated for this testimony other than through payments received by Moelis, as a proposed professional to be retained by the Debtors. If called upon to testify, I could and would testify as to the facts set forth herein.

5.    Prior to the Petition Date, the Debtors engaged Moelis as investment banker to market all or substantially all of the Debtors' assets (the "**Assets**") and otherwise explore potential transactions to seek to maximize value for all stakeholders.  This marketing process is well underway, and Moelis and the Debtors are in ongoing communications with numerous parties to acquire some or all of the Assets.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Bidding Procedures Motion, the Bidding Procedures Order, the Stalking Horse Supplement, or the Stalking Horse APA (as defined below), as applicable.

32041235.7

6.      As further explained below, based on my experience in other chapter 11 cases, current market conditions, the Debtors' circumstances, and the feedback received from potentially interested bidders, I believe the marketing and Sale process described in the Bidding Procedures and Stalking Horse Supplement are appropriate to facilitate the Debtors efforts to seek to maximize the value of the Assets for all stakeholders.

## BACKGROUND AND QUALIFICATIONS

7.      Moelis has advised companies, creditors, investors, and financial sponsors across various industries on a range of in-court and out-of-court restructurings, financings, and other transactions, in traditional and distressed situations.   Moelis' business reorganization professionals have served as financial advisors and/or investment bankers in numerous cases, including, among others:  *In re Express, Inc., et al.,* No. Case No. 24-10831 (KBO) (Bankr. D. Del. June 5, 2024); *In re Diamond Sports Grp., LLC, et al.,* No. 23-90116 (CML) (Bankr. S.D. Tex. May 8, 2023); *In re Invitae Corp., et al.,* No 24-11362 (MBK) (Bankr. NJ, April 23, 2023); *In re Party City Holdco Inc., et al.* No. 23-90005 (DRJ) (Bankr. S.D. Tex. Feb. 21, 2023); *In re Genesis Global Holdco, LLC, et al.,* No. 23-10063 (SHL) (Bankr. S.D. NY., Feb. 17, 2023); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. July 26, 2022); *In re TPC Grp. Inc.*, No. 22-10493 (CTG) (Bankr. D. Del. June 30, 2022); *In re MD Helicopters, Inc.*, No. 22-10263 (KBO) (Bankr. D. Del. May 6, 2022); *In re Brazos Elec. Power*, No. 21-30725 (DRJ) (Bankr. S.D. Tex. Mar. 1, 2021); *In re Knotel, Inc.*, No. 21-10146 (MFW) (Bankr. D. Del. Jan. 31, 2021); *In re Mallinkrodt plc, No. 20-12522* (JTD) (Bankr. D. Del. Jan. 14, 2021); *In re Energy Alloys Holdings, LLC*, No. 20-12088; (MFW) (Bankr. D. Del. Nov. 23, 2020); *In re Internap Tech.*

32041235.7

3

*Sols. Inc.*, No. 20-22393 (RDD) (Bankr. S.D.N.Y. May 5, 2020); and *In re Rentpath Holdings,*

*Inc.*, No. 20-10312 (BLS) (Bankr. D. Del. Mar. 10, 2020).[3]

        8.      I received a Bachelor of Arts degree from the University of Michigan.  I

currently hold the Series 79 and Series 63 securities licenses.

**THE MARKETING PROCESS**

        9.      Since Moelis was retained in May 2024, Moelis has worked closely with

the Debtors and their other professional advisors to become knowledgeable about the Debtors'

business, finances, and operations.  I have participated directly in discussions, due diligence, and

negotiations with potential bidders.  In doing so, I have been working closely with the Debtors'

management, legal counsel, and other advisors.

        10.     Prior to the Petition Date, Moelis assisted the Debtors in evaluating

potential sources of additional debt financing and commenced a marketing process for a sale of

the Assets.  As part of this process, the Debtors and Moelis engaged a targeted group of potential

bidders and held several diligence meetings in July and August 2024, which led to the receipt of

several indications of interest with potential bidders.

        11.     While the Debtors received significant interest, the Debtors determined it

was not feasible to transact quickly enough with any of these parties to avoid commencement of

the Chapter 11 Cases.

