

**The New York Times Company**

620 8th Avenue
New York, NY 10018
nytimes.com

# PROOF OF PUBLICATION

September 17, 2024

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

9/17/2024, NY/NATL, pg B3

*Larnyce Tabron*

JOHN MCGILL
Electronic Notary Public
Commonwealth of Virginia
Registration No. 8038092
My Commission Expires Dec 31, 2027

Digitally signed by John McGill
Date: 2024.09.17 13:50:37 -04'00'

## Amazon Sends Corporate Staff Back to Office

**By KAREN WEISE and EMMA GOLDBERG**

SEATTLE — Amazon told its corporate employees on Monday that they had to return to working in the company's offices five days a week starting in January.

The new rule — up from a three-day-a-week mandate set in 2023 — appears to be the most stringent return-to-office decision among big tech companies and could be a harbinger of more to come.

That Amazon, which has always operated with tighter rules for its corporate work force than its peers, is leading the way back to the office is not a surprise. Amazon has shunned plush corporate campuses and lavish employee perks common among tech companies, while giving managers attrition targets for how many people should leave their teams.

"If anything, the last 15 months we've been back in the office at least three days a week has strengthened our conviction about the benefits," Andy Jassy, Amazon's chief executive, wrote in a memo. Mr. Jassy said in-person collaboration allowed Amazon to move quickly and retain its culture, which he said had become particularly hard to maintain as the company grew quickly during the pandemic.

"We want to operate like the world's largest startup," he wrote. The change will affect more than 350,000 corporate employees. Amazon also has more than a million employees working in warehouses and operations.

An internal site for Amazon employees, viewed by The New York Times, said that attendance would be monitored by swipes of corporate badges, and that employees must return to the office even if there were not many members of their team in their location. It said the company was working to make conference rooms more available and was adding about 3,500 so-called phone booths in their offices to accommodate the additional employees.

Amazon's internal messaging channels lit up with discontent over the changes, according to screenshots of the messages.

Since they essentially shut down their offices in the early days of the pandemic, tech companies have been inching toward getting employees back. Other big tech companies like Microsoft, Google, Meta and Apple expect employees to work in the office two or three days a week.

Giving employees workplace flexibility allowed companies to save money on office space and to offer work flexibility as a perk. But executives are increasingly saying there have been trade offs that they no longer want to make.

As employers focus on productivity, they also note that outside the office people have returned entirely to prepandemic levels of activity.

"There is a sense the pendulum swung way too far in the opposite direction — this 'the office is super optional,'" said Zach Dunn, co-founder of the workplace management platform Robin, which has helped companies establish hybrid policies.

Nick Bloom, an economist at Stanford who studies work-from-home policies, noted that many companies had previously done turnabouts on their return-to-office rules. In a February survey of more than 2,600 workers, nearly 40 percent said they had experienced two or more changes in company R.T.O. rules.

*Karen Weise reported from Seattle and Emma Goldberg from New York.*

## Federal Reserve Is Still Banking on a Labor Market Miracle

FROM FIRST BUSINESS PAGE

likely to forecast that they will lower interest rates further before the end of the year, perhaps predicting that they will cut them by a full point from their current 5.33 percent.

But even as the Fed turns an important corner on its fight against inflation, real risks remain. And those center on the labor market.

Unemployment has been slowly, but steadily, rising. Wage growth has been consistently slowing. Job openings have come down, and hiring rates have come down along with them. And while all of those developments are what the Fed wanted — the point of this exercise was to slow an overheated job market and prevent it from fueling future inflation — central bankers have been clear that they do not want to see it continue.

"We do not seek or welcome further cooling in labor market conditions," Jerome H. Powell, the Fed chair, said in his latest speech.

The problem is that it is not obvious what, exactly, will cause the deceleration that is clearly happening in the labor market to suddenly stop. Fed rate cuts should help by cheering up businesses and padding demand, but central bank policy changes work like slow-release medicine. They do not change the economy overnight.

That is why some onlookers are beginning to worry that the Fed might fall behind the curve if it reacts too gradually — something that would leave it scrambling to lower borrowing costs quickly enough to keep the job market from falling to pieces.

