# EXHIBIT A

**DIP Credit Agreement**

SENIOR SECURED PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION
CREDIT AND GUARANTY AGREEMENT

Dated as of August 12, 2024

by and among

BLINK COMPANY INTERMEDIATE HOLDCO INC.,
as Debtor, Debtor-in-Possession, Parent and a Guarantor,

BLINK HOLDINGS, INC.
AND ANY OTHER PERSON JOINED HERETO AS A BORROWER,

as Debtors, Debtors-in-Possession and the Borrowers,

VARAGON CAPITAL PARTNERS AGENT, LLC,
as Administrative Agent,

and

THE OTHER LENDERS PARTY HERETO

# TABLE OF CONTENTS

Page

Article 1 DEFINITIONS AND ACCOUNTING TERMS ........................................................ 2

    1.01.   Defined Terms ................................................................................... 2
    1.02.   Other Interpretive Provisions. ....................................................... 24
    1.03.   Accounting Terms. ......................................................................... 25
    1.04.   [Reserved]. ..................................................................................... 26
    1.05.   Times of Day ................................................................................. 26

Article 2 THE COMMITMENTS AND CREDIT EXTENSIONS ............................................ 26

    2.01.   Loans. ............................................................................................ 26
    2.02.   Borrowings of Loans. .................................................................... 27
    2.03.   [Reserved]. ..................................................................................... 27
    2.04.   [Reserved]. ..................................................................................... 27
    2.05.   Prepayments. ................................................................................. 27
    2.06.   Termination or Reduction of New Money DIP Commitment. ............ 29
    2.07.   Repayment of Loans. ..................................................................... 29
    2.08.   Interest. .......................................................................................... 30
    2.09.   Fees. .............................................................................................. 30
    2.10.   Computation of Interest and Fees. ................................................. 31
    2.11.   Evidence of Debt. .......................................................................... 31
    2.12.   Payments Generally. ...................................................................... 31
    2.13.   Sharing of Payments. .................................................................... 32
    2.14.   [Reserved]. ..................................................................................... 33
    2.15.   [Reserved]. ..................................................................................... 33
    2.16.   Defaulting Lenders. ....................................................................... 33
    2.17.   [Reserved]. ..................................................................................... 33
    2.18.   [Reserved]. ..................................................................................... 33
    2.19.   Grant of Lien; Super Priority Nature of Obligations and Lender's Liens. ........... 33

Article 3 TAXES, YIELD PROTECTION AND ILLEGALITY ............................................ 34

    3.01.   Taxes. ............................................................................................ 34
    3.02.   [Reserved]. ..................................................................................... 37
    3.03.   [Reserved]. ..................................................................................... 37
    3.04.   [Reserved]. ..................................................................................... 37
    3.05.   [Reserved]. ..................................................................................... 37
    3.06.   Matters Applicable to all Requests for Compensation. ................... 37
    3.07.   Survival. ........................................................................................ 38

Article 4 CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ..................................... 38

    4.01.   Conditions of Initial Credit Extension. ......................................... 38
    4.02.   Conditions to all Subsequent Credit Extensions. ........................... 40

Article 5 REPRESENTATIONS AND WARRANTIES ............................................................ 41

5.01.   Existence, Qualification and Power. ........................................................... 41
5.02.   Authorization; No Contravention. .............................................................. 42
5.03.   Governmental Authorization; Other Consents ............................................ 42
5.04.   Binding Effect. ......................................................................................... 42
5.05.   Financial Statements; No Material Adverse Effect. ..................................... 42
5.06.   Litigation. ................................................................................................ 43
5.07.   No Default. ............................................................................................... 43
5.08.   Ownership of Property; Liens. ................................................................... 43
5.09.   Environmental Compliance. ...................................................................... 43
5.10.   Insurance. ................................................................................................ 44
5.11.   Taxes. ...................................................................................................... 44
5.12.   ERISA Compliance. .................................................................................. 45
5.13.   Subsidiaries. ............................................................................................ 45
5.14.   Margin Regulations; Investment Company Act. ......................................... 45
5.15.   Disclosure. ............................................................................................... 46
5.16.   Compliance with Laws. ............................................................................. 46
5.17.   Intellectual Property; Licenses, Etc. .......................................................... 46
5.18.   Broker's Fees. .......................................................................................... 47
5.19.   Labor Matters. .......................................................................................... 47
5.20.   Business Locations ................................................................................... 47
5.21.   Bankruptcy Matters. ................................................................................. 47
5.22.   [Reserved]. ............................................................................................... 48
5.23.   Sanctions Concerns and Anti-Corruption Laws. ......................................... 48
5.24.   [Reserved]. ............................................................................................... 48
5.25.   Patriot Act. ............................................................................................... 48
5.26.   Franchise Agreements. .............................................................................. 48

Article 6 AFFIRMATIVE COVENANTS ......................................................................... 50

6.01.   Financial Statements. ................................................................................ 50
6.02.   Certificates; Other Information. ................................................................. 51
6.03.   Notices. .................................................................................................... 52
6.04.   Payment of Obligations. ............................................................................ 53
6.05.   Preservation of Existence, etc. .................................................................. 53
6.06.   Maintenance of Properties. ....................................................................... 54
6.07.   Maintenance of Insurance. ........................................................................ 54
6.08.   Compliance with Laws. ............................................................................. 55
6.09.   Books and Records. .................................................................................. 55
6.10.   [Reserved]. ............................................................................................... 55
6.11.   Use of Proceeds. ...................................................................................... 55
6.12.   Additional Subsidiaries. ............................................................................ 55
6.13.   ERISA Compliance. .................................................................................. 56
6.14.   Pledged Assets. ........................................................................................ 56
6.15.   Covenant with Respect to Environmental Matters. ..................................... 57
6.16.   [Reserved]. ............................................................................................... 58

6.17.    Lender Meetings. ........................................................................ 58
6.18.    Post-Closing Covenants. ............................................................ 58
6.19.    Cash Management Systems ........................................................ 58
6.20.    Franchise Matters. ..................................................................... 59
6.21.    Administrative Agent Access. .................................................... 59
6.22.    Access to Borrowers' Non-Legal Advisors and Restructuring Committee. ......... 60
6.23.    Bankruptcy Court Filings. .......................................................... 60
6.24.    Bankruptcy Covenants. ............................................................... 61
6.25.    Chapter 11 Case. ........................................................................ 61
6.26.    Milestones. .................................................................................. 61
6.27.    Other Sale-Related Matters. ....................................................... 61
6.28.    Investment Banker.. .................................................................... 61
6.29.    Access Rights. ............................................................................. 61
6.30.    Restructuring Committee. ........................................................... 62
6.31.    Approved Budget. ....................................................................... 62
6.32.    Other Reporting. ......................................................................... 63

Article 7 NEGATIVE COVENANTS ............................................................ 63

7.01.    Indebtedness. ............................................................................... 63
7.02.    Liens. ........................................................................................... 64
7.03.    Investments. ................................................................................ 65
7.04.    Fundamental Changes. ................................................................ 66
7.05.    Dispositions. ............................................................................... 67
7.06.    Restricted Payments. ................................................................... 68
7.07.    Change in Nature of Business. .................................................... 68
7.08.    Transactions with Affiliates and Insiders. ................................. 68
7.09.    Burdensome Agreements. ............................................................ 68
7.10.    Use of Proceeds. ......................................................................... 69
7.11.    Capital Expenditures .................................................................. 69
7.12.    Organization Documents; Fiscal Year; Legal Name, State of Formation
         and Form of Entity. .................................................................... 69
7.13.    [Reserved] ................................................................................... 69
7.14.    [Reserved]. .................................................................................. 69
7.15.    Limitations on Parent. ................................................................ 69
7.16.    [Reserved]. .................................................................................. 70
7.17.    Anti-Terrorism Laws. ................................................................. 70
7.18.    KEIP Plan. ................................................................................... 70
7.19.    Chapter 11 Claims. ..................................................................... 70
7.20.    The DIP Orders. .......................................................................... 70
7.21.    Critical Vendor and Other Payments. ........................................ 70

Article 8 [Reserved] .................................................................................... 71

Article 9 EVENTS OF DEFAULT AND REMEDIES .................................. 71

9.01.    Events of Default. ....................................................................... 71

9.02.   Remedies Upon Event of Default. ....................................................... 78
9.03.   Remedies Notice Period. .................................................................... 79
9.04.   Collections of Rents and Profits by Receiver or Administrative Agent. .............. 79
9.05.   Application of Funds. ......................................................................... 79

Article 10 GUARANTY ........................................................................... 80

10.01.  The Guaranty. ................................................................................. 80
10.02.  Obligations Unconditional. ............................................................... 81
10.03.  Reinstatement. ................................................................................ 82
10.04.  Waivers. ......................................................................................... 82
10.05.  Remedies. ....................................................................................... 83
10.06.  Contribution by Guarantors. ............................................................. 83
10.07.  Guarantee of Payment; Continuing Guarantee. ................................... 84
10.08.  Subordination of Other Obligations. .................................................. 84

Article 11 THE ADMINISTRATIVE AGENT ............................................. 84

11.01.  Appointment and Authorization of Administrative Agent. ................... 84
11.02.  Delegation of Duties. ....................................................................... 85
11.03.  Liability of Administrative Agent. ..................................................... 85
11.04.  Reliance by Administrative Agent. ..................................................... 86
11.05.  Notice of Default. ............................................................................ 86
11.06.  Credit Decision; Disclosure of Information by Administrative Agent. ............... 87
11.07.  Indemnification of Administrative Agent. ........................................... 87
11.08.  Administrative Agent in its Individual Capacity. ................................. 88
11.09.  Successor Administrative Agent. ........................................................ 88
11.10.  Administrative Agent May File Proofs of Claim. ................................. 89
11.11.  Collateral and Guaranty Matters. ...................................................... 89
11.12.  Other Agents; Arrangers and Managers. ............................................ 90
11.13.  Additional Secured Parties. .............................................................. 90
11.14.  Erroneous Payments. ....................................................................... 90

Article 12 MISCELLANEOUS ................................................................. 92

12.01.  Amendments, Etc. ........................................................................... 92
12.02.  Notices and Other Communications; Facsimile Copies. ....................... 94
12.03.  No Waiver; Cumulative Remedies. ..................................................... 95
12.04.  Attorney Costs, Expenses. ................................................................ 95
12.05.  Indemnification by the Loan Parties. ................................................. 96
12.06.  Payments Set Aside. ........................................................................ 97
12.07.  Successors and Assigns. ................................................................... 98
12.08.  Confidentiality. ............................................................................. 102
12.09.  Set-off. ........................................................................................ 104
12.10.  Interest Rate Limitation. ................................................................ 104
12.11.  Counterparts. ................................................................................ 105
12.12.  Integration. .................................................................................. 105

12.13.  Survival of Representations and Warranties....................................................... 105
12.14.  Severability. ............................................................................................................ 105
12.15.  [Reserved]. .............................................................................................................. 105
12.16.  Governing Law. ....................................................................................................... 105
12.17.  Waiver of Right to Trial by Jury............................................................................. 106
12.18.  USA Patriot Act Notice. .......................................................................................... 106
12.19.  Nonliability of Lenders. .......................................................................................... 107
12.20.  Acknowledgement and Consent to Bail-In of EEA Financial Institutions. ........ 107
12.21.  [Reserved]. .............................................................................................................. 108
12.22.  Parties Including Trustees; Bankruptcy Court Proceedings.  . ........................... 108
12.23.  Inconsistency............................................................................................................ 108
12.24.  Lender Consent to Credit Bid. ............................................................................... 108
12.25.  Limitation of Liability.............................................................................................. 109

Article 13 APPOINTMENT OF THE BORROWER REPRESENTATIVE; JOINT AND
           SEVERAL LIABILITY OF THE BORROWERS ....................................... 109

13.01.  Borrower Representative. ....................................................................................... 109
13.02.  Joint and Several Liability of Borrowers. ............................................................. 109

**SCHEDULES**

2.01        Commitments and Pro Rata Shares
5.10        Insurance
5.13        Capitalization
5.17        IP Rights
5.20(a)     Locations of Real Property
5.20(b)     Locations of Tangible Personal Property
5.20(c)     Locations of Chief Executive Office
5.24        [Reserved]
5.26        Franchise Matters
6.18        Post-Closing Covenants
7.01        Indebtedness Existing on the Closing Date
7.02        Liens Existing on the Closing Date
7.03        Investments Existing on the Closing Date
12.02       Certain Addresses for Notices

EXHIBITS

A-1         Form of Loan Notice
D-1         Form of Assignment and Assumption Agreement
E           Form of Interim Order

## SENIOR SECURED PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT

This SENIOR SECURED PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AND GUARANTY AGREEMENT is entered into as of August [__], 2024 among, (a) BLINK HOLDINGS, INC., a Delaware corporation, as debtor and debtor-in-possession ("Blink"), and such other Persons joined hereto as a Borrower from time to time, as debtors and debtors-in-possession (together with Blink, each a "Borrower" and collectively, the "Borrowers"), (b) Parent (as hereinafter defined), and the other Guarantors (as hereinafter defined) from time to time party hereto, (c) the Lenders (as hereinafter defined) from time to time party hereto and (d) VARAGON CAPITAL PARTNERS AGENT, LLC, as the administrative agent, or any successor administrative agent ("Administrative Agent" or "Agent").

WHEREAS, on August [12], 2024, the Loan Parties (the "Petition Date") filed voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

WHEREAS, from and after the Petition Date, the Loan Parties are continuing to operate their business and manage their properties as debtors in possession under Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Loan Parties have requested, and the Lenders have agreed to make available to the Borrowers, a $21,000,000 New Money DIP Commitment (as defined below) subject to the terms and conditions set forth in this Agreement, the proceeds of which facilities will be used in accordance with Sections 6.11 and 7.10 hereof and the respective DIP Orders; provided, that until the Final Order shall have been entered by the Bankruptcy Court, no loans or advances under the New Money DIP Commitment shall be made or issued, other than the New Money DIP Loans in an aggregate principal amount or face amount, as applicable, not to exceed the amount permitted by the Interim Order;

WHEREAS, the Borrowers, the Persons named therein as Guarantors, Varagon, as the Prepetition Agent, and the financial institutions party thereto as lenders are parties to that certain Credit and Guaranty Agreement dated as of November 8, 2018 (as amended or otherwise modified on or prior to the Petition Date, the "Prepetition Credit Agreement");

WHEREAS, the Borrowers desire to secure all of its Obligations under the Loan Documents by granting to Administrative Agent, for the benefit of the Secured Parties, a security interest in and lien upon substantially all of its Property, as provided herein and in the DIP Orders; and

WHEREAS, Parent directly owns all of the Capital Stock of Blink, and is willing to guaranty all of the Obligations and to pledge to Administrative Agent, for the benefit of the Secured Parties, all of the Capital Stock of Blink and substantially all of its other Property to secure the Obligations, as provided herein and in the DIP Orders.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

# ARTICLE 1

## DEFINITIONS AND ACCOUNTING TERMS

1.01.   <u>Defined Terms</u>.

As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Accounts</u>" means all of the Loan Parties' present and future: (a) accounts (as defined in the UCC); (b) instruments, documents, chattel paper (including electronic chattel paper) (all as defined in the UCC); (c) reserves and credit balances arising in connection with or pursuant to this Agreement; (d) guaranties; (e) other supporting obligations, payment intangibles and letter of credit rights (all as defined in the UCC); (f) property, including notes and deposits, of the Loan Parties' account debtors securing the obligations owed by such account debtors to the Loan Parties; and (g) all proceeds of any of the foregoing.

"<u>Acquisition</u>", by any Person, means the acquisition by such Person, in a single transaction or in a series of related transactions, of (i) all or substantially all of the Property of another Person, (ii) all or substantially all of a division, operating group of another Person, (iii) one or more fitness centers of another Person, or (iv) all or substantially all of the Capital Stock of another Person, in each case whether or not involving a merger or consolidation with such other Person and whether for cash, property, services, assumption of Indebtedness, securities or otherwise.

"<u>Administrative Agent</u>" has the meaning set forth in the preamble hereto.

"<u>Administrative Agent's Office</u>" means the Administrative Agent's address and, as appropriate, account as set forth on <u>Schedule 12.02</u> or such other address or account as the Administrative Agent may from time to time notify the Borrowers and the Lenders.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"<u>Affiliate</u>" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Affiliated Lender</u>" means, at any time, any Lender that is an Affiliate of any Borrower (other than Parent, any Borrower, any of their respective Subsidiaries, any Debt Fund Affiliate and any natural person) at such time.

"<u>Affiliated Lender Participant</u>" means, at any time, a Person who holds or who, upon the effectiveness of a grant of a participation in a Loan would hold, a participation in a Loan, and who would be, if such Person were a Lender, an Affiliated Lender; <u>provided</u> that for the purposes of <u>Section 12.07(i)(i)(C)</u>, a Person that holds a participation in a Loan solely granted by an Affiliated Lender shall not be an Affiliated Lender Participant.

"<u>Agent</u>" has the meaning set forth in the preamble hereto

"Agent-Related Persons" means the Administrative Agent together with Affiliates, and its Approved Funds, and the officers, directors, employees, agents, advisors, auditors and Controlling Persons and attorneys-in-fact of such Persons, Affiliates and Approved Funds; provided, however, that for the purposes of this Agreement, no Agent-Related Person shall be deemed an Affiliate of the Borrowers or the Guarantors.

"Aggregate Payments" has the meaning set forth in Section 10.06.

"Agreement" means this Credit and Guaranty Agreement, as amended, modified, restated, supplemented and extended from time to time.

"Approved Budget" shall have the meaning set forth in the DIP Orders.

"Approved Fund" means (i) any Person (other than a natural person) engaged in making, purchasing, holding, or investing in commercial loans and similar extensions of credit and that is advised, administered, or managed by a Lender, an Affiliate of a Lender (or an entity or an Affiliate of an entity that administers, advises or manages a Lender); (ii) with respect to any Lender that is an investment fund, any other investment fund that invests in loans and that is advised, administered or managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor; and (iii) any third party that provides "warehouse financing" to a Person described in the preceding clause (i) or (ii) (and any Person described in said clause (i) or (ii) shall also be deemed an Approved Fund with respect to such third party providing such warehouse financing).

"Assignment and Assumption" means an Assignment and Assumption Agreement substantially in the form of Exhibit D-1, or any other form approved by the Administrative Agent.

"Attorney Costs" means and includes all reasonable and documented fees, expenses and disbursements of any outside law firm or other external counsel.

"Attributable Indebtedness" means, on any date, in respect of any Capital Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"<u>Bankruptcy Court</u>" shall mean the United States Bankruptcy Court for the District of Delaware.

"<u>Beneficial Ownership Certification</u>" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"<u>Beneficial Ownership Regulation</u>" means 31 C.F.R. § 1010.230.

"<u>Blink Board</u>" means, collectively, the board of directors of Blink Holdings II, Inc., and its various direct and indirect subsidiaries.

"<u>Blink Intermediate Holdco</u>" means Blink Company Intermediate Holdco Inc., a Delaware corporation.

"<u>Borrower Non-Legal Advisors</u>" has the meaning specified in <u>Section 6.22</u>.

"<u>Borrower Representative</u>" means Blink, in its capacity as the borrowing agent on behalf of itself and the other Borrowers, if any.

"<u>Borrowers</u>" has the meaning specified in the introductory paragraph hereto.

"<u>Borrowing</u>" means a borrowing consisting of Loans.

"<u>Budget Covenant</u>" has the meaning set forth in the DIP Orders.

"<u>Business Day</u>" means, as applicable, any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, either New York or in the state where the Administrative Agent's Office is located.

"<u>Businesses</u>" means, at any time, a collective reference to the businesses operated by the Borrowers and their Subsidiaries at such time.

"<u>Capital Lease</u>" means, with respect to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such person.

"<u>Capital Stock</u>" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interest in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"<u>Cash Collateral</u>" shall have the meaning set forth in the DIP Orders.

"Cash Equivalents" means, as at any date, (a) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than twelve months from the date of acquisition, (b) Dollar denominated time deposits and certificates of deposit (i) of any Lender, (ii) any domestic commercial bank of recognized standing having capital and surplus in excess of $500,000,000 or (iii) any bank whose short term commercial paper rating from S&P is at least A1 or the equivalent thereof or from Moody's is at least P1 or the equivalent thereof (any such bank being an "Approved Bank"), in each case with maturities of not more than 270 days from the date of acquisition, (c) commercial paper and variable or fixed rate notes issued by any Approved Bank (or by the parent company thereof) or any variable rate notes issued by, or guaranteed by, any domestic corporation rated A1 (or the equivalent thereof) or better by S&P or P1 (or the equivalent thereof) or better by Moody's and maturing within six months of the date of acquisition, (d) repurchase agreements entered into by any Person with a bank or trust company (including any of the Lenders) or recognized securities dealer having capital and surplus in excess of $500,000,000 for direct obligations issued by or fully guaranteed by the United States in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a fair market value of at least 100% of the amount of the repurchase obligations and (e) Investments, classified in accordance with GAAP as current assets, in money market investment programs registered under the Investment Company Act of 1940, as amended, which are administered by reputable financial institutions having capital of at least $500,000,000 and the portfolios of which are limited to Investments of the character described in the foregoing subdivisions (a) through (d).

"Carve-Out" shall have the meaning set forth in the DIP Orders.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means, at any time: (i) the Permitted Holders shall cease to own, directly or indirectly, at least 51% of the voting and economic interests in the Capital Stock of Blink and Parent (on a fully diluted basis); (ii) Parent shall cease to own and control one hundred percent (100%), on a fully diluted basis, of the economic and voting interests in the Capital Stock of Blink; or (iii) except as permitted by any Loan Document, Blink shall cease to beneficially own and control one hundred percent (100%), on a fully diluted basis, of the economic and voting interests in the Capital Stock of any Borrower (other than Blink) or any Guarantor.

"<u>Chapter 11 Case</u>" means the jointly administered Chapter 11 case of Parent and the Borrowers, filed on August [12], 2024 by the Loan Parties, by the filing of voluntary petitions with the Bankruptcy Court.

"<u>Closing Date</u>" means August [12], 2024.

"<u>Collateral</u>" means, collectively, all real and personal Property with respect to which Liens in favor of the Agent are granted (or were intended to be granted) pursuant to and in accordance with the terms of the Collateral Documents or the DIP Orders. Without limiting the generality of the foregoing, "Collateral" shall include all "property of the estate" (within the meaning of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible or mixed, and all rents, products, substitutions, accessions, profits, replacements and cash and non-cash proceeds of all of the foregoing.

"<u>Collateral Documents</u>" means, collectively, to the extent requested by the Administrative Agent or any Lender, all security agreements, pledge agreements, patent, trademark and copyright security agreements, lease assignments, guaranties and other similar agreements, and all amendments, restatements, modifications or supplements thereof or thereto, by or between any one or more of any Loan Party, any of their respective Subsidiaries or any other Person pledging or granting a lien on Collateral or guarantying the payment and performance of the Obligations, and any Lender or Administrative Agent for the benefit of Administrative Agent, the Lenders and other Secured Parties now or hereafter delivered to the Lenders or Administrative Agent pursuant to or in connection with the transactions contemplated hereby, and all financing statements (or comparable documents now or hereafter filed in accordance with the UCC or comparable law) against any such Person as debtor in favor of any Lender or Administrative Agent for the benefit of Administrative Agent, the Lenders and the other Secured Parties, as secured party, as any of the foregoing may be amended, restated and/or modified from time to time.

"<u>Commitment</u>" means, as to each Lender, the New Money DIP Commitment, set forth opposite such Lender's name on <u>Schedule 2.01</u> or in the Register, as applicable, as the same may be reduced or modified at any time and from time to time pursuant to the terms hereof.

"<u>Consolidated Group</u>" means Blink and its Subsidiaries.

"<u>Contractual Obligation</u>" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"<u>Contributing Guarantors</u>" has the meaning set forth in <u>Section 10.06</u>.

"<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "<u>Controlling</u>" and "<u>Controlled</u>" have meanings correlative thereto. Without limiting the generality of the foregoing, a Person shall be deemed to be Controlled by another Person if such other Person possesses, directly or indirectly, power to vote 10% of more of the securities having ordinary voting power for the election of directors, managing general partners or the equivalent.

"Control Agreement" means, with respect to any deposit account, securities account, commodity account, securities entitlement or commodity contract, an agreement, in form and substance reasonably satisfactory to Administrative Agent, among Administrative Agent, the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried and the Loan Party maintaining such account or owning such entitlement or contract, effective to grant "control" (within the meaning of Articles 8 and 9 under the applicable UCC) over such account to Administrative Agent (and, if applicable, such holder or representative); provided that, for the avoidance of doubt, no such Control Agreement shall require compliance with instructions originated by the Collateral Agent directing disposition of funds within any such account until an Event of Default has occurred and is continuing and the Required Lenders have instructed the Administrative Agent to exercise remedies pursuant to Section 9.02.

"Control Investment Affiliate" means as to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies. For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Credit Extension" means a Borrowing.

"Debt Fund Affiliate" means any affiliate of the Parent (other than any Borrower or any Subsidiary of any Borrower) that is a bona fide debt fund or an investment vehicle that is engaged in the making, purchasing, holding or otherwise investing in, acquiring or trading commercial loans, bonds or similar extensions of credit in the ordinary course, and the Parent does not have the power, directly or indirectly, to direct the investment policies or decisions of such affiliate.

"Debt Issuance" means the issuance of any Indebtedness for borrowed money by any Loan Party other than Indebtedness permitted under Section 7.01.

"Debtor Relief Law" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Excess" means, with respect to any Defaulting Lender, the excess, if any, of such Defaulting Lender's Pro Rata Share of the aggregate outstanding principal amount of all New Money DIP Loans (calculated as if all Defaulting Lenders (other than such Defaulting Lender) had funded their respective Pro Rata Shares of all Loans) over the aggregate outstanding principal amount of all New Money DIP Loans of such Defaulting Lender.

"Default Rate" means when used with respect to all Obligations consisting of Loans and past-due interest and Lender fees, an interest rate equal to (i) the PIK Applicable Rate, plus (ii) 2% per annum, in all cases to the fullest extent permitted by applicable Law. Interest accruing at the Default Rate shall be immediately payable upon demand.

31927159.1

"Defaulting Lender" means any Lender that has (a) defaulted in its obligation under this Agreement to make a Loan required to be made or funded by it hereunder within three Business Days of the date when due (unless such failure is the subject of a good faith dispute), (b) failed to pay over to the Administrative Agent, or any Lender any other amount required to be paid by it hereunder within three (3) Business Days of the date when due (unless such failure is the subject of a good faith dispute), (c) notified the Administrative Agent, as applicable, or a Loan Party in writing that it does not intend to satisfy any obligation listed in clause (a) above or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under agreements in which it commits to extend credit generally, (d) failed within three (3) Business Days after the request of the Administrative Agent, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund the Loan, (e) become the subject of a Bail-In Action or (f) (i) been (or has a parent company that has been) determined by any Governmental Authority having regulatory authority over such Person or its assets to be insolvent, or the assets or management of which has been taken over by any Governmental Authority, or (ii) become (or has a parent company that has become) the subject of a bankruptcy or insolvency proceeding under any Debtor Relief Law, unless in the case of any Lender subject to this clause (f), the Borrowers, Administrative Agent shall have determined that such Lender intends, and has all approvals required to enable it, to continue to perform its obligations as a Lender hereunder.

"Designated Jurisdiction" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"DIP Orders" means the Interim Order and the Final Order, as applicable, based on which such order is then in effect.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition of any Property by any Loan Party or any Subsidiary (including the Capital Stock of any Subsidiary), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Dollar" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any political subdivision of the United States (other than a territory or possession of the United States).

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Environmental Laws" means the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 5101, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, et seq.), the Federal Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Safe Drinking Water Act (42 U.S.C. § 300f to 300j-26 et seq.), the Oil Pollution Act of 1990 (33 U.S.C. § 2701 et seq.) and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), as such laws may be amended or otherwise modified from time to time, and any other federal, state, local, foreign and other applicable statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions and common law relating to pollution, the protection of the environment, or natural resources, human health or the release of any materials into the environment, including those related to Hazardous Materials, hazardous substances or wastes, indoor and outdoor air emissions, soil, groundwater, wastewater, surface water, stormwater, wetlands, sediment and discharges of wastewater to public treatment systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, losses, punitive damages, consequential damages, costs of environmental investigation and remediation, fines, penalties, indemnities or expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants)), of the Parent or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equinox" means Equinox Holdings, Inc., a Delaware corporation.

"ERISA" means the Employee Retirement Income Security Act of 1974, and any successor thereto.

"ERISA Affiliate" means any corporation, trade or business (whether or not incorporated) under common control with a Borrower within the meaning of Section 414(b) or (c) of the Internal Revenue Code (and Sections 414(m) and (o) of the Internal Revenue Code for purposes of provisions relating to Section 412 of the Internal Revenue Code). Any former ERISA Affiliate of the Parent or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of the Parent or any of its Subsidiaries within the meaning of this definition with respect to liabilities arising during the period such entity was an ERISA Affiliate of the Parent or any of its Subsidiaries and with respect to liabilities arising after such period, in each case, to the extent the Parent or any of its Subsidiaries could reasonably be expected to be liable under the Internal Revenue Code or ERISA.

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by a Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by a Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon a Borrower or any ERISA Affiliate; (g) the occurrence of an act or omission which could give rise to the imposition on a Borrower or any ERISA Affiliate of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Plan; (h) the assertion of a material claim (other than routine claims for benefits) against any Plan other than a Multiemployer Plan or the assets thereof, or against the Borrowers or any ERISA Affiliate in connection with any Plan; (i) receipt from the IRS of notice of the failure of any Pension Plan (or any other Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; (j) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan; (k) the commencement of any administrative investigation, audit or other administrative proceeding by the Department of Labor, IRS or other Governmental Authority, including any voluntary compliance submission through the IRS's Employee Plans Compliance Resolution System or the Department of Labor's Voluntary Fiduciary Correction Program; or (l) the occurrence of a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Internal Revenue Code.

