## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BLINK HOLDINGS, INC., *et al.*,[1] | Case No. 24-11686 (JKS) |
| Debtors. | (Jointly Administered) |

## NOTICE OF FILING OF RESTRUCTURING SUPPORT AGREEMENT

      **PLEASE TAKE NOTICE** that, on September 23, 2024, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), entered into that certain *Restructuring Support Agreement*, dated September 23, 2024 (the "**RSA**"), with the Consenting Lenders.[2]  The RSA is attached hereto as <u>Exhibit A</u>.  The RSA sets forth the terms by which the Consenting Lenders have agreed to support a chapter 11 plan in the Debtors' chapter 11 cases.

*[Signature Page Follows]*

---

[1]    The last four digits of Blink Holdings, Inc.'s federal tax identification number are 6354.  The mailing address for Blink Holdings, Inc. is 45 West 45th Street, 10th Floor, New York, New York 10036. Due to the large number of debtors in these chapter 11 cases, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/BlinkFitness, or by contacting the undersigned counsel for the Debtors.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the RSA.

Dated: Wilmington, Delaware
September 24, 2024

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Sean T. Greecher*
Michael R. Nestor (No. 3526)
Sean T. Greecher (No. 4484)
Allison S. Mielke (No. 5934)
Timothy R. Powell (No. 6894)
Rebecca L. Lamb (No. 7223)
Benjamin C. Carver (No. 7176)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:  mnestor@ycst.com
      sgreecher@ycst.com
      amielke@ycst.com
      tpowell@ycst.com
      rlamb@ycst.com
      bcarver@ycst.com

*Counsel to the Debtors and Debtors in Possession*

## <u>EXHIBIT A</u>

**Restructuring Support Agreement**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (together with all exhibits (including, without limitation, the Restructuring Term Sheet (as defined below)), schedules and attachments hereto, as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**"), dated as of September 23, 2024, is entered into by and among: (a) BLINK HOLDINGS, INC., a Delaware corporation, as debtor and debtor-in-possession ("**Blink**"), and such other Persons joined hereto as a Borrower from time to time, as debtors and debtors-in-possession (together with Blink, each a "**Borrower**" and collectively, the "**Borrowers**"), (b) BLINK COMPANY INTERMEDIATE HOLDCO, INC. ("**Parent**"), (c) the other Guarantors (as defined in the DIP Credit Agreement (as defined below)) from time to time party hereto (together with the Borrowers and Parent, the "**Debtors**"), (d) the DIP Lenders (as defined below) from time to time party hereto (the "**Consenting DIP Lenders**"), (e) the Prepetition Lenders (as defined below) from time to time party hereto (the "**Consenting Prepetition Lenders**"), and (f) VARAGON CAPITAL PARTNERS AGENT, LLC, as the administrative agent, or any successor administrative agent, for the DIP Lenders (in such capacity, "**DIP Agent**") and the Prepetition Lenders (in such capacity, "**Prepetition Agent**", and together with the DIP Agent, the Consenting DIP Lenders and the Consenting Prepetition Lenders, the "**Consenting Lenders**"). Each of the Debtors and the Consenting Lenders are referred to herein as a "**Restructuring Support Party**" and, collectively, the "**Restructuring Support Parties**". Capitalized terms used herein and not defined herein shall have the meanings ascribed to such terms in the Restructuring Term Sheet (as defined below) or the Interim DIP Order (as defined below), as applicable.

## PRELIMINARY STATEMENTS

**WHEREAS**, in connection with the Debtors' chapter 11 cases (the "**Chapter 11 Cases**") pending in the U.S. Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), the Restructuring Support Parties have agreed to negotiate in good faith and support a chapter 11 plan that incorporates, and is otherwise consistent with, the terms of this Agreement and the Restructuring Term Sheet attached hereto as Exhibit A (including any schedules, annexes and exhibits attached thereto, each as may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, the "**Restructuring Term Sheet**")[1] and is in form and substance acceptable to the Required Consenting Lender Parties (as defined below) (such plan, together with all exhibits, schedules and attachments thereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement, the "**Plan**");

**WHEREAS**, this Agreement is the product of arm's-length, good faith negotiations among the Restructuring Support Parties and their respective advisors;

**WHEREAS**, prior to the filing of the Chapter 11 Cases, the Debtors were party to that certain Credit and Guaranty Agreement, dated as of November 8, 2018 (as amended, restated,

---

[1] The Restructuring Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein. To the extent this Agreement is silent as to a particular matter set forth in the Restructuring Term Sheet, such matter shall be governed by the terms and conditions set forth in the Restructuring Term Sheet. In the event the terms and conditions as set forth in the Restructuring Term Sheet and this Agreement are inconsistent, the terms and conditions of the Restructuring Term Sheet shall control.

supplemented, or otherwise modified from time to time prior to the filing of the Chapter 11 Cases, the "**Prepetition Credit Agreement**"), by and among Blink, as borrower, Parent and the other Debtors, as guarantors, each of the lenders from time to time party thereto (the "**Prepetition Lenders**") and Prepetition Agent, as agent for the Prepetition Lenders;

**WHEREAS**, the DIP Lenders (as defined below) have agreed to provide financing during the pendency of the Chapter 11 Cases, subject to the terms and conditions set forth in (i) that certain Senior Secured Priming and Superpriority Debtor-in-Possession Credit and Guaranty Agreement, dated as of August 12, 2024 (the "**DIP Credit Agreement**") by and among the Debtors, the lenders party thereto (the "**DIP Lenders**") and the DIP Agent, and all other agreements, documents, and instruments delivered or executed in connection therewith (collectively with the DIP Credit Agreement, the DIP Orders, and all other documents and instruments included in the definition of "Loan Documents" in the DIP Credit Agreement, the "**DIP Documents**") and (ii) the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Utilize Cash Collateral; (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (Docket No. 63), entered by the Bankruptcy Court in the Chapter 11 Cases on August 13, 2024 (the "**Interim DIP Order**") and the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Utilize Cash Collateral; (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* (Docket No. 63) (as may be amended or otherwise modified in accordance with its terms, the "**Final DIP Order**," and together with the Interim DIP Order, the "**DIP Orders**"); and

**WHEREAS**, the Restructuring Support Parties desire to express to each other their mutual support and commitment in respect of the matters discussed herein and in the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the promises, mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Restructuring Support Parties, intending to be legally bound, agrees as follows:

1.    <u>**Rules of Construction**</u>.

Unless otherwise specified, references in this Agreement to any Section, subsection, clause, subclause or paragraph refer to such Section, subsection, clause, subclause or paragraph as contained in this Agreement.  The words "herein," "hereof" and "hereunder" and other words of similar import in this Agreement refer to this Agreement as a whole, and not to any particular Section, subsection, clause, subclause or paragraph contained in this Agreement.  Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders.  The words "including," "includes" and "include" shall be deemed to be followed by the words "without limitation".

