# EXHIBIT A

**BROADHOLLOW/PINELAWN CW NF LLC and
BROADHOLLOW/PINELAWN J.E.S. NF LLC**

**LANDLORD**

with

**BLINK MELVILLE, INC.**

**TENANT**

<u>**AGREEMENT OF LEASE**</u>

PREMISES: portion of 121 Broadhollow Road
         Melville, New York

2365808.7
2422284.1

## **TABLE OF CONTENTS**

ARTICLE 1 – DEMISE ............................................. 1

ARTICLE 2 – PREMISES ........................................... 1

ARTICLE 3 – TERM ............................................... 2

ARTICLE 4 – BASIC ANNUAL RENT AND ADDITIONAL RENT ............. 5

ARTICLE 5 – REAL ESTATE TAXES ................................. 7

ARTICLE 6 – USE; OPERATING COVENANTS; SIGNAGE ................ 11

ARTICLE 7 – LANDLORD'S WORK; USE APPROVALS ................... 19

ARTICLE 8 – TENANT'S INITIAL WORK; ALTERATIONS AND
     INSTALLATIONS ........................................... 21

ARTICLE 9 – UTILITIES AND SERVICES; CLEANING; GARBAGE
     REMOVAL ................................................. 27

ARTICLE 10 – REPAIRS ......................................... 30

ARTICLE 11 – REQUIREMENTS OF LAW ............................. 32

ARTICLE 12 – INSURANCE, LOSS, REIMBURSEMENT, LIABILITY ....... 33

ARTICLE 13 – DAMAGE BY FIRE OR OTHER CAUSE ................... 36

2365808.7
2422284.1

ARTICLE 14 – ASSIGNMENT AND SUBLETTING ......................... 38

ARTICLE 15 – DEFAULT-BANKRUPTCY .............................. 43

ARTICLE 16 – ADJACENT EXCAVATION – SHORING ................... 50

ARTICLE 17 – CONDEMNATION ..................................... 51

ARTICLE 18 – ACCESS TO PREMISES ............................... 53

ARTICLE 19 – QUIET ENJOYMENT .................................. 54

ARTICLE 20 – INVALIDITY OF ANY PROVISION ..................... 54

ARTICLE 21 – BROKERAGE ........................................ 54

ARTICLE 22 – SUBORDINATION; NONDISTURBANCE; ATTORNMENT ........ 55

ARTICLE 23 – SURRENDER OF PREMISES/HOLD OVER .................. 56

ARTICLE 24 – FORCE MAJEURE .................................... 57

ARTICLE 25 – NOTICES .......................................... 57

ARTICLE 26 – CAPTIONS ......................................... 58

ARTICLE 27 – ENVIRONMENTAL MATTERS ........................... 58

ARTICLE 28 – MECHANIC'S LIENS ................................. 61

ARTICLE 29 - RIGHT TO PERFORM COVENANTS ....................... 61

ARTICLE 30 - CUMULATIVE REMEDIES - NO WAIVER ................. 62

ARTICLE 31 - LANDLORD'S DEFAULT AND LIABILITY ................ 62

ARTICLE 32 - COMMON AREAS .................................... 63

ARTICLE 33 - FORCE MAJEURE ................................... 66

ARTICLE 34 - MISCELLANEOUS ................................... 66

ARTICLE 35 - PRE-SALES ACTIVIITES ............................ 67

ARTICLE 36 - ANTI-TERRORISM LAW .............................. 68

ARTICLE 37 -RULES AND REGULATIONS ............................ 68

Exhibits:

Exhibit A       Demised Premises
Exhibit B       Site Plan
Exhibit B-1     Tenant's Signage Program
Exhibit C       Landlord's Work
Exhibit D       Rules and Regulations
Exhibit E-1     SNDA
Exhibit E-2     Recognition and Attornment Agreement

**AGREEMENT OF LEASE** made as of the _____ day of November, 2011, by and between **BROADHOLLOW/PINELAWN CW NF LLC and BROADHOLLOW/PINELAWN J.E.S. NF LLC**, with offices c/o Wachtler Knopf Equities, 500 Bi-County Boulevard, Suite 230S, Farmingdale, New York 11735, hereinafter referred to as the "Landlord" and **BLINK MELVILLE, INC.**, a New York corporation, being a subsidiary of Blink Holdings, Inc., having an address at 895 Broadway, Third Floor, New York, New York 10003, hereinafter referred to as "Tenant".

## W I T N E S S E T H:

Landlord is the owner of the property, including the land ("Land") and the building (the "Building"), located at 121 Broadhollow Road, Melville, New York 11747 (the Land and the Building collectively referred to as the "Property").

In consideration of the mutual covenants herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby covenant and agree as follows:

### ARTICLE 1 - DEMISE

1.1   Subject to the terms of this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, approximately 18,150 rentable square feet (comprised of approximately 10,000 rentable square feet on the second floor and approximately 8,150 rentable square feet on the ground floor) in the Building at the Property, all as depicted and otherwise described on Exhibit "A" annexed hereto and made a part hereof (the "Premises") for the term hereinafter stated, for the rents hereinafter reserved, upon and subject to the terms, covenants and conditions contained herein.

### ARTICLE 2 - PREMISES

2.1   The Premises represent 16.31% of the Building ("Tenant's Proportionate Share").   Landlord represents that in determining Tenant's Proportionate Share, the total square footage of the Premises and the Building were measured on a consistent basis.   Tenant's Proportionate Share shall not be changed for any reason other than a physical change to the

1

2365808.7
2422284.1

Premises or to the Building.

## ARTICLE 3 - TERM

3.1   The initial term of this Lease shall be for a period of fifteen (15) years (the "Initial Term") from the Rent Commencement Date (as hereinafter defined). The phrase "Term", as used herein, shall mean the Initial Term and, if applicable, the Extension Period, as such term is defined herein. The Lease shall commence on the Lease Commencement Date as hereinafter defined. For purposes hereof, the "Lease Commencement Date" shall be deemed to mean the later of the date (i) Landlord delivers actual and exclusive physical possession of the Premises to Tenant in the condition and with all of the work described in the Work Letter substantially completed; and (ii) Landlord receives the Use Approvals (as defined in Section 7.2 herein), (iii) Landlord has delivered a Subordination Non-Disturbance and Attornment Agreement (an "SNDA") in the form attached hereto as Exhibit "E-1", subject to reasonable comments by and approval of Tenant's counsel, executed by Landlord's mortgage lender and a Recognition and Attornment Agreement from BDG 115 Land, LLC, the ground lessor/fee owner of the Property, in the form attached hereto as Exhibit "E-2", and (iv) which is eight (8) weeks from the date hereof. The "Initial Expiration Date" of the Initial Term shall be the last day of fifteenth Lease Year, unless sooner terminated pursuant to the terms set forth in this Lease.

3.2   For purposes hereof, the term "Lease Year" shall be deemed to mean a period of twelve (12) consecutive months after the Rent Commencement Date, except that the first Lease Year shall commence on the Lease Commencement Date and shall end on the last day of the month in which the first (1st) anniversary of the Rent Commencement Date occurs, unless the Rent Commencement Date is the first day of a month, in which event the first Lease Year shall end on the date preceding the first anniversary of the Rent Commencement Date. Each succeeding Lease Year during the Term shall end on the anniversary date of the end of the last day of the first Lease Year.

3.3   Extension Option. Tenant shall have the option, to be exercised as hereinafter provided, to extend the Initial Term of this Lease for one (1) period of five (5) years (the "Extension Period") upon the following terms and conditions:

2

2365808.7
2422284.1

(a)     That at the time of the exercise of such option and at the commencement of the Extension Period, Tenant shall not then be in default in the performance of any of the monetary or other material terms, covenants or conditions herein contained, beyond the expiration of applicable notice and cure periods;

(b)     That the extension shall be upon the same terms, covenants and conditions as in this Lease provided except that the Basic Annual Rent for the Extension Period shall be the greater of (i) ninety percent (90%) of the Prevailing Market Rate (as hereinafter defined) and (ii) the rent stated in the chart set forth in Section 4.1(a) below for the Extension Period;

(c)     Tenant shall exercise the option to extend the Term of this Lease by notifying the Landlord ("Tenant's Extension Notice") of Tenant's election to exercise such option at least twelve (12) months prior to the Initial Expiration Date, **TIME BEING OF THE ESSENCE.**  Upon giving of Tenant's Extension Notice, this Lease shall be deemed extended for the Extension Period, subject to the provisions of this Article, without execution of any further instrument.  As used in this Lease, the defined term "Expiration Date" shall mean the Initial Expiration Date if Tenant does not exercise the option to extend the Term, or if Tenant does extend the Term of this Lease, the last day of the Extension Period, or sooner pursuant to the terms, covenants and conditions of this Lease.

(d)     (i)  For purposes of this Section 3.3,  the term "Prevailing Market Rate" shall mean the annual amount per square foot that a willing, comparable tenant would pay, and a willing, comparable landlord would accept, at arm's length, in similar buildings located within a two-mile radius of the Building, taking into account all relevant factors.  In determining the Prevailing Market Rate, no effect shall be given to transactions that have been entered into more than six (6) months prior to the delivery of Tenant's Extension Notice.

(ii)  Landlord shall initially determine the Prevailing Market Rate using its good faith judgment.  Landlord shall provide written notice of its determination of the Prevailing Market Rate to Tenant within thirty (30) days following Tenant's delivery of Tenant's Extension Notice.  Tenant shall have thirty

3

2365808.7
2422284.1

(30) days (the "Tenant's Review Period") after receipt of Landlord's written determination of the Prevailing Market Rate to either accept or reject Landlord's determination thereof. If Tenant does not in writing reject Landlord's determination within the Tenant Review Period, Tenant will be deemed to have accepted such determination. In the event Tenant does object in writing to Landlord's determination of the Prevailing Market Rate, Landlord and Tenant shall attempt to agree upon such Prevailing Market Rate, using their best good faith efforts. If Landlord and Tenant fail to reach agreement within twenty (20) days following Tenant's Review Period (the "Outside Agreement Date"), then by such date Tenant and Landlord shall each submit to the other its final estimate of the Prevailing Market Rate, and each party's determination shall be submitted to arbitration in accordance with subparagraphs (iii) through (v) below.

(iii) Landlord and Tenant shall each appoint one arbitrator who shall by profession be a real estate broker who shall have not less than ten (10) years experience in the leasing of properties similar to the Premises in the geographic area described in Section 3.3(d)(i) above. The determination of the arbitrators shall be limited solely to the issue of whether Landlord's or Tenant's submitted Prevailing Market Rate for the Premises is the closest to the actual Prevailing Market Rate for the Premises as determined by the arbitrators, taking into account the requirements of this Section 3.3. Each such arbitrator shall be appointed within fifteen (15) days after the Outside Agreement Date. Landlord and Tenant shall pay all costs associated with the retention of their respective arbitrators.

(iv) The two (2) arbitrators so appointed shall, within fifteen (15) days of the date of the appointment of the last appointed arbitrator, agree upon and appoint a third arbitrator who shall be qualified under the same criteria set forth hereinabove for qualification of the initial two arbitrators. The costs of the third arbitrator shall be paid by Landlord and Tenant equally.

(v) The three (3) arbitrators shall, within thirty (30) days of the appointment of the third arbitrator, reach a decision as to whether the parties shall use Landlord's or Tenant's submitted Prevailing Market Rate, and shall notify Landlord and Tenant thereof. The decision of the majority of

4

the three (3) arbitrators shall be binding upon Landlord and Tenant.

3.4    Option to Surrender.  Tenant shall have the right, at anytime during the Term to surrender a portion of the Premises consisting of approximately 3,000 rentable square feet of space in the area identified in Exhibit "A-1" annexed hereto and made a part hereof (the "Surrender Space").   If Tenant wishes to terminate the Lease with respect to the Surrender Space, Tenant shall give Landlord at least one hundred and twenty (120) days prior written notice of such election.  On the effective date of the surrender, the Surrender Space must be in marketable condition, meaning it has a legal egress and a demising wall. Alternatively, Tenant may elect that Landlord, at Tenant's cost and expense perform such work necessary to put the Surrender Space in marketable condition and such amount shall be added to the Termination Fee (as hereinafter defined).  Within ten (10) days after Landlord renders a bill therefor, Tenant shall pay to Landlord a termination fee by official bank check or by wire transfer, in an amount equal to:  The unamortized cost of the Tenant Improvement Allowance with respect to the Surrender Space, which amount shall be amortized over a period of seven (7) years and, if applicable, the cost incurred by Landlord to make the Surrender Space marketable, as aforesaid (the "Termination Fee").

If Tenant elects to terminate the Lease with regard to the Surrender Space, then effective as of the date of surrender, the Premises shall be deemed to consist of approximately 15,150 rentable square feet and Tenant's Proportionate Share shall be reduced to 13.48%.  Basic Annual Rent shall also be adjusted.

ARTICLE 4 – BASIC ANNUAL RENT AND ADDITIONAL RENT

4.1    (a)    Commencing on the Rent Commencement Date (as defined below) and continuing throughout the Term, Tenant shall pay to Landlord a basic annual rent (the "Basic Annual Rent") as follows:

| Period | Rent P.S.F. | Basic Annual Rent | Monthly Rent |
|---|---|---|---|
| Years 1-5 | $25.00 | $453,750.00 | $37,812.50 |
| Years 6-10 | $27.45 | $498,217.50 | $41,518.13 |

2365808.7
2422284.1

| Years 11-15 | $30.15 | $547,222.50 | $45,601.88 |
| **Extension Period** | | | |
| Years 16-20 | $33.11 | $600,946.50 | $50,078.88 |

       (b)      For purposes hereof, the "Rent Commencement Date" shall be deemed to mean the earlier of (a) nine (9) months from the Lease Commencement Date, subject to extension by reason of Force Majeure, including, but not limited to, Force Majeure type events, incurred by Tenant in connection with Tenant's obtaining of building permits for Tenant's Initial Work, or (b) four (4) months from the date Tenant opens for business at the Premises (excluding any pre-sales activity as further detailed in Section 35 of this Lease). Notwithstanding the foregoing, the Rent Commencement Date shall be extended on a day-to-day basis only if Tenant is prevented from (i) obtaining access to the Demised Premises or (ii) obtaining building permits for Tenant's Initial Work or final sign-offs on its permits and/or approvals for Tenant's Initial Work due to: (x) physical impediments either created by Landlord or not removed by Landlord(and not otherwise caused by Tenant) or (y) open permits, violations or applications of Landlord or of other tenants in the Building or (z) Landlord's failure to complete Landlord's Work and/or obtain any required final sign-offs of Landlord's Work.

       (c)   Basic Annual Rent shall be paid by Tenant in advance, in equal monthly installments, on the first (1st) day of each calendar month during the Term from and after the Rent Commencement Date, at the office of Landlord or such other place as Landlord may designate. Should the Rent Commencement Date fall on any day other than the first day of a month, then the Basic Annual Rent for such month shall be pro-rated on a per diem basis, and Tenant agrees to pay the amount thereof for such partial month on the Rent Commencement Date.

       (d)   Tenant shall pay the Basic Annual Rent and all Additional Rent (as defined below) payable hereunder in lawful money of the United States by good and sufficient check (subject to collection) drawn to Landlord's order on a bank which is a member of the New York Clearinghouse Association (or a successor thereto).

6

4.2    Additional Rent. All sums, other than Basic Annual Rent, payable by Tenant hereunder shall be deemed additional rent ("Additional Rent") and shall be payable thirty (30) days after demand therefor unless other payment dates are hereinafter provided.    In the event Tenant fails to timely pay Additional Rent, Landlord shall be entitled to avail itself of the same remedies as if Tenant failed to pay Basic Annual Rent.

4.3    Late Fee.    In the event any payment of Basic Annual Rent shall not be made on or before the tenth (10th) day of the month, or any payment of Additional Rent shall not be paid within ten (10) days of its due date, Tenant shall pay to Landlord an amount equal to five (5%) percent of such late payment as a fee and not as a penalty to help defray Landlord's additional administrative costs in connection therewith. Notwithstanding the foregoing, Landlord shall not impose a late charge or interest on Tenant the first time in any twelve (12) month period that payment is not received by Landlord within such ten (10) day period.

## ARTICLE 5 - REAL ESTATE TAXES

5.1    In addition to the Basic Annual Rent payable during the Term, Tenant shall pay, as Additional Rent, Tenant's Proportionate Share of the amount of increases in the Real Estate Taxes over the Base Tax Year (all such terms as defined below) levied against the Land and Building for each Lease Year in accordance with the terms set forth below.

5.2    The term "Real Estate Taxes" or "Taxes" shall include all real estate taxes, assessments, water and sewer rents and impositions and charges of every kind and nature, extraordinary as well as ordinary, foreseeable and unforeseeable, and each and every installment thereof which shall or may during the Term, be assessed, imposed upon, or liens upon or arising in connection with the use, occupancy or possession of or become due and payable out of, or for the Building, the Adjacent Buildings (as defined Section 6.1(b)), the Land or any part thereof.    In the event that at any time during the Term, under the Laws of the United States, the State of New York, or any political subdivision thereof, in which the Premises are situated, a tax or excise on rents or other tax, however described, is levied or assessed against Landlord or the Property of which the Premises form a part as a substitute in whole or in part for the Taxes or

7

in addition to the Taxes, the same shall be deemed to be Taxes as herein provided. Tax bills issued by the Office of the Receiver of Taxes or copies thereof submitted by Landlord to Tenant shall be conclusive evidence of the amount of taxes or installments thereof. Nothing herein contained shall be construed to include as a tax which shall be the basis of additional rent, any inheritance, estate, succession, transfer, gift, franchise, income or profit tax or capital levy that is or may be imposed upon Landlord, provided, however, that if, at any time during the Term, the method of taxation prevailing at the execution of this Lease shall be altered so that in lieu of or as a substitute to or in addition to the whole or any part of the taxes now levied, assessed or imposed on real estate as such, there shall be levied, assessed or imposed: (i) a tax on the rents received from real estate; or (ii) a license fee measured by the rent receivable by Landlord for the Building, the Adjacent Buildings, or any portion thereof; or (iii) a tax or license fee imposed on Landlord which is otherwise measured by or based, in whole or in part, upon the value of the Building, the Adjacent Buildings, or any portion thereof; or (iv) any other tax or levy imposed in lieu of or as a supplement to Taxes which are in existence as of the date of execution of this Lease, then the same shall be included in the computation of Taxes hereunder, computed as if the amount of such tax or fee so payable were then due if the Building and the Adjacent Buildings were the only property of Landlord subject thereto.

5.3    (A)    "Base Year Taxes" shall be deemed to mean the actual real estate taxes assessed for the **2011/2012** Tax Year (with the "Base Year" being the period December 1, 2011 to November 30, 2012). To the extent that during the Base Year (i) there are any Real Estate Tax abatements, reductions or similar programs in effect with respect to the Building, or (ii) the assessed value of the Building and Adjacent Buildings does not take into account construction to the Building or the Adjacent Buildings, including tenant improvements by Landlord or tenants other than the Tenant named herein, or a rent roll reflecting at least ninety (90%) occupancy, then in the case of clause (i) or clause (ii), Landlord shall calculate Base Year Taxes as if there were no such abatement, reduction or similar program (in the case of clause (i)) and/or so as to adjust the assessed value of the Building or the Adjacent Buildings for such construction and/or rent roll, as applicable (in the case of clause (ii)).

8

2365808.7
2422284.1

(B)    "Escalation Year" shall mean each Tax year following the Base Year, which shall include any part of the Term (December 1 – November 30).

(C)    "Escalation Year Taxes" shall be the actual real estate taxes assessed for any Escalation Year during the Term.

(D)    Should the taxing authority impose any additional Taxes or increase the assessed valuation of the Building by reason of any improvements made by or for Tenant, or include machinery, equipment, fixtures, inventory or other personal property or assets of Tenant in the assessed valuation of the Building, then, Tenant shall pay the entire tax attributable to such items.    Payments of these items of Taxes shall be made by Landlord and reimbursed by Tenant to Landlord (as Additional Rent) no later than ten (10) days after Landlord gives notice to Tenant of the amount thereof.

(E)    In the event that any Escalation Year Taxes shall exceed the Base Year Taxes, Tenant shall pay to Landlord, as Additional Rent, Tenant's Proportionate Share of such excess ("Tenant's Tax Payment" or "Tax Payment").    Tenant's Tax Payment shall be paid to Landlord at least twenty (20) days prior to the last day Landlord must make the Tax Payment to the applicable taxing authority without the imposition of penalties.

(F) (i)    Notwithstanding that set forth in Section 5.3(E) above, within thirty (30) days after the Rent Commencement Date, Landlord may instead give Tenant written notice of Landlord's estimate of the Taxes for the remainder of the Tax Year in which the term is to commence ("Landlord's Estimate").    During December of each calendar year or as soon after December as practicable, Landlord will give Tenant notice of Landlord's Estimate for the ensuing calendar year.    On or before the first day of each month during the ensuing calendar year, Tenant shall pay to Landlord one-twelfth (1/12th) of such estimated amount; however, if such a notice is not given in December, Tenant will continue to pay on the basis of the prior year's estimate until the month after such notice is given.    If at any time or times it appears to Landlord that the payments to be made under paragraph (A) for the current calendar year will vary from its estimate by more than five (5%) percent, Landlord will, by written notice to Tenant, revise its estimate for such

9

year, and subsequent payments by Tenant for such year will be based upon such revised estimate.

