**<u>EXHIBIT 1</u>**

THIS LEASE ("Lease") dated as of July _19_, 2013 (the "Effective Date"), between 3560 WPR LLC and 3572 WPR LLC whose address is c/o Irgang Group, 121 Tweed Boulevard, Nyack, New York 10960 (collectively, "Landlord") and BLINK WILLIAMSBRIDGE, INC., a New York corporation, whose address is 895 Broadway, Third Floor, New York, New York 10003 ("Tenant").

Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Demised Premises (as hereinafter defined) for the Term provided for in Article I hereof at the rent provided for in Article V hereof and, subject to the terms and conditions set forth herein, for Tenant's use, occupancy and benefit, as well as for the use, occupancy and benefit of Tenant's customers, employees, agents, contractors, invitees, subtenants, licensees and concessionaires (to the extent permitted herein), during the Term. Intending to be legally bound hereunder and in consideration of One ($1.00) Dollar and other good and valuable consideration, Landlord and Tenant hereby agree with each other as follows:

## ARTICLE I.  LEASE SCHEDULE

The following terms shall be applicable to the various provisions of this Lease which refer to them:

### Section 1.01    Demised Premises.

Means a portion of the Building (as hereinafter defined), excluding the exterior surfaces of the exterior walls, the area beneath the Demised Premises and the roof or any other level of the Building above the Demised Premises.  The Demised Premises consists of approximately 16,621 square feet of Floor Area (as hereinafter defined) on two levels (approximately 4,608 square feet of Floor Area on the ground floor of the Building and approximately, 12,013 square feet of Floor Area on the second floor of the Building) and is depicted on Exhibit A as attached hereto and made a part hereof.  The Demised Premises shall have a finished ceiling height of no less than eleven feet two inches (11'2"), with the duct work and any other obstructions above such finished ceiling.

### Section 1.02    Building.

Means, collectively, the two (2) buildings in which the Demised Premises are located, with the address of: (i) 3560-3570 White Plains Road, Bronx, New York (a/k/a 701 East 212th Street, Bronx, New York), and identified as Block 4657, Lot 94, and (ii) 3572-3584 White Plains Road, Bronx, New York, and identified as Block 4657, Lot 96.  96

### Section 1.03    Term.

Means a term commencing on the Commencement Date (as defined in Section 4.01 hereof) and expiring on the Expiration Date (as defined in Section 2.02 hereof).

### Section 1.04    Rent.

Minimum Rent shall be payable as follows:  the sum of Fifty-One Thousand Six Hundred Sixty-Six and 67/100 ($51,666.67) Dollars per month ($620,000.00 per annum) during the first sixty (60) months of the Term following the Rent Commencement Date; and (ii) the sum of Fifty-Six Thousand Eight Hundred Thirty-Three and 33/100 ($56,833.33) Dollars per month ($682,000.00 per annum) for the next sixty (60) months of the Term; and (iii) the sum of Sixty-Two Thousand Five Hundred and No/100 ($62,500.00) Dollars per month ($750,000.00 per annum) during the balance of the initial Term, subject to the provisions of Section 19.21 hereof regarding the Renewal Terms.

### Section 1.05    Taxes and Tax Contributions.  See Section 5.03 hereof.

### Section 1.06    Permitted Use; Tenant's Exclusive.

(a)    Subject to Tenant's compliance with all applicable Requirements (as hereinafter defined) and all Insurance Requirements (as hereinafter defined), Tenant may use, occupy, maintain and operate the Demised Premises during the Term for the following use: for the operation of a health, sports and fitness club, including, but not limited to, the following potential uses (Tenant hereby agreeing that a pool shall not be permitted): (i) the provision of

cardiovascular, strength, free weight training, tanning services, massage and related modalities (including therapeutic massage), steam rooms, sauna rooms, group fitness programs (including but not limited to, yoga, pilates, zumba and spinning), personal training (including therapeutic massage), exercise training and supervision, social activities incidental to health club membership, spa (including, but not limited to, massage, facials and body wraps), meditation classes, health and fitness and dance related educational programs, dance and aerobic classes, and classes and programs and all activities ancillary thereto, physical therapists', sports/rehab therapy, and specialists' offices, and office space for internal Tenant purposes only and related Tenant meeting rooms; (ii) an ancillary food and beverage service offering coffee, juice, sports beverages, yogurt, vitamins, other sports-related supplements and other food items involving limited food preparation, which food and beverage service may alternatively, at Tenant's election, be provided by way of refrigerated units, vending machines, a snack counter or a juice bar (provided Tenant obtains all permits in connection therewith) within the Demised Premises containing pre-bottled water, soft drinks and/or juices and pre-packaged snack and other foods, nutritional bars and the like for the comfort and convenience of Tenant's members and the general public, (iii) an ancillary retail facility for the sale of fitness-related goods and apparel (which goods and apparel may be sold by way of vending machines) and branded non-workout accessories and products, and an ATM machine for Tenant's customers, and for no other uses or purposes (the foregoing (i), (ii) and (iii) collectively, the "Permitted Use"). This description of the Permitted Use and all of the possible components thereof is not intended to be, nor shall it be interpreted to be, a representation or covenant by Tenant that all or any one specific activity shall be provided by Tenant at any given time, it being understood that the range and scope of health club and ancillary service offerings shall be determined solely by Tenant in the exercise of its prudent business judgment. Landlord makes no representation to Tenant regarding the ability of Tenant to operate the Permitted Use in the Demised Premises.

(b)     Subject to Tenant's compliance with all applicable Requirements, Tenant may use and occupy the Demised Premises up to twenty-four (24) hours a day, seven (7) days per week (or such lesser number of hours and days as Tenant shall determine), provided, that, there shall be a direct entrance to the Demised Premises from the street.

(c)     Except for the Demised Premises, Landlord will not lease or permit or allow any other space or property within the Building to be used for (i) a gym or health, sports and/or fitness club, and/or (ii) any other fitness use (i.e., any and all fitness modalities, including but not limited to, indoor cycling, yoga, pilates, personal training, group fitness classes, barre method, cross-fit) ("Tenant's Exclusive"), but which Tenant's Exclusive shall not include a retail store selling fitness clothing and/or equipment (for example, a sneaker store) or a nail or hair salon. Upon breach of Tenant's Exclusive by Landlord, for which Tenant shall notify Landlord (which breach shall not include a situation in which the lease between Landlord and any tenant in the Building prohibits the tenant therein from violating Tenant's Exclusive and despite such prohibition, such tenant (a "Rogue Tenant") violates Tenant's Exclusive), in addition to all other remedies available at law or in equity, the Minimum Rent payable hereunder shall be reduced by 50% and, if such breach of Tenant's Exclusive shall exceed three hundred sixty-five (365) days following Tenant's written notice to Landlord, Tenant may elect to terminate this Lease by written notice to Landlord within ten (10) days following the end of such 365-day period (failing which, Tenant shall be deemed to have waived its right to terminate this Lease on account thereof and Minimum Rent shall resume in the full amount provided in Section 1.04 herein). In the event of a violation of Tenant's Exclusive at the Building by a Rogue Tenant, Landlord agrees to use commercially reasonable efforts to enforce Tenant's Exclusive against such Rogue Tenant pursuant to all available remedies at law or equity, including, without limitation, the right to enjoin such use by the Rogue Tenant that violates Tenant's Exclusive (but Landlord shall not be under the obligation to terminate the lease, or evict, such Rogue Tenant). If, despite Landlord's commercially reasonable efforts, the Rogue Tenant shall continue to violate Tenant's Exclusive for a period in excess of one hundred twenty (120) days following Tenant's written notice to Landlord regarding such violation by the Rogue Tenant, then Tenant, as its sole remedy against Landlord therefor (but Tenant may seek, at its sole cost, to enjoin such use by the Rogue Tenant that violates Tenant's Exclusive, provided that Tenant may not initiate any action to terminate the Rogue Tenant's lease or to evict such Rogue Tenant), shall be entitled to reduce the Minimum Rent payable hereunder by 33% and, if such breach of Tenant's Exclusive by the Rogue Tenant shall exceed three hundred sixty-five (365) days following Tenant's written notice to Landlord regarding such violation by the Rogue Tenant, then Tenant may elect to terminate this Lease, by written notice to Landlord within ten (10) days following the end of such 365-day

period (failing which, Tenant shall be deemed to have waived its right to terminate this Lease on account thereof and Minimum Rent shall resume in the full amount provided in Section 1.04 herein). Landlord represents to Tenant that prior to the Effective Date (i) it has not entered into any lease or occupancy agreement for a use that would violate Tenant's Exclusive, and (ii) the Permitted Use does not violate any existing leases or exclusive uses granted to any other tenant at the Building.

(d)    Landlord acknowledges that some noise and vibration does result from Tenant's Permitted Use and certain vibration from exercise equipment, and Landlord agrees that noise and vibration customarily associated with a health and fitness club shall not be considered a nuisance and shall not constitute a violation of this Lease.

(e)    Tenant's Trade Name: Blink or Blink Fitness or any reasonable derivation thereof. Tenant may change its trade name to (i) a new trade name adopted by a majority of the health clubs theretofore operated under Blink or Blink Fitness or (ii) following an assignment or sublease pursuant to this Lease, the trade name used by any approved assignee or subtenant or by any assignee or subtenant with respect to which approval is not required.

Section 1.07    Broker: Retail Zone, LLC.

Section 1.08    Notice Addresses:

(a)    Landlord's Notice Address:
c/o Irgang Group
121 Tweed Boulevard
Nyack, New York 10960
Attention: Mark Irgang

(b)    Tenant's Notice Address:

895 Broadway
Third Floor
New York, New York 10003
Attention: Larry Segall, CFO
With a copy to:

Blank Rome LLP
405 Lexington Avenue
New York, New York 10174
Attention: Samuel M. Walker, Esq.

Section 1.09    Limited Guarantor. Blink Holdings, Inc., a New York corporation and Equinox Holdings, Inc., a Delaware corporation.

ARTICLE II.  DEFINITIONS.

As used herein, the following words and phrases have the following meanings:

Section 2.01    Common Area.

Means: (i) the following areas within the Building (if applicable): pedestrian plazas, pedestrian passage areas, public transportation loading and unloading facilities, truckways, loading docks, delivery areas, landscaped areas, community rooms, office facilities, malls, courts and corridors, berms, elevators, escalators, stairs, ramps and vertical transportation facilities not contained within any leased premises, public restrooms and comfort stations, service areas, service and fire and exit corridors, passageways and retention ponds; (ii) subject to Tenant's Critical Rights (as defined in Section 11.01 hereof), those areas within the Building and areas adjacent thereto which from time to time may be provided by the owners of such areas for the convenience and common use of Landlord, the tenants of the Building and their respective concessionaires, agents, employees, customers, invitees and all other licensees and others entitled to the use thereof; and (iii) subject to Tenant's Critical Rights, any other facilities or areas, whether within or outside the Building, as may be designated for common use by Landlord from time to time.

Section 2.02    Expiration Date.

Means 11:59 PM (EST) on the fifteenth (15th) anniversary of the last day of the month in which the Rent Commencement Date occurs. If the Term has been extended or this Lease has been renewed, the Expiration Date shall be 11:59 PM (EST) on the last day of the Term as so extended or renewed. If this Lease is canceled or terminated prior to the originally fixed Expiration Date, then the Expiration Date shall be the date on which this Lease is so canceled or terminated; provided, however, if this Lease is canceled or terminated pursuant to the terms herein prior to the originally fixed Expiration Date by reason of a Default (as hereinafter defined), Tenant's liability under the provisions of this Lease shall continue, in accordance with applicable law, until the date the Term would have expired as if such cancellation or termination had not occurred.

Section 2.03    Expedited Arbitration Proceeding.

Means a binding arbitration proceeding conducted in The City of New York under the Commercial Arbitration Rules of the AAA and administered pursuant to the Expedited Procedures provisions thereof; provided, however, that with respect to any such arbitration, (i) the list of arbitrators referred to in Section E-5(b) shall be returned within five (5) business days from the date of delivery to the applicable party, (ii) the parties shall notify the AAA by telephone, within four (4) business days, of any objections to the arbitrator appointed and, subject to clause (vii) below, shall have no right to object if the arbitrator so appointed was on the list submitted by the AAA and was not objected to in accordance with Section E-5(b) as modified by clause (i) above; (iii) the notification of the hearing referred to in Section E-8 shall be four (4) business days in advance of the hearing; (iv) the hearing shall be held within seven (7) business days after the appointment of the arbitrator; (v) the arbitrator shall have no right to award damages; (vi) the decision of the arbitrator shall be final and binding on the parties; and (vii) the arbitrator shall not have been employed by either party (or their respective affiliates) during the period of three (3) years prior to the date of the Expedited Arbitration Proceeding. In connection with an Expedited Arbitration Proceeding, the arbitrator shall determine the extent to which each party is successful in such Expedited Arbitration Proceeding in addition to rendering a decision on the dispute submitted. If the arbitrator determines that one (1) party is entirely unsuccessful, then such party shall pay all of the fees of such arbitrator. If the arbitrator determines that both parties are partially successful, then each party shall be responsible for such arbitrator's fees only to the extent such party is unsuccessful (e.g., if Landlord is eighty percent (80%) successful and Tenant is twenty (20%) successful, then Landlord shall be responsible for twenty percent (20%) of such arbitrator's fees and Tenant shall be responsible for eighty percent (80%) of such arbitrator's fees).

Section 2.04    Floor Area.

Means, with respect to a particular floor area within the Demised Premises (or, if applicable, of any other improvement located in the Building), the actual number of square feet of gross leasable area measured from the outside face of any exterior walls of the Building or other improvement and from the center line of walls shared with other premises, shared with common areas and/or shared with other non-leaseable areas, excluding, however, from Floor Area: common elevator shafts (but not exclusive elevator shafts), and non-exclusive egress stairways.

Section 2.05    Force Majeure.

Means any of the following events: acts of God, unusually adverse weather conditions, strikes, lock-outs, or labor difficulty, explosion, inability to procure labor, materials, or reasonable substitutes thereof, power failure(s), restrictive governmental laws or controls, judicial orders, enemy or hostile governmental action, riot or civil commotion, fire or other casualty, sabotage, accident, act of war or terrorism, Requirements, delays caused by the other party and any unforeseeable causes beyond the reasonable control of a party. Notwithstanding the foregoing, the occurrence of such events shall not excuse either party's obligation to make any payments to the other party due under this Lease nor excuse either party's inability to obtain funds.

Section 2.06    Governmental Authority.

Means the United States of America, the State of New York, The City of New York, any political subdivision thereof and any agency, department, commission, board, bureau or instrumentality of any of the foregoing, or any quasi-Governmental Authority, now existing or hereafter created, having jurisdiction over the Demised Premises, the Building or any portion thereof.

Section 2.07    Insurance Requirements.

Means the applicable provisions of (a) the insurance policies carried by Landlord covering the Demised Premises, the Building or any part thereof and (b) all requirements and recommendations of the issuer of any such policy, and all orders, rules, regulations and other requirements and recommendations of any insurance service office which serves the community in which the Building is situated, provided, that, such requirements that the issuer of Landlord's insurance policies may impose are reasonably consistent with the requirements imposed by reputable insurers of comparable properties in the city (or cities, as the case may be) in which the Building is located.

Section 2.08    Landlord's Work.

Means the work set forth on Exhibit C. To the extent any there exists any conflict between Exhibit C and Exhibit C-1 ("Turnkey Plans"), the applicable portions of Exhibit C-1 shall control. Notwithstanding the foregoing, Tenant acknowledges and agrees that in no event shall Landlord's Work include, and Landlord shall not be responsible to perform any of the work listed on Exhibit C-2 hereto, all of which work shall be Tenant's responsibility.

Section 2.09    Lease Interest Rate.

Means, at any particular time, the lesser of (x) two hundred (200) basis points above the rate of interest announced publicly from time to time by Citibank, N.A., or its successor, as its "prime lending rate" (or such other term as may be used by Citibank, N.A. (or its successor), from time to time, for the rate presently referred to as its "prime lending rate"), and (y) the maximum rate permitted by applicable law at such time.

Section 2.10    Mortgage.

Means any mortgage, deed to secure debt, trust indenture, or deed of trust executed by Landlord, which may now or hereafter affect, encumber or be a lien upon the Demised Premises, the Building, the real property of which the Building forms a part, or Landlord's interest therein (whether fee, leasehold or otherwise), and any spreading agreements, or future advances made pursuant to any Mortgage, renewals, modifications, consolidations, future advances, replacements and extensions thereof.

Section 2.11    Mortgagee.

Means the holder of any Mortgage, or any lender providing financing to Landlord, at any time.

Section 2.12    Person.

Means an individual, fiduciary, estate, trust, partnership, firm, association, corporation, limited liability company, or other organization, or a government or Governmental Authority.

Section 2.13    Pro Rata Share.

Means, collectively, as to the portion of the Building with (a) a tax map designation of Block 4657, Lot 94, fifty percent (50%), and (b) a tax map designation of Block 4657, Lot 96, eighty-seven and one-half percent (87.5%). Notwithstanding the foregoing, in connection with a lot merger of the Building or Landlord's potential expansion pursuant to Section 11.03 hereof, Landlord may elect to have Tenant's Pro Rata Share be determined based on the square footage of the Demised Premises in relation to the total commercial square footage of the Building (i.e., excluding any residential portion of the Building, as it may be so expanded)

but Tenant's obligations with respect to Taxes shall not be increased by reason of such expansion from what would have been otherwise.

###### Section 2.14    Repair.

Includes the words "replacement and restoration," "replacement or restoration," "replace and restore," as the case may be.

###### Section 2.15    Requirements.

Means all present and future laws, rules, orders, ordinances, regulations, statutes, requirements, codes and executive orders of all Governmental Authorities, and of any applicable fire rating bureau, or other body exercising similar functions.

###### Section 2.16    Tenant's Agents.

Includes Tenant's employees, servants, licensees, subtenants, assignees, contractors, heirs, successors, legatees and devisees.

###### Section 2.17    Tenant's Initial Work.

Means the construction and other work defined as Tenant's Initial Work in Section 3.04 hereof.

###### Section 2.18    Year.

For the purposes of this Lease, the word "year", wherever appearing herein, shall have the following meaning: the first year shall commence on the Commencement Date and shall terminate on the three hundred sixty-fourth (364th) day thereafter. Each year thereafter shall commence on the anniversary of the Commencement Date (and on each successive anniversary of the Commencement Date occurring during the Term) and shall continue for three hundred sixty-four (364) days thereafter, provided, however, that the last year shall terminate on the Expiration Date.

## ARTICLE III.  CONDITION OF DEMISED PREMISES

###### Section 3.01    Board of Standards and Appeals Approval and Place of Assembly Permit.

(a)    Landlord shall endeavor to obtain Department of Buildings ("DOB") Notice of Objection (hereinafter referred to as the "BSA Denial"), as described below, within forty-five (45) days after the Effective Date. Landlord will include such drawings on Schedule A of Landlord's ALT-1 Application to be filed with the DOB for purposes of obtaining the BSA Denial.  Immediately upon receipt of the BSA Denial from the DOB, Landlord shall remit same to Tenant or Tenant's counsel (via email or facsimile delivery, with the original sent via overnight courier).  Within ten (10) days after receipt of said BSA Denial, and provided Tenant has received the BSA Affidavit of Ownership executed by Landlord, Tenant shall apply to the New York City Board of Standards and Appeals (the "BSA") for its approval of a special permit and/or variance (hereinafter referred to as the "BSA Approval") to permit Tenant to operate the Premises for the Permitted Use and as a Physical Culture Establishment ("PCE") as defined by the NYC Zoning Resolutions.

(b)    Tenant shall prepare and submit any and all applications, plans and other documentation required in connection with the BSA Approval, attend meetings or hearings with respect to the BSA Approval and comply with all other requirements or requests of the BSA.  In connection therewith, at no cost to Landlord, Landlord agrees to diligently and in good faith cooperate with Tenant in Tenant's attempts to obtain the BSA Approval, at no cost to Landlord. Tenant agrees to use its commercially reasonable and diligent efforts in pursuing the BSA Approval.

(c)    Landlord and Tenant acknowledge and agree that Landlord shall be responsible, at its sole cost and expense, for filing the necessary ALT-1 application(s) with the DOB in connection with obtaining the BSA Denial (and for purposes of filing for a new or amended Certificate of Occupancy for the Building to permit Tenant to occupy the Premises for

the Permitted Use and as a PCE) and for purposes of commencing Landlord's Work in accordance with the provisions of this Lease and Exhibit C hereof. Landlord and Tenant hereby acknowledge that the BSA Denial of the ALT-1 application by the DOB and subsequent referral to the BSA by the DOB is necessary in order for Tenant to be able to prepare and file the application to the BSA for BSA Approval and Landlord agrees same shall not be considered or deemed to be a default under this Lease. Once Landlord obtains the BSA Denial from DOB, Landlord agrees to amend its ALT-1 application by removing Tenant's layout plans and drawings and said reference to the PCE use from said Schedule A of the ALT-1 applications and resubmit said ALT-1 application for "retail" use so that Landlord may obtain the building permit(s) necessary to complete Landlord's Work in accordance with this Lease and Exhibit C hereof. Design of egress facilities and structural capacity of said "retail" or "physical culture establishment" use shall be code compliant with requirements for assembly occupancy that apply to a PCE use (egress capacity of the PCE space shall be adequate to accommodate the number of occupants for the PCE space as determined by applicable construction codes; live load of the structural slab floor(s) for PCE space shall be minimum 100 lbs per square foot). Once Tenant obtains BSA Approval, Landlord agrees to amend its ALT-1 applications and Schedule A thereto to add the "physical culture establishment" use to the Building's occupancy schedule and seek approval of the ALT-1 egress and occupancy plans to show the "physical culture establishment" use. Thereafter, Landlord shall commence and compete Landlord's Work in accordance with this Lease and Exhibit C hereof. Upon completion of Landlord's Work, Landlord shall diligently and in good faith pursue and obtain all necessary sign-offs from the DOB and obtain a temporary and final Certificate of Occupancy for a physical culture establishment.

<u>Section 3.02    Place of Assembly Permit.</u>

(a)    Landlord shall be responsible, at Landlord's sole cost and expense, for obtaining and filing the application for the initial Public Assembly/Place of Assembly ("PA") permit (the "PA Permit") required in connection with the Permitted Use (including the PCE use). Landlord agrees, at Landlord's sole cost and expense, that any PA requirements and conditions, including, but not limited to, egress requirements, remoteness requirements, etc. ("PA Requirements") relating to and/or encompassed under Landlord's Work shall be satisfied by Landlord. In the event there are any PA Requirements that are arise in connection with Tenant's Initial Work, same shall be satisfied by Tenant, at Tenant's sole cost and expense. Once Landlord obtains the initial PA Permit, Tenant agrees to renew same (and pay for said renewal) each year thereafter. Landlord and Tenant further acknowledge and agree that the PA Permit will not be issued by the DOB until BSA Approval is issued by the BSA and until such time as Landlord's ALT-1 application is approved to include the PCE use, and therefore, Landlord specifically acknowledges that Tenant opening for business prior to the issuance of either BSA Approval or the PA Permit shall not be deemed or considered to be a default hereunder and Tenant shall be expressly permitted to do so, provided that Tenant hereby indemnifies Landlord for all costs, claims, penalties and fines that may be sustained by Landlord (or its agents) as a result of Tenant's use of the Demised Premises prior the issuance of the BSA Approval or Certificate of Occupancy (temporary or final), the PA Permit and such other approvals to be obtained by Tenant hereunder.

(b)    Notwithstanding anything herein to the contrary, Landlord and Tenant acknowledge that the Commencement Date is not contingent upon Tenant obtaining the BSA Approval and, following Delivery of Possession, nothing in this Lease shall prohibit Tenant from commencing and performing Tenant's Initial Work and/or opening for business within the Demised Premises prior to BSA Approval for the Permitted Use; provided, that (i) Tenant has commenced the appropriate application processes and continues to diligently pursue the applicable approvals for the Permitted Use, and  (ii) Tenant hereby indemnifies Landlord for all costs, claims, penalties and fines that may be sustained by Landlord (or its agents) as a result of Tenant's use of the Demised Premises prior the issuance of the BSA Approval or Certificate of Occupancy (temporary or final) and such other approvals to be obtained by Tenant hereunder, such indemnity not to include penalties or fines solely resulting from delays in the Certificate of Occupancy procurement caused by building violations that are unrelated to the Tenants acts or omissions, its work, use and/or occupancy.

(c)    Landlord hereby acknowledges and agrees that as a result of Landlord and Tenant commencing any renovations as described above and required under this Lease, or in connection with Tenant's application for BSA Approval to operate a PCE, or in connection with Tenant opening for business prior to the issuance of the BSA Approval or the issuance of the PA

Permit or Certificate of Occupancy (temporary or final), as contemplated hereunder, it is not unusual for violations to be placed upon the Premises by the DOB as a result thereof, and that further, said BSA Denial is required to be obtained from the DOB in order for Tenant to proceed to obtain BSA Approval. Accordingly, the issuance of any violations by the DOB as a result of Tenant's attempt to obtain BSA Approval (or as a result of Tenant opening for business before such BSA Approval is obtained and prior to the issuance of the PA Permit) shall not be considered to be a default hereunder, provided that Tenant and/or Tenant's agents address same within a commercially reasonable time, use commercially reasonable efforts to address and/or remedy any such issues or violations, pay any fines relating thereto, provided same have not been caused by Landlord or are not as a result of Landlord's Violation Delay for which the Landlord would be responsible, and Tenant and/or Tenant's agents shall attend any hearings or meetings with the appropriate governmental agency relating thereto. Tenant shall provide Landlord with evidence of the removal or satisfaction of any such issues or violations once received by Tenant.

Section 3.03    Landlord's Work and Delivery of Possession.

