

**FRANCHISE DISCLOSURE DOCUMENT**

Blink Fitness Franchising, Inc.
A Delaware corporation
386 Park Avenue South, 11th Floor
New York, New York 10016
212-359-8780
franchiseinfo@blinkfitness.com
www.blinkfitness.com

The franchise offered is to operate a health and fitness center under the "BLINK®" name and other trademarks providing cardiovascular and strength training equipment and related products and services.

The total investment necessary to begin operation of a Blink Fitness Gym is $642,800 to $2,082,100. This includes $31,400 that must be paid to the franchisor or affiliate. If you want development rights, you must pay the franchisor a development fee equal to $75,000 if you commit to develop 3 Blink Fitness Gyms, $100,000 if you commit to develop 5 Blink Fitness Gyms, and $100,000 plus $10,000 for each of the 6th and each successive Blink Fitness Gym if you commit to develop 6 or more Blink Fitness Gyms. We do not charge separate initial franchise fees if you sign a Development Rights Agreement.

This disclosure document summarizes certain provisions of your franchise agreement and other information in plain English. Read this disclosure document and all accompanying agreements carefully. You must receive this disclosure document at least 14 calendar-days before you sign a binding agreement with, or make any payment to, the franchisor or an affiliate in connection with the proposed franchise sale. **Note, however, that no governmental agency has verified the information contained in this document.**

You may wish to receive your disclosure document in another format that is more convenient for you. To discuss the availability of disclosures in different formats, contact Ed Yancey, our Vice President, Franchise Development, at 386 Park Avenue South, 11th Floor, New York, New York 10016, 212-359-8780.

The terms of your contract will govern your franchise relationship. Don't rely on the disclosure document alone to understand your contract. Read all of your contract carefully. Show your contract and this disclosure document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment. The information in this disclosure document can help you make up your mind. More information on franchising, such as "A Consumer's Guide to Buying a Franchise," which can help you understand how to use this disclosure document, is available from the Federal Trade Commission. You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, D.C. 20580. You can also visit the FTC's home page at www.ftc.gov for additional information. Call your state agency or visit your public library for other sources of information on franchising.

There may also be laws on franchising in your state. Ask your state agencies about them.

Issuance date of this Franchise Disclosure Document: March 2, 2016, as amended December 2, 2016

## STATE COVER PAGE

Your state may have a franchise law that requires a franchisor to register or file with a state franchise administrator before offering or selling in your state.  REGISTRATION OF A FRANCHISE BY A STATE DOES NOT MEAN THAT THE STATE RECOMMENDS THE FRANCHISE OR HAS VERIFIED THE INFORMATION IN THIS DISCLOSURE DOCUMENT.

Call the state franchise administrator listed in <u>Exhibit F</u> for information about the franchisor or about franchising in your state.

MANY FRANCHISE AGREEMENTS DO NOT ALLOW YOU TO RENEW UNCONDITIONALLY AFTER THE INITIAL TERM EXPIRES.  YOU MAY HAVE TO SIGN A NEW AGREEMENT WITH DIFFERENT TERMS AND CONDITIONS IN ORDER TO CONTINUE TO OPERATE YOUR BUSINESS.  BEFORE YOU BUY, CONSIDER WHAT RIGHTS YOU HAVE TO RENEW YOUR FRANCHISE, IF ANY, AND WHAT TERMS YOU MIGHT HAVE TO ACCEPT IN ORDER TO RENEW.

Please consider the following RISK FACTORS before you buy this franchise:

1. THE FRANCHISE AGREEMENT AND THE DEVELOPMENT RIGHTS AGREEMENT REQUIRE YOU TO RESOLVE DISPUTES WITH US BY MEDIATION, ARBITRATION, AND LITIGATION ONLY IN CITY AND STATE WHERE WE HAVE OUR PRINCIPAL BUSINESS ADDRESS WHEN THE ACTION IS COMMENCED (IT CURRENTLY IS IN NEW YORK, NEW YORK).  OUT-OF-STATE MEDIATION, ARBITRATION, AND LITIGATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES.  IT MAY ALSO COST YOU MORE TO MEDIATE, ARBITRATE, AND LITIGATE WITH US IN OUR HOME CITY AND STATE THAN IN YOUR OWN STATE.

2. THE FRANCHISE AGREEMENT AND THE DEVELOPMENT RIGHTS AGREEMENT REQUIRE THAT NEW YORK LAW GOVERNS THE AGREEMENTS, AND THIS LAW MAY NOT PROVIDE THE SAME PROTECTIONS AND BENEFITS AS LOCAL LAW.  YOU MAY WANT TO COMPARE THESE LAWS.

3. THERE MAY BE OTHER RISKS CONCERNING THIS FRANCHISE.

Effective Date:  See the next page for state effective dates.

# BLINK FITNESS FRANCHISING, INC.

## STATE REGISTRATIONS

The following states require that the Franchise Disclosure Document be registered or filed with the state or be exempt from registration:   California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington, and Wisconsin.

This Franchise Disclosure Document is registered, on file, or exempt from registration in the following states having franchise registration and/or disclosure laws, with the following effective dates:

| | |
|---|---|
| California | March 16, 2016 |
| Illinois | March 4, 2016 |
| Indiana | March 4, 2016, as amended December 2, 2016 |
| Maryland | March 11, 2016 |
| Michigan | March 4, 2016, as amended December 2, 2016 |
| Minnesota | June 23, 2016 |
| New York | March 10, 2016, as amended December 6, 2016 |
| Rhode Island | March 9, 2016 |
| Virginia | March 4, 2016 |
| Washington | July 26, 2016 |
| Wisconsin | March 3, 2016 |

In all other states without franchise registration laws, the effective date of this Franchise Disclosure Document is the issuance date of March 2, 2016, as amended December 2, 2016.

## THE FOLLOWING PROVISIONS APPLY ONLY TO TRANSACTIONS GOVERNED BY THE MICHIGAN FRANCHISE INVESTMENT LAW

The state of Michigan prohibits certain unfair provisions that are sometimes in franchise documents.  If any of the following provisions are in these franchise documents, the provisions are void and cannot be enforced against you:

(A)     A prohibition on the right of a franchisee to join an association of franchisees.

(B)     A requirement that a franchisee assent to a release, assignment, novation, waiver, or estoppel which deprives a franchisee of rights and protections provided in this act.  This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

(C)     A provision that permits a franchisor to terminate a franchise prior to the expiration of its term except for good cause.  Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure such failure.

(D)     A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchisee's inventory, supplies, equipment, fixtures, and furnishings. Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures, and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation.  This subsection applies only if:  (i) the term of the franchise is less than 5 years; and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising, or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least 6 months advance notice of franchisor's intent not to renew the franchise.

(E)     A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances. This section does not require a renewal provision.

(F)     A provision requiring that arbitration or litigation be conducted outside this state. This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

(G)     A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause.  This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise.  Good cause shall include, but is not limited to:

(i)     The failure of the proposed transferee to meet the franchisor's then current reasonable qualifications or standards.

(ii)    The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.

(iii)    The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(iv)    The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

(H)    A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor.  This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in subdivision (c).

(I)    A provision which permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000, the franchisor shall, at the request of a franchisee, arrange for the escrow of initial investment and other funds paid by the franchisee until the obligations to provide real estate, improvements, equipment, inventory, training, or other items included in the franchise offering are fulfilled.  At the option of the franchisor, a surety bond may be provided in place of escrow.

The fact that there is a notice of this offering on file with the attorney general does not constitute approval, recommendation, or endorsement by the attorney general.

Any questions regarding this notice should be directed to:

State of Michigan Consumer Protection Division
Attn:  Franchise
670 G. Mennen Williams Building
525 West Ottawa
Lansing, Michigan  48909
(517) 373-3117

Despite subparagraph (f) above, we intend to enforce fully the provisions of the arbitration section contained in our Franchise Agreement and Development Rights Agreement.  We believe that subparagraph (f) is unconstitutional and cannot preclude us from enforcing our arbitration section.  You acknowledge that we will seek to enforce that section as written.

# TABLE OF CONTENTS

**Page**

ITEM 1    THE FRANCHISOR, AND ANY PARENTS, PREDECESSORS, AND AFFILIATES ............................................................................... 1

ITEM 2    BUSINESS EXPERIENCE ......................................................... 2

ITEM 3    LITIGATION .............................................................................. 4

ITEM 4    BANKRUPTCY .......................................................................... 4

ITEM 5    INITIAL FEES ............................................................................ 4

ITEM 6    OTHER FEES ............................................................................. 5

ITEM 7    ESTIMATED INITIAL INVESTMENT ..................................... 12

ITEM 8    RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES ................. 15

ITEM 9    FRANCHISEE'S OBLIGATIONS ............................................. 19

ITEM 10   FINANCING ............................................................................... 20

ITEM 11   FRANCHISOR'S ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS, AND TRAINING ............................................................... 21

ITEM 12   TERRITORY ............................................................................... 35

ITEM 13   TRADEMARKS .......................................................................... 38

ITEM 14   PATENTS, COPYRIGHTS, AND PROPRIETARY INFORMATION ............... 40

ITEM 15   OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS .................................................................. 41

ITEM 16   RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL ......................... 43

ITEM 17   RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION ................................................................................ 43

ITEM 18   PUBLIC FIGURES ..................................................................... 48

ITEM 19   FINANCIAL PERFORMANCE REPRESENTATIONS ..................... 49

ITEM 20   OUTLETS AND FRANCHISEE INFORMATION ......................... 54

-i-

## TABLE OF CONTENTS
(continued)

**Page**

ITEM 21    FINANCIAL STATEMENTS ...................................................................... 57

ITEM 22    CONTRACTS ............................................................................................ 57

ITEM 23    RECEIPTS ................................................................................................. 57

<u>EXHIBITS</u>

Exhibit A    Financial Statements

Exhibit B    Unit Franchise Agreement

Exhibit C    Development Rights Agreement

Exhibit D    Operations Manual Table of Contents

Exhibit E    List of Franchisees

Exhibit F    List of State Agencies/Agents for Service of Process

Exhibit G    Franchisee Representations Document

Exhibit H    Form of General Release

Exhibit I    Development Incentive Addendum to Unit Franchise Agreement

Exhibit J    State-Specific Additional Disclosures and Agreement Riders

APPLICABLE STATE LAW MIGHT REQUIRE ADDITIONAL DISCLOSURES RELATED TO THE INFORMATION CONTAINED IN THIS DISCLOSURE DOCUMENT.  THESE ADDITIONAL DISCLOSURES, IF ANY, APPEAR IN <u>EXHIBIT J</u>.

## <u>Item 1</u>
## THE FRANCHISOR, AND ANY PARENTS, PREDECESSORS, AND AFFILIATES

<u>The Franchisor</u>

The franchisor is Blink Fitness Franchising, Inc. ("we," "us," or "our"). "You" means the person or entity to whom we grant a franchise and, if applicable, development rights. If you are a corporation, limited liability company, or other legal entity, your owners must sign our "Guaranty and Assumption of Obligations." This means that all or some of our Franchise Agreement's provisions (<u>Exhibit B</u>) also will apply to your owners.

We are a Delaware corporation. Our principal business address is 386 Park Avenue South, 11th Floor, New York, New York 10016. We conduct business under our corporate name and the trademarks described in Item 13 and no other name.

<u>Our Predecessors and Affiliates</u>

We are a wholly-owned subsidiary of Blink Holdings, Inc. ("Blink Holdings"), which shares our principal business address. Blink Holdings, which owns the trademarks we license to you, was a wholly-owned subsidiary of Equinox Holdings, Inc. ("Equinox") until December 1, 2016. Blink Holdings is now owned by the owners of Equinox. While Equinox no longer is our parent company, it remains an affiliate. Equinox owns and operates luxury fitness clubs under the "EQUINOX®" brand designed to provide unprecedented service, innovative fitness programming, and restorative wellness treatments. Equinox's principal business address is 895 Broadway, New York, New York 10003. Equinox has never offered franchises in any line of business or directly operated Blink Fitness Gyms. Our affiliated Blink Fitness Gyms (defined below) are operated by one or more subsidiaries of Blink Holdings.

We have no predecessors or other parents or affiliates disclosable in this Item 1. If we have an agent in your state for service of process, we disclose that agent in <u>Exhibit F</u>.

<u>The Franchise Offered</u>

We grant franchise rights to develop and operate health and fitness centers identified by the Marks (defined below) that currently provide cardiovascular and strength training equipment and related products and services. In this disclosure document, we call these centers "Blink Fitness Gyms"; we call the Blink Fitness Gym you will operate under the Franchise Agreement the "Gym." Blink Fitness Gyms operate under the trademarks, service marks and other commercial symbols that we periodically designate, including "BLINK®" (the "Marks"). They operate under our mandatory and suggested specifications, standards, operating procedures and rules that we periodically specify for Blink Fitness Gyms ("Brand Standards").

In certain areas of the country, we grant multi-unit development rights to qualified franchisees, who then will have the right to develop 3, or 5 or more, Blink Fitness Gyms within a defined geographic area (the "Area") according to a mandatory development schedule (the "Schedule"). We grant these rights under the Development Rights Agreement (<u>Exhibit C</u>). If you sign the Development Rights Agreement, you will sign our then current form of franchise agreement for each Blink Fitness Gym developed under the Development Rights Agreement.

Each then current form of franchise agreement may differ from the version of Franchise Agreement attached to this disclosure document. However, you will not pay an initial franchise fee for the Blink Fitness Gyms developed under the Development Rights Agreement.

In addition, if you sign a Development Rights Agreement, you are entitled to lower royalty fees and a waiver of Brand Fund (defined in Item 11) contributions during the early years you operate each Blink Fitness Gym developed in full compliance with the Schedule in the Development Rights Agreement. These incentives (our "Development Incentive Program") appear in a Development Incentive Addendum to Unit Franchise Agreement (Exhibit I) you will sign concurrently with each franchise agreement signed under the Development Rights Agreement.

We have offered franchises and development rights for Blink Fitness Gyms since April 2015. We have no other business activities and have not offered franchises in other lines of business. We have never operated a Blink Fitness Gym (although certain of our affiliates do).

The fitness market is mature and competitive. You will face national, regional and local competition, including company-owned and franchised chains as well as independent fitness centers, other fitness facilities, sports complexes, and gyms, in some cases operated by not-for-profit organizations or governmental organizations. Some competitors may be larger and have better financial resources and name recognition than "BLINK®." You also might compete with other "BLINK®" company-owned, affiliate-owned or franchisee-owned locations or other businesses. However, we believe that the low cost, value-priced segment of the fitness market we target has significant room for growth.

The fitness industry can be seasonal, and your business might be impacted by many factors, including the time of year, local economic and market conditions, your experience and business knowledge, competition, and the geographic location of your Gym within your market.

Some states might have laws that apply specifically to the industry in which Blink Fitness Gyms operate. For example, some state laws require postings concerning steroids and other drug use, require certain medical equipment in fitness and health centers, limit the supplements that centers can sell, require bonds if a center sells memberships valid for more than a specified time period, require owners to deposit into escrow certain amounts collected from members before the center opens (so-called "presale" memberships), regulate certain terms of membership agreements and/or impose other restrictions on memberships that centers sell. These laws might apply to Blink Fitness Gyms. You also must comply with laws that apply generally to all businesses. You should investigate these laws.

## Item 2
## BUSINESS EXPERIENCE

Todd Magazine:  President and Director

Mr. Magazine has been our President and Director since our incorporation in August 2014. He also has been Executive Vice President and General Manager of Blink Holdings, located in New York, New York, since May 2014. He was Executive Vice President, New

Businesses of Equinox (which included the Blink Fitness Gym brand), located in New York, New York, from April 2012 to May 2014. From November 2009 to October 2011, Mr. Magazine was President of North America, Pfizer Consumer Healthcare for Pfizer, Inc., located in Madison, New Jersey. Mr. Magazine was in between positions from October 2011 to April 2012.

### Dos Condon:  Vice President, Operations

Mr. Condon has been our Vice President, Operations since our incorporation in August 2014 and has served in the same capacity for Blink Holdings, located in New York, New York, since April 2010. From May 1992 to March 2010, Mr. Condon held several positions at Equinox, located in New York, New York, including Personal Trainer, Co-Founder of the Equinox Fitness Training Institute, Personal Training Manager, General Manager, and Regional Director.

### Patricia R. Perry:  Vice President, Franchise Development

Ms. Perry has been our Vice President, Franchise Development since October 2016. She held various positions with Krispy Kreme Doughnuts Inc., located in Winston-Salem, North Carolina, from January 2013 until October 2016, most recently Vice President, Global Franchise Development from January 2016 until October 2016, and with Church's Chicken, located in Atlanta, Georgia, from March 2008 until December 2012, including Director, Franchise Sales and Development from January 2012 until December 2012.

### Ellen Roggemann:  Vice President, Marketing

Ms. Roggemann has been our Vice President, Marketing since our incorporation in August 2014. She also has been Vice President, Marketing of Blink Holdings, located in New York, New York, since May 2014. From June 2012 to May 2014, she served as the Vice President, Brand & Marketing for Pret A Manger (USA) Ltd., located in New York, New York. She was the Executive Marketing Director, Northeast Region for Whole Foods Market, Inc., located in Engelwood Cliffs, New Jersey, from September 2009 to June 2012.

### Marc Benathen:  Vice President, Finance

Mr. Benathen has been our Vice President, Finance and the Vice President, Finance for Blink Holdings, located in New York, New York, since April 2015. From our incorporation in August 2014 to March 2015, he was our Senior Director, Finance. He also served as the Senior Director, Finance of Blink Holdings from January 2014 to March 2015. From November 2010 to January 2014, Mr. Benathen held several finance positions, including Senior Manager, Corporate Finance, with ANN Inc., located in New York, New York.

### Harvey Spevak:  Director

Mr. Spevak has been one of our Directors since our incorporation in August 2014. He also has served as a Director of Blink Holdings since June 2010 and the Chief Executive Officer of Equinox, located in New York, New York, since January 1999.

Paul Tizik:  Director

Mr. Tizik has been one of our Directors since June 2015.  He also has served as Chief Financial Officer and Executive Vice President of Equinox, located in New York, New York, since June 2015, and as Equinox's Senior Vice President, Finance from April 2008 to June 2015.

**Item 3**
**LITIGATION**

No litigation is required to be disclosed in this Item.

**Item 4**
**BANKRUPTCY**

No bankruptcy information is required to be disclosed in this Item.

**Item 5**
**INITIAL FEES**

Franchise Agreement

You must pay us an initial franchise fee in a lump sum when you sign the Franchise Agreement.  The initial franchise fee is $25,000 (unless you sign a Development Rights Agreement, as described below).  We might pay a portion of the initial franchise fee we collect from you to a third party site consultant we designate (the "Site Consultant") to assist you by reviewing potential sites for your Gym.  The initial franchise fee is not refundable.

You must pay us a lump sum, nonrefundable $4,000 registration and support fee when you sign the Gym's lease.  This is part of your overall costs for the required Computer System (defined in Item 11).  We use the registration and support fee to provide configuration services for the technology platforms that your Gym will operate.  This fee is not refundable.

You also must pay us a monthly technology and support services fee (currently $600 per month).  The first technology and support services fee is due on the date we specify of the month following the month during which you start the presale of memberships for the Gym.  (We estimate 4 monthly technology and support services fee payments before the Gym's opening date.)  The technology and support services fee reimburses our costs for dedicated help desk support, vendor coordination and support, and proactive monitoring.  These payments are not refundable.

Development Rights Agreement

You must pay us a lump sum development fee when you sign the Development Rights Agreement.  If you agree to develop 3 Blink Fitness Gyms, the development fee is $75,000.  If you agree to develop 5 Blink Fitness Gyms, the development fee is $100,000.  If you agree to develop 6 or more Blink Fitness Gyms, the development fee is $100,000 plus $10,000 for each of the 6th and each successive Blink Fitness Gym you agree to develop under the Schedule, including the Blink Fitness Gym covered by the first Franchise Agreement you sign.  We will

insert this fee in the Development Rights Agreement before signing it.  The development fee is non-refundable.  If you sign the Development Rights Agreement, you will not pay a separate initial franchise fee for any Blink Fitness Gym you develop and open under that Agreement.

## Item 6
## OTHER FEES

| Column 1<br><br>Type of Fee[1] | Column 2<br><br>Amount[2] | Column 3<br><br>Due Date | Column 4<br><br>Remarks |
|---|---|---|---|
| Royalty | 5% of Gross Sales[3] | Due monthly on day we specify[4] | First Royalty payment is due following the month during which you first open the Gym for business, based on Gross Sales before then (including Gross Sales derived during presale of memberships).<br><br>Under our current Development Incentive Program, if you commit to develop 3 Blink Fitness Gyms under the Development Rights Agreement, we will reduce the Royalty as follows for each Blink Fitness Gym if it opens for business by the deadline in the Schedule:  (1) 2% of Gross Sales for the Blink Fitness Gym's first full 12 months of operation; and (2) 3% of Gross Sales for the Blink Fitness Gym's second full 12 months of operation.  The 5% Royalty will apply during the remaining franchise term.  If you commit to develop 5 or more Blink Fitness Gyms under the Development Rights Agreement, we will reduce the Royalty as follows for each Blink Fitness Gym if it opens for business by the deadline in the Schedule:  (1) you will pay no Royalty for the Blink Fitness Gym's first full 12 months of operation; and (2) we will reduce the Royalty to (i) 2% of Gross Sales for the Blink Fitness Gym's second full 12 months of operation, (ii) 3% of Gross Sales for the Blink Fitness Gym's third full 12 months of operation, and (iii) 4% of Gross Sales for the Blink Fitness Gym's fourth full 12 months of operation.  The 5% Royalty will apply during the remaining franchise term. |

| Column 1<br><br>Type of Fee[1] | Column 2<br><br>Amount[2] | Column 3<br><br>Due Date | Column 4<br><br>Remarks |
|---|---|---|---|
| New Member Fee | $5 for each new member who signs an online membership agreement with the Gym and for each former member signing a new online membership agreement | Payable in the month following the month in which the online membership agreement is signed | We charge this fee only for new and former members signing new online membership agreements through the System Website.  We may increase the New Member Fee on an annual basis (separate and apart from any inflation-based increase), but it will never be greater than the New Member Fee we require new Blink Fitness Gym franchisees to pay, as reflected in our then current form of franchise agreement. |
| Brand Fund contributions | An amount we specify, not to exceed 3% of Gross Sales | Due monthly on day we specify[4] | We have not yet begun collecting Brand Fund contributions but may do so on 30 days' prior written notice to you.  We expect the Brand Fund contribution will be 2% of your Gym's Gross Sales when the Brand Fund first becomes operational.  Item 11 has a detailed discussion about the Brand Fund. |
| Cooperative contributions[6] | Amount determined by Cooperative, subject to Local Marketing Spending Requirement[5] | As Cooperative specifies | We reserve the right to require you to contribute an additional 1% of the Gym's monthly Gross Sales to the Cooperative.  We count Cooperative contributions toward the Local Marketing Spending Requirement. |
| Successor franchise fee | $11,250 | Upon signing successor franchise agreement | |
| Transfer | $11,250 | Upon transfer | No transfer fee if the transferee: (1) is an entity you control; (2) has been a franchisee in good standing for at least 5 years; or (3) has managed a franchised or company-owned Blink Fitness Gym for 5 or more years. |
| Transfer Training Fee | Our then current initial training fee<br><br>(Currently $2,000 per person; we may increase this fee and charge up to $5,000) | Upon transfer | Due for the transferee (or its owner) and each person (*e.g.*, the transferee's management personnel and instructors if different from your management personnel and instructors) who must satisfactorily complete our then current initial training program upon transfer. |

| Column 1 Type of Fee[1] | Column 2 Amount[2] | Column 3 Due Date | Column 4 Remarks |
|---|---|---|---|
| Ongoing and supplemental training | Our then current fee for continuing and advanced training, plus travel expenses and room and board for our employees if the training occurs locally at or near your Gym (see below)  (Currently $500 per trainer per day, but we may increase this fee and charge up to $750 per trainer per day) | As incurred | We may charge you for supplemental training courses, programs and conventions and for additional or supplemental training. |
| Retraining of Operating Principal or Club Manager | Our then current retraining fee  (Currently $2,000 per person; we may increase this fee and charge up to $5,000) | As incurred | Payable if your Operating Principal or the Club Manager fails to complete the initial training program to our satisfaction, or if we determine after an inspection that the Gym is not operating according to Brand Standards. |
| Replacement Operating Principal or Club Manager Training | Our then current training fee  (Currently $2,000 per person; we may increase this fee and charge up to $5,000) | As incurred | Due for (1) your 2nd and any subsequent Replacement Manager who must attend our replacement manager training program and (2) any new Operating Principal who must undergo training. |
| Local training | Our then current fee for local training, plus travel expenses and room and board for our employees  (Currently $500 per trainer per day, but we may increase this fee and charge up to $750 per trainer per day) | As incurred | Payable if you request that any additional or supplemental training occur locally. Subject to the availability of our training personnel. |

| Column 1 Type of Fee[1] | Column 2 Amount[2] | Column 3 Due Date | Column 4 Remarks |
|---|---|---|---|
| Testing and evaluation fees | Projected costs of testing (amount of which depends on circumstances, including supplier's location, testing required, and item involved) | As incurred | Covers costs of testing new products or inspecting new suppliers you propose. |
| Relocation | $5,000 and reasonable costs we incur | As incurred | Due only if you relocate the Gym. |
| Audit | Cost of inspection or audit, including legal fees and independent accountants' fees, plus travel expenses, room and board, and compensation of our employees | As incurred | Due only if you fail to report or understate Gross Sales by 2% or more. |
| Inspection fee | Our then current evaluation fee (we may charge up to $1,000, plus travel expenses and room and board for our employees) | As incurred | Payable to compensate us for our costs and expenses during any follow-up inspection to confirm that you corrected deficiencies and are otherwise complying with the Franchise Agreement and all Brand Standards, or for any evaluation that you request. |
| Interest | Lesser of 1.5% per month or highest commercial contract interest rate law allows | Upon receipt of invoice from us | Our acceptance of interest on overdue amounts is not an indication that we choose to offer financing to you. |
| Administrative fee | $75 | Upon receipt of invoice from us | Due for each late or dishonored payment. |
| Costs and attorneys' fees[7] | Will vary under circumstances and depends on nature of your non-compliance | As incurred | Due when you do not comply with the Franchise Agreement or Development Rights Agreement. |

| Column 1 | Column 2 | Column 3 | Column 4 |
|---|---|---|---|
| Type of Fee[1] | Amount[2] | Due Date | Remarks |
| Indemnification[7] | Will vary under circumstances and depend on nature of third-party claim | As incurred | You must reimburse us for all claims arising out of (i) the Gym's operations, (ii) the business you conduct under the Franchise Agreement, (iii) your breach of the Franchise Agreement, or (iv) non-compliance with any law, ordinance or regulation. |
| Management Fee | Up to 5% of Gross Sales, plus any out-of-pocket expenses incurred in connection with the Gym's management | As incurred | Due if you abandon or fail to actively operate the Gym for any period and we assume the Gym's management. |
| Technology and Support Services Fee | Currently $600 monthly, but we may increase this fee up to 3% each year | Due monthly on day we specify[4] | Defrays our costs for software support for the kiosks, System Website, and POS System (defined in Item 8); proactive monitoring and notification of the Gym's network and Wi-Fi outages; dedicated level 1 help desk support; and vendor issue management and coordination support. |

Notes:

1. Except for product and service purchases described in Item 8, and except as otherwise noted in this Item 6, all fees are imposed and collected by, and payable to, us. Except as noted above, all fees are non-refundable and currently are uniformly imposed. Unless otherwise indicated, the fees described apply only to the Franchise Agreement.

2. We and our affiliates reserve the right to increase the amount of any fixed fee or fixed payment due under the Franchise Agreement based on changes in the Index (defined below) ("Annual Increase"). An Annual Increase may occur only once per calendar year and may not exceed the corresponding cumulative increase in the Index since the Franchise Agreement's effective date or, if applicable, the date on which the last Annual Increase became effective for the particular fixed fee or payment being increased. Any and all Annual Increases will be made at the same time during the calendar year. "Index" refers to the Consumer Price Index for All Urban Consumers (CPI-U) for the U.S. City Average for all Items (1982 – 1984 = 100), not seasonally adjusted, as published by the United States Department of Labor, Bureau of Labor Statistics, or in a successor index. We also reserve the right (i) to increase the New Member Fee and, (ii) if any fixed fee or fixed payment due from you under the Franchise Agreement encompasses any third party charges that we collect from you on a pass-through basis (*i.e.*, for ultimate payment to the third party), to increase the fixed fee or fixed payment, even beyond the Annual Increase, to reflect any increases in the third party's charges to us.

3. "Gross Sales" means the aggregate amount of all revenue generated from any source, including revenue generated from the sale of memberships, goods, products, merchandise, services, and advertising, other types of revenue you receive, including the proceeds of business interruption insurance and rental income of any type, and the value of goods, products, merchandise, and services bartered in exchange for memberships or other goods and services. Gross Sales are not reduced by the amount of any discounts on memberships or other services to employees, family members, or other businesses you own or control. However, Gross Sales exclude: (i) federal, state, or municipal sales, use or service taxes collected from members and paid to the appropriate taxing authority; (ii) proceeds from insurance, excluding business interruption insurance; (iii) proceeds from any civil forfeiture, condemnation, or seizure by government entities; and (iv) the amount of any credits provided in compliance with our Operations Manual (defined in Item 11). Each charge or sale upon credit will be treated as a sale for the full price on the day such charge or sale is made, irrespective of when you receive payment (whether full or partial, or at all) on that sale. Revenue from gift cards that we approve for sale at Blink Fitness Gyms is included in Gross Sales when the gift card is used to pay for products and services. Your Gym may not issue or redeem any gift certificates, coupons, or gift, loyalty, or similar cards unless we first approve in writing their form and content and your proposed issuing and honoring/redemption procedures. We may grant or withhold approval as we deem best.

4. You must sign and deliver to us the documents that we periodically require to authorize us to debit your business checking account automatically for the Royalty and other amounts due under the Franchise Agreement or any related agreement. If we institute an automatic debit program for the Gym, we will debit your account for the Royalty and other amounts on or after the payment day we specify, based on the Gross Sales for the previous month. You must make the funds available for withdrawal by electronic transfer before each due date. We may require you (at your expense) to obtain overdraft protection for your business checking account in an amount we specify. You must reimburse us for any "insufficient funds" charges and related expenses that we incur relating to any checks that we receive from you or your failure to maintain sufficient funds in your automatic debit account.

If you fail to report the Gym's Gross Sales for any month, we may debit your account for 125% of the Royalty that we debited for the previous month. If the amount we debit from your account is less than the amount you actually owe us for the month (once we have determined the Gym's true and correct Gross Sales for the month), we will debit your account for the balance due on the day that we specify. If the amount we debit from your account is greater than the amount you actually owe us for the month (once we have determined the Gym's true and correct Gross Sales for the month), we will credit the excess, without interest, against the amount that we otherwise would debit from your account during the following month.

Upon notice to you, we may periodically change the timing and terms for payment of Royalties and other amounts payable to us under the Franchise Agreement. For example, we may change the frequency at which we calculate payments to weekly or bi-weekly.

5. You generally must spend at least 5% of the Gym's Gross Sales each calendar year on Marketing Materials (defined in Item 11) and advertising, marketing and promotional programs for the Gym (the "Local Marketing Spending Requirement"). However, because we have not yet begun collecting Brand Fund contributions as of this disclosure document's issuance date, your Local Marketing Spending Requirement will be 7% of the Gym's Gross Sales until we start collecting Brand Fund contributions (after which time your Local Marketing Spending Requirement for the balance of the franchise term will be at least 5% of the Gym's Gross Sales, as specified above). We will credit your Cooperative contributions (see note 5 below) toward the Local Marketing Spending Requirement. However, we will not count the Presale Marketing Budget or contributions to the Brand Fund toward this minimum obligation. We may review your books and records and require you to submit reports periodically to determine your advertising, marketing and promotion expenses. If you fail to spend (or prove that you spent) the Local Marketing Spending Requirement in any year, then we may require you to contribute the shortfall to the Brand Fund. We may require you to contribute your Local Marketing Spending Requirement to the Brand Fund (unrelated to the shortfall referenced above).

Under our current Development Incentive Program, if we have begun collecting Brand Fund contributions as of the date the Gym opens for business (or if we begin collecting Brand Fund contributions during the first full 12 months you operate the Gym), then for the Gym's first full 12 months of operation (or the balance of those first full 12 months if we begin collecting Brand Fund contributions during the first full 12 months), you may spend the 2% of Gross Sales that we otherwise would require you to contribute to the Brand Fund on local marketing, advertising, and promotional programs for the Gym, meaning that during the Gym's first full 12 months of operation (or the balance of those first full 12 months, as noted above), the Local Marketing Spending Requirement would be 7% of the Gym's Gross Sales (rather than 5%).

6. We may designate a geographic area for an advertising cooperative (a "Cooperative"). The Cooperative's members in any area are the owners of the Blink Fitness Gyms located and operating in that area (including us and our affiliates, if applicable). Under the Franchise Agreement, we may require you to contribute an additional 1% of the Gym's monthly Gross Sales to the Cooperative. However, any Cooperative dues you contribute (including any additional amounts we require you to contribute to the Cooperative) will count toward the Local Marketing Spending Requirement you must spend to promote the Gym, but in no event will amounts you contribute to a Cooperative affect your new opening financial and advertising obligations or your required contributions to the Brand Fund.

7. These fees also are due under the Development Rights Agreement.

**Item 7**
**ESTIMATED INITIAL INVESTMENT**

**YOUR ESTIMATED INITIAL INVESTMENT**

| Column 1<br><br>Type of expenditure | Column 2<br><br>Amount | Column 3<br><br>Method of payment | Column 4<br><br>When due | Column 5<br>To whom payment is to be made |
|---|---|---|---|---|
| Initial franchise fee[1] | $25,000 | Lump sum | When you sign the Franchise Agreement | Us |
| Training[2] | $18,000 to $22,000 | Out of pocket travel-related expenses, as incurred | During training | Third party vendors |
| Presale Marketing Budget | $35,000 to $50,000 | As incurred | Before opening | Outside suppliers |
| Rent, security deposit, and other real estate services and costs[3] | See Note 3 | As agreed | As agreed | Landlord |
| Leasehold improvements, signage, utility costs, furniture, fixtures, licenses and permits[4] | $225,000 to $1,500,000 | As incurred | As incurred | Suppliers and other third parties |
| Fitness equipment – Down payment[5] | $125,000 to $175,000 | Lump sum | Before opening | Suppliers |
| Opening inventory and supplies[6] | $10,000 to $30,000 | Lump sum | Before opening | Suppliers |
| Computer hardware and software[7] | $50,000 to $56,000 | Lump sum | Before opening | Us and suppliers |
| Technology and Support Services Fee[8] | $1,800 to $3,600 | Installments | Before opening | Us |
| Professional fees[9] | $3,000 to $10,000 | As arranged | Before opening | Accountants, lawyers and other third parties |
| Insurance deposits | $0 to $10,500 | As incurred | As incurred | Insurance broker |

| Column 1 Type of expenditure | Column 2 Amount | Column 3 Method of payment | Column 4 When due | Column 5 To whom payment is to be made |
|---|---|---|---|---|
| Additional funds – 3 months[(10)] | $150,000 to $200,000 | As incurred | As incurred | Employees, suppliers, and other third parties |
| TOTAL ESTIMATED INITIAL INVESTMENT (excluding real estate costs)[(11)] | $642,800 to $2,082,100 | | | |

Except for security and utility deposits, none of these expenditures is refundable.

Notes:

1. As described in Item 5, the initial franchise fee is $25,000.  However, you pay no initial franchise fee for any Blink Fitness Gym you develop and open under the Development Rights Agreement.  Except for the non-refundable development fee, there is no initial investment required to begin operating under the Development Rights Agreement.

2. We describe training in Item 11.  Although we do not impose a fee for the initial training program, this figure estimates your and your personnel's costs for travel and other expenses during training.  The costs in New York City vary greatly based on the time of year and choices you make for hotels, restaurants, etc.

3. A standard Blink Fitness Gym occupies approximately 12,000 to 20,000 square feet of space.  The typical location is on high-traffic streets in metropolitan or suburban areas.  Rent depends on geographic location, size, local rental rates, businesses in the area, site profile, and other factors, varies from market to market, and could be higher in large metropolitan areas than in suburban markets and smaller metropolitan areas.  Your landlord likely will require you to pay a security deposit equal to one month's rent or more.  Your lease negotiations with your landlord and the size and market area of the Gym's location ultimately will dictate when your rental payments will begin.

We expect you to rent the Gym's location.  It is possible, however, that you will choose to buy, rather than rent, real estate on which a building suitable for the Gym already is constructed or could be constructed.  Real estate costs depend on location, size, visibility, economic conditions, accessibility, competitive market conditions, and the type of ownership interest you are buying.  Because of the numerous variables affecting the value of a particular piece of real estate, this initial investment table does not reflect the potential purchase cost of real estate or the costs of constructing a building suitable for the Gym.

We or a Site Consultant will assist you by reviewing potential sites for the Gym. However, you also will incur costs related to site evaluation, selection, and lease negotiation.  You must use a licensed commercial real estate broker during the site selection process, and we have the right to pre-approve your proposed broker before you move forward.

4.  The estimate includes amounts for construction, remodeling, fixed assets, leasehold improvements and decorating costs.  This figure is based upon our expectations that you will lease your Gym from the landlord in good condition (a "Vanilla Box").  We expect the Vanilla Box to have certain specifications detailed in the Operations Manual. Leasehold improvement costs – which could include floor covering, wall treatment, counters, ceilings, painting, window coverings, electrical, carpentry and similar work, and contractor's fees – depend on the site's condition, location, and size; the demand for the site among prospective lessees; the site's previous use; the build-out required to conform the site for your Gym; and any construction or other allowances the landlord grants.  Your costs might be more or less than this estimate depending on where you plan to operate your Gym.

5.  This estimate assumes you will lease the cardiovascular and strength training fitness equipment from approved vendors or suppliers.  This figure covers your down payment under the lease.  If you choose to purchase the equipment for your Gym, we estimate you will pay approved vendors or suppliers $550,000 to $665,000 for such equipment.

6.  This includes costs for an initial inventory of supplies for Gym maintenance, cleaning supplies, key tags, and retail and food and beverage items.

7.  We describe the required Computer System in Item 11.  As discussed in Item 5, $4,000 of your initial computer hardware and software costs is payable to us for our assistance with configuration services for the technology platforms that your Gym will operate.

8.  This includes expenses for proactive monitoring and notification of network and Wi-Fi outages.  It also includes expenses for software support for the kiosks, System Website, and POS System; dedicated level 1 help desk support; and vendor issue management and coordination support.

9.  This estimates the costs of professional advisors (like an attorney and accountant) for the initial advice consistent with the start-up of a franchised business.  We strongly recommend that you seek professional assistance when evaluating this franchise opportunity and our franchise documents.  Your professional advisors also should review the lease and other contracts you sign for your Gym.

10.  This estimates the funds needed to cover your operating expenses for the first 3 months of operation (other than the items identified separately in the table).  These funds could be offset by revenue earned during that period.  This is only an estimate, and you might need additional working capital during the first 3 months you operate your Gym and for a longer time period after that.  This 3-month period is not intended, and should not be interpreted, to identify a point at which your Gym will break even.  Your costs will

depend on how closely you follow our methods and procedures; your management skill, experience, and business acumen; local economic conditions; the prevailing wage rate; competition; and your Gym's sales during the initial period. The level of presales you make before you open your Gym will impact your working capital needs.

11. We relied on the experience of our affiliate-owned Blink Fitness Gyms in New York and New Jersey to compile these estimates (including the estimate of additional funds). You should review these figures carefully with a business advisor before deciding to acquire the franchise. We do not offer financing directly or indirectly for any part of the initial investment. The availability and terms of financing depend on many factors, including the availability of financing generally, your creditworthiness and collateral, and lending policies of financial institutions from which you request a loan. We strongly recommend that you use these categories and estimates as a guide to develop your own business plan and budget and investigate specific costs in your area.

## <u>Item 8</u>
## RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

You must operate the Gym according to our Brand Standards. Brand Standards may regulate, among other things, types, models, and brands of required furniture, fixtures, equipment (including components of and required software licenses for the Computer System), and signs that we periodically require for the Gym and the business you operate under the Franchise Agreement (collectively, "Operating Assets") and other products and services you use or provide at the Gym; other required, authorized and unauthorized services and products; and designated and approved suppliers of these items and services. You must buy or lease all Operating Assets and other products and services for the Gym only according to our standards and specifications and, if we require, only from suppliers that we designate or approve (which may include or be limited to us or our affiliates) at the prices that those suppliers decide to charge.

You currently must use our Intranet to operate the Gym. We are the only approved supplier of initial and ongoing IT support for the Gym, including registration and configuration services for the technology platforms; software support for the kiosks, System Website, and POS System; proactive monitoring and notification of the Gym's network and Wi-Fi outages; dedicated level 1 help desk support; and vendor issue management and coordination support.

To ensure that all Blink Fitness Gyms follow similar practices for billing, payment processing, and customer service standards, you currently must purchase the club and member management software (the "POS System") from our approved supplier. You will contract with the supplier directly for all Gym billing, payment processing, collections, member services functions, and POS System software licenses.

We are an approved supplier of other products, equipment, and advertising and marketing materials, but currently you can acquire these items from other suppliers. While you need not purchase these items from us, we typically offer them to franchisees at lower prices than the prices offered by third-party suppliers because we purchase them in high volume. Brand Standards may cover terms and conditions of the sale and delivery of, and terms and methods of

payment for, products and services that you obtain from us and affiliated and unaffiliated suppliers.

You currently must buy fitness equipment, Gym supplies, technology, furniture, fixtures, equipment, retail products, and food and beverage inventory only from suppliers that we designate or approve. None of our officers owns any interest in any current supplier to the franchise system. We restrict your sources of items and services to protect trade secrets and other intellectual property rights, help assure quality, help assure a reliable supply of products that meet our standards, achieve better terms of purchase and delivery service, control third parties' use of the Marks, and monitor the manufacture, packaging, processing, and sale of these items.

Before using them, you must send us, for our approval, Marketing Materials for the Gym that we have not prepared or previously approved, or all materials that we have prepared or already approved and which you propose to change in any way. If we do not notify you in writing of our approval of these materials within 10 days after we actually receive them, they are deemed disapproved. You may not use any Marketing Materials that we have disapproved. You will also prepare a presale marketing program for the Gym that you must implement after approval from us.

You must send us for our written acceptance any lease or sublease for the Gym's site before you sign it. You may not relocate the Gym without our prior written approval.

You are responsible for developing the Gym at your expense. We will provide you with prototype documents and mandatory and suggested specifications and layouts for a Blink Fitness Gym, including requirements or recommendations (as applicable) for dimensions, design, interior layout, décor, signage, security, and Operating Assets. It is your responsibility to make sure that the Gym complies with the Americans with Disabilities Act (the "ADA") and similar rules governing public accommodations for persons with disabilities, other applicable ordinances, building codes, permit requirements, and lease requirements and restrictions. You must submit all construction and remodeling plans and specifications to us for our written approval before beginning build-out for the Gym and all revised or "as built" plans and specifications during construction and development. Our review is limited to ensuring your compliance with prototype requirements. Our review is not designed to assess compliance with federal, state, or local laws and regulations, including the ADA, as compliance with those laws is your responsibility.

At our option, we may periodically require you to alter substantially the Gym's appearance, layout and/or design, and/or replace a material portion of the Operating Assets, to meet our then current requirements for new Blink Fitness Gyms. You must incur any necessary costs. We reserve the right to approve the architects and contractors you use. Within 90 days after receiving written notice from us, you must have plans prepared according to our standards and specifications. You must submit these plans to us for our written approval. You must complete all work according to the approved plans within the time period that we specify. If you do not maintain the condition or appearance of the Gym or the Operating Assets as required, we may do so at your expense.

You must obtain and maintain insurance coverage for the Gym containing the minimum liability coverages that we periodically prescribe.  This insurance is maintained at your expense, in addition to any other insurance required by applicable law, your landlord, lender or otherwise. We may periodically change the amounts of coverage required under the insurance policies, and require different or additional kinds of insurance, to reflect inflation, identification of new risks, changes in law or standards of liability, higher damage awards, or other relevant changes in circumstances, if the changes apply to all franchised Blink Fitness Gyms.

You must obtain your insurance from an insurance company with an "A-" or better rating by A.M. Best and a Financial Size Rating of "VIII" or better.  You currently must have the following minimum insurance coverage: (i) Statutory worker's compensation coverage and Employers Liability; (ii) "All Risk" Property Insurance for all equipment, supplies, extended coverage for fire, theft, vandalism and malicious mischief for all equipment, supplies, and other property used in the operation of the Gym, including Business Interruption insurance; and (iii) Commercial General Liability insurance and product liability insurance coverage, including products/completed operation coverage, personal/advertising injury coverage, sexual abuse/molestation coverage, hired/non-owned auto coverage, and employee-related practices insurance (sexual harassment, wrongful termination, discrimination, or wrongful failure to employ or promote).  We recommend, but do not require, that you obtain Cyber coverage, Notification Expense coverage, and Umbrella Liability coverage, the amount of which will vary based on the number of Blink Fitness Gyms you open and operate.

At least 30 days before you open the Gym or begin any construction, you must send us a certificate of insurance issued by an approved insurance company showing compliance with the insurance requirements and a paid receipt showing the certificate number.  Each certificate of insurance must include a statement by the insurer that the policy will not be canceled, subject to non-renewal, or materially altered without at least 30 days' written notice to us.  Each insurance policy must name us and entities and persons affiliated with us as additional insureds.  We may require that some or all of your insurance policies provide for waiver of subrogation in favor of us and our affiliates.  On our request, you must provide us with copies of all insurance policies together with proof of payment for insurance.  You must send us current certificates of insurance and copies of all insurance policies on an annual basis.

Except as described above, there are no goods, services, supplies, fixtures, equipment, inventory, computer hardware and software, real estate, or comparable items related to establishing or operating the Gym that you currently must buy or lease from us (or our affiliate) or from designated or approved suppliers.  In the future, we may designate other products and services that you must buy only from us, our affiliates, or designated or approved suppliers.  To maintain the quality of the products and services that Blink Fitness Gyms offer and sell and our franchise network's reputation, all Operating Assets and other products and services that your Gym uses or sells (besides those described above that you may obtain only from us, our affiliates and/or approved suppliers) must meet our minimum standards and specifications.  We issue and modify standards and specifications based on our and our franchisees' experience in operating Blink Fitness Gyms.  Standards and specifications may impose minimum requirements for production, performance, reputation, prices, quality, design, and appearance.  Our Operations Manual and other technical manuals or other communications will identify our standards and

specifications for you and, where appropriate, you may provide those standards and specifications to suppliers.

If you want to use any products or services for or at the Gym that we have not yet evaluated or purchase any product or service from a supplier that we have not yet approved (for products and services that we require you to purchase only from designated or approved suppliers), you first must submit sufficient information, specifications and samples for us to determine whether the product or service complies with our standards and specifications or the supplier meets our criteria. We may charge you a reasonable fee and will decide within a reasonable time (no more than 30 days). We may condition our written approval of a supplier on requirements relating to product quality, prices, consistency, warranty, reliability, financial capability, labor relations, member relations, frequency of delivery, concentration of purchases, standards of service (including prompt attention to complaints), and/or other criteria. We may inspect the proposed supplier's facilities and require the proposed supplier to deliver product samples or items, at our option, either directly to us or to any third party we designate for testing. We may periodically re-inspect the facilities and products of any approved supplier and revoke our approval of any supplier, product or service that does not continue to meet our criteria by notifying you and/or the supplier. We do not make our criteria for approving suppliers available to our franchisees. Despite these procedures, we may limit the number of approved suppliers with whom you may deal, designate sources that you must use, and/or refuse any of your requests for any reason, including that we have already designated an exclusive source (which might be us or our affiliate) for a particular item or service or if we believe that doing so is in the best interests of the Blink Fitness network. If we approve of any supplier or distributor recommended by you, from which you purchase or lease any Operating Assets or other products or services, we are authorized to allow other Blink Fitness Gyms to purchase or lease any Operating Assets or other products or services from these suppliers or distributors without compensation to you.

We and/or our affiliates may derive revenue or other material consideration based on your purchases and leases, including from charging you for products and services that we or our affiliates provide to you and from promotional allowances, volume discounts and other payments that designated, approved or recommended suppliers make to us and our affiliates. We and our affiliates may use all amounts received from suppliers, whether or not based on your and other franchisees' prospective or actual dealings with them, without restriction for any purposes that we and our affiliates deem appropriate.

Collectively, the purchases and leases that you must make from us or our affiliates, from designated or approved suppliers, or according to our standards and specifications represent about 80% to 90% of your overall purchases and leases in establishing and operating the Gym. During 2015 we and our affiliates did not (1) derive any revenues or other material consideration from franchisees' direct purchases or leases or (2) receive any payments from designated and approved suppliers on account of franchisee purchases or leases of required and approved items from those suppliers.

There currently are no purchasing or distribution cooperatives. We and our affiliates currently negotiate purchase arrangements with suppliers (including price terms) for the items and services described earlier in this Item that you may obtain only from designated sources. In

doing so, we and our affiliates seek to promote the overall interests of the franchise system and affiliate-owned operations and our interests as the franchisor. We do not provide material benefits to you (for example, renewal or granting additional franchises) based on your purchase of particular products or services or use of particular suppliers.

The Development Rights Agreement does not require you to buy or lease from us (or our affiliates), our designees, or approved suppliers, or according to our specifications, any goods, services, supplies, fixtures, equipment, inventory, computer hardware and software, or comparable items related to establishing or operating your business under the Development Rights Agreement. However, you must give us information and materials we request concerning each site at which you propose to operate a Blink Fitness Gym so that we can assess that site, which is subject to our written acceptance.

## Item 9
## FRANCHISEE'S OBLIGATIONS

**This table lists your principal obligations under the franchise and other agreements. It will help you find more detailed information about your obligations in these agreements and in other items of this disclosure document.**

| | Obligation | Section in agreement | Disclosure document item |
|---|---|---|---|
| a. | Site selection and acquisition/lease | 4.A and 4.B of Franchise Agreement; 3 and 5 of Development Rights Agreement | 5, 7, 8, 11, and 12 |
| b. | Pre-opening purchases/leases | 4.C and 4.D of Franchise Agreement | 5, 7, 8, and 11 |
| c. | Site development and other pre-opening requirements | 4.C of Franchise Agreement; 3 of Development Rights Agreement | 5, 7, 8, and 11 |
| d. | Initial and ongoing training | 6.A, 6.B, 6.C, 6.D, 6.E, and 6.F of Franchise Agreement | 6, 7, and 11 |
| e. | Opening | 4.E of Franchise Agreement | 8, 11 and 12 |
| f. | Fees | 5, 6.C, 6.D, 6.E, 6.F, 13.B, 13.D, 13.E, 15.B, 16.C, and 17 of Franchise Agreement; 2 and 3 of Development Agreement; and 2 and 3 of Development Incentive Addendum to Unit Franchise Agreement | 5, 6, 7 and 8 |
| g. | Compliance with standards and policies/operating manual | 7.B and 7.C of Franchise Agreement | 8 and 11 |
| h. | Trademarks and proprietary information | 8 and 9 of Franchise Agreement | 13 and 14 |
| i. | Restrictions on products/services offered | 7.E of Franchise Agreement | 11, 12, and 16 |

| | Obligation | Section in agreement | Disclosure document item |
|---|---|---|---|
| j. | Warranty and customer service requirements | 7.B and 7.C of Franchise Agreement | Not Applicable |
| k. | Territorial development and sales quotas | 1, 3 and 5 of Development Rights Agreement | 12 |
| l. | On-going product/service purchases | 7.E and 7.F of Franchise Agreement | 6 and 8 |
| m. | Maintenance, appearance and remodeling requirements | 7.A of Franchise Agreement | 8, 11, 16, and 17 |
| n. | Insurance | 20.D of Franchise Agreement | 7 |
| o. | Advertising | 13 of Franchise Agreement | 5, 6, 7, 8, and 11 |
| p. | Indemnification | 20.E of Franchise Agreement; 11 of Development Rights Agreement | 6 |
| q. | Owner's participation/ management/staffing | 4.E, 7.C, and 7.D of Franchise Agreement | 11 and 15 |
| r. | Records and reports | 14 of Franchise Agreement | 6 |
| s. | Inspections and audits | 15 of Franchise Agreement | 6 |
| t. | Transfer | 16 of Franchise Agreement; 10 of Development Rights Agreement | 6 and 17 |
| u. | Renewal | 17 of Franchise Agreement | 6 and 17 |
| v. | Post-termination obligations | 19 of Franchise Agreement | 17 |
| w. | Non-competition covenants | 12 and 19.E of Franchise Agreement | 15 and 17 |
| x. | Dispute resolution | 21.F, 21.G, and 21.I of Franchise Agreement; 11 of Development Rights Agreement | 17 |
| y. | Presale of Memberships | 4.D of Franchise Agreement | 11 and 16 |

## Item 10
## FINANCING

We do not offer direct or indirect financing.  We do not guarantee your note, lease, or obligation.

## Item 11
## FRANCHISOR'S ASSISTANCE, ADVERTISING,
## COMPUTER SYSTEMS, AND TRAINING

**Except as listed below, we are not required to provide you with any assistance.**

<u>Pre-Opening Assistance</u>

Before you begin operating the Gym, we or another representative we authorize will:

1.      Provide your Operating Principal and one manager for the Gym (the "Club Manager") with initial orientation and training, which we describe in detail later in this Item.  (Franchise Agreement – Section 6.A)

2.      Provide up to 5 days of local in-market training and opening support for the Gym upon successful completion of the initial training program and during the Gym's initial opening period (which may begin before and continue after the Gym's actual opening date).  (Franchise Agreement – Section 6.B)

3.      Provide, or designate a Site Consultant who will provide, assistance in reviewing potential sites for the Gym you identify within the Site Selection Area (defined in Item 12) after you sign the Franchise Agreement or a Development Rights Agreement covering the proposed location.  We, our affiliates, and our designated suppliers (including the Site Consultant, if you use one) will not provide assistance, recommendations, or written acceptance of any particular site or lease for any site unless (a) you and we, at our respective sole options, first sign a Franchise Agreement, or (b) a previously signed Development Rights Agreement covers that site.  You must use a licensed commercial real estate broker during the site selection process, and we have the right to pre-approve your proposed broker before you move forward.  We may physically visit your proposed sites.  We may condition our making a proposed site visit and our acceptance of a proposed site on your first sending us complete site reports and other materials (including photographs and video recordings) we request.  We or the Site Consultant will provide you with our then current criteria for sites for Blink Fitness Gyms (including population density and other demographic characteristics, visibility, traffic flow, competition, accessibility, parking, size, and other physical and commercial characteristics) to assist you in selecting and identifying your site.  Even if we or the Site Consultant gives you information regarding a potential site or site criteria, you acknowledge that (i) the Site Consultant is solely responsible for its activities, its communications, and the information it shares with you, and (ii) we have made and will make no representations or warranties of any kind, express or implied, about the suitability of the site for a Blink Fitness Gym or any other purpose, or of the likelihood that we ultimately will accept that site for the Gym's location.  (Franchise Agreement – Section 4.A; Development Rights Agreement – Section 3)

4.      Provide written acceptance of sites you propose which meet our criteria. You have 6 months after the Franchise Agreement's effective date to obtain our written acceptance of a site at which to operate the Gym.  If you do not, we may terminate the

Franchise Agreement.  You must use a licensed commercial real estate broker during the site selection process, and we have the right to pre-approve your proposed broker before you move forward.  You will submit all information that we request when you propose a site.  We will use reasonable efforts to review and accept or reject the sites you propose within 30 days after we receive all requested information and materials (including photographs and video recordings).  We will not unreasonably withhold our acceptance of a site that meets our then current criteria.  However, we have the absolute right to reject any site that does not meet these criteria.  Our acceptance of a site indicates only that we believe that the site meets, or has the potential to meet, or that we have waived, our then current criteria for site suitability.  Our application of criteria that have appeared effective with other sites might not accurately reflect the potential for all sites, and demographic and/or other factors included in or excluded from our criteria could change, altering a site's potential.  The uncertainty and instability of these criteria are beyond our control, and we are not responsible if a particular site fails to meet your expectations.  Upon accepting a proposed site, we will list the accepted site's location as the Gym's address in Exhibit A of the Franchise Agreement.  Deadlines for finding acceptable sites under the Development Rights Agreement are determined by the development schedule we and you negotiate before signing.  (Franchise Agreement – Section 4.A; Development Rights Agreement – Section 5)

5.     Accept or reject the lease for the Gym.  You must present to us for our written acceptance any lease or sublease (and any renewals and amendments of the lease or sublease) that will govern your occupancy and lawful possession of the Gym before you intend to sign it.  These obligations apply even if we have accepted the Gym's site before signing the Franchise Agreement.  We may (but have no obligation to) provide you guidance or assistance relating to the lease or sublease but will not negotiate the lease on your behalf or provide any legal advice.  You must receive our written acceptance of the lease before you sign it.  The lease or sublease must either (i) include the lease rider attached to the Franchise Agreement, or (ii) provide in the body of the lease or sublease the terms and conditions found in the lease rider.  Our guidance and assistance (if we choose to provide it) and/or acceptance of the lease is not a guarantee or warranty, express or implied, of the success or profitability of a Blink Fitness Gym operated at the site or the suitability of the lease for your business purposes.  (Franchise Agreement – Section 4.B)

6.     Provide you prototype documents and mandatory and suggested specifications and layouts for a Blink Fitness Gym, including requirements or recommendations (as applicable) for dimensions, design, interior layout, décor, signage, security, and Operating Assets.  These specifications and layouts might not reflect the requirements of any federal, state or local law, code or regulation, including those arising under zoning regulations, environmental laws and regulations, other applicable ordinances, building codes or permit requirements, or any lease requirements or restrictions.  It is your responsibility to prepare all required construction and remodeling plans and specifications to suit the Gym and to construct, remodel, and decorate the Gym's premises.  You may not begin build-out for the Gym until we have approved the plans and specifications in writing.  Our review of the plans and specifications is limited to reviewing your compliance with our prototype requirements and not compliance with

laws, ordinances, or permits. You must develop the Gym in accordance with the plans and specifications that we have approved in writing. During build-out of the Gym, we may physically inspect the Gym or require you to send us pictures and images (including video recordings) of the interior and/or exterior of the Gym to review your development of the Gym in accordance with our Brand Standards detailed in the Operations Manual. (Franchise Agreement – Section 4.C)

7.      As discussed in Item 8, identify the Operating Assets, inventory, supplies, and other products and services that you must use to develop and operate the Gym, the minimum standards and specifications that you must satisfy, and the designated and approved suppliers from whom you must or may buy or lease items and services (which may be limited to or include us and/or our affiliates). We or our affiliate will provide some items and we will provide names of approved suppliers for some other items. Our Operations Manual provides specifications for some items. As noted in Item 8, we will configure certain hardware and software for the Gym and either ship or deliver the hardware and software to you at the Gym. (Franchise Agreement – Sections 4.C, 6.G and 7.E)

8.      Authorize you to engage in the presale of memberships and other rights to participate in the services at the Gym if you meet our requirements. We will not authorize your presale activities unless: (i) we have authorized you in writing to offer or sell memberships or those rights to the public; (ii) you in good faith expect to open the Gym for business within the 120-day period following the offer or sale; (iii) your Operating Principal and the Gym's Club Manager have completed to our satisfaction the initial training program; and (iv) you have secured all financing and permits necessary to develop, build and fully equip the Gym. You are responsible for ensuring that your membership agreements and presale activities comply with all applicable laws and other legal requirements. (Franchise Agreement – Section 4.D)

9.      Provide you access to our operating manual and other technical manuals (collectively, the "Operations Manual"). The Operations Manual may include written or electronic materials that we may make available to you by various means, including hardcopy or access through the Intranet. The Operations Manual contains Brand Standards and information on your other obligations under the Franchise Agreement. We may modify the Operations Manual periodically to reflect changes in Brand Standards, but these modifications will not alter your fundamental rights or status under the Franchise Agreement. You must keep your copy of the Operations Manual current and communicate all updates to your personnel in a timely manner. You must keep all parts of the Operations Manual in a secure location and restrict access to any passwords for accessing the Operations Manual. If there is a dispute over its contents, our master copy of the Operations Manual controls. The contents of the Operations Manual are confidential and you may not disclose any part of the Operations Manual to any person other than Gym employees and others who need to know that part and who agree to maintain its confidentiality by signing a confidentiality agreement. You may not at any time copy, duplicate, record or otherwise reproduce any part of the Operations Manual.

While we may designate the form of confidentiality agreement you must use with employees having access to our Confidential Information (defined below) in order to protect that Confidential Information, under no circumstances will we control the forms or terms of your employment agreements or otherwise be responsible for your labor relations.  In addition, the Brand Standards do not include any personnel policies or procedures or security-related policies or procedures that we (at our option) may make available to you in the Operations Manual or otherwise for your optional use.  You will determine to what extent, if any, these policies and procedures might apply to your operations at the Gym.  We neither dictate nor control labor or employment matters for franchisees and their employees and we are not responsible for the safety and security of Gym employees, members, guests, and visitors.  You must hire and train all Gym employees.

At our option, we may post the Operations Manual on the Intranet or another restricted website to which you will have password access.  If we do so, you must periodically monitor the website for any updates to the Operations Manual or Brand Standards.  Any passwords or other digital identifications necessary to access the Operations Manual on such a website are part of the Confidential Information.  The Operations Manual currently contains approximately 311 total pages and its current table of contents is Exhibit D.  (Franchise Agreement – Section 6.G)

10.     Consult and jointly prepare with you a presale marketing program that contemplates spending an agreed amount on the initial promotion of the Gym (the "Presale Marketing Budget") that we will approve.  At least 45 days before you intend to implement the presale marketing program, you must submit it to us for our approval.  If we do not accept the presale marketing program in writing within 15 days after receiving it, it will be deemed rejected.  You must implement the approved program according to our requirements.  You will use the Presale Marketing Budget to pay providers of products and services according to the approved presale marketing program.  (Franchise Agreement – Section 13.A)

If you sign the Development Rights Agreement, then before you begin operating under that Agreement, we will complete the Schedule which designates a specific number of Blink Fitness Gyms that you (or a Controlled Affiliate) must open at acceptable sites within your Area.  (Development Rights Agreement – Sections 1, 3 and 5)  "Controlled Affiliate" means any corporation, limited liability company or other business entity of which you or one or more of your majority owners owns at least 51% of the total authorized ownership interests, as long as you or such owners have the right to control the entity's management and policies.

Ongoing Assistance

During your operation of your Gym, we or another representative we authorize will:

1.     Advise you regarding the Gym's operation based on your reports or our evaluations and inspections.  We may guide you on standards, specifications, operating procedures and methods that Blink Fitness Gyms use; purchasing required or recommended Operating Assets and other products, supplies and materials; methods of

providing advice to Gym members; instructor and employee training methods and procedures (although you are responsible for hiring the Gym's employees and for the terms and conditions of their employment); and accounting, advertising, and marketing. We may guide you in our Operations Manual, in bulletins or other written materials, by electronic media, by telephone consultation, and/or at our office or the Gym. (Franchise Agreement – Section 6.G)

2.      Establish a restricted website providing communications among us, our affiliates, you, other Blink Fitness franchisees, and other persons and entities to whom we (in our judgment) periodically determine to give access (the "Intranet"). We may make the Intranet part of the System Website, which we describe in more detail later in this Item. The Intranet will provide the features, services and functionality that we periodically specify.

You must comply with the requirements that we periodically specify concerning connecting to the Intranet and using the Intranet in operating your Gym. This includes entering the information concerning each person who registers for a membership that the Gym offers and all Gross Sales of the Gym using the Intranet in the manner that we periodically specify. We will own all intellectual property and other rights in the Intranet and all information it contains, including its domain name or URL, the log of "hits" by visitors, any personal or business data that visitors (including you) supply, and all information relating to the members and other patrons of the Gym, whether that information is contained on your Computer System or our (or our designee's) computer system (collectively, the "Data"). We may implement and periodically modify Brand Standards relating to the Intranet and, at our option, may discontinue the Intranet, or any services offered through the Intranet, at any time. (Franchise Agreement – Sections 7.G, 10, and 13.G)

3.      Give you, at your request and expense (and our option), additional or special guidance, assistance, and training. Any specific ongoing training, conventions, advice or assistance we provide does not create an obligation to continue providing that specific training, convention, advice or assistance, all of which we may discontinue and modify at any time. (Franchise Agreement – Section 6.D)

4.      Continue to provide you access to our Operations Manual. (Franchise Agreement – Section 6.G)

5.      Issue and modify Brand Standards. Because of our periodic modification of the Brand Standards (including to accommodate changes to the required Computer System for Blink Fitness Gyms and the Marks), you might need to invest additional capital in and otherwise improve and develop the Gym and incur higher operating costs. You must comply with those obligations within the time period we specify. Although we may establish and periodically modify Brand Standards that you must follow, you retain the responsibility for the Gym's day-to-day management and operation and implementing and maintaining Brand Standards at the Gym. (Franchise Agreement – Section 7.C)

6.      Let you use our Marks. (Franchise Agreement – Section 8)

7.    Let you use certain confidential information, some of which constitutes trade secrets under applicable law, relating to the development and operation of Blink Fitness Gyms (the "Confidential Information") (Franchise Agreement – Section 9)

8.    At our option, establish and administer a Brand Fund for the advertising, marketing and public relations programs and materials that we deem appropriate.    We describe the Brand Fund and other aspects of our advertising, marketing and promotional programs later in this Item.  (Franchise Agreement – Section 13.B)

If you sign the Development Rights Agreement, then during your operation under that Agreement, we will grant you (or a Controlled Affiliate) franchises for Blink Fitness Gyms if we approve of your (or the Controlled Affiliate's) financial and operation ability and proposed site. We describe our site acceptance process and criteria earlier in this Item.  After you sign the Development Rights Agreement and the Franchise Agreement for the Gym, we or a Site Consultant will assist you by reviewing potential sites for the Gym you are to develop under the Franchise Agreement.  We may physically visit your proposed sites.   We may condition our making a proposed site visit and our acceptance of a proposed site on your first sending us complete site reports and other materials (including photographs and video recordings) we request.  You or the approved Controlled Affiliate (and your or the Controlled Affiliate's owners) must sign our then current form of franchise agreement and related documents for each Blink Fitness Gym (the "Franchise Documents"), the terms of which may differ substantially from those in the Franchise Agreement attached to this disclosure document, provided, however, that:  (1) no initial franchise fee is due for any Blink Fitness Gym you develop and open under the Development Rights Agreement; (2) you will pay a reduced royalty fee during the initial years you operate the Blink Fitness Gyms you develop in compliance with the deadlines in the Schedule; and (3) your required Brand Fund contribution during the first full 12 months you operate each Blink Fitness Gym may be spent instead on local store marketing (assuming we have begun collecting Brand Fund contributions).  If you or the Controlled Affiliate does not timely sign the Franchise Documents, or is unable to obtain lawful possession of the proposed site within a reasonable time after we accept it, we may withdraw our acceptance.  Neither you nor any Controlled Affiliate may sign any lease or sublease for a site without our written acceptance and first signing, and complying with, our Franchise Documents.  (Development Rights Agreement – Sections 1, 3 and 5)

Advertising and Marketing Programs

Brand Fund

We may, upon 30 days' prior written notice to you, establish and then administer and maintain a fund for advertising, marketing, and public relations programs and materials, the purpose of which is to enhance, promote, and protect the Blink Fitness brand and franchise system (the "Brand Fund" or "Fund").  You must contribute the amount that we periodically specify to the Brand Fund, not to exceed 3% of your Gym's Gross Sales.  (We expect your Brand Fund contribution will be 2% of your Gym's Gross Sales when the Brand Fund first becomes operational.)  Blink Fitness Gyms that we or our affiliates own will contribute to the Brand Fund on the same percentage basis as franchisees.

We will direct all programs financed by the Brand Fund, with sole control over all creative and business aspects, but we will consult periodically with the franchisee advertising council (or its successor, if any) when established concerning the Fund's significant advertising programs and expenditures.  The Brand Fund may pay for preparing, producing, and placing video, audio and written materials, electronic media and Social Media; developing, maintaining, and administering one or more System Websites, including online membership capabilities, lead management and member retention programs; administering national, regional and multi-regional marketing and advertising programs, including purchasing trade journal, direct mail, and other media advertising and using advertising, promotion, and marketing agencies and other advisors to provide assistance; establishing regional and national promotions and partnerships and hiring spokespersons to promote the Blink Fitness brand; and supporting public and member relations, market research, and other advertising, promotion, marketing and brand-related activities.  The Brand Fund may advertise locally, regionally, and/or nationally in printed materials, on radio or television, and/or on the Internet, whatever we think best.  We and/or an outside national or regional advertising agency will produce all advertising and marketing.  The Brand Fund periodically will make available samples of advertising, marketing and promotional formats and materials at no cost and will sell you multiple copies of these materials at its direct cost of producing them, plus any related shipping, handling and storage charges.

We will account for the Brand Fund separately from our other funds and not use the Brand Fund for any of our general operating expenses.  However, the Brand Fund may reimburse us and our affiliates for the reasonable salaries and benefits of personnel who manage and administer the Brand Fund or otherwise provide assistance or services to the Brand Fund, the Brand Fund's administrative costs, travel expenses of personnel while they are on Brand Fund business, meeting costs, overhead relating to the Brand Fund's business, and other expenses that we and they incur in administering or directing the Brand Fund and its programs, including conducting market research, preparing advertising, promotional and marketing materials, collecting and accounting for Brand Fund contributions and any other costs or expenses we incur in operating the Brand Fund or as a consequence of the Fund.  We will not use the Brand Fund's resources to develop materials and programs to solicit new franchise sales.  Because the Brand Fund does not yet exist, it has no operating history.

The Brand Fund is not a trust, and we do not owe you fiduciary obligations because of our maintaining, directing, or administering the Brand Fund or any other reason.  The Brand Fund may spend in any fiscal year more or less than the total Brand Fund contributions in that year, borrow from us or others (paying reasonable interest) to cover deficits, or invest any surplus for future use.  We will use all interest earned on Brand Fund contributions to pay costs before using the Brand Fund's other assets.  We will prepare an annual, unaudited statement of Brand Fund collections and expenses and give you the statement upon written request.  We may (but need not) have the Brand Fund audited annually, at the Brand Fund's expense, by a certified public accountant.  We may incorporate the Brand Fund or operate it through a separate entity whenever we deem appropriate.  The successor entity will have all of the rights and duties specified here.

We intend the Brand Fund to maximize recognition of the Marks and patronage of Blink Fitness Gyms, and to enhance, promote, and protect the Blink Fitness brand and franchise system.  Although we will try to use the Brand Fund in the aggregate to develop advertising and

marketing materials and programs, and implement programs that will benefit all Blink Fitness Gyms, we need not ensure that Brand Fund expenditures in or affecting any geographic area are proportionate or equivalent to the Brand Fund contributions by Blink Fitness Gyms operating in that geographic area or that any Blink Fitness Gym benefits directly or in proportion to its Brand Fund contribution from the development of advertising and marketing materials or implementation of programs.  (In other words, the Brand Fund need not spend any specific amount in your market area.)  We have the right, but no obligation, to use collection agents and institute legal proceedings to collect Brand Fund contributions at the Brand Fund's expense.  We also may forgive, waive, settle and compromise all claims by or against the Brand Fund.  We assume no direct or indirect liability or obligation to you for collecting amounts due to, maintaining, directing, or administering the Brand Fund.

We may at any time defer or reduce the Brand Fund contributions of a Blink Fitness Gym franchisee and, upon 30 days' prior written notice to you, reduce or suspend Brand Fund contributions and operations for one or more periods of any length and terminate (and, if terminated, reinstate) the Brand Fund.  If we terminate the Brand Fund, we will either (i) spend the balance remaining in the Fund on advertising programs and expenditures or (ii) distribute all unspent funds to our then existing franchisees, and to us and our affiliates, in proportion to their respective Brand Fund contributions during the preceding 12-month period.   (Franchise Agreement – Section 13.B)

<u>Local Marketing</u>

You generally must spend at least 5% of the Gym's Gross Sales each calendar year on approved Marketing Materials and other approved advertising, marketing and promotional programs for the Gym.  However, because we have not yet begun collecting Brand Fund contributions as of this disclosure document's issuance date, your Local Marketing Spending Requirement will be 7% of the Gym's Gross Sales until we start collecting Brand Fund contributions (after which time your Local Marketing Spending Requirement for the balance of the franchise term will be at least 5% of the Gym's Gross Sales, as specified above).  You must prepare a written local marketing plan for the expenditure of your Local Marketing Spending Requirement and submit the plan to us for our written approval in accordance with our approval process.  (Franchise Agreement – Section 13.D)  We may require you to contribute your Local Marketing Spending Requirement to the Brand Fund.  If we do so, we will direct the Brand Fund to spend the Local Marketing Spending Requirement, less our costs or expenses in operating the Brand Fund or as a consequence of the Fund (as described above), on advertising, marketing, and promotional programs in or for the Gym's local market.

Under our current Development Incentive Program, if we have begun collecting Brand Fund contributions as of the date the Gym opens for business (or if we begin collecting Brand Fund contributions during the first full 12 months you operate the Gym), then for the Gym's first full 12 months of operation (or the balance of those first full 12 months if we begin collecting Brand Fund contributions during the first full 12 months), you may spend the 2% of Gross Sales that we otherwise would require you to contribute to the Brand Fund on local marketing, advertising, and promotional programs for the Gym, meaning that during the Gym's first full 12 months of operation (or the balance of those first full 12 months, as noted above), the Local Marketing Spending Requirement would be 7% of the Gym's Gross Sales (rather than 5%).

<u>Advertising Councils</u>

There currently are no franchisee advertising councils that advise us on advertising and marketing policies and programs.

<u>Advertising Cooperatives</u>

There currently are no advertising cooperatives. We may designate a geographic area for an advertising cooperative (a "Cooperative"). The Cooperative's members in any area are the owners of all Blink Fitness Gyms located and operating in that area (including us and our affiliates, if applicable). Each Cooperative will be organized and governed in a form and manner, and begin operating on a date, that we determine. We may change, dissolve, and merge Cooperatives. Each Cooperative's purpose is, with our approval, to administer advertising programs and develop advertising, marketing and promotional materials for the area that the Cooperative covers. You must sign the documents that we require to become a member of the Cooperative we specify and participate in the Cooperative as those documents require. We reserve the right to require you to contribute an additional 1% of the Gym's monthly Gross Sales to the Cooperative. Any Cooperative dues you contribute (including any additional amounts we require you to contribute to the Cooperative) will count toward the Local Marketing Spending Requirement for the Gym, but in no event will your amounts contributed to a Cooperative affect your new store opening financial and advertising obligations or your required contributions to the Brand Fund.

All material decisions of the Cooperative, including contribution levels (which also require our approval), will require the affirmative vote of at least 2/3$^{rds}$ of all Blink Fitness Gyms operating within the Cooperative's area, including, if applicable, those that we or our affiliates operate. Each Blink Fitness Gym will receive one vote. (Franchise Agreement – Section 13.E)

<u>Approval of Advertising</u>

All advertising, promotion, marketing and public relations activities you conduct ("Marketing Materials") must be legal and not misleading and conform to the policies in the Operations Manual as we periodically specify. At least 30 days before using them, you must send us for our approval samples of all Marketing Materials that we have not prepared or previously approved or materials that we have approved but that you intend to change in any way. If you do not receive written notice of approval from us within 10 days after we receive these materials, they are deemed disapproved. You may not use any Marketing Materials that we have not approved or have disapproved. We may upon 30 days' prior written notice require you to discontinue the use of any approved Marketing Materials. (Franchise Agreement – Section 13.C)

<u>System Website and Electronic Advertising</u>

We or one or more of our designees may establish a website or series of websites for the Blink Fitness network: (1) to advertise, market and promote Blink Fitness Gyms and the products and services they offer, and/or the Blink Fitness franchise opportunity; (2) to function as the Intranet; and/or (3) for any other purposes that we determine are appropriate for Blink Fitness Gyms (collectively, the "System Website"). If we include information about the Gym on

the System Website, you must give us the information and materials that we periodically request concerning the Gym and otherwise participate in the System Website in the manner that we periodically specify.  By posting or submitting to us information or materials for the System Website, you are representing to us that the information and materials are accurate and not misleading and do not infringe any third party's rights.

We own all intellectual property and other rights in the System Website and all information it contains, including the domain name or URL for the System Website, the log of "hits" by visitors, and any Data and other personal or business data that visitors (including you) supply.  We may use the Brand Fund's assets to develop, maintain and update the System Website.  We may implement and periodically modify Brand Standards relating to the System Website and, at our option, may discontinue the System Website, or any services offered through the System Website, at any time.

All Marketing Materials that you develop for the Gym must contain notices of the URL of the System Website in the manner that we periodically designate.  You may not develop, maintain or authorize any other website, other online presence or other electronic medium that mentions or describes the Gym or displays any of the Marks without our prior written approval. You may not conduct commerce or directly or indirectly offer or sell any products or services using any website, another electronic means or medium, or otherwise over the Internet.  We have the right to maintain websites other than the System Website and to offer and sell products and services under the Marks from the System Website, another website or otherwise over the Internet without payment or obligation of any kind to you.  (Franchise Agreement – Section 13.G)

You may not establish an independent website or register any URL containing the Blink Fitness name, Marks or any derivation.  You may not advertise your Gym or reference the Marks on any independent website or through Social Media without our prior written approval. (Franchise Agreement – Sections 13.G and 13.H)

<u>Computer System</u>

You must obtain and use the computer hardware and software that we periodically specify, including self-service kiosks to be located within the Gym and other hardware components, dedicated telephone and power lines, modems, printers, and other computer-related accessories and peripheral equipment (the "Computer System").  You currently will use the Computer System to access the Intranet and to input and access information about your members, sales and operations, and for the self-service use of members.  The Computer System will store some Consumer Data and Gym Lists and information about the Gym's finances and operations based on information you input.  The Computer System will permit 24 hours per day, 7 days per week electronic communications between us, including access to the Internet and Intranet (but excluding matters relating to your labor relations and employment practices).  We will have unlimited access to all information maintained on the Computer System (excluding matters relating to your labor relations and employment practices) and to the content of any Blink e-mail accounts we may provide to you.

The Computer System includes hardware, software, and network access and requires an initial investment ranging from $50,000 to $56,000. This cost includes all technology requirements except for telephony, Internet access, and structured cabling installed during construction. The Computer System includes:

- Front desk technology: Hardware, including 3 front-desk computers, tablet computers with secure enclosures, membership touch screen systems, network laser printer, bar code scanners, magnetic stripe reader, receipt printers, web cameras and mounts, and computer software licenses and pre-configuration for membership touch screen systems.

- Environmental technology: Up to 2 digital media players/screens, content licenses, and music player source.

- Back office computer and printer.

- Managed network switches, firewall, wireless access points with mounting hardware, uninterruptible power supply, and cables.

- Remote configurations of the point-of-sale system, franchise operations system (the Intranet), network monitoring, firewall, digital media players, and in-Gym Wi-Fi.

You must purchase the POS System from our approved supplier. You will contract with the supplier directly for all Gym billing, payment processing, collections, member services functions, and POS System software licenses. The supplier will charge you a fee for such services and licenses equal to a percentage of the Gym's Gross Sales. All functions performed by our approved supplier are Payment Card Industry ("PCI")-compliant.

The third parties whose computer-related products you buy have no contractual right or obligation to provide ongoing maintenance, repairs, upgrades, or updates unless you obtain a service contract or a warranty covers the product.

We may periodically modify specifications for and components of the Computer System. Our modification of specifications for the Computer System, and/or other technological developments or events, may require you to purchase, lease and/or license new or modified computer hardware, software and other components and to obtain service and support for the Computer System. There are no contractual limitations on the frequency and cost of this obligation. We need not reimburse your costs. We anticipate that the fees for Computer System maintenance, support, software upgrades, and related licenses may increase up to 3% annually.

We and our affiliates may condition any license to you of required or recommended proprietary software, and/or your use of technology developed or maintained by or for us (including the Intranet), on your signing a software license agreement or similar document, or otherwise agreeing to the terms (for example, by acknowledging your consent to and accepting the terms of a click-through license agreement), that we and our affiliates require to regulate your use of the software or technology. We and our affiliates may charge you up-front and ongoing

fees for any required or recommended proprietary software or technology that we or our affiliates license to you and for other Computer System maintenance and support services provided during the Franchise Agreement's term.

Despite your obligation to buy, use, and maintain the Computer System according to our standards and specifications, you have sole and complete responsibility for:  (1) the acquisition, operation, maintenance, and upgrading of the Computer System; (2) the manner in which your Computer System interfaces with our and any third party's computer system; and (3) any and all consequences if the Computer System is not properly operated, maintained, and upgraded. (Franchise Agreement – Section 7.F)

Opening

It could take up to 16 months after you sign the Franchise Agreement before you begin operating your Gym.  The specific timetable for opening depends on how quickly you find the Gym's site and finalize the Gym's lease; the Gym's condition and the extent to which you must upgrade or remodel it; the construction schedule; the delivery schedule for Operating Assets and supplies; schedule for completing training; and complying with local laws and regulations.

You may not begin operating the Gym (except for approved presale activities, as described above) until: (1) we have inspected and approved in writing the Gym as having been developed in accordance with our specifications and standards; (2) your Operating Principal and the Gym's Club Manager have completed the initial training program to our satisfaction; (3) you have sufficient employees to manage and operate your Gym on a day-to-day basis, and the employees have been trained by you or the Club Manager; (4) your Operating Principal, the Club Manager, and your Gym's employees have completed all required third party certifications, including cardiopulmonary resuscitation ("CPR"), automated external defibrillator ("AED"), and first aid; (5) you have obtained all required licenses and permits to operate the Gym; (6) you have paid all amounts owed to us and our affiliates and principal suppliers; (7) you are not in default under the Franchise Agreement or any other agreement with us, our affiliates, or principal suppliers; (8) you have given us copies of all required permits, licenses, and insurance policies; and (9) you have met all other opening requirements as established in our Operations Manual.

You must open the Gym and otherwise conduct business at the Gym under the Franchise Agreement on or before the opening deadline listed in the Franchise Agreement.  We will determine the opening deadline for each situation depending on the factors described above that impact the timetable for opening.  The opening deadline will not be longer than 16 months after you sign the Franchise Agreement.  (Franchise Agreement – Sections 4.C and 4.E)

Training

Initial Orientation and Training Programs

If this is your first Blink Fitness Gym, your Operating Principal must attend an initial orientation session on the Blink Fitness Gym system at our principal business address within 45 days after the Franchise Agreement's effective date.  Before you sell any memberships (including through presale), advertise, or open the Gym to the public, your Operating Principal and the Gym's Club Manager must attend and complete our initial training program to our

satisfaction.  The initial training program may include training at our designated training facility or through a web-based platform.  We plan to be flexible in scheduling training to accommodate our personnel, your Operating Principal, and the Club Manager.  Our Operations Manual and other handouts comprise the instructional materials for our training program.  We will provide the initial orientation and training programs for no additional fee.  You will be responsible for the compensation, travel and living expenses of the Operating Principal and Club Manager during orientation and training.

The following chart describes our current initial training program, which may be increased, decreased, or otherwise modified to address the particular needs and qualifications of trainees:

### TRAINING PROGRAM

| Column 1 | Column 2 | | Column 3 |
|---|---|---|---|
| | Hours of Training | | |
| Subject | Classroom | On-the-job | Location |
| Blink Orientation (includes a deep dive on Real Estate, Design, and Construction) | 8 | 0 | At Blink's Home Office in NY, NY, virtual/digital, or at a Blink Fitness Gym appropriate for type of training |
| Team Management | 4 | 8 | At Blink's Home Office in NY, NY, virtual/digital programming, or at a Blink Fitness Gym appropriate for type of training |
| Marketing & Promotions | 8 | 0 | At Blink's Home Office in NY, NY, virtual/digital programming, or at a Blink Fitness Gym appropriate for type of training |
| Pre-Sale | 8 | 16 | At Blink's Home Office in NY, NY, virtual/digital programming, or at a Blink Fitness Gym appropriate for type of training |

| | | | |
|---|---|---|---|
| Technology | 8 | 0 | At Blink's Home Office in NY, NY, virtual/digital programming, or at a Blink Fitness Gym appropriate for type of training |
| Finance and Reporting | 8 | 0 | At Blink's Home Office in NY, NY, virtual/digital programming, or at a Blink Fitness Gym appropriate for type of training |
| Operations | 12 | 62 | At Blink's Home Office in NY, NY, virtual/digital programming, or at a Blink Fitness Gym appropriate for type of training |
| Grand Opening | 4 | 4 | At Blink's Home Office in NY, NY, virtual/digital programming, or at a Blink Fitness Gym appropriate for type of training |
| TOTAL | 60 | 90 | |

Dos Condon, our Vice President, Operations, has over 20 years of experience in all aspects of the preopening and ongoing operations of Blink Fitness Gyms and other health clubs and will supervise franchisee training.

After your Operating Principal and the Club Manager successfully complete the initial training program and during the first week following the opening of the Gym, we will provide up to 5 days of local in-market training and opening support for your Gym (which may begin before and continue after the Gym's actual opening date).

Retraining

If your Operating Principal or the Club Manager fails to complete the initial training program to our satisfaction, or if we determine after an inspection that the Gym is not operating according to Brand Standards, he or she may attend a retraining session. You must pay our then current retraining fee for anyone attending the retraining session. You also will be responsible for the attendees' compensation and travel and living expenses during retraining.

Training for Replacement Club Managers

In the event the Club Manager is no longer employed by you at the Gym, you must appoint a new manager (the "Replacement Manager") to act as the manager for the Gym within 45 days after the last day of the former Club Manager's employment.  The Operating Principal will serve as the Gym's manager until you appoint a Replacement Manager.  The Replacement Manager, and any subsequent Replacement Managers, must satisfactorily complete our web-based training program within 10 days after they are hired and attend and satisfactorily complete our training program for replacement managers at our designated training facility within 45 days after they are hired.  This training program may differ from our standard initial training program. We will provide the replacement manager training program at no additional charge for your first Replacement Manager during the franchise term.  You must pay our then current retraining fee for all subsequent Replacement Managers attending the replacement manager training program. You will be responsible for the compensation and travel and living expenses for the Replacement Manager during training.

Training for Gym Employees

All Gym employees must be properly trained by you or the Club Manager within 10 days after being hired to competently perform the tasks for their respective positions.  We will develop and make available training tools and recommendations for you to implement in training the Gym's employees.  We may periodically update these training materials to reflect changes in our training methods and procedures.

We may require that employees of the Gym be retrained by you or your Club Manager if we determine during a review of your Gym's performance that you are not operating your Gym according to our Brand Standards.

Ongoing and Supplemental Training

We may require your Operating Principal and/or the Club Manager to attend and satisfactorily complete various training courses, programs and conventions that we or third parties offer periodically at the times and locations that we designate.  You will be responsible for the compensation, travel and living expenses for your Operating Principal and the Club Manager during training.  We may charge our then current daily per-trainer training fee for continuing and advanced training.  If you request that the training courses or programs occur locally, and subject to the availability of our training personnel, you must pay our then current training fee and the travel and living expenses for our training personnel.

## Item 12
## TERRITORY

Franchise Agreement

If the Gym's address is unknown when we and you sign the Franchise Agreement, then within 6 months after the Franchise Agreement's effective date, you must obtain our written acceptance of a site at which to operate the Gym within the particular geographic area identified in the Franchise Agreement (the "Site Selection Area").  The time period during which you must

search for, propose, and obtain our written acceptance of a site within the Site Selection Area (the "Site Selection Period") will expire upon the earliest of (i) our accepting a site for the Gym and sending you an amended and restated Exhibit A of the Franchise Agreement, (ii) the Franchise Agreement's termination, or (iii) 6 months after the effective date of the Franchise Agreement.

You may operate the Gym only at an accepted site and may not relocate without our written approval, which we may grant or deny as we deem best. Whether or not we would allow relocation depends on the circumstances at the time and what is in the Gym's and our system's best interests. Factors include, for example, the new site's market area, its proximity to other Blink Fitness Gyms, whether you are in compliance with your Franchise Agreement, and how long it will take you to open at the new site. We may condition our approval of your relocation request on (1) the new site and its lease being acceptable to us, (2) your paying us a reasonable relocation fee, (3) your reimbursing any costs we incur during the relocation process, (4) your confirming that your Franchise Agreement remains in effect and governs your operation of the Gym at the new site with no change in the term or, at our option, your signing our then current form of franchise agreement to govern your operation of the Gym at the new site for a new franchise term (in either case, we may change the definition of the Protected Area), (5) your signing a general release, in a form satisfactory to us, of any and all claims against us and our owners, affiliates, officers, directors, employees, and agents, (6) your continuing to operate the Gym at the original premises until we authorize its closure, and (7) your taking, within the timeframe we specify and at your own expense, all action we require to de-brand and de-identify the Gym's former premises so that it no longer is associated in any manner (in our opinion) with the franchise system.

The Franchise Agreement will grant you an exclusive territory we call the "protected area" (the "Protected Area"). We will describe your Protected Area in the Franchise Agreement before we and you sign it (if you already have found an acceptable site for the Gym). If you have not found an acceptable site for the Gym before signing the Franchise Agreement, we will describe the Protected Area in the Franchise Agreement after the Gym's site is found. The Protected Area surrounding the Gym generally will be bound by straight lines and encompass a living population of at least 100,000 people. With 2 exceptions, we may not change the Protected Area's size or boundaries during the franchise term. One exception is if the population encompassed within the Protected Area doubles in size, in which case we may, at our sole option upon delivery of written notice to you, change the Protected Area's boundary lines to encompass a smaller population. We also may modify the Protected Area if the Gym relocates. Otherwise, we may not alter your Protected Area or territorial rights.

If you are fully complying with the Franchise Agreement, we and our affiliates will not during the franchise term own or operate, or allow another franchisee or licensee to own or operate, another Blink Fitness Gym that has its physical location within the Protected Area. Your rights under the Franchise Agreement otherwise are non-exclusive. We and our affiliates retain all rights with respect to Blink Fitness Gyms, the Marks, the sale of similar or dissimilar products and services, and any other activities we deem appropriate, whether inside or outside the Protected Area, including:

(1)    to own and operate, and to allow other franchisees and licensees to own and operate, Blink Fitness Gyms at any locations outside the Protected Area (including at the boundary of the Protected Area) and on any terms and conditions we deem appropriate;

(2)    to provide, offer and sell, and to grant others the right to provide, offer and sell, products or services that are identical or similar to and/or competitive with those provided at Blink Fitness Gyms, whether identified by the Marks or other trademarks or service marks, through similar or dissimilar distribution channels and on any terms and conditions we deem appropriate (including by providing products, fitness advice and other services through the Internet);

(3)    to establish and operate, and to grant others the right to establish and operate, businesses offering similar products and services under trademarks and service marks other than the Marks; and

(4)    to establish and operate, and to grant to others the right to establish and operate, businesses offering similar or dissimilar products and services under the Marks and on any terms and conditions we deem appropriate.

We need not compensate you if we engage in these activities.

We do not operate, franchise, or have present plans to operate or franchise a business under a different trademark that sells or will sell goods or services similar to those you will sell, but we may do so in the future.  As described in Item 1, Equinox (an affiliate) and its subsidiaries own and operate membership-based luxury fitness clubs in the United States under the "EQUINOX®" brand.  They also own and operate SOULCYCLE®, the category leading indoor cycling brand.  Additionally, they are the exclusive licensee of the PURE YOGA® brand in the United States and currently own and operate membership-based yoga studios in the United States under that brand.  There may be other affiliated operations and franchise programs in the future.  You will compete with the gyms and studios operated by our affiliates that are located near your Gym.  The principal business address of Equinox and Pure Yoga is 895 Broadway, New York, New York 10003.  SoulCycle's principal business address is 609 Greenwich Street, New York, New York 10014.  We have no formal process in place for resolving conflicts that might arise between your Gym and the gyms/studios owned and operated (now and in the future) by our affiliates in terms of area of operation, customers, and franchisor support.  However, because all brands are affiliated, we will strive to resolve any conflict in the best interests of all brands.

Unless you sign a Development Rights Agreement, you have no options, rights of first refusal, or similar rights to acquire additional franchises.

You may not develop, maintain or authorize any website, other online presence or other electronic medium that mentions or describes the Gym or displays any of the Marks without our prior written approval.  We may regulate, without restriction, your advertising, promotional, marketing, and related activities outside the Protected Area, or directed to individual members or customers located outside the Protected Area, to protect what we consider to be the best interests of other Blink Fitness Gym franchisees, Blink Fitness Gyms we and our affiliates operate, or the Franchise System.  You may use other channels of distribution, such as catalog sales,

telemarketing, or other direct marketing, to solicit members inside and outside the Protected Area only if we approve the materials and programs at the time.

Development Rights Agreement

If you sign the Development Rights Agreement, you (and your Controlled Affiliates) will develop 3, or 5 or more, Blink Fitness Gyms within the Area. We and you will identify the Area in the Development Rights Agreement before signing it. Sizes and boundaries for Areas will vary widely depending on factors like economic conditions in the market you are developing, the number of Blink Fitness Gyms that you agree to develop, demographics, and site availability. There is no minimum size for Areas. We will describe the Area using streets or other natural boundaries or, in some markets, city or county boundaries. We and you will negotiate the Schedule describing the number of Blink Fitness Gyms that you must develop to keep your development rights and the dates by which you must develop them. We and you then will complete the Schedule in the Development Rights Agreement before signing it.

If you and your Controlled Affiliates are in full compliance with the Development Rights Agreement and other agreements (including Franchise Documents), then, during the Development Rights Agreement's term, neither we nor our affiliates will operate, or authorize any other party to operate, a Blink Fitness Gym that has its physical location within the Area. We may exercise in the Area all of the rights that we now reserve in the Franchise Agreement (as described above). After the Development Rights Agreement expires or is terminated, regardless of the reason, we and our affiliates may engage, and allow others to engage, in any activities we desire within and outside the Area without any restrictions whatsoever, subject only to your (or any Controlled Affiliate's) rights under franchise agreements with us then in effect.

There are no other restrictions on us or our affiliates under the Development Rights Agreement. You may not develop or operate Blink Fitness Gyms outside the Area. We may terminate the Development Rights Agreement (but not Franchise Documents with you or your Controlled Affiliates) if you do not satisfy your development obligations according to the Schedule. Except as described above, continuation of your territorial rights in the Area does not depend on your achieving a certain sales volume, market penetration, or other contingency. We may not alter your Area or your territorial rights.

## <u>Item 13</u>
## TRADEMARKS

You may use certain Marks in operating the Gym. Blink Holdings owns and has registered the following principal Marks on the Principal Register of the United States Patent and Trademark Office (the "USPTO"):

| MARK | REGISTRATION NUMBER | REGISTRATION DATE | SERVICES |
|---|---|---|---|
| blink | 4,020,320 | 8/30/2011 | IC 041: Health club services; Physical fitness training services; Providing fitness and exercise facilities |
| | 4,401,938 | 9/10/2013 | IC 025: Shirts. IC 041: Educational services; Health club services; Physical fitness studio services; Physical fitness training services; Providing fitness and exercise facilities |

No affidavit or renewal filings are yet due for these Marks.  Blink Holdings licenses us to use the above Marks and related intellectual property and to sublicense them to franchisees to use in operating Blink Fitness Gyms under a Trademark, Copyright, and Know-How License Agreement effective April 1, 2015 (the "License Agreement").  The License Agreement's term is 20 years, which we have the right to renew for 3 successive 10 year terms.  We may terminate the License Agreement at any time.  Blink Holdings may terminate the License Agreement immediately if we breach the License Agreement and fail to cure the breach within 30 days after receiving written notice from Blink Holdings.  When the License Agreement terminates or expires, we must stop using and sublicensing the Marks and related intellectual property, but any Blink Fitness Gym franchisee who has been authorized to use the Marks for its Blink Fitness Gym franchise may continue using the Marks until that franchisee's franchise agreement, and any permitted successor franchise agreement, expire or are terminated, but only on the condition that the franchisee continues to comply with its obligations in the franchise agreement and in any permitted successor franchise agreement during their remaining terms.  No other agreement limits our right to use or sublicense any of the Marks (whether we own them or Blink Holdings licenses them for use in the operation of Blink Fitness Gyms).

There are no currently effective material determinations of the USPTO, the Trademark Trial and Appeal Board, or any state trademark administrator or court, and no pending infringement, opposition, or cancellation proceedings or material federal or state court litigation, involving the principal Marks.  We do not know of either superior prior rights or infringing uses that could materially affect your use of the Marks in any state.

You must follow our rules and other Brand Standards when using the Marks.  If we believe at any time that it is advisable for us and/or you to modify, discontinue using and/or replace any Mark, and/or use one or more additional or substitute trademarks or service marks, you must comply with our directions within a reasonable time after receiving notice.  We need not reimburse you for your expenses in complying with these directions (such as costs that you incur in changing the signs or replacing supplies for the Gym), for any loss of revenue due to any

modified or discontinued Mark, or for your expenses of promoting a modified or substitute trademark or service mark.

You must notify us immediately of any actual or apparent infringement or challenge to your use of any Mark or of any person's claim of any rights in any Mark (or any identical or confusingly similar trademark) or claim of unfair competition relating to any Mark. You may not communicate with any person other than us and Blink Holdings, our respective attorneys, and your attorneys, regarding any infringement, challenge or claim. We and Blink Holdings may take the action that we or Blink Holdings deems appropriate (including no action) and control exclusively any litigation, USPTO proceeding or other administrative proceeding arising from any infringement, challenge or claim or otherwise concerning any Mark. You must sign any documents and take any other reasonable actions that, in our or Blink Holdings' attorneys' opinion, are necessary or advisable to protect and maintain our and Blink Holdings' interests in any litigation or USPTO or other proceeding or otherwise to protect and maintain our and Blink Holdings' interests in the Marks.

We will reimburse you for all damages and expenses you incur in any trademark infringement proceeding disputing your authorized use of any Mark, provided your use has been consistent with the Franchise Agreement, the Operations Manual, and Brand Standards communicated to you and if you have timely notified us of, and complied with our directions in responding to, the proceeding. At our option, we and/or our affiliates may defend and control the defense of any proceeding arising from or relating to your use of any Mark.

The Development Rights Agreement does not grant you rights to use the Marks. These rights arise only under the Franchise Agreement.

<u>**Item 14**</u>
**PATENTS, COPYRIGHTS, AND PROPRIETARY INFORMATION**

No patents or pending patent applications are material to the franchise. We and our affiliates claim copyrights in the Operations Manual (which contains our trade secrets and Confidential Information), Gym blueprints and other design features, signage, advertising and marketing materials, our System Website, and similar items used in operating Blink Fitness Gyms. We and our affiliates have not registered these copyrights with the United States Copyright Office but currently need not do so to protect them. You may use copyrighted items only as we specify while operating your Gym (and must stop using them at our direction). Our right to use many of the copyrighted materials described above and much of the Confidential Information described below arises from the License Agreement described in Item 13.

Our Operations Manual and other materials contain our and our affiliates' Confidential Information (some of which constitutes trade secrets under applicable law). Confidential Information includes things like layouts, designs, and other plans and specifications for Blink Fitness Gyms; methods, formats, specifications, standards, systems, procedures, sales and marketing techniques, and knowledge and experience used in developing and operating Blink Fitness Gyms; marketing research and promotional, marketing and advertising programs for Blink Fitness Gyms; knowledge of specifications for and suppliers of, and methods of ordering, certain Operating Assets, products, materials and supplies that Blink Fitness Gyms use and sell;

knowledge of the operating results and financial performance of Blink Fitness Gyms other than your Gym; member solicitation, communication and retention programs, along with data and information used or generated in connection with those programs; information generated by, or used or developed in, the operation of your Gym, including Consumer Data and Gym Lists, and any other information contained in the Computer System or that visitors (including you) provide to the System Website.  "Consumer Data" means the names, addresses, telephone numbers, e-mail addresses, dates of birth, demographic or related information, and credit card information of customers and previous, current and prospective members.  "Gym Lists" means all member lists and membership records for the Gym, which include the names, addresses, phone numbers, and membership numbers of previous, current, and prospective members.

You may use our Confidential Information under the Franchise Agreement.  You and your owners may not use any Confidential Information in any other business or capacity; must keep the Confidential Information absolutely confidential; must not make unauthorized copies of any Confidential Information; must adopt and implement all reasonable procedures that we periodically specify to prevent unauthorized use or disclosure (including limiting disclosure to your personnel and using confidentiality agreements we specify with those having access); and must not sell, trade or otherwise profit in any way from the Confidential Information (including Consumer Data and Gym Lists), except during the Franchise Agreement's term using methods that we have approved.  We are the sole owners of the Gym Lists; you may not distribute the Gym Lists to any third party without our prior written consent.  During the franchise term, we may communicate with and provide notifications to members and other individuals listed on the Gym Lists.  When the franchise term ends, you and your affiliates may not use the Gym Lists, and we and our affiliates may use the Gym Lists in any manner we or they deem necessary or appropriate.

You must promptly disclose to us all ideas, concepts, techniques or materials relating to a Blink Fitness Gym ("Innovations"), whether or not protectable intellectual property and whether created by or for you or your owners, employees or contractors.  Innovations are our sole and exclusive property and works made-for-hire for us.  If any Innovation does not qualify as a "work made-for-hire" for us, then you assign ownership of that item, and all related rights to that item, to us and must sign (and cause your owners, employees and contractors to sign) whatever assignment or other documents that we periodically request to evidence our ownership and to help us obtain intellectual property rights in the item.  You may not use any Innovation in operating the Gym or otherwise without our prior written approval.

The Development Rights Agreement does not grant you rights to use the Confidential Information.  These rights arise only under the Franchise Agreement.

## Item 15
## OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION
## OF THE FRANCHISE BUSINESS

Franchise Agreement

You must at all times faithfully, honestly, and diligently perform your contractual obligations and use best efforts to promote and enhance the Gym.  Brand Standards may regulate

the Gym's staffing levels, and employee training, dress, and appearance. However, you have sole responsibility and authority for your labor relations and employment practices, including, among other things, employee selection, promotion, termination, hours worked, rates of pay, benefits, work assigned, discipline, adjustments of grievances and complaints, and working conditions. Gym employees are under your control at the Gym. You must communicate clearly with Gym employees in your employment agreements, human resource manuals, written and electronic correspondence, paychecks, and other materials that you (and only you) are their employer and that we, as the franchisor of Blink Fitness Gyms, are not their employer and do not engage in any employer-type activities (including those described above) for which only franchisees are responsible.

Only you or your operating principal (the "Operating Principal") are authorized to operate the Gym. You may designate yourself as the Operating Principal, or you may designate one of your owners or another individual with no equity ownership in you as the Operating Principal. The Operating Principal must be approved by us in writing, and you must obtain our written approval to change the individual designated as the Operating Principal. The Operating Principal is responsible for the day-to-day management of your business, and, without our prior written consent, may not engage in any business activity other than the development and operation of the Gym. The Operating Principal may serve as the Gym's Club Manager or may designate another individual to serve as the Club Manager. If you sign the Development Rights Agreement, however, each Blink Fitness Gym that you develop and operate must have a Club Manager, and the individual you designate and retain to serve as the Operating Principal of the Gym may not serve as the Club Manager for any other Blink Fitness Gym you open and operate. The Operating Principal will remain fully responsible for the performance of the Club Manager (and, if you sign the Development Rights Agreement, all Club Managers of the Blink Fitness Gyms you operate). The Operating Principal must successfully complete our initial training program before you sell any memberships (including through presale), advertise, or open the Gym to the public. The Operating Principal, the Club Manager, and your officers, directors, and managers must sign confidentiality and non-competition agreements we require. Our right to review and approve the forms of these agreements is solely to protect Confidential Information and the competitiveness of Blink Fitness Gyms. Under no circumstances will we control the forms of employment agreements you use with Gym employees or otherwise be responsible for your labor relations.

If you propose to change the Operating Principal, you must designate a new individual (the "Replacement Operating Principal") to act as the Gym's operating principal within 45 days after the former Operating Principal's last day. You or one of your owners must serve as the operating principal until you designate, and we approve in writing, a Replacement Operating Principal. The Replacement Operating Principal, and any subsequent Replacement Operating Principals, must satisfactorily complete our initial training program within 45 days after we approve him or her. (Item 6 describes related costs.)

You may not delegate or assign any of your rights or obligations under the Franchise Agreement or any aspect of the Gym's management or operation.

Each owner of any of your ownership interests must personally guarantee all of your obligations under the Franchise Agreement and agree to be bound personally by every

contractual provision, whether containing monetary or non-monetary obligations, including the covenant not to compete.  This "Guaranty and Assumption of Obligations" is Exhibit B of the Franchise Agreement.

Development Rights Agreement

You must develop the number of Blink Fitness Gyms in your Area according to the Schedule.  We do not require, but do recommend, that you personally supervise your development of Blink Fitness Gyms.  You must hire sufficient personnel to manage and supervise the development of your Blink Fitness Gyms.  The personnel need not have an equity interest in your business or attend our training program.  If you are a business entity, your owners need not sign any personal guarantees of your obligations under the Development Rights Agreement.

## Item 16
## RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

The Gym must offer for sale all products and services that we periodically specify, including all products (whether or not branded under the Marks) for sale.  Before you sell any memberships (including through presale), advertise, or open the Gym, your Operating Principal and the Club Manager must successfully complete our initial training program to our satisfaction. You may not offer, sell or otherwise distribute at the Gym or any other location any products or services or offer any courses that we have not authorized.  There are no limits on any of our rights to modify the products and services that your Gym may or must provide.

You may not engage in presale activities without our prior written approval.  Brand Standards may regulate minimum and maximum pricing (if the law allows), and the standards, procedures and requirements for reciprocity programs, transferring membership programs, and other programs designed to enhance member satisfaction with the Blink Fitness network, including revenue and cost sharing requirements for these programs.

## Item 17
## RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION

### THE FRANCHISE RELATIONSHIP

**These tables list certain important provisions of the franchise and related agreements.  You should read these provisions in the agreements attached to this disclosure document.**

Franchise Agreement

|  | Provision | Section in franchise or other agreement | Summary |
|---|---|---|---|
| a. | Length of the franchise term | 3.B of Franchise Agreement | 10 years. |

| | Provision | Section in franchise or other agreement | Summary |
|---|---|---|---|
| b. | Renewal or extension of the term | 17 of Franchise Agreement | If you give timely notice, have complied with obligations during the Franchise Agreement's term, and (at our option) either remodel/upgrade or relocate Gym, you may acquire a successor franchise for a 10-year term. |
| c. | Requirements for franchisee to renew or extend | 17 of Franchise Agreement | Sign then current franchise agreement and releases (if state law allows) and pay successor franchise fee.  "Renewal" means signing our then current franchise agreement for the 10-year successor franchise term, which could contain materially different terms (including fees and territory), except that successor franchise fee is $11,250. |
| d. | Termination by franchisee | 18.A of Franchise Agreement | You may terminate the Franchise Agreement on 30 days' written notice if you are fully complying with, and we materially fail to comply with, the Franchise Agreement, and we do not correct the failure within 30 days after notice (or, if failure cannot reasonably be corrected in 30 days, we must give you reasonable evidence of our effort to correct the failure within a reasonable time). |
| e. | Termination by franchisor without cause | 18.B of Franchise Agreement | We cannot terminate the Franchise Agreement without cause. |
| f. | Termination by franchisor with cause | 18.B of Franchise Agreement | We may terminate the Franchise Agreement if you commit one of several violations. |
| g. | "Cause" defined — curable defaults | 18.B of Franchise Agreement | You have 15 days to cure material law, ordinance or regulation violations; 5 days to cure monetary defaults and 5 days to cure failure to maintain insurance; and 30 days to cure other defaults not listed in (h) below.  We also may assume the Gym's management if you default. |

| Provision | Section in franchise or other agreement | Summary |
|---|---|---|
| h. "Cause" defined — non-curable defaults | 18.B of Franchise Agreement | Non-curable defaults under the Franchise Agreement are material misrepresentations or omissions, failing to complete mandatory training satisfactorily, failing to obtain our site acceptance in writing within 6 months after signing the Franchise Agreement, failing to open on time, abandonment or failing to operate for 3 or more consecutive days or for 5 or more days within any period of 12 consecutive months, losing rights to the Gym, conviction of or pleading no contest to a felony, dishonest, unethical or illegal conduct, unauthorized transfer, breach of non-compete, unauthorized use or disclosure of the Confidential Information, failure to pay taxes, understating Gross Sales, entry of judgment in excess of $100,000, repeated defaults (even if cured), and bankruptcy-related events. |
| i. Franchisee's obligations on termination/nonrenewal | 19 of Franchise Agreement | You must pay outstanding amounts, stop using Marks and our other intellectual property, deliver advertising material, signs and other proprietary items to us, de-identify, stop using and maintain confidentiality of all Confidential Information and return the Operations Manual and other confidential materials, and allow us to notify members and customers (also see (o) and (r) below). |
| j. Assignment of contract by franchisor | 16.A of Franchise Agreement | No restriction on our right to assign or transfer ownership interests without your approval. |
| k. "Transfer" by franchisee — defined | 16.B of Franchise Agreement | Includes transfer of interest in the Franchise Agreement, the Gym or its profits or losses, all or substantially all of the Operating Assets, or any ownership interest in you or your owner (if that owner is an entity), or a controlling ownership interest in an entity with an ownership interest in you. If a business entity owns an interest in you, individual(s) must own that business entity. |
| l. Franchisor approval of transfer by franchisee | 16.B of Franchise Agreement | No transfers without our prior written consent. |

| | Provision | Section in franchise or other agreement | Summary |
|---|---|---|---|
| m. | Conditions for franchisor approval of transfer | 16.C of Franchise Agreement | We will approve transfer of non-controlling interest in you if transferee (and each owner) qualifies and is not (and has no affiliate which is) in a competitive business. We will approve control transfer if transferee (and each owner) qualifies; you pay us and our affiliates all amounts due, submit all reports and are otherwise not in violation of any provision; transferee, its owners and affiliates are not in a competitive business; training completed and training fee paid; transferee signs our then current franchise agreement and other documents (which may have materially different terms); transfer fee paid; transferee agrees to upgrade and remodel; you (and transferring owners) sign general release (if state law allows); we determine that sale terms will not adversely affect Gym's operation; you subordinate amounts due to you; and you stop using Marks and our other intellectual property (also see (r) below). |
| n. | Franchisor's right of first refusal to acquire franchisee's business | 16.G of Franchise Agreement | We may match any offer for the Gym or the Operating Assets or controlling ownership interest in you. |
| o. | Franchisor's option to purchase franchisee's business | 19.F of Franchise Agreement | We may buy the Gym's assets at fair market value after Franchise Agreement is terminated or expires. |
| p. | Death or disability of franchisee | 16.E of Franchise Agreement | Must transfer to approved party within 6 months. We may operate the Gym if it is not being properly managed. |
| q. | Non-competition covenants during the term of the franchise | 12 of Franchise Agreement | No owning interest in, performing services for, loaning money or guaranteeing loan to, or diverting business, customers or members to competitive business anywhere and no interference with our, our affiliates' or franchisees' employees. |
| r. | Non-competition covenants after the franchise is terminated or expires | 19.E of Franchise Agreement | For 2 years after the Franchise Agreement terminates or expires, no owning interest in or performing services for a competitive business at the Gym or 10 miles from the Gym or any other Blink Fitness Gym (same restrictions apply after transfer). |
| s. | Modification of the agreement | 21.N of Franchise Agreement | No modifications without signed writing, but we may change Operations Manual and Brand Standards. |

| | Provision | Section in franchise or other agreement | Summary |
|---|---|---|---|
| t. | Integration/merger clause | 21.N of Franchise Agreement | Only the Franchise Agreement's terms are binding (subject to state law).  Any representations or promises outside of the disclosure document and Franchise Agreement may not be enforceable. |
| u. | Dispute resolution by arbitration or mediation | 21.F and 21.G of Franchise Agreement | We and you must mediate, and then arbitrate, all disputes within 10 miles of where we have our principal business address at the time the demand is filed (it currently is in New York, New York). |
| v. | Choice of forum | 21.I of Franchise Agreement | Subject to mediation and arbitration requirements, litigation generally must be where we have our principal business address at the time the action is commenced (it currently is in New York, New York), subject to state law. |
| w. | Choice of law | 21.H of Franchise Agreement | Except for Federal Arbitration Act and other federal law, New York law governs (subject to state law). |

Development Rights Agreement

| | Provision | Section in franchise or other agreement | Summary |
|---|---|---|---|
| a. | Length of the franchise term | 8 of Development Rights Agreement | Expires on date when last Blink Fitness Gym under Schedule opens or is scheduled to open (whichever is earlier). |
| b. | Renewal or extension of the term | Not applicable | You have no right to renew or extend. |
| c. | Requirements for franchisee to renew or extend | Not applicable | Not applicable. |
| d. | Termination by franchisee | Not applicable | You may not terminate (except as the law allows). |
| e. | Termination by franchisor without cause | Not applicable | We may not terminate without cause. |
| f. | Termination by franchisor with cause | 9 of Development Rights Agreement | We may terminate if you commit one of several violations. |
| g. | "Cause" defined — curable defaults | Not applicable | You have no right to cure defaults. |
| h. | "Cause" defined — non-curable defaults | 9 of Development Rights Agreement | Non-curable defaults are failure to meet Schedule, breach of any obligation, and termination of any franchise agreement with you or Controlled Affiliate. |
| i. | Franchisee's obligations on termination/nonrenewal | Not applicable | Not applicable. |
| j. | Assignment of contract by franchisor | 10 of Development Rights Agreement | No restriction on our right to assign or transfer ownership interests without your approval. |

| | Provision | Section in franchise or other agreement | Summary |
|---|---|---|---|
| k. | "Transfer" by franchisee — defined | 10 of Development Rights Agreement | Includes transfer of interest in the Development Rights Agreement or any ownership interest in you or your owner (if that owner is an entity). |
| l. | Franchisor approval of transfer by franchisee | 10 of Development Rights Agreement | No transfers without our prior written consent. |
| m. | Conditions for franchisor approval of transfer | 10 of Development Rights Agreement | We may grant or withhold consent for any or no reason. |
| n. | Franchisor's right of first refusal to acquire franchisee's business | Not applicable | Not applicable. |
| o. | Franchisor's option to purchase franchisee's business | Not applicable | Not applicable. |
| p. | Death or disability of franchisee | Not applicable | Not applicable. |
| q. | Non-competition covenants during the term of the franchise | Not applicable | There is no non-competition covenant under the Development Rights Agreement, but the covenant under the Franchise Agreement applies. |
| r. | Non-competition covenants after the franchise is terminated or expires | Not applicable | There is no non-competition covenant under the Development Rights Agreement, but the covenant under the Franchise Agreement applies. |
| s. | Modification of the agreement | 11 of Development Rights Agreement | No modifications without signed writing. |
| t. | Integration/merger clause | 11 of Development Rights Agreement | Only the Development Rights Agreement's terms are binding (subject to state law.  Any representations or promises outside of the disclosure document and Franchise Agreement may not be enforceable. |
| u. | Dispute resolution by arbitration or mediation | 11 of Development Rights Agreement | We and you must mediate, and then arbitrate, all disputes within 10 miles of where we have our principal business address at the time the demand is filed (it currently is in New York, New York). |
| v. | Choice of forum | 11 of Development Rights Agreement | Subject to mediation and arbitration requirements, litigation generally must be where we have our principal business address at the time the action is commenced (it currently is in New York, New York), subject to state law. |
| w. | Choice of law | 11 of Development Rights Agreement | Except for Federal Arbitration Act and other federal law, New York law governs (subject to state law). |

## Item 18
## PUBLIC FIGURES

We do not use any public figure to promote our franchise.

<u>Item 19</u>
**FINANCIAL PERFORMANCE REPRESENTATIONS**

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure document. Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

This financial performance representation discloses historical information regarding the average and median end-of-year membership numbers, annual Gross Sales, annual expenses, annual EBITDAR, annual rent and occupancy costs, and annual EBITDA (all terms defined below) for 35 Blink Fitness Gyms operated by our parent company, Blink Holdings, in the States of New York (28) and New Jersey (7) that were open and operating for at least one full year as of December 31, 2015. Of these 35 Blink Fitness Gyms that were open and operating for at least one full year as of December 31, 2015, 24 of them (69%) also had been open and operating for at least 2 full years (but less than 3 full years) as of December 31, 2015, 9 of them (26%) also had been open and operating for at least 3 full years (but less than 4 full years) as of December 31, 2015, and 3 of them (9%) also had been open and operating for at least 4 full years as of December 31, 2015. As of December 31, 2015, Blink Holdings also operated an additional 6 Blink Fitness Gyms in the State of New York (a total of 41 Blink Fitness Gyms were open and operating as of that date). However, the performance of those 6 additional Blink Fitness Gyms is not included below because they had not been open and operating for at least 1 full year as of December 31, 2015. No franchised Blink Fitness Gyms were in operation as of this disclosure document's issuance date.

The 35 affiliate-owned Blink Fitness Gyms included in this financial performance representation are substantially similar to the Blink Fitness Gyms for which we are offering franchises in this disclosure document, and their services and products are the same as those to be offered and sold by franchised Blink Fitness Gyms. These affiliate-owned Blink Fitness Gyms reflect the standard Blink Fitness Gym prototypes and a wide range of demographics and business conditions found in urban and suburban markets.

The information in the tables below shows both the historical average and the historical median end-of-year membership numbers, annual Gross Sales, annual expenses, annual EBITDAR, annual rent and occupancy costs, and annual EBITDA of all 35 affiliated Blink Fitness Gyms during their first full 12 months of operation, of 24 of those affiliated Blink Fitness Gyms during their 2nd full 12 months of operation, of 9 of those affiliated Blink Fitness Gyms during their 3rd full 12 months of operation, and of 3 of those Blink Fitness Gyms during their 4th full 12 months of operation. The beginning and ending dates of the 12 months of operation represented for each Blink Fitness Gym differ because each Blink Fitness Gym opened on a different date. If a Blink Fitness Gym opened on the 1st through the 15th day of a calendar month, its 1st full month of operation for purposes of this financial performance representation began on the 1st day of the month during which it actually opened. If a Blink Fitness Gym

opened on the 16th through the last day of a calendar month, its 1st full month of operation for purposes of this financial performance representation began on the 1st day of the month <u>following</u> the month during which it actually opened.  For example, the first full 12 months of operation for a Blink Fitness Gym opened on February 7 would, for purposes of this financial performance representation, begin on February 1 and run through January 31 of the following year.  The first full 12 months of operation for a Blink Fitness Gym opened on February 25 would, for purposes of this financial performance representation, begin on March 1 and run through February 28 of the following year.

### Average Year-End Results for Blink Fitness Gyms Open at Least 12 Months

|  | Year 1 | Year 2 | Year 3 | Year 4 |
|---|---|---|---|---|
| Total # of Blink Fitness Gyms | 35 | 24 | 9 | 3 |
| Year-End Membership | 4,965 | 5,361 | 5,573 | 7,012 |
| *Number (%) of Gyms exceeding average* | *16 (46%)* | *9 (38%)* | *4 (44%)* | *1 (33%)* |
| Gross Sales | $1,186,184 | $1,492,344 | $1,584,989 | $2,155,793 |
| *Number (%) of Gyms exceeding average* | *18 (51%)* | *9 (38%)* | *3 (33%)* | *1 (33%)* |
| Personnel Costs | $276,461 | $281,543 | $284,434 | $305,455 |
| *Number (%) of Gyms exceeding average* | *14 (40%)* | *8 (33%)* | *5 (56%)* | *1 (33%)* |
| Supplies & Maintenance | $35,025 | $32,378 | $32,961 | $31,191 |
| *Number (%) of Gyms exceeding average* | *16 (46%)* | *11 (46%)* | *4 (44%)* | *1 (33%)* |
| Utilities | $88,104 | $89,390 | $78,372 | $78,475 |
| *Number (%) of Gyms exceeding average* | *18 (51%)* | *9 (38%)* | *5 (56%)* | *1 (33%)* |
| Other Club Expenses | $151,459 | $190,596 | $204,172 | $253,477 |
| *Number (%) of Gyms exceeding average* | *19 (54%)* | *10 (42%)* | *5 (56%)* | *1 (33%)* |
| EBITDAR | $635,134 | $898,436 | $985,049 | $1,487,195 |
| *Number (%) of Gyms exceeding average* | *16 (46%)* | *9 (38%)* | *4 (44%)* | *1 (33%)* |
| Rent & Occupancy | $394,068 | $576,300 | $525,587 | $536,270 |
| *Number (%) of Gyms exceeding average* | *17 (49%)* | *9 (38%)* | *3 (33%)* | *1 (33%)* |
| EBITDA | $241,066 | $322,135 | $459,463 | $950,925 |
| *Number (%) of Gyms exceeding average* | *18 (51%)* | *11 (46%)* | *4 (44%)* | *1 (33%)* |

**Annual Franchise Expense Not Encompassed in Table Above (assuming average annual Gross Sales) (See Note A below)**

|  | Year 1 | Year 2 | Year 3 | Year 4 |
|---|---|---|---|---|
| Royalties (5%) | $59,309 | $74,617 | $79,249 | $107,790 |
| Technology and Support Services Fees ($600 monthly) | $7,200 | $7,200 | $7,200 | $7,200 |
| Brand Fund (2%) | $23,724 | $29,847 | $31,700 | $43,116 |
| Local Marketing (5%) | $59,309 | $74,617 | $79,249 | $107,790 |

## Median Year-End Results for Blink Fitness Gyms Open at Least 12 Months

|  | Year 1 | Year 2 | Year 3 | Year 4 |
|---|---|---|---|---|
| Total # of Blink Fitness Gyms | 35 | 24 | 9 | 3 |
| Year-End Membership | 4,593 | 5,016 | 5,208 | 6,628 |
| Gross Sales | $1,189,440 | $1,369,948 | $1,444,956 | $1,784,977 |
| Personnel Costs | $257,960 | $263,067 | $293,862 | $279,570 |
| Supplies & Maintenance | $32,585 | $31,610 | $31,165 | $28,751 |
| Utilities | $88,204 | $82,447 | $79,581 | $75,913 |
| Other Club Expenses | $159,085 | $187,511 | $220,977 | $221,404 |
| EBITDAR | $651,606 | $805,314 | $819,370 | $1,179,339 |
| Rent & Occupancy | $385,197 | $548,967 | $507,263 | $488,234 |
| EBITDA | $266,409 | $256,347 | $312,107 | $691,105 |

**Annual Franchise Expense Not Encompassed in Table Above (assuming median annual Gross Sales) (See Note A below)**

|  | Year 1 | Year 2 | Year 3 | Year 4 |
|---|---|---|---|---|
| Royalties (5%) | $59,472 | $68,497 | $72,248 | $89,249 |
| Technology and Support Services Fees ($600 monthly) | $7,200 | $7,200 | $7,200 | $7,200 |
| Brand Fund (2%) | $23,789 | $27,399 | $28,899 | $35,700 |
| Local Marketing (5%) | $59,472 | $68,497 | $72,248 | $89,249 |

For purposes of the charts above, "Year-End Membership" means the total number of members under contract as of the end of the particular 12 months of operation (as described above), regardless of the number of members during the course of those 12 months. "Gross Sales" is comprised of monthly member dues billings, annual dues billings, start-up fees, personal training and small group training fees, day passes, contract fees, and retail, food, and beverage collections. "Personnel Costs" is comprised of all salaries, wages, and payroll taxes. "Other Club Expenses" includes expenses for cost of goods sold, computer, telephone, data and software costs, insurance, credit charges, and allowance for uncollectible balances. "EBITDAR," which is an acronym for "earnings before interest, taxes, depreciation, amortization, and rent," is defined as Gross Sales minus (i) all gym cash expenses before debt repayment, (ii) leasehold improvement costs, and (iii) any financing costs and ongoing expenditures for fitness equipment. "EBITDA," which is an acronym for "earnings before interest, taxes, depreciation, and amortization," is defined as Gross Sales minus (i) all gym cash expenses before debt repayment, (ii) leasehold improvement costs, (iii) rent and occupancy, and (iv) any financing costs and ongoing expenditures for fitness equipment. "Rent & Occupancy" expenses include all base rent and any extra charges, such as property taxes and Common Area Maintenance (CAM) paid for affiliate-owned Blink Fitness Gyms. Rent & Occupancy costs can vary widely by market. No part of EBITDAR or EBITDA reflects any Royalty, Brand Fund and

local marketing contributions, or similar payment you must make under your Franchise Agreement.

A Blink Fitness Gym's actual Gross Sales volume may vary widely. Numerous factors will affect a particular Blink Fitness Gym's sales, including goodwill and name recognition in the market; length of time in business; nearby businesses; nearby working and living population; traffic count; site accessibility and visibility; the local market and competition from other health and fitness clubs; general economic conditions; the franchisee's management skill, experience, business acumen, and ability to promote and market its Blink Fitness Gym effectively in the local market; service levels and customer satisfaction; and the degree of adherence to our methods and procedures in operating the Blink Fitness Gym.

A Blink Fitness Gym's actual operating costs (impacting EBITDAR and EBITDA) may vary widely based on many of the same factors impacting Gross Sales. Even the chief operating costs, for example, labor costs (employee wages, workers compensation, and insurance) and rent and other leasehold expenses, can vary significantly depending upon the specific market and location. All 35 affiliate-owned Blink Fitness Gyms included in this financial performance representation are located in the greater New York City metropolitan area (including 7 Blink Fitness Gyms in New Jersey), which may have higher population densities, labor costs, and rent expense than other markets across the United States in which you are interested in developing a Blink Fitness Gym.

We expect to provide to franchisees some of the services that our affiliates' management provides to the Blink Fitness Gyms whose results appear above. However, we do not provide services that a Blink Fitness Gym's owner normally would provide, such as financing, accounting, legal, personnel/labor, construction, and management services. The availability of these services to a franchisee, as well as their cost and quality, will affect operations.

<u>Explanatory Notes</u>

(A)    Because the Blink Fitness Gyms whose results appear above are affiliate-owned and operated, they paid no Royalties. You must consider your Gym's required Royalty payment (currently 5% of monthly Gross Sales) as part of its expected operating expenses. The annual Royalty your Gym would have been required to pay had it achieved the average and median Gross Sales levels reflected in the tables above is identified in the tables.

These affiliate-owned and operated Blink Fitness Gyms spent various amounts during the applicable 12-month period on advertising and marketing. Under the Franchise Agreement, we may establish a Brand Fund into which you must contribute up to 3% of your Gym's monthly Gross Sales (we do not currently collect this 3%), and you must spend at least 5% of your Gym's annual Gross Sales on local advertising and marketing. (We may require you to contribute an additional 1% of your Gross Sales to an advertising Cooperative established in your market (described in Item 11); that contribution will count toward your Local Marketing Spending Requirement.) The annual Local Marketing Spending Requirement and Brand Fund contributions (had the Brand Fund been operational) your Gym would have been required to pay had it achieved the average and median annual Gross Sales levels reflected in the tables above is identified in the tables. We calculated the annual Brand Fund contributions in the tables above at

a 2% contribution rate because we expect to charge 2% when the Brand Fund first becomes operational.

These affiliate-owned and operated Blink Fitness Gyms also spent various amounts on technology services during each 12-month period of operation.  The Franchise Agreement obligates you to pay us monthly technology fees for certain technology services, including point-of-sale, data warehousing, and Intranet support. You also will incur costs for necessary technology services obtained from other service providers. The annual technology and support services fee currently payable to us is identified in the tables above.

(B)    Depreciation of leasehold improvements and equipment is not included in EBITDAR or EBITDA.  To the extent leasehold improvements (estimated in Item 7 of the disclosure document) are paid for and capitalized by a franchisee, these amounts are normally depreciated over the life of the lease. Equipment is normally depreciated over 3 to 5 years. Leasehold improvements are normally depreciated over 10 to 15 years depending on the lease's term.

(C)    The financing, amortization, and interest costs for leasehold improvements and equipment are not included in EBITDAR and EBITDA. Similarly, amortization of the initial franchise fee and organization costs is not included.

<u>Other Possible Differentiating Factors in Operations</u>

Operating results of Blink Fitness Gyms are likely to be affected by the following:

(1)    Differing rent and related expenses for which a franchisee is obligated;

(2)    Economic conditions in a franchisee's market;

(3)    Competition from other businesses offering the same, similar, or competitive services and products;

(4)    Different leasehold improvement or financing costs;

(5)    Different levels of employee wages, fringe benefits, and other costs; and

(6)    Different costs on a local basis of obtaining products and supplies.

Our management prepared this financial performance representation based on information provided by our affiliates that we believe to be reliable.  This financial performance representation was prepared without an audit.  Prospective franchisees or sellers of franchises should be advised that no certified public accountant has audited these figures or expressed his/her opinion with regard to their contents or form.  Written substantiation of all financial information presented in this financial performance representation will be made available to you upon reasonable request.

**Some Blink Fitness Gyms have earned this amount.  Your individual results may differ.  There is no assurance that you will earn as much.**

Other than the preceding financial performance representation, we do not make any financial performance representations. We also do not authorize our employees or representatives to make any such representations either orally or in writing. If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet. If you receive any other financial performance information or projections of your future income, you should report it to our management by contacting Blink Fitness Franchising, Inc., Attn: General Counsel, 386 Park Avenue South, 11th Floor, New York, New York 10016, (212) 359-8780, the Federal Trade Commission, and the appropriate state regulatory agencies.

## Item 20
## OUTLETS AND FRANCHISEE INFORMATION

All figures in the tabular charts below are as of December 31st of each year. The "Company-Owned" outlets referenced in tables 1 and 4 below are owned by one or more of our affiliates.

Table No. 1

### Systemwide Outlet Summary
### For years 2013 to 2015

| Column 1 Outlet Type | Column 2 Year | Column 3 Outlets at the Start of the Year | Column 4 Outlets at the End of the Year | Column 5 Net Change |
|---|---|---|---|---|
| Franchised | 2013 | 0 | 0 | 0 |
| | 2014 | 0 | 0 | 0 |
| | 2015 | 0 | 0 | 0 |
| Company-Owned | 2013 | 8 | 21 | +13 |
| | 2014 | 21 | 35 | +14 |
| | 2015 | 35 | 41 | +6 |
| Total Outlets | 2013 | 8 | 21 | +13 |
| | 2014 | 21 | 35 | +14 |
| | 2015 | 35 | 41 | +6 |

Table No. 2

**Transfers of Outlets from Franchisees to New Owners (other than the Franchisor)
For years 2013 to 2015**

| Column 1<br><br>State | Column 2<br><br>Year | Column 3<br><br>Number of Transfers |
|---|---|---|
| We had no franchise transfers during any of our past 3 fiscal years | 2013 | 0 |
| | 2014 | 0 |
| | 2015 | 0 |
| Total | 2013 | 0 |
| | 2014 | 0 |
| | 2015 | 0 |

Table No. 3

**Status of Franchised Outlets
For years 2013 to 2015**

| Col. 1<br><br>State | Col. 2<br><br>Year | Col. 3<br><br>Outlets at Start of Year | Col. 4<br><br>Outlets Opened | Col. 5<br><br>Termin-ations | Col. 6<br><br>Non-Renewals | Col. 7<br><br>Reacquired by Franchisor | Col. 8<br><br>Ceased Operations-Other Reasons | Col. 9<br><br>Outlets at End of the Year |
|---|---|---|---|---|---|---|---|---|
| We had no franchises during any of our past 3 fiscal years | 2013 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2014 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Totals | 2013 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2014 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2015 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Table No. 4

## Status of Company-Owned Outlets
## For years 2013 to 2015

| Col. 1 State | Col. 2 Year | Col. 3 Outlets at Start of the Year | Col. 4 Outlets Opened | Col. 5 Outlets Reacquired From Franchisee | Col. 6 Outlets Closed | Col. 7 Outlets Sold to Franchisee | Col. 8 Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| New Jersey | 2013 | 1 | 1 | 0 | 0 | 0 | 2 |
| | 2014 | 2 | 5 | 0 | 0 | 0 | 7 |
| | 2015 | 7 | 0 | 0 | 0 | 0 | 7 |
| New York | 2013 | 7 | 12 | 0 | 0 | 0 | 19 |
| | 2014 | 19 | 9 | 0 | 0 | 0 | 28 |
| | 2015 | 28 | 6 | 0 | 0 | 0 | 34 |
| Totals | 2013 | 8 | 13 | 0 | 0 | 0 | 21 |
| | 2014 | 21 | 14 | 0 | 0 | 0 | 35 |
| | 2015 | 35 | 6 | 0 | 0 | 0 | 41 |

Table No. 5

## Projected Openings as of December 31, 2015

| Column 1 State | Column 2 Franchise Agreements Signed But Outlets Not Opened | Column 3 Projected New Franchised Outlets In the Next Fiscal Year | Column 4 Projected New Company-Owned Outlets In the Next Fiscal Year |
|---|---|---|---|
| New Jersey | 0 | 0 | 2 |
| New York | 2 | 2 | 10 |
| Total | 2 | 2 | 12 |

Exhibit E identifies the 2 franchisees who have signed franchise agreements with us but whose Blink Fitness Gyms are not yet open as of the issuance date of this disclosure document. There were no franchisees who had Blink Fitness Gyms terminated, canceled, or not renewed, or who otherwise voluntarily or involuntarily ceased doing business under our Franchise Agreement or Development Rights Agreement, during our last fiscal year or who have not communicated with us within 10 weeks of this disclosure document's issuance date.  If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

During the last 3 fiscal years, no current or former franchisees have signed confidentiality clauses restricting them from discussing with you their experiences as a franchisee in our franchise system.  There are no trademark-specific franchisee organizations associated with the Blink Fitness Gym franchise system.

### Item 21
### FINANCIAL STATEMENTS

Exhibit A contains our audited financial statements for the fiscal year ended December 31, 2015, and for the period from August 13, 2014 through December 31, 2014.  Because we have not been in existence for 3 years or more, we do not have available and cannot yet include the 3 full years of audited financial statements required by the franchise laws.

### Item 22
### CONTRACTS

The following contracts/documents are exhibits:

1.      Unit Franchise Agreement (Exhibit B)
2.      Development Rights Agreement (Exhibit C)
3.      Franchisee Representations Document (Exhibit G)
4.      Form of General Release (Exhibit H)
5.      Development Incentive Addendum to Unit Franchise Agreement (Exhibit I)
6.      State-Specific Agreement Riders (Exhibit J)

### Item 23
### RECEIPTS

Our and your copies of the Franchise Disclosure Document Receipt are located at the last 2 pages of this disclosure document.

BLINK FITNESS - 2016 AMENDED FDD
EAST\137554766. 2                          57

## EXHIBIT A

## FINANCIAL STATEMENTS

# BLINK FITNESS FRANCHISING, INC.

## FINANCIAL STATEMENTS
## ANNUAL REPORT (Period: December 31, 2015)
TOGETHER WITH REPORT OF INDEPENDENT AUDITORS

**Delaware**
(State of incorporation)

**30-0838012**
(I.R.S. Employer Identification No.)

**386 PARK AVENUE SOUTH, 11th FL**
**NEW YORK, NEW YORK 10016**
**TELEPHONE: (212) 359-8800**
(ADDRESS, ZIP CODE, AND TELEPHONE NUMBER, INCLUDING
AREA CODE, OF PRINCIPAL EXECUTIVE OFFICES.)



**KPMG LLP**
345 Park Avenue
New York, NY 10154-0102

**Independent Auditors' Report**

The Board of Directors
Blink Fitness Franchising, Inc.:

We have audited the accompanying financial statements of Blink Fitness Franchising, Inc. (the Company) which comprise the balance sheets as of December 31, 2015 and 2014, and the related statements of operations, changes in stockholder's equity, and cash flows for the year ended December 31, 2015 and the period from August 13, 2014 (inception) to December 31, 2014, and related notes to the financial statements.

*Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these financial statements in accordance with U.S. generally accepted accounting principles; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

*Auditors' Responsibility*

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statement. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Opinion*

In our opinion, the financial statements referred to above present fairly in all material respects, the financial position of Blink Fitness Franchising, Inc. as of December 31, 2015 and 2014, and the results of its operations and their cash flows for the year ended December 31, 2015, and the period from August 13, 2014 (inception) to December 31, 2014, in accordance with U.S. generally accepted accounting principles.

*KPMG LLP*

New York, New York
March 2, 2016

KPMG LLP is a Delaware limited liability partnership,
the U.S. member firm of KPMG International Cooperative
("KPMG International"), a Swiss entity.

**BLINK FITNESS FRANCHISING, INC.**
**Balance Sheets**
**December 31**
*(In thousands, except shares)*

| Assets | | 2015 | | 2014 |
|---|---|---|---|---|
| Current assets: | | | | |
| Cash and cash equivalents | $ | 1,091 | $ | 750 |
| Prepaid expenses | | 16 | | 24 |
| Total current assets | | 1,107 | | 774 |
| Property and equipment, net (Note 3) | | 77 | | - |
| Total assets | $ | 1,184 | $ | 774 |
| **Liabilities and Stockholder's Equity** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued expenses (Note 4) | $ | 118 | $ | 8 |
| Due to affiliates (Note 6) | | 140 | | 205 |
| Deferred revenue (Note 7) | | 20 | | - |
| Deferred liabilities (Note 7) | | 70 | | - |
| Total liabilities | | 348 | | 213 |
| Stockholder's equity: | | | | |
| Common stock, no par value; 200 shares authorized, issued and outstanding | | - | | - |
| Paid-in capital | | 2,405 | | 750 |
| Accumulated deficit | | (1,569) | | (189) |
| Total stockholder's equity | | 836 | | 561 |
| Total liabilities and stockholder's equity | $ | 1,184 | $ | 774 |

See accompanying notes to Financial Statements

3

**BLINK FITNESS FRANCHISING, INC.**
Statements of Operations
**For the year ended December 31, 2015 and the period from August 13, 2014 (inception) through December 31, 2014**
*(In thousands)*

|  | 2015 | 2014 |
|---|---|---|
| Revenue: | $ - | $ - |
| Expenses: |  |  |
| General and administrative | $ 1,368 | $ 189 |
| Depreciation (Note 3) | 12 | - |
| Total operating expenses | 1,380 | 189 |
| Loss from operations | (1,380) | (189) |
| Net loss | $ (1,380) | $ (189) |

See accompanying notes to Financial Statements

4

**BLINK FITNESS FRANCHISING, INC.**
Statements of Stockholder's Equity
**For the year ended December 31, 2015 and the period from August 13, 2014 (inception) through December 31, 2014**
*(In thousands except for shares)*

|  | Common Stock | | Additional paid-in capital | Accumulated deficit | Total |
|  | Shares | Value | | | |
|---|---|---|---|---|---|
| Balance August 13, 2014 | - | $ - | $ - | $ - | $ - |
| Contribution from Parent | 200 | - | 750 | - | 750 |
| Net loss | - | - | - | (189) | (189) |
| Balance December 31, 2014 | 200 | | 750 | (189) | 561 |
| Contribution from Parent | - | - | 1,655 | - | 1,655 |
| Net loss | - | - | - | (1,380) | (1,380) |
| Balance December 31, 2015 | 200 | $ - | $ 2,405 | $ (1,569) | $ 836 |

See accompanying notes to Financial Statements

**BLINK FITNESS FRANCHISING, INC.**
Statements of Cash Flows
**For the year ended December 31, 2015 and the period from August 13, 2014 (inception) through December 31, 2014**
*(In thousands)*

|  | 2015 | 2014 |
|---|---|---|
| Cash flows from operating activities: |  |  |
| Net loss | $ (1,380) | $ (189) |
| Adjustments to reconcile net loss to net cash used in operating activities: |  |  |
| Depreciation (Note 3) | 12 | - |
| Due to affiliates | (65) | 205 |
| Changes in operating assets and liabilities |  |  |
| Prepaid expenses | 8 | (24) |
| Accounts payable and accrued expenses (Note 4) | 110 | 8 |
| Deferred revenue (Note 7) | 20 | - |
| Deferred liabilities (Note 7) | 70 | - |
| Net cash used in operating activities | (1,225) | - |
| Cash flows from investing activities: |  |  |
| Purchases of property and equipment | (89) | - |
| Net cash used in investing activities | (89) | - |
| Cash flows from financing activities: |  |  |
| Contribution from parent | 1,655 | 750 |
| Net cash provided by financing activities | 1,655 | 750 |
| Net increase in cash and cash equivalents | 341 | 750 |
| Cash and cash equivalents at beginning of period | 750 | - |
| Cash and cash equivalents at end of period | $ 1,091 | $ 750 |

See accompanying notes to Financial Statements

6

**BLINK FITNESS FRANCHISING, INC.**
Notes to Financial Statements

1. **Description, Organization and Development of Business**

   Blink Fitness Franchising, Inc. (the Company) is a wholly owned subsidiary of Blink Holdings, Inc. ("BHI"). The Company was capitalized on September 15, 2014 through a transfer of cash in the amount of $750,000 from BHI to the Company in return for 100% of the shares of the Company. In 2015 there was an additional capital contribution in the amount of $1,655,000 from BHI to the Company.

   The Company grants franchise rights to develop and operate health and fitness centers that currently provide cardiovascular and strength training equipment and related products and services. Franchised Blink Fitness Gyms will operate under mandatory and suggested specifications, standards, operating procedures and rules specified by the Company.

   In certain areas of the country, the Company will grant multi-unit development rights to qualified franchisees, who then will have the right to develop a number of Franchised Blink Fitness Gyms within a defined geographic area, according to a mandatory development schedule.

2. **Summary of Significant Accounting Policies**

   *Cash and Cash Equivalents* -The Company considers all highly liquid investments purchased with original maturities of three months or less to be cash equivalents.

   *Income Taxes* - The Company accounts for income taxes under the asset and liability method. Deferred income tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement and tax bases of existing assets and liabilities and operating loss and tax credit carry-forwards. Deferred tax assets and liabilities are measured using the enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

   *Concentration of Credit Risk* - Financial instruments that potentially subject the Company to concentrations of credit risk consist of cash and cash equivalents. The Company considers all highly liquid investments with a maturity of three months or less, when purchased, to be cash equivalents. The Company maintains its cash and cash equivalents in bank deposit accounts which, at times, may exceed federally insured limits.

   *Property, Equipment and Depreciation*- Property and equipment is initially recorded at cost. Significant additions and improvements to property and equipment are capitalized. Expenditures for maintenance and repairs are charged to current operations as incurred.

   Depreciation is computed using the straight-line method over the following estimated useful lives:

   |                                   |         |
   | --------------------------------- | ------- |
   | Furniture and fixtures            | 5 years |
   | Computer equipment and software   | 5 years |

   *Deferred Revenue* – Upon signing of a Franchise agreement document, the Franchisee is required to pay an upfront initial franchisee fee. This fee can only be recognized as revenue upon substantial completion of the Franchisor's obligation to the Franchisee, which we define as the opening of the Franchisee's gym. Until opening, the initial franchise fee is held as short term deferred revenue.

   **BLINK FITNESS FRANCHISING, INC.**

Notes to Financial Statements

**2.  Summary of Significant Accounting Policies - Continued**

*Subsequent Events* - The Company has evaluated subsequent events from the balance sheet date through February XX, 2016, which is the date the financial statements were available to be issued and determined there are no other items to disclose.

**3.  Property and Equipment, net**

Property and equipment, net consists of the following at December 31:

| ($000's) | 2015 | 2014 |
|---|---|---|
| Computer equipment and software | $ 40 | $ - |
| Furniture and fixtures | 49 | - |
| | 89 | - |
| Less accumulated depreciation | (12) | - |
| Total | $ 77 | $ - |

Depreciation expense was approximately $12,000 for the year ended December 31, 2015.

**4.  Accounts Payable and Accrued Expenses**

Accounts payable and accrued expenses consist of the following at December 31:

| ($000's) | 2015 | 2014 |
|---|---|---|
| Accounts payable | $ 38 | $ 8 |
| Payroll, related benefits and payroll taxes | 80 | - |
| Total | $ 118 | $ 8 |

**5.  Income Taxes**

A reconciliation of the benefit from income tax is computed by applying the federal statutory rate to loss before income taxes to the benefit from income taxes on the accompanying Statements of Operations as follows:

| ($000's) | 2015 | 2014 |
|---|---|---|
| Federal statutory benefit | $ 483 | $ 64 |
| State and local income tax benefits | 106 | 14 |
| Valuation allowance | (588) | (78) |
| Meals and entertainment | (1) | - |
| Benefit from income tax | $ - | $ - |

**BLINK FITNESS FRANCHISING, INC.**

Notes to Financial Statements

5.  **Income Taxes - continued**

The Company files a consolidated tax return with BHI, who files a consolidated tax return with EHI and its parent Related Equinox Holdings II, LLC ("REH II"), while the provision of the Company is calculated on a separate return basis.  For the year ended December 31, 2015, the only significant differences between the reported amount of income tax benefit and the expected amount of income tax benefit that would result from applying Federal statutory income tax rate of 35.0% to the pretax loss is primarily for state and local income taxes and a valuation allowance against net operating loss carry-forwards.

As of December 31, 2015, the Company has net operating losses of $1.6 million that will begin to expire in 2034 and will completely expire in 2035.  Other deferred taxes primarily relate to timing differences for depreciation. The Company has generated both book and tax losses since inception resulting in significant net deferred tax assets related to its net operating losses.  Due to the history of losses, the Company has determined that it is not more likely than not that it can realize its net deferred tax assets and therefore has established a full valuation allowance against its net deferred tax assets

As of December 31, 2015, the Company has no unrecognized tax benefits. The Company's uncertain tax positions, if any, are reviewed and adjusted as events occur that affect the estimated liability for additional taxes, such as the lapsing of applicable statutes of limitations, the conclusion of tax audits, the measurement of additional estimated liabilities based on current calculations, the identification of new tax contingencies, the release of administrative tax guidance affecting the Company's estimates of tax liabilities, or the rendering of court decisions affecting its estimates of tax liabilities.

6.  **Related Party Transactions**

BHI pays expenses on the Company's behalf, which are reimbursed in future periods.  As of December 31, 2015 and 2014, due to affiliates was approximately $140,000 and $205,000, respectively.

7.  **Deferred Revenue and Deferred Liabilities**

As of December 31, 2015 the Company has recorded deferred franchise fees of $20,000 in connection with the sale of two franchise units that have not opened.

In connection with the sales, the Company also collected $70,000 from the franchisees which the Company is obligated to use to reimburse the franchisees for their expenses related to preopening marketing costs for these two franchise units.

**<u>EXHIBIT B</u>**

**UNIT FRANCHISE AGREEMENT**

B-1

**BLINK FITNESS FRANCHISING, INC.**
**<u>UNIT FRANCHISE AGREEMENT</u>**

_____

FRANCHISEE NAME

_____

EFFECTIVE DATE OF AGREEMENT

_____

_____

_____

ADDRESS OF GYM

_____

GYM NAME

_____

BLINK FITNESS GYM NUMBER

## TABLE OF CONTENTS

**SECTION**                                                                     **PAGE**

1. PREAMBLES ............................................................................................ 1

2. ACKNOWLEDGEMENTS ...................................................................... 1

3. GRANT OF FRANCHISE .......................................................................... 2

    A.     GRANT OF FRANCHISE ......................................................... 2

    B.     TERM ......................................................................................... 3

    C.     TERRITORIAL RIGHTS .......................................................... 3

    D.     RESERVATION OF RIGHTS .................................................... 3

    E.     GUARANTY ............................................................................. 4

4. SITE SELECTION, LEASE, AND DEVELOPING THE GYM ..................... 4

    A.     SITE SELECTION AND ACCEPTANCE ................................ 4

    B.     LEASE ACCEPTANCE ............................................................ 6

    C.     DEVELOPMENT OF GYM ...................................................... 6

    D.     PRESALE OF MEMBERSHIPS .............................................. 7

    E.     OPENING .................................................................................. 8

5. FEES ........................................................................................................... 9

    A.     INITIAL FRANCHISE FEE...................................................... 9

    B.     ROYALTY ................................................................................. 9

    C.     NEW MEMBER FEE .............................................................. 10

    D.     PAYMENT METHOD AND TIMING .................................... 10

    E.     INTEREST ON LATE PAYMENTS ...................................... 11

    F.     APPLICATION OF PAYMENTS AND RIGHT OF SET-OFF ........................ 11

    G.     ANNUAL INCREASE IN FIXED FEES ................................ 11

6. TRAINING, GUIDANCE, AND ASSISTANCE ......................................... 12

    A.     INITIAL ORIENTATION AND TRAINING.......................... 12

    B.     OPENING SUPPORT .............................................................. 12

    C.     RETRAINING ......................................................................... 12

    D.     ONGOING AND SUPPLEMENTAL TRAINING.................. 12

    E.     TRAINING FOR REPLACEMENT CLUB MANAGERS ............... 13

    F.     TRAINING FOR GYM EMPLOYEES..................................... 13

    G.     GENERAL GUIDANCE AND THE OPERATIONS MANUAL ............ 13

    H.     DELEGATION ......................................................................... 15

7. GYM OPERATION AND BRAND STANDARDS ..................................... 15

    A.     CONDITION AND APPEARANCE OF GYM ....................... 15

## TABLE OF CONTENTS

**SECTION**      **PAGE**

B.    COMPLIANCE WITH APPLICABLE LAWS AND GOOD BUSINESS PRACTICES ............................................................................ 16

C.    COMPLIANCE WITH BRAND STANDARDS ................................ 16

D.    OPERATING PRINCIPAL ............................................................ 18

E.    APPROVED PRODUCTS AND SUPPLIERS ................................ 20

F.    COMPUTER SYSTEM ................................................................... 20

G.    INTRANET ..................................................................................... 21

8.    MARKS ........................................................................................... 22

A.    OWNERSHIP AND GOODWILL OF MARKS .............................. 22

B.    LIMITATIONS ON USE OF MARKS ........................................... 22

C.    NOTIFICATION OF INFRINGEMENTS AND CLAIMS .............. 23

D.    DISCONTINUANCE OF USE OF MARKS ................................. 23

E.    INDEMNIFICATION FOR USE OF MARKS .............................. 23

9.    CONFIDENTIAL INFORMATION ................................................ 23

10.    CONSUMER DATA AND GYM LISTS ......................................... 25

11.    INNOVATIONS .............................................................................. 25

12.    EXCLUSIVE RELATIONSHIP ..................................................... 26

13.    ADVERTISING AND MARKETING ............................................. 27

A.    PRESALE MARKETING PROGRAM ........................................... 27

B.    BRAND FUND ............................................................................... 27

C.    APPROVAL OF MARKETING AND OTHER EXTERNAL COMMUNICATIONS ................................................................... 29

D.    LOCAL MARKETING ................................................................... 29

E.    REGIONAL ADVERTISING COOPERATIVES ........................... 30

F.    ADVERTISING ALLOCATION ..................................................... 30

G.    SYSTEM WEBSITE ...................................................................... 30

H.    YOUR WEBSITE AND SOCIAL MEDIA ACTIVITIES ................ 31

14.    RECORDS, REPORTS AND FINANCIAL STATEMENTS ........... 31

15.    INSPECTIONS AND AUDITS ....................................................... 32

A.    INSPECTIONS ............................................................................... 32

B.    OUR RIGHT TO AUDIT ............................................................... 33

16.    TRANSFER ..................................................................................... 33

A.    TRANSFER BY US ....................................................................... 33

## TABLE OF CONTENTS

**SECTION**                                                                                      **PAGE**

    B.     TRANSFER BY YOU AND DEFINITION OF TRANSFER ............................ 33

    C.     CONDITIONS FOR APPROVAL OF TRANSFER........................................... 34

    D.     TRANSFER TO A WHOLLY-OWNED CORPORATION OR LIMITED LIABILITY COMPANY ..................................................................................... 37

    E.     DEATH OR DISABILITY ................................................................................ 37

    F.     EFFECT OF CONSENT TO TRANSFER........................................................ 37

    G.    OUR RIGHT OF FIRST REFUSAL ............................................................... 38

17.    EXPIRATION OF THIS AGREEMENT .................................................................... 39

18.    TERMINATION OF AGREEMENT ......................................................................... 40

    A.     TERMINATION BY YOU................................................................................ 40

    B.     TERMINATION BY US .................................................................................. 40

    C.     ASSUMPTION OF GYM'S MANAGEMENT ................................................. 42

    D.     OTHER REMEDIES UPON DEFAULT ......................................................... 43

19.    RIGHTS AND OBLIGATIONS UPON TERMINATION OR EXPIRATION OF THIS AGREEMENT ............................................................................................... 43

    A.     PAYMENT OF AMOUNTS OWED ............................................................... 43

    B.     DE-IDENTIFICATION ................................................................................... 44

    C.     CONFIDENTIAL INFORMATION ............................................................... 44

    D.     NOTIFICATION TO MEMBERS AND CUSTOMERS................................... 45

    E.     COVENANT NOT TO COMPETE ................................................................. 45

    F.     OPTION TO PURCHASE OPERATING ASSETS........................................... 46

    G.    CONTINUING OBLIGATIONS...................................................................... 48

20.    RELATIONSHIP OF THE PARTIES; INDEMNIFICATION....................................... 48

    A.     INDEPENDENT CONTRACTORS ................................................................ 48

    B.     NO LIABILITY FOR ACTS OF OTHER PARTY ........................................... 48

    C.     TAXES........................................................................................................... 49

    D.     INSURANCE ................................................................................................. 49

    E.     INDEMNIFICATION..................................................................................... 49

21.    ENFORCEMENT .................................................................................................... 50

    A.     SEVERABILITY ............................................................................................ 50

    B.     WAIVER OF OBLIGATIONS AND FORCE MAJEURE................................. 51

    C.     COSTS AND ATTORNEYS' FEES................................................................. 51

    D.     YOU MAY NOT WITHHOLD PAYMENTS ................................................... 52

## TABLE OF CONTENTS

| SECTION | | PAGE |
|---|---|---|
| E. | RIGHTS OF PARTIES ARE CUMULATIVE | 52 |
| F. | MEDIATION | 52 |
| G. | ARBITRATION | 52 |
| H. | GOVERNING LAW | 54 |
| I. | CONSENT TO JURISDICTION | 54 |
| J. | WAIVER OF PUNITIVE DAMAGES | 55 |
| K. | WAIVER OF JURY TRIAL | 55 |
| L. | WAIVER OF CLASS ACTION LITIGATION | 55 |
| M. | BINDING EFFECT | 55 |
| N. | LIMITATIONS OF CLAIMS | 55 |
| O. | CONSTRUCTION | 56 |
| P. | THE EXERCISE OF OUR BUSINESS JUDGMENT | 57 |
| 22. | COMPLIANCE WITH ANTI-TERRORISM LAWS | 57 |
| 23. | NOTICES AND PAYMENTS | 57 |
| 24. | ELECTRONIC MAIL | 58 |

## **EXHIBITS**

Exhibit A – Basic Terms

Exhibit B – Guaranty and Assumption of Obligations

Exhibit C – Franchisee and Its Owners

Exhibit D – Lease Rider

Exhibit E – Form of Confidentiality Agreement

**BLINK FITNESS FRANCHISING, INC.**
**UNIT FRANCHISE AGREEMENT**

**THIS UNIT FRANCHISE AGREEMENT** (this "**Agreement**") is made effective as of _____, 201__ (the "**Effective Date**," regardless of when the parties execute and date this Agreement), by and between **BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation whose principal business address is 386 Park Avenue South, 11th Floor, New York, New York 10016 ("**we**," "**us**," or "**our**"), and _____, a(n) _____ ("**you**" or "**your**").

## 1. PREAMBLES

We and our affiliates have designed and developed a method of developing and operating health and fitness centers identified by the Marks (defined below) that currently provide cardiovascular and strength training equipment and related products and services ("**Blink Fitness Gyms**").

We and our affiliates have developed, and use, promote and license, certain trademarks, service marks and other commercial symbols in operating Blink Fitness Gyms, including "BLINK®," and we may from time to time create, use and license other trademarks, service marks and commercial symbols for Blink Fitness Gyms (collectively, the "**Marks**").

We offer franchises to own and operate a Blink Fitness Gym using our business system, business formats, methods, procedures, designs, layouts, trade dress, standards, specifications and Marks, all of which we may improve, further develop and otherwise modify periodically (collectively, the "**Franchise System**").

You have applied for a franchise to own and operate a Blink Fitness Gym, and we wish to grant you such a franchise on the terms and conditions contained in this Agreement.

## 2. ACKNOWLEDGEMENTS

You acknowledge that:

i.    You have independently investigated the Blink Fitness franchise opportunity and recognize that, like any other business, the nature of the business a Blink Fitness Gym conducts may, and probably will, evolve and change over time;

ii.   An investment in a Blink Fitness Gym involves business risks that could result in the loss of a significant portion or all of your investment;

iii.  Your business abilities and efforts are vital to your success;

iv.   Attracting members for your Blink Fitness Gym will require you to make consistent marketing efforts in your community through various methods, such as media advertising, direct mail advertising, and display and use of in-store promotional materials;

v.      Retaining members for your Blink Fitness Gym will require you to have a well-maintained facility, a high level of customer service, and strict adherence to the Franchise System and our Brand Standards (defined in Section 6.G below);

vi.      You are committed to maintaining Brand Standards;

vii.      Other than any disclosures in our franchise disclosure document, you have not received from us and are not relying upon any representations or guarantees, express or implied, as to the potential volume, sales, income, or profits of a Blink Fitness Gym;

viii.      In all of their dealings with you, our officers, directors, employees, consultants, lawyers and agents act only in a representative, and not in an individual, capacity and business dealings between you and them as a result of this Agreement are deemed to be only between you and us;

ix.      You have represented to us, to induce our entry into this Agreement, that all statements you have made and all materials you have given us are accurate and complete and you have made no misrepresentations or material omissions in obtaining the franchise;

x.      You have read this Agreement and our franchise disclosure document and understand and accept that this Agreement's terms and covenants are reasonably necessary for us to maintain our high standards of quality and service, as well as the uniformity of those standards at each Blink Fitness Gym, and to protect and preserve the goodwill of the Marks;

xi.      We have not made any representation, warranty, or other claim regarding this Blink Fitness franchise opportunity, other than those made in this Agreement and our franchise disclosure document, and you have independently evaluated this opportunity, including by using your business professionals and advisors, and have relied solely upon those evaluations in deciding to enter into this Agreement;

xii.      You have been afforded an opportunity to ask any questions you have and to review any materials of interest to you concerning the Blink Fitness franchise opportunity; and

xiii.      You have been afforded an opportunity, and have been encouraged by us, to have this Agreement and all other agreements and materials we have given or made available to you reviewed by an attorney or another professional advisor.

## 3.   GRANT OF FRANCHISE

### A.   GRANT OF FRANCHISE

Subject to the terms of this Agreement, we grant you the right, and you undertake the obligation, to operate a Blink Fitness Gym at the address identified on Exhibit A (the "**Gym**") and to use the Franchise System and Marks in its operation. (If the address of the Gym is

unknown as of the Effective Date, the address will be determined in accordance with Section 4.A and listed on an amended and restated Exhibit A that we will provide to you.)  Your right to operate a Blink Fitness Gym is limited to the services provided at the Gym and does not include the right to distribute goods and services over the Internet or to engage in other channels of supply or distribution.

### B.  TERM

The term of the franchise (the "**Term**") begins on the Effective Date and will end ten (10) years from the date on which the Gym opens to the public for business under the Marks, unless sooner terminated as provided in this Agreement.

### C.  TERRITORIAL RIGHTS

During the Term, we and our affiliates will not own or operate, or allow another franchisee or licensee to own or operate, another Blink Fitness Gym that has its physical location within the geographical area described on Exhibit A (the "**Protected Area**"), which we may modify only as provided in Exhibit A.  If the Gym's address is unknown as of the Effective Date, we will describe the Protected Area on an amended and restated Exhibit A that we will send you once we accept a site for the Gym in accordance with Section 4.A.  However, you acknowledge that our affiliates operate other fitness facilities using different brand names and trademarks and service marks, some of which may operate and have facilities within the Protected Area, and otherwise in close proximity to the Gym, which may compete directly with the Gym.  You may engage in advertising, promotional, marketing, and related activities we authorize within the Protected Area.  However, we have the unrestricted right to regulate all such activities conducted outside the Protected Area, or directed to individual members or customers located outside the Protected Area, in order to protect what we consider to be the best interests of other Blink Fitness Gym franchisees, Blink Fitness Gyms operated by us and our affiliates, or the Franchise System.

### D.  RESERVATION OF RIGHTS

Except for your location exclusivity described in Section 3.C above, we and our affiliates retain all rights with respect to Blink Fitness Gyms, the Marks, the sale of similar or dissimilar products and services, and any other activities we deem appropriate whenever and wherever we desire, whether inside or outside the Protected Area.  Specifically, but without limitation, we reserve the following rights:

    i.       the right to own and operate, and to allow other franchisees and licensees to own and operate, Blink Fitness Gyms at any locations outside the Protected Area (including at the boundary of the Protected Area) and on any terms and conditions we deem appropriate;

    ii.      the right to provide, offer and sell, and to grant others the right to provide, offer and sell, products or services that are identical or similar to and/or competitive with those provided at Blink Fitness Gyms, whether identified by the Marks or other trademarks or service marks, through similar or dissimilar distribution channels and on any terms and conditions we deem appropriate (including by providing products, fitness advice and other services through the Internet);

iii.    the right to establish and operate, and to grant others the right to establish and operate, businesses offering similar products and services under trademarks and service marks other than the Marks;

iv.    the right to establish and operate, and to grant to others the right to establish and operate, businesses offering similar or dissimilar products and services under the Marks and on any terms and conditions we deem appropriate;

v.    the right to acquire the assets or ownership interests of one or more businesses providing products and services similar to those provided at Blink Fitness Gyms, and operating, franchising, licensing or creating similar arrangements with respect to these businesses once acquired, wherever these businesses (or the franchisees or licensees of these businesses) are located or operating; and

vi.    the right to be acquired (whether through acquisition of assets, ownership interests or otherwise, regardless of the form of transaction) by a business providing products and services similar to those provided at Blink Fitness Gyms, or by another business, even if such business operates, franchises and/or licenses Competitive Businesses (defined in Section 12 below).

### E.  GUARANTY

The Guarantors must fully guarantee all of your financial and other obligations to us under this Agreement or otherwise arising out of the relationship established by this Agreement, and agree personally to comply with this Agreement's terms, by executing the form of Guaranty attached hereto as Exhibit B.  "**Guarantors**" means each owner having an ownership interest in you, or in any entity directly or indirectly owning a controlling ownership interest in you, and any other owner designated by us as a Guarantor in Exhibit B of this Agreement.  The name of each owner and his, her or its percentage ownership interest in you are set forth in Exhibit C. Subject to our rights and your obligations in Section 16, you will notify us of any change in the information in Exhibit C within ten (10) days after the change occurs.

## 4.  SITE SELECTION, LEASE, AND DEVELOPING THE GYM

### A.  SITE SELECTION AND ACCEPTANCE

If the address of the Gym is unknown as of the Effective Date, then this Section 4.A will govern the site selection and acceptance process.  Within six (6) months after the Effective Date, you must obtain our written acceptance of a site at which to operate a Blink Fitness Gym within the particular geographic area listed in Exhibit A (the "**Site Selection Area**").  The time period during which you must search for, propose, and obtain our written acceptance of a site for the Gym within the Site Selection Area (the "**Site Selection Period**") will expire upon the earliest of (i) our accepting a site for the Gym and providing an amended and restated Exhibit A to you, (ii) this Agreement's termination, or (iii) six (6) months after the Effective Date.

It is your responsibility to locate, evaluate and select the site for your Gym.  We or a designated third-party supplier of site evaluation, leasing and related services (the "**Site Consultant**") will assist you by reviewing potential sites for the Gym you identify within the

Site Selection Area.  You must use a licensed commercial real estate broker during the site selection process, and we have the right to pre-approve your proposed broker before you move forward.  We may, but have no obligation to, physically visit your proposed sites.  We may condition our making a proposed site visit and our approval of a proposed site on your first sending us complete site reports and other materials (including, without limitation, photographs and video recordings) we request.  We or the Site Consultant will provide you with our then current criteria for sites of Blink Fitness Gyms (including, but not limited to, population density and other demographic characteristics, visibility, traffic flow, competition, accessibility, parking, size, and other physical and commercial characteristics) to assist you in selecting and identifying your site.  However, even if we or the Site Consultant gives you information regarding a potential site or site criteria, you acknowledge that (i) the Site Consultant is solely responsible for its activities, its communications, and the information it shares with you, and (ii) we have made and will make no representations or warranties of any kind, express or implied, about the suitability of the site for a Blink Fitness Gym or any other purpose, or of the likelihood that we ultimately will accept that site for the Gym's location.

You must propose a site for the Gym's location and obtain our written acceptance of the proposed site within six (6) months after the Effective Date.  You must submit all information that we request when you propose a site, including a signed letter of intent specifying the key terms of the proposed lease or purchase transaction.  We agree to use reasonable efforts to review and accept or reject each site that you propose within thirty (30) days after we receive all requested information and materials.  If we have not accepted the site in writing within thirty (30) days after we receive all requested information and materials, then the site will be deemed rejected.  We will not unreasonably withhold our acceptance of a site that meets our then current criteria.  We have the absolute right to reject any site that does not meet our criteria.  Our acceptance of a site indicates only that we believe that the site meets or has the potential to meet, or that we have waived, our then current criteria for site suitability.  Our application of criteria that have appeared effective with other sites might not accurately reflect the potential for all sites, and demographic and/or other factors included in or excluded from our criteria could change, altering the potential of a site.  The uncertainty and instability of these criteria are beyond our control, and we are not responsible if a particular site fails to meet your expectations.  Upon accepting a proposed site, we will list the accepted site's location as the Gym's address in Exhibit A.

You may not relocate the Gym to a new site without our prior written consent, which we may grant or deny as we deem best.  We may condition our approval of your relocation request on (1) the new site and its lease being acceptable to us, (2) your paying us a reasonable relocation fee (as set forth in the Operations Manual), (3) your reimbursing any costs we incur during the relocation process, (4) your confirming that this Agreement remains in effect and governs your operation of the Gym at the new site with no change in the Term or, at our option, your signing our then current form of franchise agreement to govern your operation of the Gym at the new site for a new franchise term (in either case, we may change the definition of the Protected Area), (5) your signing a general release, in a form satisfactory to us, of any and all claims against us and our owners, affiliates, officers, directors, employees, and agents, (6) your continuing to operate the Gym at its original site until we authorize its closure, and (7) your taking, within the timeframe we specify and at your own expense, all action we require to de-

brand and de-identify the Gym's former premises so that it no longer is associated in any manner (in our opinion) with the Franchise System.

## B.  LEASE ACCEPTANCE

You must present to us for our written acceptance, which we will not unreasonably withhold, any lease or sublease (and any renewals and amendments of the lease or sublease) that will govern your occupancy and lawful possession of the Gym at least thirty (30) days before you intend to sign it.  The lease or sublease must either (i) include the lease rider attached hereto as Exhibit D and made a part hereof, or (ii) provide in the body of the lease or sublease the terms and conditions found in the lease rider.  You may not sign any lease or sublease (or any renewal or amendment of the lease or sublease) that we have not accepted in writing.  We may (but have no obligation to) provide you guidance or assistance relating to the lease or sublease but will not negotiate the lease on your behalf or provide any legal advice.  If we have not accepted the lease or sublease in writing within thirty (30) days after we receive a complete copy of the lease or sublease, then the lease or sublease will be deemed rejected.  You acknowledge that our guidance and assistance (if we choose to provide it) and written acceptance of the lease or sublease (or renewal or amendment) are not a guarantee or warranty, express or implied, of the success or profitability of the Gym or of the suitability of the lease or sublease for your business purposes.

## C.  DEVELOPMENT OF GYM

Notwithstanding any other deadline with respect to obtaining our acceptance of the site or signing an accepted lease or sublease, you must, within sixteen (16) months after the Effective Date (the "**Opening Deadline**"), (i) secure all financing required to develop and operate the Gym; (ii) obtain all permits and licenses required to construct and operate the Gym; (iii) construct all required improvements to the site and decorate the Gym in compliance with our approved plans and specifications; (iv) purchase or lease and install all required Operating Assets (as defined below); (v) purchase an opening inventory of required, authorized, and approved products, materials, and supplies; and (vi) open your Gym in accordance with all the requirements of this Agreement.

You are responsible for developing the Gym at your expense.  We will provide you with prototype documents and mandatory and suggested specifications and layouts for a Blink Fitness Gym, including requirements or recommendations (as applicable) for dimensions, design, interior layout, décor, signage, security, and Operating Assets.  All other decisions relating to the Gym's development and its layout, design, color scheme, finishes, improvements, décor and Operating Assets are subject to our review and prior written approval.  These specifications and layouts might not reflect the requirements of any federal, state or local law, code or regulation, including those arising under the Americans with Disabilities Act (the "**ADA**"), zoning regulations, environmental laws and regulations, other applicable ordinances, building codes or permit requirements, or any lease requirements or restrictions.

You agree at your expense to construct, install trade dress and furnish all Operating Assets in, and otherwise develop the Gym according to our standards, specifications and directions.  The Gym must contain all Operating Assets, and only those Operating Assets, that

we specify.  You agree to place or display, according to our guidelines, at the Gym (interior and exterior) only the signs, emblems, lettering, logos and display materials that we approve from time to time.  You agree to purchase or lease from time to time only the approved brands, types and models of Operating Assets according to our standards and specifications and, if we specify, only from one or more suppliers that we designate or approve (which may include or be limited to us and/or our affiliates).  "**Operating Assets**" means all required furniture, fixtures, equipment (including components of and required software licenses for the Computer System (defined in Section 7.F)), and signs that we periodically require for the Gym and the business you operate under this Agreement.

You must prepare all required construction and remodeling plans to suit the Gym and make sure they comply with the ADA and similar rules governing public accommodations for persons with disabilities, other applicable ordinances, building codes, permit requirements, and lease requirements and restrictions.  We reserve the right to approve the architects and contractors that you use in the construction and development of the Gym.  You must submit to us for our written approval all construction and remodeling plans and specifications before beginning build-out of the Gym and all revised or "as built" plans and specifications as they are prepared during the Gym's construction and development.  You may not begin build-out for the Gym until we have approved the plans and specifications in writing.  Our review of the plans and specifications is limited to reviewing your compliance with our prototype requirements.  Our review is not designed to assess your compliance with the ADA and similar rules governing public accommodations for persons with disabilities, other applicable ordinances, building codes, permit requirements, and lease requirements and restrictions, as compliance with those laws, requirements and restrictions is your responsibility.  You must develop the Gym in accordance with the plans and specifications that we have approved in writing.  During build-out of the Gym, we may physically inspect the Gym or require you to send us pictures and images (including video recordings) of the interior and/or exterior of the Gym to review your development of the Gym in accordance with our Brand Standards set forth in the Operations Manual (defined in Section 6.G).

Our services under this Agreement do not include assisting you in securing financing for the Gym's development.

### D.  PRESALE OF MEMBERSHIPS

No memberships or other rights to participate in the services at the Gym may be offered or sold prior to opening the Gym to the general public, unless:  (i) we have authorized you in writing to offer or sell memberships or those rights to the public; (ii) you in good faith expect to open the Gym for business within the one hundred twenty (120)-day period following the offer or sale; (iii) your Operating Principal and the Gym's Club Manager (defined in Sections 7.D and 6.A, respectively) have completed to our satisfaction the initial training program described in Section 6.A; and (iv) you have secured all financing and permits necessary to develop, build and fully equip the Gym.

You must propose a temporary site at or near the Gym from which you will conduct the presale of memberships and obtain our written acceptance of the site at least thirty (30) days prior to opening the temporary site.  We may physically inspect the site or require you to send us

pictures and images (including video recordings). Your temporary site may be at the Gym (if legally permissible) or in an available retail space in a high traffic location that meets our then current criteria. You are prohibited from conducting any presale of memberships from your or your Operating Principal's home or other residence. You may not use, or allow any other party to use, any part of the temporary site for any purpose other than the presale of memberships and other pre-marketing activities as described in Section 13.A. You agree to equip the temporary site with adequate furnishings, computer software and hardware, and place or display, according to our guidelines, signs, logos, and advertising materials that we periodically specify for use in temporary sites. You may not begin offering or selling memberships at the temporary site until we have reviewed and approved the site in writing as having been developed in accordance with our specifications and standards for temporary sites. We may physically inspect the temporary site or require you to send us pictures and images (including video recordings) of the interior and/or exterior of the temporary site. You agree to maintain the condition and appearance of the temporary site in accordance with Brand Standards. You must hire a Club Manager and adequate employees to conduct the presale of memberships at the temporary site in compliance with our standards and specifications. You must (i) close the temporary site and cease conducting the presale of memberships on or before the Opening Deadline and (ii) de-identify the temporary site within one (1) week after the Opening Deadline by making alterations that we specify to distinguish the temporary site from its former appearance, including by removing all signs, sign faces, advertising, marketing and promotional materials, forms, and other materials containing any Mark.

You alone are responsible for ensuring that your membership agreements and presale of memberships comply with all applicable laws and other legal requirements. You will be liable to the applicable legal authorities if you fail to do so (and also will be liable to us if we are brought into the matter because of your failure).

### E. OPENING

On or before the Opening Deadline listed on <u>Exhibit A</u>, you must open the Gym for business; provided, however, you may not open the Gym for business until:

    i.      we have inspected and approved in writing the Gym as having been developed in accordance with our specifications and standards. As an alternative, or in addition, to our physical inspection of the Gym, we may require you to send us pictures and images (including video recordings) of the Gym. You must give us at least thirty (30) days' prior written notice of the Gym's planned opening date and also notify us in writing when the Gym is ready for inspection or review. If we do not inspect or review the Gym within twenty-five (25) business days after you deliver notice that the Gym is ready for inspection or review, or if we do not deliver written comments to you within seven (7) business days after our inspection or review, then the Gym is deemed approved for opening. Our inspection and approval are limited to ensuring your compliance with our standards and specifications, although our approval is not a representation that the Gym complies with our standards and specifications or a waiver of our right to enforce any provision of this Agreement. Our inspection and approval are not designed to assess compliance with federal, state or local laws or regulations,

including the ADA, as compliance with such laws is your responsibility. We will not unreasonably withhold our approval of the Gym;

ii.     your Operating Principal and the Gym's Club Manager, as applicable, have completed the initial orientation and training programs described in Section 6.A to our satisfaction;

iii.    the Gym has sufficient employees to manage and operate the Gym on a day-to-day basis in compliance with Brand Standards, and the employees have been trained by you or the Club Manager;

iv.     your Operating Principal, the Club Manager, and the Gym's employees have completed all required third party certifications (including certifications required under applicable law (e.g., cardiopulmonary resuscitation ("**CPR**"), automated external defibrillator ("**AED**"), and first aid));

v.      you have satisfied all state and federal permitting, bonding, licensing, and other legal requirements for the lawful operation of your Gym, including, without limitation, by ensuring that your planned membership offerings following the Gym's opening and your forms of membership agreement comply with applicable law;

vi.     all amounts due to us, our affiliates, and principal suppliers have been paid;

vii.    you are not in default under any agreement with us, our affiliates or principal suppliers;

viii.   we have received copies of required permits, licenses, and insurance policies required by this Agreement; and

ix.     you have met all other opening requirements as established by us in our Operations Manual.

## 5.  FEES

### A.  INITIAL FRANCHISE FEE

You must pay us an initial franchise fee in the amount of Twenty-Five Thousand Dollars ($25,000) in a lump sum upon the execution of this Agreement (the "**Initial Franchise Fee**"). The Initial Franchise Fee is non-refundable.

### B.  ROYALTY

You agree to pay us, on or before the day of each month that we periodically specify (the "**Payment Day**"), a royalty ("**Royalty**") in an amount equal to five percent (5%) of the Gross Sales of the Gym. The first Royalty payment is due on the Payment Day of the month following the month during which you first open the Gym for business, based on the Gross Sales during the period beginning when the first Gross Sales were recognized (including Gross Sales derived

during any presale of memberships or other services) and ending on the last day of the previous month.

In this Agreement, "**Gross Sales**" means the aggregate amount of all revenue generated from any source, including, without limitation, revenue generated from the sale of memberships, goods, products, merchandise, services, and advertising, other types of revenue you receive, including the proceeds of business interruption insurance and rental income of any type, and the value of goods, products, merchandise, and services bartered in exchange for memberships or other goods or services.  Gross Sales are not reduced by the amount of any discounts on memberships or other services to employees, family members, or other businesses you own or control.  However, Gross Sales exclude:  (i) federal, state, or municipal sales, use or service taxes collected from members and paid to the appropriate taxing authority; (ii) proceeds from insurance, excluding business interruption insurance; (iii) proceeds from any civil forfeiture, condemnation, or seizure by government entities; and (iv) the amount of any credits provided in accordance with the terms and conditions set forth in the Operations Manual.  Each charge or sale upon credit will be treated as a sale for the full price on the day during which such charge or sale is made, irrespective of when you receive payment (whether full or partial, or at all) on that sale.  Revenue from gift cards that we approve for offer and sale at Blink Fitness Gyms is included in Gross Sales when the gift card is used to pay for products and services.  Your Gym may not issue or redeem any gift certificates, coupons, or gift, loyalty, or similar cards unless we first have approved in writing their form and content and your proposed issuing and honoring/redemption procedures, which approval we may grant or withhold as we deem best.

### C.  NEW MEMBER FEE

You agree to pay us a non-refundable new member fee (the "**New Member Fee**") in the amount equal to Five Dollars ($5.00) for each new or former member who signs a new online membership agreement with the Gym through the System Website.  The New Member Fee is payable in the month following the month in which the online membership agreement is signed.  We may increase the New Member Fee on an annual basis (separate and apart from the inflation-based increase permitted under Section 5.G below), but in no event will the New Member Fee payable by you be greater than the New Member Fee we require new Blink Fitness Gym franchisees to pay, as reflected in our then current form of Franchise Agreement.

### D.  PAYMENT METHOD AND TIMING

You agree to sign and deliver to us the documents that we periodically require to authorize us to debit your business checking account automatically for the Royalty and other amounts due under this Agreement or any related agreement between us (or our affiliates) and you.  If we institute an automatic debit program for the Gym, we will debit your account for the Royalty and other amounts on or after the Payment Day, based on the Gross Sales for the previous month.  You agree to make the funds available for withdrawal by electronic transfer before each due date.  In connection with the automatic debit program, we may require you to procure, at your expense, overdraft protection for your business checking account in an amount that we specify.  You agree to reimburse us for any "insufficient funds" charges and related expenses that we incur in connection with your failure to maintain sufficient funds in your automatic debit account.

If you fail to report the Gym's Gross Sales for any month, we may debit your account for one hundred twenty-five percent (125%) of the Royalty that we debited for the previous month. If the amount we debit from your account is less than the amount you actually owe us for the month (once we have determined the Gym's true and correct Gross Sales for the month), we will debit your account for the balance due on the day that we specify.  If the amount we debit from your account is greater than the amount you actually owe us for the month (once we have determined the Gym's true and correct Gross Sales for the month), we will credit the excess, without interest, against the amount that we otherwise would debit from your account during the following month.

We have the right, at our sole option upon notice to you, to change from time to time the timing and terms for payment of Royalties and other amounts payable to us under this Agreement.

You may not subordinate to any other obligation your obligation to pay Royalties or any other fee or charge under this Agreement.

### E.  INTEREST ON LATE PAYMENTS

In addition to all other remedies we have, including, without limitation, the right to terminate this Agreement pursuant to Section 18, if you fail to pay (or make available for withdrawal from your account) any amounts you owe us or our affiliates, including, without limitation, amounts for Royalties or New Member Fees, whether such amounts are reflected as due on any report you submit to us or are subsequently determined by verification, examination or audit to have been due, those amounts will bear interest, accruing as of their original due date, at one and one-half percent (1.5%) per month or the highest commercial contract interest rate the law allows, whichever is less.  In addition, you must pay us a Seventy-Five Dollar ($75) administrative fee for each payment which you do not make to us when due (or for each dishonored payment) to cover the increased costs and expenses we will incur as a result of your failure to pay the amounts when due.

### F.  APPLICATION OF PAYMENTS AND RIGHT OF SET-OFF

Notwithstanding any designation that you make, we may apply any of our debits or your payments to any of your past due indebtedness to us or our affiliates.  We may set-off any amounts you or your owners owe us or our affiliates against any amounts that we or our affiliates owe you or your owners, whether in connection with this Agreement or otherwise.

### G.  ANNUAL INCREASE IN FIXED FEES

We and our affiliates reserve the right to increase the amount of any fixed fee or fixed payment due under this Agreement based on changes in the Index (defined below) ("**Annual Increase**").  An Annual Increase to such fees and payments may occur only once during any calendar year and may not exceed the corresponding cumulative increase in the Index since the Effective Date or, as the case may be, the date on which the last Annual Increase became effective for the particular fixed fee or payment being increased.  Any and all Annual Increases will be made at the same time during the calendar year.  "Index" refers to the Consumer Price

Index for All Urban Consumers (CPI-U) for the U.S. City Average for all Items (1982 – 1984 = 100), not seasonally adjusted, as published by the United States Department of Labor, Bureau of Labor Statistics, or in a successor index.  Notwithstanding this Section, we also reserve the right (i) to increase the New Member Fee as provided in Section 5.C above and, (ii) if any fixed fee or fixed payment due under this Agreement encompasses any third party charges that we collect from you on a pass-through basis (*i.e.*, for ultimate payment to the third party), to increase the fixed fee or fixed payment, even beyond the Annual Increase, to reflect any increases in the third party's charges to us.

## 6.  TRAINING, GUIDANCE, AND ASSISTANCE

### A.  INITIAL ORIENTATION AND TRAINING

If this is your first Blink Fitness Gym, your Operating Principal must attend an initial orientation session on the Blink Fitness Gym system at our principal business address within forty-five (45) days after the Effective Date.  We also will furnish without additional charge at our designated training facility and/or through a web-based platform an initial training program on the operation of a Blink Fitness Gym for your Operating Principal and one (1) manager for the Gym (the "**Club Manager**").  Before you sell any memberships (including, without limitation, through presale), advertise, or open the Gym to the public, your Operating Principal and the Club Manager must complete our training program to our satisfaction.  You will be responsible for the compensation, travel and living expenses for your Operating Principal and the Club Manager during training.

### B.  OPENING SUPPORT

Upon successful completion of the initial training program and during the Gym's initial opening period (which may begin before and continue after the Gym's actual opening date), we will provide up to five (5) days of local in-market training for supervisory employees and opening support for the Gym.

### C.  RETRAINING

If your Operating Principal or the Club Manager fails to complete the initial training program to our satisfaction, or we determine after an inspection that retraining is necessary because the Gym is not operating according to Brand Standards, he or she may attend a retraining session.  You must pay our then current retraining fee (as set forth in the Operations Manual) for anyone attending the retraining session.  You also will be responsible for the attendees' compensation and travel and living expenses during retraining.  We may terminate this Agreement if your Operating Principal or the Club Manager fails to attend the initial training program and/or does not complete the initial training program to our satisfaction.

### D.  ONGOING AND SUPPLEMENTAL TRAINING

We may require your Operating Principal and/or the Club Manager to attend and satisfactorily complete various training courses, programs and conventions offered periodically by us or by third parties at the times and locations that we designate.  You will be responsible for the compensation, travel and living expenses for your Operating Principal and the Club Manager

during training.  We may charge our then current fee for continuing and advanced training (as set forth in the Operations Manual).  If you request that any training courses and programs be provided locally, then subject to the availability of our training personnel, you must pay our then current training fee (as set forth in the Operations Manual) and the travel and living expenses for our training personnel.

### E.  TRAINING FOR REPLACEMENT CLUB MANAGERS

In the event the Club Manager is no longer employed by you at the Gym, you must appoint a new manager (the "**Replacement Manager**") to act as the manager for the Gym within forty-five (45) days after the last day of the former Club Manager's employment.  The Operating Principal will serve as the Gym's manager until you appoint a Replacement Manager.   The Replacement Manager, and any subsequent Replacement Managers, must satisfactorily complete our web-based training program within ten (10) days after they are hired and must attend and satisfactorily complete our training program for replacement managers at our designated training facility within forty-five (45) days after they are hired.  This training program may differ from our standard initial training program.  We will furnish the replacement manager training program at no additional charge for your first Replacement Manager during the Term.  You must pay our then current retraining fee (as set forth in the Operations Manual) for all subsequent Replacement Managers hired during the Term who must attend the replacement manager training program. You will be responsible for the compensation and travel and living expenses for the Replacement Manager during training.

### F.  TRAINING FOR GYM EMPLOYEES

All Gym employees must be properly trained by you or the Club Manager within ten (10) days after being hired to competently perform the tasks required of their respective positions. We will develop and make available training tools and recommendations for you to implement in training the Gym's employees.  We may periodically update these training materials to reflect changes in our training methods and procedures.

We may periodically and without prior notice review the Gym's performance to determine if the Gym meets our Brand Standards.  If we determine that the Gym is not operating according to Brand Standards, in addition to the other rights provided in this Agreement, we may require that you or the Club Manager retrain one or more employees of the Gym.

### G.  GENERAL GUIDANCE AND THE OPERATIONS MANUAL

We will periodically advise you regarding the operation of the Gym based on your reports or our inspections with respect to:

    i.      standards, specifications, operating procedures and methods that Blink Fitness Gyms use;

    ii.     purchasing required or recommended Operating Assets and other products, supplies and materials;

iii.     supervisory employee training methods and procedures (although you are solely responsible for the terms and conditions of employment of all Gym employees); and

iv.     accounting, advertising, and marketing.

We may guide you by means of our operating manual and other technical manuals ("**Operations Manual**"), in bulletins or other written materials, by electronic media, by telephone consultation, and/or at our office or the Gym. If you request and we agree to provide additional or special guidance, assistance or training, you agree to pay our then applicable charges, including reasonable training fees and our personnel's per diem charges and any travel and living expenses. Any specific ongoing training, conventions, advice or assistance that we provide does not create an obligation to continue providing that specific training, convention, advice or assistance, all of which we may discontinue and modify at any time.

We will provide you access to one (1) copy of our Operations Manual, which may include written or electronic materials and which we may make available to you by various means, including hardcopy or access through the Intranet. The Operations Manual contains mandatory and suggested specifications, standards, operating procedures and rules that we periodically prescribe for operating a Blink Fitness Gym ("**Brand Standards**") and information on your other obligations under this Agreement. We may modify the Operations Manual periodically to reflect changes in Brand Standards, but these modifications will not alter your fundamental rights or status under this Agreement. You agree to keep your copy of the Operations Manual current and communicate all updates to your employees in a timely manner. You agree to keep all parts of the Operations Manual in a secure location and restrict access to any passwords provided to or developed by you for accessing the Operations Manual. If there is a dispute over its contents, our master copy of the Operations Manual controls. You agree that the contents of the Operations Manual are confidential and that you will not disclose any part of the Operations Manual to any person other than Gym employees and others who need to know such part and who agree to maintain its confidentiality by signing a confidentiality agreement attached hereto as <u>Exhibit E</u>. You may not at any time copy, duplicate, record or otherwise reproduce any part of the Operations Manual, with the exception of certain forms as specified in the Operations Manual.

While we may designate the form of confidentiality agreement you must use with Gym employees having access to our Confidential Information (defined in Section 9 below) in order to protect that Confidential Information, under no circumstances will we control the forms or terms of employment agreements you use with Gym employees or otherwise be responsible for your labor relations. In addition, the Brand Standards do not include any personnel policies or procedures or security related policies or procedures that we (at our option) may make available to you in the Operations Manual or otherwise for your optional use. You will determine to what extent, if any, these policies and procedures might apply to your operations at the Gym. You and we recognize that we neither dictate nor control labor or employment matters for franchisees and Blink Fitness Gym employees and we are not responsible for the safety and security of Gym employees, members, guests, and visitors.

At our option, we may post the Operations Manual on the Intranet (defined in Section 7.G below) or another restricted website to which you will have password access. If we do so, you agree to periodically monitor the website for any updates to the Operations Manual or Brand Standards. Any passwords or other digital identifications necessary to access the Operations Manual on such a website will be deemed to be part of Confidential Information.

### H. DELEGATION

We have the right, from time to time, to delegate the performance of any portion or all of our obligations under this Agreement to designees, whether they are our affiliates, agents or independent contractors with which we contract to provide such services.

### 7. GYM OPERATION AND BRAND STANDARDS

#### A. CONDITION AND APPEARANCE OF GYM

You may not use, or allow any other party to use, any part of the Gym for any purpose other than your operation of a Blink Fitness Gym in compliance with this Agreement. You agree to place or display, according to our guidelines, at the Gym (interior and exterior) only those signs, emblems, designs, artwork, lettering, logos and display and advertising materials that we periodically specify. You agree to maintain the condition and appearance of the Gym, the site and the Operating Assets in accordance with the Brand Standards. Without limiting that obligation, you agree to take, at your expense, the following actions during the Term: (i) thorough cleaning, repainting and redecorating of the interior and exterior of the Gym at intervals that we may periodically specify and at our direction; (ii) interior and exterior repair of the Gym and the site as needed; and (iii) repair or replacement, at our direction, of damaged, worn-out or obsolete Operating Assets, or Operating Assets that no longer meet our Brand Standards, at intervals that we periodically specify (or, if we do not specify an interval for replacing any Operating Asset, as that Operating Asset needs to be repaired or replaced).

In addition to your obligations described above, we may from time to time, but not more than two (2) times during the Term (after the Gym's opening), require you to substantially alter the Gym's appearance, branding, layout and/or design, and/or replace a material portion of the Operating Assets, in order to meet our then current requirements for new Blink Fitness Gyms. You acknowledge that this obligation could result in your making extensive structural changes to, and significantly remodeling and renovating, the Gym, and/or in your spending substantial amounts for new Operating Assets, and you agree to incur, without limitation, any expenditures required in order to comply with this obligation and our requirements (even if such expenditures cannot be amortized over the remaining Term). Within sixty (60) days after receiving written notice from us, you must have plans prepared according to the standards and specifications that we prescribe and, if we require, using architects and contractors that we designate or approve, and you must submit those plans to us for our written approval. You agree to complete all work according to the plans that we approve within the time period that we reasonably specify and in accordance with this Agreement.

We may also from time to time request and require you to participate in certain testing programs for new services, products, and/or Operating Assets. You acknowledge that this

obligation could result in your making expenditures for new Operating Assets and other operating costs associated with the Gym, which you agree to incur and for which we have no obligation to reimburse you.  You agree to maintain any records and reports related to the testing programs as we may require and to submit any records and reports to us in a timely manner.  We reserve the right to discontinue any testing programs prior to their scheduled completion dates and to choose not to implement any changes to the Franchise System.

## B. COMPLIANCE WITH APPLICABLE LAWS AND GOOD BUSINESS PRACTICES

You must secure and maintain in force all required licenses, permits and certificates relating to the operation of the Gym and must operate the Gym in full compliance with all applicable laws, ordinances and regulations, including government regulations relating to occupational hazards, health, environment, employment, worker's compensation and unemployment insurance and withholding and payment of federal and state income taxes, social security taxes and sales and service taxes.  All advertising and promotion by you must be completely factual and must conform to the highest standards of ethical advertising.  The Gym must in all dealings with its members, suppliers, us and the public adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct.  You agree to refrain from any business or advertising practice which may injure our business and the goodwill associated with the Marks, the Franchise System, and other Blink Fitness Gyms.  You acknowledge our right to regulate your advertising and related activities outside the Protected Area, as provided in Section 3.C above.  You must notify us in writing within three (3) days of the commencement of any action, suit or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which may adversely affect your or the Gym's operation or financial condition and of any notice of violation of any law, ordinance, or regulation relating to the Gym.

## C. COMPLIANCE WITH BRAND STANDARDS

You agree to comply with all Brand Standards, as we may periodically modify them, as if they were part of this Agreement.  You will not offer, sell, or provide at or from the Gym any goods or services not authorized in the Operations Manual.  You must offer, sell, and furnish all those goods and services we prescribe from time to time.

Brand Standards may direct any aspect of the operation and maintenance of the Gym, including any one or more of the following:

    i.     sales, marketing, advertising and promotional programs and materials and media used in these programs, including participation in and compliance with the requirements of any special advertising, marketing and promotional programs that we periodically specify;

    ii.    adequate staffing levels for the Gym to operate the Gym in compliance with Brand Standards, appearance of instructors and other Gym personnel, practices and procedures for soliciting members, and competent and courteous service to members and other customers.  However, you have sole responsibility and

authority for your labor relations and employment practices, including, among other things, employee selection, promotion, termination, hours worked, rates of pay, benefits, work assigned, discipline, adjustments of grievances and complaints, and working conditions. Gym employees are under your control at the Gym. You must communicate clearly with Gym employees in your employment agreements, human resource manuals, written and electronic correspondence, paychecks, and other materials that you (and only you) are their employer and that we, as the franchisor of Blink Fitness Gyms, are not their employer and do not engage in any employer-type activities (including those described above) for which only franchisees are responsible;

iii.     standards, procedures and requirements for reciprocity programs, transferring memberships, changing membership programs, and other programs designed to enhance member satisfaction with the Blink Fitness network, including revenue and cost sharing requirements for these programs;

iv.      standards, procedures and requirements for attributing revenue with respect to members who attend and utilize other Blink Fitness Gyms in addition to the Gym;

v.       maximum, minimum or other pricing requirements for products and services that the Gym offers, including requirements for promotions, special offers and discounts in which some or all Blink Fitness Gyms participate, in each case to the maximum extent the law allows;

vi.      standards, requirements and procedures for training your Gym's supervisory personnel;

vii.     use and display of the Marks;

viii.    bookkeeping, accounting, data processing and recordkeeping systems and forms, including, without limitation, document retention requirements and use of the Intranet (but not including any records or information relating to Gym employees, as you control exclusively your labor relations and employment practices);

ix.      terms and conditions of the sale and delivery of, and terms and methods of payment for, products and services that you obtain from us and affiliated and unaffiliated suppliers, including ordering, return and warranty terms and conditions and our and our affiliates' right to sell you any products only on a "cash-on-delivery" or other basis if you are in default, have failed to pay when due amounts owed under any agreement with us or our affiliates, or have insufficient net worth to meet our or our affiliates' credit standards, which we may determine from credit reports you hereby authorize us to order periodically on you and your owners to confirm your and their financial condition and help us assess whether to extend credit to you on items purchased from us;

x.       member and customer satisfaction surveys and programs (the costs of which we may require you to share with us and/or other Blink Fitness Gym franchisees);

xi.      days and hours of operation;

xii.     accepting credit and debit cards, other payment systems and check verification services;

xiii.    standards and procedures for any use of blogs, common social networks like Facebook and Instagram, professional networks like LinkedIn, live-blogging tools like Twitter, virtual worlds, file, audio and video sharing sites, and other similar social networking media or tools (collectively, "**Social Media**") that in any way reference the Marks or involve the Gym;

xiv.     standards and requirements for processing, collecting and accounting for payments from Gym members;

xv.      relocation conditions and procedures concerning the Gym's new and former premises; and

xvi.     any other aspects of operating and maintaining the Gym that we determine to be useful to preserve or enhance the efficient operation, image or goodwill of the Marks and Blink Fitness Gyms.

Except for the training and qualifications of the Gym's Club Manager and supervisory employees described above, Brand Standards will not include any employment-related policies or procedures and will not dictate or regulate the terms and conditions of employment for your employees. Except as described above, any information we provide (whether in the Operations Manual or otherwise) concerning employment-related policies or procedures, or relating to the terms and conditions of employment for Gym employees, is for your optional use.

We have the right periodically to modify and supplement Brand Standards, which may require you to invest additional capital in the Gym and incur higher operating costs, and such Brand Standards will constitute legally binding obligations upon you when communicated to you. Although we retain the right to establish and periodically modify the Brand Standards that you have agreed to follow, you retain the responsibility for the day-to-day management and operation of the Gym and for implementing and maintaining the Brand Standards at the Gym.

### D.  OPERATING PRINCIPAL

Upon the execution of this Agreement, you must designate and retain an individual to serve as the operating principal (the "**Operating Principal**"). You must at all times during the Term have an Operating Principal meeting the following qualifications and such other standards as may be set forth from time to time by us in the Operations Manual or otherwise in writing:

i.       If you are an individual, you may designate yourself as the Operating Principal. If you are an entity, you may designate one of your owners or another individual with no equity ownership in you as the Operating Principal. The Operating Principal must be approved by us in writing prior to the earlier of the Effective Date of this Agreement or the execution of the Development Rights Agreement (if any). We have

the right, as we deem best, to approve or disapprove the proposed Operating Principal or any proposed change in the individual designated as the Operating Principal.

ii.   If the Operating Principal is not required to execute this Agreement or our Guaranty, the Operating Principal must execute our form of non-competition agreement and form of confidentiality agreement attached hereto as <u>Exhibit E</u>.  Our right to regulate the forms of these agreements is solely to protect Confidential Information and the competitiveness of Blink Fitness Gyms.  Under no circumstances will we control the forms or terms of employment agreements you use with Gym employees or otherwise be responsible for your labor relations.

iii.  The Operating Principal is responsible for the day-to-day management of your business, and, without our prior written consent, may not engage in any business activity other than the development and operation of the Gym.  You agree to vest the Operating Principal with sufficient decision-making authority to make the decisions that are essential to the effective and efficient operation of the Gym and to make such decisions on your behalf.  The Operating Principal must communicate directly with us regarding any matters that relate to the Gym (excluding matters relating to labor relations and employment practices).

iv.   The Operating Principal may serve as the Gym's Club Manager or may designate another individual to serve as the Club Manager, provided that the Operating Principal must take all necessary action to ensure that such designee conducts and fulfills all obligations in accordance with the terms of this Agreement.  The Operating Principal remains fully responsible for the performance of the Club Manager.

v.    The Operating Principal must successfully complete our initial training program before you sell any memberships (including, without limitation, through presale), advertise, or open the Gym to the public.  If the Operating Principal fails to complete the initial training program to our satisfaction, we may terminate this Agreement in accordance with Section 18.

vi.   If you propose to change the individual designated as the Operating Principal, you must designate a new individual (the "**Replacement Operating Principal**") to act as the Gym's operating principal within forty-five (45) days after the last day the former Operating Principal serves as the Gym's Operating Principal.  One of your owners must serve as the operating principal until you designate, and we approve in writing, the Replacement Operating Principal.  The Replacement Operating Principal, and any subsequent Replacement Operating Principals, must satisfactorily complete our initial training program within forty-five (45) days after we approve the individual.  You must pay our then current Replacement Operating Principal training fee (as set forth in the Operations Manual) for all Replacement Operating Principals designated during the Term who must attend our initial training program.  You will be responsible for the compensation, travel and living expenses of the Replacement Operating Principal during training.

### E.  APPROVED PRODUCTS AND SUPPLIERS

We may periodically designate and approve standards, specifications, brands, models, manufacturers, suppliers and/or distributors of the Operating Assets and other products and services that we periodically authorize for use at or sale by Blink Fitness Gyms.  You must purchase or lease all Operating Assets and other products and services that you use or sell at the Gym only according to our Brand Standards and, if we require, only from suppliers or distributors that we designate or approve (which may include or be limited to us, our affiliates, and/or other restricted sources).  We and/or our affiliates may derive revenue based on your purchases and leases, including, without limitation, from charging you for products and services that we or our affiliates provide to you and from promotional allowances, volume discounts and other payments made to us and our affiliates by suppliers that we designate, approve or recommend for some or all Blink Fitness Gym franchisees.  We and our affiliates may use all amounts received from suppliers, whether or not based on your and other franchisees' prospective or actual dealings with them, without restriction for any purposes that we and our affiliates deem appropriate.

If you wish to purchase or lease any Operating Assets or other products or services from a supplier or distributor which we have not then approved (if we require you to buy or lease the product or service only from an approved supplier or distributor), then you must establish to our reasonable satisfaction that the product or service is of equivalent quality and functionality to the product or service it replaces and that the supplier or distributor is, among other things, reputable, financially responsible, and adequately insured for product liability claims.  Upon request, you must pay any actual expenses we may incur in order to determine whether or not any such products, services, suppliers or distributors meet these requirements and specifications.  We may condition our written approval of a supplier or distributor on requirements relating to product quality, prices, consistency, warranty, reliability, financial capability, labor relations, member relations, frequency of delivery, concentration of purchases, standards of service (including prompt attention to complaints), and/or other criteria.  We have the right to inspect the proposed supplier's or distributor's facilities and to require the proposed supplier or distributor to deliver product samples or items, at our option, either directly to us or to any third party we designate for testing.  If we approve any supplier or distributor you recommend from which you purchase or lease any Operating Assets or other products or services, you agree that we are authorized to allow other Blink Fitness Gyms to purchase or lease any Operating Assets or other products or services from these suppliers or distributors, without limitation, and without compensation to you.  Notwithstanding the foregoing, we may limit the number of approved suppliers and/or distributors with whom you may deal, designate sources that you must use, and/or refuse any of your requests for any reason, including, without limitation, that we have already designated any exclusive source (which might be us or our affiliate) for a particular item or service or if we believe that doing so is in the best interests of the Blink Fitness network.

### F.  COMPUTER SYSTEM

You agree to obtain and use the computer hardware and software that we periodically specify, including self-service kiosks to be located within the Gym and other hardware components, dedicated telephone and power lines, modems, printers, and other computer-related accessories and peripheral equipment (the "**Computer System**").  At our option, you will use the

Computer System to access the Intranet and to input and access information about your members, sales and operations, and for the self-service use of members. You must maintain the continuous operation of the Computer System. We will have unlimited access to all information maintained on the Computer System (excluding matters relating to labor relations and employment practices) and to the content of any Blink Fitness e-mail accounts we may provide to you.

We may periodically modify specifications for and components of the Computer System. Our modification of specifications for the Computer System, and/or other technological developments or events, may require you to purchase, lease and/or license new or modified computer hardware, software and other components and to obtain service and support for the Computer System. Although we cannot estimate the future costs of the Computer System or required service or support, you agree to incur the costs of obtaining the computer hardware, software and other components comprising the Computer System (and additions and modifications) and required service or support. Within ninety (90) days after we deliver notice to you, you agree to obtain the Computer System components that we designate and ensure that your Computer System, as modified, is functioning properly.

We and our affiliates may condition any license of required or recommended proprietary software to you, and/or your use of technology developed or maintained by or for us (including the Intranet), on your signing a software license agreement or similar document, or otherwise agreeing to the terms (for example, by acknowledging your consent to and accepting the terms of a click through license agreement), that we and our affiliates periodically prescribe to regulate your use of, and our (or our affiliates') and your respective rights and responsibilities with respect to, the software or technology. We and our affiliates may charge you up front and ongoing fees for any required or recommended proprietary software or technology that we or our affiliates license to you and for other Computer System maintenance and support services provided during the Term of this Agreement.

Notwithstanding your obligation to buy, use, and maintain the Computer System according to our standards and specifications, you have sole and complete responsibility for: (1) the acquisition, operation, maintenance, and upgrading of the Computer System; (2) the manner in which your Computer System interfaces with our and any third party's computer system; and (3) any and all consequences if the Computer System is not properly operated, maintained, and upgraded. The Computer System must permit twenty-four (24) hours per day, seven (7) days per week electronic communications between you and us, including access to the Internet and Intranet (but excluding matters relating to labor relations and employment practices).

### G. INTRANET

We will establish a restricted website providing communications among us, our affiliates, you, other Blink Fitness Gym franchisees, and other persons and entities to whom we (in our judgment) periodically determine to give access, including Blink Fitness Gym members (the "**Intranet**"). The Intranet may be part of the System Website (defined in Section 13.G) and will provide the features, services and functionality that we periodically specify. We may implement and periodically modify Brand Standards relating to the Intranet and, at our option, may discontinue the Intranet, or any services offered through the Intranet, at any time.

You agree to comply with the requirements that we periodically specify (whether set forth in the Operations Manual or otherwise) concerning connecting to the Intranet and using the Intranet in the operation of the Gym. Without limiting the foregoing, you agree to enter the information concerning each person who registers for a membership that the Gym offers and all Gross Sales of the Gym using the Intranet in the manner that we periodically specify. We will own all intellectual property and other rights in the Intranet and all information it contains, including its domain name or URL, the log of "hits" by visitors, any personal or business data that visitors supply, and all information relating to the members and other patrons of the Gym, whether that information is contained on your Computer System or our (or our designee's) computer system (collectively, the "**Data**").

## 8. <u>MARKS</u>

### A. OWNERSHIP AND GOODWILL OF MARKS

Your right to use the Marks is derived only from this Agreement and is limited to your operating the Gym according to this Agreement and all mandatory Brand Standards that we prescribe during the Term. Your unauthorized use of the Marks is a breach of this Agreement and infringes our (and our licensor's) rights in the Marks. Any use of the Marks relating to the Gym, and any goodwill established by that use, are for our (and our licensor's) exclusive benefit. We (and our licensor) may take the action necessary to enforce all trademark use obligations under this Agreement. This Agreement does not confer any goodwill or other interests in the Marks upon you, other than the right to operate the Gym according to this Agreement. All provisions of this Agreement relating to the Marks apply to any additional and substitute trademarks and service marks that we periodically authorize you to use. You may not at any time during or after the Term of this Agreement contest or assist any other person in contesting the validity, or our (or our licensor's) ownership, of the Marks.

### B. LIMITATIONS ON USE OF MARKS

You agree to use the Marks as the sole identification of the Gym, subject to the notices of independent ownership that we periodically designate. You may not use any Mark (i) as part of any corporate or legal business name, (ii) with any prefix, suffix or other modifying words, terms, designs or symbols (other than logos that we have licensed to you), (iii) in selling any unauthorized services or products, (iv) as part of any domain name, homepage, electronic address, metatag or otherwise in connection with any website or other online presence without our consent, or (v) in any other manner that we have not expressly authorized in writing. You may not use any Mark in advertising the transfer, sale or other disposition of the Gym or an ownership interest in you without our prior written consent, which we will not unreasonably withhold. You agree to give the notices of trademark and service mark registrations that we periodically specify and obtain any fictitious or assumed name registrations that applicable law requires. To the extent you use any Mark in employment-related materials, you must include a clear disclaimer that you (and only you) are the employer of employees at the Gym and that we, as the franchisor of Blink Fitness Gyms, are not their employer and do not engage in any employer-type activities for which only franchisees are responsible, such as employee selection, promotion, termination, hours worked, rates of pay, other benefits, work assigned, discipline, adjustment of grievances and complaints, and working conditions.

### C. NOTIFICATION OF INFRINGEMENTS AND CLAIMS

You agree to notify us immediately of any actual or apparent infringement of or challenge to your use of any Mark, or of any person's claim of any rights in any Mark (or any identical or confusingly similar trademark) or claim of unfair competition relating to any Mark. You agree not to communicate with any person other than us and our licensor, our respective attorneys, and your attorneys regarding any infringement, challenge or claim. We and our licensor may take the action that we deem appropriate (including no action) and control exclusively any litigation, U.S. Patent and Trademark Office proceeding or other administrative proceeding arising from any infringement, challenge or claim or otherwise concerning any Mark. You agree to sign any documents and take any other reasonable actions that we and our and our licensor's attorneys deem necessary or advisable to protect and maintain our (and our licensor's) interests in any litigation or Patent and Trademark Office or other proceeding or otherwise to protect and maintain our (and our licensor's) interests in the Marks.

### D. DISCONTINUANCE OF USE OF MARKS

If we believe at any time that it is advisable for us and/or you to modify, discontinue using and/or replace any Mark, and/or use one or more additional or substitute trademarks or service marks, you agree to comply with our directions within a reasonable time after receiving notice. We need not reimburse you for your expenses in complying with these directions (such as costs that you incur in changing the signs and panels on equipment in order to remove the Marks or our trade dress, or replacing supplies for the Gym), for any loss of revenue due to any modified or discontinued Mark, or for your expenses of promoting a modified or substitute trademark or service mark.

### E. INDEMNIFICATION FOR USE OF MARKS

We agree to reimburse you for all damages and expenses that you incur in any trademark infringement proceeding disputing your authorized use of any Mark under this Agreement, provided your use has been consistent with this Agreement, the Operations Manual, and Brand Standards communicated to you and you have timely notified us of, and complied with our directions in responding to, the proceeding. At our option, we and/or our affiliate(s) may defend and control the defense of any proceeding arising from or relating to your use of any Mark under this Agreement.

## 9. <u>CONFIDENTIAL INFORMATION</u>

We and our affiliates possess (and will continue to develop and acquire) certain confidential information, some of which constitutes trade secrets under applicable law, relating to the development and operation of Blink Fitness Gyms (the "**Confidential Information**"), which includes, but is not limited to:

     i.     information in the Operations Manual and Brand Standards;

     ii.     layouts, designs, and other plans and specifications for Blink Fitness Gyms;

iii.    methods, formats, specifications, standards, systems, procedures, sales and marketing techniques, and knowledge and experience used in developing and operating Blink Fitness Gyms;

iv.    marketing research and promotional, marketing and advertising programs for Blink Fitness Gyms;

v.    knowledge of specifications for and suppliers of, and methods of ordering, certain Operating Assets, products, materials and supplies that Blink Fitness Gyms use and sell;

vi.    knowledge of the operating results and financial performance of Blink Fitness Gyms other than the Gym;

vii.    member solicitation, communication and retention programs, along with data and information used or generated in connection with those programs;

viii.    all Data and all other information generated by, or used or developed in, the operation of the Gym, including Consumer Data and Gym Lists (defined in Section 10), and any other information contained from time to time in the Computer System or that visitors (including you) provide to the System Website; and

ix.    any other information that we reasonably designate as confidential or proprietary.

You will not acquire any interest in any Confidential Information, other than the right to use certain Confidential Information as we specify in operating the Gym during the Term of this Agreement and according to the Brand Standards and the other terms and conditions of this Agreement. You acknowledge that your use of any Confidential Information in any other business would constitute an unfair method of competition with us, our affiliates, our suppliers, and our franchisees. You acknowledge and agree that the Confidential Information is proprietary, includes our and our affiliates' trade secrets, and is disclosed to you only on the condition that you, your owners, your Operating Principal, and your employees agree, and you and they do agree:

i.    not to use any Confidential Information in any other business or capacity and at all times to keep the Confidential Information absolutely confidential, both during and after the Term of this Agreement (afterward for as long as the information is not generally known in the health and fitness industry);

ii.    not to make unauthorized copies of any Confidential Information disclosed via electronic medium or in written or other tangible form;

iii.    to adopt and implement all reasonable procedures that we periodically specify to prevent unauthorized use or disclosure of Confidential Information, including disclosing it only to Gym personnel and others needing to know such Confidential Information to operate the Gym, and using confidentiality and non-disclosure agreements with those having access to Confidential Information. (We have the

right to review and approve the forms of agreements you use solely to ensure that you adequately protect Confidential Information and the competitiveness of Blink Fitness Gyms. Under no circumstances will we control the forms or terms of employment agreements you use with Gym employees or otherwise be responsible for your labor relations or employment practices); and

iv.     not to sell, trade or otherwise profit in any way from the Confidential Information (including by selling or assigning any Consumer Data, Gym Lists, or related information or Data), except during the Term of this Agreement using methods that we have approved.

"Confidential Information" does not include information, knowledge or know-how which is or becomes generally known in the health and fitness industry or which you knew from previous business experience before we provided it to you (directly or indirectly) or before you began training or operating the Gym. If we include any matter in Confidential Information, anyone who claims that it is not Confidential Information must prove that the exclusion in this paragraph is applicable.

## 10. CONSUMER DATA AND GYM LISTS

You must comply with any reasonable instruction by us regarding the organizational, physical, administrative and technical measures and security procedures to safeguard the confidentiality and security of the names, addresses, telephone numbers, e-mail addresses, dates of birth, demographic or related information, and credit card information of customers and previous, current and prospective members ("**Consumer Data**") and, in any event, employ reasonable means to safeguard the confidentiality and security of Consumer Data. You must comply with all applicable laws governing the use, protection, and disclosure of Consumer Data. If there is a suspected or actual breach of security or unauthorized access involving Consumer Data, you must notify us immediately after becoming aware of such actual or suspected occurrence and specify the extent to which Consumer Data was compromised or disclosed.

Subject to any applicable state or federal laws, you will provide to us at our request and in a manner we designate all member lists and membership records for the Gym, which include the names, addresses, phone numbers, and membership numbers of previous, current, and prospective members (the "**Gym Lists**"). You acknowledge and agree that we are the sole owners of the Gym Lists and that you may not distribute, in any form or manner, the Gym Lists to any third party without our prior written consent. During the Term of this Agreement, we and our affiliates reserve the right to communicate with and provide notifications to members and other individuals listed on the Gym Lists. Upon termination of this Agreement, you agree that you and your affiliates may not use the Gym Lists in any form or manner, and we and our affiliates reserve the right to make any and all disclosures and use the Gym Lists in any manner that we or they deem necessary or appropriate.

## 11. INNOVATIONS

All ideas, concepts, techniques or materials relating to a Blink Fitness Gym ("**Innovations**"), whether or not protectable intellectual property and whether created by or for

you or your owners, employees or contractors, must be promptly disclosed to us and will be deemed to be our sole and exclusive property and works made-for-hire for us. To the extent any Innovation does not qualify as a "work made-for-hire" for us, by this paragraph you assign ownership of that item, and all related rights to that item, to us and agree to sign (and to cause your owners, employees and contractors to sign) whatever assignment or other documents that we periodically request to evidence our ownership and to help us obtain intellectual property rights in the item. You may not use any Innovation in operating the Gym or otherwise without our prior written approval.

## 12. <u>EXCLUSIVE RELATIONSHIP</u>

You acknowledge that we have granted you the rights under this Agreement in consideration of and reliance upon your and your owners' agreement to deal exclusively with us with respect to the products and services that Blink Fitness Gyms offer. You therefore agree that, during the Term of this Agreement, neither you, your owners, the Operating Principal, nor any members of your or their Immediate Families (defined below) will:

i.  have any direct or indirect, controlling or non-controlling interest as an owner - whether of record, beneficial or otherwise - in a Competitive Business (defined below), wherever located or operating, provided that this restriction will not prohibit the ownership of shares of a class of securities which are publicly traded on a United States stock exchange representing less than three percent (3%) of the number of shares of that class of securities issued and outstanding;

ii. perform services as a director, officer, manager, employee, consultant, representative or agent for a Competitive Business, wherever located or operating;

iii. directly or indirectly loan any money or other thing of value, or guarantee any other person's loan, to any Competitive Business or any owner, director, officer, manager, employee or agent of any Competitive Business, wherever located or operating;

iv. employ or seek to employ any individual who is, or within six (6) months of such employment or solicitation was, employed by us, our affiliate or our franchisee in a supervisory position or otherwise directly or indirectly induce or attempt to induce any such individual to leave that employment, without our or the employer's prior written consent; or

v.  divert or attempt to divert any actual or potential business, member, or customer of the Gym to a Competitive Business.

The term "**Competitive Business**" means any business providing fitness services or facilities, or any business which grants franchises or licenses to others to operate such a business, other than a Blink Fitness Gym operated under a franchise agreement with us. The term "**Immediate Family**" includes the named individual, his or her spouse, and all children of the named individual or his or her spouse.

You agree to obtain similar covenants from your senior personnel whom we specify, including the Operating Principal, the Club Manager, and officers, directors, and managers, by having the personnel sign our form of confidentiality agreement attached hereto as Exhibit E and other agreements we specify.  We have the right to review and approve the forms of agreements you use solely to ensure that you adequately protect Confidential Information and the competitiveness of Blink Fitness Gyms.  Under no circumstances will we control the forms or terms of employment agreements you use with Gym employees or otherwise be responsible for your labor relations or employment practices.

## 13. ADVERTISING AND MARKETING

### A.  PRESALE MARKETING PROGRAM

You agree, at your expense, to implement a presale marketing program for the Gym in accordance with the Brand Standards.  We will consult with you on a customizable market introduction plan for the Gym that contemplates your spending the amount listed on Exhibit A on the initial promotion of the Gym (the "**Presale Marketing Budget**").  (If the Gym's address is unknown as of the Effective Date, we will list the Presale Marketing Budget on an amended and restated Exhibit A that we will send you once we accept a site for the Gym in accordance with Section 4.A.)  You must obtain our written approval of the presale marketing program.  At least forty-five (45) days before you intend to implement the presale marketing program, you must submit it to us for our approval.  If we do not accept the presale marketing program in writing within fifteen (15) days after receiving it, it will be deemed rejected.  You agree to implement the approved program according to our requirements.  You will use the Presale Marketing Budget to pay providers of products and services according to the approved presale marketing program.

### B.  BRAND FUND

We may, upon thirty (30) days' prior written notice to you, establish and then administer and maintain a fund ("**Brand Fund**" or "**Fund**") for advertising, marketing, research, and public relations programs and materials, the purpose of which is to enhance, promote, and protect the Blink Fitness brand and Franchise System.  You agree to contribute the amount that we periodically specify to the Brand Fund, not to exceed three percent (3%) of the Gym's Gross Sales.  Your Brand Fund contribution is payable in the same manner as the Royalty or in such other manner as we periodically specify.  Blink Fitness Gyms that we or our affiliates own will contribute to the Brand Fund on the same percentage basis as franchisees.

We will direct all programs financed by the Brand Fund, with sole control over all creative and business aspects, but we will consult periodically with the franchisee advertising council (or its successor, if any) when established concerning the Fund's significant advertising programs and expenditures.  The Brand Fund may pay for preparing, producing and placing video, audio and written materials, electronic media and Social Media; developing, maintaining and administering one or more System Websites, including, without limitation, online membership capabilities, lead management and member retention programs; administering national, regional and multi-regional marketing and advertising programs, including, without limitation, purchasing trade journal, direct mail, and other media advertising and using

advertising, promotion, and marketing agencies and other advisors to provide assistance; establishing regional and national promotions and partnerships and hiring spokespersons to promote the Blink Fitness brand; and supporting public and member relations, market research, and other advertising, promotion, marketing and brand-related activities.

We will account for the Brand Fund separately from our other funds and not use the Brand Fund for any of our general operating expenses. However, the Brand Fund may reimburse us and our affiliates for the reasonable salaries and benefits of personnel who manage and administer the Brand Fund or otherwise provide assistance or services to the Brand Fund, the Brand Fund's administrative costs, travel expenses of personnel while they are on Brand Fund business, meeting costs, overhead relating to the Brand Fund's business, and other expenses that we and our affiliates incur in administering or directing the Brand Fund and its programs, including conducting market research, preparing advertising, promotional and marketing materials, collecting and accounting for Brand Fund contributions, and any other costs or expenses we incur in operating the Brand Fund or as a consequence of the Fund. The Brand Fund is not a trust, and we do not owe you fiduciary obligations because of our maintaining, directing or administering the Brand Fund or any other reason. The Brand Fund may spend in any fiscal year more or less than the total Brand Fund contributions in that year, borrow from us or others (paying reasonable interest) to cover deficits, or invest any surplus for future use. We will use all interest earned on Brand Fund contributions to pay costs before using the Brand Fund's other assets. We will prepare an annual, unaudited statement of Brand Fund collections and expenses and give you the statement upon written request within sixty (60) days of our fiscal year end. We may (but need not) have the Brand Fund audited annually, at the Brand Fund's expense, by a certified public accountant. We may incorporate the Brand Fund or operate it through a separate entity whenever we deem appropriate. The successor entity will have all of the rights and duties specified in this Section 13.B.

We intend the Brand Fund to maximize recognition of the Marks and patronage of Blink Fitness Gyms, and to enhance, promote, and protect the Blink Fitness brand and Franchise System. Although we will try to use the Brand Fund in the aggregate to develop advertising and marketing materials and programs, and implement programs, that will benefit all Blink Fitness Gyms, we need not ensure that Brand Fund expenditures in or affecting any geographic area are proportionate or equivalent to the Brand Fund contributions by Blink Fitness Gyms operating in that geographic area or that any Blink Fitness Gym benefits directly or in proportion to its Brand Fund contribution from the development of advertising and marketing materials or implementation of programs. We have the right, but no obligation, to use collection agents and institute legal proceedings to collect Brand Fund contributions at the Brand Fund's expense. We also may forgive, waive, settle and compromise all claims by or against the Brand Fund. Except as expressly provided in this Section 13.B, we assume no direct or indirect liability or obligation to you for collecting amounts due to, maintaining, directing or administering the Brand Fund.

We may at any time defer or reduce the Brand Fund contributions of any Blink Fitness Gym franchisee and, upon thirty (30) days' prior written notice to you, reduce or suspend Brand Fund contributions and operations for one or more periods of any length and terminate (and, if terminated, reinstate) the Brand Fund. If we terminate the Brand Fund, we will either (i) spend the balance remaining in the Fund on appropriate programs and expenditures or (ii) distribute all

unspent funds to our then existing franchisees, and to us and our affiliates, in proportion to their respective Brand Fund contributions during the preceding twelve (12) month period.

## C. APPROVAL OF MARKETING AND OTHER EXTERNAL COMMUNICATIONS

All advertising, promotion, marketing, and public relations activities conducted by you ("**Marketing Materials**") must be legal and not misleading and conform to the policies set forth in the Operations Manual as we prescribe from time to time.  At least thirty (30) days before you intend to use them, you must send us samples or proofs of (a) all Marketing Materials that we have not prepared or already approved, and (b) all Marketing Materials that we have prepared or already approved and which you propose to change in any way.  However, you do not need to send us any advertising or marketing materials for which you have simply completed the missing Gym-specific or pricing information based on templates that we sent to you.  If we do not notify you in writing of our approval of these materials within ten (10) days after we actually receive them, they will be deemed disapproved.  We will not unreasonably withhold our approval.  You may not use any Marketing Materials that we have not approved or have disapproved.  We reserve the right upon thirty (30) days written notice to require you to discontinue the use of any previously-approved Marketing Materials.  We also reserve the rights under Section 3.C above.

## D. LOCAL MARKETING

You agree to spend a total of at least five percent (5%) of the Gym's Gross Sales each calendar year on approved Marketing Materials and other approved advertising, marketing and promotional programs for the Gym (the "**Local Marketing Spending Requirement**").  If we have not begun collecting Brand Fund contributions as of the date on which the Gym opens to the public for business under the Marks, then your Local Marketing Spending Requirement will be seven percent (7%) of the Gym's Gross Sales until we require you to make Brand Fund contributions (after which time your Local Marketing Spending Requirement for the balance of the Term will be at least five percent (5%) of the Gym's Gross Sales, as provided in this Section 13.D).  As with the presale marketing program, you must prepare a written local marketing plan for the expenditure of your Local Marketing Spending Requirement and submit the plan to us for our written approval in accordance with our approval process.  However, we will not count any of the following expenditures towards your Local Marketing Spending Requirement:  Presale Marketing Budget, Brand Fund contributions, free membership or other service offers, discounts off of a base membership price or similar price reductions that you provide as a promotion, permanent on-premises signs, lighting, personnel salaries, administrative costs, transportation vehicles (even if they display the Marks), Yellow Pages advertising, employee incentive programs, and other amounts that we, in our reasonable judgment, deem inappropriate for meeting the Local Marketing Spending Requirement.  We may review your books and records from time to time and require you to submit reports periodically to determine your advertising, marketing and promotion expenses.  If you fail to spend (or prove that you spent) the Local Marketing Spending Requirement in any year, then we may, in addition to and without limiting our other rights and remedies, require you to contribute the shortfall to the Brand Fund, to be used as provided in Section 13.B above.

Notwithstanding the foregoing, we reserve the right, upon delivery of written notice to you, to require you to contribute your Local Marketing Spending Requirement to the Brand Fund. If we do so (unrelated to the shortfall referenced above), we will direct the Brand Fund to spend the Local Marketing Spending Requirement, less our costs or expenses in operating the Brand Fund or as a consequence of the Fund (as described in Section 13.B), on advertising, marketing, and promotional programs in or for the Gym's local market.

### E.  REGIONAL ADVERTISING COOPERATIVES

We may designate a geographic area for an advertising cooperative (a "**Cooperative**"). The Cooperative's members in any area are the owners of all of the Blink Fitness Gyms located and operating in that area (including us and our affiliates, if applicable). Each Cooperative will be organized and governed in a form and manner, and begin operating on a date, that we determine. We may change, dissolve and merge Cooperatives. Each Cooperative's purpose is, with our approval, to administer advertising programs and develop advertising, marketing and promotional materials for the area that the Cooperative covers. If, as of the Effective Date, we have established a Cooperative for the geographic area in which the Gym is located, or if we establish a Cooperative in that area during the Term of this Agreement, you agree to sign the documents that we require to become a member of the Cooperative and to participate in the Cooperative as those documents require. We reserve the right to require you to contribute an additional one percent (1%) of the Gym's monthly Gross Sales to the Cooperative. Any Cooperative dues you contribute (including any additional amounts we require you to contribute to the Cooperative) will count toward the Local Marketing Spending Requirement you are required to spend under Section 13.D to promote the Gym, but in no event will your amounts contributed to a Cooperative affect your new store opening financial and advertising obligations required under Section 13.A or your required contributions to the Brand Fund.

### F.  ADVERTISING ALLOCATION

We reserve the right to reallocate the total percentage of Gross Sales that we may require you to spend on the Brand Fund, Local Marketing Spending Requirement, and Cooperative at our sole discretion during the Term of this Agreement upon ninety (90) days' prior written notice to you.

### G.  SYSTEM WEBSITE

We or one or more of our designees may establish a website or series of websites for the Blink Fitness network:  (1) to advertise, market and promote Blink Fitness Gyms and the products and services they offer, and/or the Blink Fitness franchise opportunity; (2) to function as the Intranet; and/or (3) for any other purposes that we determine are appropriate for Blink Fitness Gyms (collectively, the "**System Website**"). If we include information about the Gym on the System Website, you agree to give us the information and materials that we periodically request concerning the Gym and otherwise participate in the System Website in the manner that we periodically specify. By posting or submitting to us information or materials for the System Website, you are representing to us that the information and materials are accurate and not misleading and do not infringe any third party's rights.

We will own all intellectual property and other rights in the System Website and all information it contains, including the domain name or URL for the System Website, the log of "hits" by visitors, and any Data and other personal or business data that visitors (including you) supply. We may use the Brand Fund's assets to develop, maintain and update the System Website. We may implement and periodically modify Brand Standards relating to the System Website and, at our option, may discontinue the System Website, or any services offered through the System Website, at any time.

All advertising, marketing and promotional materials that you develop for the Gym must contain notices of the URL of the System Website in the manner that we periodically designate. You may not develop, maintain or authorize any other website, other online presence or other electronic medium that mentions or describes the Gym or displays any of the Marks without our prior written approval. You may not conduct commerce or directly or indirectly offer or sell any products or services using any website, another electronic means or medium, or otherwise over the Internet.

Nothing in this Section limits our right to maintain websites other than the System Website or to offer and sell products and services under the Marks from the System Website, another website or otherwise over the Internet without payment or obligation of any kind to you.

### H.  YOUR WEBSITE AND SOCIAL MEDIA ACTIVITIES

You may not establish an independent website or register any URL containing the Blink Fitness name, Marks, the trademarks of any of our affiliates, or any derivation thereof. You may not advertise your Gym or reference the Marks on any independent website or through Social Media without our prior written approval.

### 14. <u>RECORDS, REPORTS AND FINANCIAL STATEMENTS</u>

You agree to establish and maintain at your own expense a bookkeeping, accounting, and recordkeeping system conforming to the requirements and formats (including, at our option, the accounting methods) that we prescribe from time to time. The records and information contained in this system will not include any records or information relating to the Gym's employees, as you control exclusively your labor relations and employment practices. We may require you to use a Computer System to maintain certain revenue data and other information (including Consumer Data and Gym Lists) and provide us access to that data and other information (but excluding employee records, as you control exclusively your labor relations and employment practices) in the manner we specify. You agree to give us in the manner and format that we prescribe from time to time:

     i.      within ten (10) days after the end of each month, statistical reports showing the Gym's total Gross Sales; new member sales; attrition; total member count; personal training sales; retail, beverage, and packaged goods sales; and other information we request regarding you and the Gym covering that month;

ii.     within thirty (30) days after the end of each month, the Gym's operating statements and financial statements (including a balance sheet and cash flow and profit and loss statements);

iii.    within forty-five (45) days after the end of each of your fiscal years, annual profit and loss and cash flow statements and a balance sheet for the Gym as of the end of the previous fiscal year, and a narrative written description of your year-end operating results; and

iv.     within ten (10) days after our request, exact copies of federal and state income and other tax returns and any other forms, records, books, reports and other information that we periodically require relating to you or to the Gym (other than Gym employee records, as you control exclusively your labor relations and employment practices).

We may periodically specify the form and content of the reports and financial statements described above.  You agree to verify and sign each report and financial statement in the manner we prescribe.  We will not publicly disclose data derived from these reports unless we make such public disclosure without disclosing your identity or your Gym's financial results on an individual (i.e., unconsolidated) basis (except to the extent we disclose, and you acknowledge that we may disclose, the Gym's financial results in a financial performance representation appearing in Item 19 of our franchise disclosure document).

You agree to preserve and maintain all records, in the manner we periodically specify, in a secure location at the Gym or at such other location that we have approved in writing for at least seven (7) years after the end of the fiscal year to which such records relate, or for such time as required by applicable law.  If we reasonably determine that any report or financial statement submitted to us is willfully and materially inaccurate, then following our delivery of written notice to you, we may require you to have audited financial statements prepared annually during the Term until we determine that your reports and statements accurately reflect the Gym's business and operations.

## 15. <u>INSPECTIONS AND AUDITS</u>

### A.  INSPECTIONS

We and our designated representatives have the right before you open the Gym for business and thereafter from time to time during your regular business hours, and without prior notice to you, to inspect and evaluate the Gym, observe and record operations, interview employees and members, and inspect all books and records relating to the Gym (but excluding any employment records, as you control exclusively your labor relations and employment practices).  You will cooperate with us in these activities.  We will give you a written summary of our evaluation.  Without limiting our other rights and remedies under this Agreement, you agree promptly to correct at your own expense all deficiencies (i.e., failures to comply with Brand Standards) noted by our evaluators within the time period we specify following your receipt of our notice of such deficiencies.  We then may conduct one or more follow-up evaluations to confirm that you have corrected these deficiencies and otherwise are complying

with this Agreement and all Brand Standards. We may charge you our then current evaluation fee (as set forth in the Operations Manual) to compensate us for our costs and expenses during any such follow-up evaluation or any evaluation that you request.

Since we will not have the right to inspect your employment records, you agree to send us written certification periodically (as specified in the Brand Standards) that the Gym's employees have all required third-party certifications.

### B.  OUR RIGHT TO AUDIT

We and our designated representatives may at any time during your business hours, and without prior notice to you, examine the Gym's business, bookkeeping and accounting records, sales and income tax records and returns, and other records (other than those records which we have no authority to control and/or remedy such as your employment records, as you control exclusively your labor relations and employment practices). You agree to fully cooperate with our representatives and independent accountants hired by us to conduct any such inspection or audit. If any inspection or audit discloses an understatement of the Gym's Gross Sales, you must pay us, within ten (10) days after receiving the inspection or audit report, the amounts due on the amount of the understatement, plus our administrative fee and interest from the date originally due until the date of payment. If any inspection or audit discloses an overstatement of the Gym's Gross Sales, we will credit you (without interest) for any overpayments you made to us. Further, if an inspection or audit is made necessary due to your failure to furnish reports, supporting records or other information as required, or to furnish these items on a timely basis, or if our examination reveals an understatement exceeding two percent (2%) of the amount that you actually reported to us for the period examined, you agree to reimburse us for the cost of our examination, including, without limitation, legal fees and independent accountants' fees, plus the travel expenses, room and board, and compensation of our employees. These remedies are in addition to our other remedies and rights under this Agreement and applicable law.

### 16. <u>TRANSFER</u>

#### A.  TRANSFER BY US

We may change our ownership or form and/or assign this Agreement and any other agreement to a third party without restriction. After our assignment of this Agreement to a third party who expressly assumes this Agreement's obligations, we no longer will have any performance or other obligations under this Agreement. That assignment will constitute a release and novation with respect to this Agreement, and the new owner-assignee will be liable to you as if it had been an original party to this Agreement. Specifically and without limiting the foregoing, you agree that we may sell our assets (including this Agreement), the Marks, or the Franchise System to a third party; offer our ownership interests privately or publicly; merge, acquire other business entities, or be acquired by another business entity; and/or undertake a refinancing, recapitalization, leveraged buyout, or other economic or financial restructuring.

#### B.  TRANSFER BY YOU AND DEFINITION OF TRANSFER

You acknowledge that the rights and duties this Agreement creates are personal to you and your owners and that we have granted you the rights under this Agreement in reliance upon

our perceptions of your (or your owners') individual or collective character, skill, aptitude, attitude, business ability and financial capacity. Accordingly, neither: (i) this Agreement or any interest in this Agreement; (ii) the Gym or any right to receive all or a portion of the profits or losses or any capital appreciation relating to the Gym; (iii) all or substantially all of the Operating Assets; (iv) any ownership interest in you (if you are an entity); nor (v) a controlling ownership interest in an entity with an ownership interest in you, may be transferred without our prior written approval. A transfer of the Gym's ownership, possession or control, or all or substantially all of the Operating Assets, may be made only with a transfer of this Agreement. Any transfer without our written approval is a breach of this Agreement and conveys no rights under or interest in this Agreement.

In this Agreement, the term "**transfer**" includes a voluntary, involuntary, direct or indirect assignment, sale, gift or other disposition and includes the following events:

i.      transfer of record or beneficial ownership of stock or any other ownership interest or right to receive (directly or indirectly) all or a portion of the profits or losses or any capital appreciation relating to the Gym;

ii.     a merger, consolidation or exchange of ownership interests, or issuance of additional ownership interests or securities representing or potentially representing ownership interests, or a redemption of ownership interests;

iii.    any sale or exchange of voting interests or securities convertible to voting interests, or any management agreement or other agreement granting the right (directly or indirectly) to exercise or control the exercise of the voting rights of any owner or to control the operations or affairs of you (or an entity with an ownership interest in you) or the Gym;

iv.     transfer in a divorce, insolvency or entity dissolution proceeding, or otherwise by operation of law;

v.      transfer by will, declaration of or transfer in trust, or under the laws of intestate succession; or

vi.     the grant of a mortgage, charge, pledge, collateral assignment, lien or security or other interest in this Agreement, the Gym, any of the Operating Assets (other than vehicles), or an ownership interest in you (or in an entity with an ownership interest in you), excluding only an equipment lease arrangement or financing arrangement for equipment on arm's-length terms; foreclosure upon or attachment or seizure of the Gym or any of its Operating Assets or any interest in you (or in an entity with an ownership interest in you); or your transfer, surrender or loss of the possession, control or management of the Gym.

### C.  CONDITIONS FOR APPROVAL OF TRANSFER

If you are in full compliance with this Agreement, then, subject to the other provisions of this Section 16.C, we will approve a transfer that meets all the requirements in this Section.

i.    We will approve the transfer of a non-controlling interest in you (determined as if the proposed transfer had occurred) if the proposed transferee and its owners are of good moral character, have no interest in and do not perform services for (and have no affiliates which have an interest in or perform services for) a Competitive Business, otherwise meet our then applicable standards for non-controlling owners of Blink Fitness franchisees, and sign our then current form of Guaranty and Assumption of Obligations.  The term "**controlling interest**" is defined in Section 21.O.

ii.   If the proposed transfer is of this Agreement or a controlling interest in you or in an entity owning a controlling ownership interest in you, or is one of a series of transfers (regardless of the period of time over which these transfers take place) which in the aggregate transfer this Agreement or a controlling interest in you or in an entity owning a controlling ownership interest in you, then all of the following conditions must be met before or concurrently with the effective date of the transfer:

a.    we determine that the transferee and its direct and indirect owners (if the transferee is an entity) have sufficient business experience, aptitude and financial resources to operate the Gym;

b.    you have paid all required Royalties, Brand Fund contributions and other amounts owed to us and our affiliates, have submitted all required reports and statements, and are not in violation of any provision of this Agreement or any other agreement with us or our affiliates;

c.    neither the transferee nor any of its direct or indirect owners (if the transferee is an entity) or affiliates operates, has an ownership interest in or performs services for a Competitive Business;

d.    the transferee (or its owner) and its management personnel and instructors, if different from your management personnel and instructors, satisfactorily complete our then current initial training program and pay our then current initial training fee (as set forth in the Operations Manual);

e.    the transferee and each of its owners (if the transfer is of this Agreement), or you and your owners (if the transfer is of a controlling interest in you or in an entity owning a controlling ownership interest in you), sign our then current form of franchise agreement and related documents, the provisions of which may differ materially from any and all of those contained in this Agreement;

f.    you or the transferee pays us a transfer fee of Eleven Thousand Two Hundred Fifty Dollars ($11,250) to partially cover our administrative and out-of-pocket costs and expenses;

g.    the transferee agrees to repair and/or replace the Operating Assets and upgrade the Gym in accordance with our then current requirements and

specifications for new Blink Fitness Gyms within the time period that we specify following the effective date of the transfer;

h.   you (and your transferring owners) sign a general release, in a form satisfactory to us, of any and all claims against us and our affiliates and our and their respective owners, officers, directors, employees, representatives, agents, successors and assigns;

i.   we have determined that the purchase price, payment terms, and required financing will not adversely affect the transferee's operation of the Gym;

j.   if you or your owners finance any part of the purchase price, you and they agree that all of the transferee's obligations under promissory notes, agreements or security interests reserved in the Operating Assets or ownership interests in you are subordinate to the transferee's (and its owners') obligation to pay Royalties, Brand Fund contributions and other amounts due to us and our affiliates and otherwise to comply with this Agreement;

k.   you and your transferring owners (and members of their Immediate Families) agree, for two (2) years beginning on the transfer's effective date, not to engage in any of the activities proscribed in Section 19.E below; and

l.   you and your transferring owners agree not to directly or indirectly at any time thereafter or in any manner (except with respect to Blink Fitness Gyms that any of them owns or operates):  (i) identify themselves or any business as a current or former Blink Fitness Gym or as one of our franchisees; (ii) use any Mark, any colorable imitation of a Mark, any trademark, service mark or commercial symbol that is confusingly similar to any Mark, or other indicia of a Blink Fitness Gym in any manner or for any purpose; or (iii) utilize for any purpose any trade dress, trade name, trademark, service mark or other commercial symbol that suggests or indicates a connection or association with us.

If the proposed transfer is to or among your owners, your or their Immediate Family members, or an entity controlled by you, or the transferee either is a franchisee in good standing for the past five (5) years or managed a franchised or company-owned Blink Fitness Gym for at least five (5) years, then Paragraph (f) will not apply, although you agree to reimburse us for the out-of-pocket costs that we incur in the transfer, up to the amount of the transfer fee described in Paragraph (f).  You acknowledge that we have legitimate reasons to evaluate the qualifications of potential transferees and to analyze and critique the terms of their purchase contracts with you and that our contact with potential transferees to protect our business interests will not constitute improper or unlawful conduct.   You expressly authorize us to investigate any potential transferee's qualifications, to analyze and critique the proposed purchase terms, to communicate candidly and truthfully with the transferee regarding your operation of the Gym, and to withhold consent for the reasons specified above.  You waive any claim that the action we take in good

faith to protect our business interests in connection with a proposed transfer constitutes tortious interference with contractual or business relationships. Similarly, we may review all information regarding the Gym that you give the proposed transferee, correct any information we believe is inaccurate, and give the proposed transferee copies of any reports you have given us or we have made regarding the Gym.

### D. TRANSFER TO A WHOLLY-OWNED CORPORATION OR LIMITED LIABILITY COMPANY

Notwithstanding Section 16.C above, if you are in full compliance with this Agreement, you may transfer this Agreement, together with the Operating Assets and all other assets associated with the Gym, to a corporation or limited liability company which conducts no business other than the Gym and, if applicable, other Blink Fitness Gyms and of which you own and control one hundred percent (100%) of the equity and voting power of all issued and outstanding ownership interests, provided that all of the assets of the Gym are owned, and the Gym is operated, only by that single entity. The entity must expressly assume all of your obligations under this Agreement, but you will remain personally liable under this Agreement as if the transfer to the entity did not occur. Transfers of ownership interests in that entity are subject to the restrictions in Section 16.C.

### E. DEATH OR DISABILITY

i.    Transfer Upon Death or Disability

Upon your (or your owner's) death or disability, your (or the owner's) executor, administrator, conservator, guardian or other personal representative (the "**Representative**") must transfer your interest in this Agreement, the Operating Assets and the Gym, or the owner's ownership interest in you (or an owner), to a third party. That transfer (including transfer by bequest or inheritance) must occur, subject to our rights under this Section 16.E, within a reasonable time, not to exceed six (6) months from the date of death or disability, and is subject to all of the terms and conditions in this Section 16. A failure to transfer such interest within this time period is a breach of this Agreement.

ii.    Operation Upon Death or Disability

If, upon your (or your owner's) death or disability, the day-to-day operations of the Gym are not being managed by a trained manager whom we have approved, then you or the Representative (as applicable) must within a reasonable time, not to exceed fifteen (15) days from the date of death or disability, appoint a manager whom we approve in writing to operate the Gym. The manager must at our expense satisfactorily complete the training that we designate within the time period that we specify. However, nothing in this Section 16.E limits our rights under Section 18.C.

### F. EFFECT OF CONSENT TO TRANSFER

Our consent to any transfer is not a representation of the fairness of the terms of any contract between you (or your owner) and the transferee, a guarantee of the Gym's or

transferee's prospects of success, or a waiver of any claims that we have against you (or your owners) or of our right to demand full compliance with this Agreement.

### G.  OUR RIGHT OF FIRST REFUSAL

If you, any of your owners, or the owner of a controlling ownership interest in an entity with an ownership interest in you at any time determines to sell or transfer for consideration an interest in this Agreement and the Gym (or all or substantially all of its Operating Assets), a controlling interest in you, or a controlling ownership interest in the entity with an ownership interest in you (except to or among your current owners or in a transfer pursuant to Section 16.D, which are not subject to this Section 16.G), you agree to obtain from a responsible and fully disclosed buyer, and send us, a true and complete copy of a bona fide, executed written offer (which may be a letter of intent) relating exclusively to this Agreement and the Gym or the controlling interest in you or in the entity with an ownership interest in you.  The offer must include details of the payment terms of the proposed sale and the sources and terms of any financing for the proposed purchase price and must provide for an earnest money deposit of at least five percent (5%) of the proposed purchase price.  To be a valid, bona fide offer, the proposed purchase price must be in a fixed dollar amount and without any contingent payments of purchase price (such as earn-out payments), and the proposed transaction must relate exclusively to an interest in this Agreement and the Gym (or all or substantially all of its Operating Assets) or a controlling interest in you or in the entity with an ownership interest in you and not to any other interests or assets.  We may require you (or your owners) to send us copies of any materials or information sent to the proposed buyer or transferee regarding the possible transaction.

We may, by delivering written notice to you within thirty (30) days after we receive both an exact copy of the offer and all other information that we request, elect to purchase the interest for the price and on the terms and conditions contained in the offer, provided that:  (i) we may substitute cash for any form of payment proposed in the offer; (ii) our credit will be deemed equal to the credit of any proposed buyer; (iii) the closing will be not less than thirty (30) days after notifying you of our election to purchase or, if later, the closing date proposed in the offer; and (iv) we must receive, and you and your owners agree to make, all customary representations, warranties and indemnities given by the seller of the assets of a business or ownership interests in a legal entity, as applicable, including representations and warranties regarding ownership and condition of, and title to, assets and (if applicable) ownership interests, liens and encumbrances on assets, validity of contracts and agreements, and the liabilities, contingent or otherwise, relating to the assets or ownership interests being purchased, and indemnities for all actions, events and conditions that existed or occurred in connection with the Gym prior to the closing of our purchase.

Once you or your owners submit the offer and related information to us triggering the start of the thirty (30) day decision-period referenced above, the offer is irrevocable for that thirty (30) day period.  This means that we have the full thirty (30) days to decide whether to exercise the right of first refusal and may choose to do so even if you or your owners change your, his, her, or its mind during that period and prefer after all not to sell the particular interest that is the subject of the offer.  You and your owners may not withdraw or revoke your offer for

any reason during the thirty (30) days, and we may exercise the right to purchase the particular interest in accordance with this Section's terms.

If we exercise our right of first refusal, you and your transferring owners agree that, for two (2) years beginning on the closing date, you or the transferring owners (and members of your or their Immediate Families) will be bound by the non-competition covenants contained in Section 19.E.

If we do not exercise our right of first refusal, you or your owners may complete the sale to the proposed buyer on the original offer's terms, but only if we approve the transfer as provided in this Section.  If you do not complete the sale to the proposed buyer within sixty (60) days after we notify you that we do not intend to exercise our right of first refusal, or if there is a material change in the terms of the sale (which you agree to tell us promptly), we will have an additional right of first refusal during the thirty (30)-day period following either the expiration of the sixty (60)-day period or our receipt of notice of the material change(s) in the sale's terms, either on the terms originally offered or the modified terms, at our option.  We have the unrestricted right to assign this right of first refusal to a third party (including an affiliate), who then will have the rights described in this Section 16.G.  We waive our right of first refusal to sales or transfers to Immediate Family members who meet the criteria in Section 16.C.

## 17. <u>EXPIRATION OF THIS AGREEMENT</u>

When this Agreement expires (unless it is terminated sooner), you will have the right to acquire a successor franchise and continue operating the Gym as a Blink Fitness Gym for a ten (10)-year term under our then current form of franchise agreement, but only if you have:

i.    given us written notice of your request for a business review at least twenty-five (25) months, but not more than thirty (30) months, before the end of the Term of this Agreement;

ii.   complied with all of your obligations under this Agreement and all other agreements with us or our affiliates, as noted in the business review conducted by us at least twenty-four (24) months before the end of the Term of this Agreement; and

iii.  at our option, either (i) remodeled and upgraded the Gym and otherwise brought the Gym into full compliance with the specifications and standards then applicable for new Blink Fitness Gyms before this Agreement expires, or (ii) agreed to relocate the Gym to a substitute site that we have accepted and construct and develop a new Blink Fitness Gym at that site.

To acquire a successor franchise, you and your owners agree to (i) sign our then current form of franchise agreement (and related documents), which may contain terms and conditions that differ materially from any or all of those in this Agreement, modified to reflect the fact it is for a successor franchise, except that such franchise agreement will impose a successor franchise fee of Eleven Thousand Two Hundred Fifty Dollars ($11,250) and will not grant any rights to another renewal or successor franchise; and (ii) sign a general release in the form that we specify as to any and all claims against us, our affiliates and our and their respective owners, officers,

directors, employees, agents, representatives, successors and assigns. If you fail to sign and return to us the documents referenced in (i) and (ii) above, and pay the successor franchise fee, within sixty (60) days after we deliver those documents to you, that will be deemed your election not to acquire a successor franchise. If you (and each of your owners) are not, both on the date you give us written notice of your election to acquire a successor franchise and on the date on which this Agreement expires, in full compliance with this Agreement and all other agreements with us or our affiliates, you acknowledge that we need not grant you a successor franchise, whether or not we had, or chose to exercise, the right to terminate this Agreement during its Term under Section 18.

## 18. TERMINATION OF AGREEMENT

### A. TERMINATION BY YOU

You may terminate this Agreement if we commit a material breach of any of our obligations under this Agreement and fail to correct such breach within thirty (30) days after your delivery of written notice to us of such breach; provided, however, that if we cannot reasonably correct the breach within this thirty (30)-day period but provide you, within this thirty (30)-day period, with evidence of our effort to correct the breach within a reasonable time period, then the cure period will run through the end of such reasonable time period. Your termination of this Agreement other than according to this Section 18.A will be deemed a termination without cause and a breach of this Agreement.

### B. TERMINATION BY US

Upon the occurrence of any one of the following events, we may, at our option, terminate this Agreement, effective immediately upon delivery of written notice to you:

  i.  you (or any of your direct or indirect owners) have made or make any material misrepresentation or omission in connection with your application for and acquisition of the franchise or your operation of the Gym, including, without limitation, by intentionally, or through your gross negligence, understating the Gym's Gross Sales for any period;

  ii.  you fail to obtain our written acceptance of the site, to secure the accepted site under a lease or sublease that we accept, or otherwise to meet any of the development obligations identified in Section 4 on or before the applicable deadline established in Section 4, or you fail to develop, open and begin operating the Gym in accordance with this Agreement and our Brand Standards on or before the Opening Deadline;

  iii.  you abandon or fail to actively operate the Gym offering full services to its members during all of the hours we specify (other than due to a force majeure) for three (3) or more consecutive days, or for five (5) or more days within any period of twelve (12) consecutive months;

iv.    you, any of your owners, or the owner of a controlling ownership interest in an entity with an ownership interest in you makes a purported transfer in violation of Section 16 above;

v.    you (or any of your direct or indirect owners with a controlling ownership interest) are or have been convicted of, or plead or have pleaded either guilty or no contest to, a felony, or to another crime or lesser offense that may adversely affect your reputation, the reputation of your Gym or the goodwill associated with the Marks;

vi.    you (or any of your direct or indirect owners with a controlling ownership interest) engage in any dishonest, dangerous, unethical or other conduct which, in our sole opinion, adversely affects our reputation and/or the goodwill associated with the Marks;

vii.    a lender forecloses on its lien on a substantial and material portion of the Gym's assets;

viii.    an entry of judgment against you involving aggregate liability of One Hundred Thousand Dollars ($100,000) or more in excess of your insurance coverage and such judgment remains unpaid for a period of ten (10) days or more following the entry thereof;

ix.    you (or any of your direct or indirect owners) misappropriate any Confidential Information or violate any provisions of Section 12, including, but not limited to, by holding interests in or performing services for a Competitive Business;

x.    you violate any material law, ordinance, or regulation applicable to the development, operation or marketing of the Gym or the offer or sale of Gym memberships or otherwise applicable to the Gym and do not correct such noncompliance or violation within fifteen (15) days after delivery of written notice of such noncompliance or violation, or do not completely correct such noncompliance or violation within the time period prescribed by law, unless you are in good faith contesting your liability for such violation through appropriate proceedings or provide reasonable evidence of your continual effort to correct the violation within a reasonable time period;

xi.    you fail to report the Gym's Gross Sales or fail to make any payment due to us or any of our affiliates, and do not correct such failure within five (5) days after delivery of written notice of such failure;

xii.    you underreport the Gym's Gross Sales by two (2%) percent on three (3) separate occasions within any period of thirty-six (36) consecutive months or by five (5%) percent during any reporting period;

xiii.    you fail to maintain the insurance required by this Agreement or to furnish us with satisfactory evidence of such insurance within the required time, or significantly

modify your insurance coverage without our written approval, and do not correct such failure within five (5) days after delivery of written notice of such failure;

xiv.     you fail to pay when due any federal or state income, service, sales, employment, or other taxes due from the operations of the Gym, unless you are in good faith contesting your liability for such taxes through appropriate proceedings;

xv.      you (or any of your direct or indirect owners) breach this Agreement or any other agreement between us (or any of our affiliates) and you (or any of your direct or indirect owners) on three (3) or more separate occasions within any period of twelve (12) consecutive months and we provide you with written notice of such breaches in accordance with Section 23 below, whether or not such breaches are corrected after notice from us;

xvi.     you repeatedly fail to pay amounts owed to our designated, approved, or recommended suppliers within thirty (30) days following the due date (unless you are contesting the amount in good faith), or you default (and fail to cure within the allocated time) under any note, lease, or agreement we deem material pertaining to the operation or ownership of the Gym, and do not correct such failure within five (5) days after delivery of written notice of such failure;

xvii.    you make an assignment for the benefit of creditors or admit in writing your insolvency or inability to pay your debts generally as they become due; you consent to the appointment of a receiver, trustee, or liquidator of all or a substantial part of your property; the Gym is attached, seized, or levied upon, unless such attachment, seizure, or levy is vacated within sixty (60) days; or any order appointing a receiver, trustee, or liquidator of you or the Gym is not vacated within sixty (60) days following the entry of such order; or

xviii.   you fail to comply with any other obligation under this Agreement or any other agreement between us (or any of our affiliates) and you, including, without limitation, any Brand Standard, and do not correct the failure to our satisfaction within thirty (30) days after we deliver written notice of the failure to you.

## C.  ASSUMPTION OF GYM'S MANAGEMENT

If you abandon or fail to actively operate the Gym for any period, or under the circumstances described in Section 16.E, we or our designee has the right (but not the obligation) to enter the site and assume the Gym's management for any period of time that we deem appropriate.  The manager will exercise control over the working conditions of the Gym's employees only to the extent that such control is related to our legitimate interest in protecting, and is necessary at that time to protect, the quality of our services or brand.  If we assume the Gym's management, all funds from the Gym's operation during the period of our (or our designee's) management will be kept in a separate account and all Gym expenses will be charged to such account.  In addition to all other fees and payments owed hereunder, we may charge you a reasonable management fee that we specify, not to exceed five percent (5%) of the Gym's Gross Sales, plus any out-of-pocket expenses incurred in connection with the Gym's

management.  We or our designee has a duty only to use reasonable efforts upon assuming the Gym's management and will not be liable to you for any debts, losses or obligations that the Gym incurs, or to any creditors for any supplies or other products or services purchased for the Gym, in connection with such management.

### D.  OTHER REMEDIES UPON DEFAULT

Upon your failure to remedy any failure to comply with any provision of this Agreement or any Brand Standard, or other default specified in any written notice issued to you under Section 18.B, within the time period (if any) we specify in our notice to you, then we have the right, until you correct the failure or remedy the default to our satisfaction, to take any one or more of the following actions:

i.      suspend your right to participate in one or more advertising, marketing or promotional programs that we or the Brand Fund provides;

ii.     suspend or terminate your participation in any temporary or permanent fee reductions to which we might have agreed (whether as a policy, in an amendment to this Agreement or otherwise);

iii.    refuse to provide any operational support that this Agreement requires; and/or

iv.     assume the Gym's management pursuant to Section 18.C.

Our exercise of any of these rights will not constitute an actual or constructive termination of this Agreement nor be our sole and exclusive remedy for your failure to comply or other default.  If we exercise our right not to terminate this Agreement but to implement any remedies in this Section 18.D, we may at any time after the appropriate cure period under the written notice has lapsed (if any) terminate this Agreement without giving you any additional corrective or cure period.  During any suspension period, you must continue to pay all fees and other amounts due under, and otherwise comply with, this Agreement and all related agreements. Our election to suspend your rights as provided above will not be a waiver by us of any breach of this Agreement.  If we rescind any suspension of your rights, you will not be entitled to any compensation (including, without limitation, repayment, reimbursement, refunds, or offsets) for any fees, charges, expenses, or losses you might have incurred due to our exercise of any suspension right provided above.

## 19. RIGHTS AND OBLIGATIONS UPON TERMINATION OR EXPIRATION OF THIS AGREEMENT

### A.  PAYMENT OF AMOUNTS OWED

You agree to pay within ten (10) days after this Agreement expires or is terminated, or on any later date that the amounts due are determined, the Royalties, Brand Fund contributions, interest and all other amounts owed to us or our affiliates which then are unpaid, including our damages arising from the termination of this Agreement.

## B.  DE-IDENTIFICATION

Upon the termination or expiration of this Agreement, you must de-identify the Gym in accordance with this Section 19.B and as reasonably required by us.  De-identification includes, but is not limited to, taking the following actions:

i.  beginning on the De-identification Date (defined below), you and your owners may not directly or indirectly at any time thereafter or in any manner (except in connection with other Blink Fitness Gyms that you or any of them own and operate):  (i) identify yourself or themselves or any business as a current or former Blink Fitness Gym or as one of our current or former franchisees; (ii) use any Mark, any colorable imitation of a Mark, any trademark, service mark or commercial symbol that is confusingly similar to any Mark or any other indicia of a Blink Fitness Gym in any manner or for any purpose; or (iii) use for any purpose any trade dress, trade name, trademark, service mark or other commercial symbol that indicates or suggests a connection or association with us;

ii.  you agree, within fifteen (15) days after the De-identification Date, to take the action required to cancel all fictitious or assumed name or equivalent registrations relating to your use of any Mark;

iii.  if we do not exercise the option under Section 19.F below, within fifteen (15) days after the De-identification Date, you agree at your own cost and without any payment from us for such items to deliver to us all signs, sign faces, advertising, marketing and promotional materials, forms, and other materials containing any Mark or otherwise identifying or relating to a Blink Fitness Gym that we request and allow us, without liability to you or third parties, to remove these items from the Gym;

iv.  if we do not exercise the option under Section 19.F below, within fifteen (15) days after the De-identification Date, you agree, at your own expense, to make the alterations that we specify to distinguish the Gym clearly from its former appearance and from other Blink Fitness Gyms in order to prevent public confusion; and

v.  you agree to give us from time to time upon request evidence satisfactory to us of your compliance with these obligations.

The "**De-identification Date**" means:  (i) if we exercise the option under Section 19.F, the closing date of our (or our designee's) purchase of the Gym's assets; or (ii) if we do not exercise the option under Section 19.F, the date upon which that option expires or the date upon which we provide you written notice of our decision not to exercise, or to withdraw our previous exercise, of that option, whichever occurs first.

## C.  CONFIDENTIAL INFORMATION

Upon termination or expiration of this Agreement, you and your owners will immediately cease to use any of our Confidential Information in any business or otherwise and return to us all

copies of the Operations Manual and any other confidential materials that we have loaned to you. You may not sell, trade or otherwise profit in any way from any Consumer Data or other Confidential Information at any time following the expiration or termination of this Agreement.

### D.  NOTIFICATION TO MEMBERS AND CUSTOMERS

When this Agreement expires or is terminated, we have the right to contact (at our expense) previous, current, and prospective members and other customers to inform them that a Blink Fitness Gym will no longer operate at the Gym's location or, if we intend to exercise the option under Section 19.F, that the Gym will operate under new management.  We also have the right to inform them of other nearby Blink Fitness Gyms.  Our exercise of these rights will not constitute an interference with your contractual or business relationship with such members or customers.

### E.  COVENANT NOT TO COMPETE

Upon our termination of this Agreement for any reason, your termination of this Agreement without cause, or expiration of this Agreement (without the grant of a successor franchise), you agree that, for two (2) years beginning on the effective date of termination or expiration or the date on which all persons restricted by this Section 19.E begin to comply fully with this Section 19.E, whichever is later, and except in connection with other Blink Fitness Gyms operating under effective franchise agreements with us, neither you nor any of your owners, nor any member of your or their Immediate Families, will:

i.  have any direct or indirect, controlling or non-controlling interest as an owner – whether of record, beneficial or otherwise – in any Competitive Business which is located or operating:

    a.  at the Gym's site, or

    b.  within ten (10) miles of the Gym's site, or

    c.  within ten (10) miles of any other Blink Fitness Gym in operation or under construction on the later of the effective date of the termination or expiration or the date on which all persons restricted by this Section 19.E begin to comply with this Section 19.E, provided that this restriction will not prohibit the ownership of shares of a class of securities which are publicly traded on a United States stock exchange representing less than three percent (3%) of the number of shares of that class of securities issued and outstanding; or

ii. perform services as a director, officer, manager, employee, consultant, representative or agent for a Competitive Business which is located or operating:

    a.  at the Gym's site, or

    b.  within ten (10) miles of the Gym's site, or

c.  within ten (10) miles of any other Blink Fitness Gym in operation or under construction on the later of the effective date of the termination or expiration or the date on which all persons restricted by this Section 19.E begin to comply with this Section 19.E.

These restrictions also apply after transfers and other events, as provided in Section 16 above.  You (and each of your owners) expressly acknowledge that you (and they) possess skills and abilities of a general nature and have other opportunities for exploiting these skills. Consequently, our enforcing the covenants made in this Section 19.E will not deprive you (and them) of personal goodwill or the ability to earn a living.

### F.  OPTION TO PURCHASE OPERATING ASSETS

i.  Exercise of Option

Upon our termination of this Agreement for any reason, your termination of this Agreement other than pursuant to and in compliance with Section 18.A, or expiration of this Agreement (without the grant of a successor franchise), we have the option, exercisable by giving you written notice within thirty (30) days after the date of termination or expiration, to purchase those Operating Assets and other assets associated with the operation of the Gym that we designate.  We have the unrestricted right to assign this option to purchase to a third party (including an affiliate), who will then have the rights and obligations described in this Section 19.F.  We are entitled to all customary representations, warranties and indemnities in our asset purchase, including representations and warranties as to ownership and condition of, and title to, assets, liens and encumbrances on assets, validity of contracts and agreements, and the liabilities affecting the assets, contingent or otherwise, and indemnities for all actions, events and conditions that existed or occurred in connection with the Gym prior to the closing of our purchase.

If you or one of your affiliates owns the site upon which the Gym is located, we may elect to include a fee simple interest in that site as part of the assets purchased or, at our option, lease that site from you or such affiliate for an initial ten (10)-year term with one (1) renewal term of ten (10) years (at our option) on commercially reasonable terms.  If you lease the Gym's site from an unaffiliated lessor, you agree (at our option) to assign the lease to us or to enter into a sublease for the remainder of the lease term on the same terms (including renewal options) as the lease.

ii.  Purchase Price

If we elect to purchase all or substantially all of the Operating Assets and other assets associated with the operation of the Gym, then the purchase price for those assets, together with an assignment of the lease or a sublease for the Gym's site on the terms set forth in Paragraph (i) above, will be their fair market value, although fair market value will not include any value for (a) the franchise or any rights granted by this Agreement, (b) goodwill attributable to our Marks, brand image, and other intellectual property, or (c) participation in the network of Blink Fitness Gyms.  In all cases, we may exclude from the assets purchased any Operating Assets or other items that are not reasonably necessary (in function or quality) to the Gym's operation or that we

have not approved as meeting Brand Standards; the purchase price will reflect these exclusions. If we elect to purchase a fee simple interest in the site upon which the Gym is located pursuant to Paragraph (i) above, its purchase price also will be fair market value and will be added to the purchase price for the other Operating Assets we choose to buy. We and you must work together in good faith to agree upon the assets' fair market value within fifteen (15) days after we send you our notice exercising our right to purchase. If we and you cannot agree on fair market value within this fifteen (15) day period, fair market value will be determined by the following appraisal process.

Fair market value will be determined by one (1) independent accredited appraiser upon whom we and you agree, who, in conducting the appraisal, will be bound by the criteria specified above. You and we agree to select the appraiser within fifteen (15) days after we deliver our purchase notice (if we and you do not agree on fair market value before then). If we and you cannot agree on a mutually acceptable appraiser within fifteen (15) days after we deliver our notice, then we will provide you with a list of three (3) independent appraisers and you must select one (1) of those choices to act as the designated appraiser that will determine the purchase price. We and you will share equally the costs of the appraiser's fees and expenses. Within thirty (30) days after delivery of the notice invoking the appraisal mechanism, we and you each must submit to the appraiser our and your respective calculations of the purchase price with such detail and supporting documentation as the appraiser requests and according to the criteria specified above. Within fifteen (15) days after receiving both calculations, the appraiser must decide whether our proposed purchase price or your proposed purchase price most accurately reflects the fair market value of the assets purchased under this Section 19.F. The appraiser has no authority to compromise between the two (2) proposed purchase prices, but instead is authorized to choose only one or the other. The appraiser's choice will be the purchase price and is final.

     iii.    Closing

We will pay the purchase price at the closing, which will take place not later than thirty (30) days after the purchase price is determined, although we may decide after the purchase price is determined not to complete the purchase and will have no liability to you for doing so. We may set off against the purchase price, and reduce the purchase price by, any and all amounts that you owe us (or our affiliates). At the closing, you agree to deliver instruments transferring to us: (a) good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us), with all sales and transfer taxes paid by you; and (b) all of the Gym's licenses and permits which may be assigned or transferred.

If you cannot deliver clear title to all of the purchased assets, or if there are other unresolved issues, the sale will be closed through an escrow. You further agree to sign general releases, in a form satisfactory to us, of any and all claims against us and our affiliates and our and their respective owners, officers, directors, employees, agents, representatives, successors and assigns. If we exercise our rights under this Section 19.F, then for two (2) years beginning on the closing date, you and your owners (and members of your and their Immediate Families) will be bound by the non-competition covenants contained in Section 19.E.

### G.  CONTINUING OBLIGATIONS

All of our and your (and your owners') obligations hereunder which expressly or by their nature survive the expiration or termination of this Agreement will continue in full force and effect subsequent to and notwithstanding its expiration or termination and until these obligations are satisfied in full or by their nature expire.

## 20. RELATIONSHIP OF THE PARTIES; INDEMNIFICATION

### A.  INDEPENDENT CONTRACTORS

This Agreement does not create a fiduciary relationship between you and us.  You have no authority, express or implied, to act as an agent of ours or any of our affiliates for any purpose.  You are, and will remain, an independent contractor responsible for all obligations and liabilities of, and for all losses or damages to, the Gym and its assets, including any personal property, equipment, fixtures or real property, and for all claims or demands based on damage to or destruction of property or based on injury, illness or death of any person or persons, directly or indirectly, resulting from the operation of the Gym.  Further, we and you are not and do not intend to be partners, joint venturers, associates, or employees of the other in any way, and we will not be construed to be jointly liable for any of your acts or omissions under any circumstances.  We are not the employer or joint employer of the Gym's employees.  You or your Operating Principal is solely responsible for the management and operation of the Gym and the supervision of the Gym's employees.  You agree to identify yourself conspicuously in all dealings with members, other customers, suppliers, public officials, Gym personnel and others as the owner, operator, and manager of the Gym under a franchise that we have granted and to place notices of independent ownership at the Gym and on the forms, business cards, stationery, advertising, e-mails and other materials that we require from time to time.

We will not exercise direct or indirect control over the working conditions of Gym personnel, except to the extent that such indirect control is related to our legitimate interest in protecting the quality of our services or brand.  We do not share or codetermine the terms and conditions of employment of the Gym's employees and do not affect matters relating to the employment relationship between you and the Gym's employees, such as employee selection, promotion, termination, hours worked, rates of pay, other benefits, work assigned, discipline, adjustment of grievances and complaints, and working conditions.  To that end, you agree to notify Gym personnel that you are their employer and that we, as the franchisor of Blink Fitness Gyms, are not their employer and do not engage in any employer-type activities for which only franchisees are responsible, such as employee selection, promotion, termination, hours worked, rates of pay, other benefits, work assigned, discipline, adjustment of grievances and complaints, and working conditions.

### B.  NO LIABILITY FOR ACTS OF OTHER PARTY

We and you agree not to make any express or implied agreements, warranties, guarantees or representations, or incur any debt, in the name or on behalf of the other or represent that our and your relationship is other than franchisor and franchisee.  We will not be obligated for any

damages to any person or property directly or indirectly arising out of the operation of the Gym or the business you conduct under this Agreement.

### C. TAXES

We will have no liability for any sales, use, service, occupation, excise, gross receipts, income, property, employment, or other taxes, whether levied upon you or the Gym, due to the business you conduct (except for our own income taxes). You must pay these taxes and reimburse us for any taxes we must pay to any taxing authority on account of either your operation or payments you make to us (except for our own income taxes).

### D. INSURANCE

During the Term of this Agreement, you agree to maintain in force at your sole expense insurance coverage for the Gym in the amounts, and covering the risks, that we periodically specify. We may require that some or all of your insurance policies provide for waiver of subrogation in favor of us and our affiliates. All of your insurance carriers must be licensed to do business in the state in which the Gym is located and be rated A- or higher by A.M. Best and Company, Inc. (or such similar criteria as we periodically specify). These insurance policies must be in effect before you open the Gym for business. We may periodically increase the amounts of coverage required under these insurance policies and/or require different or additional insurance coverage at any time to reflect inflation, identification of new risks, changes in law or standards of liability, higher damage awards or relevant changes in circumstances. Insurance policies must name us and any affiliates we periodically designate as additional insureds and provide for thirty (30) days' prior written notice to us of the material modification, cancellation or non-renewal of any policy. You agree to periodically send us a valid certificate of insurance or duplicate insurance policy evidencing the coverage specified above and the payment of premiums.

### E. INDEMNIFICATION

To the fullest extent permitted by law, you agree to indemnify, defend and hold harmless us, our affiliates and our and their respective owners, directors, officers, employees, agents, lawyers, consultants, representatives, successors and assigns (the "**Indemnified Parties**") from and against, and to reimburse any one or more of the Indemnified Parties for, any and all claims, losses, obligations and damages directly or indirectly arising out of or relating to: (i) the operation of the Gym, (ii) the business you conduct under this Agreement, (iii) your breach of this Agreement or any other agreement with us or our affiliates, or (iv) your noncompliance or alleged noncompliance with any law, ordinance, rule or regulation concerning the construction, design or operation of the Gym (including laws relating to operating and selling memberships for health and fitness centers, if and to the extent applicable, the ADA and other laws regarding public accommodations for persons with disabilities, and laws regulating employment practices and employee relations), including those claims, obligations and damages alleged to be caused by an Indemnified Party's negligence or willful misconduct, except as specifically set forth below in this Section.

For purposes of this indemnification, "**claims**" include all losses, expenses, obligations, and damages (actual, consequential, punitive or otherwise) and costs that an Indemnified Party reasonably incurs in defending any claim against it, including reasonable accountants', arbitrators', attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, travel and living expenses, and other expenses of litigation, arbitration or alternative dispute resolution, including, without limitation, claims by employees, members, or third parties, regardless of whether litigation, arbitration or alternative dispute resolution is commenced.  Each Indemnified Party may defend and control the defense of any claim against it which is subject to this indemnification at your expense, and you may not settle any claim or take any other remedial, corrective or similar actions relating to any claim without the consent of the Indemnified Party.   The provisions of this Section will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.   An Indemnified Party need not seek recovery from an insurer or other third party, or otherwise mitigate its losses and expenses, in order to maintain and recover fully a claim against you.  You agree that a failure to pursue a recovery or mitigate a loss will not reduce or alter the amounts that an Indemnified Party may recover from you.

Notwithstanding the foregoing, you have no obligation to indemnify under this Section if a court of competent jurisdiction makes a final decision not subject to further appeal that we, our affiliates, or any of our or their respective employees directly engaged in willful misconduct or intentionally caused the property damage or bodily injury that is the subject of the claim, so long as that claim is not asserted on the basis of theories of vicarious liability (including agency, apparent agency, or employment), joint employer liability, or our failure to compel you to comply with this Agreement, which are claims for which we are entitled to indemnification under this Section.

## 21. ENFORCEMENT

### A. SEVERABILITY

Except as expressly provided to the contrary in Section 21.G or otherwise in this Agreement, each Section, paragraph, term and provision of this Agreement is severable, and if, for any reason, any part is held to be invalid or contrary to or in conflict with any applicable present or future law or regulation in a final, unappealable ruling issued by any court, arbitrator, agency or tribunal with competent jurisdiction, that ruling will not impair the operation of, or otherwise affect, any other portions of this Agreement, which will continue to have full force and effect and bind the parties.  If any covenant which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited, and/or length of time, but would be enforceable if modified, you and we agree that the covenant will be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction whose law determines the covenant's validity.  If any applicable and binding law or rule of any jurisdiction requires more notice than this Agreement requires of the termination of this Agreement or of our refusal to enter into a successor franchise agreement, or if, under applicable and binding law or rule of any jurisdiction, any provision of this Agreement or any Brand Standard is invalid, unenforceable or unlawful, the notice and/or other action required by the law or rule will be substituted for the comparable provisions of this Agreement, and we may modify the invalid or unenforceable provision or Brand Standard to the extent required to be

valid and enforceable or delete the unlawful provision in its entirety.  You agree to be bound by any promise or covenant imposing the maximum duty the law permits which is subsumed within any provision of this Agreement, as though it were separately articulated in and made a part of this Agreement.

### B.  WAIVER OF OBLIGATIONS AND FORCE MAJEURE

We and you may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under this Agreement, effective upon delivery of written notice to the other or another effective date stated in the notice of waiver.  However, no interpretation, change, termination or waiver of any provision of this Agreement will bind us unless in writing and signed by one of our officers, and which is specifically identified as an amendment to this Agreement.  No modification, waiver, termination, discharge or cancellation of this Agreement affects the right of any party hereto to enforce any claim or right hereunder, whether or not liquidated, which occurred prior to the date of such modification, waiver, termination, discharge or cancellation.  Any waiver we grant will be without prejudice to any other rights we have, will be subject to our continuing review, and may be revoked at any time and for any reason, effective upon delivery to you of ten (10) days' prior written notice.

We and you will not be deemed to waive or impair any right, power or option this Agreement reserves (including our right to demand exact compliance with every term, condition and covenant or to declare any breach to be a default and to terminate this Agreement before its term expires) because of any custom or practice at variance with the terms of this Agreement; our or your failure, refusal or neglect to exercise any right under this Agreement or to insist upon the other's compliance with this Agreement, including your compliance with any Brand Standard; our waiver of or failure to exercise any right, power or option, whether of the same, similar or different nature, with other Blink Fitness Gyms; the existence of franchise agreements for other Blink Fitness Gyms which contain provisions different from those contained in this Agreement; or our acceptance of any payments due from you after any breach of this Agreement. No special or restrictive legend or endorsement on any check or similar item given to us will be a waiver, compromise, settlement or accord and satisfaction.  We are authorized to remove any legend or endorsement, and it will have no effect.

Neither we nor you will be liable for loss or damage or be in breach of this Agreement if our or your failure to perform obligations results from:  (i) acts of God; (ii) fires, strikes, embargoes, war, acts of terrorism or similar events, or riot; or (iii) any other similar event or cause.  Any delay resulting from any of these causes will extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, except that these causes will not excuse payments of amounts owed at the time of the occurrence or payment of Royalties, Brand Fund contributions and other amounts due afterward.

### C.  COSTS AND ATTORNEYS' FEES

If either we or you seek to enforce this Agreement in an arbitration, judicial or other proceeding, the prevailing party is entitled to recover its reasonable costs and expenses (including attorneys' fees, arbitrators' fees and expert witness fees, costs of investigation and

proof of facts, court costs, other arbitration or litigation expenses and travel and living expenses) incurred in connection with such arbitration, judicial or other proceeding.

### D.  YOU MAY NOT WITHHOLD PAYMENTS

You agree that you will not withhold payment of any amounts owed to us or our affiliates on the grounds of our or their alleged nonperformance of any of our or their obligations under this Agreement or any other agreement.

### E.  RIGHTS OF PARTIES ARE CUMULATIVE

Our and your rights under this Agreement are cumulative, and our and your exercise or enforcement of any right or remedy under this Agreement will not preclude our or your exercise or enforcement of any other right or remedy under this Agreement which we and you are entitled by law to enforce.

### F.  MEDIATION

We and you acknowledge that, during the Term of this Agreement, disputes may arise regarding our and your relationship, rights and obligations under this Agreement.  To facilitate resolution of these disputes, we and you agree that, during the Term of this Agreement, before commencing an arbitration action, we and you must submit any dispute arising from or relating to this Agreement or our relationship (other than disputes relating to the Marks or to your failure to pay amounts owed to us or our affiliates) for non-binding mediation.  The mediation will occur in the county where our headquarters are then located and be conducted by one (1) mediator under the then current Commercial Mediation Rules of the American Arbitration Association.  The mediation will be limited to one (1) eight (8)-hour day.  Any statements made by any person during the mediation are not admissible in any subsequent litigation or arbitration proceeding.  We and you will each bear our own costs and expenses for the mediation and share equally the costs of any independent third parties or fees required for the mediation.  If the dispute is not resolved within forty-five (45) days after the mediator is appointed, either we or you may bring an arbitration action according to the terms of this Agreement.

Notwithstanding anything to the contrary contained in this Section or in Section 21.G, we and you have the right to obtain temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction.  In that case, we and you agree to contemporaneously submit our dispute for arbitration on the merits according to Section 21.G. Furthermore, nothing in this Section or Section 21.G limits either party's right to deliver a notice of default under, and terminate, this Agreement in accordance with Section 18.

### G.  ARBITRATION

Subject to the parties' right to obtain temporary restraining orders and temporary or preliminary injunctive relief pursuant to Section 21.F, all controversies, disputes or claims between us (and our affiliates and our and their respective owners, officers, directors, agents and employees, as applicable) and you (and your affiliates and your and their respective owners, officers, and directors, as applicable) arising out of or related to:

    i.      this Agreement or any other agreement between you (or your owner) and us (or our affiliate) or any provision of any of such agreements;

    ii.     our relationship with you;

    iii.    the scope or validity of this Agreement or any other agreement between you (or your owner) and us (or our affiliate) or any provision of any of such agreements (including the validity and scope of the arbitration obligation under this Section, which we and you acknowledge is to be determined by an arbitrator, not a court); or

    iv.    any Brand Standard,

will be submitted for arbitration to the American Arbitration Association.  Except as otherwise provided in this Agreement, such arbitration proceedings will be heard by one (1) arbitrator in accordance with the then existing Commercial Arbitration Rules of the American Arbitration Association.  All proceedings will be conducted at a suitable location chosen by the arbitrator that is within ten (10) miles of where we have our principal business address at the time the arbitration demand is filed.  The arbitrator will have no authority to select a different hearing locale other than as described in the prior sentence.  All matters within the scope of the Federal Arbitration Act (9 U.S.C. Sections 1 et seq.) will be governed by it and not by any state arbitration law.

The arbitrator has the right to award any relief which he or she deems proper in the circumstances, including money damages (with interest on unpaid amounts from the date due), specific performance, injunctive relief and attorneys' fees and costs in accordance with Section 21.C above, provided that:  (i) the arbitrator has no authority to declare any Mark generic or otherwise invalid; and (ii) subject to the exceptions in Section 21.J, we and you waive to the fullest extent permitted by law any right to or claim for any punitive, exemplary, and treble and other forms of multiple damages against the other.  The award and decision of the arbitrator will be conclusive and binding upon all parties hereto and judgment upon the award may be entered in any court of competent jurisdiction.

We and you agree to be bound by the provisions of any limitation on the period of time by which claims must be brought under this Agreement or applicable law, whichever expires first.  We and you further agree that, in connection with any such arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by the then current Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates.  Any such claim which is not submitted or filed in such proceeding will be barred.  The arbitrator may not consider any settlement discussions or offers that might have been made by either you or us.  We reserve the right, but have no obligation, to advance your share of the costs of any arbitration proceeding in order for such arbitration proceeding to take place and by doing so will not be deemed to have waived or relinquished our right to seek the recovery of those costs in accordance with Section 21.C above.

We and you agree that arbitration will be conducted on an individual, not a class wide, basis, that only we (and our affiliates and our and their respective owners, officers, directors,

agents and employees, as applicable) and you (and your affiliates and your and their respective owners, officers and directors, as applicable) may be the parties to any arbitration proceeding described in this Section, and that no such arbitration proceeding may be consolidated with any other arbitration proceeding involving us and/or any other person.   Notwithstanding the foregoing or anything to the contrary in this Section or Section 21.A, if any court or arbitrator determines that all or any part of the preceding sentence is unenforceable with respect to a dispute that otherwise would be subject to arbitration under this Section 21.G, then we and you agree that this arbitration clause will not apply to that dispute and that such dispute will be resolved in a judicial proceeding in accordance with this Section 21 (excluding this Section 21.G).

The provisions of this Section are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

## H.  GOVERNING LAW

Except to the extent governed by the Federal Arbitration Act, the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051 et seq.) or other federal law, all controversies, disputes or claims arising from or relating to:

i.      this Agreement or any other agreement between you (or your owners) and us (or our affiliates);

ii.     our relationship with you;

iii.    the validity of this Agreement or any other agreement between you (or your owners) and us (or our affiliate); or

iv.     any Brand Standard,

will be governed by the laws of the State of New York, without regard to its conflict of laws rules, except that any law regulating the offer or sale of franchises, business opportunities or similar interests, or governing the relationship between a franchisor and a franchisee or any similar relationship (including the New York General Business Law, Art. 33, Sections 680 to 695), will not apply unless its jurisdictional requirements are met independently without reference to this Section 21.H.

## I.  CONSENT TO JURISDICTION

Subject to the arbitration obligations in Section 21.G, you and your owners agree that all judicial actions brought by us against you or your owners, or by you or your owners against us, our affiliates or our or their respective owners, officers, directors, agents, or employees, must be brought exclusively in the state or federal court of general jurisdiction located closest to where we have our principal business address at the time the action is commenced.  You and each of your owners irrevocably submit to the jurisdiction of such courts and waive any objection that you or any of them may have to either jurisdiction or venue.  Notwithstanding the foregoing, we may bring an action for a temporary restraining order or for temporary or preliminary injunctive

relief, or to enforce an arbitration award, in any federal or state court in the state in which you reside or the Gym is located.

### J.  WAIVER OF PUNITIVE DAMAGES

EXCEPT FOR THE INDEMNIFICATION OBLIGATIONS UNDER SECTION 20.E AND CLAIMS BASED ON UNAUTHORIZED USE OF THE MARKS OR UNAUTHORIZED USE OR DISCLOSURE OF ANY CONFIDENTIAL INFORMATION, WE AND YOU (AND YOUR OWNERS) WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE, EXEMPLARY, AND TREBLE AND OTHER FORMS OF MULTIPLE DAMAGES AGAINST THE OTHER AND AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN US AND YOU (AND/OR YOUR OWNERS), THE PARTY MAKING A CLAIM WILL BE LIMITED TO EQUITABLE RELIEF AND TO RECOVERY OF ANY ACTUAL DAMAGES HE, SHE, OR IT SUSTAINS.

### K.  WAIVER OF JURY TRIAL

WE AND YOU (AND YOUR OWNERS) IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER US OR YOU (OR YOUR OWNERS).  WE AND YOU (AND YOUR OWNERS) EACH ACKNOWLEDGE THAT WE AND YOU (AND THEY) MAKE THIS WAIVER KNOWINGLY, VOLUNTARILY, WITHOUT DURESS, AND ONLY AFTER CONSIDERATION OF THIS WAIVER'S RAMIFICATIONS.

### L.  WAIVER OF CLASS ACTION LITIGATION

Litigation arising out of or related to this Agreement must be conducted on an individual, not a class-wide, basis.  No litigation under this Agreement may be consolidated with any other litigation and any other person without our prior written consent.

### M.  BINDING EFFECT

This Agreement is binding upon us and you and our and your respective executors, administrators, heirs, beneficiaries, permitted assigns and successors in interest.  Subject to our rights to modify the Operations Manual and the Brand Standards, this Agreement may not be modified except by a written agreement signed by both you and us.

### N.  LIMITATIONS OF CLAIMS

EXCEPT FOR CLAIMS ARISING FROM YOUR NON-PAYMENT OR UNDERPAYMENT OF AMOUNTS THAT YOU OWE US AND EXCEPT FOR OUR (AND CERTAIN OF OUR RELATED PARTIES') RIGHT TO SEEK INDEMNIFICATION FROM YOU FOR THIRD-PARTY CLAIMS AS PROVIDED IN THIS AGREEMENT, ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN US AND YOU WILL BE BARRED UNLESS AN ARBITRATION OR JUDICIAL PROCEEDING, AS PERMITTED, IS COMMENCED IN THE APPROPRIATE FORUM WITHIN EIGHTEEN (18) MONTHS FROM THE DATE ON WHICH THE PARTY

ASSERTING THE CLAIM KNEW OR SHOULD HAVE KNOWN OF THE FACTS GIVING RISE TO THE CLAIM.

### O.  CONSTRUCTION

The preambles and exhibits are a part of this Agreement, which, together with any riders or addenda signed at the same time as this Agreement, constitutes the entire agreement and supersedes all prior and contemporaneous oral or written agreements and understandings between us and you relating to the subject matter of this Agreement.  There are no other oral or written representations, warranties, understandings or agreements between us and you relating to the subject matter of this Agreement.  Notwithstanding the foregoing, nothing in this Agreement disclaims or requires you to waive reliance on any representation that we made in the most recent disclosure document (including its exhibits and amendments) that we delivered to you or your representative.  Any policies that we adopt and implement from time to time to guide us in our decision-making are subject to change, are not a part of this Agreement and are not binding on us. Except as provided in Sections 20.E and 21.G, nothing in this Agreement is intended or deemed to confer any rights or remedies upon any person or legal entity not a party to this Agreement.

The headings of the sections and paragraphs are for convenience only and do not define, limit or construe the contents of these sections or paragraphs.

References in this Agreement to "**us**" with respect to all of our rights and all of your obligations to us under this Agreement include any of our affiliates with whom we deal in connection with the Gym.  The term "**affiliate**" means any person or entity directly or indirectly owned or controlled by, under common control with, or owning or controlling the party indicated.  "**Control**" means the power to direct or cause the direction of management and policies.

If two or more persons are at any time the owners of your rights under this Agreement and/or the Gym, whether as partners or joint venturers, their representations, warranties, obligations and liabilities to us will be joint and several.  The term "**owner**" means any person holding a direct or indirect ownership interest (whether of record, beneficial, or otherwise) or voting rights in you (or your owner or a transferee of this Agreement and the Gym or any interest in you), including any person who has a direct or indirect interest in you (or your owner or a transferee), this Agreement, or the Gym and any person who has any other direct or indirect legal or equitable interest, or the power to vest in himself or herself any legal or equitable interest, in their revenue, profits, rights, or assets.  References to a "**controlling ownership interest**" or "**controlling interest**" means any of the following:  (a) thirty-three percent (33%) or more of the ownership interests, voting shares or other voting rights in you or one of your owners, whether held directly or through one or more owners; (b) an interest the acquisition of which allows an individual to become or appoint an owner (subject to our consent pursuant to this Agreement); or (c) an interest the acquisition of which grants the power to direct or cause the direction of management and polices of you, your owners (if an entity) or the Gym to any person that did not have such power before that acquisition.  "**Person**" means any natural person, corporation, limited liability company, general or limited partnership, unincorporated association, cooperative

or other legal or functional entity.  Unless otherwise specified, all references to a number of days mean calendar days and not business days.

The term "Gym" includes all of the assets of the Blink Fitness Gym that you operate under this Agreement, including its revenue and income.  The words "include," "including," and words of similar import will be interpreted to mean "including, but not limited to" and the terms following such words will be interpreted as examples of, and not an exhaustive list of, the appropriate subject matter.

This Agreement may be executed in multiple copies, each of which will be deemed an original.

### P.  THE EXERCISE OF OUR BUSINESS JUDGMENT

Because complete and detailed uniformity under many varying conditions might not be possible or practical, you acknowledge that we specifically reserve the right and privilege, as we deem appropriate according to our reasonable business judgment and subject to reasonable deviations, to vary Brand Standards or other aspects of the Franchise System for any franchise owner.  You have no right to require us to grant you a similar variation or accommodation.  Notwithstanding the foregoing, we will not unreasonably withhold, condition, or delay our consent to a proposed transfer or assignment you submit for our approval if the proposed transfer satisfies the terms and conditions of Section 16.

### 22. <u>COMPLIANCE WITH ANTI-TERRORISM LAWS</u>

You and your owners agree to comply, and to assist us to the fullest extent possible in our efforts to comply, with Anti-Terrorism Laws (defined below).  In connection with that compliance, you and your owners certify, represent, and warrant that none of your property or interests is subject to being blocked under, and that you and your owners otherwise are not in violation of, any of the Anti-Terrorism Laws.  "**Anti-Terrorism Laws**" mean Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other present and future federal, state, and local laws, ordinances, regulations, policies, lists, and other requirements of any governmental authority addressing or in any way relating to terrorist acts and acts of war.  Any violation of the Anti-Terrorism Laws by you or your owners, or any blocking of your or your owners' assets under the Anti-Terrorism Laws, constitutes good cause for immediate termination of this Agreement, as provided in Section 18 above.

### 23. <u>NOTICES AND PAYMENTS</u>

All acceptances, approvals, requests, notices, and reports required or permitted under this Agreement will not be effective unless in writing and delivered to the party entitled to receive the notice in accordance with this Section 23.  All such acceptances, approvals, requests, notices, and reports will be deemed delivered at the time delivered by hand; or one (1) business day after being placed in the hands of a nationally recognized commercial courier service for next business day delivery; or three (3) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid; and must be addressed to the party to be notified at its most current principal business address of which the notifying party has been notified and/or, with respect to any approvals and notices that we provide to you or your owners,

at the Gym's address.  Payments will be deemed delivered on any of the applicable dates described above or, if earlier, at the time we actually receive payment electronically.  As of the Effective Date of this Agreement, notices should be addressed to the following addresses unless and until a different address has been designated by written notice to the other party:

To us:                                      Blink Fitness Franchising, Inc.
                                            386 Park Avenue South, 11th Floor
                                            New York, NY  10016
                                            Attn:
                                            Facsimile No.:

Notices to you and your owners:    _____
                                   _____
                                   _____
                                   _____

## 24. ELECTRONIC MAIL

You acknowledge and agree that exchanging information with us by e-mail is efficient and desirable for day-to-day communications and that we and you may utilize e-mail for such communications.  You authorize the transmission of e-mail by us and our employees, vendors, and affiliates ("**Official Senders**") to you during the Term of this Agreement.

You further agree that:  (i) Official Senders are authorized to send e-mails to those of your supervisory employees as you may occasionally authorize for the purpose of communicating with us; (ii) you will cause your officers, directors, and supervisory employees to give their consent to Official Senders' transmission of e-mails to them; (iii) you will require such persons not to opt out or otherwise ask to no longer receive e-mails from Official Senders during the time that such person works for or is associated with you; and (iv) you will not opt out or otherwise ask to no longer receive e-mails from Official Senders during the Term of this Agreement.

The consent given in this Section 24 will not apply to the provision of notices by either party under this Agreement pursuant to Section 23 using e-mail unless the parties otherwise agree in a written document manually signed by both parties.

**[Signature Page Follows]**

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement as of the dates below, to be effective on the Effective Date stated on the first page above.

**BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation

**FRANCHISEE**

**(IF CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP)**:

By:_____

    Title:_____

    Date:_____, 201\_

_____

[Name]

By:_____

    Title:_____

    Date:_____, 201\_

**(IF INDIVIDUALS)**:

_____

[Signature / Date]

_____

[Print Name]

_____

[Signature / Date]

_____

[Print Name]

**EXHIBIT A**
**TO THE BLINK FITNESS FRANCHISING, INC.**
**UNIT FRANCHISE AGREEMENT**

**BASIC TERMS**

The Site Selection Area is _____

_____

_____.

The Gym's physical location is _____.

The Gym's Protected Area is defined as _____

_____.

We may, at our sole option and upon delivery of written notice to you, reduce the geographic scope of the Protected Area during the Franchise Agreement's term if the living population encompassed within the Protected Area during the term doubles in size when compared with the size of such population as of the Franchise Agreement's Effective Date.  (We also may modify the Protected Area in the event of the Gym's relocation.)

The Opening Deadline for the Gym is _____.

The Presale Marketing Budget is $_____.

**BLINK FITNESS FRANCHISING,**
**INC.**, a Delaware corporation

By:_____
   Title:_____
   Date:_____, 201_

**FRANCHISEE**

**(IF CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP)**:

_____
[Name]

By:_____
   Title:_____
   Date:_____, 201_

A-1

**(IF INDIVIDUALS)**:

_____
[Signature / Date]

_____
[Print Name]

_____
[Signature / Date]

_____
[Print Name]

A-2

<u>**EXHIBIT B**</u>
**TO THE BLINK FITNESS FRANCHISING, INC.
UNIT FRANCHISE AGREEMENT**

<u>**GUARANTY AND ASSUMPTION OF OBLIGATIONS**</u>

**THIS GUARANTY AND ASSUMPTION OF OBLIGATIONS** is given this _____ day of _____, 201__, by _____.

In consideration of, and as an inducement to, the execution of that certain Unit Franchise Agreement (the "**Agreement**") on this date by **BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation ("**Franchisor**"), each of the undersigned personally and unconditionally (a) guarantees to Franchisor and its successors and assigns, for the term of the Agreement (including, without limitation, any extensions of its term) and afterward as provided in the Agreement, that _____ ("**Franchisee**") will punctually pay and perform each and every undertaking, agreement, and covenant set forth in the Agreement (including, without limitation, any amendments or modifications of the Agreement) and (b) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement (including, without limitation, any amendments or modifications of the Agreement), including (i) monetary obligations, (ii) obligations to take or refrain from taking specific actions and to engage or refrain from engaging in specific activities, including, but not limited to, the non-competition, confidentiality, and transfer requirements, and (iii) the enforcement and other provisions in Sections 21, 22, and 23 of the Agreement, including the arbitration provision.

Each of the undersigned consents and agrees that: (1) his or her direct and immediate liability under this Guaranty will be joint and several, both with Franchisee and among other guarantors; (2) he or she will render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so; (3) this liability will not be contingent or conditioned upon Franchisor's pursuit of any remedies against Franchisee or any other person; (4) this liability will not be diminished, relieved, or otherwise affected by any extension of time, credit, or other indulgence which Franchisor may from time to time grant to Franchisee or to any other person, including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims (including, without limitation, any extensions of its term or the release of other guarantors), none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable during the term of the Agreement (including, without limitation, any extensions of its term), for so long as any performance is or might be owed under the Agreement by Franchisee or any of its owners, and for so long as Franchisor has any cause of action against Franchisee or any of its owners; (5) this Guaranty will continue in full force and effect for (and as to) any extension or modification of the Agreement and despite the transfer of any interest in the Agreement or Franchisee, and each of the undersigned waives notice of any and all renewals, extensions, modifications, amendments, or transfers; and (6) any indebtedness by Franchisee to the undersigned, for whatever reason, whether currently existing or hereafter arising, will at all times be inferior and subordinate to any indebtedness owed by Franchisee to Franchisor or its affiliates.

Each of the undersigned waives: (i) all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Franchisee arising as a result of the undersigned's execution of and performance under this Guaranty; (ii) acceptance and notice of acceptance by Franchisor of his or her undertakings under this Guaranty, notice of demand for payment of any indebtedness or non-performance of any obligations hereby guaranteed, protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed, and any other notices to which he or she may be entitled; and (iii) all rights to assert or plead any statute of limitations as to or relating to this Guaranty.  The undersigned expressly acknowledges that the obligations hereunder survive the expiration or termination of the Agreement.

If Franchisor seeks to enforce this Guaranty in an arbitration, judicial or other proceeding, and prevails in such proceeding, Franchisor is entitled to recover its reasonable costs and expenses (including, but not limited to, attorneys' fees, arbitrators' fees, and expert witness fees, costs of investigation and proof of facts, court costs, other arbitration or litigation expenses and travel and living expenses) incurred in connection with such proceeding.  If Franchisor is required to engage legal counsel in connection with any failure by the undersigned to comply with this Guaranty, the undersigned must reimburse Franchisor for any of the above-listed costs and expenses Franchisor incurs, even if Franchisor does not commence a judicial or arbitration proceeding.

Subject to the arbitration obligations (as set forth in the Agreement) and the provisions below, each of the undersigned agrees that all actions arising under this Guaranty or the Agreement, or otherwise as a result of the relationship between Franchisor and the undersigned, must be brought exclusively in the state or federal court of general jurisdiction in the state, and in (or closest to) the city, where Franchisor has its principal business address at the time the action is commenced, and each of the undersigned irrevocably submits to the jurisdiction of those courts and waives any objection he or she might have to either the jurisdiction of or venue in those courts.  Nonetheless, each of the undersigned agrees that Franchisor may enforce this Guaranty and any arbitration orders and awards in the courts of the state or states in which he or she is domiciled.  FRANCHISOR AND THE UNDERSIGNED IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY ANY OF THEM.  EACH ACKNOWLEDGES THAT THEY MAKE THIS WAIVER KNOWINGLY, VOLUNTARILY, WITHOUT DURESS, AND ONLY AFTER CONSIDERATION OF THIS WAIVER'S RAMIFICATIONS.

**IN WITNESS WHEREOF**, each of the undersigned has affixed his or her signature on the same day and year as the Agreement was executed.

**GUARANTOR(S)**                **PERCENTAGE OF OWNERSHIP IN FRANCHISEE**

_____      _____%
_____      _____%
_____      _____%
_____      _____%
_____      _____%

**EXHIBIT C**
**TO THE BLINK FITNESS FRANCHISING, INC.**
**UNIT FRANCHISE AGREEMENT**

**FRANCHISEE AND ITS OWNERS**

**Effective Date:  This Exhibit C is current and complete**
**as of _____, 201__**

**Form of Franchisee.**

    **Individual Proprietorship**.  Franchisee's owner(s) (is) (are) as follows:

_____

_____

_____

    **Corporation, Limited Liability Company or Partnership**.  Franchisee was incorporated or formed on _____, 201__, under the laws of the State of _____.  Franchisee has not conducted business under any name other than Franchisee's corporate, limited liability company, or partnership name and _____.  The following is a list of Franchisee's directors or managers (if applicable) and officers as of the effective date shown above:

| **Name** | **Position(s) Held** |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

    **Owners**.  The following list includes the full name of each person who is one of Franchisee's direct or indirect owners and fully describes the nature of each owner's interest (attach additional pages if necessary).

| **Owner's Name** | **Description of Interest** |
|---|---|
| _____ | _____ |

| **Owner's Name** | **Description of Interest** |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**Managing Owner**.  Franchisee's Managing Owner is _____.

**BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation

By:_____
     Title:_____
     Date:_____, 201_

**FRANCHISEE**

**(IF CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP)**:

_____
[Name]

By:_____
     Title:_____
     Date:_____, 201_

**(IF INDIVIDUALS)**:

_____
[Signature / Date]

_____
[Print Name]

_____
[Signature / Date]

_____
[Print Name]

**EXHIBIT D**
**TO THE BLINK FITNESS FRANCHISING, INC.**
**UNIT FRANCHISE AGREEMENT**

**LEASE RIDER**

**LEASE PROVISIONS FOR BLINK FITNESS GYM FRANCHISES**

The following provisions must be inserted into your lease for your Gym that you will operate under the "BLINK®" brand (the "**Lease**"). You may add this language via a rider or addendum to your Lease, as long as the rider or addendum document is signed by both the tenant and the landlord. Please send us a copy of the signed Lease, along with any riders or addenda.

**REQUIRED LANGUAGE:**

A.   During the Term of the franchise agreement (the "**Franchise Agreement**") between Tenant and Blink Fitness Franchising, Inc. ("**BFF**"), Tenant will use the premises only for the operation of a Blink Fitness Gym.

B.   Landlord shall send to BFF copies of all default notices and all notices of Landlord's intent to terminate the Lease (or any rights of Tenant thereunder), or evict Tenant from the leased premises, simultaneously with sending such notices to Tenant. Such copies shall be sent to:

> Blink Fitness Franchising, Inc.
> 386 Park Avenue South, 11th Floor
> New York, NY  10016
> Attn:

C.   Tenant may assign the Lease to BFF or its affiliates upon expiration or termination of the Franchise Agreement, and Landlord will not withhold its consent to this assignment. Landlord will not impose or assess any assignment fee or similar payment or accelerate rental payments under the Lease in connection with the assignment.

D.   BFF or its affiliates may enter the premises to make any modification or alteration necessary to protect the Franchise System and the Marks or to cure any default under the Franchise Agreement or Lease at any time and without prior notice to Landlord.

E.   Tenant will not assign or sublease the premises or renew or extend the term of the Lease, or modify the Lease in any manner, without prior written approval from BFF.

F.   Upon the occurrence of any of the following:

(1)   a default by Tenant under the Lease, the Franchise Agreement, or any document or instrument securing or relating to the Franchise Agreement, or

(2)      the termination of the Franchise Agreement before its term expires by BFF or Tenant for any reason other than a default by BFF,

BFF shall have the right (but no obligation), exercisable upon delivery of written notice to Tenant and Landlord, to compel an assignment of the Lease, and all of Tenant's rights thereunder, to BFF or to an assignee of BFF's choice, at BFF's option.  If BFF (or its assignee) exercises the rights under this paragraph (F), Tenant shall have no further right, title or interest under the Lease or to the leased premises, but shall remain solely liable to Landlord for all rents, charges and other obligations under the Lease prior to the date upon which BFF (or its assignee) assumes possession of the leased premises.

G.      BFF is an intended third party beneficiary under the provisions set forth above with independent rights to enforce them and neither Landlord nor Tenant may alter or limit any of those provisions without BFF's prior written approval.

D-2

**EXHIBIT E**
**TO THE BLINK FITNESS FRANCHISING, INC.**
**UNIT FRANCHISE AGREEMENT**

**FORM OF CONFIDENTIALITY AGREEMENT**

In consideration of my employment or contract with and/or interest in _____ (hereinafter, the "**Franchisee**") and the salary, honorariums, wages and/or fees paid to me, I acknowledge that Blink Fitness Franchising, Inc., a Delaware corporation, having its principal place of business at 386 Park Avenue South, 11th Floor, New York, New York 10016 (hereinafter referred to as "**Blink Fitness**"), has imposed the following conditions on the Franchisee, any owner of the Franchisee, and the Franchisee's officers, directors, and senior personnel, and as a condition of performing services to or having an interest in Franchisee, I agree to accept the following conditions without limitation:

1.      Without obtaining the prior written consent of Blink Fitness (which consent may be withheld in Blink Fitness' sole discretion), I will (i) not disclose, publish, or divulge to any other person, firm or corporation, through any means, some or all of the Confidential Information of Blink Fitness, either during or subsequent to my employment by or association with Franchisee, (ii) not use the Confidential Information for any purposes other than as related to my employment or association with Franchisee, and (iii) not make copies or translations of any documents, data, or compilations containing any or all of the Confidential Information, nor commingle any portion of the documents, data or compilation or otherwise use the documents, data or compilations containing Confidential Information, for my own purpose or benefit.  I also agree to surrender any material containing some or all of the Confidential Information of Blink Fitness upon request or upon termination of employment or association with Franchisee and understand that the Operations Manual is provided by Blink Fitness to Franchisee for a limited purpose and will remain the property of Blink Fitness and may not be reproduced, in whole or in part, without the prior written consent of Blink Fitness.

For purposes of this Agreement, "**Confidential Information**" shall mean certain information, processes, methods, techniques, procedures and knowledge, including know-how (which includes information that is secret and substantial), manuals and trade secrets (whether or not judicially recognized as a trade secret), developed or to be developed by Blink Fitness relating directly or indirectly to the development or operation of a Blink Fitness Gym.  With respect to the definition of know-how, "**secret**" means that the know-how as a body or in its precise configuration is not generally known or easily accessible and "**substantial**" means information which is important and useful to Franchisee in developing and operating Franchisee's Gym.  Without limiting the foregoing, Confidential Information includes, but is not limited to:

    i.      information in the Operations Manual and Brand Standards;

    ii.     layouts, designs, and other plans and specifications for Blink Fitness Gyms;

iii.    methods, formats, specifications, standards, systems, procedures, sales and marketing techniques, and knowledge and experience used in developing and operating Blink Fitness Gyms;

iv.    content and methods of instruction;

v.    marketing research and promotional, marketing and advertising programs for Blink Fitness Gyms;

vi.    knowledge of specifications for and suppliers of, and methods of ordering, certain Operating Assets, products, materials and supplies that Blink Fitness Gyms use and sell;

vii.    knowledge of the operating results and financial performance of Blink Fitness Gyms other than the Gym;

viii.    member solicitation, communication and retention programs, along with data and information used or generated in connection with those programs;

ix.    all Data and all other information generated by, or used or developed in, the operation of the Gym, including Consumer Data and Gym Lists, and any other information contained from time to time in the Computer System or that visitors (including you) provide to the System Website; and

x.    any other information that we reasonably designate as confidential or proprietary.

2.    In the event of a dispute or question arising out of the interpretation of this Agreement or any of its terms, the laws of the State of New York shall govern.

3.    I acknowledge receipt of a copy of this Agreement, and that I have read and I understand this Agreement. This Agreement may not be modified except in writing with prior approval of an officer of each of Franchisee and Blink Fitness.

Owner, officer, director, and senior personnel:

By:_____
Name:_____
Title:_____
Date:_____

Social Security No.:_____
or Tax ID No._____
Address:_____
_____
_____
Phone:_____
Fax:_____

Check the following that apply:

___ Owner                    ___ Senior Personnel
___ Officer                  ___ Other (please specify)
___ Director

**<u>EXHIBIT C</u>**

**DEVELOPMENT RIGHTS AGREEMENT**

BLINK FITNESS - 2016 AMENDED FDD
EAST\137554766.2

**BLINK FITNESS FRANCHISING, INC.**
<u>**DEVELOPMENT RIGHTS AGREEMENT**</u>

**THIS DEVELOPMENT RIGHTS AGREEMENT** (this "**Agreement**") is made effective as of _____, 201__ (the "**Effective Date**," regardless of when the parties execute and date this Agreement), by and between **BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation whose principal business address is 386 Park Avenue South, 11th Floor, New York, New York 10016 ("**we**," "**us**," or "**our**"), and _____, a(n) _____ ("**you**" or "**your**").

<u>**RECITALS**</u>

A.      We and our affiliates have designed and developed a method of developing and operating health and fitness centers identified by the Marks (defined below) that currently provide cardiovascular and strength training equipment and related products and services ("**Blink Fitness Gyms**").

B.      We and our affiliates have developed, and use, promote and license, certain trademarks, service marks and other commercial symbols in operating Blink Fitness Gyms, including "BLINK®," and we may from time to time create, use and license other trademarks, service marks and commercial symbols for Blink Fitness Gyms (collectively, the "**Marks**").

C.      Simultaneously with signing this Agreement, we and you (or your Controlled Affiliate, as defined below) are signing a franchise agreement dated as of _____, 201__ pursuant to which you (or such Controlled Affiliate) will operate a Blink Fitness Gym (the "**Unit Franchise Agreement**"). We and you are signing this Agreement because you have requested the right to develop and operate three (3), or five (5) or more, Blink Fitness Gyms within a certain geographic area over a certain period of time, and we are willing to grant you such rights if you comply with the terms of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants, agreements, and obligations set forth in this Agreement, we and you agree as follows:

**1.      <u>Grant of Development and Territorial Rights</u>.** Subject to your compliance with this Agreement, we hereby grant you (and/or any of your approved Controlled Affiliates) the right to develop _____ (__) new Blink Fitness Gyms, including the Blink Fitness Gym to be developed under the Unit Franchise Agreement being signed simultaneously with this Agreement, according to the mandatory development schedule (the "**Schedule**") identified on <u>Exhibit A</u> to this Agreement, within the geographic area described on <u>Exhibit B</u> to this Agreement (the "**Area**"). In this Agreement, the term "**Controlled Affiliate**" means any corporation, limited liability company or other business entity of which you or one or more of your majority owners owns at least fifty-one percent (51%) of the total authorized ownership interests, as long as you or such owner(s) has the right to control the entity's management and policies.

Provided you and your Controlled Affiliates are in full compliance with this Agreement and all other agreements between you (or any of the Controlled Affiliates) and us (or any of our

affiliates), including, without limitation, the Unit Franchise Agreement and all other franchise agreements then in effect between you (or any Controlled Affiliate) and us for the operation of Blink Fitness Gyms, then, during this Agreement's term only, except as otherwise provided in this Agreement, neither we nor our affiliates will operate, or authorize any other party to operate, a Blink Fitness Gym that has its physical location within the Area.  You acknowledge and agree that we may exercise in the Area any and all of the rights that we now reserve in the Unit Franchise Agreement (and related documents), including in Section 3.D of the Unit Franchise Agreement.  After this Agreement expires or is terminated, regardless of the reason, we and our affiliates may engage, and allow others to engage, in any activities we desire within and outside the Area without any restrictions whatsoever, subject only to your (or any Controlled Affiliate's) rights under franchise agreements with us then in effect.

**2.** **Development Fee**.  Simultaneously with signing this Agreement, you must pay us a fee of _____ Thousand Dollars ($___,000) (the "**Development Fee**").  We calculate the Development Fee as follows:

a.  If you agree to develop three (3) Blink Fitness Gyms under the Schedule, then the Development Fee is Seventy-Five Thousand Dollars ($75,000), which is Twenty-Five Thousand Dollars ($25,000) multiplied by the three (3) Blink Fitness Gyms you agree to develop, including the Blink Fitness Gym covered by the Unit Franchise Agreement.

b.  If you agree to develop five (5) Blink Fitness Gyms under the Schedule, then the Development Fee is One Hundred Thousand Dollars ($100,000), which is Twenty Thousand Dollars ($20,000) multiplied by the five (5) Blink Fitness Gyms you agree to develop, including the Blink Fitness Gym covered by the Unit Franchise Agreement.

c.  If you agree to develop six (6) or more Blink Fitness Gyms under the Schedule, then the Development Fee is One Hundred Thousand Dollars ($100,000) for the first five (5) Blink Fitness Gyms you agree to develop, including the Blink Fitness Gym covered by the Unit Franchise Agreement, plus an additional Ten Thousand Dollars ($10,000) for each of the sixth and each successive Blink Fitness Gym you agree to develop under the Schedule.

The Development Fee is fully earned by us when this Agreement is signed and is non-refundable.  We do not charge you any initial franchise fees when you sign franchise agreements for the Blink Fitness Gyms you have agreed to develop under the Schedule.

**3.** **Development Obligations**.  To maintain your rights under this Agreement, you and/or approved Controlled Affiliates must sign franchise agreements for, develop, and open for business the agreed-upon number of Blink Fitness Gyms within the Area by the dates set forth on the Schedule.  You or a Controlled Affiliate will operate each Blink Fitness Gym under a separate franchise agreement (and related documents) with us.  The franchise agreement (and related documents) that you or your Controlled Affiliate will sign for each Blink Fitness Gym will be our then current form of franchise agreement and related documents, including, without limitation, personal guarantees (collectively, the "**Franchise Documents**"), any or all of the

2

terms of which may differ substantially from the terms contained in the Unit Franchise Agreement, provided, however, that: (a) no initial franchise fee is due for any Blink Fitness Gym you develop and open under this Agreement; (b) you will pay a reduced royalty fee (see below) during the initial years you operate the Blink Fitness Gyms you develop in compliance with the deadlines in the Schedule; and (c) your required contributions to a fund ("**Brand Fund**") for advertising, marketing, research, and public relations programs and materials during the first year you operate each Blink Fitness Gym may (assuming we have begun collecting Brand Fund contributions) be spent instead on local store marketing. Your reduced royalty fee depends on the number of Blink Fitness Gyms you agree to develop under this Agreement:

     i.     If you agree to develop three (3) Blink Fitness Gyms, then we will reduce the royalty fee payable under the Unit Franchise Agreement and the Franchise Documents, in the following manner, for each Blink Fitness Gym if it opens for business on or before the specific opening deadline for that Blink Fitness Gym listed on the Schedule: (1) two percent (2%) of the Gross Sales of the Blink Fitness Gym for the first full twelve (12) months of the franchise term during which you operate the Blink Fitness Gym; and (2) three percent (3%) of the Gross Sales of the Blink Fitness Gym for the second full twelve (12) months of the franchise term during which you operate the Blink Fitness Gym. A five percent (5%) royalty fee will apply during the balance of the franchise term.

     ii.     If you agree to develop five (5) or more Blink Fitness Gyms, then we will reduce the royalty fee payable under the Unit Franchise Agreement and the Franchise Documents, in the following manner, for each Blink Fitness Gym if it opens for business on or before the specific opening deadline for that Blink Fitness Gym listed on the Schedule: (1) you will pay no royalty fee for the first full twelve (12) months of the franchise term during which you operate the Blink Fitness Gym; and (2) we will reduce the royalty fee payable under the Unit Franchise Agreement and the Franchise Documents to (A) two percent (2%) of the Gross Sales of the Blink Fitness Gym for the second full twelve (12) months of the franchise term during which you operate the Blink Fitness Gym, (B) three percent (3%) of the Gross Sales of the Blink Fitness Gym for the third full twelve (12) months of the franchise term during which you operate the Blink Fitness Gym, and (C) four percent (4%) of the Gross Sales of the Blink Fitness Gym for the fourth full twelve (12) months of the franchise term during which you operate the Blink Fitness Gym. A five percent (5%) royalty fee will apply during the balance of the franchise term.

To retain your development rights under this Agreement, each Blink Fitness Gym opened pursuant to this Agreement must operate continuously throughout this Agreement's term.

After you sign both the Unit Franchise Agreement and this Agreement, we or a designated third party supplier of site evaluation, leasing and related services (the "**Site Consultant**") will assist you by reviewing potential sites for the Blink Fitness Gym you must develop pursuant to the Unit Franchise Agreement. You must use a licensed commercial real estate broker during the site selection process, and we have the right to pre-approve your proposed broker before you move forward. We may, but have no obligation to, physically visit

your proposed sites. We may condition our making a proposed site visit and our acceptance of a proposed site on your first sending us complete site reports and other materials (including, without limitation, photographs and video recordings) we request. We or the Site Consultant will provide you with our then current criteria for sites for Blink Fitness Gyms to assist you in selecting and identifying your site. However, even if we or the Site Consultant gives you information regarding a potential site for a future Blink Fitness Gym, you acknowledge that (i) the Site Consultant is solely responsible for its activities, its communications, and the information it shares with you and they are not activities, communications, or information from us, and (ii) we have made and will make no representations or warranties of any kind, express or implied, about the suitability of any particular site for a new Blink Fitness Gym or any other purpose, or of the likelihood that we ultimately will accept a particular site for a future Blink Fitness Gym location.

4. **No Sublicensing Rights**. This Agreement does not grant you any right to license others to operate Blink Fitness Gyms. Only you (and your approved Controlled Affiliates) may open and operate Blink Fitness Gyms pursuant to this Agreement and only under Franchise Documents with us.

5. **Grant of Franchises**. You agree to give us all information and materials we request to assess each proposed Blink Fitness Gym site and your (or your Controlled Affiliate's) financial and operational ability to develop and operate each proposed Blink Fitness Gym. We will not unreasonably withhold acceptance of any site you propose that meets our then current criteria for population density and other demographic characteristics, visibility, traffic flow, competition, accessibility, parking, size, and other physical and commercial characteristics. However, we have the absolute right to reject any site that does not meet these criteria. We agree to use reasonable efforts to review and accept in writing the sites you propose within thirty (30) days after we receive all requested information and materials (including, without limitation, photographs and video recordings). If we accept a proposed site and your (or your Controlled Affiliate's) financial and operational ability to develop and operate the proposed Blink Fitness Gym, then you or your approved Controlled Affiliate (and your or the Controlled Affiliate's owners) must sign separate Franchise Documents for that Blink Fitness Gym. If you or the Controlled Affiliate (and such owners) do not do so, or are unable to obtain lawful possession of the proposed site within a reasonable time after we accept the proposed site, we may withdraw our acceptance. Neither you nor any Controlled Affiliate may sign any lease or sublease for a site without our written acceptance and first signing, and complying with, the Franchise Documents. After you (or your Controlled Affiliate) signs the Franchise Documents, their terms and conditions will control the development and operation of the Blink Fitness Gym, although the opening deadline is controlled by the Schedule.

This Agreement is not a franchise agreement and does not grant you the right to engage in the business of offering, selling or distributing goods and services under the Marks or to use the Marks in any manner. These rights are granted only by Franchise Documents signed by you (or your approved Controlled Affiliates) and us. Subject to Section 7(b), any and all Franchise Documents are independent of this Agreement.

6. **Club Managers**. Notwithstanding anything to the contrary in Section 7.D of the Unit Franchise Agreement, each of your Blink Fitness Gyms must have a designated manager

4

(the "**Club Manager**").  The individual you designate and retain to serve as the operating principal of the Blink Fitness Gym you develop and open under the Unit Franchise Agreement (the "**Operating Principal**") may not serve as the Club Manager for any other Blink Fitness Gym you open and operate under the Franchise Documents.  We must approve the Operating Principal in writing prior to the earlier of the Effective Date of this Agreement or the execution of the Unit Franchise Agreement.

      **7.**    **Term**.  This Agreement's term begins on the Effective Date and ends on the date when (a) you open the final Blink Fitness Gym under the Schedule, or (b) this Agreement otherwise is terminated, but in any event the term will end no later than _____.

      **8.**    **Termination**.  We may terminate this Agreement and your right to develop additional Blink Fitness Gyms within the Area at any time, effective upon delivery of written notice of termination, if:  (a) you fail to satisfy either your development obligations under the Schedule or any other obligation under this Agreement, which defaults you have no right to cure; or (b) the Unit Franchise Agreement or any other franchise agreement between us and you (or any Controlled Affiliate) for a Blink Fitness Gym is terminated by us or you (or the Controlled Affiliate) for any reason.  If this Agreement is terminated for any reason, you will lose all rights to further develop Blink Fitness Gyms in the Area; provided, however, termination will not affect your right to operate any Blink Fitness Gym in existence or under development provided you are in compliance with the Franchise Documents for any such Blink Fitness Gym.  No portion of the Development Fee is refundable.

      **9.**    **Assignment**.  You (and your owners) acknowledge that we are granting you the rights under this Agreement because of our perception of your (and your owners') individual and collective character, skill, business acumen, financial capability and ability to operate Blink Fitness Gyms according to our Brand Standards.  These rights are personal to you and your owners.  Therefore, you and your owners may not assign this Agreement or any of your ownership interests without our prior written approval, which we may grant or withhold for any or no reason.  We may assign this Agreement or any of our ownership interests without restriction.

      **10.**    **Incorporation of Other Terms**.  Sections 20-21 and 23-24 of the Unit Franchise Agreement, entitled "Relationship of the Parties; Indemnification," "Enforcement," "Notices and Payments" and "Electronic Mail," respectively, including, without limitation, the mediation and arbitration obligations under Sections 21.F and 21.G of the Unit Franchise Agreement, are incorporated by reference in this Agreement and will govern all aspects of this Agreement and our and your relationship as if fully restated within the text of this Agreement.

**[Signature Page Follows]**

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement as of the dates below, to be effective on the Effective Date stated on the first page above.

**BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation

By:_____

    Title:_____

    Date:_____, 201_

**DEVELOPER**

**(IF CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP)**:

_____
[Name]

By:_____

    Title:_____

    Date:_____, 201_

**(IF INDIVIDUALS)**:

_____
[Signature / Date]

_____
[Print Name]

_____
[Signature / Date]

_____
[Print Name]

BLINK FITNESS - 2016 DRA
EAST\121352050.6

**EXHIBIT A**
**TO THE BLINK FITNESS FRANCHISING, INC.**
**DEVELOPMENT RIGHTS AGREEMENT**

You agree to open _____ (___) new Blink Fitness Gyms within the Area (including the Blink Fitness Gym governed by the Unit Franchise Agreement) according to the following Schedule:

| Franchise Agreement To Be Executed By (Date) | Gym Opening by (Date) | Cumulative Minimum Number of New Blink Fitness Gyms To Be Open and Operating No Later Than the Opening Date (in Previous Column) |
|---|---|---|
| Simultaneously with this Agreement | | 1 |
| | | 2 |
| | | 3 |
| | | |
| | | |

**BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation

By:_____
  Title:_____
  Date:_____, 201_

**DEVELOPER**:

**(IF CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP)**:

_____
[Name]

By:_____
  Title:_____
  Date:_____, 201_

**(IF INDIVIDUALS)**:

_____
[Signature / Date]

_____
[Print Name]

_____
[Signature / Date]

_____
[Print Name]

A-2

## EXHIBIT B
## TO THE BLINK FITNESS FRANCHSING, INC.
## DEVELOPMENT RIGHTS AGREEMENT

The Area is defined as the entire territory encompassed by _____ in the State of _____. If the Area is identified by city or other political subdivisions, political boundaries will be considered fixed as of the date of this Agreement, notwithstanding any political reorganization or change to the boundaries. The Area is depicted on the map attached to this Exhibit B. However, if there is an inconsistency between the language in this Exhibit B and the attached map, the language in this Exhibit B shall control. All street boundaries will be deemed to end at the street center line unless otherwise specified.

**BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation

**DEVELOPER**:

**(IF CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP)**:

By:_____
   Title:_____
   Date:_____, 201_

_____
[Name]

By:_____
   Title:_____
   Date:_____, 201_

**(IF INDIVIDUALS)**:

_____
[Signature / Date]

_____
[Print Name]

_____
[Signature / Date]

_____
[Print Name]

**MAP OF AREA**

B-2

## **EXHIBIT D**

## **OPERATIONS MANUAL TABLE OF CONTENTS**

Operations Manual Table of Contents

|     |                        | No. of Pages |
| --- | ---------------------- | ------------ |
| 1.  | **Welcome**            | 10           |
| 2.  | **Development**        | 26           |
| 3.  | **Sweepstakes**        | 7            |
| 4.  | **Pre-Sale**           | 20           |
| 5.  | **Preview**            | 7            |
| 6.  | **Grand Opening**      | 8            |
| 7.  | **Open Club**          | 72           |
| 8.  | **Marketing**          | 17           |
| 9.  | **Technology**         | 136          |
| 10. | **Finance & Reporting**| 8            |

Total Number of Pages: 311

## **EXHIBIT E**

## **LIST OF FRANCHISEES**

Allen Marc Pinero*
Maria Cristina Pinero
Oyster Bay, New York
(516) 922-5015

Bairrada Group Inc.*
Syosset, New York
(516) 729-3504 (Harit Desai)
(516) 244-4669 (Vipul Sawhney)

*Not yet opened.

E-1

## **EXHIBIT F**

## **LIST OF STATE AGENCIES/AGENTS FOR SERVICE OF PROCESS**

BLINK FITNESS - 2016 AMENDED FDD
EAST\137554766.2

## STATE AGENCIES/AGENTS
## FOR SERVICE OF PROCESS

Listed here are the names, addresses and telephone numbers of the state agencies having responsibility for the franchising disclosure/registration laws.  We may not yet be registered to sell franchises in any or all of these states.

If a state is not listed, we have not appointed an agent for service of process in that state in connection with the requirements of the franchise laws.  There may be states in addition to those listed below in which we have appointed an agent for service of process.

There also may be additional agents appointed in some of the states listed.

### CALIFORNIA

Commissioner of the Department
  of Business Oversight:
Toll Free: 1 (866) 275-2677

#### *Los Angeles*

Suite 750
320 West 4th Street
Los Angeles, California  90013-2344
(213) 576-7500

#### *Sacramento*

1515 K Street, Suite 200
Sacramento, California  95814-4052
(916) 445-7205

#### *San Diego*

1350 Front Street, Rm. 2034
San Diego, California  92101-3697
(619) 525-4233

#### *San Francisco*

One Sansome Street, Suite 600
San Francisco, California  94105-2980
(415) 972-8559

### HAWAII

(for service of process)

Commissioner of Securities
Business Registration Division
Department of Commerce
and Consumer Affairs
335 Merchant Street, Room 205
Honolulu, Hawaii  96813
(808) 586-2722

(for other matters)

Commissioner of Securities
Business Registration Division
Department of Commerce
and Consumer Affairs
335 Merchant Street, Room 205
Honolulu, Hawaii  96813
(808) 586-2722

### ILLINOIS

Illinois Attorney General
500 South Second Street
Springfield, Illinois  62706
(217) 782-4465

**INDIANA**

(for service of process)

Indiana Secretary of State
201 State House
200 West Washington Street
Indianapolis, Indiana  46204
(317) 232-6531

(state agency)

Indiana Secretary of State
Securities Division
Room E-111
302 West Washington Street
Indianapolis, IN  46204
(317)232-6681

**MARYLAND**

(state agency)

Office of the Attorney General-
Securities Division
200 St. Paul Place
Baltimore, Maryland  21202-2021
(410) 576-6360

(for service of process)

Maryland Securities Commissioner
at the Office of Attorney General-
Securities Division
200 St. Paul Place
Baltimore, Maryland 21202-2021
(410) 576-6360

**MICHIGAN**

Corporations Division
Franchise
P.O. Box 30054
Lansing, MI 48909
(517) 373-7117

**MINNESOTA**

Commissioner of Commerce
Department of Commerce
85 7th Place East, Suite 500
St. Paul, Minnesota  55101
(651) 296-6328

**NEW YORK**

(Administrator)

Office of the New York State Attorney General
Investor Protection Bureau
Franchise Section
120 Broadway, 23rd Floor
New York, NY 10271-0332
(212) 416-8236 (Phone)
(212) 416-6042 (Fax)

(Agent for Service)

Attention: New York Secretary of State
New York Department of State
One Commerce Plaza,
99 Washington Avenue, 6th Floor
Albany, NY 12231-0001
(518) 473-2492

**NORTH DAKOTA**

(state agency)

North Dakota Securities Department
600 East Boulevard Avenue State Capitol
Fifth Floor Dept 414
Bismarck, North Dakota  58505-0510
(701) 328-4712

(for service of process)

Securities Commissioner
600 East Boulevard Avenue State Capitol
Fifth Floor Dept 414
Bismarck, North Dakota  58505-0510
 (701) 328-4712

2

## OREGON

Oregon Division of Finance and Corporate Securities
350 Winter Street NE, Room 410
Salem, Oregon  97301-3881
(503) 378-4387

## RHODE ISLAND

Securities Division
Department of Business Regulations
1511 Pontiac Avenue
John O. Pastore Complex-Building 69-1
Cranston, RI 02920
 (401) 462-9500

## SOUTH DAKOTA

Division of Securities
Department of Labor and Regulation
124 S. Euclid, Suite 104
Pierre, SD 57501
(605) 773-4823

## VIRGINIA

(for service of process)

Clerk, State Corporation Commission
1300 East Main Street
First Floor
Richmond, Virginia  23219
(804) 371-9733

(for other matters)

State Corporation Commission
Division of Securities and Retail Franchising
1300 East Main Street
Ninth Floor
Richmond, Virginia 23219
(804) 371-9051

## WASHINGTON

(for service of process)

Director Department of Financial Institutions
Securities Division
150 Israel Road SW
Tumwater, Washington  98501
(360) 902-8760

(for other matters)

Department of Financial Institutions
Securities Division
P. O. Box 9033
Olympia, Washington  98501-9033
(360) 902-8760

## WISCONSIN

Commissioner of Securities
345 W. Washington Ave., 4th Floor
Madison, Wisconsin  53703
(608) 266-8557

## <u>EXHIBIT G</u>

**FRANCHISEE REPRESENTATIONS DOCUMENT**

BLINK FITNESS - 2016 AMENDED FDD
EAST\137554766.2

**BLINK FITNESS FRANCHISING, INC.**
**FRANCHISEE REPRESENTATIONS**

**Important Instructions**:  Blink Fitness Franchising, Inc. ("we," "us," or "our") and you are preparing to enter into a Development Rights Agreement and/or Franchise Agreement for the development and operation of one or more BLINK® Fitness Gyms (the "Gym").  This document's purpose is to determine whether any statements or promises were made to you that we have not authorized, that do not appear in or are inconsistent with our franchise documents and/or that may be untrue, inaccurate, or misleading.  We also want to be sure that you understand certain terms of the agreements you will sign and their ramifications.  Please review each of the following statements carefully and do not sign this document if it contains anything you think might be untrue.  If you sign this document, you are confirming the truth of what it says.  In addition, if you sign it, we will take actions in reliance on the truth of what it says.

Name of Prospective Franchisee:_____
(the "Franchisee")

Each of the undersigned represents that all of the following statements are true:

1.      Each of the undersigned has conducted its, his, or her own independent investigation of us, the Franchise System (as that term is used in our Franchise Agreement), the risks, burdens, and nature of the business Franchisee will conduct under the Franchise Agreement, the Gym, the shopping center or other location for the Gym (if already selected), and the Gym's market area.

**\*Insert initials into the following blank to confirm this statement:  ___**

2.      Each of the undersigned understands that the business Franchisee will conduct under the Franchise Agreement involves risk and any success or failure will be substantially influenced by Franchisee's ability and efforts, the viability of the Gym's location, competition from other fitness and health clubs, interest rates, inflation, labor and supply costs, lease terms, and other economic and business factors.

**\*Insert initials into the following blank to confirm this statement:  ___**

3.      Each of the undersigned understands that we previously might have entered into development rights agreements and franchise agreements with provisions different from the provisions of the Development Rights Agreement and/or Franchise Agreement that Franchisee is signing and in the future will enter into development rights agreements and franchise agreements with provisions different from the provisions of the Development Rights Agreement and/or Franchise Agreement that Franchisee is signing.

**\*Insert initials into the following blank to confirm this statement:  ___**

4.      If we unilaterally made material changes in Franchisee's final, ready-to-be signed copies of the Development Rights Agreement, Franchise Agreement, and related documents (other than as a result of our negotiations with Franchisee), Franchisee has had possession of those documents for at least seven (7) calendar days before executing them and has had ample

opportunity to consult with its, his, or her attorneys, accountants, and other advisors concerning those documents.

**\*Insert initials into the following blank to confirm this statement:** **___**

5.      Franchisee has received a franchise disclosure document ("FDD") as required by law at least 14 calendar days before signing the Development Rights Agreement and/or Franchise Agreement and at least 14 calendar days before paying any consideration to us or an affiliate in connection with this franchise and has had ample opportunity to consult with its, his, or her attorneys, accountants, and other advisors concerning the FDD.

**\*Insert initials into the following blank to confirm this statement:** **___**

Franchisee also has received the FDD at the earlier of our first personal meeting with Franchisee to discuss the franchise opportunity but at least 10 business days before signing the Development Rights Agreement and/or Franchise Agreement and at least 10 business days before paying any consideration to us or an affiliate in connection with this franchise.

**\*Insert initials into the following blank to confirm this statement:** **___**

6.      Except as provided in Item 19 of our FDD, we have made no representation, warranty, promise, guaranty, prediction, projection, or other statement, and given no information, as to the future, past, likely, or possible income, sales volume, or profitability, expected or otherwise, of the Gym or any other business, except:  (None, unless something is filled-in here or provided on additional sheets) _____

_____

_____.

**\*Insert initials into the following blank to confirm this statement:** **___**

7.      Each of the undersigned understands that:

7.1     Except as provided in Item 19 of our FDD, we do not authorize our officers, directors, or employees to furnish any oral or written representation, warranty, promise, guaranty, prediction, projection, or other statement or information concerning actual or potential income, sales volume, or profitability, either generally or of any BLINK® Fitness Gym.

**\*Insert initials into the following blank to confirm this statement:** **___**

7.2     Actual results vary from unit to unit and from time period to time period, and we cannot estimate, project, or predict the results of any particular BLINK® Fitness Gym.

**\*Insert initials into the following blank to confirm this statement:** **___**

7.3     We have specifically instructed our officers, directors, and employees that, except as provided in Item 19 of our FDD, they are not permitted to make any representation, warranty, promise, guaranty, prediction, projection, or other statement or

give other information as to income, sales volume, or profitability, either generally or with respect to any particular BLINK® Fitness Gym.

**\*Insert initials into the following blank to confirm this statement:** ___

7.4    If any unauthorized representation, warranty, promise, guaranty, prediction, projection, or other statement or information is made or given, the undersigned should not (and will not) rely on it.

**\*Insert initials into the following blank to confirm this statement:** ___

8.    Before signing the Development Rights Agreement, Franchise Agreement, and any related documents, the undersigned Franchisee has had ample opportunity: (A) to discuss the Development Rights Agreement, the Franchise Agreement, any related document, and the business Franchisee will conduct with its, his, or her own attorneys, accountants, and real estate and other advisors; (B) to contact our existing franchisees; and (C) to investigate all statements and information made or given by us and our officers, directors, employees, and agents relating to the Franchise System, the Gym, and any other subject.

**\*Insert initials into the following blank to confirm this statement:** ___

9.    Each of the undersigned understands that the Franchise Agreement licenses certain rights for one, and only one, Gym, located only at the location now specified (or to be specified) in the Franchise Agreement, and that, except as expressly provided in the Franchise Agreement or a signed Development Rights Agreement with us, no "exclusive," "expansion," "protected," "non-encroachable," or other territorial rights, rights of first refusal, or rights of any other kind are granted or have been promised concerning the shopping center or other structure in which the Gym is located, the contiguous or any other market area of the Gym, or any other existing or potential BLINK® Fitness Gym or geographic territory.

**\*Insert initials into the following blank to confirm this statement:** ___

10.    Each of the undersigned understands that the Development Rights Agreement and/or Franchise Agreement (including any riders and exhibits) constitutes the entire agreements between the parties and supersedes all prior and contemporaneous oral or written agreements, statements, representations (except for those in the FDD), or understandings of us, the undersigned, and Franchisee.

**\*Insert initials into the following blank to confirm this statement:** ___

11.    Each of the undersigned understands that nothing stated or promised by us that is not specifically set forth in the Development Rights Agreement, Franchise Agreement, or FDD can be relied upon by the undersigned or Franchisee.

**\*Insert initials into the following blank to confirm this statement:** ___

12.    Each of the undersigned has confirmed that no employee of ours or other person speaking on our behalf has made any statement, promise, or agreement concerning the advertising, marketing, training, support service, or assistance we will furnish to Franchisee that

is contrary to, or different from, the information contained in the FDD and the Franchise Agreement.

**\*Insert initials into the following blank to confirm this statement:** ___

13. Each of the undersigned understands that we may sell or transfer our assets, our trademarks, or the BLINK® Fitness system outright to a third party; may go public; may engage in a private placement of some or all of our securities; may merge, acquire other corporations, or be acquired by another corporation; and/or may undertake a refinancing, a recapitalization, a leveraged buy-out, or other economic or financial restructuring.

**\*Insert initials into the following blank to confirm this statement:** ___

14. The only state(s) in which each of the undersigned is a resident is (are): _____.
_____.

**\*Insert initials into the following blank to confirm this statement:** ___

15. Each of the undersigned understands the importance of the Gym's location. The undersigned and Franchisee have had, or will have, ample opportunity and the means to investigate, review, and analyze independently the Gym's location, the shopping center or other building in which it is contained, the market area and all other facts relevant to the selection of a site for a BLINK® Fitness Gym, and the lease documents for such location.

**\*Insert initials into the following blank to confirm this statement:** ___

16. Each of the undersigned understands that neither our acceptance or selection of any location nor our negotiation or acceptance of any lease implies or constitutes any warranty, representation, guarantee, prediction, or projection that the location will be profitable or successful or that the lease is on favorable terms. It often is the case that leases are available only on very tough terms.

**\*Insert initials into the following blank to confirm this statement:** ___

17. Each of the undersigned understands that site selection is a difficult and risky proposition. We have not given (and will not give) any representation, warranty, promise, guaranty, prediction, projection, or other statement or information relied upon by the undersigned or Franchisee regarding a location's prospects for success, nearby tenants or other attributes, or the form or contents of any lease. Franchisee will have any lease reviewed by its, his, or her own attorney and other advisors.

**\*Insert initials into the following blank to confirm this statement:** ___

18. The covenants and restrictions concerning competition contained in the Franchise Agreement are fair and reasonable and will not impose an undue hardship on the undersigned or Franchisee. Each of them has other considerable skills, abilities, opportunities, and experience in other matters and of a general nature enabling each of them to derive income that is satisfactory to them from other endeavors.

**\*Insert initials into the following blank to confirm this statement:** ___

19.     There is no fiduciary or confidential relationship between us and the undersigned or between us and Franchisee.  Each of the undersigned expects us to deal, and will act as if we are dealing, with it, him, or her at arm's length and in our own best interests.

**\*Insert initials into the following blank to confirm this statement:  ___**

20.     We have advised the undersigned and Franchisee to consult with their own advisors on the legal, financial, and other aspects of the Development Rights Agreement, the Franchise Agreement, this document, the Gym, any lease or sublease for the premises, and the business contemplated.  Each of the undersigned has either consulted with such advisors or deliberately declined to do so.

**\*Insert initials into the following blank to confirm this statement:  ___**

21.     Neither we nor any employee of ours has provided the undersigned or Franchisee with services or advice that is legal, accounting, or other professional services or advice.

**\*Insert initials into the following blank to confirm this statement:  ___**

22.     The statements made in this document supplement and are cumulative to statements, warranties, and representations made in other documents, such as the Development Rights Agreement and Franchise Agreement.  The statements made in this document, the Development Rights Agreement, or the Franchise Agreement are made separately and independently.  They are not intended to be, and will not be, construed as modifying or limiting each other.

**\*Insert initials into the following blank to confirm this statement:  ___**

23.     Each of the undersigned understands that, in the franchise relationship, we and Franchisee will be independent contractors.  Nothing is intended to make either Franchisee or us a general or special agent, joint venturer, partner, or employee of the other for any purpose.  We will not exercise direct or indirect control over the Gym's personnel except to the extent any indirect control is related to our legitimate interest in protecting the quality of our brand, products, or services.  We will not share or codetermine the terms and conditions of employment of Gym employees or affect matters relating to the employment relationship between Franchisee and the Gym's employees, such as employee selection, promotion, termination, hours worked, rates of pay, other benefits, work assigned, discipline, adjustment of grievances and complaints, and working conditions.  We will not be the employer or joint employer of the Gym's employees.

**\*Insert initials into the following blank to confirm this statement:  ___**

24.     The President of the United States of America has issued Executive Order 13224 (the "Executive Order") prohibiting transactions with terrorists and terrorist organizations, and the United States government has adopted, and in the future may adopt, other anti-terrorism measures (the "Anti-Terrorism Measures").  We therefore require certain certifications that the parties with whom we deal are not directly or indirectly involved in terrorism.  For that reason, the undersigned and Franchisee hereby certify that neither they nor any of their employees, agents, or representatives, nor any other person or entity associated with Franchisee, is:  (a) a

person or entity listed in the Annex to the Executive Order; (b) a person or entity otherwise determined by the Executive Order to have committed acts of terrorism or to pose a significant risk of committing acts of terrorism; (c) a person or entity who assists, sponsors, or supports terrorists or acts of terrorism; or (d) owned or controlled by terrorists or sponsors of terrorism. The undersigned and Franchisee further covenant that neither they nor any other person or entity associated with them will during the term of the Franchise Agreement become a person or entity described above or otherwise become a target of any Anti-Terrorism Measure.

**\*Insert initials into the following blank to confirm this statement:  ___**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**<u>The following language applies only to transactions governed by the Maryland Franchise Registration and Disclosure Law</u>**

The representations above are not intended to nor shall they act as a release, estoppel, or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**FRANCHISEE:**

**[Name]**

By:  _____
              **Signature**

Print Name:  _____
Title:  _____
Date:  _____, 20__


**Owners and executives of the Franchisee legal entity must sign below in their individual capacities**


_____
              **Signature**
Print Name:  _____
Date:  _____, 20__


_____
              **Signature**
Print Name:  _____
Date:  _____, 20__

## **EXHIBIT H**

## **FORM OF GENERAL RELEASE**

BLINK FITNESS - 2016 AMENDED FDD
EAST\137554766.2

**BLINK FITNESS FRANCHISING, INC.**

**GRANT OF FRANCHISOR CONSENT AND FRANCHISEE RELEASE**

Blink Fitness Franchising, Inc. ("we," "us," or "our") and the undersigned franchisee, _____ *[insert name of franchisee entity]* ("you" or "your"), currently are parties to a Unit Franchise Agreement dated _____ (the "Franchise Agreement") for the operation of a Blink Fitness Gym at _____. You have asked us to _____ *[insert relevant detail]*. We currently have no obligation under your Franchise Agreement or otherwise to _____ *[repeat relevant detail]*, or we have the right under the Franchise Agreement to condition our approval on your and your owners signing a release of claims. We are willing to _____ *[repeat relevant detail]* if you and your owners give us the release and covenant not to sue provided below in this document. You and your owners are willing to give us the release and covenant not to sue provided below in consideration for our willingness to _____ *[repeat relevant detail]*.

Consistent with the previous introduction, you, on your own behalf and on behalf of your successors, heirs, executors, administrators, personal representatives, agents, assigns, partners, owners, principals, directors, officers, principals, employees, and affiliated entities (collectively, the "Releasing Parties"), hereby forever release and discharge us and our parent and other affiliated entities, and our and their respective current and former officers, directors, owners, principals, employees, agents, representatives, successors, and assigns (collectively, the "Blink Parties") from any and all claims, damages, demands, causes of action, suits, duties, liabilities, and agreements of any nature and kind, whether known or unknown and whether vested or contingent (collectively, "Claims"), that you and any of the other Releasing Parties now have, ever had, or, but for this document, hereafter would or could have against any of the Blink Parties (1) arising out of or related to the Blink Parties' performance of their obligations under the Franchise Agreement before the date of your signature below, (2) arising out of or related to our offer and grant to you of your Blink Fitness Gym franchise, and (3) otherwise arising out of or related to your and the other Releasing Parties' relationship, from the beginning of time to the date of your signature below, with any of the Blink Parties. You, on your own behalf and on behalf of the other Releasing Parties, further covenant not to sue any of the Blink Parties on any of the Claims released by this paragraph and represent that you have not assigned any of the Claims released by this paragraph to any individual or entity who is not bound by this paragraph.

We also are entitled to a release and covenant not to sue from your owners. By his, her, or their separate signatures below, your owners likewise grant to us the release and covenant not to sue provided above.

***************************

**The following language applies only to transactions with California franchisees**

**Each of the parties acknowledges a familiarity with Section 1542 of the Civil Code of the State of California, which provides as follows:**

"**A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release which, if known by him, must have materially affected the settlement with the debtor.**"

**Each of the parties hereto recognizes that he, she, or it may have some claim, demand, or cause of action against the other parties of which he, she, or it is unaware and unsuspecting, and which he, she, or it is giving up by signing this Amendment. Each of the parties hereby waives and relinquishes every right or benefit which he, she, or it has under Section 1542 of the Civil Code of the State of California, and any similar statute under any other state or federal law, to the fullest extent that such right or benefit may lawfully be waived.**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**<u>The following language applies only to transactions governed by the Maryland Franchise Registration and Disclosure Law</u>**

The release provided above will not apply to the extent prohibited by the Maryland Franchise Registration and Disclosure Law.  You may commence a lawsuit against us in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law that are not released.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**BLINK FITNESS FRANCHISING, INC.**

                *[Name of Franchisee]*

By:_____   By:_____

  Title:_____     Title:_____

  Date:_____     Date:_____

                _____
                [Name of Owner]

                _____
                [Signature and Date]

2

## EXHIBIT I

## DEVELOPMENT INCENTIVE ADDENDUM TO UNIT FRANCHISE AGREEMENT

BLINK FITNESS - 2016 AMENDED FDD
EAST\137554766.2

**BLINK FITNESS FRANCHISING, INC.**
**DEVELOPMENT INCENTIVE ADDENDUM TO UNIT FRANCHISE AGREEMENT**

**THIS DEVELOPMENT INCENTIVE ADDENDUM TO UNIT FRANCHISE AGREEMENT** (this "**Addendum**") is entered into by and between **BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation ("**we**," "**us**," or "**our**"), and _____, a(n) _____ ("**you**" or "**your**").

    **1.**   **Background**. Simultaneously with signing this Addendum, we and you are signing that certain Unit Franchise Agreement for the right to develop and operate a Blink Fitness Gym (the "**Franchise Agreement**"). We and you wish to make certain additions and modifications to the Franchise Agreement to reflect certain incentives we have offered you under an incentive program for new development. This Addendum shall be annexed to and form a part of the Franchise Agreement, and all initial capitalized terms used but not defined in this Addendum have the meanings given to those terms in the Franchise Agreement.

    **2.**   **Initial Franchise Fee**. Section 5.A of the Franchise Agreement is deleted in its entirety. You have no obligation to pay us an initial franchise fee.

    **3.**   **Royalty**. The following is added at the end of the first paragraph of Section 5.B of the Franchise Agreement:

> Notwithstanding the foregoing, if you signed a Development Rights Agreement with us granting you the right to develop and operate three (3) Blink Fitness Gyms within a certain geographic area over a certain period of time, then we will reduce the Royalty payable under this Agreement, in the following manner, for the Gym if it opens for business on or before the specific opening deadline for the Gym listed on the mandatory development schedule identified on Exhibit A to the Development Rights Agreement: (1) two percent (2%) of the Gross Sales of the Gym for the first full twelve (12) months of the Term during which you operate the Gym; and (2) three percent (3%) of the Gross Sales of the Gym for the second full twelve (12) months of the Term during which you operate the Gym. The five percent (5%) Royalty will apply during the balance of the Term.

> If you signed a Development Rights Agreement with us granting you the right to develop and operate five (5) or more Blink Fitness Gyms within a certain geographic area over a certain period of time, then we will reduce the Royalty payable under this Agreement, in the following manner, for the Gym if it opens for business on or before the specific opening deadline for the Gym listed on the mandatory development schedule identified on Exhibit A to the Development Rights Agreement: (1) you will pay no Royalty for the first full twelve (12) months of the Term during which you operate the Gym; and (2) we will reduce the Royalty payable under this Agreement to (i) two percent (2%) of the Gross Sales of the Gym for the second full twelve (12) months of the Term during which you operate the Gym, (ii) three percent (3%) of the Gross Sales of the Gym for the third full twelve (12) months of the Term during which you operate the Gym, and (iii) four percent (4%) of the Gross Sales of the Gym for the fourth full

twelve (12) months of the Term during which you operate the Gym.  The five percent (5%) Royalty will apply during the balance of the Term.

For the avoidance of doubt, we will not reduce the Royalty payable under this Section if you fail to open the Gym for business on or before the opening deadline listed on the mandatory development schedule identified on Exhibit A to the Development Rights Agreement.

4.    **Brand Fund**.  Notwithstanding anything to the contrary in Sections 13.B and 13.D of the Franchise Agreement, if we have begun collecting Brand Fund contributions as of the date on which the Gym opens to the public for business under the Marks (or if we begin collecting Brand Fund contributions during the first full twelve (12) months of the Term during which you operate the Gym), then for the first full twelve (12) months of the Term during which you operate the Gym (or the balance of those first full twelve (12) months if we begin collecting Brand Fund contributions during the first full twelve (12) months), you may spend the two percent (2%) of Gross Sales that we otherwise would require you to contribute to the Brand Fund on local marketing, advertising, and promotional programs for the Gym, meaning that during the first full twelve (12) months of the Term during which you operate the Gym (or the balance of those first full twelve (12) months, as noted above), the Local Marketing Spending Requirement would be seven percent (7%) of the Gym's Gross Sales (rather than five percent (5%)).

**IN WITNESS WHEREOF**, the parties have executed and delivered this Addendum as of the dates below, to be effective on the Effective Date stated in the Franchise Agreement.

**BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation

**FRANCHISEE**

**(IF CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP)**:

By:_____

      Title:_____

      Date:_____, 201_

_____

[Name]

By:_____

      Title:_____

      Date:_____, 201_

**(IF INDIVIDUALS)**:

_____
[Signature / Date]

_____
[Print Name]

_____
[Signature / Date]

_____
[Print Name]

## **EXHIBIT J**

**STATE-SPECIFIC ADDITIONAL DISCLOSURES AND AGREEMENT RIDERS**

BLINK FITNESS - 2016 AMENDED FDD
EAST\137554766.2

**ADDITIONAL DISCLOSURES FOR THE**
**FRANCHISE DISCLOSURE DOCUMENT OF**
**BLINK FITNESS FRANCHISING, INC.**

The following are additional disclosures for the Franchise Disclosure Document of BLINK FITNESS FRANCHISING, INC. required by various state franchise laws. Each provision of these additional disclosures will not apply unless, with respect to that provision, the jurisdictional requirements of the applicable state franchise registration and disclosure law are met independently without reference to these additional disclosures.

<u>**CALIFORNIA**</u>

1.     THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE DISCLOSURE DOCUMENT.

2.     SECTION 31125 OF THE FRANCHISE INVESTMENT LAW REQUIRES US TO GIVE YOU A DISCLOSURE DOCUMENT APPROVED BY THE COMMISSIONER OF BUSINESS OVERSIGHT BEFORE WE ASK YOU TO CONSIDER A MATERIAL MODIFICATION OF YOUR FRANCHISE AGREEMENT.

3.     OUR WEBSITE, www.blinkfitness.com, HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT. ANY COMPLAINTS CONCERNING THE CONTENT OF THE WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT AT www.dbo.ca.gov.

4.     The following is added at the end of Item 3:

Neither we, nor any person in Item 2 of the disclosure document, is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities Exchange Act of 1934, 15 U.S.C.A. Sections 78a et seq., suspending or expelling such person from membership in that association or exchange.

5.     The following paragraphs are added at the end of Item 17:

California Business and Professions Code Sections 20000 through 20043 provide rights to franchisees concerning termination or non-renewal of a franchise. If the Franchise Agreement contains a provision that is inconsistent with the law, and the law applies, then the law will control.

The Franchise Agreement contains a covenant not to compete that extends beyond termination of the franchise. This provision might not be enforceable under California law.

The Franchise Agreement provides for termination upon insolvency. This provision might not be enforceable under federal bankruptcy law (11 U.S.C.A. Sections 101 et seq.).

The Franchise Agreement requires application of the laws of the State of New York. This provision might not be enforceable under California law.

The Franchise Agreement requires binding arbitration at a suitable location chosen by the arbitrator that is within ten (10) miles of where we have our principal business address at the time the arbitration demand is filed (currently New York, New York). You will be required to travel to that location and pay the expenses you incur in any such arbitration proceeding. Prospective franchisees are encouraged to consult private legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code Section 20040.5, Code of Civil Procedure Section 1281, and the Federal Arbitration Act) to any provisions of the Franchise Agreement restricting venue to a forum outside the State of California.

You must sign a general release of claims if you renew or transfer the franchise. California Corporations Code Section 31512 provides that any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of that law or any rule or order thereunder is void. Section 31512 might void a waiver of your rights under the Franchise Investment Law (California Corporations Code Sections 31000 – 31516). Business and Professions Code Section 20010 might void a waiver of your rights under the Franchise Relations Act (Business and Professions Code Sections 20000 – 20043).

## ILLINOIS

1.      The "Summary" section of Item 17(v), entitled Choice of forum, is deleted and replaced with the following:

Subject to mediation and arbitration requirements, litigation generally must be in courts located in Illinois.

2.      The "Summary" section of Item 17(w), entitled Choice of law, is deleted and replaced with the following:

Except for Federal Arbitration Act and other federal law, Illinois law governs.

## MARYLAND

1.      The following is added to the end of the "Summary" sections of Item 17(c), entitled Requirements for franchisee to renew or extend, and Item 17(m), entitled Conditions for franchisor approval of transfer:

Any release required as a condition of renewal and/or assignment/transfer will not apply to claims or liability arising under the Maryland Franchise Registration and Disclosure Law.

2.      The following is added to the end of the "Summary" section of Item 17(h), entitled <u>"Cause" defined – non-curable defaults</u>:

The Franchise Agreement provides for termination upon insolvency.  This provision might not be enforceable under federal bankruptcy law (11 U.S.C. Sections 101 <u>et seq.</u>), but we will enforce it to the extent enforceable.

3.      The following sentence is added to the end of the "Summary" section of Item 17(v), entitled <u>Choice of forum</u>:

Subject to mediation and arbitration requirements, you may bring suit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

4.      The "Summary" section of Item 17(w), entitled <u>Choice of law</u>, is amended to read as follows:

Except for Federal Arbitration Act and other federal law, and except as otherwise required by the Maryland Franchise Registration and Disclosure Law, New York law applies.

5.      The following language is added to the end of the chart in Item 17:

You must bring any claims arising under the Maryland Franchise Registration and Disclosure Law within 3 years after the grant of the franchise.

## <u>MINNESOTA</u>

1.      The following sentence is added to the "Remarks" column of the "Administrative fee" line item in Item 6:

With respect to franchises governed by Minnesota law, we will comply with Minn. Stat. Sec. 604.113, which puts a cap of $30 on an NSF check.

2.      The following paragraphs are added at the end of the chart in Item 17:

With respect to franchises governed by Minnesota law, we will comply with Minn. Stat. Sec. 80C.14, Subds. 3, 4 and 5 which require, except in certain specified cases, that you be given 90 days' notice of termination (with 60 days to cure) of the Franchise Agreement and 180 days' notice for non-renewal of the Franchise Agreement.

Minn. Stat. Sec. 80C.21 and Minn. Rule 2860.4400J might prohibit us from requiring litigation to be conducted outside Minnesota, requiring waiver of a jury trial or requiring you to consent to liquidated damages, termination penalties or judgment notes.  In addition, nothing in the disclosure document, Development Rights Agreement or Franchise Agreement can abrogate or reduce any of your rights as provided for in Minnesota Statutes 1984, Chapter 80C, or your rights to any procedure, forum or remedies provided for by the laws of the jurisdiction. Those provisions also provide that no condition, stipulation or provision in the Development Rights Agreement or Franchise Agreement will in any way abrogate or reduce any of your rights under the Minnesota Franchises Law, including, if applicable, the right to submit matters to the jurisdiction of the courts of Minnesota.

Any release required as a condition of renewal, sale and/or transfer/assignment will not apply to the extent prohibited by applicable law with respect to claims arising under Minn. Rule 2860.4400D.

## <u>NEW YORK</u>

1.      The following information is added to the cover page of the disclosure document:

INFORMATION COMPARING FRANCHISORS IS AVAILABLE.  CALL THE STATE ADMINISTRATORS LISTED IN EXHIBIT F OR YOUR PUBLIC LIBRARY FOR SOURCES OF INFORMATION.  REGISTRATION OF THIS FRANCHISE BY NEW YORK STATE DOES NOT MEAN THAT NEW YORK STATE RECOMMENDS IT OR HAS VERIFIED THE INFORMATION IN THIS DISCLOSURE DOCUMENT.  IF YOU LEARN THAT ANYTHING IN THE DISCLOSURE DOCUMENT IS UNTRUE, CONTACT THE FEDERAL TRADE COMMISSION AND NEW YORK STATE DEPARTMENT OF LAW, INVESTMENT PROTECTION BUREAU, 120 BROADWAY, 23RD FLOOR, NEW YORK, NEW YORK 10271.

THE FRANCHISOR MAY, IF IT CHOOSES, NEGOTIATE WITH YOU ABOUT ITEMS COVERED IN THIS DISCLOSURE DOCUMENT. HOWEVER, THE FRANCHISOR CANNOT USE THE NEGOTIATING PROCESS TO PREVAIL UPON A PROSPECTIVE FRANCHISEE TO ACCEPT TERMS WHICH ARE LESS FAVORABLE THAN THOSE SET FORTH IN THIS DISCLOSURE DOCUMENT.

2.      The following is added at the end of Item 3:

Neither the franchisor, its predecessor, a person identified in Item 2, or an affiliate offering franchises under the franchisor's principal trademark:

A.      Has an administrative, criminal or civil action pending against that person alleging: a felony, a violation of a franchise, antitrust or securities law, fraud, embezzlement, fraudulent conversion, misappropriation of property,

unfair or deceptive practices; or comparable civil or misdemeanor allegations, or any pending actions, other than routine litigation incidental to the business, which are significant in the context of the number of franchisees and the size, nature or financial condition of the franchise system or its business operations.

B.     Has been convicted of a felony or pleaded nolo contendere to a felony charge or, within the 10-year period immediately preceding the application for registration, has been convicted of a or pleaded nolo contendere to a misdemeanor charge or has been the subject of a civil action alleging: violation of a franchise, antifraud or securities law, fraud, embezzlement, fraudulent conversion or misappropriation of property, or unfair or deceptive practices; or comparable allegations.

C.     Is subject to a currently effective injunctive or restrictive order or decree relating to the franchise, or under a Federal, State or Canadian franchise, securities, antitrust, trade regulation or trade practice law, resulting from a concluded or pending action or proceeding brought by a public agency, or is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities and Exchange Act of 1934, suspending or expelling such person from membership in such association or exchange; or is subject to a currently effective injunctive or restrictive order relating to any other business activity as a result of an action brought by a public agency or department, including, without limitation, actions affecting a license as a real estate broker or sales agent.

3.     The following is added to the end of Item 4:

Neither the franchisor, its affiliate, its predecessor, officers, or general partner during the 10-year period immediately before the date of the offering circular:

(a)     filed as debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code;

(b)     obtained a discharge of its debts under the bankruptcy code; or

(c)     was a principal officer of a company or a general partner in a partnership that either filed as a debtor (or had filed against it) a petition to start an action under the U.S. Bankruptcy Code or that obtained a discharge of its debts under the U.S. Bankruptcy Code during or within 1 year after the officer or general partner of the franchisor held this position in the company or partnership.

4.      The following is added to the end of Item 5:

The initial franchise fee constitutes part of our general operating funds and will be used as such in our discretion.

5.      The following is added to the end of the "Summary" sections of Item 17(c), entitled <u>Requirements for franchisee to renew or extend</u>, and Item 17(m), entitled <u>Conditions for franchisor approval of transfer</u>:

However, to the extent required by Article 33 of the General Business Law of the State of New York, all rights you enjoy and any causes of action arising in your favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of General Business Law Sections 687.4 and 687.5 be satisfied.

6.      The following is added to the end of the "Summary" section of Item 17(d), entitled <u>Termination by franchisee</u>:

You also may terminate the Franchise Agreement on any grounds available by law.

7.      The following is added to the end of the "Summary" section of Item 17(j), entitled <u>Assignment of contract by franchisor</u>:

However, no assignment will be made except to an assignee who, in our good faith judgment, is willing and able to assume our obligations under the Franchise Agreement.

8.      The following is added to the end of the "Summary" section of Item 17(s), entitled <u>Modification of the agreement</u>:

Modifications to the Operations Manual will not unreasonably affect your obligations, including economic requirements, under the Franchise Agreement.

## **RHODE ISLAND**

1.      The following language is added to the end of the "Summary" section of Item 17(v), entitled <u>Choice of forum</u>:

Subject to mediation and arbitration requirements, litigation generally must be where we have our principal business address at the time the action is commenced (it currently is in New York, New York), except that, to the extent required by the Rhode Island Franchise Investment Act, you may bring an action in Rhode Island.

2.	The following language is added to the end of the "Summary" section of Item 17(w), entitled <u>Choice of law</u>:

Except for Federal Arbitration Act and other federal law, and except as otherwise required by the Rhode Island Franchise Investment Act, New York law applies.

## VIRGINIA

1.	The following risk factor is added to the state cover page of the disclosure document:

We were formed on August 13, 2014 and have a brief operating history.  You may want to consider this when making a decision to purchase this franchise opportunity.

2.	The following is added to the end of the "Summary" section of Item 17(h), entitled <u>"Cause" defined – non-curable defaults</u>:

Pursuant to Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a franchisor to cancel a franchise without reasonable cause.  If any grounds for default or termination stated in the Franchise Agreement do not constitute "reasonable cause," as that term may be defined in the Virginia Retail Franchising Act or the laws of Virginia, that provision may not be enforceable.

## WASHINGTON

1.	The following paragraph is added at the end of Item 17:

If any of the provisions in this disclosure document, Franchise Agreement, or Development Rights Agreement are inconsistent with the relationship provisions of Revised Code of Washington Section 19.100.180 or any other requirements of the Washington Franchise Investment Protection Act (the "Act"), the provisions of the Act will prevail over the inconsistent terms of the disclosure document, Franchise Agreement, or Development Rights Agreement.

**THE FOLLOWING PAGES IN THIS EXHIBIT ARE
STATE-SPECIFIC RIDERS TO THE
FRANCHISE AGREEMENT**

**RIDER TO THE BLINK FITNESS FRANCHISING, INC.**
**UNIT FRANCHISE AGREEMENT**
**FOR USE IN ILLINOIS**

**THIS RIDER** is made and entered into by and between **BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation whose principal business address is 386 Park Avenue South, 11th Floor, New York, New York 10016 ("we," "us," or "our"), and _____, a _____ ("you" or "your").

1. **BACKGROUND**. We and you are parties to that certain Unit Franchise Agreement dated _____, 20___ (the "Franchise Agreement"). This Rider is annexed to and forms part of the Franchise Agreement. This Rider is being signed because (a) any of the offering or sales activity relating to the Franchise Agreement occurred in Illinois <u>and</u> the Blink Fitness Gym that you will operate under the Franchise Agreement will be located in Illinois, and/or (b) you are a resident of Illinois.

2. **GOVERNING LAW**. The following language is added to the end of Section 21.H of the Franchise Agreement:

> However, Illinois law will apply to claims arising under the Illinois Franchise Disclosure Act.

3. **CONSENT TO JURISDICTION**. Section 21.I of the Franchise Agreement is deleted in its entirety.

4. **WAIVER OF PUNITIVE DAMAGES AND JURY TRIAL**. The following language is added to the end of Sections 21.J and 21.K of the Franchise Agreement:

> HOWEVER, THIS WAIVER SHALL NOT APPLY TO THE EXTENT PROHIBITED BY SECTION 705/41 OF THE ILLINOIS FRANCHISE DISCLOSURE ACT OF 1987 OR ILLINOIS REGULATIONS AT SECTION 260.609.

5. **LIMITATION OF CLAIMS**. The following language is added to the end of Section 21.N of the Franchise Agreement:

> However, nothing in this Section shall shorten any period within which you may bring a claim under Section 705/27 of the Illinois Franchise Disclosure Act or constitute a condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of the Illinois Franchise Disclosure Act of 1987 or any other Illinois law (as long as the jurisdictional requirements of that Illinois law are met).

6.    **ILLINOIS FRANCHISE DISCLOSURE ACT**.  The following language is added as a new Section 25 of the Franchise Agreement:

25.  **WAIVERS VOID**

Nothing in this Agreement shall constitute a condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of the Illinois Franchise Disclosure Act of 1987 or any other Illinois law (as long as the jurisdictional requirements of that Illinois law are met).

**IN WITNESS WHEREOF**, the parties have executed and delivered this Rider to be effective as of the Effective Date of the Franchise Agreement.

**BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation

**FRANCHISEE**

**(IF CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP)**:

By:_____

   Title:_____

_____

[Name]

By:_____

   Title:_____

**(IF INDIVIDUALS)**:

_____

[Signature]

_____

[Print Name]

_____

[Signature]

_____

[Print Name]

## RIDER TO THE BLINK FITNESS FRANCHISING, INC.
## UNIT FRANCHISE AGREEMENT
## FOR USE IN MARYLAND

**THIS RIDER** is made and entered into by and between **BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation whose principal business address is 386 Park Avenue South, 11th Floor, New York, New York 10016 ("we," "us," or "our"), and _____, a _____ ("you" or "your").

1.      **BACKGROUND**.  We and you are parties to that certain Unit Franchise Agreement dated _____, 20___ (the "Franchise Agreement").  This Rider is annexed to and forms part of the Franchise Agreement.  This Rider is being signed because (a) you are a resident of Maryland, and/or (b) the Blink Fitness Gym that you will operate under the Franchise Agreement will be located in Maryland.

2.      **RELEASES**.  The following is added to the end of Sections 4.A, 16.C(ii)(h), 17, and 19.F(iii) of the Franchise Agreement:

However, such general release will not apply to claims arising under the Maryland Franchise Registration and Disclosure Law.

3.      **INSOLVENCY**.  The following sentence is added to the end of Sections 16.B and 18.B(xvii) of the Franchise Agreement:

This Section may not be enforceable under federal bankruptcy law (11 U.S.C. Sections 101 et seq.), but we will enforce it to the extent enforceable.

4.      **GOVERNING LAW**.   The following sentence is added to the end of Section 21.H of the Franchise Agreement:

However, Maryland law will apply to claims arising under the Maryland Franchise Registration and Disclosure Law.

5.      **CONSENT TO JURISDICTION**.  The following sentence is added to the end of Section 21.I of the Franchise Agreement:

However, subject to your arbitration obligations, you may bring an action in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

6.      **<u>LIMITATION OF CLAIMS</u>**.  The following sentence is added to the end of Section 21.N of the Franchise Agreement:

However, you must bring any claims arising under the Maryland Franchise Registration and Disclosure Law within three (3) years after we grant you the franchise.

7.      **<u>ACKNOWLEDGMENTS</u>**.  The following is added as a new Section 21.Q of the Franchise Agreement:

### Q.  ACKNOWLEDGMENTS

All representations requiring you to assent to a release, estoppel or waiver of liability are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the parties have executed and delivered this Rider to be effective as of the Effective Date of the Franchise Agreement.

**BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation

**FRANCHISEE**

**(IF CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP)**:

By:_____

    Title:_____

_____

[Name]

By:_____

    Title:_____

**(IF INDIVIDUALS)**:

_____

[Signature]

_____

[Print Name]

_____

[Signature]

_____

[Print Name]

**RIDER TO THE BLINK FITNESS FRANCHISING, INC.**
**UNIT FRANCHISE AGREEMENT**
**FOR USE IN MINNESOTA**

**THIS RIDER** is made and entered into by and between **BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation whose principal business address is 386 Park Avenue South, 11th Floor, New York, New York 10016 ("we," "us," or "our"), and _____, a _____ ("you" or "your").

1.    **BACKGROUND**.    We and you are parties to that certain Unit Franchise Agreement dated _____, 20___ (the "Franchise Agreement"). This Rider is annexed to and forms part of the Franchise Agreement. This Rider is being signed because (a) the Blink Fitness Gym that you will operate under the Franchise Agreement will be located in Minnesota; and/or (b) any of the offering or sales activity relating to the Franchise Agreement occurred in Minnesota.

2.    **RELEASES**.    The following language is added to the end of Sections 4.A, 16.C(ii)(h), 17, and 19.F(iii) of the Franchise Agreement:

However, any release required as a condition of renewal, sale and/or assignment/transfer will not apply to the extent prohibited by the Minnesota Franchises Law with respect to claims arising under Minn. Rule 2860.4400D.

3.    **RENEWAL AND TERMINATION**.    The following language is added to the end of Section 18.B of the Franchise Agreement:

However, with respect to franchises governed by Minnesota law, we will comply with Minn. Stat. Sec. 80C.14, Subds. 3, 4 and 5 which require, except in certain specified cases, that you be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice of non-renewal of this Agreement.

4.    **INJUNCTIVE RELIEF**.    The first sentence of the last paragraph of Section 21.F of the Franchise Agreement is deleted and replaced with the following:

Notwithstanding anything to the contrary contained in this Section or in Section 21.G, we and you have the right to seek temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction.

The introductory clause of the first sentence of Section 21.G of the Franchise Agreement is deleted and replaced with the following:

Subject to the parties' right to seek temporary restraining orders and temporary or preliminary injunctive relief pursuant to Section 21.F,

4.    **GOVERNING LAW**.    The following language is added to the end of Section 21.H of the Franchise Agreement:

Nothing in this Agreement will abrogate or reduce any of your rights under Minnesota Statutes Chapter 80C or your right to any procedure, forum or remedies that the laws of the jurisdiction provide.

5. **CONSENT TO JURISDICTION**.  The following language is added to the end of Section 21.I of the Franchise Agreement:

Notwithstanding the foregoing, Minn. Stat. Sec. 80C.21 and Minn. Rule 2860.4400J prohibit us, except in certain specified cases, from requiring litigation to be conducted outside of Minnesota.  Nothing in this Agreement will abrogate or reduce any of your rights under Minnesota Statutes Chapter 80C or your rights to any procedure, forum or remedies that the laws of the jurisdiction provide.

6. **WAIVER OF PUNITIVE DAMAGES AND JURY TRIAL**.  If and then only to the extent required by the Minnesota Franchises Law, Sections 21.J and 21.K of the Franchise Agreement are deleted in their entirety.

7. **LIMITATION OF CLAIMS**.  The following sentence is added to the end of Section 21.N of the Franchise Agreement:

Minnesota law provides that no action may be commenced under Minn. Stat. Sec. 80C.17 more than three (3) years after the cause of action accrues.

**IN WITNESS WHEREOF**, the parties have executed and delivered this Rider to be effective as of the Effective Date of the Franchise Agreement.

**BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation

**FRANCHISEE**

**(IF CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP)**:

By:_____

Title:_____

_____

[Name]

By:_____

Title:_____

**(IF INDIVIDUALS)**:

_____
[Signature]

_____
[Print Name]

_____
[Signature]

_____
[Print Name]

## RIDER TO THE BLINK FITNESS FRANCHISING, INC.
## UNIT FRANCHISE AGREEMENT
## STATE OF NEW YORK

**THIS RIDER** is made and entered into by and between **BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation whose principal business address is 386 Park Avenue South, 11th Floor, New York, New York 10016 ("we," "us," or "our"), and _____, a _____ ("you" or "your").

1.    **BACKGROUND**.    We and you are parties to that certain Unit Franchise Agreement dated _____, (the "Franchise Agreement").    This Rider is being signed because (a) you are a resident of the State of New York <u>and</u> the Blink Fitness Gym that you will operate under the Franchise Agreement will be located in New York, and/or (b) any of the offering or sales activity relating to the Franchise Agreement occurred in New York.

2.    **RELEASES**.  The following is added to the end of Sections 4.A, 16.C(ii)(h), 17, and 19.F(iii) of the Franchise Agreement:

Notwithstanding the foregoing, all rights you enjoy and any causes of action arising in your favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of the proviso that the non-waiver provisions of GBL 687 and 687.5 be satisfied.

3.    **TRANSFER BY US**.    The following language is added to the end of Section 16.A of the Franchise Agreement:

However, to the extent required by applicable law, no transfer will be made except to an assignee who, in our good faith judgment, is willing and able to assume our obligations under this Agreement.

4.    **TERMINATION BY YOU**.  The following language is added to the end of Section 18.A of the Franchise Agreement:

You also may terminate this Agreement on any grounds available by law under the provisions of Article 33 of the General Business Law of the State of New York.

5.    **APPLICATION OF RIDER**.    There are circumstances in which an offering made by us would not fall within the scope of the New York General Business Law, Article 33, such as when the offer and acceptance occurred outside the State of New York.  However, an offer or sale is deemed to be made in New York if you are domiciled in and the franchise will be opened in New York.  We are required to furnish a New York prospectus to every prospective franchisee who is protected under the New York General Business Law, Article 33.

        **IN WITNESS WHEREOF**, the parties have executed and delivered this Rider to be effective as of the Effective Date of the Franchise Agreement.

**BLINK FITNESS FRANCHISING,**
**INC.**, a Delaware corporation


**FRANCHISEE**

**(IF CORPORATION, LIMITED**
**LIABILITY COMPANY OR**
**PARTNERSHIP)**:

By:_____

Title:_____

_____
[Name]


By:_____

    Title:_____

**(IF INDIVIDUALS)**:


_____
[Signature]

_____
[Print Name]


_____
[Signature]

_____
[Print Name]

**RIDER TO THE BLINK FITNESS FRANCHISING, INC.**
**UNIT FRANCHISE AGREEMENT**
**FOR USE IN RHODE ISLAND**

**THIS RIDER** is made and entered into by and between **BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation whose principal business address is 386 Park Avenue South, 11th Floor, New York, New York 10016 ("we," "us," or "our"), and _____, a _____ ("you" or "your").

1.    **BACKGROUND**.   We and you are parties to that certain Unit Franchise Agreement dated _____, 20____ (the "Franchise Agreement").   This Rider is annexed to and forms part of the Franchise Agreement.  This Rider is being signed because (a) you are a resident of Rhode Island <u>and</u> the Blink Fitness Gym that you will operate under the Franchise Agreement will be located in Rhode Island; and/or (b) any of the offering or sales activity relating to the Franchise Agreement occurred in Rhode Island.

2.    **GOVERNING LAW/CONSENT TO JURISDICTION**.   The following is added at the end of Sections 21.H and 21.I of the Franchise Agreement:

Section 19-28.1-14 of the Rhode Island Franchise Investment Act provides that "A provision in a franchise agreement restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under this Act."  To the extent required by applicable law, Rhode Island law will apply to claims arising under the Rhode Island Franchise Investment Act.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the parties have executed and delivered this Rider to be effective as of the Effective Date of the Franchise Agreement.

**BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation

**FRANCHISEE**

**(IF CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP)**:

By:_____

_____

Title:_____

[Name]

By:_____

Title:_____

**(IF INDIVIDUALS)**:

_____

[Signature]

_____

[Print Name]

_____

[Signature]

_____

[Print Name]

## RIDER TO THE BLINK FITNESS FRANCHISING, INC.
## UNIT FRANCHISE AGREEMENT
## FOR USE IN WASHINGTON

**THIS RIDER** is made and entered into by and between **BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation whose principal business address is 386 Park Avenue South, 11th Floor, New York, New York 10016 ("we," "us," or "our"), and _____, a _____ ("you" or "your").

1.    **BACKGROUND**.  We and you are parties to that certain Unit Franchise Agreement dated _____, 20____ (the "Franchise Agreement").  This Rider is annexed to and forms part of the Franchise Agreement.  This Rider is being signed because (a) you are domiciled in Washington; and/or (b) the Blink Fitness Gym that you will operate under the Franchise Agreement will be located or operated in Washington; and/or (c) any of the offering or sales activity relating to the Franchise Agreement occurred in Washington.

2.    **WASHINGTON LAW**.  The following paragraphs are added to the end of the Franchise Agreement:

In recognition of the requirements of the Washington Franchise Investment Protection Act (the "Act") and the rules and regulations promulgated thereunder, the Franchise Agreement shall be modified as follows:

The State of Washington has a statute, RCW 19.100.180, which might supersede this Agreement in your relationship with us, including the areas of termination and renewal of your franchise.  There might also be court decisions which supersede this Agreement in your relationship with us, including termination and renewal of your franchise.

In the event of a conflict of laws, to the extent required by the Act, the provisions of the Act, Chapter 19.100 RCW, shall prevail.

To the extent required by the Act, a release or waiver of rights executed by you shall not include rights under the Act, except when executed pursuant to a negotiated settlement after the Franchise Agreement is in effect and where the parties are represented by independent counsel.  Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, or rights or remedies under the Act, such as a right to a jury trial, might not be enforceable.

To the extent required by the Act, transfer fees are collectable to the extent that they reflect our reasonable estimate or actual costs in effecting a transfer.

In any arbitration involving a franchise purchased in Washington, the arbitration site shall be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration, or as determined by the arbitrator.

**IN WITNESS WHEREOF**, the parties have executed and delivered this Rider to be effective as of the Effective Date of the Franchise Agreement.

**BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation

**FRANCHISEE**

**(IF CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP)**:

By:_____

    Title:_____

_____
[Name]

By:_____

    Title:_____

**(IF INDIVIDUALS)**:

_____
[Signature]

_____
[Print Name]

_____
[Signature]

_____
[Print Name]

**THE FOLLOWING PAGES IN THIS EXHIBIT ARE
STATE-SPECIFIC RIDERS TO THE
DEVELOPMENT RIGHTS AGREEMENT**

**RIDER TO THE BLINK FITNESS FRANCHISING, INC.
DEVELOPMENT RIGHTS AGREEMENT
FOR USE IN ILLINOIS**

      **THIS RIDER** is made and entered into by and between **BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation whose principal business address is 386 Park Avenue South, 11th Floor, New York, New York 10016 ("we," "us," or "our"), and _____, a _____ ("you" or "your").

      1.    **BACKGROUND**.  We and you are parties to that certain Development Rights Agreement dated _____, 20___ (the "Development Rights Agreement") and that certain Unit Franchise Agreement dated _____, 20___ (the "Franchise Agreement").  This Rider is annexed to and forms part of the Development Rights Agreement.  This Rider is being signed because (a) any of the offering or sales activity relating to the Development Rights Agreement occurred in Illinois <u>and</u> the Area in which you will develop Blink Fitness Gyms will be located in Illinois, and/or (b) you are a resident of Illinois.

      2.    **GOVERNING LAW**.  The following language is added to the end of Section 21.H of the Franchise Agreement, as incorporated by reference in Section 10 of the Development Rights Agreement:

      However, Illinois law will apply to claims arising under the Illinois Franchise Disclosure Act.

      3.    **CONSENT TO JURISDICTION**.  Section 21.I of the Franchise Agreement, as incorporated by reference in Section 10 of the Development Rights Agreement, is deleted in its entirety.

      4.    **WAIVER OF PUNITIVE DAMAGES AND JURY TRIAL**.  The following language is added to the end of Sections 21.J and 21.K of the Franchise Agreement, as incorporated by reference in Section 10 of the Development Rights Agreement:

      HOWEVER, THIS WAIVER SHALL NOT APPLY TO THE EXTENT PROHIBITED BY SECTION 705/41 OF THE ILLINOIS FRANCHISE DISCLOSURE ACT OF 1987 OR ILLINOIS REGULATIONS AT SECTION 260.609.

      5.    **LIMITATION OF CLAIMS**.  The following language is added to the end of Section 21.N of the Franchise Agreement, as incorporated by reference in Section 10 of the Development Rights Agreement:

      However, nothing in this Section shall shorten any period within which you may bring a claim under Section 705/27 of the Illinois Franchise Disclosure Act or constitute a condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of the Illinois

Franchise Disclosure Act of 1987 or any other Illinois law (as long as the jurisdictional requirements of that Illinois law are met).

6.   **ILLINOIS FRANCHISE DISCLOSURE ACT**.   The following language is added as a new Section 11 of the Development Rights Agreement:

**11.**   **Waivers Void**.   Nothing in this Agreement shall constitute a condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of the Illinois Franchise Disclosure Act of 1987 or any other Illinois law (as long as the jurisdictional requirements of that Illinois law are met).

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the parties have executed and delivered this Rider to be effective as of the Effective Date of the Development Rights Agreement.

**BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation

**DEVELOPER**

**(IF CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP)**:

By:_____

    Title:_____

_____

[Name]

By:_____

    Title:_____

**(IF INDIVIDUALS)**:

_____

[Signature]

_____

[Print Name]

_____

[Signature]

_____

[Print Name]

**RIDER TO THE BLINK FITNESS FRANCHISING, INC.
DEVELOPMENT RIGHTS AGREEMENT
FOR USE IN MARYLAND**

    **THIS RIDER** is made and entered into by and between **BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation whose principal business address is 386 Park Avenue South, 11th Floor, New York, New York 10016 ("we," "us," or "our"), and _____, a _____ ("you" or "your").

    1.    **BACKGROUND**.  We and you are parties to that certain Development Rights Agreement dated _____, 20___ (the "Development Rights Agreement") and that certain Unit Franchise Agreement dated _____, 20___ (the "Franchise Agreement").  This Rider is annexed to and forms part of the Development Rights Agreement.  This Rider is being signed because (a) you are a resident of Maryland, and/or (b) the Area in which you will develop Blink Fitness Gyms will be located in Maryland.

    2.    **GOVERNING LAW**.  The following sentence is added to the end of Section 21.H of the Franchise Agreement, as incorporated by reference in Section 10 of the Development Rights Agreement:

    However, Maryland law will apply to claims arising under the Maryland Franchise Registration and Disclosure Law.

    3.    **CONSENT TO JURISDICTION**.  The following sentence is added to the end of Section 21.I of the Franchise Agreement, as incorporated by reference in Section 10 of the Development Rights Agreement:

    However, subject to your arbitration obligations, you may bring an action in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

    4.    **LIMITATION OF CLAIMS**.  The following sentence is added to the end of Section 21.N of the Franchise Agreement, as incorporated by reference in Section 10 of the Development Rights Agreement:

    However, you must bring any claims arising under the Maryland Franchise Registration and Disclosure Law within three (3) years after we grant you the franchise.

    5.    **ACKNOWLEDGMENTS**.  The following is added as a new Section 11 of the Development Rights Agreement:

    **11.**    **Acknowledgments**.  All representations requiring you to assent to a release, estoppel or waiver of liability are not intended to nor shall they act as a

release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

**IN WITNESS WHEREOF**, the parties have executed and delivered this Rider to be effective as of the Effective Date of the Development Rights Agreement.

**BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation

**DEVELOPER**

**(IF CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP)**:

By:_____

_____

Title:_____

[Name]

By:_____

Title:_____

**(IF INDIVIDUALS)**:

_____

[Signature]

_____

[Print Name]

_____

[Signature]

_____

[Print Name]

**RIDER TO THE BLINK FITNESS FRANCHISING, INC.
DEVELOPMENT RIGHTS AGREEMENT
FOR USE IN MINNESOTA**

**THIS RIDER** is made and entered into by and between **BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation whose principal business address is 386 Park Avenue South, 11th Floor, New York, New York 10016 ("we," "us," or "our"), and _____, a _____ ("you" or "your").

1. **BACKGROUND**. We and you are parties to that certain Development Rights Agreement dated _____, 20___ (the "Development Rights Agreement") and that certain Unit Franchise Agreement dated _____, 20___ (the "Franchise Agreement"). This Rider is annexed to and forms part of the Development Rights Agreement. This Rider is being signed because (a) the Area in which you will develop Blink Fitness Gyms under the Development Rights Agreement will be located in Minnesota; and/or (b) any of the offering or sales activity relating to the Development Rights Agreement occurred in Minnesota.

2. **GOVERNING LAW**. The following language is added to the end of Section 21.H of the Franchise Agreement, as incorporated by reference in Section 10 of the Development Rights Agreement:

> Nothing in this Agreement will abrogate or reduce any of your rights under Minnesota Statutes Chapter 80C or your right to any procedure, forum or remedies that the laws of the jurisdiction provide.

3. **CONSENT TO JURISDICTION**. The following language is added to the end of Section 21.I of the Franchise Agreement, as incorporated by reference in Section 10 of the Development Rights Agreement:

> Notwithstanding the foregoing, Minn. Stat. Sec. 80C.21 and Minn. Rule 2860.4400J prohibit us, except in certain specified cases, from requiring litigation to be conducted outside of Minnesota. Nothing in this Agreement will abrogate or reduce any of your rights under Minnesota Statutes Chapter 80C or your rights to any procedure, forum or remedies that the laws of the jurisdiction provide.

4. **WAIVER OF PUNITIVE DAMAGES AND JURY TRIAL**. If and then only to the extent required by the Minnesota Franchises Law, Sections 21.J and 21.K of the Franchise Agreement, as incorporated by reference in Section 10 of the Development Rights Agreement, are deleted in their entirety.

5. **LIMITATION OF CLAIMS**. The following sentence is added to the end of Section 21.N of the Franchise Agreement, as incorporated by reference in Section 10 of the Development Rights Agreement:

Minnesota law provides that no action may be commenced under Minn. Stat. Sec. 80C.17 more than three (3) years after the cause of action accrues.

**IN WITNESS WHEREOF**, the parties have executed and delivered this Rider to be effective as of the Effective Date of the Development Rights Agreement.

**BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation

**DEVELOPER**

**(IF CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP)**:

By:_____

_____

    Title:_____

[Name]

By:_____

    Title:_____

**(IF INDIVIDUALS)**:

_____

[Signature]

_____

[Print Name]

_____

[Signature]

_____

[Print Name]

## RIDER TO THE BLINK FITNESS FRANCHISING, INC.
## DEVELOPMENT RIGHTS AGREEMENT
## FOR USE IN RHODE ISLAND

**THIS RIDER** is made and entered into by and between **BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation whose principal business address is 386 Park Avenue South, 11th Floor, New York, New York 10016 ("we," "us," or "our"), and _____, a _____ ("you" or "your").

1.    **BACKGROUND**.  We and you are parties to that certain Development Rights Agreement dated _____, 20\_\_\_\_ (the "Development Rights Agreement") and that certain Unit Franchise Agreement dated _____, 20\_\_\_ (the "Franchise Agreement").   This Rider is annexed to and forms part of the Development Rights Agreement.  This Rider is being signed because (a) you are a resident of Rhode Island <u>and</u> the Area in which you will develop Blink Fitness Gyms will be located in Rhode Island; and/or (b) any of the offering or sales activity relating to the Development Rights Agreement occurred in Rhode Island.

2.    **GOVERNING LAW/CONSENT TO JURISDICTION**.    The following is added at the end of Sections 21.H and 21.I of the Franchise Agreement, as incorporated by reference in Section 10 of the Development Rights Agreement:

Section 19-28.1-14 of the Rhode Island Franchise Investment Act provides that "A provision in a franchise agreement restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under this Act."  To the extent required by applicable law, Rhode Island law will apply to claims arising under the Rhode Island Franchise Investment Act.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the parties have executed and delivered this Rider to be effective as of the Effective Date of the Development Rights Agreement.

**BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation

**DEVELOPER**

**(IF CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP)**:

By:_____

    Title:_____

_____

[Name]

By:_____

    Title:_____

**(IF INDIVIDUALS)**:

_____

[Signature]

_____

[Print Name]

_____

[Signature]

_____

[Print Name]

## <u>NEW YORK REPRESENTATIONS PAGE</u>

**FRANCHISOR REPRESENTS THAT THIS FRANCHISE DISCLOSURE DOCUMENT DOES NOT KNOWINGLY OMIT ANY MATERIAL FACT OR CONTAIN ANY UNTRUE STATEMENT OF A MATERIAL FACT.**

# RECEIPT

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language.  Read this disclosure document and all agreements carefully.

If Blink Fitness Franchising, Inc. offers you a franchise, it must provide this disclosure document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale.  New York and Rhode Island require us to give you this disclosure document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.  Michigan requires us to give you this disclosure document at least 10 business days before the execution of any binding franchise or other agreement or the payment of any consideration, whichever occurs first.

If Blink Fitness Franchising, Inc. does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the appropriate state agency identified on Exhibit F.

The franchisor is Blink Fitness Franchising, Inc., located at 386 Park Avenue South, 11th Floor, New York, New York 10016.  Its telephone number is 212-359-8780.

Issuance date:  March 2, 2016, as amended December 2, 2016

The franchise seller(s) for this offering are: Patricia Perry, Dos Condon, Marc Benathen, Todd Magazine, and _____ at Blink Fitness Franchising, Inc., 386 Park Avenue South, 11th Floor, New York, New York 10016.  The telephone number is 212-359-8780.

We authorize the respective state agents identified on Exhibit F to receive service of process for us in the particular states.

I received a disclosure document from Blink Fitness Franchising, Inc. dated as of March 2, 2016, as amended December 2, 2016, that included the following Exhibits:

A.       Financial Statements
B.       Franchise Agreement
C.       Development Rights Agreement
D.       Operations Manual Table of Contents
E.       List of Franchisees
F        List of State Agencies/Agents for Service of Process
G.       Franchisee Representations Document
H.       Form of General Release
I.        Development Incentive Addendum to Unit Franchise Agreement
J.       State-Specific Additional Disclosures and Agreement Riders

_____          Date: _____
Prospective Franchisee


_____
Print Name

## RECEIPT

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language.  Read this disclosure document and all agreements carefully.

If Blink Fitness Franchising, Inc. offers you a franchise, it must provide this disclosure document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale.  New York and Rhode Island require us to give you this disclosure document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.  Michigan requires us to give you this disclosure document at least 10 business days before the execution of any binding franchise or other agreement or the payment of any consideration, whichever occurs first.

If Blink Fitness Franchising, Inc. does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and the appropriate state agency identified on <u>Exhibit F</u>.

The franchisor is Blink Fitness Franchising, Inc. located at 386 Park Avenue South, 11th Floor, New York, New York 10016.  Its telephone number is 212-359-8780.

Issuance date:  March 2, 2016, as amended December 2, 2016

The franchise seller(s) for this offering are: Patricia Perry, Dos Condon, Marc Benathen, Todd Magazine, and _____ at Blink Fitness Franchising, Inc., 386 Park Avenue South, 11th Floor, New York, New York 10016.  The telephone number is 212-359-8780.

We authorize the respective state agents identified on <u>Exhibit F</u> to receive service of process for us in the particular states.

I received a disclosure document from Blink Fitness Franchising, Inc. dated as of March 2, 2016, as amended December 2, 2016, that included the following Exhibits:

A.     Financial Statements
B.     Franchise Agreement
C.     Development Rights Agreement
D.     Operations Manual Table of Contents
E.     List of Franchisees
F      List of State Agencies/Agents for Service of Process
G.     Franchisee Representations Document
H.     Form of General Release
I.     Development Incentive Addendum to Unit Franchise Agreement
J.     State-Specific Additional Disclosures and Agreement Riders

_____     Date: _____
Prospective Franchisee


_____
Print Name