c.    within ten (10) miles of any other Blink Fitness Gym in operation or under construction on the later of the effective date of the termination and expiration or the date on which all persons restricted by this Section 19.E begin to comply with this Section 19.E.

These restrictions also apply after transfers and other events, as provided in Section 16 above. You (and each of your owners) expressly acknowledge that you (and they) possess skills and abilities of a general nature and have other opportunities for exploiting these skills. Consequently, our enforcing the covenants made in this Section 19.E will not deprive you (and them) of personal goodwill or the ability to earn a living.

### F.  OPTION TO PURCHASE OPERATING ASSETS

i.    Exercise of Option

Upon our termination of this Agreement for any reason, your termination of this Agreement other than pursuant to and in compliance with Section 18.A, or expiration of this Agreement (without the grant of a successor franchise), we have the option, exercisable by giving you written notice within thirty (30) days after the date of termination or expiration, to purchase those Operating Assets and other assets associated with the operation of the Gym that we designate. We have the unrestricted right to assign this option to purchase to a third party (including an affiliate), who will then have the rights and obligations described in this Section 19.F. We are entitled to all customary representations, warranties and indemnities in our asset purchase, including representations and warranties as to ownership and condition of, and title to, assets, liens and encumbrances on assets, validity of contracts and agreements, and the liabilities affecting the assets, contingent or otherwise, and indemnities for all actions, events and conditions that existed or occurred in connection with the Gym prior to the closing of our purchase.

If you or one of your affiliates owns the site upon which the Gym is located, we may elect to include a fee simple interest in that site as part of the assets purchased or, at our option, lease that site from you or such affiliate for an initial ten (10)-year term with one (1) renewal term of ten (10) years (at our option) on commercially reasonable terms. If you lease the Gym's site from an unaffiliated lessor, you agree (at our option) to assign the lease to us or to enter into a sublease for the remainder of the lease term on the same terms (including renewal options) as the lease.

ii.    Purchase Price

If we elect to purchase all or substantially all of the Operating Assets and other assets associated with the operation of the Gym, then the purchase price for those assets, together with an assignment of the lease or a sublease for the Gym's site on the terms set forth in Paragraph (i) above, will be their fair market value, although fair market value will not include any value for (a) the franchise or any rights granted by this Agreement, (b) goodwill attributable to our Marks, brand image, and other intellectual property, or (c) participation in the network of Blink Fitness Gyms. In all cases, we may exclude from the assets purchased any Operating Assets or other items that are not reasonably necessary (in function or quality) to the Gym's operation or that we

have not approved as meeting Brand Standards; the purchase price will reflect these exclusions. If we elect to purchase a fee simple interest in the site upon which the Gym is located pursuant to Paragraph (i) above, its purchase price also will be fair market value and will be added to the purchase price for the other Operating Assets we choose to buy. We and you must work together in good faith to agree upon the assets' fair market value within fifteen (15) days after we send you our notice exercising our right to purchase. If we and you cannot agree on fair market value within this fifteen (15) day period, fair market value will be determined by the following appraisal process.

Fair market value will be determined by one (1) independent accredited appraiser upon whom we and you agree, who, in conducting the appraisal, will be bound by the criteria specified above. You and we agree to select the appraiser within fifteen (15) days after we deliver our purchase notice (if we and you do not agree on fair market value before then). If we and you cannot agree on a mutually acceptable appraiser within fifteen (15) days after we deliver our notice, then we will provide you with a list of three (3) independent appraisers and you must select one (1) of those choices to act as the designated appraiser that will determine the purchase price. We and you will share equally the costs of the appraiser's fees and expenses. Within thirty (30) days after delivery of the notice invoking the appraisal mechanism, we and you each must submit to the appraiser our and your respective calculations of the purchase price with such detail and supporting documentation as the appraiser requests and according to the criteria specified above. Within fifteen (15) days after receiving both calculations, the appraiser must decide whether our proposed purchase price or your proposed purchase price most accurately reflects the fair market value of the assets purchased under this Section 19.F. The appraiser has no authority to compromise between the two (2) proposed purchase prices, but instead is authorized to choose only one or the other. The appraiser's choice will be the purchase price and is final.

    iii.    Closing

We will pay the purchase price at the closing, which will take place not later than thirty (30) days after the purchase price is determined, although we may decide after the purchase price is determined not to complete the purchase and will have no liability to you for doing so. We may set off against the purchase price, and reduce the purchase price by, any and all amounts that you owe us (or our affiliates). At the closing, you agree to deliver instruments transferring to us: (a) good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us), with all sales and transfer taxes paid by you; and (b) all of the Gym's licenses and permits which may be assigned or transferred.

If you cannot deliver clear title to all of the purchased assets, or if there are other unresolved issues, the sale will be closed through an escrow. You further agree to sign general releases, in a form satisfactory to us, of any and all claims against us and our affiliates and our and their respective owners, officers, directors, employees, agents, representatives, successors and assigns. If we exercise our rights under this Section 19.F, then for two (2) years beginning on the closing date, you and your owners (and members of your and their Immediate Families) will be bound by the non-competition covenants contained in Section 19.E.

### G.  CONTINUING OBLIGATIONS

All of our and your (and your owners') obligations hereunder which expressly or by their nature survive the expiration or termination of this Agreement will continue in full force and effect subsequent to and notwithstanding its expiration or termination and until these obligations are satisfied in full or by their nature expire.

