**BLINK FITNESS FRANCHISING, INC.**
**<u>UNIT FRANCHISE AGREEMENT</u>**

Platinum Gym Two, Inc.
FRANCHISEE NAME

August 1, 2018
EFFECTIVE DATE OF AGREEMENT

465 Salem Street
Medford, Massachusetts  02155

ADDRESS OF GYM

GYM NAME

BLINK FITNESS GYM NUMBER

## TABLE OF CONTENTS

**SECTION** **PAGE**

1.  PREAMBLES ................................................................................................... 1

2.  ACKNOWLEDGEMENTS .............................................................................. 1

3.  GRANT OF FRANCHISE ................................................................................ 2

    A.    GRANT OF FRANCHISE .................................................................... 2

    B.    TERM ................................................................................................... 3

    C.    TERRITORIAL RIGHTS ..................................................................... 3

    D.    RESERVATION OF RIGHTS ............................................................. 3

    E.    GUARANTY ......................................................................................... 4

4.  SITE SELECTION, LEASE, AND DEVELOPING THE GYM ..................... 4

    A.    SITE SELECTION AND ACCEPTANCE ......................................... 4

    B.    LEASE ACCEPTANCE ....................................................................... 6

    C.    DEVELOPMENT OF GYM ................................................................ 6

    D.    PRESALE OF MEMBERSHIPS ........................................................ 7

    E.    OPENING ............................................................................................ 8

5.  FEES .................................................................................................................. 9

    A.    INITIAL FRANCHISE FEE ................................................................ 9

    B.    ROYALTY .......................................................................................... 10

    C.    NEW MEMBER FEE ........................................................................ 10

    D.    PAYMENT METHOD AND TIMING ............................................... 11

    E.    INTEREST ON LATE PAYMENTS .................................................. 11

    F.    APPLICATION OF PAYMENTS AND RIGHT OF SET-OFF ........ 12

    G.    ANNUAL INCREASE IN FIXED FEES ........................................... 12

6.  TRAINING, GUIDANCE, AND ASSISTANCE ........................................... 12

    A.    INITIAL ORIENTATION AND TRAINING .................................... 12

    B.    OPENING SUPPORT ........................................................................ 12

    C.    ADDITIONAL TRAINING ............................................................... 13

    D.    ONGOING AND SUPPLEMENTAL TRAINING ........................... 13

    E.    TRAINING FOR REPLACEMENT CLUB MANAGERS ............... 13

    F.    TRAINING FOR GYM EMPLOYEES ............................................. 13

    G.    GENERAL GUIDANCE AND THE OPERATIONS MANUAL ...... 14

    H.    DELEGATION ................................................................................... 15

7.  GYM OPERATION AND BRAND STANDARDS ........................................ 15

    A.    CONDITION AND APPEARANCE OF GYM ................................. 15

i

# TABLE OF CONTENTS

**SECTION**                                                                  **PAGE**

    B.    COMPLIANCE WITH APPLICABLE LAWS AND GOOD BUSINESS PRACTICES .................................................................. 16

    C.    COMPLIANCE WITH BRAND STANDARDS ................................. 16

    D.    OPERATING PRINCIPAL ....................................................... 18

    E.    APPROVED PRODUCTS AND SUPPLIERS ................................. 20

    F.    COMPUTER SYSTEM ............................................................ 21

    G.    INTRANET ............................................................................ 22

8.    MARKS ...................................................................................... 22

    A.    OWNERSHIP AND GOODWILL OF MARKS ............................. 22

    B.    LIMITATIONS ON USE OF MARKS ........................................ 22

    C.    NOTIFICATION OF INFRINGEMENTS AND CLAIMS ............... 23

    D.    DISCONTINUANCE OF USE OF MARKS ................................. 23

    E.    INDEMNIFICATION FOR USE OF MARKS ............................... 23

9.    CONFIDENTIAL INFORMATION ................................................. 24

10.    CONSUMER DATA AND GYM LISTS ........................................... 25

11.    INNOVATIONS ........................................................................... 26

12.    EXCLUSIVE RELATIONSHIP ...................................................... 26

13.    ADVERTISING AND MARKETING .............................................. 27

    A.    PRESALE MARKETING PROGRAM ....................................... 27

    B.    BRAND FUND ...................................................................... 27

    C.    APPROVAL OF MARKETING AND OTHER EXTERNAL COMMUNICATIONS ............................................................ 29

    D.    LOCAL MARKETING ........................................................... 29

    E.    REGIONAL ADVERTISING COOPERATIVES .......................... 30

    F.    ADVERTISING ALLOCATION ............................................... 30

    G.    SYSTEM WEBSITE ............................................................... 30

    H.    YOUR WEBSITE AND SOCIAL MEDIA ACTIVITIES ................. 31

14.    RECORDS, REPORTS AND FINANCIAL STATEMENTS ................. 31

15.    INSPECTIONS AND AUDITS ....................................................... 32

    A.    INSPECTIONS ...................................................................... 32

    B.    OUR RIGHT TO AUDIT ........................................................ 33

16.    TRANSFER ................................................................................. 33

    A.    TRANSFER BY US ............................................................... 33

EAST\159342593.3

### TABLE OF CONTENTS

**SECTION**                                                       **PAGE**

|  |  |  |  |
|---|---|---|---|
| | B. | TRANSFER BY YOU AND DEFINITION OF TRANSFER | 34 |
| | C. | CONDITIONS FOR APPROVAL OF TRANSFER | 35 |
| | D. | TRANSFER TO A WHOLLY-OWNED CORPORATION OR LIMITED LIABILITY COMPANY | 37 |
| | E. | DEATH OR DISABILITY | 37 |
| | F. | EFFECT OF CONSENT TO TRANSFER | 38 |
| | G. | OUR RIGHT OF FIRST REFUSAL | 38 |
| 17. | | EXPIRATION OF THIS AGREEMENT | 39 |
| 18. | | TERMINATION OF AGREEMENT | 40 |
| | A. | TERMINATION BY YOU | 40 |
| | B. | TERMINATION BY US | 40 |
| | C. | ASSUMPTION OF GYM'S MANAGEMENT | 42 |
| | D. | OTHER REMEDIES UPON DEFAULT | 43 |
| 19. | | RIGHTS AND OBLIGATIONS UPON TERMINATION OR EXPIRATION OF THIS AGREEMENT | 44 |
| | A. | PAYMENT OF AMOUNTS OWED | 44 |
| | B. | DE-IDENTIFICATION | 44 |
| | C. | CONFIDENTIAL INFORMATION | 45 |
| | D. | NOTIFICATION TO MEMBERS AND CUSTOMERS | 45 |
| | E. | COVENANT NOT TO COMPETE | 45 |
| | F. | OPTION TO PURCHASE OPERATING ASSETS | 46 |
| | G. | CONTINUING OBLIGATIONS | 48 |
| 20. | | RELATIONSHIP OF THE PARTIES; INDEMNIFICATION | 48 |
| | A. | INDEPENDENT CONTRACTORS | 48 |
| | B. | NO LIABILITY FOR ACTS OF OTHER PARTY | 49 |
| | C. | TAXES | 49 |
| | D. | INSURANCE | 49 |
| | E. | INDEMNIFICATION | 49 |
| 21. | | ENFORCEMENT | 50 |
| | A. | SEVERABILITY | 50 |
| | B. | WAIVER OF OBLIGATIONS AND FORCE MAJEURE | 51 |
| | C. | COSTS AND ATTORNEYS' FEES | 52 |
| | D. | YOU MAY NOT WITHHOLD PAYMENTS | 52 |

**TABLE OF CONTENTS**

**SECTION**                                                                     **PAGE**

E.    RIGHTS OF PARTIES ARE CUMULATIVE ................................................... 52

F.    MEDIATION ......................................................................................................... 52

G.    ARBITRATION ..................................................................................................... 53

H.    GOVERNING LAW ............................................................................................. 54

I.    CONSENT TO JURISDICTION ....................................................................... 55

J.    WAIVER OF PUNITIVE DAMAGES ............................................................. 55

K.    WAIVER OF JURY TRIAL ............................................................................... 55

L.    WAIVER OF CLASS ACTION LITIGATION ............................................... 55

M.    BINDING EFFECT ............................................................................................... 55

N.    LIMITATIONS OF CLAIMS ............................................................................. 56

O.    CONSTRUCTION ................................................................................................. 56

P.    THE EXERCISE OF OUR BUSINESS JUDGMENT ................................... 57

22.    COMPLIANCE WITH ANTI-TERRORISM LAWS ................................................ 57

23.    NOTICES AND PAYMENTS ...................................................................................... 58

24.    ELECTRONIC MAIL ..................................................................................................... 58

**EXHIBITS**

Exhibit A – Basic Terms

Exhibit B – Guaranty and Assumption of Obligations

Exhibit C – Franchisee and Its Owners

Exhibit D – Lease Rider

Exhibit E – Form of Confidentiality Agreement

iv

**BLINK FITNESS FRANCHISING, INC.**
**UNIT FRANCHISE AGREEMENT**

     **THIS UNIT FRANCHISE AGREEMENT** (this "**Agreement**") is made effective as of August 1, 2018 (the "**Effective Date**," regardless of when the parties execute and date this Agreement), by and between **BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation whose principal business address is 386 Park Avenue South, 11th Floor, New York, New York 10016 ("**we**," "**us**," or "**our**"), and **PLATINUM GYM TWO, INC.**, a Massachusetts corporation ("**you**" or "**your**").

## 1.  PREAMBLES

     We and our affiliates have designed and developed a method of developing and operating health and fitness centers identified by the Marks (defined below) that currently provide cardiovascular and strength training equipment and related products and services ("**Blink Fitness Gyms**").

     We and our affiliates have developed, and use, promote and license, certain trademarks, service marks and other commercial symbols in operating Blink Fitness Gyms, including "BLINK®," and we may from time to time create, use and license other trademarks, service marks and commercial symbols for Blink Fitness Gyms (collectively, the "**Marks**").

     We offer franchises to own and operate a Blink Fitness Gym using our business system, business formats, methods, procedures, designs, layouts, trade dress, standards, specifications and Marks, all of which we may improve, further develop and otherwise modify periodically (collectively, the "**Franchise System**").

     You have applied for a franchise to own and operate a Blink Fitness Gym, and we wish to grant you such a franchise on the terms and conditions contained in this Agreement.

## 2.  ACKNOWLEDGEMENTS

     You acknowledge that:

i.    You have independently investigated the Blink Fitness franchise opportunity and recognize that, like any other business, the nature of the business a Blink Fitness Gym conducts may, and probably will, evolve and change over time;

ii.    An investment in a Blink Fitness Gym involves business risks that could result in the loss of a significant portion or all of your investment;

iii.    Your business abilities and efforts are vital to your success;

iv.    Attracting members for your Blink Fitness Gym will require you to make consistent marketing efforts in your community through various methods, such as media advertising, direct mail advertising, and display and use of in-store promotional materials;

EAST\159342593.3

v.     Retaining members for your Blink Fitness Gym will require you to have a well-maintained facility, a high level of customer service, and strict adherence to the Franchise System and our Brand Standards (defined in Section 6.G below);

vi.    You are committed to maintaining Brand Standards;

vii.   Other than any disclosures in our franchise disclosure document, you have not received from us and are not relying upon any representations or guarantees, express or implied, as to the potential volume, sales, income, or profits of a Blink Fitness Gym;

viii.  In all of their dealings with you, our officers, directors, employees, consultants, lawyers and agents act only in a representative, and not in an individual, capacity and business dealings between you and them as a result of this Agreement are deemed to be only between you and us;

ix.    You have represented to us, to induce our entry into this Agreement, that all statements you have made and all materials you have given us are accurate and complete and you have made no misrepresentations or material omissions in obtaining the franchise;

x.     You have read this Agreement and our franchise disclosure document and understand and accept that this Agreement's terms and covenants are reasonably necessary for us to maintain our high standards of quality and service, as well as the uniformity of those standards at each Blink Fitness Gym, and to protect and preserve the goodwill of the Marks;

xi.    We have not made any representation, warranty, or other claim regarding this Blink Fitness franchise opportunity, other than those made in this Agreement and our franchise disclosure document, and you have independently evaluated this opportunity, including by using your business professionals and advisors, and have relied solely upon those evaluations in deciding to enter into this Agreement;

xii.   You have been afforded an opportunity to ask any questions you have and to review any materials of interest to you concerning the Blink Fitness franchise opportunity; and

xiii.  You have been afforded an opportunity, and have been encouraged by us, to have this Agreement and all other agreements and materials we have given or made available to you reviewed by an attorney or another professional advisor.

## 3.  **GRANT OF FRANCHISE**

### A.  **GRANT OF FRANCHISE**

Subject to the terms of this Agreement, we grant you the right, and you undertake the obligation, to operate a Blink Fitness Gym at the address identified on Exhibit A (the "**Gym**") and to use the Franchise System and Marks in its operation.  (If the address of the Gym is

2

unknown as of the Effective Date, the address will be determined in accordance with Section 4.A and listed on an amended and restated <u>Exhibit A</u> that we will provide to you.)  Your right to operate a Blink Fitness Gym is limited to the services provided at the Gym and does not include the right to distribute goods and services over the Internet or to engage in other channels of supply or distribution.

### B.  TERM

The term of the franchise (the "**Term**") begins on the Effective Date and will end ten (10) years from the date on which the Gym opens to the public for business under the Marks, unless sooner terminated as provided in this Agreement.

### C.  TERRITORIAL RIGHTS

During the Term, we and our affiliates will not own or operate, or allow another franchisee or licensee to own or operate, another Blink Fitness Gym that has its physical location within the geographical area described on <u>Exhibit A</u> (the "**Protected Area**"), which we may modify only as provided in <u>Exhibit A</u>.  If the Gym's address is unknown as of the Effective Date, we will describe the Protected Area on an amended and restated <u>Exhibit A</u> that we will send you once we accept a site for the Gym in accordance with Section 4.A.  However, you acknowledge that our affiliates operate other fitness facilities using different brand names and trademarks and service marks, some of which may operate and have facilities within the Protected Area, and otherwise in close proximity to the Gym, which may compete directly with the Gym.  You may engage in advertising, promotional, marketing, and related activities we authorize within the Protected Area.  However, we have the unrestricted right to regulate all such activities conducted outside the Protected Area, or directed to individual members or customers located outside the Protected Area, in order to protect what we consider to be the best interests of other Blink Fitness Gym franchisees, Blink Fitness Gyms operated by us and our affiliates, or the Franchise System.

### D.  RESERVATION OF RIGHTS

Except for your location exclusivity described in Section 3.C above, we and our affiliates retain all rights with respect to Blink Fitness Gyms, the Marks, the sale of similar or dissimilar products and services, and any other activities we deem appropriate whenever and wherever we desire, whether inside or outside the Protected Area.  Specifically, but without limitation, we reserve the following rights:

     i.    the right to own and operate, and to allow other franchisees and licensees to own and operate, Blink Fitness Gyms at any locations outside the Protected Area (including at the boundary of the Protected Area) and on any terms and conditions we deem appropriate;

     ii.    the right to provide, offer and sell, and to grant others the right to provide, offer and sell, products or services that are identical or similar to and/or competitive with those provided at Blink Fitness Gyms, whether identified by the Marks or other trademarks or service marks, through similar or dissimilar distribution channels and on any terms and conditions we deem appropriate (including by providing products, fitness advice and other services through the Internet);

3

    iii.      the right to establish and operate, and to grant others the right to establish and operate, businesses offering similar products and services under trademarks and service marks other than the Marks;

    iv.      the right to establish and operate, and to grant to others the right to establish and operate, businesses offering similar or dissimilar products and services under the Marks and on any terms and conditions we deem appropriate;

    v.      the right to acquire the assets or ownership interests of one or more businesses providing products and services similar to those provided at Blink Fitness Gyms, and operating, franchising, licensing or creating similar arrangements with respect to these businesses once acquired, wherever these businesses (or the franchisees or licensees of these businesses) are located or operating; and

    vi.      the right to be acquired (whether through acquisition of assets, ownership interests or otherwise, regardless of the form of transaction) by a business providing products and services similar to those provided at Blink Fitness Gyms, or by another business, even if such business operates, franchises and/or licenses Competitive Businesses (defined in Section 12 below).

### E.  GUARANTY

The Guarantors must fully guarantee all of your financial and other obligations to us under this Agreement or otherwise arising out of the relationship established by this Agreement, and agree personally to comply with this Agreement's terms, by executing the form of Guaranty attached hereto as <u>Exhibit B</u>.  "**Guarantors**" means each owner having an ownership interest in you, or in any entity directly or indirectly owning a controlling ownership interest in you, and any other owner designated by us as a Guarantor in <u>Exhibit B</u> of this Agreement.  The name of each owner and his, her or its percentage ownership interest in you are set forth in <u>Exhibit C</u>. Subject to our rights and your obligations in Section 16, you will notify us of any change in the information in <u>Exhibit C</u> within ten (10) days after the change occurs.

## 4.  <u>SITE SELECTION, LEASE, AND DEVELOPING THE GYM</u>

### A.  SITE SELECTION AND ACCEPTANCE

If the address of the Gym is unknown as of the Effective Date, then this Section 4.A will govern the site selection and acceptance process.  Within six (6) months after the Effective Date, you must obtain our written acceptance of a site at which to operate a Blink Fitness Gym within the particular geographic area listed in <u>Exhibit A</u> (the "**Site Selection Area**").  The time period during which you must search for, propose, and obtain our written acceptance of a site for the Gym within the Site Selection Area (the "**Site Selection Period**") will expire upon the earliest of (i) our accepting a site for the Gym and providing an amended and restated <u>Exhibit A</u> to you, (ii) this Agreement's termination, or (iii) six (6) months after the Effective Date.

It is your responsibility to locate, evaluate and select the site for your Gym.  We or a designated third-party supplier of site evaluation, leasing and related services (the "**Site Consultant**") will assist you by reviewing potential sites for the Gym you identify within the

Site Selection Area.  You must use a licensed commercial real estate broker during the site selection process, and we have the right to pre-approve your proposed broker before you move forward.  We may, but have no obligation to, physically visit your proposed sites.  We may condition our making a proposed site visit and our approval of a proposed site on your first sending us complete site reports and other materials (including, without limitation, photographs and video recordings) we request.  We or the Site Consultant will provide you with our then current criteria for sites of Blink Fitness Gyms (including, but not limited to, population density and other demographic characteristics, visibility, traffic flow, competition, accessibility, parking, size, and other physical and commercial characteristics) to assist you in selecting and identifying your site.  However, even if we or the Site Consultant gives you information regarding a potential site or site criteria, you acknowledge that (i) the Site Consultant is solely responsible for its activities, its communications, and the information it shares with you, and (ii) we have made and will make no representations or warranties of any kind, express or implied, about the suitability of the site for a Blink Fitness Gym or any other purpose, or of the likelihood that we ultimately will accept that site for the Gym's location.

You must propose a site for the Gym's location and obtain our written acceptance of the proposed site within six (6) months after the Effective Date.  You must submit all information that we request when you propose a site, including a signed letter of intent specifying the key terms of the proposed lease or purchase transaction.  We agree to use reasonable efforts to review and accept or reject each site that you propose within thirty (30) days after we receive all requested information and materials.  If we have not accepted the site in writing within thirty (30) days after we receive all requested information and materials, then the site will be deemed rejected.  We will not unreasonably withhold our acceptance of a site that meets our then current criteria.  We have the absolute right to reject any site that does not meet our criteria.  Our acceptance of a site indicates only that we believe that the site meets or has the potential to meet, or that we have waived, our then current criteria for site suitability.  Our application of criteria that have appeared effective with other sites might not accurately reflect the potential for all sites, and demographic and/or other factors included in or excluded from our criteria could change, altering the potential of a site.  The uncertainty and instability of these criteria are beyond our control, and we are not responsible if a particular site fails to meet your expectations.  Upon accepting a proposed site, we will list the accepted site's location as the Gym's address in Exhibit A.

