# **Exhibit A**

FINAL

Exhibit A – Blink Building Plan
Exhibit A-1 – Shopping Center Site Plan
Exhibit B – Landlord's Work
Exhibit C – Renewal Options
Exhibit D – Use Restrictions
Exhibit E-1 – Guaranty of Blink Holdings, Inc.
Exhibit E-2 – Limited Guaranty of Equinox Holdings, Inc.
Exhibit F – Tenant's Approved Signage
Exhibit G – Delivery of Possession Letter
Exhibit H – Utility Locations
Exhibit I-1 – Landlord's Preliminary Plans and Exterior Elevations
Exhibit I-2 - Tenant's Preliminary Plans and Specifications
Exhibit J – Landlord's Standard Construction Covenants
Exhibit K – Landlord's Sign Criteria
Exhibit L – Form of SNDA Agreement
Exhibit M –Big Lots Lease Redevelopment Area
Exhibit N- Bank Parking Sign Area

## RETAIL LEASE

This Retail Lease (this "Lease") is entered into as of ~~December~~ February 3, 2014 ~~2013~~, by Landlord and Tenant.

## ARTICLE 1.
### DEFINITIONS AND CERTAIN BASIC PROVISIONS

1.1    Landlord:  Levin Properties, L.P., a New Jersey limited partnership

Landlord's address:    c/o Levin Management Corporation
P.O. Box 326
Plainfield, New Jersey 07061-0326

1.2    Tenant:  Blink Clifton, Inc., a New Jersey corporation

Tenant's address:    895 Broadway
Third Floor
New York, NY 10003

Any rental invoices, and related billings to Tenant shall also be delivered to:

Tenant, c/o Equinox Fitness Clubs
One Park Avenue, 2nd floor, New York, NY 10016
Attention: Directory of Treasury

1

1

1.3     Tenant's Trade Name:   Blink or Blink Fitness or any reasonable derivation thereof. Tenant may change its trade name to (i) a new trade name adopted by a majority of the health clubs theretofore operated under Blink or Blink Fitness or (ii) following an assignment or sublease pursuant to Article 17 below, the trade name used by any approved assignee or subtenant or by any assignee or subtenant with respect to which approval is not required.

1.4     Premises:   A newly constructed single story building (the "Blink Building"), which Landlord covenants to construct as part of Landlord's Work, comprising approximately 15,000 useable square feet (subject to re-measurement pursuant to Section 1.11 below), located in the Shopping Center as more particularly shown on Exhibit A.

1.5     Shopping Center:   The shopping center known as Clifton Plaza, located at 1006 Route 46, Clifton, New Jersey, as more particularly shown on Exhibit A-1 (the "Site Plan").

1.6     Term:   The term of this Lease shall commence on the Commencement Date and expire on the last day of the month in which the fifteenth (15) anniversary of the Rent Commencement Date occurs, subject to Tenant's right to extend the term of this Lease for two (2) successive five (5) year renewal periods as set forth in Exhibit C hereto. "Term" shall mean the initial term of this Lease together with any renewals thereof.

1.7     Commencement Date:   The date on which all of the following (a) through (c) have occurred: (a) Landlord has, at Landlord's sole cost, delivered exclusive physical possession of the Premises to Tenant with Landlord's Work (as defined in Section 3.2 below) substantially complete (as defined in Article 3); it being understood that Landlord's Work shall specifically include the construction of the Blink Building as shown on Exhibit A; (b) [intentionally omitted] , and (c) Landlord has received, at Landlord's sole cost, (i) all unappealable and unconditional governmental approvals, consents and authorizations required for the performance and completion of Landlord's Work, and (ii) all unappealable and unconditional governmental permits, approval, variances, permits, consents, authorizations and entitlements, required to permit the use and occupancy of the Premises for the Permitted Use (it being understood that a permanent certificate of occupancy- shall not be required to satisfy this contingency), including any required parking and traffic permits, but specifically excluding Tenant's Permits which shall be Tenant's responsibility subject to Section 3.9 below) (the foregoing items exclusive of Tenant's Permits set forth in this item (c) referred to as "Entitlements and Use Approvals") (items (a) through (c) collectively referred to as "Landlord's Turnover Date Obligations"; the date on which Landlord's Turnover Date Obligations are fully satisfied shall be referred to as the "Landlord Turnover Date"). Notwithstanding anything to the contrary contained herein, if substantial completion of Landlord's Work shall be delayed by reason of any Tenant Delay, item (a) of Landlord's Turnover Date Obligations shall be deemed to have been satisfied on the date when Landlord's Work would have been substantially completed but for such Tenant Delay. "Tenant Delay" shall mean any delay that Landlord may encounter in the performance of Landlord's Work solely by reason of a (i) delay due to requests for changes to Landlord's Work or (ii) delay due to Tenant's or Tenant's contractors' performance or execution of Tenant's own work or interference with Landlord's contractors; provided, however, that a Tenant Delay shall not be deemed to have occurred until Landlord notifies Tenant in writing of the event which

2

constitutes the Tenant Delay and such matter is not cured within five (5) business days of the delivery of such notice.

      1.8    Estimated Landlord Turnover Date  The date which is six (6) months following the date Landlord has received all of its Entitlements and Use Approvals (including all building permits required to perform Landlord's Work).

      1.9    Permitted Use: The Premises shall be used solely for the operation of a health, sports and fitness club operated under Tenant's Trade Name, including, but not limited to, the following ancillary services: (i) the provision of cardiovascular, strength, free weight training, tanning services, massage and related modalities (including therapeutic massage), steam rooms, sauna rooms, group fitness programs (including but not limited to, yoga, Pilates, and spinning), personal training (including therapeutic massage), yoga, exercise training and supervision, social activities incidental to health club membership, spa (including, but not limited to, massage, facials and body wraps), meditation classes, health and fitness and dance related educational programs, dance and aerobic classes, and classes and programs and all activities ancillary thereto, medical offices, physical therapists', sports/rehab therapy, and specialists' offices, babysitting, office space and meeting rooms; (ii) an ancillary food and beverage service offering coffee, juice, sports beverages, yogurt, vitamins, other sports-related supplements and other food items involving limited preparation, which food and beverage service may alternatively, at Tenant's election, be provided by way of refrigerated units, vending machines, a snack counter or a juice bar within the Premises containing pre-bottled water, soft drinks and/or juices and pre-packaged snack and other foods, nutritional bars and the like for the comfort and convenience of Tenant's members and the general public (provided, however, that Tenant shall not voluntarily solicit non-members for the sale of food and beverage service as if Tenant were operating a restaurant within the Premises independently of the health, sports and fitness club) and (iii) an ancillary retail facility for the sale of goods and apparel (which goods and apparel may be sold by way of vending machines) and incidental services, and for no other uses or purposes (the foregoing (i), (ii) and (iii) collectively, the "Permitted Use"). Notwithstanding the foregoing, Tenant agrees (x) the aggregate usable square footage of the Premises used for the sale of food and/or beverages (including vending machines) shall not exceed fifteen percent (15%) of the usable square feet of the Premises; and (y) the aggregate usable square footage of the Premises used as a retail facility for the sale of goods, apparel and other incidental services shall not exceed fifteen percent (15%) of the usable square feet of the Premises (i.e., the aggregate usable square footage devoted to sale of food and/or beverages and the sale of goods, apparel and other incidental services is permitted up to thirty percent (30%) of the usable square footage of the Premises, provided the individual fifteen percent (15%) limits are adhered to). This description of the Permitted Use and all of the possible components thereof is not intended to be, nor shall it be interpreted to be, a representation or covenant by Tenant that all or any one specific activity shall be provided by Tenant at any given time, it being understood that the range and scope of health club and ancillary service offerings shall be determined solely by Tenant in the exercise of its prudent business judgment. In no event shall the Premises be used for any of the following: (a) a tavern, bar, nightclub, discotheque; (b) an adult type book store or other establishment selling or exhibiting pornographic materials, including an X-rated movie theater or video shop; (c) a "head shop" or any establishment displaying or selling drug paraphernalia; (d) a massage parlor (but this shall not prohibit therapeutic massage related to the Permitted Use), topless bar or

3038835v9

club or restaurant which provides striptease entertainment (it being understood that the outfits or clothing worn by Tenant's customers in connection with the Permitted Use shall be deemed acceptable, including, without limitation, such customers wearing only tank tops or sports bras as their top covering); (e) a sports, game or off track betting facility or club or any other type of gaming establishment, provided that Tenant shall be permitted to conduct contests and promotions related to the Permitted Use; (f) any center for medical procedures, counseling or activities related to abortion, birth control or euthanasia; (g) a government office or department of motor vehicle facility; (h) a temporary placement service; (i) a drug or alcohol recovery or treatment facility; or (j) any use set forth on Exhibit D (the "Use Restrictions"), so long as such lease shall be in full force and effect at the Shopping Center.

1.10    "Lease Year" means the period commencing on the Rent Commencement Date and expiring on the last day of the month in which the first (1st) anniversary of the Rent Commencement Date occurs, and each successive twelve (12) month period thereafter which falls within the Term.

1.11    Base Rent:

| Lease Year | Annual Base Rent | Monthly Base Rent | Rent Per Square Foot |
|---|---|---|---|
| 1-5 | $405,000.00 | $33,750.00 | $27.00 |
| 6-10 | $445,500.00 | $37,125.00 | $29.70 |
| 11-15 | $490,050.00 | $40,837.50 | $32.67 |

A.    At any time following the date the outer walls of the Premises have been raised during the course of Landlord's Work, Landlord shall provide notice thereof to Tenant and Tenant shall have the right within fifteen (15) days following delivery of such notice (the "Outside Measurement Date") to re-measure the actual useable square footage of the Premises (the "Actual Square Footage"). The Actual Square Footage shall be determined in accordance with the standards set forth in ANSI-Z65.1 – 1996 as promulgated by the Building Owners and Managers Association, including without limitation, calculation from the exterior of outside walls and the center of common walls. Such re-measurement by Tenant shall be completed and the results thereof delivered to Landlord on or before the Outside Measurement Date. If such re-measurement is not timely delivered to Landlord, the Actual Square Footage shall be deemed to be 15,000 useable square feet. If Landlord or Tenant dispute the Actual Square Footage, each party shall engage a licensed architect to measure the useable square footage of the Premises in accordance with the foregoing standards. If such architects cannot agree upon the Actual Square Footage within thirty (30) days of such engagement by Landlord and Tenant, such architects shall appoint a third (3rd) licensed architect to measure the Actual Square Footage of the Premises in accordance with the foregoing standards and the Actual Square Footage determined by such third (3rd) licensed architect shall be binding on the parties for purposes of this Lease. Landlord may delay the performance of Landlord's Work during the pendency of such dispute,

4

and any such delay shall constitute an Unavoidable Delay, if the disagreement concerning the Actual Square Footage could result in the termination of this Lease pursuant to Section 1.11(C) below. The date of the determination of the Actual Square Footage or the deemed determination of the Actual Square Footage shall be referred to as the "Square Footage Determination Date".

        B.      If the Actual Square Footage exceeds 15,225 useable square feet, then the Base Rent shall be increased based on the Actual Square Footage utilizing the Rent Per Square Foot rates set forth on the Table above; provided, however, that in no event shall the Premises be deemed to contain more than 15,450 useable square feet for purposes of calculating Base Rent and other payments due hereunder. If the Actual Square Footage is less than 14,775 useable square feet, then the Base Rent shall be reduced based on the Actual Square Footage utilizing the Rent Per Square Foot rates set forth on the Table above.

        C.      If the Actual Square Footage determined pursuant to Section 1.11(A) is less than 14,550 useable square feet (the "Minimum Square Footage"), then Tenant may elect to either (i) continue this Lease in full force and effect (at the reduced Base Rent determined per subsection B above) or (ii) terminate this Lease by delivering notice to Landlord (the "Termination Notice") no later than the date that is ten (10) days after the Square Footage Determination Date. If Tenant delivers the Termination Notice to Landlord, then this Lease shall terminate upon delivery of such notice; provided, however, if the Tenant shall not timely deliver the Termination Notice, then the Tenant's right to terminate this Lease shall be waived.

        1.12   Rent Commencement Date: The earlier to occur of the date that is: (a) seven (7) months after the Commencement Date or (b) three (3) months from the date Tenant opens for business to the general public in the Premises (excluding any presales activities). Occupancy of the Premises by Tenant prior to the Rent Commencement Date shall be subject to all of the provisions of this Lease excepting only those requiring the payment of Rent. In addition, Rent will partially abate for the first six (6) months following the Rent Commencement Date such that the monthly Base Rent payable for each of the first six (6) months following the Rent Commencement Date shall be equal to one-half (1/2) of the monthly Base Rent indicated for Lease Years 1 through 5 in Section 1.11, above (i.e., the monthly Base Rent payable for each of the first six (6) months following the Rent Commencement Date shall be $16,875.00). At the request of either, Landlord and Tenant will, following the Commencement Date, execute and deliver a commencement date agreement reciting the exact Commencement Date, Rent Commencement Date and expiration date of this Lease. The Rent Commencement Date shall be extended on a day for day basis for each day of Non-Tenant Delay. Tenant shall promptly notify Landlord, in writing, of any Non-Tenant Delay. "Non-Tenant Delay" shall mean (except and to the extent caused by Tenant and/or Tenant's agents and contractors) any violations, stop work orders, open permit applications or other legal non-compliance affecting the Premises or the Shopping Center, which prevents or delays the performance of Tenant's Work or Tenant's receipt of governmental approvals or sign-offs (including, but not limited to, a certificate of occupancy) for Tenant's Work, or Tenant's ability to open for business in the Premises and continues for five (5) business days following Landlord's receipt of notice from Tenant. Landlord shall promptly, continuously and diligently seek to cure, correct and/or remove any Non-Tenant Delay of which Landlord receives notice. If any Non-Tenant Delay of which

Tenant notifies Landlord continues unabated or uncured for more than forty-five (45) days, then, in addition to the day for day extension of the Rent Commencement Date, for each day of Non-Tenant Delay after the initial forty-five (45) day period, Tenant shall also accrue a day for day credit against Base Rent, which credit shall be applied to the first installments of Base Rent that come due after the Rent Commencement Date. For the avoidance of doubt, if a Non-Tenant Delay of which Landlord has received notice lasts for sixty (60) days, the Rent Commencement Date shall be extended for sixty (60) days, and, in addition to the day for day extension of the Rent Commencement Date Tenant shall also be entitled to a fifteen (15) day credit against Base Rent. Notwithstanding the foregoing, if Tenant has substantially completed Tenant's Work and is prepared and able to open for business in the Premises, but is prevented from opening for business due to a Non-Tenant Delay, then the Base Rent and all additional Rent shall fully abate for each day that Tenant is prepared and able to open for business but is prevented from doing so and until the Non-Tenant Delay is cured or otherwise corrected. Landlord shall promptly, continuously and diligently seek to cure, correct and/or remove any Non-Tenant Delay of which Landlord receives notice.

1.13    Tenant Work Allowance: Up to $850,050.00 (regardless of whether the Actual Square Footage is greater or less than 15,000 useable square feet).

1.14    Tenant's Pro-Rata Share: 15.76%. Tenant's Pro-Rata Share has been calculated using a fraction, the numerator which is the Actual Square Footage of the Premises (which is currently estimated to be 15,000 square feet for purposes of this Section 1.14) and the denominator which is the useable square footage of the Shopping Center as determined by Landlord (which is currently 95,177 square feet); provided, however, if the Actual Square Footage is greater or less than 15,000 useable square feet, Tenant's Proportionate Share shall be adjusted accordingly, subject to the maximum number of square feet permitted pursuant to Section 1.11(B).

1.15    Renewal Options: Tenant shall have the right to extend the term of this Lease for two (2) successive five (5) year renewal periods as described in Exhibit C of this Lease.

1.16    Security Deposit: None.

1.17    Guarantors: Blink Holdings, Inc. pursuant to the Form of Guaranty attached hereto as Exhibit E-1; and Equinox Holdings, Inc., pursuant to the Form of Limited Guaranty attached hereto as Exhibit E-2.

## ARTICLE 2.
## GRANTING CLAUSE

2.1    Subject to the terms of this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises, together with the non-exclusive right to use all Common Area (as hereinafter defined) of the Shopping Center for the purposes for which each area of the Common Area was intended to be used in common with other tenants, for the Term.

6

2.2     From and after the date that is one (1) month prior to the Estimated Landlord Turnover Date and until the earlier of (a) the date Tenant opens for business in the Premises and (b) the expiration or earlier termination of this Lease, Tenant shall have a license to occupy approximately five hundred (500) square feet of vacant space within the Shopping Center, to the extent available and subject to the terms of leases in the Shopping Center in a location reasonably acceptable to Landlord and Tenant (the "Pre-Sales Space"), and all of Tenant's obligations hereunder shall apply to such Pre-Sales Space except for the obligation to pay monthly Rent.  For the avoidance of doubt, if the Pre-Sales Space becomes subject to a lease or is required to be vacant for purposes of any lease in the Shopping Center, then such Pre-Sales Space location shall no longer be available and Landlord may, on thirty (30) days' prior written notice to Tenant, revoke Tenant's license therefor, in which case, the Pre-Sales Space shall move to another available location reasonably acceptable to Landlord and Tenant.  If no space is then available in the Shopping Center, Landlord shall carve out approximately five hundred (500) square feet of space within the Blink Building for Tenant's Pre-Sales Space; provided, however, that Tenant's occupancy of space within the Blink Building in accordance herewith shall not interfere with the timely completion of Landlord's Work, and the specific space within the Blink Building provided to Tenant as Pre-Sales Space shall be selected in Landlord's reasonable discretion, taking into account the then existing construction status and remaining Landlord's Work to be completed.  Tenant may only use the Pre-Sales Space for the purposes of pre-selling memberships and staff training and for no other use whatsoever.  Tenant shall make no alterations or improvements to the Pre-Sales Space without Landlord's prior written consent, not to be unreasonably withheld, conditioned or delayed; provided that all alterations or improvements to the Pre-Sales Space shall be made at Tenant's sole cost and expense and Landlord shall have no obligations or liabilities to Tenant with respect to the Pre-Sales Space other than to provide the space and utilities as described herein.  Landlord, at Tenant's cost, shall reasonably cooperate with Tenant in Tenant's procurement of any required permits or approvals for the Pre-Sales Space including signing off on any applications therefor, if required.  Tenant shall have the right to maintain such signs and banners in and on the façade of the Pre-Sales Space and the Premises announcing the coming of Tenant's fitness club and/or the grand opening of the Premises or the future home of Blink as Tenant may reasonably determine are appropriate, subject to Landlord's prior written approval, not to be unreasonably withheld, and to compliance with applicable law, as long as same does not create a Tenant Delay. Tenant shall reimburse Landlord for all actual utilities Tenant uses at the Pre-Sales Space and, prior to taking possession of the Pre-Sales Space, will provide evidence to Landlord of Tenant's insurance in accordance with the requirements of Section 13.2 hereof, with respect to the Pre-Sales Space.  Landlord and Tenant acknowledge and agree that the terms of this Section 2.2 shall set forth all of the terms with regard to Tenant's occupancy of the Pre-Sales Space (except that Tenant shall provide evidence that it has in effect adequate insurance for all risks of loss associated with its occupancy of the Pre-Sale Space (naming Landlord as an additional insured)) and that no additional agreement or other document will be required to govern such occupancy.  So long as Tenant is in occupancy of the Pre-Sale Space, Tenant's indemnification obligations under Section 13.1 hereof shall apply to the Pre-Sale Space.

ARTICLE 3.
CONSTRUCTION AND ACCEPTANCE OF DEMISED PREMISES

7

3.1     On the date of this Lease, Landlord has made application for the Entitlements and Use Approvals to the applicable authorities (other than building permits). The "County Approval" has been obtained and it is anticipated that the appeal period in respect of such Approval shall expire on December 9, 2013. If the County Approval is appealed, the Landlord shall diligently and continuously challenge the appeal and otherwise use all commercially reasonable efforts to obtain the final Entitlements and Use Approvals. The Landlord shall have the right to pursue a Favorable Resolution (as defined below) of any such appeal for a period of six (6) months from the date such appeal is filed (the "Outside Appeal Date"). If such appeal is not Favorably Resolved on or before such Outside Appeal Date, unless the Landlord shall extend the Outside Appeal Date as provided for in the next sentence, then either Landlord or Tenant by written notice to the other on any date after the Outside Appeal Date (but prior to the date the appeal is Favorably Resolved) shall have the right to terminate this Lease, whereupon neither Landlord or Tenant shall have any further liability pursuant to this Lease, except with respect to provisions that expressly survive termination of this Lease.  If the appeal is not Favorably Resolved on or before the Outside Appeal Date, but Landlord has nevertheless been using commercially reasonable efforts to pursue a Favorable Resolution of the appeal, on or before the last date of the Outside Appeal Date, by written notice to Tenant, the Landlord shall have the right to extend the Outside Appeal Date for an additional three (3) months for a total of nine (9) months. As used herein a "Favorable Resolution" of an appeal means a dismissal of the appeal or other judgment in favor of the Landlord (reaffirming the terms and conditions of the County Approval without condition which would be unacceptable to Landlord and/or contrary to the Tenant's requirements as provided for in this Lease) without any further appeal being taken and with applicable time periods to file an appeal having expired.

Landlord shall provide Tenant with at least fifteen (15) days' prior notice of the date Landlord reasonably estimates will be the Landlord Turnover Date. Landlord shall use its good faith, commercially reasonable efforts to cause the Landlord Turnover Date to occur by the Estimated Landlord Turnover Date. For each day after the date that is thirty (30) days following the Estimated Landlord Turnover Date (the "First Outside Date") that the Landlord Turnover Date does not occur, except to the extent resulting from Unavoidable Delay or Tenant Delays, Tenant shall receive a credit of one day's Base Rent, beginning on the Rent Commencement Date. If the Landlord Turnover Date has not occurred by the date that is one hundred eighty (180) days following the Estimated Landlord Turnover Date (the "Second Outside Date"), except to the extent resulting from Unavoidable Delay or Tenant Delays, Tenant shall have the right to terminate this Lease upon notice to Landlord given within thirty (30) days following such one hundred eighty (180) day period setting forth a date for termination no fewer than thirty (30) days following the date of Tenant's notice, provided that if the Landlord Turnover Date occurs prior to the date set forth for termination in Tenant's notice, then this Lease shall continue in full force and effect as if Tenant's notice had not been given. In the event of any termination pursuant to this Section 3.1, this Lease shall be of no further force or effect, except for the provisions which are expressly stated to survive the termination of this Lease.

3.2     Prior to, and as a condition of, the Landlord Turnover Date, Landlord shall complete, at Landlord's sole cost, the work set forth on Exhibit B attached hereto (collectively, "Landlord's Work"), in a good and workmanlike manner and in compliance with applicable law. Prior to commencing Landlord's Work, Landlord shall have obtained, at Landlord's sole cost, all

8

permits and governmental approvals required for the performance and completion of Landlord's Work, and paid any municipal "impact fees" or similar fees required in connection with Landlord's Work.

On or before forty five (45) days following the date hereof, Landlord shall submit to Tenant, for its review, a complete set of construction plans and specifications for Landlord's Work (in CAD format) (the "Construction Documents"), and Tenant shall have the right to object to such Construction Documents in accordance with Section 3.10 below, but such right to object shall be limited to a good faith confirmation that the Construction Documents are substantially consistent with the Site Plan, the preliminary plans and exterior elevations shown on Exhibit F (as to the appearance of the store front elevation, not the signage as shown), Exhibit H, Exhibit I-1 and Exhibit I-2 attached hereto (collectively, the "Tenant Review Items").

The Landlord agrees to file its application for building permits on or before the date which is thirty (30) days following the date that the Construction Documents are approved by Tenant in accordance with this Section 3.2 and Section 3.10.

The term "substantially complete," as used in this Lease, shall mean that Landlord's Work has been completed in accordance with Exhibit B and all applicable law, approvals, permits and other governmental requirements (and Landlord's architect shall have provided certification to Tenant of such compliance), such that only "punch list" items which do not materially and adversely affect Tenant's ability to commence and complete Tenant's Work or Tenant's ability to occupy or open for business in the Premises for the Permitted Use, remain to be completed, all of which shall be confirmed by the Delivery of Possession Letter. Landlord shall complete any such "punch list" items of Landlord's Work in the manner provided in the Delivery of Possession Letter. The substantial completion of any item of Landlord's Work shall include, in each case, obtaining any required signoffs from governmental or quasi-governmental authorities having jurisdiction over the permitting, performance or approval of such work. When Landlord reasonably believes Landlord's Work has been substantially completed, Landlord shall provide ten (10) business days' advance notice to Tenant (the "Pre-Commencement Notice"), whereupon Landlord and Tenant shall conduct a joint inspection of the Premises and based on the results thereof execute the Delivery of Possession letter in the form attached hereto as Exhibit G (the "Delivery of Possession Letter"). In performing such "punch list" items, Landlord shall use commercially reasonable efforts to not unreasonably interfere with Tenant's operations in, or occupancy of, the Premises.

3.3     During the first year of the Term, or during any longer period to the extent the particular defects in Landlord's Work are covered by any guaranty or warranty, Landlord shall make repairs to the Premises required because of defects in Landlord's materials or workmanship in connection with Landlord's work, other than with respect to the HVAC system installed by Landlord in or about the Premises which shall not be covered by the foregoing warranty. To the extent assignable, Landlord shall assign to Tenant all guaranties and warranties relating to the HVAC system servicing the Premises.

3.4     [Intentionally omitted].

9

3.5 Upon completion of Landlord's Work, Landlord shall deliver to Tenant the following documents: (i) an affidavit signed by Landlord certifying that Landlord has substantially completed Landlord's Work in accordance with the terms of this Lease and (ii) as built drawings of the Premises with Landlord's Work in hard copy (or marked shop drawings). If, upon completion of Landlord's Work, Tenant shall have to revise its construction documents and the Approved Tenant Work Plans based on inconsistencies between the as built condition of the Blink Building and the Site Plan, then Landlord shall pay for Tenant's actual reasonable out-pocket-costs in connection with such required changes to Tenant's construction documents and the Approved Tenant Work Plans.

