**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: <br><br> BLINK HOLDINGS, INC., *et al.*[1] <br><br> Debtors. | Chapter 11 <br><br> Case No. 24-11686 (JKS) <br><br> (Jointly Administered) <br><br> Hearing Date: Nov. 6, 2024 at 1:00 p.m. (ET) <br> Obj. Deadline: Oct. 14, 2024 at 4:00 p.m. (ET) <br> (Objection Deadline Extended by Consent to Oct. 17, 2024 at 4:00 p.m. (ET)) |

**HARTFORD FIRE INSURANCE COMPANY'S LIMITED OBJECTION TO DEBTORS' SALE MOTION AND *PROPOSED* SALE ORDER (I) APPROVING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (II) AUTHORIZING THE ASSUMPTIONAND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF [SEE DOCKET NOS. 81, 348, 466]**

Hartford Fire Insurance Company (the "Surety"), by and through its undersigned counsel, hereby submits this limited objection (the "Limited Objection") to the Debtors' Sale Motion [Docket No. 81] and *Proposed* Sale Order (I) Approving the Sale of Assets Free and Clear of all Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief [Docket No. 466] (the "Proposed Sale Order").and respectfully states as follows:

**BACKGROUND**

1. On August 12, 2024 (the "Petition Date"), the Debtors filed petitions for relief under Chapter 11 of Title 11 of the Bankruptcy Code. The Debtors continue to operate their businesses as debtors in possession and their chapter 11 cases are being jointly administered.

---

[1] The last four digits of Blink Holdings, Inc.'s federal tax identification number are 6354. The mailing address for Blink Holdings, Inc. is 45 West 45th Street, 10th Floor, New York, New York 10036. Due to the large number of debtors in these chapter 11 cases, which the Debtors have requested be jointly administered, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/BlinkFitness, or by contacting counsel for the Debtors.

2. According to the Debtors, they are a leading provider of fitness services in the high value, low price fitness category. (*See* Declaration of Steven Shenker, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions. (Docket No. 2 at ¶ 9)).

3. Prior to the Petition Date, the Surety issued certain health club/spa surety bonds in which various Debtors were listed as principal on the bonds, and, which were issued, generally, in favor of members of such Debtors' health clubs/spas who suffer a financial loss as a result of the closure of a facility. In aggregate, such active bonds have a penal sum of $1,285,000.00. (the "Bonds). (*See* Declaration of Greg Daily at ¶ 3).

4. In connection with the Surety's execution and/or issuance of the Bonds, Debtor Blink Holdings, Inc. agreed to indemnify, exonerate and hold harmless the Surety. (*Id*. at ¶ 4).

5. Specifically, Debtor Blink Holdings, Inc. executed in favor of the Surety as indemnitee, a General Indemnity Agreement dated November 2, 2020 ("Indemnity Agreement"). (*Id*. at ¶ 5).

6. The Indemnity Agreement, among other provisions provides in pertinent part:

> 1(g) **"Loss"** means all payments made or obligations incurred by Hartford: (i) as a result of or arising out of any Default; and/or (ii) in the belief that it was or might be liable as a result of having Underwritten ay Bond; and/or (iii) in investigating and responding to any Claim; and/or (iv) in enforcing this Agreement or any Other Surety Documents; and/or (v) in the belief that it would mitigate its exposure. Loss shall include, but not be limited to, Claim payments, attorney fees, consultant fees, court costs, mediation fees, arbitration fees, expert witness fees, travel expenses, unpaid premiums, advances and guarantees on behalf of an Indemnitor and interest on all amounts paid at the maximum statutory rate.
>
> 4. **Indemnification, Hold Harmless and Exoneration**. The Indemnitors shall indemnify, hold harmless and exonerate Hartford from and against any and Default, Loss, Claims and exposure or liabilities relating to Underwriting. The Indemnitors shall immediately be liable to Hartford for all Loss from the date such Loss was incurred by Hartford….

