**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BLINK HOLDINGS, INC., *et al.,* | Case No. 24-11686 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 81, 348** |
| | **Hearing Date: November 6, 2024 at 11:00 a.m. (ET)** |
| | **Objection Deadline: October 22, 2024[1]** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) AUTHORIZING AND APPROVING THE DEBTORS' ENTRY INTO AN ASSET
PURCHASE AGREEMENT, (II) AUTHORIZING THE SALE OF ALL OR
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL
ENCUMBRANCES, (III) APPROVING THE ASSUMPTION AND ASSIGNMENT
OF THE ASSUMED CONTRACTS, AND (IV) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 bankruptcy cases of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors" or "Blink"), by and through its undersigned counsel, hereby files this objection (the "Objection") to the *Debtors' Motion for Entry of Orders (I) (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets, (C) Establishing Certain Assumption and Assignment Procedures and Approving Manner of Notice Thereof, and (D) Granting Related Relief; and (II) (A) Authorizing and Approving the Debtors' Entry into an Asset Purchase Agreement, (B) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (C) Approving the Assumption*

---

[1]     Extended on consent.

16999539/1

*and Assignment of the Assumed Contracts, and (D) Granting Related Relief* (the "Sale Motion").[2]

In support of its Objection, the Committee also files (i) the *Declaration of Richard D. Gage in*

*Support of the Objection of the Official Committee of Unsecured Creditors to Debtors' Sale*

*Motion* (the "Gage Declaration"), attached as Exhibit A, and (ii) the *Declaration of Peter Hurwitz*

*in Support of the Objection of the Official Committee of Unsecured Creditors to Debtors' Sale*

*Motion* (the "Hurwitz Declaration"), attached as Exhibit B.  In further support of its Objection, the

Committee respectfully states as follows:

## PRELIMINARY STATEMENT[3]

1.      The Committee supports a going concern sale of the Debtors' business to

the highest and best bidder.  Full stop.  Nothing in this Objection says otherwise or imperils the

Debtors' ability to accomplish that goal.  However, the Sale is anything but the standard third-

party transaction the Debtors would have the Court believe.  The Sale is designed to insulate

Equinox and other insiders from over █████████ of claims arising from Equinox's failure to

respect the Debtors' corporate separateness and longtime manipulation of the Debtors for its own

benefit.

2.      The Committee's investigation of Insider Claims is in its infancy.

Discovery has been challenging, in large part because ████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████  As a result,

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████  This unusual

---

[2]      Docket No. 81.  Capitalized terms used but not otherwise defined in this Objection have the meanings ascribed to them in the Sale Motion.

[3]      Capitalized terms used but not defined in the Preliminary Statement have the meanings ascribed to them further below.

arrangement has caused extensive confusion and delay, significantly increased costs and impeded the Committee's investigation.

3.      Despite these roadblocks, ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████ To date, the Debtors or Equinox have been unable to produce ██

███████████████████████████████████. There is ample evidence to suggest that viable claims exist to pierce the corporate veil and impute the Debtors' more than ██████████ of liabilities to Equinox.

4.      Other suspect transactions ████████████████ give rise to valuable claims against ██████████████████████████████████.
For example, the Debtors:  (i) ██████████████████████████████
██████████ (ii) ██████████████████████████████████
███████████████████████████████████████████████
(iii) "borrowed" $80 million (now $103 million) from Equinox under loans ripe for recharacterization or subordination; and (iv) paid Equinox approximately $12 million during the insider preference period.

5.      Equinox's attempt to ████████████████████████
███████████████████████████████████████████████
██████████████████████████████, is specious at best. ████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████. Equinox also made sure the Debtors paid extra for any services Equinox might have to provide in connection with these bankruptcy cases despite the Debtors' retention of a full slate of outside restructuring advisors.

6.     Confronted with Equinox's transgressions, the Debtors advised the Committee that ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████. The Debtors further advised that, ████████████████

██████████████████████████████████████████████████████████

██████████████████. And, not surprisingly, ████████████████████████████████

████████████████████████████████████

7.     Despite ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██r. Indeed, the Debtors did not even ██████████████████████████████████████

██████████████████████████████.

8.     The Debtors and Equinox will have the Court believe ████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████ ████████████████████████████████████

████████████████████████ .

9.      If the Court determines an insider release is necessary and appropriate under these troubling circumstances, the value of the Insider Claims may still be preserved for general unsecured creditors.  The Court can require the Debtors to escrow the sale proceeds until the claims are investigated, valued and allocated under the Bankruptcy Code.

10.      As set forth in detail below, the Committee's limited investigation demonstrates this is not an academic exercise.  The Debtors should not be permitted to release Equinox and other insiders from valuable claims outside of a plan ███████████████████ ██████  Nor should Equinox be granted a release based on its refusal to cooperate with a sale. Because it will release insiders, the sale is subject to heightened scrutiny.  To survive such scrutiny, the Debtors must prove they have investigated the claims and are receiving fair value in exchange for releasing them.  The Debtors cannot meet that burden.

11.      Unless the Stalking Horse APA and proposed Sale Order are modified, extremely valuable Insider Claims will be sold for nothing, ██████████████████████ ██████ , and the prospect of any recovery for general unsecured creditors will be eliminated.


**BACKGROUND**

**I.      General Background**

12.      The Debtors operate in the high-value, low-price fitness industry, with 101 gyms located throughout New York, New Jersey, Massachusetts, Texas, Illinois, and California.[4]

---

[4]      *Declaration of Steven Shenker, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Decl."), Docket No. 2, ¶¶ 10, 15.

