### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BLINK HOLDINGS, INC., *et al.*,[1] | Case No. 24-11686 (JKS) |
|  | (Jointly Administered) |
| Debtors. | **Ref. Docket Nos. 81, 348, 350 & 532** |

### DEBTORS' REPLY IN SUPPORT OF THE SALE MOTION AND IN
### RESPONSE TO THE SALE OBJECTION FILED BY THE COMMITTEE

The debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") hereby file this reply (this "**Reply**") in support of the *Debtors' Motion for Entry of Orders (I)(A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets, (C) Establishing Certain Assumption and Assignment Procedures and Approving Manner of Notice Thereof, and (D) Granting Related Relief; and (II)(A) Authorizing and Approving the Debtors' Entry into an Asset Purchase Agreement, (B) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (C) Approving the Assumption and Assignment of the Assumed Contracts, and (D) Granting Related Relief* [Docket No. 81] (the "**Sale Motion**"),[2] and in

---

[1] The last four digits of Blink Holdings, Inc.'s federal tax identification number are 6354. The mailing address for Blink Holdings, Inc. is 45 West 45th Street, 10th Floor, New York, New York 10036. Due to the large number of debtors in these chapter 11 cases, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/BlinkFitness, or by contacting the undersigned counsel for the Debtors.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion, the Stalking Horse APA, or the *Declaration of Steven Shenker, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 2] (the "**First Day Declaration**"), as the context indicates.

response to the objection [Docket No. 518] (the "**Committee Objection**") to the Sale Motion filed by the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "**Committee**").[3]

## PRELIMINARY STATEMENT

1.      The Debtors' extensive prepetition and postpetition marketing process has culminated in the highest and best bid with a well-financed strategic buyer—Pinnacle US Holdings LLC, a wholly owned subsidiary of PureGym Ltd., whose investors include Leonard Green & Partners and KKR & Co., Inc. (the "**Purchaser**")—that has (a) a proven track record for operating fitness clubs in the high value, low price market, largely abroad; (b) is represented by sophisticated advisors that have prepared and begun to implement an extensive plan to expeditiously and responsibly transition the Acquired Assets to a new ownership regime; (c) expended significant time, effort, and resources to diligence the Acquired Assets and understand the challenges and opportunities presented by the Debtors' business operations under the circumstances; and (d) committed to (i) honoring and otherwise satisfying significant obligations owed to the Debtors' existing vendors and contract counterparties, and (ii) employing substantially all of the Debtors' workforce, saving millions in potential WARN liability and preserving jobs.  The Committee would have this Court believe that the Debtors are spoiled for choice and are ignoring substantially equally viable alternative bids that would yield a plainly better outcome.  The Committee's position is belied by the facts and, frankly, is not true.

2.      At the auction, the Debtors engaged with two bidders for the Acquired Assets—the Purchaser and a well-known fitness brand and direct competitor with an extensive footprint in the

---

[3]      The Debtors received various formal objections and informal responses to the Sale Motion (including with respect to assumption and assignment of executory contracts and unexpired leases), the majority of which the Debtors have resolved or expect to resolve prior to the Sale Hearing.  Aside from certain contract assumption issues, only the Committee Objection remains unresolved as of the date hereof.

Debtors' existing markets ("**Bidder**")—in a grueling hybrid (in-person and Zoom) auction that lasted for nearly three full days.  The Debtors immediately engaged with the Bidder upon receipt of its bid on October 23, 2024 to provide input regarding infirmities with its bid.  Prior to and throughout the auction, the Debtors expended a supermajority of their effort to address myriad issues with the Bidder's bids related to deal structure, conditionality, and risk.[4]  Specifically, Bidder's bid raised substantial regulatory approval issues that, if borne out, could delay closing by months or years—well after the maturity date of the Debtors' postpetition financing— and burdening the Debtors' estates with protracted uncertainty, business operational risk, and costs. Throughout that process, the Debtors made clear that any conditionality and risk must be borne by the bidders, and not the Debtors and their estates.[5]  The Bidder's continued reluctance to remove such conditionality and risk monopolized the auction process, repeatedly delayed the auction, and threatened to hamper the auction process.

3.      To facilitate progress, after dedicating more than two days of the auction working with the Bidder to address its deal structure infirmities (which included substantial response delays by the Bidder, sometimes for hours or an entire day), the Debtors worked with both bidders to address issues with each of the bidders' proposals and established supplemental bidding rules, including a timeclock for submitting bids, to avoid further delays and to enable the bidding to proceed more effectively and efficiently.  Notwithstanding the Debtors' clear communication of

---

[4]     For example, as a workaround for certain vendor issues that posed execution risk and conditionality, Bidder proposed that the Debtors initiate litigation proceedings against one of their material vendors to turnover customer billing data—a act that would have, among other things, breached the terms of the bid Proposed by Purchaser and impacted the Debtors' business relationship with an important vendor), which delayed the auction further while the parties negotiated such a provision and the Debtors dutifully evaluated the potential consequences of the proposal.

[5]     It stands to reason that if deal conditionality and risk would preclude this Court's ability and willingness to approve a buyer as a stalking horse, the Debtors could not seek Court approval of a final transaction that includes such conditionality and risk.

these parameters on the record, and in spite of its clear understanding of the Debtors' concerns regarding the deal risks and conditions, Bidder was unable to timely submit an actionable bid on terms that were both higher and better than the Purchaser's bid.   Accordingly, Purchaser's bid (the "**Successful Bid**") was determined to be the best, most actionable bid, providing the Debtors' estates with more than $121 million in cash consideration ($16 million more than the Stalking Horse Bid), along with the assumption of approximately $13.1 million in liabilities, including approximately $6.5 in contract cure costs, and eliminating approximately $1.3 million in potential WARN liability, as noted above.

4.      Perhaps unsurprisingly, the Committee has actively worked to undermine the Successful Bid because it interferes with the Committee's strategy—preservation of claims against Equinox Holdings, Inc. ("**EHI**").  The Debtors currently operate under a shared services agreement with EHI, pursuant to which EHI provides the Debtors will all of their corporate back office and infrastructure necessary to operate the Debtors' business.[6]  The Successful Bidder requires a transition of such shared services for up to one year to enable a smooth transition of the business. Because the current TSA expires in December, it is the Debtors' understanding that EHI is unwilling to agree to a transition services agreement with any buyer unless such buyer provides EHI with certainty regarding any real or perceived claims that the estate may assert against EHI. Consequently, Purchaser's winning bid contemplates the purchase of any potential claims and causes of action against EHI.  In a desperate attempt to preserve claims that, for the reasons below, the Debtors do not believe exist, the Committee has repeatedly inserted itself into negotiations

---

[6]     EHI currently provides the Debtors with administrative and back-office services through that certain *Transition Services Agreement* (the "**Equinox TSA**"), by and between EHI and Debtor Blink Holdings, Inc., including payroll processing, accounts payable administration, tax compliance services, financial audit and reporting services, human resource administration (recruitment, benefits management, etc.), and technology management infrastructure and compliance.

with Bidder to manipulate the outcome of the auction, and has refused to acknowledge (or just ignored) the significant risks posed by each of the Bidder's bids, instead placing outsized importance on the headline purchase price of a bid that may never close (or at least will not close on a timeline required by the Debtors and their estates). It is unfortunate that, despite its purportedly full-throated support of this Court's approval of a going-concern sale transaction over all else, as stated in the Committee Objection, the Committee fails to seriously consider the closing risk, liability of the Debtors and their estates, and the consequences if the Bidder's bid is unable to close.[7]

5.      Despite what the Committee would have the Court believe, the Debtors worked tirelessly to facilitate a competitive auction process and drive value by working to secure an alternative bid that both accounted for the closing risk differential and that yielded the maximum potential recovery to the estates, which entailed repeated engagement with Bidder over several rounds of bidding and over the course of three days to resolve deficiencies in its bids. Ultimately, however, the Bidder was unwilling to submit a bid that resolved the conditionality and execution risk issues that the Debtors and their lenders made conspicuously clear. Bidder's recent submission of another bid proposal[8]—two days after the close of the auction for the Acquired Assets—is a Hail Mary strategy that the Debtors carefully reviewed, but ultimately had no alternative but to reject for two reasons. First, the auction process approved by this Court was clear and the Debtors provided Bidder with every opportunity to submit a higher and better bid.