        12.     Moelis has contacted over 160 parties, including both strategic and financial

buyers, regarding the potential sale of the Assets.  Over 40 have executed non-disclosure

agreements and have been provided access to Company information.  Moelis, at the direction of

---

[3]    Because of the voluminous nature of the orders cited herein, such orders are not attached to this Declaration. Copies of these orders are available upon request of the Debtors' counsel.

32041235.7

the Debtors and in conjunction with the Debtors' management and other professionals, continues to respond to diligence inquiries, engage with potential bidders, and facilitate discussions among stakeholders to foster a competitive marketing and sale process.

## THE STALKING HORSE APA

13. After considering all proposals received to date, negotiating and exchanging drafts of an asset purchase agreement, working with the proposed bidder to improve the terms of the asset purchase agreement, and consulting with the Prepetition Agent and DIP Agent, as an exercise of their business judgment, the Debtors designated Pinnacle US Holdings LLC (d/b/a Pure Gym, the "**Buyer**" or "**Purchaser**") to be the proposed Stalking Horse Bidder with respect to the "Acquired Assets" as defined in the Asset Purchase Agreement dated September 10, 2024 (the "**Stalking Horse APA**"), filed contemporaneously herewith, on the terms and conditions set forth in the Stalking Horse APA.

14. Pursuant to the Stalking Horse APA, the Buyer has agreed to purchase the Acquired Assets free and clear of all Liens (other than Permitted Post-Closing Liens).  The Stalking Horse APA will include consideration comprising the following (as such terms are defined in the Stalking Horse APA):  (a) $105,000,000 in cash (less the Seller Property Tax Amount, the Total Deferred Rent Adjustment, the Closing PTO Adjustment, and the Customer Credit Adjustment, plus the Buyer Cure Cost Adjustment); and (b) the assumption of certain liabilities of the estates, including Deferred Rent, Pre-Closing Payables (provided that the aggregate amount does not exceed $100,000, without the prior written consent of Buyer), all Customer Credits, all Assumed PTO, and all Buyer Cure Costs, constituting at least $118 million of total enterprise value.

15. The Debtors have agreed, subject to Court approval, to provide the Stalking Horse Bidder with the following standard bid protections (collectively, the "**Bid Protections**"),

should the Debtors consummate an alternative transaction for the Acquired Assets with another bidder: (i) a break-up fee in the amount of $3,250,000; and (ii) reimbursement of the Purchaser for all reasonable and documented out of pocket costs and expenses incurred by Buyer or any of its Affiliates in connection with the negotiation, preparation, and execution of the Stalking Horse APA, the Related Agreements, the consummation of the transactions contemplated thereby, and the Bankruptcy Cases and all other judicial and regulatory proceedings related to this Stalking Horse APA or the Related Agreements, including all fees and disbursements and other charges of counsel to Buyer in an amount not to exceed $2,000,000.

16.    The Debtors and the Stalking Horse Bidder heavily negotiated the Bid Protections, which the Stalking Horse Bidder required as a condition to execution of the Stalking Horse Bid given the substantial costs and expenses that the Stalking Horse Bidder has expended in performing diligence and documenting the Stalking Horse APA.  I do not believe that the Stalking Horse Bidder would have agreed to serve as a stalking horse at the values reflected in the Stalking Horse Bid absent the Bid Protections.  I believe that the terms of the Stalking Horse APA are the best available option under the circumstances based on the sale process to date.  I believe that the Bid Protections are consistent with market norms for a transaction of this nature, and the Debtors' acceptance of the Bid Protections is reasonable and appropriate given that the Stalking Horse APA, if designated, will establish a floor for further bidding that will be subject to higher and better offers and may serve to increase consideration offered in exchange for the Acquired Assets, which will serve to benefit the Debtors' estates in the form of a competitive bidding process.

17.    It is my belief that the Stalking Horse APA was negotiated and entered into in good faith and on an arms'-length basis.  I believe that, taken as a whole and under the

circumstances, the terms of the proposed sale of the Acquired Assets to the Stalking Horse Purchaser are fair and reasonable, and that the Stalking Horse APA constitutes the best offer available for the Acquired Assets at this time.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: September 10, 2024

/s/ Andrew Swift

Andrew Swift
Managing Director
Moelis & Company LLC

32041235.7