"Not all slowdowns lead to recessions, but all recessions start with slowdowns," said Skanda Amarnath, executive director at Employ America, an employment-focused research and advocacy group. "I think the data is signaling a certain amount of urgency."

The Fed has been approaching rate cuts cautiously because it does not want to risk taking its foot off the economic brakes too early or too swiftly, allowing the economy to heat back up and making it harder to fully stamp out inflation.

But caution on the inflation front could translate into risk-taking on the employment front.

The first and most concerning sign of labor market deterioration has been the recent rise in joblessness. After dropping to 3.4 percent in 2023, unemployment had risen to 4.2 percent as of August. That happened both as people left jobs and as new people entering the labor market took time to find open positions.

The question is whether the upcoming shift in Fed policy will be enough to cause that slow but steady increase in joblessness to halt abruptly. While it paused in August, the slow move up has in general been playing out ever since last summer.

The same question applies to wage growth, which is a signal of how hard companies are competing to hire. If the job market is roaring and employees are hard to come by, businesses tend to pay up to lure them away from the competition or to retain their existing employees. If the job market is softening, pay growth slows.

That's what's happening now. Average hourly earnings for rank-and-file workers have gone from a peak 2022 growth rate of 7 percent to a more muted 4 percent. That's still faster than just before the pandemic, but just a touch: Wage growth was about 3.7 percent in the summer of 2019.

And a noteworthy change is happening in job openings. They have marched steadily lower and are back where they were on the eve of the pandemic. That's relevant because unemployment historically climbs as job openings decline, a relationship that economists often refer to as the "Beveridge Curve."

In fact, Dallas Fed research this year predicted that joblessness might rise, warning that "the decline in job vacancies without a corresponding increase in unemployment may not last."

But even as signs of a softening labor market accumulate, Fed officials have explained that there are reasons to hope that this time could be different.

Past Fed efforts to cool inflation by slowing the labor market have resulted in painful recessions: The clearest example of that is the back-to-back downturns that plagued the country during the early 1980s.

And past economic relationships would suggest that with unemployment rising the way it has recently, an economic downturn is likely. Usually, higher joblessness heralds recession, as unemployed people and jittery workers pull back on consumption.

But this time, the pandemic has rattled the economy so much that economists think it is possible that what is happening is a gradual reversion to normal, rather than a painful crunch.

"It should be clear to everyone that many prepandemic economic relationships have not proven to be good policy guides post-pandemic," Christopher J. Waller, a Fed governor, said in a recent speech. "While I don't see the recent data pointing to a recession, I do see some downside risk to employment that I will be watching closely."

For instance, Fed officials often note that part of the increase in unemployment has come from a wave of new entrants into the labor market, not from a spike in layoffs. While layoffs are gently rising, they have not jumped sharply.

That is why some economists are still hoping for the soft landing — especially if the Fed acts in time.

Fed officials are considering a bigger rate decrease this month specifically because they are alert to the job market risks. And even if they do not make a big cut, they are likely to signal that more rate moves are coming, and that a large rate cut at their next meeting is possible if data warrants it.

"If employment weakens from here, they are going to have to — at some point — do a half-point cut," said Diane Swonk, chief economist at KPMG. "The bottom line is that the Fed, Powell, clearly wants to nail the soft landing. This is his legacy."



"We do not seek or welcome further cooling in labor market conditions," Jerome H. Powell, the Federal Reserve chair, said in his latest speech. CHERISS MAY FOR THE NEW YORK TIMES

### 4%
Growth in average hourly earnings for rank-and-file workers, below 2022's peak of 7 percent.

### 4.2%
Nation's unemployment rate in August, an increase from 3.4 percent last year.

## Boeing to Freeze Hiring and Cut Spending Amid Strike

**By NIRAJ CHOKSHI**

Days after thousands of employees went on strike, Boeing said on Monday that it would freeze hiring and cut spending, halting production of its most popular commercial jet.