"Erroneous Payment" has the meaning assigned to it in Section 11.14(a).

"Erroneous Payment Notice" has the meaning assigned to it in Section 11.14(a).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Event of Default" has the meaning specified in Section 9.01.

"Excluded Account" has the meaning set forth in Section 6.19.

"Excluded Foreign Subsidiary" shall mean, any Foreign Subsidiary of Parent (i) that is a "controlled foreign corporation" as defined in the Internal Revenue Code, (ii) for which the failure to include such subsidiary as an "Excluded Foreign Subsidiary" hereunder would result in materially adverse tax consequence to the Borrowers, the Guarantors and their Subsidiaries taken as a whole, or to any of their direct or indirect equityholders, or (iii) all or substantially all of the

assets of which consist of Capital Stock (or Capital Stock and debt of the same Subsidiary) of one or more Subsidiaries described in clause (i) above, in each case that has not guaranteed or pledged any of its assets or suffered a pledge of more than 65% of its voting Capital Stock to secure, directly or indirectly, any Indebtedness of any Grantor or any other Subsidiary of Parent which is a United States person within the meaning of Section 7701(a)(30) of the Internal Revenue Code.

"Excluded Property" has the meaning set forth in the Security Agreement.

"Excluded Subsidiary" means (a) any Subsidiary that is an Excluded Foreign Subsidiary, (b) any Subsidiary for which guarantees of the Obligations are (i) prohibited by Law (including as a result of applicable financial assistance, directors' duties or corporate benefit requirements) or require consent, approval, license or authorization of a Governmental Authority, unless such consent, approval, license or authorization has been received; provided, that there shall be no obligation to seek or obtain such consent or (ii) contractually prohibited on the Closing Date or, following the Closing Date, the date of any acquisition, so long as such prohibition is not created in contemplation of the transactions contemplated hereby to be consummated on the Closing Date or any such acquisition, (c) any other Subsidiary with respect to which, in the reasonable judgment of the Borrower Representative and the Administrative Agent, the burden or cost of providing a Guarantee is excessive in relation to the value afforded to the Lenders therefrom (taking into account tax, accounting and regulatory matters), (d) any not-for-profit Subsidiaries, (d) any special purpose securitization vehicle, (e) any direct or indirect Subsidiary of the Borrower that is a FSHCO, (f) any Subsidiary that is a direct or indirect Subsidiary of an Excluded Foreign Subsidiary or a FSHCO, (g) [reserved], (h) captive insurance Subsidiaries, (i) broker dealer Subsidiaries, and (j) any Subsidiary acquired pursuant to a Permitted Acquisition or other Investment permitted under this Agreement and financed with assumed Indebtedness permitted to be incurred pursuant to this Agreement (and not incurred in contemplation of such Permitted Acquisition or Investment), and each Subsidiary acquired in such Permitted Acquisition or other Investment permitted hereunder (and not incurred in contemplation of such Permitted Acquisition or Investment) that guarantees such Indebtedness, in each case to the extent that, and for so long as, the documentation relating to such Indebtedness to which such Subsidiary is a party prohibits such Subsidiary from guaranteeing the Obligations.

"Facilities" means, at any time, the facilities and real properties owned, leased, managed or operated by any Loan Party or any Subsidiary, from which any Loan Party or any Subsidiary provides or furnishes goods or services.

"Fair Share" has the meaning set forth in Section 10.06.

"Fair Share Contribution Amount" has the meaning set forth in Section 10.06.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code, any intergovernmental agreements entered into between the United States and any other country and any foreign regulation, administrative ruling or official interpretation of such intergovernmental agreements.

"<u>FCA</u>" has the meaning set forth in <u>Section 3.03(b)(i)</u>.

"<u>Federal Funds Rate</u>" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank on the Business Day next succeeding such day, <u>provided</u> that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) quoted to the Administrative Agent on such day on such transactions by three (3) federal funds brokers of recognized standing selected by Administrative Agent acting reasonably.

"<u>Fee PIK Amount</u>" shall have the meaning specified in <u>Section 2.09</u>.

"<u>Final Order</u>" means an order of the Bankruptcy Court with respect to the Loan Parties after a final hearing, in form and substance acceptable to the Administrative Agent and Required Lenders in their sole discretion, which order is in effect and not stayed, together with all extensions, supplements modifications and amendments thereto, in each case in form and substance acceptable to the Administrative Agent and the Required Lenders, in their sole discretion, which, among other things, provides that the relief requested in the motions seeking approval of the Loan Documents and the Interim Order and Final Order and granted on an interim basis in the Interim Order is granted on a final basis (including any additional relief required by the Bankruptcy Court or agreed to by the Administrative Agent at the direction of the Required Lenders).

"<u>FIRREA</u>" means the Financial Institutions Reform Recovery and Enforcement Act of 1989, as amended from time to time.

"<u>Fiscal Quarter</u>" means any of the quarterly accounting periods ending on March 31, June 30, September 30 and December 31 of any Fiscal Year.

"<u>Fiscal Year</u>" means the fiscal year of Loan Parties and their Subsidiaries ending on December 31 of each calendar year.

"<u>Following Business Day Convention</u>" means a contractual provision or provision of applicable Laws pursuant to which a scheduled date for payment or performance of an obligation, which date is not a Business Day, is extended to the first following day that is a Business Day.

"<u>Foreign Lender</u>" has the meaning specified in <u>Section 3.01(e)</u>.

"<u>Foreign Subsidiary</u>" means any Subsidiary that is not a Domestic Subsidiary.

"<u>Franchise</u>" means a franchise or licensing arrangement subject to a Franchise Agreement for the operation of a fitness center.

"<u>Franchise Agreements</u>" means any franchise or license agreements (including any amendments or addenda) whether now existing or hereafter entered into by any Loan Party and related to franchising the business of operating a fitness center, and all other agreements with any

Franchisee, sub-franchisee or similar Person to which any Loan Party is a party, in each case, related to franchising the business of operating a fitness center, all as amended or modified from time to time.

"Franchisee" means any franchisee or licensee under a Franchise Agreement.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"FSHCO" means any Domestic Subsidiary substantially all the assets of which consist of equity of (or equity and debt of the same Excluded Foreign Subsidiary) one or more of Excluded Foreign Subsidiaries.

"Funded Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations for borrowed money, whether current or long-term (including the Obligations) and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, in each case, other than trade indebtedness in the ordinary course of business;

(b)    all purchase money indebtedness other than trade indebtedness in the ordinary course of business;

(c)    drawn but unreimbursed letters of credit;

(d)    [reserved];

(e)    [reserved];

(f)    Attributable Indebtedness in respect of Capital Leases;

(g)    [reserved];

(h)    "earnouts" and similar payment obligations of such Person to the extent required by GAAP to be included as a liability on such Person's balance sheet;

(i)    all Funded Indebtedness of others secured by (or for which the holder of such Funded Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on, or payable out of the proceeds of production from, Property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed; and

(j)    all Guarantees with respect to Funded Indebtedness of the types specified in clauses (a) through (i) above of another Person.

"Funding Guarantor" has the meaning set forth in Section 10.06.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute

of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, consistently applied and as in effect from time to time.

"Governmental Approvals" means any and all governmental licenses, authorizations, registrations, permits, certificates, franchises, qualifications, accreditations, consents and approvals required under any applicable Law and required in order for any Person to carry on its business as now conducted, of each Governmental Authority issued or required under Laws applicable to the business of any Loan Party or any of its Subsidiaries or to the transactions described herein (including any Acquisitions and the Loans made hereunder) or necessary in the sale, furnishing, or delivery of goods or services under Laws applicable to the business of any Loan Party or any of its Subsidiaries.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, including, The National Association of Insurance Commissioners (or any successor thereto) and its Securities Valuation Office.

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guaranteed Obligations" has the meaning set forth in Section 10.01.

"Guarantor" means each of Parent, and all current and future direct or indirect Domestic Subsidiaries of Parent (other than the Borrowers or any Excluded Subsidiary).

"Guaranty" means the guaranty made by each Guarantor in favor of the Administrative Agent, the Lenders and the other Secured Parties pursuant to Article 10.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, lead-based paint, toxic mold or fungus, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a) all Funded Indebtedness;

(b) [reserved];

(c) [reserved];

(d) the principal portion of all obligations under conditional sale or other title retention agreements relating to Property purchased by such Person (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business);

(e) the maximum amount available to be drawn under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(f) all obligations in respect of the deferred purchase price of Property or services (other than trade accounts payable in the ordinary course of business);

(g) [reserved]; and

(h) all Guarantees with respect to outstanding Indebtedness of the types specified in clauses (b) and (g) above of any other Person.

"Indemnified Liabilities" has the meaning set forth in Section 12.05.

"Indemnified Taxes" has the meaning set forth in Section 3.01(a).

"Indemnitees" has the meaning set forth in Section 12.05.

"Information" has the meaning set forth in Section 12.08(b).

"Initial New Money DIP Loan Advance" shall mean an Advance of New Money DIP Loans pursuant to this Agreement made on the Closing Date (or shortly after the date of the entry of the Interim Order) and as authorized by the Interim Order.

"Interest Payment Date" means, as to any Loan, the last Business Day of each month and the Maturity Date.

"Interim Order" means the order of the Bankruptcy Court with respect to the Loan Parties, in substantially the form of Exhibit E hereto, with such extensions, amendments, modifications or

31927159.1

15

supplements acceptable to the Agent and the Required Lenders in their sole discretion, which order is in effect and not stayed.

"<u>Internal Revenue Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Investment</u>" means, as to any Person, any acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of any of the Capital Stock of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, or (c) an Acquisition. The amount of any Investment shall be the amount actually initially invested (determined on a net basis as of the date such Investment is made), without adjustment for subsequent increases or decreases in the value of such Investment, but with adjustments for returns of capital or repayments of Loans.

"<u>Involuntary Disposition</u>" means any loss of, damage to or destruction of, or any condemnation or other taking for public use of, any Property of any Loan Party.

"<u>IP Rights</u>" has the meaning set forth in <u>Section 5.17</u>.

"<u>IRS</u>" means the United States Internal Revenue Service.

"<u>Laws</u>" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, compacts, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"<u>Lender</u>" means each Person identified as a "Lender" on the signature pages hereto and such Person's successors and assigns.

"<u>Lender Parties</u>" has the meaning specified in <u>Section 12.07(g)</u>.

"<u>Lending Office</u>" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower Representative and the Administrative Agent.

"<u>Lien</u>" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, and any financing lease having substantially the same economic effect as any of the foregoing).

"<u>Loan</u>" means an extension of credit by a Lender to any Borrower under <u>Article 2</u> in the form of a New Money DIP Loan or a Roll-Up Loan.

"Loan Documents" means this Agreement, each Collateral Document, the DIP Orders, each Request for Credit Extension and each other document, instrument or agreement from time to time executed by any Loan Party or any Subsidiary or any Responsible Officer thereof in favor of the Administrative Agent or any Secured Party and delivered in connection with the transactions contemplated by this Agreement.

"Loan Notice" means a written notice of a Borrowing, which shall be substantially in the form of Exhibit A-1.

"Loan Parties" means, collectively, each Borrower and each Guarantor a party hereto.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the business or financial condition of the Consolidated Group taken as a whole; (b) a material impairment of the ability of the Consolidated Group, taken as a whole, to perform their payment obligations under the Loan Documents (as determined by the Administrative Agent in its reasonable discretion); (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any member of the Consolidated Group of any Loan Documents to which it is a party; or (d) a material adverse effect on the validity, perfection or priority of a Lien in favor of the Administrative Agent for the benefit of the Lenders pursuant to any Loan Document on any material assets constituting Collateral unless such material adverse effect arises due to any action or inaction of the Administrative Agent, in each case, other than as a result of the filing, commencement, announcement, prosecution and continuation of the Chapter 11 Case, the events and conditions related and/or leading up thereto and the effects thereof and any action required to be taken under the Loan Documents or under the DIP Orders, general economic changes, changes generally affecting the industry in which the Consolidated Group operates, changes in financial, banking or securities markets, changes in GAAP, changes in applicable laws, failures by the Consolidated Group to meet internal or disseminated projections, forecasts or predictions for any period, natural disasters, extreme weather conditions, in each case, other than to the extent such matters have had or could reasonably be expected to have a disproportionate impact on the Consolidated Group relative to other participants in the same industry or geography.

"Maturity Date" means the earliest to occur of (a) 120 days from the date of the commencement of the Chapter 11 Case, (b) the date of the consummation of the sale of all or substantially all of the assets or Capital Stock of the Loan Parties, (c) the effective date of a plan of reorganization in the Chapter 11 Case, (d) the date on which all Obligations become due and payable, whether at stated maturity, following an Event of Default or otherwise, and (e) an Event of Default; provided that the Maturity Date shall only occur due to the occurrence of an Event of Default upon the written election of the Administrative Agent (at the direction of the Required Lenders); provided, that, in each case, if any such Maturity Date occurs on a day that is not a Business Day, such Maturity Date shall be deemed to be the next following Business Day.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Sections 4001(a)(3) or 3(37) of ERISA that is sponsored or maintained by any Borrower or any ERISA Affiliate or to which any Borrower or any ERISA Affiliate makes or is obligated to make

contributions, or during the precedent six (6) years, has made or been obligated to make contributions.

"Net Cash Proceeds" means the aggregate cash and Cash Equivalents proceeds received by any Loan Party or any Subsidiary in respect of any Disposition, Involuntary Disposition or Debt Issuance net of any payments consented to the Administrative Agent and Required Lenders or otherwise authorized by the DIP Orders, sale order, or other order of the Bankruptcy Court which orders shall be in form and substance satisfactory to the Administrative Agent and Required Lenders; it being understood that "Net Cash Proceeds" shall include any cash or Cash Equivalents received upon the sale or other disposition of any non-cash consideration received by any Loan Party or any Subsidiary in any Disposition, Involuntary Disposition or Debt Issuance in respect of which cash and Cash Equivalents proceeds are actually received by a Loan party, up to the amount retired.

"New Money DIP Commitment" means, as to each Lender, its obligation to make its portion of the New Money DIP Loan to the Borrowers pursuant to Section 2.01(c) and the other terms and conditions of this Agreement, in the principal amount set forth opposite such Lender's name on Schedule 2.01, as such amounts may be adjusted from time to time in accordance with this Agreement.

"New Money DIP Loan" has the meaning specified in Section 2.01(c), which shall include the Initial New Money DIP Loan Advance made by the Lenders (or made by such Lender's affiliates or managed accounts on its behalf) on the Closing Date (or shortly after the date of the entry of the Interim Order).

"New Money DIP Lender" means, as of any date of determination, any Lender holding a New Money DIP Commitment or any portion of the then-outstanding New Money DIP Loan.

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party now or hereinafter arising from time to time under this Agreement and any other Loan Document or otherwise with respect to any Loan and the Roll-Up Loans upon the entry of the Interim Order or Final Order, as applicable, (including the obligation to pay principal and interest thereon and all fees and other costs and liabilities with respect thereto), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"OIG" means the Office of Inspector General of HHS and any successor thereof.

"Organization Documents" means, (a) with respect to any corporation, the charter, certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c)

31927159.1

with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" has the meaning set forth in Section 3.01(b).

"Parent" means Blink Intermediate Holdco.

"Participant" has the meaning set forth in Section 12.07(d).

"Participant Register" has the meaning set forth in Section 12.07(d).

"Patriot Act" has the meaning specified in Section 5.25.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" means any employee pension benefit plan (as defined under Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Borrower or any ERISA Affiliate or to which any Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding six (6) plan years.

"Permitted Holders" means (i) Related Management Holdco LLC and its Control Investment Affiliates and (ii) those Persons who are involved in the management of Blink on the date hereof.

"Permitted Prior Liens" shall have the meaning set forth in the DIP Orders.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" shall have the meaning set forth in the recitals hereto.

"PIK Amounts" shall collectively mean all Principal PIK Amounts and all Fee PIK Amounts.

"PIK Applicable Rate" means 15% per annum.

"Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed by the Parent, any of their Subsidiaries or any of their respective ERISA Affiliates.

"Post-Petition" means the time period beginning immediately upon the filing of the Chapter 11 Case and ending upon the closing of the Chapter 11 Case.

"Prepetition Agent" means the "Agent" and "Administrative Agent" as defined in the Prepetition Credit Agreement.

"Prepetition Collateral" means the "Collateral" as defined in the Prepetition Credit Agreement.

"Prepetition Credit Agreement" shall have the meaning set forth in the recitals hereto.

"Prepetition Obligations" means all "Obligations" outstanding under (and as defined in) the Prepetition Credit Agreement.

"Prepetition Protective Advances" means $17,414,235.74 of Prepetition Obligations in respect of the Protective Advances (as defined in the Prepetition Credit Agreement), including without limitation, interest and fees thereon.

"Prepetition Secured Parties" means the "Secured Parties" as defined in the Prepetition Credit Agreement.

"Priming Debt" has the meaning specified in Section 12.01(a).

"Principal PIK Amount" has the meaning specified in Section 2.08(d).

"Proceedings" means any actual or threatened civil, equitable or criminal proceeding litigation, action, suit, claim, investigation (governmental or judicial or otherwise), dispute indictment or prosecution, pleading, demand or the imposition of any fine or penalty or similar matter.

"Pro Rata Share" means, with respect to any Lender at any time, (a) with respect to the outstanding Roll-Up Loan at any time, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the principal amount of the outstanding Roll-Up Loan held by such Lender at such time and the denominator of which is the aggregate outstanding principal amount of the Roll-Up Loan held by all Roll-Up Lenders at such time, and (b) with respect to the New Money DIP Commitments and outstanding New Money DIP Loan, at any time, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the sum of the New Money DIP Commitments and the principal amount of the outstanding New Money DIP Loan held by such Lender at such time and the denominator of which is the sum of the aggregate New Money DIP Commitments and the outstanding principal amount of the New Money DIP Loan held by all New Money DIP Loan Lenders at such time. The initial Pro Rata Share of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Property" means any interest of any kind in any property or asset, whether real, personal or mixed, or tangible or intangible, including Capital Stock.

"Rating Agencies" has the meaning set forth in Section 12.08(b).

"Real Property" means the real estate listed on Schedule 5.20(a), and any other real estate owned or leased after the Closing Date.

"Register" has the meaning set forth in Section 12.07(c).

"Registrar" has the meaning set forth in Section 12.07(c).

"Related Persons" shall mean Administrative Agent's or Administrative Agent's counsel's employees, agents, representatives, advisors and consultants (including, without limitation, any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf Administrative Agent or Administrative Agent's counsel).

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty-day notice period has been waived.

"Representatives" has the meaning set forth in Section 12.08(b).

"Request for Credit Extension" means a Borrowing of Loans or a Loan Notice, as the case may be.

"Required Lenders" means, at any time, Lenders holding in the aggregate more than fifty percent (50%) of the outstanding principal amount of Roll-Up Loan and the New Money DIP Commitments (or, if the New Money DIP Loan has been funded in accordance with Article 2, the sum of any New Money DIP Commitments and outstanding principal amount of the New Money DIP Loan) provided, that, if at any time there are two (2) or more unaffiliated Lenders, Required Lenders shall then mean at least two (2) unaffiliated Lenders.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means the chief executive officer, president, chief financial officer, Chief Restructuring Officer, Vice President, Finance, or treasurer of a Loan Party. Any document delivered hereunder that is executed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means (a) any dividend or other distribution, on account of any shares (or equivalent) of any class of Capital Stock of any Loan Party or any of its Subsidiaries, now or hereafter outstanding, (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value of any shares (or equivalent) of any class of Capital Stock of any Loan Party or any of its Subsidiaries, now or hereafter outstanding or (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire

shares of any class of Capital Stock of any Loan Party or any of its Subsidiaries, now or hereafter outstanding.

"Restructuring Committee" means a special committee of the Blink Board (the "Restructuring Committee") that shall have sole and exclusive authority over the following matters related to the Loan Parties and their respective businesses until the earlier of such time as (1) the Borrowers' obligations under the Amended Credit Agreement (including the Obligations, as defined in the Amended Credit Agreement), as well as any other obligations arising from pre- or post-petition financing provided by one or more of the Lenders or their respective affiliates or managed funds (collectively, the "Lender Obligations") are satisfied in full, (2) all or substantially all assets of the Loan Parties have been sold, conveyed, transferred or otherwise disposed of pursuant to a transaction consented to by the requisite Lenders as set forth in the Amended Credit Agreement and any applicable debtor-in-possession financing agreement, including, without limitation, in any transaction under Section 363 of the Bankruptcy Code, and the proceeds thereof in an amount necessary to indefeasibly repay the Lender Obligations in full (or such lesser amount as shall be agreed to by such requisite Lenders shall have been distributed (any such sale, an "Acceptable Sale") or (3) the conversion to chapter 7 or dismissal with prejudice, in each case with the consent of the Administrative Agent, of all voluntary chapter 11 proceedings initiated by the Companies that, prior to such conversion or dismissal with prejudice, resulted in an Acceptable Sale: (a) commencement and administration of any bankruptcy or other insolvency proceeding, including, without limitation, in connection with debtor-in-possession financing, treatment of executory contracts and unexpired leases, employee incentive and/or retention plans, negotiations with creditors and equityholders and exit strategies, (b) any sale, disposition or other transfer or all or a material portion of the Loan Parties' assets, equity or businesses, and any post-closing matters related to the foregoing, including, without limitation, with respect to any transition services or similar agreements or arrangements, (c) any other in or out-of-court restructuring, recapitalization, financing or other strategic transaction involving one or more Loan Parties or their respective assets, equity or businesses.

"Restructuring Committee Appointment Documents" means the corporate governance and other documentation in form and substance acceptable to the Required Lenders that creates and delineates the duties and authorities of the Restructuring Committee, including, without limitation, the (i) Unanimous Written Consent of the Boards of Directors of Blink Holdings II, Inc., Blink Company Intermediate Holdco Inc., Blink Holdings, Inc. and Blink's Operating Subsidiaries in Lieu of Meetings dated July 16, 2024, (ii) Unanimous Written Consent of the Boards of Directors of Blink Holdings II, Inc., Blink Company Intermediate Holdco Inc., Blink Holdings, Inc. and Blink's Operating Subsidiaries in Lieu of Meetings dated July 23, 2024, (iii) Certificate of Amendment of Certificate of Incorporation of Blink Holdings II, Inc., dated July 26, 2024, (iv) Certificate of Amendment of Certificate of Incorporation of Blink Company Intermediate Holdco Inc., dated July 26, 2024, (v) Certificate of Amendment of Certificate of Incorporation of Blink Holdings, Inc., dated July 26, 2024, and (vi) Unanimous Written Consent of the Boards of Directors of Blink Holdings II, Inc., Blink Company Intermediate Holdco Inc., Blink Holdings, Inc. and Blink's Operating Subsidiaries in Lieu of Meetings dated July 26, 2024.

"Roll-Up Lenders" shall mean, individually and collectively, any Lender (or, if applicable, affiliates or managed accounts of such Lenders designated by such Lenders to receive the benefit of any roll-up on their behalf) that holds Roll-Up Loans.

"Roll-Up Loan" means, a roll-up, upon entry of the Interim Order, by the Roll-Up Lenders of their ratable share of certain Prepetition Obligations in respect of the Prepetition Protective Advances into Obligations pari passu with the New Money DIP Loans (the "Interim Roll-Up") and an additional roll-up, subject to entry of the Final Order, by the Roll-Up Lenders of their ratable share of additional Prepetition Obligations (other than Prepetition Protective Advances) in respect of Term Loans and Delayed Draw Term Loans (as defined in the Prepetition Credit Agreement) in the additional amount of $35,085,764.26 into Obligations junior to the New Money DIP Loans and Interim Roll-Up (the "Final Roll-Up").

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc. and any successor thereto.

"Sanctions" means any sanction administered or enforced by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the European Union, His Majesty's Treasury ("HMT").

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Parties" means, collectively, the Administrative Agent and the Lenders.

"Securitization Transaction" means any financing transaction or series of financing transactions (including factoring arrangements) pursuant to which any Loan Party or any Subsidiary may sell, convey or otherwise transfer, or grant a security interest in, accounts, payments, receivables, rights to future lease payments or residuals or similar rights to payment to a special purpose subsidiary or affiliate of any Person.

"Security Agreement" means the Security and Pledge Agreement, if requested by the Administrative Agent, executed in favor of the Administrative Agent by each of the Loan Parties which is a party thereto, as amended, modified and supplemented from time to time.

"Social Security Act" means the Social Security Act of 1965 as set forth in Title 42 of the United States Code, as amended, and any successor statute thereto, as interpreted by the rules and regulations issued thereunder, in each case as in effect from time to time.

"Subsidiary" of a Person means a corporation, partnership, limited liability company or other business entity of which a majority of the shares of Capital Stock having ordinary voting power for the election of directors or other governing body (other than Capital Stock having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Loan Parties. For the avoidance of doubt, "Subsidiary" shall not include any joint venture designated as an Excluded Subsidiary by the Borrower Representative.

"Taxes" has the meaning set forth in Section 3.01(a).

"Title Insurance Company" means a title insurance company satisfactory to the Administrative Agent.

"UCC" or "Uniform Commercial Code" has the meaning set forth in the Security Agreement.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Internal Revenue Code for the applicable plan year.

"United States" and "U.S." mean the United States of America.

"Varagon" means Varagon Capital Partners Agent, LLC, or any of its affiliates or managed accounts.

"Wholly Owned Subsidiary" means any Person 100% of whose Capital Stock is at the time owned by a Loan Party directly or indirectly through other Persons 100% of whose Capital Stock is at the time owned, directly or indirectly, by such a Loan Party.

"Write-Down and Conversion Powers" means (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.02.   Other Interpretive Provisions.

With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all real and personal property and tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Any reference herein to "paid in full", "repaid in full" or "prepaid in full" or similar usage, shall be construed to refer to such payment, repayment or prepayment, as applicable, in full, in cash.

1.03.    <u>Accounting Terms.</u>

(a)    Except as otherwise specifically prescribed herein, all accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with GAAP applied on a consistent basis, as in effect from time to time. Notwithstanding any GAAP accounting principle to the contrary, any lease which would be accounted for as an operating lease as of the Closing Date (whether or not such lease was in effect on the Closing Date) shall be accounted for as an operating lease through the term of this Agreement, notwithstanding when such obligation was incurred, assumed or otherwise arose.

(b)     If at any time any change in GAAP would affect the computation of any requirement set forth in any Loan Document, and any of the Borrowers, the Administrative Agent or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower Representative on behalf of the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower Representative shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

(c)     [Reserved].

(d)     All financial statements delivered hereunder shall be prepared without giving effect to any election under Statement of Financial Accounting Standards 159 (or any similar accounting principle) permitting a Person to value its financial liabilities at the fair value thereof.

1.04.   [Reserved].

1.05.   Times of Day.

Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

## ARTICLE 2

## THE COMMITMENTS AND CREDIT EXTENSIONS

2.01.   Loans.

(a)     [Reserved].

(b)     [Reserved].

(c)     New Money DIP Loans. Subject to the terms and conditions set forth herein, each Lender, or one or more affiliates or managed accounts on its behalf, severally agrees to fund its Pro Rata Share of a loan to the Borrower Representative on behalf of the Borrowers (the "New Money DIP Loan") prior to the Maturity Date in an aggregate amount not to exceed such Lender's New Money DIP Commitment. Any portion of the New Money DIP Loan that is repaid or prepaid may not be reborrowed. The Borrowing of New Money DIP Loans shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof. The New Money DIP Commitment of each Lender shall be automatically and permanently reduced (i) on the date of any New Money DIP Loan Borrowing by the amount of such Borrowing and (ii) to zero on the Maturity Date. Borrower Representative shall be able to draw New Money DIP Loans bi-weekly, solely to the extent projected disbursements for the immediately following two-week period, as set forth in the Approved Budget, exceeds the Debtors' budgeted, unrestricted cash on hand, net

of outstanding checks, for such period as set forth in the Approved Budget, which amount during any time during the period shall be no less than $3 million, and each borrowing of New Money DIP Loans permitted hereunder shall be otherwise in accordance with the DIP Orders. Notwithstanding the foregoing to the contrary, the aggregate principal amount of New Money DIP Loans that constitute PIK Amounts shall not be included in the determination of the New Money DIP Loan Commitments of the Lenders for all purposes of this Agreement and as such shall not limit availability under the New Money DIP Loan Commitment for purposes of funding New Money DIP Loans.

      2.02.   <u>Borrowings of Loans.</u>

      (a)   Each Borrowing shall be made upon the Borrower Representative's irrevocable written notice to the Administrative Agent, which may be delivered by e-mail request (or such other means as may be agreed upon by the Administrative Agent, in its sole discretion) in the form of a Loan Notice. Each such Loan Notice must be received by the Administrative Agent not later than 12:00 noon three (3) Business Days prior to the requested date of any Borrowing. Each written notice by the Borrower Representative pursuant to this <u>Section 2.02(a)</u> must be appropriately completed and executed by a Responsible Officer of the Borrower Representative. Each Borrowing shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof. Each Loan Notice pursuant to this <u>Section 2.02(a)</u> shall specify (i) the requested date of the Borrowing, (ii) the principal amount of Loans to be borrowed, (iii) wiring instructions for the proceeds of such Borrowing and (iv) a schedule corresponding to the Approved Budget that will be in effect in respect of such proposed borrowing (and demonstration, to the satisfaction of the Required Lenders, that such disbursements comply with the Approved Budget or otherwise with the DIP Orders).