## 2. **Agreements of the Consenting Lenders**.

(a) <u>Support of Restructuring</u>. Each of the Consenting Lenders hereby agrees severally (and not jointly) that, for the period (the "**Restructuring Support Period**") commencing on the Restructuring Support Effective Date (as defined below) and ending on the earlier of (i) the effective date of a Plan (the "**Plan Effective Date**"), (ii) the date on which this Agreement is terminated in accordance with <u>Section 4</u> hereof, and (iii) the date that is 120 days from the Petition Date, such Consenting Lender shall:

(i) negotiate in good faith with the Debtors a Plan (which, for the avoidance of doubt, shall comply with, incorporate the terms and conditions of, and be in all respects consistent with, the Restructuring Term Sheet and this Agreement); and

(ii) (A) subject to the receipt of a disclosure statement in form and substance reasonably acceptable to the Required Consenting Lender Parties and in all respects consistent with the Restructuring Term Sheet and this Agreement (the "**Disclosure Statement**") approved by an order of the Bankruptcy Court (the "**Bankruptcy Court Order**"), timely vote, or cause to be voted, all of the claims held by such Consenting Lender at the voting record date (the "**Claims**") provided for in the Bankruptcy Court Order by timely delivering its duly executed and completed ballot(s) accepting the Plan following commencement of the solicitation of the Plan (the "**Solicitation**"), and (B) not change, withdraw or revoke such vote (or cause or direct such vote to be changed, withdrawn or revoked), except to the extent the Plan or the Disclosure Statement is amended, supplemented, or otherwise modified in a way that is inconsistent with the terms and conditions set forth herein and in the Restructuring Term Sheet, any DIP Order, the DIP Credit Agreement or this Agreement; <u>provided</u>, <u>however</u>, that such vote may be revoked (and, upon such revocation, deemed void *ab initio*) by such Consenting Lender at any time following the expiration or termination of the Restructuring Support Period with respect to such Consenting Lender (it being understood that any termination of the Restructuring Support Period with respect to a Consenting Lender shall entitle such Consenting Lender to change its vote in accordance with section 1127(d) of the Bankruptcy Code, and the Solicitation materials with respect to the Plan shall be consistent with this proviso).

(b) <u>Rights of Consenting Lenders Unaffected</u>. Nothing contained herein shall: (i) limit (A) the rights of a Consenting Lender under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, without limitation, appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases (including, without limitation, the Sale Process), in each case, so long as the exercise of any such right is not inconsistent with such Consenting Lender's obligations hereunder, (B) the ability of a Consenting Lender to purchase, sell or enter into any transactions regarding the Claims, subject to the terms hereof, (C) except as set forth in this Agreement, any right or remedy of (x) any Prepetition Lender under (I) the Prepetition Credit Agreement or any other documents executed in connection therewith (collectively, the "**Prepetition Secured Credit Facility Documents**"), (II) the Bidding Procedures Order, or (III) the Sale Order, and (y) any Prepetition Secured Party or DIP Secured Party under any other applicable agreement, instrument or document that gives rise to the Claims of such Prepetition Secured Party or DIP Secured Party, as applicable, including, without limitation, the DIP Orders, the DIP Credit Agreement, or any other DIP Documents, (D) the ability of a Consenting Lender to consult with any of the other Restructuring Support Parties,

other holders of Claims or any other party in interest, (E) the rights of any Consenting Lender to engage in any discussions, enter into any agreements or take any other action regarding matters to be effectuated after the expiration or termination of the Restructuring Support Period, or (F) the ability of a Consenting Lender to enforce any right, remedy, condition, consent or approval requirement under this Agreement, the Bidding Procedures Order, the Sale Order, the DIP Orders, the DIP Credit Agreement, or any other DIP Documents, or (ii) constitute a waiver or amendment of any term or provision of (x) the Prepetition Credit Agreement or any of the other Prepetition Secured Credit Facility Documents, (y) the DIP Orders, the DIP Credit Agreement, or any other DIP Documents, or (z) any other agreement, instrument or document that gives rise to a Consenting Lender's Claims.

(c)    Transfers.  Each Consenting Lender agrees severally (and not jointly) that, for the duration of the Restructuring Support Period, such Consenting Lender shall not, directly or indirectly, sell, transfer, loan, issue, pledge, hypothecate, assign, grant, or otherwise dispose of (including by participation) (collectively, "**Transfer**"), in whole or in part, any of its Claims, or any option thereon or any right or interest therein (including granting any proxies with respect to any Claims, depositing any Claims into a voting trust or entering into a voting agreement with respect to any Claims), unless the transferee of such Claims (the "**Transferee**") either (i) is a Consenting Lender at the time of such Transfer or (ii) prior to the effectiveness of such Transfer, agrees in writing, for the benefit of the Restructuring Support Parties, to become a Restructuring Support Party hereunder as a Consenting Lender and to be bound by all of the terms and conditions of this Agreement applicable to a Consenting Lender with respect to such transferred Claims, by executing a joinder agreement, substantially in the form attached hereto as <u>Exhibit B</u> (the "**Joinder Agreement**"), and by delivering an executed copy thereof to (A) counsel to the Debtors and (B) counsel to the DIP Agent and Prepetition Agent (at the address set forth herein), in which event (x) the Transferee shall be deemed to be a Consenting Lender hereunder to the extent of such transferred Claims  and (y) the transferor Consenting Lender shall be deemed to relinquish its rights, and be released from its obligations, under this Agreement solely to the extent of such transferred Claims; <u>provided</u>, <u>however</u>, that such Transfer shall not release any Consenting DIP Lender from its commitments under, and subject to, the DIP Credit Agreement.  Each Consenting Lender agrees severally (and not jointly) that any Transfer of any Claims that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and each of the Debtors and each other Consenting Lender shall have the right to enforce the voiding of such Transfer.

3.    **Agreements of the Debtors.**

(a)    <u>Affirmative Covenants</u>.  Each of the Debtors, jointly and severally, agrees that, for the duration of the Restructuring Support Period, the Debtors shall:

(i)    subject to any applicable Milestones or other time constraints imposed by this Agreement or order of the Bankruptcy Court, continue the Sale Process after the commencement of the Chapter 11 Cases in order to determine the highest and/or best offer for an Acceptable Sale in a commercially reasonable manner, in each case in accordance with the DIP Order then in effect, the other DIP Documents, and the Bidding Procedures Order;

(ii)     take all commercially reasonable actions necessary to implement and consummate an Acceptable Sale in accordance with the DIP Order then in effect (including, without limitation, the Milestones), the other DIP Documents, and the Bidding Procedures Order;

(iii)     comply with all other Milestones set forth in the DIP Order then in effect, the other DIP Documents, and any other milestones set forth in the Restructuring Term Sheet; and

(iv)     negotiate in good faith and propose a Plan that complies with the terms and conditions in the Restructuring Term Sheet and this Agreement, and not negotiate, propose or otherwise pursue a Plan that differs from such terms and conditions.