(ii) Within ninety (90)days after the close of each calendar year or as soon after such ninety (90) day period as practicable, Landlord will deliver to Tenant (i) a copy of the prior year's Tax bills.   If on the basis of such statement, Tenant owes an amount that is less than the estimated payments for such calendar year previously made by Tenant, Landlord will credit the excess to the next succeeding monthly installment of Basic Annual Rent.   If on the basis of such statements Tenant owes an amount that is more than the estimated payments for such calendar year previously made by Tenant, Tenant will pay the deficiency to Landlord within thirty (30) days after delivery of such statements.

5.4    Landlord may contest the validity of any Real Estate Taxes or the amount of the assessed valuation of the Building. In the event that Landlord shall be successful in any such contest and shall receive a refund of Taxes paid for prior years, Landlord shall pay to Tenant, providing Tenant is not in default hereunder, Tenant's Proportionate Share of the net refund of Real Estate Taxes paid by Tenant.  As used herein, the term "net refund" shall mean the refund plus interest, if any, thereon, paid by the governmental authority less costs for appraisal, engineering, expert testimony, attorney, printing and filing fees and all other costs and expenses of the proceeding. In the event that there shall be no refund for Taxes for prior years but that such contest shall result in the lowering of the assessed valuation and consequently the reduction of Real Estate Taxes for future years then, during the first year thereafter, Tenant shall pay its Proportionate Share of Landlord's cost for obtaining such reduction which shall include, all of the expenses hereinabove set forth for determining the "net refund", but in no event shall Tenant's Proportionate Share of said expenses together with Tenant's Proportionate Share of Tax increases for said year, exceed the Real Estate Taxes which Tenant would have paid had no such reduction been made.  In any case provided in this Paragraph 5.4 in which Tenant is entitled to a refund, Landlord may, in lieu of paying such refund, credit against installments of Basic Annual Rent or Additional Rent next coming due.   If this Lease shall expire before any such credit shall have been fully applied, then, provided Tenant is not in default hereunder, Landlord shall refund to Tenant the

10

unapplied balance of such credit.

In no event shall the Tenant have a right to participate in, nor institute any such proceeding, it being understood that the commencement, settlement or conduct thereof shall be in the sole discretion of the Landlord.

5.5    A. Landlord's failure to render Landlord's Statement with respect to any Tax Year shall not prejudice Landlord's right to thereafter render a Landlord's Statement with respect thereto or with respect to any other Tax Year, nor shall the rendering of a Landlord's Statement prejudice Landlord's right to thereafter render a corrected Landlord's Statement for that Tax Year.

B.    Landlord represents that it has not, as of the date hereof, received any written notice of any special assessments with respect to the Building or the Land.

C.    The expiration or termination of this Lease during any Escalation Year (for any part or all of which there is tax payment due under this Article) shall not affect the rights or obligations of Landlord respecting such payment and any Landlord's Statement relating to such payment may, on a pro-rata basis, be sent to Tenant subsequent to, and all such rights and obligations shall survive, any such expiration or termination.   Any payments due under such Landlord's Statement shall be payable within ten (10) days after such Landlord's Statement is sent to Tenant.

5.6    Landlord agrees to file or cooperate with Tenant and execute all applications for Tenant to file for a 485(b) tax abatement with regard to Tenant's Initial Work (as defined herein).

ARTICLE 6- USE; OPERATING COVENANTS; SIGNAGE

6.1    (a)    The Premises shall be used solely for the operation of a health, sports and fitness club including, but not limited to, (i) the provision of cardiovascular, strength, free weight training), steam rooms, sauna rooms, personal training, exercise training and supervision, meditation classes, health and fitness and dance related educational programs (excluding programs regarding nutrition by a nutritionist),

11

dance and aerobic classes; and ancillary thereto, babysitting; (ii) tanning services; massage and related modalities (including therapeutic massage); group fitness programs (including but not limited to yoga, Pilates and spinning); social activities incidental to health club membership, spa (including, but not limited to, massage, facials and body wraps); medical offices, physical therapists', sports/rehab therapy, and specialists' offices; office space and meeting rooms; and ancillary food and beverage service offering coffee, juice, sports beverages, yogurt, vitamins, other sports-related supplements and other food items involving limited preparation; which food and beverage service may alternatively, at Tenant's election, be provided by way of refrigerated units and/or vending machines within the Demised Premises containing pre-bottled water, soft drinks and/or juices and pre-packaged snack and other foods, nutritional bars and the like for the comfort and convenience of Tenant's members; and (iii) an ancillary retail facility for the sale of goods and apparel, which retail service may alternatively, at Tenant's election, be provided by way of vending machines within the Premises, subject to Landlord's approval, and for no other purpose. The foregoing uses are hereinafter referred to as the "Permitted Use". This description of the Permitted Use and all of the possible components thereof is not intended to be, nor shall it be interpreted to be, a representation or covenant by Tenant that all or any one specific activity shall be provided by Tenant at any given time, it being understood that the range and scope of health club and ancillary service offerings shall be determined solely by Tenant in the exercise of its prudent business judgment. Tenant shall have the right to install (i) pay lockers in the Premises for use by its members, employees and invitees and (ii) up to two (2) automatic teller machines within the Premises, all in accordance with applicable legal requirements. With regard to Tenant's sale of products from vending machines, Tenant agrees that if Tenant requests bids from vending machine suppliers for its contract at the Building, Tenant shall include Landlord's affiliate as a bidder for such contract.

(b) Tenant has the exclusive right to operate each of the activities described in clause (i) of the definition of Permitted Use within the Building and within the adjacent buildings owned by Landlord (the "Adjacent Buildings"), but with respect to the Adjacent Buildings, the exclusive shall only apply for so long as Landlord owns the Adjacent Buildings

12

2365808.7
2422284.1

("Tenant's Exclusive"). From and after the date on which this Lease is executed and delivered by Landlord and Tenant, Landlord shall not lease or allow any space in the Building or the Adjacent Buildings (for so long as Landlord owns the Adjacent Buildings) to be leased or used during the Lease Term (including the Extension Period) for all or any of the activities described in clause (i) of the definition of Permitted Use, except for those tenants or occupants of the Building in occupancy prior to the date of this Lease. Tenant shall have an exclusive with regard to all of these uses. Landlord represents to Tenant that prior to the date of this Lease, it has not entered into any lease or occupancy agreement or otherwise permitted any other space in the Building or the Adjacent Buildings (for so long as Landlord owns the Adjacent Buildings), to be used for a use included in Tenant's Exclusive.

(c)    Landlord acknowledges and agrees that the granting of Tenant's Exclusive (i) is a material covenant to Tenant, (ii) is a material inducement for Tenant to enter into this Lease and (iii) is necessary to protect Tenant's business, good will and reputation in the fitness industry. Landlord further acknowledges that violation of Tenant's Exclusive would cause irreparable harm that is not compensable by money damages. Accordingly, if Landlord and/or its successors or assigns leases to or permits any other tenant or occupant in the Building to engage in a use which violates Tenant's Exclusive, and Landlord and/or its successors or assigns fails to cure such violation within thirty (30) days after receipt of written notice thereof, then the same shall be a default hereunder and Tenant shall have the right to pursue any and all of its rights and remedies at law and in equity (including, without limitation, the right to enjoin any such use, the right to bring action for damages, the right to bring an action for specific performance and/or the right to terminate this Lease) until said violation is cured.

(d)    If, in derogation or breach of its lease of, or other occupancy agreement related to a portion of the Building or any of the Adjacent Buildings (whether now existing or hereafter entered into) another tenant or occupant in the Building uses (or suffers or permits any subtenant to use) its premises for one or more of the activities described in clause (i) of the definition of Permitted Use, Landlord shall, upon Tenant's written request and at Landlord's sole cost and expense, promptly use its best efforts to cause the termination

13

2365808.7
2422284.1

of such use. Such efforts shall include, but not be limited to, (i) filing of pleadings in a court of competent jurisdiction and diligently pursuing such litigation to conclusion (however, Landlord shall not be obligated to pursue an appeal of a final decision of the court); and (ii) filing for temporary or permanent injunctive relief asking the court to stop the renegade tenant or occupant from violating Tenant's Exclusive. If, in the event of a violation by a renegade tenant or occupant, the violation has not been cured within one hundred fifty (150) days after Landlord's receipt of Tenant's notice of said violation, in addition to Landlord's and its successors and assigns obligation to continue to use its best efforts to stop the renegade tenant or occupant, Tenant shall have the right to pursue any and all of its rights and remedies at law and in equity (including, without limitation, the right to enjoin any such use, the right to bring action for damages, the right to bring an action for specific performance and/or the right to terminate this Lease) until said violation is cured.

(e) Notwithstanding anything to the contrary set forth in this Section 6.1, during the first twenty-four (24) months after Tenant opens for business, Tenant shall also have the exclusive right to operate group fitness programs (including, but not limited to, yoga, pilates and spinning) and tanning services in the Building and within the Adjacent Buildings, except with respect to the Adjacent Buildings, the exclusive right with respect to group fitness shall last only for so long as Landlord owns the Adjacent Buildings. If Tenant is offering any one or more of these group fitness services at the end of the twenty-four (24) month period the exclusive shall continue with respect to the group fitness activity then being offered. If Tenant has not offered any group fitness programs or tanning services within the first twenty-four (24) months, then Tenant shall no longer have an exclusive with respect to these uses. After the first twenty-four (24) months, Landlord may, from time to time, but no more than twice per year, request confirmation from Tenant as to whether or not it is then offering tanning services or group fitness programs, and if Tenant is not then offering any one or more of such services then the exclusive with respect to same shall cease. As to any group fitness service being offered within the first twenty-four (24) months following Tenant's opening for business and thereafter, Tenant's exclusive shall continue.

14

2365808.7
2422284.1

6.2    Tenant shall not use or permit the use of the Premises or any part thereof in any way that would violate any of the covenants, agreements, terms, provisions and conditions of this Lease, or, provided Landlord shall have obtained all of the Use Approvals (as hereinafter defined), in violation of the certificate of occupancy for the Building, or for any unlawful purposes or in any unlawful manner.

6.3    Except as otherwise set forth in Article 7 below, Tenant shall, at its sole cost and expense, obtain and maintain all necessary licenses and permits for the operation of its business in the Premises (specifically excluding any permits and consents which are included in the definition of Use Approvals), such as, for example, food handling permits, if applicable, building permits and a certificate of occupancy or certificate of completion for Tenant's Initial Work.   Landlord, at Tenant's cost (except as set forth below in connection with obtaining the Use Approvals) shall reasonably cooperate with Tenant's efforts to obtain the necessary licenses and permits in order to allow for the Permitted Use in the Premises.   Landlord's cooperation shall include, without limitation, the prompt sign-off on all filings or submissions that require Landlord execution and the timely cure of Building violations and open applications caused by acts or omissions of Landlord.   Landlord shall execute all necessary building permit applications (and related building department and other governmental authority applications) promptly upon presentation by Tenant.    To the extent that Landlord subsequently reasonably objects to Tenant's plans and specifications, Tenant, upon making the required amendments to such plans and specifications, warrants that it will either amend or supplement its filing documents, if required, or make the appropriate field changes so that Tenant's Initial Work is completed in accordance with the amended plans and specifications.   Except as otherwise expressly set forth in this Lease, Tenant shall, at its sole cost and expense, comply with all conditions affecting the interior of the Demised Premises.

6.4    Tenant further covenants and agrees that throughout the Term, Tenant shall, at Tenant's sole cost and expense:

(i)    keep, to the reasonable satisfaction of Landlord, the Premises free from vermin, rats, mice and insects and maintain a contract with a licensed exterminator;

15

(ii) clean and maintain the Premises;

(iii) maintain the Premises and all of Tenant's personal property therein as an attractive location for the Permitted Use;

(iv) not conduct any auction, distress, fire, bankruptcy or going-out-of-business sale (whether real or fictitious); and

(v) comply with all present and future laws, ordinances, requirements, orders, directions, rules, and regulations of the federal, state, county and city governments and of all other authorities having or claiming jurisdiction, over the Premises, or appurtenances or any part thereof, and the business conducted therein, including without limitation, environmental rules and regulations, regulations or standards as are or may be promulgated under the Federal Occupational Safety and Health Act of 1970 or similar federal, state or local requirements and compliance with the Americans with Disabilities Act which are from time to time applicable to the Premises or appurtenances or any part thereof and the business conducted therein by Tenant ("Legal Requirements"). Notwithstanding the foregoing, Tenant shall not be responsible for the performance of structural work, alterations or repairs in the Premises, in the Building or on the Property necessary for compliance with Legal Requirements (collectively, the "Structural Work"), all of which required Structural Work shall be the obligation of Landlord, except to the extent such Structural Work is necessitated by (i) the particular manner of use by Tenant of the Premises (as opposed to general use for health club purposes) or (ii) the particular configuration of Tenant's alterations, including Tenant's Initial Work within the Premises.

6.5    Tenant agrees that it shall not utilize any unethical method of business operation in the Premises or any portion thereof.    Tenant shall not at any time, without first obtaining Landlord's prior written consent:

(i) use the plumbing facilities for any purpose other than that for which they were constructed, or dispose of any garbage or other foreign substance therein, whether through the utilization of so-called "disposal" or similar units, or

16

otherwise;

(ii) perform any act, or carry on any practice, that may damage, mar, or deface the Premises or Building; or

(iii)provided the Premises are delivered with a floor load as specified in the Work Letter, place a load on any floor in the Premises exceeding the floor load per square foot that such floor was designed to carry and that is allowed by law, or install, operate or maintain therein any heavy item of equipment.

6.6   Signage. Tenant shall not place or install any sign on any exterior portion of the Premises that does not comply with all applicable Legal Requirements.   Subject to compliance with Legal Requirements, Tenant, at its sole cost and expense, may install the signage, as indicated on the site plan annexed hereto as Exhibit "B-1", including signage on the exterior storefront and Building façades facing Broadhollow Road and Pinelawn Road.   Landlord shall cooperate with Tenant with respect to Tenant's applications for municipal approval of any signage, including executing applications and other documentation, all at no cost to Landlord.   In furtherance of the foregoing, Landlord hereby approves Tenant's façade program depicted on Exhibit "B-1" annexed hereto and made a part hereof, including, without limitation, Tenant's storefront, signs and flags on the exterior of the Building, and permanent signs and/or vinyl on the interior of Tenant's windows. Tenant shall have the right, without further approval from Landlord, to erect signs upon the Building and Premises as depicted on said Exhibit "B-1", provided same are installed in accordance with all local, municipal, county, state and federal laws relating thereto, are installed pursuant to lawful permits from the licensing authority having jurisdiction thereof, and further provided that all installation permits are obtained by the Tenant at its own cost and expense.    In furtherance thereof, Landlord (i) specifically authorizes and permits Tenant to remove, alter or replace any existing façade and/or monument signage currently existing at the Property and confirms that the locations shown on Exhibit B-1 for Tenant's signage are exclusive to Tenant, and (ii) confirms that if in connection with Tenant's removal of the existing sign(s), any damage to the Building or the Property from the existing signage shall be uncovered, Tenant shall not be obligated to repair any of such damage, it being agreed that

17

Tenant may simply re-cover the damaged area with its new signage. Tenant, however, shall be obligated to repair any damage to the Building and/or Property caused by Tenant during the installation or removal of its signage. Landlord shall indemnify and hold Tenant harmless from and against any and all claims made by the existing Tenant arising out of Tenant's removal, alteration and/or replacement of the existing Tenant's signage. Tenant may install additional or replacement signage on the exterior of the Building, its storefront and in its windows in the locations identified on Exhibit "B-1" without Landlord's consent, provided such signage is consistent with the signage and branding of the majority of other affiliated locations operating under the same trade name as Tenant. Any sign, once approved by Landlord (and any additional or replacement signage that complies with the preceding sentence), cannot be challenged as non-compliant with Landlord's signage criteria (if any). Tenant shall also be permitted without any further consent from Landlord, subject to compliance with Legal Requirements, to install monument signage and directional signage at the two entrances to the parking lot. Landlord shall have reasonable approval rights with respect to any other exterior Tenant signage, flags and banners, which approval rights shall not be unreasonably withheld, conditioned or delayed. Landlord's approval shall be limited to the method of construction, size and installation of the signs and in no event shall Landlord have any consent or approval rights with respect to the name, content, design, logo or colors used by Tenant in its signs as long as they are consistent with signs used by Tenant and its affiliates on a brand-wide basis and otherwise comply with applicable governmental requirements/approvals. Landlord shall not have approval rights over Tenant's interior signs, even if they are visible from the exterior of the Premises. To the extent that Landlord's consent or approval is required therefor, Landlord covenants and agrees that Landlord shall not unreasonably withhold, delay or condition its consent to any additional or replacement signage proposed to be installed by Tenant from time to time with respect to the Premises, provided that Tenant shall comply with all Legal Requirements with respect to such signage. Tenant shall be entitled to install and maintain temporary signs, banners and flags during Tenant's pre-opening construction and sales phase, without Landlord's consent, so long as same comply with all Legal Requirements. Tenant shall be responsible for removing all signage at the expiration of the Lease and the cost of

18

repair due to any damage caused to the Building and/or Premises in the installation and/or removal of Tenant's signage.

6.7    Landlord shall, at its sole cost and expense, install (if same does not already exist) fire extinguishing devices as part of Landlord's Work, as required, by all rules, regulations, laws, ordinances, statutes and requirements of all governmental authorities having jurisdiction over the Premises and as approved by the Fire Insurance Rating Organization and its successors. Tenant shall, at its sole cost and expense, keep such devices under service, and maintain such devices in good working order, throughout the Term.  Moreover, Tenant shall be responsible to adjust the sprinkler heads to comply with its Permitted Use and to maintain same during the Term.

6.8    Landlord and Tenant acknowledge and agree that Tenant shall be solely responsible for security of the Premises, including, but not limited to verification of entrants to the Premises and controlling access to the Premises.   Tenant shall indemnify and hold Landlord harmless in connection therewith.

6.9    Access.   Tenant shall have access to the Premises and Common Areas, including the Parking Area (as hereinafter defined) and may operate its business therefrom, twenty-four (24) hours per day, seven (7) days per week. If governmental approval is required for Tenant's conduct of business on a 24/7 basis, Landlord shall obtain such approval (at Landlord's sole cost and expense) as one of the Use Approvals and Landlord's receipt of same shall be a condition to the occurrence of the Commencement Date.

## ARTICLE 7 - LANDLORD'S WORK; USE APPROVALS

7.1    Landlord, at Landlord's sole cost and expense, shall perform the work set forth in Exhibit "C" annexed hereto ("Landlord's Work") and deliver the Premises to Tenant on the Lease Commencement Date in accordance with Exhibit "C". Landlord shall, at Landlord's expense, obtain all permits and governmental approvals as may be required for the performance of the Landlord's Work, and Landlord shall pay any municipal "impact fees" as may be required in connection with the Landlord's Work.

19

On or before thirty (30) business days from the date of
this Lease, Landlord shall submit to Tenant, for its review and
future use, a complete set of plans and specifications for
Landlord's Work necessary for Landlord to file for permits in
order to perform Landlord's Work.  Promptly after submission of
the plans to Tenant, Landlord shall submit a complete
application to the applicable governmental authority for all
necessary permits and licenses to construct Landlord's Work.
Landlord shall provide Tenant's project manager with all plans
and architectural drawings with regard to the Demised Premises
and Landlord's Work, as same may be amended from time to time.
Promptly after receipt of the necessary governmental approvals
and licenses, Landlord shall commence to perform Landlord's
Work.    Landlord shall prosecute Landlord's Work with due
diligence to completion and otherwise in accordance with good
construction practice.    Landlord shall use best efforts to
substantially complete Landlord's Work and deliver the Premises
to Tenant promptly following mutual Lease execution, subject to
Force Majeure, and if to the extent required, subject to the
receipt of Use Approvals.  For purposes of this Lease, the term
"substantially completed" shall mean that Landlord has completed
its Landlord's Work in accordance with Landlord's plans to such
an extent as to permit Tenant to take possession of the Premises
and perform and complete Tenant's Initial Work (as defined
below) without undue interference and to legally open for
business in the Premises in accordance with the Permitted Use
upon completion of Tenant's Initial Work, notwithstanding minor
items of construction which remain incomplete. Any punch list
items relating to Landlord's Work shall be completed by Landlord
within thirty (30) days after Landlord's Work has been
substantially completed. However, if the performance of Tenant's
Initial Work prevents Landlord from completing the punch list
items, or if it is not practical to complete the punch list
items until Tenant's Initial Work is completed, then Landlord
shall complete the punch list items within thirty (30) days
after Tenant completes Tenant's Initial Work.    In performing
such punch list items, Landlord shall use all commercially
reasonable efforts to minimize interference with the performance
by Tenant of Tenant's Initial Work. When completed, Landlord's
Work shall comply with all applicable laws, ordinances, rules,
orders and regulations of the governmental authorities having
jurisdiction thereover.  Warranties received in connection with
Landlord's Work shall inure to the benefit of Tenant. The
completion of any item of Landlord's Work shall include, in each

20

case, obtaining any required signoffs from governmental or quasi-governmental authorities having jurisdiction over the permitting, performance or approval of such work. Notwithstanding anything to the contrary set forth herein, if Landlord has not substantially completed Landlord's Work by April 30, 2012 and the reason for the delay is not caused by Tenant delay or other reasons beyond Landlord's control, Tenant shall have the right to terminate this Lease on thirty (30) days' notice to Landlord and this Lease shall expire on the expiration of the 30th day after Landlord's receipt of Tenant's notice, as if such date were the Expiration Date. However, if Landlord shall have substantially completed Landlord's Work within the thirty (30) day period, Tenant's notice to terminate shall automatically be voided.