(a)    Within forty-five (45) days following the Effective Date, Landlord shall submit to Tenant, for Tenant's review and approval, a complete set of construction drawings and specifications for Landlord's Work (the "Construction Drawings"), which Construction Drawings shall reflect (a) delivery of the Demised Premises to Tenant in accordance with the Turnkey Plans, (b) the requirements of all applicable governmental authorities, permits and approvals, (c) the Blink Design and Construction Standardization Manual (2011) (the "Blink Manual") and the Blink prototype construction plans, each provided by Tenant to Landlord prior to the Effective Date, unless same requires such work to be performed by a tenant, (d) the concept plan of the Demised Premises annexed hereto as Exhibit B (the "Concept Plan") and (e) those items set forth on Exhibit C and Exhibit C-1 attached hereto designated as Landlord's responsibility (but excluding the work set forth on Exhibit C-2). Within fifteen (15) days following receipt of the Construction Drawings, Tenant shall either (i) approve such Construction Drawings or (ii) specify for Landlord any modifications to the Construction Drawings reasonably required for Tenant's approval, to the extent the Construction Drawings are inconsistent with the Blink Manual or the Concept Plan. Within ten (10) days following Tenant's response, if Tenant shall not have approved the Construction Drawings as aforesaid, Landlord shall revise the Construction Drawings to reflect Tenant's responses. Such process shall continue, with each party having ten (10) days to respond to the other, until the Construction Drawings are finally approved by Tenant. No failure of Tenant to respond within such fifteen (15) or ten (10) day period, as applicable, shall be deemed an approval of the Construction Drawings, provided that each day beyond such applicable time period that Tenant fails to respond to Landlord's submission or re-submission of the Construction Drawings shall be deemed a "Tenant Delay," and provided further that no Tenant Delay shall be deemed to have occurred until Landlord has notified Tenant of such Tenant Delay and Tenant has had a reasonable opportunity to cure the same. Upon the approval of the Construction Drawings by Landlord and Tenant, both parties shall sign same (the date of such signed, approved and final Construction Drawings is hereinafter referred to as the "CD Date"), and neither party shall have the right to change the final Construction Drawings, except that Landlord may make such changes as field conditions necessitate. In the event the Construction Drawings are not so approved and signed within one hundred eighty (180) days following the date hereof, either party may terminate this Lease upon written notice to the other party.

(b)    Landlord, at its sole cost and expense, shall diligently and duly procure all building permits for the performance of Landlord's Work and, following the issuance of such permits, (i) perform Landlord's Work in accordance with the Blink Manual, Exhibit C, and the Turnkey Plans and (ii) purchase and install Tenant's kiosks pursuant to the Construction Drawings (provided Tenant shall timely provide Landlord with full shop drawings for same in order that Landlord may use its own millwork contractors to construct same). Following Landlord's commencement of Landlord's Work, Landlord shall diligently perform Landlord's Work to completion and shall perform Landlord's Work in accordance with all applicable Requirements. During Landlord's construction, Tenant may attend weekly site visits and Landlord shall allow Tenant to be part of meetings with the general contractor. Landlord shall give Tenant a preliminary notice prior to the estimated date on which Landlord's Work is anticipated to be completed. Except for the performance of Landlord's Work, Tenant shall accept possession of the Demised Premises in its present "as is" condition, with no obligations, warranties or representations whatsoever in respect of such condition, except as is expressly set

forth in this Lease. Notwithstanding the foregoing, Landlord's Work shall be guaranteed by Landlord, to be free from any and all defects in the workmanship and materials, for at least one (1) year from the date of completion, and on the Commencement Date, Landlord shall assign to Tenant for the duration of the Term, the manufacturer's warranty with respect to heating, ventilation and air-conditioning system to be installed by Landlord in the Demised Premises as part of Landlord's Work. Subject to Force Majeure, if Landlord's Work has not been substantially completed as of the date that is fifteen (15) months after the CD Date, then, as Tenant's sole remedy, Tenant shall be entitled to a day-for-day rent abatement for each day thereafter until the Landlord's Work is actually substantially complete. Subject to Force Majeure, if Landlord's Work has not been substantially completed as of the date that is eighteen (18) months after the CD Date, then, as Tenant's sole remedy, Tenant shall be entitled to a two (2) day rent abatement for each day thereafter until Landlord's Work is actually substantially complete. Subject to Force Majeure, if Landlord's Work has not been substantially completed by the date that is twenty-one (21) months after the CD Date, then Tenant, as Tenant's sole remedy, shall have the right to terminate this Lease upon notice to Landlord setting forth a date for termination no fewer than fifteen (15) days following the date of Tenant's notice, provided that if Landlord's Work is substantially completed prior to the date set forth for termination in Tenant's notice, then this Lease shall continue in full force and effect as if Tenant's notice had not been given. In the event of any termination pursuant to this Section 3.03, this Lease shall be of no further force or effect. Tenant shall have the right to request in writing to Landlord change orders and/or modifications to such Construction Drawings (each, a "Change Order"). If any Change Order would cause, in Landlord's judgment, a material increase to the cost of Landlord's Work or a delay to the substantially completion date of Landlord's Work, then Landlord may reject such Change Order (unless Tenant shall elect, in writing within five (5) business days following Landlord's notice, to pay Landlord the cost of such Change Order in advance together with such notice, and Tenant shall agree in writing that the Delivery of Possession shall be deemed to have occurred on the date that Landlord's Work would have been substantially completed but for the Change Order, whereupon such Change Order shall be incorporated into Landlord's Work). If any Change Order would not cause, in Landlord's judgment, a material increase to the cost of Landlord's Work or a delay to the substantially completion date of Landlord's Work, then Landlord shall incorporate such Change Order into Landlord's Work and the net costs of such Change Order, as hereinafter described, shall be paid by Tenant to Landlord within ten (10) days following Landlord's completion of such work and Landlord's demand therefor. Such net costs shall be determined as the full amount of such Change Order less only the actual amount incurred by Landlord in connection with a substitution or less expensive item resulting from such Change Order.

(c)     Delivery of possession of the Demised Premises to Tenant ("Delivery of Possession") shall be deemed to have occurred on the date when the Demised Premises shall be delivered broom clean and free of all tenancies, and the following shall actually occur:

(i)     Landlord's Work shall have been substantially completed in accordance with the applicable provisions of the Blink Manual, Exhibit C and the Turnkey Plans and all applicable law, approvals, permits and other governmental requirements (notwithstanding that certain non-material approvals that will not prevent Tenant's ability to occupy the Demised Premises, such as, by way of example, elevator sign-offs, or BSA Approval, may not yet have been issued); and

(ii)     Landlord shall provide Tenant with at least thirty (30) days advance notice that it reasonably believes Landlord's Work shall be substantially complete and within thirty (30) days of such notice Landlord and Tenant have conducted a joint inspection of the Demised Premises and confirmed substantial completion. In connection therewith, Landlord and Tenant shall conduct a joint inspection of the Demised Premises and based on the results thereof execute the Delivery of Possession letter in the form attached hereto as Exhibit D.

(iii)     As used herein, the term "substantially complete," as used in this Article 3, shall mean that Landlord's Work has been substantially completed (a) in accordance with the finally approved Construction Drawings, Exhibit C and all applicable law, approvals, permits and other governmental requirements, and any required sign-offs from governmental authorities having jurisdiction (such as, elevator sign-off), (b) with all building systems (i.e., the central heating, ventilating, air conditioning, plumbing, electric, life safety, mechanical, wiring, sprinkler, Class E (i.e., fire and life safety), sewer, water, mechanical, elevator and other utilities and/or systems installed by Landlord in the Demised Premises in good working order and (c)

such that only "punch list" items (i.e., details of decoration and mechanical adjustment which do not affect Tenant's ability to occupy or operate the Premises for the Permitted Use, or to install any equipment, fixtures or personal property within the Premises) remain to be completed. In performing any required "punch list" items to the extent Landlord shall not complete a certain element(s) of Landlord's Work), Landlord shall use commercially reasonable efforts to not interfere with Tenant's operations in, or occupancy of, the Demised Premises.

        (iv)    Tenant and Landlord both agree to act promptly, reasonably and in good faith in implementing the design and construction of the Demised Premises pursuant to this Lease. Landlord shall cause Landlord's general contractor to copy Tenant and Tenant's architect (if previously designed by Tenant to Landlord in writing) on all submittals relating to the material samples of finishes of the Demised Premises. Tenant shall be invited to attend progress meetings as established. Tenant shall have the right to visit the Demised Premises from time to time, in its discretion, during the progress of construction to confirm that Landlord's Work is being accomplished in accordance with the Construction Drawings, provided that Tenant shall give Landlord at least 24 hours prior written notice of any such visit and Tenant shall be accompanied by a representative of Landlord. Landlord recognizes that certain design features of the Demised Premises are deemed to be proprietary to Tenant and the "Blink"-branded business. Landlord agrees that it shall not have any right to use any portion of the Construction Drawings in connection with any project other than Landlord's Work with respect to the Demised Premises and Landlord shall cause its architect and other design consultants to agree to comply with the foregoing restriction.

        <u>Section 3.04</u>   <u>Tenant's Initial Work</u>.

        (a)    After Delivery of Possession, Tenant shall fully and completely prepare the Demised Premises for its occupancy as an operational Blink Fitness club for the Permitted Use (such preparation of the Demised Premises, the "Tenant's Initial Work"). Landlord hereby approves the Concept Plan for the Demised Premises depicted on <u>Exhibit B</u> attached hereto. The Tenant's Initial Work shall exclude Landlord's Work but shall include a complete build out of the interior of the Demised Premises to be consistent with other Blink Fitness facilities. Tenant shall perform Tenant's Initial Work in good faith with due diligence. Tenant shall perform no work in the Demised Premises until Tenant's plans therefor have been approved in writing by Landlord, and Tenant has procured the requisite approvals therefor. Subject to the provisions set forth in this Section 3.04(a) and Section 7.03, Landlord reserves the right to disapprove any plans and specifications related to any exterior, structural or roof work or any work outside the Demised Premises in its sole discretion, or any work affecting the systems within the Building. In no event shall Landlord's review of or comments to Tenant's plans and specifications be deemed a representation by Landlord of their sufficiency or compliance with law (it being agreed that such sufficiency and compliance are solely Tenant's responsibility).

        (b)    Tenant agrees that prior to commencing Tenant's Initial Work and, with respect to any other construction permitted under the Lease, Tenant will select its general contractor and submit the name thereof to Landlord for Landlord's approval, which approval Landlord shall not unreasonably withhold, condition or delay. Landlord will, within ten (10) business days after Tenant's written request, advise Tenant of whether or not Landlord approves of potential bidders desiring to serve as Tenant's general contractor. Landlord shall be permitted to consider the following in its determination of reasonable approval for a general contractor: (x) whether the contractor has the financial net worth to perform and complete Tenant's Initial Work (or such other construction as is thereafter proposed), and (y) whether the contractor has reasonable experience in performing the construction work contemplated. Tenant shall promptly submit such information pertaining to its proposed general contractor as Landlord may reasonably require for Landlord to determine whether or not to grant its approval. Landlord shall be named as an additional insured under such general contractor's liability insurance policy pursuant to Sections 6.04 and 14.02 hereof.

        (c)    All of Tenant's Initial Work (or any Alterations as defined in Section 7.03 hereof) shall be completed at Tenant's sole cost and expense. In performing Tenant's Initial Work or any Alterations ("Tenant's Work"), Tenant shall comply with the following requirements:

        (i)    At all times during the performance of same, same must be managed by a qualified general contractor that has been approved by Landlord as set forth in

Subsection 3.04(b) hereof. All subcontractors providing on-site labor are to be employed by the Tenant's general contractor that was approved by Landlord, or shall otherwise be approved by Landlord, who shall not unreasonably withhold, condition or delay such approval. Under no circumstances shall Tenant be obligated to utilize union labor in connection with the performance of Alterations (including Tenant's Work).

(ii)    Any approval of or consent to any or all of Tenant's criteria, systems, plans, specifications, drawings shall neither constitute an assumption of responsibility by Landlord for any aspect of such criteria, systems, plans, specifications, drawings or Tenant's Work, including, their accuracy or sufficiency, nor obligate Landlord in any manner with respect to Tenant's Work, and Tenant shall be solely responsible for any deficiency in design or construction of all portions of Tenant's Work.

(iii)    Tenant shall maintain the Demised Premises and the Common Areas adjoining the same in a clean and orderly condition during construction. Tenant shall promptly remove all unused construction materials, equipment shipping containers, packaging, debris and waste from the Building, and deposit it in receptacles, if any, provided by Landlord or otherwise remove the same from the Building. Tenant shall contain all construction materials, equipment, fixtures, and merchandise, shipping containers and debris within the Demised Premises.

(iv)    From time to time, during the performance of Tenant's Work, Landlord, its managing agent, Landlord's architect and/or Landlord's general contractor may, upon no less than twenty-four (24) hours prior notice and only when accompanied by a representative of Tenant, enter upon the Demised Premises and inspect the work being performed by Tenant to ensure the same is being constructed and completed in accordance with the terms of this Lease. Tenant's Work shall be performed in a good and workmanlike manner, shall incorporate only new materials which are free from asbestos or other Hazardous Materials (as defined in Section 7.08) and shall be in good and usable condition at the date of completion.

(v)    Tenant shall use commercially reasonable efforts so that Tenant's Work shall be coordinated with all work being performed or to be performed by Landlord and other occupants of the Building to the end that Tenant's Work will not adversely interfere with the operation of the Building or adversely interfere with or delay the completion of any other construction within the Building, and each such contractor and subcontractor shall comply with all procedures and regulations prescribed by Landlord for integration of Tenant's Initial Work or Alterations with that to be performed in connection with any construction in the Building and with the operation of the Building ("Procedures and Regulations").

(vi)    Neither Tenant nor its contractors or subcontractors may use any space within the Building (except the Demised Premises) during the performance of Tenant's Work for storage, handling and moving of materials and equipment. It shall be Tenant's responsibility to cause each Tenant's contractor and subcontractor to maintain continuous protection of adjacent property and improvements against damage by reason of Tenant's Work.

(vii)    Tenant agrees to use reasonable efforts to secure its contractor's acknowledgment of receipt of the Procedures and Regulations, and shall instruct its contractor to comply with the same.

(viii)    Tenant shall have the exclusive right, subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed, to install self-promotional advertising signage on any barricade, storefront cover and sidewalk shed erected by Tenant in connection with Tenant's Work, provided in all instances same complies with applicable law, is professionally prepared and in good taste, and does not interfere with any signage of other tenants and occupants of the Building.

(d)    Tenant shall perform, at Tenant's sole cost and expense all of Tenant's Initial Work in accordance with the final plans and specifications approved by Landlord pursuant to Section 3.04(a) above, all Requirements and Insurance Requirements, and in a good and workmanlike manner.

(e)    Tenant shall use diligent and good faith efforts to obtain and deliver to Landlord, within ninety (90) days after the completion of Tenant's Initial Work, an executed and

acknowledged final waiver and release of mechanics' liens with respect to the Demised Premises executed by Tenant's general contractor and by every major subcontractor and supplier of labor and/or materials engaged in Tenant's Initial Work. In addition, within one hundred fifty (150) days after the completion of Tenant's Initial Work, Tenant shall supply to Landlord (i) properly issued certificates evidencing acceptance or approval of the Demised Premises by appropriate Governmental Authorities, and (ii) a set of "as-built" plans and specifications for Tenant's Initial Work prepared and sealed by Tenant's architect, together with names and addresses of Tenant's electrical, plumbing, and other contractors.

(f)     Notwithstanding anything herein to the contrary contained in this Lease, Landlord shall promptly cure, at Landlord's expense, and pay all fines, interest and penalties with respect to, any violations affecting the Demised Premises or the Building and not (i) caused by Tenant (or its agents, employees or contractors) or (ii) resulting from Tenant's failure to obtain the BSA Approval (unless such failure is the result of Building violations not caused by Tenant or its agents, employees or contractors), to the extent such violations actually delay or prevent Tenant from obtaining all required permits in connection with Tenant's Initial Work, or performing same, or opening for business at the Demised Premises for the Permitted Use, and Rent shall fully abate in the event Tenant shall be prevented from opening for business at the Demised Premises solely as a result such violation and provided Tenant shall demonstrate to Landlord such violation causing the delay of such opening.

## ARTICLE IV.  TERM.

### Section 4.01    Commencement Date and Rent Commencement Date.

(a)     The term of this Lease ("Term") shall commence on the date of Delivery of Possession (the "Commencement Date"), at which time all of Tenant's obligations under this Lease shall be applicable, except for Tenant's obligations to pay Minimum Rent. As used herein, the "Rent Commencement Date" shall be such date that is ninety (90) days following the Commencement Date, except that (a) Landlord shall endeavor to use best efforts to have the temporary certificate of occupancy for a physical culture establishment at the Demised Premises (the "TCO") within thirty (30) days following the Commencement Date (the "TCO Date"), subject to any Tenant Delays and (b) if, notwithstanding Tenant's efforts, the TCO is not issued as of the TCO Date (subject to any Tenant Delays and Force Majeure), then the number of days from after the TCO Date until the TCO is actually issued shall be added to such remaining number of days of such ninety (90)-day period, whereupon such Rent Commencement Date shall occur. Notwithstanding the foregoing, Tenant may elect upon written notice to Landlord, to open for business at the Demised Premises prior to TCO issuance, in which event the Rent Commencement Date stops tolling and shall be deemed to have occurred as of such opening date (and Landlord shall pay all violations that may result in any fines due to Tenant's opening without a TCO), except that if Tenant's operations at the Demised Premises are shut down by applicable governmental authority due to the failure of TCO issuance, then, as of such date of shutting down until the TCO is issued, the Rent Commencement Date shall toll again as aforesaid and Tenant shall receive a day-for-day abatement of Rent until TCO issuance, at which time Rent shall resume.

(b)     Tenant's obligations to pay Minimum Rent shall commence on the Rent Commencement Date. The Term shall expire on the Expiration Date.

### Section 4.02    Commencement Date Certificate.

Within thirty (30) days following written request of either party accompanied by the reasonably requested document, the other shall execute and deliver a document in recordable form setting forth the Commencement Date, the Rent Commencement Date and the Term and such other basic Lease terms as are reasonably requested by either party.

## ARTICLE V.  RENT AND TAX CONTRIBUTIONS

### Section 5.01    Minimum Rent.

Tenant shall pay Minimum Rent to Landlord commencing on the Rent Commencement Date. Minimum Rent shall be payable at the rates set forth in Article I. Minimum Rent shall be payable in equal monthly installments in advance. The first monthly

installment shall be due on the Rent Commencement Date. Each subsequent installment shall be due on the first day of each month during the Term. If the Rent Commencement Date is a day other than the first day of the month, the first installment shall be pro-rated by the actual number of days in that month. If the Expiration Date occurs on a day other than the last day of any month, Minimum Rent for the last month during the Term shall be pro-rated in the same manner.

Section 5.02   Payment of Rent.

(a)   "Rent" means Minimum Rent and all other amounts and charges required to be paid by Tenant to Landlord hereunder, whether or not described as additional rent, Additional Rent or rent under this Lease. In addition to the Rent, Tenant covenants and agrees to pay to Landlord all other sums and charges which are to be paid by Tenant in connection with or pursuant to the provisions of this Lease ("additional rent" or "Additional Rent"). Except as otherwise provided in this Lease, additional rent shall be due and payable within thirty (30) days following the date on which Tenant is given notice that the additional rent is due.

(b)   Minimum Rent shall be paid without notice, demand, counterclaim, offset, deduction, defense, or abatement, except as otherwise set forth to the contrary in this Lease.

(c)   All Rent payable under this Lease shall be payable at Landlord's address at: c/o Irgang Group, Inc., P.O. Box 20342, Cherokee Station, New York, New York 10021, or at such other address as Landlord shall designate by giving no less than thirty (30) days' advance notice to Tenant.

(d)   If Tenant shall fail to pay any other charges payable hereunder, whether or not the same are called Rent or additional rent hereunder, Landlord shall have all remedies provided for in this Lease or at law for non-payment of Minimum Rent. Landlord's and Tenant's obligations (accruing during the Term) under this Article V and Article XI hereof, shall survive the expiration or sooner termination of this Lease.

(e)   The parties acknowledge that Tenant shall not be responsible for paying a separate common area maintenance charge, marketing charges, or operating expenses to Landlord in connection with this Lease (other than Tax Contribution pursuant to Section 5.03 hereof) as such expenses are included as part of the Minimum Rent payable by Tenant hereunder. Tenant shall not be responsible for paying any percentage rent in connection with this Lease.

Section 5.03   Tax Contributions.

(a)   In addition to all other charges Tenant is required to pay hereunder, Tenant shall pay Tax Contributions (as hereinafter defined) to Landlord.

(b)   The following terms shall have the following meanings:

(i)   "Taxes" shall mean the sum of the (i) real estate taxes and assessments and special assessments imposed upon the fully-assessed Building and/or the land on which the Building is situated by any governmental bodies or authorities (the "Land") and any rights or interests appurtenant thereto payable by Landlord during any Tax Year and (ii) attorneys' fees, court, or other administrative costs and disbursements incurred by Landlord in connection with any reduction in Taxes which is obtained prior to the date such Taxes are payable. If at any time during the term of this Lease the methods of taxation prevailing at the commencement of the term hereof shall be altered so that in lieu of, or as an addition to or as a substitute for the whole or any part of the taxes, assessments, levies, impositions or charges now levied, assessed or imposed on real estate and the improvements thereof, there shall be levied, assessed and imposed (a) a tax, assessment, levy or otherwise on the rents received therefrom, or (b) a license fee measured by the rent payable by Tenant to Landlord, or (c) any other such additional or substitute tax, assessment, levy, imposition or charge, then all such taxes, assessments, levies, impositions or charges or the part thereof so measured or based shall be deemed to be included within the term "Taxes" for the purpose hereof. In no event shall "Taxes" include income, inheritance, estate, franchise, gross receipts or other similar taxes. A copy of the tax bill of The City of New York or other taxing authority imposing Taxes on the Land or the Building shall be sufficient evidence of the amount of Taxes. Taxes shall be paid by Tenant as provided herein regardless of the fact that Tenant or Landlord may be exempt, in whole or in

part, from the payment of any Taxes for any reason whatsoever. Taxes shall specifically exclude any taxes from any new expansion or development of the Building.

(ii)    "Base Tax" shall mean the Taxes for the Tax Year (the "Base Tax Year") that reflect the taxing authority's full assessment of the Building (assuming the Building is fully leased, and Landlord's Work is completed and the Delivery of Possession has occurred). In the event that any tax abatement applicable to the Base Tax Year expires during the Term so that the Taxes after such date thereby increase, then the calculation of Tenant's tax payment after such date shall be calculated as if such tax abatement (in such amount that was actually in effect during such Base Tax Year) was not in effect during such Base Tax Year (the "Abatement Adjustment"); it being understood that in no event shall the Abatement Adjustment result in Tenant being entitled to any credit or offset from base annual rent or additional rent hereunder, and it being further understood that under no circumstances shall either the tax payment for any Tax Year be less than zero, nor shall the Minimum Rent or Additional Rent payable under this Lease be less than the Minimum Rent and Additional Rent set forth in this Lease.

(iii)    "Tax Year" shall mean the fiscal year commencing on July 1 and ending on June 30 (or such other period as hereinafter may be duly adopted by the City of New York as its fiscal year for real estate tax purposes), any portion of which fiscal period occurs during the term of this Lease.

(iv)    "Tenant's Pro Rata Share" shall be as set forth in Section 2.13 hereof.

(c)    If the Taxes for any Tax Year shall be more than the Base Tax, Tenant shall pay as Additional Rent for such Tax Year an amount equal to Tenant's Pro Rata Share of the amount by which the Taxes for such Tax Year are greater than the Base Tax (the amount payable by Tenant is hereinafter called the "Tax Contributions"). The Tax Contributions shall be prorated, if necessary, to correspond with that portion of a Tax Year occurring within the term of this Lease. At Landlord's sole option, the Tax Contributions shall either (1) be payable by Tenant within twenty (20) days after receipt of a demand from Landlord therefor or (2) shall be payable by Tenant to Landlord in equal monthly installments on the first day of each month in an amount as reasonably estimated by the Landlord, and shall in any event be adjusted from time to time with such adjusted amount being remitted by Tenant to Landlord upon Landlord's written demand therefor.

(i)    Only Landlord shall be eligible to institute tax reduction or other proceedings to reduce the assessed valuation of the Land and the Building, provided, however, that Tenant shall be required to make all Tax Contributions due under this Article while any such proceedings are pending. Should Landlord be successful in any such reduction proceedings and obtain a rebate for periods during which Tenant has paid its share of increases, Landlord shall after deducting its actual, out-of-pocket expenses, including attorneys' fees and disbursements in connection therewith, return Tenant's Pro Rata Share (respectively) of such rebate to Tenant.

(ii)    With respect to any period at the expiration of the term of this Lease which shall constitute a partial tax year, Landlord's statement shall apportion the amount of the Additional Rent due hereunder. The obligation of Tenant in respect to such Additional Rent applicable for the last year of the term of this Lease or part thereof shall survive the expiration of the term of this Lease.

(iii)    At such times as are required by the New York City Department of Finance or other authority having jurisdiction (of which times Landlord shall give Tenant reasonable prior written notice), Tenant agrees to report to Landlord the number of workers permanently engaged in employment in the Demised Premises, the nature of each worker's employment and whether each worker is a New York City resident. Tenant further agrees to provide access to the Demised Premises to the New York City Department of Finance or other authority having jurisdiction at all reasonable times and upon reasonable notice at the request of Landlord.

(iv)    In addition to Tax Contributions, Tenant shall pay to the appropriate governmental agency whether or not imposed upon Landlord or Tenant (or to Landlord as Rent if Landlord is responsible for the collection and payment of such monies), prior to the time such obligation shall become delinquent or payable with a penalty, all other taxes

required to be paid by Tenant, such as: (i) all sales, excise, business privilege, use and occupancy, and any other tax levied, imposed or assessed by the state, in the Demised Premises is located, or by any political subdivision, or other taxing authority having appropriate jurisdiction, upon any Rent payable by Tenant, (ii) all taxes and assessments upon or against the conduct of Tenant's business at the Demised Premises including but not limited to, business and occupation taxes and occupational license taxes, and (iii) all taxes imposed upon Tenant's inventory, signs, furniture, fixtures, apparatus, equipment, alterations, betterments, and improvements, and any other personal property of Tenant (the foregoing (i), (ii) and (iii) shall be individually and collectively known as "Special Taxes".

<u>ARTICLE VI.  CONDITION OF PREMISES AND SIGNS</u>

Section 6.01    <u>No Representation</u>.

Landlord has made no representation, covenant or warranty with respect to the Demised Premises or the condition thereof, except as expressly set forth in this Lease.

Section 6.02    <u>Mechanics' Liens</u>.