## 20. <u>RELATIONSHIP OF THE PARTIES; INDEMNIFICATION</u>

### A.  INDEPENDENT CONTRACTORS

This Agreement does not create a fiduciary relationship between you and us.  You have no authority, express or implied, to act as an agent of ours or any of our affiliates for any purpose.  You are, and will remain, an independent contractor responsible for all obligations and liabilities of, and for all losses or damages to, the Gym and its assets, including any personal property, equipment, fixtures or real property, and for all claims or demands based on damage to or destruction of property or based on injury, illness or death of any person or persons, directly or indirectly, resulting from the operation of the Gym.  Further, we and you are not and do not intend to be partners, joint venturers, associates, or employees of the other in any way, and we will not be construed to be jointly liable for any of your acts or omissions under any circumstances.  We are not the employer or joint employer of the Gym's employees.  You or your Operating Principal is solely responsible for the management and operation of the Gym and the supervision of the Gym's employees.  You agree to identify yourself conspicuously in all dealings with members, other customers, suppliers, public officials, Gym personnel and others as the owner, operator, and manager of the Gym under a franchise that we have granted and to place notices of independent ownership at the Gym and on the forms, business cards, stationery, advertising, e-mails and other materials that we require from time to time.

We will not exercise direct or indirect control over the working conditions of Gym personnel, except to the extent that such indirect control is related to our legitimate interest in protecting the quality of our services or brand.  We do not share or codetermine the terms and conditions of employment of the Gym's employees and do not affect matters relating to the employment relationship between you and the Gym's employees, such as employee selection, promotion, termination, hours worked, rates of pay, other benefits, work assigned, discipline, adjustment of grievances and complaints, and working conditions.  To that end, you agree to notify Gym personnel that you are their employer and that we, as the franchisor of Blink Fitness Gyms, are not their employer and do not engage in any employer-type activities for which only franchisees are responsible, such as employee selection, promotion, termination, hours worked, rates of pay, other benefits, work assigned, discipline, adjustment of grievances and complaints, and working conditions.

### B.  NO LIABILITY FOR ACTS OF OTHER PARTY

We and you agree not to make any express or implied agreements, warranties, guarantees or representations, or incur any debt, in the name or on behalf of the other or represent that our and your relationship is other than franchisor and franchisee.  We will not be obligated for any

damages to any person or property directly or indirectly arising out of the operation of the Gym or the business you conduct under this Agreement.

## C. TAXES

We will have no liability for any sales, use, service, occupation, excise, gross receipts, income, property, employment, or other taxes, whether levied upon you or the Gym, due to the business you conduct (except for our own income taxes). You must pay these taxes and reimburse us for any taxes we must pay to any taxing authority on account of either your operation or payments you make to us (except for our own income taxes).

## D. INSURANCE

During the Term of this Agreement, you agree to maintain in force at your sole expense insurance coverage for the Gym in the amounts, and covering the risks, that we periodically specify. We may require that some or all of your insurance policies provide for waiver of subrogation in favor of us and our affiliates. All of your insurance carriers must be licensed to do business in the state in which the Gym is located and be rated A- or higher by A.M. Best and Company, Inc. (or such similar criteria as we periodically specify). These insurance policies must be in effect before you open the Gym for business. We may periodically increase the amounts of coverage required under these insurance policies and/or require different or additional insurance coverage at any time to reflect inflation, identification of new risks, changes in law or standards of liability, higher damage awards or relevant changes in circumstances. Insurance policies must name us and any affiliates we periodically designate as additional insureds and provide for thirty (30) days' prior written notice to us of the material modification, cancellation or non-renewal of any policy. You agree to periodically send us a valid certificate of insurance or duplicate insurance policy evidencing the coverage specified above and the payment of premiums.

## E. INDEMNIFICATION

To the fullest extent permitted by law, you agree to indemnify, defend and hold harmless us, our affiliates and our and their respective owners, directors, officers, employees, agents, lawyers, consultants, representatives, successors and assigns (the "**Indemnified Parties**") from and against, and to reimburse any one or more of the Indemnified Parties for, any and all claims, losses, obligations and damages directly or indirectly arising out of or relating to: (i) the operation of the Gym, (ii) the business you conduct under this Agreement, (iii) your breach of this Agreement or any other agreement with us or our affiliates, or (iv) your noncompliance or alleged noncompliance with any law, ordinance, rule or regulation concerning the construction, design or operation of the Gym (including laws relating to operating and selling memberships for health and fitness centers, if and to the extent applicable, the ADA and other laws regarding public accommodations for persons with disabilities, and laws regulating employment practices and employee relations), including those claims, obligations and damages alleged to be caused by an Indemnified Party's negligence or willful misconduct, except as specifically set forth below in this Section.

For purposes of this indemnification, "**claims**" include all losses, expenses, obligations, and damages (actual, consequential, punitive or otherwise) and costs that an Indemnified Party reasonably incurs in defending any claim against it, including reasonable accountants', arbitrators', attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, travel and living expenses, and other expenses of litigation, arbitration or alternative dispute resolution, including, without limitation, claims by employees, members, or third parties, regardless of whether litigation, arbitration or alternative dispute resolution is commenced. Each Indemnified Party may defend and control the defense of any claim against it which is subject to this indemnification at your expense, and you may not settle any claim or take any other remedial, corrective or similar actions relating to any claim without the consent of the Indemnified Party. The provisions of this Section will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement. An Indemnified Party need not seek recovery from an insurer or other third party, or otherwise mitigate its losses and expenses, in order to maintain and recover fully a claim against you. You agree that a failure to pursue a recovery or mitigate a loss will not reduce or alter the amounts that an Indemnified Party may recover from you.

Notwithstanding the foregoing, you have no obligation to indemnify under this Section if a court of competent jurisdiction makes a final decision not subject to further appeal that we, our affiliates, or any of our or their respective employees directly engaged in willful misconduct or intentionally caused the property damage or bodily injury that is the subject of the claim, so long as that claim is not asserted on the basis of theories of vicarious liability (including agency, apparent agency, or employment), joint employer liability, or our failure to compel you to comply with this Agreement, which are claims for which we are entitled to indemnification under this Section.