You may not relocate the Gym to a new site without our prior consent, which we may grant or deny as we deem best.  We may condition our approval of your relocation request on (1) the new site and its lease being acceptable to us, (2) your paying us a Five Thousand Dollar ($5,000) relocation fee, (3) your reimbursing any costs we incur during the relocation process, (4) your confirming that this Agreement remains in effect and governs your operation of the Gym at the new site with no change in the Term or, at our option, your signing our then current form of franchise agreement to govern your operation of the Gym at the new site for a new franchise term (in either case, we may change the definition of the Protected Area), (5) your signing a general release, in a form satisfactory to us, of any and all claims against us and our owners, affiliates, officers, directors, employees, and agents, (6) your continuing to operate the Gym at its original site until we authorize its closure, and (7) your taking, within the timeframe we specify and at your own expense, all action we require to de-brand and de-identify the Gym's

5

former premises so that it no longer is associated in any manner (in our opinion) with the Franchise System.

## B. LEASE ACCEPTANCE

You must present to us for our acceptance, which we will not unreasonably withhold, any lease or sublease (and any renewals and amendments of the lease or sublease) that will govern your occupancy and lawful possession of the Gym at least thirty (30) days before you intend to sign it.  The lease or sublease must either (i) include the lease rider attached hereto as <u>Exhibit D</u> and made a part hereof, or (ii) provide in the body of the lease or sublease the terms and conditions found in the lease rider.  You may not sign any lease or sublease (or any renewal or amendment of the lease or sublease) that we have not accepted.  We may (but have no obligation to) provide you guidance or assistance relating to the lease or sublease but will not negotiate the lease on your behalf or provide any legal advice.  If we have not accepted the lease or sublease within thirty (30) days after we receive a complete copy of the lease or sublease, then the lease or sublease will be deemed rejected.  You acknowledge that our guidance and assistance (if we choose to provide it) and acceptance of the lease or sublease (or renewal or amendment) are not a guarantee or warranty, express or implied, of the success or profitability of the Gym or of the suitability of the lease or sublease for your business purposes.

## C. DEVELOPMENT OF GYM

Notwithstanding any other deadline with respect to obtaining our acceptance of the site or signing an accepted lease or sublease, you must, within sixteen (16) months after the Effective Date (the "**Opening Deadline**"), (i) secure all financing required to develop and operate the Gym; (ii) obtain all permits and licenses required to construct and operate the Gym; (iii) construct all required improvements to the site and decorate the Gym in compliance with our approved plans and specifications; (iv) purchase or lease and install all required Operating Assets (as defined below); (v) purchase an opening inventory of required, authorized, and approved products, materials, and supplies; and (vi) open your Gym in accordance with all the requirements of this Agreement.

You are responsible for developing the Gym at your expense.  We will provide you with prototype design documents and suggested specifications and layouts for a Blink Fitness Gym, including requirements or recommendations (as applicable) for dimensions, design, interior layout, décor, signage, security, and Operating Assets.  All other decisions relating to the Gym's development and its layout, design, color scheme, finishes, improvements, décor and Operating Assets are subject to our review and prior written approval.  These specifications and layouts might not reflect the requirements of any federal, state or local law, code or regulation, including those arising under the Americans with Disabilities Act (the "**ADA**"), zoning regulations, environmental laws and regulations, other applicable ordinances, building codes or permit requirements, or any lease requirements or restrictions.

You agree at your expense to construct, install trade dress and furnish all Operating Assets in, and otherwise develop the Gym according to our standards, specifications and directions.  The Gym must contain all Operating Assets, and only those Operating Assets, that we specify.  You agree to place or display, according to our guidelines, at the Gym (interior and

6

exterior) only the signs, emblems, lettering, logos and display materials that we approve from time to time. You agree to purchase or lease from time to time only the approved brands, types and models of Operating Assets according to our standards and specifications and, if we specify, only from one or more suppliers that we designate or approve (which may include or be limited to us and/or our affiliates). "**Operating Assets**" means all required furniture, fixtures, equipment (including components of and required software licenses for the Computer System (defined in Section 7.F)), and signs that we periodically require for the Gym and the business you operate under this Agreement.

You must prepare all required construction and remodeling documents and specifications to suit the Gym and make sure they comply with the ADA and similar rules governing public accommodations for persons with disabilities, other applicable ordinances, building codes, permit requirements, and lease requirements and restrictions. We reserve the right to designate or approve the architects and contractors that you must use to construct and develop the Gym. We may condition our written approval of an architect and/or contractor on first receiving proof that the architect and/or contractor maintains the required licenses and permits in the state, city, and/or town in which you will develop the Gym. If this is your first Blink Fitness Gym, you must use an architect we designate to construct and develop the Gym. You must submit to us for our written approval all construction and remodeling documents and specifications before beginning build-out of the Gym and all revised or "as built" plans and specifications as they are prepared during the Gym's construction and development. You may not begin building out the Gym until we have approved the plans and specifications in writing. Our review of the plans and specifications is limited to reviewing your compliance with our prototype requirements. Our review is not designed to assess your compliance with the ADA and similar rules governing public accommodations for persons with disabilities, other applicable ordinances, building codes, permit requirements, and lease requirements and restrictions, as compliance with those laws, requirements and restrictions is your responsibility. You must develop the Gym in accordance with the plans and specifications that we have approved in writing. During build-out of the Gym, we may physically inspect the Gym or require you to send us pictures and images (including video recordings) of the interior and/or exterior of the Gym to review your development of the Gym in accordance with the approved construction and remodeling documents and our Brand Standards set forth in the Operations Manual (defined in Section 6.G). You also must provide us with copies of meeting minutes generated by your designated project manager for each week during build-out of the Gym.

Our services under this Agreement do not include assisting you in securing financing for the Gym's development.

### D.  PRESALE OF MEMBERSHIPS

No memberships or other rights to participate in the services at the Gym may be offered or sold prior to opening the Gym to the general public, unless: (i) we have authorized you to offer or sell memberships or those rights to the public; (ii) you in good faith expect to open the Gym for business within the one hundred twenty (120)-day period following the offer or sale; (iii) your Operating Principal and the Gym's Club Manager (defined in Sections 7.D and 6.A, respectively) have completed to our satisfaction the initial training program described in Section

6.A; and (iv) you have secured all financing and permits necessary to develop, build and fully equip the Gym.

You must propose a temporary site at or near the Gym from which you will conduct the presale of memberships and obtain our written acceptance of the site at least thirty (30) days prior to opening the temporary site. We may physically inspect the site or require you to send us pictures and images (including video recordings). Your temporary site may be at the Gym (if legally permissible) or in an available retail space in a high traffic location that meets our then current criteria. You are prohibited from conducting any presale of memberships from your or your Operating Principal's home or other residence. You may not use, or allow any other party to use, any part of the temporary site for any purpose other than the presale of memberships and other pre-marketing activities as described in Section 13.A. You agree to equip the temporary site with adequate furnishings, computer software and hardware, and place or display, according to our guidelines, signs, logos, and advertising materials that we periodically specify for use in temporary sites. You may not begin offering or selling memberships at the temporary site until we have reviewed and approved the site in writing as having been developed in accordance with our specifications and standards for temporary sites. We may physically inspect the temporary site or require you to send us pictures and images (including video recordings) of the interior and/or exterior of the temporary site. You agree to maintain the condition and appearance of the temporary site in accordance with Brand Standards. You must hire a Club Manager and adequate employees to conduct the presale of memberships at the temporary site in compliance with our standards and specifications. You must (i) close the temporary site and cease conducting the presale of memberships on or before the Opening Deadline and (ii) de-identify the temporary site within one (1) week after the Opening Deadline by making alterations that we specify to distinguish the temporary site from its former appearance, including by removing all signs, sign faces, advertising, marketing and promotional materials, forms, and other materials containing any Mark.

You alone are responsible for ensuring that your membership agreements and presale of memberships comply with all applicable laws and other legal requirements. You will be liable to the applicable legal authorities if you fail to do so (and also will be liable to us if we are brought into the matter because of your failure).

### E. OPENING

On or before the Opening Deadline listed on <u>Exhibit A</u>, you must open the Gym for business; provided, however, you may not open the Gym for business until:

     i.     we have inspected and approved the Gym as having been developed in accordance with our specifications and standards. As an alternative, or in addition, to our physical inspection of the Gym, we may require you to send us pictures and images (including video recordings) of the Gym. You must give us at least thirty (30) days' prior written notice of the Gym's planned opening date and also notify us in writing when the Gym is ready for inspection or review. If we do not inspect or review the Gym within twenty-five (25) business days after you deliver notice that the Gym is ready for inspection or review, or if we do not deliver written comments to you within seven (7) business days after our

8

inspection or review, then the Gym is deemed approved for opening. Our inspection and approval are limited to ensuring your compliance with our standards and specifications, although our approval is not a representation that the Gym complies with our standards and specifications or a waiver of our right to enforce any provision of this Agreement. Our inspection and approval are not designed to assess compliance with federal, state or local laws or regulations, including the ADA, as compliance with such laws is your responsibility. We will not unreasonably withhold our approval of the Gym;

ii.    your Operating Principal and the Gym's Club Manager, as applicable, have completed the initial orientation and training programs described in Section 6.A to our satisfaction;

iii.    the Gym has sufficient employees to manage and operate the Gym on a day-to-day basis in compliance with Brand Standards, and the employees have been trained by you or the Club Manager;

iv.    your Operating Principal, the Club Manager, and the Gym's employees have completed all required third party certifications (including certifications required under applicable law (e.g., cardiopulmonary resuscitation ("**CPR**"), automated external defibrillator ("**AED**"), and first aid as dictated by local legislation));

v.    you have satisfied all state and federal permitting, bonding, licensing, and other legal requirements for the lawful operation of your Gym, including, without limitation, by ensuring that your planned membership offerings following the Gym's opening and your forms of membership agreement comply with applicable law;

vi.    all amounts due to us, our affiliates, and principal suppliers have been paid;

vii.    you are not in default under any agreement with us, our affiliates or principal suppliers;

viii.    we have received copies of required permits, licenses, and insurance policies required by this Agreement; and

ix.    you have met all other opening requirements as established by us in our Operations Manual.

## 5.  FEES

### A.  INITIAL FRANCHISE FEE

You must pay us an initial franchise fee in the amount of Forty Thousand Dollars ($40,000) in a lump sum upon the execution of this Agreement (the "**Initial Franchise Fee**"). The Initial Franchise Fee is non-refundable.

### B.  ROYALTY

You agree to pay us, on or before the day of each month that we periodically specify (the "**Payment Day**"), a royalty ("**Royalty**") in an amount equal to five percent (5%) of the Gross Sales of the Gym.  The first Royalty payment is due on the Payment Day of the month following the month during which you first open the Gym for business, based on the Gross Sales during the period beginning when the first Gross Sales were recognized (including Gross Sales derived during any presale of memberships or other services) and ending on the last day of the previous month.

In this Agreement, "**Gross Sales**" means the aggregate amount of all revenue generated from any source, including, without limitation, revenue generated from the sale of memberships, goods, products, merchandise, services, and advertising, other types of revenue you receive, including the proceeds of business interruption insurance and rental income of any type, and the value of goods, products, merchandise, and services bartered in exchange for memberships or other goods or services.  Gross Sales are not reduced by the amount of any discounts on memberships or other services to employees, family members, or other businesses you own or control.  However, Gross Sales exclude:  (i) federal, state, or municipal sales, use or service taxes collected from members and paid to the appropriate taxing authority; (ii) proceeds from insurance, excluding business interruption insurance; (iii) proceeds from any civil forfeiture, condemnation, or seizure by government entities; and (iv) the amount of any credits provided in accordance with the terms and conditions set forth in the Operations Manual.  Each charge or sale upon credit will be treated as a sale for the full price on the day during which such charge or sale is made, irrespective of when you receive payment (whether full or partial, or at all) on that sale.  Revenue from gift cards that we approve for offer and sale at Blink Fitness Gyms is included in Gross Sales when the gift card is used to pay for products and services.  Your Gym may not issue or redeem any gift certificates, coupons, or gift, loyalty, or similar cards unless we first have approved in writing their form and content and your proposed issuing and honoring/redemption procedures, which approval we may grant or withhold as we deem best.

### C.  NEW MEMBER FEE

You agree to pay us a non-refundable new member fee (the "**New Member Fee**") in the amount equal to Five Dollars ($5.00) for each new or former member who signs a new online membership agreement with the Gym through the System Website.  The New Member Fee is payable in the month following the month in which the online membership agreement is signed.  We may increase the New Member Fee on an annual basis (separate and apart from the inflation-based increase permitted under Section 5.G below), but in no event will the New Member Fee payable by you be greater than the New Member Fee we require new Blink Fitness Gym franchisees to pay, as reflected in our then current form of Franchise Agreement.  For the avoidance of doubt, no New Member Fee will be due for any new or former member who signs a new membership agreement through the System Website while physically present at the Gym's premises, including, without limitation, through a kiosk or the point-of-sale system at the Gym's front desk.

### D.  PAYMENT METHOD AND TIMING

You agree to sign and deliver to us the documents that we periodically require to authorize us to debit your business checking account automatically for the Royalty and other amounts due under this Agreement or any related agreement between us (or our affiliates) and you.  If we institute an automatic debit program for the Gym, we will debit your account for the Royalty and other amounts on or after the Payment Day, based on the Gross Sales for the previous month.  You agree to make the funds available for withdrawal by electronic transfer before each due date.  In connection with the automatic debit program, we may require you to procure, at your expense, overdraft protection for your business checking account in an amount that we specify.  You agree to reimburse us for any "insufficient funds" charges and related expenses that we incur in connection with your failure to maintain sufficient funds in your automatic debit account.

If you fail to report the Gym's Gross Sales for any month, we may debit your account for one hundred twenty-five percent (125%) of the Royalty that we debited for the previous month.  If the amount we debit from your account is less than the amount you actually owe us for the month (once we have determined the Gym's true and correct Gross Sales for the month), we will debit your account for the balance due on the day that we specify.  If the amount we debit from your account is greater than the amount you actually owe us for the month (once we have determined the Gym's true and correct Gross Sales for the month), we will credit the excess, without interest, against the amount that we otherwise would debit from your account during the following month.

We have the right, at our sole option upon notice to you, to change from time to time the timing and terms for payment of Royalties and other amounts payable to us under this Agreement.

You may not subordinate to any other obligation your obligation to pay Royalties or any other fee or charge under this Agreement.

### E.  INTEREST ON LATE PAYMENTS

In addition to all other remedies we have, including, without limitation, the right to terminate this Agreement pursuant to Section 18, if you fail to pay (or make available for withdrawal from your account) any amounts you owe us or our affiliates, including, without limitation, amounts for Royalties or New Member Fees, whether such amounts are reflected as due on any report you submit to us or are subsequently determined by verification, examination or audit to have been due, those amounts will bear interest, accruing as of their original due date, at one and one-half percent (1.5%) per month or the highest commercial contract interest rate the law allows, whichever is less.  In addition, you must pay us a Seventy-Five Dollar ($75) administrative fee for each payment which you do not make to us when due (or for each dishonored payment) to cover the increased costs and expenses we will incur as a result of your failure to pay the amounts when due.

EAST\159342593.3

### F.  APPLICATION OF PAYMENTS AND RIGHT OF SET-OFF

Notwithstanding any designation that you make, we may apply any of our debits or your payments to any of your past due indebtedness to us or our affiliates.  We may set-off any amounts you or your owners owe us or our affiliates against any amounts that we or our affiliates owe you or your owners, whether in connection with this Agreement or otherwise.

### G.  ANNUAL INCREASE IN FIXED FEES

We and our affiliates reserve the right to increase the amount of any fixed fee or fixed payment due under this Agreement based on changes in the Index (defined below) ("**Annual Increase**").  An Annual Increase to such fees and payments may occur only once during any calendar year and may not exceed the corresponding cumulative increase in the Index since the Effective Date or, as the case may be, the date on which the last Annual Increase became effective for the particular fixed fee or payment being increased.  Any and all Annual Increases will be made at the same time during the calendar year.  "Index" refers to the Consumer Price Index for All Urban Consumers (CPI-U) for the U.S. City Average for all Items (1982 – 1984 = 100), not seasonally adjusted, as published by the United States Department of Labor, Bureau of Labor Statistics, or in a successor index.  Notwithstanding this Section, we also reserve the right (i) to increase the New Member Fee as provided in Section 5.C above and, (ii) if any fixed fee or fixed payment due under this Agreement encompasses any third party charges that we collect from you on a pass-through basis (*i.e.*, for ultimate payment to the third party), to increase the fixed fee or fixed payment, even beyond the Annual Increase, to reflect any increases in the third party's charges to us.

### 6.  TRAINING, GUIDANCE, AND ASSISTANCE

### A.  INITIAL ORIENTATION AND TRAINING

If this is your first Blink Fitness Gym, your Operating Principal must attend an initial orientation session on the Blink Fitness Gym system at our principal business address within forty-five (45) days after the Effective Date.  We also will furnish without additional charge at our designated training facility and/or through a web-based platform an initial training program on the operation of a Blink Fitness Gym for your Operating Principal and one (1) manager for the Gym (the "**Club Manager**").  Before you sell any memberships (including, without limitation, through presale), advertise, or open the Gym to the public, your Operating Principal and the Club Manager must complete our training program to our satisfaction.  You will be responsible for the compensation, travel and living expenses for your Operating Principal and the Club Manager during training.

### B.  OPENING SUPPORT

Upon successful completion of the initial training program and during the Gym's initial opening period (which may begin before and continue after the Gym's actual opening date), we will provide up to five (5) days of local in-market training for supervisory employees and opening support for the Gym.

### C.  ADDITIONAL TRAINING

If your Operating Principal or the Club Manager fails to complete the initial training program to our satisfaction, or we determine after an inspection that additional training is necessary because the Gym is not operating according to Brand Standards, we may require that he or she attend an additional training session.  You must pay our then current training fee (as set forth in the Operations Manual) for anyone attending the additional training session.  You also will be responsible for the attendees' compensation and travel and living expenses during training.  We may terminate this Agreement if your Operating Principal or the Club Manager fails to attend the initial training program and/or does not complete the initial training program to our satisfaction.

### D.  ONGOING AND SUPPLEMENTAL TRAINING

We may require your Operating Principal and/or the Club Manager to attend and satisfactorily complete various training courses, programs and conventions offered periodically by us or by third parties at the times and locations that we designate.  You will be responsible for the compensation, travel and living expenses for your Operating Principal and the Club Manager during training.  We may charge our then current fee for continuing and advanced training (as set forth in the Operations Manual).  If you request that any training courses and programs be provided locally, then subject to the availability of our training personnel, you must pay our then current training fee (as set forth in the Operations Manual) and the travel and living expenses for our training personnel.

### E.  TRAINING FOR REPLACEMENT CLUB MANAGERS

In the event the Club Manager is no longer employed by you at the Gym, you must appoint a new manager (the "**Replacement Manager**") to act as the manager for the Gym within forty-five (45) days after the last day of the former Club Manager's employment.  The Operating Principal will serve as the Gym's manager until you appoint a Replacement Manager.  The Replacement Manager, and any subsequent Replacement Managers, must be properly trained by the Operating Principal within ten (10) days after they are hired.

### F.  TRAINING FOR GYM EMPLOYEES

All Gym employees must be properly trained by you or the Club Manager within ten (10) days after being hired to competently perform the tasks required of their respective positions.  We will develop and make available training tools and recommendations for you to implement in training the Gym's employees.  We may periodically update these training materials to reflect changes in our training methods and procedures.

We may periodically and without prior notice review the Gym's performance to determine if the Gym meets our Brand Standards.  If we determine that the Gym is not operating according to Brand Standards, in addition to the other rights provided in this Agreement, we may require that you or the Club Manager retrain one or more employees of the Gym.

13

### G.  GENERAL GUIDANCE AND THE OPERATIONS MANUAL

We will periodically advise you regarding the operation of the Gym based on your reports or our inspections with respect to:

i.      standards, specifications, operating procedures and methods that Blink Fitness Gyms use;

ii.     purchasing required or recommended Operating Assets and other products, supplies and materials;

iii.    supervisory employee training methods and procedures (although you are solely responsible for the terms and conditions of employment of all Gym employees); and

iv.     accounting, advertising, and marketing.

We may guide you by means of our operating manual and other technical manuals ("**Operations Manual**"), in bulletins or other written materials, by electronic media, by telephone consultation, and/or at our office or the Gym.  If you request and we agree to provide additional or special guidance, assistance or training, you agree to pay our then applicable charges, including reasonable training fees and our personnel's per diem charges and any travel and living expenses.  Any specific ongoing training, conventions, advice or assistance that we provide does not create an obligation to continue providing that specific training, convention, advice or assistance, all of which we may discontinue and modify at any time.