3.6 Promptly following the Commencement Date, Tenant shall (i) diligently perform all initial leasehold improvements pursuant to plans and specifications approved or deemed approved by Landlord pursuant to Section 3.10 below (the "Approved Tenant Work Plans"; the date on which the Approved Tenant Work Plans have been approved in accordance with Section 3.10 is hereinafter referred to as the "Approved Tenant Work Plan Date")) and (ii) install all furniture, fixtures, equipment, inventories and supplies necessary for Tenant to open for business as a fully stocked, fully fixtured Blink Fitness retail store (collectively "Tenant's Work"). Tenant's Work shall be performed by Tenant in accordance with the Approved Tenant Work Plans and with all laws, rules, regulations and ordinances applicable thereto and the provisions of Article 9 below. Landlord hereby approves the preliminary layout for the Premises depicted on Exhibit F (as to the appearance of the store front elevation, not the signage as shown), Exhibit H, Exhibit I-1 and Exhibit I-2 and Landlord acknowledges that during its review of Tenant's plans and specifications it shall have no right to object to any portion of the design and layout shown on the preliminary layout plan depicted on such exhibits (except to the extent required by a Governmental Authority) and Landlord's review shall be limited to (a) structural items and all items that impact building mechanical systems, and (b) matters that impact Landlord's Work and/or (c) any departures from the Site Plan or the matters shown on Exhibit F, Exhibit H, Exhibit I-1 and Exhibit I-2 attached hereto (collectively, the "Landlord Review Items").

All building permits for Tenant's Work shall be obtained by Tenant at Tenant's sole cost and expense. Tenant shall not commence Tenant's Work until Tenant has delivered to Landlord evidence of the insurance required under 13.2 of this Lease. Landlord shall reimburse Tenant for portions of Tenant's Work in accordance with Article 28 of this Lease.

3.7 Prior to the Commencement Date, Tenant shall be permitted access to the Premises for the purposes of taking measurements and performing Tenant's Work, subject to reasonable mutual agreement of the parties as to the areas of the Premises in which Tenant may work before Landlord's Work is substantially complete. Unless Tenant causes a Tenant Delay, such early access and performance of Tenant's Work by Tenant shall not cause an acceleration of the Commencement Date or the Rent Commencement Date nor a delay of the First Outside Date or the Second Outside Date. Any work performed by Tenant, whether prior or subsequent to the Commencement Date, shall be subject to the terms and conditions set forth in this Lease, including without limitation, insurance requirements and the approval rights of Landlord with respect to Tenant's plans and specifications pursuant to Section 3.10 below. Any such entry shall be at Tenant's sole risk and Landlord shall not be responsible for any damage or loss to property or installations placed in the Premises or caused by Tenant, other than due to Landlord's

10

gross negligence or willful misconduct.  Tenant shall indemnify and hold Landlord harmless from and against any and all losses, costs, damages, liabilities, expenses and claims arising from Tenant's entry hereunder.  In addition, in no event shall Tenant undertake any action that would actually delay the performance of Landlord's Work.

      3.8    Upon completion of Tenant's Work, Tenant shall deliver to Landlord the following documents: (i) an affidavit signed by Tenant certifying that Tenant has substantially completed Tenant's Work in compliance with the Approved Tenant Work Plans, (ii) a final notarized original, unconditional waiver of lien with respect to the Premises executed by Tenant's general contractor and final notarized original, unconditional waiver of liens executed by each Material Subcontractor (as hereinafter defined) and (iii) as built drawings of the Premises with Tenant's Work in hard copy (or marked shop drawings).

      3.9    Within thirty (30) days following the Approved Tenant Work Plan Date, Tenant shall submit completed applications for all building permits required for Tenant's Work and signage permits for the Approved Signage (collectively, "Tenant's Permits"), subject to Landlord's compliance with its cooperation obligations as hereinafter set forth in this Section. Tenant shall use its commercially reasonable efforts to obtain Tenant's Permits and occupancy approvals.  Landlord shall cooperate, at Tenant's reasonable cost, with Tenant's efforts to obtain the necessary licenses, permits and approvals in order to allow for the performance of Tenant's Work in the Premises.  Landlord's cooperation shall include, without limitation, the prompt sign-off on all filings or submissions in accordance with the terms of this Lease that require Landlord execution within seven (7) business days following presentation by Tenant, the failure of which shall cause the Rent Commencement Date to be extended on a day for day basis until such applications are executed and delivered by Landlord.  In addition, such cooperation may include, without limitation, promptly executing applications reasonably required by Tenant for such permits prior to commencement or completion of Landlord's review of Tenant's plans for Tenant's Work; provided, if, and to the extent, Tenant requests that Landlord execute any permit applications prior to commencement or completion of Landlord's review of Tenant's plans for Tenant's Work, then any such execution shall be solely as a courtesy to and at the specific request of Tenant, based upon Tenant's express acknowledgment and agreement that no such Tenant's Work shall be performed until such time as (x) consent to Tenant's plans with respect to such Tenant's Work has been given by Landlord (to the extent required under this Lease) and (y) Tenant shall thereafter refile an amendment to any such permit application to the extent required by any changes required by Landlord in connection with Landlord's approval of Tenant's plans for the Tenant's Work.  Notwithstanding anything to the contrary contained in this Lease, Landlord hereby consents to Tenant obtaining, at Tenant's sole cost and expense, any required permits and approvals for any alterations (including Tenant's Work) based upon Tenant's architect's and engineer's self-certification of the Approved Tenant Work Plans.  For the avoidance of doubt, in no event shall the Tenant's failure to obtain building permits or any Tenant Permits delay Rent Commencement Date, except that in the event, and subject to Section 3.10 below, the Landlord makes an Unreasonable Objection to the Submission for Tenant's Work and, as a result of such Unreasonable Objection, the Approved Tenant Work Plan Date occurs more than sixty (60) days following the initial Submission of Tenant's plans and specifications pursuant to Section 3.10 below, then to the extent of such delay caused by Landlord for an Unreasonable Objection beyond such sixty (60) day period, the Rent

11

Commencement Date shall be delayed day for day to account for such delay, provided that Tenant provides written notice to Landlord of such claimed delay at the time of the Unreasonable Objection (and subject to Landlord having the right to dispute Tenant's claimed delay).

3.10   It is understood and agreed that each of the Landlord's Work and Tenant's Work includes a review and approval of certain plans and/or other materials prepared by the other (a "Submission"). The intention is that both Landlord and Tenant shall act reasonably and diligently in connection with any such Submission. With respect to Landlord's Work or Tenant's Work, as the case may be, if pursuant to Section 3.2 or Section 9.1 review and approval is sought, the party required to deliver plans or other materials shall be referred to as the "Delivering Party", and the party receiving the plans or other materials shall be referred to as the "Receiving Party". The Receiving Party shall have a period of fifteen (15) business days to review and approve the Submission as provided in Section 3.2 or Section 9.1, as applicable. Within such fifteen (15) business day period the Receiving Party shall either approve or reject such Submission, and if rejected, specifying its objections with reasonable detail. If the Receiving party shall not approve or properly reject within said time period, then the Receiving Party shall be deemed to have approved the Submission. If the Receiving Party shall reject such Submission and to the extend such rejection is not based on an Unreasonable Objection (as defined below) then the Delivering Party shall in good faith promptly address the Receiving Party's objections and resubmit a revised Submission to the Receiving Party whereupon the Receiving Party shall have a period of ten (10) calendar days to review and approve the re-Submission pursuant to the method provided for herein above. If the Receiving Party shall not approve or properly reject within said ten (10) day time period, then the Receiving Party shall be deemed to have approved the Submission.    To the extent the rejection is based on an Unreasonable Objection, then the Receiving Party shall not be required to address such item and the Submission shall be deemed approved without regard to such Unreasonable Objection. As used herein "Unreasonable Objection" shall mean an objection (i) made in bad faith; (ii) in the case of the Landlord, an objection which is made other than with respect to a Landlord Review Item or item required by a Governmental Authority; and (iii) in the case of the Tenant, an objection which is made other than with respect to a Tenant Review Item. If a party rejects a Submission and a good faith effort has been made to provide reasonable detail for the party's objections, the fact that more detail may be required to address the objections shall not make them Unreasonable Objections, rather the parties shall work in good faith to address such objections.

## ARTICLE 4.
### RENT

4.1    Base Rent shall accrue from, and commence on, the Rent Commencement Date, and shall be payable in advance at Landlord's address listed in Section 1.1 of this Lease or such address designated by Landlord on 30 days advance notice, without demand therefor and without any right of abatement, set-off or deduction, for any reason whatsoever, except as expressly set forth in this Lease. Base Rent, Additional Rent and all other amounts payable by Tenant pursuant to this Lease are herein referred to as "Rent".

12

4.2      The first Base Rent payment shall be due and payable on the Rent Commencement Date (partially abated, as set forth in the definition of "Rent Commencement Date"), and subsequent Base Rent payments shall be due and payable, in advance, on or before the first day of each succeeding calendar month during the Term; provided, however, if the Rent Commencement Date is other than the first day of a month, the initial Base Rent payment shall include the first full month of the first Lease Year, plus the partial month (prorated) immediately prior to such first full month.

4.3      In addition to the Base Rent amounts set forth above, Tenant shall pay to Landlord, as additional rent, the amount of $10,000.00 per annum during Lease Years 1 through 10 (in equal monthly installments of $833.33 per month).

4.4      In addition to Base Rent, Tenant shall pay, as and when the same become due and owing, as additional rent, all other monies expressly provided for in Articles 5 and 6 of this Lease to be paid to Landlord ("<u>Additional Rent</u>").

## ARTICLE 5.

## TAXES

5.1      As Additional Rent, Tenant agrees to pay, as part of Tenant's Common Area Costs (as hereinafter defined) pursuant to and subject to the terms and conditions of Article 6 below, Tenant's Pro-Rata Share of Taxes; provided, however, that if Landlord is required by the holder of any fee mortgage secured by the Shopping Center to escrow any amount for Taxes, then for so long as such escrow shall be required, upon written notice from Landlord to Tenant, Tenant agrees that Tenant's payment under this Section 5.1 shall equal Tenant's Pro-Rata Share of the monthly escrow amount for Taxes required to be paid by Landlord. "<u>Taxes</u>" shall mean all real estate taxes and all assessments, including, without limitation, ad valorem and non-ad valorem real estate taxes and assessments for settlements and improvements that are levied and assessed against and on the Shopping Center, including any substitution therefor, which may be levied against the Shopping Center for, and allocable to, any tax fiscal year during the Term following the Rent Commencement Date. Landlord shall be responsible for all late charges and interest charges imposed by the taxing authority by reason of Landlord's untimely payment of Taxes. If at any time during the Term of this Lease the methods of taxation prevailing at the commencement of the Term are altered so that in lieu of or as a substitute for the whole or any part of the taxes, assessments, levies, impositions or charges now levied, assessed or imposed on real estate and the improvements thereon there shall be levied, assessed or imposed (i) a tax, assessment, levy, imposition or charge wholly or partially as capital levy or otherwise on the rents received therefrom, or (ii) a tax, assessment, levy, imposition or charge measured by or based in whole or in part upon the Shopping Center or the Premises and imposed upon Landlord, or (iii) a license fee measured by the rent payable by Tenant to Landlord, then all such taxes, assessments, levies, impositions, charges or fees, or the part thereof as measured or based, shall be deemed to be included within the term "Taxes" for the purposes hereof. However, except to the extent provided in the immediately preceding sentence, Tenant shall not be required hereunder to pay any franchise, income, corporate, profit, estate, inheritance, succession, gift, transfer, mortgage, recording, or other such taxes, or any other capital levies, that are, or may be,

13

imposed upon Landlord, the Shopping Center or the Premises, or any revenue derived therefrom. Taxes in each fiscal tax year shall reflect any discounts actually received by Landlord for the early payment of Taxes or otherwise. Landlord represents that as of the date hereof, there are no pending general or special assessments on the Shopping Center and that all Taxes on the Shopping Center are paid current. If any Taxes may, at the option of the taxpayer, be paid in installments, then the same shall be deemed paid in installments over the maximum period permitted by the taxing authority and for purposes of determining Tenant's Tax payment, Taxes for any Lease Year or partial Lease Year shall be deemed to include only those installments which would have actually become due and payable (i.e., failing which payment the same would become delinquent), during that Lease Year or partial Lease Year if the applicable Tax was paid in installments over such maximum period. Tenant shall not be obligated to pay any portion of Taxes or installments thereof which become due and payable with respect to any period prior to or subsequent to the Term of this Lease. Taxes pursuant to this Section 5.1 payable for any fraction of a Lease Year at the commencement or expiration of the Term shall be appropriately prorated. Any reasonable expenses incurred by Landlord in attempting to protest, reduce or minimize Taxes shall be included in Taxes in the calendar year such expenses are paid. Tax refunds shall be deducted from Taxes in the year they are received by Landlord, but if such refund shall relate to taxes paid in a prior year of the Term, and the Lease shall have expired, Landlord shall pay Tenant's Pro Rata Share of such net refund within thirty (30) days after receipt thereof by Landlord.

5.2    Tenant shall pay all taxes levied against personal property and trade fixtures placed by Tenant in the Premises. If any such taxes are levied against Landlord or Landlord's property and Landlord elects to pay the same, or if the assessed value of Landlord's property is increased by inclusion of Tenant's personal property and trade fixtures and Landlord elects to pay the taxes based on such increase, Tenant shall pay to Landlord within thirty (30) days following written demand that part of such taxes for which Tenant is primarily liable. Tenant hereby acknowledges that it must, and hereby agrees to, collect all applicable State, local and district sales tax from its customers and pay such sales tax to the appropriate taxing authority when and as due.

5.3    The terms of this Article 5 shall survive the expiration or earlier termination of this Lease.

## ARTICLE 6.
## COMMON AREA

6.1    "Common Area" shall mean all areas, facilities, installations, improvements and equipment within the bounds of the Shopping Center now or hereafter intended for the common non-exclusive use and benefit of all occupants of the Shopping Center, and/or their employees, agents, licensees, customers and other invitees, including without limitation, parking areas, footways, exits, entrances, access roads, driveways, sidewalks, retaining walls, landscaped areas, delivery areas, trash removal areas, security areas, public washrooms and pedestrian malls or courts. Landlord hereby grants to Tenant, its licensees, sublessees, concessionaires, successors and assigns, and its and their employees, agents, licensees, customers, and invitees the non-exclusive easement and right to use the Common Area during the Term hereof for the

purposes for which they were intended. During the Term, Tenant and Tenant's employees, customers and invitees shall have the right, at no charge by Landlord or any other party to Tenant or its employees, customers or invitees, to use all parking spaces in the Shopping Center (now or hereafter existing) on an unreserved, unassigned first come first serve basis; provided, however, that Tenant agrees that Landlord may place "Bank Parking" signage in the  parking areas as shown on Exhibit N.  Tenant will reasonably cooperate (at no cost to Tenant)  with Landlord's efforts to protect the Bank Parking lot for Bank patrons so as to dissuade Tenant's patrons from using the Bank parking lot during  Bank business hours, however beyond such cooperation Tenant shall not be responsible for enforcing any parking restrictions.  Landlord represents that the Shopping Center is in compliance with all applicable laws and requirements regarding the required number of parking spaces at the Shopping Center.  The current design of the layout of the Shopping Center within the "Protected Area" located in front of or close to the Blink Building, which is delineated as such on Exhibit A-1 (including, without limitation, the parking area located therein), will be substantially adhered to by Landlord and its agents so as to maintain the position of the parking areas, curb cuts and roadways within such Protected Area. During the Term, Landlord shall not place or install improvements, landscaping, barriers, structures or equipment at, or make any changes, modifications or alterations to, the Protected Area; provided, however, that Landlord may make modifications to the Protected Area which are (a) required maintenance, repairs and replacements to the Common Area or (b) de minimis, so long as, in the case of either (a) or (b), same do not unreasonably and adversely affect the accessibility to the Premises from the parking areas or permanently reduce the number of parking spaces within the Protected Area and, in the case of (b), Landlord shall exercise commercially reasonable efforts to minimize any such adverse effect on accessibility.  Notwithstanding the foregoing, Landlord may make any modifications to the Protected Area required by applicable law and may temporarily impair the accessibility to the Premises to carry out such required modifications, provided that Landlord shall exercise commercially reasonable efforts to minimize such impairment.  In addition, Landlord shall not do anything or cause or allow anything to be done to reduce the number of parking spaces in the Shopping Center below that number which is required by applicable law.

6.2    Landlord shall maintain, repair and replace all portions of the Common Area. Landlord shall operate, manage, maintain and keep such areas at all times in an order, condition and repair in accordance with Landlord's past practices and in a well-lit clean and sanitary condition in accordance with sound and accepted shopping center practices and all applicable legal requirements (collectively, "Common Area Maintenance"), which Common Area Maintenance shall include, without limitation, the following:

      i.     Maintaining, repairing and resurfacing, when necessary, all paved surfaces in a level, smooth and evenly covered condition; and restriping, when necessary;

     ii.     Plowing and removing all snow, ice, papers, debris, filth and refuse to the extent reasonably necessary to keep the area in a clean and orderly condition;

15

iii.  Maintaining, repairing and replacing, when necessary, all traffic directional signs, markers and lines, and all informational signs such as "Handicapped Parking";

iv.  Operating, maintaining, repairing and replacing, when necessary, such artificial lighting facilities as shall be reasonably required;

v.  Maintaining all landscaped areas (including, without limitation, those on the perimeter of the Shopping Center); maintaining, repairing and replacing, when necessary, automatic sprinkler systems and water lines; and replacing shrubs and other landscaping as is necessary;

vi.  Maintaining, repairing and replacing, when necessary, all Common Area walls;

vii.  Maintaining, repairing and replacing, when necessary, all Common Area storm drains, sewers and other utility lines and facilities not dedicated to the public or conveyed to any public or private utility which are necessary for the operation of the improvements located in the Shopping Center;

viii.  Keeping the center pylon sign(s) lighted from dusk to dawn or during such other times;

ix.  Maintaining, repairing and replacing, when necessary, the center pylon sign(s);

x.  Providing reasonable and customary security services with respect to the Common Area (and not the Premises which shall be Tenant's sole responsibility), to the extent deemed necessary or desirable by Landlord in its reasonable discretion;

xi.  Maintaining the insurance set forth in Section 13.5 of this Lease required to be maintained on the part of Landlord;

xii.  Keeping all common utility lines free from any obstructions; and

xiii.  Keeping all Common Area lights illuminated seven (7) days a week from 5 a.m. until dawn and from dusk until at least 11 p.m.

6.3    Commencing on the Rent Commencement Date, Tenant shall pay (A) its Pro-Rata Share of the (i) reasonable and customary (provided that any expenses incurred in good faith or in accordance with past practices shall be deemed to be reasonable and customary) out-of-pocket costs actually incurred by Landlord for Common Area Maintenance and (ii) Taxes, as more particularly described in and subject to the terms and conditions of Article 5 of this Lease (collectively, the "Common Area Costs") and (B) an administrative fee equal to fifteen percent (15%) of Tenant's Pro-Rata Share of Common Area Costs (the "Administrative Fee").

16

6.4     Notwithstanding anything herein to the contrary, Common Area Costs shall not include (i) expenses incurred in leasing space, such as legal expenses, brokerage commissions, tenant improvements or advertising or promotional expenses, (ii) interest and amortization under mortgages or any other secured or unsecured loan payable by Landlord, (iii) expenses separately reimbursed by any other tenants of the Shopping Center, (iv) financing and refinancing costs, including fees paid by Landlord to obtain financing or refinancing such as origination fees and brokerage commissions, (v) any management, overhead, administrative or similar fees, (vi) non-cash depreciation, (vii) costs incurred in connection with the enforcement of leases, including attorneys' fees or other costs and expenses incurred in connection with summary proceedings to dispossess any other tenant in the Shopping Center, (viii) any expenses associated with any special requirements of a particular tenant in connection with the Common Area or the maintenance thereof (including without limitation costs of increased security necessitated by other tenants' uses or special activities), (ix) after the third (3rd) Lease Year, costs incurred by Landlord in connection with any capital expenditures or capital improvements, except that Tenant shall pay Tenant's Pro-Rata Share of the amortization costs of any such capital expenditures or capital improvements over the useful life thereof during the Term, (x) any reserves for future expenses, (xi) costs attributable to goods and services provided by persons affiliated with Landlord to the extent such costs exceed the fair market value of such goods and services as reflected by costs for same generally available from unaffiliated sources in the market area, (xii) costs resulting from the gross negligence or willful misconduct of Landlord, (xiii) costs (including fees, fines and penalties, and interest thereon) incurred due to violations by Landlord of any applicable laws, rules, regulations or other governmental requirement, (xiv) any advertising and promotional expenditures, (xv) [intentionally omitted], (xvi) any costs or expenses of a partnership, or other entity, which constitutes Landlord not directly related to the Shopping Center (such as accounting fees, tax returns and income taxes of such entity), expenses incurred by Landlord not directly related to the Shopping Center, and/or its operations including, without limitation, compensation paid to officers, executives, or partners of Landlord above the level of Shopping Center manager, (xvii) costs reimbursed by warranties, insurance proceeds, other tenants or occupants of the Shopping Center or from any other parties, (xviii) any and all costs related to the initial construction, renovation or preparation of the Shopping Center, (xix) costs of removing, remediating, or otherwise dealing with any Hazardous Substances, (xx) salaries, fringe benefits, bonuses and other compensation (a) to or for those above the level of Shopping Center manager, or (b) to or for those who do not devote 100% of their working time to the operation or management of the Shopping Center (in which case an appropriate proportionate amount of such sums may be included in Common Area Costs based on the amount of working time devoted to the Common Area), (xxi) expenses for vacant or vacated space, including utility costs, securing and renovation of the same, and (xxii) the cost of alterations, decorations, repairs, and any other work or services performed in any of the leasable areas in the Shopping Center.

6.5     From and after the Rent Commencement Date, Tenant shall pay to Landlord on a monthly basis in advance one-twelfth of Landlord's reasonable estimate of the annual amount due hereunder on account of Common Area Costs and the Administrative Fee. Within one hundred twenty (120) days after the expiration of each calendar year, Landlord shall furnish Tenant a certified statement showing the Common Area Costs and Administrative Fee for such

17

calendar year or portion thereof, if applicable. Such statement shall contain a breakdown of Common Area Costs, in reasonable detail, showing the items included therein, and the manner of the computation of Tenant's Pro-Rata Share for such payment and the payments made by Tenant with respect to such year. If Tenant's aggregate payments for such costs with respect to such year are greater than Tenant's Pro-Rata Share of the costs, Tenant shall receive a credit for the excess against the Common Area Costs and Administrative Fee payment next becoming due to Landlord; if said payments are less than Tenant's Pro-Rata Share, Tenant shall pay to Landlord the difference within thirty (30) days thereafter.

    6.6    Notwithstanding anything contained in this Lease, commencing on the second (2nd) Lease Year and each Lease Year thereafter, the aggregate "Controllable Expenses" (as defined below) included in Common Area Costs in any calendar year during the Term shall be the lesser of: (i) the actual Controllable Expenses; or (ii) the Base Amount (as permitted to be increased herein during the Term), subject to the terms of this Section 6.6. The "Base Amount" shall mean, with respect to each Lease Year, the actual Controllable Expenses incurred by Landlord during the prior Lease Year, increased by five percent (5%). For purposes of this Lease, "Controllable Expenses" shall mean all Common Area Costs except (i) Taxes, (ii) actual costs of utilities, (iii) insurance carried by Landlord with respect to the Shopping Center, (iv) snow removal and (v) security costs, to the extent reasonably incurred to address circumstances first arising after the Commencement Date. Notwithstanding the foregoing, as of the commencement of each Renewal Term, the Base Amount shall be reset to the actual amount of such Controllable Expenses for the first (1st) Lease Year of such Renewal Term (i.e., without regard to any prior cap), and the aforesaid cap for Controllable Expenses shall be applicable commencing in the second (2nd) Lease Year of such Renewal Term, and thereafter throughout such Renewal Term (but then commencing with the next Renewal Term, the Base Amount will be once again reset the actual Controllable Expenses, without any prior cap).

    6.7    Landlord shall retain its records relating to the Common Area Costs at Landlord's principal office, and upon thirty (30) days' prior notice to Landlord, Tenant shall have the right to inspect all of Landlord's records relating to such Common Area Costs for the immediately preceding calendar year. Appropriate adjustments shall be made for errors in the computation of such costs revealed by such audit or inspection. If any audit by Tenant correctly indicates an overcharge in the amount of the Common Area Costs for the immediately preceding calendar year by more than four percent (4%), in addition to reimbursement in full of the overcharged amount, the reasonable out-of-pocket cost of such audit shall be paid on demand by Landlord to Tenant, up to an aggregate amount of three thousand dollars ($3,000) for the cost of such audit; otherwise the expenses of Tenant's audit shall be borne by Tenant. Tenant agrees to keep all of the information disclosed by any such audit confidential other than as between Landlord and Tenant and each of their agents, consultants and advisors. In no event shall any auditor or accountant retained by Tenant to perform such audit be paid on a contingency or percentage basis.

    6.8    The terms of this Article 6 shall survive the expiration or earlier termination of this Lease.

18

ARTICLE 7.
USE AND CARE OF PREMISES

7.1    The Premises may be used only for the Permitted Use and for no other purpose, unless permitted pursuant to Section 17.2 hereof. Tenant shall utilize Tenant's Trade Name in conducting business at the Premises. Tenant shall have access to the Premises and related Common Area twenty-four (24) hours per day, seven (7) days per week at no additional cost to Tenant.  Subject to applicable law, Tenant may be open for business such additional hours (i.e., beyond the normal operating hours for a Blink Fitness location) as it deems appropriate, including up to twenty-four (24) hours per day, seven (7) days per week.

7.2    All property kept, stored or maintained within the Premises by Tenant shall be at Tenant's sole risk.

7.3    Tenant shall not (a) permit any objectionable or unpleasant odors to emanate from the Premises, but the mere odors from a fitness work-out consistent with the operation of a first class fitness facility are not deemed to be objectionable or unpleasant, (b) except as set forth in Section 10.2, place or permit any radio, television, loudspeaker or amplifier on the roof or outside the Premises, (c) except as expressly permitted pursuant to the other provisions of this Lease, place an antenna, awning or other projection on the exterior of the Premises, (d) take any other action which would constitute a nuisance or disturb or endanger other tenants of the Shopping Center or unreasonably interfere with their use of their respective premises, (e) do nor permit to be done in, on or about the Premises anything which is illegal or unlawful, (f) serve liquor or alcoholic beverages, or (g) conduct within or from the Premises any fire, auction or bankruptcy sales. Notwithstanding the preceding sentence and other contrary provisions of this Lease, Landlord recognizes that some noise and vibration does result from Tenant's Permitted Use and agrees that noise and vibration customarily associated with a health and fitness club shall not be considered a nuisance and shall not constitute a violation of this Lease. Tenant shall keep the Premises reasonably free of insects and vermin and, to the extent food is prepared at the Premises, shall provide proper extermination service and proper sanitation practices, so as to prevent the occurrence of insects and vermin in the Premises and the Blink Building.