***

> 6. **Additional Rights**. Hartford has the absolute right to: (a) Underwrite or decline to Underwrite any Bond; (b) consent to or refuse to modify any Bond; and (c) consistent with the Bond or applicable law continue, cancel, or non-renew any Bond.
>
> \*\*\*
>
> 14. **Books and Records.** Until Hartford's liability or potential liability for all Bonds, Underwriting and Claims has been terminated and Hartford is without Loss or Claim, Hartford shall have the right to review and copy in their entirety each Indemnitor's Books and Records or other information it deems necessary. Indemnitors agree to fully cooperate and provide immediate access to Books and Records or other information requested and shall direct third parties to cooperate and disclose same to Hartford.
>
> \*\*\*
>
> 16. **Set-off.** Hartford shall have the absolute right to set off any amount owed to any Principal or Indemnitor against any amount owed by any Principal or Indemnitor to Hartford. Hartford shall have the absolute right to apply any amount owed to any Principal or Indemnitor against any amount owed by any Principal or Indemnitor to Hartford. Hartford shall have the absolute right to apply any amount owed to any third party owned or controlled by any Principal or Indemnitor against the amount owed by any Principal or Indemnitor to Hartford whether the transactions are related or no

(*Id*. at ¶ 6 and Exhibit "A" thereto, redacted Indemnity Agreement).

7. On September 10, 2024, the Bankruptcy Court entered an Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of All or substantially all of the Debtors' Assets, (C) Establishing Certain Assumption and Assignment Procedures and Approving Manner of Notice Thereof, and (D) Granting Related Relief (Docket No. 348), which provides in pertinent part, that "[t]he Debtors will file and serve a proposed form of Sale Order on or before … October 4, 2024" and objections thereto are to be filed by October 14, 2024. (Docket No. 348 at ¶ 3)(original bolding removed).

8. On September 10, 2024, the Debtors filed a Notice of Filing of Stalking Horse Supplement (Docket No 350), which included as Exhibit "B," the Stalking Horse Asset Purchase

Agreement ("APA") between the Debtors ad Pinnacle US Holdings LLC (the "Buyer"). The Stalking Horse APA purported to contain a Form of Transition Services Agreement at Exhibit "D," but no such form was attached.

9. On October 4, 2024, the Proposed Sale Order was filed. (Docket No. 466).

## ARGUMENT

10. By way of this Limited Objection, the Surety does not object to the concept of the proposed sale of Debtors' assets, as contemplated in the Proposed Sale Order. However, the Surety hereby objects and puts all parties on notice that, *inter alia*, the Indemnity Agreement and Bonds cannot be sold, transferred and/or assumed and assigned without the consent of the Surety, which consent is currently not granted by the Surety, but which may or may not be granted by the Surety, after the Surety has more information concerning a proposed sale.

### A. Indemnity and Surety Agreements Cannot be Assumed or Assigned without Consent

11. With respect to the Debtors' request seeking to have the Bankruptcy Court authorize assumption and assignment of executory contracts, to the extent that the Debtors seek to assume and assign any of the Bonds or the Indemnity Agreement, such assumption and assignment is not allowed pursuant to 11 U.S.C. § 365(c)(2) (absent the Surety's consent). The Indemnity Agreement is a "financial accommodation" contract through which the Bonds, among other things, are executed, issued and/or controlled, and thus all of these and related assets of the Surety may not be assumed or assigned without prior consent of the Surety.

12. Specifically, the ability of a debtor to assume and assign a contract is not unlimited. The Bankruptcy Code specifically prohibits debtors from assuming certain contracts. Section 365 (c)(2) provides the following in pertinent part:

> (c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
> …
> (2) such contract is a contract to make a loan, or extend other debt financing or *financial accommodations*, to or for the benefit of the debtor, or to issue a security of the debtor….

(emphasis added).[2]

13. The Bankruptcy Code does not define the term "financial accommodation." *See e.g. In re Adana Mortg. Bankers, Inc.*, 12 B.R. 977, 986 (Bankr. N.D. Ga. 1980) (regarding "financial accommodations" as used in Section 365(e)(2)(B)).