The Debtors were founded by Equinox (defined below) in 2011.[5]

13.    On August 12, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.  Since the Petition Date, the Debtors have (i) remained in possession of their assets and continue to operate and manage their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, and (ii) ████████████████████████████████ █████[6]

14.    As of the Petition Date, the Debtors' debts totaled approximately $284.8 million, consisting of (i) $161.5 million on account of the Prepetition Secured Debt (defined below), (ii) $103.5 million on account of the Equinox Loans (defined below), and (iii) approximately $19.8 million on account of other general unsecured claims.  Together with the New Money DIP Financing (defined below), the Debtors' aggregate debts currently total approximately $305.8 million.[7]

15.    On August 23, 2024, the U.S. Trustee appointed a five-member Committee consisting of:  (i) Johnson Health Tech NA, Inc.; (ii) Motionsoft, Inc.; (iii) FW IL-Riverside/Rivers Edge, LLC; (iv) 96 N. 10th Street Holdings LLC; and (v) GS FIT ILL-1 LLC.[8]  The Committee selected Kelley Drye & Warren LLP as its lead counsel and Morris James LLP as its Delaware co-counsel.  The Committee also selected Dundon Advisers LLC as its financial advisor.

---

[5]      *Id.*, ¶ 10, Ex. A.

[6]      Hurwitz Decl., ¶ 9.

[7]      *Id.*, ¶ 10.

[8]      Docket No. 109.

16.     On the Petition Date, the Debtors filed the Sale Motion, seeking authority to sell substantially all of their assets to the prevailing bidder in an auction process (the "Sale").[9]

17.     On September 10, 2024, the Debtors filed a notice designating Pinnacle US Holdings LLC (a subsidiary of PureGym Ltd. ("PureGym")) as a stalking horse bidder (the "Stalking Horse," and its bid, the "Stalking Horse Bid").[10]

18.     On September 18, 2024, the Court entered a final Order (the "DIP Order") authorizing the Debtors to obtain $73.5 million in postpetition financing (the "DIP Financing") from the Prepetition Secured Parties (defined below).[11]  The DIP Financing consists of $21 million of new money financing (the "New Money") and a rollup of $52.5 million (the "Roll-Up") of Prepetition Secured Debt (defined below).[12]  Pursuant to the DIP Order, the Debtors' ability to use cash is subject to a budget (the "DIP Budget").[13]

19.     On September 24, 2024, the Debtors filed a notice of their entry into a restructuring support agreement (as amended, the "RSA") with Varagon (defined below).[14] Pursuant to the RSA, the Debtors and Varagon agreed, *inter alia*, to pursue a chapter 11 plan that (i) delivers all of the Sale proceeds to Varagon on account of its prepetition secured claim, and (ii) provides no recovery to the Debtors' general unsecured creditors.[15]

---

[9]     Docket No. 81.

[10]    Docket No. 350.

[11]    Docket No. 393.

[12]    *Id.* at 2.

[13]    *Id.*, ¶ 4.

[14]    Docket Nos. 404, 483.

[15]    Docket No. 483, Ex. A at 4.

16999539/1

20.    On October 16, 2024, the Debtors filed a combined disclosure statement and plan of liquidation (the "DS and Plan") that implements the RSA.[16] If the Plan is confirmed, Varagon will receive all of the Sale proceeds, regardless of whether they were generated by assets that are unencumbered by their liens.[17]  Holders of general unsecured claims will receive no recovery.[18]

## II.    Equinox Dominates the Debtors

21.    Equinox Group (together with its insiders and affiliates, "Equinox") is the indirect owner of each of the Debtors.[19] In addition to Blink, Equinox directly or indirectly owns and operates health clubs under the Equinox and SoulCycle brands.[20]

████        █████████████████████████

22.    Harvey Spevak ("Spevak") is the Executive Chairman and Managing Partner of Equinox.[21] ██████████████████████████████████

███████████████████████████████████████████████████

the "Board").[22] █████████████████████████████████████

████████  ███████████████████████████████        ████        The Committee does not know

---

[16]    Docket No. 502.

[17]    *Id.* at 20.

[18]    *Id.* at 21.

[19]    First Day Decl., ¶ 4.

[20]    *See* https://careers.equinox.com/about, last visited on October 20, 2024.

[21]    *See* https://www.linkedin.com/in/harvey-spevak-614a0914, last visited on October 20, 2024.

[22]    Gage Decl., Ex. 1, 2.

[23]    *Id.*, Ex. 1, 3.

[24]    *Id.*, Ex. 2.

██████████████, but Varagon was sufficiently concerned about Spevak to make his return to the

Debtors' management an event of default under the DIP Financing documents.[25]

23.    ████████████████████████████████



24.    ████████████████████████████████

25    Docket No. 13, Ex. A at 9.01(m).

26    Gage Decl., Ex. 4.

27    *Id.*

28    *Id.*, Ex. 3.

29    *Id.*, Ex. 5.

30    *Id.*, Ex. 6.

31    Hurwitz Decl., ¶ 11.

32    Gage Decl., Ex. 7.

33    *Id.*, Ex. 8.

34    *Id.*

35    *Id.*, Ex. 9.

16999539/1

25.    On June 23, 2024, Emanuel Pearlman was appointed to the Board as an independent director (the "Independent Director").[36] ███ ██████ ██ █████ ███
███████████████████████████████████████████████████

26.    On the Petition Date, Steven Shenker of Triple P RTS, LLC ("Portage") became the Debtors' Chief Restructuring Officer (the "CRO").[37] █████████████
██████████████████████████████

### B.    Control Through the TSA

27.    Equinox manages all of the Debtors' accounting, IT, payroll, human resources, and other back-office functions pursuant to a Transition Services Agreement, dated as of December 1, 2016 (as amended, the "Original TSA").[38] Pursuant to the Original TSA, ██████
███████████████████████[39]

28.    The Original TSA ████████████████████████████
███████████████████ █████████████████████████
████████████████████████████ █████

29.    ███████████████████████████████
██████████████████ ██████████████████████
██████████████████████████ █

---

[36]    First Day Decl., ¶ 38.