---

[7]     Committee Obj. ¶ 1 ("The Committee supports a going concern sale of the Debtors' business to the highest and best bidder. Full stop.").

[8]     *See Supplemental Objection and Reservation of Rights of the Official Committee of Unsecured Creditors to the Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Entry into an Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (III) Approving the Assumption and Assignment of the Assumed Contracts, and (IV) Granting Related Relief* Ex. A [Docket No. 546].

Bidder chose not to remove provisions that the Debtors and their lenders required, and the auction closed.  The auction process is complete, and the Debtors submit that the bidding procedures approved by this Court and the integrity of the auction process (for this and other cases) requires that the Debtors and the Court not consider a post-auction bid from the Bidder who had a full and fair opportunity to bid at the auction with clear and conspicuous knowledge of the implications for not submitting a higher and better bid.  Second, and equally important, Bidder's post-auction bid still contains persistent defects that pose unacceptable closing and other risks for the Debtors, risks that were identified and made clear to the Bidder at the auction.

6.      Deal certainty is of paramount importance, and the Debtors' focus on ensuring that a transaction is viable and can promptly close is entirely consistent with the Debtors' fiduciary duties to stakeholders and the goal of maximizing and preserving value.  The Debtors must consider how to best transition their assets to preserve going concern value, preserve jobs, fund payroll, and satisfy vendor obligations, all while facing the precipice of a liquidity crisis in only five weeks.  On the other hand, the out-of-the-money Committee's gambit to focus blindly on speculative option value and derail the results of the closed auction (despite all the collateral benefits that a consummated sale would provide for employees, landlords, vendors, customers, and other parties who are within the Committee's constituency) ignores the risks thoughtfully considered by the Debtors and, unbelievably, jeopardizes the benefits to unsecured creditors proposed in the Purchaser's bid (including, without limitation, benefits that would be realized to vendors, employees, customers, landlords, and all other parties to whom the Committee owes fiduciary duties).  Further, the Purchaser has indicated that any engagement regarding alternative bids following the auction, which the Debtors believe would be contrary to the bidding procedures,

would risk derailing the Successful Bid. The Committee's uninformed position is woefully deficient and unable to upset the well-founded business judgment of the Debtors.

7.      The selection of the Purchaser's bid as the Successful Bid and the Sale of the Acquired Assets to the Purchaser are amply supported by the record and authorized by a special restructuring committee of the Debtors' board of directors, comprising an independent director (the "**Independent Director**") with extensive restructuring experience who actively participated in the process, attended the auction virtually, and engaged with, and relied on, the advice of the Debtors' professionals. The Court has ample evidence to approve the Sale to the Purchaser.

**<u>REPLY</u>**

**I.      The Court Should Approve the Sale**

        *A.      <u>The proposed Sale is the result of a lengthy and robust sale process.</u>*

8.      The Debtors have engaged in extensive efforts to market the Debtors' assets. Prior to the Petition Date, beginning in June 2024, the Debtors' investment banker, Moelis & Company LLC ("**Moelis**"), began actively marketing the Debtors' assets to a targeted group of potential purchasers by distributing confidentiality agreements (each, a "**Confidentiality Agreement**"), a confidential information memorandum, a high-level financial model, and an overview of certain operating performance. To further support these parties in advancing their diligence efforts, the Debtors provided parties with access to a virtual data room (the "**Data Room**") populated with information regarding, among other things, the Debtors' operations, lease portfolio, and revenue statistics, ensuring potential purchasers had access to the information needed for informed decision-making. The Debtors received several indications of interest with credible potential bidders, but ultimately determined that it was not feasible to transact quickly enough with any parties to avoid the filing of the Chapter 11 Cases.

9.    Following the Petition Date, the Debtors continued their marketing efforts, broadening their solicitation to more than 160 prospective strategic potential buyers including all outreach parties suggested by the Committee.   The Debtors entered into Confidentiality Agreements with 44 parties who, together with the parties who had executed Confidentiality Agreements during the prepetition marketing process, were provided access to the Data Room.  Of those, several strategic bidders conducted purposeful due diligence, which included reviewing the Debtors' financials, contracts, and engaging in multiple discussions with Moelis, the Debtors' counsel, and the Debtors' management personnel.   The Debtors and their professionals provided copious amounts of information to prospective bidders, including the Debtors' contracts, financial information, tax returns, and other business performance data.  The Debtors and their management personnel engaged in meetings with potential bidders, provided tours of facilities and access to key personnel, vendors, and landlords.   The Debtors also provided notice of the sale of the Acquired Assets to all parties in interest, including more than 443,000 members.

10.    On September 10, 2024, the Debtors filed that certain *Notice of Filing of Stalking Horse Supplement* [Docket No. 350], identifying the Purchaser as the Stalking Horse Bidder and attaching as an exhibit thereto an executed asset purchase agreement.  On September 20, 2024, the Court entered an order approving the Purchaser as the Stalking Horse Bidder.  *See* Docket No. 397.

11.    On October 23, 2024, two days after the Bid Deadline, which the Debtors extended for the Bidder at Bidder's request, Bidder submitted to the Debtors a bid package.[9]  Promptly thereafter, Debtors engaged with Bidder to address infirmities with the bid and clearly informed

---

[9]    The Debtors had requested that Bidder provide its form of bid package in advance of the Bid Deadline to ensure that the Debtors and their advisors would be able to review and provide comments and proposed revisions in advance of the Bid Deadline (and well in advance of the auction).  Bidder was unable to do so and, as set forth herein, was unable to comply with the Bid Deadline.

Bidder that any conditionality and closing risk would need to be remedied.  Bidder waited until October 27, 2024—the night before the auction commenced—to submit a revised bid, which did not address the issues that the Debtors had unequivocally identified.

12.     On October 28, 2024, the Debtors commenced an auction for the Acquired Assets, which lasted for nearly three full days.  Parties attended remotely and in person.  The bidders and the Debtors engaged in extensive arm's-length negotiations that involved each party, their representatives (including operational and executive management personnel), and discussions with regulatory counsel, contract counterparties, and the Consultation Parties.  The Debtors paused the auction proceeding repeatedly, for as long as an entire day, to remind the Bidder of, and to permit the Bidder to remedy, the risk and conditionality deficiencies in its bids, with a primary focus on eliminating conditions to closing, each time communicating specifically regarding the Debtors' concerns and potential solutions.

13.     The Debtors have at all times been focused on maximizing transaction value and ensuring transaction certainty.  The process utilized by the Debtors to market their assets is consistent with other marketing processes in similar chapter 11 cases, and was spearheaded by leading, experienced advisors—Moelis, Portage Point Partners, and Young Conaway Stargatt & Taylor LLP—who were all actively involved throughout, met regularly with and advised the Debtors' board and independent restructuring committee, and engaged with the Committee, the Debtors' lenders, prospective buyers, vendors, landlords, and other stakeholders, all to best position the Debtors to obtain the highest and/or best value for their assets.  Such process was performed in consultation with the Consultation Parties and ultimately led to a competitive auction process that generated an additional $16 million in value for the benefit of the Debtors' stakeholders.