Union leaders called for more than 33,000 Boeing workers to go on strike on Friday, after members voted overwhelmingly to reject a tentative contract negotiated by their union and company management. The walkout brought production of the 737 Max and other planes to a virtual halt, hampering Boeing's recovery from a safety crisis after a panel blew off one of its planes during a passenger flight in January.

The company is "working in good faith to reach a new contract agreement," but needs to take steps to rein in spending during the walkout, Brian West, Boeing's chief financial officer, wrote in a message to employees on Monday.

"Our business is in a difficult period," he said. "This strike jeopardizes our recovery in a significant way and we must take necessary actions to preserve cash and safeguard our shared future."

Mr. West said Boeing would protect funding for safety, quality and customer support while cutting spending in other areas. In addition to pausing hiring, the company froze nonessential travel and eliminated first- and business-class air travel for top executives.

Boeing also limited spending on consultants, advertising, marketing, charitable giving and on-site catering, and it is considering temporary furloughs for rank-and-file workers, managers and executives.

Mr. West said Boeing was also planning to cut supplier spending, a move that could have prolonged consequences. The aerospace supply chain is fragile, and cost-cutting can imperil smaller vendors to larger manufacturers like Boeing or its main rival, Airbus. The supplier spending cuts include stopping most orders for parts used in Boeing's 737, 767 and 777 airplanes, Mr. West said.

It is not clear how long the strike will last, but ending it will not be easy. In a vote on Thursday, nearly 95 percent of Boeing workers represented by the International Association of Machinists and Aerospace Workers rejected the tentative contract, while a slightly larger share voted in favor of a strike. Many members were dissatisfied by the size of raises and retirement benefits in the proposed contract.

The employees represented by the union last went on strike in 2008 for nearly two months. The contract the union ultimately reached with the company after that walkout has been extended several times before it expired at midnight on Thursday.

Boeing and the union are scheduled to restart talks on Tuesday, with the help of federal mediators.

> 'We must take necessary actions to preserve cash and safeguard our shared future.'
>
> Brian West, C.F.O. of Boeing, in a message to employees.

IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

In re: BLINK HOLDINGS, INC., et al.,¹ Debtors.

Chapter 11
Case No. 24-11686 (JKS)
(Jointly Administered)
Ref. Docket No. 347

NOTICE OF DEADLINES FOR THE FILING OF PROOFS OF CLAIM, INCLUDING REQUESTS FOR PAYMENTS UNDER SECTION 503(B)(9) OF THE BANKRUPTCY CODE

THE GENERAL BAR DATE IS OCTOBER 10, 2024
THE GOVERNMENTAL BAR DATE IS FEBRUARY 10, 2025
THE AMENDED SCHEDULES BAR DATE IS AS DEFINED HEREIN
THE REJECTION DAMAGES BAR DATE IS AS DEFINED HEREIN

PLEASE TAKE NOTICE OF THE FOLLOWING:

Deadlines for Filing Proofs of Claim. On September 10, 2024, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order (Docket No. 347) (the "Bar Date Order") establishing certain deadlines for the filing of proofs of claim, including requests for payment under section 503(b)(9) of the Bankruptcy Code, in the chapter 11 cases of the above captioned debtors and debtors in possession (collectively, the "Debtors").

The Bar Dates. Pursuant to the Bar Date Order, all entities (except governmental units), including individuals, partnerships, estates, and trusts who have a claim or potential claim against the Debtors that arose before August 12, 2024 (the "Petition Date"), no matter how remote or contingent such right to payment or equitable remedy may be, including requests for payment under section 503(b)(9) of the Bankruptcy Code, MUST FILE A PROOF OF CLAIM on or before October 10, 2024 at 11:59 p.m., prevailing Eastern Time (the "General Bar Date"). Governmental entities who have a claim or potential claim against the Debtors that arose before the Petition Date, no matter how remote or contingent such right to payment or equitable remedy may be, MUST FILE A PROOF OF CLAIM on or before February 10, 2025 at 11:59 p.m., prevailing Eastern Time (the "Governmental Bar Date"). All entities who have a claim or potential claim against the Debtors based on the Debtors' rejection of an executory contract or unexpired lease, no matter how remote or contingent such right to payment or equitable remedy may be, MUST FILE A PROOF OF CLAIM on the later of (i) the General Bar Date, and (ii) (A) 11:59 p.m., prevailing Eastern Time on the date that is 30 days after the entry of an order approving the rejection of any executory contract or unexpired lease of the Debtors, or (B) the effective date of rejection (the "Rejection Claim Bar Date").