      (b)   Following receipt of a Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the applicable Loans. In the case of a Borrowing, each Lender, or one or more affiliates or managed accounts on its behalf, shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 11:00 a.m. on the Business Day specified in the applicable Loan Notice. Upon satisfaction of the conditions set forth in <u>Section 4.02</u> (and, if such Borrowing is the initial Credit Extension, <u>Section 4.01</u>) and upon receipt of all funds, the Administrative Agent shall make all funds so received available to the Borrower Representative in like funds as received by Administrative Agent by wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) Administrative Agent by the Borrower Representative.

      2.03.   <u>[Reserved].</u>

      2.04.   <u>[Reserved].</u>

      2.05.   <u>Prepayments.</u>

      (a)   <u>Voluntary Prepayments of Loans</u>.

      (i)   Subject to the limitations set forth in this <u>Section 2.05(a)</u>, the Borrowers may, upon written notice from the Borrowers to the Administrative Agent, at

any time or from time to time voluntarily prepay the Loans in whole or in part, without premium or penalty; provided that (i) such notice must be received by the Administrative Agent not later than 12:00 noon three (3) Business Days prior to any date of prepayment of Loans and (ii) any such prepayment of Loans shall be in a principal amount of $100,000 or a whole multiple of $50,000 in excess thereof (or, if less, the entire principal amount thereof then outstanding). Each such notice shall specify the date and amount of such prepayment. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment. If such notice is delivered by the Borrowers, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein; provided that any notice of prepayment of all outstanding Loans may state that such prepayment is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower Representative (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Any prepayment of a Loan shall be accompanied by all accrued interest thereon.

(ii)    Application of Voluntary Prepayments of Roll-Up Loan and New Money DIP Loan. Any voluntary prepayment of the Roll-Up Loan and the New Money DIP Loan shall be applied in the manner set forth in Section 2.05(b)(viii). Each such prepayment shall be applied to the Loans of the applicable Lenders in accordance with their respective Pro Rata Shares.

(b)    Mandatory Prepayments of Loans.

(i)    [Reserved].

(ii)    Dispositions and Involuntary Dispositions. Immediately upon receipt by any Loan Party or any Subsidiary of Net Cash Proceeds of any Disposition and Involuntary Disposition, the Borrowers shall prepay the Loans in an aggregate amount equal to 100% of the Net Cash Proceeds of all Dispositions and Involuntary Dispositions (each such prepayment to be applied as set forth in clause (viii) below).

(iii)    [Reserved].

(iv)    Debt Issuances. Immediately upon receipt by any Loan Party or any Subsidiary of the Net Cash Proceeds of any Debt Issuance, the Borrowers shall prepay the Loans in an aggregate amount equal to one hundred percent (100%) of all such Net Cash Proceeds (such prepayment to be applied as set forth in clause (viii) below).

(v)    [Reserved].

(vi)    Notice. Blink shall provide the Administrative Agent with written notice of the amount of any prepayment required to be made pursuant to this Section 2.05(b) not later than 12:00 noon three (3) Business Days prior to any date of prepayment of Loans.

(vii)    [Reserved].

(viii)    Application of Mandatory Prepayments. All amounts required to be paid pursuant to this Section 2.05(b) shall be applied first to any New Money DIP Loans and Roll-Up Loans constituting Prepetition Protective Advances then outstanding on a pari passu basis, and second to any Roll-Up Loans, other than Roll-Up Loans constituting Prepetition Protective Advances then outstanding.

All prepayments under this Section 2.05(b) shall be subject to Section 3.05 and all prepayments under Section 2.05(b)(iv) shall be without premium or penalty, and shall be accompanied by a payment of all interest accrued on the principal amount prepaid through the date of prepayment.

2.06.    Termination or Reduction of New Money DIP Commitment.

The Borrowers may, upon prior written notice from the Borrower Representative to the Administrative Agent terminate the New Money DIP Commitment, or from time to time permanently reduce the New Money DIP Commitment; provided, however, that (a) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. (i) ten (10) Business Days prior to the date of termination or (ii) three (3) Business Days prior to the date of reduction, (b) any such partial reduction shall be in an aggregate amount of $500,000 or any whole multiple of $100,000 in excess thereof and (c) the Administrative Agent shall not be required to release its Lien on any Collateral in connection with any termination or reduction. The Administrative Agent will promptly notify the New Money DIP Loan Lenders of any such notice of termination or reduction of the New Money DIP Commitment. Any reduction of the New Money DIP Commitments shall be applied to the New Money DIP Commitment of each Lender according to its Pro Rata Share. All fees accrued with respect thereto until the effective date of any termination or reduction of the New Money DIP Commitment shall be paid on the effective date of such termination or reduction. Any notice of termination of the New Money DIP Commitment delivered by the Borrower Representative pursuant to this Section 2.06 shall be irrevocable; provided that a notice of termination of the New Money DIP Commitment may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower Representative (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

2.07.    Repayment of Loans.

(a)    [Reserved].

(b)    Roll-Up Loan. The Borrowers shall pay the unpaid principal amount of the Roll-Up Loan then outstanding on the Maturity Date, which for the avoidance of doubt, shall include all accrued interest in respect of the Roll-Up Loans. The foregoing amounts are subject to reduction to the extent otherwise provided for in this Agreement with respect to voluntary and mandatory prepayments.

(c)    New Money DIP Loan. Subject to the priority of payments provisions set forth in Section 2.05(b)(viii), the Borrowers shall pay the outstanding principal amount of the New Money DIP Loan on the Maturity Date, in an amount equal to the unpaid principal amount of the New Money DIP Loan then outstanding, which for the avoidance of doubt, shall include all

accrued interest in respect of the New Money DIP Loan. The foregoing amounts are subject to reduction to the extent otherwise provided for in this Agreement with respect to voluntary and mandatory prepayments.

2.08.   Interest.

(a)     Subject to the provisions of subsection (b) below each Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the PIK Applicable Rate.

(b)     After the occurrence and during the continuation of an Event of Default, the Borrowers shall pay interest on the principal amount of all outstanding Loans and any interest payments thereon not paid when due and any fees and other amounts then due and payable hereunder or under any other Loan Document at a rate per annum equal to the Default Rate to the fullest extent permitted by applicable Laws, commencing upon the occurrence of such Event of Default.

(c)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law whether or not allowed in such proceeding.

(d)     Notwithstanding the foregoing or anything contained in this Section 2.08 to the contrary, the portion of the aggregate interest accrued in respect of the Loans at the PIK Applicable Rate shall automatically be paid in kind by capitalizing the amount of such interest accrued at the PIK Applicable Rate and adding such accrued amounts to the principal balance of such Loan (ratably among the Loans held by each Lender) on each such applicable Interest Payment Date (the "Principal PIK Amount").  Any reference in this Agreement or any Loan Document to the Loans or the outstanding principal balance of the Loans shall include all interest on the Loan that shall have been capitalized and added to the principal balance thereof on each Interest Payment Date that has not been repaid or prepaid in accordance with the terms hereof.

2.09.   Fees.

(a)     Administration Fee.  The Borrower agrees to pay to the Administrative Agent, a non-refundable administration fee of $50,000, which fee shall be fully earned, due and payable in cash on upon the entry of the Interim Order.

(b)     Closing Fee.  The Borrower agrees to pay each New Money DIP Lender a non-refundable fee of 3.00% of the principal amount of New Money DIP Commitments by each such New Money DIP Lender, which fee shall be fully earned upon the entry of the Interim Order and due and payable in cash on the Maturity Date.

(c)     Fees. Subject to the DIP Orders, all fees shall be non-refundable for any reason whatsoever.

(d)     [Reserved].

(e)    General. Subject to the DIP Orders, all fees payable under hereunder or any other Loan Document shall be fully earned when paid and shall be non-refundable for any reason whatsoever.

2.10.    Computation of Interest and Fees.

All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid.

2.11.    Evidence of Debt.

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent, in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

2.12.    Payments Generally.

(a)    All payments to be made by the Borrowers of principal, interest, fees and other Obligations shall be absolute and unconditional and shall be made without condition or deduction for any counterclaim, defense, recoupment, setoff or rescission. Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office, in Dollars and in immediately available funds not later than 12:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by Administrative Agent after 12:00 p.m. may in the Administrative Agent's discretion be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)    If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(c)    Unless any Lender has notified the Administrative Agent, prior to the date any payment is required to be made by it to Administrative Agent hereunder, that Lender, as the case may be, will not make such payment, Administrative Agent may assume that the Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto. If and to the extent that such payment was not in fact made to Administrative Agent in immediately

31927159.1

available funds, then, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in immediately available funds, together with interest thereon for the period from the date such amount was made available by Administrative Agent to the Borrowers to the date such amount is recovered by Administrative Agent (the "Compensation Period") at a rate per annum equal to the Federal Funds Rate. If such Lender pays such amount to Administrative Agent, then such amount shall constitute such Lender's Loan included in the applicable Borrowing. If such Lender does not pay such amount forthwith upon Administrative Agent's demand therefor, Administrative Agent may make a demand therefor upon the Borrowers, and the Borrowers shall pay such amount to Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing.

A notice of either Agent to any Lender or the Borrower Representative with respect to any amount owing under this subsection (c) shall be conclusive, absent manifest error.

(d)    The obligations of the Lenders hereunder to make Loans are several and not joint. The failure of any Lender to make any Loan or to fund any participation on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or purchase its participation

2.13.   Sharing of Payments.

If, other than as expressly provided elsewhere herein, any Lender shall obtain on account of the Loans made by it, any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) in excess of its Pro Rata Share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them, as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, pro rata with each of them; provided, that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 12.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon. The Borrowers agree that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off, but subject to Section 12.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrowers in the amount of such participation. The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section and will in each case notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this Section shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to

the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

2.14.    [Reserved].

2.15.    [Reserved].

2.16.    Defaulting Lenders.

In the event that any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)    [Reserved].

(b)    the New Money DIP Commitments and Loans of such Defaulting Lender shall not be included in determining whether all Lenders, all New Money DIP Lenders, or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 12.01); provided that any waiver, amendment or modification requiring the consent of each affected Lender which affects such Defaulting Lender differently than other affected Lenders shall require the consent of such Defaulting Lender.

(c)    in the event a Defaulting Lender has defaulted on its obligation to fund any Loan, until such time as the Default Excess with respect to such Defaulting Lender has been reduced to zero, any prepayments or repayments on account of the Loans shall be applied to the Loans and funded participations of other Lenders as if such Defaulting Lender had no Loans or funded participations outstanding.

(d)    [Reserved]:

(e)    [Reserved].

(f)    [Reserved].

(g)    [Reserved].

(h)    The rights and remedies with respect to a Defaulting Lender under this Section 2.16 are in addition to any other rights and remedies which the Borrowers, or the Lenders, or, as applicable, may have against such Defaulting Lender.

2.17.    [Reserved].

2.18.    [Reserved].

2.19.    Grant of Lien; Super Priority Nature of Obligations and Lender's Liens.

(a)    Grant of Lien. Each Loan Party, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Obligations, hereby mortgages, pledges and hypothecates to the Administrative Agent for the benefit of the Secured Parties, and grants to the

Administrative Agent for the benefit of the Secured Parties a Lien on and security interest in, all of its right, title and interest in, to and under the Collateral of such Loan Party, all as further provided in the DIP Orders.

(b)    <u>Superpriority Claims</u>.  Each Loan Party hereby covenants, represents and warrants that, upon entry of the Interim Order (and the Final Order, as applicable), the Obligations will have the superpriority administrative expense status and sub priorities as expressly set forth in the DIP Orders.

## ARTICLE 3

## TAXES, YIELD PROTECTION AND ILLEGALITY

3.01.    <u>Taxes.</u>

(a)    Any and all payments by any Loan Party to or for the account of any Recipient (as defined below) under any Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and all liabilities with respect thereto ("<u>Taxes</u>"), except as required by applicable law. The following are excluded taxes for purposes of <u>Article 3</u>: in the case of the Administrative Agent and each Lender, (A) Taxes imposed on or measured by the overall net income, branch profit Taxes, and franchise Taxes imposed on (in lieu of net income Taxes) the Administrative Agent, any Lender or any other recipient of a payment under any Loan Document (each a "<u>Recipient</u>"), in each of the foregoing cases by the jurisdiction (or any political subdivision thereof) under the Laws of which the Recipient is organized or maintains its Lending Office or that are Other Connection Taxes; (B) Taxes imposed on amounts payable to or for the account of a Recipient with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which such Recipient acquires such interest in the Loan or Commitment or on the date on which such Recipient changes its Lending Office; (C) any Taxes imposed as a result of a Recipient failing to comply with <u>Section 3.01</u>; and (D) any Taxes imposed under FATCA (all such non-excluded Taxes being hereinafter referred to as "<u>Indemnified Taxes</u>"). If any Loan Party shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Loan Document to the Administrative Agent, or any Lender, (i) if such Taxes are Indemnified Taxes the sum payable shall be increased as necessary so that after making all required deductions of Indemnified Taxes (including deductions applicable to additional sums payable under this Section), each of the Administrative Agent, and such Lender receives an amount equal to the sum it would have received had no such deductions of Indemnified Taxes been made, (ii) such Loan Party shall make all deductions of Taxes, (iii) such Loan Party shall pay the full amount of Taxes deducted to the relevant taxation authority or other authority in accordance with applicable Laws, and (iv) within thirty (30) days after the date of such payment, such Loan Party shall furnish to the Administrative Agent (which shall forward the same to such Lender), as applicable, the original or a certified copy of a receipt evidencing payment thereof or if no receipt is available, other evidence of payment reasonably satisfactory to the Administrative Agent.

(b)    In addition, the Borrowers agree to pay any and all present or future stamp, recording, court or documentary taxes and any other excise or property taxes or charges or similar levies which arise from any payment made under any Loan Document or from the execution,

delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document except for any Taxes imposed on an assignment or participation that are Other Connection Taxes (hereinafter referred to as "Other Taxes").

(c)     The Borrowers agree to indemnify the Administrative Agent and each Lender for (i) the full amount of Indemnified Taxes and Other Taxes (including any Indemnified Taxes or Other Taxes imposed or asserted by any jurisdiction on amounts payable under this Section 3.01) paid by the Administrative Agent and such Lender, and (ii) any liability (including additions to tax, penalties, interest and expenses) arising therefrom or with respect thereto, in each case whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; provided that the Loan Parties shall not be obligated to reimburse the Administrative Agent or any Lender for any Indemnified Taxes or Other Taxes imposed as a result of the gross negligence or willful misconduct of the Administrative Agent or such Lender. Payment under this subsection (d) shall be made within thirty (30) days after the date the Lender or the Administrative Agent makes a demand therefor.

(d)     If any Loan Party is required to pay any amount to any Lender or the Administrative Agent pursuant to this Section 3.01, then such Lender shall use reasonable efforts (consistent with legal and regulatory restrictions) to change the jurisdiction of its Lending Office so as to eliminate any such additional payment which may thereafter accrue, if such change in the judgment of such Lender is not otherwise disadvantageous to such Lender.

(e)     Each Lender, if any, that is not organized under the laws of the United States or a state thereof (each, a "Foreign Lender") shall, to the extent legally entitled to do so, (i) on or prior to the date of the execution and delivery of this Agreement, in the case of each Lender listed on the signature pages hereof, or, in the case of an assignee Lender, on or prior to the date it becomes a Lender, execute and deliver to the Borrowers and the Administrative Agent, two or more (as the Borrowers or the Administrative Agent may reasonably request) IRS Forms W-8IMY (with all required attachments), Forms W-8ECI, Forms W-8BEN, or Forms W-8BEN-E (or successor forms) establishing the Lender's exemption from, or reduced rate of, United States federal withholding tax, or, solely if such Lender is claiming exemption from United States withholding tax under Section 871(h) or 881(c) of the Internal Revenue Code with respect to payments of "portfolio interest," IRS Form W-8BEN or Form W-8BEN-E and a certificate executed by a duly authorized officer of such Lender representing that such Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (B) a "10 percent shareholder" of the Borrowers within the meaning of Section 871(h)(3) or 881(c)(3)(B) of the Internal Revenue Code or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code, and any such other forms or documents (or successor forms or documents) to the extent required by U.S. federal tax law, appropriately completed, establishing that payments to such Lender are exempt from, or subject to a reduced rate of, withholding or deduction of United States federal withholding taxes; and (ii) deliver to the Borrowers and the Administrative Agent two further copies of any such form or documents on or before the date that any such form or document expires or becomes obsolete and after the occurrence of any event requiring a change in the most recent such form or document previously delivered by it to the Borrowers. If the forms provided by a Foreign Lender at the time such Foreign Lender first becomes a party to this Agreement indicate a United States interest withholding tax rate in excess of zero, withholding tax at such rate shall be considered excluded from Indemnified Taxes unless

31927159.1

and until such Foreign Lender provides the appropriate forms certifying that a lesser rate applies, whereupon withholding tax at such lesser rate only shall be considered excluded from Indemnified Taxes for periods governed by such forms; provided, however, that, if at the date of an assignment pursuant to which a Foreign Lender becomes a party to this Agreement, the Foreign Lender assignor was entitled to payments under Section 3.01(a) in respect of United States withholding tax with respect to interest paid at such date, then, to such extent, the term Indemnified Taxes shall include (in addition to withholding taxes that may be imposed in the future or other amounts otherwise includable in Indemnified Taxes) United States withholding tax, if any, applicable with respect to the Foreign Lender assignee on such date. If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower Representative and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower Representative or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment under FATCA, if any. Solely for the purposes of this Section 3.01(e), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(f)    [reserved].

(g)    The Administrative Agent may, without reduction, withhold any Taxes required to be deducted and withheld from any payment under any of the Loan Documents with respect to which the Borrowers are not required to pay additional amounts under this Section 3.01. In addition, the Administrative Agent shall deliver to the Loan Parties (x)(i) prior to the date on which the first payment by the Loan Parties is due hereunder or (ii) prior to the first date on or after the date on which such Administrative Agent becomes a successor Agent on which payment by the Loan Parties is due hereunder, as applicable, two copies of either (A) a properly completed and executed IRS Form W-9 certifying its exemption from U.S. federal backup withholding or (B) a properly completed and executed IRS Form W-8ECI (with respect to any payments to be received on its own behalf) and IRS Form W- 8IMY (certifying that it is either a "qualified intermediary" within the meaning of Treasury Regulation Section 1.1441-1(e)(5) that has assumed primary withholding obligations under the Code, including Chapters 3 and 4 of the Code, or a "U.S. branch" within the meaning of Treasury Regulation Section 1.1441-1(b)(2)(iv) that is treated as a U.S. person for purposes of withholding obligations under the Code) (with respect to any payments received by the Administrative Agent on the account of others), and (y) on or before the date on which any such previously delivered documentation expires or becomes obsolete or invalid, after the occurrence of any event requiring a change in the most recent documentation previously delivered by it to the Loan Parties, and from time to time if reasonably requested by the Loan Parties, two further copies of such documentation.

(h)    Upon the request of the Administrative Agent. each Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code shall

deliver to the Administrative Agent two duly signed completed copies of IRS Form W-9. If such Lender fails to deliver such forms, then the Administrative Agent may withhold from any interest payment to such Lender an amount equivalent to the applicable back-up withholding tax imposed by the Internal Revenue Code, without reduction.

(i)    If any Governmental Authority asserts that the Administrative Agent or any Agent-Related Person did not properly withhold or backup withhold, as the case may be, any tax or other amount from payments made to or for the account of any Lender, such Lender shall indemnify the Administrative Agent or any Agent-Related Person therefor, including all penalties and interest, any taxes imposed by any jurisdiction on the amounts payable to the Administrative Agent or any Agent-Related Person under this Section 3.01, and costs and expenses (including Attorney Costs) of the Administrative Agent or any Agent- Related Person. The obligation of the Lenders under this Section shall survive the termination of all commitments to make Loans, repayment of all Obligations and the resignation of the Administrative Agent.

(j)    If the Administrative Agent, or a Lender, determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrowers or with respect to which any Borrower has paid additional amounts pursuant to this Section 3.01, it shall pay to the Borrowers an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrowers under this Section 3.01 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out- of-pocket expenses of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that such Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender (as the case may be) in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrowers or any other Person.

(k)    [Reserved].

3.02.    [Reserved].

3.03.    [Reserved].

3.04.    [Reserved].

3.05.    [Reserved].

3.06.    Matters Applicable to all Requests for Compensation.

(a)    A certificate of the Administrative Agent or any Lender claiming compensation under this Article 3 and setting forth the additional amount or amounts to be paid to it hereunder in reasonable detail shall be conclusive in the absence of manifest error. In determining such amount, the Administrative Agent or such Lender may use any reasonable

averaging and attribution methods. The Borrowers shall pay the Administrative Agent or Lender, the amount shown as due on any such certificate within ten (10) days of receipt thereof.

3.07.    Survival.

All of the Borrowers' obligations under this Article 3 shall survive the Maturity Date.

## ARTICLE 4

## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

4.01.    Conditions of Initial Credit Extension.

The obligation of each Lender to make its initial Credit Extension on the Closing Date hereunder is subject to satisfaction of each of the following conditions precedent (except to the extent that any condition is expressly listed on Schedule 6.18) (collectively, the "Interim DIP Loan Conditions"):

(a)    Loan Documents. Receipt by the Administrative Agent of executed counterparts of this Agreement, and the agreements and the other documents (or, in each case, original or electronic copies thereof) executed in connection herewith and therewith (as required by the Administrative Agent), each properly executed by a Responsible Officer of the signing Loan Party and, in the case of this Agreement, by each Lender.

(b)    Organization Documents, Resolutions, Etc. Receipt by the Administrative Agent of the following, each of which shall be originals or electronic copies (followed promptly by originals), dated as of a recent date before the Closing Date and in form and substance satisfactory to the Administrative Agent and its legal counsel:

(i)    copies of the Organization Documents of each Loan Party certified to be true and complete as of a recent date by the appropriate Governmental Authority of the state or other jurisdiction of its incorporation or organization, where applicable, and certified by a secretary, assistant secretary or other duly appointed officer of such Loan Party to be true and correct as of the Closing Date; and

(ii)    such resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may require evidencing the identity, authority and capacity of each Responsible Officer thereof (A) executing any agreement, certificate of other document required to be delivered hereby or (B) authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party.

(c)    Loan Notice. Receipt by the Administrative Agent of a Loan Notice.

(d)    Fees. Receipt by the Administrative Agent of any fees and expenses (including Attorney Costs) required to be paid on or before the Closing Date under this Agreement and under the Interim Order, which fees and expenses may be paid out of the proceeds of the Initial New Money DIP Loan Advance, and all reasonable and documented out-of-pocket fees and

expenses of the Administrative Agent and the Prepetition Credit Agent incurred and accrued on or before the Closing Date (including prior to the Petition Date) shall have been paid.

(e)    <u>Debtor-in-Possession</u>. Each Loan Party shall be a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code.

(f)    <u>Interim Order</u>. The Bankruptcy Court shall have entered the Interim Order in form and substance acceptable to Administrative Agent and the Lenders, and such Interim Order shall be in full force and effect and shall not have been stayed, vacated, reversed, amended or otherwise modified without the prior written consent of the Administrative Agent and the Lenders in their sole discretion.

(g)    <u>No Other Relief</u>. No motion, pleading or application seeking relief affecting the provision of the financing contemplated hereunder shall have been filed in the Bankruptcy Court by any Loan Party without the prior written consent of the Administrative Agent (at the direction of Required Lender) in its sole discretion.

(h)    <u>Cash Management Order</u>. The Bankruptcy Court shall have entered a cash management order in form and substance reasonably acceptable to the Required Lenders and in no respect inconsistent with the DIP Orders, and such order shall be in full force and effect and shall not have been stayed, vacated, reversed, amended or otherwise modified without the prior written consent of the Required Lenders in their sole discretion.

(i)    <u>Approved Budget</u>. The Administrative Agent and Lenders shall have received the initial Approved Budget, which for the avoidance of doubt shall be acceptable in form and substance to Administrative Agent and Lenders.

(j)    <u>DIP Order Conditions</u>.  All other conditions to borrowing in the Interim Order shall have been satisfied.

(k)    <u>Funding Direction Letter</u>.  If requested by the Administrative Agent, the Administrative Agent shall have received a Funding Direction Letter dated as of the Closing Date, by the Borrower to the Administrative Agent with respect to the distribution of the proceeds of the Loans and the other sources and uses of funds occurring on the Closing Date.

(l)    <u>Filings with Bankruptcy Court</u>. All motions and other documents to be filed with the Bankruptcy Court in connection with this Agreement or otherwise on the Petition Date (including, without limitation, all (i) customary "first-day" operational pleadings, (ii) the Interim Order and motion seeking approval of this Agreement, and (iii) pleadings and other documents relating to any potential sale shall be in form and substance acceptable to the Lenders in their sole discretion and shall include an executed asset purchase agreement with a stalking horse bidder.

(m)    <u>Events of Default</u>. No default or Event of Default shall have occurred or be continuing, or would result from such proposed Credit Extension.

(n)    <u>Fees and Expenses</u>. All reasonable and documented out-of-pocket fees and expenses of the Administrative Agent and the Prepetition Agent incurred and accrued on or before the Closing Date (including prior to the Petition Date) shall have been paid or will be paid on the

Closing Date, which fees and expenses may be paid out of the proceeds of the Initial New Money DIP Loan Advance.

(o)      Insurance Report. A report in form and substance reasonably satisfactory to Administrative Agent outlining all material insurance coverage maintained as of the Closing Date.

(p)      Representations and Warranties. The representations and warranties of each Loan Party contained in Article 5 or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct (i) if such date is the Closing Date, on and as of such date and (ii) otherwise, in all material respects (provided, that if any representation or warranty is by its terms qualified by concepts of materiality, such representation shall be true and correct in all respects) on and as of such date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, and except that for purposes of this Section 4.02, the representations and warranties contained in subsections (a) and (b) of Section 5.05 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01.

(q)      Transition Services Agreement. Administrative Agent shall have received a form transition services agreement in form and substance acceptable to Administrative Agent and Required Lenders (including, without limitation, with respect to the schedule of services and costs) for use in connection with any bid by any of the Lenders or their affiliates for any or all of the assets or equity of the Loan Parties, which shall have been memorialized by a memorandum of understanding or similar documentation among Administrative Agent and Equinox Holdings, Inc. and which shall be acceptable in form and substance to Administrative Agent and Required Lenders.

For the purpose of determining satisfaction with the conditions specified in this Section 4.01, each Lender that has signed and delivered this Agreement shall be deemed to have accepted, and to be satisfied with, each document or other matter required under this Section 4.01 unless the Agent shall have received written notice from such Lender prior to the Closing Date specifying its objection thereto.

4.02.   Conditions to all Subsequent Credit Extensions.

Following the initial Credit Extension, the Loan Parties may make subsequent draws of New Money DIP Loans on a bi-weekly basis; provided that the obligation of each Lender to honor any such subsequent Request for Credit Extension, whether on the Closing Date or at any time thereafter, is subject to each of the following conditions precedent:

(a)      The Interim DIP Loan Conditions shall be satisfied.

(b)      The representations and warranties of each Loan Party contained in Article 5 or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct (i) if such date is the Closing Date, on and as of such date and (ii) otherwise, in all material respects (provided, that if any representation or warranty is by its terms qualified by concepts of materiality, such representation shall be true and correct in all respects) on and as of such date, except to the extent that such

representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, and except that for purposes of this Section 4.02, the representations and warranties contained in subsections (a) and (b) of Section 5.05 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01.

(c)     No Default or Event of Default shall exist, or would result from such proposed Credit Extension, including, for the avoidance of doubt, with respect to compliance with the Approved Budget (including the Budget Covenant).

(d)     The Administrative Agent and Required Lenders shall have received in accordance with this Agreement a Loan Notice, pursuant to the Administrative Agent's requirements and executed by an authorized signatory of the Borrower Representative.

(e)     (i) If such date is on or after the Termination Date (as defined in the Interim Order), the Bankruptcy Court shall have entered the Final Order, (ii) if the Interim Order has expired, the Bankruptcy Court shall have entered the Final Order, (iii) the Interim Order or the Final Order, as the case may be, shall not have been vacated, stayed, reversed, modified or amended without the Administrative Agent's and Lenders' consent or shall otherwise be in full force and effect and shall be in compliance in all respects with the Final Order or (iv) the Interim Order or the Final Order, as the case may be, in any respect shall not be the subject of a stay pending either appeal or a motion for reconsideration thereof.

(f)     For any New Money DIP Loan to be made prior to the entry of the Final Order, the sum of the outstanding principal amount of the New Money DIP Loans (after giving effect to the amount of the requested New Money DIP Loan) shall not exceed the amount permitted by the Interim Order.

Each Request for Credit Extension submitted by the Borrower Representative and acceptance of the proceeds of any Loan shall be deemed to be, (i) a representation and warranty by the Loan Parties that the conditions specified in Section 4.02 have been satisfied on and as of the date of the applicable Credit Extension and (ii) a reaffirmation by each Loan Party of the granting and continuance of the Administrative Agent's Lien, on behalf of itself and the Secured Parties, pursuant to this Agreement, the DIP Orders and the Collateral Documents.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES

The Loan Parties hereby represent and warrant to the Administrative Agent and the Lenders that, both prior to and after giving effect to any Credit Extension:

5.01.   Existence, Qualification and Power.

Upon the entry of the Interim Order, during the Interim Period (as defined in the Interim Order) and thereafter after the entry of the Final Order, each Loan Party (a) is a corporation, partnership or limited liability company duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite

power and authority and all requisite Permits to (i) own its assets and carry on its business, except where the failure to have such Permits, either singularly or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, except, in the case of this clause (c), where the failure to be so qualified could not reasonably be expected to result in a Material Adverse Effect.