## 4.     Termination of Agreement.

(a)     Consenting Lender Termination Events.  The Required Consenting Lenders may terminate this Agreement, and such termination shall be effective immediately upon written notice (a "**Consenting Lender Termination Notice**") delivered by the Required Consenting Lenders (or their counsel) to the Debtors, at any time after the occurrence, and during the continuation, of any of the following events (each, a "**Consenting Lender Termination Event**"), unless waived in writing by the Required Consenting Lenders:

(i)     the breach by any Debtor of any of its covenants, undertakings, obligations, representations or warranties contained in this Agreement (including, without limitation, any such breach due to any Debtor's determination that complying with such covenants, undertakings, obligations, representations or warranties, as applicable, would result in a breach of its fiduciary duties), and, to the extent such breach is curable, such breach remains uncured for a period of five (5) business days;

(ii)     the occurrence of an "Event of Default" under the DIP Credit Agreement or the occurrence of a termination event (or similar event) or any other violation or breach by the Debtors of any term, condition or covenant under any DIP Order or the other DIP Documents (including, without limitation, the failure to timely satisfy any Milestones (as defined in the then applicable DIP Order); provided that failure to comply with any Milestones shall not be subject to cure);

(iii)     the Bankruptcy Court grants relief that (A) is materially inconsistent with this Agreement or (B) would prevent the consummation of the Acceptable Sale or the Plan;

(iv)     the Bankruptcy Court enters an order denying confirmation of the Plan or any disclosure statement in related thereto;

(v)     the Debtors file with the Bankruptcy Court a chapter 11 plan containing terms that are inconsistent with or contrary to the terms set forth in this Agreement and the Restructuring Term Sheet;

(vi)     the Debtors' exclusive right to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy code is terminated;

(vii)     the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(viii)     the Committee or other party in interest in the Chapter 11 Cases successfully prosecutes a Challenge (as defined in the DIP Order then in effect); or

(ix)     the Debtors enter into, and/or seek Bankruptcy Court approval of, any "stalking horse" or other purchase agreement that is not acceptable in form and substance to the Required Consenting Lenders.

(b)     <u>Debtor Termination Events</u>.  The Debtors may terminate this Agreement and such termination shall be effective immediately upon written notice (a "**Debtor Termination Notice**" and, together with a Consenting Lender Termination Notice, a "**Termination Notice**") delivered to each of the Consenting Lenders, at any time after the occurrence, and during the continuation, of any of the following events (each, a "**Debtor Termination Event**" and, together with each Consenting Lender Termination Event, each, a "**Termination Event**" and, collectively, the "**Termination Events**"), unless waived in writing by the Debtors:

(i)     the breach in any material respect (without giving effect to any "materiality" qualifiers set forth therein) by one or more of the Consenting Lenders of any of their respective covenants, undertakings, obligations, representations or warranties contained in this Agreement; or

(ii)     notwithstanding anything to the contrary herein, to the extent that any Debtors' boards of directors (or comparable governing body) determine in good faith after consulting with outside legal counsel that the Debtors' fiduciary obligations under applicable law require the Debtors to terminate this Agreement and the Debtors' obligations hereunder, the Debtors may terminate this Agreement.  In the event that the Debtors determine to terminate this Agreement in accordance with this subsection, the Debtors shall provide notice of such termination to each of the Restructuring Support Parties and their advisors not more than one (1) business day after such determination.  Notwithstanding anything to the contrary herein, (i) nothing in this Agreement shall create any additional fiduciary obligations on the part of the Debtors or any members, managers, or officers of the Debtors or their affiliated entities, in such capacity that did not exist prior to the date of this Agreement, and (ii) the Consenting Lenders reserve the right to object to, oppose or otherwise challenge any action taken in the exercise of such fiduciary duties.

(c)     <u>Mutual Termination</u>.  This Agreement may be terminated by mutual written agreement of the Debtors and the Required Consenting Lenders.  Notwithstanding anything in this Agreement to the contrary, this Agreement shall terminate automatically without further required action upon the occurrence of the Plan Effective Date.

(d)     <u>Effect of Termination</u>.  Upon the termination of this Agreement in accordance with this section, and except as provided in <u>Section 10</u> hereof, this Agreement shall forthwith become void and of no further force or effect, and each Restructuring Support Party shall, except as otherwise expressly provided in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement, have no further rights, benefits or privileges hereunder, and shall have all the rights and remedies that it

would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law; provided, however, that in no event shall any such termination relieve a Restructuring Support Party from (i) liability for its breach or non-performance of its obligations under this Agreement prior to the date of such termination or (ii) obligations under this Agreement which by their terms expressly survive termination of this Agreement.

(e)    Automatic Stay.  The Debtors acknowledge and agree, and shall not dispute, that after the commencement of the Chapter 11 Cases, the giving of a Termination Notice by the Consenting Lenders pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Debtors hereby waive, to the greatest extent possible, the applicability of the automatic stay to the giving of such Termination Notice).

5.    **Representations and Warranties.**

(a)    Each Consenting Lender severally (and not jointly), and each of the Debtors, on a joint and several basis, represents and warrants to the other Restructuring Support Parties that the following statements are true and correct as of the date hereof (or, in the case of a Consenting Lender that becomes a party hereto after the Restructuring Support Effective Date, as of the date such Consenting Lender becomes a party hereto):

(i)    such Restructuring Support Party is validly existing and in good standing under the laws of its jurisdiction of incorporation, organization or formation (as applicable), and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated under this Agreement and perform its obligations contemplated under this Agreement, and the execution and delivery of this Agreement by such Restructuring Support Party and the performance of such Restructuring Support Party's obligations under this Agreement have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery and performance by such Restructuring Support Party of this Agreement do not and will not (A) violate any provision of law applicable to it, (B) violate its or any of its subsidiaries' organizational documents, or (C) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party, other than, with respect to the Debtors, breaches that arise from the filing of the Chapter 11 Cases;

(iii)    the execution, delivery and performance by such Restructuring Support Party of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action of, with or by, any governmental entity, except such filings as may be necessary or required under the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (the "**Exchange Act**") or the Bankruptcy Code;

(iv)    subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of such Restructuring Support Party, enforceable against it in accordance with its terms, except as enforcement may be limited by

bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(v)        such Restructuring Support Party (A) is a sophisticated party with respect to the subject matter of this Agreement and the transactions contemplated hereby, (B) has adequate information concerning the matters that are the subject of this Agreement and the transactions contemplated hereby, (C) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has independently and without reliance upon any warranty or representation by, or information from, any other Restructuring Support Party or any officer, employee, agent or representative thereof, of any sort, oral or written, except the warranties and representations expressly set forth in this Agreement, and based on such information as such Restructuring Support Party has deemed appropriate, made its own analysis and decision to enter into this Agreement and the transactions contemplated hereby, and (D) acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress; and

(vi)        such Restructuring Support Party is not aware of the occurrence of any event that, due to any fiduciary or similar duty to any other Person, would prevent it from taking any action required of it under this Agreement.