7.2    Notwithstanding anything contained herein to the contrary, Landlord shall be responsible, and it shall be a condition to the Commencement Date that Landlord obtains all required governmental permits, approvals, consents, authorizations and entitlements required for Tenant's use and occupancy of the Premises for the Permitted Use, including, without limitation, all required governmental parking, traffic, site, sewer and use approvals (including, but not limited to physical therapy), but excluding any signage approvals and building permits for Tenant's Initial Work (the foregoing being referred to as the "Use Approvals"). Landlord shall obtain all Use Approvals at Landlord's sole cost and expense. Tenant shall be responsible for obtaining a Certificate of Occupancy for Tenant's Initial Work at Tenant's sole cost and expense. On or before September 30, 2011, Landlord shall submit complete applications for the Use Approvals to all governmental authorities with jurisdiction and shall thereafter diligently and continuously pursue receipt of all Use Approvals. Landlord shall keep Tenant regularly apprised of the status of the Approvals process. In the event Landlord's application is denied or rejected or Landlord is unable, after using good faith, continuous, diligent efforts, to obtain the Use Approvals by April 30, 2012, Tenant or Landlord shall have the right to terminate this Lease by ten (10) days written notice to the other party.

ARTICLE 8 – TENANT'S INITIAL WORK; ALTERATIONS AND INSTALLATIONS

8.1    (a) Except as hereinafter expressly provided, Tenant

21

shall make no alterations, installations, additions or
improvements in or to the Premises, including, without
limitation, Tenant's Initial Work (collectively "Alterations"),
without Landlord's prior written consent (such consent not to be
unreasonably withheld, delayed or conditioned). Subject to
Landlord's obligation to pay the Tenant Improvement Allowance
(as hereinafter defined) in connection with Tenant's Initial
Work, all such work, alterations, installation, additions and
improvements shall be done at Tenant's sole cost and expense.
In any event, no consent shall be necessary for (a) decorative
changes; (b) changes involving moveable furniture; and (c)
interior non-structural changes that (i) do not require a
building permit for such change and (ii) costs less than
$75,000.00 to perform and (iii)do not affect the plumbing, life
safety and electrical systems in the Premises, all of which
shall not be deemed "Alterations" for purposes of this Lease.

(b)    The parties contemplate that promptly after the
Lease Commencement Date, Tenant shall commence construction in
the Premises to build-out such Premises for Tenant's Permitted
Use ("Tenant's Initial Work"). Tenant's Initial Work shall be
done substantially in accordance with plans and specifications,
including electrical and mechanical specifications and drawings,
approved by Landlord, such approval not to be unreasonably
withheld, delayed or conditioned. Such plans and specifications
shall be delivered to Landlord for approval no later than eight
(8) weeks from the date hereof (the plans and specifications for
Tenant's Initial Work so delivered to Landlord for approval
being referred to herein as "Tenant's Plans"). Landlord shall
have three (3) business days after receipt of Tenant's Plans to
review Tenant's Plans  and to provide a written response to
Tenant.   If Landlord reasonably objects to Tenant's Plans (or
any portion thereof), Tenant shall within two (2) days, revise
Tenant's Plans and resubmit Tenant's Plans with the appropriate
revisions requested by Landlord duly made. Landlord shall then
have two (2) business days to review the revised Tenant's Plans
and respond in writing to Tenant. If Landlord shall fail to
respond to Tenant's Plans submitted by Tenant within the
aforesaid time periods, then Tenant shall submit to Landlord a
reminder notice advising Landlord of its failure to respond (the
"Reminder Notice").   If Landlord still fails to respond to
Tenant's Plans within two (2) business days after receipt of the
Reminder Notice, Landlord's approval to the work shown on
Tenant's Plans shall be deemed given.   Tenant's Plans, as

22

approved by Landlord, shall hereinafter be referred to as the "Approved Plans". If Landlord shall withhold its consent to all or any portion of Tenant's Plans, Landlord's response shall include a list of such objections and a reason for such objection. In connection with Tenant's Initial Work and all subsequent Alterations, Landlord agrees, at no cost to Landlord, to execute all necessary building permit applications (and related building department and other governmental authority applications) promptly after Tenant requests same. To the extent that after signing any such building permit or other application, Landlord subsequently reasonably objects to Tenant's Plans, Tenant, upon making the required amendments to Tenant's Plans, warrants that it will either amend or supplement its filing documents, if required, or make the appropriate field changes so that Tenant's Initial Work is completed in accordance with the amended Tenant's Plans. If necessary, Landlord shall execute or re-execute, as applicable, any revised or amended building permit or other application to the extent such revisions or amendments are required as a result of changes to Tenant's Plans. Tenant shall submit complete applications and Tenant's Plans or, if Tenant's Plans shall theretofore have been approved by Landlord, the Approved Plans to the applicable governmental authority for all necessary permits and/or approvals to construct Tenant's Initial Work no later than the date which is eight (8) weeks from the date hereof or within three (3) business days from the date the Use Approvals have been approved, whichever is later.

(c)    Landlord agrees to contribute $862,500.00, (calculated at the rate of $50.00 per rentable square foot for the 15,150 rentable square feet of space and $35.00 per rentable square foot with regard to the Surrender Space) toward the cost of Tenant's Initial Work ("Tenant's Improvement Allowance"). The Tenant's Improvement Allowance shall be available to Tenant for the payment of (i) physical alterations to the Premises (which shall include labor, materials, insurance costs charged by the contractors and subcontractors, and permit and expediting fees), (ii) decorative items made to the Premises, such as painting, carpeting and wall coverings, (iii) so-called "soft costs" such as architectural, engineering and other specialty consultant fees and expenses directly related to Tenant's Work and reasonable costs of moving into the Premises, and (iv) up to 10% of the Tenant Improvement Allowance may be used for working capital purposes for the Melville location only. Landlord shall

23

pay to Tenant the Tenant's Improvement Allowance as follows: the Tenant Improvement Allowance shall be paid by Landlord to Tenant within thirty (30) days following receipt of (i) a monthly requisition by Tenant, with certification from Tenant's architect, subject to Landlord's verification, that the work for which the requisition was made is actually in place, and (ii) partial lien waivers showing that all Material Contractors (as hereinafter defined) have been paid for all work covered by previous requisitions. Landlord shall pay to Tenant ninety (90%) percent of the requisition amount. The retainage amount (ten (10%) percent) shall be paid over to Tenant within fifteen (15) days after Tenant delivers a permanent certificate of occupancy or certificate of completion for the Premises to Landlord. It is understood and agreed that the Tenant Improvement Allowance distribution shall commence upon the presentation of the first monthly requisition by Tenant. "Material Contractors" shall mean contractors, subcontractors and suppliers having a contract cost of at least Two Thousand Dollars ($2000).

(d) Tenant shall have the right to perform portions of Tenant's Initial Work prior to the Lease Commencement Date and concurrently with Landlord's performance of Landlord's Work provided that Tenant does not unreasonably delay, interfere or disrupt completion of Landlord's Work. If Landlord, in its sole but reasonable discretion, determines that Tenant and/or its contractors are unreasonably interfering with Landlord's performance of Landlord's Work, Landlord may order Tenant and/or its contractors to discontinue those activities causing such unreasonable interference until such time as the performance of such work will no longer unreasonably interfere. The performance of such work by Tenant shall not cause an acceleration of the Commencement Date or the Rent Commencement Date.

(e) In no event shall Tenant or any of its contractors or subcontractors be required to post a bond or other security in connection with the performance of any alterations, including, without limitation, Tenant's Initial Work or to pay any construction coordination, plan review fee or similar charge, unless required by any municipality having jurisdiction over the Demised Premises. Under no circumstances, shall Tenant be obligated to utilize union labor in connection with the performance of alterations, including, without limitation, Tenant's Initial Work. However, Tenant must use an

24

open method of bidding.   If Tenant's non-union labor causes a labor dispute at the Demised Premises and the performance of Tenant's Initial Work is stopped, same shall constitute a "Tenant delay" and the Rent Commencement Date shall be accelerated one day for each day that the performance of Tenant's Initial Work is stopped.

8.2   Except as provided in Section 8.1(a) above, any future Alterations in the Premises shall be done solely in accordance with plans and specifications therefor first approved in writing by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.   With respect to such future work, Landlord shall have twenty (20) business days after receipt of plans and specifications therefor to review such plans and specifications and provide a detailed written response to Tenant.   Tenant shall then have up to twenty (20) business days to revise and resubmit such plans and specifications with the appropriate revisions requested by Landlord duly made.   Landlord shall then have seven (7) business days to review such amended plans and specifications and respond in writing to Tenant.   If Landlord shall fail to respond to Tenant within either of the above-referenced timeframes, then Landlord's consent shall be deemed to be granted.   If Landlord shall withhold its consent to all or any portion of the plans and specifications, Landlord's response shall include a specific list of such objections and a reason for such objection.

8.3   Prior to commencement of any Alterations (including Tenant's Initial Work), Tenant shall furnish to Landlord certificates evidencing the existence of:

(i)   Worker's Compensation insurance covering all persons employed for such Alterations with statutorily required limits;

(ii) employer's liability coverage including bodily injury with limits of not less than $100,000 per employee; and

(iii)   comprehensive general liability insurance including, but not limited to, completed operations coverage, products liability coverage, contractual coverage, broad form property damage, independent contractor's coverage and personal injury coverage naming Landlord as an additional named insured, with coverage of not less than $5,000,000.00

25

2365808.7
2422284.1

combined single limit coverage; and

(iv) a guarantee of completion and payment by Tenant's parent company, Blink Holdings, Inc., to be executed simultaneously with the execution of the Lease.

8.4    All Alterations made and installed by Tenant, or at Tenant's expense, upon or in the Premises which are of a permanent nature and which cannot be removed without damage to the Premises and/or the Building shall be Tenant's property when installed or completed and throughout the Term, but shall become and be the property of Landlord, and shall remain upon and be surrendered with the Premises as a part thereof at the end of the Term. Tenant shall not have to restore or remove any Alterations (including Tenant's Initial Work) made to the Premises at or prior to the expiration of the Term of this Lease.

8.5    Tenant's personal property shall remain the property of Tenant and may be removed by Tenant at any time and from time to time throughout the Term of this Lease, provided that Tenant shall repair any damage sustained to the Demised Premises and/or Building during the removal of any such property. Upon expiration of the Term, Tenant may and shall be required to remove Tenant's movable furniture, fixtures, equipment and inventory (the "Removal Property") from the Premises. As to such Removal Property, if same is left by Tenant, it shall be deemed abandoned by Tenant and the same may be disposed of by Landlord at Tenant's expense.

8.6    During the performance of all Alterations (including Tenant's Initial Work), Tenant shall have all necessary and reasonable access to Common Area passageways and points of connection, including, without limitation, a right of any access to Landlord's reserved space within adjacent tenant's premises, in order to perform such Alterations or Tenant's Initial Work, as applicable, including, without limitation, mechanical, electrical and plumbing work. Landlord shall cooperate with Tenant in securing such access and shall exercise all available rights and remedies under applicable leases in order to ensure such access for Tenant. However, Tenant shall not unreasonably interfere with the rights or occupancy of any other tenant in the Building during any such access.

26

ARTICLE 9 – UTILITIES AND SERVICES; CLEANING; GARBAGE REMOVAL

9.1    A.    Electric:    Landlord    shall    make    electric    energy available to the Demised Premises to operate the HVAC equipment serving the Premises as further described in Section 10.01A below ("HVAC System").    The electricity for the Premises, including the dedicated HVAC System, shall be supplied to Tenant by Landlord on a sub-metering basis and Tenant covenants and agrees to purchase the same from Landlord (or Landlord's designated agent) at the rates hereinafter set forth.

B.    Tenant, at its sole cost and expense, shall install in the Premises one or more sub-meters (collectively, the "Tenant's Sub-meter") to measure Tenant's consumption of electricity.    If Tenant's Sub-meter consists of more than one sub-meter, then the consumption of the electricity registered on each such sub-meter may be billed separately or on an aggregate basis.

C.    Tenant, within ten (10) days after its receipt of each invoice therefor from Landlord, shall pay to Landlord, as Additional Rent, for the electricity consumed during any period, an amount per kilowatt hour of electricity consumed during such period, as shown on Tenant's Sub-meter, equal to one hundred percent (100%) of the amount at which Landlord from time to time purchases each kilowatt hour of electricity for the Building for the same period from the utility company or alternate service provider (including all surcharges, taxes, fuel adjustments, taxes passed on to consumers by the public utility or alternate service, and other sums payable in respect thereof), which amount    (herein,    as    adjusted    from    time    to    time,    called "Landlord's Rate") shall be determined by dividing the cost determined by said utility or alternate service provider during each respective billing period by the number of kilowatts hours consumed by the Building appearing on the utility company invoice for such period.

D.    If any tax is imposed upon Landlord's receipts from the sale or resale of electric current to Tenant by Federal, State or municipal authority, Tenant agrees that, unless prohibited by law, Tenant's Proportionate Share of such taxes shall be passed on to and included in the bill of and paid by Tenant to Landlord as Additional Rent.

27

E.   Tenant shall make no alterations or additions to the electrical distribution system, electrical equipment or appliances without the prior written consent of Landlord in each instance.   Provided that as of the Lease Commencement Date, Landlord has provided the electric capacity as set forth in the Work Letter, Tenant covenants and agrees that at all times its use of electric current shall not exceed the capacity of existing feeders to the Building or the risers or wiring installation therein, and Tenant may not use any electrical equipment which, in Landlord's reasonable judgment, will overload such installations or interfere with the use thereof by other tenants of the Building.

F.   Landlord shall not be liable for any damages (including diminution of rental value, loss of business or otherwise) incurred or sustained by Tenant by reason of any diminution in the quantity or quality of electrical service or any change thereof or the temporary discontinuance of such service by reason of work done in the Building or repairs to be made therein by Landlord unless the same is caused by the gross negligence or willful misconduct of Landlord, its partners, members, managers, contractors, employees or agents. Notwithstanding the foregoing, in the event that any utility service is interrupted for at least ten (10) consecutive working days solely as a result of any of Landlord's or any of Landlord's agents' willful acts of misconduct or gross negligence, and Tenant is unable to operate its business within the Premises as a result thereof, then Landlord shall, after three (3) days' written notice from Tenant to Landlord concerning such interruption, abate Basic Annual Rent beginning after such tenth(10th)day on a day-to-day basis if and until such time as said utility services are restored.

G.   Tenant (at no cost to Tenant) and Landlord will at all times comply, and Landlord shall require all other tenants in the Building at all times to comply, with the rules, regulations, terms and conditions applicable to service, equipment, wiring and requirements of the public utility supplying electricity to the Building.   If pursuant to any laws or other legal requirements the amount which Landlord is permitted to charge Tenant for the electricity being provided shall be reduced below that which Landlord is otherwise entitled to charge Tenant hereunder, then Tenant shall pay the difference

28

between such amounts to Landlord as compensation for the use of the Building's electrical system.

H.    Landlord shall have no liability to Tenant for any loss, damage or expense sustained or incurred by reason of any change, failure, inadequacy, unsuitability or defect in the supply or character of the electric energy furnished to the Premises or if the quantity or character of the electric energy is no longer available or suitable for Tenant's requirements, except for any actual damage suffered by Tenant by reason of any such failure, inadequacy or defect caused by the gross negligence or willful misconduct of Landlord its partners, members, managers, contractors, employees or agents and then only ten (10) days after Landlord's receipt of notice from Tenant of such failure, inadequacy or defect.

9.2    Utilities (other than Electric). Tenant shall pay to Landlord as Additional Rent, Tenant's Proportionate Share of the amounts charged to Landlord for gas supplied to the Building. Tenant shall pay such amounts due to Landlord within ten (10) days after demand therefor.   Additionally, Landlord shall, at Tenant's sole cost and expense, install at the Premises a submeter to measure Tenant's consumption of water at the Premises.    Tenant, within ten (10)days after receipt of each invoice therefor from Landlord, shall pay to Landlord, as Additional Rent, for the water consumption during any period as shown on the submeter, equal to one hundred percent (100%) of the amount which Landlord is charged, including all surcharges, taxes and other sums payable in respect therefor.   Tenant shall be responsible for all of its requirements for all other utilities required or desired to be used by Tenant at the Premises by direct application to and arrangement with the applicable utility company servicing the Building.

9.3    Tenant, at its sole cost and expense, shall keep the interior of the Premises (including any glass windows) and the portions of the sidewalk directly in front of the entrance to the Premises clean and orderly, it being agreed however, that if any replacement is required with respect to the sidewalks (for example if there is a crack or if a panel needs to be replaced), such replacement shall be done by and at the sole cost and expense of Landlord, unless the need for the repair is caused by Tenant, its agents, contractors, employees and/or invitees.

29

9.4    Cleaning; Trash Removal and Recycling. A. Cleaning and rubbish removal for the Premises shall be furnished by Tenant at its sole cost and expense.  Tenant shall independently contract for such services with contractors selected by Tenant and reasonably acceptable to Landlord.

B.    Tenant covenants and agrees, at Tenant's sole cost and expense, to comply with all Legal Requirements regarding the collection, sorting, separation and recycling of waste products, garbage, refuse and trash as well as the disposal of medical and other waste products requiring special procedures in connection with the operation of its business at the Premises.  Tenant shall pay all costs, expenses, fines, penalties or damages which may be imposed on Landlord or Tenant by reason of Tenant's failure to comply with the provisions of this section, and, at Tenant's sole cost and expense, shall indemnify defend and hold Landlord harmless from and against any and all actions, claims, costs (including, without limitation, reasonable legal fees) and suits arising from such non-compliance.


ARTICLE 10 - REPAIRS

10.1  (a)    Except as set forth in Section 10.1(b), Tenant shall, at its sole cost and expense, be responsible for the maintenance and repair of the interior of the Premises and keep same in good order and condition, including all necessary painting and decorating, and make such non-structural repairs and replacements to the interior of the Premises and the fixtures and appurtenances therein as and when needed to preserve them in good working order and condition.  Tenant shall keep all glass, including windows, doors and skylights, clean and in good condition and repair and Tenant shall immediately replace any glass that may be damaged with glass of the same kind and quality.  In addition, as of the Lease Commencement Date, Tenant shall assume responsibility for the HVAC System (as more particularly described in Exhibit C hereof) servicing the Premises and shall maintain, replace and repair same throughout the Term.  Tenant shall, at all times during the Term, maintain a maintenance contract for the HVAC System and provide a copy of the contract to Landlord.  The HVAC System shall be surrendered to Landlord at the end of the Term in its then current condition.

30

(b)     Throughout the Term, except for any work made
necessary by any negligent act or omission of Tenant, its
agents, employees and invitees, Landlord shall keep in good
repair and maintain and replace as necessary: all structural
elements of the Building (both interior and exterior), the
Property and the Premises, (including, without limitation, the
foundation walls, the exterior walls, any load-bearing interior
walls,   the roof, roof membrane, interior and exterior of
windows, mullions, subsurface areas, common elevators and egress
stairs,); the base building infrastructure, including interior
structural steel members, the mains, conduits and systems
including electrical, water, plumbing, mechanical, fire-safety
and other services (other than the HVAC System) to the points of
connection to the Premises; the exterior of the Building and the
Property, including landscaped areas, walks, driveways, parking
areas and loading areas, including the plowing of snow and
sanding of ice therefrom and maintenance of access thereto; all
other common areas and facilities of the Building and the
Property; and any damage to the Premises caused by the willful
misconduct or gross negligent act or omission of Landlord,
Landlord's agents, employees, contractors or invitees; all in
first-class condition and appearance as reasonably determined by
Landlord and subject to the terms and provisions of this Lease.
Without limiting the generality of the preceding sentence, at
Landlord's sole cost and expense and except as otherwise set
forth below, Landlord shall keep the Building and Common Areas
secure and safe, and shall light, plow, clean and provide
landscaping services to the outside Common Areas, all so as to
maintain a first-class appearance and condition. Landlord shall
be solely responsible for ensuring that the Building and the
Property (including, without limitation, the Common Areas) are
in compliance with all Laws, including, without limitation, The
Americans with Disabilities Act. Landlord shall exercise
reasonable efforts to minimize any inconvenience to Tenant or
interference with Tenant's use of the Premises, its business
operations therein, its means of ingress thereto and egress
therefrom and/or Tenant's signage, in connection with any
repairs, alterations or other work done by Landlord under the
Lease and Landlord shall carry out such work promptly and
diligently but shall not be obligated to incur expense for
overtime labor Landlord shall not store any construction
materials within the Premises unless necessary due to the type
of repair to be performed and shall remove any and all debris

31

caused as a result of any work to the Premises by Landlord.  The foregoing, however, shall not require Landlord to do any work other than at normal working hours (i.e., 8:00 a.m. to 5:00 p.m. Monday through Friday. ("Working Hours")   Notwithstanding the foregoing, Tenant shall, at its sole cost and expense, contract with Landlord's vendor for snow removal to arrange for snow plowing of the parking lot and sidewalks adjacent to the Building after Working Hours.  In the event that Tenant, in its sole reasonable discretion, determines that Landlord is not addressing its maintenance and repair obligations in this Section 10.1(b) in a timely and diligent fashion, Tenant may provide Landlord with a written notice of such failure together with a written estimate for the cost of the desired repair and/or maintenance.   If Landlord does not commence such maintenance and/or repair obligations within seven (7) business days after receipt of Tenant's notice, and thereafter continuously and diligently pursue such maintenance and/or repair obligations to completion, Tenant may, at its option, perform the repair or maintenance obligation, in whole or in part to the extent necessary to alleviate an emergency, or alleviate a condition which prevents Tenant from using a material portion of the Demised Premises due to Landlord's alleged failure to maintain, and Landlord, in such instance shall reimburse Tenant for the cost of the repair, up to the amount set forth on the estimate.  Nothing herein shall prevent Tenant from exercising its rights hereunder in law or equity against Landlord for an alleged breach of obligation under the Lease, including, without limitation, the right to seek recovery of the actual cost of the repair to the extent same is in excess of the amount set forth on the estimate.