If any mechanic's or materialman's lien or other lien is filed against the Demised Premises or the Building as a result of any additions, alterations, repairs, installations or improvements made by or for Tenant (unless made by Landlord not at the request of Tenant), or any other work or act of Tenant, Tenant shall discharge the same by payment or filing the bond required by law within thirty (30) days from notice of the filing of the lien.  If Tenant shall fail to discharge or bond the lien within such 30-day period, Landlord may bond or pay the lien or claim for the account of Tenant without inquiring into the validity of the lien or claim and Tenant shall pay to Landlord on demand, as additional rent, the reasonable and actual amount so paid by Landlord to remove or discharge the lien or claim together with interest thereon at the Lease Interest Rate for the period from Landlord's payment of such sum until the date that Landlord is reimbursed by Tenant.  Tenant's failure to discharge or bond the lien within the aforesaid thirty (30) day period or to timely reimburse Landlord for any amounts due hereunder shall constitute a default hereunder, notwithstanding that Landlord has the option to cure such default.  Nothing contained in this Section 6.02 shall limit Tenant's right to challenge the claim filed by such mechanic's lien, provided that Tenant discharges such lien of record as aforesaid.  Nothing in this Lease contained shall be construed a consent on the part of Landlord to subject Landlord's estate in the Demised Premises to any lien or liability under the Lien Law of the State of New York.

Section 6.03    <u>Signage</u>.

(a)    Subject to the maximum extent permitted under applicable Requirements (without a variance with respect thereto), Tenant may install Tenant's building signage on each side of the Building in which the Demised Premises is a part ("Exterior Signage"), provided such Exterior Signage shall be as set forth on <u>Exhibit G</u> annexed hereto and made a part hereof.  In addition, if Tenant shall request such other exterior Building signage, such signage shall be subject to the approval by Landlord as to the design, size and location of such signage, which approval shall not be reasonably withheld, conditioned or delayed.  Upon surrender or vacation of the Premises, Tenant shall have removed all Exterior Signage and repair, paint, and/or replace the building facia surface, as reasonably necessary, to which the Exterior Signage are attached. Tenant shall obtain all applicable governmental permits and approvals for the Exterior Signage. Tenant shall maintain the Exterior Signage in good condition and repair during the Term.  Except as shown on <u>Exhibit G</u> annexed hereto, the size, content, design, method of construction, method of installation and location of any signs are subject to the approval of Landlord.  Notwithstanding anything to the contrary contained in this Lease, signs, displays and advertisements on the interior of the Premises including its windows, even if visible from the outside of the Premises, shall not be subject to Landlord's consent, provided they comply with law, and are professionally printed and prepared.  The method of construction and installation thereof shall be subject to: (i) the approval of Landlord which approval shall not to be unreasonably withheld or delayed; (ii) applicable Requirements; and (iii) the Insurance Requirements.  Tenant shall obtain and pay for all required permits and licenses relating to Exterior Signage.

(b)    Tenant may, subject to Landlord's prior approval (not to be unreasonably withheld, conditioned or delayed), install and maintain on the storefront of the Demised Premises a temporary banner or sign announcing "Coming Soon", at such location, and for such duration

prior to the opening of the Demised Premises for the conduct of Tenant's business, as the parties shall reasonably agree and any such temporary banner or sign shall be maintained in first class condition by Tenant, at its sole expense.

Section 6.04    Insurance Covering Tenant's Work.

Tenant shall not make any alterations, repairs or installations, or perform Tenant's Initial Work or any other work to or in the Demised Premises unless prior to the commencement of such work, Tenant shall (or shall cause its contractors to) obtain (and during the performance of such work keep in force) builder's risk, public liability and worker's compensation insurance to cover every contractor to be employed, and any other insurance reasonably required by Landlord. Such policies shall be non-cancelable without thirty (30) days' notice to Landlord. The policies shall be in commercially reasonable amounts and shall be issued by companies satisfactory to Landlord in its reasonable discretion. Prior to the commencement of such work, Tenant shall deliver duplicate originals or certificates of such insurance policies to Landlord.

## ARTICLE VII.  REPAIRS, MAINTENANCE, ALTERATIONS, COMPLIANCE, SURRENDER

Section 7.01    Repairs and Maintenance by Landlord.

(a)    During the Term, Landlord shall keep and maintain in good condition and repair the roof, foundation, exterior walls, structural components and Common Areas of the Building and Demised Premises (but excluding all wall treatments, paintings, windows, plate glass, storefront, doors and any fixtures and appurtenances composed of glass) and Building electrical or mechanical systems not within the Demised Premises (and excluding the plumbing and sewer systems serving the Demised Premises), excepting any damage caused by any act, omission or negligence of Tenant or Tenant's Agents and further excepting  any of Tenant's Work (which Landlord shall repair at the reasonable cost of Tenant).

(b)     In the event that Tenant, in its reasonable discretion, determines that Landlord has not performed its maintenance and repair obligations set forth in Section 7.01(a) hereof, upon written notice to Landlord and an opportunity to cure of not less than fifteen (15) days (or, if such cure cannot reasonably be cured within said 15-day period, such longer period, not to exceed 60 days, provided that Landlord shall have commenced such maintenance or repairs), unless an emergency situation to person or property shall be imminent, in which event, such notice and cure period shall be as is practicable under the circumstances, Tenant may, but shall not be obligated to, perform such maintenance and repair work, at the reasonable and actual cost of Landlord; provided such maintenance and repairs shall be solely within the interior of the Demised Premises.

Section 7.02    Repairs and Maintenance by Tenant.

Except for repairs Landlord is obligated to make or cause to be made hereunder, Tenant shall make all repairs to the Demised Premises necessary or desirable to keep the Demised Premises in good order and repair and in a safe and tenantable condition. Without limiting the generality of the foregoing, Tenant shall be specifically required to make repairs: (i) to those portions of any pipes, lines, ducts, wires, or conduits that service Tenant exclusively, as well as plumbing, electrical, sprinkler systems or other mechanical systems and sewer lines within the Demised Premises or under the floor slab thereof (including free flow to the main sewer line) and which service the Demised Premises exclusively; (ii) to the storefront, windows, plate glass, doors, and any fixtures or appurtenances composed of glass, and to the sidewalks adjacent to the Demised Premises (and to remove snow and ice therefrom), but not structural repairs to the Building; (iii) to Tenant's signs; (iv) to any heating, ventilating or air-conditioning equipment installed in or servicing the Demised Premises only ("HVAC System"); (v) to all fixtures, interior walls, floors, ceilings, electrical systems and equipment located within the Demised Premises; and (vi) to the Demised Premises or the Building to the extent repairs to the same are necessitated by any act or omission of Tenant, or Tenant's Agents, or the failure of Tenant to perform its obligations under this Lease, provided, that, Tenant shall have no obligation to repair any damage to the Demised Premises, the Building, or the Common Areas caused by the negligence or willful acts or omissions of Landlord or Landlord's agents, employees, contractors or invitees. Tenant shall keep the Demised Premises in a clean and sanitary condition, in such a condition that it does not attract vermin and other pests, and free

from vermin and escaping offensive odors. In addition, Tenant, at its own cost and expense, will keep all exterior and interior storefront surfaces clean. Tenant shall contract for, in its own name, and shall pay for a qualified service contractor to inspect, adjust, clean and repair the HVAC System, including changing filters on a quarterly basis. Tenant shall furnish evidence of such contract to Landlord.

Section 7.03    Approval by Landlord of Repairs and Alterations. After completion of the Tenant's Initial Work, the issuance of the BSA Approval and the certificate of occupancy for the Demised Premises, Tenant may make non-structural alterations, additions, improvements, decorations or changes or perform any other non-structural work in and to the Demised Premises ("Alterations") to the Demised Premises, subject to compliance with the terms of Sections 6.02 and 6.04 hereof and the following provisions: (a) Tenant shall give Landlord prompt notice of any Alteration costing more than $150,000 in the aggregate in any 12-month period or any Decorative Alteration (as hereinafter defined) to be performed by Tenant for Landlord's reasonable approval; (b) such Alterations shall be effected with due diligence and in good and workmanlike manner in accordance with all applicable Requirements and Insurance Requirements; (c) such Alterations shall be promptly and fully paid for by Tenant; (d) any Alterations to the plumbing, mechanical, electrical, sewerage, sprinkler or HVAC system which affect other premises in the Building or which change the capacity of any such system, or which require a permit shall be done in accordance with plans and specifications approved by Landlord in its reasonable discretion provided that Tenant (with Landlord's reasonable cooperation, at Tenant's cost) takes all such actions as are necessary for the other premises in the Building to remain unaffected by Tenant's alterations or repairs, as the case may be; (e) Tenant shall not make any structural or exterior Alterations to the Demised Premises without obtaining Landlord's prior written consent in its sole discretion and, as to any other Alterations, Landlord's prior written consent shall be required, which consent shall not be unreasonably withheld, delayed or conditioned; (f) Tenant shall, within a reasonable time after completion of any Alteration, which required the preparation of plans and specifications, furnish Landlord with a set of updated plans and specifications therefor; (g) notwithstanding anything to the contrary contained herein, Tenant may not construct a mezzanine nor add or subtract Floor Area in the Demised Premises; and (h) Tenant shall be responsible, at Tenant's sole cost, to make all filings of plans and other documents and to obtain all permits and approvals with respect to such Alterations. For purposes of this Lease, the term "Decorative Alteration" shall mean alterations that constitute merely decorative changes within the interior of the Demised Premises (such as, for example, the installation of carpeting or other customary floor coverings or painting or the installation of customary wall coverings) that in each case do not involve electrical, plumbing or mechanical connections and do not require a permit for the completion of same.

Section 7.04    Landlord's Approval Rights. In each case where Landlord's consent is required pursuant to the terms hereof, Tenant shall give Landlord written notice of its intention to perform such Alterations, together with reasonably detailed specifications and working drawings of such proposed Alterations. If Landlord fails to either approve or disapprove Tenant's specifications and drawings within ten (10) business days after Landlord's receipt thereof or within five (5) business days with respect to any resubmission of disapproved plans or specifications, after Landlord's receipt thereof, then Tenant shall send Landlord a reminder notice (the "Alteration Second Notice") stating at the top of the notice: "LANDLORD'S FAILURE TO APPROVE OR DISAPPROVE THESE PLANS AND SPECIFICATIONS WITHIN 5 BUSINESS DAYS AFTER RECEIPT SHALL BE DEEMED TO BE LANDLORD'S APPROVAL". If Landlord shall fail to respond to Tenant within five (5) business days after receiving the Alteration Second Notice with the aforesaid caption at the top of such notice, then Landlord shall be deemed to have approved such plans and specifications, provided nothing contained in the plans is expressly prohibited herein or changes the terms or conditions of the provisions contained in this Lease. Landlord reserves the right (in its reasonable discretion as to any Alteration that is not a Decorative Alteration) to disapprove any plans and specifications in part, to reserve approval of items shown thereon pending its review and approval of other plans and specifications to be submitted by Tenant, to condition its approval upon Tenant making reasonable revisions to the plans and specifications or supplying additional information reasonably required by Landlord. In no event shall Landlord's review of Tenant's plans and specifications be deemed an approval by Landlord as to their sufficiency or compliance with law (it being agreed that such compliance is solely Tenant's responsibility). All permitted work shall be commenced promptly after Tenant has obtained all necessary permits and approvals and performed by Tenant in a manner so as to not unreasonably disrupt other

tenants of the Building. Tenant shall perform all work in a good and workmanlike manner and in accordance with the approved detailed specifications and working drawings and prosecute the work diligently to completion. Any work performed by Tenant, irrespective of cost, shall be subject to Landlord's inspection and reasonable approval after completion to determine whether the work complies with the requirements of this Lease.

### Section 7.05    Compliance with Laws.

(a)    Tenant shall not use, occupy, suffer or permit the Demised Premises or any part thereof to be used or occupied for any purpose which may be contrary to law or to the rules or regulations of any public authority, or which will increase any insurance rates and premiums (unless Tenant shall pay for all of such increase) on the Demised Premises or the Building.

(b)    Tenant shall promptly observe and comply with all Requirements and Insurance Requirements relating to or affecting the Demised Premises, any sign of Tenant, the use and occupancy of the Demised Premises, or any appurtenance thereto. If such compliance requires the making of exterior or structural alterations or repairs, Tenant shall not commence such exterior or structural alterations or repairs unless and until Tenant has submitted plans and specifications for such work to Landlord as required pursuant to Sections 7.03 hereof, and, subject to the terms and conditions thereof, Tenant has obtained the approval thereof from Landlord. Notwithstanding anything to the contrary contained in this Lease, Tenant shall not be responsible for the performance of structural work, alterations, repairs, or capital expenditures in the Demised Premises necessary for compliance with law (collectively, the "Structural Work"), all of which required Structural Work shall be the obligation of Landlord, except to the extent such Structural Work is necessitated by (i) the particular manner of use by Tenant of the Demised Premises or (ii) Tenant's alterations or improvements.

### Section 7.06    Emergency Repairs.

If as a result of an emergency it shall become necessary to prevent imminent threat or danger to person or property for Landlord to make any repairs which are the obligation of Tenant hereunder, and Tenant has not commenced such repairs, Landlord may enter the Demised Premises (subject to the applicable access provisions herein) and proceed to have such repairs made and pay the cost of such repairs. Within thirty (30) days after Landlord renders a bill for such repairs, Tenant shall reimburse Landlord, as additional rent, for the cost of making such repairs.

### Section 7.07    Surrender of Demised Premises.

On the Expiration Date, Tenant shall quit and surrender the Demised Premises "broom-clean," and in good condition and repair (normal wear and tear and casualty excepted), together with all alterations, fixtures (including, light fixtures) and HVAC System, installations, additions and improvements which may have been made in or attached on or to the Demised Premises; provided, however, that Tenant shall only be required to remove its trade fixtures, signs (interior and exterior) equipment and other personal property (and shall not be required to remove any installations, improvements and/or additions), and shall promptly repair any damage caused by such removal. Any personal property of Tenant or any subtenant or occupant which shall remain in or on the Demised Premises after the termination of this Lease and the dispossession of Tenant or any subtenant or occupant from the Demised Premises or the surrender by Tenant of the Demised Premises, may, at the option of Landlord and without notice, be deemed to have been abandoned by Tenant or such subtenant or occupant and may either be retained by Landlord as its property or be disposed of, at Tenant's sole (but reasonable) cost and expense, without accountability, in such manner as Landlord may see fit, or if Landlord shall give written notice to Tenant to such effect, such property shall be promptly removed by Tenant, at Tenant's cost and expense. Landlord shall not be responsible for any loss or damage occurring to any such property owned by Tenant or any subtenant or occupant. Tenant's obligations under this Section shall survive the Expiration Date.

### Section 7.08    Hazardous Materials.

(a)    Except as otherwise provided in this Lease, Tenant shall not use, store or dispose of at the Demised Premises (i) materials, substances or wastes which are defined as

hazardous or toxic in any Requirements relating to the environment or to the pollution, contamination or remediation thereof (hereinafter, "Environmental Laws"), or (ii) pollutants or contaminants as defined in any applicable Environmental Laws, including, without limitation, asbestos and mold (individually and collectively "Hazardous Materials"). Nothing herein shall prohibit Tenant from using and storing at the Demised Premises (y) quantities of cleaning fluid and supplies which may constitute Hazardous Materials but which are customarily present in premises devoted to retail use and (z) if due to the nature of Tenant's business, any other Hazardous Materials; provided, however that such use and storage of Hazardous Materials is in compliance with all applicable Environmental Laws, and all Hazardous Materials used or stored by Tenant are removed from the Demised Premises prior to the expiration or sooner termination of the Lease. Tenant shall be responsible and liable for (1) any use or storage of Hazardous Materials by Tenant at the Demised Premises that is found to be in violation of applicable Environmental Laws or (2) any Hazardous Materials found at or near the Building, as a result of the acts or omissions of Tenant or Tenant's Agents (including payment of any fines or penalties imposed by any government authority for such violations), and shall, at its sole cost and expense, cure, remove and/or remediate the same, as required by applicable Environmental Laws

(b)      Landlord warrants that the interior of the Demised Premises (excluding the roof of the Building) will be free of Hazardous Materials on the Commencement Date, to the extent required pursuant to applicable Environmental Laws. Tenant shall have no responsibility or liability with respect to any (i) Hazardous Materials in, at, on, under or adjacent to the Building or the Demised Premises existing prior to the Commencement Date and (ii) any violation of Environmental Laws relating to the Building or the Demised Premises or the previous uses thereof existing prior to the Commencement Date, unless caused or exacerbated by Tenant, Tenant's agents, employees or contractors or any person claiming by, through or under Tenant. Landlord represents to Tenant that it has not received any notice of the violation of any Environmental Laws from any governmental authority that remains uncured, except as may be set forth in that certain (y) Transaction Screen Process Report dated as of June 6, 2012 and prepared by Middletown Environmental Inc. (Project No. 12-543), and (z) Transaction Screen Process Report dated as of June 15, 2012 and prepared by Middletown Environmental Inc. (Project No. 12-544). Landlord agrees that to the extent any Hazardous Materials are present in, at, on, under or adjacent to the Demised Premises (excluding the roof of the Building) as of the Commencement Date and/or any pre-existing violation of Environmental Laws remains uncured or unresolved as of the Commencement Date, Landlord shall be responsible for removing or otherwise remediating such Hazardous Materials and curing and resolving such Environmental Law violations (including, without limitation, removing and/or satisfying the conditions of any (E) designations which may interfere with or delay any building permit desired by Tenant with respect to the Demised Premises) to the extent required by, and in full compliance with, all applicable Environmental Laws, at no cost to Tenant, and Rent shall abate for any period that Tenant is materially delayed from opening for business due to the presence or remediation of Hazardous Materials or the uncured/unresolved violations of Environmental Laws.

Section 7.09

Landlord may have applied (or may in the future apply) to the New York City Industrial and Commercial Abatement Program and the Rules and Regulations promulgated thereunder ("ICAP"). To the extent required, all work (including, but not limited to, Landlord's Work, and any Tenant's Work) must be done in strict compliance with the ICAP laws for as long as the Building continues to qualify for ICAP benefits and, to the extent required, Tenant acknowledges that Landlord may be required to condition its approval for any work to be done within the Demised Premises on the approval of a governmental agency (such as, for instance, the New York City Department of Finance or other agency, authority or department) in connection with the foregoing. In furtherance of the foregoing, Tenant and Tenant's contractor must cooperate in filing documents required by the Department of Finance and the Department of Business Services of the City of New York in the procurement of an ICAP exemption or abatement. Tenant shall indemnify and hold Landlord harmless for any and all losses, claims, damages, costs or liabilities suffered or incurred by Landlord arising out of Tenant's failure to comply with all ICAP or other similar requirements applicable to Tenant in connection with any Tenant's Work or otherwise in connection with this Lease and of which Landlord shall have provided Tenant notice.

## ARTICLE VIII.  SERVICE AND UTILITIES

Section 8.01   Meters and Payments.

(a)      Landlord shall install, as part of Landlord's Work, at its sole cost and expense, meters to measure the electricity, gas (if provided) and a sub-meter to measure domestic water consumed at the Demised Premises. Tenant shall make its own arrangements with the utility company supplying the utilities for service. Tenant shall make all appropriate applications to the local utility companies at such times as shall be necessary to ensure that utilities are available at the Demised Premises no later than the Commencement Date, and shall pay all required deposits, connection fees and/or charges for meters within the applicable time period set by the local utility company. Tenant shall be solely responsible for and promptly pay all charges for heat, electricity, and any other utility used or consumed by Tenant in the Demised Premises or in providing heating and air-conditioning to the Demised Premises, including in each instance, all sales and other taxes applicable to the sale or supply of such utilities, said responsibility commencing on the earlier of the Commencement Date or the date Tenant first enters the Demised Premises for any reason. Tenant shall keep all such meters in good order and repair (except that Tenant shall not be responsible any latent defects thereto). Tenant shall pay for water and sewer, or water rent, and/or sewer charges, commencing on Delivery of Possession. In addition, domestic water and sewer service will be sub-metered and billed to Tenant by Landlord approximately every month by multiplying Tenant's water consumption as measured by Tenant's submeter by the water and sewer rates as billed to landlord by the City of New York at the time the submeter reading is taken. Said water and sewer charges shall be collectable by Landlord as Additional Rent.

(b)      In the event that the local authority, municipality, utility or other body collects for the water and/or sewerage or sanitary service and/or consumption, as aforesaid, Tenant covenants and agrees to pay the water and/or sewer rent charge (both minimum and otherwise) and any other tax, rent, levy, connection fee or meter or other charge which now or hereafter is assessed, imposed or may become a lien upon the Demised Premises, or the realty of which they are a part, pursuant to law, order or regulation made or issued in connection with the use, consumption, maintenance or supply of water, or the water or sewerage connection or system at or servicing the Demised Premises. In the alternative, if any sewer or water rent, charge, tax or levy is imposed against the Building, Tenant shall pay its equitable share thereof within thirty (30) days after Landlord renders a bill to Tenant therefor (together with a copy of the bill evidencing such amount).

(c)      If Landlord is required by any Requirement to discontinue furnishing any utility service to the Demised Premises as contemplated by this Lease, Landlord may, after thirty (30) days notice to Tenant, cease to furnish any one or more of the utility services to the Demised Premises so long as another reasonable source is available and such source is identified in Landlord's notice. Landlord shall be required to connect Tenant's distribution facilities with a replacement source for any utilities disconnected and Tenant shall have the right, at no additional cost to Tenant, to use the facilities so existing in the Building to obtain such service directly from the utility company. Notwithstanding the foregoing, if Tenant uses commercially reasonable efforts and diligence to connect with the replacement source identified in Landlord's notice, then Landlord shall not cease to furnish said services to the Demised Premises until Tenant has connected with the same. Notwithstanding anything to the contrary contained in this Lease, if Tenant is reasonably unable to operate the Demised Premises in its customary manner for five (5) consecutive business days due to a failure, defect or interruption of, or change in the supply, character and/or quantity of utility service furnished to the Demised Premises resulting from the negligence of Landlord, then Minimum Rent shall abate from the sixth (6th) consecutive business day that Tenant is unable to operate until such service is restored.

Section 8.02   Domestic Water.

Landlord shall provide domestic water to the Demised Premises.

Section 8.03   Alteration of Utility Systems.

In connection with any expansion, repair, renovation and/or remodeling of the Building, or the utility systems therein, Landlord reserves the right to modify Tenant's utility services, including, without limitation, water, electricity, gas, sprinkler and HVAC System, in

any manner that Landlord may deem necessary or appropriate in light of changes to the systems for the Building, provided, that, such modifications do not materially and adversely affect Tenant's Critical Rights.

ARTICLE IX.USE AND OPERATION

Section 9.01    Use.  Tenant shall open the Demised Premises for business for at least one (1) day for the Permitted Use.  Thereafter, Tenant shall not have any obligation to operate for any specific period of time or specific hours, or continuously operate a health and fitness club, or any other business, in the Demised Premises, and at any time thereafter, Tenant may, in its sole option, cease to conduct business in the Demised Premises ("Go Dark"), subject to the provisions of Section 9.02 hereof.  However, Tenant's election to Go Dark shall not affect Tenant's obligation to pay all Rent as and when due hereunder and to reasonably maintain the Demised Premises so that at all times the Demised Premises shall appear clean and orderly as viewed from the street outside the Building.

Section 9.02    Landlord's Right to Recapture.

(a)    If at any time during the Term, after Tenant opens for business to the general public, Tenant shall Go Dark in all of the Demised Premises (other than for a Permitted Closure, as defined below), for a period of three hundred sixty-five (365) consecutive days or more (a "Recapture Event"), for reasons other than damage, destruction, alterations eminent domain, Force Majeure, Landlord shall have the right to deliver a notice to Tenant indicating that Landlord believes that Tenant has ceased retail operations in the Demised Premises for such period. Within thirty (30) days after delivery of such notice Tenant shall (i) deliver a notice to Landlord stating the Tenant does not intend to cease retail operations in the Demised Premises, and (ii) resume retail operations in the Demised Premises within such thirty (30) day period.  As used herein, a "Permitted Closure" shall mean a closing or temporary discontinuance of the operation of Tenant's business in the Demised Premises for the following reasons: (i) to permit the performance of repairs or permitted alterations in and to the Demised Premises, (ii) due to the taking by eminent domain as provided for in accordance with the terms of this Lease, (iii) due to fire or casualty as provided for and in accordance with the terms of this Lease, (iv) up to ten (10) days per year for activities auxiliary to Tenant's business operations in the Demised Premises, including, without limitation, taking inventory and training employees and staff, (v) to observe State and Federal holidays, (vi) force majeure delays, (vii) when necessary to effect an assignment of this Lease or subletting of the Premises as permitted under this Lease or (viii) for such period of time as operating would materially violate any applicable laws or subject Tenant or its employees to a fine or penalty (provided such violations or fines or penalties are not solely due to Tenant's wrongful acts or omissions).

(b)    If Tenant fails to notify Landlord that it shall resume retail operations or fails to so resume retail operations in of the Demised Premises within the thirty (30) day period described in Section 9.02(a) hereof, then Landlord may terminate this Lease (a "Closure Termination") at any time by giving notice thereof to Tenant unless Tenant has therefore re-opened retail operations at the Demised Premises. If Landlord exercises Landlord's right to consummate a Closure Termination, then (i) the Term shall expire and this Lease shall terminate on a date specified by Landlord, and (ii) Tenant, on such date, shall deliver exclusive possession of the Demised Premises to Landlord in accordance with the provisions of Section 7.07 hereof. Upon the termination of this Lease, pursuant to and in accordance with this Section 9.02(b) Landlord and Tenant shall be released of all obligations under this Lease, other than those that expressly survive, and the Minimum Rent shall be apportioned and any prepaid portion of Minimum Rent for any period after such date shall be refunded by Landlord and the date upon which such date of termination occurs shall be deemed the Expiration Date for the purposes of this Lease.  Landlord's rights under this Section shall be continuing rights which shall apply to each Recapture Event which occurs under this Lease.

Section 9.03    Store Operations.

(a)    Keeping Demised Premises Clean:  Tenant shall keep the Demised Premises, including exterior and interior portions of all windows, doors and all other glass, in neat and clean condition.

(b)   Paying Taxes: Tenant shall pay before delinquency, any and all taxes, assessments and public charges levied, assessed or imposed upon Tenant, Tenant's business or the operation thereof, foreseen or unforeseen, or upon Tenant's fixtures, furnishings, appliances, personal property or equipment in the Demised Premises, or which constitute a lien on any of the foregoing.