## 21. ENFORCEMENT

### A. SEVERABILITY

Except as expressly provided to the contrary in Section 21.G or otherwise in this Agreement, each Section, paragraph, term and provision of this Agreement is severable, and if, for any reason, any part is held to be invalid or contrary to or in conflict with any applicable present or future law or regulation in a final, unappealable ruling issued by any court, arbitrator, agency or tribunal with competent jurisdiction, that ruling will not impair the operation of, or otherwise affect, any other portions of this Agreement, which will continue to have full force and effect and bind the parties. If any covenant which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited, and/or length of time, but would be enforceable if modified, you and we agree that the covenant will be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction whose law determines the covenant's validity. If any applicable and binding law or rule of any jurisdiction requires more notice than this Agreement requires of the termination of this Agreement or of our refusal to enter into a successor franchise agreement, or if, under any applicable and binding law or rule of any jurisdiction, any provision of this Agreement or any Brand Standard is invalid, unenforceable or unlawful, the notice and/or other action required by the law or rule will be substituted for the comparable provisions of this Agreement, and we may modify the invalid or unenforceable provision or Brand Standard to the extent required to be

valid and enforceable or delete the unlawful provision in its entirety. You agree to be bound by any promise or covenant imposing the maximum duty the law permits which is subsumed within any provision of this Agreement, as though it were separately articulated in and made a part of this Agreement.

## B. WAIVER OF OBLIGATIONS AND FORCE MAJEURE

We and you may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under this Agreement, effective upon delivery of written notice to the other or another effective date stated in the notice of waiver. However, no interpretation, change, termination or waiver of any provision of this Agreement will bind us unless in writing and signed by one of our officers, and which is specifically identified as an amendment to this Agreement. No modification, waiver, termination, discharge or cancellation of this Agreement affects the right of any party hereto to enforce any claim or right hereunder, whether or not liquidated, which occurred prior to the date of such modification, waiver, termination, discharge or cancellation. Any waiver we grant will be without prejudice to any other rights we have, will be subject to our continuing review, and may be revoked at any time and for any reason, effective upon delivery to you of ten (10) days' prior written notice.

We and you will not be deemed to waive or impair any right, power or option this Agreement reserves (including our right to demand exact compliance with every term, condition and covenant or to declare any breach to be a default and to terminate this Agreement before its term expires) because of any custom or practice at variance with the terms of this Agreement; our or your failure, refusal or neglect to exercise any right under this Agreement or to insist upon the other's compliance with this Agreement, including your compliance with any Brand Standard; our waiver of or failure to exercise any right, power or option, whether of the same, similar or different nature, with other Blink Fitness Gyms; the existence of franchise agreements for other Blink Fitness Gyms which contain provisions different from those contained in this Agreement; or our acceptance of any payments due from you after any breach of this Agreement. No special or restrictive legend or endorsement on any check or similar item given to us will be a waiver, compromise, settlement or accord and satisfaction. We are authorized to remove any legend or endorsement, and it will have no effect.

Neither we nor you will be liable for loss or damage or be in breach of this Agreement if our or your failure to perform obligations results from: (i) acts of God; (ii) fires, strikes, embargoes, war, acts of terrorism or similar events, or riot; or (iii) any other similar event or cause. Any delay resulting from any of these causes will extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, except that these causes will not excuse payments of amounts owed at the time of the occurrence or payment of Royalties, Brand Fund contributions and other amounts due afterward.

## C. COSTS AND ATTORNEYS' FEES

If either we or you seek to enforce this Agreement in an arbitration, judicial or other proceeding, the prevailing party is entitled to recover its reasonable costs and expenses (including attorneys' fees, arbitrators' fees and expert witness fees, costs of investigation and

proof of facts, court costs, other arbitration or litigation expenses and travel and living expenses) incurred in connection with such arbitration, judicial or other proceeding.

### D. YOU MAY NOT WITHHOLD PAYMENTS

You agree that you will not withhold payment of any amounts owed to us or our affiliates on the grounds of our or their alleged nonperformance of any of our or their obligations under this Agreement or any other agreement.

### E. RIGHTS OF PARTIES ARE CUMULATIVE

Our and your rights under this Agreement are cumulative, and our and your exercise or enforcement of any right or remedy under this Agreement will not preclude our or your exercise or enforcement of any other right or remedy under this Agreement which we and you are entitled by law to enforce.

### F. MEDIATION

We and you acknowledge that, during the Term of this Agreement, disputes may arise regarding our and your relationship, rights and obligations under this Agreement. To facilitate resolution of these disputes, we and you agree that, during the Term of this Agreement, before commencing an arbitration action, we and you must submit any dispute arising from or relating to this Agreement or our relationship (other than disputes relating to the Marks or to your failure to pay amounts owed to us or our affiliates) for non-binding mediation. The mediation will occur in the county where our headquarters are then located and be conducted by one (1) mediator under the then current Commercial Mediation Rules of the American Arbitration Association. The mediation will be limited to one (1) eight (8)-hour day. Any statements made by any person during the mediation are not admissible in any subsequent litigation or arbitration proceeding. We and you will each bear our own costs and expenses for the mediation and share equally the costs of any independent third parties or fees required for the mediation. If the dispute is not resolved within forty-five (45) days after the mediator is appointed, either we or you may bring an arbitration action according to the terms of this Agreement.

Notwithstanding anything to the contrary contained in this Section or in Section 21.G, we and you have the right to obtain temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction. In that case, we and you agree to contemporaneously submit our dispute for arbitration on the merits according to Section 21.G. Furthermore, nothing in this Section or Section 21.G limits either party's right to deliver a notice of default under, and terminate, this Agreement in accordance with Section 18.