We will provide you access to one (1) copy of our Operations Manual, which may include written or electronic materials and which we may make available to you by various means, including hardcopy or access through the Intranet.  The Operations Manual contains mandatory and suggested specifications, standards, operating procedures and rules that we periodically prescribe for operating a Blink Fitness Gym ("**Brand Standards**") and information on your other obligations under this Agreement.  We may modify the Operations Manual periodically to reflect changes in Brand Standards, but these modifications will not alter your fundamental rights or status under this Agreement.  You agree to keep your copy of the Operations Manual current and communicate all updates to your employees in a timely manner.  You agree to keep all parts of the Operations Manual in a secure location and restrict access to any passwords provided to or developed by you for accessing the Operations Manual.  If there is a dispute over its contents, our master copy of the Operations Manual controls.  You agree that the contents of the Operations Manual are confidential and that you will not disclose any part of the Operations Manual to any person other than Gym employees and others who need to know such part and who agree to maintain its confidentiality by signing a confidentiality agreement attached hereto as Exhibit E.  You may not at any time copy, duplicate, record or otherwise reproduce any part of the Operations Manual, with the exception of certain forms as specified in the Operations Manual.

While we may designate the form of confidentiality agreement you must use with Gym employees having access to our Confidential Information (defined in Section 9 below) in order to protect that Confidential Information, under no circumstances will we control the forms or terms

14

of employment agreements you use with Gym employees or otherwise be responsible for your labor relations.  In addition, the Brand Standards do not include any personnel policies or procedures or security related policies or procedures that we (at our option) may make available to you in the Operations Manual or otherwise for your optional use.  You will determine to what extent, if any, these policies and procedures might apply to your operations at the Gym.  You and we recognize that we neither dictate nor control labor or employment matters for franchisees and Blink Fitness Gym employees and we are not responsible for the safety and security of Gym employees, members, guests, and visitors.

At our option, we may post the Operations Manual on the Intranet (defined in Section 7.G below) or another restricted website to which you will have password access.  If we do so, you agree to periodically monitor the website for any updates to the Operations Manual or Brand Standards.  Any passwords or other digital identifications necessary to access the Operations Manual on such a website will be deemed to be part of Confidential Information.

### H.  DELEGATION

We have the right, from time to time, to delegate the performance of any portion or all of our obligations under this Agreement to designees, whether they are our affiliates, agents or independent contractors with which we contract to provide such services.

## 7.  GYM OPERATION AND BRAND STANDARDS

### A.  CONDITION AND APPEARANCE OF GYM

You may not use, or allow any other party to use, any part of the Gym for any purpose other than your operation of a Blink Fitness Gym in compliance with this Agreement.  You agree to place or display, according to our guidelines, at the Gym (interior and exterior) only those signs, emblems, designs, artwork, lettering, logos and display and advertising materials that we periodically specify.  You agree to maintain the condition and appearance of the Gym, the site and the Operating Assets in accordance with the Brand Standards.  Without limiting that obligation, you agree to take, at your expense, the following actions during the Term:  (i) thorough cleaning, repainting and redecorating of the interior and exterior of the Gym at intervals that we may periodically specify and at our direction; (ii) interior and exterior repair of the Gym and the site as needed; and (iii) repair or replacement, at our direction, of damaged, worn-out or obsolete Operating Assets, or Operating Assets that no longer meet our Brand Standards, at intervals that we periodically specify (or, if we do not specify an interval for replacing any Operating Asset, as that Operating Asset needs to be repaired or replaced).

In addition to your obligations described above, we may from time to time, but not more than two (2) times during the Term (after the Gym's opening), require you to substantially alter the Gym's appearance, branding, layout and/or design, and/or replace a material portion of the Operating Assets, in order to meet our then current requirements for new Blink Fitness Gyms. You acknowledge that this obligation could result in your making extensive structural changes to, and significantly remodeling and renovating, the Gym, and/or in your spending substantial amounts for new Operating Assets, and you agree to incur, without limitation, any expenditures required in order to comply with this obligation and our requirements (even if such expenditures

cannot be amortized over the remaining Term). Within sixty (60) days after receiving written notice from us, you must have plans prepared according to the standards and specifications that we prescribe and, if we require, using architects and contractors that we designate or approve, and you must submit those plans to us for our written approval. You agree to complete all work according to the plans that we approve within the time period that we reasonably specify and in accordance with this Agreement.

We may also from time to time request and require you to participate in certain testing programs for new services, products, and/or Operating Assets. You acknowledge that this obligation could result in your making expenditures for new Operating Assets and other operating costs associated with the Gym, which you agree to incur and for which we have no obligation to reimburse you. You agree to maintain any records and reports related to the testing programs as we may require and to submit any records and reports to us in a timely manner. We reserve the right to discontinue any testing programs prior to their scheduled completion dates and to choose not to implement any changes to the Franchise System.

## B. COMPLIANCE WITH APPLICABLE LAWS AND GOOD BUSINESS PRACTICES

You must secure and maintain in force all required licenses, permits and certificates relating to the operation of the Gym and must operate the Gym in full compliance with all applicable laws, ordinances and regulations, including government regulations relating to occupational hazards, health, environment, employment, worker's compensation and unemployment insurance and withholding and payment of federal and state income taxes, social security taxes and sales and service taxes. All advertising and promotion by you must be completely factual and must conform to the highest standards of ethical advertising. The Gym must in all dealings with its members, suppliers, us and the public adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. You agree to refrain from any business or advertising practice which may injure our business and the goodwill associated with the Marks, the Franchise System, and other Blink Fitness Gyms. You acknowledge our right to regulate your advertising and related activities outside the Protected Area, as provided in Section 3.C above. You must notify us in writing within three (3) days of the commencement of any action, suit or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which may adversely affect your or the Gym's operation or financial condition and of any notice of violation of any law, ordinance, or regulation relating to the Gym.

## C. COMPLIANCE WITH BRAND STANDARDS

You agree to comply with all Brand Standards, as we may periodically modify them, as if they were part of this Agreement. You will not offer, sell, or provide at or from the Gym any goods or services not authorized in the Operations Manual. You must offer, sell, and furnish all those goods and services we prescribe from time to time.

Brand Standards may direct any aspect of the operation and maintenance of the Gym, including any one or more of the following:

i.      sales, marketing, advertising and promotional programs and materials and media used in these programs, including participation in and compliance with the requirements of any special advertising, marketing and promotional programs that we periodically specify;

ii.     adequate staffing levels for the Gym to operate the Gym in compliance with Brand Standards, appearance of instructors and other Gym personnel, practices and procedures for soliciting members, and competent and courteous service to members and other customers.  However, you have sole responsibility and authority for your labor relations and employment practices, including, among other things, employee selection, promotion, termination, hours worked, rates of pay, benefits, work assigned, discipline, adjustments of grievances and complaints, and working conditions.  Gym employees are under your control at the Gym.  You must communicate clearly with Gym employees in your employment agreements, human resource manuals, written and electronic correspondence, paychecks, and other materials that you (and only you) are their employer and that we, as the franchisor of Blink Fitness Gyms, are not their employer and do not engage in any employer-type activities (including those described above) for which only franchisees are responsible;

iii.    standards, procedures and requirements for reciprocity programs, transferring memberships, changing membership programs, and other programs designed to enhance member satisfaction with the Blink Fitness network, including revenue and cost sharing requirements for these programs;

iv.     standards, procedures and requirements for attributing revenue with respect to members who attend and utilize other Blink Fitness Gyms in addition to the Gym;

v.      maximum, minimum or other pricing requirements for products and services that the Gym offers, including requirements for promotions, special offers and discounts in which some or all Blink Fitness Gyms participate, in each case to the maximum extent the law allows;

vi.     standards, requirements and procedures for training your Gym's supervisory personnel;

vii.    use and display of the Marks;

viii.   bookkeeping, accounting, data processing and recordkeeping systems and forms, including, without limitation, document retention requirements and use of the Intranet (but not including any records or information relating to Gym employees, as you control exclusively your labor relations and employment practices);

ix.     terms and conditions of the sale and delivery of, and terms and methods of payment for, products and services that you obtain from us and affiliated and unaffiliated suppliers, including ordering, return and warranty terms and conditions and our and our affiliates' right to sell you any products only on a "cash-on-delivery" or other basis if you are in default, have failed to pay when

17

due amounts owed under any agreement with us or our affiliates, or have insufficient net worth to meet our or our affiliates' credit standards, which we may determine from credit reports you hereby authorize us to order periodically on you and your owners to confirm your and their financial condition and help us assess whether to extend credit to you on items purchased from us;

x.      member and customer satisfaction surveys and programs (the costs of which we may require you to share with us and/or other Blink Fitness Gym franchisees);

xi.     days and hours of operation;

xii.    accepting credit and debit cards, other payment systems and check verification services;

xiii.   standards and procedures for any use of blogs, common social networks like Facebook and Instagram, professional networks like LinkedIn, live-blogging tools like Twitter, virtual worlds, file, audio and video sharing sites, and other similar social networking media or tools (collectively, "**Social Media**") that in any way reference the Marks or involve the Gym;

xiv.    standards and requirements for processing, collecting and accounting for payments from Gym members;

xv.     relocation conditions and procedures concerning the Gym's new and former premises; and

xvi.    any other aspects of operating and maintaining the Gym that we determine to be useful to preserve or enhance the efficient operation, image or goodwill of the Marks and Blink Fitness Gyms.

Except for the training and qualifications of the Gym's Club Manager and supervisory employees described above, Brand Standards will not include any employment-related policies or procedures and will not dictate or regulate the terms and conditions of employment for your employees. Except as described above, any information we provide (whether in the Operations Manual or otherwise) concerning employment-related policies or procedures, or relating to the terms and conditions of employment for Gym employees, is for your optional use.

We have the right periodically to modify and supplement Brand Standards, which may require you to invest additional capital in the Gym and incur higher operating costs, and such Brand Standards will constitute legally binding obligations upon you when communicated to you. Although we retain the right to establish and periodically modify the Brand Standards that you have agreed to follow, you retain the responsibility for the day-to-day management and operation of the Gym and for implementing and maintaining the Brand Standards at the Gym.

### D.  OPERATING PRINCIPAL

Upon the execution of this Agreement, you must designate and retain an individual to serve as the operating principal (the "**Operating Principal**"). You must at all times during the

18

Term have an Operating Principal meeting the following qualifications and such other standards as may be set forth from time to time by us in the Operations Manual or otherwise in writing:

i.   If you are an individual, you may designate yourself as the Operating Principal. If you are an entity, you may designate one of your owners or another individual with no equity ownership in you as the Operating Principal. The Operating Principal must be approved by us in writing prior to the earlier of the Effective Date of this Agreement or the execution of the Development Rights Agreement (if any). We have the right, as we deem best, to approve or disapprove the proposed Operating Principal or any proposed change in the individual designated as the Operating Principal. We may condition our approval on the proposed Operating Principal living in close proximity to the Gym or other Blink Fitness Gyms that you or your affiliates develop and operate.

ii.   If the Operating Principal is not required to execute this Agreement or our Guaranty, the Operating Principal must execute our form of non-competition agreement and form of confidentiality agreement attached hereto as <u>Exhibit E</u>. Our right to regulate the forms of these agreements is solely to protect Confidential Information and the competitiveness of Blink Fitness Gyms. Under no circumstances will we control the forms or terms of employment agreements you use with Gym employees or otherwise be responsible for your labor relations.

iii.   The Operating Principal is responsible for the day-to-day management of your business, and, without our prior written consent, may not engage in any business activity other than the development and operation of the Gym. You agree to vest the Operating Principal with sufficient decision-making authority to make the decisions that are essential to the effective and efficient operation of the Gym and to make such decisions on your behalf. The Operating Principal must communicate directly with us regarding any matters that relate to the Gym (excluding matters relating to labor relations and employment practices).

iv.   The Operating Principal may serve as the Gym's Club Manager or may designate another individual to serve as the Club Manager, provided that the Operating Principal must take all necessary action to ensure that such designee conducts and fulfills all obligations in accordance with the terms of this Agreement. The Operating Principal remains fully responsible for the performance of the Club Manager.

v.   The Operating Principal must successfully complete our initial training program before you sell any memberships (including, without limitation, through presale), advertise, or open the Gym to the public. If the Operating Principal fails to complete the initial training program to our satisfaction, we may terminate this Agreement in accordance with Section 18.

vi.   If you propose to change the individual designated as the Operating Principal, you must designate a new individual (the "**Replacement Operating Principal**") to act as the Gym's operating principal within forty-five (45) days after the last day the former Operating Principal serves as the Gym's Operating Principal. One of your owners

19

must serve as the operating principal until you designate, and we approve in writing, the Replacement Operating Principal. The Replacement Operating Principal, and any subsequent Replacement Operating Principals, must satisfactorily complete our initial training program within forty-five (45) days after we approve the individual. You must pay our then current Replacement Operating Principal training fee (as set forth in the Operations Manual) for all Replacement Operating Principals designated during the Term who must attend our initial training program. You will be responsible for the compensation, travel and living expenses of the Replacement Operating Principal during training.

## E. APPROVED PRODUCTS AND SUPPLIERS

We may periodically designate and approve standards, specifications, brands, models, manufacturers, suppliers and/or distributors of the Operating Assets and other products and services that we periodically authorize for use at or sale by Blink Fitness Gyms. You must purchase or lease all Operating Assets and other products and services that you use or sell at the Gym only according to our Brand Standards and, if we require, only from suppliers or distributors that we designate or approve (which may include or be limited to us, our affiliates, and/or other restricted sources). We and/or our affiliates may derive revenue based on your purchases and leases, including, without limitation, from charging you for products and services that we or our affiliates provide to you and from promotional allowances, volume discounts and other payments made to us and our affiliates by suppliers that we designate, approve or recommend for some or all Blink Fitness Gym franchisees. We and our affiliates may use all amounts received from suppliers, whether or not based on your and other franchisees' prospective or actual dealings with them, without restriction for any purposes that we and our affiliates deem appropriate.

If you wish to purchase or lease any Operating Assets or other products or services from a supplier or distributor which we have not then approved (if we require you to buy or lease the product or service only from an approved supplier or distributor), then you must establish to our reasonable satisfaction that the product or service is of equivalent quality and functionality to the product or service it replaces and that the supplier or distributor is, among other things, reputable, financially responsible, and adequately insured for product liability claims. Upon request, you must pay any actual expenses we may incur in order to determine whether or not any such products, services, suppliers or distributors meet these requirements and specifications. We may condition our written approval of a supplier or distributor on requirements relating to product quality, prices, consistency, warranty, reliability, financial capability, labor relations, member relations, frequency of delivery, concentration of purchases, standards of service (including prompt attention to complaints), and/or other criteria. We have the right to inspect the proposed supplier's or distributor's facilities and to require the proposed supplier or distributor to deliver product samples or items, at our option, either directly to us or to any third party we designate for testing. If we approve any supplier or distributor you recommend from which you purchase or lease any Operating Assets or other products or services, you agree that we are authorized to allow other Blink Fitness Gyms to purchase or lease any Operating Assets or other products or services from these suppliers or distributors, without limitation, and without compensation to you. Notwithstanding the foregoing, we may limit the number of approved suppliers and/or distributors with whom you may deal, designate sources that you must use,

20

and/or refuse any of your requests for any reason, including, without limitation, that we have already designated any exclusive source (which might be us or our affiliate) for a particular item or service or if we believe that doing so is in the best interests of the Blink Fitness network.

### F.  COMPUTER SYSTEM

You agree to obtain and use the computer hardware and software that we periodically specify, including self-service kiosks to be located within the Gym and other hardware components, dedicated telephone and power lines, modems, printers, and other computer-related accessories and peripheral equipment (the "**Computer System**").  At our option, you will use the Computer System to access the Intranet and to input and access information about your members, sales and operations, and for the self-service use of members.  You must maintain the continuous operation of the Computer System.  We will have unlimited access to all information maintained on the Computer System (excluding matters relating to labor relations and employment practices) and to the content of any Blink Fitness e-mail accounts we may provide to you.

We may periodically modify specifications for and components of the Computer System. Our modification of specifications for the Computer System, and/or other technological developments or events, may require you to purchase, lease and/or license new or modified computer hardware, software and other components and to obtain service and support for the Computer System.  Although we cannot estimate the future costs of the Computer System or required service or support, you agree to incur the costs of obtaining the computer hardware, software and other components comprising the Computer System (and additions and modifications) and required service or support.  Within ninety (90) days after we deliver notice to you, you agree to obtain the Computer System components that we designate and ensure that your Computer System, as modified, is functioning properly.

We and our affiliates may condition any license of required or recommended proprietary software to you, and/or your use of technology developed or maintained by or for us (including the Intranet), on your signing a software license agreement or similar document, or otherwise agreeing to the terms (for example, by acknowledging your consent to and accepting the terms of a click through license agreement), that we and our affiliates periodically prescribe to regulate your use of, and our (or our affiliates') and your respective rights and responsibilities with respect to, the software or technology.  We and our affiliates may charge you up front and ongoing fees for any required or recommended proprietary software or technology that we or our affiliates license to you and for other Computer System maintenance and support services provided during the Term of this Agreement.

Notwithstanding your obligation to buy, use, and maintain the Computer System according to our standards and specifications, you have sole and complete responsibility for:  (1) the acquisition, operation, maintenance, and upgrading of the Computer System; (2) the manner in which your Computer System interfaces with our and any third party's computer system; and (3) any and all consequences if the Computer System is not properly operated, maintained, and upgraded.  The Computer System must permit twenty-four (24) hours per day, seven (7) days per week electronic communications between you and us, including access to the Internet and Intranet (but excluding matters relating to labor relations and employment practices).

21

### G. INTRANET

We will establish a restricted website providing communications among us, our affiliates, you, other Blink Fitness Gym franchisees, and other persons and entities to whom we (in our judgment) periodically determine to give access, including Blink Fitness Gym members (the "**Intranet**"). The Intranet may be part of the System Website (defined in Section 13.G) and will provide the features, services and functionality that we periodically specify. We may implement and periodically modify Brand Standards relating to the Intranet and, at our option, may discontinue the Intranet, or any services offered through the Intranet, at any time.

You agree to comply with the requirements that we periodically specify (whether set forth in the Operations Manual or otherwise) concerning connecting to the Intranet and using the Intranet in the operation of the Gym. Without limiting the foregoing, you agree to enter the information concerning each person who registers for a membership that the Gym offers and all Gross Sales of the Gym using the Intranet in the manner that we periodically specify. We will own all intellectual property and other rights in the Intranet and all information it contains, including its domain name or URL, the log of "hits" by visitors, any personal or business data that visitors supply, and all information relating to the members and other patrons of the Gym, whether that information is contained on your Computer System or our (or our designee's) computer system (collectively, the "**Data**").

## 8. <u>MARKS</u>

### A. OWNERSHIP AND GOODWILL OF MARKS

Your right to use the Marks is derived only from this Agreement and is limited to your operating the Gym according to this Agreement and all mandatory Brand Standards that we prescribe during the Term. Your unauthorized use of the Marks is a breach of this Agreement and infringes our (and our licensor's) rights in the Marks. Any use of the Marks relating to the Gym, and any goodwill established by that use, are for our (and our licensor's) exclusive benefit. We (and our licensor) may take the action necessary to enforce all trademark use obligations under this Agreement. This Agreement does not confer any goodwill or other interests in the Marks upon you, other than the right to operate the Gym according to this Agreement. All provisions of this Agreement relating to the Marks apply to any additional and substitute trademarks and service marks that we periodically authorize you to use. You may not at any time during or after the Term of this Agreement contest or assist any other person in contesting the validity, or our (or our licensor's) ownership, of the Marks.

### B. LIMITATIONS ON USE OF MARKS

You agree to use the Marks as the sole identification of the Gym, subject to the notices of independent ownership that we periodically designate. You may not use any Mark (i) as part of any corporate or legal business name, (ii) with any prefix, suffix or other modifying words, terms, designs or symbols (other than logos that we have licensed to you), (iii) in selling any unauthorized services or products, (iv) as part of any domain name, homepage, electronic address, metatag or otherwise in connection with any website or other online presence without our consent, or (v) in any other manner that we have not expressly authorized in writing. You

may not use any Mark in advertising the transfer, sale or other disposition of the Gym or an ownership interest in you without our prior written consent, which we will not unreasonably withhold. You agree to give the notices of trademark and service mark registrations that we periodically specify and obtain any fictitious or assumed name registrations that applicable law requires. To the extent you use any Mark in employment-related materials, you must include a clear disclaimer that you (and only you) are the employer of employees at the Gym and that we, as the franchisor of Blink Fitness Gyms, are not their employer and do not engage in any employer-type activities for which only franchisees are responsible, such as employee selection, promotion, termination, hours worked, rates of pay, other benefits, work assigned, discipline, adjustment of grievances and complaints, and working conditions.