7.4    Tenant shall have the right to install (a) pay lockers in the Premises for use by its members, employees and invitees and (b) up to two (2) automatic teller machines within the Premises.

7.5    Tenant shall take good care of the Premises and keep the same free from material waste. Tenant shall keep the Premises neat, clean and free from dirt, rubbish, insects and pests. Tenant shall maintain all display windows in a neat and attractive condition.

7.6    Except for the Entitlements and Use Approvals (which Landlord is obligated to obtain as a condition to the Landlord Turnover Date hereunder) Tenant shall procure all permits and licenses required for the transaction of business in the Premises and shall comply with all laws, ordinances and regulations applicable to the use or occupancy of the Premises (including making necessary alterations). Notwithstanding the foregoing, Tenant shall not be responsible for the performance of work, alterations or repairs to the structural components of the Premises,

19

the Blink Building or the Shopping Center necessary for compliance with law (collectively, the "Structural Work"), all of which required Structural Work shall be the obligation of Landlord, except to the extent such Structural Work is necessitated by (i) the particular manner of use by Tenant of the Premises (as opposed to general use for the Permitted Use) or (ii) Tenant's alterations.

7.7     Upon the expiration or termination of this Lease, Tenant shall: (a) deliver possession of the Premises to Landlord in a broom clean condition free of debris, ordinary wear and tear and damage by casualty or condemnation excepted; and (b) remove all of its movable trade fixtures, personal property and signage and repair any damage caused by such removal. In no event shall Tenant have any obligation to remove any alterations, installations, additions or improvements (including Landlord's Work or Tenant's Work), except as provided in Article 9. In the event that Tenant shall fail to so timely remove the property specified in the immediately preceding sentence, then all such property shall become the property of Landlord and may be removed by Landlord at Tenant's sole cost and expense.  Tenant's obligation to reimburse Landlord upon demand for such removal costs shall survive the expiration or earlier termination of this Lease.

ARTICLE 8.
MAINTENANCE AND REPAIR OF PREMISES

8.1     Landlord shall keep, maintain, repair and replace, in good repair and condition consistent with past practices, ordinary wear and tear excepted, (i) all structural components of the Blink Building (both interior and exterior) and the Premises, including, without limitation, the foundation, the exterior walls and any load-bearing interior walls, the roof, roof membrane, subsurface areas, egress stairs, sewer and water mains outside of the Premises (to points of connection within the Premises), the fire sprinkler, and fire alarm; (ii) all mechanical equipment and building systems not servicing the Premises exclusively, to points of connection within the Premises, including, without limitation, electrical, plumbing, mechanical, fire-safety and HVAC systems (it being understood that Landlord's obligations as to the HVAC systems shall be governed by Section 8.4 below), (iii) [intentionally omitted], and (iv) any damage to the Premises caused by the willful misconduct or negligent act or omission of the Landlord, its agents, employees and contractors (but excluding any damage to the Premises or Shopping Center caused by the willful misconduct or negligent act or omission of Tenant, its agents, employees and contractors) or any breach of this Lease by Landlord.  Repairs required to be made by Landlord that are occasioned by the negligence or willful misconduct of Tenant, its agents, employees, invitees, subtenants, licensees and concessionaires shall be paid for by Tenant within thirty (30) days following written demand to the extent not covered by net insurance proceeds paid to Landlord therefor.    If the Premises need repairs that are Landlord's responsibility, Tenant shall notify Landlord and Landlord shall promptly commence and diligently prosecute to completion all such repairs following delivery of such notice.

8.2     In the event that Tenant, in its reasonable discretion, determines that Landlord is not addressing its maintenance and repair obligations in Section 8.1 hereof in a timely and diligent fashion, Tenant may provide Landlord with written notice of such failure. In the event Landlord does not commence such maintenance and repair obligations within five (5) business

20

days after receipt of Tenant's notice thereof and thereafter and continuously and diligently pursue completion of such maintenance and repair, Tenant shall send Landlord a second (2nd) notice regarding the need for such repairs containing the bolded caption: "THIS IS THE SECOND (2ND) NOTICE REGARDING REQUIRED REPAIRS UNDER SECTION 8.1 OF THE LEASE.    TENANT MAY BE ENTITLED TO CERTAIN SELF HELP RIGHTS THEREUNDER UPON FAILURE TO PERFORM SUCH REPAIRS." If Landlord continues to not promptly commence within five (5) business days and diligently complete such maintenance and repair obligations, Tenant may, but shall not be obligated to, perform all such maintenance and repair work at the sole cost of Landlord.  If Landlord fails to reimburse Tenant for such costs within ten (10) business days after receipt of an invoice therefor with supporting documentation, Tenant may, at its election, offset the reasonable, out-of-pocket cost thereof against subsequent installments of monthly Base Rent then becoming due and payable under this Lease (up to a maximum of fifty percent (50%) of each monthly payment of Base Rent until such cost is recouped in full).    Notwithstanding the foregoing, if Landlord shall give Tenant notice that Landlord disputes Tenant's claim with respect to such offset within five (5) business days of Tenant's demand for reimbursement, Tenant shall not have any offset right with respect to such disputed amount unless Landlord continues to fail to reimburse Tenant for thirty (30) days after Tenant has obtained and docketed a final and unappealable judgment therefor, in which event such amount may be offset by Tenant as aforesaid.

8.3    Throughout the term of this Lease, Tenant shall maintain and repair as necessary all parts of the Premises not Landlord's responsibility to maintain and repair pursuant to the terms of this Lease (except for ordinary wear and tear), including all HVAC equipment and mechanical systems serving the Property exclusively. Tenant shall also repair any damage to the Premises or the Shopping Center caused by the willful misconduct or negligent act or omission of Tenant, its agents, employees, contractors, sublessees, licensees and invitees.

8.4    As part of Landlord's Work, Landlord shall deliver the Premises with a new HVAC system and equipment servicing the Premises in good working order as more particularly described in Landlord's Work  and Landlord shall assign to Tenant any warranties of the new HVAC system serving the Premises. Throughout the term of this Lease, Tenant shall maintain in good condition all HVAC systems and equipment serving the Premises and shall enter into a preventive maintenance/service contract with a maintenance contractor reasonably approved by Landlord for servicing such systems and equipment.

8.5    Tenant shall pay for all utility usage directly to the utility company providing such utility service with no premium to Landlord (and Landlord shall, as part of Landlord's Work, separately meter such utility service at Landlord's cost).  There shall be no "after hours" charges associated with Tenant's use of any utilities at the Premises.

8.6    Tenant shall pay for its own janitorial service within the Premises.

ARTICLE 9.
ALTERATIONS

21

9.1     Except as hereinafter expressly permitted, Tenant shall not make any alterations, additions or improvements to the Premises without the prior written consent (or deemed consent) of Landlord.  Tenant may install trade fixtures if the same can be installed without drilling, cutting or otherwise defacing the Premises.  All alterations, additions, improvements, carpeting, floor coverings, and fixtures (other than trade fixtures) installed by either party upon the Premises shall be Tenant's property when installed or completed and throughout the Term, but shall remain upon the Premises and become the property of Landlord at the end of the Term. Upon the expiration or earlier termination of this Lease, Tenant shall remove those Specialty Alterations (as defined herein) made to the Premises; provided that other than Specialty Alterations, Tenant shall not have to restore or remove any alterations made to the Premises at or prior to the expiration of the Term of this Lease, provided such work was approved (or deemed approved) by Landlord or is permitted to be performed by Tenant without the approval of Landlord.  For the purposes of this Section 9.1, "Specialty Alterations" shall mean alterations consisting of kitchens, pantries, elevators, internal stair cases, raised computer floors, server rooms, vaults, libraries, filing systems, internal staircases, dumbwaiters, pneumatic tubes and other alterations of a similar character which are not customary for retail use and which are unusually expensive to remove.

Landlord will not unreasonably withhold, condition or delay its consent to alterations (including Tenant's Work, however the timing for Tenant Work approvals shall be governed by Section 3.10). Landlord shall review plans and specifications for any proposed alterations and provide Tenant with approval thereof or detailed objections within fifteen (15) days after submission to Landlord (or five (5) business days with respect to resubmissions) (for the avoidance of doubt, the timing for approval and resubmissions as to Tenant's Work shall be governed by Section 3.10, and the foregoing time periods address Alterations other than Tenant's Work).  Failure to respond within the applicable time frame shall be deemed to be Landlord's consent to the work shown in the plans and specifications. Tenant may make interior, non-structural alterations that do not affect any mechanical systems of the Premises and do not cost more than fifty thousand dollars ($50,000) (which amount shall increase by three percent (3%) during each successive Lease Year) without Landlord's consent such as painting, carpeting and wall coverings; provided that such interior alterations shall be completed in a good and workmanlike manner in accordance with applicable laws.  In addition, Tenant may make interior, non-structural cosmetic or decorative alterations without Landlord's consent.  For the purposes of this Article 9, the term "structural" shall mean all of the components of the Blink Building described in clauses (i) through (iii) of Section 8.1.

9.2     All work done by Tenant within the Premises shall be performed in accordance with the terms of Exhibit J and in a good and workmanlike manner, in compliance with all governmental requirements and so as to cause a minimum of interference with other construction in progress and with the transaction of business in the Shopping Center.  All work shall be performed by a licensed and reputable general contractor selected by Tenant pursuant to plans and specifications approved (or deemed approved) by Landlord to the extent such approval is required in accordance with Section 9.1. Prior to commencement of any such work Tenant shall provide to Landlord: (a) copies of all governmental permits and authorizations that may be required in connection with such work; (b) certificates evidencing that Tenant or Tenant's contractors have procured employers' general liability insurance and workers' compensation

22

insurance covering all persons employed in connection with the work who might reasonably assert claims for death or bodily injury against Landlord or the Shopping Center (and Landlord shall be named an additional insured); and (c) such additional bodily injury and property damage insurance as Landlord may reasonably require because of the nature of the work being done by Tenant (and Landlord shall be named an additional insured). In no event shall Tenant or any of its contractors or subcontractors be required to post a bond or other security in connection with the performance of any alterations (including with respect to Tenant's Work) or to pay any construction coordination, plan review fee or similar charge (including with respect to Tenant's Work). Tenant will use commercially reasonable efforts to employ labor that is harmonious with other labor at the Shopping Center and shall reasonably cooperate with Landlord to avoid disruption of the Shopping Center operations, but Tenant shall not be obligated to utilize union labor. Tenant shall provide Landlord with five (5) business days' advance notice before commencing any work to permit Landlord to post notices of non-responsibility.

9.3 Landlord shall execute all necessary permit applications for any approved alterations within five (5) business days following presentation of fully completed applications by Tenant, which may include, without limitation, promptly executing applications reasonably required by Tenant for such permits prior to commencement or completion of Landlord's review of Tenant's plans for such alterations; provided, if, and to the extent, Tenant requests that Landlord execute any permit applications prior to commencement or completion of Landlord's review of Tenant's plans for such alterations, then any such execution shall be solely as a courtesy to and at the specific request of Tenant, based upon Tenant's express acknowledgment and agreement that no such alterations shall be performed until such time as (x) consent to Tenant's plans with respect to such alterations has been given by Landlord (to the extent required under this Lease) and (y) Tenant shall thereafter refile an amendment to any such permit application to the extent required by any changes required by Landlord in connection with Landlord's approval of Tenant's plans for the alteration in question.

## ARTICLE 10.
## LANDLORD'S RIGHT OF ACCESS; USE OF ROOF

10.1 Landlord may enter the Premises at any reasonable time upon not less than twenty-four (24) hours prior written notice (except in an emergency, when only such notice as is practicable need be given) for the purposes of inspecting the same, of making repairs or additions to the Blink Building, or showing the Premises to prospective purchasers or lenders. Except in emergencies, Landlord's access to the Premises shall only be with an authorized representative of Tenant, whom Tenant shall make promptly available. In connection with such access and/or work, Landlord shall exercise commercially reasonable efforts to minimize any interference with Tenant's use of the Premises, its business operations therein, its means of ingress thereto and egress therefrom and/or Tenant's signage, and Landlord shall carry out such access and/or work promptly and diligently; shall consult with Tenant and shall make reasonable efforts to schedule such work in a manner, and in such locations (including the manner, method and location of exterior scaffolding, barriers or similar construction aids), as to create the least practicable interference with Tenant's use of the Premises, business operations, ingress and egress and/or signage. If, notwithstanding the foregoing, scaffolding, barriers, or construction aids shall interfere with Tenant's signage, Landlord shall, at Landlord's expense, provide Tenant with

23

suitable replacement signage during the entire duration that such exterior equipment remains in place. Landlord shall not store any construction materials within the Premises and shall remove any and all debris caused as a result of any work to the Premises by Landlord.

10.2   Subject to compliance with all applicable laws, the terms of this Lease with respect to alterations, and subject to Landlord's prior approval of the plans therefor, which approval shall not be unreasonably withheld, delayed or conditioned, Tenant may install a satellite communication system (including two (2) satellite dishes) for use in connection with the Permitted Use for use solely by Tenant (the "Communication System") on the roof of the Blink Building.  Tenant is hereby granted an irrevocable non-exclusive license throughout the Term hereof in conjunction with its use of the Premises for (i) use of any shafts, chases, and other services areas in the Blink Building required to install the electrical or communication wiring and cables related to Tenant's Communication System, (ii) access to the roof at all reasonable times (and in emergencies) to install, maintain, repair, replace or remove such Communication System, and (iii) installation and operation of a Communication System on the roof of the Blink Building at a location to be mutually agreed upon by Landlord and Tenant.  Tenant shall repair any damage to the roof of the Blink Building or any surrounding property resulting from the installation, operation and removal of Tenant's Communication System.  Tenant, at its sole cost and expense, shall secure any and all permits for its Communication System.  Notwithstanding anything to the contrary contained herein, if requested by Landlord at the end of the Term, Tenant shall promptly remove the Communication System and repair any damage to the Blink Building caused thereby, which obligation shall survive the expiration or earlier termination of this Lease.  The rights granted to Tenant in this Section 10.2 shall not be assignable by Tenant separate and apart from this Lease.  Tenant shall use the Communication System in a manner that does not interfere materially with (a) the use and occupancy of Shopping Center by other tenants or occupants, (b) the reception or transmission of communication signals by or from any antennae, satellite dishes or similar equipment installed by Landlord or any other tenant or occupant in the Shopping Center in either case prior to the date that the Communication System is installed, or (c) the operation of the mechanical systems of the Blink Building.  Landlord shall not have any obligation to maintain, repair or restore the Communication System, or to cause the Communication System to comply with applicable law.  Tenant shall (i) be solely responsible for any damage caused to Landlord or any other person or property as a result of the installation, maintenance or use of the Communication System, (ii) promptly pay any tax, license, permit or other fees or charges imposed pursuant to applicable law relating to the installation, maintenance or use of the Communication System, (iii) promptly comply with all precautions and safeguards recommended by Landlord's insurance company and all governmental authorities in either case relating to the Communication System, and (iv) perform all necessary repairs or replacements to, or maintenance of, the Communication System.

## ARTICLE 11.
## SIGNS; STORE FRONTS

11.1   Except as set forth in this Section 11.1, Tenant shall not, without Landlord's prior written consent (which consent is not to be unreasonably withheld, conditioned or delayed) (a) make any changes to or paint the store front; or (b) install any exterior lighting, decorations or

24

paintings; or (c) erect or install any signs, banners, window or door lettering, placards, decorations or advertising media of any type visible from the exterior of the Premises.

Notwithstanding the foregoing, Landlord hereby approves Tenant's façade program depicted on Exhibit F annexed hereto and made a part hereof, including, without limitation, Tenant's storefront, signs and flags on the exterior of the Premises and the Blink Building, Tenant's panel on the pylon sign located at the Shopping Center, and permanent signs and/or vinyl on the interior of Tenant's windows (the "Approved Signage"). Prior to installation, Tenant shall obtain all permits for the Approved Signage and shall erect and install such Approved Signage. Tenant may install additional or replacement signage on the exterior of the Premises, the Blink Building, the Premises storefront and in the Premises windows in the locations identified on Exhibit F without Landlord's consent, but subject to the approval of the applicable governmental authorities, provided such signage (i) is consistent with the signage and branding of the majority of other affiliated locations operating under Tenant's Trade Name; (ii) complies with Landlord's sign criteria attached hereto as Exhibit K (it being expressly agreed that signage which complies with the signage depicted on Exhibit F shall be deemed to comply with Landlord's sign criteria set forth on Exhibit K); (iii) with respect to replacement signage, is no larger than the initial signage; and (iv) complies with all applicable laws and ordinances. Any sign, once approved by Landlord (and any additional or replacement signage that complies with the preceding sentence), shall not be challenged as non-compliant with Landlord's signage criteria, except if same violates applicable laws or ordinances.

Subject to applicable laws and ordinances, Tenant shall be entitled to a sign panel at the location on the existing Shopping Center pylon sign (and any future Shopping Center pylon sign) and Shopping Center directory, as more particularly shown on Exhibit F, which shall be installed by Landlord at Tenant's sole cost and expense; provided, however, that Tenant shall pay the cost of splitting the panel in half as shown on Exhibit F. For a period of one hundred eighty (180) days prior to the Estimated Landlord Turnover Date, and without Landlord's consent, Tenant may install a temporary "Coming Soon" or "Future Home of Blink" banner on the exterior of the Premises, so long as same does not interfere with Landlord's Work or cause any Tenant Delay. Landlord shall run rigid conduit from Tenant's sign locations to a mutually agreed upon location within the Premises for the provision of electricity to such signage.

Notwithstanding anything to the contrary contained in this Lease, signs, displays and advertisements on the interior of the Premises including its windows, even if visible from the outside of the Premises, shall not be subject to Landlord's consent, provided they (x) comply with applicable law; (y) are consistent with the signage and branding of the majority of other affiliated locations operating under Tenant's Trade Name; and (z) are professionally prepared.

## ARTICLE 12.
### UTILITIES

12.1    At Landlord's sole cost and expense and as part of Landlord's Work (as further detailed on attached Exhibits B and I-1 and I-2), Landlord shall cause heat, fuel, electricity, gas, and water/sewer equipment to be stubbed to the Blink Building and Premises by the public utility providers. Landlord shall cause said utilities to be connected to the Premises in the locations

25

identified on Exhibit H annexed hereto and made a part hereof, and also as part of Landlord's Work (and as further detailed on attached Exhibits B and I-1 and I-2). Landlord shall install water, gas, and electric meters in the Premises as part of Landlord's Work, at Landlord's sole cost and expense. To the extent there are any impact, tap, connection, or other similar fees payable to a public utility or to a local governmental authority in order for Landlord to cause utility services to be connected to the Blink Building and/or Premises as provided in this Lease, Landlord shall be solely responsible for, and shall pay all such fees to the public utility companies and/or governmental authorities as and when they are due. Once Landlord causes all utility services to be stubbed to the Blink Building and Premises and installs such meters (all at Landlord's sole cost and expense), Tenant hereby agrees to establish its own utility accounts and Tenant shall promptly pay all charges for electricity, water, gas, telephone service, sewerage service and other utilities furnished to the Premises directly by the utility companies, and Tenant shall not be required to pay any overhead or other fees charged by Landlord in connection therewith. If and to the extent that any utilities shall be submetered by Landlord (as opposed to directly metered by the public utility company), Tenant shall pay Landlord for such utilities based on Tenant's consumption as shown on the submeter and Landlord's actual cost of obtaining such service from the public utility, without any overhead, profit, depreciation or other charge by Landlord.

12.2    Landlord shall not be liable for any interruption or failure whatsoever in utility services unless caused by Landlord's negligence or willful misconduct. Tenant shall comply with all provisions of this Lease notwithstanding any such failure or interruption. Landlord shall have the right to reduce such utilities within the Blink Building, including, without limitation, the Premises, as required by any mandatory fuel or energy saving allocation, or any similar mandatory statute, regulation, order or program, and Tenant shall comply with any such mandatory energy conservation program and all related measures and regulations promulgated by applicable governmental authorities provided such compliance does not adversely affect Tenant's rights under this Lease or increase Tenant's obligations.

12.3    Tenant may select the telecommunications service carrier to provide Tenant's voice and data communications service, subject to the prior consent of Landlord not to be unreasonably withheld, conditioned or delayed. Tenant shall be responsible for payment of all services provided by the carrier selected. Tenant must obtain Landlord's written approval, not to be unreasonably withheld, conditioned or delayed before installing, replacing, removing, using or modifying any wiring, cables, risers, lines or similar equipment or installations ("Wiring") inside or outside of the Premises or affecting any building systems within the Blink Building. Tenant shall also comply with the provisions in this Lease with respect to alterations in connection with the Wiring.  In its request for approval, Tenant shall submit to Landlord reasonably detailed plans and specifications for the proposed work. Tenant shall be responsible for ensuring that its telecommunications carrier and contractors comply with all laws, codes, ordinances and regulations, the applicable provisions of this Lease and any other reasonable rules and requirements which may be imposed by Landlord. All work shall be conducted during non-business hours, if Landlord so directs. Tenant shall promptly restore any portion of the Blink Building or Shopping Center that is disturbed by such work to its pre-existing condition. Upon the expiration or earlier termination of this Lease, Tenant agrees that Tenant shall surrender all of the Wiring to Landlord, free and clear of all liens and encumbrances, in good and safe condition,

26

in working order and properly labeled at each end and in each telecommunications/electrical closet and junction box. Landlord may require Tenant to remove, within ten (10) days' notice, any Wiring (i) which is installed or is at any time in violation of the applicable provisions of this Lease or applicable laws, regulations, ordinances or codes or (ii) which at any time presents a dangerous condition to persons or serious threat of damage to the Shopping Center. Tenant shall not otherwise remove and take the Wiring from the Premises.

## ARTICLE 13.
### INDEMNITY; INSURANCE

13.1    Except to the extent caused by the negligent or willful acts or omissions of Landlord, its agents, employees or contractors, Tenant shall indemnify, defend and hold harmless Landlord and Landlord's agents, employees and contractors from all actual loss, damage, expense, claims or actions arising out of (a) the use of the Premises during the Term or the conduct of Tenant's business therein; (b) any willful, negligent or tortious act or omission done or permitted by Tenant, its agents, contractors or employees; and/or (c) any breach or default in the performance of any obligation of Tenant under this Lease (including any court costs and attorneys' fees). Except to the extent caused by the negligent or willful acts or omissions of Tenant, its agents, employees or contractors, Landlord shall indemnify, defend and hold harmless Tenant and Tenant's agents, employees and contractors from all actual loss, damage, expense, claims or actions arising out of (x) any willful, negligent or tortious act or omission done or permitted by Landlord, its agents, contractors or employees; and/or (y) any breach or default in the performance of any obligation of Landlord under this Lease (including any court costs and reasonable attorneys' fees). The provisions of this Section 13.1 shall survive the termination or expiration of this Lease with respect to any claims or liability occurring prior to such termination or expiration.

13.2    Tenant shall procure and maintain throughout the Term from and after the date possession of the Premises is delivered to Tenant, at its sole expense, (a) Commercial General Liability Insurance (also known as broad form comprehensive general liability insurance) insuring Landlord, as an additional insured, and Tenant against all claims arising out of Tenant's use or occupancy of the Premises or the condition of the Premises, in an amount not less than $1,000,000 per occurrence and $2,000,000 aggregate for both premises operations and products/completed operations and at least $1,000,000 for fire legal liability, (b) property insurance on a "special peril" broad form coverage basis, covering the replacement cost of all fixtures, furniture and equipment and other personal property installed in the Premises, (c) insurance covering glass breakage in the Premises, (d) Workers Compensation in an amount not less than the statutory minimum and including Employers Liability in an amount not less than $1,000,000, (e) umbrella liability in an amount not less than $15,000,000 (to cover at least all risks described in the Commercial General Liability policy), and (f) comprehensive automobile liability, bodily injury and property damage in an amount not less than $1,000,000 combined single limit, including non-owned and hired automobile liability. All policies of insurance under clauses (a), (e) and (f) shall name Landlord, and any other entity as required by Landlord, as an additional named insured. All policies of insurance under clauses (b) and (c) shall name Landlord and Landlord's mortgagee as a loss payee. All policies of insurance shall be on an occurrence (as opposed to a claims made) basis; be issued by an insurance company reasonably

27

acceptable to Landlord; provide that they shall not be canceled unless the insurer shall provide thirty (30) days' prior written notice to Landlord; and provide primary coverage to Landlord when any policy issued to Landlord is similar or duplicate in coverage (Landlord's policy shall be excess over Tenant's policies). Tenant shall deliver evidence satisfactory to Landlord of the insurance required hereunder prior to the Commencement Date and each renewal of coverage. Such evidence shall be in the form of, (a) a Certificate of Insurance, and (b) an Additional Insured Endorsement or a Blanket Additional Insured Endorsement.    Notwithstanding any contrary provision of this Article 13, Tenant may fulfill its insurance obligations under this Article 13 through a "blanket" insurance policy so long as such blanket insurance policy complies with the terms and conditions of this Article 13.

13.3    Tenant will not permit the Premises to be used in any manner that would void the insurance thereon or on the Shopping Center; increase the insurance risk; or cause the disallowance of any sprinkler credits. Tenant shall pay any increased insurance costs caused by Tenant's use of the Premises or because Tenant vacates the Premises. Landlord represents that the operation of the Permitted Use, by itself, shall not void the insurance on the Shopping Center nor increase the insurance risk nor cause the disallowance of any sprinkler credits.