14. However, in *In re Adana*, the Court found the following regarding guaranty agreements:

> The debtor contends that the Guaranty Agreements do not constitute contracts to make financial accommodations to or for the benefit of debtor. To the contrary, the facts show that the Guaranty Agreements are contracts to make financial accommodations to or for the benefit of debtor. First, the debtor asserts that the securities constitute a type of liability of the debtor. Second, GNMA is obligated to pay the securities holders if the debtor fails to do so. In other words, GNMA is required by the Guaranty Agreements to make payments promptly on liabilities of the debtor, should the debtor fail to make them. The obligation to pay money on the obligation of another is a financial accommodation.

*Id.* at 987.

---

[2] In addition, Section 365 (e)(2)(B) provides that although certain contracts cannot be terminated or modified based on the bankruptcy filing, this prohibition does not apply when "such contract is a contract to make a loan, or extend other debt financing *or financial accommodations*, to or for the benefit of the debtor, or to issue a security of the debtor." (Emphasis added).

15. Surety bonds are considered "financial accommodations" because they represent obligations to pay money based on the obligations of another. *In re Wegner Farms Co.*, 49 B.R. 440 (Bankr. N.D. Iowa 1985). The *Wegner Farms* Court explained that:

> Certainly a surety bond does not fit neatly within the framework of traditional debt financing. Nonetheless, as noted by the court in *In re Adana Mortgage Bankers Inc.*, 12 B.R. 977, 987 (Bkrtcy.N.D.Ga.1980) (*Adana I*), even giving the term financial accommodation a narrow construction, "[t]he obligation to pay money on the obligation of another is a financial accommodation" within the meaning of section 365(c) and (e).

*Id.* at 444. Further, as set forth in *Matter of Edwards Mobile Home Sales, Inc.*, 119 B.R. 857, 859 (Bankr. M.D. Fla. 1990):

> This Court agrees with the finding in *Wegner* and *Adana I* that an obligation to pay the debts of another is a "financial accommodation" and as such is encompassed by Section 365(c)(2). Accordingly, the Court finds the Ohio Casualty surety bond to be a financial accommodation which cannot be assumed pursuant to Section 365(c)(2).

16. Here, the Surety issued Bonds on behalf of certain of the Debtors and/or their non-debtor affiliates by virtue of, among other things, the Indemnity Agreement. The Bonds and the Indemnity Agreement, without limitation, are financial accommodation contracts and therefore, they are not assignable by the Debtors at this time.

17. Moreover, the Bonds are not property of the Debtors or their estates and therefore cannot be assigned without the Surety's consent. "[T]he 'overwhelming weight of authority,' under both the Bankruptcy Act and Code holds that a contractor [principal] has no property interest in a surety bond issued by a third-party [surety] to guarantee the contractor's performance on its commercial or personal services contracts." *O'Malley Lumber Co. v. Lockard (In re Lockard)*, 884 F.2d 1171, 1177 (9th Cir. 1989). Moreover, because the Debtors have no property rights in the Bonds, the Debtors cannot simply transfer the Bonds to a winning bidder. The Bonds do not assure

6

performance of any party other than the named principal. In fact, the law of suretyship is clear that a surety is discharged from liability under its bond if there is an involuntary substitution of the principal under the bond, since such a change is a material modification to the underlying bonded contract that is prejudicial to the surety. *See, e.g., Becker v. Faber*, 19 N.E.2d 997, 999 (N.Y. 1939). Accordingly, the Bonds and the Surety's obligations thereunder are not assignable to a new buyer without the Surety's consent.

### B. Preservation of the Surety's Subrogation and Setoff/Recoupment Rights

18. The Surety objects to the Sale, among other reasons, in the event this sale involves selling any of the bond principal's claims against the Surety.

19. If any such claims are being sold, the Surety objects to the extent the sale infringes on the Surety's rights of subrogation as well as any setoff and recoupment rights in connection with these claims. Language should be added to the Sale Order clarifying that the setoff and recoupment rights of the Surety, as well as its subrogation rights, are unaffected by entry of this order.