[37]    *Id.*, ¶ 1.

[38]    *Id.*, ¶ 22; Gage Decl., Ex. 10.

[39]    Gage Decl., ¶ 16.

[40]    *Id.*, Ex. 10, § 4.1.

[41]    *Id.*, Ex. 10, Schedule 4.

[42]    Hurwitz Decl. ¶ 12.

[43]    Gage Decl., ¶ 16.

30.    ██████████████████████████████████████████████

████████████████████████████████████████████  ████  ██████

████████████████████████████████████████████████████████

████████████████  ████████

31.    On February 5, 2024, presumably in anticipation of an eventual bankruptcy, the Debtors and Equinox entered into a First Amendment to Transition Services Agreement (the "First Amendment").[46]  The First Amendment ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

32.    On August 2, 2024 ████████████████████████████  the Debtors and Equinox amended the Original TSA again (the "Second Amendment"[48] and together with the First Amendment, the "TSA Amendments").   Pursuant to the Second Amendment, ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[44]    The Debtors have not yet provided this information to the Committee.  *See* Hurwitz Decl., ¶ 13.

[45]    Hurwitz Decl., ¶ 12.

[46]    Gage Decl., Ex. 11.  The Committee does not know why the Original TSA was amended on February 5, 2024, but Equinox closed a comprehensive $1.8 billion refinancing of itself (but not the Debtors) shortly thereafter on March 8, 2024.  *See* https://www.prnewswire.com/news-releases/equinox-group-secures-strategic-investments-to-refinance-existing-loans-and-support-growth-as-the-global-leader-in-high-performance-living-302084332.html, last visited on October 22, 2024.

[47]    *Id.*, §§ 1(b), (a), (c).

[48]    Gage Decl., Ex. 12.

16999539/1

████████████████████████ ■ Equinox is using ███████████████████████████

███████████████ to compel an insider release under the Sale.

33.    The Committee is unable to identify what benefits, if any, the Debtors obtained in exchange for augmenting Equinox's leverage over them under the TSA Amendments.

**C.    Other ███████████████**

34.    █████████████████████████████████████████, the Debtors entered into several insider transactions that raise significant questions warranting additional scrutiny.  Based on the information obtained to date, ██████████████████████ ████████████████████████████████████.

■ ████████████████████████████████

35.    On November 8, 2018, the Debtors entered into a Credit and Guaranty Agreement (the "Prepetition Credit Agreement") with Varagon Capital Partners Agent, LLC ("Varagon"), as administrative agent, CIT Bank, N.A., as revolving agent, and various lenders (collectively, the "Prepetition Secured Parties").[50]  The Debtors borrowed $145 million under the Prepetition Credit Agreement (the "Prepetition Secured Debt").[51]  The Prepetition Secured Debt is secured by first priority liens on substantially all of the Debtors' assets,[52] but not commercial tort claims or avoidance actions.

36.    The Prepetition Secured Debt was used ████████████████████████

████████████████████████████████████████████████████████████

---

[49]    *Id.*, §§ 1(a)-(c), 1(d), 1(b).

[50]    Docket No. 13, ¶ 6.

[51]    *Id.*

[52]    *Id.*, ¶ 7.

███████████████████████████████████████████████████████████████

████████████████████████████

37.     Neither the Debtors nor Equinox have produced a full set of records

regarding ████████████████████████ Among other deficiencies, the Committee has not

received documentation of ████████████████████████████████████ ████████

**ii.   Alshaya Venture:** █ ████████████████████

38.     ██████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████ ██████████████████ (the "Alshaya Venture") to

operate Equinox, SoulCycle and Blink-branded gyms in the Middle East.[57]

39.     The Debtors produced ████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████ ████████████████████████

██████████████████████████ ███████████████████████████

████████████████████████████ ███████████████████████

███████████████████████████████████████████████████████████████

[53]     Gage Decl., Ex. 13.  The Debtors ████████████████████████████████
         █████████████████████████████

[54]     Gage Decl., Ex. 14.

[55]     *Id.*, ¶ 23.

[56]     *Id.*, Ex. 15, 16.

[57]     *See*     https://prod.alshaya.com/sa/en/media-centre/alshaya-news/equinox-partners-with-alshaya-group-to-bring-portfolio-of-influential-lifestyle-brands-to-the-middle-east/, last visited on October 20, 2024.

[58]     Gage Decl. ¶ 27.

[59]     Hurwitz Decl., Ex. 1.

[60]     Gage Decl., ¶ 27.

16999539/1

████████████████████████████████████████████ While the Debtors disclosed the Alshaya Agreements on their schedules of executory contracts, their schedules of assets make no mention of the Alshaya Ventures.[62]

40.    The Committee does not know ████████████████████████████

███████████████████████ Neither the Debtors nor Equinox have provided an explanation.[63]

### iii.    Equinox "Loans":  $103 Million

41.    The Prepetition Credit Agreement ███████████████████████

████████████████████ ████████

42.    ████████████████████████████████

█████████████████████████████ ██████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████ ██

43.    ███████████████████████████████

███████████████████████████████████ █

██████████████████████████████████████████

███████████████ ██████████████████████████

<hr>

[61]    *Id.*, Ex. 17 at 4.

[62]    *See* Docket No. 298 at 28, 14-20.

[63]    Query whether this is related to Equinox's $1.8 billion refinancing in March 2024.

[64]    *Id.*, ¶ 24.

[65]    *Id.*, Ex. 18.

[66]    *Id.*, § 5(b).

[67]    *Id.*, Ex. 19.