B.  The Debtors have determined that the Successful Bid is the best offer for the Acquired Assets.

14.    After a full and fair marketing process, the Successful Bid was determined to be the best offer for the Debtors' assets.  Pursuant to the Successful Bid, the Purchaser will, among other things:

- preserve nearly 1,520 jobs;

- assume substantial liabilities, including deferred and unpaid rent obligations owed to landlords and employee-related obligations, thereby reducing potential priority and unsecured claims against the estates that would otherwise arise on account of unpaid vacation time and other obligations;

- avoid nearly $1.3 million in potential WARN liability;

- preserve business relationships with vendors and contract counterparties;

- honor membership agreements and obligations associated therewith;

- inject much needed capital into the Debtors' business, increasing the Debtors' business prospects for continued future success; and

- efficiently and timely close the sale transaction.

15.    The Sale will allow for the satisfaction of all administrative expense claims and maximize value for the estates.  Finally, in addition to the contract, employee, and other obligations that the Purchaser will be assuming the Purchaser is providing $121 million in cash as consideration for the Acquired Assets, all while providing a clear path to a prompt closing with minimal execution risk.

16.    To be clear, the Debtors received alternative bids for the Acquired Assets that included a purchaser price higher than the Successful Bid. [10]  However, as this Court well knows, a headline purchase price alone does not render a bid higher and better.  Prior to and throughout

---

[10]    See Suppl. Committee Obj. Ex. A.

the auction, the Independent Director and the Debtors' Chief Restructuring Officer consulted with their advisors to address and be informed regarding the relative risks of bids from both Purchaser and bidder. Specifically, the Debtors' independent fiduciaries consulted extensively with special anti-trust and regulatory counsel so that they were fully informed regarding the risks of any proposed transaction. As discussed above, the purported higher bids posed execution risk and attendant costs at levels that were unacceptable to the Debtors and their lenders, who are, given the value of *all* of the bids submitted for the Acquired Assets, the primary beneficiary of the sale proceeds.

17. When weighed against the substantial benefits provided by the Successful Bid and the correspondingly low execution risk posed thereby, the Debtors determined in their reasonable business judgment, after extensive consultation with their advisors, the Consultation Parties, and other parties in interest, that Successful Bid was the highest and best bids for the Debtors' assets, and that the Debtors were unwilling to burden the estate with the material risks of the Bidder's bids.

### C. *The Sale satisfies the standard for approval under § 363(b) of the Bankruptcy Code.*

18. The standard for approval of a sale outside the ordinary course of business is well settled. Under section 363(b) of the Bankruptcy Code, courts will require a debtor to show that "a sound business reason" justifies the sale. *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991). A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve and enhance the value of the assets for the debtor's estate, its creditors, or interest holders. *See, e.g.*, *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir.

1997) (stating that, in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

19.     Once a court determines that a valid business justification exists for a sale outside of the ordinary course of business, the court must determine whether (i) the debtor has provided adequate and reasonable notice; (ii) the sale will produce a fair and reasonable price; and (iii) the parties have acted in good faith. *See, e.g.*, *In re Pursuit Capital Mgmt., LLC*, Civ. No. 15-801-RGA, 2016 WL 5402735, at *4 n.10 (D. Del. Sept. 26, 2016); *Del. & Hudson Ry. Co.*, 124 B.R. at 176; *In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014); *In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012).

20.     "Generally, 'where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.'" *Filene's Basement*, 2014 WL 1713416, at *12 (quoting *In re MF Global, Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012)); *see also In re Johns–Manville Corp.*, 60 B.R. 612, 616 (Bankr.S.D.N.Y.1986). "'If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate; the burden of rebutting that presumption falls to parties opposing the transaction.'" *Filene's Basement*, 2014 WL 1713416, at *12 (quoting *MF Global*, 467 B.R. at 730).

21.     Here, the proposed Sale to the Purchaser easily satisfies the standard under section 363(b).  In light of the Debtors' liquidity constraints, a sale or other disposition of the Debtors' assets is the only viable option for preserving the Debtors' going-concern value for the benefit of all constituents and, as discussed above, the Successful Bid provides the best and most

certain opportunity to preserve that value.  Absent alternative funding sources, of which there are none, or approval of the Sale, the Debtors will run out of cash at the end of November 2024 and will be unable to fund payroll or satisfy other operating obligations.  All of the Debtors' more than 2,000 employees will lose their jobs, more than 80 landlords will lose tenants and a stream of income, and contract counterparties will be left holding substantial unpaid claims.  Most importantly, the Debtors' estates will be faced with a potential foreclosure or liquidation of the Debtors' business at fire sale values, significantly decreasing already discounted recoveries.  The Debtors' decision to accept the Successful Bid provides the Debtors and their stakeholders with a clear path to a value maximizing transaction that avoids a parade of horribles and contemplates a timeline that does not impair the Debtors' operations and preserves going concern value, and is therefore justified under the circumstances.

22.     *First*, the Debtors provided reasonable and adequate notice.  The Debtors provided notice to each party entitled to such notice in accordance with the Bidding Procedures and the Bidding Procedures Order.  *See* Docket Nos. 81 & 348.  Specifically, the Debtors provided notice of the Sale Motion, the Bidding Procedures, the Auction, the Sale Hearing, assumption and assignment of contracts, the proposed cure amounts related thereto, and the selection of the Purchaser as the Successful Bidder, all in accordance with the Court's prior orders.  *Id*.

23.     *Second*, the Successful Bid provides a fair price for the Acquired Assets.  The Debtors conducted an extensive marketing campaign designed to elicit the highest and best offers for the Debtors' assets.  The postpetition process was overseen by the Independent Director with the assistance of the Debtors' experienced professionals.  All of the bidders that submitted Qualified Bids were third parties unrelated to the Debtors who negotiated with the Debtors at arm's-length and with the benefit of counsel.  The Debtors will establish at the Sale Hearing

through appropriate evidence that the bid process was free from undue influence, that negotiations with bidders was extensive and at all times conducted at arms' length, and that all potential bidders had a full and fair opportunity to conduct diligence and bid on some or all the Debtors' assets.

24.     Further, prior to the filing of the Chapter 11 Cases (and certainly long before the Debtors received any bids regarding the Debtors' assets), the Debtors' restructuring committee (the "**Special Committee**"), of which the Independent Director is the sole member, caused the Debtors to conduct an investigation into potential legal claims that the estates may hold against the Debtors' directors, officers, and affiliates (the "**Investigation**"), and did not find evidence to support the pursuit of claims and causes of action against EHI or other of the Debtors' affiliates— the claims for which the Committee has attributed extraordinary value with barely any specificity or support.  Set forth on the chart attached hereto as **<u>Exhibit A</u>** (the "**Response Chart**"), the Debtors have responded to various of the Committee's sweeping allegations, which all amount to faintly-supported conjecture.

25.     *Third*, notwithstanding the Committee's unsubstantiated allegations regarding Equinox's alleged prepetition abuse of the Debtors, the Committee has not provided, and cannot provide, any evidence that the proposed Sale was negotiated in bad faith.  In fact, the Committee has conceded that the Purchaser engaged in the sale process in good faith, and that it would not object to a sale to the Purchaser on the grounds of bad faith.[11]

26.     In sum, a sound business purpose justifies the Sale of the Debtors' assets to the Purchaser, and the Court should not permit the Committee to derail a transaction that will continue

---

[11]     Committee Obj. ¶ 109 ("the Stalking Horse and Supreme Fitness have engaged in the auction process and are pursuing an acquisition of the Debtors in good faith. If the Debtors' assets are sold to either of those parties, the Committee has no objection to, and would fully support, a good faith finding in their favor").

the Debtors' business as a going concern, preserve jobs, eliminate or reduce liabilities, and maximize the value of the estates.