ANY PERSON OR ENTITY WHO FAILS TO FILE A PROOF OF CLAIM, INCLUDING ANY REQUEST FOR PAYMENT UNDER SECTION 503(B) (9) OF THE BANKRUPTCY CODE, ON OR BEFORE THE APPLICABLE BAR DATE SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING AND DISTRIBUTION ON ANY CHAPTER 11 PLAN.

Filing a Proof of Claim. Each proof of claim must be filed, including supporting documentation, so as to be actually received by the Debtors' notice and claims agent, Epiq Corporate Restructuring, LLC ("Epiq"), on or before the applicable Bar Date, either: (i) electronically through the Online Portal available at https://dm.epiq11.com/BlinkFitness or (ii) by overnight mail, or other hand delivery system, at the following address: Blink Holdings, Inc., Claims Processing Center, c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Blvd., Beaverton, OR 97005 or by first class mail to: Blink Holdings, Inc., Claims processing Center, c/o Epiq Corporate Restructuring, LLC, P.O. Box 4420, Beaverton, OR 97076-4420.

Contents of Proofs of Claim. Each proof of claim must: (i) be written in English; (ii) include a claim amount denominated in United States dollars; (iii) clearly identify the Debtor against which the claim is asserted; (iv) conform substantially with the Proof of Claim Form provided by the Debtors or Official Form 410; (v) be signed by the claimant or by an authorized agent or legal representative of the claimant; and (vi) include as attachments any and all supporting documentation on which the claim is based. Please note that each proof of claim must state a claim against only one Debtor and clearly indicate the specific Debtor against which the claim is asserted. To the extent more than one Debtor is listed on the proof of claim, a proof of claim is treated as if filed only against the first-listed Debtor, or if a proof of claim is otherwise filed without identifying a specific Debtor, the proof of claim may be deemed as filed only against Blink Holdings, Inc.

Requests for Payment Under Section 503(b)(9) of the Bankruptcy Code. Any proof of claim and/or priority asserting a claim arising under section 503(b)(9) of the Bankruptcy Code must also (i) include the value of the goods delivered to and received by the Debtors in the 20 days before the Petition Date; (ii) attach any documentation identifying the particular invoices for which such 503(b)(9) claim is being asserted; and (iii) attach documentation of any reclamation demand made to the Debtors under section 546(c) of the Bankruptcy Code (if applicable).

Additional Information. If you require additional information regarding the filing of a proof of claim, you may contact the Debtors' claims agent, Epiq, by calling the Debtors' restructuring hotline at: (877) 848-5813, or writing: (i) by hand delivery or overnight mail to: Blink Holdings, Inc. Claims Processing Center, c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd., Beaverton, OR 97005; (ii) by first class mail to: Blink Holdings, Inc. Claims processing Center c/o Epiq Corporate Restructuring, LLC P.O. Box 4420, Beaverton, OR 97076-4420; (iii) via email to: BlinkFitnessInfo@epiqglobal.com; or (iv) online at https://dm.epiq11.com/BlinkFitness. Please note that Epiq cannot offer legal advice or advise whether you should file a proof of claim.

¹ The last four digits of Blink Holdings, Inc.'s federal tax identification number are 6354. The mailing address for Blink Holdings, Inc. is 104 West 45th Street, 10th Floor, New York, New York 10036. Due to the large number of debtors in these chapter 11 cases, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/BlinkFitness, or by contacting the undersigned counsel for the Debtors.

Second Amended and Restated UCC Public Sale Notice
THIS UCC PUBLIC SALE NOTICE AMENDS AND RESTATES ALL PRIOR UCC PUBLIC SALE NOTICES FOR THIS COLLATERAL.