5.02.    <u>Authorization; No Contravention.</u>

Upon the entry of the Interim Order, during the Interim Period (as defined in the Interim Order) and thereafter after the entry of the Final Order, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is party, (a) have been duly authorized by all necessary corporate or other organizational action, and (b) do not (i) contravene the terms of any Loan Party's Organization Documents; (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under, (A) any Contractual Obligation to which any Loan Party is a party, except for any conflicts which could not reasonably be expected to result in a Material Adverse Effect or (B) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which any Loan Party or the Property of any Loan Party is subject; (iii) violate any Law (including Regulation U or Regulation X issued by the FRB) except for any violations which could not reasonably be expected to result in a Material Adverse Effect; or (iv) result in a limitation on any licenses, permits or other Governmental Approvals applicable to the business, operations or properties of any Loan Party.

5.03.    <u>Governmental Authorization; Other Consents.</u>

Upon the entry of the Interim Order, during the Interim Period (as defined in the Interim Order) and thereafter after the entry of the Final Order, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, other than (i) those that have already been obtained and are in full force and effect, and (ii) filings to perfect the Liens created by the Collateral Documents.

5.04.    <u>Binding Effect.</u>

Each Loan Document has been duly executed and delivered by each Loan Party that is party thereto. Each Loan Document constitutes a legal, valid and binding obligation of each Loan Party that is party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by any applicable Debtor Relief Law or by equitable principles relating to enforceability.

5.05.    <u>Financial Statements; No Material Adverse Effect.</u>

(a)    [Reserved].

(b)    [Reserved].

31927159.1

42

(c)     [Reserved].

(d)     The financial statements delivered pursuant to Sections 6.01(a) and 6.01(b) have been prepared in accordance with GAAP (except as may otherwise be permitted under Sections 6.01(a) and 6.01(b)) and present fairly (on the basis disclosed in the footnotes to such financial statements) in all material respects the consolidated financial condition, results of operations and cash flows of Blink and its Subsidiaries as of the dates thereof and for the periods covered thereby, subject, in the case of financial statements delivered pursuant to Section 6.01(b), to the absence of footnotes and to normal year-end adjustments.

(e)     Since the date of this Agreement, there has been no event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect.

5.06.   Litigation.

There are no Proceedings pending or, to the knowledge of the Loan Parties, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or (b) could reasonably be expected to have a Material Adverse Effect, other than the filing of the Chapter 11 Case.

5.07.   No Default.

(a)     No Loan Party is in breach of or default under any Contractual Obligation that, in each case, could reasonably be expected to have a Material Adverse Effect.

(b)     No Default or Event of Default has occurred and is continuing.

5.08.   Ownership of Property; Liens.

Each of the Loan Parties has good record and marketable title in fee simple to, or valid leasehold interests in, all material Real Property necessary for the ordinary conduct of its business. No Property of the Loan Parties and their Subsidiaries is subject to any Liens, other than Permitted Prior Liens.

5.09.   Environmental Compliance.

Except as could not reasonably be expected to have a Material Adverse Effect:

(a)     Each of the Facilities and all operations at the Facilities are in compliance with all applicable Environmental Laws, and there is no violation of any Environmental Law with respect to the Facilities or the Businesses.

(b)     None of the Facilities contains, or has previously contained, any Hazardous Materials at, on or under the Facilities in amounts or concentrations that constitute or constituted a violation of, or could give rise to liability under, Environmental Laws.

(c)    Neither any Loan Party nor any Subsidiary has received any written notice of, or inquiry from any Governmental Authority regarding, any violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Facilities or the Businesses, nor does any Responsible Officer of any Loan Party have knowledge or reason to believe that any such notice will be received or is being threatened.

(d)    Hazardous Materials have not been transported or disposed of from the Facilities, or generated, treated, stored or disposed of at, on or under any of the Facilities or any other location, in each case by or on behalf of any Loan Party or any Subsidiary in violation of, or in a manner that would be reasonably likely to give rise to liability under, any applicable Environmental Law.

(e)    No judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Responsible Officers of the Loan Parties, threatened, under any Environmental Law to which any Loan Party or any Subsidiary is or will be named as a party, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to any Loan Party, any Subsidiary, the Facilities or the Businesses.

(f)    There has been no release or, threat of release of Hazardous Materials at or from the Facilities, or arising from or related to the operations (including disposal) of any Loan Party or any Subsidiary in connection with the Facilities or otherwise in connection with the Businesses, in violation of or in amounts or in a manner that could give rise to liability under Environmental Laws.

5.10.    Insurance.

The properties of the Loan Parties and their Subsidiaries are insured with financially sound and reputable insurance companies (none of which are Affiliates of the Loan Parties other than to the extent of any self-insurance), in such amounts, with such deductibles and covering such risks (after giving effect to any self-insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the applicable Loan Party or the applicable Subsidiary operates. The insurance coverage of the Loan Parties complies with the requirements of Section 6.07 and the insurance coverage in effect on the Closing Date is outlined as to carrier, policy number, expiration date, type, amount and deductibles on Schedule 5.10.

5.11.    Taxes.

The Loan Parties have filed all federal and other material tax returns and reports required to be filed, and have paid all federal and other material taxes levied or imposed upon them otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP. To the knowledge of the Loan Parties, there is no proposed tax assessment against any Loan Party that could reasonably be expected to, if made, have a Material Adverse Effect. No Loan Party nor any Subsidiary thereof is party to any tax sharing agreement with a non-Loan Party.

5.12.    ERISA Compliance.

(a)    Except to the extent not reasonably expected to result in a Material Adverse Effect, (i) each Plan is in compliance with the applicable provisions of ERISA, the Internal Revenue Code, the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and the regulations and published interpretations thereunder, and other federal or state Laws; (ii) each Loan Party and each ERISA Affiliate has made all required contributions to each Plan subject to Section 412 of the Internal Revenue Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Internal Revenue Code has been made with respect to any Plan; and (iii) each Loan Party and each ERISA Affiliate has performed all their obligations under each Plan according to their terms, including filing or furnishing to the IRS, Department of Labor or other Governmental Authority, or to participants or beneficiaries of each Plan, any reports, returns, notices and other documentation required to be filed or furnished.

(b)    Except to the extent not reasonably expected to result in a Material Adverse Effect, there are no pending or, to the knowledge of the Loan Parties, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan. Except to the extent not reasonably expected to result in a Material Adverse Effect, there has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan.

(c)    Except to the extent not reasonably expected to result in a Material Adverse Effect, (i) no ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) no Loan Party or any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) no Loan Party or any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) no Loan Party or any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

5.13.    Subsidiaries.

 Set forth on Schedule 5.13 is a complete and accurate list as of the Closing Date of the name and jurisdiction of organization of each Loan Party and each Subsidiary, together with (a) the number of shares of each class of Capital Stock outstanding and (b) the number and percentage of outstanding shares of each class owned (directly or indirectly) by any Loan Party or any Subsidiary. The outstanding Capital Stock of each Loan Party and each Subsidiary is validly issued, fully paid and, solely with respect to corporations, non-assessable.

5.14.    Margin Regulations; Investment Company Act.

(a)    The Loan Parties are not engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock. No proceeds of any Borrowing shall be used for the purpose of purchasing or carrying margin stock.

(b)    None of the Loan Parties or any Subsidiary of a Loan Party is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

5.15.    <u>Disclosure.</u>

No report, financial statement, certificate or other written information (other than projections, general industry and/or economic information) furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or, taken as a whole with all such information furnished, omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading in any material respect; <u>provided</u> that, with respect to any projections, the Loan Parties represent that such information was prepared in good faith based upon assumptions believed to be reasonable at the time made. Notwithstanding the foregoing, Administrative Agent and Lenders acknowledge that the pro forma financial statements and other economic forecasts delivered by Borrowers hereunder are not factual representations and that the actual financial results of the Borrowers may differ materially from the pro forma financial statements and other economic forecasts submitted from time to time.

5.16.    <u>Compliance with Laws.</u>

Each of the Loan Parties and each Subsidiary is in compliance with the requirements of all Laws and all orders, writs, conditions of participation, injunctions, decrees, and Governmental Approvals applicable to it, its properties or the Facilities, except, in each case, where noncompliance individually or in the aggregate could not reasonably be expected to result in a Material Adverse Effect. Without limiting the generality of the foregoing, neither any Loan Party nor any Subsidiary thereof is in receipt of any written notice of any material violation of any Law, statute, rule, regulation, ordinance, code, judgment, order writ, decree, permit, concession, franchise or other governmental approval applicable to it or any of its property, which notice, individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect.

5.17.    <u>Intellectual Property; Licenses, Etc.</u>

The Loan Parties and their Subsidiaries own, or possess the legal right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights (collectively, "IP Rights") that are necessary for the operation of their respective businesses without conflict with the rights of any other Person. Set forth on <u>Schedule 5.17</u> is a list of all IP Rights registered or pending registration with the United States Copyright Office or the United States Patent and Trademark Office and owned by any Loan Party as of the Closing Date. Except as set forth on <u>Schedule 5.17</u>, as of the Closing Date no Loan Party has knowledge of any claim that has been asserted and is pending by any Person challenging or questioning the use of any IP Rights or the validity or effectiveness of any IP Rights, in each case to the extent such IP Rights are material to the business of the Loan Parties. To the knowledge of the Loan Parties, the use of any IP Rights by any Loan Party or any Subsidiary or the granting of a right or a license in respect of any IP Rights from any Loan Party or any Subsidiary does not

infringe on the rights of any Person, that, in each case, could reasonably be expected to have a Material Adverse Effect. As of the Closing Date, none of the IP rights owned by any of the Loan Parties is subject to any licensing agreement or similar arrangement except as set forth on Schedule 5.17.

5.18.   Broker's Fees.

Neither any Loan Party nor any Subsidiary has any obligation to any Person in respect of any finder's, broker's, investment banking or other similar fee in connection with any of the transactions contemplated under the Loan Documents, other than for the benefit of a Secured Party.

5.19.   Labor Matters.

There are no collective bargaining agreements covering the employees of any Loan Party or any Subsidiary as of the Closing Date, and neither any Loan Party nor any Subsidiary has suffered any strikes, walkouts, work stoppages or other material labor difficulty within the last five (5) years that, in each case, could reasonably be expected to have a Material Adverse Effect.

5.20.   Business Locations.

Set forth on Schedule 5.20(a) is a list of all Real Property located in the United States that is owned or leased by any Loan Party as of the Closing Date. Set forth on Schedule 5.20(b) is a list of all locations where any tangible personal property with a fair market value in excess of $500,000 of any Loan Party is located as of the Closing Date excluding goods in transit to a warehouse, fitness center, or other location operated by a Loan Party. Set forth on Schedule 5.20(c) is the state of organization, chief executive office, tax payer identification number and organizational identification number of each Loan Party as of the Closing Date. The exact legal name of each Loan Party is as set forth on the signature pages hereto.

5.21.   Bankruptcy Matters.

Upon entry of and subject to the respective DIP Orders:

(a)     The Chapter 11 Case were commenced on the Petition Date in accordance with applicable law and the proper notice thereof, to the extent given or required to be given prior to the date hereof, was given for (x) the motions seeking approval of the Loan Documents and the Interim Order and Final Order, (y) the hearing(s) for the approval of the Interim Order, and (z) the hearing(s) for the approval of the Final Order.

(b)     From and after the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expenses in the Chapter 11 Case having priority over all administrative expenses and unsecured claims against the Loan Parties as set forth in the DIP Orders.

(c)     From and after the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected first priority lien on all of the Collateral, subject, as to priority only, to the Carve-Out and the Permitted Prior Liens, as set forth in the DIP Orders.

(d)     The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended without the Administrative Agent's and Required Lenders' consent in their sole discretion.

5.22.   [Reserved].

5.23.   Sanctions Concerns and Anti-Corruption Laws.

(a)     No Loan Party nor any Subsidiary thereof, nor, to the knowledge of the Loan Parties, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by any individual or entity that is (i) currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated Nationals, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant sanctions authority or (iii) located, organized or resident in a Designated Jurisdiction.

(b)     The Loan Parties and their Subsidiaries have conducted their business in compliance with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar anti-corruption legislation in other relevant jurisdictions, and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws and applicable Sanctions, and to the knowledge of Loan Party, Parent and each Subsidiary are in compliance with such anti-corruption laws and applicable Sanctions in all material respects.

(c)     No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

5.24.   [Reserved].

5.25.   Patriot Act.

To the extent applicable, each Loan Party is in compliance with the (i) Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V) and any other enabling legislation or executive order relating thereto, and (ii) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001) (the "Patriot Act").

5.26.   Franchise Agreements.

(a)     Schedule 5.26 sets forth, as of the Closing Date, (i) a complete and accurate list of all material Franchise Agreements currently in effect, (ii) a complete and accurate list of each of the Loan Parties' standard forms of Franchise Agreements currently in effect, including the year or years during which the applicable Loan Party used such form of Franchise Agreement, and (ii) a list of all Franchisees of the Loan Parties or their Subsidiaries currently party to a Franchise Agreement, together with, to the extent available, telephone numbers and addresses.

(b)    As of the Closing Date, except as set forth on Schedule 5.26, each Franchise Agreement is in full force and effect and constitutes a valid and binding obligation of the applicable Loan Party and, to the knowledge of such Loan Party, the other party thereto, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws and general principles of equity. No Loan Party is in breach thereunder, and, to the knowledge of the Loan Parties, no event has occurred and no condition or state of facts exists which, with the passage of time or the giving of notice or both, would constitute such a breach by the applicable Loan Party thereunder.

(c)    As of the Closing Date, the Loan Parties' franchise disclosure documents currently in effect and franchise disclosure documents previously in effect: (A) materially comply and have materially complied with all applicable United States Federal Trade Commission ("FTC") franchise disclosure rules and state franchise and business opportunity sales laws in effect at such time; (B) have been timely amended to reflect any material changes or developments in the Loan Parties' franchise system, agreements, operations, financial condition, litigation matters, or other matters requiring disclosure under any applicable law; and (C) include, and have included, all material documents (including audited financial statements for the applicable Person) required by any applicable law to be provided to prospective franchisees. After the Closing Date, all the Franchises granted under the Franchise Agreements to be entered into after the Closing Date will be sold in material compliance with applicable law, including franchise disclosure and registration requirements. Each of the Loan Parties and their Subsidiaries are and have been in material compliance with all applicable laws relating to franchise matters.

(d)    A list of each of the Loan Parties' franchise disclosure documents for its currently offered form or forms of Franchise Agreement as of the Closing Date is set forth on Schedule 5.26. The Loan Parties have provided the Administrative Agent with true and complete copies of each franchise disclosure document for its currently offered form or forms of Franchise Agreement as of the Closing Date set forth on Schedule 5.26. As of the Closing Date, the Loan Parties have not received any currently effective written notice of any threatened, in writing, administrative, criminal or civil action against them or any persons disclosed in any of the Loan Parties' applicable franchise disclosure document for its Franchise Agreements, where such threatened administrative, criminal and/or civil action alleges a violation of a franchise law, antitrust law, securities law, fraud, unfair or deceptive practices, or comparable allegations, and are not parties to any current actions other than ordinary routine litigation incidental to the Loan Parties' business, that are material in the context of the number of the Loan Parties' Franchisees and the size, nature, or financial condition of the franchise system or the Loan Parties' business operations.

(e)    [Reserved].

(f)    The Loan Parties have properly accounted for all payments made by each Franchisee with respect to any advertising fund or advertising- cooperative, except to the extent where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(g)    As of the Closing Date, to the knowledge of any Loan Party, no franchise association (either independent or sponsored by any Loan Party) is currently in place on the Closing Date.

(h)     As of the Closing Date, no Loan Party currently employs or uses any franchise brokers in connection with the Loan Parties' franchising system sales.

# ARTICLE 6

## AFFIRMATIVE COVENANTS

On the Closing Date and at all times thereafter until and including the Maturity Date, the Loan Parties shall and shall cause each Subsidiary to:

6.01.   Financial Statements.

Deliver to the Administrative Agent for the benefit of each Lender:

(a)     Annual Financial Statements. Within 120 days after the end of each Fiscal Year, consolidated balance sheets of Blink and its Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of income or operations, retained earnings, shareholders' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures as of the end of and for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, and in the case of the consolidated financial statements audited and accompanied by a report and opinion of KPMG LLP or another certified public accountants of nationally recognized standing acceptable to the Administrative Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards.

(b)     Quarterly Financial Statements. Within forty-five (45) days after the end of each Fiscal Quarter of each Fiscal Year, consolidated balance sheets of Blink and its Subsidiaries as at the end of such Fiscal Quarter, and the related consolidated statements of income or operations, retained earnings, shareholders' equity and cash flows for such Fiscal Quarter and for the portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures as of the end of and for the corresponding Fiscal Quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year, all in reasonable detail and certified by a Responsible Officer of the Borrower Representative as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of Blink and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes; and

(c)     Management Discussion and Analysis. Concurrently with any delivery under paragraph (a) or (b) above, a management discussion and analysis describing any material differences in the reported financial results as between the periods covered and that in the same periods during the immediately preceding Fiscal Year, and as between such periods and the same periods included in the budget delivered pursuant to Section 6.02(c) below, which shall include, among any other information or explanation reasonably requested by the Administrative Agent, an explanation of any changes in revenues, consolidated adjusted EBITDA, consolidated capital expenditures and material changes in the number of customers or customer mix that would assist the Lenders to better understand the results being reported; and

(d)     Variance Reports.  By no later than 12:00 noon on Friday of each week following the week in which the Petition Date occurs, the Borrower shall deliver to the

Administrative Agent (i) a variance report (each, a "<u>Variance Report</u>"), in form and substance acceptable to Administrative Agent and the Lenders, showing comparisons of actual line item receipts and disbursements compared against such line items set forth in the Approved Budget, (ii) written management discussion and analysis of any line item variance between actual and budgeted items greater than 10%, and (iii) a compliance certificate (each, a "<u>Compliance Certificate</u>"), in form and substance acceptable to Administrative Agent (it being agreed that the form and substance proposed by Portage Point Partners to Administrative Agent prior to the date hereof is acceptable to Administrative Agent), certifying as to Debtors' compliance with the Approved Budget and Section 6.31 for the immediately preceding applicable period.

(e)    <u>Monthly Reports</u>. Within thirty (30) days after the end of each calendar month of each Fiscal Year (other than the last calendar month of each Fiscal Quarter), a calculation of consolidated adjusted EBITDA for such month, the trailing twelve month period ended on the last day of such month and the year-to-date, together with a statement of cash and debt balances as of the end of such month, all in reasonable detail and certified by a Responsible Officer of the Borrower Representative as fairly presenting in all material respects the consolidated adjusted EBITDA for such trailing twelve month period.

Notwithstanding anything to the contrary herein, all financial statements delivered hereunder shall be prepared, and the financial covenant required to be delivered under <u>Section 8.01(a)</u> below, shall be calculated without giving effect to any election under Statement of Financial Accounting Standards 159 (or any similar accounting principle) permitting a Person to value its financial liabilities at the fair value thereof.

6.02.    <u>Certificates; Other Information.</u>

Deliver to the Administrative Agent for the benefit of each Lender, in form and detail satisfactory to the Administrative Agent:

(a)    [Reserved];

(b)    [Reserved];

(c)    [Reserved];

(d)    <u>Audit Letters</u>. Promptly upon receipt thereof, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of the Loan Parties and their Subsidiaries by independent accountants in connection with the accounts or books of the Loan Parties and their Subsidiaries, or any audit of any of them;

(e)    <u>Government Reporting</u>. Promptly upon receipt thereof, copies of (i) all reports and written information to and from the United States Occupational Health and Safety Administration or any successor agencies or authorities concerning environmental, health or safety matters and (ii) all reports and written information to and from any state or local agency responsible for health and safety matters, or any successor agencies or authorities concerning environmental, health or safety matters, in each case to the extent such reports or written information pertain to

events which could reasonably be expected to result in liabilities to the Borrowers and their Subsidiaries in excess of $25,000;

(f)     [Reserved];

(g)     [Reserved];

(h)     Real Property Leases. Immediately upon execution of any Real Property Lease by a Loan Party, which shall not be entered into without the prior written consent of the Required Lenders, a report in form and substance satisfactory to the Administrative Agent identifying: (i) such Real Property lease agreement, (ii) the property governed by such Real Property lease agreements, (iii) the expiration dates of such lease agreements, and (iv) the amount of rental payments due under each lease agreement and attaching such Real Property Lease to such report and such other information as the Administrative Agent may request;

(i)     Additional Information. Promptly such additional information regarding the business, financial or corporate affairs of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent may from time to time request;

(j)     Variance Report; Compliance Certificate. At the times required by the DIP Orders, a Variance Report and a Compliance Certificate; and

(k)     DIP Order Reports and Certificates. As soon as available, but not later than the date such reports or certificates are required to be delivered pursuant to the terms of the DIP Orders, copies of all other reports and certificates required to be delivered by the Loan Parties pursuant to the terms of the DIP Orders.

6.03.   Notices.

(a)     Promptly (and in any event within one (1) Business Day) notify the Administrative Agent and each Lender in writing of a Responsible Officer knowing of (or reasonably should have known of) the occurrence of any Default or Event of Default; provided that such notice shall be due within one (1) Business Day after the occurrence of any Default or Event of Default under Section 9.01(b) as a result of the failure of the Loan Parties to comply with Section 8.01(b).

(b)     Promptly (and in any event within one (1) Business Day) notify the Administrative Agent and each Lender in writing of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)     Promptly (and in any event within one (1) Business Day) notify the Administrative Agent and each Lender in writing of the occurrence of any ERISA Event.

(d)     [Reserved].

(e)     Promptly (and in any event within one (1) Business Day), notify the Administrative Agent and each Lender, in writing, of the threat or institution of, or any material development in, any Proceeding against or affecting any Loan Party (including injunctive relief)

(i) in which the amount involved or relief sought, or (ii) which could reasonably be expected to have a Material Adverse Effect.

(f)    Promptly (and in any event within (and in any event one (1) Business Day of such event), notify the Administrative Agent and each Lender, in writing, of any loss, damage or destruction to the Collateral in the amount of $100,000 or more individually, whether or not covered by insurance.

(g)    [Reserved].

(h)    Upon the written request of the Administrative Agent following the occurrence of any event or the discovery of any condition which the Administrative Agent or the Required Lenders reasonably believe has caused (or could be reasonably expected to cause) the representations and warranties set forth in Section 5.09 to be untrue in any material respect, furnish or cause to be furnished to the Administrative Agent, at the Loan Parties' expense, a report of an environmental assessment of reasonable scope, form and depth, (including, where appropriate, invasive soil or groundwater sampling) by a consultant reasonably acceptable to the Administrative Agent as to the nature and extent of the presence of any Hazardous Materials on any Facilities and as to the compliance by any Loan Party or any of its Subsidiaries with Environmental Laws at such Facilities. If the Loan Parties fail to deliver such an environmental report within sixty (60) days after receipt of such written request then the Administrative Agent may arrange for same, and the Loan Parties hereby grant to the Administrative Agent and its representatives access to the Facilities to reasonably undertake such an assessment (including, where appropriate, invasive soil or groundwater sampling). The reasonable cost of any assessment arranged for by the Administrative Agent pursuant to this provision will be payable by the Loan Parties on demand and added to the obligations secured by the Collateral Documents.

Each notice pursuant to this Section 6.03 shall be accompanied by a statement of a Responsible Officer of the Borrower Representative setting forth details of the occurrence referred to therein and stating what action the Borrowers have taken and proposes to take with respect thereto. Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

6.04.    Payment of Obligations.

To the extent permitted by the DIP Orders and in accordance with the Approved Budget, pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all federal and other material tax liabilities, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by such Loan Party or such Subsidiary; and (b) all lawful claims which, if unpaid, would by law become a Lien (other than a Permitted Lien) upon its Property unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by such Loan Party or such Subsidiary.

6.05.    Preservation of Existence, etc.

(a)     Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or Section 7.05.

(b)     Preserve, renew and maintain in full force and effect its good standing and qualification to do business under the Laws of the jurisdiction of its organization (except in a transaction permitted by Section 7.04 or Section 7.05) and in any other jurisdiction where failure to so maintain good standing or qualification would have or would constitute a Material Adverse Effect.

(c)     Preserve, renew and maintain all Governmental Approvals as are necessary for the conduct of its business as currently conducted and herein contemplated.

(d)     Preserve, register and renew whenever applicable all of its material registered patents, copyrights, trademarks, trade names and service marks where failure to so preserve, register or renew such patents, copyrights, trademarks, trade names and service marks would have or would constitute a Material Adverse Effect.

6.06.   Maintenance of Properties.

(a)     Maintain, preserve and protect all of its property necessary in the operation of its business in good working order and condition where failure to so maintain such property would have or would constitute a Material Adverse Effect, ordinary wear and tear excepted.

(b)     [Reserved].

(c)     Use the standard of care typical in the industry in the operation and maintenance of its Facilities except where failure to use such standard of care would not be reasonably expected to have a Material Adverse Effect.

6.07.   Maintenance of Insurance.

Maintain or cause to be maintained, with financially sound and reputable insurers rated not less than B+, Class VI by Best's, comprehensive general liability insurance, business interruption insurance and all risk casualty insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of each Loan Party as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks, and in amounts and otherwise on such terms and conditions as shall be customary for such Persons and reasonably acceptable to the Administrative Agent. Each such policy of insurance shall (i) name Administrative Agent, on behalf of each Lender as an additional insured thereunder as its interests may appear, (ii) in the case of each casualty insurance policy, contain a lender's loss payable clause or endorsement, reasonably satisfactory in form and substance to Administrative Agent, that names Administrative Agent, on behalf of Lenders as the loss payee thereunder and (iii) provide for at least thirty (30) days' prior written notice (or ten (10) days' prior written notice in the case of cancellation for non-payment) to Administrative Agent of any modification or cancellation of such policy. The Administrative Agent and Secured Parties have no responsibility for premiums, warranties or representations to underwriters. The Loan

Parties or their insurance broker shall provide a certificate of insurance upon each policy renewal or replacement. In the event Borrowers fail within thirty (30) Business Days after Administrative Agent's request to provide Administrative Agent with evidence of the insurance coverage required by this Agreement, Administrative Agent may purchase insurance at Borrowers' expense to protect the Administrative Agent's interests in the Collateral. This insurance may, but need not, protect Borrowers' interests. The coverage purchased by Administrative Agent may, but need not, pay any claim made by any Borrower or any claim that is made against any Borrower in connection with the Collateral. Borrowers may later cancel any insurance purchased by Administrative Agent, but only after providing Administrative Agent with evidence that Borrowers have obtained insurance as required by this Agreement. If Administrative Agent purchases insurance for the Collateral, to the fullest extent provided by law, Borrowers will be responsible for the costs of that insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the Obligations. The costs of the insurance may be more than the cost of insurance Borrowers are able to obtain on their own.

6.08.    <u>Compliance with Laws.</u>

Except for such noncompliance as could not reasonably be expected to result in a Material Adverse Effect, comply in all material respects with the requirements of all Laws and Governmental Approvals applicable to it (including Environmental Laws) and all orders, writs, injunctions and decrees applicable to it or to its business or Property, except in such instances in which such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted. Conduct its business in compliance in all material respects with all applicable anti-corruption laws and maintain policies and procedures designated to promote and achieve compliance with such laws.

6.09.    <u>Books and Records.</u>

(a)    Maintain proper books of record and account, in which entries which are full, true and correct in all material respects and in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Loan Party or such Subsidiary, as the case may be.

(b)    Maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over such Loan Party or such Subsidiary, as the case may be.

6.10.    <u>[Reserved].</u>

6.11.    <u>Use of Proceeds.</u>

Subject to the last sentence of this Section 6.11, the Borrower shall use the proceeds of (x) the Initial New Money DIP Loan Advance, (y) any other New Money DIP Loan requested prior to the receipt by the Lenders of an Approved Budget and (z) Cash Collateral, in each case, solely in accordance with the Approved Budget and the Budget Covenant.

6.12.    <u>Additional Subsidiaries.</u>

In connection with any Acquisition or the formation of any Subsidiary (other than Excluded Subsidiaries), at the end of each Fiscal Quarter period occurring after the Closing Date (or such longer period as the Administrative Agent may provide in its sole discretion):

(a)    notify the Administrative Agent thereof in writing, together with (i) jurisdiction of formation, (ii) number of shares of each class of Capital Stock outstanding, (iii) number and percentage of outstanding shares of each class owned (directly or indirectly) by any Loan Party or any Subsidiary and (iv) number and effect, if exercised, of all outstanding options, warrants, rights of conversion or purchase and all other similar rights with respect thereto of each such Acquisition or formation of Subsidiary occurring during such period; and

(b)    cause such Subsidiary so acquired or formed, if a Domestic Subsidiary, to (A) become a Borrower or Guarantor (to be determined by the Administrative Agent in its sole discretion) by executing and delivering to the Administrative Agent a joinder agreement or such other document as the Administrative Agent shall deem appropriate for such purpose, and (B) deliver to the Administrative Agent documents of the types referred to in Sections 4.01(b), (c), (d), (e) and (f), and in Section 6.14 and, if requested by the Administrative Agent, favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (A)), all in form, content and scope satisfactory to the Administrative Agent.

6.13.    ERISA Compliance.

Do, and cause each of its ERISA Affiliates to do, each of the following except for such omissions or failures to act as could not reasonably be expected to constitute a Material Adverse Effect: (a) maintain each Plan, if any, in compliance in all material respects with the applicable provisions of ERISA, the Internal Revenue Code and other federal or state Law; (b) cause each Plan, if any, that is qualified under Section 401(a) of the Internal Revenue Code to maintain such qualification; and (c) make all required contributions to any Plan, if any, subject to Section 412, Section 430 or Section 431 of the Internal Revenue Code.

6.14.    Pledged Assets.

(a)    To the extent not delivered to the Administrative Agent on or before the Closing Date (including in respect of after-acquired property and Persons that become Subsidiaries of any Loan Party after the Closing Date), the Loan Parties will promptly deliver to the Administrative Agent such modifications to the terms of the Loan Documents (or, to the extent applicable as determined by the Administrative Agent, such other documents), in each case in form and substance reasonably satisfactory to the Administrative Agent and as the Administrative Agent deems necessary or advisable in order to ensure that each Loan Party (including any Person required to become a Guarantor or Borrower pursuant to Section 6.12 hereof) shall effectively grant to the Administrative Agent, for the benefit of the Secured Parties, a valid and enforceable security interest in all of its property (other than Excluded Property), including all of its Capital Stock, as security for the Obligations of such Loan Party.