6.        **Amendments and Waivers**.

(a)        This Agreement, including the Restructuring Term Sheet and any other exhibits, schedules, annexes or attachments hereto, may be amended, amended and restated, supplemented, modified or waived if, and only if, such amendment, amendment and restatement, supplement, modification or waiver is in writing and signed, (1) in the case of an amendment, amendment and restatement, supplement or modification, by (i) the Debtors, (ii) the DIP Agent and Prepetition Agent, (iii) the Consenting DIP Lenders signatory hereto holding no fewer than 50% in number of the DIP Lenders' claims and 66.7% in amount of the DIP Lenders' Claims (the "**Required Consenting DIP Lenders**"), and (iv) the Consenting Prepetition Lenders signatory hereto holding no fewer than 50% in number of the Prepetition Lenders' claims and 66.7% in amount of the Prepetition Lenders' Claims (the "**Required Consenting Prepetition Lenders**", and collectively with the Required Consenting DIP Lenders, the "**Required Consenting Lender Parties**"), or (2) in the case of a waiver, by each Restructuring Support Party against whom the waiver is to be effective; provided, however, that any amendment, amendment and restatement, supplement or modification that treats or affects any Consenting Lender in a manner that is materially and disproportionately adverse, on an economic or non-economic basis, to the manner in which any of the other Consenting Lenders are treated (after taking into account each of the Consenting Lender's respective Claims) shall require the written consent of such Consenting Lender.

(b)        In determining whether any consent or approval has been given or obtained by the Consenting Lenders, any then-existing Consenting Lender that is in material breach of its covenants, obligations or representations under this Agreement (and the respective Claims held by such Consenting Lender) shall be excluded from such determination and the Claims held by such Consenting Lender shall be treated as if they were not outstanding.

7.      **Effectiveness**.

This Agreement shall only become effective and binding upon the Restructuring Support Parties upon the satisfaction of all the following conditions (the first day on which all of the following conditions have been satisfied being referred to herein as the "**Restructuring Support Effective Date**"):

>    (a)  each Restructuring Support Party shall have executed this Agreement and delivered its signature page to this Agreement to the other Restructuring Support Parties; and
>
>    (b)  no Challenge or motion seeking standing to file a Challenge shall be pending.

With respect to any person that becomes a party to this Agreement by executing and delivering a Joinder Agreement after the Restructuring Support Effective Date, this Agreement shall become effective as to such Person at the time such Joinder Agreement is executed and delivered as hereinabove provided.

8.      **Governing Law**.

This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

9.      **Specific Performance/Remedies**.

It is understood and agreed by the Restructuring Support Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Restructuring Support Party and each non-breaching Restructuring Support Party shall be entitled to specific performance and injunctive or other equitable relief (including reasonable attorneys' fees, costs and expenses) as a remedy of any such breach, in addition to any other remedy to which such non-breaching Restructuring Support Party may be entitled, at law or in equity, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Restructuring Support Party to comply promptly with any of its obligations hereunder.  Each Restructuring Support Party hereby waives any requirement for the securing or posting of any bond in connection with such remedies.

10.      **Survival**.

Notwithstanding the termination of this Agreement pursuant to Section 4 hereof or the expiration of the Restructuring Support Period, the agreements and obligations of the Restructuring Support Parties in this Section 10 and Sections 4(d), 4(e), 8, and 11-20 hereof shall survive such termination and shall continue in full force and effect in accordance with the terms hereof.

11.    **Successors and Assigns; Severability**.

This Agreement is intended to bind and inure to the benefit of the Restructuring Support Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this section shall be deemed to permit sales, assignments or other Transfers of the Claims other than in accordance with Section 2(c) of this Agreement.  If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision and this Agreement shall continue in full force and effect; provided, however, that nothing in this section shall be deemed to amend, supplement or otherwise modify, or constitute a waiver of, any Termination Event.  Upon any such determination of invalidity, the Restructuring Support Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Restructuring Support Parties as closely as possible, in a reasonably acceptable manner, such that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

12.    **No Third-Party Beneficiaries**.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Restructuring Support Parties and no other Person shall be a third-party beneficiary hereof.

13.    **Prior Negotiations; Entire Agreement**.

This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Restructuring Support Parties, and supersedes all other prior negotiations, with respect to the subject matter of this Agreement, whether written or oral.

14.    **Counterparts**.

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Any execution copies of this Agreement and executed counterpart signature pages to this Agreement may be delivered by e-mail or other electronic imaging means, which shall be deemed to be an original for the purposes of this section.

15.    **Notices**.

All notices, requests, demands, document deliveries and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided, made or received when sent by e-mail (or at such other addresses or e-mail addresses for a Restructuring Support Party as shall be specified by like notice):

    **If to the Debtors:**

    Young Conaway Stargatt & Taylor, LLP
    Rodney Square
    1000 North King Street

Wilmington, DE 19801

E-mail:        mnestor@ycst.com
                 sgreecher@ycst.com

Attention:   Michael R. Nestor
                 Sean T. Greecher

**If to the DIP Agent, Prepetition Agent, or other Consenting Lenders**:

To each Consenting Lender at the addresses or e-mail addresses set forth in the Consenting Lenders' signature pages to this Agreement (or in the signature page to a Joinder Agreement in the case of any Consenting Lender that becomes a party hereto after the Restructuring Support Effective Date)

**with copies to (which shall not constitute notice)**:

Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661

Email:       peter.knight@katten.com
              allison.yager@katten.com

Attention:   Peter P. Knight
                 Allison E. Yager

**16.**    <u>**Reservation of Rights; No Admission.**</u>

Except as expressly provided in this Agreement and in any amendment hereto, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Restructuring Support Parties to (a) protect and preserve its rights, remedies and interests, including its claims against any of the other Restructuring Support Parties (or their respective affiliates or subsidiaries) and any encumbrances it may have on or in any assets or properties of any of the Debtors, (b) consult with any of the other Restructuring Support Parties, (c) fully participate in any bankruptcy case filed by any Debtor, or (d) purchase, sell or enter into any transactions in connection with Claims, in each case subject to the terms hereof.  Without limiting the foregoing sentence in any way, if the Restructuring is not consummated, or if this Agreement is terminated for any reason, nothing herein shall be construed as a waiver by any Restructuring Support Party of any or all of such Restructuring Support Party's rights, remedies, claims and defenses and the Restructuring Support Parties expressly reserve any and all of their respective rights, remedies, claims and defenses.  No Consenting Lender shall have, by reason of this Agreement, a fiduciary relationship in respect of any other Restructuring Support Party, any holder of Claims, or any other Person, and nothing in this Agreement, express or implied, is intended to impose, or shall be construed as imposing, upon any Consenting Lender any obligations in respect of this Agreement or the Restructuring except as expressly set forth herein.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the