## ARTICLE 11 – REQUIREMENTS OF LAW

11.1 Tenant, at Tenant's own expense, shall comply with all Legal Requirements of law, rules, ordinances and regulations, present and future, of any federal, state, town or village government or other public authority having jurisdiction over the Demised Premises, and with all requirements of the New York Board of Fire Underwriters, or similar body, and of any liability insurance company insuring Landlord against liability for accidents in or connected with the Premises, and shall not at any time use or occupy the Premises in violation of the Certificate of Occupancy for the Building, or be in conflict with fire insurance policies covering the Building, or the

32

fixtures and property therein, or in a manner contrary to the purposes set forth in Paragraph 6.1 hereof. Landlord represents and covenants that, upon Landlord obtaining the Use Approvals, Tenant's use of the Premises for the Permitted Use shall not cause Tenant to be in violation of the Certificate of Occupancy for the Building, or be in conflict with fire insurance policies covering the Building.   Notwithstanding the foregoing, Tenant shall not be responsible for the performance of structural work, alterations or repairs in the Premises, in the Building or on the Property necessary for compliance with any of the foregoing (collectively, the "Structural Work"), all of which required Structural Work shall be the obligation of Landlord, except to the extent such Structural Work is necessitated by (i) the particular manner of use by Tenant of the Premises (as opposed to general use for health club purposes) or (ii) the particular configuration of Tenant's alterations, including Tenant's Initial Work within the Premises. Subject to the provisions of Article 37 hereof, Tenant shall comply with all reasonable rules, regulations and orders of Landlord designed to promote safety and good order, and with respect to the placing of safes, machinery or other heavy material.   Any increase in the fire insurance premium applicable to the Building resulting from Tenant's failure to comply with the foregoing or from the particular manner in which the Tenant uses and occupies the Premises (as opposed to general use for health club purposes), or any other expense to Landlord by reason of Tenant's failure to comply with the foregoing, shall be paid by Tenant to Landlord as Additional Rent within thirty (30) days after demand therefor.


ARTICLE 12 - INSURANCE, LOSS, REIMBURSEMENT, LIABILITY

12.1  Landlord or its agents, servants or employees shall not be liable for any injury or damage to persons or to Tenant's property resulting from fire, explosion, steam, gas, electricity, water, rain or snow or leaks from any part of the Building, or from the pipes, appliances or plumbing works or from the roof, street or subsurface or from any other place or by dampness or by any other cause of whatsoever nature, unless any of the foregoing shall be caused by or due to the negligence or willful misconduct of Landlord, its agents, servants or employees or a willful default by Landlord of its obligations under this Lease.

33

12.2  Tenant shall give Landlord written notice in the case of fire or accidents in the Premises promptly after Tenant is aware of such event.

12.3  (a) Notwithstanding anything to the contrary contained in this Lease, Tenant shall, at its sole cost and expense, include in its property insurance policies appropriate clauses pursuant to which the insurance companies (i) waive all right of subrogation against Landlord with respect to losses payable under such policies and (ii) agree that such policies shall not be invalidated should the insured waive in writing prior to a loss any or all right of recovery against any party for losses covered by such policies.  Tenant shall furnish Landlord upon demand evidence satisfactory to Landlord evidencing the inclusion of said clauses in Tenant's property insurance policies.

(b) Notwithstanding anything to the contrary contained in this Lease, Landlord agrees that it will, at its sole cost and expense, include in its property insurance policies appropriate clauses pursuant to which the insurance companies (i) waive all right of subrogation against Tenant payable under such policies and (ii) agree that such policies shall not be invalidated should the insured waive in writing prior to a loss any or all right of recovery against any party for losses covered by such policies.

(c) Landlord and its officers, directors, shareholders, partners, members, agents and employees hereby waives any and all right of recovery which it might otherwise have against Tenant, and its licensees, concessionaires and subtenants, its agents, servants and employees, for loss or damage occurring to the Building and the fixtures, appurtenances and equipment therein, to the extent the same is covered by Landlord's insurance, notwithstanding that such loss or damage may result from the negligence or fault of Tenant, its servants, agents or employees.

(d) Tenant and its licensees, concessionaires and subtenants hereby waive any and all right of recovery which it might otherwise have against Landlord, its agents, servants and employees who shall have executed a similar waiver as set forth in this Section for loss or damage to Tenant's furniture,

34

furnishings, fixtures and other property removable by Tenant under the provisions hereof to the extent that same is covered by Tenant's insurance, notwithstanding that such loss or damage may result from the negligence or fault of Landlord, or its servants, agents or employees.

12.4 Tenant covenants and agrees to provide, at its expense, on or before the Lease Commencement Date, or such earlier date if Tenant has possession of the Premises prior to the Lease Commencement Date, and to keep in force during the Term, naming Landlord and any mortgagee of which Landlord has notified Tenant as an additional named insured, (a) a comprehensive general liability insurance policy (hereinafter referred to as a "Liability Policy")with a Best's rating of "A", including, without limitation, blanket contractual liability coverage, broad form property damage, independent contractor's coverage and personal injury coverage protecting Landlord against any liability whatsoever, occasioned by any occurrence on or about the Premises or any appurtenances thereto, (b) a fire and other casualty policy (a "Fire Policy") insuring the full replacement value of all of the furniture, trade fixtures and other personal property of Tenant located in the Premises against loss or damage by fire, theft and such other risks or hazards as are insurable under present and future forms of "All Risk" insurance policies, and (c) a business interruption insurance policy for a period of at least one (1) year's worth of Basic Annual Rent and Additional Rent. Such policies are to be written by good and solvent insurance companies licensed, authorized or permitted to do business in the State of New York. Landlord requires limits of liability under (i) the Liability Policy of not less than $5,000,000.00 combined single limit per occurrence for bodily or personal injury (including death) and property damage combined and (ii) the Fire Policy equal to the value of Tenant's Initial Work, and furniture, trade fixtures and other personal property of Tenant located at the Building. Such insurance may be carried under a blanket policy covering the Premises and other locations of Tenant, if any, provided that each such policy shall in all respects comply with this Article and shall specify that the portion of the total coverage of such policy that is allocated to the Premises is in the amounts required pursuant to this Section. Tenant's failure to provide and keep in force the aforementioned insurance shall be regarded as a material default hereunder entitling Landlord, after written notice to Tenant and the passage of all cure

35

periods, to exercise any or all of the remedies provided in this Lease in the event of Tenant's default.    Prior to taking possession of the Premises, Tenant shall deliver to Landlord a certificate(s) of insurance certifying that the aforesaid policies of insurance are in effect.    A certificate evidencing the renewal of such policies shall be delivered to Landlord at least twenty (20) days prior to the expiration thereof and each such renewal certificate shall include Landlord as an additional insured.    Such policies shall also provide that said insurance may not be canceled unless ten (10) days notice is given to Landlord prior to such cancellation and that the insurance as to the interest of Landlord shall not be invalidated by any act, failure to act or negligence of Tenant.

12.5    Landlord shall carry such insurance, including comprehensive commercial liability insurance and "All-Risk" property coverage in such amounts as required by Landlord's lender holding a mortgage encumbering the Building.

ARTICLE 13 - DAMAGE BY FIRE OR OTHER CAUSE

13.1  A.    If the Premises or any part thereof shall be damaged by fire or other casualty, Tenant shall give prompt notice thereof to Landlord and this Lease shall continue in full force and effect, except as hereinafter set forth.

B.    If the Premises are wholly or partially damaged or rendered wholly or partially unusable by fire or other casualty, the damage thereto shall be repaired by and at the expense of Landlord to the extent that said damage includes those installations originally installed by Landlord, including, without limitation, Landlord's Work.

C.    If the Premises are totally damaged or rendered wholly unusable by fire or other casualty, then Landlord shall have the right to elect not to restore the same as hereinafter provided.

D.    If the Building shall be so damaged that Landlord shall decide to demolish it or not to rebuild it, then, in any of such events, Landlord may elect to terminate this Lease by written notice to Tenant given within ninety (90) days after such fire or casualty specifying a date for the expiration of the Lease, which date shall not be more than sixty (60) days

36

2365808.7
2422284.1

after the giving of such notice.  Upon the date specified in a notice of termination, the Term shall expire as fully and completely as if such date were the date set forth above for the termination of this Lease and Tenant shall forthwith quit, surrender and vacate the Premises without prejudice however, to Landlord's rights and remedies against Tenant under the Lease provisions in effect prior to such termination, and any Basic Annual Rent or Additional Rent owed shall be paid up to the date of the casualty and any payments of Basic Annual Rent or Additional Rent made by Tenant which were on account of any period subsequent to the date of the casualty shall be returned to Tenant.  Notwithstanding the foregoing, Landlord shall not have the right to terminate this Lease unless it shall simultaneously be terminating leases representing at least 80% of the entire rentable square footage of the Building. Unless Landlord shall serve a termination notice as provided for herein, Landlord shall make the repairs and restorations under the conditions of "B" and "C" hereof, with all reasonable expedition subject to delays due to adjustment of insurance claims, labor troubles and causes beyond Landlord's control. Notwithstanding anything to the contrary set forth herein, if (x) the Premises are damaged or destroyed by fire or other casualty and the damage or destruction cannot be repaired or reconstructed in 270 days following the date of the casualty, or (y) the damage or destruction occurs during the last two (2) years of the term of this Lease (or of any renewal term if Tenant's renewal option shall have previously been exercised), or (z) Landlord shall have elected to repair or rebuild, but Landlord's repairs and restoration work shall not be completed within 270 days following the date of the casualty, then, in any of such events, Tenant may, by written notice to Landlord, terminate this Lease.

E.   Nothing contained herein shall relieve Tenant, or any licensee or concessionaire or subtenant from liability that may exist as a result of damage from fire or other casualty. Notwithstanding the foregoing, each party shall look first to any insurance in its favor before making any claim against the other party for recovery for loss or damage resulting from fire or other casualty.  Tenant and each licensee, concessionaire and subtenant acknowledge that Landlord will not carry insurance on Tenant's furniture and/or furnishings or any fixtures or equipment, improvements, or appurtenances removable by Tenant and agrees that Landlord will not be obligated to repair any

37

2365808.7
2422284.1

damage thereto or replace the same.

F. Tenant hereby waives the provisions of Section 227 of the Real Property Law and agrees that the provisions of this Article shall govern and control in lieu thereof.

13.2 Tenant shall not knowingly do or permit to be done any act or thing upon the Premises, which will invalidate or be in conflict with fire insurance policies covering the Building, and fixtures and property therein. Subject to the provisions of Article 11 hereof, Tenant shall, at its expense, comply with all rules, orders, regulations or requirements of the New York Board of Fire Underwriters, or any other similar body, which may be applicable to the Tenant's use and occupancy of the Premises, and shall not do, or permit anything to be done in or upon the Premises or bring or keep anything therein, or use the Premises in a manner which shall increase the rate of fire insurance on the Building, or on the property located therein, over that in effect when the Lease commenced, unless the Tenant shall reimburse Landlord, as Additional Rent hereunder, for that part of all insurance premiums thereafter paid by Landlord, which shall have been charged because of such failure or use by Tenant, and shall make such reimbursement upon the first day of the month following receipt of notice of such outlay by Landlord and evidence of the payment thereof.

13.3 Notwithstanding anything to the contrary contained in this Lease, during any period after damage or destruction and until the Premises have been restored, Tenant shall be entitled to an abatement of Basic Annual Rent and all Additional Rent for the portion of the Premises which is unusable by Tenant for the normal conduct of its business, on a square foot basis.

ARTICLE 14 - ASSIGNMENT AND SUBLETTING

14.1 Except as may otherwise be provided in this Article, Tenant, for itself, its heirs, distributees, executors, administrators, legal representatives, successors and assigns, expressly covenants that it shall not assign, mortgage, or encumber this Lease or any of its rights or estates hereunder, sublet the Premises or any part thereof, or suffer, or permit, the Premises, or any part thereof, to be used or occupied by others, without the prior written consent of Landlord in each instance, such approval not to be unreasonably withheld, delayed

38

or conditioned. In determining reasonableness, Landlord shall take into consideration the use to which the subtenant or assignee will put the space and nature of the subtenant's or assignee's business in order to maintain the integrity of the Building as a whole. Landlord's consent to an assignment or subletting shall not, in any way, (i) be construed to relieve Tenant from obtaining Landlord's express written consent to any further assignment or subletting, to the extent such consent is otherwise required, (ii) relieve Tenant from any obligations as set forth in this Lease; and (iii) shall not be deemed to be a waiver by Landlord of any right or remedy of Landlord under this Lease. For the purpose of this Article, except as expressly hereinafter provided, the following shall constitute a transfer as if such were an assignment of this Lease: The issuance or transfer of interests in Tenant or a Related Entity (as defined below) to a person or group of related persons, whether in a single transaction or a series of related transactions, in such quantities that after such issuance or transfer, control of Tenant (as it shall be constituted after giving effect to such issuance or transfer of interests in Tenant or a Related Entity) shall have changed.

14.2 If Tenant shall, at any time or times during the Term of this Lease, desire to assign this Lease or sublet all or part of the Premises, Tenant shall give notice thereof to Landlord, which notice shall be accompanied by: (i) a fully executed conformed or photostatic copy of the proposed assignment or sublease, the effective or commencement date of which shall be not less than ten (10) days nor more than ninety (90) days after the giving of such notice; (ii) a statement setting forth, in reasonable detail, the identity of the proposed assignee or subtenant, the nature of its business and its proposed use of the Premises; and (iii) current financial information with respect to the proposed assignee or subtenant. The provisions of this Section 14.2 shall not be applicable to Permitted Transfers (hereinafter defined).

14.3 With respect to each and every sublease or subletting, it is further agreed that:

> (a) no subletting shall be for a term ending later than one day prior to the expiration of this Lease;
>
> (b) no sublease shall be valid, and no subtenant shall take possession of the Premises or any part

39

thereof, until a true, complete, fully-executed counterpart of such sublease has been delivered to Landlord; and

(c) each sublease shall provide that it is subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate, and that, in the event of termination, re-entry, or dispossess by Landlord under this Lease, Landlord may, at its option, take over all of the right, title and interest of Tenant as sublandlord under such sublease, and such subtenant shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of such sublease, except that Landlord shall not (i) be liable for any previous act or omission of Tenant under such sublease, (ii) be subject to any offset, not expressly provided in such sublease, that theretofore accrued to such subtenant against Tenant or (iii) be bound by any previous modification of such sublease or by any previous prepayment of more than one month's Basic Annual Rent or any Additional Rent then due.

14.4 Any assignment or transfer, whether made with Landlord's consent pursuant to Section 14.1 or without Landlord's consent pursuant to section 14.5 below, shall be made only if, and shall not be effective until, the assignee shall execute, acknowledge and deliver to Landlord an agreement whereby the assignee shall assume all of the obligations of this Lease on the part of Tenant to be performed or observed and whereby the assignee shall agree that the provisions contained in Section 14.1 shall, notwithstanding such assignment or transfer, continue to be binding upon it, in respect of all future assignments and transfers.

14.5 Notwithstanding anything to contrary contained herein, the following assignments, transactions or transfers shall not require Landlord consent, but shall require Tenant to notify Landlord, in writing of such assignment (collectively, the "Permitted Transfers") and shall not be required to comply with the provisions of Section 14.2 or 14.7 hereof:

40

(i)  If Tenant or a Related Entity is a corporation listed and traded on a nationally recognized stock exchange, NASDAQ or over-the-counter market, the transfer, sale or other disposition (including pursuant to a registration statement filed under The Securities Act of 1933, as amended) of the stock of such corporation shall not be deemed a transfer or assignment of this Lease.

(ii) (a) Transfers of stock of Tenant or a Related Entity to a Related Entity or to an entity into which or with which Tenant or a Related Entity is merged or consolidated or to which all or substantially all of Tenant's or a Related Entity's assets are transferred, or (b) an assignment or sublease of all or a portion of the Premises to a Related Entity, or (c) issuance of stock in Tenant or a Related Entity pursuant to an initial public offering or a private placement.

(iii) transfers of all or a majority of the stock or assets in Tenant or a Related Entity to a third party, provided that there is no material change in the then senior management of Tenant or its Parent Company; the use of the Premises is limited to the Permitted Use and an executed copy of the assignment and assumption agreement shall be delivered to Landlord prior to the effective date of the transaction.

(iv)  transfer of all or a majority of the stock or assets in Tenant or a Related Entity to a third party provided that the third party or such third party's holding company or Parent Company or its affiliates, has owned or operated one or more fitness clubs for a period of at least three (3) years prior to the transfer; the use of the Premises is limited to the Permitted Use and an executed copy of the assignment and assumption agreement shall be delivered to Landlord prior to the effective date of the transaction.

(v) transfer of stock of a Related Entity that causes a change in control of such entity provided that the tenant continues to operate in accordance with the Permitted Use.

(vi) the transfer, assignment, pledge, hypothecation or new issuance of the stock (including a controlling interest) of Tenant's direct or indirect parent entities (including, but not limited to, Blink Holdings, Inc., Equinox Holdings, Inc. and/or EQX Holdings, LLC).

41

A "Related Entity" shall mean an entity that controls, is controlled by or is under common control with Tenant. The word "control," such as "controlled by" or "under common control with" shall mean ownership of more than 50% of the outstanding voting capital stock of a corporation or more than 50% of the beneficial interests of any other entity.

14.6  Landlord agrees that, without Landlord's consent and without being required to comply with the provisions of Section 14.2 or 14.7 hereof, licensees and/or concessionaires may operate in the Premises without same being deemed an assignment of this Lease or a subletting of the Premises, provided that: (a)  such  licensees  and/or  concessionaires  occupy  in  the aggregate not more than an amount of space equal to twenty-five percent (25%) of the total floor area of the Premises; (b) the use of the Premises by such licensees and/or concessionaires is permitted by the Permitted Use; (c) Tenant shall notify Landlord in writing prior to such licensee and/or concessionaire taking occupancy, as to the identity with address and a reasonable description  of  the  business  of  all  licensees  and/or concessionaires; (d) prior to occupancy of any licensee and/or concessionaire, Tenant must obtain any necessary permit, special use permit, variance or other approval which may be required by the Town of Huntington for the operation of the business of the licensee  or  concessionaire;  and  (e)  all  licensees  and/or concessionaires shall be obligated pursuant to written agreement with Tenant to operate in the Premises in compliance with this Lease.

14.7  In the event that Tenant shall assign this Lease, except in connection with a "No Consent" transaction enumerated in Section 14.5 hereof, to which this Section 14.7 shall not apply, and shall receive any consideration therefor, one-half of the Transfer Consideration (as hereinafter defined) shall be paid to Landlord, as Additional Rent.  In the event Tenant shall sublet any of the space hereunder Tenant shall pay to Landlord, as  Additional  Rent,  as  and  when  same  is  due,  one-half  the Transfer Consideration.  "Transfer Consideration" shall mean all rent,  additional  rent  or  other  consideration  which  Tenant receives in connection with the Transfer, to the extent such rent and other consideration is attributable to a Transfer of Tenant's interest in this Lease or the Premises (as opposed to proceeds  payable  to  Tenant  in  connection  with  the  sale  of

42

Tenant's business), in excess of the Base Rent and Additional Rent payable by Tenant under this Lease during the term of the Transfer on a per rentable square foot basis if less than all of the Premises is transferred. If the Transfer is an assignment of the Lease, "Transfer Consideration" shall also include key money, bonus money or other cash consideration paid by the transferee to Tenant in connection with such Transfer (but excluding any proceeds payable to Tenant in connection with a sale of its business). There shall be deducted from the Transfer Consideration the reasonable expenses incurred by Tenant for (i) any changes, alterations and improvements to the Premises in connection with the Transfer, (ii) any free base rent reasonably provided to the transferee, (iii) any brokerage commissions in connection with the Transfer, (iv) out-of-pocket costs of advertising the space subject to the Transfer, (v) any improvement allowance or other economic concessions paid by Tenant to the transferee in connection with the Transfer, and (vi) reasonable attorneys' fees incurred by Tenant in connection with the Transfer (collectively, "Transfer Deductions"). Tenant shall pay Landlord for Landlord's share of any Transfer Consideration (after deducting the Transfer Deductions) within thirty (30) days after same is due by the transferee. In no event shall Landlord's participation rights apply to licensees and concessionaire arrangements referred to in Section 14.6 hereof.

14.8 In the event that any sub-tenant, assignee, licensee and/or concessionaire should hold over in the Premises beyond the expiration of the Term, Tenant hereunder shall be responsible to Landlord for all sums due pursuant to Article 23 until the Premises are delivered to Landlord in the condition provided for in this Lease.

14.9 Tenant shall pay Landlord's reasonable legal fees with reference to approving any sublease or assignment and assumption agreement, not to exceed Three Thousand Dollars ($3,000.00) in connection with any proposed transfer.