(c)   Exclusive Delivery Facilities: Tenant shall keep and maintain in good order, condition and repair any loading platform, truck dock or truck maneuvering space which Tenant has the right of exclusive use (if applicable) notwithstanding the fact that the same may be deemed to be a portion of the Common Area.

(d)   Garbage: Tenant agrees not to permit the accumulation (unless in concealed metal containers) or burning of any rubbish or garbage in, on or about any part of the Building. Tenant shall handle and dispose of all rubbish and garbage in accordance with the reasonable regulations established by Landlord and shall not permit any rubbish or garbage to be collected or disposed of from the Demised Premises, except by Landlord or its designee, and shall pay all reasonable costs and expenses for such disposal and collection.  In lieu of the foregoing provisions of this subdivision (d), Landlord, at its option, may purchase or lease a garbage compactor for use of tenants and occupants of the Building.  If the Building is already equipped with, or Landlord purchases or leases, a garbage compactor for the use of tenants in the Building, Tenant agrees to use the same for the disposal of its garbage and refuse.  Tenant shall pay to Landlord monthly, in advance, as additional rent, the reasonable charges therefor based upon Landlord's reasonable estimate of the amount of the refuse and garbage generated and the frequency of use by Tenant, in order to cover Landlord's reasonable and actual costs thereof, without mark-up by Landlord.  Tenant shall cause its garbage and refuse to be taken to such garbage compactor.  Tenant's monthly charge as aforementioned will not include pick-up service.  Tenant shall not soil the areas immediately adjoining the Demised Premises, and Tenant shall not place, suffer or permit any obstructions or merchandise in such areas.

(e)   Rules and Regulations: Tenant agrees that at all times during the Term it shall comply with all Rules and Regulations specified in Exhibit E annexed hereto and made a part hereof.  Landlord reserves the right to reasonably amend the existing rules, adopt and promulgate, from time to time, further reasonable rules and regulations and to reasonably amend and supplement the same, applicable to the occupancy of the Building, the Demised Premises, and the Common Area, provided that  such other rules and regulations do not (A) increase Tenant's monetary obligations or liabilities or decrease Tenant's rights hereunder, (B) do not restrict the Permitted Use or the times when members and employees can gain access to the Demised Premises, (C) otherwise adversely affect the operation of Tenant's business at the Demised Premises (such rules and regulations that are attached hereto, and such other rules, being collectively referred to herein as the "Rules"). Landlord shall not enforce any Rules against Tenant if Landlord is not then enforcing such Rules against other similarly situated tenants.  If a conflict or inconsistency exists between the Rules and the provisions of the remaining portion of this Lease, then the provisions of the remaining portion of this Lease shall control.

(f)   Offensive Odors: If at any time during the Term, Landlord shall notify Tenant that offensive odors are escaping from the Demised Premises into other premises or areas in the Building as reasonably determined by Landlord ("Odor Problem"), Tenant shall, at its sole cost and expense, promptly after receipt of such notice from Landlord, perform any reasonable alterations to and install any equipment in the Demised Premises that is reasonably necessary to eliminate the Odor Problem.  Any work performed by Tenant in connection with the elimination of the Odor Problem shall be performed in accordance with the applicable provisions of this Lease.  Notwithstanding anything to the contrary in this Section 9.03(f), Landlord recognizes that some odors may result from Tenant's Permitted Use and agrees that odors customarily associated with a health and fitness club shall not constitute an Odor Problem.

(g)   Animals: No live animals shall be kept on or within the Demised Premises (other than seeing-eye dogs).

(h)   Promotions: Tenant shall not use the Common Area for business or promotional purposes. Except as expressly permitted in this Lease, Tenant shall not place, suffer or permit displays, decorations or shopping carts in the Building, or on the sidewalks in front of or at the rear of the Demised Premises, if any, or on or upon the Common Area.

(i)    Vending Machines:  Tenant shall not operate in the Demised Premises or in any part of the Building, any coin (or token) operated lockers, toilets, scales and amusement devices including without limitation video games, except Tenant may operate the foregoing in the Demised Premises solely for use by Tenant's employees, contractors', customers and invitees.

Section 9.04    Restriction on Tenant's Activities.

(a)    Plumbing Facility Use:  Tenant shall not use the plumbing facilities of the Demised Premises for any purpose other than the purpose for which they are intended. Accordingly, Tenant may not knowingly dispose of any substances which may clog, erode or damage the pipelines and conduits of the Building.

(b)    Floor Load:  Tenant shall not place a load on any floor exceeding one hundred (100) pounds per square foot, unless same shall be deemed a structural Alteration and Tenant shall appropriately reinforce the applicable area of the floor pursuant to the applicable provisions of Section 7.03 hereof with respect thereto.

(c)    Exterior or Roof:  Tenant shall not use for any purpose any portion of the roof or exterior walls of the Building; it being understood and agreed, that except as otherwise expressly set forth in this Lease, Landlord shall have the exclusive right to use or grant permission to use the roof and the exterior walls of the Building for any purpose, and/or to erect in connection with the construction thereof, temporary scaffolds and other aids to construction on the exterior of the Demised Premises, provided that access to the Demised Premises shall not be denied.  Tenant shall not cause a violation or do any act which may result in a violation of the roof bond or warranty with respect to the Building.  Notwithstanding the foregoing and subject to compliance with all applicable Requirements and Landlord's prior approval of the location and plans therefor, Tenant may install on the roof of the Building one (1) satellite communication system (the "Communication System"), which may be comprised of up to two (2) satellite dishes, for use in connection with the Permitted Use.  Tenant shall maintain and operate the Communication System in a good and workmanlike manner in accordance with, and at the reasonable direction of, Landlord relative thereto, at Tenant's sole cost and expense.  Tenant shall obtain, at Tenant's sole cost and expense, all the necessary permits and approvals which may be required from all Governmental Authorities having jurisdiction over Tenant's right to maintain and operate such Communication System.  Tenant shall maintain property insurance and liability insurance, both in amounts reasonably approved by Landlord, with respect to such Communication System.  Tenant is hereby granted a non-exclusive license throughout the Term hereof in conjunction with its use of the Demised Premises for (i) use of any shafts in the Building required to install the electrical or communication wiring and cables to the Communication System, and (ii) access to the roof at all reasonable times (and in emergencies) to install, maintain, repair, replace or remove such Communication System.  Tenant hereby agrees to indemnity and hold Landlord harmless from any and all liabilities or claims for personal injury or property damage in any way arising out of said Communication System. Upon the expiration or earlier termination of this Lease, Tenant shall remove the Communication System from the roof in a good and workmanlike manner and repair any damage to the roof caused by the Communication System.  The provisions of this Section 9.04(c) regarding tenant's obligations shall survive the expiration or sooner termination of this Lease.

(d)    Deliveries:  All deliveries or shipments of any kind to and from the Demised Premises, including loading and unloading of goods, shall be made only at the rear of the Demised Premises.  Tenant shall not use any forklift truck, tow truck or any other machine for handling freight, except as may be approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.

Section 9.05    Insurance Rate.

Tenant agrees to comply with all Insurance Requirements relating to or affecting Tenant's Initial Work, Alterations or changes in, to or use of the Demised Premises or the Building.  If the insurance rates applicable to the Building are raised as a result of: (i) any failure by Tenant to comply with the Insurance Requirements; or (ii) the particular manner of use and occupancy of the Demised Premises (as distinguished from mere retail use) by Tenant or anyone claiming by, through or under Tenant, whether or not Landlord has consented to the same; then Tenant shall pay Landlord, within thirty (30) days after Landlord's demand therefor, as

additional rent, the entire portion of the increase in premiums for said insurance. Landlord acknowledges and agrees that the mere use of the Demised Premises by Tenant for the Permitted Use shall not increase Landlord's insurance rates with respect to the Building.

Section 9.06    Illegal Purposes.

Tenant shall not use the Demised Premises for any illegal trade, manufacture, or other business, or any other illegal purpose.

ARTICLE X.    TRANSFER OF INTEREST, PRIORITY OF LIEN

Section 10.01    Assignment, Subletting.

(a)    Tenant covenants and agrees for Tenant and its successors, assigns and legal representatives, that, except as otherwise provided in this Section 10.01, neither this Lease nor the term and estate hereby granted, nor any part hereof or thereof, will be assigned, mortgaged, pledged, encumbered or otherwise transferred, and that neither the Demised Premises, nor any part thereof, will be encumbered in any manner by reason of any act or omission on the part of Tenant, or will be used or occupied, or will be sublet, without the prior written consent of Landlord in every case.

(b)    Subject to the provisions of Section 10.02 hereof, if applicable, Landlord agrees not to unreasonably withhold, condition or delay its consent to any proposed assignment or subletting, and such request shall be responded to by Landlord within thirty (30) days after request of Tenant (failing which, such request shall be deemed approved); provided, however, that Landlord shall not in any event be obligated to consent to any such proposed assignment or subletting unless:

(i)    the proposed assignee or subtenant is a reputable party of a financial standing which will allow such proposed assignee or subtenant to meet its obligations under this Lease or under such sublease, as the case may be; and the nature and character of the proposed subtenant or assignee, its business activities and intended use of the Demised Premises are in keeping with the provisions of Section 1.07 hereof (or that such use shall be for another lawful use, which shall be subject to Landlord's reasonable approval, and which approval may be denied by Landlord if such proposed lawful use shall either violate any then-existing exclusive affecting or encumbering the Building of which Tenant has notice, or if such proposed lawful use shall require that Landlord consent to an exclusive in favor of such assignee or subtenant);

(ii)    neither the proposed assignee, nor the proposed subtenant, is then a tenant or occupant of any part of the Building or a person or entity that is then (or has been in the immediately prior three (3) months) engaged in bona fide negotiations with Landlord to lease space in any portion of the Building;

(iii)    there shall be no Default (as hereinafter defined) by Tenant under any of the terms, covenants and conditions of this Lease at the time that Landlord's consent to any such assignment or subletting is requested;

(iv)    Tenant shall reimburse Landlord for any reasonable, out of pocket expenses (not to exceed $2,000) that may be incurred by Landlord in connection with a request for consent to a proposed assignment or sublease, including, without limitation, the reasonable costs of making investigations as to the acceptability of a proposed assignee or subtenant and legal fees and disbursements incurred in connection with the requested consent to the assignment or sublease, including, without limitation, legal fees of Landlord's counsel;

(v)    The Demised Premises shall not, without Landlord's prior consent, have been publicly listed or publicly advertised for subletting at a rental rate less than the prevailing rental rate set by Landlord for space in the Building for comparable space (but may be so listed on a broker's internal listings);

(vi)    such proposed subletting shall not result in there being more than three (3) occupants (including Tenant) in the Demised Premises at any one time;

(vii)    a copy of a term sheet shall be delivered to Landlord with the request for consent and the proposed sublease agreement or assignment and assumption

agreement shall be delivered to Landlord prior to the effective date thereof (and shall not differ in any material way from the term sheet with respect to the proposed business terms); and

(viii)    Tenant and the subtenant or assignee, as the case may be, shall enter into Landlord's then standard form of consent agreement, provided that same is commercially reasonable and does not impose any additional material obligations or liabilities on Tenant and/or such subtenant or assignee that are not contained in this Lease.

(c)    Each subletting pursuant to this Section 10.01 shall be subject to all the covenants, agreements, terms, provisions and conditions contained in this Lease. Tenant covenants and agrees that, notwithstanding such assignment or any such subletting to any subtenant and/or acceptance of rent or additional rent by Landlord from any assignee or any subtenant, Tenant shall and will remain fully and primarily liable for the payment of the Minimum Rent and additional rent due and to become due hereunder and for the performance of all the covenants, agreements, terms, provisions and conditions contained in this Lease on the part of Tenant to be performed. Tenant further covenants and agrees that notwithstanding any such assignment or subletting, no other and further assignment, underletting or subletting of the Premises or any part thereof shall or will be made without Landlord's prior consent thereto in accordance with this Section 10.01.

(d)    If this Lease is assigned, or if the Demised Premises, or any portion thereof, is sublet or occupied by anybody other than Tenant, Landlord may, after default by Tenant in the payment of any sums due under this Lease, after the expiration of any applicable grace or cure periods, collect rent from the assignee, subtenant or occupant, and apply the net amount collected to the rent herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed a waiver by Landlord of any of Tenant's covenants contained in this Section 10.01 or the acceptance of the assignee, subtenant or occupant as Tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained.

(e)    Tenant shall indemnify and hold Landlord harmless of and from any and all loss, costs, damage or expense (including, without limitation, reasonable attorneys' fees, court costs and disbursements) incurred by Landlord by reason of any claim of or liability to any real estate broker or other finder for a brokerage commission which may be due or payable on account of any proposed assignment or subletting.

(f)    Each assignment and assumption agreement or sublease agreement (as the case may be) shall specifically state that (i) it is subject to all of the terms, covenants agreements, provisions, and conditions of this Lease, (ii) the subtenant or assignee, as the case may be, will not have the right to further assign or sublet all or part of the Demised Premises or to allow same to be used by others, without the consent of Landlord in each instance (which consent shall not be unreasonably withheld or delayed subject to the criteria set forth in Section 10.01(b) hereof), (iii) a consent by Landlord thereto shall not be deemed or construed to modify, amend or affect the terms and provisions of this Lease, or Tenant's obligations hereunder, and which terms, provisions and obligations shall continue to apply to the Demised Premises involved, and the occupants thereof, as if the assignment and assumption or sublease agreement had not been made.

(g)    The consent by Landlord to any assignment, subletting, or occupancy shall not in any way be construed to relieve Tenant from obtaining the express consent, in writing, of Landlord to any further assignment, subletting, sub-subletting, or occupancy, which consent Landlord shall have the right to withhold for any reason whatsoever, provided that Landlord shall not unreasonably withhold its consent in accordance with the provisions of this Section 10.01 with respect to a further subletting by an approved or permitted subtenant of all of the Demised Premises or an assignee of this Lease.

(h)    Notwithstanding anything to the contrary contained herein, Tenant may without Landlord's consent, assign Tenant's interest in this Lease (by operation of law or otherwise) or sublet all or a portion of the Demised Premises to any corporation or other entity (i) which is a successor to Tenant either by merger or consolidation, or (ii) to which, directly or indirectly, substantially all of Tenant's assets are transferred or (iii) which is acquiring, directly or indirectly, at least three (3) or more of Tenant's (or its affiliates) other leases for the conduct of the same business therein as Tenant was then conducting in the Demised Premises, or (iv) a

deemed assignment through the transfer, assignment, pledge, hypothecation or new issuance of the stock or equity interests (including a controlling interest) of Tenant's direct or indirect parent entities (including, but not limited to, Blink Holdings, Inc., Equinox Holdings, Inc. and/or EQX Holdings, LLC), (v) through transfers of stock or equity interests of Tenant to a Related Entity (as hereinafter defined) or to an entity into which or with which Tenant or a Related Entity is merged or consolidated or to which all or substantially all of Tenant's or a Related Entity's assets, stock or equity interests are transferred, (vi) through an assignment of the Lease or sublease of all of the Premises to a Related Entity or (vii) through issuance of stock in Tenant or a Related Entity pursuant to an initial public offering or a private placement, provided that as to the foregoing clauses "(i)," "(ii)," and "(iii)" (and not "(iv)," "(v)," "(vi)" and "(vii)"): (x) the successor to Tenant has a net worth computed in accordance with generally accepted accounting principles at least equal to the net worth of Tenant immediately prior to such transfer, and proof satisfactory to Landlord of such net worth shall have been delivered to Landlord at least ten (10) days prior to the effective date of any such transaction, (y) the use of the Demised Premises shall comply with the provisions of this Lease, including, without limitation, the Permitted Use, and (z) no such transfer shall diminish the respective obligations of Blink Holdings, Inc. and Equinox Holdings, Inc. pursuant to Article XXI hereof. A "Related Entity," for the purposes of this Section 10.01(h), shall mean an entity that controls, is controlled by or is under common control with Tenant. The word "control," such as "controlled by" or "under common control with" shall mean: (i) ownership of more than 50% of the outstanding voting capital stock of a corporation or more than 50% of the beneficial interests of any other entity or (ii) the ability effectively to control or direct the business decisions of such corporation or entity.

(i)    Notwithstanding the foregoing, Tenant shall have the absolute right, without Landlord's consent, but upon notice to Landlord, to license no more than twenty-five (25%) percent of the Demised Premises to licensees or concessionaires providing goods or services to Tenant in connection with the Permitted Use.

(j)    If this Lease is sublet or assigned in violation of this Lease and without Landlord's consent (provided consent was required), such subletting or assignment shall be void and of no force or effect; provided, however, that Landlord (x) may collect an amount equal to the then Rent from the assignee as a fee for such assignee's use and occupancy, and (y) shall apply the net amount collected to the Rent reserved in this Lease. No such assignment, subletting, occupancy or use, with or without Landlord's prior consent, nor any such collection or application of fees for use and occupancy, shall (i) be deemed a waiver by Landlord of any term, covenant or condition of this Lease, (ii) be deemed the acceptance by Landlord of such assignee, subtenant, occupant or user as tenant hereunder, or (iii) relieve Tenant of the obligations of the tenant under this Lease.

<u>Section 10.02  Landlord's Recapture Right and Transfer Profit:</u>

(a)    Subject to the terms of this Section 10.02, in connection with a proposed assignment of this Lease to an unrelated third party, other than, in either case, in connection with an assignment or subletting pursuant to Section 10.01(h) hereof or within the Permitted Use, if such assignment shall be for a use that is not a Permitted Use, then Landlord shall have the option to elect to recapture the entire Demised Premises and terminate this Lease only by providing an irrevocable notice (the "Recapture Notice") to Tenant with thirty (30) days (time being of the essence) after its receipt of Tenant's notice (the "Offer Notice") of such proposed assignment (which Offer Notice shall include a term sheet for the proposed transaction).  In the event that Landlord fails to timely elect to recapture as provided for in this Section 10.02 or Landlord elects not to recapture, Landlord shall be deemed to have waived its right to recapture and Landlord shall, as provided in Section 10.01, advise Tenant of whether Landlord consents to such assignment within such thirty (30) day period.  The failure by Landlord to exercise its option under this Section 10.02 with respect to any assignment shall not be deemed a waiver with respect to any subsequent assignment in accordance with Section 10.01.

(b)    If Landlord timely exercises its option to recapture the Demised Premises and terminate this Lease, then (i) the term of this Lease shall end on the date that such assignment was to become effective or commence, as the case may be, and (ii) Tenant shall surrender to Landlord and vacate the Demised Premises on or before such date in the same condition as is otherwise required upon the expiration of this Lease by its terms, (iii) the Rent due hereunder shall be paid and apportioned to such date, (iv) Tenant shall be released of all liability under the terms of this Lease, and (v) Landlord shall be free to lease the Demised

Premises (or any portion thereof) to any individual or entity including, without limitation, Tenant's proposed assignee (except that any recapture in the event of an assignment of the Lease shall be subject to the rights of any existing subtenants in the Premises). Landlord shall pay all brokerage fees and all other costs imposed on Tenant in connection with any recapture. Tenant shall have a one-time right, by written notice to landlord no later than ten (10) days following its receipt of the Recapture Notice, to nullify Landlord's recapture of the Demised Premises pursuant to this Section 10.02, in which event this Lease shall remain in full force and effect in accordance with its terms.

(c)     Except with respect to an assignment or subletting pursuant to the terms of Section 10.01(h) hereof, Tenant shall pay as additional rent to Landlord, on the first (1st) day of each calendar month during the Term in the same manner as Minimum Rent, an amount equal to fifty percent (50%) of the "bonus rent" to be realized from any such assignment or subletting. The bonus rent shall mean any lump sum payment or other value received by Tenant, plus any base rent, percentage rent or periodic compensation received by Tenant from or for the benefit of an assignee or sublessee in excess of (i) all amounts owed for Minimum Rent and other charges pursuant to this Lease, and (ii) all reasonable and actual third-party costs incurred by Tenant with respect to such assignment or subletting, excluding brokerage commissions and fees, tenant work allowances, rent concessions, attorneys' fees, customary changes, alterations and improvements to the Demised Premises paid for by Tenant and out-of-pocket monetary concessions provided by Tenant, including improvement and moving allowances. If a portion of the Demised Premises is subleased, the amount in clause (i) shall be prorated based on the portion of the Demised Premises' rentable area to be subleased. No amounts shall be paid until actually received by Tenant (or any affiliate or subsidiary thereof).

Section 10.03  Lender Approval; Subordination:

(a)     Tenant acknowledges that this Lease is contingent upon the consent of Landlord's existing Mortgagee, Astoria Federal Savings and Loan Association ("Lender"). Promptly following the execution and delivery hereof, Landlord shall submit this Lease to Lender in connection with requesting Lender's consent, and a subordination, non-disturbance and attornment agreement (a "SNDA") on Lender's form in favor of Tenant (with reasonable changes requested by Tenant). Tenant hereby agrees that it shall cooperate in good faith with Landlord and shall comply with any reasonable requests made by Lender or Landlord (without changing any economic or material terms of this Lease) in the procurement of the Lender's consent and the SNDA. This Lease shall terminate if, as of the Commencement Date, (i) Lender's consent of this Lease is not obtained and (ii) Lender has not executed a SNDA, unless Landlord elects, in its sole discretion, to pay off the loan from Lender, in which event no such Lender's consent (or SNDA) shall be a contingency to this Lease.

(b)     With respect to the lien of any Mortgage entered into by Landlord from and after the Commencement Date, Landlord may elect that this Lease be subordinate to the lien of such Mortgage, provided Landlord shall use commercially reasonable efforts to cause the holder of such Mortgage to execute a SNDA on such holder's form (with changes reasonably requested by Tenant), whereupon Tenant shall execute same in confirmation of the subordination of this Lease to such Mortgage. Upon Landlord's request, from time to time, Tenant shall: (a) confirm in writing and in recordable form that this Lease is so subordinate or so superior to the lien of any Mortgage and/or (b) execute an instrument making this Lease so subordinate or so superior to the lien of any Mortgage, in such form as may be required by an applicable Mortgagee, provided that Tenant shall receive a SNDA.

Section 10.04  Attornment.

(a)     If the Demised Premises or the Building are encumbered by a Mortgage and such Mortgage is foreclosed, or if the Demised Premises or the Building are sold pursuant to foreclosure or by reason of a default under said Mortgage, then notwithstanding such foreclosure, such sale, or such default: (i) Tenant shall not disaffirm this Lease or any of its obligations hereunder; and (ii) at the request of the Mortgagee or purchaser at such foreclosure or sale, Tenant shall attorn to such Mortgagee or purchaser (provided such Mortgagee or purchaser agrees not to disturb Tenant's use and possession of the Demised Premises unless Tenant is in Default under this Lease), and execute a new lease for the Demised Premises setting forth all of the provisions of this Lease and upon the terms set forth in the SNDA, except that (x) the term of such new lease shall be for the balance of the Term; (y) such Mortgagee or purchaser shall not be

bound by any payment of Rent or additional rent for more than one (1) month in advance, except prepayments for the first month's prepayment of Minimum Rent, or Tenant's Contribution required pursuant to this Lease and unless such prepayment shall have been expressly approved in writing by the Mortgagee or purchaser, and (z) such Mortgagee or purchaser shall not be bound by any amendment or modification of this Lease made without the consent of such Mortgagee or purchaser to the extent such consent is or was required.

### Section 10.05  Transfer of Landlord's Interest.

The term "Landlord" as used in this Lease means only the owner for the time being or the Mortgagee in possession for the time being of the Demised Premises. In the event of any sale of the Demised Premises, or in the event the Demised Premises are leased to any person (subject to this Lease), then Landlord shall be and hereby is entirely freed and relieved of all of its covenants, obligations and liability hereunder accruing from and after the date of such transfer, provided that the transferee assumes all obligations of Landlord under this Lease from and after the date of the transfer and Landlord shall assign any security and any prepayments of Minimum Rent and Additional Rent provided by Tenant under this Lease. This subsection shall be applicable to each owner of the Demised Premises, from time to time, and shall not be limited to the first owner of the Demised Premises.

### Section 10.06  Mortgagee Lease Amendments.

If Landlord's proposed Mortgagee requires modifications of this Lease, then Tenant will not unreasonably withhold its approval, provided that Tenant shall not be required to modify any of the provisions of this Lease (i) relating to the amount of Rent, the Permitted Use, the size and location of the Demised Premises or the duration of the Term Including any renewal options), or (ii) that would increase Tenant's liabilities or obligations (monetary or non-monetary) or decrease Tenant's rights in either case more than to a *de minimis* extent, (iii) that would change the form of the SNDA in any material way, (iv) that would reduce Landlord's obligations under this Lease, (v) that would require any escrow be funded by Tenant hereunder other than solely related to monthly real estate tax payments, or (vi) with respect to any of Tenant's notice or cure rights under this Lease, other than solely allowing Mortgagee to be added to copies of notices and an additional cure period before Tenant has a cancellation right.

## ARTICLE XI.  COMMON AREA

### Section 11.01  Use of Common Area.

During the Term, Tenant is hereby granted the non-exclusive license and right to use the Common Area. The use and occupancy by Tenant of the Demised Premises shall include the use of the Common Area in common with Landlord and with all others for whose convenience and use the Common Area have been or may hereafter be provided by Landlord or by the owner of common areas not within the Building, subject, however, to rules and regulations for the use thereof as prescribed from time to time by Landlord or the owner of such Common Area in accordance with this Lease, including, without limitation, the right of Landlord to determine the hours and mode of operation of the elevators, escalators and vertical transportation facilities serving the Building. In no event, however, shall Tenant or Tenant's Agents use the Common Area for the display or sale of merchandise. Landlord shall not modify the Common Area or any other portion of the Building such that the same shall materially and adversely affect Tenant's primary access to the Demised Premises from the street or the visibility of the exterior of the Demised Premises from outside the Building ("Tenant's Critical Rights").

### Section 11.02  Landlord's Rights.  Upon reasonable prior notice to Tenant and provided Landlord uses commercially reasonable efforts to minimize interference to Tenant's operations at the Demised Premises, Landlord shall have the following rights: (i) to temporarily close all or any portion of the Common Area to such extent as may in the opinion of Landlord's counsel be necessary to prevent a dedication thereof or the accrual of any rights of any Person or the public therein; (ii) to close all or any portion of the Common Area temporarily to discourage non-customer use; (iii) subject to Tenant's Critical Rights, to expand, change, decrease or alter the size, layout or configuration of the Building or any part thereof (including, without limitation, the Building, the Common Area, the parking areas, the buildings and the means of ingress and egress); and (iv) to make any use it desires of the side and rear walls of the ground level of the Demised Premises but not Tenant's entrance doors, provided that there shall be no

encroachment upon the interior of the Demised Premises and same does not alter the code compliance for the Demised Premises.