### G. ARBITRATION

Subject to the parties' right to obtain temporary restraining orders and temporary or preliminary injunctive relief pursuant to Section 21.F, all controversies, disputes or claims between us (and our affiliates and our and their respective owners, officers, directors, agents and employees, as applicable) and you (and your affiliates and your and their respective owners, officers, and directors, as applicable) arising out of or related to:

    i.     this Agreement or any other agreement between you (or your owner) and us (or our affiliate) or any provision of any of such agreements;

    ii.    our relationship with you;

    iii.   the scope or validity of this Agreement or any other agreement between you (or your owner) and us (or our affiliate) or any provision of any of such agreements (including the validity and scope of the arbitration obligation under this Section, which we and you acknowledge is to be determined by an arbitrator, not a court); or

    iv.   any Brand Standard,

will be submitted for arbitration to the American Arbitration Association. Except as otherwise provided in this Agreement, such arbitration proceedings will be heard by one (1) arbitrator in accordance with the then existing Commercial Arbitration Rules of the American Arbitration Association. All proceedings will be conducted at a suitable location chosen by the arbitrator that is within ten (10) miles of where we have our principal business address at the time the arbitration demand is filed. The arbitrator will have no authority to select a different hearing locale other than as described in the prior sentence. All matters within the scope of the Federal Arbitration Act (9 U.S.C. Sections 1 et seq.) will be governed by it and not by any state arbitration law.

The arbitrator has the right to award any relief which he or she deems proper in the circumstances, including money damages (with interest on unpaid amounts from the date due), specific performance, injunctive relief and attorneys' fees and costs in accordance with Section 21.C above, provided that: (i) the arbitrator has no authority to declare any Mark generic or otherwise invalid; and (ii) subject to the exceptions in Section 21.J, we and you waive to the fullest extent permitted by law any right to or claim for any punitive, exemplary, and treble and other forms of multiple damages against the other. The award and decision of the arbitrator will be conclusive and binding upon all parties hereto and judgment upon the award may be entered in any court of competent jurisdiction.

We and you agree to be bound by the provisions of any limitation on the period of time by which claims must be brought under this Agreement or applicable law, whichever expires first. We and you further agree that, in connection with any such arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by the then current Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any such claim which is not submitted or filed in such proceeding will be barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either you or us. We reserve the right, but have no obligation, to advance your share of the costs of any arbitration proceeding in order for such arbitration proceeding to take place and by doing so will not be deemed to have waived or relinquished our right to seek the recovery of those costs in accordance with Section 21.C above.

We and you agree that arbitration will be conducted on an individual, not a class wide, basis, that only we (and our affiliates and our and their respective owners, officers, directors,

agents and employees, as applicable) and you (and your affiliates and your and their respective owners, officers and directors, as applicable) may be the parties to any arbitration proceeding described in this Section, and that no such arbitration proceeding may be consolidated with any other arbitration proceeding involving us and/or any other person.    Notwithstanding the foregoing or anything to the contrary in this Section or Section 21.A, if any court or arbitrator determines that all or any part of the preceding sentence is unenforceable with respect to a dispute that otherwise would be subject to arbitration under this Section 21.G, then we and you agree that this arbitration clause will not apply to that dispute and that such dispute will be resolved in a judicial proceeding in accordance with this Section 21 (excluding this Section 21.G).

The provisions of this Section are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

### H. GOVERNING LAW

Except to the extent governed by the Federal Arbitration Act, the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051 et seq.) or other federal law, all controversies, disputes or claims arising from or relating to:

i.      this Agreement or any other agreement between you (or your owners) and us (or our affiliates);

ii.      our relationship with you;

iii.      the validity of this Agreement or any other agreement between you (or your owners) and us (or our affiliate); or

iv.      any Brand Standard,

will be governed by the laws of the State of New York, without regard to its conflict of laws rules, except that any law regulating the offer or sale of franchises, business opportunities or similar interests, or governing the relationship between a franchisor and a franchisee or any similar relationship (including the New York General Business Law, Art. 33, Sections 680 to 695), will not apply unless its jurisdictional requirements are met independently without reference to this Section 21.H.

### I. CONSENT TO JURISDICTION

Subject to the arbitration obligations in Section 21.G, you and your owners agree that all judicial actions brought by us against you or your owners, or by you or your owners against us, our affiliates or our or their respective owners, officers, directors, agents, or employees, must be brought exclusively in the state or federal court of general jurisdiction located closest to where we have our principal business address at the time the action is commenced.  You and each of your owners irrevocably submit to the jurisdiction of such courts and waive any objection that you or any of them may have to either jurisdiction or venue.  Notwithstanding the foregoing, we may bring an action for a temporary restraining order or for temporary or preliminary injunctive

relief, or to enforce an arbitration award, in any federal or state court in the state in which you reside or the Gym is located.

### J. WAIVER OF PUNITIVE DAMAGES

EXCEPT FOR THE INDEMNIFICATION OBLIGATIONS UNDER SECTION 20.E AND CLAIMS BASED ON UNAUTHORIZED USE OF THE MARKS OR UNAUTHORIZED USE OR DISCLOSURE OF ANY CONFIDENTIAL INFORMATION, WE AND YOU (AND YOUR OWNERS) WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE, EXEMPLARY, AND TREBLE AND OTHER FORMS OF MULTIPLE DAMAGES AGAINST THE OTHER AND AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN US AND YOU (AND/OR YOUR OWNERS), THE PARTY MAKING A CLAIM WILL BE LIMITED TO EQUITABLE RELIEF AND TO RECOVERY OF ANY ACTUAL DAMAGES HE, SHE, OR IT SUSTAINS.

### K. WAIVER OF JURY TRIAL

WE AND YOU (AND YOUR OWNERS) IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER US OR YOU (OR YOUR OWNERS).  WE AND YOU (AND YOUR OWNERS) EACH ACKNOWLEDGE THAT WE AND YOU (AND THEY) MAKE THIS WAIVER KNOWINGLY, VOLUNTARILY, WITHOUT DURESS, AND ONLY AFTER CONSIDERATION OF THIS WAIVER'S RAMIFICATIONS.