## C.  NOTIFICATION OF INFRINGEMENTS AND CLAIMS

You agree to notify us immediately of any actual or apparent infringement of or challenge to your use of any Mark, or of any person's claim of any rights in any Mark (or any identical or confusingly similar trademark) or claim of unfair competition relating to any Mark. You agree not to communicate with any person other than us and our licensor, our respective attorneys, and your attorneys regarding any infringement, challenge or claim. We and our licensor may take the action that we deem appropriate (including no action) and control exclusively any litigation, U.S. Patent and Trademark Office proceeding or other administrative proceeding arising from any infringement, challenge or claim or otherwise concerning any Mark. You agree to sign any documents and take any other reasonable actions that we and our and our licensor's attorneys deem necessary or advisable to protect and maintain our (and our licensor's) interests in any litigation or Patent and Trademark Office or other proceeding or otherwise to protect and maintain our (and our licensor's) interests in the Marks.

## D.  DISCONTINUANCE OF USE OF MARKS

If we believe at any time that it is advisable for us and/or you to modify, discontinue using and/or replace any Mark, and/or use one or more additional or substitute trademarks or service marks, you agree to comply with our directions within a reasonable time after receiving notice. We need not reimburse you for your expenses in complying with these directions (such as costs that you incur in changing the signs and panels on equipment in order to remove the Marks or our trade dress, or replacing supplies for the Gym), for any loss of revenue due to any modified or discontinued Mark, or for your expenses of promoting a modified or substitute trademark or service mark.

## E.  INDEMNIFICATION FOR USE OF MARKS

We agree to reimburse you for all damages and expenses that you incur in any trademark infringement proceeding disputing your authorized use of any Mark under this Agreement, provided your use has been consistent with this Agreement, the Operations Manual, and Brand Standards communicated to you and you have timely notified us of, and complied with our directions in responding to, the proceeding. At our option, we and/or our affiliate(s) may defend and control the defense of any proceeding arising from or relating to your use of any Mark under this Agreement.

## 9.  CONFIDENTIAL INFORMATION

We and our affiliates possess (and will continue to develop and acquire) certain confidential information, some of which constitutes trade secrets under applicable law, relating to the development and operation of Blink Fitness Gyms (the "**Confidential Information**"), which includes, but is not limited to:

i.      information in the Operations Manual and Brand Standards;

ii.     layouts, designs, and other plans and specifications for Blink Fitness Gyms;

iii.    methods, formats, specifications, standards, systems, procedures, sales and marketing techniques, and knowledge and experience used in developing and operating Blink Fitness Gyms;

iv.    marketing research and promotional, marketing and advertising programs for Blink Fitness Gyms;

v.     knowledge of specifications for and suppliers of, and methods of ordering, certain Operating Assets, products, materials and supplies that Blink Fitness Gyms use and sell;

vi.    knowledge of the operating results and financial performance of Blink Fitness Gyms other than the Gym;

vii.   member solicitation, communication and retention programs, along with data and information used or generated in connection with those programs;

viii.  all Data and all other information generated by, or used or developed in, the operation of the Gym, including Consumer Data and Gym Lists (defined in Section 10), and any other information contained from time to time in the Computer System or that visitors (including you) provide to the System Website; and

ix.    any other information that we reasonably designate as confidential or proprietary.

You will not acquire any interest in any Confidential Information, other than the right to use certain Confidential Information as we specify in operating the Gym during the Term of this Agreement and according to the Brand Standards and the other terms and conditions of this Agreement.  You acknowledge that your use of any Confidential Information in any other business would constitute an unfair method of competition with us, our affiliates, our suppliers, and our franchisees.  You acknowledge and agree that the Confidential Information is proprietary, includes our and our affiliates' trade secrets, and is disclosed to you only on the condition that you, your owners, your Operating Principal, and your employees agree, and you and they do agree:

i.      not to use any Confidential Information in any other business or capacity and at all times to keep the Confidential Information absolutely confidential, both during

and after the Term of this Agreement (afterward for as long as the information is not generally known in the health and fitness industry);

ii.     not to make unauthorized copies of any Confidential Information disclosed via electronic medium or in written or other tangible form;

iii.    to adopt and implement all reasonable procedures that we periodically specify to prevent unauthorized use or disclosure of Confidential Information, including disclosing it only to Gym personnel and others needing to know such Confidential Information to operate the Gym, and using confidentiality and non-disclosure agreements with those having access to Confidential Information.  (We have the right to review and approve the forms of agreements you use solely to ensure that you adequately protect Confidential Information and the competitiveness of Blink Fitness Gyms.  Under no circumstances will we control the forms or terms of employment agreements you use with Gym employees or otherwise be responsible for your labor relations or employment practices); and

iv.     not to sell, trade or otherwise profit in any way from the Confidential Information (including by selling or assigning any Consumer Data, Gym Lists, or related information or Data), except during the Term of this Agreement using methods that we have approved.

"Confidential Information" does not include information, knowledge or know-how which is or becomes generally known in the health and fitness industry or which you knew from previous business experience before we provided it to you (directly or indirectly) or before you began training or operating the Gym.  If we include any matter in Confidential Information, anyone who claims that it is not Confidential Information must prove that the exclusion in this paragraph is applicable.

## 10. <u>CONSUMER DATA AND GYM LISTS</u>

You must comply with any reasonable instruction by us regarding the organizational, physical, administrative and technical measures and security procedures to safeguard the confidentiality and security of the names, addresses, telephone numbers, e-mail addresses, dates of birth, demographic or related information, and credit card information of customers and previous, current and prospective members ("**Consumer Data**") and, in any event, employ reasonable means to safeguard the confidentiality and security of Consumer Data.  You must comply with all applicable laws governing the use, protection, and disclosure of Consumer Data. If there is a suspected or actual breach of security or unauthorized access involving Consumer Data, you must notify us immediately after becoming aware of such actual or suspected occurrence and specify the extent to which Consumer Data was compromised or disclosed.

Subject to any applicable state or federal laws, you will provide to us at our request and in a manner we designate all member lists and membership records for the Gym, which include the names, addresses, phone numbers, and membership numbers of previous, current, and prospective members (the "**Gym Lists**").  You acknowledge and agree that we are the sole owners of the Gym Lists and that you may not distribute, in any form or manner, the Gym Lists

EAST\159342593.3

to any third party without our prior written consent. During the Term of this Agreement, we and our affiliates reserve the right to communicate with and provide notifications to members and other individuals listed on the Gym Lists. Upon termination of this Agreement, you agree that you and your affiliates may not use the Gym Lists in any form or manner, and we and our affiliates reserve the right to make any and all disclosures and use the Gym Lists in any manner that we or they deem necessary or appropriate.

## 11. <u>INNOVATIONS</u>

All ideas, concepts, techniques or materials relating to a Blink Fitness Gym ("**Innovations**"), whether or not protectable intellectual property and whether created by or for you or your owners, employees or contractors, must be promptly disclosed to us and will be deemed to be our sole and exclusive property and works made-for-hire for us. To the extent any Innovation does not qualify as a "work made-for-hire" for us, by this paragraph you assign ownership of that item, and all related rights to that item, to us and agree to sign (and to cause your owners, employees and contractors to sign) whatever assignment or other documents that we periodically request to evidence our ownership and to help us obtain intellectual property rights in the item. You may not use any Innovation in operating the Gym or otherwise without our prior written approval.

## 12. <u>EXCLUSIVE RELATIONSHIP</u>

You acknowledge that we have granted you the rights under this Agreement in consideration of and reliance upon your and your owners' agreement to deal exclusively with us with respect to the products and services that Blink Fitness Gyms offer. You therefore agree that, during the Term of this Agreement, neither you, your owners, the Operating Principal, nor any members of your or their Immediate Families (defined below) will:

    i.    have any direct or indirect, controlling or non-controlling interest as an owner - whether of record, beneficial or otherwise - in a Competitive Business (defined below), wherever located or operating, provided that this restriction will not prohibit the ownership of shares of a class of securities which are publicly traded on a United States stock exchange representing less than three percent (3%) of the number of shares of that class of securities issued and outstanding;

    ii.    perform services as a director, officer, manager, employee, consultant, representative or agent for a Competitive Business, wherever located or operating;

    iii.    directly or indirectly loan any money or other thing of value, or guarantee any other person's loan, to any Competitive Business or any owner, director, officer, manager, employee or agent of any Competitive Business, wherever located or operating; or

    iv.    divert or attempt to divert any actual or potential business, member, or customer of the Gym to a Competitive Business.

26

The term "**Competitive Business**" means any business providing fitness services or facilities, or any business which grants franchises or licenses to others to operate such a business, other than a Blink Fitness Gym operated under a franchise agreement with us.  The term "**Immediate Family**" includes the named individual, his or her spouse, and all children of the named individual or his or her spouse.

You agree to obtain similar covenants from your senior personnel whom we specify, including the Operating Principal, the Club Manager, and officers, directors, and managers, by having the personnel sign our form of confidentiality agreement attached hereto as Exhibit E and other agreements we specify.  We have the right to review and approve the forms of agreements you use solely to ensure that you adequately protect Confidential Information and the competitiveness of Blink Fitness Gyms.  Under no circumstances will we control the forms or terms of employment agreements you use with Gym employees or otherwise be responsible for your labor relations or employment practices.

## 13. ADVERTISING AND MARKETING

### A.  PRESALE MARKETING PROGRAM

You agree, at your expense, to implement a presale marketing program for the Gym in accordance with the Brand Standards.  We will consult with you on a customizable market introduction plan for the Gym that contemplates your spending the amount listed on Exhibit A on the initial promotion of the Gym (the "**Presale Marketing Budget**").  (If the Gym's address is unknown as of the Effective Date, we will list the Presale Marketing Budget on an amended and restated Exhibit A that we will send you once we accept a site for the Gym in accordance with Section 4.A.)  You must obtain our written approval of the presale marketing program.  At least forty-five (45) days before you intend to implement the presale marketing program, you must submit it to us for our approval.  If we do not accept the presale marketing program in writing within fifteen (15) days after receiving it, it will be deemed rejected.  You agree to implement the approved program according to our requirements.  You will use the Presale Marketing Budget to pay providers of products and services according to the approved presale marketing program.

### B.  BRAND FUND

We may, upon sixty (60) days' prior written notice to you, establish and then administer and maintain a fund ("**Brand Fund**" or "**Fund**") for advertising, marketing, research, and public relations programs and materials, the purpose of which is to enhance, promote, and protect the Blink Fitness brand and Franchise System.  You agree to contribute the amount that we periodically specify to the Brand Fund, not to exceed three percent (3%) of the Gym's Gross Sales.  Your Brand Fund contribution is payable in the same manner as the Royalty or in such other manner as we periodically specify.  Blink Fitness Gyms that we or our affiliates own will contribute to the Brand Fund on the same percentage basis as franchisees.

We will direct all programs financed by the Brand Fund, with sole control over all creative and business aspects, but we will consult periodically with the franchisee advertising council (or its successor, if any) when established concerning the Fund's significant advertising

27

programs and expenditures. The Brand Fund may pay for preparing, producing and placing video, audio and written materials, electronic media and Social Media; developing, maintaining and administering one or more System Websites, including, without limitation, online membership capabilities, lead management and member retention programs; administering national, regional and multi-regional marketing and advertising programs, including, without limitation, purchasing trade journal, direct mail, and other media advertising and using advertising, promotion, and marketing agencies and other advisors to provide assistance; establishing regional and national promotions and partnerships and hiring spokespersons to promote the Blink Fitness brand; and supporting public and member relations, market research, and other advertising, promotion, marketing and brand-related activities.

We will account for the Brand Fund separately from our other funds and not use the Brand Fund for any of our general operating expenses. However, the Brand Fund may reimburse us and our affiliates for the reasonable salaries and benefits of personnel who manage and administer the Brand Fund or otherwise provide assistance or services to the Brand Fund, the Brand Fund's administrative costs, travel expenses of personnel while they are on Brand Fund business, meeting costs, overhead relating to the Brand Fund's business, and other expenses that we and our affiliates incur in administering or directing the Brand Fund and its programs, including conducting market research, preparing advertising, promotional and marketing materials, collecting and accounting for Brand Fund contributions, and any other costs or expenses we incur in operating the Brand Fund or as a consequence of the Fund. The Brand Fund is not a trust, and we do not owe you fiduciary obligations because of our maintaining, directing or administering the Brand Fund or any other reason. The Brand Fund may spend in any fiscal year more or less than the total Brand Fund contributions in that year, borrow from us or others (paying reasonable interest) to cover deficits, or invest any surplus for future use. We will use all interest earned on Brand Fund contributions to pay costs before using the Brand Fund's other assets. We will prepare an annual, unaudited statement of Brand Fund collections and expenses and give you the statement upon written request within sixty (60) days of our fiscal year end. We may (but need not) have the Brand Fund audited annually, at the Brand Fund's expense, by a certified public accountant. We may incorporate the Brand Fund or operate it through a separate entity whenever we deem appropriate. The successor entity will have all of the rights and duties specified in this Section 13.B.

We intend the Brand Fund to maximize recognition of the Marks and patronage of Blink Fitness Gyms, and to enhance, promote, and protect the Blink Fitness brand and Franchise System. Although we will try to use the Brand Fund in the aggregate to develop advertising and marketing materials and programs, and implement programs, that will benefit all Blink Fitness Gyms, we need not ensure that Brand Fund expenditures in or affecting any geographic area are proportionate or equivalent to the Brand Fund contributions by Blink Fitness Gyms operating in that geographic area or that any Blink Fitness Gym benefits directly or in proportion to its Brand Fund contribution from the development of advertising and marketing materials or implementation of programs. We have the right, but no obligation, to use collection agents and institute legal proceedings to collect Brand Fund contributions at the Brand Fund's expense. We also may forgive, waive, settle and compromise all claims by or against the Brand Fund. Except as expressly provided in this Section 13.B, we assume no direct or indirect liability or obligation to you for collecting amounts due to, maintaining, directing or administering the Brand Fund.

We may at any time defer or reduce the Brand Fund contributions of any Blink Fitness Gym franchisee and, upon sixty (60) days' prior written notice to you, reduce or suspend Brand Fund contributions and operations for one or more periods of any length and terminate (and, if terminated, reinstate) the Brand Fund.  If we terminate the Brand Fund, we will either (i) spend the balance remaining in the Fund on appropriate programs and expenditures or (ii) distribute all unspent funds to our then existing franchisees, and to us and our affiliates, in proportion to their respective Brand Fund contributions during the preceding twelve (12)-month period.

## C. APPROVAL OF MARKETING AND OTHER EXTERNAL COMMUNICATIONS

All advertising, promotion, marketing, and public relations activities conducted by you ("**Marketing Materials**") must be legal and not misleading and conform to the policies set forth in the Operations Manual as we prescribe from time to time.  At least thirty (30) days before you intend to use them, you must send us samples or proofs of (a) all Marketing Materials that we have not prepared or already approved, and (b) all Marketing Materials that we have prepared or already approved and which you propose to change in any way.  However, you do not need to send us any advertising or marketing materials for which you have simply completed the missing Gym-specific or pricing information based on templates that we sent to you.  If we do not notify you in writing of our approval of these materials within ten (10) days after we actually receive them, they will be deemed disapproved.  We will not unreasonably withhold our approval.  You may not use any Marketing Materials that we have not approved or have disapproved.  We reserve the right upon thirty (30) days written notice to require you to discontinue the use of any previously-approved Marketing Materials.  You must remove from the Gym or other location any unapproved Marketing Materials at your own cost.  We also reserve the rights under Section 3.C above.

## D. LOCAL MARKETING

You agree to spend a total of at least five percent (5%) of the Gym's Gross Sales each calendar year on approved Marketing Materials and other approved advertising, marketing and promotional programs for the Gym (the "**Local Marketing Spending Requirement**").  We will administer up to one percent (1%) of your five percent (5%) Local Marketing Spending Requirement on e-mail marketing.  You will pay us this one percent (1%) of the Gym's Gross Sales at the same time and in the same manner as the Royalty, or in such other manner as we periodically specify.  As with the presale marketing program, you must prepare a written local marketing plan for the expenditure of your Local Marketing Spending Requirement and submit the plan to us for our approval in accordance with our approval process.  However, we will not count any of the following expenditures towards your Local Marketing Spending Requirement: Presale Marketing Budget, Brand Fund contributions, free membership or other service offers, discounts off of a base membership price or similar price reductions that you provide as a promotion, permanent on-premises signs, lighting, personnel salaries, administrative costs, transportation vehicles (even if they display the Marks), Yellow Pages advertising, employee incentive programs, and other amounts that we, in our reasonable judgment, deem inappropriate for meeting the Local Marketing Spending Requirement.  We may review your books and records from time to time and require you to submit reports periodically to determine your advertising, marketing and promotion expenses.  If you fail to spend (or prove that you spent) the

Local Marketing Spending Requirement in any year, then we may, in addition to and without limiting our other rights and remedies, require you to contribute the shortfall to the Brand Fund, to be used as provided in Section 13.B above.

Notwithstanding the foregoing, we reserve the right, upon delivery of written notice to you, to require you to contribute your Local Marketing Spending Requirement to the Brand Fund.  If we do so (unrelated to the shortfall referenced above), we will direct the Brand Fund to spend the Local Marketing Spending Requirement, less our costs or expenses in operating the Brand Fund or as a consequence of the Fund (as described in Section 13.B), on advertising, marketing, and promotional programs in or for the Gym's local market.

### E.  REGIONAL ADVERTISING COOPERATIVES

We may designate a geographic area for an advertising cooperative (a "**Cooperative**"). The Cooperative's members in any area are the owners of all of the Blink Fitness Gyms located and operating in that area (including us and our affiliates, if applicable).  Each Cooperative will be organized and governed in a form and manner, and begin operating on a date, that we determine.  We may change, dissolve and merge Cooperatives.  Each Cooperative's purpose is, with our approval, to administer advertising programs and develop advertising, marketing and promotional materials for the area that the Cooperative covers.  If, as of the Effective Date, we have established a Cooperative for the geographic area in which the Gym is located, or if we establish a Cooperative in that area during the Term of this Agreement, you agree to sign the documents that we require to become a member of the Cooperative and to participate in the Cooperative as those documents require.  We reserve the right to require you to contribute an additional one percent (1%) of the Gym's monthly Gross Sales to the Cooperative.  Any Cooperative dues you contribute (including any additional amounts we require you to contribute to the Cooperative) will count toward the Local Marketing Spending Requirement you are required to spend under Section 13.D to promote the Gym, but in no event will your amounts contributed to a Cooperative affect your new store opening financial and advertising obligations required under Section 13.A or your required contributions to the Brand Fund.

### F.  ADVERTISING ALLOCATION

We reserve the right to reallocate the total percentage of Gross Sales that we may require you to spend on the Brand Fund, Local Marketing Spending Requirement, and Cooperative at our sole discretion during the Term of this Agreement upon ninety (90) days' prior written notice to you.

### G.  SYSTEM WEBSITE

We or one or more of our designees may establish a website or series of websites for the Blink Fitness network:  (1) to advertise, market and promote Blink Fitness Gyms and the products and services they offer, and/or the Blink Fitness franchise opportunity; (2) to function as the Intranet; and/or (3) for any other purposes that we determine are appropriate for Blink Fitness Gyms (collectively, the "**System Website**").  If we include information about the Gym on the System Website, you agree to give us the information and materials that we periodically request concerning the Gym and otherwise participate in the System Website in the manner that

we periodically specify.  By posting or submitting to us information or materials for the System Website, you are representing to us that the information and materials are accurate and not misleading and do not infringe any third party's rights.