13.4    Notwithstanding anything contained herein, each of Landlord and Tenant hereby releases the other from any and all liability or responsibility to the other or anyone claiming through or under them by way of subrogation or otherwise from any loss or damage to property caused by fire or any other perils insured in the policies of insurance required to be obtained or actually obtained hereunder, even if such loss or damage shall have been caused by the fault or negligence of the other party or anyone for whom such party may be responsible, including any other tenants or occupants of the Shopping Center. Each party shall cause its insurer to obtain and carry during the Term a waiver of subrogation in favor of the other party.

13.5    Landlord shall maintain during the Term (a) Commercial General Liability Insurance in an amount not less than $5,000,000 (inclusive of any umbrella coverage that Landlord may maintain) and (b) property insurance on a "special peril" broad form coverage basis, including flood, if in a flood zone and same is available at commercially reasonable rates, covering the full replacement cost of the improvements in the Shopping Center, including the Blink Building, owned by Landlord.

## ARTICLE 14.
### NON-LIABILITY FOR CERTAIN DAMAGES

14.1    Except to the extent caused by or arising from the negligence or willful misconduct of Landlord or its agents, employees or contractors, Landlord and Landlord's agents and employees shall not be liable to Tenant or any other person for any injury to person or damage to property caused by the Premises or other portions of the Shopping Center becoming out of repair or damaged or by defect in or failure of equipment, pipes or wiring, or broken glass, or by the backing up of drains or by gas, water, steam, electricity or oil leaking, escaping or flowing into the Premises, nor shall Landlord be liable to Tenant or any other person for any loss or damage that may be occasioned by or through the acts or omissions of other tenants of the Shopping Center or of any other persons or entities whomsoever.

28

## ARTICLE 15.
## DAMAGE BY CASUALTY

15.1    Tenant shall give prompt written notice to Landlord of any damage to the Premises by fire or other casualty.

15.2    If the Blink Building shall be destroyed or rendered untenantable by fire or other casualty, (a) to the extent in excess of fifty percent (50%) of the floor area of the Blink Building or (b) if insurance proceeds are not made available by any lender of Landlord for restoration of the Blink Building, then, in either case, Landlord may elect to either terminate this Lease or to rebuild and repair the Blink Building. If the Blink Building is so damaged or destroyed and Landlord does not elect to (or does not have the right to) terminate this Lease, Landlord shall proceed with reasonable diligence to rebuild and repair the Blink Building. Should Landlord elect to terminate this Lease pursuant to the first sentence of this Section 15.2, it shall give written notice of such election to Tenant within ninety (90) days after the occurrence of such casualty. In the event of any damage or destruction to the Premises, Tenant shall, upon notice from Landlord, remove, at Landlord's expense, such portion or all of Tenant's shelves, bins, equipment, trade fixtures and other property from such portion of the Premises as Landlord shall request. If (x) the Blink Building is damaged or destroyed by fire or other casualty and Landlord's architect estimates that the damage or destruction cannot be repaired or reconstructed within twelve (12) months following the date of the casualty, or (y) the damage or destruction occurs during the last two (2) years of the term of this Lease (or of any renewal term if Tenant's applicable renewal option shall have previously been exercised), or (z) Landlord shall have elected to repair or rebuild, but Landlord's repairs and restoration work shall not be completed within the lesser of (A) nine (9) months from the date on which insurance proceeds are made available for restoration and (B) one (1) year following the date of the casualty, then, in any of such events, Tenant may, by written notice to Landlord within thirty (30) days following (i) receipt by Tenant of Landlord's estimate (in the case of clause (x)), (ii) such damage (in the case of clause (y)), or (iii) the expiration of such lesser period (in the case of clause (z)), terminate this Lease; provided, however, that in the case of clause (y), Landlord may also, by written notice to Tenant, terminate this Lease within thirty (30) days of such damage. In each case, the Term of this Lease shall end as of the date which is thirty (30) days following the giving of such notice.

15.3    Landlord's obligation to rebuild and repair under this Article 15 shall be limited to restoring the Blink Building and the Premises to substantially the condition in which the same existed immediately prior to the casualty (subject to changes necessary to comply with then existing laws applicable thereto). Promptly after completion of such work by Landlord, Tenant will proceed with reasonable diligence to repair and restore its fixtures and equipment. Notwithstanding anything to the contrary contained herein, Landlord will not carry insurance on Tenant's furniture and/or furnishings or any fixtures or equipment, improvements or appurtenances removable by Tenant, and Tenant agrees that Landlord will not be obligated to restore or repair same pursuant to the terms of this Article 15.

15.4    During any repair of the Premises, Tenant will continue the operation of its business within the Premises to the extent practicable in Tenant's reasonable judgment. During the period from the occurrence of the casualty until the date which is the earlier of (a) Tenant re-

29

opening for business with the general public and (b) a reasonable period of time for Tenant to diligently and continuously pursue and complete any work required to prepare the Premises to re-open for business with the general public following the date on which Landlord's repairs are substantially completed, Base Rent and all Additional Rent (including, without limitation, Tenant's Tax payment) shall be reduced and abated in proportion to the amount of floor area of the Premises which is rendered unusable as a result of such casualty; provided, however a reasonable period of time shall in no event exceed one hundred eighty (180) days.

## ARTICLE 16.
### EMINENT DOMAIN

16.1    If all or substantially all of the Premises should be taken by eminent domain or by purchase in lieu thereof, this Lease shall terminate effective on the date physical possession is taken by the condemning authority. If less than all or substantially all of the Premises shall be condemned, this Lease shall continue in effect as to the remaining portion of the Premises but shall terminate as to the condemned portion as of the date of vesting of title in the governmental authority. However, if twenty-five percent (25%) or more of the Premises shall be condemned or if access to and egress from the Premises shall be materially impaired, then in any such case, either Landlord or Tenant shall have the option to terminate this Lease upon fifteen (15) days' notice to the other party, provided such notice is given no later than thirty (30) days after the date of such taking condemnation, reconfiguration, vacation, deed or other instrument. All Rent shall be apportioned as of the date of such termination, or the date of such taking, whichever shall first occur. If any part of the Premises shall be taken, and this Lease shall not be so terminated, the Rent shall be proportionately abated. In the event of any partial taking which does not result in a termination of this Lease, Landlord, at its expense, shall proceed with due diligence to repair, alter and restore the remaining parts of the Premises to substantially their former condition to the extent that the same may be feasible and so as to constitute a complete and tenantable Premises.

16.2    All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) of the Premises or Common Area shall be the property of Landlord and Tenant hereby assigns its interest in any such award to Landlord; however, Tenant shall have the right to file any separate claim available to Tenant and Landlord shall have no interest in any separate award made to Tenant for loss of business or for the taking of Tenant's fixtures and other property, for moving expenses and/or for loss of good will, to the extent such award does not diminish Landlord's award. Tenant shall not be entitled to any award for the value of the unexpired term of this Lease.

## ARTICLE 17.
### ASSIGNMENT AND SUBLETTING

17.1    Except as expressly permitted below, Tenant shall not (a) assign, encumber, mortgage, or in any other manner transfer this Lease or any estate or interest therein; (b) sublet the Premises or any part thereof, or grant any license, concession or other right to occupy any portion of the Premises; (c) if Tenant is an entity other than a corporation whose stock is publicly traded, permit the transfer of ownership interests in Tenant so as to result in a change in the control of Tenant; or (d) permit any other person to become Tenant by merger, consolidation, or

30

otherwise (each a "Transfer") without the prior written consent of Landlord. Notwithstanding anything to the contrary contained in this Lease (including this Article 17), the following shall not be deemed to be Transfers within the meaning of this Article 17 (and, therefore, shall not require Landlord consent), but shall in each case require ten (10) days' prior written notice to the Landlord describing the transaction (unless prohibited by confidentiality requirements, in which case Tenant shall provide notice to Landlord as promptly as possible following the consummation of such transaction) and indicating compliance with one of the below conditions and the terms of this Article 17, and in the case of clause (iv) below, a copy of the assignment or sublease documents, as applicable: (i) the transfer, assignment, pledge, hypothecation or new issuance of the stock or equity interests (including a controlling interest) of Tenant's direct or indirect parent entities (including, but not limited to, Blink Holdings, Inc., Equinox Holdings, Inc. and/or EQX Holdings, LLC) (ii) the pledge, encumbrance, or hypothecation of stock or equity interests of Tenant or Tenant's direct or indirect parent entities, (iii) transfers of stock or equity interests of Tenant or a Related Entity (as hereinafter defined) to a Related Entity or to an entity into which or with which Tenant or a Related Entity is merged or consolidated or to which all or substantially all of Tenant's or a Related Entity's assets, stock or equity interests are transferred (iv) an assignment of the Lease or sublease of all or a portion of the Premises to a Related Entity or (v) issuance of stock in Tenant or a Related Entity pursuant to an initial public offering or a private placement (each of clauses (i) through (v), a "Permitted Transfer"). A "Related Entity," for the purposes of this Article 17, shall mean an entity that controls, is controlled by or is under common control with Tenant. The word "control," such as "controlled by" or "under common control with" shall mean: (A) ownership of more than 50% of the outstanding voting capital stock of a corporation or more than 50% of the beneficial interests of any other entity or (B) the ability effectively to control or direct the business decisions of such corporation or entity.

17.2    Notwithstanding the foregoing Section 17.1, other than in connection with a Permitted Transfer, Tenant shall not, without Landlord's prior written consent (not to be unreasonably withheld, conditioned or delayed), assign this Lease or sublet all or part of the Premises to any assignee or subtenant who is not a Related Entity or who proposes to use the Premises for a use other than the Permitted Use; provided that Landlord shall be deemed reasonable in withholding its consent to any such proposed assignment or subletting in the event of any of the following at the time of Tenant's request for such consent: (a) an Event of Default exists and is continuing under this Lease; (b) the proposed transferee has a tangible net worth in accordance with generally accepted accounting principles of less than ten million and 00/100 dollars ($10,000,000) (the tangible net worth of the proposed transferee and any guarantor therefor may be aggregated, so long as such guarantor is not a Related Entity to the named Tenant hereunder or any existing Guarantor); (c) the proposed transferee is not a nationally or regionally recognized retailer (it being understood that a retailer operating at least ten (10) units in the tri-state (New Jersey, New York, Connecticut) area (the "Tri-State Area") or at least twenty (20) units nationally is deemed a nationally or regionally recognized retailer); (d) the proposed sublease is for less than seventy-five percent (75%) of the Premises; (e) the proposed transferee intends to operate the Premises as a restaurant use; (f) the proposed transferee or its affiliate occupies space in the Shopping Center that it would no longer occupy in the event of such assignment or sublease of the premises, or the proposed transferee is, or has been at any time within the last six (6) months, engaged in bona fide negotiations with Landlord or its agent

31

to lease other space in the Shopping Center; (g) the proposed transferee is engaged in a business or proposes to use the Premises in the manner that will violate the Use Restrictions (or those use restrictions applicable to the Shopping Center at the time of Tenant's request for such consent); (h) the proposed transferee or its affiliate has been a party to a litigation opposite Landlord or its affiliate within the last three (3) years; (i) the proposed transferee is a governmental or quasi-governmental entity which is immune from suits or claims; and/or (j) the proposed transferee is engaged in a business or proposes to use the Premises in a manner that will cause the Shopping Center to be in violation of the parking code or applicable ordinances relating to traffic flow and access ways in the parking area and other Common Areas of the Shopping Center. If this Lease is assigned, or if the Premises or any part thereof is sublet or occupied by anybody other than Tenant, Landlord may collect rent from the assignee, subtenant or occupant, and apply the net amount collected to the Rent herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed the acceptance of the assignee, subtenant or occupant as tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained.

17.3    Tenant may, without Landlord's consent, but upon ten (10) days' prior written notice to Landlord describing the transaction and demonstrating compliance with the criteria contained herein, assign this Lease to any assignee who is not a Related Entity that continues to operate its business at the Premises for the Permitted Use (a "Continued Use Assignment"); provided that all of the following criteria shall be met at the time of such Continued Use Assignment: (a) an Event of Default does not then exist under this Lease; (b) the proposed transferee (or its parent) owns and operates at least ten (10) fitness clubs of the type and under the trade name proposed at the Premises and has owned and operated fitness clubs of such type for at least five (5) years; (c) the assignment is part of a simultaneous transfer of at least fifteen (15) Blink fitness clubs located in the Tri-State Area to the proposed transferee (or its parent or affiliate); (d) the proposed transferee has a tangible net worth in accordance with generally accepted accounting principles equal to or greater than ten million and 00/100 dollars ($10,000,000) (the tangible net worth of the proposed transferee and any guarantor therefor may be aggregated, so long as such guarantor is not a Related Entity to the named Tenant hereunder or any existing Guarantor); (e) the proposed transferee or its affiliate does not occupy space in the Shopping Center that it would no longer occupy in the event of such assignment or sublease of the premises, or the proposed transferee is not, nor has been at any time within the last six (6) months, engaged in bona fide negotiations with Landlord or its agent to lease other space in the Shopping Center; (f) the proposed transferee or its affiliate has not been a party to a litigation opposite Landlord or its affiliate within the last three (3) years; and (g) the proposed transferee is not a governmental or quasi-governmental entity which is immune from suits or claims.

17.4    Tenant may, without Landlord's consent but upon ten (10) days' prior written notice to Landlord describing the transaction and enclosing a copy of the form of license or concession agreement, enter into license or concession agreements with respect to the Premises with licensees and concessionaires providing goods or services in connection with Tenant's business, provided that (i) any use conducted by a licensee or concessionaire shall be within or complementary to the Permitted Use and shall not violate any of the terms of this Lease (including, without limitation, the Use Restrictions), (ii) such licensees and concessionaires may not, in the aggregate, occupy more

3038835v9

than twenty-five percent (25%) of the floor area of the Premises, and (iii) any such licensee or concessionaire shall not have a separate entrance to the Premises from that of Tenant.

17.5    At any time that Tenant desires to assign this Lease or sublet all or any portion of the Premises to any assignee or subtenant and such assignment or sublease is not permitted without Landlord's consent under Section 17.2 above, Tenant shall provide prompt written notice thereof to Landlord together with (a) Tenant's request for Landlord's consent pursuant to this Section 17.5; (b) Tenant's Recapture Offer pursuant to Section 17.6; and (c) the material terms of any proposed assignment or sublease and reasonably detailed financial information for such proposed assignee or sublessee ("Tenant's Notice").    Landlord's consent to any such proposed assignment or sublease shall not be unreasonably withheld, conditioned, or delayed (and shall be deemed approved if Landlord does not respond to Tenant's Notice within sixty (60) days after receipt of same; provided that Tenant sends a second (2nd) notice following such sixty (60) day period regarding such request containing the bolded caption: "THIS IS THE SECOND (2ND) NOTICE REGARDING A REQUESTED CONSENT TO ASSIGNMENT OR SUBLEASE UNDER ARTICLE 17 OF THE LEASE. FAILURE TO RESPOND WILL BE DEEMED APPROVAL", and Landlord does not respond within five (5) business days of receipt of such request).

17.6    Tenant's Notice shall include an offer to Landlord in writing of the right to recapture the lease ("Tenant's Recapture Offer") and, at Landlord's option, to terminate this Lease without any payment of moneys or other consideration therefor. Tenant's Recapture Offer shall specify the date when the Premises will be made available to Landlord, which date shall be in no event earlier than ninety (90) days nor later than one hundred eighty (180) days following the acceptance of Tenant's Recapture Offer (the "Recapture Date").    Landlord shall have a period of sixty (60) days from the receipt of such Tenant's Recapture Offer (which, if Tenant complies with the terms of this Section 17.6, shall be concurrent with the sixty (60) day period provided in Section 17.5) to either accept or reject Tenant's Recapture Offer (the "Recapture Period"). If Landlord does not accept or reject Tenant's Recapture Offer within such sixty (60) day period, Tenant shall send a second notice which will specify the following "THIS IS THE SECOND (2ND) NOTICE REGARDING A TENANT RECAPTURE OFFER UNDER ARTICLE 17 OF THE LEASE. FAILURE TO RESPOND WILL BE DEEMED REJECTION OF SUCH TENANT RECAPTURE OFFER", and Landlord does not respond within five (5) business days, such Tenant's Recapture Offer shall be deemed rejected. Tenant shall have the right to nullify Tenant's Notice, Tenant's Recapture Offer and Tenant's assignment or subletting request under Section 17.5 by giving notice within ten (10) business days of receipt of Landlord's acceptance of Tenant's Recapture Offer, in which case this Lease shall continue in full force and effect.

17.7    Consent by Landlord to one or more Transfers shall not operate as a waiver of Landlord's rights as to any subsequent Transfer. Notwithstanding any Transfer, Tenant and any Guarantor of Tenant's obligations under this Lease shall remain fully and jointly and severally liable under this Lease subject to the provisions of the Guaranty. FOR THE AVOIDANCE OF DOUBT, THERE IS NO EVENT OR CONDITION BY WHICH THE LANDLORD HAS AGREED TO RELEASE THE TENANT OR GUARANTOR FROM RESPONSIBILITY IN CONNECTION WITH AN ASSIGNMENT OR SUBLET; ANY SUCH RELEASE WOULD

ONLY OCCUR IN WRITING AND WOULD BE IN THE LANDLORD'S SOLE ABSOLUTE DISCRETION.

      17.8   If Landlord gives its consent or deemed consent to any assignment of this lease or assignment of any sublease or to any sublease or sub-sublease, Tenant shall, in consideration therefor, pay to Landlord, as and when received by Tenant:

      A.    in the case of an assignment, fifty percent (50%) of the amount, if any, by which (i) all sums and other considerations paid to Tenant by or on behalf of the assignee for or by reason of such assignment (including, but not limited to, sums paid for the sale of Tenant's fixtures, equipment, furniture, furnishings or other personal property, less, in the case of a sale thereof, the then net unamortized or undepreciated cost thereof determined on the basis of Tenant's federal income tax or federal information returns) exceeds (ii) the amount of any rental concessions and work allowance granted by Tenant or costs incurred by Tenant in preparing the demised premises for the assignee's occupancy, and all reasonable and customary out-of-pocket expense reasonably incurred by Tenant directly relating to such assignment for so-called take-over costs, legal fees, advertising expenses and brokerage commissions, but only to the extent such commissions, expenses and fees are reasonable and actually paid to independent and unrelated third parties, as evidenced by receipted bills furnished to Landlord; and

      B.    in the case of a sublease, fifty percent (50%) of the amount, if any, by which (i) any rents, additional charges or other consideration payable under or by reason of the sublease to Tenant by or on behalf of the subtenant (including, but not limited to, sums paid for the sale or rental of Tenant's fixtures, equipment, furniture or other personal property less, in the case of a sale thereof, the then net unamortized or undepreciated cost thereof determined on the basis of Tenant's federal income tax or federal information returns) exceeds (ii) the sum of (x) the Fixed Rent and additional rent accruing during the term of the sublease in respect of the Space (at the rate per square foot payable by Tenant hereunder) pursuant to the Term and (y) the amount of any rental concessions and work allowance granted by Tenant or costs incurred by Tenant in physically separating the Space from the rest of the demised premises or otherwise in preparing the Space for the subtenant's occupancy, and all reasonable and customary out-of-pocket expenses reasonably incurred by Tenant directly relating to such subletting for so-called take-over costs, legal fees, advertising expenses and brokerage commissions, but only to the extent such commissions, expenses and fees are reasonable and actually paid to independent and unrelated third parties, as evidenced by receipted bills furnished to Landlord.

      This Section 17.8 shall not apply to assignments and subleases made pursuant to Sections 17.1 and 17.3 hereof.

      17.9   The use of the Premises by any assignee, sublessee and/or successor of Tenant and/or by any other occupant of the Premises shall be subject to all then existing use restrictions applicable to the Shopping Center pursuant to applicable laws, tenant leases in the Shopping Center and any other contracts and agreements binding upon Landlord or the Shopping Center and of record or provided to Tenant in writing upon Tenant's request before such assignment or sublease.

34

## ARTICLE 18.
## DEFAULT BY TENANT AND REMEDIES

18.1    The following shall be "Events of Default" by Tenant:

A.    The failure to pay any Rent payable hereunder within five (5) business days after receiving written notice thereof from Landlord that such amount is overdue; provided, however, that if Landlord has sent to Tenant two (2) such notices within any consecutive twelve (12) month period, Landlord shall no longer be required to send Tenant further notices of a default of the payment of Rent, and any such default shall thereafter automatically constitute an Event of Default without notice or cure period.

B.    If the Premises shall become permanently abandoned and such abandonment continues for more than sixty (60) consecutive days after written notice from Landlord.

C.    If a Transfer shall occur, whether by operation of law or otherwise, except as expressly permitted in Article 17 hereof.

D.    A default beyond any applicable notice and/or cure periods shall have occurred under any guaranty of the Lease.

E.    The failure to comply with any other provision of this Lease (other than those defaults referenced in Sections 18.1(A), (B), (C), (D), (F) and (G)) that is not cured within thirty (30) days after written notice thereof to Tenant which notice shall specify such default with particularity; provided, however, if the matter in question is not reasonably susceptible of being cured within thirty (30) days, then it shall not be an Event of Default hereunder if Tenant commences to cure such matter within such thirty (30) day period and thereafter diligently and with continuity prosecutes such cure to completion.

F.    The filing of any case, proceeding or other action by or against Tenant or any Guarantor of the Lease (i) seeking to have an order of relief entered against it as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, or (ii) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, which in each case if involuntary is not discharged or stayed within ninety (90) days after the commencement thereof.

G.    Tenant or any Guarantor of the Lease is insolvent, fails to pay its debts generally as they become due, makes an assignment for the benefit of its creditors, or a receiver, trustee or liquidator of Tenant or of any material part of its assets or of Tenant's interest in this Lease is appointed in any proceeding, provided that if any of the foregoing is involuntary, same is not discharged or stayed within ninety (90) days after the commencement thereof.

35

3038835v9

18.2   Upon the occurrence of an Event of Default, in addition to any and all other remedies available to Landlord at law or in equity, Landlord may pursue any one or more of the following remedies in compliance with legal process without further notice or demand except as required by law:

A.     Terminate this Lease and recover damages therefor (subject to the terms and conditions provided elsewhere in this Lease) and/or re-enter the Premises without such re-entry working a forfeiture of Rent, and with process of law to expel, remove and put out Tenant or any person or persons occupying the Premises, so as to repossess and enjoy the Premises as before this demise, without prejudice to any remedies which might otherwise be used for arrears of rent or preceding breach of covenant. In case suit shall be brought for recovery of possession of the Premises, for the recovery of Rent or any other amount due under this Lease, or because of the breach of any other covenant herein contained on the part of Tenant, Tenant shall pay to Landlord all expenses incurred therefor, including reasonable attorneys' fees, in the event that Landlord shall prevail.

B.     Terminate Tenant's right to possess the Premises by re-entering the Premises by summary proceedings, ejection or otherwise, without terminating this Lease and recover damages. In such event, Landlord may alter or change locks and other security devices at the Premises. Landlord shall have no obligation to furnish a new key.

C.     Perform any of Tenant's obligations under this Lease, and Tenant shall reimburse Landlord on demand for all reasonable out-of-pocket costs incurred by Landlord in doing so.

D.     Exercise any other remedy provided in this Lease or under applicable law or equity.

18.3   Exercise by Landlord of any one or more remedies hereunder or otherwise available shall not be an acceptance of surrender of the Premises. If Landlord terminates this Lease or Tenant's right to possess the Premises, Tenant shall immediately deliver possession of the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other right, take possession of the Premises and remove Tenant and any other occupants. Tenant shall have no (and hereby waives) claim for damages by reason of any entry, repossession or alteration of locks or other security devices.

18.4   If Landlord terminates Tenant's right of possession without terminating the Lease under Section 18.2(B), Tenant shall remain liable for all Rent and other amounts payable to Landlord pursuant to this Lease, diminished by any net sums thereafter received by Landlord through reletting the Premises (after deducting reasonable out-of-pocket expenses incurred by Landlord as provided in Section 18.6). Tenant shall not be entitled to any excess obtained by reletting over the Rent herein reserved. Actions to collect amounts due by Tenant to Landlord as provided in this Section 18.4 may be brought from time to time, on one or more occasions. If Landlord terminates Tenant's right of possession under Section 18.2(B), it may at any time thereafter elect to terminate this Lease under Section 18.2(A).

3038835v9

18.5    If Landlord shall elect to terminate this Lease due to an Event of Default, then it may recover from Tenant:

A.    The worth at the time of the award ("Award") by a court of competent jurisdiction, of the unpaid Rent payable hereunder which had been earned at the date of such termination; plus,

B.    The worth at the time of the Award by a court of competent jurisdiction of the amount by which the unpaid Rent which would have been earned after termination and until the time of the Award exceeds the amount of such rental loss which could have been reasonably avoided; plus,

C.    The worth at the time of the Award of the amount by which the unpaid Rent for the balance of the then current term of the Lease after the time of the Award exceeds the amount of such rental loss which could be reasonably avoided; plus,

D.    Any other reasonable amounts necessary to compensate Landlord for all detriment proximately caused by Tenant's failure to perform its obligations hereunder; and

E.    At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted by applicable state law from time to time.

As used in subparagraphs (A) and (B) above, the "worth at the time of the Award" is computed by allowing interest at the rate of six percent (6%) per annum, or the maximum rate permitted by applicable law, whichever is lower. As used in subparagraph (C) above, the "worth at the time of the Award" is computed by discounting such amount to present value at the rate of three percent (3%) per annum.

18.6    In case of an Event of Default, Tenant shall also be liable for any reasonable out-of-pocket broker's fees incurred by Landlord in connection with reletting the whole or any part of the Premises; the reasonable out-of-pocket costs of removing and storing Tenant's or other occupant's property; the reasonable out-of-pocket cost of repairing, altering, remodeling or otherwise putting the Premises into condition acceptable to new tenants; and all reasonable out-of-pocket expenses incurred by Landlord in enforcing or defending Landlord's rights including reasonable attorneys' fees.

18.7    Following termination of Tenant's right of possession under Section 18.2(B), Landlord may relet the Premises or any part thereof for such rent and upon such terms as it shall determine. If Landlord elects to relet the Premises, it shall use the same efforts it then uses to lease other space, but shall not be required to give any preference to the leasing of the Premises over any other space that Landlord may have available.

18.8    The rights and remedies of Landlord herein stated shall be in addition to any and all other rights and remedies which Landlord has or may hereafter have at law or in equity.