20. Indeed, the Surety has equitable subrogation rights that arise by common law to the extent that the Surety pays any claim under any of the bonds it has issued.

21. Courts have recognized that a surety, upon payment of a bond claim, is subrogated to the rights of the principal on the bond and/or a beneficiary on the bond. *See Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135-36 (1962) ("there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed"); *Henningsen v. United States Fid. & Guar. Co.*, 208 U.S. 404, 410 (1908) (holding surety has superior equity under the doctrine of subrogation in sums due under the contract after the surety made payments to beneficiaries/claimants under the bond where the bond

principal failed to do so); *Prairie State Natal Bank v. United States*, 164 U.S. 227, 232-33 (1896) (holding surety had subrogation rights to contract funds after satisfying bonded obligations); *Ky. Cent. Ins. Co. v. Brown (In re Larbert Corp.)*, 177 F.3d 439, 443 (6th Cir. 1999) (noting "[t]he law is clear" that a surety's right to subrogation arises "when a [bond principal] defaults on its obligations and a surety completes the work called for by the contract and pays all of the related bills"); *Nat'l Shawmut Bank of Boston v. New Amsterdam Cas. Co.*, 411 F.2d 843, 848-49 (1st Cir. 1969) (noting that upon bond principal's default, the surety is subrogated to the obligee's right to pay beneficiaries under the bond (in this case, laborers and materialmen), and to apply earned but unpaid progress payments at the time of default to the cost of completion of bonded obligations); *Mendelsohn v. The Dormitory Authority of N.Y. (In re QC Piping Installations, Inc.)*, 225 B.R. 553, 562 (Bankr. E.D.N.Y. 1998) ("it is now irrefutable that a surety, after satisfying its obligations under either a payment or performance bond, is subrogated to the rights of the party he paid"); *John's Insulation, Inc. v. Hartford Accident & Indem. Co. (In re John's Insulation, Inc.)*, 221 B.R. 683, 688 (Bankr. E.D.N.Y. 1998) (noting that a surety, after completing a contract upon the default of the principal, is "subrogated to the rights of the principal, and has rights to the funds that are due and are to become due under a contract, including any undisbursed proceeds previously earned and any retainages held until contract completion"). In other words, the Surety may step into the shoes of these entities and enforce the claims they may have against each other, or other third parties, including the Debtor.

22. Recoupment is a creditor's right, long recognized in bankruptcy proceedings that is not in the nature of a mere lien, but is a defense to a claim for payment. *Lee v. Schweiker,* 739 F. 2d 870, 875 (3d Cir. 1984) ("[W]here the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim . . . ."). In other

words, the recoupment is used to determine the proper liability on amounts owed. *Reiter v. Cooper*, 507 U.S. 258, 265 n.2 (1993).

23. Setoff "gives a creditor the right 'to offset a mutual debt owing by such creditor to the debtor,' provided that both debts arose before commencement of the bankruptcy action and are in fact mutual." *In re University Medical Center,* 973 F.2d 1065, 1079 (3d Cir. 1992) (*quoting in re Davidovich*, 901 F.2d 1533, 1537 (10th Cir. 1990). While setoff rights are defined and delineated by applicable non-bankruptcy law, the Bankruptcy Code recognizes and preserves these rights: "11 U.S.C. § 553(a) provides that with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy." *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995); *see also In re Luongo*, 259 F.3d 323, 333 (5th Cir. 2001) ("It is impossible for us to ignore the clear statement of § 553 that 'this title . . . does not affect any right of a creditor to offset . . . .'") (internal quotation source omitted).

24. Setoff "gives a creditor the right 'to offset a mutual debt owing by such creditor to the debtor,' provided that both debts arose before commencement of the bankruptcy action and are in fact mutual." *In re University Medical Center,* 973 F.2d 1065, 1079 (3d Cir. 1992) (*quoting in re Davidovich*, 901 F.2d 1533, 1537 (10th Cir. 1990). While setoff rights are defined and delineated by applicable non-bankruptcy law, the Bankruptcy Code recognizes and preserves these rights: "11 U.S.C. § 553(a) provides that with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy." *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995); *see also In re Luongo*, 259 F.3d 323, 333 (5th Cir. 2001) ("It is impossible for us to ignore the clear statement of § 553 that 'this title . . . does not affect any right of a creditor to offset . . . .'") (internal quotation source omitted).