[68]    *Id.*, § 3.e.

under a Subordinated Unsecured Revolving Promissory Note (the "First Equinox Loan").[69]

44. ███████████████████████████████████████████

███████████████████████████████████████████ ███████████

███████████████████████████████████████████████

███████████████████████████ On November 15, 2022, Equinox "lent" the Debtors

up to $55 million (later increased to $67.5 million) pursuant to a Subordinated Unsecured

Revolving Promissory Note (the "Second Equinox Loan," and together with the First Equinox

Loan, the "Equinox Loans").[72]

45. The Equinox Loans ██████████████████████████ ███

████████████████████ █████████████████ subordinated to the Prepetition

Secured Debt.[75] The Second Equinox Loan █████████████████████████████████

███████████

46. As of the Petition Date, the Debtors contend they owe Equinox

approximately $103.5 million on account of the Equinox Loans.[77]

iv. ████████████████████

47. In 2022, the Debtors attempted to address their overleveraged balance sheet

---

[69]    *Id.*, Ex. 20.

[70]    *Id.*, Ex. 21.

[71]    *Id.*, § 3.e.

[72]    *Id.*, Ex. 22.

[73]    *Id.*, Ex. 20, § 2(c); Ex. 22, § 2(c).

[74]    *Id.*

[75]    DIP Order, ¶ E(v); Gage Decl., Ex. 23.

[76]    Gage Decl., Ex. 23, § 2(h).

[77]    First Day Decl., ¶ 23.

out-of-court.[78]  They engaged ████████████████████ an investment bank, to conduct a marketing process.[79]  They also engaged a real estate advisor to try and renegotiate their lease portfolio.[80]  According to the Debtors, they did not receive any actionable offers for their business, and lease concessions were insufficient to address their fundamental financial challenges.[81]

48.    The Committee requested documents from the Debtors and Equinox regarding the 2022 marketing process.[82]  In response, the Debtors produced two documents:



Equinox produced one document:

49.    The Committee does not yet know

.

III.    **Pre-Filing Corporate Governance Changes**

50.    In mid-June 2024, the Debtors engaged a slate of restructuring advisors, including (i) Portage, as financial advisor, (ii) Moelis & Company LLC ("Moelis"), as investment

---

[78]    First Day Decl., ¶ 34.

[79]    Gage Decl., ¶ 34-37.

[80]    First Day Decl., ¶ 34.

[81]    *Id.*

[82]    Gage Decl., Ex. 14 at 29.

[83]    *Id.*, Ex. 24.

[84]    *Id.*, Ex. 25.

[85]    *Id.*, Ex. 26.

banker, and (iii) Young Conaway Stargatt & Taylor, LLP ("YCST," and together with Portage and Moelis, the "Outside Professionals"), as restructuring counsel.[86]

51.    Shortly    after    the    Outside    Professionals    were    engaged, ▮▮ ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (iii) appointed the Independent Director to the Board,[89] and (iv) appointed the Independent Director as the sole member of a Restructuring Committee charged with decision making for the Debtors' restructuring efforts.[90]

52.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ ▮▮▮▮

## IV.    The Bankruptcy Filing

53.    In addition to implementing the corporate governance changes described

---

[86]    First Day Decl., ¶¶ 13, 35.

[87]    Gage Decl., ¶¶ 38-39.

[88]    *Id.*, Ex. 3.

[89]    First Day Decl., ¶ 38.

[90]    *Id.*

[91]    Gage Decl., ¶ 38.

[92]    *Id.*, Ex. 27. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮

[93]    *Id.*, Ex. 27. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮

above, during the Pre-Filing Period, the Outside Professionals prepared the Debtors to file these cases if an out-of-court solution did not materialize.[94] ███████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████

54.    During the Pre-Filing Period, the Outside Professionals, *inter alia*: (i) initiated a marketing process to sell the Debtors' business as a going concern, (ii) prepared documents for the chapter 11 filing, (iii) commenced an investigation of potential estate claims against their directors, officers, employees, lenders, stockholders and advisors arising in or after 2021 (the "Debtors' Investigation"),[96] (iv) negotiated DIP Financing with Varagon,[97] and (v) negotiated the Second Amendment.[98]

55.    The Debtors' Investigation is ongoing.[99] ██████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████

56.    ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████.

---

[94]    First Day Decl., ¶¶ 35-37.

[95]    Gage Decl., Ex. 6 at 10.

[96]    Docket No. 502, § 3.3(c).

[97]    First Day Decl. ¶ 22.

[98]    *See* ¶ 32, *supra.*

[99]    Docket No. 502, § 3.3(c).

57.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████

## V.    <u>The Sale</u>

58.    The Debtors filed the Sale Motion on the Petition Date and designated PureGym as the Stalking Horse on September 10, 2024.[102]

59.    Pursuant to the Stalking Horse Bid, the Stalking Horse agreed to acquire ██ ███████████████████████ along with other assets required to operate the Debtors' business at the acquired locations for a cash price of $105 million.[103]  The Stalking Horse's asset purchase agreement (the "<u>Stalking Horse APA</u>") is conditioned on the Stalking Horse's entry into a new TSA with Equinox (the "<u>Stalking Horse TSA</u>").[104] ████████████████████████████ ███████████████████████████

60.    Pursuant to the bidding procedures, ███████████████████████ ████████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████ ██████████ ████████████████████████████████████████████████████████████████████████

---

[100]    *See* Gage Decl., Ex. 27 at 19.

[101]    *Id.* at 20.

[102]    Docket Nos. 81, 350.

[103]    Docket No. 350 at 4.

[104]    *Id.*, Ex. B, §§ 6.11, 7.1(i); Gage Decl., Ex. 28.

[105]    Gage Decl., Ex. 28, §  4.1(a).

[106]    Gage Decl., Ex. 29.



61.

VI.

62.

63.

64.

[107]    Hurwitz Decl., ¶ 15.