## II.     The Court Should Overrule the Committee Objection

27.      None of the arguments raised in the Committee Objection provides a basis to reject the Successful Bid, and for the reasons set forth above, the Sale should be approved.  Nevertheless, several of the Committee's erroneous arguments are worth highlighting.

### A.    *The Purchaser requires transition services to preserve the going-concern value of the Debtors' businesses.*

28.      As the Debtors have disclosed throughout the Chapter 11 Cases, the Debtors entered into the Equinox TSA with EHI in an effort to achieve greater cost savings and efficiencies with respect to certain back office, human resources, software, and other support services.  EHI provides, among other things, services and personnel to the Debtors that are essential to the Debtors' operations.  Specifically, in the ordinary course of business and pursuant to the Equinox TSA, EHI incurs the cost of procuring certain shared benefits programs and contracts, including, but not limited to, the Debtors' medical, dental, and vision plans, which are then offered to the Debtors' workforce, to the extent applicable.  The contracts associated with such programs are negotiated by EHI, taking advantage of EHI's size, reputation, and business relationships, on terms that are more favorable than Debtors could obtain independently.  Subsequently, EHI invoices the Debtors in arrears for reimbursement of the costs and expenses allocable to Debtors under the Equinox TSA.   The Debtors and EHI twice amended the Equinox TSA—once in February 2024, to, among other things, extend the term of the Equinox TSA to December 31, 2024, and again on August 2, 2024, to document the Debtors' and EHI's agreement on the terms and the process by which EHI would be reimbursed for providing services related to the preparation and filing of the Chapter 11 Cases.

29.     Entry into the Equinox TSA has provided the Debtors with substantial cost savings, and the Debtors could not obtain the benefits programs from other third-party sources without incurring substantial additional cost and expense.  EHI also provides services related to the Debtors' legal, financial, tax, information technology, and human resources operations, among others.  The Debtors do not have the infrastructure in place to perform these functions independent of EHI.  Given that Purchaser has only a limited presence in the U.S. fitness market, Purchaser requires the services provided to the Debtors by EHI under the Equinox TSA for a period of time to ensure continuity in operations and to otherwise responsibly transition the Acquired Assets to an independent platform.

30.     Notwithstanding the Debtors' limited administrative infrastructure, and as acknowledged in the Committee Objection, the Debtors considered any bid of sufficient value, regardless of whether the bidder required support services from EHI.[12]  For example, the Debtors evaluated, considered, and accepted bids proposed by Bidder, the terms of which fluctuated at various times between requiring services from EHI and not requiring such services, seemingly based on attempts to differentiate Bidder's bid from the Purchaser's bid, and not on the Bidder's actual need for the services, which Bidder indicated at various times would be necessary for a smooth transition.[13]  The Debtors' primary concern throughout the sale process was maximizing the value obtained for the Acquired Assets and mitigating to the greatest extent possible any potential execution risk, given the Debtors' limited liquidity.

---

[12]    *See* Committee Obj. ¶ 60.

[13]    The confusion surrounding these matters continues, even in the Bidder's post-auction submission.  The latest submission now unequivocally states (**for the first time**) that the Bidder will not acquire EHI claims and causes of action, but it continues to provide for optionality that Bidder may enter into a transition services agreement with EHI and seek to have the Debtors lease employees to Bidder for some time (which, as noted above, requires the Debtors to maintain a services relationship with EHI under some sort of transition services agreement).

31.     In exchange for the provision of transition services by EHI, Purchaser proposed to acquire any claims and causes of action, if any, against vendors and certain contract counterparties, including EHI, to ensure a smooth transition of the Acquired Assets without the threat and distraction of potential litigation related to the Chapter 11 Cases.  As set forth in the Response Chart, the Debtors determined, through the Investigation, that any claims and causes of action against EHI that are contemplated to be purchased pursuant to the Successful Bid are not of any value to the estates.  The Committee's conjecture and related histrionics about any such claims and causes of action are in the service of a predictable litigation strategy that is not supported by the record.

32.     It is commonplace for buyers to purchase claims and causes of action against material vendors because it does not make good business sense for an acquirer to subject its employees, customers, and vendors to potential suit, and this instance is no exception.[14]  *See, e.g.*, *Cedar Rapids Lodge & Suites, LLC v. Seibert*, No. 14-CV-04839 SRN/KMM, 2018 WL 747408, at *8 (D. Minn. Feb. 7, 2018) ("The cases strongly favor finding that the fraudulent transfer claims here were property of the estate . . . .  [A]llowing a trustee to sell § 544(b) rights of action is in accord with the trustee's existing powers . . . ." (internal quotation marks omitted)); *see also In re Moore*, 608 F.3d 253, 262 (5th Cir. 2010) ("We conclude, therefore, that the fraudulent-transfer claims are property of the estate . . . . and—like other estate property—may be sold pursuant to § 363(b)."); *In re Lahijani*, 325 B.R. 282, 288 (B.A.P. 9th Cir. 2005) ("Causes of action that exist independent of bankruptcy are commonly sold by bankruptcy trustees under § 363(b)."). For this

---

[14]     *See, e.g.*, *In re Real Mex Rests., Inc.*, Case No. 11-13122 (BLS) (Bankr. D. Del. Feb. 22, 2012) [Docket No. 923]; *In re F & H Acquisition Corp.*, Case No. 13-13220 (KG) (Bankr. D. Del. Feb. 28, 2014) [Docket No. 447]; *In re OCZ Tech. Grp., Inc.*, Case No. 13-13126 (PJW) (Bankr. D. Del. Jan. 16, 2014) [Docket No. 241]; *In re Landauer Healthcare Holdings, Inc.*, Case No. 13-12098 (CSS) (Bankr. D. Del. Jan. 6, 2014) [Docket No. 477]; *In re Allen Family Foods, Inc.*, Case No. 11-11764 (KJC) (Bankr. D. Del. July 29, 2011) [Docket No. 220].

reason, ensuring that litigation does not upend the Purchaser's working relationships with its employees, customers, and vendors is an essential component of the Sale. As noted in *Real Mex Restaurants*, "the sale or release of these types of claims is not unusual as it relates to general Chapter 5 causes of action." [15]

33.     The purchase of the estate claims and causes of action to facilitate a smooth transition of the Acquired Assets is a reasonable and necessary component of the Successful Bid. Accordingly, it is well within the business judgment of the Debtors to transfer the Acquired Assets to Purchaser, including various claims and causes of action. To disregard the Successful Bid solely on the grounds that EHI would effectively obtain a release of estate claims and causes of action that the Debtors have determined have no value would give outsized credence to the Committee's unsubstantiated accusations to the detriment of stakeholders if, as the Special Committee has determined in its reasonable business judgment, the ability to close a going concern sale is substantially at risk in connection with a proposed sale to the Bidder.

B. *There is no basis for subjecting the Sale to heightened scrutiny.*

34.     The Sale is not an insider transaction that requires heighted scrutiny. The Debtors' restructuring efforts, including the sale process, are authorized by the Special Committee, comprised only of the Independent Director. The Debtors' Chapter 11 Cases are managed by the Debtors' Chief Restructuring Officer (himself an unrelated, third-party restructuring professional), and other experienced restructuring professionals. None of the sale process, auction, evaluation of bids, or the decision to select the Successful Bid as the best bid for the Acquired Assets was influenced or determined by EHI, its personnel, or any other non-debtor affiliate of the Debtors.

---

[15]   Hr'g Tr. at 191:6–11, *In re Real Mex Rests., Inc.*, Case No. 11-13122 (BLS) (Bankr. D. Del. Feb. 10, 2012) ("I will also approve the sale or transfer of the avoidance actions, including the claim versus the noteholder, pursuant to the terms of the APA. The sale or release of these types of claims is not unusual as it relates to general Chapter 5 causes of action and including fraudulent conveyance claims for business reasons.").