PLEASE TAKE NOTICE that on October 9, 2024 commencing at 11:00 AM Eastern Time (the "Sale Date"), both in-person and remotely outside of the New York Supreme Court located at 60 Centre Street, New York, New York 10007, with access afforded in person and remotely via Zoom or other web-based video conferencing and/or telephonic conference program selected by Secured Party (defined below), the details of which will be provided to interested parties in advance of the Sale Date pursuant to the Terms of Public Sale (described below), based upon the occurrence of one or more Events of Default under certain documents (the "Loan Documents") copies of which are available for inspection as hereinafter described, pursuant to such Loan Documents, as amended, and Article 9 of the Uniform Commercial Code as enacted in the State of New York, ARGENTIC REAL ESTATE INVESTMENT LLC, or a successor and/or assignee (the "Secured Party") shall dispose of, by public sale, the right, title, and interest of Pledgor (defined below) in and to the following assets (collectively, the "Collateral"):

(i) The 20.44% limited liability company membership interest of 600 Chestnut LLC, a New York limited liability company ("600"), in Baycrest PLB Realty LLC, a Pennsylvania limited liability company ("Pledged Entity");
(ii) The 48.03% limited liability company membership interests of STPA LLC, a Pennsylvania limited liability company ("STPA"), in Pledged Entity;
(iii) The 1.0% limited liability company membership interests of Baycrest PLB SPE, LLC, a Delaware limited liability company ("PLB"), in Pledged Entity;
(iv) The 10.09% limited liability company membership interests of 14th Ave Ventures LLC, a New York limited liability company ("14thAve"), in Pledged Entity;
(v) The 20.44% limited liability company membership interest of Chestnut 1441 LLC, a New York limited liability company ("1441"), individually and/or collectively with 600, STPA, PLB and 14th Ave, "Pledgor") in Pledged Entity; and
(vi) All other assets pledged by Pledgor under the Loan Documents. The public sale shall be conducted by an auctioneer licensed in the State of New York as: 330 Madison Avenue, New York, New York 10017, Attn: Brett Rosenberg, Tel. (212) 812-5926, email Brett.Rosenberg@JLL.com.

Based upon information provided by Pledgor, Pledged Entity, and certain other persons and entities affiliated therewith, it is the understanding of Secured Party (but without any representation or warranty by Secured Party as to the accuracy or completeness of the following matters) that: (i) Pledgor owns one hundred percent (100%) of the limited liability company membership interests in Pledged Entity (the "Membership Interests"); (ii) Pledged Entity has good, marketable and insurable fee simple title in and to the West Tower Unit (together with a 48.86% interest in the common elements appurtenant thereto, the "Unit") within the Public Ledger Condominium (the "Condominium"), which Condominium has a street address of 150 South Independence Mall West, Philadelphia, Pennsylvania, as more particularly described in the Mortgage; and (iii) the Unit is encumbered by and subject to an Open-Ended Mortgage, Assignment of Leases and Rents and Security Agreement (the "Mortgage") held by Secured Party securing indebtedness under the Loan Documents in the original principal amount of up to $32,500,000.00.

The Collateral is offered "AS IS, WHERE IS", with all faults, and Secured Party makes no guarantee, representation, or warranty (including, without limitation, any representation or warranty of merchantability of fitness), express or implied, of any kind or nature whatsoever.

Secured Party will be permitted to bid at the sale, and notwithstanding any requirement herein that the sale of the Collateral be for cash, Secured Party may credit bid all or any portion of the outstanding balance of the amounts due under the Loan Documents. Secured Party reserves the right, in its sole and absolute discretion, to (a) reject all bids and terminate the sale or adjourn the sale to such other date and time as Secured Party may deem proper, by announcement at the place and on the date of sale, and any subsequent announcement thereof, without further publication, and (b) impose any other commercially reasonable conditions upon the sale of the Collateral as Secured Party may deem proper in its sole and absolute discretion.