(b)    Without limiting the generality of the foregoing, the Loan Parties will (i) cause all of the owned Real Property (other than Excluded Property) of each Loan Party to be

subject at all times to first priority, perfected Liens (subject only to Permitted Prior Liens) and, in the case of owned Real Property (other than Excluded Property), title insured Liens in favor of the Administrative Agent to secure the Obligations pursuant to the terms and conditions of the Collateral Documents and, with respect to any such Property acquired subsequent to the Closing Date, such other additional security documents as the Administrative Agent shall request, subject in any case to Permitted Prior Liens and (ii) deliver such other documentation as the Administrative Agent may request in connection with the foregoing, including appropriate UCC financing statements, real estate title insurance policies, surveys, environmental reports, certified resolutions and other organizational and authorizing documents of such Person, favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to above and the perfection of the Administrative Agent's Liens thereunder) and other items of the types required to be delivered pursuant to Section 4.01(f), all in form and substance reasonably satisfactory to the Administrative Agent.

(c)     Without limiting the generality of the above, the Loan Parties will cause 100% of the issued and outstanding Capital Stock of each Subsidiary, to be subject at all times to a first priority, perfected Lien in favor of the Administrative Agent pursuant to the terms and conditions of the Collateral Documents or such other security documents as the Administrative Agent shall request.

(d)     With respect to each Account for which either the perfection, enforceability, or validity of the Administrative Agent's Liens in such Account, or the Administrative Agent's right or ability to obtain direct payment to the Administrative Agent of the proceeds of such Account, is governed by any federal, state, or local statutory requirements other than those of the UCC, the Loan Parties will take such steps as may be required or as the Administrative Agent may from time to time request to ensure such perfection, enforceability, validity of the Lien or right to obtain direct payment, including compliance with the Federal Assignment of Claims Act of 1940.

(e)     [Reserved].

6.15.   Covenant with Respect to Environmental Matters.

In respect of all environmental matters:

(a)     except to the extent not reasonably expected to result in a Material Adverse Effect, comply with the requirements of all federal, state, and local Environmental Laws applicable to the Loan Parties or their Property; notify the Administrative Agent promptly in the event of any spill, release or disposal of Hazardous Material on, or hazardous waste pollution or contamination affecting, the Facilities in violation of applicable Environmental Laws of which a Loan Party has actual knowledge to the extent reasonably expected to result in a Material Adverse Effect; forward to the Administrative Agent promptly any written notices relating to such matters received from any Governmental Authority; and pay when due any fine or assessment against the Facilities the nonpayment of which would reasonably be expected to result in a Material Adverse Effect; provided, that the Loan Parties shall not be required to pay any such fine or assessment so long as the validity thereof shall be diligently contested in good faith by appropriate proceedings and they shall have set aside on their books reasonable reserves (in accordance with GAAP) with respect to any such fine or assessment so contested; and provided further that, in any event, payment of any

such fine or assessment shall be made before any of their Property shall be subjected to a Lien or be seized or sold in satisfaction thereof;

(b)   [reserved];

(c)   except as would not reasonably be expected to result in a Material Adverse Effect, not become involved, and will not knowingly permit any tenant of the Facilities to become involved, in any operations at the Facilities generating, storing, disposing, or handling Hazardous Materials in material violation of applicable Environmental Laws or any other activity that could lead to the imposition on any Lender or the Administrative Agent of any liability, or the imposition on the Loan Parties or the Facilities of any material liability or any lien under any Environmental Laws;

(d)   except as would not reasonably be expected to result in a Material Adverse Effect, promptly contain or remove any Hazardous Materials found on the Facilities in violation of any applicable Environmental Law, which containment or removal must be done in compliance with applicable Environmental Laws and at the Borrowers' expense; and the Borrowers agree that the Administrative Agent has the right, at its sole option but at the Borrowers' reasonable expense, to have an environmental engineer or other representative review the work being done; and

(e)   [reserved].

6.16.   [Reserved].

6.17.   Lender Meetings.

The Loan Parties will, upon the request of the Administrative Agent, participate in a meeting of the Administrative Agent and Lenders (which may be held telephonically) at such time as may be agreed to by the Borrowers and the Administrative Agent; provided, that at all times after the Closing Date, and during each calendar week (during business hours and at a time that is mutually convenient to the parties), the Loan Parties shall conduct a telephonic conference call, and shall cause the senior management of the Borrower to attend and participate on such call, with the Lenders to discuss the Loan Parties' operational performance, budget, recently delivered Variance Reports, Chapter 11 Case, sale process, financial condition and any other matters.

6.18.   Post-Closing Covenants.

The Loan Parties shall satisfy the requirements and/or provide to the Administrative Agent each of the documents, instruments, agreements and information set forth on Schedule 6.18, in form and substance acceptable to the Administrative Agent, on or before the date specified for such requirement in such Schedule or such later date to be determined by the Administrative Agent, in its sole discretion, each of which shall be completed or provided in form and substance satisfactory to the Administrative Agent.

6.19.   Cash Management Systems.

Each Loan Party shall enter into, and cause each depository, securities intermediary or commodities intermediary to enter into, Control Agreements with respect to each deposit,

securities, commodity or similar account maintained by such Person (other than (a) any payroll account so long as such payroll account is a zero balance account or is funded no earlier than the Business Day immediately prior to the date of any payroll disbursements and in an amount not exceeding the same, (b) zero balance accounts or petty cash accounts, amounts on deposit in which do not exceed $250,000 in the aggregate at any one time and (c) withholding tax and fiduciary accounts (such excluded accounts, "Excluded Accounts") as of and after the Closing Date.

6.20.   Franchise Matters.

 (a) Comply in all material respects with all of its material obligations under the Franchise Agreements to which it is a party; (b) appear in and defend any action challenging the validity or enforceability of any Franchise Agreement, except for such actions which, individually or in the aggregate, have not had and could not reasonably be expected to result in a Material Adverse Effect; (c) give prompt notice to the Administrative Agent of (i) any written notice of default under any Franchise Agreement given by such Loan Party with respect to any Franchisee-operated fitness center, (ii) any written notice by a Franchisee with a Franchisee-operated fitness center that terminates or threatens to terminate any Franchise Agreement or withhold any payments under any Franchise Agreement, together with a copy or statement of any information submitted or referenced in support of such notices and any reply by the Loan Party or its Subsidiary, and (iii) any notice or other communication received by it in which any other party to any Franchise Agreement (x) declares a breach or default by a Loan Party or Subsidiary of any material term under such Franchise Agreement; (d) provide Franchisees and prospective Franchisees with a franchise disclosure document or other disclosure statement of similar import as required by 16 C.F.R. 436; and (e) promptly upon any material amendment, revision or modification (except for any new, modified, terminated or expired Franchise Agreements in the ordinary course of business) to the information on Schedule 5.26, deliver an updated Schedule 5.26 to the Administrative Agent.

6.21.   Administrative Agent Access.

Without limiting Administrative Agent's and Lenders' rights under this Agreement and any other Loan Document and notwithstanding any provision contained herein to the contrary, Borrowers and the other Loan Parties hereby agree to: (a) give Administrative Agent and Administrative Agent's Related Persons reasonable access to the offices, properties, assets, officers, employees, accountants, auditors, financial advisors and consultants, books and records of Borrowers and the other Loan Parties, (b) furnish to Administrative Agent and its Related Persons such financial, operating and property-related data and other information as such persons request, and (c) instruct any Borrower's and any other Loan Party's officers, employees, accountants, auditors, financial advisors and consultants to provide reasonable cooperation during business hours to the Administrative Agent and its Related Persons in respect of the aforementioned clauses (a) and (b). Borrowers and the other Loan Parties each hereby waive and release each such officer, director, employee and advisor (other than the Loan Parties' legal counsel) from the operation and provisions of any confidentiality agreement with Borrowers or other Loan Party, as the case may be, such that such Person is not prohibited from providing any of the foregoing information to Administrative Agent, the Related Persons or the Lenders. For purposes of Sections 6.21 and 6.22 of this Agreement, the term "Related Persons" shall mean Administrative Agent's or Administrative Agent's counsel's employees, agents, representatives,

advisors and consultants (including, without limitation, any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf Administrative Agent or Administrative Agent's counsel). Without limiting the foregoing, upon reasonable request of the Administrative Agent, Borrowers shall, and shall cause each other Loan Party to, conduct a review of the Collateral, or to cooperate with Administrative Agent in its review of the Collateral, including, without limitation, all of the Borrowers' and each other Loan Party's accounts, equipment, real estate, and other assets, which review shall be completed to Administrative Agent's satisfaction.

6.22.    <u>Access to Borrowers' Non-Legal Advisors and Restructuring Committee.</u>

Commencing on the Closing Date, the Borrower Representative and any financial advisors or similar consultants or investment bankers or other non-legal advisors (including Moelis & Company) that are engaged by, or on behalf of, any or all of the Loan Parties and/or the Restructuring Committee (collectively, the "<u>Borrower Non-Legal Advisors</u>") shall: (a) disclose fully and promptly to Administrative Agent and its Related Persons all material developments in connection with its engagement, (b) regularly consult with, and respond to the reasonable inquiries of Administrative Agent and its Related Persons concerning any and all matters relating to the affairs, finances and businesses of any Borrower or any other Loan Party, the assets and capital stock of any Borrower or any other Loan Party, any aspect of its engagement and/or Borrower Non-Legal Advisors' and the Restructuring Committee's activities related thereto (including, without limitation, communications outside the presence of any representatives of any Borrower or any other Loan Party or Sponsor), (c) provide Administrative Agent and its Related Persons copies of all reports, analyses, materials (including, without limitation, any and all confidential memoranda or other work product provided by Borrower Non-Legal Advisors and the Restructuring Committee to any or all of the Borrowers, the Loan Parties, and their respective Borrower Non-Legal Advisors and the Restructuring Committee) and (d) provide periodic updates on a conference call (at a date and time mutually agreed by the Administrative Agent, the Borrower Representative, the Borrower Non-Legal Advisors and the Restructuring Committee) with Administrative Agent and/or its Related Persons and the Lenders.

6.23.    <u>Bankruptcy Court Filings</u>.  The Loan Parties agree to use reasonable efforts to furnish the Administrative Agent and Lenders, no later than two (2) business days prior to filing, or distribution of, (unless doing so is unreasonable, in which case the Loan Parties shall do so as soon as practicable under the circumstances) copies of all material operational and financial pleadings, motions, applications, financial information and other documents to be filed by or on behalf of Loan Parties with the Bankruptcy Court or the United States Trustee in the Chapter 11 Case, including without limitation (i) the motion seeking approval of and proposed forms of the Interim Order and the Final Order, which motion shall be in form and substance satisfactory to the Administrative Agent, and which orders shall be in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole discretion, (ii) the Bid Procedures Motion (as defined in the DIP Orders), which motion shall be in form and substance satisfactory to the Administrative Agent, and the proposed form of the Bid Procedures order in form and substance satisfactory to Administrative Agent in its sole discretion, (iii) all other proposed orders and pleadings related to the financing contemplated hereunder, which orders and pleadings shall be in form and substance satisfactory to the Administrative Agent, (iv) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan or disclosure

statement shall comply with the requirements set forth herein), which plan of reorganization or liquidation and any related disclosure statement shall be in form and substance satisfactory to Administrative Agent, (v) any motion, and proposed form of order, seeking to extend or otherwise modify the Loan Parties' exclusive periods set forth in section 1121 of the Bankruptcy Code, which motion and proposed order shall be in form and substance satisfactory to Administrative Agent, (vi) any motion, other than the Bid Procedures Motion (as defined in the DIP Orders), seeking approval of any sale of any Loan Party's assets, which motion shall be in form and substance reasonably acceptable to the Administrative Agent and any proposed form of a bidding procedures order and sale order, which orders shall be in form and substance satisfactory to the Administrative Agent in its sole discretion and (vii) any motion and proposed form of order filed with the Bankruptcy Court relating to the assumption, rejection, modification or amendment of any employment agreement, or the assumption, rejection, modification or amendment of any contract, each of which motions and orders must be in form and substance satisfactory to the Administrative Agent.

6.24.   <u>Bankruptcy Covenants</u>. Notwithstanding anything in the Loan Documents to the contrary, the Loan Parties shall comply with all covenants, terms and conditions and otherwise perform all obligations set forth in the DIP Orders.

6.25.   <u>Chapter 11 Case</u>. In connection with the Chapter 11 Case, the Loan Parties shall give the proper notice for (v) the motions seeking approval of the Loan Documents and the Interim Order and Final Order, (w) the hearings for the approval of the Interim Order, (x) the hearings for the approval of the Final Order, (y) the motions seeking approval of the sale of all or substantially all of the assets or the Capital Stock of the Loan Parties and (z) the hearings for the approval of the sale of all or substantially all of the assets or the Capital Stock of the Loan Parties. The Loan Parties shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

6.26.   <u>Milestones</u>. The Loan Parties shall timely comply with the Milestones (as defined in the DIP Orders) set forth in the DIP Orders, except to the extent any Milestone is waived or extended solely at the discretion of the Administrative Agent and Required Lenders.

6.27.   <u>Other Sale-Related Matters</u>. Prior to the bidding deadline, the Loan Parties and their investment banker shall consult with the Administrative Agent and any Lender regarding outreach to, and the status of marketing efforts with, third party buyers.

6.28.   <u>Investment Banker</u>. During the Chapter 11 Cases, the Loan Parties shall continue to retain Moelis & Company or such other investment banking firm(s) acceptable to the Administrative Agent and Required Lenders with such duties and scope of authority as may be acceptable to the Administrative Agent and Required Lenders, including, without limitation, for purposes of conducting a sale process for the Debtors' businesses as a going concern in accordance with the Milestones (as defined in the DIP Orders) set forth in the DIP Orders.

6.29.   <u>Access Rights</u>. During the Chapter 11 Cases, the Loan Parties shall afford the Administrative Agent, Lenders, Prepetition Agent, and Prepetition Credit Agreement Lenders (and their respective advisors) reasonable access to the Loan Parties' management team and

professionals, and when reasonably requested, for such information, updates and other purposes as the Administrative Agent, Lenders, Prepetition Agent, and other Prepetition Secured Parties may reasonably determine; provided that, without limiting the foregoing, each of the Debtors' management and professionals will hold required status calls with the Administrative Agent, Lenders, Prepetition Agent, and other Prepetition Secured Parties (and their advisors) no less frequently than once per week.

6.30.  <u>Restructuring Committee</u>. Emanuel Pearlman (or such other individual(s) acceptable to the Administrative Agent and Required Lenders) shall remain appointed as independent director(s) and/or managers(s) of each of the Loan Parties, and as the sole member of the Restructuring Committee, and the decision-making authority and control of the Restructuring Committee, as provided in the Restructuring Committee Appointment Documents as in effect on the Petition Date, shall remain in effect and shall not be modified without the prior written consent of the Administrative Agent and the Required Lenders.

6.31.  <u>Approved Budget</u>.

(a)    Subject to the terms and conditions set forth below and in the DIP Orders, the proceeds of Collateral and the proceeds of the Loans made under this Agreement and any other Collateral shall be used only in accordance with this Agreement, the Approved Budget, and the DIP Orders and the Loan Parties shall at all times be in compliance with the covenants set forth in the DIP Orders. The Loan Parties shall be authorized to make disbursements solely in accordance with the Approved Budget and in compliance with the Budget Covenant (as defined in the DIP Orders); provided, that if the aggregate amount of cumulative disbursements actually made by the Loan Parties, measured on a weekly basis, is less than the amount of cumulative disbursements forecasted in the Approved Budget during such period, then for purposes of the Budget Covenant, the Loan Parties may carry over any such unused amounts to the future periods in the Approved Budget. For the avoidance of doubt, the Budget Covenant shall exclude and shall not apply to the "Lender Counsel" line item contained in the Approved Budget.

(b)    The initial Approved Budget shall be the cash flow and expense forecast attached to the Interim Order; provided that a new budget may be effectuated and become the "Approved Budget" at any time with the consent of the Loan Parties, Administrative Agent, Prepetition Agent and Required Lenders.

(c)    The line items in the Approved Budget for payment of interest, expenses and other amounts to Administrative Agent and Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents, the Interim Order and the Final Order. The payment of any fees, costs and expenses of professionals for the Administrative Agent or Prepetition Agent shall not be capped notwithstanding the amounts allocated for such items in the Approved Budget.

(d)    Once an Approved Budget is approved by Required Lenders, the Administrative Agent and Lenders (i) may assume that the Loan Parties will comply with the Approved Budget to the extent required by this Section 6.31 and shall have no duty to monitor such compliance and (ii) shall not be obligated to pay (directly or indirectly from

the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to the Approved Budget. Nothing in the Approved Budget shall constitute an amendment or other modification of this Agreement or any of such restrictions or other lending limits set forth therein.

6.32.    <u>Other Reporting</u>. The Loan Parties shall also provide the Administrative Agent and Lenders with the following documentation and reports (collectively, the "Reporting Information"): (i) commencing on the last Business Day of the second week covered by the initial Approved Budget, and on the last Business Day of each subsequent week thereafter, an updated cash flow forecast in form and substance acceptable to Administrative Agent and Required Lenders, containing (x) projected cash receipts, disbursements, and expenses for the subsequent weeks covered by the Approved Budget and (y) actual cash receipts, disbursements, and incurred expenses for the weeks preceding the applicable week; (ii) copies of all reports filed with the Office of the United States Trustee; (iii) upon reasonable request, a good-faith estimate of the accrued but unpaid fees, expenses, and costs incurred by the Loan Parties' professionals and advisors as of any date identified in writing by the Administrative Agent (at the direction of the Required Lenders); (iv) upon reasonable request, an illustrative, non-binding forecast of the projected fees, expenses, and costs of the Loan Parties' professionals and advisors for any period identified in writing by the Administrative Agent (at the direction of the Required Lenders); and (v) such additional financial or other information concerning the acts, conduct, property, assets, liabilities, operations, financial condition, and transactions of the Loan Parties, or concerning any matter that may affect the administration of the estate, as the Administrative Agent (for itself or at the direction of the Required Lenders) may from time to time reasonably request in writing as soon as reasonably practicable but in no event later than ten (10) business days after any such request. For the avoidance of doubt, the updated cash flow forecasts described in this paragraph shall not constitute an Approved Budget unless and until approved as such by the Prepetition Agent, Administrative Agent and Required Lenders.

# ARTICLE 7

# NEGATIVE COVENANTS

On the Closing Date and at all times thereafter until and including the Maturity Date, no Loan Party shall, nor shall it permit any Subsidiary to:

7.01.    <u>Indebtedness.</u>

Create, incur, assume or suffer to exist any Indebtedness, except, to the extent permitted by the DIP Orders:

(a)    Indebtedness under the Loan Documents;

(b)    Indebtedness of the Loan Parties and their Subsidiaries existing on the Closing Date and set forth in <u>Schedule 7.01</u>;

(c)    [reserved];

(d)    [reserved];

(e)     intercompany Indebtedness permitted under <u>Section 7.03(h)</u>; <u>provided</u>, that in the case of any such intercompany Indebtedness that is evidenced by a note, such note shall be in form and substance satisfactory to the Administrative Agent and in the event such Indebtedness is owed to a Loan Party, such note shall be pledged and delivered to the Administrative Agent pursuant to the Security Agreement as additional collateral security for the Obligations;

(f)     liabilities arising out of endorsements of checks and other negotiable instruments for deposit or collection in the ordinary course of business;

(g)     Indebtedness incurred in the ordinary course of business in connection with the financing of insurance premiums;

(h)     Indebtedness incurred in the ordinary course of business relating to overdraft protection or netting services and any cash management and treasury services;

(i)     [reserved]; and

(j)     Guarantees with respect to Indebtedness and other obligations not prohibited under this <u>Section 7.01</u>.

7.02.   <u>Liens.</u>

 Create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, other than the following, to the extent permitted by the DIP Orders:

(a)     Liens pursuant to any Loan Document (including cash collateral delivered to any Secured Party);

(b)     Permitted Prior Liens;

(c)     Liens for taxes, assessments or governmental charges or levies not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP; <u>provided</u> that enforcement of the applicable Lien is effectively stayed during such challenge;

(d)     statutory Liens (or contractual restatements of such Liens) of landlords and Liens of carriers, warehousemen, mechanics, materialmen and suppliers and other Liens imposed by law or pursuant to customary reservations or retentions of title arising in the ordinary course of business; provided that such Liens secure only amounts not yet due and payable or, if due and payable, (i) are unfiled and no other action has been taken to enforce the same, (ii) are being contested in good faith by appropriate proceedings for which adequate reserves determined in accordance with GAAP have been established and compliance with the obligation that is the subject of such contest is effectively stayed during such challenge, or (iii) constitute judgment Liens which do not yet cause an Event of Default under Section 9.01(h);

(e)    pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, and any Lien imposed by ERISA not constituting an Event of Default;

(f)    deposits to secure the performance of bids, trade contracts, licenses and leases, statutory obligations, regulatory obligations, environmental obligations, surety bonds, performance bonds and other obligations of a like nature (other than Indebtedness for borrowed money) incurred in the ordinary course of business;

(g)    easements, rights-of-way, restrictions and other similar encumbrances affecting Real Property which, in the aggregate, do not materially detract from the marketability of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(h)    [reserved];

(i)    [reserved];

(j)    any interest of title of a lessor under, and Liens arising from precautionary UCC financing statements (or equivalent filings, registrations or agreements in foreign jurisdictions) solely evidencing such lessor's interest under, leases permitted by this Agreement;

(k)    [reserved];

(l)    customary rights of setoff upon deposits of cash in favor of banks, securities brokers or other depository institutions holding such deposits or securities accounts;

(m)    Liens of a collection bank arising under Section 4-210 of the UCC on items in the course of collection; and

(n)    Liens on insurance proceeds and premium rebates incurred in the ordinary course of business in connection with the financing of insurance premiums.

7.03.  Investments.

Make any Investments, except, to the extent permitted by the DIP Orders and in compliance with the Approved Budget:

(a)    cash or Cash Equivalents;

(b)    accounts receivable created, acquired or made and trade credit extended in the ordinary course of business;

(c)    Investments consisting of stock, obligations, securities or any other property received in settlement of accounts receivable (created in the ordinary course of business) from bankrupt, insolvent or defaulting obligors;

(d)     Investments existing as of the Closing Date and set forth in <u>Schedule 7.03</u>; <u>provided</u> that the amount of such Investment is not increased by subsequent Investments made after the Closing Date except in accordance with this <u>Section 7.03</u>;

(e)     Guarantees and other credit support not prohibited by <u>Section 7.01</u> and other Guarantees and credit support by a Loan Party of obligations of another Loan Party;

(f)     [reserved];

(g)     [reserved];

(h)     Investments by (i) any Loan Party in any other Loan Party (other than Investments in Parent) and (ii) Subsidiaries that are not Loan Parties in any Loan Party or in other Subsidiaries that are not Loan Parties; <u>provided</u>, that no Investments may be made in reliance on this <u>Section 7.03(h)(iii)</u> after the Closing Date without the prior written consent of the Required Lenders;

(i)     [reserved];

(j)     [reserved];

(k)     [reserved]; and

(l)     Investments made to effect, or otherwise in connection with, the transactions contemplated hereby to be consummated on the Closing Date.

Notwithstanding the foregoing, or anything to the contrary contained herein, in no event shall any material IP Rights owned by any Loan Party be contributed as an Investment or otherwise transferred by any Loan Party to any non-Loan Party, other than to the extent constituting a Disposition permitted under <u>Section 7.05(f)</u>.

7.04.    <u>Fundamental Changes.</u>

Merge, dissolve, liquidate, consolidate with or into another Person; <u>provided</u>, <u>however</u>, that, subject to the DIP Orders and the applicable terms of <u>Sections 6.12</u> and <u>6.14</u>: (a) any Loan Party other than Parent may merge or consolidate with any other Loan Party other than Parent; <u>provided</u> <u>further</u> that, if such transaction involves a Borrower, a Borrower is the surviving entity, (b) any Wholly Owned Subsidiary that is not a Loan Party may merge or consolidate with any other Wholly Owned Subsidiary that is not a Loan Party or a Loan Party other than Parent; <u>provided</u> that, if such transaction involves a Loan Party, a Loan Party is the surviving entity, (c) any Subsidiary may merge with any Person that is not a Loan Party in connection with a Disposition permitted under <u>Section 7.05</u>, (d) any Subsidiary (other than, for the avoidance of doubt, Parent) may dissolve, liquidate or wind up its affairs at any time provided that such dissolution, liquidation or winding up, as applicable, could not reasonably be expected to have a Material Adverse Effect, and with respect to any such Subsidiary that is a Loan Party, all of its assets (other than *de minimis* assets) and business is transferred to a Loan Party (other than Parent) in a manner satisfactory to the Administrative Agent, (e) any Person may merge into a Loan Party (other than Parent) in connection with a Permitted Acquisition; <u>provided</u> that such Loan Party is

the surviving entity and (f) any Person may consummate an Investment pursuant to <u>Section 7.03(h)</u>.

7.05.   <u>Dispositions.</u>

Make any Disposition other than:

(a)     sales and other Dispositions of inventory and fitness related equipment or services in the ordinary course of business of the Loan Parties and their Subsidiaries;

(b)     any sale, transfer or other Disposition of Property by any Loan Party to any other Loan Party (other than Property to Parent);

(c)     any sale, transfer or other Disposition of Property by any Subsidiary which is not a Loan Party to any Loan Party (so long as such Property is acquired for fair market value (or less) as determined by the applicable Loan Party in good faith) or to any other Subsidiary which is not a Loan Party;

(d)     the sale, transfer or other Disposition of obsolete, worn out, damaged or surplus Property or fitness equipment which is no longer used or useful in the conduct of business of the Loan Parties and their Subsidiaries;

(e)     any Involuntary Disposition by any Loan Party or any Subsidiary for any transaction not prohibited by the Loan Documents;

(f)     any non-exclusive license or sublicense of any IP Rights (including material IP Rights) by any Loan Party or any Subsidiary in the ordinary course of business; <u>provided</u> that such license or sublicense does not materially impair the business of the Borrowers and their Subsidiaries; <u>provided</u>, <u>further</u>, that licenses and sublicenses of IP Rights to Franchisees in connection with the operation of fitness centers in specific countries or regions, in either case, outside the United States of America may be exclusive as to such country or region and the Loan Parties may enter into exclusive product or co-branding licenses, in each case under this proviso, in the ordinary course of business and <u>provided</u> that such licenses (x) are not sublicensable by the licensee other than with respect to transactions outside the United States (in which case, sublicenses are permitted) and (y) do not materially impair the business of the Borrowers and their Subsidiaries;

(g)     the sale, transfer or other Disposition of accounts receivable constituting bad debts in connection with the compromise, settlement or collection thereof in the ordinary course of business (and not as part of a bulk sale or receivables financing);

(h)     the granting of Franchises with respect to fitness centers and the disposition of property in connection therewith made to Franchisees, other than any conversion of any fitness centers operated by a Loan Party or a Subsidiary of a Loan Party to a franchised fitness center;

(i)     to the extent constituting Dispositions, Liens permitted under <u>Section 7.02</u>, Investments permitted under <u>Section 7.03</u>, and Restricted Payments permitted under <u>Section 7.06</u>;

(j)      the use of cash and Cash Equivalents;

(k)      leases, subleases, licenses and sublicenses of real or personal Property (other than material IP Rights) entered into by Loan Parties or their Subsidiaries in the ordinary course of business at arm's length and on market terms;

(l)      other Dispositions (excluding Dispositions of material IP Rights) by the Borrowers and their Subsidiaries, subject to the sole and exclusive prior written consent of the Administrative Agent and the Required Lenders;

(m)      [reserved];

(n)      any Disposition of Property by any Loan Party in connection with any closure of any fitness club location, subject to the sole and exclusive prior written consent of the Administrative Agent and the Required Lenders;

(o)      any exchange of property for property of like-kind; and

(p)      any Disposition resulting from the consummation of an Investment pursuant to Section 7.03(h).

7.06.    Restricted Payments.

Directly or indirectly make any Restricted Payment, except that each Subsidiary of the Borrowers may make Restricted Payments (directly or indirectly) to any Loan Party (other than Parent) or any Borrower to the extent permitted by the DIP Orders and in compliance with the Approved Budget.

7.07.    Change in Nature of Business.

Engage to any material extent in any business different from the business conducted by the Loan Parties and their Subsidiaries on the Closing Date and businesses reasonably related thereto.

7.08.    Transactions with Affiliates and Insiders.

Consummate any transaction or series of related transactions with any Affiliate of such Person, to the extent permitted by the DIP Orders, other than: (a) transactions between the Loan Parties and (b) transactions expressly permitted by Sections 7.01, 7.02, 7.03, 7.04, 7.05 or 7.06.