Restructuring Support Parties.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any Proceeding other than a Proceeding to enforce its terms.  This Agreement shall not be construed as or be deemed to be evidence of an admission or concession on the part of any Restructuring Support Party of any claim, fault, liability or damages whatsoever.  Each of the Restructuring Support Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

## 17.    **Relationship Among Restructuring Support Parties.**

Notwithstanding anything herein to the contrary, the duties and obligations of the Consenting Lenders under this Agreement shall be several, and not joint and several.  It is understood and agreed that no Consenting Lender owes any duty of trust or confidence of any kind or form to any other Restructuring Support Party, and, except as expressly provided in this Agreement, there are no commitments among or between them.  In this regard, it is understood and agreed that any Consenting Lender may trade in the Claims of any Debtor without the consent of any other Restructuring Support Party, subject to applicable securities laws and the terms of this Agreement; provided, however, that no Consenting Lender shall have any responsibility for any such trading to any other entity by virtue of this Agreement.  No Consenting Lender shall, as a result of its entering into and performing its obligations under this Agreement, be deemed to be part of a "group" (as that term is used in Section 13(d) of the Exchange Act) with any other Restructuring Support Party.  For the avoidance of doubt, no action taken by a Consenting Lender pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Restructuring Support Parties that the Consenting Lenders are in any way acting in concert or as such a "group."

## 18.    **Consideration.**

Each Restructuring Support Party hereby acknowledges that no consideration, other than that specifically described herein, shall be due or paid to any Restructuring Support Party for its agreements set forth herein.

## 19.    **ACKNOWLEDGEMENTS.**

THIS AGREEMENT, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED HEREIN AND THEREIN ARE THE PRODUCT OF ARMS'-LENGTH NEGOTIATIONS BETWEEN THE RESTRUCTURING SUPPORT PARTIES AND THEIR RESPECTIVE REPRESENTATIVES.    EACH RESTRUCTURING SUPPORT PARTY HEREBY ACKNOWLEDGES THAT THIS AGREEMENT IS NOT, AND SHALL NOT BE DEEMED TO BE, A SOLICITATION OF VOTES FOR THE ACCEPTANCE OF THE PLAN OR REJECTION OF ANY OTHER CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR OTHERWISE.  THE PROPONENTS OF THE PLAN SHALL NOT SOLICIT ACCEPTANCES OF THE PLAN FROM ANY PERSON UNTIL THE PERSON HAS BEEN PROVIDED WITH A COPY OF THE PLAN, DISCLOSURE STATEMENT, AND RELATED DOCUMENTS.  NOTHING IN THIS AGREEMENT SHALL REQUIRE ANY RESTRUCTURING SUPPORT PARTY TO TAKE ANY ACTION PROHIBITED BY THE

BANKRUPTCY CODE, ANY OTHER APPLICABLE LAW OR REGULATION, OR AN ORDER OR DIRECTION OF ANY COURT OR ANY OTHER GOVERNMENTAL ENTITY.

### 20. <u>No Effect on DIP Documents</u>.

Notwithstanding anything to the contrary set forth in this Agreement, nothing in this Agreement shall, or shall be deemed or construed to, affect or impact in any way Debtors' covenants and obligations under the DIP Orders, the DIP Credit Agreement, and the other DIP Documents; nor shall anything in this Agreement be deemed to amend, supplement, or otherwise modify any terms, conditions, covenants or other provisions of the foregoing.

[Signatures on Next Page]

**EXHIBIT A**
**RESTRUCTURING TERM SHEET**

**Error! Unknown document property name.**

**EXHIBIT A**

**BLINK HOLDINGS, INC.**
**RESTRUCTURING TERM SHEET**

This term sheet (this "**Term Sheet**")[1] sets forth certain principal terms and conditions of a joint liquidating plan of reorganization to be consummated by the below-referenced Debtors in cases commenced by the Debtors (the "**Chapter 11 Cases**") on August 12, 2024 (the "**Petition Date**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**") before the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") concurrently with, or shortly following, the consummation of a sale or other transfer of all or substantially all of the Debtors' assets in accordance with the DIP Orders and DIP Credit Documents (as each term is defined below), and on terms and conditions, and subject to definitive documentation, acceptable to each of the Required DIP Lenders and Required Prepetition Lenders (as each such term is defined below), respectively (an "**Acceptable Sale**," and the plan of reorganization memorializing the terms and conditions set forth herein, the "**Plan**"). As reflected in the Restructuring Support Agreement, dated September 23, 2024, to which this Term Sheet is attached (as amended, restated or otherwise modified from time to time in accordance with its terms, the "**RSA**"), the Plan is supported by each of the DIP Agent, the DIP Lenders signatory thereto (the "**Consenting DIP Lenders**"), the Prepetition Agent, the Prepetition Lenders signatory thereto (the "**Consenting Prepetition Lenders**"), and together with the DIP Agent, Consenting DIP Lenders, and Prepetition Agent, the "**Consenting Lenders**"), and the Debtors.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION OR LIQUIDATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, MAY ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS. THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF THE DEBTORS AND THE CONSENTING LENDERS, EXCEPT AS REQUIRED BY LAW AND AS CONTEMPLATED BY THE RSA.

| Parties Overview | |
|---|---|
| **Debtors:** | Blink Holdings, Inc. ("**Blink**"); Blink Company Intermediate Holdco Inc. ("**Parent**"); and each direct or indirect subsidiary of Blink (such entities, together with Blink and Parent, collectively referred to as the "**Debtors**"). |
| **Prepetition Secured Parties:** | The "**Lenders**" under, and as defined in, that certain *Credit and Guaranty Agreement*, dated as of November 8, 2018 (as amended, restated, modified, or supplemented from time to time prior to the Petition Date, the "**Prepetition Credit Agreement**"), by and among Blink and the other borrowers party thereto, as borrowers, Parent and the other guarantors party thereto, Varagon Capital Partners Agent, LLC, as administrative agent (in such capacity, the "**Prepetition Agent**"), and the lenders from time to time party thereto (collectively, the "**Prepetition Lenders**," and together with the Prepetition Agent, the "**Prepetition Secured Parties**"). The "Required Lenders" under, and as defined in, the Prepetition Credit Agreement shall be referred to herein as the "**Prepetition Required Lenders**". |
| **DIP Secured Parties:** | The "**Lenders**" under, and as defined in, that certain *Senior Secured Priming and Superpriority Debtor-In-Possession Credit and Guaranty Agreement*, dated as of August 12, 2024 (as amended, restated or otherwise modified from time to time in accordance with its terms and the applicable DIP Order (as defined below), the "**DIP Credit Agreement**"), by and among the |

---

[1]    Capitalized terms used but not defined herein have the meanings assigned to them in the RSA (as defined below) or the Interim DIP Order (as defined below). To the extent of any conflict between this Term Sheet and the RSA, this Term Sheet will govern and control.