ARTICLE 15 - DEFAULT-BANKRUPTCY

15.1 Events of Default. A. The following shall be Events of Default under this Lease:

43

(i)    Tenant's failure to pay any monthly installment of Basic Annual Rent or Additional Rent within ten (10) days after Tenant's receipt of written notice of such failure from Landlord.

(ii)    Tenant's failure to make any other payment required under this Lease if such failure shall continue beyond ten (10) days after Tenant's receipt of written notice from Landlord that the same has not been paid.

(iii)    Tenant's violation or failure to perform any of the other terms, conditions, covenants or agreements herein made by Tenant if such violation or failure continues for a period of fifteen (15) days after Landlord's written notice thereof to Tenant.

(iv)    In the event of any violation or failure to perform a covenant as contemplated in Section 15.1(A)(iii), and if such covenant cannot be performed within the said fifteen (15) day period, then and in that event, providing Tenant has promptly commenced to cure such violation and is diligently proceeding with the cure, the time within which Tenant may cure the same shall be extended to such reasonable time as may be necessary to cure the same with all due diligence.

B.    Landlord's Remedies.    If an Event of Default as hereinabove specified in Section 15.1(A)(i), (ii) or (iii) shall occur, and shall not be cured within the time period specified above, or if Tenant shall commence a cure but fails to diligently proceed with such cure within the fifteen (15) day (or such longer) period, then:

(i) Landlord may give Tenant a five (5) day notice of its intention to end the Term, and thereupon, at the expiration of said five (5) day period, this Lease shall expire as fully and completely as if the day were the date herein originally fixed for the expiration of the Term, and Tenant shall then quit and surrender the Premises to Landlord, but Tenant shall continue to remain liable as hereinafter provided; or,

(ii) Landlord, without prejudice to any other right or remedy of Landlord, held hereunder or by

44

2365808.7
2422284.1

operation of law, and notwithstanding any waiver of any breach of a condition or Event of Default hereunder may, at its option and without further notice (except as may be required by law), re-enter the Premises or dispossess Tenant and any legal representative or successor of Tenant or other occupant of the Premises by summary proceedings or other appropriate suit, action or proceeding; and Tenant hereby expressly waives the service of notice of intention to re-enter or to institute legal proceedings to that end.

C.    Notwithstanding such default, re-entry, expiration and/or dispossession by summary proceedings or otherwise, as provided in Section 15.1B above, Tenant shall continue to be liable during the full period which would otherwise have constituted the balance of the Term. If Landlord terminates this Lease under Section 15.1(B)(i), Tenant shall be liable for all Rent and other amounts payable accrued to the date of termination, plus, as damages, an amount equal to excess of (a) the total Rent for the remaining Term, over (b) the fair market rental value of the Premises for the remaining Term (the amounts of each of clauses (a) and (b) being first discounted to present value at an annual rate of   eight percent (8%)., If Landlord terminates Tenant's right of possession without terminating the Lease under Section 15.1(B)(ii), Tenant shall pay as liquidated damages at the same times as the Basic Annual Rent and Additional Rent and other charges become payable under the terms hereof, a sum equivalent to the Basic Annual Rent and Additional Rent and other charges reserved herein (less only the net proceeds of reletting as hereinafter provided), and Landlord may rent the   Premises either in the name of Landlord or otherwise, reserving the right to rent the   Premises for a term or terms which may be less than or exceed the period which would otherwise have been the balance of the Term without releasing the original Tenant from any liability, applying any monies collected first to the reasonable out-of-pocket expense of resuming or obtaining possession, next to the reasonable out-of-pocket cost of restoring the   Premises to a rentable condition, and then to the payment of any reasonable out-of-pocket brokerage commissions and reasonable out-of-pocket legal fees in connection with the reletting of the Premises and then to the payment of the Basic Annual Rent, Additional Rent and other charges due and to become due to Landlord hereunder, together

45

with reasonable legal fees of Landlord therefor.

D.   Waiver of Trial by Jury.   Tenant does hereby waive trial by jury in any action, proceeding or counterclaim brought by Landlord against Tenant with regard to any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, and Tenant's use or occupancy of the Premises.   Any action or proceeding brought by either party hereto against the other, directly or indirectly, arising out of this agreement, shall be brought in a court in the County in which the  Premises are located and all motions in any such action shall be made in such County.

E.   Tenant hereby agrees that in any action or summary proceeding commenced by Landlord to recover possession of the Premises, whether by reason of non-payment or the holding over after expiration of the Term, Tenant shall not interpose any counterclaim (other than compulsory counterclaims) or set-off of whatever nature or description in any such proceedings and Tenant shall not seek to consolidate or join for trial any such proceeding with any other action or proceeding to which it is a party or over which it has control.

F.   Legal Fees.   In the event of any default by Tenant hereunder and Landlord shall commence any action or other proceeding against Tenant in which Landlord shall be successful or which shall be settled by the payment of a sum of money to Landlord by Tenant, Tenant agrees to reimburse Landlord for reasonable attorneys'  fees in connection with such action or proceeding.   Notwithstanding the foregoing, the prevailing party shall be entitled to reasonable attorney's fees in an action or proceeding commenced by Tenant against Landlord for the following:   (i) an alleged breach of Tenant's Exclusive; (ii) an alleged breach by Landlord of a maintenance or performance obligation under the Lease, or (iii) if Tenant believes Landlord has acted unreasonably in withholding its consent.

15.2 A.   Events of Bankruptcy.   The following shall be Events of Bankruptcy under this Lease:

(i)   Tenant's becoming insolvent, as the term is defined in Title 11 of the United States Code, entitled Bankruptcy, 11 U.S.C. Sec. 101 et seq. (The "Bankruptcy Code") or under the insolvency laws of New York State;

46

2365808.7
2422284.1

(ii)    The appointment of a Receiver or Custodian for any or all of Tenant's property or assets provided that if the foregoing is involuntary, same is not discharged or stayed within ninety (90) days after the commencement thereof;

(iii)    The filing of a voluntary petition under the provisions of the Bankruptcy Code or Insolvency Laws;

(iv)    The filing of an involuntary petition against Tenant as the subject debtor under the Bankruptcy Code or Insolvency Laws, which is either not dismissed within ninety (90) days of filing, or results in the issuance of an order for relief against the debtor, whichever is later; or,

(v)    Tenant's making or consenting to an assignment for the benefit of creditors of a common law composition of creditors.

B.   Landlord's Remedies:

(i)    Termination of Lease.    Upon the occurrence of an Event of Bankruptcy, Landlord shall have the right to terminate this Lease by giving thirty (30) days prior written notice to Tenant, provided, however, that this Section 15.2(B)(i) shall have no effect while a case in which Tenant is the subject debtor under the Bankruptcy Code is pending, unless Tenant or its Trustee in Bankruptcy is unable to comply with the provisions of Sections 15.2(B)(v) and 15.2(B)(vi) below.    If Tenant or its Trustee is unable to comply with Sections 15.2(B)(v) and 15.2(B)(vi) below, this Lease shall automatically cease and terminate, and Tenant shall be immediately obligated to quit the Premises upon the giving of notice pursuant to this Section 15.2(B)(i).    Any other notice to quit, or notice of Landlord's intention to re-enter is hereby expressly waived.    If Landlord elects to terminate this Lease, everything contained in this Lease on the part of Landlord to be done and performed shall cease without prejudice, subject, however to the right of Landlord to recover from Tenant all Basic Annual Rent, Additional Rent and any other sums accrued up to the time of termination or recovery of possession by Landlord, whichever is later, and any other monetary damages or loss of reserved rent sustained by Landlord.

47

2365808.7
2422284.1

(ii)   <u>Suit for Possession</u>.  Upon termination of this Lease, pursuant to Section 15.2(B)(i), Landlord may proceed to recover possession under and by virtue of the provisions of the laws of the State of New York, or by such other proceedings, including re-entry and possession, as may be applicable.

(iii)   <u>Reletting of Premises</u>.  Upon termination of this Lease, pursuant to Section 15.2(B)(i), the  Premises may be relet by Landlord for such rent and upon such terms as are not unreasonable under the circumstances, and if the full rental reserved under this Lease (and any of the costs, expenses, or damages indicated below) shall not be realized by Landlord, Tenant shall be liable for all damages sustained by Landlord, including, without limitation, deficiency in rent, reasonable attorneys' fees, brokerage fees, and expenses of placing the Premises in the first class rentable condition.  Landlord, in putting the Premises in good order or preparing the same for re-rental may, at Landlord's option, make such alterations, repairs, or replacements in the Premises as Landlord, in Landlord's sole judgment, considers advisable and necessary for the purpose of reletting the  Premises, and the making of such alterations, repairs, or replacements shall not operate or be construed to release Tenant from liability hereunder as aforesaid.  Landlord shall, in no event, be liable in any way whatsoever for failure to relet the Premises, or in the event that the  Premises are relet, for failure to collect the rent thereof under such reletting, and in no event shall Tenant be entitled to receive any excess, if any, of such net rent collected over the sums payable by Tenant to Landlord hereunder.

(iv)  <u>Monetary Damages</u>.  Any damage or loss of rent sustained by Landlord as a result of an Event of Bankruptcy may be recovered by Landlord, at Landlord's option, at the time of the reletting, or in separate actions, from time to time, as said damage shall have been made more easily ascertainable by successive relettings, or in a single proceeding deferred until the expiration of the Term (in which event Tenant hereby agrees that the cause of action shall not be deemed to have accrued until the date of expiration of said Term) or in a single proceeding prior to either the time of reletting or the expiration of the Term, in which event Tenant agrees to pay Landlord the difference between the present value of the rent reserved under this Lease on the date of breach, discounted at eight percent per annum, and the fair market rental value of the

48

Premises on the date of breach.  In the event Tenant becomes the subject debtor in a case under the Bankruptcy Code the provisions of this Section 15.2(B)(iv) may be limited by the limitations of damage provisions of the Bankruptcy Code.

(v)   Assumption or Assignment by Trustee.  In the event Tenant becomes the subject debtor in a case pending under the Bankruptcy Code, Landlord's right to terminate this Lease pursuant to this Section 15.2 shall be subject to the rights of the Trustee in Bankruptcy to assume or assign this Lease.  The Trustee shall not have the right to assume or assign this Lease unless the Trustee:  (a) promptly cures all defaults under this Lease; and   (b) promptly compensates Landlord for monetary damages incurred as a result of such default, and (c) provides adequate assurance of future performance.

(vi)   Adequate Assurance of Future Performance.  Landlord and Tenant hereby agree in advance that adequate assurance of future performance, as used in Section 15.2(B)(v) above, shall mean that all of the following minimum criteria must be met:

(a)   The Trustee must pay to Landlord, at the time the next payment of rent is then due under this Lease, in addition to such payment of Basic Annual Rent, an amount equal to the next three month's Basic Annual Rent due under this Lease, said amount to be held by Landlord in escrow until either the Trustee or Tenant defaults in its payment of Basic Annual Rent or other obligations under this Lease (whereupon Landlord shall have the right to draw such escrow funds) or until the expiration of this Lease (whereupon the funds shall be returned to the Trustee or Tenant);

(b) Tenant or Trustee must agree to pay to Landlord, at any time Landlord is authorized to and does draw on the funds escrowed pursuant to Section 15.2(B)(vi)(a) above, the amount necessary to restore such escrow account to the original level required by said provision;

(c) Tenant must pay the estimated cost of all services provided by Landlord (whether directly or through agents or contractors, and whether or not the cost of such service is to be passed through to Tenant) in advance of the performance or provision of such services;

49

(d) The Trustee must agree that Tenant's business shall be conducted in a first class manner, and that no liquidating sales, auctions, or other non-first class business operations shall be conducted on the Premises;

(e) The Trustee must agree that the use of the Premises as stated in this Lease will remain unchanged;

(f) The Trustee must agree that the assumption or assignment of this Lease will not violate or affect the rights of other Tenants of Landlord.

(vii) <u>Failure to Provide Adequate Assurance</u>.  In the event Tenant is unable to:

(a) cure its defaults; or

(b) reimburse Landlord for its monetary damages; or

(c) pay the Basic Annual Rent due under this Lease, on time (or within five (5) days of the due date); or

(d) meet the criteria and obligations imposed by Section 15.2(B)(vi) above; then Tenant agrees in advance that it has not met its burden to provide adequate assurance of future performance, and this Lease may be terminated by Landlord in accordance with Section 15.2(B)(i) above.

## ARTICLE 16 - ADJACENT EXCAVATION - SHORING

16.1  If an excavation or other substructure work shall be made upon or about the Building or the land adjacent to the Building, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation, license to enter upon the Premises for the purpose of doing such work as shall be necessary to preserve the wall of the Building from injury or damage and to support the same by proper foundations without any claim for damages or indemnity against Landlord, or diminution or abatement of Basic Annual Rent provided that Tenant shall continue to have reasonable access to the Premises and the Building.

50

ARTICLE 17 - CONDEMNATION

17.1  If the whole of the Premises or the whole of the Parking Area which has not been replaced with an alternate parking area, shall be taken for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain, or by agreement between Landlord and those having the authority to exercise such right (hereinafter called "Taking"), the Term and all rights of Tenant hereunder, except as hereinafter provided, shall cease and expire as of the date of vesting of title as a result of the Taking and the Basic Annual Rent or Additional Rent paid for a period after such date shall be refunded to Tenant after the vesting of title.

17.2  In the event of a Taking of less than the whole of the Premises, or of a part of the parking area, this Lease shall cease and expire in respect of the portion of the  Premises and/or the parking area taken upon vesting of title as a result of the Taking, and, if the Taking results in the portion of the Premises or of the parking area remaining after the Taking being inadequate or non-compliant with laws to the extent that Tenant is unable to use the Premises for the Permitted Use, in the reasonable judgment of Tenant, or for the efficient, economical operation of the Tenant's business conducted at such time in the Premises, or if Tenant shall not have reasonable access to the Premises, Tenant may elect to terminate this Lease by giving notice to Landlord of such election not more than thirty (30) days after the actual Taking by the condemning authority, stating the date of termination, which date of termination shall be not more than thirty (30) days after the date on which such notice to Landlord is given, and upon the date specified in such notice to Landlord, this Lease and the Term hereof shall cease and expire as if such date were the date originally set forth herein for the expiration of the Term.  If Tenant does not elect to terminate this Lease aforesaid:

(i)  The new Basic Annual Rent payable under this Lease shall be the product of the Basic Annual Rent payable under this Lease multiplied by a fraction, the numerator of which is the area of the  Premises remaining after the Taking, and the denominator of which is the area of the  Premises immediately preceding the Taking (or if the taking shall have

51

2365808.7
2422284.1

affected the parking area, the Basic Annual Rent shall be equitably reduced to reflect such reduction), and

(ii) The net award for the Taking shall be paid to and first used by Landlord, subject to the rights of mortgagee, to restore the portion of the Premises remaining after the Taking to substantially the same condition as existed immediately preceding the date of the Taking (hereinafter called the "Pre-Taking Condition"). Landlord shall proceed with reasonable diligence to repair, alter and restore the Premises and the parking area.

17.3 In the event of a Taking of less than the whole of the Premises which occurs during the period of two (2) years next preceding the date of expiration of the Term, taking into consideration the option periods, Landlord may elect to terminate this Lease by giving notice to the Tenant of such election, not more than forty-five (45) days after the actual Taking by the condemning authority, stating the date of termination, which date of termination shall not be more than thirty (30) days after the date on which such notice of termination is given, and upon the date specified in such notice, this Lease and the Term shall cease and expire all Basic Annual Rent and Additional Rent paid under this Lease for a period after such date of termination shall be refunded to Tenant upon demand. On or before such date of termination, Tenant shall vacate the Premises, and any of Tenant's property remaining in the Premises subsequent to such date of termination shall be deemed abandoned by Tenant and shall become the property of Landlord.

17.4 In the event of a Taking of the Premises or any part thereof, and whether or not this Lease is terminated, Tenant shall have no claim against Landlord or the condemning authority for the value of the unexpired Term, but Tenant may interpose and prosecute in any proceedings in respect of the Taking, independent of any claim of Landlord, any separate claim available to Tenant and Landlord shall have no interest in any separate award made to Tenant for loss of business or for the taking of Tenant's fixtures and other property, for moving expenses, and/or for the unamortized cost of Tenant's leasehold improvements, less the unamortized amounts of Tenant's Improvement Allowance.

52

ARTICLE 18 - ACCESS TO PREMISES

18.1 Tenant shall permit Landlord and the authorized representatives of Landlord to enter the Premises at all reasonable times and following not less than 24 hours prior written notice (unless in the event of an emergency), during Tenant's usual Working Hours for the purpose of (a) inspecting the same, and (b) making any necessary repairs to the Premises, such repairs to be performed in a manner so as to reduce to a minimum the interference with Tenant's use of the Premises. Except in emergencies, Landlord's access to the Premises shall only be with an authorized representative of Tenant . In connection with such access and/or work, Landlord shall exercise reasonable efforts to minimize any inconvenience to Tenant or interference with Tenant's use of the Premises, its business operations therein, its means of ingress thereto and egress therefrom and/or Tenant's signage, and Landlord shall carry out such access and/or work promptly and diligently; and shall make reasonable efforts to schedule such work in a manner, and in such locations (including the manner, method and location of exterior scaffolding, barriers or similar construction aids), as to create the least practicable interference with Tenant and/or Tenant's use of the Premises, business operations, ingress and egress and/or signage. If, notwithstanding the foregoing, scaffolding barriers or construction aids shall interfere with Tenant's signage, Tenant may, at its sole cost and expense and provided same is permissible under applicable law, provide suitable replacement signage on the scaffolding or construction aid during the period that the exterior equipment remains in place. Moreover, Landlord shall remove any construction materials it deems necessary to store within the Premises at the end of each day, if practicable.

18.2 Landlord may, at reasonable times and upon not less than 24 hours prior written notice to Tenant (a) during the nine (9) months prior to expiration of the Term, exhibit the Premises to prospective tenants and (b) at any time during the Term, exhibit the Premises to actual and prospective holders of superior instruments, such as ground leases or mortgages with respect to the Building or purchasers of all or any portion thereof.

18.3 If Tenant shall not be personally present to open and

53

permit an entry into the Premises at any time when for any reason an entry therein shall be necessary due to an emergency situation, Landlord or Landlord's agents may forcibly enter the same without rendering Landlord or such agents liable therefor (if during such entry Landlord or Landlord's agents shall accord reasonable care to Tenant's property) and without in any manner affecting the obligations and covenants of this Lease.

## ARTICLE 19 - QUIET ENJOYMENT

19.1 Landlord covenants and agrees, if, and so long as this Lease is in full force and effect, then Tenant may peaceably and quietly enjoy the Premises, subject, however, to the provisions of this Lease, and the Landlord shall take all reasonable steps required to provide for such quiet enjoyment.

## ARTICLE 20 - INVALIDITY OF ANY PROVISION

20.1 If any term, covenant, condition or provision of this Lease or the application thereof to any circumstance or to any person, firm or corporation shall be invalid or unenforceable to any extent, the remaining terms, covenants, conditions and provisions of this Lease shall not be affected thereby and each remaining term, covenant, condition and provision of this Lease shall be valid and shall be enforceable to the fullest extent permitted by law.

## ARTICLE 21 - BROKERAGE

21.1 Tenant and Landlord each covenant, represent and warrant to the other that neither party has had dealings or negotiations with any broker other than **Charter Realty & Development Corp**. ("Broker") in connection with the consummation of this Lease. Each party covenants and agrees to pay, hold harmless and indemnify the other party from and against any and all cost, expense (including reasonable attorneys' fees and court costs), loss and liability for any compensation, commissions or charges claimed by any other broker or agent with respect to this Lease or the negotiation thereof if such claim or claims by any such broker or agent are based in whole or in part on dealing with Tenant or its representatives or Landlord or its representatives. Landlord shall pay Broker its commission pursuant to a separate written agreement and shall indemnify and

54

hold harmless Tenant from and against any claim made by Broker for non-payment. Landlord's and Tenant's obligations hereunder shall survive the expiration or earlier termination of this Lease

### ARTICLE 22 - SUBORDINATION; NONDISTURBANCE; ATTORNMENT

22.1 This Lease shall be subject and subordinate at all times during the Term to: (a) the lien of any mortgage, renewals, replacements, extensions or modifications thereof, or other method of financing or refinancing, which may now be or shall hereafter become liens on the Building or the Land (a "superior mortgage"), and (b) to any and all current or future ground or master leases (a "superior lease"), and no further instrument of subordination need be required by a mortgagee, but Tenant shall execute promptly any certificate that Landlord may reasonably request in confirmation of such subordination. Failure of Tenant to execute such confirmatory certificate within fifteen (15) days of request therefor by Landlord shall be deemed a material default hereunder, subject to applicable notice and cure periods set forth in this Lease. Notwithstanding the foregoing, the subordination of this Lease and the Lease Commencement Date hereof is expressly subject to and conditioned upon Landlord obtaining, at its expense, a fully executed Subordination, Non-Disturbance and Attornment Agreement from the current holder of the leasehold mortgage encumbering the Building and the Property (the "Superior Mortgagee")substantially in the form attached hereto as Exhibit "E-1", subject to reasonable comments by and approval of Tenant's counsel ("SNDA Agreement") and a Recognition and Attornment Agreement from BDG 115 Land, LLC, the ground lessor/fee owner of the Property in the form attached hereto as Exhibit "E-2" on or before the tenth (10th) business day next following the execution of this Lease by Landlord and Tenant. Landlord represents to Tenant that as of the date of this Lease, the only Superior Mortgagee is Wells Fargo Bank, N.A. In the event Landlord does not obtain one or both of the above agreements within such ten (10) business day period, Tenant shall have the option to cancel the Lease by providing Landlord with ten (10) days prior written notice of such cancellation. Landlord shall be permitted to obtain the SNDA and/or Recognition and Attornment Agreement and void Tenant's cancellation of the lease within said ten (10) day period. Notwithstanding anything to the contrary herein, this Lease

55

shall not be subordinate to any future mortgage, deed of trust or other lien or to any future superior lease unless the holder of any such mortgage, deed or trust, other lien or lease executes and delivers to Tenant a non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit "E-1", "E-2"or such other form as shall be reasonably satisfactory to Tenant and such mortgagee or other party.