Section 11.03  Additional Stories to the Building.  Notwithstanding anything herein to the contrary, from and after the date that is seven hundred thirty (730) days following the date on which  Delivery of Possession occurs, Landlord reserves the right (but not the obligation) to build additional stories, levels or buildings above and behind the Demised Premises (in the general location, as depicted in concept on Exhibit I hereto, that is above and behind 3560-3570 White Plains Road, as may be reasonably modified by Landlord in accordance with the applicable provisions of this Section 11.03) ("Landlord's Construction"); provided and on the express condition that (i) Landlord notifies Tenant reasonably in advance of Landlord's Construction (which shall be no less than 6 months prior to starting) which shall be accompanied by a complete set of Landlord's plans and a proposed construction schedule for informational purposes only (and with no approval rights on the part of Tenant), (ii)  Landlord's construction shall be completed within thirty (30) months following the commencement thereof, (iii) Landlord's construction shall not affect Tenant's Critical Rights (except as provided below regarding Tenant's visibility and signage) or otherwise cause or create excessive noise or vibration to emanate into the Demised Premises, or adversely impact on Tenant's utility service, (iv) Landlord may only have access into the Demised Premises to perform Landlord's Construction with Tenant's consent, which shall not be unreasonably withheld or delayed, and all in all cases access shall be subject to the access provisions in the Lease, (v) in the event Landlord's Construction creates or causes any damage or leaks, Landlord shall immediately repair same at Landlord's costs, and in all cases Tenant shall have no liability for any damages which it suffered due to Landlord's Construction, (vi) Landlord shall, at Landlord's sole cost, provide Tenant with reasonable temporary signage to the extent its then-existing Exterior Signage shall be covered or otherwise not reasonably visible from the street (i.e., East 212th Street), and (vii) solely during the construction of any additional stories above the 3560-3570 White Plains Road portion of the Demised Premises (as opposed to any building behind said portion of the Demised Premises), during the time that Landlord's construction shed or scaffolding shall be located on, or adjacent to, the exterior of the Demised Premises in any of the locations shown on Exhibit J hereto or Landlord otherwise breaches its obligations under this Section 11.03, the Minimum Rent payable hereunder shall be reduced by twenty-five percent (25%) until such time that Landlord shall cause such construction shed to be removed or such condition shall be remedied by Landlord, as the case may be. In addition, (i) Tenant shall have no obligation to continuously operate during Landlord's Construction (ii) Tenant may seek injunctive relief if Landlord breaches any of the foregoing provisions and (iii) Landlord agrees to indemnify, defend and hold Tenant harmless from and against any claims, liabilities, costs, losses and damages that arise or are incurred by Tenant by reason of Landlord's Construction; provided that in no event shall Landlord be liable for any consequential, special or punitive damages

## ARTICLE XII.DESTRUCTION AND FIRE INSURANCE

Section 12.01  Notice.  After the Commencement Date, Tenant shall, upon having actual knowledge thereof,  notify Landlord promptly of any fire or other casualty that occurs in the Demised Premises.

Section 12.02  Landlord's Restoration Obligations.  Subject to the terms of this Section 12.02, Landlord, with reasonable diligence, at Landlord's own cost and expense, shall repair the damage to (i) the core and shell of the Demised Premises (including, without limitation, Landlord's Work but not Tenant's Initial Work or any Alterations) and access thereto, (ii) the systems that service the Demised Premises, and (iii) the common elements of the Building that Tenant uses to gain access to the Demised Premises, in each case to the extent caused by fire or other casualty, and to the condition existing immediately prior to the casualty and in accordance with the Turnkey Plans, and consistent with zoning laws and building codes then in existence to the extent applicable to such repairs. Landlord shall commence the performance of such repairs as promptly as reasonably practicable after the occurrence of such fire or other casualty. Landlord shall use commercially reasonable efforts to perform such repairs diligently, in a good and workmanlike manner, and in a manner that minimizes to the extent reasonably practicable interference with Tenant's access to the Demised Premises and/or Tenant's use and occupancy of any portion of the Premises that remains tenantable. Landlord shall not be required to restore Tenant's personal property. Landlord shall not be required to commence such restoration until Tenant gives Landlord the notice described in Section 12.01

hereof (unless Landlord otherwise has received actual notice of the fire or other casualty). Landlord shall have the right to adapt the restoration of the Demised Premises as contemplated by this Section 12.02 to comply with applicable Requirements that are then in effect. Landlord shall not be obligated to restore the Demised Premises as provided in this Section 12.02 to the extent that this Lease terminates by reason of such fire or other casualty as provided in this Article XII. During any such period of restoration by Landlord, Tenant may, at Tenant's option, continue the operation of its business within the Demised Premises to the extent practicable, subject to applicable Requirements.

Section 12.03  Rent Abatement. The Minimum Rent shall be reduced in the proportion that the number of square feet of Floor Area of the part of the Demised Premises that is not usable or accessible by Tenant by reason of such fire or other casualty bears to the total Floor Area of the Demised Premises immediately prior to such fire or other casualty, for the period commencing on the date of such fire or other casualty and ending on the date that Landlord substantially completes the restoration described in Section 12.02 hereof or the applicable portion of the Demised Premises becomes accessible, as the case may be.

Section 12.04  Landlord's Option to Terminate. If the Building is so damaged by fire or other casualty after the Commencement Date that, complete demolition, or complete reconstruction of the Building is required, as determined in the reasonable opinion of a reputable independent engineer or contractor selected by Landlord (the "Engineer") then Landlord may terminate this Lease by giving Tenant notice thereof (the "Casualty Notice") on or prior to the sixtieth (60th) day after such fire or other casualty (which Casualty Notice shall include the Engineer's findings). If Landlord elects to terminate this Lease as aforesaid, then (I) the Term shall expire on a date set by Landlord that (A) is not sooner than (i) the tenth (10th) day after the date that Landlord gives such notice (if all or substantially all of the Demised Premises is rendered untenantable by such fire or other casualty), and (ii) the ninetieth (90th) day after the date that Landlord gives such notice (if less than all or substantially all of the Demised Premises is rendered untenantable by such fire or other casualty), and (B) is not later than one hundred eighty (180) days after the anniversary of the date on which such fire or other casualty occurred), and (II) Tenant, on such date set by Landlord, shall vacate the Demised Premises and surrender the Demised Premises to Landlord in accordance with the terms of this Lease that govern Tenant's obligations upon the expiration or earlier termination of the Term. Upon the termination of this Lease under this Section 12.04, the Rent shall be apportioned and any prepaid portion of the Rent for any period after the date that the abatement of Rent as described in Section 12.03 hereof becomes effective shall be refunded promptly by Landlord to Tenant (and Landlord's obligation to make such refund shall survive the Expiration Date). If Landlord fails to timely give the Casualty Notice, Landlord shall be deemed to have waived its termination right with respect to such casualty and shall promptly comply with its restoration obligations hereunder.

Section 12.05  Tenant's Option to Terminate.

(a)    Landlord, within forty-five (45) days after the earlier to occur of (x) the date that Tenant gives Landlord notice of the occurrence of a fire or other casualty as contemplated by Section 12.01 hereof, and (y) the date that Landlord otherwise has actual notice of such fire or other casualty, shall give to Tenant a statement prepared by a reputable and independent contractor setting forth such contractor's estimate in good faith as to the time required for Landlord to substantially complete the restoration described in Section 12.02 hereof (including, without limitation, in all cases, the entire Demised Premises, access to the Demised Premises and all of Landlord's Work) (such statement that Landlord gives to Tenant being referred to herein as the "Casualty Statement"); provided, however, that Landlord shall not be required to give Tenant a Casualty Statement if Landlord has theretofore exercised Landlord's right to terminate this Lease under Section 12.04 hereof. If the estimated time period as set forth in the Casualty Statement exceeds (i) one hundred eighty (180) days following the date of the casualty, or (ii) the damage or destruction occurs during the last year of the Term of this Lease (or the last year of any renewal term if Tenant's applicable renewal option shall have previously been exercised), then, in either of such events, Tenant may elect to terminate this Lease by giving notice to Landlord not later than the thirtieth (30th) day after the date that Landlord gives the Casualty Statement to Tenant. In such case, the term of this Lease shall end as of the date, following the giving of such notice, on which Tenant vacates the Premises and removes all of its trade fixtures and personal property therefrom.

(b)     Tenant shall also have the right to terminate this Lease if (i) a fire or other casualty occurs, and, by reason thereof, Landlord has an obligation to perform a restoration as contemplated by Section 12.02 hereof, (ii) Tenant does not exercise Tenant's right to terminate this Lease under Section 12.05(a) hereof in connection with such fire or other casualty (or Tenant does not have the right to terminate this Lease under Section 12.05(a) hereof in connection with such fire or other casualty), (iii) Landlord fails to substantially complete the performance of the restoration work that Landlord is required to perform on or prior to the last day of the estimated time period set forth in the Casualty Statement, as extended by Force Majeure (the date described in this clause (iii) being referred to herein as the "Second Bite Date"), (iv) Tenant gives Landlord notice no earlier than the Second Bite Date to the effect that this Lease will terminate under this Section 12.05(b) if Landlord fails to substantially complete the restoration within sixty (60) days after the Second Bite Date, and (v) Landlord fails to substantially complete the restoration within sixty (60) days after the Second Bite Date.

(c)     If the Term terminates as provided in this Section 12.05, then (i) Tenant shall vacate the Premises and surrender the Premises to Landlord on the date of such termination "as is" and otherwise in accordance with the terms of this Lease that govern Tenant's obligations upon the expiration or earlier termination of the Term, (ii) any Rent due hereunder shall be apportioned as of the date of such termination, and (iii) any portion of the Rent that is then prepaid by Tenant and relates to the period after the Expiration Date shall be promptly refunded by Landlord to Tenant (with the understanding that Landlord's obligation to make any such refund shall survive such termination of this Lease).

Section 12.06   No Other Termination Rights.  Neither Landlord nor Tenant shall have any right to cancel this Lease by virtue of a fire or other casualty except to the extent specifically set forth herein. This Article XII is intended to constitute an "express agreement to the contrary" for purposes of Section 227 of the New York Real Property Law.

Section 12.07   Tenant's Obligation to Rebuild.

If this Lease is not terminated in accordance with this Article XII, Landlord shall, at its sole cost and expense, repair and restore the entire Demised Premises, to the extent set forth on Exhibit C hereto.  Tenant shall commence the performance of its work when Landlord's restoration work is substantially completed and the Demised Premises is delivered to Tenant.

Section 12.08   Insurance Proceeds.

In all events, all insurance proceeds received by Landlord in connection with a fire or other casualty to the Building or any portion thereof, shall belong to Landlord without Tenant having any rights thereto.

## ARTICLE XIII.  CONDEMNATION

Section 13.01   Effect of Condemnation.

(a)     Subject to the provisions of Section 13.02 hereof, if the entire Building or the entire Demised Premises is condemned or otherwise acquired by the exercise of the power of eminent domain (a "Taking"), then this Lease shall terminate as of the date that such condemnation or acquisition is consummated (such date, the "Taking Date").

(b)     If only a part of the Building and not the entire Demised Premises is so acquired or condemned, then:

(i)     except as hereinafter provided in this Section 13.01, this Lease shall remain effective, and, from and after the date that the condemnation or acquisition is consummated, (y) the Minimum Rent and Tenant's additional rent obligations shall be fully abated until the earlier to occur of (i) the date that Landlord shall substantially complete the restoration of the Demised Premises as provided herein, and (ii) the date upon which Tenant reopens the Demised Premises for the conduct of business (provided that Tenant hereby agrees to reopen the Demised Premises promptly after completion of Tenant's work in the Demised Premises following Landlord's substantial completion of the restoration of the Demised Premises, which work shall be performed by Tenant in a diligent manner) and thereafter the Minimum Rent shall be reduced in the proportion that the number of square feet of Floor Area of the part of the Demised Premises so acquired or condemned bears to the total Floor Area of the

Demised Premises immediately prior to such acquisition or condemnation, and (z) Landlord shall make all repairs or alterations that are required to make the Demised Premises an architectural whole in a diligent and expeditious manner, but in any event within twelve (12) months from the date of such Taking; and

(ii)    if (a) more than fifty percent (50%) of the Floor Area of the Building or of the Demised Premises is so acquired or condemned, or (b) by reason of such acquisition or condemnation, Tenant no longer has reasonable means of access to the Premises, or (c) by reason of such acquisition or condemnation, a material part of the Demised Premises is condemned and Landlord's restoration of the remainder of the Building, Common Areas or the Demised Premises shall constitute a major restoration such that Tenant is unable, in Tenant's reasonable judgment, to reasonably operate for the Permitted Use in the remainder of the Demised Premises during such restoration, then Tenant may elect to terminate this Lease by giving notice to Landlord on or prior to the thirtieth (30th) day after the date that Tenant is given notice of such acquisition or condemnation being consummated. The Term shall expire on the thirtieth (30th) day after the date that Tenant gives any such notice to terminate this Lease.

(c)    Landlord shall refund to Tenant, promptly after the date that such Taking becomes effective, any Rent that Tenant has theretofore paid for the Demised Premises (or the applicable portion thereof that is so taken or acquired) to the extent that such Rent is properly allocable to the period after the date that such taking or acquisition becomes effective (and Landlord's obligation to make such refund shall survive the Expiration Date).

(d)    If this Lease terminates pursuant to any of the provisions of this Section 13.01, then the Rent for the portion of the Demised Premises that is not taken or acquired shall be apportioned as of the termination date. Landlord shall refund promptly to Tenant any Rent that Tenant has theretofore paid for any period after the date that such termination becomes effective (and Landlord's obligation to make such refund shall survive the Expiration Date).

Section 13.02  Restoration.

(a)    If a part of the Demised Premises is so acquired or condemned and this Lease and the Term is not terminated pursuant to the foregoing provisions of this Section 13.01, then Landlord, at Landlord's expense, shall promptly restore the part of the Demised Premises that is not so acquired or condemned to a self-contained rental unit inclusive of Landlord's Work (but not Tenant's Initial Work or any Alterations), to the extent practical. Landlord, within forty-five (45) days after the Taking, shall give to Tenant a statement prepared by an Engineer setting forth such Engineer's estimate in good faith as to the time required for Landlord to complete the restoration (including, without limitation, in all cases, the entire Demised Premises, access to the Demised Premises and all of the Landlord's Work) (such statement that Landlord gives to Tenant being referred to herein as the "Restoration Statement"); provided, however, that Landlord shall not be required to give Tenant a Restoration Statement if Landlord has theretofore exercised Landlord's right to terminate this Lease under Section 13.01. In the event Landlord fails to so restore within eighteen (18) months following the Taking, subject to Force Majeure, then either party shall have the right to terminate this Lease by written notice given to the other party within thirty (30) days after such 18-month period. If either party makes such election, then the Term shall expire on the thirtieth (30th) day after the notice of such election is given and, accordingly, Tenant, on or prior to such thirtieth (30th) day, shall vacate the Demised Premises and surrender the Demised Premises to Landlord in accordance with the applicable provisions of this Lease.

(b)    Without limiting the foregoing, in the event of a Taking that does not result in the termination of this Lease under the provisions of Section 13.01 hereof, Tenant may elect to terminate if the estimated time period for restoration as set forth in the Restoration Statement exceeds eighteen (18) months. Tenant may make such election by giving notice to Landlord not later than the thirtieth (30th) day after the date that Landlord gives the Restoration Statement to Tenant. If Tenant makes such election to so terminate this Lease, then the Term shall expire on the thirtieth (30th) day after Tenant gives such notice to Landlord and, accordingly, Tenant, on or prior to such thirtieth (30th) day, shall vacate the Demised Premises and surrender the Demised Premises to Landlord in accordance with the applicable provisions of this Lease.

(c)    Upon the termination of this Lease under this Section 13.02, the Rent shall be apportioned and any prepaid portion of the Rent for any period after the Expiration Date shall

be refunded promptly by Landlord to Tenant (and Landlord's obligation to make such refund shall survive the Expiration Date).

Section 13.03  Intentionally Omitted.

Section 13.04  Disposition of Awards.

(a)    As used herein, an "Award" shall mean the award for or proceeds of any Taking, including accrual interest thereon, less all actual expenses in connection therewith, including architectural attorneys' and other professionals' fees.

(b)    All Awards arising from a total Taking of the Demised Premises or the Building shall belong to Landlord without any participation by Tenant, except, that Tenant shall be entitled to make a separate claim for the unamortized value of the Tenant's Initial Work and such other leasehold improvements, in which event, Landlord shall not make a claim for any Award related to such improvements. As to the Awards belonging to Landlord as aforesaid, Tenant hereby assigns to Landlord any share of such Award which may be awarded. Notwithstanding anything to the contrary contained herein, Tenant shall not be precluded, at its sole cost and expense, from independently prosecuting any separate claim directly against the condemning authority in such condemnation proceedings for loss of business, depreciation to, damage to, cost of removal of and for the value of stock, trade fixtures, furniture and other personal property belonging to Tenant and any other claim which does not result in a reduction of Landlord's Award, and any Award therefor shall belong solely to Tenant.

## ARTICLE XIV.  INDEMNITY AND LIABILITY

Section 14.01  Indemnity.

(a)    Definition:  Within the meaning of Article XIV, "Claims" means any actual losses, claims, suits, proceedings, actions, causes of action, responsibility, liability, demands, judgments, and executions, including reasonable attorneys fees and expenses for such Claims and for enforcing this indemnification. Within the meaning of Article XIV, "Landlord's Indemnitees" means, collectively, Landlord, each Lessor, each Mortgagee, and their respective partners, members, managers, shareholders, officers, directors, employees, trustees and agents.

(b)    To the fullest extent as allowed by law, but subject to the provisions of Section 14.04 hereof, Tenant hereby indemnifies, defends and agrees to hold and save Landlord Indemnitees harmless from and against any and all Claims, which either (i) arise from or are in connection with the possession, use, occupation, management, repair, alteration, improvement, maintenance or control of the Demised Premises, or the performance of Tenant's Initial Work, (ii) arise from or are in connection with any wrongful act or wrongful omission of Tenant or Tenant's Agents, (iii) arise from any Claims for bodily injury (including mental injury or death), personal injury (including violation of civil rights, defamation, wrongful arrest and invasion of privacy), property damage, theft, and damage to the environment, alleged to have been caused by Tenant or Tenant's Agents, or (iv) arise from any Claims resulting from Tenant's operations. This indemnification agreement is separate and apart from and in no way limited by, any insurance provided pursuant to this Lease or otherwise. Tenant, upon notice from Landlord, shall defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord. Tenant shall give prompt notice to Landlord of any claims related hereto. The parties intend that the Landlord Indemnitees (other than Landlord) shall constitute third-party beneficiaries of this Section.

Section 14.02  Insurance.

(a)    During the Term, from and after the Commencement Date, Tenant shall provide on or before it enters the Demised Premises for any reason and shall keep in force during the Term, and naming Landlord, Mortgagee as additional insureds with respect to liability coverage, the following types of insurance coverages:

(i)    Worker's Compensation insurance with statutory limits for all applicable state regulations and Employers Liability insurance with policy limits of not less than Five Hundred Thousand Dollars ($500,000.00).

(ii)    Commercial General Liability insurance covering the Demised Premises and as to Tenant and Tenant's Agents' acts, as will protect Tenant, Landlord, and Mortgagee from and against all claims for damages due to bodily injury (including death), personal injury, or property damage. Such insurance coverage shall: (a) be the broadest enhanced Commercial General Liability coverage currently in the market, but in no case less than or more restrictive than the ISO 2001 form or its equivalent; (b) provide coverage in an amount equal to the full amount maintained from time to time by Tenant in the normal course of its business (including excess and umbrella liability coverage, but in no event, shall such coverage be in an amount less than Five Million Dollars ($5,000,000.00), combined single limit); (c) include at least those coverages generally designated Demised Premises/Operations, Products/Completed Operations, and Contractual Liability.

(iii)    Fire and other casualties and risks covered by All Risk Property Insurance under the ISO Special Causes of Loss Form (or equivalent), including business interruption, inclusive of rental insurance for a minimum period of one (1) year, terrorism, and increased cost of construction, on all alterations and all contents of the Demised Premises, including leasehold improvements (such insurance being referred to as "Tenant's Property Policy"). Such insurance shall provide coverage in amount not less than the actual replacement value of the property. Tenant shall also carry insurance against such other hazards and in such amounts as may be customarily carried by tenants, owners and operators of similar properties as Landlord may require for its protection from time to time.

(b)    Tenant shall have the right to maintain any or all of the insurance coverages set forth in this Section 14.02 under one or more blanket insurance policies, covering the Demised Premises together with other premises owned and/or occupied by Tenant and/or its affiliates, so long as such blanket policies comply, as to coverages and amounts specifically allocable to the Demised Premises and Tenant's occupancy pursuant to this Lease, with the requirements hereinbefore set forth. Tenant shall further have the right to maintain the liability coverage referred to above in the form of primary and umbrella or excess liability coverages, in such segments as Tenant shall determine from time to time. Any or all of the insurance coverages to be maintained by Tenant pursuant to this Lease may provide for such reasonable deductibles as Tenant shall determine, provided that no such policy shall have a deductible in excess of $50,000.

Section 14.03  General Provisions with Respect to Insurance.

(a)    All insurance coverages maintained by Tenant shall be primary insurance as respect to Landlord, its officers and employees. Any insurance or self-insurance maintained by Landlord shall be in excess and non-contributory to Tenant's insurance.

(b)    All insurance required under this Lease shall be issued by insurance companies authorized to do business in the jurisdiction where the Demised Premises is located. Such companies shall have a policyholder rating of at least " A-" and be assigned a financial size category of at least VIII as rated in the most recent edition of "Best's Key Rating Guide" for insurance companies. If at any time during the Term the rating of any of Tenant's insurance carriers is reduced below the rating required pursuant to the terms hereof, Tenant shall use commercially reasonable efforts to promptly replace the insurance coverage(s) with coverage(s) from a carrier whose rating complies with the foregoing requirements. Certificates of Insurance evidencing all coverages specified in this Lease shall be furnished by Tenant to Landlord simultaneously with Tenant's execution and delivery of this Lease to Landlord. Renewal Certificates of Insurance shall be similarly submitted as required to document continuous coverage. Certificates for commercial general liability coverage shall name Landlord as additional insured, and Tenant shall endeavor to notify Landlord at least thirty (30) days prior to any modification to or cancelled of such coverage.

(c)    Liability shall in no way be limited by the amount of insurance recovery or the amount of insurance in force or required by any provisions of this Lease, subject to Section 14.05 hereof.

(d)    In the event that Tenant fails to maintain in full force and effect any of the insurance coverage's described in this Article XIV, Landlord shall have the right (but not the obligation), after prior written notice to Tenant, to procure and maintain such insurance or any part thereof at Tenant's expense, and the reasonable and actual cost of such insurance shall be

payable by Tenant to Landlord as additional rent. The procurement of such insurance or any part thereof by Landlord shall not discharge or excuse Tenant's obligation to comply with the provisions of this Article XIV.

(e)     Landlord, Landlord's agent and their officers , directors and employees shall not be liable in any manner to Tenant, Tenant's Agents or its visitors for any injury or damage to Tenant, Tenant's Agents or to any visitors, or their property, caused by the negligent or intentional misconduct of third parties or of Tenant (other than Landlord's affiliates, employees, agents, contractors or invitees), Tenant's Agents or visitors on or about the Demised Premises and/or the Building. All claims against Landlord, Landlord's agents and their respective employees for any such damage or injury are hereby expressly waived by Tenant.

(f)     Landlord, Landlord's agents and their respective employees assume no liability or responsibility with respect to the conduct and operation of the business to be conducted upon the Demised Premises. Landlord, Landlord's agents and their respective employees shall not be liable for any accident or injury to any person or persons or property in or about the Demised Premises to the extent caused by the conduct and operation of such business or by virtue of equipment or property of Tenant in the Demised Premises.

(g)     Tenant shall promptly report to Landlord's agents all accidents and incidents occurring on or about the Demised Premises and/or the Building which involve or relate to the security and safety of persons and/or property, of which Tenant has actual knowledge, but Tenant's failure to do so shall not constitute a default by Tenant under this Lease.

### Section 14.04  Waiver of Subrogation.

Subject to the provisions of this Section 14.04, Landlord and Tenant shall each obtain an appropriate clause in, or endorsement on, Landlord's property coverage or Tenant's Property Policy (as the case may be) pursuant to which the insurance companies waive subrogation or consent to a waiver of right of recovery. Landlord and Tenant also agree that, having obtained such clauses or endorsements of waiver of subrogation or consent to a waiver of right of recovery, they shall not make any claim against or seek to recover from the Landlord Indemnitees or the Tenant (as the case may be) for any loss or damage to its property or the property of others resulting from fire or other hazards covered by Landlord's property coverage or Tenant's Property Policy (as the case may be) or would be covered by a standard "all-risk" property insurance policy; provided, however, that the release, discharge, exoneration and covenant not to sue herein contained shall be limited by and be coextensive with the terms and provisions of the waiver of subrogation clause or endorsements or clauses or endorsements consenting to a waiver of right of recovery.

### Section 14.05  Brokerage.

Landlord and Tenant represent to each other that there was no broker (other than any person designated as Broker in Article I) instrumental in consummating this Lease, and that no conversations or prior negotiations were had with any broker (other than Broker) concerning the renting of the Demised Premises. Landlord and Tenant agrees to hold the other harmless against any claims for brokerage commission or compensation arising out of any conversations or negotiations had by Landlord or Tenant, as applicable, with any broker (other than Broker). Landlord shall pay the commission due to Broker. The provisions of this Section 14.05 shall survive the expiration or earlier termination of this Lease.

### ARTICLE XV.  COVENANT OF QUIET ENJOYMENT

So long as this Lease is in full force and effect, Tenant shall at all times during the Term, peaceably and quietly have, hold and enjoy the Demised Premises, without any interruption or disturbance from Landlord or anyone claiming by, through or under Landlord, subject to the terms hereof.

### ARTICLE XVI.  FAILURE TO PERFORM, DEFAULTS, REMEDIES

### Section 16.01  Defaults, Conditional Limitation.

(a)     Each of the following events shall constitute a Default:

(i)    If Tenant shall: (x) make an assignment for the benefit of creditors; or (y) file or acquiesce to a petition in any court (whether or not pursuant to any statute of the United States or of any State) in any bankruptcy, reorganization, composition, extension, arrangement or insolvency proceedings; or (z) make an application in any such proceedings for or acquiesce to the appointment of a trustee or receiver for it or all of any portion of its property.