### L. WAIVER OF CLASS ACTION LITIGATION

Litigation arising out of or related to this Agreement must be conducted on an individual, not a class-wide, basis.  No litigation under this Agreement may be consolidated with any other litigation and any other person without our prior written consent.

### M. BINDING EFFECT

This Agreement is binding upon us and you and our and your respective executors, administrators, heirs, beneficiaries, permitted assigns and successors in interest.  Subject to our rights to modify the Operations Manual and the Brand Standards, this Agreement may not be modified except by a written agreement signed by both you and us.

### N. LIMITATIONS OF CLAIMS

EXCEPT FOR CLAIMS ARISING FROM YOUR NON-PAYMENT OR UNDERPAYMENT OF AMOUNTS THAT YOU OWE US AND EXCEPT FOR OUR (AND CERTAIN OF OUR RELATED PARTIES') RIGHT TO SEEK INDEMNIFICATION FROM YOU FOR THIRD-PARTY CLAIMS AS PROVIDED IN THIS AGREEMENT, ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN US AND YOU WILL BE BARRED UNLESS AN ARBITRATION OR JUDICIAL PROCEEDING, AS PERMITTED, IS COMMENCED IN THE APPROPRIATE FORUM WITHIN EIGHTEEN (18) MONTHS FROM THE DATE ON WHICH THE PARTY

ASSERTING THE CLAIM KNEW OR SHOULD HAVE KNOWN OF THE FACTS GIVING RISE TO THE CLAIM.

### O. CONSTRUCTION

The preambles and exhibits are a part of this Agreement, which, together with any riders or addenda signed at the same time as this Agreement, constitutes the entire agreement and supersedes all prior and contemporaneous oral or written agreements and understandings between us and you relating to the subject matter of this Agreement. There are no other oral or written representations, warranties, understandings or agreements between us and you relating to the subject matter of this Agreement. Notwithstanding the foregoing, nothing in this Agreement disclaims or requires you to waive reliance on any representation that we made in the most recent disclosure document (including its exhibits and amendments) that we delivered to you or your representative. Any policies that we adopt and implement from time to time to guide us in our decision-making are subject to change, are not a part of this Agreement and are not binding on us. Except as provided in Sections 20.E and 21.G, nothing in this Agreement is intended or deemed to confer any rights or remedies upon any person or legal entity not a party to this Agreement.

The headings of the sections and paragraphs are for convenience only and do not define, limit or construe the contents of these sections or paragraphs.

References in this Agreement to "**us**" with respect to all of our rights and all of your obligations to us under this Agreement include any of our affiliates with whom we deal in connection with the Gym. The term "**affiliate**" means any person or entity directly or indirectly owned or controlled by, under common control with, or owning or controlling the party indicated. "**Control**" means the power to direct or cause the direction of management and policies.

If two or more persons are at any time the owners of your rights under this Agreement and/or the Gym, whether as partners or joint venturers, their representations, warranties, obligations and liabilities to us will be joint and several. The term "**owner**" means any person holding a direct or indirect ownership interest (whether of record, beneficial, or otherwise) or voting rights in you (or your owner or a transferee of this Agreement and the Gym or any interest in you), including any person who has a direct or indirect interest in you (or your owner or a transferee), this Agreement, or the Gym and any person who has any other direct or indirect legal or equitable interest, or the power to vest in himself or herself any legal or equitable interest, in their revenue, profits, rights, or assets. References to a "**controlling ownership interest**" or "**controlling interest**" means any of the following: (a) thirty-three percent (33%) or more of the ownership interests, voting shares or other voting rights in you or one of your owners, whether held directly or through one or more owners; (b) an interest the acquisition of which allows an individual to become or appoint an owner (subject to our consent pursuant to this Agreement); or (c) an interest the acquisition of which grants the power to direct or cause the direction of management and polices of you, your owners (if an entity) or the Gym to any person that did not have such power before that acquisition. "**Person**" means any natural person, corporation, limited liability company, general or limited partnership, unincorporated association, cooperative

or other legal or functional entity. Unless otherwise specified, all references to a number of days mean calendar days and not business days.

The term "Gym" includes all of the assets of the Blink Fitness Gym that you operate under this Agreement, including its revenue and income. The words "include," "including," and words of similar import will be interpreted to mean "including, but not limited to" and the terms following such words will be interpreted as examples of, and not an exhaustive list of, the appropriate subject matter.

This Agreement may be executed in multiple copies, each of which will be deemed an original.

### P. THE EXERCISE OF OUR BUSINESS JUDGMENT

Because complete and detailed uniformity under many varying conditions might not be possible or practical, you acknowledge that we specifically reserve the right and privilege, as we deem appropriate according to our reasonable business judgment and subject to reasonable deviations, to vary Brand Standards or other aspects of the Franchise System for any franchise owner. You have no right to require us to grant you a similar variation or accommodation. Notwithstanding the foregoing, we will not unreasonably withhold, condition, or delay our consent to a proposed transfer or assignment you submit for our approval if the proposed transfer satisfies the terms and conditions of Section 16.

### 22. COMPLIANCE WITH ANTI-TERRORISM LAWS

You and your owners agree to comply, and to assist us to the fullest extent possible in our efforts to comply, with Anti-Terrorism Laws (defined below). In connection with that compliance, you and your owners certify, represent, and warrant that none of your property or interests is subject to being blocked under, and that you and your owners otherwise are not in violation of, any of the Anti-Terrorism Laws. "**Anti-Terrorism Laws**" mean Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other present and future federal, state, and local laws, ordinances, regulations, policies, lists, and other requirements of any governmental authority addressing or in any way relating to terrorist acts and acts of war. Any violation of the Anti-Terrorism Laws by you or your owners, or any blocking of your or your owners' assets under the Anti-Terrorism Laws, constitutes good cause for immediate termination of this Agreement, as provided in Section 18 above.