We will own all intellectual property and other rights in the System Website and all information it contains, including the domain name or URL for the System Website, the log of "hits" by visitors, and any Data and other personal or business data that visitors (including you) supply.  We may use the Brand Fund's assets to develop, maintain and update the System Website.  We may implement and periodically modify Brand Standards relating to the System Website and, at our option, may discontinue the System Website, or any services offered through the System Website, at any time.

All advertising, marketing and promotional materials that you develop for the Gym must contain notices of the URL of the System Website in the manner that we periodically designate. You may not develop, maintain or authorize any other website, other online presence or other electronic medium that mentions or describes the Gym or displays any of the Marks without our prior written approval.  You may not conduct commerce or directly or indirectly offer or sell any products or services using any website, another electronic means or medium, or otherwise over the Internet.

Nothing in this Section limits our right to maintain websites other than the System Website or to offer and sell products and services under the Marks from the System Website, another website or otherwise over the Internet without payment or obligation of any kind to you.

### H.  YOUR WEBSITE AND SOCIAL MEDIA ACTIVITIES

You may not establish an independent website or register any URL containing the Blink Fitness name, Marks, the trademarks of any of our affiliates, or any derivation thereof.  You may not advertise your Gym or reference the Marks on any independent website or through Social Media without our prior written approval.

### 14.  RECORDS, REPORTS AND FINANCIAL STATEMENTS

You agree to establish and maintain at your own expense a bookkeeping, accounting, and recordkeeping system conforming to the requirements and formats (including, at our option, the accounting methods) that we prescribe from time to time.  The records and information contained in this system will not include any records or information relating to the Gym's employees, as you control exclusively your labor relations and employment practices.  We may require you to use a Computer System to maintain certain revenue data and other information (including Consumer Data and Gym Lists) and provide us access to that data and other information (but excluding employee records, as you control exclusively your labor relations and employment practices) in the manner we specify.  You agree to give us in the manner and format that we prescribe from time to time:

     i.     within ten (10) days after the end of each month, statistical reports showing the Gym's total Gross Sales; new member sales; attrition; total member count;

personal training sales; retail, beverage, and packaged goods sales; and other information we request regarding you and the Gym covering that month;

ii.     within thirty (30) days after the end of each month, the Gym's operating statements and financial statements (including a balance sheet and cash flow and profit and loss statements);

iii.    within forty-five (45) days after the end of each of your fiscal years, annual profit and loss and cash flow statements and a balance sheet for the Gym as of the end of the previous fiscal year, and a narrative written description of your year-end operating results; and

iv.     within ten (10) days after our request, exact copies of federal and state income and other tax returns and any other forms, records, books, reports and other information that we periodically require relating to you or to the Gym (other than Gym employee records, as you control exclusively your labor relations and employment practices).

We may periodically specify the form and content of the reports and financial statements described above.  You agree to verify and sign each report and financial statement in the manner we prescribe.  We will not publicly disclose data derived from these reports unless we make such public disclosure without disclosing your identity or your Gym's financial results on an individual (i.e., unconsolidated) basis (except to the extent we disclose, and you acknowledge that we may disclose, the Gym's financial results in a financial performance representation appearing in Item 19 of our franchise disclosure document).

You agree to preserve and maintain all records, in the manner we periodically specify, in a secure location at the Gym or at such other location that we have approved in writing for at least seven (7) years after the end of the fiscal year to which such records relate, or for such time as required by applicable law.  If we reasonably determine that any report or financial statement submitted to us is willfully and materially inaccurate, then following our delivery of written notice to you, we may require you to have audited financial statements prepared annually during the Term until we determine that your reports and statements accurately reflect the Gym's business and operations.

## 15. <u>INSPECTIONS AND AUDITS</u>

### A.  INSPECTIONS

We and our designated representatives have the right before you open the Gym for business and thereafter from time to time during your regular business hours, and without prior notice to you, to inspect and evaluate the Gym, observe and record operations, interview employees and members, and inspect all books and records relating to the Gym (but excluding any employment records, as you control exclusively your labor relations and employment practices).  You will cooperate with us in these activities.  We will give you a written summary of our evaluation.  Without limiting our other rights and remedies under this Agreement, you agree promptly to correct at your own expense all deficiencies (i.e., failures to comply with Brand Standards) noted by our evaluators within the time period we specify following your

receipt of our notice of such deficiencies.  We then may conduct one or more follow-up evaluations to confirm that you have corrected these deficiencies and otherwise are complying with this Agreement and all Brand Standards.  We may charge you our then current evaluation fee (as set forth in the Operations Manual) to compensate us for our costs and expenses during any such follow-up evaluation or any evaluation that you request.

Since we will not have the right to inspect your employment records, you agree to send us written certification periodically (as specified in the Brand Standards) that the Gym's employees have all required third-party certifications.

### B.  OUR RIGHT TO AUDIT

We and our designated representatives may at any time during your business hours, and without prior notice to you, examine the Gym's business, bookkeeping and accounting records, sales and income tax records and returns, and other records (other than those records which we have no authority to control and/or remedy such as your employment records, as you control exclusively your labor relations and employment practices).  You agree to fully cooperate with our representatives and independent accountants hired by us to conduct any such inspection or audit.  If any inspection or audit discloses an understatement of the Gym's Gross Sales, you must pay us, within ten (10) days after receiving the inspection or audit report, the amounts due on the amount of the understatement, plus our administrative fee and interest from the date originally due until the date of payment.  If any inspection or audit discloses an overstatement of the Gym's Gross Sales, we will credit you (without interest) for any overpayments you made to us.  Further, if an inspection or audit is made necessary due to your failure to furnish reports, supporting records or other information as required, or to furnish these items on a timely basis, or if our examination reveals an understatement exceeding two percent (2%) of the amount that you actually reported to us for the period examined, you agree to reimburse us for the cost of our examination, including, without limitation, legal fees and independent accountants' fees, plus the travel expenses, room and board, and compensation of our employees.  These remedies are in addition to our other remedies and rights under this Agreement and applicable law.

### 16. TRANSFER

### A.  TRANSFER BY US

We may change our ownership or form and/or assign this Agreement and any other agreement to a third party without restriction.  After our assignment of this Agreement to a third party who expressly assumes this Agreement's obligations, we no longer will have any performance or other obligations under this Agreement.  That assignment will constitute a release and novation with respect to this Agreement, and the new owner-assignee will be liable to you as if it had been an original party to this Agreement.  Specifically and without limiting the foregoing, you agree that we may sell our assets (including this Agreement), the Marks, or the Franchise System to a third party; offer our ownership interests privately or publicly; merge, acquire other business entities, or be acquired by another business entity; and/or undertake a refinancing, recapitalization, leveraged buyout, or other economic or financial restructuring.

### B.  TRANSFER BY YOU AND DEFINITION OF TRANSFER

You acknowledge that the rights and duties this Agreement creates are personal to you and your owners and that we have granted you the rights under this Agreement in reliance upon our perceptions of your (or your owners') individual or collective character, skill, aptitude, attitude, business ability and financial capacity.  Accordingly, neither:  (i) this Agreement or any interest in this Agreement; (ii) the Gym or any right to receive all or a portion of the profits or losses or any capital appreciation relating to the Gym; (iii) all or substantially all of the Operating Assets; (iv) any ownership interest in you (if you are an entity); nor (v) a controlling ownership interest in an entity with an ownership interest in you, may be transferred without our prior written approval.  A transfer of the Gym's ownership, possession or control, or all or substantially all of the Operating Assets, may be made only with a transfer of this Agreement. Any transfer without our written approval is a breach of this Agreement and conveys no rights under or interest in this Agreement.  In addition to our other remedies, including, without limitation, the right to terminate this Agreement pursuant to Section 18, you agree that, if there is any transfer without our written approval, you must pay us Twenty-Five Thousand Dollars ($25,000) to compensate our administrative and management costs due to the unauthorized transfer.

In this Agreement, the term "**transfer**" includes a voluntary, involuntary, direct or indirect assignment, sale, gift or other disposition and includes the following events:

    i.    transfer of record or beneficial ownership of stock or any other ownership interest or right to receive (directly or indirectly) all or a portion of the profits or losses or any capital appreciation relating to the Gym;

    ii.    a merger, consolidation or exchange of ownership interests, or issuance of additional ownership interests or securities representing or potentially representing ownership interests, or a redemption of ownership interests;

    iii.    any sale or exchange of voting interests or securities convertible to voting interests, or any management agreement or other agreement granting the right (directly or indirectly) to exercise or control the exercise of the voting rights of any owner or to control the operations or affairs of you (or an entity with an ownership interest in you) or the Gym;

    iv.    transfer in a divorce, insolvency or entity dissolution proceeding, or otherwise by operation of law;

    v.    transfer by will, declaration of or transfer in trust, or under the laws of intestate succession; or

    vi.    the grant of a mortgage, charge, pledge, collateral assignment, lien or security or other interest in this Agreement, the Gym, any of the Operating Assets (other than vehicles), or an ownership interest in you (or in an entity with an ownership interest in you), excluding only an equipment lease arrangement or financing arrangement for equipment on arm's-length terms; foreclosure upon or attachment or seizure of the Gym or any of its Operating Assets or any interest in

34

you (or in an entity with an ownership interest in you); or your transfer, surrender or loss of the possession, control or management of the Gym.

## C.  CONDITIONS FOR APPROVAL OF TRANSFER

If you are in full compliance with this Agreement, then, subject to the other provisions of this Section 16.C, we will approve a transfer that meets all the requirements in this Section.

i.  We will approve the transfer of a non-controlling interest in you (determined as if the proposed transfer had occurred) if the proposed transferee and its owners are of good moral character, have no interest in and do not perform services for (and have no affiliates which have an interest in or perform services for) a Competitive Business, otherwise meet our then applicable standards for non-controlling owners of Blink Fitness franchisees, and sign our then current form of Guaranty and Assumption of Obligations.  The term "**controlling interest**" is defined in Section 21.O.

ii.  If the proposed transfer is of this Agreement or a controlling interest in you or in an entity owning a controlling ownership interest in you, or is one of a series of transfers (regardless of the period of time over which these transfers take place) which in the aggregate transfer this Agreement or a controlling interest in you or in an entity owning a controlling ownership interest in you, then all of the following conditions must be met before or concurrently with the effective date of the transfer:

a.  we determine that the transferee and its direct and indirect owners (if the transferee is an entity) have sufficient business experience, aptitude and financial resources to operate the Gym;

b.  you have paid all required Royalties, Brand Fund contributions and other amounts owed to us and our affiliates, have submitted all required reports and statements, and are not in violation of any provision of this Agreement or any other agreement with us or our affiliates;

c.  neither the transferee nor any of its direct or indirect owners (if the transferee is an entity) or affiliates operates, has an ownership interest in or performs services for a Competitive Business;

d.  the transferee (or its owner) and its management personnel and instructors, if different from your management personnel and instructors, satisfactorily complete our then current initial training program and pay our then current initial training fee (as set forth in the Operations Manual);

e.  the transferee and each of its owners (if the transfer is of this Agreement), or you and your owners (if the transfer is of a controlling interest in you or in an entity owning a controlling ownership interest in you), sign our then current form of franchise agreement and related documents, the provisions

35

of which may differ materially from any and all of those contained in this Agreement;

f.   you or the transferee pays us a transfer fee equal to fifty percent (50%) of our then current initial franchise fee for single Blink Fitness Gym franchises (i.e., not developed pursuant to a Development Rights Agreement) to partially cover our administrative and out-of-pocket costs and expenses;

g.   the transferee agrees to repair and/or replace the Operating Assets and upgrade the Gym in accordance with our then current requirements and specifications for new Blink Fitness Gyms within the time period that we specify following the effective date of the transfer;

h.   you (and your transferring owners) sign a general release, in a form satisfactory to us, of any and all claims against us and our affiliates and our and their respective owners, officers, directors, employees, representatives, agents, successors and assigns;

i.   we have determined that the purchase price, payment terms, and required financing will not adversely affect the transferee's operation of the Gym;

j.   if you or your owners finance any part of the purchase price, you and they agree that all of the transferee's obligations under promissory notes, agreements or security interests reserved in the Operating Assets or ownership interests in you are subordinate to the transferee's (and its owners') obligation to pay Royalties, Brand Fund contributions and other amounts due to us and our affiliates and otherwise to comply with this Agreement;

k.   you and your transferring owners (and members of their Immediate Families) agree, for two (2) years beginning on the transfer's effective date, not to engage in any of the activities proscribed in Section 19.E below; and

l.   you and your transferring owners agree not to directly or indirectly at any time thereafter or in any manner (except with respect to Blink Fitness Gyms that any of them owns or operates): (i) identify themselves or any business as a current or former Blink Fitness Gym or as one of our franchisees; (ii) use any Mark, any colorable imitation of a Mark, any trademark, service mark or commercial symbol that is confusingly similar to any Mark, or other indicia of a Blink Fitness Gym in any manner or for any purpose; or (iii) utilize for any purpose any trade dress, trade name, trademark, service mark or other commercial symbol that suggests or indicates a connection or association with us.

If the proposed transfer is to or among your owners, your or their Immediate Family members, or an entity controlled by you, or the transferee either is a franchisee in good standing

36

for the past five (5) years or managed a franchised or company-owned Blink Fitness Gym for at least five (5) years, then Paragraph (f) will not apply, although you agree to reimburse us for the out-of-pocket costs that we incur in the transfer, up to the amount of the transfer fee described in Paragraph (f). You acknowledge that we have legitimate reasons to evaluate the qualifications of potential transferees and to analyze and critique the terms of their purchase contracts with you and that our contact with potential transferees to protect our business interests will not constitute improper or unlawful conduct. You expressly authorize us to investigate any potential transferee's qualifications, to analyze and critique the proposed purchase terms, to communicate candidly and truthfully with the transferee regarding your operation of the Gym, and to withhold consent for the reasons specified above. You waive any claim that the action we take in good faith to protect our business interests in connection with a proposed transfer constitutes tortious interference with contractual or business relationships. Similarly, we may review all information regarding the Gym that you give the proposed transferee, correct any information we believe is inaccurate, and give the proposed transferee copies of any reports you have given us or we have made regarding the Gym.

## D. TRANSFER TO A WHOLLY-OWNED CORPORATION OR LIMITED LIABILITY COMPANY

Notwithstanding Section 16.C above, if you are in full compliance with this Agreement, you may transfer this Agreement, together with the Operating Assets and all other assets associated with the Gym, to a corporation or limited liability company which conducts no business other than the Gym and, if applicable, other Blink Fitness Gyms and of which you own and control one hundred percent (100%) of the equity and voting power of all issued and outstanding ownership interests, provided that all of the assets of the Gym are owned, and the Gym is operated, only by that single entity. The entity must expressly assume all of your obligations under this Agreement, but you will remain personally liable under this Agreement as if the transfer to the entity did not occur. Transfers of ownership interests in that entity are subject to the restrictions in Section 16.C.

## E. DEATH OR DISABILITY

i.      Transfer Upon Death or Disability

Upon your (or your owner's) death or disability, your (or the owner's) executor, administrator, conservator, guardian or other personal representative (the "**Representative**") must transfer your interest in this Agreement, the Operating Assets and the Gym, or the owner's ownership interest in you (or an owner), to a third party. That transfer (including transfer by bequest or inheritance) must occur, subject to our rights under this Section 16.E, within a reasonable time, not to exceed six (6) months from the date of death or disability, and is subject to all of the terms and conditions in this Section 16. A failure to transfer such interest within this time period is a breach of this Agreement.

ii.      Operation Upon Death or Disability

If, upon your (or your owner's) death or disability, the day-to-day operations of the Gym are not being managed by a trained manager whom we have approved, then you or the

37

Representative (as applicable) must within a reasonable time, not to exceed fifteen (15) days from the date of death or disability, appoint a manager whom we approve in writing to operate the Gym.  The manager must at our expense satisfactorily complete the training that we designate within the time period that we specify.  However, nothing in this Section 16.E limits our rights under Section 18.C.

### F.  EFFECT OF CONSENT TO TRANSFER

Our consent to any transfer is not a representation of the fairness of the terms of any contract between you (or your owner) and the transferee, a guarantee of the Gym's or transferee's prospects of success, or a waiver of any claims that we have against you (or your owners) or of our right to demand full compliance with this Agreement.

### G.  OUR RIGHT OF FIRST REFUSAL

If you, any of your owners, or the owner of a controlling ownership interest in an entity with an ownership interest in you at any time determines to sell or transfer for consideration an interest in this Agreement and the Gym (or all or substantially all of its Operating Assets), a controlling interest in you, or a controlling ownership interest in the entity with an ownership interest in you (except to or among your current owners or in a transfer pursuant to Section 16.D, which are not subject to this Section 16.G), you agree to obtain from a responsible and fully disclosed buyer, and send us, a true and complete copy of a bona fide, executed written offer (which may be a letter of intent) relating exclusively to this Agreement and the Gym or the controlling interest in you or in the entity with an ownership interest in you.  The offer must include details of the payment terms of the proposed sale and the sources and terms of any financing for the proposed purchase price and must provide for an earnest money deposit of at least five percent (5%) of the proposed purchase price.  To be a valid, bona fide offer, the proposed purchase price must be in a fixed dollar amount and without any contingent payments of purchase price (such as earn-out payments), and the proposed transaction must relate exclusively to an interest in this Agreement and the Gym (or all or substantially all of its Operating Assets) or a controlling interest in you or in the entity with an ownership interest in you and not to any other interests or assets.  We may require you (or your owners) to send us copies of any materials or information sent to the proposed buyer or transferee regarding the possible transaction.

We may, by delivering written notice to you within thirty (30) days after we receive both an exact copy of the offer and all other information that we request, elect to purchase the interest for the price and on the terms and conditions contained in the offer, provided that:  (i) we may substitute cash for any form of payment proposed in the offer; (ii) our credit will be deemed equal to the credit of any proposed buyer; (iii) the closing will be not less than thirty (30) days after notifying you of our election to purchase or, if later, the closing date proposed in the offer; and (iv) we must receive, and you and your owners agree to make, all customary representations, warranties and indemnities given by the seller of the assets of a business or ownership interests in a legal entity, as applicable, including representations and warranties regarding ownership and condition of, and title to, assets and (if applicable) ownership interests, liens and encumbrances on assets, validity of contracts and agreements, and the liabilities, contingent or otherwise, relating to the assets or ownership interests being purchased, and indemnities for all actions,

events and conditions that existed or occurred in connection with the Gym prior to the closing of our purchase.

Once you or your owners submit the offer and related information to us triggering the start of the thirty (30) day decision-period referenced above, the offer is irrevocable for that thirty (30) day period. This means that we have the full thirty (30) days to decide whether to exercise the right of first refusal and may choose to do so even if you or your owners change your, his, her, or its mind during that period and prefer after all not to sell the particular interest that is the subject of the offer. You and your owners may not withdraw or revoke your offer for any reason during the thirty (30) days, and we may exercise the right to purchase the particular interest in accordance with this Section's terms.

If we exercise our right of first refusal, you and your transferring owners agree that, for two (2) years beginning on the closing date, you or the transferring owners (and members of your or their Immediate Families) will be bound by the non-competition covenants contained in Section 19.E.

If we do not exercise our right of first refusal, you or your owners may complete the sale to the proposed buyer on the original offer's terms, but only if we approve the transfer as provided in this Section. If you do not complete the sale to the proposed buyer within sixty (60) days after we notify you that we do not intend to exercise our right of first refusal, or if there is a material change in the terms of the sale (which you agree to tell us promptly), we will have an additional right of first refusal during the thirty (30)-day period following either the expiration of the sixty (60)-day period or our receipt of notice of the material change(s) in the sale's terms, either on the terms originally offered or the modified terms, at our option. We have the unrestricted right to assign this right of first refusal to a third party (including an affiliate), who then will have the rights described in this Section 16.G. We waive our right of first refusal to sales or transfers to Immediate Family members who meet the criteria in Section 16.C.

## 17. <u>EXPIRATION OF THIS AGREEMENT</u>

When this Agreement expires (unless it is terminated sooner), you will have the right to acquire a successor franchise and continue operating the Gym as a Blink Fitness Gym for a ten (10)-year term under our then current form of franchise agreement, but only if you have:

i.      given us written notice of your request for a business review at least twenty-five (25) months, but not more than thirty (30) months, before the end of the Term of this Agreement;

ii.     complied with all of your obligations under this Agreement and all other agreements with us or our affiliates, as noted in the business review conducted by us at least twenty-four (24) months before the end of the Term of this Agreement; and

iii.    at our option, either (i) remodeled and upgraded the Gym and otherwise brought the Gym into full compliance with the specifications and standards then applicable for new Blink Fitness Gyms before this Agreement expires, or (ii)

39

agreed to relocate the Gym to a substitute site that we have accepted and construct and develop a new Blink Fitness Gym at that site.