18.9    Tenant acknowledges that late payment by Tenant to Landlord of Rent will cause Landlord to incur costs not contemplated in this Lease, the exact amount of such costs being

37

extremely difficult and impracticable to fix. Such costs include, without limitation, processing and accounting charges, and late charges may be imposed on Landlord by the terms of any encumbrance covering the Premises. Therefore, if any Rent amount is not received by Landlord within five (5) business days after written notice that such amount shall be due, Tenant shall pay to Landlord an additional sum of five percent (5%) of such overdue Rent amount as a late charge. The parties agree that such late charge represents a fair and reasonable estimate of the costs that Landlord will incur by reason of late payment by Tenant. In addition, any overdue Rent shall accrue interest at the rate of six percent (6%) per annum ("Default Rate") until paid.

18.10  If an Event of Default shall have occurred and be continuing, Landlord, without being under any obligation to do so and without thereby waiving such default, may remedy such default for the account and at the expense of Tenant. Such out-of-pocket sums paid or obligations actually incurred by Landlord in connection therewith shall be paid by Tenant to Landlord upon demand as additional Rent.

18.11  All obligations of Landlord hereunder will be construed as covenants, not conditions. The term "Landlord" shall mean only the owner, from time to time, of the Shopping Center, and in the event of the transfer by an owner of its interest in the Shopping Center, such owner shall be released from all obligations of the Landlord, but such obligations shall be binding upon each new owner for the duration of such owner's ownership. Notwithstanding any other provisions hereof, in the event of any breach or default by Landlord under this Lease, Tenant agrees to look solely to the equity or interest then owned by Landlord in the land and improvements which constitute the Shopping Center, and in no event shall any deficiency judgment or any money judgment of any kind be sought or obtained against Landlord. For purposes of this provision Landlord's interest in the land and improvements which constitute the Shopping Center shall be deemed to include all rents and other income from the Shopping Center and any insurance proceeds pertaining to the Shopping Center and the proceeds of a sale of the Shopping Center.

### ARTICLE 19.
### MECHANICS' LIENS

19.1  Tenant shall not permit any lien or encumbrance of any kind to be placed against the Premises, the Blink Building or the Shopping Center and shall discharge any lien which is filed against the Premises, the Blink Building or the Shopping Center for work claimed to have been done for, or materials furnished to, Tenant by payment or bonding within thirty (30) days after Tenant's receipt of written notice thereof from Landlord, failing which Landlord may discharge or bond such lien at Tenant's expense.

### ARTICLE 20.
### HOLDING OVER

20.1  If Tenant remains in possession of the Premises after the expiration or termination of this Lease, such occupancy shall be a tenancy from month to month upon all the provisions of this Lease, except that monthly Rent shall equal one hundred fifty percent (150%) of the monthly of Base Rent and Additional Rent during the last month of the Term (except that any co-tenancy

38

provision, exclusive rights, renewal right, expansion right or any other right to offset or abate any item of Rent or to pay any reduced or alternative rent shall be inapplicable). Landlord's right to collect said increased rent shall be Landlord's sole monetary remedy arising out of Tenant's remaining in possession after the expiration or termination of this Lease, it being agreed that nothing herein shall limit Landlord's right to seek, commence, or pursue summary proceedings to dispossess Tenant; provided, however, that if Tenant remains in possession of the Premises for longer than thirty (30) days following the expiration or termination of this Lease, Landlord shall have all rights and remedies available to it under applicable law and in equity.

ARTICLE 21.
SUBORDINATION

21.1    Tenant accepts this Lease subject and subordinate to any mortgage, deed of trust or other lien resulting from any method of financing or refinancing presently existing or hereafter created upon the Premises or the Shopping Center (or any portion of the Shopping Center which includes the Premises), and to any renewals, extensions, modifications, consolidations and replacements thereof, and any and all advances made thereunder, but Tenant agrees that any mortgagee shall have the right at any time to subordinate such mortgage, deed of trust or other lien to this Lease, and subject to the provisions of any Subordination Non-Disturbance Agreement ("SNDA Agreement"), Tenant shall attorn to any mortgagee upon request therefor. Tenant shall execute such further instruments subordinating this Lease as Landlord may reasonably request, and as Landlord's lender may reasonably require (at no cost or expense to Tenant), within ten (10) business days of Landlord's request. Notwithstanding anything to the contrary contained herein, (i) concurrently with the execution and delivery of this Lease, Tenant and Landlord are executing and delivering an SNDA Agreement in the form annexed hereto as Exhibit L with the current holder of the mortgage encumbering the Premises and the Shopping Center (the "Superior Mortgagee") and (ii) this Lease shall not be subordinate to any mortgage, deed of trust or other lien encumbering the Premises or the Blink Building after the date of this Lease unless the holder of any such mortgage, deed of trust or other lien executes and delivers to Tenant an SNDA Agreement substantially in the form annexed hereto as Exhibit L, at no cost to Tenant. With respect to the initial SNDA Agreement or any subsequent SNDA Agreement, Landlord and Tenant shall split equally any costs and expenses charged by any mortgage holder in connection with negotiating and issuing such SNDA Agreement, up to a maximum cost of four thousand dollars ($4,000) to Tenant.

21.2    In the event of a termination of any ground or underlying lease, or if the interests of Landlord under this Lease are transferred by reason of, or assigned in lieu of, foreclosure or other proceedings for enforcement of any mortgage, or if the holder of any mortgage acquires a lease in substitution therefor, then Tenant under this Lease will, at the option to be exercised in writing by the lessor under such ground or underlying lease or such mortgagee or a purchaser, assignee or lessee who has taken title or a leasehold interest through such ground lessor or mortgagee, as the case may be ("Subsequent Lessor"), and provided such Subsequent Lessor shall be bound as Landlord under the terms and conditions of the Lease either (a) attorn to such Subsequent Lessor and will perform for its benefit all the terms, covenants and conditions of this Lease on Tenant's part to be performed with the same force and effect as if the Subsequent Lessor were the landlord originally named in this Lease, or (b) enter into a new lease with the

39

Subsequent Lessor, as landlord, for the remaining term of this Lease and otherwise on the same terms and conditions and with the same options, if any, then remaining. The foregoing provisions of this paragraph shall inure to the benefit of any Subsequent Lessor, shall be self-operative upon the exercise of such option, and no further instrument shall be required to give effect to said provisions. Tenant, however, upon demand of any Subsequent Lessor agrees to execute, from time to time, instruments in confirmation of the foregoing provision of this paragraph, reasonably satisfactory to any Subsequent Lessor, acknowledging such attornment and setting forth the terms and conditions of its tenancy.

21.3    Landlord represents to Tenant that as of the date of this Lease, the only Superior Mortgagee or superior lienholder is Metropolitan Life Insurance Company and this Lease is not currently subject to any ground lease. Any SNDA Agreement entered into shall supersede the contrary terms of this Article 21.

## ARTICLE 22.
## EXCULPATION

22.1    Anything herein to the contrary notwithstanding, the liability of Landlord for negligence, failure to perform lease obligations or otherwise under or in connection with this Lease shall be limited to Landlord's interests in the Shopping Center including, without limitation, all rents and other income from the Shopping Center and any insurance proceeds pertaining to the Shopping Center and the proceeds of a sale of the Shopping Center. Tenant shall neither seek to enforce nor enforce any judgment or other remedy against any other asset of Landlord, any partner or principal of Landlord or any party that holds any interest in Landlord.

## ARTICLE 23.
## NOTICES

23.1    Any notice or communication required by this Lease must be in writing. Notices and other communications shall be given by overnight courier or by United States Mail, postage prepaid, certified mail, return receipt requested. Notices to Landlord shall be sent to Landlord's address in Section 1.1 above with a copy to Shipman & Goodwin LLP, 300 Atlantic Street, Stamford, Connecticut 06901, Attn: Kent Nevins, Esq., and notices to Tenant shall be sent to Tenant's address in Section 1.2 above, Attention: Mr. Larry Segall, CFO, with a copy to Blank Rome LLP, 405 Lexington Avenue, New York, New York 10174, Attention: Samuel M. Walker, Esq. Any notice sent hereunder as aforesaid shall be considered to be given upon the receipt or refusal of delivery by the recipient thereof. Either party, however, may designate in writing such new or other address to which such notice or demand shall thereafter be so given, made or mailed. Notices on behalf of the respective parties may be given by their attorneys and such notices shall have the same effect as if in fact subscribed by the parties on whose behalf it is given.

## ARTICLE 24.
## MISCELLANEOUS

3038835v9

24.1    Neither party hereto shall record this Lease. However, upon request of either party hereto, the other party shall join in the execution of a memorandum of lease for the purpose of recordation, and either party may record such memorandum of lease at the sole cost and expense of the party so recording it.

24.2    One or more waivers of any provision of this Lease by either party shall not be construed as a waiver of a subsequent breach of the same provision.

24.3    Time is of the essence with respect to all provisions of this Lease, provided that except as otherwise expressly provided herein, if either party is delayed or hindered in or prevented from the performance of any obligation required hereunder by Unavoidable Delay, the time for performance of such obligation shall be extended for the period of the delay, provided that Unavoidable Delay will not excuse prompt and timely payments, including Rent. However, no delay will be excused by this Section 24.3 unless (1) the delayed party notifies the other party in writing of the delay within ten (10) days of such party's awareness of the event giving rise to such delay; (2) the delayed party has exercised commercially reasonable efforts to exhaust all other resources available at reasonable costs to avoid such delay; and (3) the delayed party diligently pursues completion of the activity that was delayed. "Unavoidable Delay" means a material delay beyond the reasonable control of the delayed party caused by labor strikes, lock-outs, labor troubles, industry-wide or regional inability to procure materials, failure of power, governmental restrictions, regulations or controls, riots, war, military or usurped governmental power, acts of terrorism, sabotage, material fire or other material casualty, or a material act of God or nature (such as a severe storm or earthquake) or other causes not within the control of the delayed party, but excluding inadequacy of insurance proceeds, litigation or other disputes, financial inability, lack of suitable financing and delays of the delayed party's contractor unless otherwise caused by an event of Unavoidable Delay. Unavoidable Delays shall also include (x) with respect to the performance of Landlord's Work, delays caused by Severe Winter Conditions; and (y) matters expressly included pursuant to the terms of this Lease. As used herein, "Severe Winter Conditions" shall include such conditions that would, in the reasonable judgment of the Landlord's contractor, (i) result in a change order increasing the cost of the Landlord's Work, or (ii) be imprudent for Landlord to proceed with the proper completion of the applicable Landlord's Work, or cause a delay to the completion of the Landlord's Work, which could not be reasonably addressed with normal construction methods in the northeastern United States. The Landlord shall provide to Tenant notice promptly following the date any claim of delay as a result of such Severe Winter Conditions shall be made, and shall exercise commercially reasonable efforts to minimize any Unavoidable Delay resulting from Severe Winter Conditions.

24.4    At any time when there is outstanding a mortgage, deed of trust or similar security instrument encumbering Landlord's interest in the Premises, subject to terms of any SNDA Agreement, Tenant may not terminate this Lease or claim a total or partial eviction hereunder unless and until the holder of the indebtedness secured by such mortgage, deed of trust or similar security instrument (whose name and address shall have theretofore been provided to Tenant in writing) shall have received written notice of such default and a reasonable time (not to exceed one hundred eighty (180) days) for curing such default shall thereafter have elapsed.

41

24.5    Provided no Event of Default shall have occurred and be continuing, Tenant shall, subject to the terms of this Lease, at all times during the Term have the peaceable and quiet enjoyment and possession of the Premises.

24.6    This Lease (including all Exhibits and Schedules attached hereto) contains the entire agreement between the parties, and no agreement shall be effective to supplement, change, modify or terminate this Lease in whole or in part unless such agreement is in writing and duly signed by the party against whom enforcement is sought. Without limiting the foregoing, one or more emails from one party to the other shall not constitute an amendment to this Lease unless expressly agreed to by Landlord and Tenant.

24.7    Tenant and Landlord represent and warrant to each other that they have had no dealing with any broker or agent in connection with the negotiation or execution of this Lease other than Levin Management Corporation and Charter Realty and Development (collectively, the "Brokers"). Each party shall defend and indemnify and hold harmless the other from and against any claims by any other broker, agent or other person claiming compensation by virtue of having dealt with such party with regard to this leasing transaction. Landlord shall pay the Brokers the commission pursuant to a separate written agreement and shall indemnify and hold harmless Tenant from and against any claim made by the Brokers for non-payment. Landlord's and Tenant's obligations hereunder shall survive the expiration or earlier termination of this Lease.

24.8    Tenant agrees to furnish from time to time, within twenty (20) days after request by Landlord, an estoppel certificate signed by Tenant addressed to such party as Landlord requests, confirming and containing such factual certifications and representations relating to this Lease as may be reasonably requested. Landlord agrees to furnish from time to time, but in no event more than once per year, within twenty (20) days after request by Tenant, an estoppel certificate signed by Landlord addressed to such party as Tenant requests, confirming and containing such factual certifications and representations relating to this Lease as may be reasonably requested.

24.9    The laws of the State of New Jersey shall govern this Lease and any action brought to enforce this Lease or otherwise arising out of the transactions hereunder shall be brought exclusively in the county and State in which the Shopping Center is located.

24.10    The person executing this Lease on behalf of Tenant represents and warrants that such execution has been duly authorized by all requisite action and this Lease is binding upon and enforceable against Tenant in accordance with its terms. The person executing this Lease on behalf of Landlord represents and warrants that such execution has been duly authorized by all requisite action and this Lease is binding upon and enforceable against Landlord in accordance with its terms.

24.11    This Lease shall be effective only when it is signed by both the Landlord and Tenant. The Tenant's submission of a signed Lease for review by the Landlord does not give the Tenant any interest, right, or option in the Premises.

42

3038835v9

24.12 Notwithstanding anything to the contrary set forth in this Lease, and except in connection with Tenant's holding over as set forth in Section 20 hereof, Landlord agrees that as to Tenant, Landlord shall not have any right to sue for or collect, and Tenant shall never have any liability or responsibility whatsoever for, any consequential or indirect damages, including, without limitation, lost profits, whether proximately or remotely related to any default of Tenant under this Lease or any act, omission or negligence of Tenant, its agents, contractors or employees, and Landlord hereby waives any and all such rights.  Tenant agrees that as to Landlord, Tenant shall not have any right to sue for or collect, and Landlord shall never have any liability or responsibility whatsoever for, any consequential or indirect damages, including, without limitation, lost profits, whether proximately or remotely related to any default of Landlord under this Lease or any act, omission or negligence of Landlord, its agents, contractors or employees, and Tenant hereby waives any and all such rights. Notwithstanding the foregoing, the waivers contained in this Section 24.12 shall not apply to the extent of third party claims against Landlord or Tenant for which the other party (as between Landlord and Tenant) is responsible.

24.13 [Omit].

24.14 Tenant certifies that: (i) it is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specifically Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control; and (ii) it is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation. Tenant hereby agrees to defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities, and expenses (including attorneys' fees and costs) arising from or related to any breach of the foregoing certification.

24.15 THE PARTIES HERETO IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, OR TENANT'S USE AND OCCUPANCY OF THE PREMISES.

24.16 Landlord hereby represents and warrants to Tenant that (i) Landlord is the fee owner of the Premises and (ii) Landlord has obtained all required consents and approvals in order to enter into this Lease (including that required from the holder of any lessors and mortgagees).

24.17 Any press release or other public disclosure of information with respect to this Lease or any matters set forth in this Lease made or released by or on behalf of Landlord (including Landlord's broker) shall be subject to Tenant's prior written approval, not to be unreasonably withheld, conditioned or delayed (provided, however, in all cases, Landlord shall not permit to be discussed or described the Blink brand beyond such identification of the name of Tenant or the name of the business to be operated by Tenant in the Premises).  Tenant shall hold

43

the terms of this Lease in strict confidence and not disclose same to any party other than: (a) Tenant's personnel having the explicit need to know such information, for which Tenant agrees to use commercially reasonable efforts to cause such personnel to similarly keep such provisions confidential; (b) any current or prospective assignee of this Lease whom Tenant shall inform of the confidential nature of such provisions; or (c) as required by applicable law.

ARTICLE 25.
LANDLORD'S LIEN

25.1    Landlord hereby agrees to waive and release any and all statutory liens or any other so-called "landlord's liens" which it may be entitled to assert against Tenant's personal property, trade fixtures, furniture and equipment ("Tenant's Property") for any Rent or Additional Rent or other sums due or to become due under this Lease,. Tenant may, without Landlord's consent, finance Tenant's Property through an equipment lease, conditional sales contract, chattel mortgage, or security agreement (any such financed Tenant's Property, the "Financed FF&E"). If Tenant shall secure any financing, Landlord shall, within thirty (30) days after request by Tenant and provided no Event of Default has occurred and is continuing, execute and deliver to the party providing any such financing a waiver of any lien Landlord may have on such Financed FF&E in form reasonably acceptable to Landlord, which waiver may authorize the party providing such financing as its assignee to enter upon the Premises and remove the Financed FF&E in question if Tenant defaults under the terms of any such security agreement. Any such security agreement shall expressly provide that the secured party will, in the event Tenant shall default thereunder, give Landlord not less than ten (10) days' notice of such default before exercising its rights to remove any such Financed FF&E.

ARTICLE 26.
HAZARDOUS WASTE

26.1    The term "Hazardous Substances," shall mean pollutants, contaminants, toxic or hazardous wastes, or any other substances, the removal of which is required, or the use of which is restricted, regulated, prohibited or penalized by any "Environmental Law," which term shall mean any federal, state or local law or ordinance relating to pollution or protection of the environment. Landlord warrants that the Premises and the Blink Building will be free of Hazardous Substances (except to the extent commonly used in construction in the nature of Landlord's Work and not in violation of Environmental Law) and in compliance with Environmental Law on the Landlord Turnover Date. Tenant agrees that (a) no activity will be conducted on the Premises that will produce any Hazardous Substance in violation of Environmental Law; (b) the Premises will not be used in any manner for the storage of any Hazardous Substances except for the temporary storage of such materials that are used in the ordinary course of Tenant's business (the "Permitted Materials") provided such Permitted Materials are properly stored in a manner and location meeting all Environmental Laws; (c) Tenant will not install any underground tanks of any type; (d) Tenant will not, by any of its actions in the Premises, cause any surface or subsurface conditions to exist or come into existence that constitute, or with the passage of time may constitute, a public or private nuisance; (e) Tenant will not permit any Hazardous Substances to be brought onto the Premises, except for the Permitted Materials in accordance with Environmental Laws, and if so brought or found

44

located thereon, the same shall be immediately removed, with proper disposal, and all required cleanup procedures shall be diligently undertaken pursuant to all Environmental Laws. If, at any time during or after the Term or thereafter, the Premises are found to be so contaminated or subject to said conditions arising by reason of the actions of Tenant or Tenant's agents, employees, contractors or subcontractors, customers or any person claiming by, through or under Tenant, Tenant shall indemnify, defend, and hold Landlord harmless from all actual claims, demands, actions, liabilities, costs, expenses, damages and obligations of any nature arising from or as a result of such contamination or conditions..

Tenant shall have no responsibility or liability with respect to pre-existing (i.e. as of the Landlord Turnover Date) conditions concerning Hazardous Substances at the Blink Building or the Premises, or conditions concerning Hazardous Substances caused by persons other than Tenant, Tenant's agents, employees, contractors or subcontractors, customers or any person claiming by, through or under Tenant. Landlord represents to Tenant that it has not received any written notice of the violation of any Environmental Law with respect to any portion of the Shopping Center from any governmental authority that remains uncured. Landlord agrees that to the extent any Hazardous Substances are present in, at, on or about (a) the Premises as of the Landlord Turnover Date, or (b) the Common Area, Premises or the Blink Building by reason of a condition emanating from the Common Areas (in either case (i.e., pursuant to clause (a) or (b)) to the extent not caused by Tenant, Tenant's agents, employees, contractors or subcontractors, customers or any person claiming by, through or under Tenant), Landlord shall be responsible for removing or otherwise remediating such Hazardous Substances if and as required by, and in full compliance with, all Environmental Laws at no cost to Tenant, and Rent shall abate for any period that Tenant is delayed from opening for business due to the presence or remediation of Hazardous Substances which the Landlord is responsible for. Landlord also agrees to indemnify, defend and hold harmless Tenant from and against any and all loss, claims, liability, costs and expenses (including court costs and reasonable attorneys' fees) incurred by Tenant as a result of third-party claims relating to the existence of any Hazardous Substances in, on, about or under the Blink Building or the Premises to the extent same are not the responsibility of Tenant to remove pursuant to the terms of this Lease.

26.2    This Article 26 shall survive the expiration or earlier termination of this Lease.

## ARTICLE 27.
## EXCLUSIVE RIGHTS

27.1    As long as Tenant shall continue to use the Premises for the Permitted Use set forth in Paragraph 1.9(i), and so long as no Event of Default exists, Landlord shall not hereafter lease or permit the lease or occupancy of any space in the Building during the Lease Term (including renewals) to a tenant or occupant whose business is: (x) a health, sports and fitness club or (y) the provision of exercise or fitness related classes or instruction in any one or more of the following areas – cardio training; strength training; free weight training; group fitness classes, such as, for example, aerobics, or pilates; and personal training ("Tenant's Exclusive Use"). The foregoing shall not preclude Landlord from leasing or permitting the lease or occupancy in the Shopping Center to tenants or occupants for medical offices, physical therapy, massage, day spas and/or a yoga, spin studio, dance or karate studio. Tenant's Exclusive Use

45

shall not be effective for so long as Tenant ceases to operate its business at the Premises for Tenant's Exclusive Use (other than for repairs, alterations, casualty or Unavoidable Delays) during the term of this Lease.

27.2    Tenant expressly understands that Section 27.1 above does not apply to presently existing leases, or to successors or assigns of tenants under such existing leases, to the extent such existing leases expressly permit such uses. Landlord represents that the Use Restrictions are a true and complete list of all exclusive uses granted to other tenants at the Shopping Center as of the date hereof. Landlord covenants that to the extent it has the right to approve or consent to any proposed assignment or subletting of a pre-existing lease, it shall refuse to approve or consent to any proposed assignment or subletting for a Tenant's Exclusive Use (other than in connection with this Lease). Landlord covenants not to amend any lease to permit another tenant in the Shopping Center to use its premises for Tenant's Exclusive Use.

27.3    Landlord acknowledges and agrees that the granting of Tenant's Exclusive Use (i) is a material covenant to Tenant and (ii) is a material inducement for Tenant to enter into this Lease. Landlord further acknowledges that violation of Tenant's Exclusive Use would cause irreparable harm that is not compensable by money damages. Accordingly, subject to the terms of Section 27.4, following the date hereof, if Landlord and/or its successors or assigns leases to or permits any other tenant or occupant in the Shopping Center to engage in Tenant's Exclusive Use in violation of Section 27.1, and Landlord and/or its successors or assigns fails to cure such violation within thirty (30) days after receipt of written notice thereof, then the same shall be a default hereunder and Tenant shall have the right to pursue any and all of its rights and remedies at law and in equity (including, without limitation, the right to enjoin any such use, the right to bring action for damages, the right to bring an action for specific performance and/or the right to terminate this Lease) until said violation is cured. Upon request, at Landlord's sole cost and expense, Tenant agrees to join in any legal action filed by Landlord to enjoin a use by another tenant in violation of this Lease.

27.4    If, in derogation or breach of its lease of, or other occupancy agreement related to, a portion of the Shopping Center (whether now existing or hereafter entered into), another tenant or occupant in the Shopping Center uses (or suffers or permits any subtenant to use) its premises for Tenant's Exclusive Use, Landlord shall, upon Tenant's written request and at Landlord's sole cost and expense, promptly use its commercially reasonable efforts to cause the termination of such tenant's use of Tenant's Exclusive Use. Such efforts shall include, but not be limited to, (i) filing of pleadings in a court of competent jurisdiction and diligently pursuing such litigation to conclusion (however, Landlord shall not be obligated to pursue an appeal of a final decision of the court); and (ii) filing for temporary or permanent injunctive relief asking the court to stop the renegade tenant or occupant from violating Tenant's Exclusive Use. Notwithstanding the terms of Section 27.3, Landlord shall not be in default under this Article 27 and Tenant shall not be permitted to exercise any remedies herein if either (A) Landlord does not have the right to enforce the provisions of this Article 27 against another tenant as a matter of law; or (B) in accordance with this Section 27.4, a tenant violates Tenant's Exclusive Use and Landlord in good faith commences performance requisite to cure same within thirty (30) days after receipt of written notice and thereafter exercises good faith, diligent efforts to cure the same.

46

27.5  The Landlord represents to the Tenant that the Blink Building shall be located in the Redevelopment Area as that term is defined in the Big Lots Lease as shown on <u>Exhibit M</u>.

## ARTICLE 28.
## TENANT WORK ALLOWANCE

28.1  Landlord agrees to pay to Tenant, in accordance with, and subject to, the provisions of this Article 28, the Tenant Work Allowance for the cost of Tenant's Work. In furtherance of the foregoing, the Tenant Work Allowance shall be available to Tenant for the payment of third party costs for physical alterations to the Premises, including painting, carpeting and wall covering, and similar items that are permanent improvements (which shall include labor, overhead, general conditions, materials, insurance costs charged by the contractors and subcontractors) . The Tenant Work Allowance shall not include soft costs except as may be included in the previous sentence. Landlord agrees to make payment to Tenant in an amount up to the aggregate amount of the Tenant Work Allowance (to reimburse Tenant for Tenant's Work as described in the foregoing sentence) after Tenant opens for business at the Premises, within thirty (30) days following Tenant's request for payment, which request shall be accompanied by: (a) evidence of payment for the applicable work performed or materials used or expenditures for soft costs, (b) unless the request is for a permitted soft costs (which will not give rise to mechanics lien rights), partial lien waivers from Tenant's general contractor and subcontractors with contracts in excess of fifty thousand dollars ($50,000), (c) written certification from an architect that the applicable portion of Tenant's Work is complete, and (d) a temporary certificate of occupancy for the Blink Building.  If Landlord fails to pay the requested portion of the Tenant Work Allowance to Tenant within the thirty (30) day period provided herein, such failure shall constitute a default by Landlord under this Lease and Tenant may (in addition to all other remedies available under this Lease, at law or in equity) offset the amount of the Tenant Work Allowance owed Tenant by Landlord (plus interest thereon at the Default Rate if Landlord's payment is not in dispute) against the next installments of Base Rent due hereunder until Tenant has been fully reimbursed therefor.  Tenant's offset rights in preceding sentence shall supersede any other provisions in this Lease prohibiting  or restricting the right to offset or requiring additional notice and cure periods.