25. Without language protecting the Surety's setoff, recoupment and subrogation rights, the Sale Motion should be denied.

### C. Transition Period

26. It appears that that the Debtors and the Buyer have or will enter into a transition services agreement, as the APA references a form of transition services agreement, although no such form was attached to the APA.

27. To the extent that any transition services agreement require the Surety to continue bond obligations during any transition period, this would be improper, for the reasons stated above.

28. Further, should the Buyer wish to try to rely on any of the Surety's bonds, including the Bonds, during any transition period, the Buyer should be required to disclose how it proposes to protect the Surety, either by agreement with the Surety or by attempting to obtain an order which, in effect, requires the Bonds to remain in place during any transition period.

29. Along these lines, the APA provides for the treatment of certain contracts or leases during the period from the Closing Date through the 90th day after the Closing Date. (*See*, Docket No. 350 at Exhibit B, APA at definition of "Designated Rights Period" and Section 2.6(c)). Any sale order should make clear that the Bonds are not contracts subject to any treatment during the Designated Rights Period.

### D. Books and Records

30. The APA provides at Section 1.1(j) that Acquired Assets include books and records related to the Business.

31. The Indemnity Agreement provides at paragraph 14 that the Surety shall have the right to review and copy of the Debtors books and records or other information it deems necessary.

32. Accordingly, to the extent a claim is asserted against any of the Bonds, then the

Surety should be granted access to, and may make copies of, any books and records that may be held by the Debtors or the Buyer relating to any such claim.

### E.     Proposed Language for Sale Order

33.     Accordingly, the Surety proposes that the following language be included in any final sale order ("Final Sale Order"):

> Notwithstanding any other provision of this Order, the Asset Purchase Agreement or any Transaction Document (the "Sale Documents"), the rights of Hartford Fire Insurance Company, or its past, present or future parents, subsidiaries or affiliates (individually and collectively as the "Surety") against the Debtors and/or their non-debtor affiliates in connection with or arising out of: (i) any surety bonds and/or related instruments previously or in the future issued and/or executed by the Surety on behalf of any of the Debtors and/or any of their non-debtor affiliates (each a "Bond" and collectively the "Bonds"); (ii) any indemnity or indemnity-related agreement, including that certain General Indemnity Agreement dated November 2, 2020, executed by Blink Holdings Inc., as indemnitor, in favor of the Surety, as indemnitee (the "Indemnity Agreement"); and (iii) any related documents, ((i), (ii), and (iii), collectively, are hereafter referred to as the "Surety Documents"), are neither affected nor impaired by the Sale Documents.
>
> Each of the Bonds will be replaced and released by the Buyer on or before the closing date of the sale pursuant to the Sale Documents such that the Bonds are fully released and fully discharged such that the Surety's actual or potential liability thereunder is extinguished, as to any Gym Location that the Buyer is taking over ("Discharge Obligation").
>
> Notwithstanding any other provision in the Sale Documents, if the Discharge Obligation is not complied with, and a claim or claims is or are asserted against any of the Bonds, then the Surety shall be granted access to, and may make copies of, any books and records that may be held by the Debtors or the buyer relating to any such claim.  The Surety shall be given sixty (60) days' prior written notice of any proposed destruction of such books and records.
>
> No Buyer has indicated that it wishes to assume the Surety Documents.  Surety Documents may not be assumed, assumed and assigned, or otherwise used in any manner for the direct or indirect benefit of any Buyer, any of the Debtors or any other related entities.  If the Discharge Obligation is not complied with as of the closing date(s) of any sale (which obligation should be complied with by that time), or if any of the Bonds are, in the discretion of the Surety, exposed to liability during any transition period under a formal or information transition agreement between or among any of the Debtors and any buyer or during a period when the Acquired Assets are being held in trust, then any such Buyer shall comply with and be bound by the Indemnity Agreement as if such Buyer had executed same and such Buyer shall indemnify and hold the Surety harmless against any

debt, liability, loss or obligation, including legal fees, costs and expenses, and shall continue to be obligated to comply with the Discharge Obligation as soon as possible.