[108]    *Id.*

[109]    *Id.*, ¶ 16.

[110]    Gage Decl., Ex. 30-34.

[111]    *Id.*

[112]    *Id.*, Ex. 30.

[113]    *Id.*, Ex. 33.

[114]    *Id.*, ¶ 43, Ex. 30-34.

[115]    *Id.*, Ex. 31.



65.

## VII.    **Discovery Efforts**

66.    Upon its formation, the Committee initiated an investigation of the Debtors, Equinox, Varagon and other parties.  Beginning on September 3, 2024, the Committee issued discovery requests to the Debtors, Equinox and Varagon and held various meet and confer sessions with each of those parties.[120]    While the Committee has received some documents from the Debtors, Equinox and Varagon, many requests remain outstanding.[121]  The Committee continues to work with the producing parties to obtain requested information.[122]

67.    The

---

[116]    *Id.*, Ex. 30, 32.

[117]    *Id.*, Ex. 33.

[118]    *Id.*, Ex. 34.

[119]    *See* Docket 350, Ex. B, §§ 6.11; 7.1(i); Gage Decl., Ex. 28, § 7.2(c).

[120]    Gage Decl., ¶ 4; Gage Decl., Ex. 14 at 1.

[121]    *Id.*, ¶ 4.

[122]    *Id.*



68. ███████████████████████████████████████████

69. ██████████████████████████████████████████

## XIII.  <u>Identified Claims</u>

70.    Notwithstanding the discovery roadblocks it has encountered, the Committee has identified over ███████████ of estate claims against Equinox and other insiders the Debtors propose to release through the Sale (collectively, the "<u>Insider Claims</u>").  Ongoing

---

123        *Id.*

124        *Id.*

125        *Id.*

126        Gage Decl., ¶ 6.

127        *Id.*

128        *Id.*

16999539/1

discovery may reveal more.  If the Debtors and Equinox have their way, every single one of the Insider Claims will be released under the Sale.

A.    **Alter Ego**

71.    Under Delaware law, a parent is liable for its subsidiary's debts if (i) it controls and operates with its subsidiary as a single entity, and (ii) abuses the subsidiary to perpetrate a fraud or injustice.[129]  While alter ego claims carry a high burden of proof,[130] the Committee's nascent investigation indicates the estates have a veil-piercing claim against Equinox.[131]

72.



B.    **D&O**

73.    Officers and directors owe their company (and the company's creditors when the company is insolvent) the fiduciary duties of care and loyalty.[134]  When those duties are

---

[129]    *See, e.g.*, *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 470 (D. Del. 2010).

[130]    *See id.*

[131]    *See, e.g.*, *In re Maxus Energy Corp.*, 571 B.R. 650, 656 (Bankr. D. Del. 2017) (holding alter ego claims are estate causes of action).

[132]    Gage Decl., Ex. 14 at 1.

[133]    *See, e.g.*, *Blair*, 720 F. Supp. 2d at 472-73 (finding plaintiff stated a colorable alter ego claim on similar facts).

[134]    *See, e.g.*, *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 179 (Del. 1986).

breached, officers and directors are liable for resulting damages.[135]  Claims against officers and directors for breach of fiduciary duty (collectively, "D&O Claims") are estate causes of action that often are the sole source of recovery for a debtor's general unsecured creditors.[136]

74.    Numerous facts indicate valuable D&O Claims exist here: ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████

### C.    Fraudulent Transfer

75.    Section 544(b) of the Bankruptcy Code allows a trustee to avoid prepetition transfers under applicable state law.[137]  Under New York's[138] Uniform Fraudulent Conveyance Act ("NY UFCA"),[139] a transfer is avoidable if (i) the transferor was insolvent, and (ii) the transfer

---

[135]    *See HOMF II Inv. Corp. v. Altenberg*, No. CV 2017-0293-JTL, 2020 WL 2529806, at *48 (Del. Ch. May 19, 2020), *aff'd*, 263 A.3d 1013 (Del. 2021).

[136]    *See, e.g., In re Wilton Armadale, Inc.*, 968 F.3d 273, 278 (3d Cir. 2020) (recognizing that D&O Claims are estate causes of action).

[137]    11 U.S.C. § 544(b).

[138]    New York law applies because Equinox and the Debtors are headquartered in NY.  *Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd.*, No. 94 CIV. 5620 (JFK), 1999 WL 64283, at *6 (S.D.N.Y. Feb. 8, 1999).

[139]    N.Y. Debt. & Cred. Law §§ 273-276.  New York enacted a form of the Uniform Voidable Transactions Act ("UVTA") on April 4, 2020, which replaced the NY UFCA.  The UVTA, however, is not retroactive.  The NY UFCA applies to transactions that occurred before April 4, 2020.  *See, e.g., Geo-Grp. Commc'ns, Inc. v. Chopra*, No. 15 CIV. 1756 (KPF), 2023 WL 6235160, at *3 n.2 (S.D.N.Y. Sept. 26, 2023).

was made "without [] fair consideration."[140]  Transfers made before April 4, 2020 are governed by the NY UFCA and carry a six-year statute of limitations.[141]  ████████████████████

████████████████████████████████████████████████████

████████████████████

### D.    <u>Insider Preferences</u>

76.    Section 547(b) of the Bankruptcy Code allows a trustee to avoid preferential payments made to a debtor's insiders within one year of the petition date.[142]  During the year before the Petition Date, the Debtors paid Equinox approximately $12 million under the Original TSA,[143] including over $6.5 million during the 90 days before the Petition Date when the Debtors were presumptively insolvent.[144]  The estates have claims to avoid those payments.

### E.    <u>Recharacterization</u>

77.    A bankruptcy court can recharacterize a debt as equity "where the circumstances show that [the] debt transaction was actually [intended to be an] equity contribution."[145]  The parties' intent "may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstance."[146]

---

[140]    NY Debt. & Cred. Law § 273 (2019).