Accordingly, the Debtors are entitled to a review under the business judgment standard. *See In re Diocese of Camden*, 653 B.R. 722, 741 (Bankr. D.N.J. 2023) (articulating the business judgement standard for a 363 sale).

35.     The Committee devotes considerable effort to arguing that the Sale should be subject to heightened scrutiny.  However, where a sale process is overseen by an independent director, entire fairness review is inapplicable. *See, e.g.*, *Pereira v. Cogan*, 267 B.R. 500, 508 (S.D.N.Y. 2001) (under Delaware law, entire fairness must be shown "[w]hen a controlling shareholder or other insider engages in a self-dealing transaction *that is not approved by an independent board*" (emphasis added)); *In re MFW Shareholders Litig.*, 67 A.3d 496, 526–27 (Del. Ch. 2013) ("Outside the controlling stockholder merger context, it has long been the law that even when a transaction is an interested one but not requiring a stockholder vote, Delaware law has invoked the protections of the business judgment rule when the transaction was approved by disinterested directors acting with due care."), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).  The Committee has conceded that the Independent Director is a disinterested fiduciary of the estates.[16]  Since the Independent Director, as the sole member of the Restructuring Committee, has exclusive authority for all aspects of the Chapter 11 Cases and the Debtors' restructuring efforts, the business judgment standard applies.

36.     The precedent cited by the Committee is irrelevant or appears to be cited by the Committee because of scant references to "insider transactions," but they do not support the Committee's position that the Sale should be evaluated under an entire fairness review.  For example, various of the cases cited relate to situations involving the sale or use of estate property *to an insider* or *approved by an insider*, or involving deliberate concealment of material facts in

---

[16]     *See* Committee Obj. ¶ 25.

the context of a sale transaction, neither of which is relevant under the current circumstances where the Debtors have engaged in an open and transparent auction process run entirely by independent third parties involving assets that are being sold to unrelated third parties at arm's-length.  *See, e.g., In re Family Christian, LLC*, 533 B.R. 600, 628 (Bankr. W.D. Mich. June 18, 2015) (holding that the debtors had failed to establish both the good faith of the purchaser, who was an insider, and justification for providing the purchaser with releases in connection in connection with the sale transaction); *In re Wingspread Corp.*, 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988) (concluding that a prior sale of assets could be disregarded where an insider deliberately concealed his own self-interest); *Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp.* (In re Enron Corp.), 335 B.R. 22, 29 (S.D.N.Y. 2005) (applying the "business-reason test" (i.e., not applying heightened scrutiny) to determine whether retention of counsel that benefitted insider employees was appropriate because the unsecured creditors committee did not establish that insiders were involved in the decision to retain counsel).

37.    Even if the Court were to evaluate the Sale under an entire fairness standard, which is not supported by the facts and circumstances of the Chapter 11 Cases, the proposed Sale should be approved.  The Debtors subjected the Acquired Assets to a full and fair market test, and no other bidders emerged to offer a higher and better price for the claims and causes of action that are proposed to be transferred.  Accordingly, the price received for the Acquired Assets, including the claims and causes of action to be transferred, is fair and reasonable.  *See e.g.*, *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 461 (3d Cir. 2006) ("Section 363 attempts to avoid the complexities and inefficiencies of valuing collateral altogether by substituting the theoretically preferable mechanism of a free market sale to set the price.  The provision is premised on the notion that the market's reaction to a sale best reflects the economic

realities of assets' worth."); *Kravitz v. Samson Energy Co., LLC (In re Samson Res. Corp.)*, Adv.

Pro. No. 17-51524, 2023 WL 4003815, at *1 (Bankr. D. Del. June 14, 2023) ("It is black letter law

in this Circuit that the gold standard for determining the value of an asset is to sell it in an open

and fair market."); *Puma v. Marriott*, 283 A.2d 693, 696 (Del. Ch. 1971) ("[S]ince the transaction

complained of was accomplished as a result of the exercise of independent business judgment of

the outside, independent directors . . . the court is precluded from substituting its uninformed

opinion for that of the experienced, independent board members[.]").  There is thus no basis to

argue that the postpetition process was unfair or that the price generated by that Court-approved

process was not the highest and best price available in the market.[17]

       C.   *The Committee's speculative estimate of the value of potential claims and causes of action is not supported and should not be considered.*

    38.    As discussed above, the Debtors subjected the Acquired Assets to a full and fair

market process.  Neither Bidder ascribed any specific monetary value to the purchase of the claims

and causes of action.  As detailed in the Response Chart, the Committee has espoused theoretical

claims and causes of action against the Debtors' non-debtor affiliates that are based on random

notations from dated internal project presentations or, in the case of the Committee's

recharacterization arguments, are unlikely to impact sale value or distributions of sale proceeds to

---

[17] As for the Bidder's untimely modified alternative bids submitted two days after the Auction was closed, they remain too little and too late.  It offers too little, as there remain significant execution risks inherent in the alternative bids that are not fully addressed, nor does the Bidder propose to leave behind sufficient deposit funds that would serve as an adequate "war chest" to find an alternative bidder in a short time period that would recover the value lost on account of a failed closing.  And it comes too late, as accepting this untimely bid would eviscerate the terms of the Bidding Procedures Order.  Indeed, the Court-approved Bidding Procedures prohibit the Debtors from accepting such an untimely offer, and engaging with Bidder on such terms would jeopardize the Successful Bid.  *See* Bidding Procedures, at Section IX. ("Unless the Bankruptcy Court orders otherwise, the Debtors shall not consider any Bids or Subsequent Bids submitted after the conclusion of the Auction and any and all such Bids and Subsequent Bids."  While, of course, the Court retains ultimate discretion here, as a matter of policy, bidders in bankruptcy auctions (both winning and losing bidders) should be entitled to and required to abide by the Bidding Procedures and the finality of an auction conducted in accordance with such bidding procedures.

stakeholders.   The Committee acknowledges in its Objection,[18] that the Special Committee conducted an investigation into potential legal claims and causes of action against the Debtors' current and former insiders.  Over the course of several months, counsel to the Special Committee reviewed copious documents provided by the Debtors and Equinox, and conducted interviews of the Debtors' current and former directors, officers, and advisors to determine whether any claims or causes of action would be worth preserving.  As noted in the Response Chart and as will be established on the record at the sale hearing, the Debtors have not identified any claims or causes of action against the Debtors' directors, officers, and non-debtor affiliates that warrant pursuing under the circumstances, and the Debtors did not uncover any evidence to suggest that a transfer of any claims or causes of action with respect to such insiders would be inappropriate.  These findings were presented to the Independent Director who approved the proposed Sale after making an informed judgment about the facts and circumstances of any potential claims or causes of action, the circumstances of the Chapter 11 Cases, and the factors impacting the need for an expeditious and value-maximizing Sale for the benefit of stakeholders.

39.    The Committee's attempts to assail the Investigation and the scope and breadth of the Special Committee's review is self-serving and uninformed.  The Debtors are entitled to the benefit of their business judgment, which the Debtors have exercised with care.  The Committee's unfounded allegations regarding the existence of valuable claims and causes of action are a flagrant attempt to use the Sale to extract value for the Committee's constituency, and nothing more.[19]

---

[18]   *See* Committee Obj. ¶ 54.