The Membership Interests are unregistered securities of Pledged Entity. Secured Party makes no representation that this, each prospective bidder seeking to be a "Qualified Bidder" (as determined by Secured Party in its sole and absolute discretion) shall be required, among other things, to execute and deliver to Secured Party a "Bidding Certificate" certifying, among other things, that such bidder: (i) will acquire the Collateral for investment purposes, solely for its own account and not with a view to distribution or resale; (ii) is an accredited investor within the meaning of the applicable securities laws; (iii) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of investment and has sufficient financial means to afford the risk of investment in the Collateral; and (iv) will not resell or otherwise hypothecate the Collateral without either a valid registration under applicable federal or state laws, including without limitation the Securities Act of 1933 as amended, or an available exemption therefrom.

The public sale of the Collateral shall be subject to the further terms and conditions set forth in the "Terms of Public Sale" (including without limitation the terms and conditions with respect to the availability of additional information, bidding requirements, deposit amounts, bidding procedures, and the consummation of the public sale), which are available free of charge by contacting: Jones Lang LaSalle Americas, Inc., 330 Madison Avenue, New York, New York 10017, Attn: Brett Rosenberg, email Brett.Rosenberg@JLL.com.

IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

In re: BLINK HOLDINGS, INC., et al.,¹ Debtors.

Chapter 11
Case No. 24-11686 (JKS)
(Jointly Administered)
Ref. Docket No. 348

NOTICE OF AUCTION AND SALE HEARING

PLEASE TAKE NOTICE OF THE FOLLOWING:

1. On August 12, 2024, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), filed voluntary petitions for relief pursuant to chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

2. On August 16, 2024, the Debtors filed a motion (the "Bidding Procedures and Sale Motion"), pursuant to sections 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), seeking entry of an order (the "Bidding Procedures Order") (a) scheduling an auction (the "Auction") for the sale of the Debtors' assets (the "Assets") and a hearing to approve the sale of the Assets (the "Sale Hearing"); (b) approving procedures (the "Bidding Procedures") for submitting competing bids for the Assets; (c) authorizing, but not directing, the Debtors to designate the Stalking Horse Bidder and approving the Bid Protections in accordance with the Bid Procedures; (d) subject to final Court approval at the Sale Hearing, authorizing and approving the Debtors to enter into and perform under the Purchase Agreement, as applicable, subject to higher or otherwise better offers submitted in accordance with the Bidding Procedures; (e) approving the form and manner of the notice of the Auction and the Sale Hearing; and (f) establishing procedures for the assumption and assignment of the Assumed Contracts (as defined in the Bidding Procedures Order) to any purchaser(s) of the Assets and approving manner of notice thereof (the "Assumption and Assignment Notice").

3. On September 10, 2024, the Bankruptcy Court entered the Bidding Procedures Order. See Docket No. 348. Pursuant to the Bidding Procedures Order, if at least two (2) Qualified Bids with respect to any particular Assets (as defined in the Bidding Procedures Order) are received by the Bid Deadline (as defined below), the Debtors will conduct the Auction. The Auction shall be held on October 28, 2024, starting at 10:00 a.m. (prevailing Eastern Time) or such other time as the Debtors, shall designate and notify to all Qualified Bidders. Professionals and principals for the Debtors, each Qualified Bidder (including, its representative(s), if any), each of the Consultation Parties, and any other parties the Debtors deem appropriate shall be permitted to attend and observe the Auction. Only parties that have submitted a Qualified Bid, as set forth in the Bidding Procedures Order, by no later than October 21, 2024 at 12:00 p.m. (prevailing Eastern Time) (the "Bid Deadline") may bid at the Auction. Any party that wishes to take part in the Auction should submit a Bid (as defined in the Bidding Procedures) for any portion of the Assets must submit their competing Bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

4. The Sale Hearing to consider approval of the sale of the Assets to the Successful Bidder(s) at the Auction, free and clear of all liens, claims and encumbrances, will be held before the Honorable J. Kate Stickles, United States Bankruptcy Judge, 824 North Market Street, Wilmington, Delaware 19801 on November 6, 2024 at 11:00 a.m. (prevailing Eastern Time), or at such other time thereafter as counsel may be heard. The Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court or on the agenda scheduled for the Sale Hearing or by holding such adjournment on any agenda filed with the Bankruptcy Court or by the filing of a notice with the Bankruptcy Court.