7.09.    Burdensome Agreements.

Consummate any Contractual Obligation that encumbers or restricts the ability of any Loan Party or any Subsidiary to (i) pay dividends or make any other distributions to any Loan Party on its Capital Stock or with respect to any other interest or participation in, or measured by, its profits, (ii) pay any Indebtedness or other obligation owed to any Loan Party, (iii) make loans or advances to any Loan Party, (iv) sell, lease or transfer any of its Property to any Loan Party, (v) grant any Lien on any of its Property to secure the Obligations pursuant to the Loan Documents or any

renewals, refinancings, exchanges, refundings or extension thereof or (vi) act as a Loan Party pursuant to the Loan Documents or any renewals, refinancings, exchanges, refundings or extension thereof, except (in respect of any of the matters referred to in clauses (i)-(vi) above) for (A) this Agreement and the other Loan Documents, (B) any document or instrument governing Indebtedness incurred pursuant to Section 7.01(c); provided that any such restriction contained therein relates only to the asset or assets constructed or acquired in connection therewith, (C) any Permitted Lien or any document or instrument governing any Permitted Lien, provided that any such restriction contained therein relates only to the asset or assets subject to such Permitted Lien, (D) customary restrictions and conditions contained in any agreement relating to the sale of any Property permitted under Section 7.05 pending the consummation of such sale; (E) customary anti-assignment provisions in contracts, leases and licenses; (F) prohibitions on transfer in joint venture agreements relative to the joint venture interests and (G) restrictions on or in respect of any Investments permitted in Section 7.03 and/or transactions permitted by Section 7.04.

7.10.    Use of Proceeds.

Use the proceeds of any Credit Extension, Cash Collateral, or other funds or Property for any purpose other than a permitted pursuant to the Approved Budget and DIP Orders.

7.11.    Capital Expenditures.

Incur, or permit to be incurred, any capital expenditures, except as permitted pursuant to the Approved Budget and DIP Orders.

7.12.    Organization Documents; Fiscal Year; Legal Name, State of Formation and Form of Entity.

(a)    Amend, modify or change its Organization Documents in any manner without the prior written consent of the Administrative Agent and the Required Lenders.

(b)    [reserved].

(c)    Change its Fiscal Year.

(d)    Change its name or its state of formation or form of organization without providing ten (10) days prior written notice to the Administrative Agent (or such shorter period as may be agreed to by the Administrative Agent).

7.13.    [Reserved]

7.14.    [Reserved].

7.15.    Limitations on Parent.

Permit Parent to (a) incur any Indebtedness or any other obligation or liability whatsoever other than its obligations under the Loan Documents, liabilities for directors' fees, liabilities for regulatory compliance and maintenance of existence, liabilities covered by insurance or to an insurance provider, liabilities to its shareholders and obligations incidental to its activities as a

holding company (including, in any event, statutory, tax and other similar obligations), (b) [reserved], (c) engage in any material business or activity or own any material assets (including, without limitation, cash and Cash Equivalents) other than (i) holding the Capital Stock of Blink and other Capital Stock of Blink that it may acquire after the Closing Date, (ii) performing its obligations under the Loan Documents, (d) consolidate with or merge with or into, or convey, transfer or lease all of substantially all its assets to, any Person (other than to any Loan Party), or (e) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons; provided, that Parent may enter into any transaction that would result in a Change of Control or transaction prohibited by Section 7.04 (provided however, the foregoing shall not eliminate any Default or Event of Default otherwise resulting therefrom).

7.16.   [Reserved].

7.17.   Anti-Terrorism Laws.

 Conduct, deal in or engage in or permit any Affiliate or agent of any Loan Party within its control to conduct, deal in or engage in any of the following activities: (a) conduct any business or engage in any transaction or dealing with any person blocked pursuant to Executive Order No. 13224 (a "Blocked Person"), including the making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person; (b) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; or (c) engage in on conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224 or the Patriot Act.

7.18.   KEIP Plan.  No Loan Party shall, and no Loan Party shall permit any of its Subsidiaries to, enter into any key employee incentive or retention plan, or other similar plan or agreement (any such agreement, a "KEIP"), unless such KEIP has been approved in writing by the Required Lenders.

7.19.   Chapter 11 Claims.  None of the Loan Parties will, and none will permit any of its Subsidiaries to, incur, create, assume, suffer to exist or permit (other than those existing, and disclosed to the Administrative Agent and Required Lenders, on the date hereof) any administrative expense, unsecured claim, or other super-priority claim or lien (except for the Carve-Out and Permitted Prior Liens to the extent such liens had priority over the liens granted under the Prepetition Credit Agreement) that are pari passu with or senior to the administrative expenses or the claims of the Secured Parties against the Loan Parties hereunder, or apply to the Bankruptcy Court for authority to do so, unless expressly permitted by the DIP Orders.

7.20.   The DIP Orders.  None of the Loan Parties shall, and none will permit any of its Subsidiaries to request any change, amendment or modification, or any application or motion for any change, amendment or modification, to the Interim Order or the Final Order, other than as approved by the Administrative Agent at the direction of the Required Lenders.

7.21.   Critical Vendor and Other Payments. None of the Loan Parties shall, and none will permit any of its Subsidiaries to, make (i) any pre-petition "critical vendor" payments or other payments on account of any creditor's pre-petition unsecured claims, (ii) payments on account of

claims or expenses arising under section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program or (iv) payments under any management incentive plan or on account of claims or expenses arising under Section 503(c) of the Bankruptcy Code, except, in each case, in amounts and on terms and conditions that are permitted by the Approved Budget.

## ARTICLE 8

## [RESERVED]

## ARTICLE 9

## EVENTS OF DEFAULT AND REMEDIES

9.01.    <u>Events of Default.</u>

The existence of any of the following shall constitute an immediate and automatic Event of Default, in each case unless waived in writing by Administrative Agent (at the direction of the Required Lenders):

(a)    <u>Non-Payment</u>. Any Borrower or any other Loan Party fails to pay in full in cash, when and as required to be paid pursuant to this Agreement or any other Loan Document (whether at maturity or otherwise), (i) any amount of principal of any Loan, or (ii) within five (5) Business Days after the same becomes due, any interest on any Loan, or any commitment fee, or other fee due hereunder, or (iii) any other amount payable hereunder, under any other Loan Document; or

(b)    <u>Specific Covenants</u>. Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of <u>Sections 6.01</u>, <u>6.02(j)</u>, <u>6.02(k)</u>, <u>6.03(a)</u> or <u>6.03(b)</u>, <u>6.05</u> (with respect to each Loan Party's existence), <u>6.07</u>, <u>6.10</u>, <u>6.11</u>, <u>6.12</u>, <u>6.14</u>, <u>6.18</u>, <u>6.21</u>, <u>6.22</u>, <u>6.23</u>, <u>6.24</u>, <u>6.25</u>, <u>6.26</u>, <u>6.27</u>, <u>6.28</u>, <u>6.31</u>, <u>Article 7</u>, <u>Article 8</u>, <u>Article 10</u>; <u>provided</u> that the failure of the Loan Parties to deliver to Administrative Agent the financial statements or other documents required by <u>Section 6.01</u> by the date due on one occasion per Fiscal Year shall not constitute an Event of Default so long as such financial statements or documents are delivered to Administrative Agent within five (5) Business Days after the date due; <u>provided</u>, <u>further</u>, that the failure of the Loan Parties to perform, observe or comply with any covenant set forth in <u>Section 6.02</u> (other than <u>Section 6.02(b)</u>), <u>6.03</u> (other than <u>Section 6.03(a)</u> or <u>6.03(b)</u>), <u>6.07</u>, <u>6.14</u> or <u>6.18</u> shall not constitute an Event of Default (or, solely with respect to a failure to comply with <u>Section 6.07</u> or <u>6.14</u>, a Default) so long as such failure is cured or otherwise ceases within three (3) Business Days after the earlier of (x) a Responsible Officer of any Loan Party becoming aware of such failure or (y) notice thereof to any Loan Party by the Administrative Agent or any Lender; or

(c)    <u>Other Defaults</u>. Any Loan Party fails to perform, observe or comply with any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document and such failure continues for three (3) days after the earlier of (x) a Responsible Officer of any Loan Party becoming aware of such failure or (y) notice thereof to any Loan Party by the Administrative Agent or any Lender; or

(d)      Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)      Cross-Default. Except for defaults occasioned by the filing of the Chapter 11 Case and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits the Loan Parties from complying or permits the Loan Parties not to comply, (i) any Loan Party or any Subsidiary fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, but after giving effect to any cure period in respect thereof) in respect of one or more items of Indebtedness; or (ii) any Loan Party or any Subsidiary fails to observe or perform any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; or

(f)      [reserved]; or

(g)      [reserved]; or

(h)      Judgments. At any time Post-Petition there is entered against any Loan Party or any of its Subsidiaries (i) one or more final judgments or orders for the payment of money (including a disgorgement order issued by a Governmental Authority) in an aggregate amount exceeding $25,000, or (ii) one or more non-monetary final non-appealable judgments that has, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of sixty (60) consecutive days during which such judgment or order shall remain undischarged, unsatisfied, unvacated, unbonded or unstayed; or

(i)      ERISA. An ERISA Event occurs which has resulted or could reasonably be expected to result in a Material Adverse Effect or a contribution failure occurs with respect to any Pension Plan sufficient to give rise to a Lien under ERISA;

(j)      Invalidity of Loan Documents. Any material Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect (other than as a result of the action or inaction of any Secured Party) or ceases to give the Administrative Agent for the benefit of the Lenders, a valid and perfected Lien in any material portion of the Collateral purported to be covered by the Loan Documents (taken as a whole) with the priority required by the relevant Loan Document; or any Loan Party or any other Affiliate of a Loan Party contests in any manner the validity or enforceability of any Loan Document; or any Loan Party denies that it

has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document other than pursuant to the terms and conditions thereof;

(k)　　<u>Change of Control</u>. There occurs any Change of Control;

(l)　　[reserved];

(m)　　<u>Board of Directors</u>.  Harvey Spevak or any other employee, consultant or independent contractor to Equinox Group LLC or any of its Affiliates (other than the Loan Parties) shall be appointed to or otherwise serve on any committees or special committees (including, without limitation, the Restructuring Committee of the board of directors of any Blink Board, or act or be appointed as an observer of the Restructuring Committee;

(n)　　<u>Restructuring Committee</u>.  (x) The Restructuring Committee shall (i) be disbanded, dissolved, terminated, or otherwise cease to exist, (ii) directly or indirectly have its duties and responsibilities limited, altered, impaired or otherwise adversely effected, (iii) be prevented from convening, (iv) otherwise cease to act as the Restructuring Committee, in accordance with the Restructuring Committee Appointment Documents (as in effect on the date hereof), or (v) otherwise be restricted and/or prohibited directly or indirectly from discharging its powers and duties as the Restructuring Committee, in accordance with the Restructuring Committee Appointment Documents (as in effect on the date hereof); or (y) the Restructuring Committee shall have one or more members or the Restructuring Committee as a whole relieved of its duties, have one or more independent directors that are members thereof resign or be terminated, in each case, to the extent not replaced within seven (7) Business Days of such termination or resignation by a Person reasonably acceptable to the Administrative Agent and Required Lenders, that in any event, has comparable independence, expertise, experience and market reputation as the outgoing director and shall not be a current or former employee of Equinox Group LLC, any Loan Party or any of their respective Affiliates. For the avoidance of doubt, each of the foregoing shall constitute an Event of Default regardless of the reason for such occurrence, including, without limitation, (i) as a result of any failure by Equinox Group LLC or any of its Affiliates, any Loan Party or any Affiliate thereof to cooperate in good faith with the Restructuring Committee, or (ii) any interference whatsoever by Equinox Group LLC or any of its Affiliates, any Loan Party or any Affiliate with the Restructuring Committee's ability to perform its duties in its role as the Restructuring Committee as set forth in the Restructuring Committee Appointment Documents (as in effect on the date hereof).

(o)　　<u>Restructuring Committee Appointment Documents</u>.  Any change, revision, override, countermand, amendment or other modification of the Restructuring Committee Appointment Documents, as in effect on the date hereof, shall be made, without the prior written consent of the Administrative Agent and the Required Lenders, or any violation or action by any Loan Party whatsoever inconsistent with the Restructuring Committee Appointment Documents.

(p)　　<u>Chapter 11 Case</u>. The occurrence of any of the following in the Chapter 11 Case; provided that with respect to the occurrence set forth in clauses (4), (20), (24), (29) and (30) below, such occurrences shall only constitute Events of Default to the extent not cured by the Loan Parties within five (5) days of written notice thereof (email notice being sufficient) by

Administrative Agent (at the direction of the Required Lenders) (such period, the "Remedies Notice Period"):

(1)     the payment by the Loan Parties of expenses (A) in excess of the amounts permitted by Section 6.31, or (B) otherwise in violation of the terms and condition of Section 6.31;

(2)     the Loan Parties shall enter into, or bring or consent to the bringing of any motion or application, or the Bankruptcy Court shall approve or enter any order authorizing (i) any debtor-in-possession credit facility in the Chapter 11 Case (except as expressly permitted herein) that does not provide for the immediate payment in full in cash of all Obligations upon approval by the Bankruptcy Court, or (ii) any order permitting the use of Cash Collateral of the Loan Parties in the Chapter 11 Case (except as expressly permitted herein), without the consent of the Administrative Agent and Required Lenders, that in any way is inconsistent with any of the provisions of the Loan Documents and the DIP Orders or otherwise adversely affects the rights, remedies, claims, liens or bankruptcy priorities of the administrative Agent and the Lenders as set forth in the Loan Documents and the DIP Orders;

(3)     other than with respect to the DIP Orders, the Loan Parties shall bring or consent to any motion or application, or take any action , or the Bankruptcy Court shall enter any order authorizing the Loan Parties to (A) obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code from any Person other than the Lenders not otherwise permitted by this Agreement, or (B) authorize any Person to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code or otherwise, (C) grant any lien other than Prior Permitted Liens upon or affecting any Collateral, or (D) grant any superpriority claim or liens which are passu with or senior to any claims of Administrative Agent or the Lenders;

(4)     the Bankruptcy Court or any other Governmental Authority shall enter any order or otherwise make any ruling that limits any Loan Party's ability to sell any material portion of its assets or equity interests, free and clear of all liens, encumbrances or other interests;

(5)     any of the Loan Parties or any official committee(s) of unsecured creditors shall make a motion (which has not been objected to by the Loan Parties) for an order of the Bankruptcy Court dismissing any of the Chapter 11 Cases and/or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code without the express prior written consent of the Administrative Agent and Required Lenders;

(6)     an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Case or converting any of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

(7)    any failure by the Loan Parties to make any adequate protection payments or other payments to the Pre-Petition Agent or Pre-Petition Secured Parties as set forth in the DIP Orders in cash, as and when due;

(8)    any failure by the Loan Parties to comply with or perform, in any respect and subject to any applicable cure periods, any of the requirements, terms, provisions, conditions, covenants, or obligations under any DIP Order, or a "Termination Date" under any DIP Order shall occur;

(9)    the Loan Parties shall for any reason fail to remit to the Lenders for application in accordance with the provisions of the Loan Documents any mandatory repayment;

(10)    the occurrence of any Material Adverse Effect on (i) the assets of the Loan Parties, (ii) the ability of the Loan Parties to perform any of their obligations under this Agreement, the other Loan Documents, or the DIP Orders, or (iii) the ability of the Administrative Agent and Lenders to enforce their rights under this Agreement, the other Loan Documents, or the DIP Orders;

(11)    any provision of this Agreement, the other Loan Documents, or the DIP Orders shall cease to be valid and binding on the parties thereto, or the Loan Parties shall so assert in any document filed in any court or extra-judicial proceeding;

(12)    the failure of any liens or security interests securing the Obligations hereunder and all other obligations under the DIP Orders to be valid, perfected, and enforceable in all respects;

(13)    the entry of an order by the Bankruptcy Court appointing an interim or permanent trustee in the Chapter 11 Case or the appointment of an examiner or other responsible person with expanded powers in the Chapter 11 Case pursuant to Section 1104 of the Bankruptcy Code,

(14)    the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any holder or holders of any other security interest or lien (other than Administrative Agent or Lenders) in any DIP Collateral, other than a holder of a Permitted Prior Lien, to permit the pursuit of any judicial or non-judicial transfer or other remedy against any Collateral with a value in excess of $100,000 in the aggregate;

(15)    an order shall be entered by the Bankruptcy Court, or the Loan Parties shall make a motion for an order of the Bankruptcy Court, amending, supplementing, staying, reversing, revoking, rescinding, vacating or otherwise modifying any this Agreement, any other Loan Document, the Interim Order, or the Final Order, or any provision thereof (including, without limitation, Administrative Agent's, any Secured Party's, Pre-Petition Agent's or Pre-Petition Secured Parties' rights, benefits, privileges or remedies hereunder and thereunder), in each case

without the express prior written consent of the Administrative Agent and Required Lenders;

(16)    an order shall be entered by the Bankruptcy Court, or the Loan Parties shall make a motion for an order of the Bankruptcy Court, approving a sale of any assets of any Loan Party pursuant to section 363 of the Bankruptcy Code or approving bidding procedures therefor other than in each case as required in the DIP Orders, without the prior express written consent of the Administrative Agent and Required Lenders;

(17)    in the event a stalking horse purchase agreement is approved by the Bankruptcy Court, the termination of such stalking horse agreement, provided there is no other back-up buyer (as designated pursuant to bid procedures approved by the Bankruptcy Court and such back-up buyer has provided a deposit in accordance with such bid procedures) acceptable to Administrative Agent and Required Lenders;

(18)    any Loan Party, any official committee(s) appointed in the Chapter 11 Case, or any other party in interest in the Chapter 11 Case asserts any claim, challenge, objection, litigation or proceeding challenging the allocation of value of any sale proceeds;

(19)    any of the Loan Parties shall be substantially consolidated or combined with each other or any other Person except pursuant to a confirmed plan of reorganization with the prior written consent of the Administrative Agent and Required Lenders;

(20)    any of the Loan Parties shall propose a chapter 11 plan that does not contain a provision for satisfaction in full in cash of all Obligations on or before the effective date of such plan;

(21)    the initiation of any Challenge (as defined in the applicable DIP Orders) by a party with standing (provided that it shall not constitute an Event of Default under this section for the Committee to conduct a customary investigation related to a potential Challenge);

(22)    except as expressly permitted by the DIP Orders, any Debtor or other party in interest shall directly or indirectly commence, pursue, join, or seek any relief adverse to the interests of any of the Administrative Agent, Lenders, Pre-Petition Agent, or Pre-Petition Lenders with respect to (i) any avoidance actions, (ii) any "lender liability" claims and causes of action; (iii) the validity, enforceability, priority and extent of, or assertion of any defense, counterclaim, or offset to, Obligations, the liens and security interests securing the Obligations, the Pre-Petition Obligations, or the liens and security interests securing the Pre-Petition Obligations; (iv) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part the Obligations or liens and security interests securing the Obligations; (v) any action seeking to modify

any of the rights, remedies, priorities, privileges, protections and benefits granted to the Administrative Agent or Lenders under any of the Loan Documents, including, claims, proceedings, or actions that might prevent, hinder or delay any of its assertions, enforcements, realizations, or remedies on or against the Collateral in accordance with the Loan Documents; (vi) any objection to, contest of, or interference with the Administrative Agent's or Lenders' enforcement or realization upon any of the Collateral following the occurrence of any other Event of Default; (vii) any objection to contest of, or interference with the Administrative Agent's or Pre-Petition Agent's rights to credit bid on the DIP Collateral or the collateral securing the Pre-Petition Obligations, as applicable; or (viii) any action seeking to equitably subordinated or recharacterize in whole or in part of the claims of the Administrative Agent or any Secured Party in respect of the Obligations or the Pre-Petition Agent or any Pre-Petition Secured Party in respect of the Pre-Petition Obligations or in each case the entry of an order by the Bankruptcy Court granting the relief described above;

(23)    the application by the Loan Parties for authority to make any Pre-Petition Payment not contemplated by the Approved Budget without the Required Lenders' prior written consent;

(24)    the Loan Parties shall fail to provide an Approved Budget that is acceptable to the Administrative Agent and Required Lenders;

(25)    the Loan Parties shall not be in compliance with the then current Approved Budget (subject to any permitted variances), or the most recent Approved Budget shall have expired;

(26)    the entry of an order in the Chapter 11 Case avoiding or requiring disgorgement of any portion of the Pre-Petition Obligations;

(27)    the Loan Parties shall make any payment of principal or interest or otherwise on account of any prepetition indebtedness to the extent not authorized by the Approved Budget;

(28)    the use, remittance or the application of Collateral or proceeds of Collateral in contravention of the terms of the Loan Documents or the DIP Orders;

(29)    the Loan Parties shall fail to timely deliver a Variance Report or Compliance Certificate;

(30)    the Loan Parties shall not be in compliance with the "Budget Covenant (as such term is defined in the DIP Orders), or the Loan Parties shall make a disbursement in excess of the variances provided for or permitted in any DIP Order;

(31)    the Loan Parties shall fail to maintain sufficient projected borrowing capacity to pay (i) all accrued administrative obligations and other administrative claims in the Chapter 11 Case when due or (ii) such other unpaid administrative

obligations and administrative claims that are required to be paid in full prior to such time that the Obligations are indefeasibly paid in full in cash.

(32)    without the prior written consent of the Administrative Agent and Required Lenders, the Loan Parties incur, create, assume, suffer to exist or permit any superpriority claim in the Chapter 11 Case that is pari passu with or senior to the claims of the Secured Parties and Administrative Agent, other than the Carve-Out;

(33)    the Bankruptcy Court enters an order (a) resulting in the marshaling of any Collateral, or (b) precluding the attachment of liens to Post-Petition property based on the "equities of the case" under Section 552(b) of the Bankruptcy Code;

(34)    the Loan Parties request or seek authority for or entry of an order that approves or provides authority to take any other action or actions adverse to the Administrative Agent or any Secured Party or its rights and remedies under the Loan Documents or its interest in the Collateral;

(35)    the termination or modification of the Borrower's exclusivity as to the proposal of any plan or reorganization or liquidation;

(36)    in the event the Administrative Agent (at the direction of the Required Lenders) elects to file a chapter 11 plan, any Loan Party fails to actively cooperate and support the formulation, drafting, filing, prosecution and consummation of such plan, including any documents related thereto;

(37)    the failure, on or before the time prescribed therefor herein or in any DIP Order, by any Loan Party to comply with any of the Milestones set forth in the applicable DIP Orders;

(38)    the change of venue of any of the Chapter 11 Case from the Bankruptcy Court to any other court without the prior written consent of the Administrative Agent and Required Lenders; or

(39)    on or after the Petition Date, the Loan Parties, without the prior written consent of the Administrative Agent and Pre-Petition Agent, file any motions or pleadings with the Bankruptcy Court seeking (i) authority for the Loan Parties to (x) use any of the properties or assets of the Loan Parties outside the ordinary course of business, (y) satisfy prepetition claims of the Loan Parties (except as provided in the Approved Budget in accordance with the DIP Orders), or (z) incur material administrative costs, in each case, to the extent such relief is inconsistent with the DIP Orders and the Loan Documents (including the Approved Budget), (ii) to reject or assume any contract, agreement, lease or other agreement to which any Loan Party is a party, or (iii) relief that is otherwise inconsistent with the Loan Documents and the DIP Orders.

9.02.    <u>Remedies Upon Event of Default.</u>

Immediately upon the occurrence and during the continuance of any Event of Default (or, if applicable, upon the termination of any Remedies Notice Period), and subject to the terms set forth in the DIP orders, the Administrative Agent may (and shall at the direction of Required Lenders) deliver to the Loan Parties a Termination Declaration, with copies to be delivered to any official committee(s) of creditors and the United States Trustee for the District of Delaware (email notice being sufficient),  declaring that, effective as of the date the Termination Declaration is delivered to the Loan Parties (such date, the "Termination Date"):

(a)      all or any portion of any one or more of the Commitments of each Lender to make Loans to be suspended or terminated, whereupon all or such portion of such Commitments shall forthwith be suspended or terminated;

(b)      all or any portion of the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each Loan Party; and/or

(c)      a termination, reduction or restriction on the ability of the Loan Parties to use any Cash Collateral

In addition, subject to the terms of the applicable DIP Order, immediately upon the delivery of a Termination Declaration, Administrative Agent (at the direction of the Required Lenders) shall be entitled to take any other actions and exercise any and all rights and remedies available to it and the Lenders under the applicable DIP Order, the Loan Documents, or other applicable law, including, without limitation, foreclosing on all or any portion of the Collateral, collecting accounts receivable and applying the proceeds thereof to the Obligations, occupying the Loan Parties' premises to sell or otherwise dispose of the Collateral or otherwise exercising remedies against the Collateral permitted by applicable non-bankruptcy law.

9.03.   <u>Remedies Notice Period.</u> Subject to the terms of the applicable DIP Orders, during the Remedies Notice Period, the Loan Parties and any statutory committee shall be entitled to an emergency hearing before the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred. Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred or is not continuing, the automatic stay, as to the Lenders and the Administrative Agent, shall, only to the extent permitted in the DIP Orders and if so permitted, subject to the terms of the DIP Orders, automatically terminate at the end of the Remedies Notice Period, without further notice or order. During the Remedies Notice Period, the Loan Parties may not use the proceeds of Loans hereunder, Cash Collateral, or other Collateral proceeds except to the limited extent permitted by the DIP Orders.

9.04.   <u>[Reserved].</u>

9.05.   <u>Application of Funds.</u>

Upon the occurrence and during the continuance of an Event of Default (or after the Loans have otherwise become due and payable as set forth in the proviso to <u>Section 9.02</u>), any amounts

received on account of the Obligations shall be applied by the Administrative Agent in the following order:

(a)     <u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including Attorney Costs and amounts payable under <u>Article 3</u>) payable to the Administrative Agent in its capacity as such;

(b)     <u>Second</u>, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs and amounts payable under <u>Article 3</u>), ratably among them in proportion to the amounts described in this clause (c) payable to them;

(c)     <u>Third</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest on the New Money DIP Loans and Roll-Up Loans constituting Prepetition Protective Advances, ratably among the Lenders in proportion to the respective amounts described in this clause (c) held by them;

(d)     <u>Fourth</u>, to payment of that portion of the Obligations constituting unpaid principal of the New Money DIP Loans and Roll-Up Loans constituting Prepetition Protective Advances, ratably among the New Money DIP Lenders and Roll-Up Lenders in proportion to the respective amounts described in this clause (d) held by them;

(e)     <u>Fifth</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Roll-Up Loans, other than Roll-Up Loans constituting Prepetition Protective Advances (including for purposes of clarification, all interest and fees accruing on the Roll-Up Loans prior to the date such interest or fees is capitalized and constitutes a portion of the PIK Amounts), ratably among the Roll-Up Loan Lenders in proportion to the respective amounts described in this clause (e) held by them;

(f)     <u>Sixth</u>, to the payment of any other unpaid Obligations; and

(g)     <u>Last</u>, the balance, if any, after all of the Obligations (other than contingent obligations in respect of contingent indemnity obligations which, in each case, have not been asserted) have been paid in full, to the Borrowers or as otherwise required by Law.

## ARTICLE 10

## GUARANTY

10.01.  <u>The Guaranty.</u>

Each Guarantor hereby guarantees to each Secured Party and the Administrative Agent as hereinafter provided, as primary obligor and not as surety, the prompt payment and performance of the Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise) strictly in accordance with the terms thereof. Each Guarantor hereby further agrees that if any of the Obligations are not paid in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise), each Guarantor will promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of

time of payment or renewal of any of the Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration or otherwise) in accordance with the terms of such extension or renewal (collectively, the "Guaranteed Obligations").

Subject to Section 10.06 and the last sentence of this Section 10.01 below, the Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which the Administrative Agent or any Secured Party may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of any Guaranteed Obligations to be paid when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code), the Guarantors will, upon demand pay, or cause to be paid, in cash, to the Administrative Agent for the ratable benefit of Secured Parties, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including any interest which, but for any Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against any Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to the Secured Parties as aforesaid.

Notwithstanding any provision to the contrary contained herein or in any other of the Loan Documents, the Guaranteed Obligations of each Guarantor under this Agreement and the other Loan Documents shall be limited to an aggregate amount equal to the largest amount that would not render such obligations subject to avoidance under any Debtor Relief Law.

10.02. Obligations Unconditional.

The Guaranteed Obligations of each Guarantor under Section 10.01 are joint and several and absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Loan Documents or any other agreement or instrument referred to therein, or any substitution, release, impairment or exchange of any other guarantee of or security for any of the Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor (other than the defense of payment in full of the Guaranteed Obligations), it being the intent of this Section 10.02 that the obligations of each Guarantor hereunder shall be absolute and unconditional under any and all circumstances. Each Guarantor agrees that such Guarantor shall have no right of subrogation, indemnity, reimbursement or contribution against the Borrowers or any other Guarantor for amounts paid under this Article 10 until the Maturity Date. Without limiting the generality of the foregoing, it is agreed that, to the fullest extent permitted by law, the occurrence of any one or more of the following shall not alter or impair the liability of any Guarantor hereunder, which shall remain joint and several and absolute and unconditional as described above:

(a)    at any time or from time to time, without notice to any Guarantor, the time for any performance of or compliance with any of the Obligations shall be extended, or such performance or compliance shall be waived;

(b)      any of the acts mentioned in any of the provisions of any of the Loan Documents or any other agreement or instrument referred to in the Loan Documents shall be done or omitted;

(c)      the maturity of any of the Obligations shall be accelerated, or any of the Obligations shall be modified, supplemented or amended in any respect, or any right under any of the Loan Documents or any other agreement or instrument referred to in the Loan Documents shall be waived or any other guarantee of any of the Obligations or any security therefor shall be released, impaired or exchanged in whole or in part or otherwise dealt with;

(d)      any Lien granted to, or in favor of, the Administrative Agent or any Secured Party or Secured Parties as security for any of the Obligations shall fail to attach or be perfected;

(e)      any of the Obligations shall be determined to be void or voidable (including for the benefit of any creditor of any Guarantor) or shall be subordinated to the claims of any Person (including any creditor of any Guarantor); or

(f)      any other action or inaction shall occur that might constitute a surety defense other than payment and performance in full of the Guaranteed Obligations (other than contingent obligations in respect of contingent indemnity obligations which, in each case, have not been asserted).

10.03.  Reinstatement.

The Guaranteed Obligations of any Guarantor under this Article 10 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Person in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and each Guarantor agrees that it will indemnify the Administrative Agent and each Secured Party on demand for all reasonable costs and expenses (including fees and expenses of counsel) incurred by the Administrative Agent or such Secured Party in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

10.04.  Waivers.

Each Guarantor hereby waives, to the fullest extent permitted by Law, for the benefit of the Administrative Agent and the Lenders: (a) any right to require the Administrative Agent or any Lender, as a condition of payment or performance by such Guarantor, to (i) proceed against any Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from any Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of the Administrative Agent and the Lenders in favor of any Borrower or any other Person, or (iv) pursue any other remedy in the power of the Administrative Agent and the Lenders whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of any Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed

Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of any Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal or any law, rule, regulation, or order of any jurisdiction affecting any term of the Guaranteed Obligations; (d) any defense based upon the Administrative Agent's, or any Lender's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that the Administrative Agent and the Lenders protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default under any Loan Document or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to any Borrower and notices of any of the matters referred to in Section 10.02 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof. Each Guarantor agrees that such Guarantor shall have no right of recourse to security for the Obligations, except through the exercise of rights of subrogation to the extent permitted by Section 10.02.

10.05.  Remedies.

Subject to the DIP Orders, each Guarantor agrees that, to the fullest extent permitted by law, as between such Guarantor, on the one hand, and the Administrative Agent and the Lenders, on the other hand, the Obligations may be declared to be forthwith due and payable as provided in Section 9.02 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 9.02) for purposes of Section 10.01 notwithstanding any stay, injunction or other prohibition preventing such declaration (or preventing the Obligations from becoming automatically due and payable) as against any other Person and that, in the event of such declaration (or the Obligations being deemed to have become automatically due and payable), the Obligations (whether or not due and payable by any other Person) shall forthwith become due and payable by each Guarantor for purposes of Section 10.01. Each Guarantor acknowledges and agrees that its Guaranteed Obligations hereunder are secured in accordance with the terms of the Collateral Documents and that the Lenders may exercise their remedies thereunder in accordance with the terms thereof.

10.06.  Contribution by Guarantors.

All Guarantors desire to allocate among themselves (collectively, the "Contributing Guarantors"), in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "Funding Guarantor") under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other

Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date. "Fair Share" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the obligations Guaranteed. "Fair Share Contribution Amount" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of the Bankruptcy Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Guarantor for purposes of this Section 10.06, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor. "Aggregate Payments" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including in respect of this Section 10.06), minus the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 10.06. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor. The allocation among Contributing Guarantors of their obligations as set forth in this Section 10.06 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 10.06 and a right to receive any Fair Share Contribution Amount shall be deemed an asset of the Guarantor entitled to such amount.

10.07.  Guarantee of Payment; Continuing Guarantee.

The guarantee in this Article 10 is an absolute and unconditional guaranty of payment and not of collection, is a continuing and irrevocable guarantee, and shall apply to all Obligations whenever arising.

10.08.  Subordination of Other Obligations.

Any Indebtedness of any Borrower or any Guarantor now or hereafter owing to any Guarantor (the "Obligee Guarantor") is hereby subordinated in right of payment to the Guaranteed Obligations.

## ARTICLE 11

## THE ADMINISTRATIVE AGENT

11.01.  Appointment and Authorization of Administrative Agent.

Each Secured Party hereby irrevocably appoints, designates and authorizes the Administrative Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto, including that the Administrative Agent may take any action required pursuant to the DIP Orders or any other order issued by the Bankruptcy Court. Notwithstanding any provision to the contrary contained elsewhere herein or in any other Loan Document, neither Agent shall have any duties or responsibilities, except those expressly set forth herein, nor shall either Agent have or be deemed to have any fiduciary relationship with any Secured Party or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against either Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

11.02.   Delegation of Duties.

The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document by or through their, or their Affiliates', agents, employees or attorneys-in-fact and shall be entitled to obtain and rely upon the advice of counsel and other consultants or experts concerning all matters pertaining to such duties. The Administrative Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects in the absence of the Administrative Agent's gross negligence or willful misconduct (as finally determined in a non-appealable decision of a court of competent jurisdiction).

11.03.   Liability of Administrative Agent.

No Agent-Related Person shall be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby, and each Loan Party and Secured Party hereby waives and agrees not to assert any right, claim or cause of action based thereon, except to the extent of liabilities resulting primarily from its own gross negligence or willful misconduct in connection with its duties expressly set forth herein, as finally determined in a non- appealable decision of a court of competent jurisdiction. Without limiting the foregoing, no Agent- Related Person shall be: (i) responsible to any other Secured Party for the due execution, validity, genuineness, effectiveness, sufficiency, or enforceability of, or for any recital, statement, warranty or representation in, this Agreement, any other Loan Document or any related agreement, document or order; (ii) required to ascertain or to make any inquiry concerning the performance or observance by any Loan Party of any of the terms, conditions, covenants, or agreements of this Agreement or any of the Loan Documents; (iii) responsible to any other Secured Party for the state or condition of any properties of the Loan Parties constituting Collateral for the Obligations or any information contained in the books or records of the Loan Parties; (iv) responsible to any other Secured Party for the validity, enforceability, collectability, effectiveness or genuineness of this Agreement or any other Loan Document or any other certificate, document or instrument furnished

in connection therewith; or (v) responsible to any other Secured Party for the validity, priority or perfection of any Lien securing or purporting to secure the Obligations or for the value or sufficiency of any of the Collateral.

11.04.  <u>Reliance by Administrative Agent.</u>

(a)    The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by the Administrative Agent. The Administrative Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders, as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Secured Parties against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Secured Parties. Notwithstanding the foregoing, the Administrative Agent shall not be required to take, or to omit to take, any action that is, in the opinion of the Administrative Agent or their counsel, contrary to any Loan Document or applicable Requirement of Law.

(b)    For purposes of determining compliance with the conditions specified in <u>Sections 4.01</u> and <u>4.02</u>, each Lender that has signed this Agreement (or an addendum or joinder to this Agreement) shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

11.05.  <u>Notice of Default.</u>

The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default and/or Event of Default, unless the Administrative Agent shall have received written notice from a Lender or any Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." The Administrative Agent will notify the Lenders of its receipt of any such notice. The Administrative Agent shall take such action with respect to such Default and/or Event of Default as may be directed by the Required Lenders, as applicable, in accordance with <u>Article 9</u>; <u>provided</u>, that unless and until the Administrative Agent has received any such direction, Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default and/or Event of Default as it shall deem advisable or in the best interest of the Lenders.

### 11.06.  Credit Decision; Disclosure of Information by Administrative Agent.

Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent-Related Person hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession. Each Lender represents to the Administrative Agent that it has, independently and without reliance upon any Agent- Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrowers and the other Loan Parties hereunder. Each Lender also represents that it will, independently and without reliance upon any Agent- Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrowers and the other Loan Parties. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent herein, no Agent-Related Person shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

### 11.07.  Indemnification of Administrative Agent.

Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities incurred by it, provided, however, that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities to the extent determined in a final, nonappealable judgment by a court of competent jurisdiction to have resulted primarily from such Agent-Related Person's own gross negligence or willful misconduct, provided, however, that no action taken in accordance with the directions of the Required Lenders shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 11.07.  Without limitation of the foregoing, each Lender shall reimburse each Agent-Related Person upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by any Agent-Related Person in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein.  The obligations of the Lenders hereunder shall not diminish the obligations of the Borrowers to indemnify and reimburse the Agent-Related Parties for such amounts.  The Administrative Agent may in their

discretion first seek payment from the Lenders hereunder before seeking payment from the Borrowers for such amounts or may seek payments first from the Borrowers.  In any event, any amounts received from Borrowers as reimbursement for amounts already reimbursed by Lenders shall be paid to Lenders in accordance with the terms hereof.  The undertaking in this <u>Section 11.07</u> shall survive the Maturity Date and the resignation of the Administrative Agent.

11.08.  <u>Administrative Agent in its Individual Capacity.</u>

Administrative Agent and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though Administrative Agent were not the Administrative Agent hereunder and without notice to or consent of the Lenders.  The Lenders acknowledge that, pursuant to such activities, Administrative Agent or its Affiliates may receive information regarding any Loan Party or its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Administrative Agent shall be under no obligation to provide such information to them. With respect to its Loans, Administrative Agent and/or their Affiliates (as applicable) shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" include the Administrative Agent and/or their Affiliates (as applicable) in their individual capacities.

11.09.  <u>Successor Administrative Agent.</u>

The Administrative Agent may resign as the Administrative Agent upon thirty (30) days' notice to the Lenders. If Administrative Agent resigns under this Agreement, the Required Lenders shall appoint from among the Lenders (or the affiliates thereof) a successor administrative agent, for the Lenders, which successor agent shall (unless an Event of Default has occurred and is continuing) be subject to the approval of the Borrower Representative (which approval shall not be unreasonably withheld or delayed). If no successor agent is appointed prior to the effective date of the resignation of the Administrative Agent, such resigning Agent may appoint, after consulting with the Lenders, a successor agent from among the Lenders (or the affiliates thereof); <u>provided</u>, that  such successor Administrative Agent shall be a Roll-Up Lender (other than an Affiliated Lender) unless no such Roll-Up Lender will accept such appointment.  Upon the acceptance of its appointment as successor administrative agent hereunder, the Person acting as such successor administrative agent shall succeed to all the rights, powers and duties of the retiring Administrative Agent and the respective terms "Administrative Agent" shall mean such successor administrative agent, and the retiring Administrative Agent's appointment, powers and duties in such capacities shall be terminated without any other further act or deed on its behalf. After any retiring Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this <u>Article 11</u> and <u>Sections 12.04</u> and <u>12.05</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under this Agreement or while it was actively engaged in transferring its rights and obligations as Administrative Agent to the successor administrative agent. If no successor administrative agent has accepted appointment as the Administrative Agent by the date ten (10) days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon

become effective and the Required Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor administrative agent as provided for above.

11.10.  <u>Administrative Agent May File Proofs of Claim.</u>

In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Loan Parties), shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Secured Parties and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Secured Parties and Administrative Agent and their respective agents and counsel and all other amounts due the Secured Parties and Administrative Agent under <u>Sections 2.09</u> and <u>12.04</u>) allowed in such judicial proceeding;

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(c)    and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Secured Party to make such payments to the Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to the Secured Parties, to pay to Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent under <u>Sections 2.09</u> and <u>12.04</u>.

11.11.  <u>Collateral and Guaranty Matters.</u>

The Secured Parties irrevocably authorize the Administrative Agent, at its option and in its discretion, to release any Guarantor and any Lien on any Collateral granted to or held by the Administrative Agent under any Loan Document (i) upon the Maturity Date, (ii) that is transferred or to be transferred as part of or in connection with any disposition permitted hereunder or under any other Loan Document, (iii) pursuant to this <u>Section 11.11</u>, or (iv) as approved in accordance with <u>Section 12.01</u>. Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of Property, pursuant to this <u>Section 11.11</u>.

Notwithstanding any other provision of this Agreement or any other Loan Document: (x) the Collateral shall exclude all Capital Stock of Equinox Group LLC and all assets or property of Equinox Group LLC owned by Predecessor Parent whether now existing or hereafter arising or acquired from time to time and (y) any security interest or Lien in favor of the Secured Parties shall not extend to or be deemed to encumber any Capital Stock of Equinox Group LLC and the

assets or property of Equinox Group LLC owned by Predecessor Parent whether now existing or hereafter arising or acquired from time to time.

11.12.  <u>Other Agents; Arrangers and Managers.</u>

None of the Lenders or other Persons identified on the facing page or signature pages of this Agreement as a "syndication agent," "documentation agent," "co-agent," "book manager," "lead manager," "arranger," "lead arranger" or "co-arranger" (each, an "<u>Additional Titled Agent</u>") shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than, in the case of such Lenders, those applicable to all Lenders as such. Without limiting the foregoing, no Additional Titled Agent shall have or be deemed to have any fiduciary relationship with any Lender. Each Lender acknowledges that it has not relied, and will not rely, on any Additional Titled Agent in deciding to enter into this Agreement or in taking or not taking action hereunder. At any time that any Lender serving as an Additional Titled Agent shall have transferred to any other Person (other than any Affiliates) all of its interests in the Loans, such Lender shall be deemed to have concurrently resigned as such Additional Titled Agent.

11.13.  <u>Additional Secured Parties.</u>

The benefit of the provisions of the Loan Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not a Lender, and designated by the Borrowers as such, as long as, by accepting such benefits, such Secured Party agrees, as among the Administrative Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by the Administrative Agent, shall confirm such agreement in a writing in form and substance acceptable to the Administrative Agent) this <u>Article 11</u>, <u>Section 2.13</u> (Sharing of Payments), <u>Section 12.08</u> (Confidentiality) and <u>Section 12.09</u> (Setoff), and the decisions and actions of the Administrative Agent and the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders) to the same extent a Lender is bound; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing, (a) such Secured Party shall be bound by <u>Section 11.07</u> (Indemnification of Administrative Agent) only to the extent of liabilities, costs and expenses with respect to or otherwise relating to the Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of ratability or similar concept, (b) except as set forth specifically herein, the Administrative Agent shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (c) except as set forth specifically herein, such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

11.14.  <u>Erroneous Payments</u>.

(a)     Each Lender hereby agrees that (a) if an Agent notifies such Lender (such notice, an "<u>Erroneous Payment Notice</u>") that Administrative Agent has determined in its sole discretion that any funds received by such Lender from Administrative Agent or any of its Affiliates within the preceding ninety (90) day period were erroneously or mistakenly transmitted

to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "Erroneous Payment") and demands in writing the return of such Erroneous Payment (or a portion thereof), such Lender shall promptly, but in no event later than two (2) Business Days thereafter, return to Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (b) to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by Administrative Agent for the return of any Erroneous Payments received, including, without limitation, waiver of any defense based on "discharge for value" or any similar theory or doctrine.  A notice of an Agent to any Lender under this Section 11.14(a) shall be conclusive, absent manifest error

(b)    Without limiting immediately preceding Section 11.14(a), each Lender hereby further agrees that if it receives a payment from an Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by Administrative Agent, (y) that was not preceded or accompanied by notice of payment, or (z) that such Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each case, if an error has been made each such Lender is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment, and to the extent permitted by applicable Law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by Administrative Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar theory or doctrine.  Each Lender agrees that, in each such case, it shall promptly (and, in all events, within one (1) Business Day of its knowledge (or deemed knowledge) of such error) notify Administrative Agent of such occurrence and, upon demand from Administrative Agent, it shall promptly, but in all events no later than two (2) Business Days thereafter, return to Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c)    Borrowers and each other Loan Party hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Erroneous Payment (or portion thereof) for any reason (and without limiting each Agent's rights and remedies under this Section 11.14), the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by Borrowers or any other

Loan Party; <u>provided</u> that this Section 11.14 shall not be interpreted to increase (or accelerate the due date of), or have the effect of increasing (or accelerating the due date of), the Obligations of the Borrowers relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by the Administrative Agent; _provided_, further, that for the avoidance of doubt, the immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from any Borrower or any other Loan Party for the purpose of making such Erroneous Payment.

(d)    In addition to any rights and remedies of each Agent provided by law, each Agent shall have the right, without prior notice to any Lender, any such notice being expressly waived by such Lender to the extent permitted by applicable law, with respect to any Erroneous Payment for which a demand has been made in accordance with this Section 11.14 and which has not been returned to Administrative Agent, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Administrative Agent or any of its Affiliate, branch or agency thereof to or for the credit or the account of such Lender.  Each Agent agrees promptly to notify the Lender after any such setoff and application made by Administrative Agent; _provided_, that the failure to give such notice shall not affect the validity of such setoff and application.

(e)    Each party's obligations under this Section 11.14 shall survive the resignation or replacement of an Agent, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

## ARTICLE 12

## MISCELLANEOUS

12.01.  Amendments, Etc.

(a)    No amendment or waiver of any provision of any Loan Document (other than any Control Agreement, and no consent to any departure by any Borrower or any other Loan Party therefrom, shall be effective unless in writing executed by (1) in the case of any amendment, consent or waiver to cure any ambiguity, omission, defect or inconsistency or granting a new Lien for the benefit of the Secured Parties or extending any existing Lien over additional property or adding additional Subsidiaries of Parent or other pledgors as parties thereto, the Administrative Agent and the applicable Borrower or Loan Party, (2) in the case of any amendment necessary to implement the terms of a Facilities Increase in accordance with the terms hereof, the Administrative Agent, the Borrowers and the Participating Lenders and (3) in the case of any other amendment, consent or waiver, the Required Lenders (or the Administrative Agent with the consent of the Required Lenders) and the applicable Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent; _provided_, that no such amendment, waiver or consent shall:

(1)    extend the expiry or increase the amount of the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 9.02) without the written consent of such Lender (it being understood and agreed that a waiver or amendment of any condition precedent set forth in Section 4.02 or of any Default or Event of Default shall not be considered an extension or increase in Commitments of any Lender);

(2)    postpone any date fixed by this Agreement or any other Loan Document for any payment of principal (excluding mandatory prepayments), interest, fees, or other amounts due to the Lenders (or any of them) hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby;

(3)    reduce or forgive the principal of, or the rate of interest specified herein on, any Loan or Unreimbursed Amounts, or any fees, or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby, provided, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate;

(4)    change Section 2.13 or Section 9.05 or the definition of "Pro Rata Share" in a manner that would alter the pro rata sharing or application of payments required thereby without the written consent of each Lender directly affected thereby;

(5)    change any provision of this Section 12.01 or the definition of "Required Lenders", or any other provision of any Loan Document specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights thereunder or make any determination or grant any consent thereunder without the written consent of each Lender;

(6)    release all or substantially all of the Collateral without the written consent of each Lender (except on the Maturity Date); or

(7)    release any Borrower, or release all or substantially all of the Guarantors from their obligations under the Loan Documents (or otherwise limit such Guarantors liability) without the written consent of each Lender (except on the Maturity Date); or

(8)    without the written consent of each Lender, increase the maximum aggregate principal amount of Roll-Up Loans and/or New Money DIP Loans (including participations or unfunded commitments in respect thereof) permitted to be held pursuant to Section 12.07(i)(i)(C) by Affiliated Lenders, or otherwise amend Section 12.07(i) or the definition of "Affiliated Lender" or "Debt Fund Affiliate"; or

(9)    subordinate the Liens on the Collateral securing the Obligations or subordinate all or any portion of the Obligations in right of payment (in each case, whether contractual, effective or otherwise) to any other Indebtedness;

and, provided further, that no amendment, waiver or consent shall, unless in writing and executed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document.

Notwithstanding the foregoing, this Agreement may be amended with the written consent of the Required Lenders, the Administrative Agent, and the Borrowers (a) to add one or more additional credit facilities or extensions of credit to this Agreement and to permit such extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Roll-Up Loans, the New Money DIP Loans and the accrued interest and fees in respect thereof and (b) to include the Lenders holding such loans and commitments in any determination of Required Lenders; provided that, no such amendment shall create one or more new term loans in a separate facility from the Roll-Up Loans without the written consent of each of the Roll-Up Lenders as of the effectiveness of such amendment.

Each waiver or consent under any Loan Document shall be effective only in the specific instance and for the specific purpose for which it was given.

12.02.  Notices and Other Communications; Facsimile Copies.

(a)  General. Unless otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (messages sent by electronic mail or other electronic transmission (other than by facsimile) shall not constitute a writing, however any signature on a document or other writing that is transmitted by electronic mail shall constitute a valid signature for the purposes hereof). All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or (subject to subsection (c) below) electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)  if to the Loan Parties, the Borrower Representative, or the Administrative Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 12.02 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Borrower Representative, Administrative Agent; and

(ii)  if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Borrower Representative and Administrative Agent.

All such notices and other communications shall be deemed to be delivered or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when received by the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of subsection (c) below), when delivered, provided,

*however*, that notices and other communications to the Administrative Agent pursuant to Article 2 shall not be effective until actually received by such Person; provided, however, notices received after 5:00 p.m. on any day shall be deemed received on the next Business Day. In no event shall a voicemail message be effective as a notice, communication or confirmation hereunder.

(b)    Effectiveness of Facsimile Documents and Signatures. Loan Documents may be transmitted and/or executed by facsimile. The effectiveness of any such documents and signatures shall, subject to applicable Law, have the same force and effect as manually signed originals and shall be binding on all Loan Parties, the Administrative Agent and the Lenders. The Administrative Agent may also require that any such documents and signatures be confirmed by a manually signed original thereof; provided, that the failure to request or deliver the same shall not limit the effectiveness of any facsimile document or signature.

(c)    [Reserved].

(d)    Reliance by Administrative Agent and Lenders. The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Loan Notices) purportedly delivered by or on behalf of any Loan Party or the Borrower Representative even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrowers shall indemnify each Agent-Related Person and each Lender from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly delivered by or on behalf of any Loan Party or Borrower Representative. All telephonic notices to and other communications with the Administrative Agent may be recorded by Administrative Agent, and each of the parties hereto hereby consents to such recording.

12.03.    No Waiver; Cumulative Remedies.

No failure by any Lender, the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

12.04.    Attorney Costs, Expenses.

Any action taken by any Loan Party under or with respect to any Loan Document, even if required under any Loan Document or at the request of any Lender, shall be at the expense of such Loan Party, and no Lender shall be required under any Loan Document to reimburse any Loan Party therefor except as expressly provided therein. The Borrowers agree (a) to pay or reimburse the Administrative Agent for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the Chapter 11 Case, the negotiation and execution of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated hereby or thereby are consummated), and the consummation, syndication and administration of the transactions

contemplated hereby, including all Attorney Costs (limited, in any event, to one primary counsel and one local counsel in any relevant jurisdictions) and reasonable and documented out-of-pocket costs and expenses in connection with the use of IntraLinks, SyndTrak, StuckyNet, or other similar information transmission systems in connection with this Agreement, and (b) to pay or reimburse the Administrative Agent, and each Lender for all out-of-pocket costs and expenses incurred in connection with the enforcement, attempted enforcement, or preservation of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any "workout" or restructuring in respect of the Obligations and during any legal proceeding, including any proceeding under any Debtor Relief Law), including all Attorney Costs (limited to one counsel for the Administrative Agent and each Lender, collectively, plus solely in the case of an actual or perceived conflict of interest, additional counsel for all such Persons claiming a conflict of interest, and one local counsel in any relevant jurisdiction for all such Persons collectively, plus solely in the case of an actual or perceived conflict of interest, additional counsel for all such Persons claiming a conflict of interest). The foregoing costs and expenses shall include all search, filing, recording, title insurance and appraisal charges and fees and taxes related thereto, and other out-of-pocket expenses incurred by the Administrative Agent and the reasonable and documented cost of independent public accountants, consultants and other outside experts retained by the Administrative Agent or any Lender. All amounts due under this <u>Section 12.04</u> shall be deemed part of the Obligations when incurred and shall be payable within twenty (20) Business Days after demand therefor; <u>provided</u>, that, the Administrative Agent may at any time, subject to the DIP Orders, draw on the New Money DIP Commitment for the purposes of paying all amount due under this <u>Section 12.04</u>.

. The agreements in this <u>Section 12.04</u> shall survive the Maturity Date.

12.05.  <u>Indemnification by the Loan Parties.</u>

Whether or not the transactions contemplated hereby are consummated, the Loan Parties agree jointly and severally to indemnify and hold harmless each Agent-Related Person (other than any Approved Fund), each Lender and the respective Affiliates of all such Persons, and the directors, officers, employees, counsel, trustees, advisors, agents and attorneys-in-fact of all of the foregoing Persons (collectively the "Indemnitees") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including Attorney Costs (limited to one counsel to the Indemnitees taken as a whole and, solely in the case of an actual or perceived conflict of interest, one additional counsel in any relevant jurisdiction to all Indemnitees taken as a whole (and, if reasonably necessary, of one local counsel in any relevant jurisdiction to all such persons, taken as a whole and, solely in the case of a conflict of interest, one additional local counsel to all such Indemnitees, taken as a whole))) incurred by each Indemnitee and other costs of investigation or defense, including those incurred upon any appeal) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance, syndication or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Commitment, Loan or the use or proposed use of the proceeds therefrom, (c) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by any Borrower, any Subsidiary or any other

Loan Party, or any Environmental Liability related in any way to any Borrower, any Subsidiary or any other Loan Party, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding), whether brought by a third party or by any Loan Party, and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "Indemnified Liabilities"); provided, that such indemnity under this Section 12.05 shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence, bad faith or willful misconduct of such Indemnitee (or such Indemnitee's officers, directors, employees or agents), the material breach of the Loan Documents by such Indemnitee, or any disputes solely among the Indemnitees and not arising out of any act or omission of any member of the Parent or any Subsidiary. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through the internet, IntraLinks or other similar information transmission systems in connection with this Agreement. **Neither any Loan Party nor any Indemnitee shall have any liability for any punitive, special, indirect or consequential damages (as opposed to direct or actual damages) relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether arising or occurring before or after the Closing Date).** All amounts due under this Section 12.05 shall be payable within ten (10) Business Days after demand therefor. The agreements in this Section 12.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender and the Maturity Date. To the extent that the indemnification set forth in this Section 12.05 may be unenforceable, each Loan Party shall contribute the maximum portion which it is permitted to pay and satisfy under applicable Law to the payment and satisfaction of all such indemnified liabilities incurred by the Indemnitees or any of them. Without limiting the generality of any provision of this Section 12.05, to the fullest extent permitted by law, each Loan Party hereby waives all rights for contribution or any other rights of recovery with respect to liabilities, losses, damages, costs and expenses arising under or relating to Environmental Laws that it might have by statute or otherwise against any Indemnitee, except to the extent that such items are determined by a final and non-appealable decision of a court of competent jurisdiction to have resulted primarily from the gross negligence or willful misconduct of such Indemnitee.

12.06.  Payments Set Aside.

To the extent that any payment by or on behalf of any Loan Party is made to the Administrative Agent or any Lender, or the Administrative Agent, or any Lender exercises its right of set-off, and such payment or the proceeds of such set-off or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such set-off had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent, upon demand its applicable share of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to

the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.

12.07.  Successors and Assigns.

(a)  Successors and Assigns Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, the Indemnitees and to the extent provided in Section 11.13 each other Secured Party; provided that neither any Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent, and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section 12.07, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section 12.07 or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section 12.07 (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section 12.07, the Indemnitees and to the extent provided in Section 11.13 each other Secured Party) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  Assignments by Lenders. Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)  Minimum Amounts.

(A)  in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)  in any case not described in subsection (b)(i)(A) of this Section 12.07, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, in the case of any assignment of a New Money DIP Commitment, or $1,000,000, in the case of any assignment of a Roll-Up Loan, unless each of the Administrative Agent, and, so long as no Event of Default has occurred and is continuing, the Borrower Representative, otherwise consents (each such consent not to be unreasonably withheld or delayed).

(ii)　　Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned, except that this clause (ii) shall not prohibit any Lender from (x) assigning all or a portion of its rights and obligations among separate tranches or facilities on a non-*pro rata* basis or (y) assigning its funded New Money DIP Loans to an Affiliate or Approved Fund separate from any unfunded New Money DIP Commitments.

(iii)　　Required Consents. No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section 12.07 and, in addition:

(A)　　the consent of the Borrower Representative (such consent not to be unreasonably withheld or delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment, or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided that the Borrower Representative shall be deemed to have consented to any such assignment unless Administrative Agent shall have received its objection thereto in writing within five (5) Business Days after the Borrower Representative's receipt of notice of such assignment; and

(B)　　the consent of the Administrative Agent shall be required for assignments in respect of a Roll-Up Loan, New Money DIP Loan or New Money DIP Commitment to a Person who is not a Lender, an Affiliate of a Lender or an Approved Fund.

(iv)　　Assignment and Assumption. The parties to each assignment shall execute and deliver to the Administrative Agent, an Assignment and Assumption, together with a processing and recordation fee of $3,500 (except no such fee shall be payable in the case of assignments to a Lender or an Affiliate or Approved Fund of a Lender), and the assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire, a W-9 and all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA PATRIOT Act..

(v)　　No Assignment to any Loan Party. No such assignment may be made to any Permitted Holder, any Loan Party or any of their respective Affiliates or Subsidiaries, except in accordance with Section 9.01(i) below.

(vi)　　No Assignment to Natural Persons.  No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section 12.07, from and after the recordation date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this

Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 12.04 and 12.05 with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section 12.07.

(c)    Register. The Administrative Agent, acting solely for this purpose as an non-fiduciary agent of the Borrowers (the "Registrar"), shall maintain at the Administrative Agent's Office, a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, the principal amounts (and stated interest) of the Loans owing to each Lender pursuant to the terms hereof from time to time (the "Register"). No assignment or transfer of a Loan or a Commitment (other than a pledge described in subsection (f) below) shall be effective unless and until registered in the Register. The entries in the Register shall be conclusive, and the Borrowers, the Administrative Agent, and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary; provided that, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or any Borrower's or other Loan Party's Obligations in respect of any Loan. The Register shall be available for inspection by any Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior written notice. Each Borrower hereby designates the entity serving as the Administrative Agent, to serve as such Borrower's agent solely for purposes of maintaining the Register as provided in this Section, and each Borrower hereby agrees that the entity serving as Registrar and its Affiliates, and their respective officers, directors, employees and agents shall constitute Indemnitees under Section 12.05. At the written request of the registered Lender, the Registrar shall note a collateral assignment of a Loan on the Register as described in subsection (f) below and; provided that the Registrar has received the name and address of such collateral assignee, the Registrar (i) shall not permit any further transfers of the Loan on the Register absent receipt of written consent to such transfers from such collateral assignee and (ii) shall record the transfer of the Loan on the Register to such collateral assignee (or such collateral assignee's designee, nominee or assignee) upon written request by such collateral assignee and compliance with the other provisions of this Agreement governing collateral assignments.

(d)    Participations. Any Lender may at any time, without the consent of, or notice to, the Borrower Representative, any Loan Party, the Administrative Agent, sell participations to any Person (other than a natural person or any Loan Party or any of its Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) each Borrower, each other Loan Party, the Administrative Agent, and the Lenders shall continue to deal solely and directly with such Lender in connection with such

Lender's rights and obligations under this Agreement and the Participant shall have agreed to be bound by the confidentiality provisions hereof.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso of Section 12.01 that affects such Participant. Subject to subsection (e) of this Section, each Borrower and each other Loan Party agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.09 as though it were a Lender; provided such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent shall not have any responsibility for maintaining a Participant Register.

(e)    Limitations upon Participant Rights. The Borrowers agree that each Participant shall be entitled to the benefits of Section 3.01, 3.04 and/or 3.05 (subject to the requirements and limitations therein, including the requirements under Section 3.01(e) (it being understood that the documentation required under Section 3.01(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment; provided that such Participant (A) agrees to be subject to the provisions of Section 12.15 as if it were an assignee; and (B) shall not be entitled to receive any greater payment under Section 3.01, 3.04 and/or 3.05, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a change in law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrowers' requires and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 12.15 with respect to any Participant; provided, further, that no Participant shall be entitled to the benefits of this Section 12.07(e), Section 3.01, 3.04 and/or 3.05, if (x) written notice to the Borrower Representative is not delivered at least one (1) Business Day prior to any such sale to a Participant and (y) the prior written consent of the Borrower Representative is not obtained, assuming that, for this purpose, the consent of the Borrower Representative would be required

pursuant to Section 12.07(b)(iii) were such sale to a Participant an assignment of obligations under this Agreement.

(f)     Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank and any pledge to a trustee as security for the benefit of the noteholders and other securityholders or creditors of a Lender; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto until the provisions of this Section regarding assignment are satisfied with respect to such pledge or assignment.

(g)     [Reserved].

(h)     Consent to Disclosure; Cooperation of Loan Parties. Subject to the provisions of Section 12.08, each Loan Party authorizes each Lender to disclose to any prospective participant or assignee of a Commitment, any and all information in such Lender's possession concerning the Loan Parties and their financial affairs which has been delivered to such Lender by or on behalf of the Loan Parties pursuant to this Agreement, or which has been delivered to such Lender by or on behalf of the Loan Parties in connection with such Lender's credit evaluation of the Loan Parties prior to entering into this Agreement. If necessary, each Loan Party agrees to (i) execute any documents (including new DIP Term Notes) reasonably required to effectuate and acknowledge each assignment of a Commitment or Loan to an assignee in accordance with Section 12.07, make the Loan Parties' management available to meet with the Administrative Agent, and prospective participants and assignees of Commitments or Loans and (iii) assist the Administrative Agent, or the Lenders in the preparation of information relating to the financial affairs of the Loan Parties as any prospective participant or assignee of a Commitment or Loan reasonably may request.

(i)     Affiliated Lenders; Debt Fund Affiliates. No Lender may assign all or a portion of any one or more of its Loans or Commitments (or grant a participation in a Loan or Commitment) to any Person who, after giving effect to such assignment or participation, would be an Affiliated Lender or an Affiliated Lender Participant, or a Debt Fund Affiliate as applicable.

12.08.  Confidentiality.

(a)     Each Loan Party acknowledges that (i) from time to time financial advisory, investment banking and other services may be offered or provided to it (in connection with this Agreement or otherwise) by each Lender or by one or more subsidiaries of such Lender and (ii) information delivered to each Lender by the Loan Parties may be provided to each such subsidiary and affiliate, it being understood that any such subsidiary or affiliate receiving such information shall be bound by the provisions of Section 12.08(b) as if it were a Lender under this Agreement.

(b)     Each of the Administrative Agent, and each Lender agrees, subject to the disclosure obligations in connection with the Chapter 11 Case, to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) (x) to its Affiliates and Approved Funds and to its and its Affiliates' and Approved Funds' respective partners,

directors, officers, employees, agents, consultants, counsel, accountants, advisors, actual and prospective investors and financing sources, and other representatives (collectively, the "Representatives") (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), or (y) to Rating Agencies, (ii) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (iii) to the extent required by applicable laws or regulations or by any subpoena or similar judicial or legal process, (iv) to any other party hereto, (v) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (vi) to (A) any actual or prospective assignee or pledgee of or Participant in any of its rights or obligations under this Agreement, or (B) any actual or prospective counterparty to any swap or derivative transaction relating to any Borrower or any other Loan Party and its obligations; provided that such parties agree to be bound by confidentiality provisions substantially similar to those hereunder, and to the Representatives of the foregoing parties in clauses (A) and (B), (vii) with the consent of the Borrower Representative, or (viii) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Section or (B) becomes available to the Administrative Agent, any Lender, or any of their respective Representatives on a non-confidential basis from a source other than the Loan Parties. The terms of this provision shall supersede and replace any previous agreement regarding the confidentiality of the Information.

This provision shall survive and remain in full force and effect until the second anniversary of the Maturity Date. For purposes of this Section, (i) "Information" means, all information received from any Loan Party or any of its Subsidiaries relating to any Loan Party or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to or in the possession of the Administrative Agent, any other Secured Party or their Representatives on a non-confidential basis prior to disclosure by any Loan Party or any of its Subsidiaries; provided that, such information was or is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information and (ii) "Rating Agencies" means Moody's, S&P, Fitch Ratings Ltd., or any other nationally recognized rating agency or service. Notwithstanding anything herein to the contrary, "Information" shall not include, and the Administrative Agent, and each other Secured Party may disclose without limitation of any kind, any information with respect to the "tax treatment" and "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Administrative Agent, or such other Secured Party relating to such tax treatment and tax structure; provided that with respect to any document or similar item that in either case contains information concerning the tax treatment or tax structure of the transaction as well as other information, this sentence shall only apply to such portions of the document or similar item that relate to the tax treatment or tax structure of the Loans and transactions contemplated hereby.

(c)    No Borrower or Affiliate thereof will issue any press releases or other public disclosure using the name of the Administrative Agent, or their Affiliates or any other Lender or

its Affiliates or referring to this Agreement or the other Loan Documents without at least three (3) Business Days' prior notice to Administrative Agent, or such Lender and without the prior written consent of Administrative Agent, or such Lender unless (and only to the extent that) such Borrower or Affiliate is required to do so under law and then, in any event, such Borrower or Affiliate will consult with Administrative Agent or Lender before issuing such press release or other public disclosure. The Borrowers hereby consent to the publication by any Secured Party of a tombstone or similar advertising material relating to the financing transactions contemplated by this Agreement. Each Secured Party reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

12.09.  Set-off.

In addition to any rights and remedies of the Lenders provided by law, upon the occurrence and during the continuance of any Event of Default, each Lender and any Affiliate of a Lender is authorized at any time and from time to time, with the prior written consent of the Administrative Agent, but without prior notice to the Borrowers or any other Loan Party (any such notice being waived by the Borrowers on their own behalf and on behalf of each Loan Party), to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, but excluding any account used solely for payment of payroll, bonuses, benefits, other compensation and related expenses (including withholding taxes)) at any time held by, and other indebtedness at any time owing by, such Lender or such Affiliate to or for the credit or the account of the respective Loan Parties against any and all Obligations owing to such Lender hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not the Administrative Agent, or such Lender shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or indebtedness. Each Lender agrees promptly to notify the Borrowers and the Administrative Agent, after any such set- off and application made by such Lender; provided, that the failure to give such notice shall not affect the validity of such set-off and application. Any Lender exercising a right to set-off shall purchase for cash (and the other Lenders shall sell) interests in each of such other Lender's Pro Rata Share of the Obligations as would be necessary to cause all Lenders to share the amount so set-off with each other Lender in accordance with their respective Pro Rata Share of the Obligations.

12.10.  Interest Rate Limitation.

Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Administrative Agent, or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers. In determining whether the interest contracted for, charged, or received by the Administrative Agent, or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

12.11.  <u>Counterparts.</u>

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.12.  <u>Integration.</u>

This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter; <u>provided</u> that the Commitment Letter shall survive the effectiveness of this Agreement and the initial Credit Extensions hereunder and shall continue to be in full force and effect after the Closing Date in accordance with their terms. In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control, <u>provided</u> that the inclusion of supplemental rights or remedies in favor of the Administrative Agent, or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

12.13.  <u>Survival of Representations and Warranties.</u>

All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent, and each Lender, regardless of any investigation made by the Administrative Agent, or any Lender or on their behalf and notwithstanding that the Administrative Agent, or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

12.14.  <u>Severability.</u>

If any provision of this Agreement or any other Loan Document is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

12.15.  <u>[Reserved].</u>

12.16.  <u>Governing Law.</u>

(a)    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO AND THERETO SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS

PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)    NOTWITHSTANDING ANY PROVISION HEREIN TO THE CONTRARY, ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO ANY LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT OR, IF THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT EXERCISE JURSIDICTION, EACH PARTY HERETO HEREBY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY (INCLUDING ITS APPELLATE DIVISION), AND OF ANY OTHER APPELLATE COURT IN THE STATE OF NEW YORK, FOR THE PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS LOAN AGREEMENT OR THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH LOAN PARTY HEREBY ALSO SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ALL FEDERAL AND STATE COURTS SITTING IN ANY STATE IN WHICH A BORROWER OR OTHER LOAN PARTY OWNS PROPERTY OR OPERATES ITS BUSINESS. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

12.17.    Waiver of Right to Trial by Jury.

EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

12.18.    USA Patriot Act Notice.

Each Lender, and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of the Loan Parties and other information that will allow such Lender, or the Administrative Agent, as applicable, to identify the Loan Parties in accordance with

31927159.1

the Patriot Act. The Loan Parties shall, promptly following a request by the Administrative Agent, or any Lender, provide all documentation and other information that Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations.

12.19.  <u>Nonliability of Lenders.</u>

The relationship between the Loan Parties on the one hand and the Lenders, and the Administrative Agent on the other hand shall be solely that of borrower or guarantor, as applicable, and lender. Neither the Administrative Agent, nor any Lender or other Secured Party has any fiduciary relationship with or duty to any Loan Party arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Loan Parties, on the one hand, and the Administrative Agent, and the Lenders and other Secured Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor. Neither the Administrative Agent, nor any Lender or any other Secured Party undertakes any responsibility to any Loan Party to review or inform any Loan Party of any matter in connection with any phase of any Loan Party's business or operations. The Loan Parties agree that neither the Administrative Agent, nor any Lender or other Secured Party shall have liability to any Loan Party (whether sounding in tort, contract or otherwise) for losses suffered by any Loan Party in connection with, arising out of, or in any way related to the transactions contemplated and the relationship established by the Loan Documents, or any act, omission or event occurring in connection therewith, unless it is determined in a final non-appealable judgment by a court of competent jurisdiction that such losses resulted from the gross negligence or willful misconduct of the party from which recovery is sought. **NO SECURED PARTY SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE USE BY OTHERS OF ANY INFORMATION OR OTHER MATERIALS OBTAINED THROUGH INTRALINKS OR OTHER SIMILAR INFORMATION TRANSMISSION SYSTEMS IN CONNECTION WITH THIS AGREEMENT. NO PARTY HERETO SHALL HAVE ANY LIABILITY WITH RESPECT TO, AND EACH PARTY HERETO, HEREBY WAIVES, RELEASES AND AGREES NOT TO SUE FOR ANY SPECIAL, PUNITIVE, INDIRECT OR CONSEQUENTIAL DAMAGES RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ARISING OUT OF ITS ACTIVITIES IN CONNECTION HEREWITH OR THEREWITH (WHETHER BEFORE OR AFTER THE CLOSING DATE)**. The Loan Parties acknowledge that they have been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party. No joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Administrative Agent, and the Lenders or among the Loan Parties and the Lenders, and the Administrative Agent,.

12.20.  <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions.</u>

Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    a conversion of all, or a portion of, such liability into Capital Stock in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such Capital Stock will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(c)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

12.21.  [Reserved].

12.22.  Parties Including Trustees; Bankruptcy Court Proceedings.  This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon the Loan Parties, the estate of each Loan Party, and any trustee, other estate representative or any successor in interest of each Loan Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Administrative Agent and the Secured Parties and their respective assigns, transferees and endorsees. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of the Loan Parties to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Administrative Agent file financing statements or otherwise perfect its Liens under applicable law. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of the Loan Parties, the Administrative Agent and Secured Parties with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

12.23.  Inconsistency. In the event of any inconsistency between the terms and conditions of this Agreement and of the DIP Orders, the provisions of the applicable DIP Order then in effect shall govern and control.

12.24.  Lender Consent to Credit Bid. Each Lender hereby irrevocably (x) authorizes and directs the Administrative Agent to, in a manner determined by the Administrative Agent and Required Lenders, credit bid all or any portion of the Obligations in connection with any Credit Bid Transaction and (y) in connection with any proposed sale of all or any portion of the assets of any or all of the Loan Parties (a "Credit Bid Transaction"), consents to the assignment and delegation to a purchaser of such rights and obligations under this Agreement and the other Loan Documents, in each case as the Administrative Agent and Required Lenders determine in order to consummate such Credit Bid Transaction (and each such Lender shall execute and deliver such documents as the Administrative Agent requests to evidence such assignment and delegation.

12.25.    Limitation of Liability. Nothing herein or in the other Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the Secured Parties or Prepetition Secured Parties any liability for any claims arising from the prepetition or post-petition activities of the Loan Parties, including with respect to the operation of their businesses, in connection with their restructuring efforts or administration of the Chapter 11 Cases.  In addition, (a) the Secured Parties and Prepetition Secured Parties shall not in any way or manner be liable or responsible for: (i) the safe-keeping of the Collateral (including any Prepetition Collateral), (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in value of the Collateral (including any Prepetition Collateral), or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage, or destruction of the Collateral (including any Prepetition Collateral) shall be borne by the Loan Parties.

## ARTICLE 13

## APPOINTMENT OF THE BORROWER REPRESENTATIVE; JOINT AND SEVERAL LIABILITY OF THE BORROWERS

13.01.    Borrower Representative.

 Each Borrower hereby irrevocably appoints the Borrower Representative, as the agent for such Borrower on its behalf, to (i) request Loans from the Lenders, (ii) to give and receive notices under the Loan Documents and (iii) take all other action which the Borrower Representative or the Borrowers are permitted or required to take under this Agreement.

13.02.    Joint and Several Liability of Borrowers.

(a)    Joint and Several Liability. Each Borrower hereby agrees that such Borrower is jointly and severally liable for, and hereby absolutely and unconditionally guarantees to the Administrative Agent, and Secured Parties and their respective successors and assigns, the full and prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of, all Obligations owed or hereafter owing to the Administrative Agent, and Secured Parties by each other Borrower. Each Borrower agrees that its guaranty obligation hereunder is a continuing guaranty of payment and performance and not of collection, that its obligations under this Section 13.02 shall not be discharged until payment and performance, in full, of the Obligations has occurred, and that its obligations under this Section 13.02 shall be absolute, unconditional and irrevocable, irrespective of, and unaffected by, (i) the genuineness, validity, regularity, enforceability or any future amendment of, or change in, any Obligation or any agreement, document or instrument to which any Borrower is or may become a party; (ii) the absence of any action to enforce any Obligation or the waiver or consent by the Administrative Agent, or any Secured Party with respect to any of the provisions governing any Obligation; (iii) the insolvency of any Loan Party or Subsidiary; and (iv) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor (other than payment and performance of the Obligations in full). Each Borrower shall be regarded, and shall be in the same position, as principal debtor with respect to the Obligations guaranteed hereunder.

(b)    <u>Waivers by Borrowers</u>. Each Borrower expressly waives all rights it may have now or in the future under any statute, or at common law, or at law or in equity, or otherwise, to compel the Administrative Agent, or Secured Parties to marshal assets or to proceed in respect of the Obligations guaranteed hereunder against any other Loan Party or Subsidiary, any other party or against any security for the payment and performance of the Obligations before proceeding against, or as a condition to proceeding against, such Borrower. Each Borrower consents and agrees that the Administrative Agent, or the Secured Parties may, at any time and from time to time, without notice or demand, whether before or after an actual or purported termination, repudiation or revocation of this Agreement by any Borrower, and without affecting the enforceability or continuing effectiveness hereof as to such Borrower: (i) with the consent of the other Borrowers, supplement, restate, modify, amend, increase, decrease, extent, renew or otherwise change the time for payment or the terms of this Agreement or any part thereof, including any increase or decrease of the rate(s) of interest thereon; (ii) with the consent of the other Borrowers, supplement, restate, modify, amend, increase, decrease, or enter into or give any agreement with respect to, this Agreement or any part thereof, or any of the Security Documents; (iii) waive, approve or consent to any action, condition, covenant, default, remedy, right, representation or term of this Agreement or any other Loan Document; (iv) accept partial payments; (v) release, reconvey, terminate, waive, abandon, fail to perfect, subordinate, exchange, substitute, transfer or enforce any security or guarantees, and apply any security and direct the order or manner of sale thereof as the Administrative Agent, or Lenders in their sole and absolute discretion may determine; (vi) release any person from any personal liability with respect to this Agreement or any part thereof; (vii) settle, release on terms satisfactory to the Required Lenders or by operation of applicable Laws or otherwise liquidate or enforce any security or guaranty in any manner, consent to the transfer of any security and bid and purchase at any sale; or (viii) consent to the merger, change or any other restructuring or termination of the corporate or partnership existence of any Borrower or any other person, and correspondingly restructure the obligations evidenced hereby, and any such merger, change, restructuring or termination shall not affect the liability of any Borrower or the continuing effectiveness hereof, or the enforceability hereof with respect to all or any part of the obligations evidenced hereby. It is agreed among each Borrower, the Administrative Agent, and Lenders that the foregoing consents and waivers are of the essence of the transaction contemplated by this Agreement and the other Loan Documents and that, but for the provisions of this <u>Section 13.02</u> and such waivers, the Administrative Agent, and Lenders would decline to enter into this Agreement.

(c)    <u>Benefit of Guaranty</u>. Each Borrower agrees that the provisions of this <u>Section 13.02</u> are for the benefit of the Administrative Agent, and the other Lenders and their respective successors, transferees, endorsees and assigns, and nothing herein contained shall impair, as between any other Borrower and the Administrative Agent, or the other Secured Parties, the obligations of such other Borrower under the Loan Documents.

(d)    <u>Waiver of Subrogation, Etc</u>. Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, and except as set forth in <u>Section 13.02(g)</u>, each Borrower hereby expressly and irrevocably waives any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off and any and all defenses available to a surety, guarantor or accommodation co-obligor. Each Borrower acknowledges and agrees that this waiver is intended to benefit the Administrative Agent, and Lenders and shall not limit or otherwise affect such Borrower's liability hereunder or the

enforceability of this Section 13.02, and that the Administrative Agent, the Secured Parties and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this Section 13.02(d).

(e)     Election of Remedies. If the Administrative Agent, or any Lender may, under applicable law, proceed to realize its benefits under any of the Loan Documents, the Administrative Agent, or any Lender may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this Section 13.02. If, in the exercise of any of its rights and remedies, the Administrative Agent, or any Lender shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Borrower or any other Person, whether because of any applicable laws pertaining to "election of remedies" or the like, each Borrower hereby consents to such action by the Administrative Agent, or such Lender and waives any claim based upon such action, even if such action by the Administrative Agent, or such Lender shall result in a full or partial loss of any rights of subrogation that each Borrower might otherwise have had but for such action by the Administrative Agent, or such Lender. Any election of remedies that results in the denial or impairment of the right of the Administrative Agent, or any Lender to seek a deficiency judgment against any Borrower shall not impair any other Borrower's obligation to pay the full amount of the Obligations.

(f)     Limitation. Notwithstanding any provision herein contained to the contrary, each Borrower's liability under this Section 13.02 (which liability is in any event in addition to amounts for which such Borrower is primarily liable under Article 2) shall be limited to an amount not to exceed as of any date of determination the greater of:

(i)     the net amount of all Loans advanced to any other Borrower under this Agreement and then re-loaned or otherwise transferred to, or for the benefit of, such Borrower; and

(ii)     the amount that could be claimed by the Administrative Agent, and Lenders from such Borrower under this Section 13.02 without rendering such claim voidable or avoidable under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law after taking into account, among other things, such Borrower's right of contribution and indemnification from each other Borrower under Section 13.02(g).

(g)     Contribution with Respect to Guaranty Obligations.

(i)     To the extent that any Borrower shall make a payment under this Section 13.02 of all or any of the Obligations (other than Obligations related to Loans and other extensions of credit made directly or indirectly to that Borrower, or on such Borrower's behalf, in which case such Borrower shall be primarily liable) (a "Guarantor Payment") that, taking into account all other Guarantor Payments then previously or concurrently made by any other Borrower, exceeds the amount that such Borrower would otherwise have paid if each Borrower had paid the aggregate Obligations satisfied by such Guarantor Payment in the same proportion that such Borrower's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the

aggregate Allocable Amounts of each of the Borrowers as determined immediately prior to the making of such Guarantor Payment, then, following payment in full in cash of the Obligations and termination of the Commitments, such Borrower shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Borrower for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(ii)    As of any date of determination, the "Allocable Amount" of any Borrower shall be equal to the maximum amount of the claim that could then be recovered from such Borrower under this Section 13.02 without rendering such claim voidable or avoidable under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.

(iii)    This Section 13.02(g) is intended only to define the relative rights of Borrowers and nothing set forth in this Section 13.02(g) is intended to or shall impair the obligations of Borrowers, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement, including Section 13.02(a). Nothing contained in this Section 13.02(g) shall limit the liability of any Borrower to pay the Loans made directly or indirectly to that Borrower, or on such Borrower's behalf, and accrued interest, fees and expenses with respect thereto for which such Borrower shall be primarily liable.

(iv)    The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Borrowers to which such contribution and indemnification is owing.

(v)    [Reserved].

(h)    Liability Cumulative. The liability of Borrowers under this Section 13.02 is in addition to and shall be cumulative with all liabilities of each Borrower to the Administrative Agent, and Lenders under this Agreement and the other Loan Documents to which such Borrower is a party or in respect of any Obligations or obligation of the other Borrower, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

(i)    Stay of Acceleration. If acceleration of the time for payment of any amount payable by the Borrowers under this Agreement is stayed upon the insolvency, bankruptcy or reorganization of any of the Borrowers, all such amounts otherwise subject to acceleration under the terms of this Agreement shall nonetheless be payable jointly and severally by the Borrowers hereunder forthwith on demand by the Administrative Agent made at the request of the Required Lenders.

(j)    Benefit to Borrowers. All of the Loan Parties and their Subsidiaries are engaged in related businesses and integrated to such an extent that the financial strength and flexibility of each such Person has a direct impact on the success of each other Person. Each Loan

Party and each Subsidiary will derive substantial direct and indirect benefit from the extension of credit hereunder.

*Signature Pages Follow*

**<u>EXHIBIT B</u>**

**Initial Approved Budget**

*Blink Fitness*
*DIP Budget*

($ in 000s)

| Week Ending | 9/15/2024 | 9/22/2024 | 9/29/2024 | 10/6/2024 | 10/13/2024 | 10/20/2024 | 10/27/2024 | 11/3/2024 | 11/10/2024 | 11/17/2024 | 11/24/2024 | 12/1/2024 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Post | Post | Post | Post | Post | Post | Post | Post | Post | Post | Post | Post | |
| **Net Cash Receipts** | $ 2,223 | 189 | 189 | 4,022 | 6,681 | 686 | 686 | 686 | 7,178 | 4,728 | 689 | 689 | $ 28,647 |
| ***Methodology Disbursements*** | | | | | | | | | | | | | |
| Wages & Benefits | $ 1,711 | 71 | 1,711 | 71 | 1,707 | 71 | 1,707 | 71 | 1,711 | 71 | 1,714 | 71 | $ 10,687 |
| Rent & Occupancy | – | 2,927 | – | 4,415 | – | – | – | 4,415 | – | – | – | – | 11,757 |
| Utilities | 30 | 215 | 165 | 151 | 181 | 190 | 173 | 101 | 105 | 115 | 176 | 106 | 1,662 |
| Equipment Leases | – | 291 | – | 293 | – | 292 | – | – | – | 292 | – | – | 1,168 |
| TSA | 331 | 123 | 495 | 239 | 123 | 196 | 123 | 239 | 123 | 123 | 135 | 196 | 2,505 |
| Insurance | – | – | – | 10 | – | – | – | 10 | – | – | – | – | 19 |
| Taxes | 249 | 440 | 34 | 124 | 200 | 200 | 217 | – | 200 | 200 | 200 | 83 | 2,131 |
| **Total Methodology Disbursements** | $ 2,321 | 4,067 | 2,404 | 5,303 | 2,210 | 949 | 2,220 | 4,836 | 2,139 | 801 | 2,225 | 456 | $ 29,930 |
| ***Non-Methodology Disbursements*** | | | | | | | | | | | | | |
| Club Supplies | $ 100 | 523 | 529 | 123 | 412 | 119 | 401 | 320 | 289 | 119 | 401 | 119 | $ 3,454 |
| Marketing | 138 | 324 | 311 | 595 | 69 | 95 | 311 | 154 | 69 | 95 | 311 | 58 | 2,529 |
| R&M | 115 | 257 | 263 | 260 | 170 | 170 | 176 | 173 | 170 | 170 | 176 | 170 | 2,270 |
| IT | 64 | 275 | 60 | 289 | 271 | 55 | 60 | 248 | 64 | 55 | 60 | 41 | 1,543 |
| Professional Fees | 10 | – | – | 124 | 10 | – | – | 74 | 10 | – | – | 50 | 279 |
| Other G&A | 156 | 140 | 69 | 114 | 73 | 94 | 69 | 114 | 73 | 94 | 69 | 69 | 1,133 |
| **Total Non-Methodology Disbursements** | $ 583 | 1,519 | 1,232 | 1,505 | 1,005 | 532 | 1,017 | 1,084 | 675 | 532 | 1,017 | 507 | $ 11,208 |
| **Operating Cash Flow** | $ (681) | (5,397) | (3,448) | (2,786) | 3,466 | (795) | (2,550) | (5,233) | 4,364 | 3,395 | (2,552) | (273) | $ (12,490) |
| ***Non-Operating Disbursements*** | | | | | | | | | | | | | |
| Deferred Rent | $ – | – | – | 393 | – | – | – | 393 | – | – | – | – | $ 787 |
| Deferred Revenue Reimbursement | – | 200 | – | – | – | – | – | – | – | – | – | – | 200 |
| **Total Non-Operating Disbursements** | $ – | 200 | – | 393 | – | – | – | 393 | – | – | – | – | $ 987 |
| ***Restructuring Costs*** | | | | | | | | | | | | | |
| Debtor Counsel | $ 188 | 318 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 188 | 130 | $ 2,323 |
| Debtor Restructuring Advisor | 115 | 230 | 115 | 115 | 115 | 165 | 165 | 165 | 140 | 140 | 140 | 115 | 1,720 |
| Debtor Investment Banker | – | – | – | 155 | – | – | – | 155 | – | – | – | 2,891 | 3,201 |
| Lender Counsel | – | 399 | – | – | 333 | – | – | 325 | – | – | – | 467 | 1,524 |
| UCC Advisors | – | 320 | 128 | 128 | 128 | 128 | 128 | 128 | 128 | 128 | 128 | 128 | 1,600 |
| ***Other Restructuring Costs*** | | | | | | | | | | | | | |
| Critical Vendors & 503(b)(9) | $ 450 | 450 | 475 | – | – | – | – | – | – | – | – | – | $ 1,375 |
| Utilities Adequate Assurance | 81 | 170 | 170 | 81 | – | – | – | – | – | – | – | (492) | (322) |
| Other First Day Relief | – | 81 | 81 | 81 | – | – | – | – | – | – | – | – | 322 |
| Claims Agent | – | 360 | – | – | – | – | – | – | – | – | – | – | 1,000 |
| Winddown Expenses | – | – | – | – | 450 | – | – | – | – | 200 | – | 1,000 | 1,000 |
| Designation Rights Period | – | – | – | – | – | – | – | – | – | – | – | 600 | 600 |
| Filing & Trustee Fees | – | – | 285 | – | – | – | – | – | – | – | – | 285 | 570 |
| Board Fees | – | – | – | – | – | – | 23 | – | – | – | 23 | – | 68 |
| Management Retention Plan | – | – | – | – | – | – | – | – | – | – | – | 1,344 | 1,344 |
| **Total Other Restructuring Costs** | $ 531 | 1,061 | 578 | 365 | 450 | – | 23 | – | – | 200 | 23 | 2,738 | $ 5,957 |
| **Total Restructuring Costs** | $ 833 | 2,317 | 1,009 | 951 | 1,214 | 481 | 503 | 961 | 456 | 656 | 478 | 6,468 | $ 16,324 |
| **Total Disbursements** | $ 3,737 | 8,103 | 4,645 | 8,153 | 4,429 | 1,962 | 3,739 | 7,273 | 3,269 | 1,989 | 3,719 | 7,430 | $ 58,449 |
| Beginning Cash (Book) | $ 19,150 | 17,637 | 9,722 | 5,266 | 4,135 | 6,387 | 5,112 | 9,859 | 3,272 | 7,181 | 9,920 | 6,880 | $ 19,150 |
| Net Cash Flow | (1,514) | (7,914) | (4,456) | (4,131) | 2,252 | (1,275) | (3,053) | (6,587) | 3,908 | 2,739 | (3,030) | (6,741) | (29,802) |
| DIP Funding | – | – | – | 3,000 | – | – | 7,800 | – | – | – | – | – | 10,800 |
| **Ending Cash (Book)** | $ 17,637 | 9,722 | 5,266 | 4,135 | 6,387 | 5,112 | 9,859 | 3,272 | 7,181 | 9,920 | 6,880 | 149 | $ 149 |
| **Ending DIP Balance** | $ 10,200 | 10,200 | 10,200 | 13,200 | 13,200 | 13,200 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | 21,000 | $ 21,000 |