Debtors, Varagon Capital Partners Agent, LLC, as administrative agent (in such capacity, the "**DIP Agent**"), and the lenders from time to time party thereto (collectively, the "**DIP Lenders**," and together with the DIP Agent, the "**DIP Secured Parties**"). The "Required Lenders" under, and as defined in, the DIP Credit Agreement shall be referred to herein as the "**DIP Required Lenders**".

| | |
|---|---|
| | **Chapter 11 Cases** |
| **Implementation:** | The Debtors have commenced the Chapter 11 Cases to pursue the consummation of a sale of all or substantially all of their assets pursuant to an Acceptable Sale and the confirmation of the Plan in accordance with the terms and conditions set forth herein and in the RSA. |
| **DIP Facility:** | The DIP Secured Parties have agreed to provide the Debtors with a senior secured, superpriority debtor-in-possession multi-draw term loan credit facility (the "**DIP Facility**") pursuant to, and in accordance with, the DIP Credit Agreement, the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Utilize Cash Collateral; (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief (Docket No. 63)* (as may be amended, extended or otherwise modified in accordance with its terms, the "**Interim DIP Order**"), and the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Utilize Cash Collateral; (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief (Docket No. 393)* (as may be amended or otherwise modified in accordance with its terms, the "**Final DIP Order**," and together with the Interim DIP Order, the "**DIP Orders**"). All disbursements made by the Debtors during the pendency of the Chapter 11 Cases shall be subject to the terms and conditions of the DIP Documents and applicable DIP Order, and shall be made in accordance with the Approved Budget (as defined in the DIP Orders) in effect from time to time pursuant to the applicable DIP Order. |
| **Sale and Marketing Process:** | The Debtors shall continue their sale and marketing process (the "**Sale Process**") and solicit bids for an Acceptable Sale in accordance with the Milestones (as defined in the DIP Orders) and procedures governing the auction and Sale Process set forth in the *Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets, (C) Establishing Certain Assumption and Assignment Procedures and Approving Manner of Notice Thereof, and (D) Granting Related Relief (Docket No. 348)* (the "**Bidding Procedures Order**"). Upon the selection of a winning bid in respect of an Acceptable Sale, the Debtors shall seek and obtain an order of the Bankruptcy Court approving and authorizing such Acceptable Sale in form and substance acceptable to the DIP Agent, DIP Required Lenders, Prepetition Agent and Prepetition Required Lenders (the "**Sale Order**"). |
| | The Debtors shall seek and diligently pursue as part of the Sale Order, and each of the Debtors and the Consenting Lenders (collectively, the "**Restructuring Support Parties**") shall each support the indefeasible distribution of 100% of the gross proceeds of the Acceptable Sale (subject to the Carve Out (as defined in the DIP Orders)) to the DIP Agent and/or Prepetition Agent, as applicable, at the consummation of such Acceptable Sale to satisfy the following Claims in the following order of priority: (1) DIP Claims (as defined in the DIP Orders) until repaid in full in cash, (2) any Other Secured Claims (as defined below) pursuant to the treatment described below, which shall not be paid using any DIP loan advances or collateral or proceeds |

|  | of the Prepetition Secured Parties or DIP Secured Parties, respectively, and (3) the Prepetition Loan Secured Claims. |
|---|---|
| **Credit Bid:** | The DIP Agent, on behalf of the DIP Secured Parties, and the Prepetition Agent, on behalf of the Prepetition Secured Parties, shall each be granted in the DIP Orders and/or the Bidding Procedures Order the unqualified right to, and may in their respective sole and absolute discretion, credit bid up to the full amount of the DIP Claims and Prepetition Loan Secured Claims, respectively (collectively, a "**Credit Bid**"). In the event that multiple qualified bids are submitted in respect of an Acceptable Sale and the Debtors conduct an auction, the DIP Secured Parties and Prepetition Secured Parties shall be permitted to submit a Credit Bid up until the conclusion of such auction.  In the event that no qualified bids are received in respect of an Acceptable Sale or the Debtors do not conduct an auction or the Debtors are otherwise unable to consummate an Acceptable Sale, the DIP Secured Parties and Prepetition Secured Parties shall be permitted to submit a Credit Bid without any time limitation. The Debtors shall not pursue, and the Restructuring Support Parties shall not support, any chapter 11 plan that does not provide for the Sale Process (as defined below) and the rights of the DIP Secured Parties and Prepetition Secured Parties to Credit Bid in connection with any sale or plan.<br><br>The Restructuring Support Parties shall agree, and the Bidding Procedures Order shall expressly provide, that the DIP Secured Parties and Prepetition Secured Parties shall be automatically deemed qualified bidders, and any Credit Bid made in accordance herewith shall be automatically deemed a qualified bid, in the Sale Process and any other sale or plan process. |
| **Sale Process Milestones:** | • Debtors shall timely comply with each of the Milestones set forth in the Interim DIP Order and any subsequent DIP Orders, as well as the following:<br><br>    o By September 1, 2024, Debtors shall have filed a motion to reject leases, which motion and any corresponding order shall each be in form and substance acceptable to the DIP Agent, Prepetition Agent, Prepetition Required Lenders and DIP Required Lenders (including with respect to specific leases designated for rejection); and<br><br>    o No later than forty-five (45) days after the date on which the auction concludes or is cancelled, as applicable, the Plan shall become effective (such effective date, the "**Plan Effective Date**"). |
| | **Classification and Treatment of Claims[2] and Interests Under the Plan** |
| **DIP Claims:** | In full satisfaction of the DIP Claims and to the extent not previously indefeasibly paid upon consummation of an Acceptable Sale, each holder thereof shall receive on the Plan Effective Date, indefeasible payment in full of its pro rata share of 100% of the gross proceeds of an Acceptable Sale (subject to the Carve Out provided in the DIP Orders). |
| **Administrative, Priority Tax, and Other Priority Claims:** | On or as soon as practicable after the Plan Effective Date, each holder of an Administrative, Priority Tax, and Other Priority Claim will be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; provided, however, nothing herein shall obligate the DIP Secured Parties or the Prepetition Secured Parties to fund, or make available DIP Collateral (as defined in the Interim DIP Order) proceeds (including Cash Collateral and including via section 506(c) surcharge) to pay, any such Claims |

---

[2] "**Claim**" defined as set forth in section 101(5) of the Bankruptcy Code.

| | |
|---|---|
| | except as and to the extent provided in the DIP Orders in accordance with the Approved Budget and Carve Out thereunder. |
| **Other Secured Claims:**<br><br>Unimpaired; Deemed to Accept | On the Plan Effective Date, to the extent any other secured claims exist (exclusive of the Prepetition Loan Secured Claims and DIP Claims, the "**Other Secured Claims**"), all such Other Secured Claims allowed as of the Plan Effective Date will be satisfied in a manner permitted by the Bankruptcy Code; provided, however, to the extent that such Other Secured Claims are proposed to be satisfied using proceeds of an Acceptable Sale, such proceeds shall not exceed $1 million without the prior written consent of the DIP Agent, Prepetition Agent, Prepetition Required Lenders and DIP Required Lenders. |
| **Prepetition Loan Secured Claims:**<br><br>Impaired; Entitled to Vote | The Prepetition Loan Secured Claims shall include not less than $159,262,642.07 in aggregate outstanding principal amount of loans arising under the Prepetition Credit Agreement as of the Petition Date, plus interest, fees, expenses, and other amounts arising under the Prepetition Credit Agreement, the other "Loan Documents" (as defined in the Prepetition Credit Agreement), and the DIP Orders (collectively, the "**Prepetition Loan Documents**"), including all "Obligations" under, and as defined in, the Prepetition Credit Agreement. The Prepetition Loan Secured Claims shall be net of, and not include, any Prepetition Loan Secured Claims included in any effectuated "Roll-Up" under, and as defined in, the respective DIP Orders. The Prepetition Loan Secured Claims shall be fully allowed.<br><br>On or prior to the Plan Effective Date to the extent not previously indefeasibly paid and following repayment in full of all DIP Claims in cash, the holders of Prepetition Loan Secured Claim will receive, subject to the "Carve Out" provided in the DIP Orders, (i) their pro rata share of 100 percent of the remaining proceeds of an Acceptable Sale on account of such holder's Allowed Prepetition Loan Secured Claim or, at the Prepetition Secured Parties' election, (ii) title to any and all of the DIP Collateral and Prepetition Collateral to the extent not transferred pursuant to an Acceptable Sale. The distribution of all such Acceptable Sale proceeds shall be deemed indefeasible and non-refundable upon receipt. |
| **General Unsecured Claims:**<br><br>Impaired; Deemed to Reject | General Unsecured Claims shall consist of any Claim against the Debtors (other than any pre- or postpetition Claim against a Debtor held by another Debtor (the "**Intercompany Claims**")) as of the Petition Date that is neither secured nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court and not otherwise classified above (the "**General Unsecured Claims**"). The General Unsecured Claims shall not include the Prepetition Loan Secured Claims; however, any deficiency claims arising from unsatisfied Prepetition Loan Secured Claims (the "**Deficiency Claims**") shall be included in the class of General Unsecured Claims. Unless the DIP Claims and Prepetition Loan Secured Claims are each paid in full in cash on or prior to the Plan Effective Date, each holder of an allowed General Unsecured Claim will receive no distribution on account of their General Unsecured Claims.<br><br>Holders of General Unsecured Claims will share in the General Unsecured Distributable Proceeds, as described below.<br><br>Any and all subordination and intercreditor agreements between and among the direct and indirect equityholders of the Debtors (including Equinox Group LLC and Equinox Holdings, Inc.), on the one hand, and the Prepetition Secured Parties (or the Prepetition Agent on their behalf), on the other hand, shall be fully enforceable in the Chapter 11 Cases and the relevant terms and priorities thereof shall be incorporated into the Plan. |
| **Intercompany Claims:** | On the Plan Effective Date, all Intercompany Claims will be cancelled, released, and extinguished without distribution, and will be of no further force or effect. |

301434215
31916478.5

| | |
|---|---|
| Impaired; Deemed to Reject | |
| **Interests:**<br><br>Impaired; Deemed to Reject | Any and all equity interests (as defined in section 101(16) of the Bankruptcy Code) of each Debtor (the "**Interests**"), including all ordinary shares, common stock, preferred stock, membership interest, partnership interest, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, including any restricted share, option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, that existed immediately before the Plan Effective Date shall be cancelled, released and extinguished without distribution, and will be of no further force or effect. |
| **General Provisions** ||
| **Executory Contracts and Unexpired Leases:** | The Debtors reserve the right, as part of the Acceptable Sale, to reject certain executory contracts and unexpired leases subject to the prior written consent of the DIP Agent (if and as directed by the DIP Required Lenders) and Prepetition Agent (if and as directed by the Prepetition Required Lenders).  All executory contracts and unexpired leases not expressly assumed or assumed and assigned pursuant to the Sale Transaction will be deemed rejected on the Plan Effective Date pursuant to the Plan. |
| **Cancellation of Loans, Interests, Instruments, Certificates, and Other Documents:** | Except as provided in the Plan, on the Plan Effective Date, pursuant to and in accordance with the Plan, all notes, instruments, certificates evidencing debt of, or Interests in, the Debtors (but excluding the DIP Credit Agreement, the Prepetition Credit Agreement, and each of their related debt documents unless all obligations thereunder are satisfied in full upon an Acceptable Sale) will be cancelled, and obligations of the Debtors thereunder will be discharged.  In addition, on the Plan Effective Date, pursuant to and in accordance with the Plan, any registration rights agreements, stockholder agreements, or similar agreements with respect to Interests in the Debtors will also be cancelled and any obligations of the Debtors thereunder will be discharged. |
| **Vesting of Assets:** | On the Plan Effective Date, and if applicable, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets of the Debtors' estates not transferred pursuant to the Acceptable Sale will vest in a post-effective date debtor or liquidating trust (the "**Post-Effective Date Entity**") administered by a plan administrator or trustee after the Plan Effective Date that is selected by the Prepetition Agent and Prepetition Required Lenders so long as the Deficiency Claims of the Prepetition Secured Parties are at least $5 million (the "**Post-Effective Date Administrator**"), free and clear of all claims, liens, encumbrances, charges, and other interests, except those provided by the Plan.<br><br>The Post-Effective Date Entity's assets  (the "**General Unsecured Distributable Proceeds**") shall be distributed as follows:<br><br>• First, in the event the DIP Obligations and other amounts owing to the DIP Lenders have not been indefeasibly repaid in full in cash, the DIP Agent, on behalf of the DIP Lenders, shall receive all proceeds of Trust Assets that constitute DIP Collateral.<br><br>• Second, in the event the DIP Obligations have been indefeasibly repaid in full in cash but the Prepetition Obligations and other amounts owing to the Prepetition Secured Parties have not been indefeasibly repaid in full in cash, the Prepetition Agent, on behalf of the Prepetition Lenders, shall receive all proceeds of Trust assets that constitute Prepetition Collateral. |

|  | • Third, General Unsecured Claims (including any Deficiency Claims) shall share pro rata in the remaining proceeds of the Trust assets that do not constitute DIP Collateral or Prepetition Collateral. |
|---|---|
| **Compromise and Settlement:** | The Plan will contain customary provisions reasonably acceptable to the Restructuring Support Parties to the fullest extent permitted by law for the compromise and settlement of claims stating that, notwithstanding anything in the Plan to the contrary, the allowance, classification, and treatment of allowed Claims and Interests and their respective distributions take into account and conform to the relative priority and rights of such Claims and Interests in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. |
| **Releases and Exculpation:** | Subject to (a) the conclusion of the investigation completed by Young Conaway Stargatt & Taylor, LLP ("**YCST**") (the results of which, along with any requested supporting information, shall be timely shared with the Prepetition Agent, DIP Agent and their advisors via a presentation by YCST), and a determination that such relief is appropriate, the Plan and order confirming the Plan shall provide customary releases (including consensual third-party releases) and exculpation provisions, in each case, to the fullest extent permitted by law, solely for the benefit of (i) the Debtors, (ii) the DIP Secured Parties and their advisors and representatives, (iii) the Prepetition Secured Parties and their advisors and representatives, (iv) YCST, (v) Moelis & Company, (vi) Portage Point Partners, (vii) FTI Consulting, (viii) Epiq Corporate Restructuring, LLC, (ix) Guy Harkless, and (x) Emanuel Pearlman. |
| **Definitive Documents:** | This Term Sheet is indicative in nature rather than final, and any final agreement will be subject to definitive documentation, *i.e.*, documents (including any related orders, agreements, instruments, schedules, or exhibits) that are contemplated by this Term Sheet and that are otherwise necessary or desirable to implement, or otherwise relate to the Plan. The Plan, any corresponding disclosure statement, plan supplement and all other definitive documentation with respect to the Plan shall be in form and substance consistent with this Term Sheet and the RSA and otherwise reasonably acceptable to the DIP Agent, the DIP Required Lenders, the Prepetition Agent and Prepetition Required Lenders. |
| **Tax Structure:** | To the extent practicable, the Plan will be structured so as to obtain the most beneficial structure for the Post-Effective Date Administrator, which structure shall be reasonably acceptable to the Prepetition Agent, DIP Agent and Required DIP Lenders. |
| **Retained Causes of Action:** | Except as otherwise set forth in the Plan, the Post-Effective Date Administrator will retain all rights to commence and pursue any causes of action that are not acquired pursuant to the Acceptable Sale and not released under the Plan, it being understood that the Post-Effective Date Administrator will not retain any claims or causes of action against the parties released pursuant to the Plan as provided herein (each a "**Released Party**"), subject to a carve-out for any act or omission of a Released Party that is a criminal act or constitutes fraud, gross negligence, or willful misconduct. The Plan will establish an oversight committee of three individuals with which the Post-Effective Date Administrator shall be obligated to consult and which shall have consent rights over, among other things, the settlement or compromise of any claims transferred to the trust pursuant to the Plan (the "**Oversight Committee**"). The Required Prepetition Lenders shall have the right to appoint at least one member of the Oversight Committee in all events, but if the Deficiency Claims arising from unpaid Prepetition Loan Secured Claims exceed $5 million as of the Plan Effective Date, the Prepetition Required Lenders shall have the right to appoint two of the three members of such Oversight Committee. Notwithstanding anything to the contrary herein, unless otherwise agreed by the DIP Agent, |

|  | Prepetition Agent, Prepetition Required Lenders and DIP Required Lenders (including, without limitation, as part of an Acceptable Sale), all claims and causes of action against the Debtors' direct and indirect equity holders in any capacity (including, without limitation, as counterparty to any contract or agreement with any Debtor) and any former directors and officers of any Debtor as of the Petition Date shall not have been released by the Debtors during the Chapter 11 Cases and shall be transferred to the Post-Effective Date Entity on the Plan Effective Date. |
| --- | --- |
| **Retention of Jurisdiction:** | The Plan will provide for a retention of jurisdiction by the Bankruptcy Court for, among other things, (i) resolution of claims; (ii) allowance of compensation and expenses for pre-Plan Effective Date services; (iii) resolution of motions, adversary proceedings, or other contested matters; and (iv) entering such orders as necessary to implement or consummate the Plan and any related documents or agreements. |
| **Resolution of Disputed Claims:** | The Plan will provide procedures for the resolution of disputed Claims, including Cure Claims. Once resolved, the claimants will receive distributions, if any, in accordance with the provisions of the Plan and the classification of their allowed Claim. The Debtors shall consult and cooperate in good faith with the Prepetition Agent and DIP Agent with respect to the treatment and resolution of any material disputed claims arising against the Debtors. |
| **Conditions to Plan Effective Date:** | The Plan shall include customary conditions for a liquidating chapter 11 plan of this type; provided, such conditions precedent shall include, without limitation, each of the following which shall not be waived by the Debtors without the prior written consent of the DIP Agent, the Prepetition Agent and the Required DIP Lenders:<br><br>• The Final DIP Order shall have been entered and shall have become a final order.<br><br>• The Debtor stipulations in the respective DIP Orders shall have become binding against all parties-in-interest in the Chapter 11 Cases and any Successor Case, including, without limitation, any Committee, and all Challenges shall have been waived, released and barred pursuant to the terms of the applicable DIP Order(s).<br><br>• The Sale Order shall have been entered and any and all objections to the entry and immediate effectiveness of the and Sale Order by any party-in-interest shall have been resolved, withdrawn or overruled to the satisfaction of the DIP Agent, Prepetition Agent, Prepetition Required Lenders and DIP Required Lenders. |

**EXHIBIT B**
**JOINDER AGREEMENT**

**[●], 2024**

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of September 23, 2024 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Agreement**"), by and among BLINK HOLDINGS, INC., a Delaware corporation, as debtor and debtor-in-possession ("**Blink**"), each of the Debtors party thereto and the parties named therein as "Consenting Lenders" thereunder.  Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Agreement.

1.    <u>Agreement to be Bound</u>.  The Joinder Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached hereto as <u>Annex I</u> (as the same has been or may hereafter be amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joinder Party shall hereafter be deemed to be a "Consenting Lender" and a "Restructuring Support Party" for all purposes under the Agreement and with respect to all Claims held such Joinder Party.

2.    <u>Representations and Warranties</u>.    The Joinder Party hereby makes the representations and warranties of the Consenting Lenders set forth in the Agreement to each other Restructuring Support Party.

3.    <u>Governing Law</u>.  This joinder agreement (the "**Joinder Agreement**") to the Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Joinder Party has caused this Joinder Agreement to be executed as of the date first written above.

[Name of Transferor: _____]

Name of Joinder Party: ___ _____

By: _____
    Name: _____
    Title: _____

Notice Address:

_____

_____

E-mail: _____
Attention: _____

with a copy to:

_____

_____

E-mail: _____
Attention: _____

# __ANNEX I__

## Agreement