22.2 If the lessor of a superior lease or the holder of a superior mortgage shall succeed to the rights of Landlord under this Lease, whether through possession or foreclosure action or delivery of a new lease or deed, or if a superior lease shall terminate or be terminated for any reason, then, at the election and upon demand of the party so succeeding to Landlord's rights, as the successor owner of the property of which the Premises is a part, or as the mortgagee in possession thereof, or otherwise (such party, owner or mortgagee being herein sometimes called the "successor Landlord"), Tenant shall attorn to and recognize such successor Landlord as Tenant's landlord under this Lease, and shall promptly execute and deliver any instrument that such successor Landlord may reasonably request to evidence such attornment. Upon such attornment, this Lease shall continue in full force and effect as, or as if it were, a direct lease between the successor Landlord and Tenant, upon all of the executory terms, conditions and covenants as are set forth in this Lease and shall be applicable after such attornment. Nothing contained in this paragraph shall be construed to impair any right, privilege or option of any successor Landlord or to impair any right, privilege or option of Tenant. Notwithstanding the foregoing, such successor Landlord shall not be responsible for any period prior to its taking title to the Premises nor any period following its transfer of the Premises.

ARTICLE 23 - SURRENDER OF PREMISES/HOLD OVER

23.1 Upon the expiration or other termination of the Term, Tenant shall quit and surrender to Landlord the Premises, broom clean, in good order and condition, ordinary wear and tear and damage by fire or other casualty excepted, and Tenant shall remove all of its Removal Property as provided for in this Lease. Tenant shall not have to restore or remove any Alterations made to the Premises at or prior to the expiration of the Term of this Lease, including, without limitation, Tenant's Initial Work. Tenant's obligation to observe or perform

56

this covenant shall survive the expiration or other termination of the Term.

23.2 Tenant covenants that it shall vacate the Premises immediately upon the expiration or sooner termination of this Lease.   If Tenant, or anyone holding through Tenant, retains possession of the Premises or any part thereof after the expiration of the Term, Tenant shall pay Landlord a fee for use and occupancy equal to one hundred fifty (150%) percent of the Basic Annual Rent and Additional Rent for the last month of the Term, for the period Tenant thus remains in possession and, in addition thereto, Tenant shall pay Landlord for all damages, consequential as well as direct, sustained by reason of such retention of possession. Neither Tenant nor anyone holding through Tenant shall be deemed a month-to-month tenant without a writing signed by Landlord.   The aforesaid amount shall be Landlord's sole monetary remedy arising out of Tenant's remaining in possession after the termination of this Lease. The provisions of this Section do not exclude Landlord's rights of re-entry or any other right hereunder.

## ARTICLE 24 - FORCE MAJEURE

24.1 Landlord and Tenant shall be excused for the period of any delay in the performance of any obligations hereunder, other than the obligation to pay Rent, when prevented from doing so by cause or causes beyond Landlord's and Tenant's control which shall include, without limitation, all labor disputes, civil commotion, war, war-like operations, invasion, rebellion, hostilities, military or usurped power, sabotage, governmental regulations or controls, fire or other casualty, inability to obtain any materials or services or through acts of God.

## ARTICLE 25 – NOTICES

25.1 Any notice or demand, consent, approval or disapproval (collectively called "Notices") required or permitted to be given by the terms and provisions of this Lease, or by any law or governmental regulation, either by Landlord to Tenant or by Tenant to Landlord, shall be in writing and shall be sent by United States mail postage prepaid as registered or certified mail, return receipt requested, or sent by nationally recognized overnight courier.   Any Notice shall be addressed:   if to

57

Landlord, c/o Wachtler Knopf Equities, 500 Bi-County Boulevard, Suite 230S, Farmingdale, New York 11735, with a copy to Certilman Balin Adler & Hyman, LLP, 90 Merrick Avenue, East Meadow, New York 11554, Attention: Jodi S. Hoffman, Esq. If to Tenant, at its address set forth on page 1 of this Lease, to the Attention of Mr. Larry Segall, CFO, with a copy to: LaRocca Hornik Rosen Greenberg & Blaha LLP, 40 Wall Street, 32nd Floor, New York, New York 10005, Attention: Rose Greenberg, Esq. Any rental invoices, payments of the Tenant Improvement Allowance, and related billings shall also be delivered to Tenant, c/o Equinox Fitness Clubs, One Park Avenue, 2nd floor, New York, New York 10016, Attention: Directory of Treasury. Either party, however, may designate in writing such new or other address to which such notice or demand shall thereafter be so given, made or mailed. All notices shall be deemed given upon receipt or notice of first refusal thereof. Attorneys for Landlord and Tenant may give notices on behalf of their respective clients with the same force as if given by the parties.

## ARTICLE 26- CAPTIONS

26.1 The captions are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope of this Lease nor the intent of any provision thereof.

## ARTICLE 27 - ENVIRONMENTAL MATTERS

27.1 Tenant agrees that Tenant shall take no action in the Premises which causes the Premises to be used for the treatment, generation, manufacture, use, refining, production, storage, disposal, release, or placement of hazardous or toxic substances (as hereinafter defined), petroleum products, pollutants, or contaminants (collectively, "Hazardous Substances"), and Tenant, its agents, employees, contractors, customers, licensees and/or concessionaires shall not take any action to release any Hazardous Substances, onto the Premises or into the subsurface thereof or onto any property whatsoever, unless in compliance with all applicable Environmental Laws (hereinafter defined). Furthermore, Tenant shall not take any action to cause any violation of any federal, state or local law, ordinance, regulation or order now or hereafter enacted, related to environmental conditions (collectively, "Environmental Laws") on, under or about the Premises, or arising from Tenant's use or

58

2365808.7
2422284.1

occupancy of the Premises, including, but not limited to, soil and ground water conditions. Tenant shall, at Tenant's own expense, operate in the Premises so as to comply with all Environmental Laws regulating the use, generation, storage, transportation or disposal of Hazardous Substances.

27.2 For the purposes hereof, the term "hazardous" or "toxic" substances shall include, without limitation, flammables, inflammables, combustibles, explosives, radioactive materials, asbestos, PCB's, chemicals known to cause cancer or reproductive toxicity and substances declared to be hazardous or toxic under any Environmental Law.

27.3 Failure of Tenant to abide by each and every one of the foregoing obligations shall be a default under this Lease which, if not cured within ten (10) days of a notice from Landlord, unless such obligation cannot be cured within ten (10) days but prior to the expiration of such ten (10) days, Tenant has commenced the cure and thereafter diligently prosecutes the cure of such obligation to completion within a reasonable period of time, or sooner if an emergency, dangerous or hazardous condition exists in, at, on, upon or about the Premises, shall entitle Landlord to pursue all remedies available in law, at equity or under this Lease.

27.4 Tenant shall indemnify and save Landlord and its successors and assigns and their respective officers, directors, shareholders, partners, members agents and employees and the Premises harmless against any and all claims, obligations, liabilities, violations, penalties, fines, suits, governmental orders, causes of action, judgments, damages, whether civil or criminal or both, of any and all kind or nature or which result from the actions of Tenant, its agents, employees, contractors, customers, licensees and/or concessionaires in the Premises in breach or default of the foregoing agreement and/or which the Landlord may be subject due to the actions of Tenant, its agents, employees, contractors, customers, licensees and/or concessionaires in the Premises in connection with any toxic or Hazardous Substances resulting from or in connection with the discharge, release or escape of Hazardous Substances at the Premises, caused by or resulting from the use and operation of the Premises by the Tenant, its successors and assigns, sublessee, and/or by reason of Tenant's invitees, licensees, concessionaires, employees, officers, agents, servants, etc. in

59

any case whether or not Tenant has complied with its obligations pursuant to this Section. This indemnification and save harmless agreement shall also cover any and all liens for hazardous waste clean-up expenses in favor of the United States, New York State or any political subdivision thereof, including the County of Suffolk, Town of Huntington, and any governmental department of the foregoing. All payments due from Tenant hereunder shall be due as additional rent within ten (10) days of the date of statement therefor from Landlord.

This indemnification shall include, but not be limited to, reasonable legal fees and other charges which Landlord may incur, in defending against any proceeding in connection with the foregoing.

Tenant shall have no responsibility or liability with respect to pre-existing conditions concerning Hazardous Substances at the Property, or conditions concerning hazardous or toxic substances caused by persons other than Tenant, Tenant's agents, employees or contractors or any person claiming by, through or under Tenant. Landlord represents to Tenant that it has not received any notice of a violation of any Environmental Law from any governmental authority that remains uncured. Landlord represents, warrants and covenants that, to the best of Landlord's knowledge, upon the date Landlord delivers the Premises to Tenant, the Premises and the Building will be free of Hazardous Substances and in compliance with all applicable Environmental Laws. Landlord agrees that to the extent any Hazardous Substances are present in, at, on or about (a) the Premises as of the date of delivery of possession of the Premises to Tenant, or (b) the common areas of the Property or the Building, Landlord shall be responsible for removing or otherwise remediating such Hazardous Substances as required by, and in full compliance with, all Environmental Laws at no cost to Tenant, unless introduced or caused by Tenant, its agents, employees, contractors, customers, licensees and/or concessionaires. Notwithstanding the foregoing, if Hazardous Substances are discovered during the performance of Tenant's Initial Work and such Hazardous Substances (i) were not introduced to the Premises by Tenant, its contractors, agents and/or employees, and (ii) require remediation, then in such event, Landlord shall promptly cause the condition to be remediated and the Rent Commencement Date shall be delayed for the period of time Landlord is remediating the Hazardous

60

Substance. However, if the discovered Hazardous Substance is permitted to remain intact, without remediation, in accordance with applicable governmental laws (such as encapsulated asbestos); Landlord shall not be required to remediate the condition and the Rent Commencement Date shall not be delayed.

## ARTICLE 28 - MECHANIC'S LIENS

28.1 Tenant covenants not to suffer or permit any mechanic's liens to be filed against the fee interest of Landlord nor against Tenant's leasehold interest in the Premises by reason of work, labor, services or materials supplied or claimed to have been supplied to Tenant or any contractor, subcontractor or any other party or person acting at the request of Tenant, or anyone holding the Premises or any part thereof through or under Tenant. Tenant agrees that in the event any mechanic's lien shall be filed against the fee interest of Landlord or against Tenant's leasehold interest Tenant shall, within thirty (30) days after receiving written notice from Landlord, cause the same to be discharged of record by payment, deposit, bond or order of a court of competent jurisdiction or otherwise.

28.2 If Tenant shall fail to cause such lien to be discharged of record within the period aforesaid, then, in addition to any other right or remedy, Landlord, may, but shall not be obligated to, discharge the same by paying the amount claimed to be due, by procuring the discharge of such lien by deposit by bonding proceedings, and in any such event, Landlord shall be entitled, if Landlord so elects, to compel the prosecution of any action for the foreclosure of such lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest, costs and allowances. Any amount so paid by Landlord and all reasonable costs and expenses incurred by Landlord in connection therewith, including, but not limited to premiums on any bonds filed and attorneys' fees, shall constitute additional rent payable by Tenant to Landlord within ten (10) days after demand therefor.

## ARTICLE 29 - RIGHT TO PERFORM COVENANTS

29.1 Tenant covenants and agrees that if Tenant shall, at

61

any time, fail to make any payment or perform any other act on
its part to be made or performed under this Lease,  Landlord,
after the expiration of the time limitation set forth in Article
15 this Lease or any other applicable notice and cure period set
forth in this Lease, (except in cases of emergency) may, but
shall not be obligated to, make such payment or perform such
other act to the extent  Landlord may deem desirable, and in
connection therewith, to pay reasonable expenses and employ
counsel.   All  sums  so  paid  by  Landlord  and  all  reasonable
expenses in connection therewith shall be payable within thirty
(30) days after demand therefor and   Landlord shall have the
same rights and remedies for the nonpayment thereof as in the
case of default in the payment of the Basic Annual Rent reserved
hereunder.

ARTICLE 30 – CUMULATIVE REMEDIES - NO WAIVER

30.1  The  specific  remedies  to  which  Landlord  may  resort
under  the  terms  of  this  Lease  are  cumulative  and  are  not
intended  to  be  exclusive  of  any  other  remedies  or  means  of
redress  of  which  it  may  be  lawfully  entitled  in  case  of  any
breach  or  threatened  breach  Tenant  of  any  provision  of  this
Lease.   The  failure  of  Landlord  to  insist  in  any  one  or  more
cases  upon  the  strict  performance  of  any  of  the  covenants  of
this  Lease,  or  to  exercise  any  option  herein  contained,  shall
not  be  construed  as  a  waiver  or  relinquishment  for  the  future  of
such  covenant  or  option.   A  receipt  by  Landlord  or  payment  by
Tenant of Basic Annual Rent with knowledge of the breach of any
covenant  thereof  shall  not  be  deemed  a  waiver  of  such  breach,
and  no  waiver,  change,  modification  or  discharge  of  any
provision  in  this  Lease  shall  be  deemed  to  have  been  made  or
shall  be  effective  unless  expressed  in  writing  and  signed  by
both Landlord and Tenant.   In addition to the other remedies in
this  Lease  provided,  Landlord  shall  be  entitled  to  seek
restraint  by  injunction  of  any  violation,  or  attempted  or
threatened  violation,  of  any  of  the  covenants,  conditions  or
provisions  of  this  Lease  or  to  seek  a  decree  compelling
performance of any such covenants, conditions or provisions.

ARTICLE 31 - LANDLORD'S DEFAULT AND LIABILITY

31.1   Landlord  shall  not  be  in  default  unless  Landlord
fails  to  perform  obligations  required  of  Landlord  within  thirty
(30) days after written notice by Tenant to Landlord (or such

62

shorter time period in the event of an emergency)and to any
mortgagee, whose addresses shall be furnished to Tenant,
specifying wherein Landlord has failed to perform such
obligation. Absent an emergency, if the nature of Landlord's
default is such that more than thirty (30) days is required for
performance then Landlord shall not be in default if Landlord or
any mortgagee commences performance within such thirty (30) day
period and diligently prosecutes same to completion.

31.2 Tenant agrees to give any mortgagee by certified
mail, return receipt requested, a copy of any notice of default
served upon the Landlord, provided that prior to such notice
Tenant has been notified, in writing, of the address of such
mortgagee. Tenant further agrees that if Landlord shall have
failed to cure such default within the time provided for in this
Lease, then the mortgagee shall have an additional thirty (30)
days within which time to cure such default or if such default
cannot be cured within that time, then such additional time as
may be necessary (not to exceed a total of 60 days in the
aggregate)if within such thirty (30) days, any mortgagee has
commenced and is diligently pursuing the remedies necessary to
cure such default, in which event this lease shall not be
terminated while such remedies are being so diligently pursued.

31.3 In the event that Landlord shall default under the
terms of this Lease and Tenant shall recover a judgment against
Landlord by reason of such default or for any reason arising out
of the tenancy or use of the Premises by Tenant or the Lease of
the Premises to Tenant, Landlord's liability hereunder shall be
limited to Landlord's interest in the Land and Building and no
further, and Tenant agrees that in any proceeding to collect
such judgment, Tenant's right to recovery shall be limited to
Landlord's interest in the Premises. For purposes of this
provision Landlord's interest in the Land and Building shall be
deemed to include all rents and other income from the Property
and any insurance proceeds pertaining to the Property and the
proceeds of a sale of the Property.


ARTICLE 32 - COMMON AREAS

32.1 The Building now contains areas (referred to in this
Lease as "Common Areas") such as, by way of illustration,
parking areas and driveways, common corridors, landscaped areas,

63

lobbies and public rest rooms.  Subject to the restrictions expressly set forth in this Lease, Tenant agrees that Landlord, in its discretion, may, at any time and from time to time, without diminution in the Basic Annual Rent, increase, reduce, change or eliminate the number, type, size, location, elevation, nature and use of any of the Common Areas or the facilities therein or the amenities constituting a part thereof, provided, however, that in so doing, (a) reasonable access to the Premises and the parking areas shall not unreasonably be impaired, (b) the total number of parking spaces available for use by Tenant and its invitees, members, guests and employees shall not be reduced below the greater of (i) the number of parking spaces available as of the date of this Lease and (ii) that permitted by law (unless replacement parking is provided), (c) the visibility of Tenant's Signage shall not be unreasonably impaired (except temporarily (i.e. not to exceed more than seven (7) consecutive business days) to effectuate repairs and/or remodeling of the Premises and/or the Building), and (d) Tenant's operations at the Premises shall not otherwise be unreasonably negatively impacted and the Building shall maintain its image as a first-class building (consistent with comparable buildings in the geographic region within which the Building is located). Landlord shall use commercially reasonable efforts to carry out all repairs and/or remodeling promptly and diligently and to schedule such work in a manner, and in such locations, as to minimize, to the extent reasonably practicable, interference with Tenant and/or Tenant's business operations at the Premises, or Tenant's ingress to or egress from the Property or the Building, as well as Tenant's approved signage hereunder. However, in no event shall Landlord be obligated to hire overtime labor.

32.2 Landlord shall light, clean, maintain and repair the Common Areas so that the respective elements therein may be used for their intended purposes in a manner consistent with operating procedures generally followed in similar first-class non-governmental and non-institutional Buildings in the area. In furtherance of the foregoing, Landlord shall keep the Common Area, including, without limitation, the Parking Area (as hereinafter defined) well-illuminated and plowed of snow, ice sanded and free of debris during all hours that the Premises are open for business and for one hour before and after such times, subject to Tenant's obligations herein to have the Parking Area by the Demised Premises plowed during hours other than Working

64

2365808.7
2422284.1

Hours.

32.3 Tenant and its employees and invitees shall have the non-exclusive right, in common with Landlord and all others to whom Landlord has granted or may hereafter grant rights (collectively "Permitted Users"), to use the Common Areas for their intended purposes, subject to such rules and regulations as Landlord may from time to time adopt.  As more particularly set forth in Sections 32.5, 32.6 and 32.7, Tenant shall have the right to use the Parking Area in common with the other tenants in the Building on a first-come first-served basis.  Subject to the express provisions of this Lease, Landlord may at any time temporarily close any part of the Common Areas to make repairs or changes or to prevent (a) the use thereof by persons who are not Permitted Users or (b) the acquisition of public rights in any such area, and may act in and with respect to the Common Areas as it in its judgment determines may be necessary or desirable.

32.4  Notwithstanding anything in this Lease contained to the contrary, Tenant agrees that it will not use, or permit, or suffer the use by its employees or invitees of (i) areas, within the Common Areas not designated as parking spaces for parking or (ii) parking spaces for other than passenger automobiles.

32.5 Throughout the Term of this Lease (including all option periods): Landlord shall, at Landlord's sole cost and expense: (i) maintain, repair, and replace, and keep open for use, the Parking Lot identified on the site plan attached to and made a part of this Lease as Exhibit B (the "Parking Area"); (ii) cause the Parking Area to be open and accessible to Tenant and Tenant's members, prospective members, guests, invitees, and employees ("Tenant Parking Parties") seven (7) days per week, at all hours that Tenant is open for business in the Leased Premises and one hour prior to opening and after closing; and (iii) cause the Parking Area to be well-lit and free of trash and plowed of snow  during working hours.  Tenant and Tenant Parking Parties shall have the right to use in common with other tenants of the Building, on a non-exclusive basis, all of the parking spaces in the Parking Area for the parking of automobiles. Such parking shall be subject to the reasonable rules and regulations now or hereafter adopted by Landlord; provided, said rules and regulations may not reduce parking rights of Tenant and Tenant Parking Parties set forth in this

65

Section    32.5, impose any fee or charge on Tenant or Tenant
Parking Parties with respect to parking (irrespective of how the
charge is characterized.

32.6 Throughout the Term Landlord shall cause the Parking
Area to contain the number of parking spaces required by
applicable law and code.  Parking in the Parking Area shall be
provided to Tenant and Tenant Parking Parties at no cost or
charge whatsoever (including, but not limited to, any cost or
charge associated with parking administration or management
and/or so-called "validation" procedures, and the like).

ARTICLE 33- FORCE MAJEURE
Intentionally Omitted.


ARTICLE 34 – MISCELLANEOUS

34.1 This Lease shall be governed by and construed in
accordance with the laws of the State of New York without
reference to the principles of conflicts of law thereof and
irrespective of the place of execution.

34.2 This Lease shall be construed without regard to any
presumption or other rule requiring construction against the
party causing this Lease to be drafted.

34.3 All Schedules and Exhibits referred to in this Lease
are hereby incorporated in this Lease by reference.

34.4 The covenants, conditions and agreements contained in
this Lease shall bind and inure to the benefit of Landlord and
Tenant and their respective successors and assigns.

34.5 This Lease constitutes the entire agreement of the
parties with respect to the matters hereof, and may not be
modified except by a written instrument executed by Landlord and
Tenant.

34.6 Subject to compliance with all applicable Legal
Requirements and subject to Landlord's prior approval of the
plans therefor, which approval shall not be unreasonably
withheld, delayed or conditioned, Tenant may install a satellite

66

communication system (including up to two (2) Direct TV satellite dishes, which may be no larger than twenty-four (24) inches in diameter and shall be for television use, for use in connection with the Permitted Use)(the "Communication System") on the roof of the Building. Tenant is hereby granted an irrevocable non-exclusive license throughout the Term hereof in conjunction with its use of the Premises for (i) use of any Building shafts, chases, and other services areas required to install the electrical or communication wiring and cables related to Tenant's Communication System, (ii) access to the roof at all reasonable times (and in emergencies) to install, maintain, repair, replace or remove such Communication System, and (iii) installation and operation of a Communication System on the roof of the Building at a location to be mutually agreed upon by Landlord and Tenant. Tenant shall repair any damage to the roof of the Building or any surrounding property resulting from the installation or operation of Tenant's Communication System. Tenant, at its sole cost and expense, shall secure any and all permits for its Communication System. Notwithstanding anything to the contrary set forth herein, Tenant shall hire Landlord's roof contractor for the installation and maintenance of the Communication System so as not to void any roof warranty.

34.7 <u>Gym Memberships.</u>  Tenant and/or its parent company, Blink Holdings, Inc. shall provide Landlord's managing agent, Wachtler Knopf Equities (WKE), at no cost, four (4) gym memberships to the Melville location and one (1) membership to any of the Blink Fitness locations for use by WKE's employees. All five (5) memberships shall be non-assignable unless the employee no longer wishes to use the membership or is no longer employed by WKE.

ARTICLE 35 – PRE-SALES ACTIVIITES

35.1 To the extent space is available, Tenant shall have the right, at no cost to Tenant, from and after the date hereof, to occupy approximately 500 rentable square feet of space on the ground floor of the Building or at Landlord's option, maintain a trailer in the Parking Area (the "Presale Space"), to commence the sale of memberships to the public and for staff training (if the size of the Presale Space permits), at any time following Lease execution provided such sales activities are compliant with applicable laws, such Presale Space to be reasonably acceptable to Landlord and Tenant. Tenant may occupy the Pre-

67

Sale upon availability and may use and occupy such space until Tenant opens for business in the Premises.  Prior to occupying the Pre-Sale Space, Tenant shall furnish Landlord with the insurance certificates as required in this Lease. Landlord and Tenant hereby agree that each of the spaces (including an area for placement of a trailer) shown on the Site Plan, which is annexed hereto as Exhibit "B" attached to and made a part of this Lease are currently available and are reasonably acceptable to Landlord and Tenant to serve as the Presale Space. Landlord shall cooperate with Tenant in procuring any required permits or approvals for the Presale Space and shall promptly sign off on any applications therefor. Tenant shall have the right to maintain such signs and banners in and around the Presale Space and the Premises announcing the coming of Tenant's fitness club and/or the grand opening of the Premises as Tenant may reasonably determine are appropriate, subject only to compliance with applicable law.

## ARTICLE 36 - ANTI-TERRORISM LAW

36.1 Tenant represents and warrants that Tenant is not now acting and shall not in the future act, directly or indirectly, for or on behalf of any person, group, entity or nation named by any Executive Order of the United States Department of the Treasury as a terrorist, "Specially Designated and Blocked Persons", or other banned or blocked person, group, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Asset Control ("OFAC") of the United States Department of the Treasury.  Tenant further represents and warrants that Tenant is not now engaged and shall not in the future be engaged, directly or indirectly, in any dealings or transactions or otherwise be associated with such person, group, entity or nation; and Tenant hereby agrees to defend, indemnify and hold Landlord harmless from and against any and all claims, losses, costs, expenses, damages and liabilities (including, without limitation, attorneys fees) arising from or related to any breach of the foregoing representations.

## ARTICLE 37-RULES AND REGULATIONS

37.1   Tenant agrees to abide by the Rules and Regulations annexed hereto as Exhibit "D", as the same may be modified.   In the event there shall be any conflict between the Rules and

68

2365808.7
2422284.1

Regulations and this lease, then this lease shall govern. In no event shall the Rules and Regulations materially or adversely interfere with Tenant's use of, or access to, the Premises. Landlord agrees to use commercially reasonable efforts to ensure that all other users of the Building comply with the Rules and Regulations. Notwithstanding anything to the contrary contained herein Tenant shall not be required to comply with any rules or regulations which either increases Tenant's obligations or decreases Tenant's rights under this Lease in either case, to more than a de minimis extent. Notice of any additional rules and regulations shall be given in writing to Tenant in accordance with Article 25 of this Lease. In no event shall Landlord enforce the rules and regulations of the Building in a manner which discriminates against Tenant. In all events where Landlord's consent or approval is required in the rules and regulations, Landlord agrees that its consent or approval shall not be unreasonably withheld, delayed or conditioned.

2365808.7
2422284.1

**IN WITNESS WHEREOF**, Landlord and Tenant have respectively executed this Lease as of the day and year first above written.

**LANDLORD:**

**BROADHOLLOW/PINELAWN CW NF LLC**
By:    CW MANAGER L.L.C., its manager

By: _____
Name: Richard A. Wilpon
Title: Manager

**BROADHOLLOW/PINELAWN J.E.S. NF LLC**
By:    157 Manager L.L.C., its manager

By: _____
Name: Michael Katz
Title: Manager

**TENANT:**

**BLINK MELVILLE, INC.**

By: _____
Name: Harvey Spevak
Title: Chief Executive officer
& President

EXHIBIT "A"
DEMISED PREMISES





71

## EXHIBIT "A-1"
## SURRENDER SPACE



PPOSED 1st FLOOR PLAN

72

EXHIBIT "B"
SITE PLAN



73

2365808.7
2422284.1



NON-ILLUMINATED DOUBLE FACED MONUMENT W/ LEXAN FACES     08.12.11 V2

EXISTING

NOTES:
1. NEW MONUMENT SIGN TO BE LOCATED NEAR BROADHOLLOW RD.
2. EXISTING MONUMENT (COSMOCON) SIGN TO BE REMOVED BY LANDLORD.
3. ALL SIGNAGE SUBJECT TO LOCAL GOVERNMENTAL REVIEW.
4. LANDLORD TO REVIEW AND APPROVE FABRICATION DRAWINGS PRIOR TO INSTALLATION.

blink FITNESS

1/2" RETAINER

**Blink Fitness**
121 Broadhollow Road
Melville, NY 11747

american**signcrafters**
NEW YORK · NEW JERSEY · FLORIDA · SOUTH CAROLINA

EXHIBIT "B-1"
TENANT'S SIGNAGE PROGRAM

74

INTERNALLY ILLUMINATED SIGN CABINET w/ LEXAN FACE          08.12.11 V2

NOTES:
1. NEW WALL SIGN
2. EXISTING WALL SIGN (COSMOCON) SIGN TO BE REMOVED BY LANDLORD.
3. ALL SIGNAGE SUBJECT TO LOCAL GOVERNMENTAL REVIEW.
4. LANDLORD TO REVIEW AND APPROVE FABRICATION DRAWINGS PRIOR TO INSTALLATION.

EXISTING

15'- 0"VIF

4'- 0' VIF

blink FITNESS

PROPOSING A NEW ILLUMINATED SIGN CABINET

**Blink Fitness**
121 Broadhollow Road
Melville, NY 11747

american**signcrafters**
NEW YORK · NEW JERSEY · FLORIDA · SOUTH CAROLINA

PROJECT MANAGER Bill Ewbank
DATE 08-02-2011
LEXFACE
DRAWN BY Sean Chow
DRAWING NUMBER 2





**RESKIN EXISTING AWNING FRAME**  08.12.11 V2

NOTES:
1. NEW WALL SIGN
2. ALL SIGNAGE SUBJECT TO LOCAL GOVERNMENTAL REVIEW.
3. LANDLORD TO REVIEW AND APPROVE FABRICATION DRAWINGS PRIOR TO INSTALLATION.

**blink** FITNESS
121 BROADHOLLOW ROAD

PROPOSING TO RESKIN EXISTING AWNING FRAME
w/ NAVY BLUE SUNBRELLA MATERIAL

**Blink Fitness**
121 Broadhollow Road
Melville, NY 11747

american **signcrafters**
NEW YORK · NEW JERSEY · FLORIDA · SOUTH CAROLINA

PROJECT MANAGER: Bill Ewbank
DATE 08-02-2011
REVISION
DRAWN BY: Sean Chow
DRAWING NUMBER: 4

23658087
2422284.1

**EXHIBIT "C"**
**LANDLORD'S WORK**

Landlord will provide[a] the following conditions and/or improvements to the Premises on or before the Lease Commencement Date:

**A. Preface:**

1. Premises will be code compliant for Tenant's Permitted Use. Tenant understands and accepts that certain regulatory approvals may be granted after Lease Commencement.

2. Premises shall be fully demolished and delivered in "broom swept" condition to include (but not limited to) the removal of all previous Tenant's installations of: ceilings, walls, furniture, fixtures, partitions, safes and other security installations, all carpeting, tiles and adhesives, electrical, plumbing, floor and ceiling mounted HVAC units and securing and capping all plumbing at drains. Tenant may utilize some or all of the existing MEP installation and, shall coordinate a walkthrough of the space with Landlord's engineer to determine what shall remain in place in order to enable the Landlord to perform selective demolition.

3. All hazardous materials will be abated from the tenant's demised premises; Tenant requires certified documentation stating such prior to Tenant's filing for a construction permit.

4. The Building will be free of all violations, so as not to preclude Tenant from acquiring any permits from any governing agencies.

**B. Building Core and Shell Work:**

1. <u>Shell</u>
   - Building's exterior/structure will be code compliant, weather tight and properly maintained. All existing leaks will be repaired.
   - Landlord shall make all necessary repairs to the exterior façade to remove any remaining attachments,

78

2365808.7
2422284.1

non-functioning fixtures, damage or identities (of previous tenant's signage).

2.  <u>Outside Walls</u>
- The interior side of all exterior walls will be finished on the interior side by Landlord with gypsum sheetrock, vapor barrier, insulation, metal stud, taped and ready to prime paint. The existing perimeter metal radiator enclosures, are to remain in as- is condition. The exterior side of the wall will be finished by the Landlord.

(a)    *Provide is defined herein as furnish and install and made completely ready for operation for its intended use.*

3.  <u>Exterior, Storefront, Entrance  and Doors</u>
- Existing building glass and doors to remain. Landlord to remove existing window film and replace with new energy efficient product throughout building, subject to mutually agreed upon product(s). Landlord to repair damaged windows and doors prior to turnover of space to Tenant's contractors.

4.  <u>Structure</u>
- Landlord will provide structural floor load of the greater of 100 lbs./Sq. Ft. (for both live and dead load), or code, for all levels of the Premises, including any mezzanines. The natural frequency of the structural slab will be a minimum of 10hz. Tenant will not be responsible for any costs associated with Landlord required structural modifications or improvements (i.e. jack slab), with the exception of the center stairwell modification.
- Landlord and Tenant to review existing slab conditions once the premises is clear and can be measured appropriately. LL will level up to 4,500 SF of existing slab in areas mutually agreed to; Any leveling required over and above 4,500 SF is Tenant's responsibility.
- Any fireproofing removed as a result of LL work will be patched.

79

5.  <u>ADA Access</u>
    - Premises will be fully handicapped accessible and ADA compliant to all levels through the use of the existing elevator.

6.  <u>Core</u>
    - Premises will be Fire/Life safety code compliant to include adequate means of egress for Tenant's occupancy loads and travel distances.
    - Pursuant to mutually agreed to stair specifications, Landlord shall demolish existing interior stair well and create an approximately 10'x20' opening for Tenant to install a new stair well to 2nd floor. If any structural work is required to provide the new opening, Tenant is responsible to provide as part of Tenant work.

7.  <u>Demising Partitions</u>
    - Per an agreed to location, Landlord will provide all necessary code compliant, fire rated, demising partitions for Tenant's Use. Landlord will finish Tenant's side of demising partitions (taped, spackled, sanded, one coat of prime, 2 coats of paint). Demising partitions will be constructed from the slab to the underside of the deck above. To the extent there are doors in any of the existing demising partitions, such doors shall be removed and enclosed, other than those required for fire egress.

C.  **Building Utility Systems Serving the Premises**

1.  <u>HVAC</u>
    - Landlord will provide a dedicated,, cooling and heating system having a cooling capacity totaling approximately 60 tons. The location of any additional unit furnished and installed by Landlord to meet the tenants 60 ton requirement will be mutually agreed upon by Landlord and Tenant. Each unit will be provided with all necessary electric connections, and control wiring. Landlord will provide code-required fire alarm interface for the HVAC units. Upon delivery, the units' fire alarm

80

and all required accessories will be fully operational. If Tenant should add additional HVAC units to the building for their specified use, the tenant would be responsible to ensure that the units are connected to the base building fire alarm system utilizing the services of the Landlords Fire Alarm vendor. Refer to: Section 10 of Lease for Maintenance of Landlord provided HVAC equipment. Landlord's HVAC Contractor or Maintenance Contractor to provide start-up and commissioning for all HVAC units and provide on-site training for end-users.

- Landlord to provide fully functional perimeter heating system.

- Landlord will provide means for toilet and locker room exhaust sized at the greater of 2 cfm per square foot or Code requirements for Tenant's plan with controls at a location to be mutually agreed to.

2. The HVAC systems will operate 7 days per week and in accordance with the Tenant's business hours, with no "after hour" charges for operations.    Refer to: Section 10.01 of Lease for Maintenance of Landlord provided HVAC equipment.

3. <u>Electrical</u>
- Landlord shall provide, at a location to be mutually agreed upon, 800 Amp, 3-phase, 4-wire utility service at 120/208 volts (inclusive of HVAC). Tenant to provide, per LL specification, sub-meter. Refer to Section 9.1 for electrical charges.

4. <u>Plumbing</u>
- Landlord shall provide a 2" sub-metered (sub meter to be provided at tenants cost), valved and capped cold water service at existing 1st floor washroom location, assuming a 2" line meets local code for a 4,500 gallons/day (60 gallons/min) demand load. If not, a 3" line will be required. Landlord to install a pressure reducing valve and Y type strainer if water pressure exceeds 60 PSI.

81

- Landlord shall provide a 2" valve and capped gas service to a mutually agreed to location within the Leased Premises, provided that a 7" water column (1/4 psi) is achieved.    If such pressure is not achieved via a 2" line, a 3" line will be required.
- Landlord shall provide one gas flue and associated roof opening for hot water heater.
- Landlord shall provide a 4" sanitary waste line and associated vent at a mutually agreed to location within the Leased Premises, assuming a 4" line meets local code for a 4,500 gallons/day (60 gallons/min) demand load.

Fire Protection

- Sprinkler System – All code required assembles (OS&Y, tamper flow), including riser on each level of Premises. Tenant to modify existing sprinkler branch distribution system for Tenant use and per code.    Landlord will remove existing sprinkler branch piping when Tenant's system is fully approved by local regulatory agencies.  Tenant responsible to notify Landlord of any and all shut downs required.
- Fire Alarm – If required by code, Landlord to provide base building panel and command center capable of supporting Tenant's devices.  Devices and associated wiring to Landlord panel by Tenant. Landlord to specify devices and vendor to be used prior to commencement.

5.    Cable and Telephone

- Landlord will provide 1-2" rigid conduit with drag line for Satellite TV (and associated satellite roof access) from the south west corner of the roof to a mutually agreed to location within the demised premises. Also, Landlord will provide 1-2" rigid conduit with drag line from the building or site telephone minimum point of entry (MPOE) to a mutually agreed to location within the demised premises.    Tenant has the right to place two (2) satellite dishes on the roof (the size, location, and mounting detail to be determined under a separate License Agreement.)

82

D.   **General Provisions**

1.   <u>Landlord Documentation</u>
- Landlord will provide the following drawings to Tenant: floor plans and exterior elevations of the existing building.  For the Lease, Landlord will prepare a Lease Outline Drawing (LOD) that graphically represents the following: Premises, and point of entry for all utilities at mutually agreed to locations.

2.   All construction will be in accordance with the requirements of all applicable codes, ordinances, rules and regulations of all authorities having jurisdiction over the work including all requirements of the Landlord's insurance carrier.

3.   Landlord will provide access to all mechanical/electrical rooms/closets for equipment and distribution outside of the Premises.

4.   Tenant will have access to the Building's pathways, riser/shafts, and the roof for Tenant's MEP requirements/system.

5.   Landlord will supply Tenant with temporary electric service (at no cost to Tenant) during the construction of Tenant's improvements.

6.   <u>Construction Logistics</u>
- Landlord will provide 24/7 construction access, 7 day week work permission, direct and unencumbered service access from street, unlimited service elevator access, materials and staging area and temporary utilities on a direct metered basis (or agreed upon stipend).  Tenant to be cognizant and respectful of other building tenants use during construction.

7.   Landlord will not charge a parking fee or impose unreasonable parking restrictions on Tenant's contractors during the construction of Tenant's work.

8.   Tenant will use commercially reasonable efforts to employ labor that is harmonious with other labor

83

within the Building, but under no circumstances, will Tenant be obligated by Landlord to utilize union labor.

9.  Tenant will be permitted to utilize its own consultants for all permitting and expediting (if necessary) requirements.

2365808.7
2422284.1

## EXHIBIT "D"
## RULES AND REGULATIONS

1.      The sidewalks, entrances, driveways, passages, courts, elevators, vestibules, stairways, corridors or halls shall not be obstructed or encumbered by any Tenant or used for any purpose other than for ingress to and egress from the Premises and for delivery of merchandise and equipment in a prompt and efficient manner using elevators and passageways designated for such delivery by Landlord.   There shall not be used in any space, or in the public hall of the building, either by any Tenant or by jobbers or others in the delivery or receipt of merchandise, any hand trucks, except those equipped with rubber tires and sideguards.

2.   The water and wash closets and plumbing fixtures shall not be used for any purposes other than those for which they were designed or constructed and no sweepings, rubbish, rags, acids or other substances shall be deposited therein, and the expenses of any breakage, stoppage, or damage resulting from the violation of this rule shall be borne by Tenant who, or whose clerks, agents, employees or visitors, shall have caused it.

3.   No Tenant shall sweep or throw or permit to be swept or thrown from the Premises any dirt or other substances into any of the corridors or halls, elevators, or out of the doors or windows or stairways of the building, and Tenant shall not use, keep or permit to be used or kept any , vending machine or permit or suffer the Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Building by reason of noise, odors and/or vibrations, or interfere in any way with other tenants or those having business therein, nor shall any animals or birds be kept in or about the Building.   Smoking or carrying lighted cigars or cigarettes in the elevators of the Building is prohibited. Landlord recognizes that some noise and vibration does result from Tenant's Permitted Use and agrees that noise and vibration customarily associated with a health and fitness club shall not constitute a violation of this Lease, however, Tenant shall use reasonable efforts to minimize such noise and vibration so as to not unreasonably interfere with the use of the Building by the other tenants.

2365808.7
2422284.1

4.    No awnings or other projections shall be attached to the outside walls of the Building without the prior written consent of Landlord.

5.    Intentionally omitted.

6.    Except as permitted in the Lease, no Tenant shall mark, paint, drill into, or in any way deface any part of the Premises or the Building of which they form a part.  No boring, cutting or stringing of wires shall be permitted, except with the prior written consent to Landlord, and as Landlord may direct.  No tenant shall lay linoleum or other similar floor covering so that the same shall come in direct contact with the floor of the Premises and, if linoleum or other similar floor covering is desired to be used, an interlining of builder's deadening felt shall be first affixed to the floor, by a paste or other water soluble material, the use of cement or other similar adhesive material being expressly prohibited.

7.    No additional locks or bolts of any kind shall be placed upon any of the doors or windows by any Tenant, nor shall any changes be made in existing locks or in the mechanisms thereof.  Each Tenant must, upon the termination of his tenancy, restore to Landlord all keys of stores, offices and toilet rooms, either furnished to, or otherwise procured by, such Tenant, and in the event of the loss of any keys so furnished, such Tenant shall pay to Landlord the cost thereof.

8.    Freight,    furniture,    business    equipment, merchandise and bulky matter of any description shall be delivered to and removed from the Premises only through the service entrances and corridors, and only during hours and in a manner approved by Landlord.  Landlord reserves the right to inspect all freight to be brought into the Building and to exclude from the Building all freight which violates any of these Rules and Regulations or the lease of which these Rules and Regulations are a part.

9.    Canvassing,    soliciting    and    peddling    in    the building is prohibited and each Tenant shall cooperate to prevent the same.

10.  Landlord reserves the right to exclude from the building (but not the Demised Premises) between the hours of 6:00

86

2365808.7
2422284.1

P.M. and 8:00 A.M. and at all hours on Sundays and legal holidays, all persons who do not present a pass to the building signed by Landlord.  Landlord will furnish passes to persons for whom any Tenant requires same in writing.  Each Tenant shall be responsible for all persons for whom he requires such a pass and shall be liable to Landlord for all acts of such persons.

   11.  Landlord shall have the right to prohibit any advertising by any Tenant which, in Landlord's opinion, tend to impair the reputation of the Building or its desirability as an office building, and upon written notice from Landlord, Tenant shall refrain from or discontinue such advertising.

   12.  Tenant shall not bring or permit to be brought or kept in or on the Premises, any inflammable, combustible, hazardous or explosive fluid, material, chemical or substance,

   13.  Tenant agrees to keep all entry doors closed at all times and to abide by all rules and regulations issued by Landlord with respect to such services.

2365808.7
2422284.1

## EXHIBIT "E"

## SNDA AGREEMENT

This Subordination, Non-Disturbance and Attornment Agreement (the "Agreement") is dated as of the _____ day of _____, 2008, between _____ as Master Servicer on behalf of _____., as trustee for the registered holders of _____ ("Lender"), and _____, a _____ ("Tenant").

### RECITALS

A.    Tenant is the tenant under a certain lease (the "Lease") dated _____, with _____, a _____ ("Landlord") or its predecessor in interest, of premises described in the Lease (the "Premises") located in a certain [shopping center/office building/warehouse/industrial park/hotel] known as _____ located _____ in _____ and more particularly described in Exhibit A attached hereto and made a part hereof (such [shopping center/office building/ warehouse/ industrial park/hotel], including the Premises, is hereinafter referred to as the "Property").

B.    This Agreement is being entered into in connection with a mortgage loan (the "Loan") previously made to Landlord and currently held by Lender, secured by, among other things: (a) a first mortgage, deed of trust or deed to secure debt on and of the Property (the "Mortgage") previously recorded with the registry or clerk of the county in which the Property is located (the "Registry"); and (b) a first assignment of leases and rents on the Property (the "Assignment of Leases and Rents") recorded with the Registry.  The Mortgage and the Assignment of Leases and Rents are hereinafter collectively referred to as the "Security Documents".

### AGREEMENT

For mutual consideration, including the mutual covenants and agreements set forth below, the receipt and

88

2365808.7
2422284.1

sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Tenant agrees that the Lease is and shall be subject and subordinate to the Security Documents and to all present or future advances under the obligations secured thereby and all renewals, amendments, modifications, consolidations, replacements and extensions of the secured obligations and the Security Documents, to the full extent of all amounts secured by the Security Documents from time to time. Said subordination is to have the same force and effect as if the Security Documents and such renewals, modifications, consolidations, replacements and extensions thereof had been executed, acknowledged, delivered and recorded prior to the Lease, any amendments or modifications thereof and any notice thereof.

2. Lender agrees that, if the Lender exercises any of its rights under the Security Documents, including an entry by Lender pursuant to the Mortgage or a foreclosure of the Mortgage, Lender shall not disturb Tenant's right of quiet possession of the Premises under the terms of the Lease so long as Tenant is not in default beyond any applicable grace period of any term, covenant or condition of the Lease.

3. Tenant agrees that, in the event of a foreclosure of the Mortgage by Lender or the acceptance of a deed in lieu of foreclosure by Lender or any other succession of Lender to fee ownership, Tenant will attorn to and recognize Lender as its landlord under the Lease for the remainder of the term of the Lease (including all extension periods which have been or are hereafter exercised) upon the same terms and conditions as are set forth in the Lease, and Tenant hereby agrees to pay and perform all of the obligations of Tenant pursuant to the Lease.

4. Tenant agrees that, in the event Lender succeeds to the interest of Landlord under the Lease, Lender shall not be:

a. liable for any act or omission of any prior Landlord (including, without limitation, the then defaulting Landlord), or

b. subject to any defense or offsets which Tenant may have against any prior Landlord (including, without limitation, the then defaulting Landlord), or

89

c. bound by any payment of rent or additional rent which Tenant might have paid for more than one month in advance of the due date under the Lease to any prior Landlord (including, without limitation, the then defaulting Landlord), or

d. bound by any obligation to make any payment to Tenant which was required to be made prior to the time Lender succeeded to any prior Landlord's interest, or

e. accountable for any monies deposited with any prior Landlord (including security deposits), except to the extent such monies are actually received by Lender, or

f. bound by any surrender, termination, amendment or modification of the Lease made without the consent of Lender.

5. Tenant agrees that, notwithstanding any provision hereof to the contrary, the terms of the Mortgage shall continue to govern with respect to the disposition of any insurance proceeds or eminent domain awards, and any obligations of Landlord to restore the real estate of which the Premises are a part shall, insofar as they apply to Lender, be limited to insurance proceeds or eminent domain awards received by Lender after the deduction of all costs and expenses incurred in obtaining such proceeds or awards.

6. Tenant hereby agrees to give to Lender copies of all notices of Landlord default(s) under the Lease in the same manner as, and whenever, Tenant shall give any such notice of default to Landlord, and no such notice of default shall be deemed given to Landlord unless and until a copy of such notice shall have been so delivered to Lender. Lender shall have the right to remedy any Landlord default under the Lease, or to cause any default of Landlord under the Lease to be remedied, and for such purpose Tenant hereby grants Lender such additional period of time as may be reasonable to enable Lender to remedy, or cause to be remedied, any such default in addition to the period given to Landlord for remedying, or causing to be remedied, any such default. Tenant shall accept performance by Lender of any term, covenant, condition or agreement to be performed by Landlord under the Lease with the same force and effect as though performed by Landlord. No Landlord default under the Lease shall exist or shall be deemed to exist (i) as

90

long as Lender, in good faith, shall have commenced to cure such default within the above referenced time period and shall be prosecuting the same to completion with reasonable diligence, subject to force majeure, or (ii) if possession of the Premises is required in order to cure such default, or if such default is not susceptible of being cured by Lender, as long as Lender, in good faith, shall have notified Tenant that Lender intends to institute proceedings under the Security Documents, and, thereafter, as long as such proceedings shall have been instituted and shall be prosecuted with reasonable diligence. In the event of the termination of the Lease by reason of any default thereunder by Landlord, upon Lender's written request, given within thirty (30) days after any such termination, Tenant, within fifteen (15) days after receipt of such request, shall execute and deliver to Lender or its designee or nominee a new lease of the Premises for the remainder of the term of the Lease upon all of the terms, covenants and conditions of the Lease. Lender shall have the right, without Tenant's consent, to foreclose the Mortgage or to accept a deed in lieu of foreclosure of the Mortgage or to exercise any other remedies under the Security Documents.

7. Tenant hereby consents to the Assignment of Leases and Rents from Landlord to Lender in connection with the Loan. Tenant acknowledges that the interest of the Landlord under the Lease is to be assigned to Lender solely as security for the purposes specified in said assignments, and Lender shall have no duty, liability or obligation whatsoever under the Lease or any extension or renewal thereof, either by virtue of said assignments or by any subsequent receipt or collection of rents thereunder, unless Lender shall specifically undertake such liability in writing or unless Lender or its designee or nominee becomes, and then only with respect to periods in which Lender or its designee or nominee becomes, the fee owner of the Premises.  Tenant agrees that upon receipt of a written notice from Lender of a default by Landlord under the Loan, Tenant will thereafter, if requested by Lender, pay rent to Lender in accordance with the terms of the Lease.

8. The Lease shall not be assigned by Tenant, modified, amended or terminated (except a termination that is permitted in the Lease without Landlord's consent) without Lender's prior written consent in each instance

91

9. Any notice, election, communication, request or other document or demand required or permitted under this Agreement shall be in writing and shall be deemed delivered on the earlier to occur of (a) receipt or (b) the date of delivery, refusal or nondelivery indicated on the return receipt, if deposited in a United States Postal Service Depository, postage prepaid, sent certified or registered mail, return receipt requested, or if sent via a recognized commercial courier service providing for a receipt, addressed to Tenant or Lender, as the case may be, at the following addresses:

If to Tenant:

with a copy to:

If to Lender:

10.    The term "Lender" as used herein includes any successor or assign of the named Lender herein, including without limitation, any co-lender at the time of making the Loan, any purchaser at a foreclosure sale and any transferee pursuant to a deed in lieu of foreclosure, and their successors and assigns, and the terms "Tenant" and "Landlord" as used herein include any successor and assign of the named Tenant and Landlord herein, respectively; provided, however, that such reference to Tenant's or Landlord's successors and assigns shall not be construed as Lender's consent to any assignment or other transfer by Tenant or Landlord.

11.    If any provision of this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be deemed modified to the extent necessary to be enforceable, or if such modification is not practicable, such provision shall be deemed deleted from this Agreement, and the other provisions of this Agreement shall remain in full

2365808.7
2422284.1

force and effect, and shall be liberally construed in favor of Lender.

12.    Neither this Agreement nor any of the terms hereof may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing executed by the party against which enforcement of the termination, amendment, supplement, waiver or modification is sought.

This Agreement shall be construed in accordance with the laws of the state of in which the Property is located.

The person executing this Agreement on behalf of Tenant is authorized by Tenant to do so and execution hereof is the binding act of Tenant enforceable against Tenant.

93

DocuSign Envelope ID: DA6E0DF3-8D09-420D-846F-67CB75ACFFBD

## AMENDMENT OF LEASE

This Amendment of Lease (this "Amendment"), dated as of June 18, 2020 (the "Effective Date"), by and between **BROADHOLLOW/PINELAWN CW NF LLC** and **BROADHOLLOW/PINELAWN J.E.S. NF LLC**, collectively as landlord ("Landlord"), and **BLINK MELVILLE, INC.**, as tenant ("Tenant").

### W I T N E S S E T H :

**WHEREAS,** Landlord and Tenant are the parties to a lease dated **December 1, 2011** (as the same may have been heretofore amended, collectively, the "Existing Lease"), demising to Tenant that certain premises consisting of approximately 18,150 rentable square feet, as more particularly set forth in the Existing Lease (the "Premises") in the building known as and located at 121 Broadhollow Road, Melville, New York 11747 (the "Building");

**WHEREAS,** Tenant, as of the date hereof, has failed to make aggregate payments of $153,123.13 due under the Existing Lease;

**WHEREAS,** in order to comply with restrictions enacted upon business establishments by state and other governmental authorities in connection with the spread of the COVID-19 virus in the United States, Tenant has been required to temporarily cease operations at the Premises for Tenant's customary use as a gym; and

**WHEREAS,** Landlord and Tenant desire to modify certain terms of the Lease.

**NOW, THEREFORE,** in consideration of the foregoing, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, Landlord and Tenant hereby agree as follows:

1.      Definitions.    All capitalized terms contained in this Amendment shall, for the purposes hereof, have the same meanings ascribed to them in the Existing Lease unless otherwise defined herein.  As used herein, the term "Lease" shall mean the Existing Lease, as amended by this Amendment and as the same may hereafter be further amended.

2.      Amended Terms.  Notwithstanding anything to the contrary set forth in the Existing Lease, effective as of the date of this Amendment, the Existing Lease is hereby amended as follows:

(A)    Rent Deferral.  During and with respect to the **four (4)** month period commencing on **April 1, 2020** and ending on **July 31, 2020**, all fixed rent and additional rent that otherwise would have been due under the Existing Lease is hereby deferred such that, instead of being payable as and when set forth under the Existing Lease, the aggregate sum of such deferred rental amounts (the "Deferred Rent Amount"), shall be payable in installments as follows: (y) the monthly installments of fixed rent payable during the Deferred Rent Payment Period (as defined below) shall be increased by an amount equal to the "Deferred Rent Monthly Amount", the Deferred Rent Amount *divided by* the number of months in the Deferred Rent Payment Period. The term "Deferred Rent Payment Period" shall mean the **twenty-three (23)** month period commencing on **February 1, 2021** and expiring on **December 31, 2022**; and (z) provided Tenant does not default on the payment of the Deferred Rent Amount, Landlord waives

DocuSign Envelope ID: DA6E0DF3-8D09-420D-846F-67CB75ACFFBD

all penalties, interest payments, late fees, defaults, events of default, and enforcement actions in connection with the deferral of such fixed rent amounts as set forth under this Amendment. For convenience and by way of example only, set forth on Exhibit A attached hereto and made a part hereof is a schedule reflecting the monthly payment of Basic Annual Rent due during the Deferred Rent Payment Period.

(B)     Second Rent Deferral.     During and with respect to the six **(6)** month period commencing on the date that is the later of (i) the date on which Tenant resumes operating for business; and (ii) **August 1, 2020**; fifty percent **(50%)** of all fixed rent and additional rent that otherwise would have been due under the Existing Lease is hereby deferred such that, instead of being payable as and when set forth under the Existing Lease, the aggregate sum of such deferred rental amounts (the "Second Deferred Rent Amount"), shall be payable in installments as follows: (y) the monthly installments of fixed rent payable during the Second Deferred Rent Payment Period (as defined below) shall be increased by an amount equal to the "Second Deferred Rent Monthly Amount", the Second Deferred Rent Amount *divided by* the number of months in the Second Deferred Rent Payment Period. The term "Second Deferred Rent Payment Period" shall mean the **twenty-three (23)** month period commencing on **February 1, 2021** and expiring on **December 31, 2022**; and (z) provided Tenant does not default on the payment of the Second Deferred Rent Amount, Landlord waives all penalties, interest payments, late fees, defaults, events of default, and enforcement actions in connection with the deferral of such fixed rent amounts as set forth under this Amendment. For convenience and by way of example only, the monthly payment of Basic Annual Rent due during the Second Deferred Rent Payment Period is set forth on Exhibit A.

(C)     Third Rent Deferral.     On September 1, 2020, Tenant shall pay to Landlord an amount equal to $25,488.62 (the "Third Deferred Rent Amount") for amounts currently owed Landlord as Additional Rent.

(D)     Reconciliation.     Notwithstanding anything to the contrary set forth in this Amendment (i) the parties understand and agree that the Deferred Rent Amount, the Second Deferred Rent Amount and the Third Deferred Rent Amount may contain items of rent whose actual monetary amounts are not yet ascertainable or known (e.g., without limitation, real estate taxes, operating expenses, common area costs, etc., as actually applicable under the terms of the Lease) and are therefore incorporated into the aggregate sum of the Deferred Rent Amount, the Second Deferred Rent Amount and the Third Deferred Rent Amount by way of estimated monetary amounts to be reconciled at such time as the actual monetary amounts for those items of rent become ascertainable or known in accordance with the terms of the Lease; (ii) promptly upon such actual amounts becoming available, Landlord and Tenant shall resolve any underpayment or overpayment in connection with the deferral of the Deferred Rent Amount, the Second Deferred Rent Amount and Third Deferred Rent Amount, as applicable, based on such actual amounts; and (iii) each of the Deferred Rent Amount, the Second Deferred Rent Amount and the Third Deferred Rent Amount shall be deemed to be a deferral with respect to the actual monetary amounts for those items of rent in question despite such items being represented as estimates in the Deferred Rent Amount, the Second Deferred Rent Amount and/or the Third Deferred Rent Amount, as applicable.

3.     Government Assistant Programs.     In connection with the COVID-19 pandemic, Tenant hereby agrees to (i) enforce its rights under any business interruption

DocuSign Envelope ID: DA6E0DF3-8D09-420D-846F-67CB75ACFFBD

insurance policy Tenant maintains with respect to Tenant and the Premises; and (ii) pursue rent and occupancy governmental subsidy and assistance programs that may be available with respect to Tenant and the Premises; and, in each of the foregoing clauses (i) and (ii), shall use any proceeds received thereby first towards payment of rent and additional rent to Landlord due and owing under the terms of the Lease.

4.      Expired Guaranty.      In connection with the execution of the Existing Lease, EQUINOX HOLDINGS, INC. ("Former Guarantor") executed and delivered that certain Guaranty of Lease dated as of or about the date of the Existing Lease in favor of Landlord (the "Expired Guaranty"), pursuant to which Former Guarantor guaranteed certain of Tenant's obligations under the Lease, as more fully set forth in the Expired Guaranty.   Landlord acknowledges and agrees that Former Guarantor's liability under the Expired Guaranty has terminated and is of no further force and effect, and hereby releases Former Guarantor from any and all claims and/or liability arising in connection with the Lease and/or the Expired Guaranty.

5.      Limited Guaranteed Items.      In order to induce Landlord to enter into this Amendment, BLINK HOLDINGS, INC. ("BHI") acknowledges and agrees that, by signing this Amendment below, BHI hereby guarantees the full and timely payment by Tenant of the Deferred Rent Amount and the Second Deferred Rent Amount in accordance with the terms of this Amendment.

6.      Lease Ratified.      Except as modified by this Amendment, the Existing Lease and all terms and conditions thereof shall remain in full force and effect and are hereby ratified and confirmed.

7.      Tenant Representations.   In order to induce Landlord to enter into this Agreement, Tenant represents and warrants that: (a) to Tenant's knowledge, Landlord is not in default under the Lease; (b) Landlord has no obligation under the Lease to make any repairs and/or alterations to the Premises and/or the building containing the Premises; (c) Tenant is not entitled to any free rent, rent concession, work and/or other payments from Landlord and/or any abatements under the Lease; and (d) Tenant has no claims or causes of action against Landlord and/or Landlord's agents, principals, members and employees.   Without limiting the foregoing, Tenant hereby waives and releases Landlord from any claims, demands, causes of actions, rights of set-off or abatement and/or counterclaims that Tenant has, had or may have against Landlord relating to the Lease, the tenancy thereunder and/or regarding the condition of the Premises.  By executing this Agreement, Tenant also acknowledges that, to its knowledge, Tenant has no claim against Landlord regarding the present and/or past condition of the Premises and that the condition of the Premises is satisfactory and acceptable to Tenant in its "AS IS" "WHERE IS" condition.

8.      Successors and Assigns.      This Amendment shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

9.      Counterparts.   This Amendment may be executed in one or more counterparts, each of which shall be an original and all of which taken together shall constitute one and the same instrument. The exchange of signature pages by facsimile or PDF transmission shall have the same legal effect as exchange of an original counterpart of such signature pages.

DocuSign Envelope ID: DA6E0DF3-8D09-420D-846F-67CB75ACFFBD

**[SIGNATURES ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment as of the day and year first above written.

**LANDLORD**:

**BROADHOLLOW/PINELAWN CW NF LLC**

By: _____
Name:  Richard A. Wilpon
Title:  Manager

**BROADHOLLOW/PINELAWN J.E.S. NF LLC**

By: _____
Name: Philip Wachtler
Title:  Authorized Signatory

**TENANT**:

**BLINK MELVILLE, INC.**

By: _____
Name: Marc Benathen
Title:  SVP finance

**SECTION 5 OF THIS AMENDMENT
AGREED TO AND ACCEPTED BY:**

**BHI**:

**BLINK HOLDINGS, INC.**

By: _____
Name: Marc Benathen
Title:  SVP finance

DocuSign Envelope ID: DA6E0DF3-8D09-420D-846F-67CB75ACFFBD

## Exhibit A

| Period | Existing Rent | Amount | Modified Rent | Additional Rent |
|--------|---------------|--------|---------------|-----------------|
| Apr-20 | $41,518.13 | $ (41,518.13) | $0.00 | Rolled into Deferred Rent Amount |
| May-20 | $41,518.13 | $ (41,518.13) | $0.00 | Rolled into Deferred Rent Amount |
| Jun-20 | $41,518.13 | $ (41,518.13) | $0.00 | Rolled into Deferred Rent Amount |
| Jul-20 | $41,518.13 | $ (41,518.13) | $0.00 | Rolled into Deferred Rent Amount |
| Aug-20 | $41,518.13 | $ (20,759.07) | $20,759.07 | Rolled into Second Deferred Rent Amount |
| Sep-20 | $41,518.13 | $ (20,759.07) | $20,759.07 | Rolled into Second Deferred Rent Amount Tenant to pay an additional payment of $25,488.62 |
| Oct-20 | $41,518.13 | $ (20,759.07) | $20,759.07 | Rolled into Second Deferred Rent Amount |
| Nov-20 | $41,518.13 | $ (20,759.07) | $20,759.07 | Rolled into Second Deferred Rent Amount |
| Dec-20 | $41,518.13 | $ (20,759.07) | $20,759.07 | Rolled into Second Deferred Rent Amount |
| Jan-21 | $41,518.13 | $ (20,759.07) | $20,759.07 | Rolled into Second Deferred Rent Amount |
| Feb-21 | $41,518.13 | $    12,635.95 | $54,154.08 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Mar-21 | $41,518.13 | $    12,635.95 | $54,154.08 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Apr-21 | $41,518.13 | $    12,635.95 | $54,154.08 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| May-21 | $41,518.13 | $    12,635.95 | $54,154.08 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Jun-21 | $41,518.13 | $    12,635.95 | $54,154.08 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Jul-21 | $41,518.13 | $    12,635.95 | $54,154.08 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Aug-21 | $41,518.13 | $    12,635.95 | $54,154.08 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Sep-21 | $41,518.13 | $    12,635.95 | $54,154.08 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Oct-21 | $41,518.13 | $    12,635.95 | $54,154.08 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Nov-21 | $41,518.13 | $    12,635.95 | $54,154.08 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Dec-21 | $41,518.13 | $    12,635.95 | $54,154.08 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Jan-22 | $41,518.13 | $    12,635.95 | $54,154.08 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Feb-22 | $41,518.13 | $    12,635.95 | $54,154.08 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Mar-22 | $41,518.13 | $    12,635.95 | $54,154.08 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Apr-22 | $41,518.13 | $    12,635.95 | $54,154.08 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| May-22 | $41,518.13 | $    12,635.95 | $54,154.08 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Jun-22 | $41,518.13 | $    12,635.95 | $54,154.08 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Jul-22 | $41,518.13 | $    12,635.95 | $54,154.08 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Aug-22 | $45,601.88 | $    12,635.95 | $58,237.83 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Sep-22 | $45,601.88 | $    12,635.95 | $58,237.83 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Oct-22 | $45,601.88 | $    12,635.95 | $58,237.83 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Nov-22 | $45,601.88 | $    12,635.95 | $58,237.83 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |
| Dec-22 | $45,601.88 | $    12,635.95 | $58,237.83 | Tenant to continue to pay all Utilities, RE Taxes, Sale Tax as per the existing lease agreement. |