(ii)    If any petition shall be filed against Tenant to which Tenant does not acquiesce in any court (whether or not pursuant to any statute of the United States or any State) in any bankruptcy, reorganization, composition, extension, arrangement or insolvency proceedings, and: (x) Tenant shall thereafter be adjudicated a bankrupt; or (y) such petition shall be approved by any such court; or (z) such proceedings shall not be dismissed, discontinued or vacated within forty-five (45) days.

(iii)    If, in any proceeding, pursuant to the application of any person other than Tenant to which Tenant does not acquiesce, a receiver or trustee shall be appointed for Tenant or for all or any portion of the property of either and such receivership or trusteeship shall not be set aside within sixty (60) days after such appointment.

(iv)    If Tenant shall refuse to take possession of the Demised Premises upon Delivery of Possession (unless such refusal is due to incomplete Landlord Work after Tenant's inspection) and such refusal shall continue after Landlord shall give notice of such failure to Tenant.

(v)    If Tenant shall fail to pay any Rent, or any other charge required to be paid by Tenant hereunder, when the same shall become due and payable, and such failure shall continue for ten (10) days after Landlord shall give notice of the failure to Tenant.

(vi)    If Tenant shall fail to perform or observe any other requirement of this Lease to be performed or observed by Tenant but not specifically referred to in this Section, and such failure shall continue for thirty (30) days after Landlord shall give notice of the failure to Tenant, or in case the failure be of such nature that it cannot be cured within said period of thirty (30) days, then if Tenant shall fail within said period of thirty (30) days to commence the cure of such failure and thereafter to complete such cure with due diligence.

(b)    Notwithstanding anything to the contrary set forth in this Lease, if Tenant shall be in default in the timely payment of any Minimum Rent two (2) or more times in any period of twelve (12) consecutive months, then, notwithstanding that such default shall have been cured within the period after notice, as provided in this Lease, any further default in the timely payment of any item of Rent within said twelve (12) month period shall automatically be deemed to be a "Default" and, without the necessity of notice from Landlord to Tenant of such failure to pay, interest shall accrue on such untimely payment as otherwise provided in Section 19.10 hereof.

(c)    This Lease is subject to the following limitation: If at any time, a Default shall occur, then upon the happening of any one or more of the aforementioned Defaults, Landlord may give to Tenant a notice of intention to end the Term of this Lease at the expiration of five (5) days, unless shall have completely cured such Default, from the date of service of such notice of termination. At the expiration of such five (5) days, this Lease and the Term as well as all of the right, title and interest of Tenant hereunder shall wholly cease and expire, and Tenant shall then quit and surrender the Demised Premises to Landlord. But notwithstanding such termination, surrender, and the expiration of Tenant's right, title and interest, Landlord's rights against Tenant under this Article XVI (and elsewhere in this Lease) shall continue.

Section 16.02  Landlord's Re-Entry.

If this Lease shall be terminated as herein provided, Landlord, or its agents or employees, may re-enter the Demised Premises at any time and remove therefrom Tenant, Tenant's Agents, subtenants, and any licensees, concessionaires or invitees, together with any of its or their property, either by summary dispossess proceedings or by any suitable action or proceeding at law or by lawful force. In the event of such termination, Landlord may repossess and enjoy the Demised Premises. Landlord shall be entitled to the benefits of all provisions of law respecting the speedy recovery of lands and tenements held over by Tenant, or proceedings in forcible entry and detainer. Landlord shall not be liable in any way in connection with any

action it takes pursuant to the foregoing. Notwithstanding any such re-entry, repossession, dispossession or removal, Tenant's liability under all of the provisions of this Lease shall continue. No such re-entry or taking possession of the Demised Premises by Landlord shall be construed as an election on its part to terminate this Lease unless notice of such intention be given to Tenant or unless the termination thereof shall result as a matter of law or be decreed by a court of competent jurisdiction. Notwithstanding any re-letting without termination, Landlord may at any time thereafter, elect to terminate this Lease for such previous breach.

### Section 16.03  Deficiency.

(a)     In case of re-entry, repossession or termination of this Lease, whether the same is the result of the institution of summary or other proceedings or not, Tenant shall remain liable (in addition to accrued liabilities) to the extent legally permissible for: (i) the Rent, and all other charges provided for herein until the date this Lease would have expired (or, in the alternative, as liquidated damages, an amount equal to the Rent and such other charges) had such termination, re-entry or repossession not occurred; and (ii) expenses, including without limitation write-off, which Landlord may incur in order to re-enter the Demised Premises, repossess the same, make good any Default of Tenant, painting, altering or dividing the Demised Premises, combining or placing the same in proper repair, protecting and preserving the same by placing therein watchmen and caretakers, reletting the same (including reasonable attorney's fees and disbursements, marshal's fees and broker's fees, in so doing), and any expenses which Landlord may incur during the occupancy of any new tenant in excess of those that would have been incurred during Tenant's occupancy. Tenant agrees to pay to Landlord the difference between (x) the sum of (i) and (ii), and (y) the net proceeds of any reletting each month, at the end of such month. Such payment shall be made to Landlord at Landlord's Notice Address or such other address as Landlord may designate by giving notice to Tenant. Any suit brought by Landlord to enforce collection of such difference for any one month shall not prejudice Landlord's right to enforce the collection of any difference for any subsequent month. In addition to the foregoing, Tenant shall pay to Landlord such sums as the court which has jurisdiction thereover may adjudge reasonable as attorneys' fees with respect to any successful lawsuit or action instituted by Landlord to enforce the provisions hereof.

(b)     Landlord may re-let the whole or any part of said Demised Premises for the whole of the unexpired Term of this Lease, or longer, or from time to time for shorter period, for any rental then obtainable, giving such concessions of rent and making such special repairs, alterations, decorations and paintings for any new tenant as it may, in its sole and absolute discretion deem advisable. Tenant's liability as aforesaid shall survive the institution of summary proceedings and the issuance of any warrant thereunder. Landlord shall be under no obligation to relet or to attempt to re-let the Demised Premises, except to the extent required pursuant to any applicable Requirements.

### Section 16.04  Agreed Final Damages.

If Landlord so elects, Tenant shall pay Landlord, on demand, as liquidated and agreed final damages, the Rent and all other charges which would have been payable by Tenant from the date of such demand to the date when this Lease would have expired if it had not been terminated as aforesaid, minus the fair rental value of the Demised Premises for the same period, as discounted to present value at a discount rate equal to the then effective rate on obligations of the U.S. Treasury having a maturity closest to the number of months remaining in the then current Term. Upon payment of such liquidated and agreed final damages, Tenant shall be under no further liability with respect to the period after the date of such demand.

### Section 16.05  Waiver of Right of Redemption.

Upon a Default, Tenant hereby expressly waives (to the extent legally permissible), for itself and all persons claiming by, through, or under it, any right of redemption or for the restoration of the operation of this Lease under any present or future law in case Tenant shall be dispossessed for any cause, or in case Landlord shall obtain possession of the Demised Premises as herein provided. In the event Landlord commences any action or proceeding for non-payment of Minimum Rent or any items of additional rent due hereunder, Tenant shall not interpose any counterclaim of any nature or description in any such action or proceeding other than compulsory counterclaims. The foregoing, however, shall not be construed as a waiver of Tenant's right to assert such claim in a separate action or proceeding instituted by Tenant.

### Section 16.06  Landlord's Right to Perform for Account of Tenant.

If Tenant shall be in Default hereunder, Landlord or any Mortgagee may, at any time thereafter, upon notice to Tenant, cure said Default for the account and at the expense of Tenant. Tenant shall pay, with interest at the maximum legal rate, on demand, to Landlord or any Mortgagee, the amount so paid, expended, or incurred by Landlord or any Mortgagee and any expense of Landlord or any Mortgagee including reasonable attorneys' fees incurred in connection with such Default.

### Section 16.07  Additional Remedies, Waivers, Etc.

With respect to the rights and remedies of and waivers by Landlord and Tenant: (a) the rights and remedies of Landlord and Tenant set forth herein shall be in addition to any other right and remedy now and hereafter provided by law. All such rights and remedies shall be cumulative and not exclusive of each other. Landlord and Tenant may exercise such rights and remedies at such times, in such order, to such extent, and as often as Landlord or Tenant, as the case may be, deems advisable without regard to whether the exercise of one right or remedy precedes, concurs with or succeeds the exercise of another, (b) single or partial exercise of a right or remedy shall not preclude: (i) a further exercise thereof; or (ii) the exercise of another right or remedy, from time to time; (c) no delay or omission by Landlord or Tenant in exercising a right or remedy shall exhaust or impair the same or constitute a waiver of, or acquiescence to a default by the other party; (d) no waiver of a default by a party shall extend to or affect any other default by such party or impair any right or remedy with respect thereto; (e) no action or inaction by Landlord or Tenant shall constitute a waiver of a default by the other party; and (f) no waiver of a default by either party shall be effective, unless it is in writing.

### Section 16.08  Miscellaneous.

(a)     Subject to Section 16.07 hereof, no waiver by Landlord or Tenant, no waiver of any covenant or condition or of the breach of any covenant or condition of this Lease by the other shall be taken to constitute a waiver of any subsequent breach of such covenant or condition or to justify or authorize the non-observance on any other occasion of the same or of any other covenant or condition hereof, nor shall the acceptance of Minimum Rent or any item of additional rent by Landlord at any time when Tenant is in Default under any covenant or condition hereof be construed as a waiver of such Default or of Landlord's right to terminate this Lease on account of such Default, nor shall any waiver or indulgence granted by Landlord or Tenant to the other be taken as an estoppel against such party; it being expressly understood that if at any time Tenant shall be in Default in any of its covenants or conditions hereunder, an acceptance by Landlord of Minimum Rent or any item of additional rent during the continuance of such Default or the failure on the part of Landlord promptly to avail itself of such other rights or remedies as Landlord may have, shall not be construed as a waiver of such Default, but Landlord may at any time thereafter, if such Default continues, terminate this Lease on account of such Default in the manner herein provided.

(b)     In the event of any breach by Landlord or Tenant of any of the terms and provisions of this Lease, the other party shall have the right to injunctive relief as if no other remedies were provided herein for such breach.

(c)     Except as otherwise provided in this Lease, the rights and remedies herein reserved by, or granted to, Landlord and Tenant are distinct, separate and cumulative, and the exercise of any one of them shall not be deemed to preclude, waive or prejudice such party's right to exercise any or all others.

(d)     In the event that Landlord should bring suit for the possession of the Demised Premises, for the recovery of any sum due under this Lease, or because of the breach of any covenant of this Lease, or for any other relief against Tenant, declaratory or otherwise, or should Tenant bring any suit for any relief against Landlord, declaratory or otherwise, including, without limitation, any Expedited Arbitration Proceeding arising out of this Lease, or exercise any of its remedies set forth herein, the non-prevailing party shall pay to the prevailing party all reasonable and actual costs, expenses and attorneys' fees that the prevailing party may have incurred in connection therewith, within thirty (30) days after the entry of an unappealable final judgment in favor of the prevailing party.

(e)     Any action, suit or proceeding relating to, arising out of or in connection with the terms, conditions and covenants of this Lease may be brought in the courts of the State in which the Building is located.  Landlord and Tenant hereby waive any objection to jurisdiction or venue in any proceeding before said courts.

## ARTICLE XVII.  ESTOPPEL CERTIFICATE

Estoppel Certificate.  At any time within twenty (20) days after request by Landlord or Tenant, the other party shall, execute, acknowledge and deliver to any Mortgagee, assignee of a Mortgagee, any purchaser, or any other person specified by Landlord or Tenant, as applicable, an Estoppel Certificate in the form of Exhibit F annexed hereto and made a part hereof, modified to conform to the type of transaction or the circumstances for which the request is being made, (e.g. mortgage, assignment, sale, etc.) and including other items reasonably requested by Landlord or Tenant (but expressly excluding matters related to such party's financial condition).

## ARTICLE XVIII. RIGHT OF ACCESS

Section 18.01  Right of Access.

(a)     Subject to the terms of this Section 18.01(a), Landlord and Landlord's designees may, upon no less than twenty-four (24) hours prior notice and only when accompanied by a representative of Tenant, enter the Demised Premises to: (i) examine the Demised Premises, (ii) show the Demised Premises to prospective tenants during the last twelve (12) months of the Term, (iii) show the Demised Premises to prospective purchasers of Landlord's interest in the Land or the Building, (iv) show the Demised Premises to Mortgagees (or prospective Mortgagees), or (v) make repairs, alterations, improvements, additions or restorations that (y) Landlord is required to make pursuant to the terms of this Lease (including, without limitation, Landlord's Work), or (z) are reasonably necessary in connection with the maintenance, repair, or operation of the Building (Landlord's entry upon the Demised Premises to perform such repairs, alterations, improvements, additions or restorations being referred to herein as "Work Access").  Landlord shall not be required to give Tenant advance notice of the entry by Landlord or Landlord's designees into the Demised Premises as contemplated by this Section 18.01(a) to the extent necessary by reason of the occurrence of an emergency (with the understanding, however, that Landlord shall give Tenant notice of such emergency access as promptly as reasonably practicable thereafter).  Landlord, in connection with any Work Access, shall have the right to bring into the Demised Premises, and store in the Demised Premises in a reasonable manner and in a location reasonably acceptable to Tenant for the duration of the Work Access, the materials and tools that Landlord reasonably requires to perform the applicable repair, alteration, improvement, addition or restoration.  Nothing contained in this Section 18.01(a) diminishes Landlord's obligation to repair the Demised Premises (to the extent that the necessity for such repair derives from a Work Access) as provided in Section 7.01 hereof, and (2) Landlord shall remain liable to Tenant for personal injury or property damage that result from Landlord's negligence or willful misconduct in connection with any such entry upon the Demised Premises.

(b)     During any such entry by Landlord into the Demised Premises, pursuant to any provisions of this Lease allowing Landlord access to the Demised Premises, Landlord shall use reasonable efforts and proceed with due diligence, in order to minimize interference with the conduct of Tenant's business, and the exercise of such rights shall not materially and adversely affect the operation of Tenant's business or Tenant's Critical Rights.

Section 18.02  Easement for Pipes.

Landlord reserves the right to install, maintain, use and repair pipes, ducts, cables, conduits, vents and wires leading in, through, over or under the Demised Premises, provided, that (i) such ducts, cabling, pipes and conduits are concealed at Landlord's own cost and expense within or above partitioning columns, walls or ceilings (or, if the ceilings are exposed ceilings, such ducts, cabling, pipes and conduits are installed in such a manner as to minimize its appearance to the extent reasonably practicable), except that if such ducts, cabling, pipes or conduits are installed in areas that are utility areas (such as storage areas, mailrooms or mud rooms), then such ducts, cabling, pipes or conduits may also be installed within partitioning walls, columns provided Landlord restores any damage to the walls or ceilings or otherwise,

occasioned by such installation, use or maintenance thereof, (ii) such ducts, cabling, pipes and conduits do not reduce the usable area of the Demised Premises by more than a de minimis amount, and (iii) Landlord installs such ducts, cabling, pipes and conduits in a manner that does not materially and adversely affects, to the extent reasonably practicable, any Alteration theretofore performed in the Demised Premises (including, without limitation, Tenant's Initial Work); it being understood that Landlord agrees to avoid unreasonable interference with or disturbance of Tenant's decorations or operations within the selling area of the Demised Premises in connection with such work by Landlord made subsequent to completion of Tenant's Initial Work and repair any damage caused to Tenant's Initial Work or other Alterations by Landlord's repair and installation of the same, and the location of such installations shall not materially adversely affect Tenant's use of the Demised Premises. Notwithstanding anything to the contrary contained in this Section 18.02, Landlord's rights shall at no time be permitted to materially and adversely affect Tenant's Critical Rights.

## ARTICLE XIX. INTERPRETATION, NOTICE, MISCELLANEOUS

### Section 19.01 Interpretation.

(a)    Every term, condition, agreement or provision contained in this Lease which imposes an obligation on Tenant, shall be deemed to be also a covenant by Tenant.

(b)    Any reference herein to subtenants or licensees shall not be deemed to imply that any subtenants or licensees are permitted hereunder, except as expressly provided in this Lease. Any references herein to any extensions or renewals of the Term or any period during which Tenant may be in possession after the Expiration Date shall not be deemed to imply that any extension or renewal of the Term is contemplated hereby or that Tenant shall be permitted to remain in possession after the expiration of the Term, except as expressly provided in this Lease.

(c)    If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

(d)    The captions and headings used throughout this Lease are for convenience of reference only and shall not affect the interpretation of this Lease.

(e)    Anything in this Lease to the contrary notwithstanding:

(i)    Any provision which permits or requires a party to take any particular action shall also be deemed to permit or require a party to cause such action to be taken; and

(ii)    Any provision which requires any party not to take any particular action shall be deemed to require the party (to the extent reasonably within the party's control) not to permit such action to be taken by any person or by operation of law.

(f)    This Lease may be executed in several counterparts, but the counterparts shall constitute but one and the same instrument.

(g)    Wherever a requirement is imposed on any party hereto, it shall be deemed that such party shall be required to perform such requirement at its own expense unless it is specifically otherwise provided herein.

(h)    The singular includes the plural and the plural includes the singular.

(i)    This Lease shall be construed and enforced in accordance with the laws of the State in which the Demised Premises are situated.

(j)    If two or more individuals, corporations, partnerships or other business associations (or any combination of two or more thereof) shall execute this Lease as Tenant, the liability of each such individual, corporation, partnership or other business association to pay Rent and perform all other obligations hereunder shall be deemed to be joint and several, and all

notices, payments and agreement given or made by, with or to any one of such individuals, corporations, partnerships or other business associations shall be deemed to have been given or made by, with or to all of them. In like manner, if Tenant shall be a partnership or other business association, the members of which are, by virtue of statute or federal law, subject to personal liability, the liability of each such member shall be joint and several.

Section 19.02  Construing Various Words and Phrases.

(a)     Wherever it is provided herein that a party may perform an act or do anything, it shall be construed that party may, but shall not be obligated to, so perform or so do.

(b)     Where in this Lease, Tenant is required to obtain Landlord's consent or approval to any assignment, sublease, license, alteration, improvement, work or other transaction or thing, unless this Lease specifically provides otherwise, Landlord's consent or approval may be withheld in Landlord's sole and absolute discretion.

Section 19.03  No Oral Changes.

This Lease may not be changed or terminated orally.

Section 19.04  Communications.

(a)     No notice, request, consent, approval, waiver or other communication under this Lease shall be effective unless, but any such communication shall be effective and shall be deemed to have been given, when rejected or received, if, the same is in writing and is mailed by registered or certified mail, return receipt requested, postage prepaid, or delivered by an overnight nationally recognized delivery service, with proof of delivery, addressed:

(b)     If to Landlord, to the address designated as Landlord's Notice Address in Article I, or such other address as Landlord may designate by giving notice thereof to Tenant, with a copy thereof under separate cover to the address designated as Landlord's Notice Copy Address in Article I, and with a copy(ies) thereof under separate cover to the address(es) and person(s) designated as Landlord's Mortgagee Notice Copy Address in Article I, if any, or to such other person or party as Landlord shall designate by notice to Tenant; and

(c)     If to Tenant, to the address designated as Tenant's Notice Address in Article I, or such other address as Tenant may designate by giving notice thereof to Landlord, with a copy thereof under separate cover to the address designated as Tenant's Notice Copy Address in Article I or to such other person or party as Tenant shall designate by notice to Landlord.

(d)     Any notice under this Lease given by Tenant's attorney shall be given with the same force and effect as if given by Tenant.

Section 19.05  Successors and Assigns.

Subject to the provisions hereof, this Lease shall bind and inure to the benefit of the parties and their respective successors, representatives, heirs and assigns.

Section 19.06  Responsibility of Tenant.

Any restriction on or requirement imposed upon Tenant hereunder shall be deemed to extend to Guarantor, if any, Tenant's subtenants, concessionaires and licensees, and it shall be Tenant's obligation to cause the foregoing persons to comply with such restriction or requirement.

Section 19.07  Hold Over.

Should Tenant hold over after the end of the Term, such holding over shall be construed as a tenancy from month-to-month, subject to all of the provisions, conditions and obligations of this Lease, except that monthly Minimum Rent shall be (a) for the first ninety (90) days of any such holding over, one hundred fifty percent (150%) of the monthly installment of Minimum Rent payable for the last month of the Term, and (b) for any period after such ninety (90) days, in addition to any consequential damages to Landlord as a result of such holding over,

the greater of (i) the fair market value, or (ii) two hundred percent (200%) of the monthly installment of Minimum Rent payable for the last month of the Term.

### Section 19.08  Liability of Landlord and Tenant.

(a)      Notwithstanding anything to the contrary herein, neither Landlord, nor any director, officer, trustee, or direct or indirect beneficial owner of Landlord or of any parent or other affiliate of Landlord shall have any personal liability with respect to any provision of this Lease, or any obligation or liability arising hereunder or in connection herewith and none of their assets (other than their interest in the Building or rents, income, or proceeds therefrom) shall be subject to levy, execution or other judicial process for the satisfaction of Tenant's claims. The liability of Landlord for Landlord's obligations under this Lease shall be limited to Landlord's interest in the Building and the proceeds thereof. Tenant shall not look to any property or assets of Landlord (other than Landlord's equity interest in the Building and such proceeds thereof), or if the interest of Landlord is a leasehold interest, Tenant shall look solely to such leasehold interest, in seeking either to enforce Landlord's obligations under this Lease or to satisfy a judgment for Landlord's failure to perform such obligations. Such exculpation of liability shall be absolute and without any exception whatsoever.

(b)      Notwithstanding anything to the contrary herein, no director, officer, trustee of Tenant shall have any personal liability with respect to any provision of this Lease, or any obligation or liability arising hereunder or in connection herewith. Such exculpation of liability shall be absolute and without any exception whatsoever.

(c)      Tenant shall have the right to institute legal proceedings in a court of competent jurisdiction against Landlord to recover the actual damages that Tenant sustains by reason of Landlord's unreasonably withholding, conditioning or delaying Landlord's consent or approval (in cases where Landlord agreed not to unreasonably withhold, condition or delay such consent or approval), provided, however, Tenant shall not have the right to make any recovery pursuant to such legal proceedings unless such court makes a final determination that Landlord unreasonably withheld, unreasonably delayed or unreasonably conditioned such consent or approval capriciously and arbitrarily or maliciously or in bad faith.

### Section 19.09  Waiver of Jury Trial.

THE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE AND OCCUPANCY OF THE DEMISED PREMISES AND/OR ANY CLAIM OF INJURY OR DAMAGE.

### Section 19.10  Interest.

Any payment required to be made by Tenant under the provisions of this Lease not made by Tenant when and as due, and such failure continues for ten (10) days after notice of such delinquency, shall thereupon be deemed to be due and payable by Tenant to Landlord on demand with interest thereon at the rate of the Lease Interest Rate, computed from the date when the particular amount became due to the date of payment thereof to Landlord.

### Section 19.11  Late Charge.

Notwithstanding anything to the contrary herein contained and in addition to the interest provided for in Section 19.10 hereof and in the other provisions of this Lease, in order to cover the additional expense involved in handling delinquent payments, Tenant, at Landlord's option, shall pay a "late charge" of four (4%) percent when any payment of Rent hereunder is paid more than ten (10) days after the due date thereof ("Delinquency"). It is understood and agreed that this charge is for additional expense incurred by Landlord and shall not be considered interest or a penalty. Notwithstanding the foregoing, Tenant shall be excused from one (1) late charge for every twenty-four (24) months if Tenant is not otherwise in default beyond applicable notice and cure periods at the time of the late payment.

Section 19.12  Scaffolding.

Tenant acknowledges that Landlord may, from time to time and at Landlord's expense, install and maintain scaffolding, hoists, so-called "sidewalk sheds", barricades and/or a sidewalk bridge (collectively, "Scaffolding") outside of the Building, if required by Requirements or in connection with work being performed at the Building. Notwithstanding the foregoing, Landlord shall (a) obtain all required permits, approvals and variances with respect to such Scaffolding, (b) provide Tenant not less than thirty (30) days' advance notice of such Scaffolding, (c) erect and maintain the Scaffolding in accordance with applicable Requirements, (d) erect and maintain the Scaffolding in a way so as to minimize any material adverse effect upon free access to the entrance of the Demised Premises, and (e) cause the Scaffolding to be removed as quickly as practicable. If, notwithstanding the foregoing, Scaffolding, barriers, or construction aids shall unreasonably interfere with Tenant's signage, Landlord shall, at Landlord's expense, provide Tenant with suitable replacement signage during the entire duration that such Scaffolding remains in place. Landlord shall comply with this Section 19.12 in connection with any construction pursuant to Section 11.03 hereof.

Section 19.13  Pre-Sale Space.  If, during or following Landlord's performance of Landlord's Work, a portion of the Demised Premises near the entrance and not exceeding five hundred (500) square feet (the "Pre-Sale Space") is available in Landlord's reasonable judgment, then Tenant may utilize such Pre-Space Space solely for the purpose of selling memberships in advance to the public in anticipation of the opening of the Blink Fitness facility (the "Pre-Sale Event"). Without limiting the foregoing, Landlord shall use commercially reasonable efforts to cause the construction of Landlord's Work in such a sequenced manner so that the front portion of the Demised Premises to be used as the Pre-Sale Space shall be available for Tenant to conduct its pre-sales events prior to the Landlord's delivery of the Demised Premises to Tenant. Tenant's occupancy of the Pre-Sale Space for the Pre-Sale Event shall not be subject to Minimum Rent, but Tenant shall abide by the other applicable provisions of this Lease (including, without limitation, Section 14.02 hereof). In addition, Tenant's occupancy of the Pre-Sale Space for the Pre-Sale Event same shall not be deemed an acceptance of possession of the Premises or a waiver of any of the conditions to the Delivery of Possession, or cause to accelerate any time periods which Tenant must abide by or is subject to under the Lease, specifically the Rent Commencement Date.

Section 19.14  Financial Statements; Waiver of Lien.

(a)    In connection with any sale of the Building, or refinancing thereof, Tenant shall submit to Landlord, within one hundred twenty (120) days after the applicable fiscal year, current annual audited financial statements of either Tenant or Guarantor (or certified by an officer of Tenant or Guarantor if audited statements are not available). All such financial statements shall be received by Landlord in confidence.

(b)    Landlord shall waive statutory and/or contractual liens against Tenant's personal property located within the Demised Premises, provided that such waiver does not limit Landlord's other rights under the Lease in any way whatsoever. Tenant may, without Landlord's consent, finance Tenant's Property through equipment lease, conditional sales contract, chattel mortgage, or security agreement (any such financed Tenant's Property, the "Financed FF&E"). In connection with the aforesaid financing, Landlord shall, within thirty (30) days after request by Tenant and provided Tenant is not then in default of its monetary obligations hereunder beyond any applicable notice or cure periods, execute and deliver to the party providing any such loan, a waiver of any lien Landlord may have on such Financed FF&E, in such form as reasonably acceptable to Landlord and the Lender. Any such security agreement shall expressly provide that the secured party will, in the event Tenant shall default thereunder, give Landlord not less than fifteen (15) days' notice of such default before exercising its rights to remove any such Financed FF&E.

Section 19.15  No Presumption Against Drafter.

Landlord and Tenant agree and acknowledge that:

(a)    This Lease has been freely negotiated by Landlord and Tenant; and

(b)    In the event of any ambiguity, controversy, dispute or disagreement over the interpretation, validity or enforceability of this Lease or any of its covenants, terms or conditions, no inference, presumption or conclusion whatsoever shall be drawn against Landlord by virtue of Landlord's having drafted this Lease.

### Section 19.16   Accord and Satisfaction.

Payment by Tenant or receipt by Landlord of a lesser amount than the Minimum Rent, additional rent or other charges herein stipulated shall be deemed to be on account of the earliest Minimum Rent, additional rent or other charges due from Tenant to Landlord.  No endorsements or statement on any check or any letter accompanying any check or payment as Minimum Rent, additional rent or other charges due under this Lease shall be deemed an accord and satisfaction, and either party shall accept such check or payment without prejudice to Landlord's right to recover the balance of any and all Minimum Rent, additional rent or other charges due from the owing party or to pursue any other remedy provided in this Lease or by law.

### Section 19.17   Solicitation of Business.

Except in connection with a Pre-Sale Event, Tenant shall not give samples, approach customers or otherwise solicit business in the Common Area, nor shall Tenant distribute any handbills or other advertising matter in the Common Area.

### Section 19.18   Entire Agreement.

All exhibits and/or addendum(s), and/or rider(s), if any, attached to this Lease are hereby made a part of this Lease, with full force and effect as if set forth herein.  This Lease sets forth all the covenants, promises, agreements and conditions, and understandings between Landlord and Tenant concerning the Demised Premises and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them other than as are set forth herein and none thereof shall be used to interpret, construe, supplement or contradict this Lease.  Landlord has made no representations or warranties regarding the profitability of the Demised Premises, and Tenant has not entered into this Lease in reliance on any such representations, warranties or financial projections prepared or furnished to Tenant by Landlord.  The parties agree that any deletion of language from this Lease prior to its mutual execution by Landlord and Tenant shall not be construed to have any particular meaning or to raise any presumption, canon of construction or implication, including, without limitation, any implication that the parties intended thereby to state the converse, obverse or opposite of the deleted language.  No alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by each party.

### Section 19.19   Execution.

This Lease shall be of no force and effect unless and until it is executed by both Landlord and Tenant and an executed original thereof is unconditionally delivered to each party.

### Section 19.20   Satellite Dish.  Subject to Landlord's rights pursuant to Section 11.03 hereof, Tenant shall have the right to install one (1) satellite dish (not greater than 2 feet in diameter, the "Dish") on a portion of the roof of the Building that is 3572-3584 White Plains Road and at a location reasonably approved by Landlord; provided that (i) the Dish shall be used by Tenant for corporate communication purposes only and not for any other purposes, (ii) Tenant shall maintain and operate the Dish at its sole cost and expense and in a good and workmanlike manner, (iii) Tenant shall obtain, at Tenant's sole cost and expense, all the necessary permits and approvals which may be required from all lawful authorities having jurisdiction, (iv) Tenant shall maintain property insurance and liability insurance, both in amounts reasonably approved by Landlord, with respect to the Dish, and (v) Tenant shall not interfere with other tenants or Building licensees, or their respective business operations in the Building or other equipment in or on the Building, in connection with Tenant's operation of the Dish.  In the event Landlord reasonably requires the Dish to be relocated to accommodate any roof maintenance, repair or alteration, Tenant shall relocate same at its sole cost and expense.  Tenant hereby agrees to indemnify and hold Landlord harmless from any and all liabilities or claims for personal injury or property damage in any way arising out of the Dish.  Upon the expiration or earlier termination of this Lease, Tenant shall remove the Dish from the roof in a good and

workmanlike manner and repair any damage to the roof caused by the Dish. The obligations of the Tenant under this Section 19.20 shall survive the expiration or other termination of this Lease

### Section 19.21  Renewal Terms.

(a)      Provided that Tenant is not then in Default under the terms of this Lease at the time of exercise of the Renewal Option (as hereinafter defined) or upon the commencement of the Renewal Term (as hereinafter defined) and this Lease has not theretofore been terminated pursuant to the provisions hereof, Tenant shall have the option (the "Renewal Option") to renew this Lease for two (2) additional period of five (5) years (each, a "Renewal Term"). The option to renew shall expire and be of no force or effect unless provided written notice thereof to Landlord of Tenant's election to extend the original Term no later than nine (9) months prior to the expiration of the original Term or the first (1st) Renewal Term, as the case may be, time being of the essence with respect to Tenant's giving notice of its exercise of a Renewal Option.

(b)      All of the terms, conditions and provisions of this Lease shall remain in full force and effect during any applicable Renewal Term, except that the Minimum Rent shall be (i) as to the first Renewal Term, $825,220.00 per annum, and (ii) as to the second Renewal Term, $907,742.00 per annum.

(c)      No option granted to Tenant to renew this Lease, nor the exercise of any such option by Tenant, shall prevent Landlord from exercising any right granted or reserved to Landlord in this Lease or which Landlord may have by virtue of any law to terminate this Lease, either during the original Term or during any applicable Renewal Term. Any termination of this Lease shall serve to terminate any renewal option whether or not Tenant shall have exercised same. Any right on the part of Landlord to terminate this Lease shall continue during any applicable Renewal Term, and no option granted to Tenant to renew this Lease shall be deemed to give Tenant any further option to renew.

### Section 19.22  Submission of Lease to Tenant.

THIS LEASE SHALL NOT BE BINDING UPON EITHER PARTY UNLESS AND UNTIL EXECUTION AND UNCONDITIONAL DELIVERY THEREOF BY LANDLORD AND TENANT TO EACH OTHER, AND THE EXECUTION BY GUARANTOR AND DELIVERY TO LANDLORD OF THE GUARANTY PURSUANT TO ARTICLE XXI HEREOF BY GUARANTOR.

### Section 19.23  Representations.

Tenant represents that it is a limited liability company and is duly authorized to do business in the State of New York, and the persons executing this Lease on behalf of Tenant are duly authorized to execute this Lease on behalf of Tenant.

Landlord represents and warrants to Tenant that (i) Landlord is the fee owner of the Building, and (ii) subject to Section 10.03(a) hereof, Landlord has obtained all required consents and approvals in order to enter into this Lease.

### Section 19.24  Consent to Jurisdiction.

Tenant hereby consents and agrees that the Supreme Court of the State of New York for Bronx County and the United States District Court for the Eastern District of New York each shall have personal jurisdiction and proper venue with respect to any dispute between Landlord and Tenant; provided that the foregoing consent shall not deprive Landlord or Tenant of the right in its discretion to voluntarily commence or participate in any action, suit or proceeding in any other court having jurisdiction and venue.

### Section 19.25  OFAC List Representation.

Tenant represents and warrants that it is not listed, nor is it owned or controlled by, or acting for or on behalf of any person or entity, on the list of Specially Designated Nationals and Blocked Persons maintained by the Office of Foreign Assets Control of the United States Department of the Treasury, or any other list of persons or entities with whom Landlord is restricted from doing business with ("OFAC List"). Notwithstanding anything to the contrary

herein contained, Tenant shall not permit the Demised Premises or any portion thereof to be used, occupied or operated by or for the benefit of any person or entity that is on the OFAC List. Tenant shall provide documentary and other evidence of Tenant's identity and ownership as may be reasonably requested by Landlord at any time to enable Landlord to verify Tenant's identity or to comply with any legal request. Tenant shall indemnify and hold Landlord harmless from and against all losses, damages, liabilities, cost and expenses (including, without limitation, reasonable attorneys' fees and expenses) that are incurred by Landlord and/or its affiliate that derive from a claim made by a third party against Landlord and/or its affiliates arising or alleged to arise from a misrepresentation made by Tenant hereunder or a breach of any covenant to be performed by Tenant hereunder.

### Section 19.26  Antitrust Provision.

The Exclusive Covenant shall lapse and be of no further force or effect in the event any action or proceeding is commenced against Landlord under a federal or state anti-trust law or similar statute based on the Exclusive Covenant and the Exclusive Covenant is held to be invalid or illegal by any court, statute or agency. Notwithstanding that the Exclusive Covenant shall lapse pursuant to Section 20.03 hereof, Section 20.02 hereof shall remain in full force and effect.

### Section 19.27  Joint Liability.

The entities comprising Landlord shall be jointly and severally liable for Landlord's obligations under this Lease.

### Section 19.28  Confidentiality.

During the Term, Landlord and Tenant each shall maintain the confidentiality of the economic terms of this Lease, as the same may hereafter be amended, and not disclose same to any other Person without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed, except for (a) the disclosure of information contained in a permitted recorded memorandum of this Lease; (b) such disclosures to third Persons as may reasonably be necessary in order to consummate the transactions contemplated by this Lease, as amended, or for the Parties to perform their respective obligations or exercise their respective rights under this Lease, as amended; (c) privileged communications by the respective Parties, including communications with the Parties' respective counsel and advisors, who shall be advised to maintain the confidentiality of the Lease terms; (d) such disclosures as may be necessary or required by those governmental agencies, authorities or examiners having jurisdiction over each of the Parties; (e) such disclosures as may be required by subpoena or any other similar court order or discovery request in any civil or criminal proceeding or investigation; (f) disclosure of such information as may already constitute a public record through no prior act of the disclosing Party; (g) such disclosures as may be necessary in connection with the enforcement of the Parties' respective rights and remedies under this Lease or applicable Law; (h) disclosures to any of the Persons to whom Tenant's financial information may be disclosed pursuant to the terms of this Lease. The consent by a Party to any disclosures shall not be deemed to be a waiver on the part of such Party of any prohibition against any future disclosure; and (i) such press releases, advertising and promotion in any media of any type, and other public disclosures regarding the opening, conduct, and nature of Tenant's business operations on the Premises as Tenant determines to be necessary, appropriate or beneficial in its good faith business judgment. Without limiting the foregoing, any press release or other public disclosure of information with respect to this Lease or any matters set forth in this Lease made or released by or on behalf of Landlord (including Landlord's broker) shall be subject to Tenant's prior written approval (which shall not be unreasonably withheld, conditioned or delayed).

## ARTICLE XX.  EXPEDITED ARBITRATION

### Section 20.01  Landlord's Consent.

If (i) this Lease obligates Landlord to not unreasonably withhold, condition or delay Landlord's consent or approval for a particular matter, (ii) Landlord withholds, delays or conditions its consent or approval for such matter, and (iii) Tenant, in good faith, believes that Landlord did so unreasonably, then Tenant shall have the right to submit the issue of whether Landlord unreasonably withheld, delayed or conditioned such consent or approval to an Expedited Arbitration Proceeding only by giving notice thereof to Landlord on or prior to the thirtieth (30th) day after the date that Landlord denied or conditioned

such consent or approval. In such proceeding, to the extent requested by Tenant, the arbitrators shall also state in their findings whether Landlord acted arbitrarily or capriciously. The sole decision to be made in the Expedited Arbitration Proceeding shall be whether Landlord unreasonably withheld, delayed or conditioned its consent with respect to the particular matter being arbitrated. If the decision in the Expedited Arbitration Proceeding is that Landlord unreasonably withheld, conditioned, or delayed consent with respect to such matter, then (i) Landlord shall be deemed to have consented to such matter, and (ii) Landlord shall execute and deliver documentation that is reasonably requested by Tenant to evidence such consent.

## ARTICLE XXI.GUARANTY

**Section 21.01** In order to induce Landlord to enter into this Lease and in consideration of Landlord's entering into this Lease, BLINK HOLDINGS, INC., a New York corporation, having an address at 895 Broadway, Third Floor, New York, New York 10003 and having a EIN of 27-2776354 ("Blink") hereby guaranties, unconditionally and absolutely, to Landlord, its successors and assigns (without requiring any notice of nonpayment, nonkeeping, nonperformance or nonobservance or proof of notice or demand whereby to charge Guarantor [as defined below], all of which Guarantor hereby expressly waives), the (i) full and faithful performance of Tenant's Initial Work and (ii) the payment as and when due of the Minimum Rent and recurring Additional Rent accruing under the Lease and attributable solely during the Term (subsections (i) and (ii), the "Blink Guaranteed Obligations"). Blink's joint and several liability pursuant to this Article XXI (hereinafter sometimes referred to as the "Guaranty") shall, from and after the sixteenth (16th) year anniversary of the Commencement Date, be limited to: (i) the payment of Minimum Rent and recurring Additional Rent that accrue up to the date that Tenant vacates and surrenders the Demised Premises in the condition required under this Lease, free of claims of occupancy by third parties, and removes its property therefrom, delivers the key(s) to Landlord and gives written notice, executed by Tenant, to Landlord that it is surrendering possession of the Demised Premises, plus (ii) the payment of all other costs and expenses incurred by Landlord in connection with enforcing the terms and provisions of this Guaranty (if Landlord is the prevailing party), including, without limitation, reasonable attorneys' fees and disbursements in connection with enforcing the terms and provisions of this Guaranty or the exercise by Landlord of any remedy permitted hereunder or at law or in equity as against Tenant, to the extent suffered or incurred on or prior to Tenant's having vacated and surrendered the Demised Premises. Blink's liability hereunder shall extend only to those Blink Guaranteed Obligations that are not satisfied by Equinox Holdings, Inc. under that Guaranty of even date by Equinox Holdings, Inc. in favor of Landlord. Notwithstanding anything to the contrary in this Guaranty, in no event shall Blink's liability include any consequential damages, or any other damages sought by Landlord, including, without limitation, any acceleration of Rent.

**Section 21.02** Without limiting the provisions of Section 21.01 hereof, in order to induce Landlord to enter into this Lease and in consideration of Landlord's entering into this Lease, EQUINOX HOLDINGS, INC., a Delaware corporation, having an address at 895 Broadway, Third Floor, New York, New York 10003 and having a EIN of 13-4034296 ("Equinox" and, together with Blink, the "Guarantors" and individually, the "Guarantor") hereby guaranties, unconditionally and absolutely, to Landlord, its successors and assigns (without requiring any notice of nonpayment, nonkeeping, nonperformance or nonobservance or proof of notice or demand whereby to charge Guarantor, all of which Guarantor hereby expressly waives), the payment as and when due of the Minimum Rent and Tax Contributions, payable by Tenant under this Lease during (and attributable solely to) the first three (3) years of the Term ("Equinox Guaranteed Obligations") (for avoidance of doubt, this is a limited guaranty of the Minimum Rent and Taxes for the first 3 years of the Term and not a guaranty during the first 3 years of the Minimum Rent and Taxes for the entire Term) and Tenant has no obligation for any Rent payable, accruing or arising or attributable after the third (3rd) year of the Term. Equinox's liability hereunder shall extend only to those Equinox Guaranteed Obligations that are not satisfied by Blink Holdings, Inc. under that Guaranty of even date by Blink Holdings, Inc. in favor of Landlord. Notwithstanding anything to the contrary in this Guaranty, in no event shall Equinox's liability include any consequential damages, or any other damages sought by Landlord, including, without limitation, any acceleration of Rent.

**Section 21.03** As a further inducement to Landlord to enter into this Lease and in consideration thereof, each of the Guarantors hereby expressly covenants and acknowledges as follows:

(a)     The obligations hereunder of Guarantors shall not be terminated or affected in any way or manner whatsoever by reason of Landlord's resort, or Landlord's omission to resort, to any summary or other proceedings, actions or remedies against Tenant for the enforcement of any of Landlord's rights under this Lease or with respect to the Demised Premises or by reason of any extensions of time or indulgences granted by Landlord, or by reason of the assignment or surrender of all or any part of this Lease or the term and estate hereby granted or all or any part of the Demised Premises. The liability of each of the Guarantors is coextensive with that of Tenant and is also joint and several. If either of the Guarantors consist of more than one individual or entity, then the liability of each of the individuals or entities comprising such Guarantor is individual, joint and several. Action or suit may be brought against Guarantors or any of the individuals comprising either of the Guarantors and carried to final judgment and/or completion and recovery had, either with or without making Tenant a party thereto. Insofar as the payment by Tenant of any sums of money to Landlord is involved, this Guaranty is a guaranty of payment and not of collection and shall remain in full force and effect until payment in full to Landlord of all sums payable under this Lease. The Guarantors waive any right to require that any action be brought against Tenant or to require that resort be had to any security or to any other credit in favor of Tenant or to claim, if there is resort to any security, that resort thereto reduces Guarantors' obligations hereunder in the amount of such application.

(b)     If, pursuant to law or to any option granted by this Lease, this Lease shall be renewed, or its term extended, for any period beyond the date specified in this Lease for the expiration of said term, or if pursuant to any such option, additional space shall be included in, or substituted for all or any part of, the Demised Premises, or if this Lease be modified by agreement between Landlord and Tenant in any other similar or dissimilar respect, the obligations hereunder of the Guarantors shall extend and apply with respect to the full and faithful keeping, performance and observance of all of the covenants, agreements, terms, provisions and conditions which, under such renewal of this Lease or extension of its term and/or with respect to any such additional space, or which under any supplemental indenture or new lease or modification agreement, entered into for the purpose of expressing or confirming any such renewal, extension, inclusion, substitution or modification, are to be kept, performed and observed by Tenant (expressly including, without being limited to, the payment as and when due of Minimum Rent, Additional Rent, and all other sums and charges provided for thereunder) and the payment of any and all damages for which Tenant shall be liable by reason of any act or omission contrary to any of said covenants, agreements, terms, provisions or conditions. Notwithstanding anything to the contrary contained in this Article XXI, no extension, modification or alteration of the Lease shall increase the Blink Guaranteed Obligations or the Equinox Guaranteed Obligations as existing prior to such extension, modification or alteration unless consented to by the applicable Guarantor.

(c)     Neither the giving nor the withholding by Landlord of any consent or approval provided for in this Lease shall affect in any way the obligations hereunder of Guarantors.

(d)     Neither Guarantors' obligation to make payment in accordance with the terms of this Guaranty nor any remedy for the enforcement thereof shall be impaired, modified, changed, stayed, released or limited in any manner whatsoever by any impairment, modification, change, release, limitation or stay of the liability of Tenant or its estate in bankruptcy or any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the Bankruptcy Act of the United States or other statute or from the decision of any court interpreting any of the same, and Guarantors shall be obligated under this Guaranty as if no such impairment, stay, modification, change, release or limitation had occurred.

(e)     This Guaranty, and all of the terms hereof, shall be binding on each of the individuals (or entities) comprising each Guarantor and the respective successors, assigns, heirs and legal representatives of each such individual (or entity) Guarantor.

(f)     Each Guarantor hereby waives the right to trial by jury in any action or proceeding that may hereafter be instituted by Landlord against such Guarantor in respect of this Guaranty.

(g)     Each Guarantor will pay to Landlord all of Landlord's expenses, including, but not limited to, reasonable attorneys' fees and disbursements, in enforcing this Guaranty, provided that Landlord is the prevailing party in all such actions.

(h)     This Guaranty and Guarantors' obligations hereunder are and shall at all times continue to be absolute, present, primary and unconditional in all respects, and shall at all times be valid and enforceable irrespective of any other agreements or circumstances of any nature whatsoever which might otherwise constitute a defense to this Guaranty and/or the obligations of each Guarantor under this Guaranty or the obligations of any other person or party (including, without limitation, Tenant) relating to this Guaranty or the obligations of each Guarantor hereunder or otherwise with respect to this Lease. This Guaranty sets forth the entire agreement and understanding of Landlord and Guarantors, and each Guarantor absolutely, unconditionally and irrevocably waives any and all right to assert any defense, set-off, counterclaim or cross-claim of any nature whatsoever with respect to this Guaranty or the obligations of any other person or party (including, without limitation, Tenant) relating to this Guaranty or the obligations of such Guarantor hereunder or otherwise with respect to this Lease in any action or proceeding brought by Landlord with respect to this Lease, this Guaranty or the obligations of such Guarantor hereunder. No oral or other agreements, understandings, representations or warranties exist with respect to this Guaranty or with respect to the obligations of Guarantor hereunder, except as specifically set forth in this Guaranty.

Section 21.04   The undersigned Guarantors have executed this Lease for the purpose set forth herein and to evidence his agreement to be bound by the provisions of this Article XXI.

Section 21.05   Guarantors and Tenant acknowledge and agree that the giving by Tenant to Landlord of the written surrender notice as provided in Section 21.01 does not affect or diminish any liability of Tenant under the Lease.

Section 21.06   Each Guarantor hereby submits itself to the jurisdiction of the State of New York in any action or proceeding arising out of or under the Lease or this Guaranty, and agrees that this Guaranty shall be governed, construed and interpreted in accordance with the laws of the State of New York which shall apply in any such action or proceeding.

Section 21.07   All judicial actions, suits or proceedings brought against each Guarantor with respect to its obligations, liabilities or any other matter under or arising out of or in connection with this Guaranty or for recognition or enforcement of any judgment rendered in any such proceedings may be brought in any State or federal court of competent jurisdiction in the City of New York. By execution and delivery of this Lease, each Guarantor accepts, generally and unconditionally, the nonexclusive jurisdiction of the aforesaid courts and irrevocably agrees to be bound by any final unappealable judgment rendered thereby in connection with the Guaranty from which no appeal has been taken or is available. Each Guarantor hereby irrevocably waives any objection to the laying of venue or based on the grounds of forum non conveniens which it may now or hereafter have to the bringing of any such action or proceeding in any such jurisdiction. Nothing herein shall limit the right of Landlord to bring any action, suit or proceeding against a Guarantor in the court of jurisdiction. Each Guarantor acknowledges that final judgment against it in any action, suit or proceeding referred to in this Article shall be conclusive and may be enforced in any other jurisdiction, by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and of the amount of any such judgment against such Guarantor.

Section 21.08   Each Guarantor hereby irrevocably appoints, authorizes, empowers and designates the Tenant hereunder, with an address at the Demised Premises, as such Guarantor's lawful agent upon whom service of any legal process may be made in the State of New York, in a like manner and with like effect as if the same were served personally upon Guarantor within the jurisdiction of the State of New York. Each Guarantor agrees that any bills, statements, notices, demands, requests or other communications given or required to be given to such Guarantor under this Guaranty at Landlord's election, shall be addressed to such Guarantor care of said agent at said address. Each Guarantor may designate, from time to time, a successor agent under this paragraph by giving notice thereof to Landlord, at the above address by certified mail, return receipt optional, and any such successor shall thereupon become the agent for all purposes of this Article XXI.

Section 21.09   Each Guarantor represents to Landlord that: (i) it is of legal age, is not under any legal disability or duress, and has the power and authority to execute this Guaranty and to perform the obligations hereunder, (ii) this Guaranty constitutes the valid and binding obligation of such Guarantor, that this Guaranty is enforceable against such Guarantor in

accordance with its terms, and that the execution of this Guaranty by such Guarantor does not violate any laws, rules, regulations or orders to which such Guarantor is subject, or any agreement to which such Guarantor is a party, (iii) this Guaranty would have the same meaning and effect as it would have if it were governed by the law of the state or country in which such Guarantor resides and/or is incorporated, (iv) this Guaranty is valid and binding on such Guarantor under the laws of the State of New York (by which it is expressed to be governed), (v) no consent or approval (government or otherwise) or the taking of any other action is required as a condition to the validity or enforceability of the Guaranty, (vi) the designation by such Guarantor of the Tenant, with an address at the Demised Premises, as such Guarantor's lawful agent upon whom service of any legal process may be made in the State of New York, in a like manner and with like effect as if the same were served personally upon such Guarantor within the jurisdiction of the State of New York is lawful and binding, (vii) the signature and delivery of the Guaranty by such Guarantor and the performance of any obligations which it may have under the Guaranty are not prohibited by any law or regulation applicable to citizens of the state or country in which Guarantor resides generally and does not require, under any law or regulation applicable to the law of the state or country in which such Guarantor resides generally, any approvals, filings, registrations or exemptions, (viii) the choice of the law of the State of New York as the governing law of the Guaranty is a valid choice of law. The law of the state or country in which such Guarantor resides and/or is incorporated will treat the validity and binding nature of any obligations contained in the Guaranty as being governed by the laws of the State of New York, (ix) a final and conclusive judgment, order or finding against such Guarantor for a definite sum of money and/or for the performance of any other covenants, obligations and agreements under the Guaranty entered by a State or federal Court of New York to whose jurisdiction such Guarantor has expressly submitted in the City of New York in any suit, action or proceedings arising out of or in connection with the Guaranty would be enforced by the law of the state or country in which such Guarantor resides and/or is incorporated, without re-examination or re-litigation of the matters adjudicated upon, (x) the Guaranty has been duly executed and delivered and constitutes the valid and legally binding obligations of such Guarantor, enforceable in accordance with its respective terms and (xi) there are no actions, suits, investigations or administrative proceedings of or before any court, arbitrator or governmental authority pending or threatened against such Guarantor or any of its property or assets that (a) either in any case or in the aggregate, if adversely determined, would materially adversely affect the business, operations or condition, financial or otherwise, of such Guarantor or (b) question the validity of the Guaranty or any action to be taken in connection with the transactions contemplated thereby.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be executed as of the day and year first above written.

WITNESS:                                LANDLORD:

                                        **3560 WPR LLC**

                                        By: _____
                                            Name:
                                            Title:

                                        **3572 WPR LLC**

                                        By: _____
                                            Name:
                                            Title:

WITNESS:                                TENANT:

                                        **BLINK WILLAMSBRIDGE, INC.**

                                        By: _____
                                            Name:    Larry M. Segall
                                            Title:   Executive Vice President, CFO

WITNESS:                                AS TO ARTICLE XXI ONLY:

                                        GUARANTOR:

                                        **BLINK HOLDINGS, INC.**

                                        By: _____
                                            Name:    Larry M. Segall
                                            Title:   Executive Vice President, CF
                                            EIN:

                                        **EQUINOX HOLDINGS, INC.**

                                        By: _____
                                            Name:    Larry M. Segall
                                            Title:   Executive Vice President, CF
                                            EIN:

2267384 v11                             51

EXHIBIT A

DEMISED PREMISES



A-1

EXHIBIT B

CONCEPT PLAN

[See attached pages]

B -1



E. 213 STREET

KEY:

------- CEILING HEIGHTS APPROX 12'-0" BOTH GROUND
        AND 2nd FLOOR

------- NOTES RENTABLE AREA
        14,948 SQFT

ENTRY

WHITE PLAINS ROAD

STRENGTH = 60
CARDIO (103)

Treads TV = 18
Elliptical TV = 13

Strength = 9

2594 WHITE PLAINS ROAD

FL TO REMAIN
COLUMNS SHOWN

N.I.C.

2560 WHITE PLAINS ROAD

BLINKS
EGRESS
STAIR
146 SQFT

E. 212 STREET

① FLOOR PLAN
  GROUND FLOOR
  4,231 SQFT
  SCALE: NTS

3560-84 White Plains Rd.
Bronx, NY

TOTAL blink DEMISED: 16,088 SF

eclipse
development

blink
FITNESS

SHEET TITLE:
Test Fit Plan

SCALE: AS SHOWN    DATE: July 7, 2013

DWG NO:
**TFP-1A**





E. 213 STREET

KEY:
------- NOTES RENTABLE AREA
14,948 SQFT

CEILING HEIGHTS APPROX 12'-0" BOTH GROUND
AND 2nd FLOOR

WHITE PLAINS ROAD

ENTRY

CARDIO (103)
STRENGTH = 60

Treads TV = 18
Elliptical TV = 13
Strength = 9

3560 WHITE PLAINS ROAD

3584 WHITE PLAINS ROAD

N.I.C

BLINKS
EGRESS
STAIR
146 SQFT

E. 212 STREET

TOTAL blink DEMISED: 16,088 SF

① FLOOR PLAN
GROUND FLOOR
4,851 SQFT
SCALE: NTS

3560-84 White Plains Rd.
Bronx, NY

eclipse
development

blink
FITNESS

SHEET TITLE:
Test Fit Plan

SCALE: AS SHOWN    DATE: July 7, 2013

DWG NO:
TFP-1A



E. 213 STREET

WHITE PLAINS ROAD

E. 212 STREET

TOTAL blink DEMISED: 16,088

FLOOR PLAN
SECOND FLOOR
16,087 SQFT

3560-84 White Plains Rd.
Bronx, NY

eclipse development

blink FITNESS

SHEET TITLE:
Test Fit Plan

SCALE: AS SHOWN    DATE: July 7, 2013    REVISION #:

DWG NO:
TFP-1B

EXHIBIT C

LANDLORD'S WORK

Landlord will provide[1] the following conditions and/or improvements to the Premises on or before the Landlord Delivery Date:

**A.   Preface:**

1.   Premises will be code compliant for Tenant's Use.

2.   Premises shall be fully demolished and delivered in "broom swept" condition to include (but not limited to) the removal of all previous Tenant's installations of: ceilings, walls, gates, furniture, fixtures, partitions, safes and other security installations, all carpeting, tiles and adhesives, electrical, plumbing, HVAC and securing and capping all plumbing at drains.  Tenant may utilize some or all of the existing MEP installation and, shall coordinate a walkthrough of the space with Landlord's engineer to determine what shall remain in place in order to enable the Landlord to perform selective demolition.

3.   All hazardous materials have been or will be abated from the site; Tenant requires certified documentation stating such prior to Tenant's filing for a construction permit.

4.   Landlord will be responsible for all landscaping, code compliant lighting.

5.   The Building and Project will be free of all violations, so as not to preclude Tenant from acquiring any permits or sign-offs from any regulatory agencies.

**B.   Building Core and Shell Work:**

1.   <u>Shell</u>
   - Building's exterior/structure will be code compliant (including applicable energy code), weather tight and properly maintained.  All existing leaks will be repaired.
   - Landlord shall make all necessary repairs to the exterior façade to remove any remaining attachments, non-functioning fixtures, damage or identities (of previous tenant's signage).

2.   <u>Outside Walls</u>
   - The interior side of all exterior walls will be finished on the interior side by Landlord with gypsum sheetrock, vapor barrier, insulation, metal stud, taped and ready to prime paint.  The exterior side of the wall will be cleaned and repointed by the Landlord.

3.   <u>Exterior, Storefront, Entrance and Doors</u>
   - Subject to a mutually agreed to design, Landlord will provide new insulated exterior walls and windows, as well as a new, insulated storefront and entrance on the Ground Floor.  Façade and storefront design to be discussed further, it being understood that the intent is to deliver natural light to the Premises.
   - Landlord will provide one service door as well as exit doors and hardware as required to meet code.

---

[1] Provide is defined herein as furnish and install and made completely ready for operation for its intended use.

C -1

4.  Structure
    - Landlord will provide structural floor load of the greater of 100 lbs./Sq. Ft. (for both live and dead load), or code, for all levels of the Premises.  Tenant will not be responsible for any costs associated with Landlord required structural modifications or improvements (i.e. floating floor, isolated ceilings).
    - Slab will be delivered with smooth, flat surface.

5.  ADA Access
    - Premises will be fully handicapped accessible and ADA compliant to all levels, including any necessary dedicated ramps.

6.  Core
    - Premises will be Fire/Life safety code compliant to include adequate means of egress for Tenant's occupancy loads and travel distances.

7.  Demising Partitions
    - Per an agreed to location, Landlord will provide all necessary code compliant, fire rated, demising partitions for Tenant's Use.  Landlord will finish Tenant's side of demising partitions (taped, spackled, sanded, one coat of prime, 2 coats of paint).  Demising partitions will be constructed floor to floor and from the slab to the underside of the deck above.

## C.  Building Utility Systems Serving the Premises

1.  HVAC
    - Subject to substitutions upon Tenant's approval, Landlord will provide a standalone dedicated, two-zone, cooling and heating system having a cooling capacity totaling approximately one-ton for every 3,300 cubic feet of rentable space.  The heating system will be sized to maintain all areas at no less than 72 degrees F with a coincident outdoor temperature of 0 degrees F.  Each unit will be provided with all necessary electric connections and control wiring.  Landlord will provide all necessary and fully functional fire/smoke/control dampers.
    - Landlord will provide new ductwork.
    - Landlord will provide code-required fire alarm interface for the HVAC units.  Upon delivery, the units' fire alarm and all required accessories will be fully operational.
    - Exterior louvers, if required, to be provided by Landlord at locations to be mutually agreed upon.
    - Landlord will provide means for toilet and locker room exhaust sized at the greater of 2 cfm per square foot or Code requirements for Tenant's plan with controls at a location to be mutually agreed to.
    - The systems will operate 7 days per week and in accordance with the Tenant's business hours.

2.  Electrical
    - Landlord shall provide, at a location to be mutually agreed upon, directly metered 800 Amp, 3-phase, 4-wire utility service at 120/208 volts (inclusive of HVAC).  Installation shall be complete with utility company CT cabinet, meter pan and shall be terminated in a single disconnect switch.
    - Landlord shall provide temporary lighting until permanent power is installed and operational.
    - Tenant to obtain meter from local utility company.

3.  Plumbing

- Landlord shall provide a 2" metered, valved and capped cold water service to a mutually agreed to location within the Premises, assuming a 2" line meets local code for a 4,500 gallons/day (60 gallons/min) demand load. If not, a 3" line will be required. Landlord to install a pressure reducing valve and Y type strainer if water pressure exceeds 60 PSI.
- Landlord shall provide a 2" metered, valved and capped gas service to a mutually agreed to location within the Leased Premises, provided that a 7" water column (1/4 psi) is achieved. If such pressure is not achieved via a 2" line, a 3" line will be required.
- Landlord shall provide one gas flue and associated roof opening for hot water heater.
- Landlord shall provide a 4" sanitary waste line (minimum) and associated vent at a mutually agreed to location within the Leased Premises, assuming a 4" line meets local code for a 4,500 gallons/day (60 gallons/min) demand load.

4. Fire Protection
- Sprinkler System - All code required assembles, including riser, loop, branch piping and heads on each level of Premises, sufficient to meet code for Tenant's occupancy and Use.
- Fire Alarm - If required by code, Landlord to provide base building panel and command center capable of supporting Tenant's devices. Devices and associated wiring to Landlord panel by Tenant.

5. Cable and Telephone
- Landlord will provide 1-2" rigid conduit with drag line for Satellite TV (and associated satellite roof access) from the south west corner of the roof to a mutually agreed to location within the demised premises. Also, Landlord will provide 1-2" rigid conduit with drag line from the building or site telephone minimum point of entry (MPOE) to a mutually agreed to location within the demised premises. Tenant has the right to place two (2) satellite dishes on the roof.
- If roof access is not possible, then Landlord will provide 1-2" rigid conduit with drag line for Cable TV service from the building/site demarcation point to a mutually agreed location within the demised premises.

## D. General Provisions

1. Landlord Documentation
- Landlord will provide complete base architecture documentation, a complete base MEP, FP documentation, current fire protection plans filed, asbestos certificates, a copy of the current Certificate of Occupancy. Copies of all base building shop drawings and plans to be provided for Tenant's review, prior to fabrication. Tenant will review all plans related to Landlord's Work.
- Documentation listed above will be issued to Tenant within 30 days after Term Sheet execution.
- For the Lease, Landlord will prepare a Lease Outline Drawing (LOD) that graphically represents the following: Premises, point of entry for all utilities at mutually agreed to locations.

2267384 v11

2. All construction will be in accordance with the requirements of all applicable codes, ordinances, rules and regulations of all authorities having jurisdiction over the work including all requirements of the Landlord's insurance carrier.

3. Landlord will provide access to all mechanical/electrical rooms/closets for equipment and distribution outside of the Premises.

4. Tenant will have access to the Building's pathways, riser/shafts, and the roof for Tenant's MEP requirements/system.

5. Landlord will supply Tenant with temporary electric service (at no cost to Tenant) during the construction of Tenant's improvements.

6. <u>Construction Logistics</u>
   - Landlord will provide 24/7 construction access, 7 day week work permission , direct and unencumbered service access from street, unlimited service elevator access, materials and staging area and temporary utilities on a direct metered basis (or agreed upon stipend). Tenant to secure work permits, as reasonably required to work off hours.

7. Tenant will use commercially reasonable efforts to employ labor that is harmonious with other labor within the Building, but under no circumstances, will Tenant be obligated by Landlord to utilize union labor.

C -4

EXHIBIT C-1

THE TURNKEY PLANS

[See attached pages]

2267384 v11





BLINK GYM ELEVATIONS

SK-001.2

2 OF 12



## BUILDING CODE NOTES

## GENERAL NOTES

GENERAL NOTES

G-001.00

CHIRAMEL SHIVAN ARCHITECT DPAL LLC

708 E 111th St and
3546-58 White Plains Road

2 OF 12

# 1 RCNY § 5000-01 CHAPTER 5000
## NEW YORK CITY ENERGY CONSERVATION CODE TABLE II - PROGRESS
### INSPECTIONS FOR ENERGY CODE COMPLIANCE - COMMERCIAL

(I) CONDITIONS FOR PROGRESS INSPECTIONS AND TESTS DESCRIBED SHALL BE PERFORMED BY ECC CHAPTER 4, INCLUDING ASHRAE 90.1, WHERE APPLICABLE.

| T | INSPECTIONS | PERIODIC (MINIMUM) | REFERENCE STANDARD, CHAPTER (5) OR OTHER CRITERIA | ECC OR OTHER CRITERION |
|---|---|---|---|---|

## ENVELOP INSPECTIONS

| 3 | Fenestration ... product ratings for air leakage and SHGC values of fenestration and doors ... | As required installation | Approved construction documents | 402.1.5, 402.2, Tables 402.1.3 |
| 3 | Fenestration ... | As required installation | Approved construction documents | 402.1.3 |
| 4 | Fenestration and door assembly product ratings for air leakage ... | As required installation | Approved construction documents | 402.2.1, ASHRAE 90.1-5.4, 5.4.3 |

## Mechanical and Service Water Heating Inspections

| B5 | Dampers integral to the building thermal envelope ... | As required during installation | Approved construction documents, RMCA 500 | 502.4, ASHRAE 90.1 - 6.4.3.4.4 |
| B5 | HVAC and service water heating equipment performance ... | Prior to final inspection | Approved construction documents | 503.2, Tables 503.2.3, 503.2.3.2, 602.4, ASHRAE 90.1 - 6.4, 6.4.1, 6.4.2, Tables 6.8.1-1-6.8.1-6.8.3, 7.8 |
| B6 | HVAC system controls and economizers ... | After installation and before occupancy | Approved construction documents | 503.2.3, 503.2.4, 503.2.3 |

## ENERGY ANALYSIS

| PC | Electrical Power and Lighting Systems | | | |
| B6 | Duct, plenum and piping insulation ... | After installation during testing | Approved construction documents | 803.2.8, 803.2.9 |
| B7 | Electrical Power and Lighting Systems | | | |
| B26 | Installation of New Windows | New Windows to be Low E | Prior to final inspection | Approved construction documents |
| B27 | Installation of New Flooring | place holder | Prior to final inspection | Approved construction documents |
| B27 | Installation of New Lighting Fixtures | place holder | Prior to final inspection | Approved construction documents |

### BUILDING ENVELOPE REQUIREMENTS (FENESTRATION)

| | U-Factor | | | |
|---|---|---|---|---|

| | Proposed Design Value | Code-Permitted Value and Citation |
|---|---|---|

EN-001.00

ENERGY ANALYSIS

705 E 211th St and 3546-58 White Plains Road

CHILI ESHRAR ARCHITECTURAL SERVICES P.L.L.C



# GENERAL NOTES

ORLI ESKHAR
SERVICES LLC

70 E 211th St and
3546-58 White Plains
Road

G-002.00

3 OF 12

GENERAL NOTES

G-003.00

7045 E 111th St and
7049-57 111th St Flats

ORLI ESKANAZI
ARCHITECT DPA
SERVICES PLLC









ORLI ESIKAR
ARCHITECTURAL
SERVICES PLLC

709 E 211th St and
3546-58 White Plains
Road

HANDICAP NOTES IV

G-007.00

3/8" = 1'-0"

9 of 12



ORLI ESHKAR
ARCHITECTURAL
SERVICES PLLC

703 E 211th St and
3546-58 White Plains
Road

SIGNAGE NOTES

G-008.00















## EXHIBIT C-2

## EXCLUDED WORK

1.    Low voltage pre-wiring and final terminations (such as, IT and phone.
2.    Audio package – pre-wire and final hardware installation.
3.    CCTV pre-wire and hardware installation.
4.    Burglar alarm pre-wire and hardware installation.
5.    Exterior signage.
6.    Interior signage.
7.    Office supplies.
8.    Furniture (such as, front porch, bar stools, office chairs, file cabinet, trash cans, defibrillator).
9.    Gym equipment.

C-1

2267384 v11

## EXHIBIT D

### DELIVERY OF POSSESSION LETTER

Project Name: _____ Gym #:

_____

Tenant:  d/b/a Blink Fitness

Landlord:

_____

Premises Address:

_____

Square Footage:

_____

Landlord and Tenant acknowledge and agree that:

1.    Landlord's Work is substantially complete (as defined in the Lease) and accepted by Tenant as of the Possession Date noted below subject to the terms and conditions of the Lease regarding latent defects and completion of the punchlist items (listed below and as otherwise communicated to Landlord) within fourteen (14) days.

Landlord's Punch list Items:

| |
|---|
| |
| |
| |
| |
| |

2.    Tenant does not accept possession of the Premises because the items of Landlord's Work indicated below are not substantially complete.  However, Tenant, at its option, may enter the Premises to begin performing Tenant's improvements in accordance with the Lease. Tenant and Landlord agree that Tenant's decision to begin its build-out shall not alter the terms of the Lease and shall not constitute Tenant's acceptance of the Premises or Landlord's Work.  Landlord and Tenant agree that Landlord will complete all unfinished items of Landlord's Work (including those described below) as soon as practicable at Landlord's expense.  Tenant will not be deemed to have accepted possession of the Premises until Landlord has substantially completed all of Landlord's Work described in the Lease.  When Landlord substantially completes all of Landlord's Work to Tenant's satisfaction,, Landlord and Tenant shall re-execute this Delivery of Possession form to acknowledge Tenant's acceptance of Landlord's Work and the Possession Date.

3.    Tenant hereby refuses possession of the Premises because the items of Landlord's Work indicated below are not substantially complete.  Landlord will substantially complete all unfinished items of Landlord's Work (including those described below) as soon as practicable at Landlord's expense subject to the express terms and conditions of the Lease.

**Incomplete items of Landlord's Work:**

| | Target Date: |
|---|---|
| | Target Date: |
| | Target Date: |
| | Target Date: |
| | Target Date: |
| | Target Date: |

[Attach additional pages if needed]

D -1

## Option I. Possession Accepted.

**Possession Date:** _____

Landlord and Tenant hereby acknowledge that Landlord's Work is completed and accepted by Tenant pursuant to Section 1, subject to the terms and conditions of the Lease including any liquidated damages.

**Landlord:**                                          **Tenant:**

_____
_____
Print Name: _____            Print Name:
_____
Title: _____                      Title:  Project Manager
Date: _____                     Date:
_____

## Option II. Possession Rejected.

**Landlord:**                                          **Tenant:**

_____
_____
Print Name: _____            Print Name:
_____
Title: _____                      Title:  Project Manager
Date: _____                     Date: _____

D -2

EXHIBIT E

RULES AND REGULATIONS

1. The sidewalk, entries, and driveways of the Building shall not be obstructed by Tenant, or its agents, or used by them for any purpose other than ingress and egress to and from the Demised Premises.

2. Except for seeing-eye dogs, no animals shall be allowed in the offices, halls, or corridors in the Building.

3. If Tenant desires telegraphic, telephonic or other electric connections in the Premises, Landlord or its agent will direct the electrician as to where and how the wires may be introduced; and, without such direction, no boring or cutting of wires will be permitted. Any such installation or connection shall be made at Tenant's expense.

4. Tenant shall not install or operate any steam or gas engine or boiler, or other mechanical apparatus in the Demised Premises, except as specifically approved in the Lease. The use of oil, gas or inflammable liquids for heating, lighting or any other purpose is expressly prohibited. Explosives or other articles deemed extra hazardous shall not be brought into the Building.

5. Tenant shall maintain the Demised Premises free from rodents, insects and other pests.

6. Landlord reserves the right to exclude or expel from the Building any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs or who shall in any manner do any act in violation of the Rules and Regulations of the Building.

7. Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness. Landlord shall not be responsible to Tenant for any loss of property on the Demised Premises, however occurring, or for any damage done to the effects of Tenant by the janitors or any other employee or person.

8. Tenant shall give Landlord prompt notice of any defects in the water, sewage, gas pipes, electrical lights and fixtures, heating apparatus, or any other service equipment affecting the Demised Premises.

9. Tenant shall not permit storage outside the Demised Premises, or dumping of waste or refuse or permit any harmful materials to be placed in any drainage system or sanitary system in or about the Demised Premises.

10. All moveable trash receptacles provided by the trash disposal firm for the Demised Premises must be kept in the trash enclosure areas, if any, provided for that purpose.

11. No auction, public or private, will be permitted on the Demised Premises.

12. No awnings shall be placed over the windows in the Demised Premises except with the prior written consent of Landlord.

13. The Demised Premises shall not be used for lodging, sleeping or cooking or for any illegal purposes or for any purpose other than that specified in the Lease.

14. Tenant assumes full responsibility for protecting the Demised Premises from theft, robbery and pilferage.

15. Tenant shall not permit smoking in the Demised Premises.

E -1

2267384 v11

## EXHIBIT F

## ESTOPPEL CERTIFICATE

[Date]

RE:    Lease dated _____, 200_____, between _____ ("Landlord") and _____ ("Tenant"), as modified by amendments on _____, 200_____ (the "Lease").

Ladies and Gentlemen:

The undersigned is the Tenant under the above-referenced Lease for the premises (the "Demised Premises") identified as _____ being a portion of the property commonly known as [Name of Store site or address], [City], [State] (the "Property").

Tenant understands that you are about to make loans which will be secured in part by a mortgage on the Property. You have required that this certificate be executed by Tenant in connection with the loans.

With the knowledge that you will be relying on the certifications contained herein, Tenant hereby certifies that as of the date hereof:

1.    The documents listed in Exhibit A hereto (the "Lease Documents"): (i) set forth the entire agreement between Landlord and Tenant with respect to the Demised Premises: (ii) are in full force and effect: and (iii) have not been modified or amended except as set forth in Exhibit A. There are no other understandings or agreements, written or oral, between Landlord and Tenant with respect to the Demised Premises or the Property. Tenant's interest in the Lease and the Demised Premises has not been assigned, sublet or encumbered, except as follows: _____.

2.    The term of the Lease commenced on _____ and expires _____. The Lease contains no options to extend other than _____.

3.    The current monthly fixed rental under the Lease is _____ and has been paid through _____. The amount of the security deposit being held by Landlord is $_____ (plus interest through _____).

4.    Tenant has accepted the Demised Premises and is in full and complete possession of the Demised Premises. Landlord has no further obligations to provide tenant improvements to the Demised Premises, such obligation, if any, having been fully performed.

5.    To Tenant's knowledge, neither Landlord nor Tenant are in default in their respective obligations under the Lease and there are no defaults which, with the passage of time, or notice, or both, would give rise to a Default under the Lease, except as follows: _____.

6.    No rent under the Lease has been paid other than is currently due under the Lease or which has been paid not more than one (1) month before the due date thereof. Tenant does not now have or hold any claim or defense against Landlord which might be set off or credited against future accruing rents, and there are no credits or allowances to which Tenant is entitled.

7.    Except as expressly set forth in the Lease and disclosed herein, Tenant (i) does not have a right to rent additional space, (ii) does not have an option or preferential right to purchase the Demised Premises, the Property or any portion thereof, and (iii) does not have any right, title or interest with respect to the Demised Premises other than as Tenant under the Lease.

8.    This Estoppel Letter is being delivered to you on the express condition that the only use or purpose of this Estoppel Letter will be to prevent the undersigned from making any statement or claim contrary to any factual matters set forth herein, except to the extent any such contrary matter is otherwise known to you prior to the time of delivery of this Estoppel Letter. No other persons shall be entitled to rely upon anything contained in this Estoppel Letter, except the addressee hereof and its successors or assigns. The undersigned shall have no obligation to

F-1

update this Estoppel Letter or advise you of changes in circumstances that would make any statement in this Estoppel Letter not true or complete after a date subsequent to the date hereof.

The provisions of this estoppel letter shall be binding upon the successors and assigns of Tenant and shall inure to your benefit and your successors and assigns.

Very truly yours,

[Name of Tenant]

F -2

## EXHIBIT G

## EXTERIOR SIGNAGE

[See attached pages]

2267384 v11



ELEVATIONS
1 STOREFRONT

SCALE: NTS

E. 212 STREET

WHITE PLAINS ROAD

INTERNALLY ILLUMINATED
WHITE CHANNEL LETTERS WITH
A WHITE RETURN MOUNTED
ON A BLINK BLUE BACKER
SIGN SIZE AND LOCATION
TO BE VERIFIED IN FIELD

INTERNALLY ILLUMINATED
WHITE CHANNEL LETTERS WITH
A WHITE RETURN.

INTERNALLY ILLUMINATED
WHITE CHANNEL LETTERS
WITH A WHITE RETURN
MOUNTED ON A BLINK
BLUE CABINET
SIGN

BLINK MODESTY FILM

AREA OF
BUILDING
BLINK BLUE
MATERIAL TBD

BLINK ADDRESS
NUMBER
BLINK STORE
HOURS
(2)13" BLINK VINYL
DOTS



SHEET TITLE:
Test Fit Plan — Storefront

3560-84 White Plains Rd
Bronx, New York

blink
FITNESS

SCALE: AS SHOWN          DATE: July 7, 2013

DWG NO:
SG-1



| | SHEET TITLE: | | DWG NO: |
|---|---|---|---|
| **blïnk** FITNESS | Test Fit Plan — Storefront | | **SG-2** |
| | SCALE: AS SHOWN | DATE: July 7, 2013 | |

## EXHIBIT H

## INTENTIONALLY OMITTED

## EXHIBIT I

## ADDITIONAL STORIES AND BUILDING – CONCEPT PLAN



2267384 v11

EXHIBIT J

SHED/SCAFFOLDING AREA

2267384 v11

Article I.        LEASE SCHEDULE ................................................................................. 1

Article II.       DEFINITIONS........................................................................................ 3

Article III.      CONDITION OF DEMISED PREMISES ................................................. 6

Article IV.       TERM ................................................................................................... 12

Article V.        RENT AND TAX CONTRIBUTIONS .................................................... 13

Article VI.       CONDITION OF PREMISES AND SIGNS............................................ 15

Article VII.      REPAIRS, MAINTENANCE, ALTERATIONS, COMPLIANCE, SURRENDER.......................................................................................... 16

Article VIII.     SERVICE AND UTILITIES .................................................................. 19

Article IX.       USE AND OPERATION........................................................................ 21

Article X.        TRANSFER OF INTEREST, PRIORITY OF LIEN ............................. 24

Article XI.       COMMON AREA .................................................................................. 28

Article XII.      DESTRUCTION AND FIRE INSURANCE............................................ 29

Article XIII.     CONDEMNATION................................................................................ 31

Article XIV.      INDEMNITY AND LIABILITY ............................................................. 33

Article XV.       COVENANT OF QUIET ENJOYMENT ............................................... 36

Article XVI.      FAILURE TO PERFORM, DEFAULTS, REMEDIES ....................... 36

Article XVII.     ESTOPPEL CERTIFICATE................................................................... 39

Article XVIII.    RIGHT OF ACCESS ............................................................................. 39

Article XIX.      INTERPRETATION, NOTICE, MISCELLANEOUS....................... 40

Article XX.       EXPEDITED ARBITRATION ............................................................... 47

Article XXI.      GUARANTY .......................................................................................... 47