### 23. NOTICES AND PAYMENTS

All acceptances, approvals, requests, notices, and reports required or permitted under this Agreement will not be effective unless in writing and delivered to the party entitled to receive the notice in accordance with this Section 23. All such acceptances, approvals, requests, notices, and reports will be deemed delivered at the time delivered by hand; or one (1) business day after being placed in the hands of a nationally recognized commercial courier service for next business day delivery; or three (3) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid; and must be addressed to the party to be notified at its most current principal business address of which the notifying party has been notified and/or, with respect to any approvals and notices that we provide to you or your owners,

at the Gym's address. Payments will be deemed delivered on any of the applicable dates described above or, if earlier, at the time we actually receive payment electronically. As of the Effective Date of this Agreement, notices should be addressed to the following addresses unless and until a different address has been designated by written notice to the other party:

To us:                          Blink Fitness Franchising, Inc.
                                386 Park Avenue South, 11th Floor
                                New York, NY 10016
                                Attn:
                                Facsimile No.:

Notices to you and your owners:  Platinum Gym One, Inc.
                                265 Webster Woods Lane
                                North Andover, Massachusetts 01845
                                Attn: Stephen L. Stabile
                                Facsimile No.: _____

## 24. ELECTRONIC MAIL

You acknowledge and agree that exchanging information with us by e-mail is efficient and desirable for day-to-day communications and that we and you may utilize e-mail for such communications. You authorize the transmission of e-mail by us and our employees, vendors, and affiliates ("**Official Senders**") to you during the Term of this Agreement.

You further agree that: (i) Official Senders are authorized to send e-mails to those of your supervisory employees as you may occasionally authorize for the purpose of communicating with us; (ii) you will cause your officers, directors, and supervisory employees to give their consent to Official Senders' transmission of e-mails to them; (iii) you will require such persons not to opt out or otherwise ask to no longer receive e-mails from Official Senders during the time that such person works for or is associated with you; and (iv) you will not opt out or otherwise ask to no longer receive e-mails from Official Senders during the Term of this Agreement.

The consent given in this Section 24 will not apply to the provision of notices by either party under this Agreement pursuant to Section 23 using e-mail unless the parties otherwise agree in a written document manually signed by both parties.

**[Signature Page Follows]**

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement as of the dates below, to be effective on the Effective Date stated on the first page above.

| | |
|---|---|
| **BLINK FITNESS FRANCHISING,** **INC.**, a Delaware corporation | **PLATINUM GYM ONE, INC.**, a Massachusetts corporation |

By: Marc Benatten (MB)
Title: VP, Finance
Date: March 10, 2017

By: Stephen L. Stabile
Title: President
Date: 3/10, 2017

**EXHIBIT A**
**TO THE BLINK FITNESS FRANCHISING, INC.**
**UNIT FRANCHISE AGREEMENT**

**BASIC TERMS**

The Site Selection Area is <u>that area in Massachusetts and New Hampshire, as described in Exhibit B to the Development Rights Agreement</u>.

The Gym's physical location is _____.

The Gym's Protected Area is <u>to be completed after the Gym's physical location is identified</u>.

We may, at our sole option and upon delivery of written notice to you, reduce the geographic scope of the Protected Area during the Franchise Agreement's term if the living population encompassed within the Protected Area during the term doubles in size when compared with the size of such population as of date the Protected Area is first identified in this Exhibit A of the Franchise Agreement.  (We also may modify the Protected Area in the event of the Gym's relocation.)

The Opening Deadline for the Gym is <u>June 1, 2018</u>.

The Presale Marketing Budget is <u>$35,000</u>.

| | |
|---|---|
| **BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation | **PLATINUM GYM ONE, INC.**, a Massachusetts corporation |
| By: _Marc Beragfhen MBB_ | By: Stephen L. Stabile |
| Title: _VP, Finance_ | Title: President |
| Date: _March 10_, 2017 | Date: _3/10_, 2017 |

A-1

## EXHIBIT B
## TO THE BLINK FITNESS FRANCHISING, INC.
## UNIT FRANCHISE AGREEMENT

### GUARANTY AND ASSUMPTION OF OBLIGATIONS

**THIS GUARANTY AND ASSUMPTION OF OBLIGATIONS** is given this ____ day of _MARCH 10_, 2017, by Stephen L. Stabile.

In consideration of, and as an inducement to, the execution of that certain Unit Franchise Agreement (the "**Agreement**") on this date by **BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation ("**Franchisor**"), each of the undersigned personally and unconditionally (a) guarantees to Franchisor and its successors and assigns, for the term of the Agreement (including, without limitation, any extensions of its term) and afterward as provided in the Agreement, that **PLATINUM GYM ONE, INC.** ("**Franchisee**") will punctually pay and perform each and every undertaking, agreement, and covenant set forth in the Agreement (including, without limitation, any amendments or modifications of the Agreement) and (b) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement (including, without limitation, any amendments or modifications of the Agreement), including (i) monetary obligations, (ii) obligations to take or refrain from taking specific actions and to engage or refrain from engaging in specific activities, including, but not limited to, the non-competition, confidentiality, and transfer requirements, and (iii) the enforcement and other provisions in Sections 21, 22, and 23 of the Agreement, including the arbitration provision.

Each of the undersigned consents and agrees that: (1) his or her direct and immediate liability under this Guaranty will be joint and several, both with Franchisee and among other guarantors; (2) he or she will render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so; (3) this liability will not be contingent or conditioned upon Franchisor's pursuit of any remedies against Franchisee or any other person; (4) this liability will not be diminished, relieved, or otherwise affected by any extension of time, credit, or other indulgence which Franchisor may from time to time grant to Franchisee or to any other person, including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims (including, without limitation, any extensions of its term or the release of other guarantors), none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable during the term of the Agreement (including, without limitation, any extensions of its term), for so long as any performance is or might be owed under the Agreement by Franchisee or any of its owners, and for so long as Franchisor has any cause of action against Franchisee or any of its owners; (5) this Guaranty will continue in full force and effect for (and as to) any extension or modification of the Agreement and despite the transfer of any interest in the Agreement or Franchisee, and each of the undersigned waives notice of any and all renewals, extensions, modifications, amendments, or transfers; and (6) any indebtedness by Franchisee to the undersigned, for whatever reason, whether currently existing or hereafter arising, will at all times be inferior and subordinate to any indebtedness owed by Franchisee to Franchisor or its affiliates.

Each of the undersigned waives: (i) all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Franchisee arising as a result of the undersigned's execution of and performance under this Guaranty; (ii) acceptance and notice of acceptance by Franchisor of his or her undertakings under this Guaranty, notice of demand for payment of any indebtedness or non-performance of any obligations hereby guaranteed, protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed, and any other notices to which he or she may be entitled; and (iii) all rights to assert or plead any statute of limitations as to or relating to this Guaranty. The undersigned expressly acknowledges that the obligations hereunder survive the expiration or termination of the Agreement.

If Franchisor seeks to enforce this Guaranty in an arbitration, judicial or other proceeding, and prevails in such proceeding, Franchisor is entitled to recover its reasonable costs and expenses (including, but not limited to, attorneys' fees, arbitrators' fees, and expert witness fees, costs of investigation and proof of facts, court costs, other arbitration or litigation expenses and travel and living expenses) incurred in connection with such proceeding. If Franchisor is required to engage legal counsel in connection with any failure by the undersigned to comply with this Guaranty, the undersigned must reimburse Franchisor for any of the above-listed costs and expenses Franchisor incurs, even if Franchisor does not commence a judicial or arbitration proceeding.

Subject to the arbitration obligations (as set forth in the Agreement) and the provisions below, each of the undersigned agrees that all actions arising under this Guaranty or the Agreement, or otherwise as a result of the relationship between Franchisor and the undersigned, must be brought exclusively in the state or federal court of general jurisdiction in the state, and in (or closest to) the city, where Franchisor has its principal business address at the time the action is commenced, and each of the undersigned irrevocably submits to the jurisdiction of those courts and waives any objection he or she might have to either the jurisdiction of or venue in those courts. Nonetheless, each of the undersigned agrees that Franchisor may enforce this Guaranty and any arbitration orders and awards in the courts of the state or states in which he or she is domiciled. FRANCHISOR AND THE UNDERSIGNED IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY ANY OF THEM. EACH ACKNOWLEDGES THAT THEY MAKE THIS WAIVER KNOWINGLY, VOLUNTARILY, WITHOUT DURESS, AND ONLY AFTER CONSIDERATION OF THIS WAIVER'S RAMIFICATIONS.

**IN WITNESS WHEREOF**, each of the undersigned has affixed his or her signature on the same day and year as the Agreement was executed.

| GUARANTOR(S) | PERCENTAGE OF OWNERSHIP IN FRANCHISEE |
|---|---|
| _Stephen L. Stabile_ | 100 _____ % |

**EXHIBIT C**
**TO THE BLINK FITNESS FRANCHISING, INC.**
**UNIT FRANCHISE AGREEMENT**

**FRANCHISEE AND ITS OWNERS**

**Effective Date:  This Exhibit C is current and complete**
**as of** _MARCH 10_ **, 2017**

**Form of Franchisee.**

    **Individual Proprietorship**.  Franchisee's owner(s) (is) (are) as follows:

    _____

    _____

    _____

    **Corporation, Limited Liability Company or Partnership**.  Franchisee was incorporated or formed on February 13, 2017, under the laws of the State of Massachusetts.  Franchisee has not conducted business under any name other than Franchisee's corporate, limited liability company, or partnership name and _____.  The following is a list of Franchisee's directors or managers (if applicable) and officers as of the effective date shown above:

| Name | Position(s) Held |
| --- | --- |
| Stephen L. Stabile | President and Director |
| | |
| | |
| | |
| | |

    **Owners**.   The following list includes the full name of each person who is one of Franchisee's direct or indirect owners and fully describes the nature of each owner's interest (attach additional pages if necessary).

| Owner's Name | Description of Interest |
| --- | --- |
| Stephen L. Stabile | 100% |

| **Owner's Name** | **Description of Interest** |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**Managing Owner**.  Franchisee's Managing Owner is Stephen L. Stabile.

**BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation

By: _Marc Benatten (MDB_
Title: _VP, Finance_
Date: _March 10_, 2017

**PLATINUM GYM ONE, INC.**, a Massachusetts corporation

By: Stephen L. Stabile
Title: President
Date: _3/10_, 2017

**EXHIBIT D**
**TO THE BLINK FITNESS FRANCHISING, INC.**
**UNIT FRANCHISE AGREEMENT**

**LEASE RIDER**

**LEASE PROVISIONS FOR BLINK FITNESS GYM FRANCHISES**

The following provisions must be inserted into your lease for your Gym that you will operate under the "BLINK®" brand (the "**Lease**"). You may add this language via a rider or addendum to your Lease, as long as the rider or addendum document is signed by both the tenant and the landlord. Please send us a copy of the signed Lease, along with any riders or addenda.

**REQUIRED LANGUAGE:**

A.    During the Term of the franchise agreement (the "**Franchise Agreement**") between Tenant and Blink Fitness Franchising, Inc. ("**BFF**"), Tenant will use the premises only for the operation of a Blink Fitness Gym.

B.    Landlord shall send to BFF copies of all default notices and all notices of Landlord's intent to terminate the Lease (or any rights of Tenant thereunder), or evict Tenant from the leased premises, simultaneously with sending such notices to Tenant. Such copies shall be sent to:

> Blink Fitness Franchising, Inc.
> 386 Park Avenue South, 11th Floor
> New York, NY 10016
> Attn:

C.    Tenant may assign the Lease to BFF or its affiliates upon expiration or termination of the Franchise Agreement, and Landlord will not withhold its consent to this assignment. Landlord will not impose or assess any assignment fee or similar payment or accelerate rental payments under the Lease in connection with the assignment.

D.    BFF or its affiliates may enter the premises to make any modification or alteration necessary to protect the Franchise System and the Marks or to cure any default under the Franchise Agreement or Lease at any time and without prior notice to Landlord.

E.    Tenant will not assign or sublease the premises or renew or extend the term of the Lease, or modify the Lease in any manner, without prior written approval from BFF.

F.    Upon the occurrence of any of the following:

> (1)    a default by Tenant under the Lease, the Franchise Agreement, or any document or instrument securing or relating to the Franchise Agreement, or

D-1

(2)      the termination of the Franchise Agreement before its term expires by BFF or Tenant for any reason other than a default by BFF,

BFF shall have the right (but no obligation), exercisable upon delivery of written notice to Tenant and Landlord, to compel an assignment of the Lease, and all of Tenant's rights thereunder, to BFF or to an assignee of BFF's choice, at BFF's option.  If BFF (or its assignee) exercises the rights under this paragraph (F), Tenant shall have no further right, title or interest under the Lease or to the leased premises, but shall remain solely liable to Landlord for all rents, charges and other obligations under the Lease prior to the date upon which BFF (or its assignee) assumes possession of the leased premises.

G.      BFF is an intended third party beneficiary under the provisions set forth above with independent rights to enforce them and neither Landlord nor Tenant may alter or limit any of those provisions without BFF's prior written approval.

D-2

**EXHIBIT E**
**TO THE BLINK FITNESS FRANCHISING, INC.**
**UNIT FRANCHISE AGREEMENT**

**FORM OF CONFIDENTIALITY AGREEMENT**

In consideration of my employment or contract with and/or interest in Platinum Gym One, Inc. (hereinafter, the "**Franchisee**") and the salary, honorariums, wages and/or fees paid to me, I acknowledge that Blink Fitness Franchising, Inc., a Delaware corporation, having its principal place of business at 386 Park Avenue South, 11th Floor, New York, New York 10016 (hereinafter referred to as "**Blink Fitness**"), has imposed the following conditions on the Franchisee, any owner of the Franchisee, and the Franchisee's officers, directors, and senior personnel, and as a condition of performing services to or having an interest in Franchisee, I agree to accept the following conditions without limitation:

1.      Without obtaining the prior written consent of Blink Fitness (which consent may be withheld in Blink Fitness' sole discretion), I will (i) not disclose, publish, or divulge to any other person, firm or corporation, through any means, some or all of the Confidential Information of Blink Fitness, either during or subsequent to my employment by or association with Franchisee, (ii) not use the Confidential Information for any purposes other than as related to my employment or association with Franchisee, and (iii) not make copies or translations of any documents, data, or compilations containing any or all of the Confidential Information, nor commingle any portion of the documents, data or compilation or otherwise use the documents, data or compilations containing Confidential Information, for my own purpose or benefit. I also agree to surrender any material containing some or all of the Confidential Information of Blink Fitness upon request or upon termination of employment or association with Franchisee and understand that the Operations Manual is provided by Blink Fitness to Franchisee for a limited purpose and will remain the property of Blink Fitness and may not be reproduced, in whole or in part, without the prior written consent of Blink Fitness.

For purposes of this Agreement, "**Confidential Information**" shall mean certain information, processes, methods, techniques, procedures and knowledge, including know-how (which includes information that is secret and substantial), manuals and trade secrets (whether or not judicially recognized as a trade secret), developed or to be developed by Blink Fitness relating directly or indirectly to the development or operation of a Blink Fitness Gym. With respect to the definition of know-how, "**secret**" means that the know-how as a body or in its precise configuration is not generally known or easily accessible and "**substantial**" means information which is important and useful to Franchisee in developing and operating Franchisee's Gym. Without limiting the foregoing, Confidential Information includes, but is not limited to:

i.      information in the Operations Manual and Brand Standards;

ii.      layouts, designs, and other plans and specifications for Blink Fitness Gyms;

     iii.      methods, formats, specifications, standards, systems, procedures, sales and marketing techniques, and knowledge and experience used in developing and operating Blink Fitness Gyms;

     iv.      content and methods of instruction;

     v.      marketing research and promotional, marketing and advertising programs for Blink Fitness Gyms;

     vi.      knowledge of specifications for and suppliers of, and methods of ordering, certain Operating Assets, products, materials and supplies that Blink Fitness Gyms use and sell;

     vii.      knowledge of the operating results and financial performance of Blink Fitness Gyms other than the Gym;

     viii.      member solicitation, communication and retention programs, along with data and information used or generated in connection with those programs;

     ix.      all Data and all other information generated by, or used or developed in, the operation of the Gym, including Consumer Data and Gym Lists, and any other information contained from time to time in the Computer System or that visitors (including you) provide to the System Website; and

     x.      any other information that we reasonably designate as confidential or proprietary.

    2.     In the event of a dispute or question arising out of the interpretation of this Agreement or any of its terms, the laws of the State of New York shall govern.

    3.     I acknowledge receipt of a copy of this Agreement, and that I have read and I understand this Agreement. This Agreement may not be modified except in writing with prior approval of an officer of each of Franchisee and Blink Fitness.

Owner, officer, director, and senior personnel:

By: _____

Name: _Stephen Stalik - Platinum Gym Ave, Inc_

Title: _President_

Date: _3/10/17_

Social Security No.: _N/A_

or Tax ID No. _81-534355 7_

Address:
_865 Webster Woods LN_
_No Andover, MA 01845_

Phone: _978-265-4294_

Fax: _____

Check the following that apply:

____ Owner                          ___ Senior Personnel
✓ Officer                           ___ Other (please specify)
✓ Director