To acquire a successor franchise, you and your owners agree to (i) sign our then current form of franchise agreement (and related documents), which may contain terms and conditions that differ materially from any or all of those in this Agreement, modified to reflect the fact it is for a successor franchise, except that such franchise agreement will impose a successor franchise fee equal to fifty percent (50%) of our then current initial franchise fee for single Blink Fitness Gym franchises (i.e., not developed pursuant to a Development Rights Agreement) and will not grant any rights to another renewal or successor franchise; and (ii) sign a general release in the form that we specify as to any and all claims against us, our affiliates and our and their respective owners, officers, directors, employees, agents, representatives, successors and assigns.  If you fail to sign and return to us the documents referenced in (i) and (ii) above, and pay the successor franchise fee, within sixty (60) days after we deliver those documents to you, that will be deemed your election not to acquire a successor franchise.  If you (and each of your owners) are not, both on the date you give us written notice of your election to acquire a successor franchise and on the date on which this Agreement expires, in full compliance with this Agreement and all other agreements with us or our affiliates, you acknowledge that we need not grant you a successor franchise, whether or not we had, or chose to exercise, the right to terminate this Agreement during its Term under Section 18.

## 18. <u>TERMINATION OF AGREEMENT</u>

### A.  TERMINATION BY YOU

You may terminate this Agreement if we commit a material breach of any of our obligations under this Agreement and fail to correct such breach within thirty (30) days after your delivery of written notice to us of such breach; provided, however, that if we cannot reasonably correct the breach within this thirty (30)-day period but provide you, within this thirty (30)-day period, with evidence of our effort to correct the breach within a reasonable time period, then the cure period will run through the end of such reasonable time period.  Your termination of this Agreement other than according to this Section 18.A will be deemed a termination without cause and a breach of this Agreement.

### B.  TERMINATION BY US

Upon the occurrence of any one of the following events, we may, at our option, terminate this Agreement, effective immediately upon delivery of written notice to you:

i.      you (or any of your direct or indirect owners) have made or make any material misrepresentation or omission in connection with your application for and acquisition of the franchise or your operation of the Gym, including, without limitation, by intentionally, or through your gross negligence, understating the Gym's Gross Sales for any period;

ii.     you fail to obtain our written acceptance of the site, to secure the accepted site under a lease or sublease that we accept, or otherwise to meet any of the development obligations identified in Section 4 on or before the applicable

40

deadline established in Section 4, or you fail to develop, open and begin operating the Gym in accordance with this Agreement and our Brand Standards on or before the Opening Deadline;

iii.      you abandon or fail to actively operate the Gym offering full services to its members during all of the hours we specify (other than due to a force majeure) for three (3) or more consecutive days, or for five (5) or more days within any period of twelve (12) consecutive months;

iv.      you, any of your owners, or the owner of a controlling ownership interest in an entity with an ownership interest in you makes a purported transfer in violation of Section 16 above;

v.      you (or any of your direct or indirect owners with a controlling ownership interest) are or have been convicted of, or plead or have pleaded either guilty or no contest to, a felony, or to another crime or lesser offense that may adversely affect your reputation, the reputation of your Gym or the goodwill associated with the Marks;

vi.      you (or any of your direct or indirect owners with a controlling ownership interest) engage in any dishonest, dangerous, unethical or other conduct which, in our sole opinion, adversely affects our reputation and/or the goodwill associated with the Marks;

vii.      a lender forecloses on its lien on a substantial and material portion of the Gym's assets;

viii.      an entry of judgment against you involving aggregate liability of One Hundred Thousand Dollars ($100,000) or more in excess of your insurance coverage and such judgment remains unpaid for a period of ten (10) days or more following the entry thereof;

ix.      you (or any of your direct or indirect owners) misappropriate any Confidential Information or violate any provisions of Section 12, including, but not limited to, by holding interests in or performing services for a Competitive Business;

x.      you violate any material law, ordinance, or regulation applicable to the development, operation or marketing of the Gym or the offer or sale of Gym memberships or otherwise applicable to the Gym and do not correct such noncompliance or violation within fifteen (15) days after delivery of written notice of such noncompliance or violation, or do not completely correct such noncompliance or violation within the time period prescribed by law, unless you are in good faith contesting your liability for such violation through appropriate proceedings or provide reasonable evidence of your continual effort to correct the violation within a reasonable time period;

EAST\159342593.3

xi.   you fail to report the Gym's Gross Sales or fail to make any payment due to us or any of our affiliates, and do not correct such failure within five (5) days after delivery of written notice of such failure;

xii.   you underreport the Gym's Gross Sales by two (2%) percent on three (3) separate occasions within any period of thirty-six (36) consecutive months or by five (5%) percent during any reporting period;

xiii.   you fail to maintain the insurance required by this Agreement or to furnish us with satisfactory evidence of such insurance within the required time, or significantly modify your insurance coverage without our written approval, and do not correct such failure within five (5) days after delivery of written notice of such failure;

xiv.   you fail to pay when due any federal or state income, service, sales, employment, or other taxes due from the operations of the Gym, unless you are in good faith contesting your liability for such taxes through appropriate proceedings;

xv.   you (or any of your direct or indirect owners) breach this Agreement or any other agreement between us (or any of our affiliates) and you (or any of your direct or indirect owners) on three (3) or more separate occasions within any period of twelve (12) consecutive months and we provide you with written notice of such breaches in accordance with Section 23 below, whether or not such breaches are corrected after notice from us;

xvi.   you repeatedly fail to pay amounts owed to our designated, approved, or recommended suppliers within thirty (30) days following the due date (unless you are contesting the amount in good faith), or you default (and fail to cure within the allocated time) under any note, lease, or agreement we deem material pertaining to the operation or ownership of the Gym, and do not correct such failure within five (5) days after delivery of written notice of such failure;

xvii.   you make an assignment for the benefit of creditors or admit in writing your insolvency or inability to pay your debts generally as they become due; you consent to the appointment of a receiver, trustee, or liquidator of all or a substantial part of your property; the Gym is attached, seized, or levied upon, unless such attachment, seizure, or levy is vacated within sixty (60) days; or any order appointing a receiver, trustee, or liquidator of you or the Gym is not vacated within sixty (60) days following the entry of such order; or

xviii.   you fail to comply with any other obligation under this Agreement or any other agreement between us (or any of our affiliates) and you, including, without limitation, any Brand Standard, and do not correct the failure to our satisfaction within thirty (30) days after we deliver written notice of the failure to you.

## C.  ASSUMPTION OF GYM'S MANAGEMENT

If you abandon or fail to actively operate the Gym for any period, or under the circumstances described in Section 16.E, we or our designee has the right (but not the obligation)

42

to enter the site and assume the Gym's management for any period of time that we deem appropriate. The manager will exercise control over the working conditions of the Gym's employees only to the extent that such control is related to our legitimate interest in protecting, and is necessary at that time to protect, the quality of our services or brand. If we assume the Gym's management, all funds from the Gym's operation during the period of our (or our designee's) management will be kept in a separate account and all Gym expenses will be charged to such account. In addition to all other fees and payments owed hereunder, we may charge you a reasonable management fee that we specify, not to exceed five percent (5%) of the Gym's Gross Sales, plus any out-of-pocket expenses incurred in connection with the Gym's management. We or our designee has a duty only to use reasonable efforts upon assuming the Gym's management and will not be liable to you for any debts, losses or obligations that the Gym incurs, or to any creditors for any supplies or other products or services purchased for the Gym, in connection with such management.

### D.  OTHER REMEDIES UPON DEFAULT

Upon your failure to remedy any failure to comply with any provision of this Agreement or any Brand Standard, or other default specified in any written notice issued to you under Section 18.B, within the time period (if any) we specify in our notice to you, then we have the right, until you correct the failure or remedy the default to our satisfaction, to take any one or more of the following actions:

    i.     suspend your right to participate in one or more advertising, marketing or promotional programs that we or the Brand Fund provides;

    ii.    suspend or terminate your participation in any temporary or permanent fee reductions to which we might have agreed (whether as a policy, in an amendment to this Agreement or otherwise);

    iii.   refuse to provide any operational support that this Agreement requires; and/or

    iv.   assume the Gym's management pursuant to Section 18.C.

Our exercise of any of these rights will not constitute an actual or constructive termination of this Agreement nor be our sole and exclusive remedy for your failure to comply or other default. If we exercise our right not to terminate this Agreement but to implement any remedies in this Section 18.D, we may at any time after the appropriate cure period under the written notice has lapsed (if any) terminate this Agreement without giving you any additional corrective or cure period. During any suspension period, you must continue to pay all fees and other amounts due under, and otherwise comply with, this Agreement and all related agreements. Our election to suspend your rights as provided above will not be a waiver by us of any breach of this Agreement. If we rescind any suspension of your rights, you will not be entitled to any compensation (including, without limitation, repayment, reimbursement, refunds, or offsets) for any fees, charges, expenses, or losses you might have incurred due to our exercise of any suspension right provided above.

**19. RIGHTS AND OBLIGATIONS UPON TERMINATION OR EXPIRATION OF THIS AGREEMENT**

### A. PAYMENT OF AMOUNTS OWED

You agree to pay within ten (10) days after this Agreement expires or is terminated, or on any later date that the amounts due are determined, the Royalties, Brand Fund contributions, interest and all other amounts owed to us or our affiliates which then are unpaid, including our damages arising from the termination of this Agreement.

### B. DE-IDENTIFICATION

Upon the termination or expiration of this Agreement, you must de-identify the Gym in accordance with this Section 19.B and as reasonably required by us. De-identification includes, but is not limited to, taking the following actions:

    i.    beginning on the De-identification Date (defined below), you and your owners may not directly or indirectly at any time thereafter or in any manner (except in connection with other Blink Fitness Gyms that you or any of them own and operate): (i) identify yourself or themselves or any business as a current or former Blink Fitness Gym or as one of our current or former franchisees; (ii) use any Mark, any colorable imitation of a Mark, any trademark, service mark or commercial symbol that is confusingly similar to any Mark or any other indicia of a Blink Fitness Gym in any manner or for any purpose; or (iii) use for any purpose any trade dress, trade name, trademark, service mark or other commercial symbol that indicates or suggests a connection or association with us;

    ii.    you agree, within fifteen (15) days after the De-identification Date, to take the action required to cancel all fictitious or assumed name or equivalent registrations relating to your use of any Mark;

    iii.    if we do not exercise the option under Section 19.F below, within fifteen (15) days after the De-identification Date, you agree at your own cost and without any payment from us for such items to deliver to us all signs, sign faces, advertising, marketing and promotional materials, forms, and other materials containing any Mark or otherwise identifying or relating to a Blink Fitness Gym that we request and allow us, without liability to you or third parties, to remove these items from the Gym;

    iv.    if we do not exercise the option under Section 19.F below, within fifteen (15) days after the De-identification Date, you agree, at your own expense, to make the alterations that we specify to distinguish the Gym clearly from its former appearance and from other Blink Fitness Gyms in order to prevent public confusion; and

    v.    you agree to give us from time to time upon request evidence satisfactory to us of your compliance with these obligations.

44

The "**De-identification Date**" means:  (i) if we exercise the option under Section 19.F, the closing date of our (or our designee's) purchase of the Gym's assets; or (ii) if we do not exercise the option under Section 19.F, the date upon which that option expires or the date upon which we provide you written notice of our decision not to exercise, or to withdraw our previous exercise, of that option, whichever occurs first.

### C.  CONFIDENTIAL INFORMATION

Upon termination or expiration of this Agreement, you and your owners will immediately cease to use any of our Confidential Information in any business or otherwise and return to us all copies of the Operations Manual and any other confidential materials that we have loaned to you. You may not sell, trade or otherwise profit in any way from any Consumer Data or other Confidential Information at any time following the expiration or termination of this Agreement.

### D.  NOTIFICATION TO MEMBERS AND CUSTOMERS

When this Agreement expires or is terminated, we have the right to contact (at our expense) previous, current, and prospective members and other customers to inform them that a Blink Fitness Gym will no longer operate at the Gym's location or, if we intend to exercise the option under Section 19.F, that the Gym will operate under new management.  We also have the right to inform them of other nearby Blink Fitness Gyms.  Our exercise of these rights will not constitute an interference with your contractual or business relationship with such members or customers.

### E.  COVENANT NOT TO COMPETE

Upon our termination of this Agreement for any reason, your termination of this Agreement without cause, or expiration of this Agreement (without the grant of a successor franchise), you agree that, for two (2) years beginning on the effective date of termination or expiration or the date on which all persons restricted by this Section 19.E begin to comply fully with this Section 19.E, whichever is later, and except in connection with other Blink Fitness Gyms operating under effective franchise agreements with us, neither you nor any of your owners, nor any member of your or their Immediate Families, will:

  i.     have any direct or indirect, controlling or non-controlling interest as an owner – whether of record, beneficial or otherwise – in any Competitive Business which is located or operating:

  a.     at the Gym's site, or

  b.     within ten (10) miles of the Gym's site, or

  c.     within ten (10) miles of any other Blink Fitness Gym in operation or under construction on the later of the effective date of the termination or expiration or the date on which all persons restricted by this Section 19.E begin to comply with this Section 19.E, provided that this restriction will not prohibit the ownership of shares of a class of securities which are publicly traded on a United States stock exchange representing less than

45

three percent (3%) of the number of shares of that class of securities issued and outstanding; or

ii.     perform services as a director, officer, manager, employee, consultant, representative or agent for a Competitive Business which is located or operating:

a.     at the Gym's site, or

b.     within ten (10) miles of the Gym's site, or

c.     within ten (10) miles of any other Blink Fitness Gym in operation or under construction on the later of the effective date of the termination or expiration or the date on which all persons restricted by this Section 19.E begin to comply with this Section 19.E.

These restrictions also apply after transfers and other events, as provided in Section 16 above. You (and each of your owners) expressly acknowledge that you (and they) possess skills and abilities of a general nature and have other opportunities for exploiting these skills. Consequently, our enforcing the covenants made in this Section 19.E will not deprive you (and them) of personal goodwill or the ability to earn a living.

## F.  OPTION TO PURCHASE OPERATING ASSETS

i.     Exercise of Option

Upon our termination of this Agreement for any reason, your termination of this Agreement other than pursuant to and in compliance with Section 18.A, or expiration of this Agreement (without the grant of a successor franchise), we have the option, exercisable by giving you written notice within thirty (30) days after the date of termination or expiration, to purchase those Operating Assets and other assets associated with the operation of the Gym that we designate. We have the unrestricted right to assign this option to purchase to a third party (including an affiliate), who will then have the rights and obligations described in this Section 19.F. We are entitled to all customary representations, warranties and indemnities in our asset purchase, including representations and warranties as to ownership and condition of, and title to, assets, liens and encumbrances on assets, validity of contracts and agreements, and the liabilities affecting the assets, contingent or otherwise, and indemnities for all actions, events and conditions that existed or occurred in connection with the Gym prior to the closing of our purchase.

If you or one of your affiliates owns the site upon which the Gym is located, we may elect to include a fee simple interest in that site as part of the assets purchased or, at our option, lease that site from you or such affiliate for an initial ten (10)-year term with one (1) renewal term of ten (10) years (at our option) on commercially reasonable terms. If you lease the Gym's site from an unaffiliated lessor, you agree (at our option) to assign the lease to us or to enter into a sublease for the remainder of the lease term on the same terms (including renewal options) as the lease.

46

ii.     Purchase Price

If we elect to purchase all or substantially all of the Operating Assets and other assets associated with the operation of the Gym, then the purchase price for those assets, together with an assignment of the lease or a sublease for the Gym's site on the terms set forth in Paragraph (i) above, will be their fair market value, although fair market value will not include any value for (a) the franchise or any rights granted by this Agreement, (b) goodwill attributable to our Marks, brand image, and other intellectual property, or (c) participation in the network of Blink Fitness Gyms.  In all cases, we may exclude from the assets purchased any Operating Assets or other items that are not reasonably necessary (in function or quality) to the Gym's operation or that we have not approved as meeting Brand Standards; the purchase price will reflect these exclusions. If we elect to purchase a fee simple interest in the site upon which the Gym is located pursuant to Paragraph (i) above, its purchase price also will be fair market value and will be added to the purchase price for the other Operating Assets we choose to buy.  We and you must work together in good faith to agree upon the assets' fair market value within fifteen (15) days after we send you our notice exercising our right to purchase.  If we and you cannot agree on fair market value within this fifteen (15) day period, fair market value will be determined by the following appraisal process.

Fair market value will be determined by one (1) independent accredited appraiser upon whom we and you agree, who, in conducting the appraisal, will be bound by the criteria specified above.  You and we agree to select the appraiser within fifteen (15) days after we deliver our purchase notice (if we and you do not agree on fair market value before then).  If we and you cannot agree on a mutually acceptable appraiser within fifteen (15) days after we deliver our notice, then we will provide you with a list of three (3) independent appraisers and you must select one (1) of those choices to act as the designated appraiser that will determine the purchase price. We and you will share equally the costs of the appraiser's fees and expenses.  Within thirty (30) days after delivery of the notice invoking the appraisal mechanism, we and you each must submit to the appraiser our and your respective calculations of the purchase price with such detail and supporting documentation as the appraiser requests and according to the criteria specified above.  Within fifteen (15) days after receiving both calculations, the appraiser must decide whether our proposed purchase price or your proposed purchase price most accurately reflects the fair market value of the assets purchased under this Section 19.F.  The appraiser has no authority to compromise between the two (2) proposed purchase prices, but instead is authorized to choose only one or the other.  The appraiser's choice will be the purchase price and is final.

iii.     Closing

We will pay the purchase price at the closing, which will take place not later than thirty (30) days after the purchase price is determined, although we may decide after the purchase price is determined not to complete the purchase and will have no liability to you for doing so.  We may set off against the purchase price, and reduce the purchase price by, any and all amounts that you owe us (or our affiliates).  At the closing, you agree to deliver instruments transferring to us:  (a) good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us), with all sales and transfer

47

taxes paid by you; and (b) all of the Gym's licenses and permits which may be assigned or transferred.

If you cannot deliver clear title to all of the purchased assets, or if there are other unresolved issues, the sale will be closed through an escrow. You further agree to sign general releases, in a form satisfactory to us, of any and all claims against us and our affiliates and our and their respective owners, officers, directors, employees, agents, representatives, successors and assigns. If we exercise our rights under this Section 19.F, then for two (2) years beginning on the closing date, you and your owners (and members of your and their Immediate Families) will be bound by the non-competition covenants contained in Section 19.E.

## G.  CONTINUING OBLIGATIONS

All of our and your (and your owners') obligations hereunder which expressly or by their nature survive the expiration or termination of this Agreement will continue in full force and effect subsequent to and notwithstanding its expiration or termination and until these obligations are satisfied in full or by their nature expire.

## 20. RELATIONSHIP OF THE PARTIES; INDEMNIFICATION

### A.  INDEPENDENT CONTRACTORS

This Agreement does not create a fiduciary relationship between you and us. You have no authority, express or implied, to act as an agent of ours or any of our affiliates for any purpose. You are, and will remain, an independent contractor responsible for all obligations and liabilities of, and for all losses or damages to, the Gym and its assets, including any personal property, equipment, fixtures or real property, and for all claims or demands based on damage to or destruction of property or based on injury, illness or death of any person or persons, directly or indirectly, resulting from the operation of the Gym. Further, we and you are not and do not intend to be partners, joint venturers, associates, or employees of the other in any way, and we will not be construed to be jointly liable for any of your acts or omissions under any circumstances. We are not the employer or joint employer of the Gym's employees. You or your Operating Principal is solely responsible for the management and operation of the Gym and the supervision of the Gym's employees. You agree to identify yourself conspicuously in all dealings with members, other customers, suppliers, public officials, Gym personnel and others as the owner, operator, and manager of the Gym under a franchise that we have granted and to place notices of independent ownership at the Gym and on the forms, business cards, stationery, advertising, e-mails and other materials that we require from time to time.

We will not exercise direct or indirect control over the working conditions of Gym personnel, except to the extent that such indirect control is related to our legitimate interest in protecting the quality of our services or brand. We do not share or codetermine the terms and conditions of employment of the Gym's employees and do not affect matters relating to the employment relationship between you and the Gym's employees, such as employee selection, promotion, termination, hours worked, rates of pay, other benefits, work assigned, discipline, adjustment of grievances and complaints, and working conditions. To that end, you agree to notify Gym personnel that you are their employer and that we, as the franchisor of Blink Fitness

48

Gyms, are not their employer and do not engage in any employer-type activities for which only franchisees are responsible, such as employee selection, promotion, termination, hours worked, rates of pay, other benefits, work assigned, discipline, adjustment of grievances and complaints, and working conditions.

### B.  NO LIABILITY FOR ACTS OF OTHER PARTY

We and you agree not to make any express or implied agreements, warranties, guarantees or representations, or incur any debt, in the name or on behalf of the other or represent that our and your relationship is other than franchisor and franchisee.  We will not be obligated for any damages to any person or property directly or indirectly arising out of the operation of the Gym or the business you conduct under this Agreement.

### C.  TAXES

We will have no liability for any sales, use, service, occupation, excise, gross receipts, income, property, employment, or other taxes, whether levied upon you or the Gym, due to the business you conduct (except for our own income taxes).  You must pay these taxes and reimburse us for any taxes we must pay to any taxing authority on account of either your operation or payments you make to us (except for our own income taxes).

### D.  INSURANCE

During the Term of this Agreement, you agree to maintain in force at your sole expense insurance coverage for the Gym in the amounts, and covering the risks, that we periodically specify.  We may require that some or all of your insurance policies provide for waiver of subrogation in favor of us and our affiliates.  All of your insurance carriers must be licensed to do business in the state in which the Gym is located and be rated A- or higher by A.M. Best and Company, Inc. (or such similar criteria as we periodically specify).  These insurance policies must be in effect before you open the Gym for business.  We may periodically increase the amounts of coverage required under these insurance policies and/or require different or additional insurance coverage at any time to reflect inflation, identification of new risks, changes in law or standards of liability, higher damage awards or relevant changes in circumstances.  Insurance policies must name us and any affiliates we periodically designate as additional insureds and provide for thirty (30) days' prior written notice to us of the material modification, cancellation or non-renewal of any policy.  You agree to periodically send us a valid certificate of insurance or duplicate insurance policy evidencing the coverage specified above and the payment of premiums.

### E.  INDEMNIFICATION

To the fullest extent permitted by law, you agree to indemnify, defend and hold harmless us, our affiliates and our and their respective owners, directors, officers, employees, agents, lawyers, consultants, representatives, successors and assigns (the "**Indemnified Parties**") from and against, and to reimburse any one or more of the Indemnified Parties for, any and all claims, losses, obligations and damages directly or indirectly arising out of or relating to:  (i) the operation of the Gym, (ii) the business you conduct under this Agreement, (iii) your breach of this Agreement or any other agreement with us or our affiliates, (iv) any breach or alleged breach

49

by you or your owners of any representation or warranty set forth in this Agreement, (v) any claim or allegation by any third party that your and your owners' signing this Agreement with us or performing your and their obligations under this Agreement violates any law or any contractual or other commitment you or your owners have, or the rights of or duties owed, to such third party, or (vi) your noncompliance or alleged noncompliance with any law, ordinance, rule or regulation concerning the construction, design or operation of the Gym (including laws relating to operating and selling memberships for health and fitness centers, if and to the extent applicable, the ADA and other laws regarding public accommodations for persons with disabilities, and laws regulating employment practices and employee relations), including those claims, obligations and damages alleged to be caused by an Indemnified Party's negligence or willful misconduct, except as specifically set forth below in this Section.

For purposes of this indemnification, "**claims**" include all losses, expenses, obligations, and damages (actual, consequential, punitive or otherwise) and costs that an Indemnified Party reasonably incurs in defending any claim against it, including reasonable accountants', arbitrators', attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, travel and living expenses, and other expenses of litigation, arbitration or alternative dispute resolution, including, without limitation, claims by employees, members, or third parties, regardless of whether litigation, arbitration or alternative dispute resolution is commenced. Each Indemnified Party may defend and control the defense of any claim against it which is subject to this indemnification at your expense, and you may not settle any claim or take any other remedial, corrective or similar actions relating to any claim without the consent of the Indemnified Party. The provisions of this Section will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement. An Indemnified Party need not seek recovery from an insurer or other third party, or otherwise mitigate its losses and expenses, in order to maintain and recover fully a claim against you. You agree that a failure to pursue a recovery or mitigate a loss will not reduce or alter the amounts that an Indemnified Party may recover from you.

Notwithstanding the foregoing, you have no obligation to indemnify under this Section if a court of competent jurisdiction makes a final decision not subject to further appeal that we, our affiliates, or any of our or their respective employees directly engaged in willful misconduct or intentionally caused the property damage or bodily injury that is the subject of the claim, so long as that claim is not asserted on the basis of theories of vicarious liability (including agency, apparent agency, or employment), joint employer liability, or our failure to compel you to comply with this Agreement, which are claims for which we are entitled to indemnification under this Section.

## 21. <u>ENFORCEMENT</u>

### A. SEVERABILITY

Except as expressly provided to the contrary in Section 21.G or otherwise in this Agreement, each Section, paragraph, term and provision of this Agreement is severable, and if, for any reason, any part is held to be invalid or contrary to or in conflict with any applicable present or future law or regulation in a final, unappealable ruling issued by any court, arbitrator, agency or tribunal with competent jurisdiction, that ruling will not impair the operation of, or

50

otherwise affect, any other portions of this Agreement, which will continue to have full force and effect and bind the parties. If any covenant which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited, and/or length of time, but would be enforceable if modified, you and we agree that the covenant will be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction whose law determines the covenant's validity. If any applicable and binding law or rule of any jurisdiction requires more notice than this Agreement requires of the termination of this Agreement or of our refusal to enter into a successor franchise agreement, or if, under any applicable and binding law or rule of any jurisdiction, any provision of this Agreement or any Brand Standard is invalid, unenforceable or unlawful, the notice and/or other action required by the law or rule will be substituted for the comparable provisions of this Agreement, and we may modify the invalid or unenforceable provision or Brand Standard to the extent required to be valid and enforceable or delete the unlawful provision in its entirety. You agree to be bound by any promise or covenant imposing the maximum duty the law permits which is subsumed within any provision of this Agreement, as though it were separately articulated in and made a part of this Agreement.

## B.  WAIVER OF OBLIGATIONS AND FORCE MAJEURE

We and you may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under this Agreement, effective upon delivery of written notice to the other or another effective date stated in the notice of waiver. However, no interpretation, change, termination or waiver of any provision of this Agreement will bind us unless in writing and signed by one of our officers, and which is specifically identified as an amendment to this Agreement. No modification, waiver, termination, discharge or cancellation of this Agreement affects the right of any party hereto to enforce any claim or right hereunder, whether or not liquidated, which occurred prior to the date of such modification, waiver, termination, discharge or cancellation. Any waiver we grant will be without prejudice to any other rights we have, will be subject to our continuing review, and may be revoked at any time and for any reason, effective upon delivery to you of ten (10) days' prior written notice.

We and you will not be deemed to waive or impair any right, power or option this Agreement reserves (including our right to demand exact compliance with every term, condition and covenant or to declare any breach to be a default and to terminate this Agreement before its term expires) because of any custom or practice at variance with the terms of this Agreement; our or your failure, refusal or neglect to exercise any right under this Agreement or to insist upon the other's compliance with this Agreement, including your compliance with any Brand Standard; our waiver of or failure to exercise any right, power or option, whether of the same, similar or different nature, with other Blink Fitness Gyms; the existence of franchise agreements for other Blink Fitness Gyms which contain provisions different from those contained in this Agreement; or our acceptance of any payments due from you after any breach of this Agreement. No special or restrictive legend or endorsement on any check or similar item given to us will be a waiver, compromise, settlement or accord and satisfaction. We are authorized to remove any legend or endorsement, and it will have no effect.

Neither we nor you will be liable for loss or damage or be in breach of this Agreement if our or your failure to perform obligations results from:  (i) acts of God; (ii) fires, strikes,

51

embargoes, war, acts of terrorism or similar events, or riot; or (iii) any other similar event or cause. Any delay resulting from any of these causes will extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, except that these causes will not excuse payments of amounts owed at the time of the occurrence or payment of Royalties, Brand Fund contributions and other amounts due afterward.

### C.  COSTS AND ATTORNEYS' FEES

If either we or you seek to enforce this Agreement in an arbitration, judicial or other proceeding, the prevailing party is entitled to recover its reasonable costs and expenses (including attorneys' fees, arbitrators' fees and expert witness fees, costs of investigation and proof of facts, court costs, other arbitration or litigation expenses and travel and living expenses) incurred in connection with such arbitration, judicial or other proceeding.

### D.  YOU MAY NOT WITHHOLD PAYMENTS

You agree that you will not withhold payment of any amounts owed to us or our affiliates on the grounds of our or their alleged nonperformance of any of our or their obligations under this Agreement or any other agreement.

### E.  RIGHTS OF PARTIES ARE CUMULATIVE

Our and your rights under this Agreement are cumulative, and our and your exercise or enforcement of any right or remedy under this Agreement will not preclude our or your exercise or enforcement of any other right or remedy under this Agreement which we and you are entitled by law to enforce.

### F.  MEDIATION

We and you acknowledge that, during the Term of this Agreement, disputes may arise regarding our and your relationship, rights and obligations under this Agreement. To facilitate resolution of these disputes, we and you agree that, during the Term of this Agreement, before commencing an arbitration action, we and you must submit any dispute arising from or relating to this Agreement or our relationship (other than disputes relating to the Marks or to your failure to pay amounts owed to us or our affiliates) for non-binding mediation. The mediation will occur in the county where our headquarters are then located and be conducted by one (1) mediator under the then current Commercial Mediation Rules of the American Arbitration Association. The mediation will be limited to one (1) eight (8)-hour day. Any statements made by any person during the mediation are not admissible in any subsequent litigation or arbitration proceeding. We and you will each bear our own costs and expenses for the mediation and share equally the costs of any independent third parties or fees required for the mediation. If the dispute is not resolved within forty-five (45) days after the mediator is appointed, either we or you may bring an arbitration action according to the terms of this Agreement.

Notwithstanding anything to the contrary contained in this Section or in Section 21.G, we and you have the right to obtain temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction. In that case, we and you agree to contemporaneously submit our dispute for arbitration on the merits according to Section 21.G.

Furthermore, nothing in this Section or Section 21.G limits either party's right to deliver a notice of default under, and terminate, this Agreement in accordance with Section 18.

### G.  ARBITRATION

Subject to the parties' right to obtain temporary restraining orders and temporary or preliminary injunctive relief pursuant to Section 21.F, all controversies, disputes or claims between us (and our affiliates and our and their respective owners, officers, directors, agents and employees, as applicable) and you (and your affiliates and your and their respective owners, officers, and directors, as applicable) arising out of or related to:

     i.     this Agreement or any other agreement between you (or your owner) and us (or our affiliate) or any provision of any of such agreements;

     ii.     our relationship with you;

     iii.     the scope or validity of this Agreement or any other agreement between you (or your owner) and us (or our affiliate) or any provision of any of such agreements (including the validity and scope of the arbitration obligation under this Section, which we and you acknowledge is to be determined by an arbitrator, not a court); or

     iv.     any Brand Standard,

will be submitted for arbitration to the American Arbitration Association. Except as otherwise provided in this Agreement, such arbitration proceedings will be heard by one (1) arbitrator in accordance with the then existing Commercial Arbitration Rules of the American Arbitration Association. All proceedings will be conducted at a suitable location chosen by the arbitrator that is within ten (10) miles of where we have our principal business address at the time the arbitration demand is filed. The arbitrator will have no authority to select a different hearing locale other than as described in the prior sentence. All matters within the scope of the Federal Arbitration Act (9 U.S.C. Sections 1 et seq.) will be governed by it and not by any state arbitration law.

The arbitrator has the right to award any relief which he or she deems proper in the circumstances, including money damages (with interest on unpaid amounts from the date due), specific performance, injunctive relief and attorneys' fees and costs in accordance with Section 21.C above, provided that:  (i) the arbitrator has no authority to declare any Mark generic or otherwise invalid; and (ii) subject to the exceptions in Section 21.J, we and you waive to the fullest extent permitted by law any right to or claim for any punitive, exemplary, and treble and other forms of multiple damages against the other. The award and decision of the arbitrator will be conclusive and binding upon all parties hereto and judgment upon the award may be entered in any court of competent jurisdiction.

We and you agree to be bound by the provisions of any limitation on the period of time by which claims must be brought under this Agreement or applicable law, whichever expires first. We and you further agree that, in connection with any such arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by

53

the then current Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any such claim which is not submitted or filed in such proceeding will be barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either you or us. We reserve the right, but have no obligation, to advance your share of the costs of any arbitration proceeding in order for such arbitration proceeding to take place and by doing so will not be deemed to have waived or relinquished our right to seek the recovery of those costs in accordance with Section 21.C above.

We and you agree that arbitration will be conducted on an individual, not a class wide, basis, that only we (and our affiliates and our and their respective owners, officers, directors, agents and employees, as applicable) and you (and your affiliates and your and their respective owners, officers and directors, as applicable) may be the parties to any arbitration proceeding described in this Section, and that no such arbitration proceeding may be consolidated with any other arbitration proceeding involving us and/or any other person. Notwithstanding the foregoing or anything to the contrary in this Section or Section 21.A, if any court or arbitrator determines that all or any part of the preceding sentence is unenforceable with respect to a dispute that otherwise would be subject to arbitration under this Section 21.G, then we and you agree that this arbitration clause will not apply to that dispute and that such dispute will be resolved in a judicial proceeding in accordance with this Section 21 (excluding this Section 21.G).

The provisions of this Section are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

### H. GOVERNING LAW

Except to the extent governed by the Federal Arbitration Act, the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051 et seq.) or other federal law, all controversies, disputes or claims arising from or relating to:

    i.      this Agreement or any other agreement between you (or your owners) and us (or our affiliates);

    ii.      our relationship with you;

    iii.      the validity of this Agreement or any other agreement between you (or your owners) and us (or our affiliate); or

    iv.      any Brand Standard,

will be governed by the laws of the State of New York, without regard to its conflict of laws rules, except that any law regulating the offer or sale of franchises, business opportunities or similar interests, or governing the relationship between a franchisor and a franchisee or any similar relationship (including the New York General Business Law, Art. 33, Sections 680 to 695), will not apply unless its jurisdictional requirements are met independently without reference to this Section 21.H.

### I.  CONSENT TO JURISDICTION

Subject to the arbitration obligations in Section 21.G, you and your owners agree that all judicial actions brought by us against you or your owners, or by you or your owners against us, our affiliates or our or their respective owners, officers, directors, agents, or employees, must be brought exclusively in the state or federal court of general jurisdiction located closest to where we have our principal business address at the time the action is commenced.  You and each of your owners irrevocably submit to the jurisdiction of such courts and waive any objection that you or any of them may have to either jurisdiction or venue.  Notwithstanding the foregoing, we may bring an action for a temporary restraining order or for temporary or preliminary injunctive relief, or to enforce an arbitration award, in any federal or state court in the state in which you reside or the Gym is located.

### J.  WAIVER OF PUNITIVE DAMAGES

EXCEPT FOR THE INDEMNIFICATION OBLIGATIONS UNDER SECTION 20.E AND CLAIMS BASED ON UNAUTHORIZED USE OF THE MARKS OR UNAUTHORIZED USE OR DISCLOSURE OF ANY CONFIDENTIAL INFORMATION, WE AND YOU (AND YOUR OWNERS) WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE, EXEMPLARY, AND TREBLE AND OTHER FORMS OF MULTIPLE DAMAGES AGAINST THE OTHER AND AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN US AND YOU (AND/OR YOUR OWNERS), THE PARTY MAKING A CLAIM WILL BE LIMITED TO EQUITABLE RELIEF AND TO RECOVERY OF ANY ACTUAL DAMAGES HE, SHE, OR IT SUSTAINS.

### K.  WAIVER OF JURY TRIAL

WE AND YOU (AND YOUR OWNERS) IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER US OR YOU (OR YOUR OWNERS).  WE AND YOU (AND YOUR OWNERS) EACH ACKNOWLEDGE THAT WE AND YOU (AND THEY) MAKE THIS WAIVER KNOWINGLY, VOLUNTARILY, WITHOUT DURESS, AND ONLY AFTER CONSIDERATION OF THIS WAIVER'S RAMIFICATIONS.

### L.  WAIVER OF CLASS ACTION LITIGATION

Litigation arising out of or related to this Agreement must be conducted on an individual, not a class-wide, basis.  No litigation under this Agreement may be consolidated with any other litigation and any other person without our prior written consent.

### M. BINDING EFFECT

This Agreement is binding upon us and you and our and your respective executors, administrators, heirs, beneficiaries, permitted assigns and successors in interest.  Subject to our rights to modify the Operations Manual and the Brand Standards, this Agreement may not be modified except by a written agreement signed by both you and us.

EAST\159342593.3

### N. LIMITATIONS OF CLAIMS

EXCEPT FOR CLAIMS ARISING FROM YOUR NON-PAYMENT OR UNDERPAYMENT OF AMOUNTS THAT YOU OWE US AND EXCEPT FOR OUR (AND CERTAIN OF OUR RELATED PARTIES') RIGHT TO SEEK INDEMNIFICATION FROM YOU FOR THIRD-PARTY CLAIMS AS PROVIDED IN THIS AGREEMENT, ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN US AND YOU WILL BE BARRED UNLESS AN ARBITRATION OR JUDICIAL PROCEEDING, AS PERMITTED, IS COMMENCED IN THE APPROPRIATE FORUM WITHIN EIGHTEEN (18) MONTHS FROM THE DATE ON WHICH THE PARTY ASSERTING THE CLAIM KNEW OR SHOULD HAVE KNOWN OF THE FACTS GIVING RISE TO THE CLAIM.

### O. CONSTRUCTION

The preambles and exhibits are a part of this Agreement, which, together with any riders or addenda signed at the same time as this Agreement, constitutes the entire agreement and supersedes all prior and contemporaneous oral or written agreements and understandings between us and you relating to the subject matter of this Agreement. There are no other oral or written representations, warranties, understandings or agreements between us and you relating to the subject matter of this Agreement. Notwithstanding the foregoing, nothing in this Agreement disclaims or requires you to waive reliance on any representation that we made in the most recent disclosure document (including its exhibits and amendments) that we delivered to you or your representative. Any policies that we adopt and implement from time to time to guide us in our decision-making are subject to change, are not a part of this Agreement and are not binding on us. Except as provided in Sections 20.E and 21.G, nothing in this Agreement is intended or deemed to confer any rights or remedies upon any person or legal entity not a party to this Agreement.

The headings of the sections and paragraphs are for convenience only and do not define, limit or construe the contents of these sections or paragraphs.

References in this Agreement to "**us**" with respect to all of our rights and all of your obligations to us under this Agreement include any of our affiliates with whom we deal in connection with the Gym. The term "**affiliate**" means any person or entity directly or indirectly owned or controlled by, under common control with, or owning or controlling the party indicated. "**Control**" means the power to direct or cause the direction of management and policies.

If two or more persons are at any time the owners of your rights under this Agreement and/or the Gym, whether as partners or joint venturers, their representations, warranties, obligations and liabilities to us will be joint and several. The term "**owner**" means any person holding a direct or indirect ownership interest (whether of record, beneficial, or otherwise) or voting rights in you (or your owner or a transferee of this Agreement and the Gym or any interest in you), including any person who has a direct or indirect interest in you (or your owner or a transferee), this Agreement, or the Gym and any person who has any other direct or indirect legal or equitable interest, or the power to vest in himself or herself any legal or equitable interest, in

56

their revenue, profits, rights, or assets.  References to a "**controlling ownership interest**" or "**controlling interest**" means any of the following:  (a) thirty-three percent (33%) or more of the ownership interests, voting shares or other voting rights in you or one of your owners, whether held directly or through one or more owners; (b) an interest the acquisition of which allows an individual to become or appoint an owner (subject to our consent pursuant to this Agreement); or (c) an interest the acquisition of which grants the power to direct or cause the direction of management and polices of you, your owners (if an entity) or the Gym to any person that did not have such power before that acquisition.  "**Person**" means any natural person, corporation, limited liability company, general or limited partnership, unincorporated association, cooperative or other legal or functional entity.  Unless otherwise specified, all references to a number of days mean calendar days and not business days.

The term "Gym" includes all of the assets of the Blink Fitness Gym that you operate under this Agreement, including its revenue and income.  The words "include," "including," and words of similar import will be interpreted to mean "including, but not limited to" and the terms following such words will be interpreted as examples of, and not an exhaustive list of, the appropriate subject matter.

This Agreement may be executed in multiple copies, each of which will be deemed an original.

### P.  THE EXERCISE OF OUR BUSINESS JUDGMENT

Because complete and detailed uniformity under many varying conditions might not be possible or practical, you acknowledge that we specifically reserve the right and privilege, as we deem appropriate according to our reasonable business judgment and subject to reasonable deviations, to vary Brand Standards or other aspects of the Franchise System for any franchise owner.  You have no right to require us to grant you a similar variation or accommodation.  Notwithstanding the foregoing, we will not unreasonably withhold, condition, or delay our consent to a proposed transfer or assignment you submit for our approval if the proposed transfer satisfies the terms and conditions of Section 16.

### Q.  REPRESENTATIONS AND WARRANTIES

You and your owners, jointly and severally, represent, warrant, and covenant to us that your execution and delivery of this Agreement, and your performance of your obligations under this Agreement, (i) have not violated and will not violate any other agreement or commitment to which you or they are a party or by which you or they are otherwise bound, and (ii) have not violated and will not violate the rights of, or duties owed to, any third party.

### 22. COMPLIANCE WITH ANTI-TERRORISM LAWS

You and your owners agree to comply, and to assist us to the fullest extent possible in our efforts to comply, with Anti-Terrorism Laws (defined below).   In connection with that compliance, you and your owners certify, represent, and warrant that none of your property or interests is subject to being blocked under, and that you and your owners otherwise are not in violation of, any of the Anti-Terrorism Laws.  "**Anti-Terrorism Laws**" mean Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other present

and future federal, state, and local laws, ordinances, regulations, policies, lists, and other requirements of any governmental authority addressing or in any way relating to terrorist acts and acts of war.  Any violation of the Anti-Terrorism Laws by you or your owners, or any blocking of your or your owners' assets under the Anti-Terrorism Laws, constitutes good cause for immediate termination of this Agreement, as provided in Section 18 above.

## 23. <u>NOTICES AND PAYMENTS</u>

All written acceptances, approvals, requests, notices, and reports permitted or required to be delivered by the provisions of this Agreement or the Operations Manual will be deemed delivered at the time delivered by hand; or one (1) business day after being placed in the hands of a nationally recognized commercial courier service for next business day delivery; or three (3) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid; and must be addressed to the party to be notified at its most current principal business address of which the notifying party has been notified and/or, with respect to any approvals and notices that we provide to you or your owners, at the Gym's address.  Payments will be deemed delivered on any of the applicable dates described above or, if earlier, at the time we actually receive payment electronically.  As of the Effective Date of this Agreement, notices should be addressed to the following addresses unless and until a different address has been designated by written notice to the other party:

To us:                                 Blink Fitness Franchising, Inc.
                                       386 Park Avenue South, 11th Floor
                                       New York, NY  10016
                                       Attn:
                                       Facsimile No.:

Notices to you and your owners:        Platinum Gym Two, Inc.
                                       265 Webster Woods Lane
                                       North Andover, Massachusetts  01845
                                       Attn:  Stephen L. Stabile
                                       Facsimile No.:  _____

## 24. <u>ELECTRONIC MAIL</u>

You acknowledge and agree that exchanging information with us by e-mail is efficient and desirable for day-to-day communications and that we and you may utilize e-mail for such communications.  You authorize the transmission of e-mail by us and our employees, vendors, and affiliates ("**Official Senders**") to you during the Term of this Agreement.

You further agree that:  (i) Official Senders are authorized to send e-mails to those of your supervisory employees as you may occasionally authorize for the purpose of communicating with us; (ii) you will cause your officers, directors, and supervisory employees to give their consent to Official Senders' transmission of e-mails to them; (iii) you will require such persons not to opt out or otherwise ask to no longer receive e-mails from Official Senders during the time that such person works for or is associated with you; and (iv) you will not opt out or

otherwise ask to no longer receive e-mails from Official Senders during the Term of this Agreement.

The consent given in this Section 24 will not apply to the provision of notices by either party under this Agreement pursuant to Section 23 using e-mail unless the parties otherwise agree in a written document manually signed by both parties.

**[Signature Page Follows]**

59

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement as of the dates below, to be effective on the Effective Date stated on the first page above.

**BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation

By: _____

Name: Marc Berathen

Title: VP Finance

Signing Date: 1/31 _____, 2019

**PLATINUM GYM TWO, INC.**, a Massachusetts corporation

By: _____

Name: Stephen L. Stabile

Title: President

Signing Date: 01/30 _____, 2019

60

**EXHIBIT A**
**TO THE BLINK FITNESS FRANCHISING, INC.**
**UNIT FRANCHISE AGREEMENT**

**BASIC TERMS**

The Site Selection Area is <u>N/A</u>.

The Gym's physical location is <u>465 Salem Street, Medford, Massachusetts 02155</u>.

The Gym's Protected Area is defined as <u>a circle that has as its center the front door of the Gym and a radius of one and six-tenths (1.6) miles, as depicted on the map attached to this Exhibit A</u>.

We may, at our sole option and upon delivery of written notice to you, reduce the geographic scope of the Protected Area during the Franchise Agreement's term if the living population encompassed within the Protected Area during the term doubles in size when compared with the size of such population as of the Franchise Agreement's Effective Date. (We also may modify the Protected Area in the event of the Gym's relocation.)

The Opening Deadline for the Gym is <u>January 31, 2019</u>.

The Presale Marketing Budget is <u>$35,000</u>.

~~The Initial Franchise Fee is $40,000~~

**BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation

By: _____
 Name: Marc Penather
 Title: SVP Finance
 Signing Date: 1/31/ , 2019

**PLATINUM GYM TWO, INC.**, a Massachusetts corporation

By: _____
 Name: Stephen L. Stabile
 Title: President
 Signing Date: 01/30/ , 2019

A-1

## MAP OF PROTECTED AREA



465 Salem St, Medford, MA
75k Pop. Protection: 1.6 mi radius

A-2

## EXHIBIT B
### TO THE BLINK FITNESS FRANCHISING, INC.
### UNIT FRANCHISE AGREEMENT

## GUARANTY AND ASSUMPTION OF OBLIGATIONS

**THIS GUARANTY AND ASSUMPTION OF OBLIGATIONS** is given this first day of August, 2018, by Stephen L. Stabile.

In consideration of, and as an inducement to, the execution of that certain Unit Franchise Agreement (the "**Agreement**") on this date by **BLINK FITNESS FRANCHISING, INC.**, a Delaware corporation ("**Franchisor**"), each of the undersigned personally and unconditionally (a) guarantees to Franchisor and its successors and assigns, for the term of the Agreement (including, without limitation, any extensions of its term) and afterward as provided in the Agreement, that **PLATINUM GYM TWO, INC.** ("**Franchisee**") will punctually pay and perform each and every undertaking, agreement, and covenant set forth in the Agreement (including, without limitation, any amendments or modifications of the Agreement) and (b) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement (including, without limitation, any amendments or modifications of the Agreement), including (i) monetary obligations, (ii) obligations to take or refrain from taking specific actions and to engage or refrain from engaging in specific activities, including, but not limited to, the non-competition, confidentiality, and transfer requirements, and (iii) the enforcement and other provisions in Sections 21, 22, and 23 of the Agreement, including the arbitration provision.

Each of the undersigned consents and agrees that: (1) his or her direct and immediate liability under this Guaranty will be joint and several, both with Franchisee and among other guarantors; (2) he or she will render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so; (3) this liability will not be contingent or conditioned upon Franchisor's pursuit of any remedies against Franchisee or any other person; (4) this liability will not be diminished, relieved, or otherwise affected by any extension of time, credit, or other indulgence which Franchisor may from time to time grant to Franchisee or to any other person, including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims (including, without limitation, any extensions of its term or the release of other guarantors), none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable during the term of the Agreement (including, without limitation, any extensions of its term), for so long as any performance is or might be owed under the Agreement by Franchisee or any of its owners, and for so long as Franchisor has any cause of action against Franchisee or any of its owners; (5) this Guaranty will continue in full force and effect for (and as to) any extension or modification of the Agreement and despite the transfer of any interest in the Agreement or Franchisee, and each of the undersigned waives notice of any and all renewals, extensions, modifications, amendments, or transfers; and (6) any indebtedness by Franchisee to the undersigned, for whatever reason, whether currently existing or hereafter arising, will at all times be inferior and subordinate to any indebtedness owed by Franchisee to Franchisor or its affiliates.

B-1

Each of the undersigned waives: (i) all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Franchisee arising as a result of the undersigned's execution of and performance under this Guaranty; (ii) acceptance and notice of acceptance by Franchisor of his or her undertakings under this Guaranty, notice of demand for payment of any indebtedness or non-performance of any obligations hereby guaranteed, protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed, and any other notices to which he or she may be entitled; and (iii) all rights to assert or plead any statute of limitations as to or relating to this Guaranty. The undersigned expressly acknowledges that the obligations hereunder survive the expiration or termination of the Agreement.

If Franchisor seeks to enforce this Guaranty in an arbitration, judicial or other proceeding, and prevails in such proceeding, Franchisor is entitled to recover its reasonable costs and expenses (including, but not limited to, attorneys' fees, arbitrators' fees, and expert witness fees, costs of investigation and proof of facts, court costs, other arbitration or litigation expenses and travel and living expenses) incurred in connection with such proceeding. If Franchisor is required to engage legal counsel in connection with any failure by the undersigned to comply with this Guaranty, the undersigned must reimburse Franchisor for any of the above-listed costs and expenses Franchisor incurs, even if Franchisor does not commence a judicial or arbitration proceeding.

Subject to the arbitration obligations (as set forth in the Agreement) and the provisions below, each of the undersigned agrees that all actions arising under this Guaranty or the Agreement, or otherwise as a result of the relationship between Franchisor and the undersigned, must be brought exclusively in the state or federal court of general jurisdiction in the state, and in (or closest to) the city, where Franchisor has its principal business address at the time the action is commenced, and each of the undersigned irrevocably submits to the jurisdiction of those courts and waives any objection he or she might have to either the jurisdiction of or venue in those courts. Nonetheless, each of the undersigned agrees that Franchisor may enforce this Guaranty and any arbitration orders and awards in the courts of the state or states in which he or she is domiciled. FRANCHISOR AND THE UNDERSIGNED IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY ANY OF THEM. EACH ACKNOWLEDGES THAT THEY MAKE THIS WAIVER KNOWINGLY, VOLUNTARILY, WITHOUT DURESS, AND ONLY AFTER CONSIDERATION OF THIS WAIVER'S RAMIFICATIONS.

**IN WITNESS WHEREOF**, each of the undersigned has affixed his or her signature on the same day and year as the Agreement was executed.

**GUARANTOR(S)**

Stephen L. Stabile

**PERCENTAGE OF OWNERSHIP IN FRANCHISEE**

100 _____ %

B-2

<u>**EXHIBIT C**</u>
**TO THE BLINK FITNESS FRANCHISING, INC.**
**UNIT FRANCHISE AGREEMENT**

<u>**FRANCHISEE AND ITS OWNERS**</u>

**Effective Date: This Exhibit C is current and complete**
**as of _____, 2018**

<u>**Form of Franchisee.**</u>

  <u>**Individual Proprietorship.**</u>  Franchisee's owner(s) (is) (are) as follows:

    _____

    _____

    _____

  <u>**Corporation, Limited Liability Company or Partnership.**</u>  Franchisee was incorporated or formed on January 5, 2018, under the laws of the Commonwealth of Massachusetts.  Franchisee has not conducted business under any name other than Franchisee's corporate, limited liability company, or partnership name and _____N/A_____.  The following is a list of Franchisee's directors or managers (if applicable) and officers as of the effective date shown above:

| <u>Name</u> | <u>Position(s) Held</u> |
|---|---|
| Stephen L. Stabile | President and Director |
| | |
| | |
| | |
| | |

  <u>**Owners**</u>.  The following list includes the full name of each person who is one of Franchisee's direct or indirect owners and fully describes the nature of each owner's interest (attach additional pages if necessary).

| <u>Owner's Name</u> | <u>Description of Interest</u> |
|---|---|
| Stephen L. Stabile | 100% |

C-1

**Owner's Name**                    **Description of Interest**

**Managing Owner**.  Franchisee's Managing Owner is <u>Stephen L. Stabile</u>.

**BLINK FITNESS FRANCHISING,**
**INC.**, a Delaware corporation

By: _____
   Name:   Marc Benythen
   Title:   SVP, Finance
   Signing Date: __1/31__, 2019

**PLATINUM GYM TWO, INC.**, a
Massachusetts corporation

By: _____
   Name:  Stephen L. Stabile
   Title:  President
   Signing Date: __01/30__, 2019

C-2

**EXHIBIT D**
**TO THE BLINK FITNESS FRANCHISING, INC.**
**UNIT FRANCHISE AGREEMENT**

**LEASE RIDER**

**LEASE PROVISIONS FOR BLINK FITNESS GYM FRANCHISES**

The following provisions must be inserted into your lease for your Gym that you will operate under the "BLINK®" brand (the "**Lease**").  You may add this language via a rider or addendum to your Lease, as long as the rider or addendum document is signed by both the tenant and the landlord.  Please send us a copy of the signed Lease, along with any riders or addenda.

**REQUIRED LANGUAGE:**

A.     During the Term of the franchise agreement (the "**Franchise Agreement**") between Tenant and Blink Fitness Franchising, Inc. ("**BFF**"), Tenant will use the premises only for the operation of a Blink Fitness Gym.

B.     Landlord shall send to BFF copies of all default notices and all notices of Landlord's intent to terminate the Lease (or any rights of Tenant thereunder), or evict Tenant from the leased premises, simultaneously with sending such notices to Tenant. Such copies shall be sent to:

> Blink Fitness Franchising, Inc.
> 386 Park Avenue South, 11th Floor
> New York, NY  10016
> Attn:

C.     Tenant may assign the Lease to BFF or its affiliates upon expiration or termination of the Franchise Agreement, and Landlord will not withhold its consent to this assignment.  Landlord will not impose or assess any assignment fee or similar payment or accelerate rental payments under the Lease in connection with the assignment.

D.     BFF or its affiliates may enter the premises to make any modification or alteration necessary to protect the Franchise System and the Marks or to cure any default under the Franchise Agreement or Lease at any time and without prior notice to Landlord.

E.     Tenant will not assign or sublease the premises or renew or extend the term of the Lease, or modify the Lease in any manner, without prior written approval from BFF.

F.     Upon the occurrence of any of the following:

(1)     a default by Tenant under the Lease, the Franchise Agreement, or any document or instrument securing or relating to the Franchise Agreement, or

(2)    the termination of the Franchise Agreement before its term expires by BFF or Tenant for any reason other than a default by BFF,

BFF shall have the right (but no obligation), exercisable upon delivery of written notice to Tenant and Landlord, to compel an assignment of the Lease, and all of Tenant's rights thereunder, to BFF or to an assignee of BFF's choice, at BFF's option.  If BFF (or its assignee) exercises the rights under this paragraph (F), Tenant shall have no further right, title or interest under the Lease or to the leased premises, but shall remain solely liable to Landlord for all rents, charges and other obligations under the Lease prior to the date upon which BFF (or its assignee) assumes possession of the leased premises.

G.    BFF is an intended third party beneficiary under the provisions set forth above with independent rights to enforce them and neither Landlord nor Tenant may alter or limit any of those provisions without BFF's prior written approval.

**[LANDLORD]**

By:_____
    Title:_____
    Date:_____, 201_

**[TENANT]**

**(IF CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP)**:

_____
[Name]

By:_____
    Title:_____
    Date:_____, 201_

**(IF INDIVIDUALS)**:

_____
[Signature / Date]

_____
[Print Name]

D-2

_____
[Signature / Date]

_____
[Print Name]

D-3

<u>EXHIBIT E</u>
**TO THE BLINK FITNESS FRANCHISING, INC.**
**UNIT FRANCHISE AGREEMENT**

<u>**FORM OF CONFIDENTIALITY AGREEMENT**</u>

In consideration of my employment or contract with and/or interest in Platinum Gym Two, Inc. (hereinafter, the "**Franchisee**") and the salary, honorariums, wages and/or fees paid to me, I acknowledge that Blink Fitness Franchising, Inc., a Delaware corporation, having its principal place of business at 386 Park Avenue South, 11th Floor, New York, New York  10016 (hereinafter referred to as "**Blink Fitness**"), has imposed the following conditions on the Franchisee, any owner of the Franchisee, and the Franchisee's officers, directors, and senior personnel, and as a condition of performing services to or having an interest in Franchisee, I agree to accept the following conditions without limitation:

1.      Without obtaining the prior written consent of Blink Fitness (which consent may be withheld in Blink Fitness' sole discretion), I will (i) not disclose, publish, or divulge to any other person, firm or corporation, through any means, some or all of the Confidential Information of Blink Fitness, either during or subsequent to my employment by or association with Franchisee, (ii) not use the Confidential Information for any purposes other than as related to my employment or association with Franchisee, and (iii) not make copies or translations of any documents, data, or compilations containing any or all of the Confidential Information, nor commingle any portion of the documents, data or compilation or otherwise use the documents, data or compilations containing Confidential Information, for my own purpose or benefit.  I also agree to surrender any material containing some or all of the Confidential Information of Blink Fitness upon request or upon termination of employment or association with Franchisee and understand that the Operations Manual is provided by Blink Fitness to Franchisee for a limited purpose and will remain the property of Blink Fitness and may not be reproduced, in whole or in part, without the prior written consent of Blink Fitness.

For purposes of this Agreement, "**Confidential Information**" shall mean certain information, processes, methods, techniques, procedures and knowledge, including know-how (which includes information that is secret and substantial), manuals and trade secrets (whether or not judicially recognized as a trade secret), developed or to be developed by Blink Fitness relating directly or indirectly to the development or operation of a Blink Fitness Gym.  With respect to the definition of know-how, "**secret**" means that the know-how as a body or in its precise configuration is not generally known or easily accessible and "**substantial**" means information which is important and useful to Franchisee in developing and operating Franchisee's Gym.  Without limiting the foregoing, Confidential Information includes, but is not limited to:

    i.      information in the Operations Manual and Brand Standards;

    ii.     layouts, designs, and other plans and specifications for Blink Fitness Gyms;

E-1

iii.      methods, formats, specifications, standards, systems, procedures, sales and marketing techniques, and knowledge and experience used in developing and operating Blink Fitness Gyms;

iv.      content and methods of instruction;

v.      marketing research and promotional, marketing and advertising programs for Blink Fitness Gyms;

vi.      knowledge of specifications for and suppliers of, and methods of ordering, certain Operating Assets, products, materials and supplies that Blink Fitness Gyms use and sell;

vii.      knowledge of the operating results and financial performance of Blink Fitness Gyms other than the Gym;

viii.      member solicitation, communication and retention programs, along with data and information used or generated in connection with those programs;

ix.      all Data and all other information generated by, or used or developed in, the operation of the Gym, including Consumer Data and Gym Lists, and any other information contained from time to time in the Computer System or that visitors (including you) provide to the System Website; and

x.      any other information that we reasonably designate as confidential or proprietary.

2.      In the event of a dispute or question arising out of the interpretation of this Agreement or any of its terms, the laws of the State of New York shall govern.

3.      I acknowledge receipt of a copy of this Agreement, and that I have read and I understand this Agreement. This Agreement may not be modified except in writing with prior approval of an officer of each of Franchisee and Blink Fitness.

Owner, officer, director, and senior personnel:

By:_____

Name:_____

Title:_____

Date:_____

Social Security No.:_____

or Tax ID No._____

Address:_____

_____

_____

Phone:_____

Fax:_____

E-2

Check the following that apply:

___ Owner                    ___ Senior Personnel
___ Officer                  ___ Other (please specify)
___ Director

EAST\159342593.3