## ARTICLE 29.
## GUARANTY

29.1  Concurrently with the execution of this Lease by Tenant, Tenant shall cause each Guarantor to execute and deliver to Landlord a guaranty in the respective forms attached hereto as <u>Exhibit E-1</u> and <u>Exhibit E-2</u> (individually and collectively, the "<u>Guaranty</u>").

**[SIGNATURES ON FOLLOWING PAGE]**

47

**IN WITNESS WHEREOF,** the parties hereto have hereunto set forth their hands and seals the day and year first above written.

LANDLORD:

LEVIN PROPERTIES, L.P.

By:    JHL Holdings, Inc., its general partner

By:    _____
       Name:  Maureen Mooney
       Title:  Vice President

TENANT:

BLINK CLIFTON, INC., a New Jersey corporation

By:    _____
       Name:  Larry Segall
       Title:  Chief Financial Officer

48

EXHIBIT A

BLINK BUILDING PLAN

3038835v9

Exhibit A



EXHIBIT A-1

<u>SHOPPING CENTER SITE PLAN</u>

EXHIBIT A-1



This Exhibit shall not be deemed a warranty, representation or agreement by Landlord that the layout, configuration and improvements of the Shopping Center or any part thereof shall remain as shown. It is intended to show the general location only of the Demised Premises as of the date of this Lease. Landlord reserves the right to modify the size, configuration, improvements, occupants and common areas of the Shopping Center including, without limitation, to make changes and construct buildings and improvements at any time in accordance with the provisions of this Lease. Areas and dimensions shown are approximate.

= Protected Area

EXHIBIT B

LANDLORD'S WORK

Landlord will provide[1] the following conditions and/or improvements to the Premises on or before the Landlord Turnover Date:

**Preface:**

1.    Premises will be code compliant for Tenant's Use upon delivery.

2.    All hazardous materials have been or will be abated from the Premises; Tenant requires certified documentation stating such prior to Tenant's filing for a construction permit.

3.    Landlord will be responsible for all landscaping, code compliant lighting and any required work associated with the adjacent parking area, as well as any agreed to directional signage within the parking areas throughout the site.

4.    The Blink Building and Project will be free of all violations, so as not to preclude Tenant from acquiring any permits or sign-offs from any regulatory agencies.

**Building Core and Shell Work:**

1.    Shell
   - Building's exterior/structure will be code compliant (including applicable energy code), weather tight and properly maintained. All existing leaks will be repaired.

2.    Outside Walls
   - The interior side of all exterior walls will be finished on the interior side by Landlord with gypsum sheetrock, vapor barrier, insulation, metal stud, taped and spackled . The exterior side of the wall will be finished by the Landlord.

3.    Exterior, Storefront, Entrance and Doors
   - Subject to a mutually agreed to design, Landlord will provide insulated exterior walls and windows, as well as an insulated storefront and entrance on the Ground Floor. Façade and storefront design to be discussed further, it being understood that the intent is to deliver natural light to the Premises.
   - Landlord will provide one service door as well as exit doors and hardware as required to meet code.

4.    Structure

---

[1] Provide is defined herein as furnish and install and made completely ready for operation for its intended use.

EXHIBIT B

- Landlord will provide structural floor load of the greater of 100 lbs./Sq. Ft. (for both live and dead load), or code. The natural frequency of the structural slab will be a minimum of 12hz. Tenant will not be responsible for any costs associated with Landlord required structural modifications or improvements (i.e. floating floor, isolated ceilings).
- Slab will be delivered with smooth, flat surface: a maximum 1/4" difference over 10'-0" in any direction.
- If applicable, the application of spray-on fireproofing at beams will be masked to avoid overspray onto deck.

5.  ADA Access
    - Premises will be fully handicapped accessible and ADA compliant to all levels, including any necessary dedicated ramps, elevators or lifts upon Landlord delivery.

6.  Core
    - Premises will be Fire/Life safety code compliant to include adequate means of egress for Tenant's occupancy loads and travel distances. Stair railings of fire stairs will be consistent with Tenant's standard railings.

**Building Utility Systems Serving the Premises**

1.  HVAC
    - Landlord will provide HVAC units (Trane or equivalent quality brand) equal to one ton per 275 SF of space. Upon delivery, the units will be fully connected and operational. Landlord shall provide supply and return insulated duct drops from each unit through the roof upon which the unit sits.
    - Landlord will provide code-required fire alarm interface for the HVAC units. Upon delivery, the units' fire alarm and all required accessories will be fully operational.
    - Landlord will provide means for toilet and locker room exhaust sized at the greater of 2 cfm per square foot or Code requirements for Tenant's plan with controls at a location to be mutually agreed to.
    - The systems will operate 7 days per week and in accordance with the Tenant's business hours.

2.  Electrical
    - Landlord shall provide, at a location to be mutually agreed upon, directly metered 800 Amp, 3-phase, 4-wire utility service at 120/208 volts (inclusive of HVAC). Installation shall be complete with utility company CT cabinet, meter pan and shall be terminated in a single disconnect switch.
    - Landlord shall provide temporary lighting until permanent power is installed and operational.
    - Tenant to obtain meter from local utility company.

EXHIBIT B

3.   Plumbing
- Landlord shall provide a 2" metered, valved and capped cold water service to a mutually agreed to location within the Premises, assuming a 2" line meets local code for a 4,500 gallons/day (60 gallons/min) demand load. If not, a 3" line will be required. Landlord to install a pressure reducing valve and Y type strainer if water pressure exceeds 60 PSI.
- Landlord shall provide a 2" metered, valved and capped gas service to a mutually agreed to location within the Leased Premises, provided that a 7" water column (1/4 psi) is achieved. If such pressure is not achieved via a 2" line, a 3" line will be required.
- Landlord shall provide one 4" gas flue and associated roof opening for hot water heater.
- Landlord shall provide a 4" sanitary waste line and associated vent     at     a mutually agreed to location within the Leased Premises, assuming a 4" line meets local code for a 4,500 gallons/day (60 gallons/min) demand load.

4.   Fire Protection
- Sprinkler System - All code required assembles, including riser, branch piping and heads on each level of Premises, sufficient to meet code for Tenant's occupancy and Use.
- Fire Alarm - If required by code, Landlord to provide base building panel and command center capable of supporting Tenant's devices. Devices and associated wiring to Landlord panel by Tenant.

5.   Cable and Telephone
- Landlord will provide 1-2" rigid conduit with drag line for Satellite TV (and associated satellite roof access) from the south west corner of the roof to a mutually agreed to location within the demised premises. Also, Landlord will provide 1-2" rigid conduit with drag line from the building or site telephone minimum point of entry (MPOE) to a mutually agreed to location within the demised premises. Tenant has the right to place two (2) satellite dishes on the roof.
- If roof access is not possible, then Landlord will provide 1-2" rigid conduit with drag line for Cable TV service from the building/site demarcation point to a mutually agreed location within the demised premises.

**General Provisions**

1.   Landlord Documentation
- Landlord will provide complete base architecture documentation, a complete base MEP, FP documentation, current fire protection plans filed, asbestos certificates, a copy of the current Certificate of Occupancy. Copies of all base building shop drawings and plans to be provided for Tenant's review, prior to fabrication. Tenant will review all plans related to Landlord's Work.

EXHIBIT B

3038835v9

- Documentation listed above will be issued to Tenant within 30 days after Term Sheet execution or when available.
- For the Lease, Landlord will prepare a Lease Outline Drawing (LOD) that graphically represents the following: Premises, point of entry for all utilities at mutually agreed to locations.

2.  All construction will be in accordance with the requirements of all applicable codes, ordinances, rules and regulations of all authorities having jurisdiction over the work including all requirements of the Landlord's insurance carrier.

3.  Landlord will provide access to all mechanical/electrical rooms/closets for equipment and distribution outside of the Premises.

4.  Tenant will have access to the Blink Building's pathways, riser/shafts, and the roof for Tenant's MEP requirements/system.

5.  Clear height from above finished floor to any obstruction shall be a minimum 12'6" a.f.f.

6.  Construction Logistics
    - Landlord will provide 24/7 construction access, 7 day week work permission (subject to city ordinances), direct and unencumbered service access from street, unlimited service elevator access, materials and staging area and temporary utilities on a direct metered basis (or agreed upon stipend). Tenant to secure work permits, as reasonably required to work off hours.

7.  Landlord will not charge a parking fee or impose unreasonable parking restrictions on Tenant's contractors during the construction of Tenant's work.

8.  Tenant will use commercially reasonable efforts to employ labor that is harmonious with other labor within the Blink Building, but under no circumstances, will Tenant be obligated by Landlord to utilize union labor.

9.  Tenant will be permitted to utilize its own consultants for all permitting and expediting (if necessary) requirements.

10. On the Landlord Turnover Date, the parking areas of Tenant's Protected Area will be delivered substantially as shown on Exhibit A-1 to the Lease.

EXHIBIT B

EXHIBIT C

RENEWAL OPTIONS

A.      Provided that as of the date Tenant exercises this renewal right pursuant to this Exhibit C and upon commencement of the applicable Renewal Term no Event of Default (as defined in Article 18) shall have occurred and be continuing and Tenant shall not have assigned the Lease or sublet the Premises in any case that shall have required the consent of Landlord pursuant to this Lease without obtaining such consent, Tenant may renew this Lease for up to two (2) additional consecutive periods of five (5) Lease Years each (each a "Renewal Term"). To exercise either renewal right hereunder, Tenant shall deliver written notice of the exercise thereof to Landlord at least nine (9) months before the expiration of the initial Term or first Renewal Term, as the case may be. If Tenant exercises any renewal right hereunder, then Landlord and Tenant shall use reasonable efforts, on or before the expiration date of the initial Term or first Renewal Term, as the case may be, to execute an amendment to this Lease extending the Term on the same terms as provided in this Lease, except: (1) Base Rent payable during each month of each Renewal Term shall be as set forth in Paragraph B below; (2) Tenant shall continue to occupy the Premises AS IS and without any allowance, free rent, construction period or other such inducement; and (3) if such extension is for the second Renewal Term, Tenant shall have no further renewal option unless expressly granted hereafter by Landlord in writing. In no event shall Tenant be entitled to exercise a Renewal Term if the prior Renewal Term (if any) was not validly exercised pursuant to the terms of this Exhibit C.

B.      Base Rent for the Renewal Terms shall be as follows:

| Renewal Term | Lease Year | Annual Base Rent | Monthly Base Rent | Rent Per Square Foot |
|---|---|---|---|---|
| First Renewal Term | 16-20 | $539,100.00 | $44,925.00 | $35.94 |
| Second Renewal Term | 21-25 | $592,950.00 | $49,412.50 | $39.53 |

EXHIBIT C

EXHIBIT D

## USE RESTRICTIONS

[See attached]

3038835v9

EXHIBIT D

Clifton Plaza
Clifton, NJ

Use Restrictions

Title Restriction
Easement to City of Clifton dated February __, 1962,
recorded June 15, 1962 in Book 076, Page 527

The party of the first part further agrees to maintain in its presently existing condition the premises hereby conveyed to the party of the second part as long as the remaining premises of the party of the first part known as Block 362, Lot (illegible) are maintained by the party of the first part as a shopping center.

**BADHA SHIVAM ENTERPRISES, INC.,** Lease Rider Par. 3, dated March 25,1997:

A.  As long as this Lease is in full force and effect and the Tenant is not in Default under this Lease and is using and occupying the Demised Premises for the Permitted Use with Tenant's Trade Name, the Landlord agrees that it will not enter into a lease for premises in the Shopping Center with any tenant whose main or primary business is the operation of a package liquor store for the retail sale of packaged liquor for off-premises consumption.  However, this restriction shall be wholly inapplicable to and shall not limit or restrict any use whatsoever of: (i) any premises leased to a supermarket or drug store; (ii) any premises in the Shopping Center which sell alcoholic beverages for off-premises consumption as an incidental use; (iii) any premises which sell liquor, beer and/or wine for on-premises consumption; or (iv) any use in contravention of the foregoing restriction which is permitted by any existing lease or any extension, renewal or modification thereof.

**VALLEY NATIONAL BANK,** Lease dated July 31, 2009
Rider P4
Notwithstanding anything to the contrary contained in this Lease, subject to the rights and/or their permitted successors and assigns under leases existing on the date of this Lease and provided (i) Tenant is not in Default of this Lease beyond any applicable cure period and (ii) Tenant (or successor financial institution) is operating a business in the Leased Premises in accordance with the permitted Use, Landlord hereby agrees not to enter into any new lease with a tenant having its principal business as, or permitting it to maintain as its principal business, the operation of a retail branch baking facility.   For purposes hereof, "retail branch banking facility at which deposits are accepted, and/or at which mortgage or lending operations are conducted."

**SALLY BEAUTY SUPPLY, INC.,** Lease dated February 25, 1997:

Addendum III - COMPETING BUSINESS:

Notwithstanding anything to the contrary contained in this Lease, provided (i) Tenant is not in Default of this Lease beyond any applicable cure period and (ii) Tenant is operating a business in the Leased Premises in accordance with the Permitted Use, Landlord hereby agrees not to lease, or permit the use of, any portion of the Shopping Center as a "Competing Business."  A "Competing Business" is hereby defined as any business which primarily sells beauty supplies and beauty equipment.

Notwithstanding anything to the contrary in the foregoing sentence, this provision shall not be applicable to (i) any tenants in the Shopping Center, their successors and assigns, who currently

have leases which permit such tenants to operate a "Competing Business"; or (ii) any Major Tenant; or (iii) any drugstore.

**DOLLAR EXPRESS, INC.,** Lease dated June 24, 1999:

Exhibit G:  Provided (i) Tenant is not in Default of this Lease beyond any applicable cure period and (ii) Tenant is operating a business in the Leased Premises in accordance with the Permitted Use, Landlord hereby agrees not to lease, or permit the use of, any portion of the Shopping Center as a "Competing Business." A "Competing Business" is hereby defined as any business which primarily operates as a general and variety type merchandise store.

Notwithstanding anything to the contrary in the foregoing sentence, this provision shall not be applicable to (i) any tenants in the Shopping Center, their successors and assigns, who currently have leases which permit such tenants to operate a "Competing Business"; or (ii) any Major Tenant.

**BKG, INC.,** Lease dated February 8, 2002, Addendum III:

Notwithstanding anything to the contrary contained in this Lease, provided (i) Tenant is not in Default of this Lease beyond any applicable cure period and (ii) Tenant is operating a business in the Leased Premises in accordance with the Permitted Use, Landlord hereby agrees not to lease, or permit the use of, any portion of the Shopping Center as a "Competing Business." A "Competing Business" is hereby defined as any business which primarily operates a nail salon.

Notwithstanding anything to the contrary in the foregoing sentence, this provision shall not be applicable to (i) any tenants in the Shopping Center, their successors and assigns, who currently have leases which permit such tenants to operate a "Competing Business"; or (ii) any Major Tenant.

**GAMESTOP, INC,** Lease dated August 1, 2002, Addendum III

Notwithstanding anything to the contrary contained in this Lease, provided (i) Tenant is not in Default of this Lease beyond any applicable cure period and (ii) Tenant is operating a business in the Leased premises in accordance with the Permitted Use, Landlord hereby agrees not to Lease any portion of the Shopping Center as a "Competing Business." A "Competing Business" is hereby defined as any business equal to or less than two thousand (2,000) square feet which primarily sells entertainment software, video software or video game cartridges.

Notwithstanding anything to the contrary in the foregoing sentence, this provision shall not be applicable to (i) any tenants in the Shopping Center, their successors and assigns, who currently have leases which permit such tenants to operate a "Competing Business"; or (ii) any Major Tenant.

**BIG LOTS, Inc., Lease** dated December 16, 2004
**Addendum III**
Notwithstanding anything to the contrary contained in this Lease, provided (i) Tenant is not in Default of this Lease beyond any applicable cure period and (ii) Tenant is operating a business in the Leased premises in accordance with the Permitted Use, Landlord hereby agrees not to Lease any portion of the Shopping Center as a "Competing Business." A "Competing Business" is hereby defined as any business which operates as a so-called "closeout store" such as, by way of example only, "Odd Jobs", "Mazel", "Ocean State Job Lots", "Building 19", "Grossman's Bargain Outlet", "Ollie's Bargain Outlet" or "National Wholesale Liquidators".

Notwithstanding anything to the contrary in the foregoing sentence, this provision shall not be applicable to any tenants in the Shopping Center, their successors and assigns, who currently have leases which permit such tenants to operate a "Competing Business".

**Addendum VIII**
Landlord, it's subsidiaries, affiliates, successors, assigns, officers, and managers shall not lease any space in the Shopping Center (except as hereinafter specified), and Tenant shall not use the Leased Premises for any of the following uses: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Leased Premises; (ii) to sell any so-called "Army and Navy", surplus, or previously worn or "used" goods, as those terms are generally used at this time and from time to time hereafter; (iii) for an auditorium, activity facility, or meeting hall, excluding the Redevelopment Area as shown on Exhibit A; (iv) for any self storage facilities, excluding the Redevelopment Area; (v) for any medical facilities or offices other than medical uses typically found in Shopping Centers such as dental, chiropractic, optical, pediatric or small doctor's offices other than the Redevelopment Area; (vi) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (vii) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage on the shopping Center or parts thereof; (viii) for any automotive, tire, gasoline, or oil service centers, excluding the Redevelopment Area; (ix) for any governmental use or office or any social service functions or facilities, excluding the Redevelopment Area; (x) for the operation of a massage parlor or bath house, adult book (which shall not be deemed to include any general interest book stores such as Barnes & Noble or Borders Books) or adult video store (which shall not be deemed to include a general video store such as Blockbuster or Hollywood Video), or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas which are visible from outside of any such premises, any sign, product or advertising material which is or is for pornographic or 'adult" material; (xi) in a manner which is a public or private nuisance including any which creates noxious noise, sound, vibration, litter or odor; (xii) for a night club or discotheque, tavern, bar (unless incidental to a permitted restaurant use), cocktail lounge or similar establishment which features any form of "adult entertainment" or any form of regularly scheduled live entertainment (unless incidental to a permitted restaurant use) or the sale of alcoholic beverages unless incidental to a permitted restaurant use; (xiii) for a roller or skating rink, skateboard or other rink or area, billiard parlor (unless incidental to a permitted restaurant use), amusement center, arcade, including use of any video or mechanical game machines, bowling alley, health spa (excluding day spas under 4,000 s.f.), health club, exercise club, gymnasium or other similar operations excluding the Redevelopment Area and excluding a "Curves" or "Ladies Fitness" type operation or small health club under 2,500 square feet of Floor Area; (xiv) for lodging, including a hotel, motor inn, apartments or condominiums; (xv) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair (other than for office functions relating to such operations) except that car leasing shall be permitted within the Redevelopment Area; (xvi) for a funeral parlor or mortuary; (xvii) for a mobile home or trailer court; (xviii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xix) for any commercial laundry or dry cleaning plant (excluding pickup stores or a plant operated on a closed loop system or other recognized up-to-date system) or coin operated Laundromat unless the Laundromat is under 4,000 square feet of floor area; (xx), unless located in the Redevelopment Area , for a day

care center or school ()other than in conjunction with a retail or, in the case of a day care, office operation); (xxi) for any veterinary hospital, unless located within the Redevelopment Area, animal boarding, training or raising facilities; (xxii) for an off-track betting business, bingo, lottery or similar "games of chance" sales or facility excluding lottery tickets sold in convenience stores; (xxiii) for the display of billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure; (xxiv) for any astrology, palm reading, tarot card or other like service or facility; or (xxv) for the use as a "head shop" selling drug paraphernalia.   All of the foregoing uses are sometimes collectively referred to herein as the "Prohibited Uses".

Notwithstanding anything to the contrary contained herein, this provision shall not be applicable to any tenants in the Shopping Center, their successors and assigns, or replacements who currently have leases which permit such tenants to operate for a "Prohibited Use".

**TIMOTHY K. BROWN, Lease dated February 17, 2009**
**Rider Sec 3:**
Landlord will not enter into a new lease for Premises located in the Shopping Center with a tenant whose primary business is an insurance agency.   However, this restriction shall be wholly inapplicable to and shall not limit or the rights of any tenant in the Shopping Center who under existing leases, renewals or extensions thereof may use their premises in contravention of this restriction.

EXHIBIT E-1

FORM OF GUARANTY

THIS GUARANTY (this "Guaranty") is executed this _____ day of _____, 2013, by Blink Holdings, Inc. ("Guarantor").

WHEREAS, a certain lease of even date herewith (as amended, supplemented, extended and otherwise modified from time to time, the "Lease") has been, or will be, executed by and between Levin Properties, L.P. (referred to therein and herein as "Landlord"), and _____ (referred to therein and herein as "Tenant"), relating to the lease of certain premises located in the Shopping Center (as defined in the Lease), and which Lease and all modifications thereto are fully incorporated herein by reference (all capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Lease); and

WHEREAS, Landlord requires as a condition to its execution of the Lease that the Guarantor guarantee certain specified obligations of Tenant under the Lease; and

WHEREAS, the Guarantor is desirous that Landlord enter into the Lease with Tenant and acknowledges that Tenant's entering into the Lease shall provide a substantial benefit to Guarantor.

NOW, THEREFORE, in consideration of the execution of the Lease by Landlord, and in exchange for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the undersigned Guarantor hereby absolutely and unconditionally guarantees: (1) the completion of Tenant's Work, (2) the full payment and performance of all of Tenant's obligations under the Lease accruing and attributable to the first fifteen (15) Lease Years, and continuing during any Renewal Term to the extent Tenant exercises its option to renew for such Renewal Term and (3) if the Lease is terminated due to an Event of Default occurring during the first ten (10) years following the Rent Commencement Date, the then unamortized portion of the Tenant Work Allowance actually paid to Tenant under the Lease, as of the date of such termination, amortized on a straight-line basis over a period of ten (10) years beginning on the Rent Commencement Date. The obligations in clauses 1, 2 and 3 of this paragraph are referred to in this Guaranty as the "Guaranteed Obligations".

The undersigned Guarantor further agrees as follows:

That this covenant and agreement on its part to guarantee the Guaranteed Obligations shall continue in favor of Landlord notwithstanding any extension, modification, or alteration of the Lease entered into by and between the parties thereto, or their successors or assigns, and notwithstanding any assignment of said Lease, with or without the consent of Landlord, and no extension, modification, alteration or assignment of the Lease shall in any manner release or discharge the undersigned Guarantor and Guarantor does hereby consent thereto.

That the liability of Guarantor hereunder is continuing and shall in no way be affected, modified or diminished by reason of any unilateral action of either Landlord or Tenant, or by reason of any dealings or transactions or agreements entered into or occurring between Landlord and Tenant (other than extensions, modifications, alterations or assignments of the Lease),

EXHIBIT E-1

including without limitation any adjustments, compromises, settlements, accord and satisfactions, or releases, or any termination of the Lease, whether or not notice thereof is given to Guarantor, all of which notices Guarantor hereby expressly waives.

That this Guaranty will continue unchanged by any bankruptcy, reorganization or insolvency of Tenant or any successor or assignee thereof or by any disaffirmance or abandonment by a trustee of Tenant.

That Landlord may, without notice, assign this Guaranty and/or the Lease in whole or in part and no assignment or transfer of this Guaranty or the Lease shall operate to extinguish or diminish the liability of the undersigned Guarantor hereunder.

That the liability of the undersigned Guarantor under this Guaranty shall be primary and that in any right of action which shall accrue to Landlord under the Lease, Landlord may, at its option, proceed against the undersigned Guarantor without having commenced any action, or having obtained any judgment against Tenant.

If Landlord shall obtain a judgment against Guarantor, Guarantor shall further be liable for and shall pay Landlord's reasonable attorney's fees and all costs and other expenses incurred in any collection or attempted enforcement or collection under this Guaranty.

GUARANTOR IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY LANDLORD HEREUNDER.

The use of the singular herein shall include the plural. The obligations of two or more parties shall be joint and several. The terms and provisions of this Guaranty shall be binding upon and inure to the benefit of the respective successors and assigns of the parties herein named.

Notwithstanding anything to the contrary contained in this Guaranty, no direct or indirect member, shareholder, partner, principal, affiliate, employee, officer, director, agent or representative of Guarantor shall have any personal liability under this Guaranty and no judgment shall be sought, obtained or enforced against any such person or entity with respect thereto.

IN WITNESS WHEREOF, the undersigned has caused this Guaranty to be executed as of the date set forth above.

GUARANTOR:

BLINK HOLDINGS, INC.

By: _____

Title: _____

EXHIBIT E-1

EXHIBIT E-2

## FORM OF LIMITED GUARANTY

THIS LIMITED GUARANTY (this "Guaranty") is executed this ____ day of _____, 2013, by Equinox Holdings, Inc. ("Guarantor").

WHEREAS, a certain lease of even date herewith (as amended, supplemented, extended and otherwise modified from time to time, the "Lease") has been, or will be, executed by and between Levin Properties, L.P. (referred to therein and herein as "Landlord"), and _____ (referred to therein and herein as "Tenant"), relating to the lease of certain premises located in the Shopping Center (as defined in the Lease), and which Lease and all modifications thereto are fully incorporated herein by reference (all capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Lease); and

WHEREAS, Landlord requires as a condition to its execution of the Lease that the Guarantor guarantee certain specified obligations of Tenant under the Lease; and

WHEREAS, the Guarantor is desirous that Landlord enter into the Lease with Tenant and acknowledges that Tenant's entering into the Lease shall provide a substantial benefit to Guarantor.

NOW, THEREFORE, in consideration of the execution of the Lease by Landlord, and in exchange for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the undersigned Guarantor hereby absolutely and unconditionally guarantees upon demand the full payment of all Rent due under the Lease accruing and attributable solely to the first three (3) Lease Years (the expiration of the third (3rd) Lease Year, the "Guaranty Cut Off Date"), but such limited payment guaranty shall not pertain to any Rent accruing and/or attributable or coming due following the Guaranty Cut Off Date; provided, further, however, that Guarantor's aggregate liability under this Guaranty shall reduce by each monthly payment of Base Rent and Additional Rent received by Landlord, such that on the Guaranty Cut Off Date, Guarantor's obligations under this Guaranty shall be fully extinguished.    The obligations in the preceding sentence are referred to in this Guaranty as the "Guaranteed Obligation".

The undersigned Guarantor further agrees as follows:

That this covenant and agreement on its part to guarantee the Guaranteed Obligation shall continue in favor of Landlord notwithstanding any extension, modification, or alteration of the Lease entered into by and between the parties thereto, or their successors or assigns, and notwithstanding any assignment of said Lease, with or without the consent of Landlord, and no extension, modification, alteration or assignment of the Lease shall in any manner release or discharge the undersigned Guarantor and Guarantor does hereby consent thereto.

That the liability of Guarantor hereunder is continuing and shall in no way be affected, modified or diminished by reason of any unilateral action of either Landlord or Tenant, or by reason of any dealings or transactions or agreements entered into or occurring between Landlord and Tenant (other than extensions, modifications, alterations or assignments of the Lease), including without limitation any adjustments, compromises, settlements, accord and

EXHIBIT E-2

satisfactions, or releases, or any termination of the Lease, whether or not notice thereof is given to Guarantor, all of which notices Guarantor hereby expressly waives.

That this Guaranty will continue unchanged by any bankruptcy, reorganization or insolvency of Tenant or any successor or assignee thereof or by any disaffirmance or abandonment by a trustee of Tenant.

That Landlord may, without notice, assign this Guaranty and/or the Lease in whole or in part and no assignment or transfer of this Guaranty or the Lease shall operate to extinguish or diminish the liability of the undersigned Guarantor hereunder.

That the liability of the undersigned Guarantor under this Guaranty shall be primary and that in any right of action which shall accrue to Landlord under the Lease, Landlord may, at its option, proceed against the undersigned Guarantor without having commenced any action, or having obtained any judgment against Tenant.

If Landlord shall obtain a judgment against Guarantor, Guarantor shall further be liable for and shall pay Landlord's reasonable attorney's fees and all costs and other expenses incurred in any collection or attempted enforcement or collection under this Guaranty.

GUARANTOR IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY LANDLORD HEREUNDER.

The use of the singular herein shall include the plural. The obligations of two or more parties shall be joint and several. The terms and provisions of this Guaranty shall be binding upon and inure to the benefit of the respective successors and assigns of the parties herein named.

Notwithstanding anything to the contrary contained in this Guaranty, no direct or indirect member, shareholder, partner, principal, affiliate, employee, officer, director, agent or representative of Guarantor shall have any personal liability under this Guaranty and no judgment shall be sought, obtained or enforced against any such person or entity with respect thereto.

IN WITNESS WHEREOF, the undersigned has caused this Guaranty to be executed as of the date set forth above.

GUARANTOR:

EQUINOX HOLDINGS, INC.

By: _____

Title: _____

EXHIBIT E-2

EXHIBIT F

<u>TENANT'S APPROVED SIGNAGE</u>

(See Attached)

3038835v9



FRONT ELEVATION
SCALE 1/8" = 1'-0"

ENTRANCE

RIGHT SIDE ELEVATION
SCALE 1/8" = 1'-0"

TOTAL blink LEASE AREA:
15,004 S.F.

① FRONT AND SIDE ELEVATION

**1006 Rt. 46**
**Clifton, New Jersey**

DWG NO: **LE-2**

SHEET TITLE: PROPOSED STORE FRONT AND SIGNAGE

DATE: OCTOBER 28, 2013

SCALE: NOT TO SCALE

**blink** FITNESS

Exhibit F - 2 of 2

EXHIBIT F

PYLON SIGN



## EXHIBIT G

### FORM OF DELIVERY OF POSSESSION LETTER

### DELIVERY OF POSSESSION LETTER

Project Name: _____ Gym #:

_____

Tenant: Blink Clifton, Inc.

Landlord: Levin Properties, L.P.

Premises Address:

_____

Square Footage:

_____

Landlord and Tenant acknowledge and agree that:

1.  ☐   Landlord's Work is substantially complete (as defined in the Lease) and accepted by Tenant as of the Landlord Turnover Date noted below subject to the terms and conditions of the Lease regarding latent defects and completion of the punchlist items (listed below and as otherwise communicated to Landlord) [within fourteen (14) days – Landlord to propose time frame for completion of punchlist items].

Landlord's Punch list Items:

_____
_____
_____
_____
_____

**Possession Accepted.**

**Possession Date:** _____

Landlord and Tenant hereby acknowledge that Landlord's Work is completed and accepted by Tenant pursuant to Section 1, subject to the terms and conditions of the Lease including any liquidated damages.

EXHIBIT G

**Landlord:**

           **Tenant:**

_____

Print Name: _____

Title: _____

Date: _____

_____

          Print Name:

          Title:  Project Manager

          Date:

EXHIBIT G

EXHIBIT H

UTILITY LOCATIONS

3038835v9



EGRESS
EXIT

161'-4"

EGRESS
EXIT

LL TO PROVIDE SPRINKLER RISER

LL TO PROVIDE A 800 AMP 3 PHASE
4 WIRE UTILITY SERVICE AT 208 VOLTS

LL TO PROVIDE FIRE ALARM PANEL AT LOCATION SHOWN,
AS PER CODE

LL TO PROVIDE
NEW SERVICE DOOR
AND HARDWARE

LL TO PROVIDE
NEW SERVICE DOOR
AND HARDWARE

LL TO PROVIDE LOCKER ROOM EXHAUST SIZED
AT THE GREATER 2 CFM PER SQUARE FOOT, OR
CODE REQUIRED

LL TO PROVIDE A
2" METERED
COLD WATER SERVICE

LOCATION OF HOT
WATER HEATER
BY BLINK

LL TO PROVIDE A SPRINKLER
SYSTEM - ALL CODE REQUIRE ASSEMBLES
INCLUDING RISER, BRANCH PIPING AND HEADS.
ALL SPRINKLER HEADS WILL BE POINTED
UPWARD FOR AN OPEN CEILING.

PROPOSED "BLINK
FITNESS" GYM
15,004 S.F.
FFE = 269.50'

STEEL COLUMN

STEEL COLUMN

STEEL COLUMN

LL TO PROVIDE STRUCTURAL
FLOOR LOAD OF 100 lbs/Sq.Ft.
FOR BOTH LIVE AND DEAD LOAD

LL TO PROVIDE A 4"
GAS FLUE AND ASSOCIATED
ROOF OPENING FOR HOT
WATER HEATER

LL TO PROVIDE A 2"
METERED VALVED AND
CAPPED GAS SERVICE

60'-0½"

LL TO PROVIDE A 1"-2"
RIGID CONDUIT WITH
DRAG LINE FOR SATELITE

8'-11"

BLINK TO PROVIDE NEW
WEATHER VESTIBULE

LL TO PROVIDE NEW STOREFRONT

LINE OF CANOPY ABOVE

HANDICAP RAMP

LINE OF CONCRETE
SIDEWALK

ENTRANCE

LEGEND:

——— DENOTES LEASE LINE

▨▨▨ PROPOSED PARTITION

═══ EXISTING PARTITION
TO REMAIN

= = = EXISTING PARTITION
TO BE REMOVED

⌐ PROPOSED DOOR

⌐ EXISTING DOOR
TO REMAIN

CEILING HEIGHTS:
BOT. OF BEAM    12'-0" MIN

TOTAL blink LEASE AREA:
15,004 S.F.

① PLAN

GROUND FLOOR (15,004 DEMISED AREA S.F.)

1006 Rt, 46
Clifton, New Jersey

DWG NO: LE-1

SHEET TITLE: PROPOSED LEASE EXHIBIT

DATE: OCTOBER 28, 2013

SCALE: NOT TO SCALE

blink
FITNESS

Exhibit I-1
Page 1 of 2



Exhibit 1-1
page 2 of 2



**FRONT ELEVATION**
SCALE: 1/8" = 1'-0"

ENTRANCE

**RIGHT SIDE ELEVATION**
SCALE: 1/8" = 1'-0"

DWG NO: **LE-2**

SHEET TITLE: PROPOSED STORE FRONT AND SIGNAGE

DATE: OCTOBER 28, 2013

SCALE: NOT TO SCALE

**blink** FITNESS

| TOTAL blink LEASE AREA: 15,004 S.F. | ① | FRONT AND SIDE ELEVATION | 1006 Rt. 46 Clifton, New Jersey |



PROPOSED FLOOR PLAN

PROGRAMS & EQUIPMENTS:

| | | | |
|---|---|---|---|
| CARDIO | | STRENGTH | |
| TREADS w/ TV | 105 UNITS | LOCKER ROOMS | 80 UNITS |
| ELIPTICAL w/ TV | 16 UNITS | MEN'S | |
| TREADS | 17 UNITS | SHOWERS | 124 UNITS |
| ELIPTICAL | 30 UNITS | | 4 STALLS |
| STAIR MASTER w/TV | 24 UNITS | WOMEN'S | |
| ABC | 5 UNITS | LOCKERS | 124 UNITS |
| RECUMBENT BIKE | 5 UNITS | SHOWERS | 4 STALLS |
| UBE | 1 UNIT | | |
| ROWER | 2 UNITS | | |

| 1 | PLAN | 1006 Rt. 46 |
|---|---|---|
| | FLOOR (15,004 S.F.) | Clifton, New Jersey |

TOTAL blink DEMISED AREA: 15,004 SF

PROPOSED TEST FIT

blink FITNESS

TF-1

EXHIBIT J

TENANT'S CONSTRUCTION COVENANTS

All work completed by Tenant at the commencement of the term and all alterations made during the Lease Term (such work and alterations hereinafter referred to as "Tenant's work") shall be performed in a good and workmanlike manner in accordance with plans and specifications approved by Landlord and all of the conditions of the Lease; however, Landlord's approval of Tenant's plans shall not excuse Tenant from performing its work in conformity with the requirements set forth herein. Without limiting the generality of the foregoing and whether or not so required by the Lease, Tenant's work shall be performed to include the following:

1.  Permits, Laws, Ordinances & Fees

Tenant shall, obtain all necessary licenses, permits and approvals, and otherwise perform its work in conformity with all applicable laws and ordinances, and the rules and regulations of all public authorities, including, without limitation, all applicable building and construction codes and the Board of Fire Underwriters (or equivalent body) having jurisdiction. Upon completion of Tenant's work, Tenant shall obtain a Certificate of Occupancy and deliver same to Landlord immediately upon issuance.

2.  Additional Installations Applicable to Restaurant Uses:

Tenant shall install grease traps or lint traps where necessary to provide for waste removal and an Ansul dry chemical automatic fire extinguisher system or its equivalent shall be installed over all cooking facilities, if any. Tenant shall also make all necessary alterations and installations to the Demised Premises and employ such other methods as may be required by Landlord including, but not limited to, installation of a grease containment system as manufactured by Grease Guard, Inc. or such other company approved by Landlord, to prevent grease from Tenant's cooking operations, if any, from accumulating on the roof or in the plumbing lines or from adversely affecting the Shopping Center's sewage disposal facility.

3.  Business Of Others & Cleaning Up

At all times during construction Tenant shall cause each of its contractors and subcontractors to maintain continuous protection at the Shopping Center. Tenant shall take all necessary measures to protect persons and property of others from injury, loss or damage, including damage from dust, debris and the elements, resulting from Tenant's work.

As soon as progress of Tenant's work permits and promptly after the completion thereof in any event, Tenant shall restore as necessary all areas of the Shopping Center which have been damaged by Tenant's work to good order and condition including, without limitation, removal of all equipment, construction materials, refuse and debris, and repair and replacement as necessary of utility pipes, lines and conduits and paving, lighting, landscaping and the like.

4.  Indemnity & Insurance

Tenant shall indemnify, defend and hold Landlord and its agents and employees harmless from and against all claims and liability for injury to persons or damage to property arising out of the

EXHIBIT J

acts or omissions of Tenant, its agents and employees in connection with the performance of Tenant's work at the Shopping Center.

Prior to commencement of construction, Tenant shall furnish Landlord (or cause to be furnished to Landlord) with a certificates of insurance and endorsements evidencing that Tenant and Tenant's contractors each has a policy of comprehensive general liability insurance required under Article VII of the Lease, in amounts not less than TWO MILLION ($2,000,000.00) DOLLARS for personal injuries and death resulting therefrom and TWO HUNDRED FIFTY THOUSAND ($250,000.00) DOLLARS for damage to property, in full force and effect. Tenant's policies shall furthermore specifically afford coverage for the indemnification set forth in the foregoing paragraph. Each party shall also afford coverage for worker's compensation insurance, automobile liability insurance and "all-risk" "builder's risk" insurance having terms and limits as required by Landlord. All insurance policies shall name Landlord, Levin Management Corporation and such others as are designated by Landlord as additional insureds.

All materials, including tools, machinery, equipment, and supplies shall be kept within the Demised Premises and shall be the sole responsibility of Tenant, and Tenant waives all right and claims against Landlord for any loss or damage of same. Tenant shall not park any construction trailers or vehicles anywhere in the Shopping Center, other than on a temporary basis and such temporary parking shall be coordinated with and approved by Landlord's construction manager.

5. Liens

No lien or encumbrance including, without limitation, a notice of unpaid balance or right to file lien shall be filed against the Demised Premises or the Shopping Center. In jurisdictions where applicable, Tenant shall duly record a Waiver of Liens in the appropriate governmental office and furnish Landlord with a duplicate original of same showing recording information, prior to commencement of work. If any such lien or encumbrance is filed, all costs, expenses and fees of removing and/or bonding said lien or encumbrance, including without limitation, legal fees, shall be paid by Tenant, as Additional Rent, within thirty (30) days after receipt of Landlord's invoice.

Promptly following completion of Tenant's work, Tenant shall furnish Landlord with documentation evidencing that all labor and materials supplied and installed in connection with Tenant's work have been fully paid and that there are no outstanding liens against the Demised Premises or the Shopping Center.

6. Completion Of Work

Promptly upon completion of Tenant's work, Tenant shall furnish Landlord with copies of "as built" plans and specifications and if applicable "as built" survey.

Tenant shall be responsible for payment of the entire amount of real estate taxes assessed against Tenant's alterations, improvements and additions to the Demised Premises, and any equipment and fixtures installed by Tenant.

7. Maintenance & Repairs

Notwithstanding anything in the Lease to the contrary, Tenant shall maintain, repair and make all necessary replacements (including, without limitation, all structural and roof repairs and replacements) to Tenant's work and to all other parts of the Demised Premises and to the

building of which the same are a part, to the extent that the need for same arises out of or in connection with Tenant's work.

8. Further Representations of Tenant

Nothing herein shall be construed to permit any alterations or improvements which would increase or decrease the square footage or cubic content of the Demised Premises or adversely affect the structural integrity or water tightness of the building within which the Demised Premises are located or any major electrical or mechanical system or component of same.

EXHIBIT J

EXHIBIT K

LANDLORD'S SIGN CRITERIA

## EXHIBIT K
## LANDLORD'S SIGNAGE CRITERIA
## CLIFTON SHOPPING CENTER
## CLIFTON, NJ

The required signage criteria for the **Clifton Shopping Center** as described in this exhibit plays an important role both for Tenant identification and as an external graphic element of the strip store's decor. All signs shall be designed in accordance with the uniform sign criteria. <u>All proposed signage must be submitted for Landlord's approval.</u>

### SECTION 1

The advertising or informative content of all signs shall be limited to letters designating the store name and/or type store (any such designation of the store type shall be by general descriptive terms and shall not include any specifications of the merchandise offered for sale therein or the services rendered therein) only and shall contain no advertising devices, slogans, tag lines, symbols or marks (other than the store name and/or type of store). Crests and corporate shield designs are not permitted.

### SECTION 2

The letters of the canopy fascia sign shall be internally LED illuminated channel letters constructed of .04 aluminum with a plexi-glass face. All interior surfaces will be sprayed white enamel. The depth of all channel letters shall not exceed five inches (5"). All signs will have one (1) line of copy. All facade signage will be mounted on a raceway not to exceed "8" inches in height and "8" inches in depth. The raceway will be mounted using stainless steel hardware and painted to match the surface on which it is mounted.

All signs will be installed on the sign band with the centerline of the sign located on the vertical centerline of the fascia or vertical centerline of architectural element. The sign must be horizontally centered on the tenants overall leased space, unless otherwise determined. No facade signage shall exceed 30" inches in height. Signage for anchor tenants can exceed 30" upon approval of landlord and if permitted under the town ordinance. If a new tenant sign is replacing existing signage; new signage shall not exceed existing size or area. All signs must be centered on the sign band and must not extend past the demising walls of the storefront. The total square footage of all storefront signage is regulated by the signage criteria set forth by the **City of Clifton.** All Tenant signage is subject to the review and approval of the local cities building department officials. (Specific storefront sign criteria are available from the city).

Pylon sign and monument sign to be an internally illuminated box frame with white plexi-glass face background. Tenants approved to be indicated on the pylon sign must provide graphics to fit within their designated area. Final review and approval of all signage by landlord.

**EXHIBIT K**
**LANDLORD'S SIGNAGE CRITERIA**
**CLIFTON SHOPPING CENTER**
**CLIFTON, NJ**

## SECTION 3

The character, design, size, color and layout of all signs shall be subject to <u>Landlord's prior written approval</u> and shall be in accordance with the criteria.

The signage contractor must provide a "Certificate of Insurance" naming, Levin Management Corporation, and Levin Properties, L.P. as additional insured for The Clifton Shopping Center.

The Tenants signage applications, permits, approvals and fees are the sole responsibility of the Tenant and/or Tenant's signage contractor.

In the event that the exterior of the shopping center should be renovated, in the future, the Tenant must comply with any signage criteria set forth for that renovation by the Landlord. All future changes to signage will be the responsibility of the Tenant.

## SECTION 4

<u>All signs shall be fabricated and installed in accordance with the following requirements:</u>

(a)    The location of the sign will be determined by the Landlord. The sign and any part thereof shall be centered top to bottom on the raceway.

(b)    Except for those signs mounted on a sign band, no sign or any part thereof shall be located on the roof on the Leases Premises.

(c)    Prior to fabrication of the sign, Tenant shall submit three (3) sets of shop drawings to Landlord for approval. These drawings are to be to scale, showing a front elevation and section through the sign, dimensioned to show overall length, height and letter depth, along with distance from end of letters to store demising lines. In addition, aid drawings shall specify all details of sign construction,    including materials, thickness, color, wiring, tubing, transformer specifications  and mounting details.

(d)    All signs shall be fabricated and installed in compliance with all applicable building and electric codes and bear a U.L. approved and the sign shall have a U.L. label attached to exterior of raceway, as required.

**EXHIBIT K**
**LANDLORD'S SIGNAGE CRITERIA**
**CLIFTON SHOPPING CENTER**
**CLIFTON, NJ**

(e)    Sign to have a dedicated circuit from tenant's panel within their space. Transformers to be housed in a concealed raceway or within fascia. All secondary power connections must be made through P K Housing or equal to meet U.L. approved installation and Material requirements, all secondary wiring jumps must be made through liquid tight Greenfield conduit. Each letter to have at least one 1/4" weep hole.

(f)    All necessary permits required for sign installation shall be obtained by Tenant or Tenant's contractor.

(g)    No sign should be fabricated and placed in final position without the written approval of Landlord.

(h)    All under canopy signage must match the centers existing criteria and subject to Landlords approval.

(i)    All tenant copy is subject to the landlord's approval.

(j)    All fastening of the façade signage to be prepared designed and determined by a licensed engineer to comply with all the applicable codes and design criteria.

(k)    Attachments of all signs to penetrate through the EIFS finish to the plywood substrate with minimum 3/8" anchor bolts.

(l)    All façade penetrations through the EIFS must be properly sealed in accordance with the manufactures recommended specifications.

(m)    Upon removal of signage the tenant is responsible for all repairs to the façade. All EIFS and painting must be performed by an owner approved contractor with the purpose of providing the area affected to its original state.

**SECTION 5**

The fabrication, installation and operation of all signs shall be subject to the following restrictions:

(a)    No flashing, moving, flickering or blinking illumination shall be permitted.

(b)    No animation, moving lights or floodlight illumination shall be permitted.

(c)    The name and/or stamp of the sign contractor or Sign Company or both shall not be exposed to view.

(d)    No exposed fluorescent tubing, incandescent lamps, raceways, ballast boxes, Electrical transformers, crossovers, conduit or sign cabinets shall be permitted.

**EXHIBIT K**
**LANDLORD'S SIGNAGE CRITERIA**
**CLIFTON SHOPPING CENTER**
**CLIFTON, NJ**

## SECTION 6

The following temporary signs are subject to Landlord's approval only:

(a)    Paper signs, or stickers utilized as signs, inside or outside glass storefront.

(b)    Signs of a temporary character or purpose, irrespective of the composition of the sign or material used therefore.



Artwork must indicate the leaselines for your storefront. Total length and height for signband of your storefront should be indicated as well as total length, height and any surrounding spaces around your signage. Total length of sign cannot exceed 75% of total length of storefront. Please refer to sign criteria for additional specifications and/or restrictions.

ARTWORK SHOULD BE SHOWING PROPOSED SIGNAGE ON YOUR BULIDING ELEVATION

SIGN

SIGN

CHANNEL LETTERS
SCALE: 3/8"= 1'-0"

SAMPLE SIGNAGE
SHOP DRAWING

DATE: 7/11/05

PAGE 1 of 2

Levin
MANAGEMENT
CORPORATION

# CHANNEL LETTERS ON A RACEWAY

.050 ALUMINUM RETURNS FINISHED
TO MATCH CORPORATE SPECS.
INTERIORS FINISHED WHITE.

3/16" BLUE PLEXI FACES WITH
BLUE TRIMCAP

.080" ALUMINUM BACKS

8" x 8" METAL RACEWAY WITH
SERVICE ACCESS PANEL ON
TOP OF RACEWAY FINISHED
TO MATCH BUILDING

3/8" KWIK-BOLT FASTENERS

PRIMARY ELECTRIC
( TO BE LOCATED WITHIN
3'-0" OF SIGN - BY OTHERS)
NON-CORROSIVE METAL CONDUIT

JUNCTION BOX

30 MA NEON TRANSFORMERS

PYREX HOUSINGS

15 mm NEON

NEON TUBE SUPPORTS

WEEP HOLES WITH LIGHT BAFFLES

EXISTING FACADE

5"

**SECTION DETAIL**
SCALE: 1-1/2"= 1'-0"

---

**SAMPLE SIGNAGE
SHOP DRAWING**

**DATE: 7/11/05**

PAGE 2 OF 2



MANAGEMENT
CORPORATION

EXHIBIT L

FORM OF SNDA AGREEMENT

EXHIBIT L

*Exhibit L*

RECORDING REQUESTED
BY AND WHEN
RECORDED RETURN TO:

Mary C. Gleason, Esq.
Associate General Counsel –
Real Estate Investments
Metropolitan Life Insurance Company
Law Department – Third Floor
10 Park Avenue, Post Office Box 1902
Morristown, New Jersey 07962-1902

SUBORDINATION,
NONDISTURBANCE
AND ATTORNMENT AGREEMENT

NOTICE:        **THIS SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT RESULTS IN YOUR LEASEHOLD ESTATE IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF SOME OTHER OR LATER SECURITY INSTRUMENT.**

DEFINED TERMS

| |
|---|
| **Execution Date: As of _____, 20_____.** |
| **Lender & Address:**<br>Metropolitan Life Insurance Company, a New York corporation, and its affiliates, as applicable<br>10 Park Avenue<br>Morristown, New Jersey 07962<br>Attn: Senior Vice President<br>    Real Estate Investments<br><br>with a copy to:<br><br>Metropolitan Life Insurance Company<br>Law Department – Third Floor<br>10 Park Avenue, Post Office Box 1902<br>Morristown, New Jersey 07962-1902<br>Attn:    Associate General Counsel, Real Estate Investments |
| **Tenant & Address:**<br>Blink Clifton, Inc., a New Jersey corporation<br>895 Broadway, Third Floor<br>New York, New York 10003<br><br>with a copy to: |

Blank Rome LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Attn: Samuel M. Walker, Esq.

**Landlord & Address:**
Levin Properties, L.P., a New Jersey limited partnership
975 U.S. Highway 22
North Plainfield, New Jersey 07060

**Loan:** A first mortgage loan in the original principal amount of $2,656,573.00 from Lender to Landlord.

**Note:** An Income Loan Note executed by Landlord (as successor in interest to Janice H. Levin, Adam K. Levin, Susan L. Tepper and Catherine M Levin) in favor of Lender in the amount of the Loan dated as of December 12, 1988, as modified by that certain Note Modification Agreement dated as of December 29, 1995, that certain Second Note and Mortgage Modification Agreement dated as of December 30, 2005 and that certain Third Note and Mortgage Modification Agreement dated as of October 26, 2007 and that certain Fourth Note and Mortgage Modification Agreement dated as of December 20, 2010 (collectively, the "Note").

**Mortgage:** A Mortgage and Security Agreement dated as of December 12, 1988 executed by Landlord (as successor in interest to Janice H. Levin, Adam K. Levin, Susan L. Tepper and Catherine M Levin), to Lender securing repayment of the Note, as modified by that certain Mortgage Modification Agreement dated as of December 29, 1995, that certain Second Note and Mortgage Modification Agreement dated as of December 30, 2005, that certain Third Note and Mortgage Modification Agreement dated as of October 26, 2007 and that certain Fourth Note and Mortgage Modification Agreement dated as of December 20, 2010, recorded in the records of the County in which the Property is located (collectively, the "Mortgage").

**Lease and Lease Date:** The lease entered into by Landlord and Tenant dated as of _____, 2013 covering the Premises.

**Property:**  Clifton Plaza
1006 Route 46
Clifton, New Jersey 07013

The Property is more particularly described on Exhibit A.

THIS SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT (the "Agreement") is made by and among Tenant, Landlord, and Lender and affects the Property described in Exhibit A. Certain terms used in this Agreement are defined in the Defined Terms. This Agreement is entered into as of the Execution Date with reference to the following facts:

      A.   Landlord and Tenant have entered into the Lease covering certain space in the

improvements located in and upon the Property (the "Premises").

      B.     Lender has made or is making the Loan to Landlord evidenced by the Note. The Note is secured, among other documents, by the Mortgage.

      C.     Landlord, Tenant and Lender all wish to subordinate the Lease to the lien of the Mortgage.

      D.     Tenant has requested that Lender agree not to disturb Tenant's rights in the Premises pursuant to the Lease in the event Lender forecloses the Mortgage, or acquires the Property pursuant to the power of sale contained in the Mortgage or receives a transfer of the Property by a conveyance in lieu of foreclosure of the Property (collectively, a "Foreclosure Sale") but only if Tenant is not then in default under the Lease beyond the expiration of any applicable notice and cure period set forth in the Lease and Tenant attorns to Lender or a third party purchaser at the Foreclosure Sale (a "Foreclosure Purchaser").

      NOW THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties agree as follows:

      1.     Subordination. The Lease and the leasehold estate created by the Lease and all of Tenant's rights under the Lease are and shall remain subordinate to the Mortgage and the lien of the Mortgage, to all rights of Lender under the Mortgage and to all renewals, amendments, modifications and extensions of the Mortgage.

      2.     Acknowledgements by Tenant. Tenant agrees that: (a) Tenant has notice that the Lease and the rent and all other sums due under the Lease have been or are to be assigned to Lender as security for the Loan, and in the event that Lender notifies Tenant of a default by Landlord under the Mortgage and requests Tenant to pay its rent and all other sums due under the Lease to Lender, Tenant shall pay such sums directly to Lender or as Lender may otherwise request; (b) Tenant shall send a copy of any notice or statement under the Lease to Lender at the same time Tenant sends such notice or statement to Landlord; and (c) this Agreement satisfies any condition or requirement in the Lease relating to the granting of a nondisturbance agreement.

      3.     Foreclosure and Sale. In the event of a Foreclosure Sale,

      (a)     So long as Tenant complies with this Agreement and is not in default under any of the provisions of the Lease beyond the expiration of any applicable notice and cure period set forth in the Lease, the Lease shall continue in full force and effect as a direct lease between Lender and Tenant for the remainder of the term under the Lease (including all extension periods which have been or are hereafter exercised) upon the same terms and conditions set forth in the Lease, and Lender will not disturb the possession of Tenant, subject to this Agreement. To the extent that the Lease is extinguished as a result of a Foreclosure Sale, a new lease shall automatically go into effect upon the same provisions as contained in the Lease between Landlord and Tenant, except as set forth in this Agreement, for the unexpired term of the Lease (including all extension periods which have been or are hereafter exercised). Tenant agrees to attorn to and accept Lender as landlord under the Lease and to be bound by and perform all of the obligations imposed by the Lease, or, as the case may be, under the new lease, in the event that the Lease is extinguished by a Foreclosure Sale, and Lender, subject to the terms of this Agreement, shall accept such attornment. Upon Lender's acquisition of title to the Property, Lender will perform all of the obligations imposed on the Landlord by the Lease except as set forth in this Agreement; provided, however, that Lender shall not be: (i) liable for any act or omission of a prior

landlord (including Landlord) except for an express default by such prior landlord (including Landlord) under any repair or maintenance obligation of Landlord set forth in the Lease which is continuing after Lender succeeds to the interest of Landlord in the Property, provided that Tenant has reasonably and diligently pursued all of its available remedies against any such prior landlord (including Landlord), Lender has received actual written notice (in accordance with Paragraph 8 below) of any such repair or maintenance default prior to acquiring title to the Property and only after the expiration of any applicable cure period provided for in the Lease (which cure period as applied to Lender shall commence no earlier than the date Lender succeeds to the interest of Landlord in the Property), provided, however, that in such event, Lender's liability shall be determined as if such default had first arisen on the day Lender acquired title to the Property; or (ii) subject to any offsets or defenses that Tenant might have against any prior landlord (including Landlord); provided, however, that nothing contained in this Paragraph 3(a)(ii) shall preclude Tenant from exercising its express right to offset against Base Rent (as such term is defined in the Lease) any unreimbursed costs incurred by Tenant as a result of Tenant's exercise of its right of self-help pursuant to and in accordance with Section 8.1 of the Lease against Lender, provided that Tenant has delivered notice to Lender of any default by Landlord giving rise to such right; or (iii) bound by any rent or additional rent which Tenant might have paid in advance to any prior landlord (including Landlord) for a period in excess of one month or by any security deposit, cleaning deposit or other sum that Tenant may have paid in advance to any prior landlord (including Landlord) unless such sum or deposit was transferred to and actually received by Lender; or (iv) bound by any amendment, modification, assignment or termination of the Lease made without the written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed; (v) obligated or liable with respect to any representations, warranties or indemnities contained in the Lease; or (vi) liable to Tenant or any other party for any conflict between the provisions of the Lease and the provisions of any other lease affecting the Property which is not entered into by Lender.

(b)     Upon the written request of Lender after a Foreclosure Sale, the parties shall execute a lease of the Premises upon the same provisions as contained in the Lease between Landlord and Tenant, except as set forth in this Agreement, for the unexpired term of the Lease (including all extension periods which have been or are hereafter exercised).

(c)     Notwithstanding any provisions of the Lease to the contrary, from and after the date that Lender acquires title to the Property as a result of a Foreclosure Sale, (i) Lender will not be obligated to expend any monies to restore casualty damage in excess of available insurance proceeds; provided, however, that Tenant shall retain all of its rights to terminate the Lease under Article 15 of the Lease in the event of a casualty; (ii) tenant shall not have the right to make repairs and deduct the cost of such repairs from the rent without a judicial determination that Lender is in default of its obligations under the Lease; (iii) in no event will Lender be obligated to indemnify Tenant, except where Lender is in breach of its obligations under the Lease or where Lender has been actively negligent in the performance of its obligations as landlord; and (iv) other than determination of fair market value, no disputes under the Lease shall be subject to arbitration unless Lender and Tenant agree to submit a particular dispute to arbitration.

4.     Subordination and Release of Purchase Options. Tenant represents that it has no right or option of any nature to purchase the Property or any portion of the Property or any interest in the Borrower. To the extent Tenant has or acquires any such right or option, these rights or options are acknowledged to be subject and subordinate to the Mortgage and are waived and released as to Lender and any Foreclosure Purchaser.

5.     Acknowledgment by Landlord. In the event of a default under the Mortgage by Landlord, at the election of Lender, Tenant shall and is directed to pay all rent and all other sums due

under the Lease to Lender.

      6.     Lender Opportunity to Cure. In the event of any act or omission of Landlord that would give Tenant the right, immediately or after lapse of a period of time, to cancel or terminate the Lease, or to claim a partial or total eviction, or to abate or offset against the payment of rent, Tenant shall not exercise such right: (i) until it has given written notice to Landlord and Lender; and (ii) until a reasonable period for remedying such act or omission shall have elapsed following the giving of such notice and following the time when Lender shall have become entitled under the Mortgage to remedy the same (which reasonable period shall in no event be less than the period to which Landlord would be entitled under the Lease or otherwise, after similar notice, to effect such remedy, plus thirty (30) days).

      7.     Construction of Improvements. Lender shall not have any obligation or incur any liability with respect to the completion of tenant improvements for the Premises, including, but not limited to, the performance of the Landlord's Work (as defined in Section 3.2 of the Lease) or the payment of the Tenant Work Allowance (as defined in Section 1.13 of the Lease and described in Section 28.1 of the Lease).

      8.     Notice. All notices under this Agreement shall be deemed to have been properly given if delivered by overnight courier service or mailed by United States certified mail, with return receipt requested, postage prepaid to the party receiving the notice at its address set forth in the Defined Terms (or at such other address as shall be given in writing by such party to the other parties) and shall be deemed complete upon receipt or refusal of delivery.

      9.     Miscellaneous. Lender shall not be subject to any provision of the Lease that is inconsistent with this Agreement. Nothing contained in this Agreement shall be construed to derogate from or in any way impair or affect the lien or the provisions of the Mortgage. This Agreement shall be governed by and construed in accordance with the laws of the State of in which the Property is located.

      10.    Liability and Successors and Assigns. In the event that Lender acquires title to the Premises or the Property, Lender shall have no obligation nor incur any liability in an amount in excess of $5,000,000 and Tenant's recourse against Lender shall in no extent exceed the amount of $5,000,000. This Agreement shall run with the land and shall inure to the benefit of the parties and, their respective successors and permitted assigns including a Foreclosure Purchaser. If a Foreclosure Purchaser acquires the Property or if Lender assigns or transfers its interest in the Note and Mortgage or the Property, all obligations and liabilities of Lender under this Agreement shall terminate and be the responsibility of the Foreclosure Purchaser or other party to whom Lender's interest is assigned or transferred. The interest of Tenant under this Agreement may not be assigned or transferred except in connection with an assignment of its interest in the Lease which has been consented to by Lender or an assignment of its interest in the Lease that is expressly permitted under the Lease without Landlord's consent as more particularly set forth in Article 17 of the Lease.

      11.    OFAC Provisions Tenant and Lender hereby represent, warrant and covenant to each other, either  that (i) it is regulated by the SEC, FINRA or the Federal Reserve (a "Regulated Entity"), or is a wholly-owned subsidiary or affiliate of a Regulated Entity or (ii) neither it nor any person or entity that directly or indirectly (a) controls it or (b) has an ownership interest in it of twenty-five percent (25%) or more, appears on the list of Specially Designated Nationals and Blocked Persons ("OFAC List") published by the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury. With respect to each Guarantor of Tenant's obligations under this Lease, Tenant further represents, warrants and covenants either that (i) any such Guarantor is  a Regulated Entity or a wholly-owned subsidiary or affiliate of a Regulated Entity or (ii) neither Guarantor nor any person or entity that

directly or indirectly (a) controls such Guarantor or (b) has an ownership interest in such Guarantor of twenty-five percent (25%) or more, appears on the OFAC List.

*[SIGNATURE PAGES FOLLOW]*

IN WITNESS WHEREOF, the parties have executed this Subordination, Nondisturbance and Attornment Agreement as of the Execution Date.

**IT IS RECOMMENDED THAT THE PARTIES CONSULT WITH THEIR ATTORNEYS PRIOR TO THE EXECUTION OF THIS SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT.**

LENDER:                          METROPOLITAN LIFE INSURANCE COMPANY,
                                 a New York corporation


                                 By _____

                                 Its _____


State of _____

County of _____


On _____, 20___ before me, _____, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.


WITNESS my hand and official seal.


Signature _____          (Seal)

**TENANT:**

BLINK CLIFTON, INC.,
a New Jersey corporation

By _____
    Larry Segall

Its _____
    CFO

State of _____ _NY_

County of _____ _NY_

On _1/3_ , 20_14_ before me, _Jeffrey Weinhaus_ personally appeared _Larry Segall_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____     (Seal)

JEFFREY M. WEINHAUS
Notary Public, State of New York
No. 02WE6070589
Qualified in New York County
Commission Expires March 4, 20_15_

**LANDLORD:**

Attest:

By: _____
Stacy A. Garrity,
Assistant Secretary

LEVIN PROPERTIES, L.P.,
a New Jersey limited partnership

By: JHL Holdings, Inc., its general partner

By _____
Name:  Maureen Mooney
Its: Vice President

State of New Jersey
County of Somerset

On _January 24_, 20_14_  before  me,  _Judith F. Scheiner_,  personally  appeared
_Maureen Mooney_, personally known to me (or proved to me on the basis of satisfactory evidence)
to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she
executed the same in his/her authorized capacity, and that by his/her signature on the instrument the
person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____          (Seal)

JUDITH F. SCHEINER
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires April 24, 2015

The undersigned Guarantors to the Lease hereby consent to the foregoing Subordination, Nondisturbance and Attornment Agreement and reaffirms that the Guaranty of Lease dated _____ remains in full force and effect as of the date of the foregoing Subordination, Nondisturbance and Attornment Agreement.

**GUARANTOR:**

BLINK HOLDINGS, INC.,
a Delaware corporation

By _____
   Larry Segall
Its _Chief Financial Officer___

EQUINOX HOLDINGS, INC.,
a Delaware corporation

By _____
   Larry Segall
Its Chief Financial Officer___

## EXHIBIT A

### PROPERTY DESCRIPTION

ALL THAT CERTAIN LOT OR PARCEL OF LAND SITUATE, LYING AND BEING IN THE CITY OF CLIFTON, COUNTY OF PASSAIC AND STATE OF NEW JERSEY AND MORE PARTICULARLY DESCRIBED AS:

BEGINNING AT A POINT ON THE NORTHERLY LINE OF NEW JERSEY STATE HIGHWAY ROUTE 46 (116 FOOT WIDE RIGHT OF WAY), SAID POINT BEING AN INTERSECTION FORMED BY SAID NORTHERLY LINE AND THE DIVIDING LINE BETWEEN LOT 23 (N/F LANDS OF LEVIN PROPERTIES, LP) AND LOT 24 AND A PORTION OF LOT 39, BLOCK 39.01, AND FROM SAID POINT OF BEGINNING RUNNING THENCE;

1. ALONG SAID DIVIDING LINE, NORTH 42 DEGREES – 37 MINUTES – 30 SECONDS WEST, A DISTANCE OF 399.00 FEET TO A POINT, THENCE;

2. ALONG THE COMMON DIVIDING LINE BETWEEN LOT 23 AND A PORTION OF LOT 39 & LOTS 40, 41, 42, 43, 44, THE SOUTHERLY TERMINUS OF PARKHILL TERRACE (50 FOOT WIDE RIGHT OF WAY) AND LOT 45, BLOCK 39.01, NORTH 43 DEGREES – 17 MINUTES – 50 SECONDS EAST, A DISTANCE OF 423.66 FEET TO A POINT, THENCE;

3. ALONG THE COMMON DIVIDING LINE BETWEEN LOT 23 AND LOT 45 AND A PORTION OF LOT 46, NORTH 41 DEGREES – 16 MINUTES – 10 SECONDS WEST, A DISTANCE OF 92.22 FEET TO A POINT, THENCE;

4. ALONG THE COMMON DIVIDING LINE BETWEEN LOT 23 AND LOTS 12, 13 AND A PORTION OF LOT 17, BLOCK 39.01, NORTH 44 DEGREES – 45 MINUTES – 50 SECONDS EAST, A DISTANCE OF 337.02 FEET TO A POINT, THENCE;

5. ALONG THE COMMON DIVIDING LINE BETWEEN LOT 23 AND LOTS 18 AND 18.01, BLOCK 39.01, SOUTH 40 DEGREES – 55 MINUTES – 10 SECONDS EAST, A DISTANCE OF 227.62 FEET TO A POINT, THENCE;

6.  ALONG THE DIVIDING LINE BETWEEN LOT 23 AND A PORTION OF LOT 18.01 (N/F LANDS OF CLIFTON S&L ASSN.), BLOCK 39.01, NORTH 46 DEGREES – 54 MINUTES – 50 SECONDS EAST, A DISTANCE OF 15.08 FEET TO A POINT, THENCE; ALONG THE DIVIDING LINE BETWEEN LOT 23, BLOCK 39.01 AND LANDS DEDICATED TO THE CITY OF CLIFTON PER DEED BOOK 76, PAGE 527, THE FOLLOWING TWO (2) COURSES:

7.  SOUTH 41 DEGREES – 21 MINUTES – 10 SECONDS EAST, A DISTANCE OF 50.02 FEET TO A POINT, THENCE;

8.  NORTH 46 DEGREES – 54 MINUTES – 50 SECONDS EAST, A DISTANCE OF 120.00 FEET TO A POINT IN THE SOUTHERLY LINE OF VAN HOUTEN AVENUE (VARIABLE WIDTH RIGHT OF WAY), THENCE;

9.  ALONG SAID SOUTHERLY LINE, SOUTH 41 DEGREES – 21 MINUTES – 10 SECONDS EAST, A DISTANCE OF 147.99 FEET TO A POINT, THENCE; ALONG THE DIVIDING LINE BETWEEN LOT 23 AND LOT 20 (N/F LANDS OF MARTHA WASHINGTON APARTMENTS), THE FOLLOWING TWO (2) COURSES:

10. SOUTH 46 DEGREES – 54 MINUTES – 50 SECONDS WEST, A DISTANCE OF 470.38 FEET TO A POINT, THENCE;

11. SOUTH 41 DEGREES – 16 MINUTES – 10 SECONDS EAST, A DISTANCE OF 243.70 FEET TO A POINT IN THE AFOREMENTIONED NORTHERLY LINE OF NEW JERSEY STATE HIGHWAY ROUTE 46, THENCE;

12. ALONG SAID NORTHERLY LINE, SOUTH 65 DEGREES – 39 MINUTES – 00 SECONDS WEST, A DISTANCE OF 430.95 FEET TO THE POINT AND PLACE OF BEGINNING.

*Exhibit M*
*Big Lots Lease*
*Redevelopment Area*

Big Lots – Schedule A

EXHIBIT



| FEDERAL REALTY INVESTMENT TRUST 1626 East Jefferson Street Rockville, Maryland 20852 (301) 998-8100 | PROJECT CLIFTON PLAZA Clifton, New Jersey | NUMBER | LEASE PLAN |

## Exhibit N



**CLIFTON PLAZA**
CLIFTON, NJ
PLOT PLAN

This Exhibit shall not be deemed a warranty, representation or agreement by Landlord that the layout, configuration and improvements of the shopping center or any part thereof shall remain as shown. It is intended to show the general location only of the leased premises as of the date of this Lease. Landlord reserves the right to modify the size, configuration, improvements, occupants and common areas of the shopping center including, without limitation, to make changes and construct buildings and improvements at any time in accordance with the provisions of this Lease. Areas and dimensions shown are approximate.

Bank Parking

EXHIBIT E-1

FORM OF GUARANTY

THIS GUARANTY (this "<u>Guaranty</u>") is executed this <u>3rd</u> day of <u>February</u>, 201**, by Blink Holdings, Inc. ("<u>Guarantor</u>").

WHEREAS, a certain lease of even date herewith (as amended, supplemented, extended and otherwise modified from time to time, the "<u>Lease</u>") has been, or will be, executed by and between Levin Properties, L.P. (referred to therein and herein as "<u>Landlord</u>"), and Blink Clifton, Inc. (referred to therein and herein as "<u>Tenant</u>"), relating to the lease of certain premises located in the Shopping Center (as defined in the Lease), and which Lease and all modifications thereto are fully incorporated herein by reference (all capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Lease); and

WHEREAS, Landlord requires as a condition to its execution of the Lease that the Guarantor guarantee certain specified obligations of Tenant under the Lease; and

WHEREAS, the Guarantor is desirous that Landlord enter into the Lease with Tenant and acknowledges that Tenant's entering into the Lease shall provide a substantial benefit to Guarantor.

NOW, THEREFORE, in consideration of the execution of the Lease by Landlord, and in exchange for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the undersigned Guarantor hereby absolutely and unconditionally guarantees: (1) the completion of Tenant's Work, (2) the full payment and performance of all of Tenant's obligations under the Lease accruing and attributable to the first fifteen (15) Lease Years, and continuing during any Renewal Term to the extent Tenant exercises its option to renew for such Renewal Term and (3) if the Lease is terminated due to an Event of Default occurring during the first ten (10) years following the Rent Commencement Date, the then unamortized portion of the Tenant Work Allowance actually paid to Tenant under the Lease, as of the date of such termination, amortized on a straight-line basis over a period of ten (10) years beginning on the Rent Commencement Date. The obligations in clauses 1, 2 and 3 of this paragraph are referred to in this Guaranty as the "<u>Guaranteed Obligations</u>".

The undersigned Guarantor further agrees as follows:

That this covenant and agreement on its part to guarantee the Guaranteed Obligations shall continue in favor of Landlord notwithstanding any extension, modification, or alteration of the Lease entered into by and between the parties thereto, or their successors or assigns, and notwithstanding any assignment of said Lease, with or without the consent of Landlord, and no extension, modification, alteration or assignment of the Lease shall in any manner release or discharge the undersigned Guarantor and Guarantor does hereby consent thereto.

That the liability of Guarantor hereunder is continuing and shall in no way be affected, modified or diminished by reason of any unilateral action of either Landlord or Tenant, or by reason of any dealings or transactions or agreements entered into or occurring between Landlord and Tenant (other than extensions, modifications, alterations or assignments of the Lease),

EXHIBIT E-1

including without limitation any adjustments, compromises, settlements, accord and satisfactions, or releases, or any termination of the Lease, whether or not notice thereof is given to Guarantor, all of which notices Guarantor hereby expressly waives.

That this Guaranty will continue unchanged by any bankruptcy, reorganization or insolvency of Tenant or any successor or assignee thereof or by any disaffirmance or abandonment by a trustee of Tenant.

That Landlord may, without notice, assign this Guaranty and/or the Lease in whole or in part and no assignment or transfer of this Guaranty or the Lease shall operate to extinguish or diminish the liability of the undersigned Guarantor hereunder.

That the liability of the undersigned Guarantor under this Guaranty shall be primary and that in any right of action which shall accrue to Landlord under the Lease, Landlord may, at its option, proceed against the undersigned Guarantor without having commenced any action, or having obtained any judgment against Tenant.

If Landlord shall obtain a judgment against Guarantor, Guarantor shall further be liable for and shall pay Landlord's reasonable attorney's fees and all costs and other expenses incurred in any collection or attempted enforcement or collection under this Guaranty.

GUARANTOR IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY LANDLORD HEREUNDER.

The use of the singular herein shall include the plural. The obligations of two or more parties shall be joint and several. The terms and provisions of this Guaranty shall be binding upon and inure to the benefit of the respective successors and assigns of the parties herein named.

Notwithstanding anything to the contrary contained in this Guaranty, no direct or indirect member, shareholder, partner, principal, affiliate, employee, officer, director, agent or representative of Guarantor shall have any personal liability under this Guaranty and no judgment shall be sought, obtained or enforced against any such person or entity with respect thereto.

IN WITNESS WHEREOF, the undersigned has caused this Guaranty to be executed as of the date set forth above.

GUARANTOR:

BLINK HOLDINGS, INC.

By: _____
    Larry Segall
Title: _Chief Financial Officer_

EXHIBIT E-2

## FORM OF LIMITED GUARANTY

THIS LIMITED GUARANTY (this "Guaranty") is executed this 3ͬͩ day of February___, 201ᶳ, by Equinox Holdings, Inc. ("Guarantor").

WHEREAS, a certain lease of even date herewith (as amended, supplemented, extended and otherwise modified from time to time, the "Lease") has been, or will be, executed by and between Levin Properties, L.P. (referred to therein and herein as "Landlord"), and Blink Clifton, Inc._____ (referred to therein and herein as "Tenant"), relating to the lease of certain premises located in the Shopping Center (as defined in the Lease), and which Lease and all modifications thereto are fully incorporated herein by reference (all capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Lease); and

WHEREAS, Landlord requires as a condition to its execution of the Lease that the Guarantor guarantee certain specified obligations of Tenant under the Lease; and

WHEREAS, the Guarantor is desirous that Landlord enter into the Lease with Tenant and acknowledges that Tenant's entering into the Lease shall provide a substantial benefit to Guarantor.

NOW, THEREFORE, in consideration of the execution of the Lease by Landlord, and in exchange for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the undersigned Guarantor hereby absolutely and unconditionally guarantees upon demand the full payment of all Rent due under the Lease accruing and attributable solely to the first three (3) Lease Years (the expiration of the third (3ʳᵈ) Lease Year, the "Guaranty Cut Off Date"), but such limited payment guaranty shall not pertain to any Rent accruing and/or attributable or coming due following the Guaranty Cut Off Date; provided, further, however, that Guarantor's aggregate liability under this Guaranty shall reduce by each monthly payment of Base Rent and Additional Rent received by Landlord, such that on the Guaranty Cut Off Date, Guarantor's obligations under this Guaranty shall be fully extinguished.    The obligations in the preceding sentence are referred to in this Guaranty as the "Guaranteed Obligation".

The undersigned Guarantor further agrees as follows:

That this covenant and agreement on its part to guarantee the Guaranteed Obligation shall continue in favor of Landlord notwithstanding any extension, modification, or alteration of the Lease entered into by and between the parties thereto, or their successors or assigns, and notwithstanding any assignment of said Lease, with or without the consent of Landlord, and no extension, modification, alteration or assignment of the Lease shall in any manner release or discharge the undersigned Guarantor and Guarantor does hereby consent thereto.

That the liability of Guarantor hereunder is continuing and shall in no way be affected, modified or diminished by reason of any unilateral action of either Landlord or Tenant, or by reason of any dealings or transactions or agreements entered into or occurring between Landlord and Tenant (other than extensions, modifications, alterations or assignments of the Lease), including without limitation any adjustments, compromises, settlements, accord and

EXHIBIT E-2

satisfactions, or releases, or any termination of the Lease, whether or not notice thereof is given to Guarantor, all of which notices Guarantor hereby expressly waives.

That this Guaranty will continue unchanged by any bankruptcy, reorganization or insolvency of Tenant or any successor or assignee thereof or by any disaffirmance or abandonment by a trustee of Tenant.

That Landlord may, without notice, assign this Guaranty and/or the Lease in whole or in part and no assignment or transfer of this Guaranty or the Lease shall operate to extinguish or diminish the liability of the undersigned Guarantor hereunder.

That the liability of the undersigned Guarantor under this Guaranty shall be primary and that in any right of action which shall accrue to Landlord under the Lease, Landlord may, at its option, proceed against the undersigned Guarantor without having commenced any action, or having obtained any judgment against Tenant.

If Landlord shall obtain a judgment against Guarantor, Guarantor shall further be liable for and shall pay Landlord's reasonable attorney's fees and all costs and other expenses incurred in any collection or attempted enforcement or collection under this Guaranty.

GUARANTOR IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY LANDLORD HEREUNDER.

The use of the singular herein shall include the plural. The obligations of two or more parties shall be joint and several. The terms and provisions of this Guaranty shall be binding upon and inure to the benefit of the respective successors and assigns of the parties herein named.

Notwithstanding anything to the contrary contained in this Guaranty, no direct or indirect member, shareholder, partner, principal, affiliate, employee, officer, director, agent or representative of Guarantor shall have any personal liability under this Guaranty and no judgment shall be sought, obtained or enforced against any such person or entity with respect thereto.

IN WITNESS WHEREOF, the undersigned has caused this Guaranty to be executed as of the date set forth above.

GUARANTOR:

EQUINOX HOLDINGS, INC.

By: _Lawy M. Byall_
    Larry Segall
Title: _Chief Financial Officer_

EXHIBIT E-2

3038835v9