Notwithstanding any other provision in the Sale Documents, all set-off and recoupment rights of Surety and any obligee or beneficiary under any of the Bonds are preserved against the Debtors and their non-debtor affiliates, and, to the extent applicable, said set-off and recoupment rights shall attach to the proceeds of any sale in the same priority as already exists.

To the extent that any transition services agreement between the Debtors and the Buyer requires the Surety to continue bond obligations during any transition period, the Surety shall be under no obligation to continue any such bond obligations absent consent of the Surety. Should the Surety so consent, then the Buyer shall be required to disclose how it proposes to protect the Surety, such as by agreement with the Surety. Moreover, the Bonds shall not be subject to any treatment during the Designated Rights Period.

The Buyer shall hold in trust all funds from members of Gym Locations located in New York, received prior to the full operation of such Gym Locations.

## **RESERVATION OF RIGHTS**

34. The submission of this Limited Objection by the Surety is not intended as, and shall not be construed as: (a) the Surety's admission of any liability or waiver of any defenses or limitation of any rights of Surety with respect to any claims against any one or more of the Bonds or under any indemnity agreement in favor of the Surety, including the Indemnity Agreement; (b) the Surety's waiver or release of any right to exoneration it may have against anyone with respect to any of the Bonds; (c) the Surety's waiver or release of its right to be subrogated to the rights of one or more of the parties paid in connection with the Bonds; (d) an election of remedy; or (e) consent to the determination of any of the Debtors' liability to the Surety by any particular court, including, without limitation, the Bankruptcy Court.

35. The Surety reserves the right to amend any argument in relation to any sale proposed by the Debtors, after an auction or otherwise, and to raise any arguments by any other party in their objection(s) to the Motions or any future sale hearing.

36. The Surety reserves the right to object and put forth any argument in relation to any motion filed by the Debtors for the Bankruptcy Court's authorization of assumption and assignment of executory contracts and unexpired leases, and to raise any arguments by any other party in their objection(s) to the Motion.

37. The Surety expressly reserves, and does not waive, any and all of its rights, claims, defenses, limitations, and/or exclusions in connection with its and any of the Debtors' or its affiliates' rights and obligations under the Indemnity Agreement, the Bonds, applicable law, or otherwise.  Surety further reserves all rights to assert any and all such rights, claims, defenses, limitations and/or exclusions in any appropriate manner or forum whatsoever (including, without limitation, any of its rights to have any non-core matter relating to the interpretation of its contractual rights and Debtors' contractual obligations adjudicated by the United States District Court).

38. Surety further reserves all of its rights to raise any issues contained in this Limited Objection and any other related issues in any procedurally appropriate contested matter and/or adversary proceeding, including, without limitation, (i) objections to confirmation of any plan; (ii) a separate adversary proceeding requesting any appropriate declaratory and/or injunctive relief; (iii) or an objection to any subsequent motion seeking approval of an asset sale to any prospective asset purchaser with respect to any contractual rights that may be adversely affected by a sale motion or the confirmation of any plan.

## **CONCLUSION**

**WHEREFORE**, for the reasons set forth herein, the Surety respectfully requests that the foregoing limited objections be addressed in any final Sale Order.

                                          **McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**

Dated: October 15, 2024                */s/ Gary D. Bressler*
Gary D. Bressler, Esq. (No. 5544)
300 Delaware Avenue, Suite 1014
Wilmington, DE 19801
Telephone: 302-300-4515
Facsimile: 302-645-4031
Email: gbressler@mdmc-law.com

-and-

Michael R. Morano, Esq. (admitted *pro hac vice*)
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962
Telephone: 973-993-8100
Facsimile: 973-425-0161
Email: mmorano@mdmc-law.com

*Counsel to Hartford Fire Insurance Company*