[141]    *See* N.Y. C.P.L.R. § 213(1) (McKinney); *see also Wall Street Assoc. v. Brodsky*, 684 N.Y.S.2d 244, 248 (1st Dep't 1999).

[142]    *See* 11 U.S.C. § 547(b).

[143]    Hurwitz Decl., ¶ 12.

[144]    *Id.*; 11 U.S.C. § 547(f).

[145]    *See, e.g., In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 747–48 (6th Cir. 2001); *In re Furniture Factory Ultimate Holding, L.P.*, No. 20-12816 (JKS), 2023 WL 5662747, at *21 (Bankr. D. Del. Aug. 31, 2023).

[146]    *See, e.g., Furniture Factor,* 2023 WL 5662747 at *21.

78.    To determine whether to recharacterize a debt as equity, courts examine several factors, none of which is dispositive.[147]  Factors supporting recharacterization include:  the names given to the transaction, whether the economic terms are consistent with a commercial loan, whether the debt is deeply subordinated, and whether the debt is convertible to equity at the lender's option.[148]  Here, several hallmarks of the Equinox Loans support a recharacterization claim:  ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

### F.    Equitable Subordination

79.    Section 510(c) of the Bankruptcy Code allows a court to subordinate a claim on equitable grounds.[150]  To equitably subordinate a claim:  (i) the creditor must have engaged in inequitable conduct, (ii) the conduct must have injured the debtor's creditors or given the creditor an unfair advantage, and (iii) subordinating the claim must not be inconsistent with the Bankruptcy Code.[151]  It is not necessary that the inequitable conduct relate to the claim being subordinated.[152]  When the claim is held by an insider, the degree of inequitable conduct required to subordinate the claim is lower.[153]  The Equinox Loans are subject to equitable subordination based on Equinox's unfair, improper conduct described throughout this Objection.

---

[147]    *See id.* at 22.

[148]    *See id.*

[149]    *See, e.g., AutoStyle Plastics*, 269 F.3d at at 750-53.

[150]    *See* 11 U.S.C. § 510(c).

[151]    *See, e.g., In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 411 (3d Cir. 2009).

[152]    *See id.* at 412.

[153]    *See id.*

## **OBJECTION**

### I.     **The Sale Does Not Withstand Heightened Scrutiny**

#### A.     **Heightened Scrutiny Requires an Insider Investigation**

80.     When a section 363 sale benefits an insider, the transaction is not subject to a deferential business judgement standard.[154]  Insider-driven sales are subject to heightened scrutiny.[155]  Close scrutiny is also required when a debtor seeks to sell substantially all of its assets on an expedited basis, outside of a plan.[156]

81.     Heightened scrutiny applies to insider transactions because dominant shareholders have strong incentives to take unfair advantage of non-insiders in a sale process.[157] When a sale includes insider releases, bankruptcy courts expect that potential insider claims will be investigated by an estate fiduciary before the sale is approved.[158]

82.     A pre-release investigation is necessary for a bankruptcy court to "make an informed decision on the relationship of the sale price to the value of the assets being sold."[159] Without a meaningful investigation of released claims, a bankruptcy court cannot determine whether a purchase price is fair, which is the lynchpin for a sale or release of insider claims to

---

[154]     *See, e.g., In re AIG Fin. Prods. Corp.*, 651 B.R. 463, 476 (Bankr. D. Del. 2023); *Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 93 (Bankr. D. Del. 2009); *Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 28 (S.D.N.Y. 2005).

[155]     *See, e.g., AIG Fin. Prods.*, 651 B.R. at 476; *Crown Vill. Farm, LLC,* 415 B.R. at 93; *Enron Corp*, 335 B.R. at 28.

[156]     *See In re Exaeris, Inc.*, 380 B.R 741, 744 (Bankr. D. Del. 2008); *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896, *27-28 (Bankr. D. N.J. Mar. 26, 2008); *In re President Casinos, Inc.*, 314 B.R. 784, 785 (Bankr. E.D. Mo. 2004); *In re Family Christian, LLC*, 533 B.R. 600, 625 (Bankr. W.D. Mich. 2015).

[157]     *See In re Wingspread Corp.*, 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988) (holding that insider transactions "are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse").

[158]     *See Exaeris*, 380 B.R. at 745, 746; *Family Christian,* 533 B.R. at 625.

[159]     *Exaeris*, 380 B.R. at 744-45.

survive heightened scrutiny.[160]  In the absence of an investigation, courts rightfully have refused to approve the *de facto* release of insiders under a sale.[161]

83.     For example, in *In re Exaeris*, the debtor sought to approve an expedited insider sale that included a *de facto* release of insider claims.[162]  The committee supported the sale, which was the only going concern option available to the debtor.[163]  No party had investigated the nature and potential value of insider claims the estates would relinquish under the sale.[164]  As a result, even facing conversion, Judge Gross held he could not approve the sale because he could not find that the purchase price fairly compensated the estate for the assets being sold, including the insider release.[165]

84.     Similarly, in *In re Family Christian, LLC*, the debtor sought to sell substantially all of its assets to the prevailing bidder at a competitive auction.[166]  The United States Trustee and a creditor objected to the transfer of insider claims, and the *de facto* release thereof, under the prevailing APA.[167]  Applying heightened scrutiny, the court did not approve the sale because, *inter alia*, the debtor failed to investigate insider claims, thereby making it impossible for the court to determine the sale price was fair.[168]

---

[160]     *See Family Christian*, 533 B.R. at 628.

[161]     *See Exaeris*, 380 B.R. at 747; *Family Christian*, 533 B.R. at 632.

[162]     *See Exaeris*, 380 B.R. at 745.

[163]     *See id.* at 744.

[164]     *See id.* at 745-46.

[165]     *See id.* at 745.

[166]     *See Family Christian*, 533 B.R. at 604-05.

[167]     *See id.* at 617.

[168]     *See id.* at 628-30, 31.

**B.**     **Limited Investigation Has Uncovered** ███████ **of Insider Claims**

85.     The Debtors cannot meet their heightened burden to justify the release of the Insider Claims under the Stalking Horse APA and the Stalking Horse TSA.  As detailed above, the Committee has uncovered numerous Insider Claims against Equinox and others resulting from ███████████████████████████████████.  The Insider Claims are valuable and offer a meaningful prospect for recovery to general unsecured creditors who otherwise will receive nothing in these cases.

86.     And those are the Insider Claims the Committee has identified so far, despite the troubling discovery challenges described above.  The Committee has open document requests to the Debtors, Equinox ███████████████████████████████ and Varagon, and it will take depositions.  The Committee's ongoing discovery is likely to bolster the identified Insider Claims and illuminate others.

87.     The Debtors' Investigation cannot supplant the Committee's independent investigation. ████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
████████████ ██

88.     The Debtors' Investigation is also artificially limited to conduct that occurred between 2021 and the Petition Date.  As a result, the Debtors are not investigating ██ ████████████████████████████████████████ or other conduct for which the three-year statute of limitations for D&O Claims might be tolled.

---

169     *See, e.g.*, *Exaeris*, 380 B.R. at 744, 745 (refusing to approve a sale with an insider release when the Committee's investigation into such claims was performed "with access to a very small universe of documents, and in [a] very short and insufficient time dictated by [the insider]").

89.    As a result of these failures, the Committee is the only fiduciary capable of investigating and fairly valuing the Insider Claims.   Until the Committee's investigation is complete, the Court should not release the Insider Claims.[170]

## II.    An Insider Release is Not Necessary for a Going Concern Sale

90.    The Debtors will tell you ████████████████████████

████████████████████████████████████████████

████████    Not true.   ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

91.    ████████████████████████████████

████████████████████████████████████████████

████████████████████████████They simply refuse to use them.

92.    Pursuant to the First Amendment, Equinox must perform under the Original TSA through December 31, 2024.   ████████████████████████

████████████████████████████████████████████

████████████████████████████████    ██████    ████

██████████████    ██    ████████████████████████

██████████████████████    ██

---

[170]    *See Exaeris*, 380 B.R. at 746; *Family Christian*, 533 B.R. at 622, 628-29.

[171]    Gage Decl., ¶ 49, Ex. 35.

[172]    *Id.*, Ex. 36.

[173]    *Id.*, Ex. 28.

93.    

94.

two more Insider Claims.  The TSA Amendments are avoidable because the Debtors did not receive reasonably equivalent value in exchange for entering into them.[177]    All benefits flowed to Equinox at the Debtors' expense.[178]

---

[174]    *See, e.g.*, *Whitestone REIT Operating P'ship, L.P. v. Pillarstone Cap. REIT*, No. 2022-0607-LWW, 2024 WL 274228, at *6 (Del. Ch. Jan. 25, 2024) (recognizing the implied covenant of good faith and fair dealing that is inherent in all contracts under Delaware law).

[175]    Hurwitz Decl., ¶ 15.

[176]    *Id.*

[177]    *See* 11 U.S.C. § 548(a)(1)(B) (authorizing a trustee to avoid constructively fraudulent transfers made within two years of the petition date).

[178]    *See* ¶¶ 31-33, *supra*.

[179]    *See, e.g.*, 11 U.S.C. § 362(d); *In re Carroll*, 903 F.2d 1266, 1270 (9th Cir. 1990) (stay relief is required to terminate an executory contract); *In re AmeriFirst Fin., Inc.*, No. 23-11240, 2024 WL 2965215, at *2 (Bankr. D. Del. June 12, 2024) (court must balance the relative harm to the debtor and the non-debtor party to assess whether cause exists to lift the stay).

-31-

95.     The Debtors did not investigate, ███████████████████

████████████████████████████████████████████████████████

███████████████████████████████████. Whatever the explanation,

the Debtors cannot release Insider Claims under the Sale until the Committee and the Court know

more about them.[180]

## III.   Escrow Proceeds Pending Allocation

96.     If the Committee's Objection is not resolved by the Sale Hearing and a *de facto* release of Equinox and others is necessary to close a going concern Sale, the Court should only allow the Debtors to use Sale proceeds to repay the New Money portion of the DIP Financing. All other Sale proceeds should be escrowed until the value of Insider Claims is determined and properly allocated to general unsecured creditors.

97.     The Committee acknowledges the DIP Financing is secured by a first priority lien on estates causes of action, including Insider Claims.[181]  The Committee also acknowledges the New Money is not subject to Challenge (as defined in the DIP Order).[182]  But the Roll-Up is.[183]

98.     Challenges under the DIP Order include, *inter alia*, any (i) challenge to Vargaon's right to credit bid the Roll-Up under section 363(k) of the Bankruptcy Code, and ██████████████████████████████████████ ██  The Committee

---

[180]     *See Exaeris*, 380 B.R. at 746; *Family Christian*, 533 B.R. at 628-29.

[181]     DIP Order, ¶ 7.

[182]     *Id.*, ¶ F(iii).

[183]     *Id.*

[184]     *Id.*, ¶¶ 12, 24, 25.

intends to raise those Challenges (and others) by the end of the Challenge Period (as defined in the DIP Order).

99.     Varagon is not entitled to payment of the Roll-Up until the Committee's Challenges are resolved.  Except for its *pro rata* recovery on any deficiency claim, Varagon is not entitled to payment from the proceeds of Insider Claims on account the portion of Prepetition Secured Debt excluded from the Roll-Up.

100.     The Sale proceeds in excess of New Money should be escrowed until the Court determines the value of Insider Claims and the appropriate allocation thereof under the Bankruptcy Code.

## IV.     Limit Varagon's Right to Credit Bid

101.     Section 363(k) of the Bankruptcy Code allows a secured creditor to credit bid the amount of its debt to acquire its collateral (but not unencumbered assets) in a bankruptcy sale.[185]  The right to credit bid is not absolute.  A bankruptcy court can limit a secured creditor's right to credit bid "for cause."[186]  Cause to limit a credit bid exists when (i) a lender has engaged in inequitable conduct, and/or (ii) a credit bid would chill bidding.[187]

102.     The Court should limit Varagon's ability to credit bid the Roll-Up against Insider Claims.  ████████████████████████████████████████

████████████████████████████████████████████████████████

███████  ████  ██████████████████████████  ████  ███████████

---

[185]     *See* 11 U.S.C. § 363(k).

[186]     *See id.*

[187]     *See, e.g., In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 61 (Bankr. D. Del. 2014) (cause exists to limit a secured creditor's right to credit bid if necessary to foster competitive bidding or to remedy a lender's inequitable conduct).

[188]     *See* ¶¶ 62-65, *supra.*

[189]     *See* ¶ 65, *supra.*

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

103.   ██████████████████████████████████████████████

████████████████████████████████████████████████   ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

## V.    <u>Preserve Section 363(n) Claims</u> ██████████████████████████

104.   ██████████████████████████████████████████████

███████████████████████████████████████   Section 363(n) prohibits agreements

between potential bidders to control the price of estate assets in a bankruptcy sale process.[190]

105.   The Bankruptcy Code provides two remedies for collusion:  (i) avoid the

sale, or (ii) allow the estate to sue the colluding parties for damages.[191]  By offering alternate

remedies, bankruptcy courts are able to approve a going concern sale to an innocent buyer on a

final, unavoidable basis and simultaneously hold colluding parties to account for damages caused

by their improper conduct.

106.   ██████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[190]   *See* 11 U.S.C. § 363(n).

[191]   *See id.  See also In re American Paper Mills of Vermont, Inc.*, 322 B.R. 84, 90 (Bankr. D. Vt. 2004) (recognizing section 363(n) provides alternate remedies).

████████████████████████████████████████████

███████████████

107.    ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

108.    ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

**VI.    No Section 363(m) Finding** ████████████████████████████

109.    ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

110.    ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

192 ██████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████

16999539/1

VII.    **Other Objections**

111.    In addition to the Committee's objections regarding the improper release of Insider Claims, the following provisions of the Stalking Horse APA and/or proposed Sale Order are also objectionable or require clarification:

- <u>Member Lists</u>:  It is unclear whether the Stalking Horse is acquiring member lists for excluded locations.  Member lists for locations the Stalking Horse is not acquiring should remain with the estates.

- <u>Avoidance Claims Against Non-Go Forward Creditors</u>: It is unclear whether the Stalking Horse is acquiring avoidance claims against creditors whose relationships will not continue with the Stalking Horse.  The Stalking Horse should only acquire claims against non-insider parties with which it will do business.  Avoidance actions against non-go forward creditors should remain with the estates.

- <u>Insurance Claims</u>: The Stalking Horse APA provides that the Stalking Horse will acquire insurance claims related to Acquired Assets.  It is unclear whether that provision will convey the Debtors' rights under their D&O policy to the Stalking Horse.  The Stalking Horse should not acquire any claims against the Debtors' D&O policy, the proceeds of which should remain with the estates and provide coverage for all D&O Claims.

- <u>Scope of the Equinox Release</u>.  It is unclear whether Equinox's *de facto* release includes former Equinox personnel.  While the Committee believes no Equinox party should be released under the Sale, the Stalking Horse Bid should clearly define the scope of its proposed insider release.

- <u>Designation Rights</u>.  Pursuant to the Stalking Horse APA, the Stalking Horse is not obligated to pay any amounts due under executory contracts and unexpired leases during the designation

---

193

16999539/1

rights period that result from the Debtors' fraud, willful misconduct or gross negligence.  Affected counterparties should not bear any risk of nonpayment during the designation rights period.  The provision limiting the Stalking Horse Bidder's liability should be removed from section 2.6(c)(iii) of the Stalking Horse APA.

- <u>Access to Records/Cooperation</u>: The Stalking Horse APA does not require the Stalking Horse to provide a post-confirmation representative access to books and records for claims reconciliation or the pursuit of estate causes of action post-closing.  The Stalking Horse should be required to provide standard cooperation regarding such matters.

## <u>CONCLUSION</u>

**WHEREFORE**, the Committee respectfully requests that the Court (i) deny the Sale Motion unless the Stalking Horse APA and Sale Order are modified as set forth herein; and (ii) grant such other and further relief as the Court deems just and proper.

Dated: October 22, 2024

**MORRIS JAMES LLP**

*/s/ Siena B. Cerra*
Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
Siena B. Cerra (DE Bar No. 7290)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: emonzo@morrisjames.com
          bkeilson@morrisjames.com
          scerra@morrisjames.com
-and-

**KELLEY DRYE & WARREN LLP**
Eric R. Wilson, Esq. (admitted *pro hac vice*)
Kristin S. Elliott, Esq. (admitted *pro hac vice*)
Andres Barajas, Esq. (admitted *pro hac vice*)
3 World Trade Center
New York, NY 10007
Telephone: (212) 808-7800
Facsimile: (212) 808-7897
E-mail: ewilson@kelleydrye.com
          kelliott@kelleydrye.com
          abarajas@kelleydrye.com

*Counsel to the Official Committee of Unsecured Creditors*

-38-

16999539/1