[19]   Over the course of the Chapter 11 Cases, the Debtors have made available to the Committee summaries, notices, documents, and varying forms of exhibits, including narratives explaining the Debtors' operations, expenditures, board composition, material business updates, and financing.  The Committee has also been provided with access to the Data Room, as well as other data access points provided by the Debtors.  The Debtors' financial advisor has worked diligently with the Committee's financial advisor to provide financial analyses, including sharing work product, and the Debtors have maintained regular communication with the Committee in an effort to respond to their requests for documentation.  The Debtors have independently produced an abundance of data and have

### D. The Committee's other arguments do not establish a basis to deny the Sale Motion.

40.    The Committee's remaining arguments can be summarily addressed as either moot or unavailing.  As an initial matter, the Committee argues that the Sale should not go forward because it is unclear whether the Purchaser will acquire member lists for excluded locations, avoidance claims against non-go forward creditors, insurance claims related to the acquired Assets, or claims against former Equinox personnel.  For the sake of clarity: (i) the Purchaser is only acquiring the member lists for the "Business" it is purchasing—i.e., the 67 gym locations in the New York and New Jersey area that are included in the Acquired Assets; (ii) given the difficulty of identifying which parties will have a continuing business relationship with the Purchaser, the purchased claims and causes of action include avoidance actions against all creditors; (iii) the Purchaser is not acquiring the Debtors' director and officer insurance policy or any of its proceeds; and (iv) the purchased claims and causes of action include any potential actions against former Equinox personnel.  The Debtors submit that none of the above terms warrant modification or establish a basis to deny the Sale Motion.

41.    The Committee also argues that the Purchaser should be obligated to pay any amounts due under executory contracts and unexpired leases during the designation rights period that result from the Debtors' fraud, willful misconduct, or gross negligence.  Because any damages resulting from the Debtors' fraud, willful misconduct, or gross negligence would give rise to administrative claims that must be paid in full under the Debtors' proposed chapter 11 plan, the

---

responded to several of the Committee's overbroad requests for documents.  Therefore, the Committee's unsubstantiated complaints regarding access to information should be ignored.

counterparties to the relevant executory contracts and unexpired leases do not bear any risk associated with any potential damages and the Committee's concerns are therefore irrelevant. [20]

42.    Finally, the Committee states that the Purchaser is not required to provide access to books and records for claims reconciliation or the pursuit of estate causes of action after closing. On the contrary, section 6.2 of the asset purchase agreement associated with the Successful Bid requires the Purchaser to provide "reasonable access to such files and records for purposes of administration of Sellers' respective Bankruptcy Cases" among other terms.  The Debtors believe the existing terms are customary and sufficient to address the Committee's concerns.

## **CONCLUSION**

At the conclusion of a comprehensive sales process overseen by the Independent Director, the Debtors determined that the Successful Bid from the Purchaser was the best offer to acquire the Acquired Assets under all of the various circumstances.  The proposed Sale to the Purchaser avoids a value-destructive liquidation, can be executed promptly with minimal risk, preserves the Debtors' business as a going concern, and otherwise maximizes the value of the estates.  Therefore, the Court should approve the Sale.  For all the foregoing reasons, as well as those set forth in the Sale Motion, the Court should overrule the Committee Objection and grant the Sale Motion.

*[Remainder of Page Intentionally Left Blank]*

---

[20]    *See Combined Disclosure Statement and Joint Chapter 11 Plan of Blink Holdings, Inc. and Its Affiliated Debtors and Debtors in Possession* [Docket No. 502].

Dated: Wilmington, Delaware
       November 4, 2024

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Sean T. Greecher*
Michael R. Nestor (No. 3526)
Sean T. Greecher (No. 4484)
Allison S. Mielke (No. 5934)
Timothy R. Powell (No. 6894)
Rebecca L. Lamb (No. 7223)
Benjamin C. Carver (No. 7176)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:  mnestor@ycst.com
       sgreecher@ycst.com
       amielke@ycst.com
       tpowell@ycst.com
       rlamb@ycst.com
       bcarver@ycst.com

*Counsel to the Debtors and Debtors in Possession*

# **EXHIBIT A**

**Response Chart**

| Objection Paragraph Reference | Objection Language | Response |
|---|---|---|
| ¶¶ 4, 38-40 | Alshaya JV<br><br>"The Debtors: [. . .] (ii) appear to have lost their interest in Alshaya Ventures, a joint venture with Equinox and the Alshaya Group, valued in excess of $50 million at the end of 2023." | Although the Debtors had at one time considered establishing a fitness club presence in the Middle East and took preliminary measures to pitch that project, including executing an incomplete LLC agreement (the "**Alshaya JV**"), the Debtors were unable to execute on that strategy, despite serious intentions to pursue it, likely due to the simultaneous occurrence of the COVID-19 pandemic, which left the Debtors constrained for liquidity and furiously managing costs.<br><br>While historical valuation reports for the Debtors prepared by an investment firm note a much more substantial value attributed to the Alshaya JV, such valuations fluctuated significantly over the course of the various quarterly and annual reports prepared by the investment banker. For example, the valuations from 2023 landed in the range of $51.758 million to $67.684 million, roughly a year prior the reports had valued the Alshaya JV at between $163.237 million and $191.107 million.[1] The valuations appear to be based solely on discussions with the Debtors' management team, and the Debtors never recorded the Alshaya JV as an asset on its balance sheet, notwithstanding these reports.[2]<br><br>The Debtors' Investigation identified only $45.00 invested by Debtors into the Alshaya JV, which is clearly noted in a capital contribution set forth in the Shareholders Agreement between Blink KWT Holdco LLC and M.H. Alshaya Co. WLL, dated as of 2019.[3] Discussions with the Debtors' management personnel have established that the Alshaya JV never resulted in Blink locations in the Middle East, is not an actionable go-forward strategy given the circumstances, and there is no existing infrastructure or investment that could be monetized that would yield any value to creditors or stakeholders. |

---

[1]   *Compare* Valuation Analysis Related to Blink Holdings II, Inc., dated March 26, 2021, p. 4 (showing a range for the "Investment in Alshaya" between $163.237 million and $191.107 million) *with* Valuation Analysis Related to Blink Holdings II, Inc., dated March 23, 2022 (showing a range for the "Investment in Alshaya" between $51.758 million and $67.684 million). Note also that a valuation analysis for Blink Holdings, Inc., dated March 31, 2020, has the value attributed to the Alshaya JV even higher, between $262.986 and $326.826.

[2]   Valuation Analysis Related to Alshaya JV, Equinox Group LLC, prepared by Houlihan Lokey, dated March 22, 2024, fn. 1.

[3]   Shareholders Agreement for an un-named company, by and between Blink KWT Holdco LLC and M.H. Alshaya Co. WLL, dated as of 2019, Schedule 1.

| Objection Paragraph Reference | Objection Language | Response |
|---|---|---|
| ¶6 | <u>Original TSA Termination</u><br><br>"The Debtors further advised that, as a result of the freshly minted TSA amendments, ***the Original TSA, which had no termination date***, now terminates by its terms on December 31, 2024.    And, not surprisingly, Equinox refused and continues to refuse to enter into a new TSA with a buyer without a full release." | Although the parties unofficially continued to operate under that certain *Transition Services Agreement*, by and between EFI and Debtor Blink Holdings, Inc. (the "**Equinox TSA**") until it was amended in February 2024, there was no agreement officially governing that relationship after its original term expired. As shown in the language in the Equinox TSA, Equinox had no obligation to continue providing services after December 31, 2019, and had not agreed to any specific extension period until the parties executed the first amendment in February 2024.<br><br>Section 4.1(a) of the Original TSA - "This Agreement will have an initial term of approximately three (3) years, commencing on the Effective Date and ***ending on December 31, 2019*** (the "Term"). ***The parties agree that Equinox shall not be obligated to perform any Service after the expiration of the Term***; provided, however, that if Blink desires and Equinox agrees to continue to perform any of the Services after the expiration of the Term, ***the Parties shall negotiate in good faith*** to determine an amount that compensates Equinox for all of its costs for such performance, including the time of its employees. The Services so performed by Equinox after the expiration of the Term shall continue to constitute Services under this Agreement and be subject in all respects to the provisions of this Agreement for the ***duration of the agreed-upon extension period***, such additional period to be part of the "Term" under this Agreement."  Under these terms, Equinox could have stopped providing services to the Debtors at will. |
| ¶¶ 3, 22-26 | <u>Board and Management</u><br><br>"Until very recently, and following changes made in anticipation of this bankruptcy filing, the Debtors' Board was dominated by Equinox and did not respect corporate formalities.    Except for the newly appointed CRO, the Debtors' officers are conflicted | It is not uncommon for directors to hold several positions at corporate affiliates. It is, in fact, so common that the courts have spoken on this topic multiple times[4] and a plethora of secondary sources have addressed the challenges faced by so-called "constituency" or "blockholder" directors.[5]<br><br>While a director's other corporate roles could result in the director being deemed interested with respect to a specific decision, such characterization does not mean |

---

[4]    *See e.g.*, Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del. 1983) ("There is no dilution of this obligation where one holds dual or multiple directorships, as in a parent-subsidiary context."); *see also* Kahn v. Lynch Comm'n Sys., Inc., 638 A.2d 1110, 1115 (Del. 1994) ("A controlling or dominating shareholder standing on both sides of a transaction, as in a parent-subsidiary context, bears the burden of proving its entire fairness.").

[5]    *See e.g.*, "How Many Masters Can a Director Serve? A Look at the Tensions Facing Constituency Directors", E. Norman Veasey and Christine T. Di Guglielmo, June 3, 2008; *see also* "Duty of Loyalty Issues for Designated Directors and the Boards of Portfolio Companies", Beskin et. al., Quinn Emanuel, May 26, 2020; *see also* "The Rights and Duties of Blockholder Directors", J. Travis Laster and John Mark Zeberkiewicz.

32320188.3

| Objection Paragraph Reference | Objection Language | Response |
|---|---|---|
| | and beholden to Equinox—the Debtors' President is compensated, in part, with Equinox stock options, and their Vice President of Finance is a longtime Equinox employee with an option to rejoin Equinox." <br><br> "Throughout Equinox's conflicted management of the Debtors, the Debtors entered into several insider transactions that raise significant questions warranting additional scrutiny. Based on the information obtained to date, it does not appear that any disinterested party was looking out for the Debtors in any of the following transactions." | that every action taken by such director was improper. In fact, even being interested as to a specific decision does not establish that a director's action with respect to that decision was improper. Rather, under Delaware law, if a director is deemed self-interested, the entire fairness test will be applied to such decision rather than the business judgment rule.[6] <br><br> Likewise, the Committee claims that no "disinterested party" was looking out for the Debtors. Even if this were true, it is not the test under Delaware law. <br><br> As explained by the Delaware Supreme Court: "In Weinberger, this Court noted that '[p]articularly in a parent-subsidiary context, a showing that the action taken was as though each of the contending parties had in fact exerted its bargaining power against the other at arm's length is strong evidence that the transaction meets the test of fairness.'"[7] <br><br> Here, the Committee attempts to invalidate years of valid actions taken by the Debtors' boards as acts tainted by perceived interested directors controlled by their ultimate parent, Equinox. Instead, the Committee has identified only that some decisionmakers in the Debtors' governance structure had multiple roles in the broader Equinox corporate structure. The Committee posits only conjecture that any potential dual loyalty situation resulted in a decisionmaker not satisfying its duties to the Debtors or that any improper action was taken. |
| ¶31 | <u>Regarding the Negotiation of the Annual Fees under the TSA</u> <br><br> "On February 5, 2024, presumably in anticipation of an eventual bankruptcy, the Debtors and Equinox entered into a First Amendment to Transition Services Agreement (the "First Amendment"). The First Amendment (i) established December 31, 2024 as a firm end date, (ii) provided an optional one-year | The Committee argues that Equinox and the Debtors failed to negotiate annual fees for the TSA in the time period from January 1, 2024 to February 2024, when the first amendment to the TSA was executed. However, the Debtors' Investigation found that, despite not having a set agreement in place during such time period, the parties engaged in an annual budgeting process. |

---

[6]  Thorpe ex rel. Castleman v. CERBCO, Inc. 676 A. 2d 436, 443 n. 9 (Del. 1996) (noting that "the entire fairness test is usually applied in a situation" where a director may be self-interested); Nixon v. Blackwell, 626 A. 2d 1366, 1376 (Del. 1993) ("Application of the entire fairness rule does not, however, always implicate liability of the conflicted corporate decisionmaker, nor does it necessarily render the decision void.").

[7]  Kahn, 638 A. 2d at 1117.

3

| Objection Paragraph Reference | Objection Language | Response |
|---|---|---|
| | extension on consent, (iii) required the parties to determine an annual fee "on an arm's length basis based on good faith estimates of the costs of comparable services provided by a non-Affiliate," (***attempting to cure the parties' historic failure to negotiate annual fees in good faith***), and (iv) gave Equinox an express right to terminate on sixty days' notice" | |
| ¶33 | <u>Regarding the TSA Amendments</u><br><br>"The Committee is unable to identify what benefits, if any, the Debtors obtained in exchange for augmenting Equinox's leverage over them under the TSA Amendments." | As discussed above, prior to the execution of the amendments to the Equinox TSA, EHI had no obligation to provide services under the Equinox TSA after December 31, 2019.[8] Although the parties continued operating unofficially under the terms of the Equinox TSA, there was no writing in place that committed EHI to providing these services until the First Amendment memorialized the extension period. By executing the First Amendment in February 2024, the Debtors, in fact, secured services under the TSA until at least the end of the calendar year.[9]<br><br>By the time the parties executed the Second Amendment on August 2, 2024, it had become clear both that: (i) EHI had been under-charging for services under the Equinox TSA, by failing to fully account for the fringe costs associated with employees providing services; and (ii) the Debtors were requesting significantly more services as a result of the restructuring than the Debtors had previously requested of EHI. Importantly, although the discrepancy in price as noted in clause (i) was identified by the parties, the parties did not modify the price for 'business-as-usual' services under the Equinox TSA. Rather, the Second Amendment focused solely on addressing the new restructuring-related services that the Debtors were requesting of EHI. |
| ¶¶ 35-38 | <u>Stock Redemptions</u> | Stock redemptions or repurchases are not improper under Delaware law. Importantly, the DGCL places cogent restrictions on a corporation's ability to repurchase stock if certain fiscal and capital requirements are not met. The DGCL |

---

[8]    Section 4.1(a) of the Original TSA.

[9]    *Compare* Section 4.1(a) of the Original TSA (stating that the term was to end on December 31, 2019 and that "Equinox shall not be obligated to perform any Service after the expiration of the Term" *with* Section 1(b) of the First Amendment (stating "[t]he parties acknowledge and agree that (i) the Term is currently in effect and has continued without interruption since the expiration of the initial term (such period, the "First Extension Term") and (ii) the Term is hereby extended until December 31, 2024…").

32320188.3

| Objection Paragraph Reference | Objection Language | Response |
|---|---|---|
| | "The Prepetition Secured Debt was used (i) to pay Equinox $77.5 million to redeem 66,420 shares of the Debtors' preferred stock held by Equinox (the "<u>Preferred Stock Redemption</u>") . . . ." | limits a corporation's ability to redeem shares when its capital is impaired.[10] The repurchase or redemption of stock will impair the corporation's capital "if the funds used in the repurchase exceed the amount of the corporation's 'surplus'."[11] The DGCL defines "surplus" as the value of the corporation's net assets over the par value of its capital.[12] <br><br> Here, on two separate occasions, six and five years ago, respectively, both before the COVID-19 pandemic and following a refinancing when the Debtors had a significant capital surplus, Blink Holdings, Inc. ("**Holdings**") effectuated a redemption of preferred shares held by Equinox Holdings, Inc. On November 8, 2018, pursuant to a Preferred Stock Purchase Agreement (the "**Preferred Stock Purchase Agreement**"), Holdings purchased 43,432 shares of preferred stock held by Equinox for $52,500,000 (the "**2018 Redemption**"). Section 4(d) of the Preferred Stock Purchase Agreement addresses the concerns set forth in the DGCL and states that "[i]mmediately after giving effect to the transactions contemplated hereby, Blink will (i) not be insolvent … (ii) have unreasonably small capital with which to engage in its business or (iii) have incurred debts beyond its ability to pay as they become due." Further, on February 27, 2019, the Senior Vice President, Finance, of Blink Holdings, Inc., executed a Solvency Certificate, which was furnished to the board of directors of Blink Holdings, Inc. in which he certified that he analyzed the consolidated balance sheets of Blink Holdings, Inc. for 2016, 2017, and (as of September 30 for) 2018, a draft of the valuation analysis prepared by Houlihan Lokey as of September 30, 2018, and consolidated financial projections for Blink Holdings, Inc. and its subsidiaries for the years 2019 through 2022, among other documentation, and determined that immediately prior to the November 8, 2018 stock redemption, the aggregate fair value of the assets of Blink Holdings, Inc. was $329 million, the aggregate value of its liabilities was not more than $134 million, the "capital" was not more than $80,000, and the surplus was at least $195 million, and that immediately |

---

[10]    *See* DGCL § 160(a)(1) ("[N]o corporation shall … [p]urchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation . . . .").

[11]    *SV Inv. Partners, LLC v. ThoughtWorks, Inc.*, 7 A.3d 973, 982 (Del. Ch. 2010).

[12]    DGCL § 154. "Net assets means the amount by which total assets exceed total liabilities."  *SV Inv. Partners*, 7 A.3d at 982.

| Objection Paragraph Reference | Objection Language | Response |
|---|---|---|
| | | following the redemption, the surplus for Blink Holdings, Inc. would be at least $143 million.[13]<br><br>The Committee has provided no facts to suggest that Holdings' capital was impaired at the time of the redemption. Instead, Committee appears to suggest that a redemption was *per se* improper, which is not the law in Delaware. |
| ¶¶ 41-46 | Promissory Notes<br><br>The Committee discusses multiple loans between Blink and Equinox, including a $12.5 million investment on August 24, 2024, associated with the Sixth Amendment to the Credit Agreement, a September 30, 2020 promissory note for $12.5 million (the "**2020 Promissory Note**"), and a November 15, 2022 loan pursuant to which $67.5 million was lent to Blink (the "**2022 Promissory Note**").<br><br>The Committee suggests that they should be subordinated or recharacterized. | The Committee attempts to use a sampling of factors related to the 2020 Promissory Note and the 2022 Promissory Note to suggest that these loans should be recharacterized as equity investments, or otherwise subordinated. For example, the Committee notes that interest under these loans, which is borne at 13%, is paid in kind. Additionally, the Committee points out that outstanding obligations under the 2022 Promissory Note are convertible to common stock of any other direct or indirect parent of Holdings.<br><br>When determining if a loan should be recharacterized as an equity interest, bankruptcy courts will generally conduct an "overarching inquiry" into the "intent of the parties at the time of the transaction, determined not by applying any specific factor, but through a *common sense* evaluation of the facts and circumstances surrounding a transaction . . . ."[14] Such "intent may be inferred by what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances."[15] To conduct that analysis, courts will often look at how the loans are described or referred to, whether they contain fixed maturity dates, and whether they contain no voting rights, among other items.[16]<br><br>Here, the facts demonstrate that the intent of the parties was that these promissory notes be considered loans between the parties. There are several factors that demonstrate that the parties intended that the 2020 Promissory Note and the 2022 Promissory Note to be loans, including the following: (1) both have a maturity date of May 8, 2025; (2) both are executed as "promissory notes"; (3) both have |

---

[13]    Blink Holdings, Inc. Solvency Certificate, prepared by Marc Benathen, Senior Vice President, Finance, February 27, 2019.

[14]    *In re Radnor Holdings Corp.*, 353 B.R. 820, 838 (Bankr. D. Del. 2006) (emphasis in original).

[15]    *In re SubMicron Sys. Corp.*, 432 F.3d 448, 456 (3d Cir. 2006).

[16]    *In re Radnor Holdings Corp.*, 353 B.R. at 839.

6

| Objection Paragraph Reference | Objection Language | Response |
|---|---|---|
| | | a fixed interest rate; and (4) both are subject to an unused line fee. In addition, contrary to the Committee's allegations, the fact that the parties negotiated for interested to be paid-in-kind establishes that no money was being sent back to Equinox pursuant to these loans during this time, as any interest due was being added to the principal of the loan rather than being sent as cash back to Equinox, and that paid-in-kind interest is a common attribute of financing agreements amount unrelated, arm's-length transactions.[17] <br><br> Moreover, the Committee's arguments are unavailing under the circumstances given that the fulcrum security in these cases is that of the prepetition secured lenders.  Therefore, whether Equinox's claims stem from a loan or an equity investment are likely irrelevant since neither an unsecured claim for a loan transaction nor an equity interest in the Debtors will receive material distributions under a chapter 11 plan in these cases. |

---

[17] *See e.g.*, "Allegations were Sufficient to State Claim for Breach of Duties of Care and Loyalty with respect to Distributions, but Trustee Failed to State Claim for Breach of Fiduciary Duties with respect to Term Loan and Lien Grant to Provide Capital Infusion after Distributions to Insiders", Nancy McKenna, 63 No. 10 Corp Forms Bulletin NL 1 (Reviewing the holding in *In re Bayou Steel BD Holdings, L.L.C.* 2023 WL 3092906 (Bankr. D. Del. 2023) and describing that the court found that the Trustee had not shown that the terms of the loan, which included a 12% paid-in-kind interest rate, were "unusual or inconsistent with those available in the marketplace".).

32320188.3

| Objection Paragraph Reference | Objection Language | Response |
|---|---|---|
| ¶¶ 47-49 | **The 2022 IOI**<br><br>"Equinox produced one document: an expression of interest by PureGym to acquire the Debtors for $250-$300 million." | The Committee simply states that Equinox received an expression of interest to acquire the Debtors for "$250-$300 million" without providing additional detail. For example, the Committee fails to mention that the expression of interest that was submitted was a first round, non-binding, and preliminary offer, and that it is commonplace for such offers not to be pursued further given timing and market conditions, among other factors.  In addition, the referenced expression of interest makes clear that such offer is on a "cash-free, debt-free basis".  While the Committee asserts that it does not know if it was pursued diligently or why it was not acted upon, it is an objective fact that a "cash-free, debt-free" offer could not be viewed simply as a "$250-$300 million" offer given the company's capital structure at the time.  This is one more example of the Committee asserting baseless conjecture to assail the Debtors' sale process. |
| ¶88 | "The Debtors' Investigation is also artificially limited to conduct that occurred between 2021 and the Petition Date. As a result, the Debtors are not investigating all potential Insider Claims, including the Preferred Stock Redemption, the 2022 IOI or other conduct for which the three-year statute of limitations for D&O Claims might be tolled." | While the Debtors' Investigation has primarily focused on the Investigation Period of 2021-2024 in an effort to conduct an efficient investigation focused on the time period most likely to result in viable claims, the Debtors' Investigation has also reviewed items related to issues preceding the Investigation Period.  For example, the Investigation has covered the Equinox TSA, which was executed in 2016, and made the parties' relationship pursuant to the TSA a point of significant focus during interviews and research.  Additionally, the Debtors' Investigation has explored the 2018 and 2019 stock redemption issue to confirm the viability of any potential claims or causes of action that could conceivably result from such repurchases. |

32320188.3