5. Objections to approval of the Sale (with the exception of objections related solely to the conduct of the Auction, identity of the Successful Bidder, the form of the sale agreement (to the extent terms differ from those set forth in the agreement of a Stalking Horse Bidder), and ability of the Successful Bidder (other than a Stalking Horse Bidder) to provide adequate assurance of future performance, which must be filed no later than a different deadline), must be in writing, state the basis of such objection with specificity, and be filed with the Bankruptcy Court and served before 4:00 p.m. (prevailing Eastern Time) on October 14, 2024 (the "Sale Objection Deadline") by the following parties (collectively, the "Notice Parties"):

(a) counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 N. King Street, Wilmington, Delaware 19801, Attn: Michael R. Nestor (mnestor@ycst.com), Sean T. Greecher (sgreecher@ycst.com), and Allison S. Mielke (amielke@ycst.com);
(b) counsel to the Prepetition Agent and the DIP Agent, (a) Katten Muchin Rosenman LLP, 525 W. Monroe Street, Chicago, Illinois 60661, Attn: Peter P. Knight (peter.knight@katten.com) and Allison E. Yager (allison.yager@katten.com), and (b) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, P.O. Box 1347, Wilmington, Delaware 19899, Attn: Curtis S. Miller (cmiller@morrisnichols.com);
(c) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Benjamin A. Hackman (benjamin.a.hackman@usdoj.gov); and
(d) proposed counsel to the Official Committee of Unsecured Creditors, (a) Kelley Drye & Warren LLP, 3 World Trade Center, New York, New York 10017, Attn: Eric R. Wilson (ewilson@kelleydrye.com) and Kristin S. Elliott (kelliott@kelleydrye.com), and (b) Morris James LLP, 500 Delaware Avenue, Suite 1500, Wilmington, Delaware 19801, Attn: Eric J. Monzo (emonzo@morrisjames.com).

6. Objections related solely to conduct of the Auction, identity of the Successful Bidder, the form of the sale agreement (to the extent terms differ from those set forth in the agreement of a Stalking Horse Bidder), and adequate assurance of future performance by the Successful Bidder (other than a Stalking Horse Bidder) must be in writing, state the basis of such objection with specificity, and be filed with the Bankruptcy Court before 4:00 p.m. (prevailing Eastern Time) on November 1, 2024 (the "Auction Objection Deadline") and served on the Notice Parties.

UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.

7. This Sale Notice is subject to the terms and conditions of the Bidding Procedures and Sale Motion and the Bidding Procedures Order, with such Bidding Procedures Order controlling in the event of any conflict. In addition, copies of the Bidding Procedures and Sale Motion, the Bidding Procedures Order, and this Notice are on file with the Clerk of the Bankruptcy Court, Third Floor, 824 North Market Street, Wilmington, Delaware 19801 and are available on the Debtors' claims and noticing website free of charge at https://dm.epiq11.com/BlinkFitness. Dated: Wilmington, Delaware, September 12, 2024, YOUNG CONAWAY STARGATT & TAYLOR, LLP, /s/ Allison S. Mielke, Michael R. Nestor (No. 3526), Sean T. Greecher (No. 4484), Allison S. Mielke (No. 5934), Timothy R. Powell (No. 6894), Rebecca L. Lamb (No. 7223), Benjamin C. Carver (No. 7176), Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Telephone: (302) 571-6600, Facsimile: (302) 571-1253, Email: mnestor@ycst.com, sgreecher@ycst.com, amielke@ycst.com, tpowell@ycst.com, rlamb@ycst.com, bcarver@ycst.com, Counsel to the Debtors and Debtors in Possession

¹ The last four digits of Blink Holdings, Inc.'s federal tax identification number are 6354. The mailing address for Blink Holdings, Inc. is 104 West 45th Street, 10th Floor, New York, New York 10036. Due to the large number of debtors in these chapter 11 cases, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/BlinkFitness, or by contacting the undersigned counsel for the Debtors.

² Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures.