## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BLINK HOLDINGS, INC., *et al.*,[1] | Case No. 24-11686 (JKS) |
| | (Jointly Administered) |
| Debtors. | **Ref. Docket Nos. 81, 348, & 550** |

### NOTICE OF FILING OF ASSET PURCHASE AGREEMENT AND
### PROPOSED SALE ORDER WITH RESPECT TO LOTEMD FIT LLC

**PLEASE TAKE NOTICE** that, on August 16, 2024, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed the Debtors' Motion for Entry of Orders (I)(A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets, (C) Establishing Certain Assumption and Assignment Procedures and Approving Manner of Notice Thereof, and (D) Granting Related Relief; and (II)(A) Authorizing and Approving the Debtors' Entry into an Asset Purchase Agreement, (B) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (C) Approving the Assumption and Assignment of the Assumed Contracts, and (D) Granting Related Relief [Docket No. 81] (the "**Motion**").

**PLEASE TAKE FURTHER NOTICE** on October 28, 2024, in accordance with the Bidding Procedures Order and the Bidding Procedures approved thereby, the Debtors commenced an Auction (in person and via Zoom) for the sale of the Assets. However, the Debtors continued the Auction as to certain Assets located outside of the New York and New Jersey markets (collectively, the "**Outer Market Assets**").

**PLEASE TAKE FURTHER NOTICE** that, on November 4, 2024, the Debtors commenced an Auction (via Zoom) for the sale of the Outer Market Assets, at which Auction Lotemd Fit LLC was named the Successful Bidder.

**PLEASE TAKE FURTHER NOTICE** that, attached hereto as Exhibit A, is an Asset Purchase Agreement (the "**APA**"), reflecting the terms of the Successful Bid.

---

[1] The last four digits of Blink Holdings, Inc.'s federal tax identification number are 6354. The mailing address for Blink Holdings, Inc. is 45 West 45th Street, 10th Floor, New York, New York 10036. Due to the large number of debtors in these chapter 11 cases, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/BlinkFitness, or by contacting the undersigned counsel for the Debtors.

**PLEASE TAKE FURTHER NOTICE** that, attached hereto as Exhibit B is a proposed form of order approving the APA (the "**Proposed Order**").  The Debtors intend to seek approval of the Proposed Order at the hearing scheduled to be held on November 6, 2024 at 11:00 a.m. (ET).

Dated: Wilmington, Delaware
November 5, 2024

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Allison S. Mielke*
Michael R. Nestor (No. 3526)
Sean T. Greecher (No. 4484)
Allison S. Mielke (No. 5934)
Timothy R. Powell (No. 6894)
Rebecca L. Lamb (No. 7223)
Benjamin C. Carver (No. 7176)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:  mnestor@ycst.com
          sgreecher@ycst.com
          amielke@ycst.com
          tpowell@ycst.com
          rlamb@ycst.com
          bcarver@ycst.com

*Counsel to the Debtors and Debtors in Possession*

# EXHIBIT A

## APA

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**BLINK HOLDINGS, INC.,**

**THE OTHER SELLER PARTIES HERETO,**

**AND**

**LOTEMD FIT LLC**
Dated:

**November 4, 2024**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................................................ 1

    Section 1.1        Definitions............................................................................. 1
    Section 1.2        Interpretations ..................................................................... 13

ARTICLE II PURCHASE AND SALE ............................................................................ 14

    Section 2.1        Purchase and Sale of Assets.............................................. 14
    Section 2.2        Assumed Liabilities ........................................................... 14
    Section 2.3        Consideration; Deposit....................................................... 15
    Section 2.4        Closing .............................................................................. 15
    Section 2.5        Closing Payments and Deliveries ...................................... 16
    Section 2.6        Assumption/Rejection of Certain Contracts and Leases.... 16
    Section 2.7        Allocation .......................................................................... 17

ARTICLE III SELLERS' REPRESENTATIONS AND WARRANTIES ............................... 17

    Section 3.1        Organization of Sellers; Good Standing ........................... 17
    Section 3.2        Authorization of Transaction ............................................ 17
    Section 3.3        Noncontravention; Government Filings ............................ 18
    Section 3.4        Title to Assets ................................................................... 18
    Section 3.5        Assumed Leases................................................................ 18
    Section 3.6        Real Property .................................................................... 18
    Section 3.7        Litigation; Decrees............................................................ 19
    Section 3.8        Labor Relations ................................................................ 19
    Section 3.9        Brokers' Fees .................................................................... 19
    Section 3.10      Taxes ................................................................................ 19
    Section 3.11      Data Privacy ..................................................................... 20
    Section 3.12      Employee Benefits ............................................................ 20
    Section 3.13      Compliance with Laws; Permits ....................................... 21
    Section 3.14      Environmental Matters ...................................................... 22

ARTICLE IV BUYERS' REPRESENTATIONS AND WARRANTIES ............................... 23

    Section 4.1        Organization of Buyer; Good Standing ............................ 23
    Section 4.2        Authorization of Transaction ............................................ 23
    Section 4.3        Noncontravention............................................................... 23
    Section 4.4        Litigation; Decrees............................................................ 23
    Section 4.5        Brokers' Fees .................................................................... 24
    Section 4.6        Sufficient Funds; Adequate Assurances ........................... 24
    Section 4.1        "AS IS" Transaction ......................................................... 24

ARTICLE V PRE-CLOSING COVENANTS.................................................................... 25

    Section 5.1        Efforts; Cooperation.......................................................... 25
    Section 5.2        Conduct of the Business Pending the Closing ................... 25
    Section 5.3        Bankruptcy Court Matters.................................................. 27
    Section 5.4        Notices and Consents........................................................ 28
    Section 5.5        Notice of Developments ................................................... 28

## TABLE OF CONTENTS

**Page**

Section 5.6     Access ................................................................. 28
Section 5.7     Bulk Transfer Laws............................................... 28
Section 5.8     Governmental Approvals and Consents............................ 29

ARTICLE VI OTHER COVENANTS ........................................................ 29

Section 6.1     Further Assurances................................................. 29
Section 6.2     Access; Enforcement; Record Retention ......................... 30
Section 6.3     Covered Employees ................................................ 30
Section 6.4     Transfer Taxes .................................................... 32
Section 6.5     Press Releases and Public Announcements ...................... 32
Section 6.6     Non-Disclosure. ................................................... 32
Section 6.7     No Successor Liability ........................................... 33
Section 6.8     Removal of "Blink" Name ......................................... 34

ARTICLE VII CONDITIONS TO OBLIGATION TO CLOSE........................... 34

Section 7.1     Conditions to Buyer's Obligations................................ 34
Section 7.2     Conditions to Sellers' Obligations ............................... 34
Section 7.3     No Frustration of Closing Conditions............................ 35

ARTICLE VIII TERMINATION ........................................................... 35

Section 8.1     Termination of Agreement........................................ 35
Section 8.2     Effect of Termination ............................................ 36

ARTICLE IX MISCELLANEOUS ......................................................... 36

Section 9.1     Survival .......................................................... 36
Section 9.2     Expenses .......................................................... 37
Section 9.3     Entire Agreement ................................................. 37
Section 9.4     Incorporation of Exhibits and Disclosure Schedule............. 37
Section 9.5     Amendments and Waivers .......................................... 37
Section 9.6     Succession and Assignment ....................................... 37
Section 9.7     Notices ........................................................... 38
Section 9.8     Governing Law .................................................... 39
Section 9.9     Submission to Jurisdiction; Service of Process ................ 39
Section 9.10    Waiver of Jury Trial............................................. 39
Section 9.11    Specific Performance ............................................ 39
Section 9.12    Severability ..................................................... 39
Section 9.13    No Third Party Beneficiaries .................................... 39
Section 9.14    Non-Recourse ..................................................... 40
Section 9.15    Mutual Drafting .................................................. 40
Section 9.16    Disclosure Schedule.............................................. 40
Section 9.17    Headings; Table of Contents...................................... 40
Section 9.18    Counterparts; Facsimile and Electronic Signatures ............ 40

# TABLE OF CONTENTS

**Page**

Exhibit A – Form of Bill of Sale for Acquired Assets
Exhibit B – Form of Assignment and Assumption Agreement


Schedule A – Other Excluded Assets

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of November 4, 2024 by and among Blink Holdings, Inc., a Delaware corporation ("Blink"), and the direct and indirect Subsidiaries or Affiliates of Blink identified on the signature pages hereto (together with Blink, each a "Seller" and, collectively, "Sellers"), and Lotemd Fit LLC, a New York limited liability company ("Buyer"). Sellers and Buyer are referred to collectively herein as the "Parties" and each, individually, as a "Party".

### WITNESSETH

WHEREAS, on August 12, 2024 (the "Petition Date"), Blink and certain of its Affiliates and Subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief (collectively, the "Bankruptcy Cases"), under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, Sellers wish to sell the assets at the Acquired Gym Locations (as defined herein) used in connection with Seller's health club and fitness business operated at the Acquired Gym Locations (the "Business"); and

WHEREAS, Sellers and Buyer desire to enter into this Agreement to provide for Buyer to purchase, acquire, and assume from the applicable Seller all of the Acquired Assets (as defined herein) and Assumed Liabilities (as defined herein), all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363, 365, and other applicable provisions of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Definitions.  For purposes of this Agreement:

"Acquired Assets" means, all of Sellers' right, title, and interest, free and clear of all Liens (other than Permitted Liens), in and to all of the properties, rights, interests, and other tangible assets of Sellers located at the Acquired Gym Locations for use in or relating to the Business (whether or not required to be reflected on a balance sheet prepared in accordance with GAAP), including any assets acquired by Sellers after the date hereof but prior to the Closing; provided, however, that the Acquired Assets shall not include any Excluded Assets.  Without limiting the foregoing, the Acquired Assets shall include the following (except to the extent listed or otherwise included as an Excluded Asset):

(a)    all tangible assets owned by Sellers at the Acquired Gym Locations, including all gym and exercise equipment and machinery, fixtures, trade fixtures, chairs, supplies, shelving, refrigeration equipment, computers, point-of-sale systems, other

computer systems and servers, hardware, inventory management equipment, signs, and signage located at the Acquired Gym Locations;

(b)     all Assumed Leases and all rights thereunder, and all security deposits, letters of credit or other credit support provided by the Sellers with respect thereto;

(c)     all Inventory and Merchandise located at the Acquired Gym Locations;

(d)     all member contact information and membership agreements related to the Acquired Gym Locations (collectively, the "Membership Agreements"), in each case, to the extent permitted to be assigned, used, or provided by Sellers under applicable Laws;

(e)     any Permit for the Acquired Gym Locations, to the extent transferable;

(f)     any and all books, records, and other data relating exclusively to the Acquired Gym Locations, including customer lists, supplier lists, mailing lists, accounting records, documentation or records, catalogs, and printed materials relating thereto to the extent available;

(g)     all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including any such item relating to the payment of Taxes) in respect of the Assumed Leases other than the Excluded Tax Assets;

(h)     any promotional materials, displays, and other property or equipment owned by Sellers and used exclusively at the Acquired Gym Locations;

(i)     all goodwill associated with the Business or the Acquired Assets;

(j)     all Sellers' telephone and facsimile numbers at the Acquired Gym Locations;

(k)     all of Sellers' rights under warranties, indemnities, and all similar rights against third parties to the extent transferable and exclusively related to any Acquired Assets;

(l)     the Gym Locations Cash Amount; and

(m)     any insurance claims, and related proceeds, related to any Acquired Assets;

provided, however, notwithstanding anything to the contrary set forth in this definition, the Acquired Assets shall not include any Excluded Assets.

"Acquired Gym Locations" means the Gym Locations associated with the Assumed Leases.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common

control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

"Affiliate Agreement" has the meaning set forth in Section 3.15.

"Agreement" has the meaning set forth in the preamble.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.5(a).

"Assumed Leases" has the meaning set forth in Section 2.6(b).

"Assumed Liabilities" means only the following Liabilities of each Seller incurred exclusively in the operation of the Business and existing as of the Closing (to the extent not paid prior to the Closing), and no other Liabilities:

> (a)     all Liabilities under the Acquired Assets to the extent such Liabilities arise from and after the Closing Date, including, without limitation, any deferred rental amounts payable in respect of any Assumed Leases;

> (b)     all Liabilities to pay for goods or services ordered in respect of the Acquired Gym Locations, prior to the Closing in the Ordinary Course of Business, but that are not delivered or performed until after the Closing;

> (c)     all (i) gym or customer credits, sales promotions, rebates, coupons, gift cards, and certificates in respect of the Acquired Gym Locations and (ii) returns of Merchandise, customer prepayments and overpayments, customer refunds, credits, reimbursements, and related adjustments with respect to Merchandise;

> (d)     all Post-Petition Trade Payables;

> (e)     all accrued and unused vacation and sick time of the Transferred Employees;

> (f)     all Location Closing Costs; and

> (g)     all Cure Costs with respect to the Assumed Leases;

provided, however, that notwithstanding anything to the contrary set forth in this definition, the Assumed Liabilities shall not include any Excluded Liabilities.

"Auction" has the meaning set forth in the Bidding Procedures Order.

"Back-up Bidder" means the Person designated at the Auction as having submitted the next highest offer to the offer submitted by the Prevailing Bidder.

"Bankruptcy Cases" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bid Deadline" has the meaning set forth in the Bidding Procedures Order.

"Bidding Procedures Order" means an Order entered by the Bankruptcy Court on September 10, 2024, authorizing and approving the bidding, auction, and sale procedures regarding the Acquired Assets, and other related relief.

"Bill of Sale" has the meaning set forth in Section 2.5(a).

"Business" has the meaning set forth in the recitals.

"Business Day" means any day, other than a Saturday, Sunday and any day that is a legal holiday under the laws of the State of Delaware or is a day on which banking institutions located in the State of Delaware are authorized or required by Law or other governmental action to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer Default Termination" has the meaning set forth in Section 2.3(b).

"Causes of Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena, or investigation of any nature, civil, criminal, administrative, regulatory, or otherwise, whether at law or in equity, including under common law, statute, or the Bankruptcy Code.

"Claim" means any claim within the meaning of section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.4.

"Closing Cash Payment" has the meaning set forth in Section 2.3(a).

"Closing Date" has the meaning set forth in Section 2.4.

"Closure Costs" means the closure costs for the Gym Locations associated with each Lease in the applicable amount set forth on Schedule 2.6(a).

"COBRA" means sections 601 through 608 of ERISA and section 4980B of the IRC.

"Company Benefit Plan" has the meaning set forth in Section 3.12(a).

"Company PTO Payments" means all amounts payable for vacation, sick leave, parental leave, and other paid time accrued by Sellers' employees who are not Transferred Employees.

"Company Severance Payments" means any amount payable in connection with, or arising out of any action resulting from, Sellers' employees' separation of employment.

"Competing Bid" has the meaning set forth in Section 5.3(d).

"<u>Contract</u>" means any agreement, contract, license, arrangement, commitment, promise, obligation, right, instrument, document, or other similar understanding, which in each case is in writing and signed by parties intending to be bound thereby (other than any Leases).

"<u>Covered Employee</u>" means an employee of Blink or any of its Subsidiaries as of the date hereof whose duties relate primarily to the operation of the Business at the Acquired Gym Locations, including such employees who have been furloughed or are on short-term disability, long-term disability, or any other approved leave of absence as of the Closing.

"<u>Cure Costs</u>" means all amounts payable, and obligations that must be satisfied, in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption of the Assumed Leases and the Membership Agreements.

"<u>Decree</u>" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order, or any other order of any Governmental Authority.

"<u>Deposit</u>" has the meaning set forth in <u>Section 2.3(b)</u>.

"<u>Disclosure Schedule</u>" has the meaning set forth in <u>Article III</u>.

"<u>Display Merchandise</u>" means those items of inventory used in the ordinary course of business as displays or floor models at the Gym Locations, including inventory that has been removed from its original packaging for the purpose of putting such item on display, which goods are not otherwise damaged or defective.

"<u>Encumbrances</u>" means any claim, community or other marital property interest, condition, equitable interest, right of way, encroachment, servitude, right of first refusal, or similar restriction, including any restriction on use, voting (in the case of any security or equity interest), transfer, receipt of income, or exercise of any other attribute of ownership.

"<u>Environmental Law</u>" means any federal, state, local, or foreign law, statute, code, ordinance, rule, or regulation relating to the protection of the environment or natural resources.

"<u>Equipment Lease</u>" means that certain Master Equipment Financing Agreement, dated July 12, 2016, between Macrolease Corporation and Blink Holdings, Inc. (Contract Number 27526), including any and all amendments and schedules associated therewith.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended.

"<u>ERISA Affiliate</u>" means any Person that, at any relevant time, is or was treated as a single employer with any Seller for purposes of IRC § 414.

"<u>Escrow</u>" has the meaning set forth in <u>Section 2.3(b)</u>.

"<u>Escrow Holder</u>" has the meaning set forth in <u>Section 2.3(b)</u>.

"Excluded Assets" means all assets of Sellers as of the Closing other than Acquired Assets, including, without limitation, the following assets:

(a)    all files, books, records and documents prepared in connection with this Agreement or the transactions contemplated hereby or primarily relating to the Bankruptcy Cases, all minute books, corporate records (such as stock registers), and organizational documents of Sellers, Tax Returns, other Tax work papers, and all other documents not related to the Business, the Acquired Gym Locations, the Acquired Assets, or the Covered Employees;

(b)    all files, books, records, and documents constituting work product of Sellers' legal counsel;

(c)    all files, books, records, and documents the disclosure or transfer of which is prohibited by third party agreement or applicable Laws;

(d)    any Contract other than the Assumed Leases and Membership Agreements;

(e)    any Lease other than the Assumed Leases;

(f)    any Excluded Tax Assets;

(g)    prepaid insurance;

(h)    all avoidance actions under chapter 5 of the Bankruptcy Code or any Causes of Action that are not an Acquired Asset;

(i)    any security deposits or pre-paid expenses paid prior to the Closing Date and not associated with the Acquired Assets;

(j)    all insurance policies and binders, all claims, refunds, and credits from insurance claims, insurance policies, or binders due or to become due with respect to such policies or binders and all rights to proceeds thereof;

(k)    all equipment, tools, or assets belonging to employees or independent contractors of Sellers;

(l)    all shares of capital stock or other equity interests of any Seller and all securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller or any other Person; and

(m)    all assets, properties, rights, interests, and Claims of every kind and description of any Sellers that (i) are not Acquired Assets, (ii) are not related to, used, or held for use in, the Business, or (iii) are described on Schedule A.

"Excluded Liabilities" means any Liabilities of Sellers, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities.  Without limiting the foregoing, Buyer shall not

be obligated to assume, and does not assume, and hereby disclaims all the Excluded Liabilities, including the following Liabilities (which shall also be considered Excluded Liabilities) of any of Sellers or of any predecessor of any of Sellers, whether incurred or accrued before or after the Closing:

(a)     any Liability not relating to or arising out of the Business or the Acquired Assets, including any Liability exclusively relating to or primarily arising out of the Excluded Assets;

(b)     any Liability of Sellers for Taxes (except as provided for in <u>Section 6.4</u>);

(c)     all Liabilities of Sellers under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby;

(d)     any Liability associated with any and all indebtedness, including any guarantees of third party obligations, and reimbursement obligations to guarantors of Sellers' obligations or under letters of credit of any Seller;

(e)     any Liabilities in respect of any Contracts or Leases other than the Assumed Leases and Membership Agreements;

(f)     all Liabilities for fees, costs, and expenses that have been incurred or that are incurred or owed by Sellers in connection with this Agreement or the administration of the Bankruptcy Cases (including all fees and expenses of professionals engaged by Sellers) and administrative expenses and priority claims accrued through the Closing Date and specified post-closing administrative wind-down expenses of the bankrupt estates pursuant to the Bankruptcy Code, and all costs and expenses incurred in connection with (i) the negotiation, execution, and consummation of the transactions contemplated under this Agreement and each of the other documents delivered in connection herewith, and (ii) the consummation of the transactions contemplated by this Agreement, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of Sellers payable as a result of the consummation of the transactions contemplated by this Agreement and the documents delivered in connection herewith;

(g)     all Liabilities (i) related to WARN Act, to the extent applicable, with respect to the termination of Sellers' employees, (ii) Company Severance Payments, and (iii) Company PTO Payments;

(h)     all Liabilities relating to claims for workers compensation for acts that occurred prior to the Closing Date, including any claims under outstanding letters of credit.

(i)     all Liabilities with respect to the termination of employment of "insiders" (as such term is defined under the Bankruptcy Code) of any Seller;

(j)     all Company Benefit Plans (including all assets, trusts, insurance policies and administration service contracts related thereto);

(k)    all Liabilities with respect to any terminated employees with respect to COBRA;

(l)    all Liabilities of Sellers to Sellers' equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments, or otherwise, and any Liability of Sellers pursuant to any Affiliate Agreement;

(m)    all Liabilities arising out of or relating to any business or property formerly owned or operated by any Sellers, any Affiliate, or predecessor thereof, but not presently owned and operated by any Sellers;

(n)    all Liabilities relating to Litigation, claims, actions, suits, arbitrations, litigation matters, proceedings, or investigations (in each case whether involving private parties, Governmental Authorities, or otherwise) involving, against, or affecting any Acquired Asset, the Business, Blink, or any assets or properties of Sellers, commenced, filed, initiated, or threatened before the Closing and relating to facts, events, or circumstances arising or occurring before the Closing;

(o)    all Liabilities arising under Environmental Laws relating to facts, events, or circumstances arising or occurring before the Closing;

(p)    Liabilities to any employees arising prior to the Closing, except for vacation, sick leave, parental leave, and other paid time accrued by Sellers' employees who are Transferred Employees; and

(q)    all Liabilities of Sellers or Sellers' predecessors arising out of any contract, agreement, Permit, franchise, or claim that is not transferred to Buyer as part of the Acquired Assets or is not transferred to Buyer because of any failure to obtain any third-party or governmental consent required for such transfer.

"Excluded Tax Assets" means any Tax refunds, net operating losses, rebates, or credits of Sellers and the owners of the Sellers.

"GAAP" means United States generally accepted accounting principles consistently applied.

"Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

"Gym Locations Cash Amount" means Sellers' cash located at the Acquired Gym Locations as of the Closing Date.

"Gym Locations" has the meaning set forth in Section 3.6.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended.

"Intellectual Property" means any and all intellectual property and other similar proprietary rights, in any jurisdiction in the world (whether arising under statutory or common law, contract, or otherwise), that includes rights pertaining to or arising from: (i) inventions, discoveries, processes, designs, techniques, developments, and related improvements whether or not patentable; (ii) patents, patent applications, industrial design registrations and applications therefor, divisions, divisionals, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, re-examinations, extensions and any provisional applications, or any such patents or patent applications, and any foreign or international equivalent of any of the foregoing; (iii) trademarks (whether registered, unregistered, or pending), trade dress, service marks, service names, trade names, brand names, product names, logos, domain names, internet rights (including IP addresses and AS numbers), corporate names, fictitious names, other names, symbols (including business symbols), slogans, translations of any of the foregoing, and any foreign or international equivalent of any of the foregoing and all goodwill associated therewith and (to the extent transferable by law but subject to Section 6.1(d)) any applications or registrations in connection with the foregoing and all advertising and marketing collateral including any of the foregoing; (iv) work specifications, databases, and artwork; (v) technical, scientific, and other know-how and information (including promotional material and tech packs and blocks), trade secrets, confidential information, methods, processes, practices, formulas, designs, patterns, assembly procedures, specifications; (vi) rights associated with works of authorship including copyrights, moral rights, design rights, rights in databases, copyright applications, copyright registrations, rights existing under any copyright laws, and rights to prepare derivative works; (vii) work for hire; (viii) the names "Blink" and "Blink Fitness" or any derivations thereof, (ix) customer lists and databases, websites, social media sites and accounts (including the content contained therein, user names, and passwords), diagrams, drawings, domain names, and all advertising and marketing materials (including all physical, digital, or electronic imagery and design files), samples, product catalogs, product designs and specifications (including tech specifications), and vendor and Merchandise supplier data and information, (x) computer software and firmware, including data files, source code, object code, and software-related specifications and documentation, (xi) all books and records, files, data, reports, computer codes and sourcing data, advertiser and supplier lists, cost and pricing information, business plans, and manuals, blueprints, research and development files, and other records; (xii) financial, marketing and business data, pricing, and cost information, business and marketing plans and other information, files, correspondence, records, data, plans, reports, recorded knowledge, historical trademark files, and prosecution files in whatever media retained or stored, including computer programs and disks, (xiii) the right to sue for infringement and other remedies against infringement of any of the foregoing, and (xiv) rights to protection of interests in the foregoing under the laws of all jurisdictions.

"Intellectual Property Licenses" means any grant to Sellers of a right to use a third Person's Intellectual Property rights (other than off-the-shelf software for which Sellers pays less than twenty-five thousand Dollars ($25,000) in licensing or other fees per software title per annum).

"Inventory" means all of Sellers' inventory and goods now owned or hereinafter acquired, located at the Gym Locations and relating to the Business, including all inventory and goods that (i) are held by Sellers for sale or lease or to be furnished by Sellers under a Contract of service or (ii) consist of raw materials, work in process, finished goods, supplies, or material used or

consumed in connection with the Business that is maintained or held by, or stored at, the Gym Locations.

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"Knowledge" of Sellers or Blink (and other words of similar import) means the actual knowledge of Guy Harkless and Benjamin Balick.

"Law" means any constitution applicable to, and any statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

"Leases" means all leases, subleases, licenses, concessions, options, contracts, extension letters, easements, reciprocal easements, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates, and other agreements (written or oral), any amendments or supplements to the foregoing, and recorded memoranda of any of the foregoing, pursuant to which any Seller holds any leasehold or subleasehold estates and other rights in respect of any Gym Locations.

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due) regardless of when arising.

"Lien" means any lien (statutory or otherwise), Claim, Encumbrance, deed of trust, right of first offer, easement, servitude, transfer restriction under any shareholder or similar agreement, mortgage, pledge, lien, charge, security interest, option, right of first refusal, easement, security agreement, or other encumbrance or restriction on the use or transfer of any property, hypothecation, license, preference, priority, covenant, right of recovery, order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any leasehold interest, license, or other right, in favor of a third party or a Seller, to use any portion of the Acquired Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown; provided, however, that "Lien" shall not be deemed to include any Intellectual Property License.

"Litigation" means any action, cause of action, suit, claim, investigation, audit, demand, hearing, or proceeding, whether civil, criminal, administrative or arbitral, whether at law or in equity, and whether before any Governmental Authority.

"Location Closing Costs" means the aggregate amount of the Closure Costs for the Gym Locations associated with any Leases set forth on Schedule 2.6(a) that Buyer does not assume pursuant to Section 2.6(b).

"Material Adverse Effect" means any effect, condition, fact, circumstance, or change that has, or could reasonably be expected to have, individually or in the aggregate, a material adverse effect on the condition of the Acquired Assets, taken as a whole, other than any effects, circumstances, or changes to the extent arising from or related to: (i) general business or economic conditions in any of the geographical areas in which the Acquired Gym Locations operate; (ii) any condition or occurrence affecting gyms and health clubs or the fitness and health industry generally; (iii) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (iv) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (v) the occurrence of any act of God or other calamity or force majeure events (whether or not declared as such), including any strike, labor dispute, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event; (vi) changes in Law or accounting rules (including GAAP); (vii) the taking of any action required or permitted by this Agreement or any Related Agreement or taken (or omitted to be taken) with the consent of the other Party (other than any action taken pursuant to Section 5.2(a)); (viii) any effects or changes as a result of the announcement, pendency, or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors, or others having relationships with Sellers; (ix) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code; (x) the closing of any gyms not acquired by Buyer or the sale of any other assets or gyms to any third parties by any Seller or any of its Affiliates; (xi) any effects or changes arising from or related to the breach of the Agreement by Buyers; (xii) the failure of Sellers to obtain any consent, permit, authorization, waiver, or approval required in connection with the transactions contemplated hereby; (xiii) any items set forth in the Disclosure Schedule; or (xiv) any effect resulting from the filing or pendency of the Bankruptcy Cases.

"Merchandise" shall mean all finished goods inventory that is owned by Sellers and located at the Gym Locations as of the Closing Date.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice from the date of the filing of the Bankruptcy Cases, but subject, however, to changes arising or resulting from the filing or pendency of the Bankruptcy Cases.

"Outside Back-up Date" has the meaning set forth in Section 5.3(c).

"Parties" has the meaning set forth in the preamble.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance, or similar right obtained from any Governmental Authority.

"Permitted Lien" means (i) Liens for Taxes not yet delinquent or that are being contested in good faith by appropriate proceedings and arising or incurred in the Ordinary Course of Business; (ii) mechanic's, workmen's, repairmen's, warehousemen's, carrier's, or other similar Liens, including all statutory liens, arising, or incurred in the Ordinary Course of Business for amounts that are not delinquent and that are not, individually or in the aggregate, material to the

Business; (iii) with respect to leased or licensed real or personal property, the terms and conditions of the lease, license, sublease, or other occupancy agreement applicable thereto that are customary; (iv) with respect to any leased real property, usual, and customary zoning, building codes, and other land use laws regulating to the use or occupancy of such leased real property or the activities conducted thereon that are imposed by any Governmental Authority having jurisdiction over such leased real property; and (v) usual and customary easements, covenants, conditions, restrictions, and other similar matters affecting title to real property and other encroachments and title and survey defects provided that they do not materially detract from the property.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

"Petition Date" has the meaning set forth in the recitals.

"Post-Petition Trade Payables" means all trade payables arising on or after the Petition Date for goods or services provided to any Seller in connection with the Acquired Gym Locations that have not been outstanding for more than thirty (30) days as of the Closing.

"Prevailing Bidder" has the meaning set forth in Section 5.3(c).

"Purchase Price" has the meaning set forth in Section 2.3.

"Related Agreements" means the Bill of Sale, the Assignment and Assumption Agreement, and any other agreement required to be executed and delivered in connection with Closing.

"Representative" means, when used with respect to a Person, the Person's controlled and controlling Affiliates (including Subsidiaries) and such Person's and any of the foregoing Person's respective officers, directors, managers, members, stockholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

"Requesting Party" has the meaning set forth in Section 6.2.

"Sale Hearing" means the hearing for approval of, among other things, this Agreement and the transactions contemplated herein.

"Sale Motion" means the motion, in form and substance reasonably acceptable to Buyer, filed by Sellers with the Bankruptcy Court seeking authority to sell the Acquired Assets which such motion may be made and included as a part of the Bid Procedures Motion.

"Sale Order" means the sale order or orders in form and substance reasonably agreed by Buyer and Sellers authorizing the sale of the Acquired Assets in accordance with this Agreement.

"Sellers" has the meaning set forth in the preamble.

"Subsidiary" means, with respect to any Person, on any date, any Person (a) the accounts of which would be consolidated with and into those of the applicable Person in such Person's

consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date or (b) of which securities or other ownership interests representing more than fifty percent of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests or more than fifty percent of the profits or losses of which are, as of such date, owned, controlled, or held by the applicable Person or one or more subsidiaries of such Person.

"Successful Bidder" has the meaning set forth in the Bidding Procedures Order.

"Tax" or "Taxes" means any United States federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary, or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto and any amendment, thereof.

"Termination Date" has the meaning set forth in Section 8.1(b)(ii).

"Transfer Tax" has the meaning set forth in Section 6.4.

"Transferred Employee" has the meaning set forth in Section 6.3(a).

"WARN Act" means, collectively, the Worker Adjustment and Retraining Notification Act of 1989 and any similar state or local law.

Section 1.2    Interpretations.  Unless otherwise indicated herein to the contrary:

(a)    When a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause, or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause, or subclause of this Agreement.

(b)    The words "include", "includes", or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof", "herein", and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(e)     The use of "or" herein is not intended to be exclusive.

(f)     The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine, or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(g)     All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

(h)     References herein to a Person are also to such Person's successors and permitted assigns.  Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto.

(i)     Any reference herein to "Dollars" or "$" shall mean United States dollars.

(j)     Buyer acknowledges and agrees that the specification of any dollar amount in the representations, warranties, or covenants contained in this Agreement is not intended to imply that such amounts or higher or lower amounts are or are not material, and Buyer shall not use the fact of the setting of such amounts in any dispute or controversy between the Parties as to whether any obligation, item, or matter is or is not material.

(k)     References in this Agreement to materials or information "furnished to Buyer" and other phrases of similar import include all materials or information made available to Buyer or Buyer's Representatives in the data room prepared by Sellers or provided to Buyer or Buyer's Representatives in response to requests for materials or information.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets.   On the terms and subject to the conditions set forth in this Agreement, Buyer will purchase and acquire from Sellers, and Sellers will sell, transfer, assign, convey, and deliver to Buyer at the Closing all of the Acquired Assets.

Section 2.2    Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, Buyer will assume and become responsible for the Assumed Liabilities at the Closing.  Buyer agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored, and discharged, all Assumed Liabilities in a timely manner in accordance with the terms thereof, including paying all Cure Costs.  For the avoidance of doubt, (a) Sellers shall not be liable for, and shall have no obligation to pay or cause to be paid, any Cure Costs and (b) Buyer shall not be liable for, and shall have no obligation to pay or cause to be paid, any Liabilities other than the Assumed Liabilities.

Section 2.3    Consideration; Deposit.

(a)    The consideration for the Acquired Assets shall be the sum of (i) Two Hundred Thousand Dollars ($200,000.00) *plus* the Location Closing Costs (the "Closing Cash Payment") and (ii) assumption of the Assumed Liabilities (together, the "Purchase Price"); provided, however, that Purchaser reserves the right to increase the Purchase Price in its sole discretion by written notice to Sellers, subject to the Bidding Procedures Order and applicable Law and to the extent the amount of the Purchase Price payable in cash is increased, Closing Cash Payment shall refer to such increased cash amount. The Closing Cash Payment shall be paid at the Closing by Buyer to the Sellers by wire transfer of immediately available funds to an account designated in writing by the Sellers Representative to Buyer no later than two (2) Business Days prior to the Closing Date.

(b)    Buyer has delivered into a segregated account (the "Escrow") maintained by an escrow holder mutually agreed to by the Parties (the "Escrow Holder") the sum of Seventy-Five Thousand Dollars ($75,000.00) (the "Deposit") in immediately available funds. Upon receipt of the Deposit, the Escrow Holder placed the Deposit into a non-interest-bearing account. The Deposit shall become nonrefundable upon the earlier of (i) the entry of an Order of the Bankruptcy Court approving Buyer as the Successful Bidder at the hearing on the Sale Motion and satisfaction by all Parties of all conditions set forth in Article VII, and the absence of any restriction, limitation, or prohibition on Buyer's right to acquire the Acquired Assets in the manner, and under the terms and conditions, set forth in this Agreement except where any such restriction, limitation, or prohibition is solely caused by an act or omission of Buyer and (ii) Sellers' termination of the transaction contemplated by this Agreement in accordance with Section 8.1(d) (a "Buyer Default Termination"). At the Closing, the Deposit shall be delivered to Sellers and credited toward payment of the Purchase Price. In the event the Deposit becomes non-refundable by reason of a Buyer Default Termination and Sellers are not then in default of this Agreement, Escrow Holder shall immediately disburse the Deposit to Sellers to be retained by Sellers for Sellers' own account as liquidated damages. If this Agreement is terminated in accordance with Section 8.1 for any reason other than a Buyer Default Termination and Buyer is not then in material breach of this Agreement, the Escrow Holder shall return the Deposit to Buyer within two (2) Business Days after the termination of this Agreement, provided, however, that if Buyer is designated as the Back-up Bidder, then the Escrow Holder shall return the Deposit to Buyer within two (2) Business Days after the closing on a Competing Bid.

Section 2.4    Closing.    The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801 (or such other location as shall be mutually agreed upon by Sellers and Buyer) commencing at 10:00 AM local time no later than November 29, 2024, subject to the prior or simultaneous satisfaction or waiver of all of the conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated hereby set forth in Article VII. The date on which the Closing is to occur shall be referred to herein as the "Closing Date".

Section 2.5    <u>Closing Payments and Deliveries</u>.

(a)    At the Closing, the applicable Seller will deliver to Buyer: (i) a duly executed Bill of Sale, substantially in the form reasonably agreed by Buyer and the Sellers (the "<u>Bill of Sale</u>"); (ii) a duly executed Assignment and Assumption Agreement, substantially in the form reasonably agreed by Buyer and the Sellers (the "<u>Assignment and Assumption Agreement</u>"); (iii) duly executed written instructions to the Escrow Holder directing the Escrow Holder to deliver the Deposit to Sellers; (iv) a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in <u>Section 7.1(a)</u> and <u>Section 7.1(b)</u> is satisfied; (v) a properly completed and duly executed IRS Form W-9 from each Seller; and (vi) a non-foreign affidavit from each Seller that is organized in or under the Laws of the United States or any state thereof, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to section 1445 of the IRC.

(b)    At the Closing, Buyer will deliver to Sellers: (i) an amount in cash equal to the Closing Cash Payment less the Deposit, (ii) the Bill of Sale duly executed by Buyer; (ii) the Assignment and Assumption Agreement duly executed by Buyer; (iii) duly executed written instructions to the Escrow Holder directing the Escrow Holder to deliver the Deposit to Sellers; (iv) a duly executed certificate from an officer of Buyer to the effect that each of the conditions specified in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> are satisfied.

(c)    With respect to the Assumed Leases assigned to Buyer on the Closing Date, Buyer shall satisfy on the Closing Date, all Cure Costs.

Section 2.6    <u>Assumption/Rejection of Certain Contracts and Leases</u>.

(a)    <u>Schedule 2.6(a)</u> sets forth a list or reference, as of the date hereof, of all unexpired Leases to which any Seller is a party that are available for assumption and assignment to Buyer in accordance with <u>Section 2.1</u> and <u>Section 2.2</u>, including, but not limited to, any amendment or modification that may contain lease concessions (such Leases together with the Equipment Lease, the "<u>Assumed Leases</u>") and sets forth the Sellers' good faith estimate of the Cure Costs, as of the date hereof, for each such Lease, and the Closure Costs for the Gym Location associated with each such Lease.

(b)    Buyer may remove any Leases from <u>Schedule 2.6(a)</u> by written notice to Sellers at any time from and after the date hereof until November 15, 2024, and any such removed Lease shall cease to be an Assumed Lease; <u>provided</u>, <u>however</u>, that (i) subject to the occurrence of the Closing, Buyer shall be responsible for payment of the Closure Costs with respect to any removed Leases and (ii) the removal of any Assumed Leases from <u>Schedule 2.6(a)</u> shall not reduce the Purchase Price. To the extent Sellers have not previously provided such notice, Sellers shall promptly notify in writing the counterparty to each Assumed Lease that such Assumed Lease will be assumed and assigned by Sellers to Buyer. Buyer will be responsible for payment (which payment shall be remitted as promptly as practicable following Buyer's receipt of an invoice or other appropriate documentation in respect of such Liabilities) of any Cure Costs related to all Assumed Leases.

(c)     Sellers shall take all actions reasonably required to assume and assign the Assumed Leases and the Membership Agreements to Buyer, including to obtain an order of the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Assumed Leases and Membership Agreements to Buyer satisfies all applicable requirements of § 365 of the Bankruptcy Code.

(d)     Buyer shall take all actions reasonably required for Sellers to assume and assign the Assumed Leases and the Membership Agreements to Buyer (including the payment of the Cure Costs related thereto), including taking all actions reasonably necessary to obtain an order of the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Assumed Leases and the Membership Agreements to Buyer satisfies all applicable requirements of § 365 of the Bankruptcy Code.

Section 2.7     Allocation.  Buyer and Sellers agree to allocate the Purchase Price (as finally determined hereunder), the Assumed Liabilities, and all other relevant items among the Acquired Assets in accordance with section 1060 of the IRC and the Treasury Regulations thereunder.   None of the Parties will take any position inconsistent with the Purchase Price Allocation, if any, on any Tax Return or in any audit or Tax proceeding, unless otherwise required by a final "determination" within the meaning of Section 1313 of the IRC (or comparable provision of state, local, or foreign Tax Law).   Notwithstanding the foregoing, the Parties recognize that certain allocations may be necessary prior to the above time schedule, such as in the case of any Transfer Tax filings, and agree to reasonably cooperate in determining the appropriate allocation in a timely manner.

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers represent and warrant to Buyer that the statements contained in this Article III are true and correct as of the date of this Agreement, except as set forth in the disclosure schedule accompanying this Agreement (the "Disclosure Schedule").

Section 3.1     Organization of Sellers; Good Standing.  Each Seller is either a corporation duly organized or a limited liability company duly formed, validly existing, and in good standing under the laws of the state of such Seller's incorporation or formation and has, subject to entry of the Sale Order, all requisite corporate or limited liability company power and authority to own, lease, and operate such Seller's assets and to carry on such Seller's business as now being conducted, except where the failure to be so organized or formed, existing, or in good standing or have such power and authority would not reasonably be expected to have a Material Adverse Effect.

Section 3.2     Authorization of Transaction.  Subject to entry of the Sale Order, each Seller has full power and authority (including full corporate or limited liability company power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which such Seller is a party and to perform such Seller's obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which each Seller is a party have been duly authorized by such Seller.  Upon due execution hereof by each Seller, this Agreement (assuming due

authorization and delivery by Buyer) shall constitute, subject to entry of the Sale Order, the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 3.3    <u>Noncontravention; Government Filings</u>.  Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in <u>Article II</u>), will (a) conflict with or result in a breach of the organizational documents of any Seller, (b) subject to the entry of the Sale Order, violate any Law or Decree to which any Seller is subject in respect of the Acquired Assets, or (c) subject to the entry of the Sale Order, result in a breach of, constitute a default under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel, or require any notice under any material Contract or Lease to which any Seller is a party or to which any of the Acquired Assets is subject, except, in the case of either clause, (b) or (c), for such conflicts, violations, breaches, defaults, accelerations, rights, or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Other than as required by, or pursuant to, the Bankruptcy Code, the Bidding Procedures Order, or the Sale Order, or such filings, if any, as may be required under the HSR Act, no Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file, or obtain such authorization, consent, or approval would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or prevent or materially impair or delay any Seller's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 3.4    <u>Title to Assets</u>.  At the Closing, subject to any Permitted Liens, Sellers will have good and valid title to, or the right to use, the Acquired Assets, except to the extent the failure to have such title or right to use would not reasonably be expected to have a Material Adverse Effect.  Pursuant to the Sale Order, Sellers will convey such title to or rights to use, all of the Acquired Assets, free and clear of all Liens (other than Permitted Liens).

Section 3.5    <u>Assumed Leases</u>.  True and materially complete copies of all Leases and the Equipment Lease set forth on Schedule 2.6(a) have been made available to Buyer in the data room prepared by Sellers, Schedule 2.6(a) sets forth the Sellers' good faith estimate of the Cure Costs, as of the date hereof, for each such Lease and the Equipment Lease, and the Closure Costs for each Lease.

Section 3.6    <u>Real Property</u>.  Sellers do not have any title interest in real property that is related to, used, useful, or held for use in the conduct of the Business. <u>Section 3.6</u> of the Disclosure Schedule sets forth the location of each of the operating gyms and health clubs (each, to the extent located at an Assumed Lease location, a "<u>Gym Location</u>", and collectively, the "<u>Gym Locations</u>"), each of which is leased to a Seller by a third party, and a list of all Leases.  Sellers have made available to Buyer a true and materially complete copy of each Lease.  With respect to each Lease, (a) assuming due authorization and delivery by the other party thereto, such Lease constitutes the valid and legally binding obligation of the Seller party thereto and, to Sellers' Knowledge, the counterparty thereto, enforceable against such Seller and, to Sellers' Knowledge,

the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity and (b) neither such Seller nor, to Sellers' Knowledge, the counterparty thereto is in breach or default under such Lease, except (i) for those defaults that will be cured in accordance with the Sale Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Leases) or (ii) to the extent such breach or default would not reasonably be expected to have a Material Adverse Effect.

Section 3.7    Litigation; Decrees.    Except as set forth in Section 3.7 of the Disclosure Schedule and other than the Bankruptcy Cases, there is no material Litigation pending against the Sellers, jointly or individually.  Other than the Bankruptcy Cases, no Seller is subject to any outstanding Decree that would (x) reasonably be expected to have a Material Adverse Effect or (y) prevent or materially delay such Seller's ability to consummate the transactions contemplated hereby or perform in any material respect its obligations hereunder.

Section 3.8    Labor Relations.  Except as set forth in Section 3.8 of the Disclosure Schedule:

(a)    No Seller is a party to or bound by any collective bargaining agreement.  To Sellers' Knowledge, no union or other labor organization; (i) is currently attempting to organize any employees of Sellers for the purpose of representation or (ii) has demanded recognition or filed any petition seeking certification.

(b)    Sellers have made available to Buyer a complete list, as of the date of this Agreement, of all employees of Sellers that identifies the job title, work location, date of hire, exempt or non-exempt status, employment status (whether active or on leave of absence), part-time or full-time, annual base salary or regular hourly wage rate, and bonus or commission entitlement for each such employee, as well as whether such employee is on leave and the date of such leave.

(c)    Except as set forth in Section 3.8(c) of the Disclosure Schedule, to Sellers' Knowledge, there is no charge or complaint of discrimination or retaliation, lawsuit, governmental investigation or audit, or other similar proceeding pending or threatened against any Seller by, on behalf of or relating to any employee(s) of Sellers.

Section 3.9    Brokers' Fees.  No Seller has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which any Buyer could become liable or obligated to pay.

Section 3.10  Taxes.

(a)    Except as set forth in Section 3.10 of the Disclosure Schedule and for matters that would not be reasonably expected to have a Material Adverse Effect, and except those Taxes for which the Sellers will seek authority from the Bankruptcy Court to pay (i) Sellers have timely filed all Tax Returns required to be filed with the appropriate Governmental Authorities in all jurisdictions in which such Tax Returns are required to be

filed (taking into account any extension of time to file granted or to be obtained on behalf of Sellers); (ii) all Taxes shown as due on such Tax Returns have been paid (other than any Taxes not due as of the date of the filing of the Bankruptcy Cases as to which subsequent payment was prohibited by reason of the Bankruptcy Cases); (iii) Sellers are not a party to any Litigation by any taxing authority; and (iv) there are no pending or, to Seller's Knowledge, threatened Litigation by any taxing authority.

(b)　　Sellers are not foreign persons within the meaning of section 1445 of the IRC.

Section 3.11　Data Privacy.　In connection with each Seller's collection, storage, transfer (including transfer across national borders) and use of any personally identifiable information from any individuals, including any members, customers, prospective members or customers, employees, and other third parties (collectively "Personal Information") each Seller is and, during the last three (3) years, has been in compliance in all material respects with applicable Laws regarding protection of Personal Information and each Seller's privacy policy in relevant jurisdictions.　Each Seller has all necessary right, title, or other interest in the Personal Information (i) to use such Personal Information as such Seller currently does in such Seller's operations; (ii) to transfer such Personal Information to Buyer; and (iii) to permit Buyer to use such Personal Information.　Neither the execution, delivery, or performance of this Agreement, nor the consummation of any of the transactions contemplated under this Agreement will violate any of Sellers' written privacy policy or applicable Law.　Each Seller has commercially reasonable physical, technical, organizational, and administrative security measures in place to protect all Personal Information collected by such Seller or on such Seller's behalf from and against unauthorized access, use, and disclosure in accordance with applicable Law.　Each Seller is and, during the last three (3) years, has been in compliance in all material respects with all Laws relating to data loss, theft, and breach of security notification obligations. To the Knowledge of Sellers, (i) there has been no unauthorized access, use, or disclosure of Personal Information in the possession or control of each Seller or any of its contractors with regard to any Personal Information obtained from or on behalf of the Seller and (ii) there has not been any unauthorized intrusions or breaches of security into any Seller systems.　Each Seller is, and during the last three (3) years, has been in compliance with the PCI Security Standards Council's Payment Card Industry Data Security Standard (PCI-DSS) and all other applicable security rules and requirements as promulgated by the PCI Security Standards Council, by any member thereof, or by any entity that functions as a card brand, card association, card network, payment processor, acquiring bank, merchant bank, or issuing bank, including all merchant- and service provider-specific requirements, the Payment Application Data Security Standards (PA-DSS) and all audit, scanning, and filing requirements..

Section 3.12　Employee Benefits.

(a)　　Section 3.12(a) of the Disclosure Schedule lists all "employee benefit plans," as defined in section 3(3) of ERISA, including any multiemployer plans as defined in section 3(37) of ERISA, and all other material employee benefit plans or arrangements (other than governmental plans and statutorily required benefit arrangements), including bonus or incentive plans, deferred compensation arrangements, severance pay, sick leave,

vacation pay, disability, medical insurance and life insurance maintained or contributed to by Sellers with respect to Covered Employees (the "Company Benefit Plans").

(b)     Sellers have delivered or made available to Buyer true, correct, and materially complete copies of the following documents with respect to each Company Benefit Plan: (i) each Company Benefit Plan (and all amendments thereto), and in the case of an unwritten Company Benefit Plan, a written description thereof, and any trust agreement, investment management contract, custodial agreement or insurance contract relating to such plan, (ii) the most recent summary plan description and all summaries of material modifications thereto, and (iii) the most recently filed annual reports on Form 5500 and all Schedules thereto.

(c)     Each of the Company Benefit Plans sponsored by Sellers that is intended to qualify under section 401 of the IRC has been determined by the IRS to be so qualified, and, except as disclosed on Section 3.12(c) of the Disclosure Schedule, to the Knowledge of Sellers, nothing has occurred with respect to the operation of any such plan which could reasonably be expected to result in the revocation of such favorable determination.

(d)     To Sellers' Knowledge, each of the Company Benefit Plans has been maintained, in all material respects, in accordance with its terms and all provisions of applicable Law.

(e)     No Company Benefit Plan is a "multiemployer plan" (as defined in section 3(37) of ERISA) ("Multiemployer Plan") or other pension plan that is subject to Title IV or Section 302 of ERISA or Section 412 of the Code and neither Sellers nor any of Sellers' ERISA Affiliates has sponsored or contributed to or been required to contribute to a Multiemployer Plan or other pension plan subject to Title IV or Section 302 of ERISA or Section 412 of the Code at any time within the previous six years. Neither Sellers nor any of Sellers' ERISA Affiliates has any liability (contingent or otherwise) relating to the withdrawal or partial withdrawal from a Multiemployer Plan.

(f)     No Company Benefit Plan provides benefits, including death or medical benefits, beyond termination of service or retirement other than (i) coverage mandated by Law, including but not limited to COBRA coverage, or (ii) death or retirement benefits under a Company Benefit Plan qualified under Section 401(a) of the Code, and neither Blink nor any of its ERISA Affiliates has made a written or oral representation promising the same.

Section 3.13   Compliance with Laws; Permits.

(a)     Sellers are in compliance with all Laws applicable to the Business, except as set forth in Section 3.13 of the Disclosure Schedule, as resulting from the filing and pendency of the Bankruptcy Cases or where the failure to be in compliance would not be reasonably expected to have a Material Adverse Effect. Sellers have not received any written notice of or been charged with the violation of any Laws, except where such violation would not be reasonably expected to have a Material Adverse Effect.

(b)      Sellers have all Permits that are required for the operation of the Business as presently conducted, except where such failure to have Permit would not be reasonably be expected to have a Material Adverse Effect.  Sellers are not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition, or provision of any Permit to which Sellers are parties, except where such default or violation would not be reasonably expected to have a Material Adverse Effect.

Section 3.14 Environmental Matters.    The representations and warranties contained in this Section 3.14 are the sole and exclusive representations and warranties of Sellers with respect to environmental matters, including matters relating to Environmental Laws.  Except as would not be reasonably likely to have a Material Adverse Effect:

(a)      the operations of Sellers are in compliance with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with all Permits issued pursuant to Environmental Laws necessary to operate the Business;

(b)      no Seller is the subject of any outstanding Litigation with any Governmental Authority with respect to Environmental Laws;

(c)      no Seller is the subject of any pending, or to the Knowledge of Sellers, threatened Litigation alleging that Sellers may (i) be in violation of any Environmental Law or any Permit issued pursuant to Environmental Law or (ii) have any liability under any Environmental Law; and

(d)      to the Knowledge of Sellers, there are no pending or threatened investigations of Sellers, or currently or previously owned, operated, or leased property of Sellers that would reasonably be expected to result in Sellers incurring liability pursuant to any Environmental Law.

Except as specifically provided in Section 3.1 through Section 3.14 above, Sellers and Sellers' Affiliates will convey the Acquired Assets to Buyer on an "As-Is, Where-Is" and "With All Faults" basis, without representations, warranties, or covenants, express or implied, of any kind or nature. Buyer hereby waives and relinquishes all rights and privileges arising out of, or with respect or in relation to, any representations, warranties or covenants, whether express or implied, that may have been made or given, or that may have been deemed to have been made or given, by Sellers or their Representatives, except for those expressly set forth in this Agreement.  Upon the Closing Date, Buyer agrees to assume all risk and liability (and agrees that Sellers will not be liable for any special, direct, indirect, consequential, or other damages) resulting or arising from or relating to the ownership, use, condition, location, maintenance, repair, or operation of the Acquired Assets. None of Sellers nor any other Person is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating to any Seller (including, but not limited to, any relating to financial condition, results of operations, assets or liabilities of such Seller), except as expressly set forth in this Article III and the Disclosure Schedule, and each of the Sellers hereby disclaims any such other representations or warranties.

## ARTICLE IV
## BUYERS' REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to each Seller that the statements contained in this <u>Article IV</u> are true and correct as of the date of this Agreement.

Section 4.1    <u>Organization of Buyer; Good Standing</u>.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Buyer's organization and has all requisite corporate power and authority to own, lease, and operate Buyer's assets and to carry on Buyer's business as now being conducted.

Section 4.2    <u>Authorization of Transaction</u>.  Buyer has full power and authority (including full company power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which Buyer is a party and to perform Buyer's obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which Buyer is a party have been duly authorized by Buyer. This Agreement (assuming due authorization and delivery by Sellers) constitutes the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with this Agreement's terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 4.3    <u>Noncontravention</u>.    Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in <u>Article II</u>) will (a) conflict with or result in a breach of the certificate of incorporation or bylaws, certificate of formation or operating agreement, or other organizational documents, as applicable, of Buyer, (b) violate any law or Decree to which Buyer is, or Buyer's assets or properties are, subject or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract or Lease to which Buyer is a party or by which Buyer is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights, or failures to give notice as would not, individually or in the aggregate, have a material adverse effect on Buyer.  Except for such filings, if any, as may be required under the HSR Act, Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform Buyer's obligations hereunder on a timely basis.

Section 4.4    <u>Litigation; Decrees</u>.  There is no Litigation pending or, to Buyer's knowledge, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  Buyer is not subject to any outstanding Decree that would prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform Buyer's obligations hereunder on a timely basis.

Section 4.5    Brokers' Fees.  Buyer has not entered into any contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Sellers or any of Sellers' Affiliates could become liable or obligated to pay.

Section 4.6    Sufficient Funds; Adequate Assurances.  Buyer has and will have at the Closing immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including the payment of the Purchase Price, the Cure Costs, and all fees, expenses of, and other amounts required to be paid by Buyer in connection with the transactions contemplated hereby.  Buyer is capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Leases, the Membership Agreements, and the related Assumed Liabilities.

Section 4.1    "AS IS" Transaction.  BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE III ABOVE, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS INCLUDING EXPENSES TO BE INCURRED IN CONNECTION WITH THE ACQUIRED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY COMPRISING A PART OF THE ACQUIRED ASSETS OR THAT IS THE SUBJECT OF THE ASSUMED LEASES TO BE ASSUMED BY BUYER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY LEASED REAL PROPERTY OR IMPROVEMENTS THAT ARE THE SUBJECT OF THE ASSUMED LEASES TO BE ASSUMED BY BUYER AT THE CLOSING, THE ZONING OF ANY SUCH LEASED REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE ACQUIRED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF PROPERTY, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE ACQUIRED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE ACQUIRED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ACQUIRED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH BUYER'S ACQUISITION OF THE ACQUIRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE III, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, BUYER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS." BUYER HEREBY EXPRESSLY ACKNOWLEDGES THAT THE ASSIGNMENT AND ASSUMPTION OF THE ASSUMED LEASES AND MEMBERSHIP AGREEMENTS

FORMING PART OF THE ACQUIRED ASSETS WILL BE CONSUMMATED IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT NOTWITHSTANDING ANY AND ALL OUTSTANDING DEFAULTS AND OTHER CLAIMS FOR FAILURES TO COMPLY WITH THE PROVISIONS OF SUCH ASSUMED LEASES AND MEMBERSHIP AGREEMENTS, CERTAIN OF WHICH DEFAULTS OR CLAIMS MAY NOT BE SUBJECT TO CURE OR WAIVER.

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1    Efforts; Cooperation.  Upon the terms and subject to the conditions set forth in this Agreement (including Section 5.4(a)), each of the Parties shall use such Party's commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things reasonably necessary, proper or advisable to consummate and make effective, the transactions contemplated hereby, except as otherwise specifically provided in Section 5.4.  Without limiting the generality of the foregoing, (i) each Seller shall use such Seller's commercially reasonable efforts to cause the conditions set forth in Section 7.1 that are within such Seller's control or influence to be satisfied or fulfilled and (ii) each Buyer shall use Buyer's commercially reasonable efforts to cause the conditions set forth in Section 7.2 that are within Buyer's control or influence to be satisfied or fulfilled.

Section 5.2    Conduct of the Business Pending the Closing.

(a)    During the period prior to the Closing, Sellers shall use commercially reasonable efforts, except as otherwise required, authorized, or restricted by applicable Law, pursuant to the Bankruptcy Code, or pursuant to a Decree of the Bankruptcy Court, to operate the Business in the Ordinary Course of Business.  Sellers shall use commercially reasonable efforts to, except as related to or the result of the filing or pendency of the Bankruptcy Cases, (i) preserve intact Sellers' respective business organizations, (ii) maintain the Business and the Acquired Assets (normal wear and tear excepted), (iii) keep available the services of Sellers' respective officers and Covered Employees, (iv) maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, vendors, and others having business relationships with Sellers in connection with the operation of the Business (other than payment of pre-petition claims), and (v) continue to operate the Business and Acquired Assets in all material respects in compliance with all Laws applicable to the Business and Sellers consistent with past practice in place immediately prior to the Petition Date.

(b)    Except (i) any and all matters as may be approved by the Bankruptcy Court, (ii) as required by applicable Law or by Decree of the Bankruptcy Court, (iii) as otherwise contemplated by this Agreement, or (iv) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed), no Seller shall, solely as it relates to the Business:

(i)    other than in the Ordinary Course of Business, (A) materially increase the annual level of compensation of any Covered Employee or (B) materially increase or decrease the coverage or benefits available under any (or create any new) Employee Benefit Plan;

(ii)    subject any of the Acquired Assets to any Lien, except for Permitted Liens and any Lien securing any debtor-in-possession loan facility or granted in an order authorizing use of cash collateral;

(iii)    terminate, amend, or fail to renew, obtain, or preserve any material Permit;

(iv)    make any material loans or material advances;

(v)    enter into any Contract that limits or restricts the conduct or operations of the business of Sellers;

(vi)    incur, create, assume, guarantee, or become liable for any indebtedness, other than trade debt and other indebtedness incurred in the Ordinary Course of Business;

(vii)    except as previously disclosed to or known by Buyer, materially modify, amend, supplement, or terminate any Leases set forth on Schedule 2.6(a);

(viii)    write up, write down, or write off the book value of any assets other than in the Ordinary Course of Business;

(ix)    modify, amend, supplement, or terminate the Assumed Leases;

(x)    except to replace any vacancy created in an existing position by an employee's departure, engage any new employee whose annual base salary would exceed one hundred thousand Dollars ($100,000);

(xi)    reject the Assumed Leases or Membership Agreements or, prior to November 15, 2022, any Leases or Membership Agreements;

(xii)    seek to accelerate the receipt of any royalty payments or licensing receivables generated by the Business, by way of discount or otherwise;

(xiii)    terminate any Covered Employee unless such termination is for "cause";

(xiv)    alter, change or otherwise modify the membership or pricing structure in existence as of the Petition Date at any Gym Location, including but not limited to, the launch of any customer promotions; or

(xv)    agree to do anything prohibited by this Section 5.2.

Section 5.3    Bankruptcy Court Matters.

(a)    This Agreement and the transactions contemplated hereby are subject to Sellers' right and ability to consider higher or better competing bids with respect to the Business and any material portion of the Acquired Assets pursuant to the Bidding Procedures Order (each a "Competing Bid").

(b)    If there is an Auction and Buyer is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Prevailing Bidder") but is designated as the Back-up Bidder, then Buyer shall keep Buyer's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) open and irrevocable until the earlier of the Termination Date and the date of closing of a Competing Bid with the Prevailing Bidder (the "Outside Back-up Date"). Following the Sale Hearing and prior to the Outside Back-up Date, if the Prevailing Bidder fails to consummate the applicable alternative transaction as a result of a breach or failure to perform on the part of such Prevailing Bidder, then Buyer, as Back-up Bidder, will be deemed to have the new prevailing bid, and Sellers will be authorized, without further order of the Bankruptcy Court, to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) with Buyer.

(c)    Sellers shall promptly serve true and correct copies of the Sale Motion and all related pleadings in accordance with the Bidding Procedures Order, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, and any other applicable order of the Bankruptcy Court.

(d)    Sellers shall seek entry of the Sale Order by the Bankruptcy Court within five (5) Business Days after conclusion of the Auction or the date on which the Auction is cancelled in accordance with the Bidding Procedures Order or the earliest date thereafter that the Bankruptcy Court is available to conduct a hearing to consider the Sale Order. The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement, (B) the sale of the Acquired Assets to Buyer on the terms set forth herein and free and clear of all Liens (other than Liens included in the Assumed Liabilities and Permitted Liens) and Encumbrances, and (C) the performance by Sellers of Sellers' respective obligations under this Agreement; (ii) authorize and empower Sellers to assume and assign to Buyers the Assumed Leases and Membership Agreements; and (iii) find that each Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to any Seller and grant Buyer the protections of Section 363(m) of the Bankruptcy Code. Buyer shall promptly take such actions as are reasonably requested by Sellers to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (a) demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (b) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy

Code.  In the event that the Bankruptcy Court's approval of the Sale Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

(e)     Unless otherwise provided in the Bidding Procedures Order, the Bidding Procedures Order shall apply to the sale of the Business hereunder.

Section 5.4   <u>Notices and Consents</u>.   Prior to the Closing and as necessary following the Closing:

(a)     To the extent that the Sale Order does not eliminate the requirement to obtain the prior consent of or notification to any one or more counterparties to an Assumed Lease, Sellers will give, or will cause to be given, any notices to third parties, and each of the Parties will use such Party's commercially reasonable efforts to obtain any third party consents as are otherwise necessary and appropriate to consummate the transactions contemplated hereby; and

(b)     Each of the Parties will give any notices to, make any filings with, and use such Party's commercially reasonable efforts to obtain any authorizations, consents, and approvals of Governmental Authorities necessary and appropriate to consummate the transactions contemplated hereby.

Section 5.5   <u>Notice of Developments</u>.   Each Seller and Buyer will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which such Party has knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in <u>Article VII</u> not to be satisfied as of a reasonably foreseeable Closing Date or (b) the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; <u>provided</u>, <u>however</u>, that the delivery of any such notice pursuant to this <u>Section 5.5</u> shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.

Section 5.6   <u>Access</u>.   Sellers will provide Buyer and Buyer's Representatives access to (a) all books and records and the Leases included in the Acquired Assets via an electronic data room, (b) each of the properties that is subject to a Lease and the Gym Locations related thereto, and appropriate personnel with respect to such Leases and Gym Locations including Blink corporate representatives and management employees, upon reasonable advance notice and in a manner reasonably acceptable to Sellers; <u>provided</u>, <u>however</u>, that, for avoidance of doubt, the foregoing shall not require any Person to waive, or take any action with the effect of waiving, such Party's attorney-client privilege with respect thereto.   Buyer shall, upon reasonable notice to Sellers, be permitted to contact any of the following Persons, at any time after the date of this Agreement (and Sellers shall provide the contact information therefor): (i) the landlords under any of the Leases and (ii)  vendors, licensors, and licensees of the Business to the extent related to the Leases or the Gym Locations.

Section 5.7   <u>Bulk Transfer Laws</u>.   Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer laws or similar laws of any jurisdiction in

connection with the transactions contemplated by this Agreement, including the United Nations Convention on the Sale of Goods, and hereby waives all claims related to the non-compliance therewith.

Section 5.8   <u>Governmental Approvals and Consents</u>.   Each Party will, as promptly as possible and, in any event, within five (5) days after the entry of the Sale Order with respect to any Notification and Report Form required under the HSR Act, if applicable, (a) make, or cause to be made, all filings and submissions required under any Law applicable to such Party or any of such Party's Affiliates and (b) use commercially reasonable efforts to obtain, or cause to be obtained, all consents, authorizations, orders, and approvals from all Governmental Authorities that, in either case, may be or become necessary for such Party's execution and delivery of this Agreement and the performance of such Party's obligations pursuant to this Agreement and the Related Agreements.   Each Party will cooperate fully with the other Parties and the other Parties' respective Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals.   The parties hereto will not willfully take any action that will have the effect of delaying, impairing, or impeding the receipt of any required consents, authorizations, orders, and approvals.   If any filing is required under the HSR Act, the filing fee with respect to such filing shall be borne one-half by Buyer and one-half by Sellers.

## ARTICLE VI
## OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing:

Section 6.1   <u>Further Assurances</u>.

(a)   In case at any time after the Closing any further action is necessary to carry out a Party's obligations under this Agreement, such Party will, at the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request which actions shall be reasonably necessary to transfer, convey, or assign to the applicable Buyer all of the Acquired Assets to be acquired by Buyer in accordance with <u>Section 2.1</u> or to confirm Buyer's assumption of the Assumed Liabilities to be assumed by Buyer in accordance with <u>Section 2.2</u>.

(b)   If, following the Closing, Buyer or any Seller becomes aware that Buyer or any of Buyer's Affiliates owns any asset or rights that is an Excluded Asset, such Party shall promptly inform the other Party of that fact.   Thereafter, at the request of any Seller, Buyer shall execute, or cause the relevant Affiliate of Buyer to execute, such documents as may be reasonably necessary to cause the transfer of and Buyer shall thereafter transfer any such asset or right to such Seller or such other entities nominated by such Seller for no consideration and such Seller shall do all such things as are reasonably necessary to facilitate such transfer.   If, following the Closing, Buyer receives any payments in respect of an Excluded Asset, Buyer shall promptly remit such payments to the applicable Seller or other entity nominated by such Seller.

(c)      If, following the Closing, Buyer or any Seller becomes aware that a Seller or any of Sellers' Affiliates owns any asset or rights that is an Acquired Asset, such Party shall promptly inform the other Party of that fact.  Thereafter, at the request of Buyer, the applicable Seller shall execute or cause the relevant Affiliate of such Seller to execute such documents as may be reasonably necessary to cause the transfer of and such Seller shall thereafter transfer any such asset or right to Buyer or any other entities nominated by Buyer for no consideration and Buyer shall do all such things as are reasonably necessary to facilitate such transfer.  If, following the Closing, a Seller or such Seller's Affiliates receive any payments in respect of the Acquired Assets, such Seller shall promptly remit such payments to Buyer or other entity nominated by Buyer.

(d)      With respect to any Acquired Asset (and any asset that is not an Acquired Asset solely as a result of a restriction on transfer or assignment) for which consent or approval is required for transfer or assignment but is not obtained prior to the Closing, Sellers shall reasonably cooperate with Buyer for up to ninety (90) days after Closing in any reasonable arrangement that Buyer may request to provide Buyer with all of the benefits of, or under, the applicable Acquired Assets (or assets that are not Acquired Assets solely as a result of a restriction on transfer or assignment), including taking actions reasonably required to enforce, for the benefit of Buyer, any and all rights of Sellers against any party to the applicable Acquired Asset.

Section 6.2    Access; Enforcement; Record Retention.    From and after the Closing, upon request by any Party (the "Requesting Party"), the other Parties will permit such Requesting Party and such Requesting Party's Representatives to have reasonable access during normal business hours, at the sole expense of such Requesting Party and in a manner so as not to interfere unreasonably with the normal business operations of the other Party, to all premises, properties, personnel, books and records, and Contracts or Leases of such Party for the purposes of (a) preparing Tax Returns, (b) monitoring or enforcing rights or obligations under this Agreement or any of the Related Agreements, (c) otherwise providing such reasonable assistance and cooperation as may be requested by Buyer from time to time to reasonably facilitate the transition of the Business; or (d) defending third-party lawsuits or complying with the requirements of any Governmental Authority; provided, however, that, for avoidance of doubt, the foregoing shall not require a Party to take any such action if (i) such action may result in a waiver or breach of any attorney-client privilege, (ii) such action could reasonably be expected to result in violation of applicable Law, or (iii) providing such access or information would be reasonably expected to be disruptive to a Party's normal business operations.  Buyer agrees to maintain the files or records that are contemplated by the first sentence of this Section 6.2 in a manner consistent in all material respects with Buyer's document retention and destruction policies, as in effect from time to time, for six (6) years following the Closing and to give Sellers access to such files and records for purposes of administration of Sellers' respective Bankruptcy Cases.

Section 6.3    Covered Employees.

(a)      Buyer shall offer employment to all of the Covered Employees (including, for the avoidance of doubt, Inactive Employees).  Any such offer of employment will be effective as of the Closing Date and contingent upon the Closing.  Each Covered Employee

who accepts such offer of employment shall be deemed a "Transferred Employee"; provided that any Covered Employee who has been furloughed or is on an approved leave of absence as of the Closing (an "Inactive Employee") shall not be considered a Transferred Employee unless and until such Inactive Employee returns to active status pursuant to the following sentence, and notwithstanding anything herein to the contrary, Buyer or Buyer's Affiliates shall not be responsible for any Liabilities relating to such Inactive Employee except to the extent related to periods from and after the date such Inactive Employee becomes a Transferred Employee. Each Transferred Employee who becomes employed by Buyer in connection with the transactions contemplated by this Agreement shall be eligible to receive their salary and benefits (excluding, severance and equity compensation) on substantially similar terms and conditions in the aggregate as are provided to similarly situated employees of Sellers. The employment of any Inactive Employee with Buyer shall be effective upon such Inactive Employee's return to active work, provided that the Inactive Employee reports to work with Buyer within five (5) Business Days after the end of their furlough or approved leave of absence and, to the extent permitted by applicable Law, in no event later than six (6) months following the Closing Date, and, as of such date they report to work, such Inactive Employee shall be a Transferred Employee. Sellers will reasonably cooperate with any reasonable requests by Buyer in order to facilitate the offers of employment and the delivery of such offers.

(b)     Each Transferred Employee shall be given credit for all service with Sellers under any employee benefit plans or arrangements of Buyer and Buyer's Affiliates maintained by Buyer or Buyer's Affiliates in which such Transferred Employees participate following the Closing Date, for purposes of eligibility, vesting, and entitlement to benefits, including for severance benefits and vacation entitlement and for accrual of pension benefits provided, however, that such service crediting shall be permitted and consistent with any Buyer defined contribution retirement plan. Notwithstanding the foregoing, nothing in this Section 6.3(b) shall be construed to require crediting of service that would result in a duplication of benefits.

(c)     Without limiting the generality of this Section 6.3, no provision of this Agreement shall create any third party beneficiary rights in any current or former employee or service provider of any Seller, any Covered Employee, or any Transferred Employee (including any beneficiary or dependent thereof) in respect of continued employment by Sellers or Seller's Affiliates or Buyer or Buyer's Affiliates or otherwise. Nothing herein shall (i) guarantee employment for any period of time or preclude the ability of Buyer or Buyer's Affiliates to terminate any Transferred Employee for any reason, (ii) require any Buyer or any of Buyer's Affiliates to continue any Company Benefit Plans, employee benefit plans, or arrangements, or prevent the amendment, modification, or termination thereof after the Closing, or (iii) constitute an amendment to any Company Benefit Plan, employee benefit plans, or arrangements.

(d)     Effective as soon as practicable following the Closing Date, Sellers, or any applicable Affiliate, shall effect a transfer of assets and liabilities from the defined contribution retirement plan that Sellers maintains, to the defined contribution retirement plan maintained by Buyer, with respect to those employees of the Business who become employed by Buyer, or an Affiliate of Buyer, in connection with the transactions

contemplated by this Agreement. Any such transfer shall be in an amount sufficient to satisfy Section 414(l) of the IRC.

(e)        Except for any Assumed Liabilities, Sellers will have the sole and absolute responsibility for any financial or other commitments to Sellers' employees for the period prior to the Closing, including any and all claims or obligations for severance pay and any and all claims and obligations arising under any collective bargaining agreement, employee benefit plan (including, any withdrawal liability), or any local, state, or federal law, rule, or regulation.  Other than as set forth in Section 6.3(a), Buyer and any of Buyer's Affiliates shall not have any contractual or other obligation with respect to hiring, offering to hire, or employing any Covered Employee or any of Sellers' other employees.  Except as set forth in Section 6.3(a), in no event shall Buyer be obligated to commit to any particular usage of employees or to any particular benefits or wage rates.  Nothing contained herein shall be deemed an admission that Sellers have any financial obligation to employees or that obligations, if any, are entitled to a particular treatment or priority under the Bankruptcy Code. Sellers' failure to pay an obligation, if any, under this Section 6.3 shall not be a default under this Agreement.

Section 6.4    Transfer Taxes.  Buyers shall pay any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or other non-income Tax, fee, or governmental charge (each a "Transfer Tax") imposed under applicable Law in connection with the transactions contemplated hereby. The Party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes described in the immediately preceding sentence shall prepare and timely file such Tax Returns. The Parties hereto shall cooperate to permit the filing Party to prepare and timely file any such Tax Returns.

Section 6.5    Press Releases and Public Announcements.  No Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of Buyer and Blink, unless a press release or public announcement is required by applicable law, or any rule or order of the Bankruptcy Court.  If any such announcement or other disclosure is required, the disclosing Party shall give the nondisclosing Parties prior notice of, and an opportunity to comment on, the proposed disclosure. The Parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order.

Section 6.6    Non-Disclosure.

(a)        From and after the Closing, no Sellers (the "Restricted Parties") shall, directly or indirectly, disclose or use at any time (and shall cause their respective Affiliates and Representatives not to use or disclose) any Confidential Information (whether or not such information is or was developed by any of the Restricted Parties), except to the extent that such disclosure or use is (i) directly related to and required by the performance of such Restricted Party's duties to Blink or the Buyers or (ii) required by applicable Law, any rule of the Bankruptcy Court, any Decree, or as otherwise provided hereunder.  The Restricted Parties each further agrees to take commercially reasonable steps, to the extent within such Restricted Party's control, to safeguard such Confidential Information and to protect it against disclosure, misuse, loss, and theft.  In the event any of the Restricted Parties is

required by Law or Decree to disclose any Confidential Information, such Restricted Party shall promptly notify Buyer in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall cooperate with the Buyer's reasonable requests to preserve the confidentiality of such Confidential Information consistent with applicable Law. For purposes of this Agreement, "Confidential Information" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, that relates to the Business, Blink, any other Seller, or their respective suppliers, distributors, customers, independent contractors, or other business relations. Confidential Information includes the following as they relate to Blink, any other Seller, or the Business and, in each case, to the extent Blink, any other Seller, or the Business obtains a commercial benefit from the secret nature of such information: internal business information (including information relating to strategic and staffing plans and practices, business, training, marketing, promotional and sales plans and practices, cost, rate, and pricing structures, accounting and business methods, and potential acquisition candidates); identities of, individual requirements of, and specific contractual arrangements with, Blink's or any other Seller's suppliers, distributors, customers, independent contractors, or other business relations and their confidential information; trade secrets, know-how, compilations of data and analyses, techniques, systems, formulae, research, records, reports, manuals, documentation, models, data and data bases relating thereto; and inventions, innovations, improvements, developments, methods, designs, analyses, drawings, and reports.

(b)     Each Restricted Party acknowledges and agrees that in the event of a breach or violation by any Restricted Party of any of the provisions of this Section 6.6, Buyer would suffer irreparable harm, no adequate remedy at law would exist for Buyer, and damages would be difficult to determine. Consequently, in the event of any such breach or violation, Buyer or Buyer's successors or assigns may, in addition to other rights and remedies existing in their favor, apply to any court of law or equity of competent jurisdiction for specific performance or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof, in each case without the requirement of posting a bond or proving actual damages; provided that any such specific performance or injunctive relief shall be limited to restraining or prohibiting such breach or threatened and not the cessation of operations or forced divestiture of the applicable business.

Section 6.7    No Successor Liability. The Parties intend that upon the Closing, each Buyer and its Affiliates shall not and shall not be deemed to: (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to Sellers, including a "successor employer" for the purposes of the IRC, ERISA, or other applicable Laws; (b) have any responsibility or liability for any obligations of Sellers, or any affiliate of Sellers, based on any theory of successor or similar theories of liability; (c) have, de facto or otherwise, merged with or into any of Sellers; (d) be an alter ego or a mere continuation or substantial continuation of any of Sellers (and there is no continuity of enterprise between Buyer and any Seller), including within the meaning of any foreign, federal, state, or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including filing requirements under any such Laws, rules, or regulations), or under any products liability law or doctrine with respect

to Sellers' liability under such law, rule or regulation or doctrine; or (e) be holding itself out to the public as a continuation of any of Sellers or Sellers' respective estates.

Section 6.8    Removal of "Blink" Name.  Within ninety (90) days after the Closing, Buyer (i) shall cease all use of the "Blink" name, (ii) shall remove any signage including the "Blink" name at the Acquired Gym Locations, and (iii) cause the "Blink" name to be removed from, or destroy, any Acquired Assets that include the "Blink" name.

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSE

Section 7.1    Conditions to Buyer's Obligations.    Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    each of the representations and warranties set forth in Article III shall have been true and correct on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct has not resulted in a Material Adverse Effect;

(b)    Sellers shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)    the Bankruptcy Court shall have entered the Bidding Procedures Order.

(d)    the Bankruptcy Court shall have entered the Sale Order, and no Decree staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date;

(e)    no material Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement; and

(f)    each delivery contemplated by Section 2.5(b) to be delivered to Buyer shall have been delivered.

Section 7.2    Conditions to Sellers' Obligations.    Sellers' obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in Article IV shall have been true and correct in all material respects on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

(b)    Buyer shall have performed and complied with Buyer's covenants and agreements hereunder through the Closing in all material respects;

(c)      the Bankruptcy Court shall have entered the Sale Order, and no Decree staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date;

(d)      no material Decree shall be in effect that prohibits consummation of any of the transactions contemplated by this Agreement; and

(e)      each payment contemplated by <u>Section 2.5(a)</u> to be made to Sellers shall have been made, and each delivery contemplated by <u>Section 2.5(c)</u> to be delivered to Sellers shall have been delivered.

Section 7.3    <u>No Frustration of Closing Conditions</u>.  Neither Buyer nor Sellers may rely on the failure of any condition to Buyer's or Sellers' respective obligations to consummate the transactions contemplated hereby set forth in <u>Section 7.1</u> or <u>Section 7.2</u>, as the case may be, to be satisfied if such failure was caused by such Party's failure to use commercially reasonable efforts to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach of a representation, warranty, or covenant hereunder.

## ARTICLE VIII
## TERMINATION

Section 8.1    <u>Termination of Agreement</u>.    The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(a)      by the mutual written consent of the Parties;

(b)      by any Party by giving written notice to the other Parties if:

(i)      any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 8.1(b)(i)</u> shall not be available to any Party if the failure to consummate the Closing because of such action by a Governmental Authority shall be due to the failure of such Party to have fulfilled any of its obligations under this Agreement;

(ii)      the Closing shall not have occurred on or prior to the Termination Date; <u>provided</u>, <u>however</u>, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or Sellers, then the breaching Party may not terminate this Agreement pursuant to this <u>Section 8.1(b)(ii)</u>.  The "Termination Date" shall be November 29, 2024, unless the Parties mutually agree to a later Closing Date pursuant to <u>Section 2.4</u>, upon which such later date shall be the Termination Date;

(c)      by Buyer by giving written notice to Sellers if there has been a breach by any Seller of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Buyer at the Closing set forth in Section 7.1(a) and Section 7.1(b), and such breach has not been waived by Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (i) ten (10) days after receipt of Buyer's notice of intent to terminate and (ii) the Termination Date; provided, that Buyer shall not have a right of termination pursuant to this Section 8.1(c) if Sellers could, at such time, terminate this Agreement pursuant to Section 8.1(d);

(d)      by Sellers by giving written notice to Buyer if there has been a breach by Buyers of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Sellers at the Closing set forth in Section 7.2(a) and Section 7.2(b), and such breach has not been waived by such Seller, or, if such breach is curable, cured by Buyer prior to the earlier to occur of (i) ten (10) days after receipt of such Seller's notice of intent to terminate and (ii) the Termination Date; provided, that Sellers shall not have a right of termination pursuant to this Section 8.1(d) if Buyer could, at such time, terminate this Agreement pursuant to Section 8.1(c);

(e)      by Buyer by giving written notice to Sellers if the Sale Order has not been entered by the date that is seven (7) days after the Sale Hearing; or

(f)      by Sellers or Buyer, if (i) (x) Sellers enter into a definitive agreement with respect to a Competing Bid, (y) the Bankruptcy Court enters an order approving a Competing Bid, and (z) the Person making the Competing Bid consummates the Competing Bid or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement.

Section 8.2    Effect of Termination.  If any Party terminates this Agreement pursuant to Section 8.1, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I, Article IX, and this Section 8.2 shall survive any such termination) and, except as set forth in this Section 8.2, no Party shall have any Liability to the other Parties hereunder; provided, however, that in the event this Agreement is terminated pursuant to Section 8.1(d) and Sellers are not then in breach of Sellers' obligations hereunder, Sellers shall be entitled to retain the Deposit as set forth in Section 2.3(b) and the maximum Liability of Buyer under this Agreement shall be equal to the Deposit to the extent payable to Sellers.  In the event of termination of this Agreement for any reason other than pursuant to Section 8.1(d) and Buyer is not then in material breach of Buyer's obligations hereunder, the Deposit shall be promptly returned to Buyer as set forth in Section 2.3(b).

## ARTICLE IX
## MISCELLANEOUS

Section 9.1    Survival.  Except for any covenant that by such covenant's terms is to be performed (in whole or in part) by any Party following the Closing, none of the

representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to Section 2.5(a) or Section 2.5(b) shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing.  Any obligations to be performed post-Closing shall survive until completion.

Section 9.2    Expenses.    Except for as provided by orders of the Bankruptcy Court or as otherwise provided in this Agreement, each Party will bear such Party's own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts, and consultants.  For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Acquired Assets.

Section 9.3    Entire Agreement.    This Agreement and the Related Agreements constitute the entire agreement among the Parties and supersede any prior understandings, agreements, or representations (whether written or oral) by or among the Parties to the extent they relate in any way to the subject matter hereof.

Section 9.4    Incorporation of Exhibits and Disclosure Schedule.  The Exhibits to this Agreement and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

Section 9.5    Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and each Seller. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation, or breach of warranty or covenant.    No conditions, course of dealing or performance, understanding, or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof.

Section 9.6    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and the Parties' respective successors and permitted assigns. No Party may assign either this Agreement or any of such Party's rights, interests, or obligations hereunder without the prior written consent of the other Parties.  Notwithstanding the foregoing, Buyer may assign (in whole or in part) either this Agreement or any of Buyer's rights, interests, or obligations hereunder to one or more Affiliates of Buyer without the prior written consent of the other Parties; provided that such assignment shall not relieve Buyer of Buyer's obligations hereunder.

Section 9.7    <u>Notices</u>.    All notices, requests, demands, claims, and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) upon receipt of confirmation of receipt if sent by facsimile transmission; (d) on the day such communication was sent by e-mail; or (e) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Seller:    Blink Holdings, Inc.
c/o Portage Point Partners
640 Fifth Avenue, 10th Floor
New York, NY 10019
Attention: Steven Shenker
E-mail: sshenker@pppllc.com

With a copy (shall not constitute notice to Sellers) to:

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 N King Street
Wilmington, DE 19801
Attention:  Sean T. Greecher, Esq.
                   Craig D. Grear, Esq.
Email:        sgreecher@ycst.com
                   cgrear@ycst.com

If to Buyer:    c/o JTRE Holdings LLC
362 Fifth Avenue, 12th Floor
New York, NY 10001
Attention:  Jack Terzi and Raphael Bildirici
Email:        Jack@jtreholdings.com
                   Rb@jtreholdings.com
With a copy (that shall not constitute notice to Buyer) to:

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attention: Gabe Sasson and Brian Kelly
Email:        gabesasson@paulhastings.com
                   briankelly@paulhastings.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this <u>Section 9.7</u>.

Section 9.8    <u>Governing Law</u>.    This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware (without giving effect to the principles of conflict of laws thereof), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

Section 9.9    <u>Submission to Jurisdiction; Service of Process</u>.    Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court.    Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court.    Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.    Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in <u>Section 9.7</u>; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 9.9</u> shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity. Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity.    The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

Section 9.10    <u>Waiver of Jury Trial</u>.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 9.11    <u>Specific Performance</u>.    From and after the date hereof, the Parties shall be entitled to an injunction or injunctions to enforce specifically the Parties' respective covenants and agreements under this Agreement that survive the Closing, without the requirement of posting a bond or other security.

Section 9.12    <u>Severability</u>.    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.    In the event that any of the provisions of this Agreement shall be held by any Governmental Authority to be illegal, invalid, or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 9.13    <u>No Third Party Beneficiaries</u>.    This Agreement shall not confer any rights or remedies upon any Person other than Buyers, each Seller, and their respective successors and permitted assigns.

Section 9.14  <u>Non-Recourse</u>.  All claims, obligations, liabilities, or causes of action that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, the negotiation, execution, or performance of this Agreement (including any representation or warranty made in connection with or as an inducement to this Agreement) or the transactions contemplated hereby may be made only against (and are those solely of) the Persons that are expressly identified as Parties to this Agreement. No other Person, including any of their Affiliates, directors, officers, employees, incorporators, members, partners, managers, stockholders, agents, attorneys, or representatives of, or any financial advisors or lenders to any of the foregoing shall have any liabilities for any claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach.

Section 9.15  <u>Mutual Drafting</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.16  <u>Disclosure Schedule</u>.  All capitalized terms not defined in the Disclosure Schedule shall have the meaning ascribed to such terms in this Agreement.  The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule.  The listing of any matter shall expressly not be deemed to constitute an admission by Sellers.  No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  In no event shall the listing of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties, or covenants set forth in this Agreement.  All attachments to the Disclosure Schedule are incorporated by reference into the applicable section of the Disclosure Schedule in which they are directly or indirectly referenced.

Section 9.17  <u>Headings; Table of Contents</u>.  The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.18  <u>Counterparts; Facsimile and Electronic Signatures</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies, delivered by electronic communications by portable document format (.pdf), or any other means of electronic execution, including by DocuSign, each of which shall be deemed an original.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

Sellers:

BLINK HOLDINGS, INC.

By:_____
    Name: Guy Harkless
    Title:   President and CEO

BLINK 1060 W ALAMEDA, INC.
BLINK 16123 BELLFLOWER BLVD.,
INC.
BLINK 2192 TEXAS PARKWAY, INC.
BLINK 8201 BROADWAY, INC.
BLINK 9901 S. ALAMEDA, INC.
BLINK AIRLINE DRIVE, INC.
BLINK ASHLAND AVENUE, INC.
BLINK BROOKHURST INC.
BLINK COURTESY PLAZA INC.
BLINK FITNESS RIALTO, INC.
BLINK LONG POINT, INC.
BLINK NORMANDIE AVENUE, INC.
BLINK NORTH RIVERSIDE LLC
BLINK STONEBROOK, INC
BLINK WESTCHASE, INC.

By:_____
    Name: Guy Harkless
    Title:   President and CEO as to each

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

Buyer:

Lotemd Fit LLC

By:_____
Name: Jack Terzi
Title: Authorized Signatory

# SCHEDULE A

## Other Excluded Assets

1. [_____]

DISCLOSURE SCHEDULES

## **EXHIBIT B**

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BLINK HOLDINGS, INC., *et al.*,[1] | Case No. 24-11686 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. 81, 348, 350, 397** |

## ORDER (I) APPROVING THE SALE OF ASSETS TO LOTEMD FIT LLC FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF

Upon consideration of the motion [Docket No. 81] (the "**Motion**") of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to sections 105(a), 363, 365, and 503 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for, among other things, entry of an order (this "**Sale Order**") (a) approving that certain *Asset Purchase Agreement*, dated as of November 4, 2024 (as amended, supplemented, or otherwise modified from time to time, and including the exhibits, schedules or attachments thereto, the "**Asset Purchase Agreement**"),[2] a copy of which is attached hereto as Exhibit A, between Debtor Blink Holdings, Inc. and its Debtor affiliates, on the one hand, and Lotemd Fit LLC, a New York limited liability company  (the "**Buyer**"), on the other hand; (b) authorizing and approving

---

[1]   The last four digits of Blink Holdings, Inc.'s federal tax identification number are 6354.  The mailing address for Blink Holdings, Inc. is 45 West 45th Street, 10th Floor, New York, New York 10036. Due to the large number of debtors in these chapter 11 cases, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/BlinkFitness, or by contacting the undersigned counsel for the Debtors.

[2]   Capitalized terms used, but not otherwise defined, herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement or the Motion (as applicable).

the transaction contemplated by the Asset Purchase Agreement, including the sale of the Acquired Assets to the Buyer (the "**Sale**") in accordance with the terms and conditions contained in the Asset Purchase Agreement (subject to higher and better bids in accordance with the Bidding Procedures Order (as defined below)), free and clear of all liens, claims and encumbrances, except for certain assumed liabilities, (c) authorizing and approving the assumption and assignment of certain executory contracts and unexpired leases in connection with the sale, including proposed cure amounts, and (d) granting related relief; and this Court having entered an order on September 10, 2024 [Docket No. 348] (the "**Bidding Procedures Order**") (a) approving certain bidding procedures (the "**Bidding Procedures**"), and the Debtors having filed the *Notice of Successful Bidder and Next-Highest Bidder in Connection With Auction for Outer Market Assets* [Docket No. 550]; and pursuant to the Asset Purchase Agreement, authorizing the Buyer to assign (in whole in or in part) certain of its rights, interests, or obligations under the Asset Purchase Agreement to one or more Affiliates (each such Affiliate, a "**Buyer Designee**"), each of which shall be entitled to the rights and protections set forth in this Sale Order, including paragraph 29 hereof, and this Court having conducted a hearing on the Motion on November [6], 2024 (the "**Sale Hearing**"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court being able to issue a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that no other or further notice of the Motion is required; and all parties in interest having been heard, or having had the opportunity to be heard, regarding the Motion, the Asset Purchase Agreement, and

this Sale Order; and this Court having reviewed and considered the Motion and all objections thereto, and the arguments of counsel made, and the evidence adduced at the Sale Hearing; and upon the entire record of the Sale Hearing, and after due deliberation thereon, and good cause appearing therefor:

**THE COURT HEREBY FINDS THAT:[3]**

A.     The Debtors have articulated good and sufficient reasons for the Court to (i) authorize the Sale free and clear of all Interests; (ii) authorize the assumption, assignment, and/or transfer of the Assumed Leases; and (iii) grant the other relief set forth in this Sale Order, in each case in accordance with the Asset Purchase Agreement.

## Notice of the Sale, Auction, and Cure Payments

B.     Actual written notice of the Sale Hearing, the Auction, the Motion, the Sale, and the assumption, assignment, and/or transfer of the Assumed Leases, and a reasonable opportunity to object or be heard with respect thereto and to the entry of this Sale Order has been afforded to all known interested Persons entitled to receive such notice, including the following parties: (i) the U.S. Trustee; (ii) the Committee; (iii) the United States Department of Justice; (iv) all state attorneys' general and consumer protection agencies in jurisdictions in which the Acquired Assets are located; (v) counsel to the Prepetition Agent and DIP Agent; (vi) counsel to Equinox Holdings, Inc.; (vii) all parties who were known by the Debtors to assert liens against the Acquired Assets, if any; (viii) all non-Debtor parties to the Assumed Leases (the "**Agreement Counterparties**"); (ix) any party known or reasonably believed to have expressed an interest in acquiring some or all or substantially all of the Debtors' assets within six (6) months prior to the Petition Date, which

---

[3]     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

service may have been sent electronically if a mailing address for any such parties was unknown; and (x) all parties who filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.

C.      The Debtors caused the Motion, the Bidding Procedures Order, the Bidding Procedures, the Asset Purchase Agreement, the Sale Notice, the Assumption and Assignment Notice and Cure Schedule, and certain other documents relevant to the Sale to be published on the website maintained by the Debtors' claims and noticing agent: https://dm.epiq11.com/BlinkFitness.  As described in the *Proof of Publication* [Docket No. 388], the Debtors caused the Sale Notice, which included the time and place of the Auction, the time and place of the Sale Hearing, and the time for filing an objection to the Motion, to be published in the national and local editions of the *New York Times* on September 17, 2024.

D.      In accordance with the provisions of the Bidding Procedures Order, the Debtors have served the Assumption and Assignment Notice on each Agreement Counterparty (i) stating the cure amounts, if any, that the Debtors believe must be paid to cure any prepetition defaults and pay all amounts accrued under the Assumed Leases (the "**Cure Amounts**"); (ii) notifying the Agreement Counterparty that such party's contract or lease may be assumed and assigned to a purchaser of the Acquired Assets at the conclusion of the Sale Hearing; (iii) stating the date of the Sale Hearing and that objections to any Cure Amount or to the assumption, assignment, and/or transfer of any executory contract or unexpired lease will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors; and (iv) stating a deadline by which the Agreement Counterparty shall file an objection to the Cure Amount or to the assumption, assignment, or transfer of its executory contracts or unexpired leases.

E.      The service of such Assumption and Assignment Notice: (i) was good, sufficient,

32353160.1

4

and appropriate under the circumstances of these Chapter 11 Cases; (ii) provided such Agreement

Counterparties with a full and fair opportunity to object to such assumption, assignment, and/or

transfer and to the proposed Cure Amount set forth in the Assumption and Assignment Notice;

and (iii) was in compliance with the Bidding Procedures Order and applicable provisions of the

Bankruptcy Rules and Local Rules.  Accordingly, no other or further notice need be given in

connection with such assumption, assignment, or transfer or with respect to the Cure Amounts,

except as expressly set forth in section 2.6(b) of the Asset Purchase Agreement (which such notice

is good, sufficient and appropriate under the circumstances).

F.      As evidenced by the affidavits of service previously filed with this Court and as

approved under the Bidding Procedures Order: (i) due, proper, timely, adequate, and sufficient

notice of the Motion, the Auction, the Sale Hearing, the assumption, assignment, and/or transfer

of the Assumed Leases, this Sale Order, and the Sale has been provided to all parties in interest;

(ii) such notice was, and is, good, sufficient, and appropriate under the circumstances of these

Chapter 11 Cases, provided a fair and reasonable opportunity for parties in interest to object and

to be heard with respect thereto, and was provided in accordance with sections 102(1), 363, and

365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, and 9014, and the

applicable Local Rules; and (iii) no other or further notice with respect to such matters is necessary

or shall be required.

### Business Judgment

G.      The Debtors have demonstrated good, sufficient, and sound business purposes and

justifications for, and compelling circumstances to promptly consummate, the Sale and other

transactions contemplated by the Asset Purchase Agreement and all related documents

(collectively, the "**Transaction Documents**"), including, without limitation, the assumption,

assignment, and/or transfer of the Assumed Leases (collectively, the "**Transactions**") pursuant to

32353160.1

5

sections 363 and 365 of the Bankruptcy Code or otherwise, prior to and outside of a plan of reorganization, and such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors, their estates, and their creditors.  Such business reasons include, but are not limited to, the facts that: (i) there is substantial risk of depreciation of the value of the Acquired Assets if the Sale is not consummated promptly; (ii) the Asset Purchase Agreement constitutes the highest or otherwise best offer for the Acquired Assets; (iii) the Asset Purchase Agreement and the Closing will present the best opportunity to realize the value of the Debtors on a going concern basis and avoid decline and devaluation of the Debtors' businesses; and (iv) unless the Sale is concluded expeditiously as provided for in this Sale Order and pursuant to the Asset Purchase Agreement, potential creditor recoveries may be substantially diminished.

### <u>Good Faith of the Buyer; No Collusion</u>

H.      The Buyer is not an insider (as that term is defined in section 101(31) of the Bankruptcy Code) of any of the Debtors.

I.      The Buyer is purchasing the Acquired Assets in good faith and is a good faith purchaser, within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to, and granted pursuant to paragraph 28 below, the full rights, benefits, privileges, and protections of that provision, and has otherwise proceeded in good faith in all respects in connection with the Transactions in that, *inter alia*: (i) the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets; (ii) the Buyer complied with the provisions in the Bidding Procedures Order; (iii) the Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures Order; (iv) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; (v) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (vi) no common identity of directors or controlling stockholders

32353160.1

exists between the Buyer and any of the Debtors; and (vii) the negotiation and execution of the

Asset Purchase Agreement and the other Transaction Documents were at arms' length and in good

faith.

J.        None of the Debtors nor the Buyer has engaged in any conduct that would cause or

permit the Asset Purchase Agreement or any of the other Transaction Documents, or the

consummation of the Transactions, to be avoidable or avoided, or for costs or damages to be

imposed, under section 363(n) of the Bankruptcy Code, or has acted in bad faith or in any improper

or collusive manner with any Person in connection therewith.

### Highest and Best Offer

K.        In accordance with the Bidding Procedures Order, the Asset Purchase Agreement

constitutes a Qualified Bid (as defined in the Bidding Procedures Order) and the Buyer was eligible

to participate at any Auction.

L.        The Debtors conducted an auction process in accordance with, and have otherwise

complied in all material respects with, the Bidding Procedures Order.  The auction process set

forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any

Person to make a higher or otherwise better offer to purchase the Acquired Assets.  The Auction

was duly noticed and the auction process was conducted in a non-collusive, fair, and good faith

manner, and a reasonable opportunity has been given to any interested party to make a higher or

otherwise better offer for the Acquired Assets.

M.        The Asset Purchase Agreement constitutes the highest and best offer for the

Acquired Assets and will provide greater value for the Debtors' estates than would be provided by

any other available alternative.  The Debtors' determination that the Asset Purchase Agreement

constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise

of the Debtors' business judgment.

32353160.1

N.      The Asset Purchase Agreement and the Purchase Price represent a fair and reasonable offer to purchase the Acquired Assets under the circumstances of these Chapter 11 Cases.  No other Person or group has made a higher or otherwise better offer for the Acquired Assets or otherwise has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Buyer.

O.      Approval of the Motion and the Asset Purchase Agreement, and the prompt consummation of the Transactions contemplated thereby, is in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

### No Fraudulent Transfer; Not a Successor

P.      The Asset Purchase Agreement and the other Transaction Documents were not entered into, and the Transactions are not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under applicable Law, and none of the Parties to the Asset Purchase Agreement or any of the other Transaction Documents are consummating the Transactions with any fraudulent or otherwise improper purpose.  The Purchase Price for the Acquired Assets constitutes (i) reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, and the Uniform Voidable Transactions Act; (ii) fair consideration under the Uniform Fraudulent Conveyance Act; and (iii) reasonably equivalent value, fair consideration, and fair value under any other applicable Laws.

Q.      Except as expressly set forth in the Asset Purchase Agreement with respect to the Assumed Liabilities, the Buyer shall have no liability, responsibility, or obligations of any kind or nature whatsoever for any Interest of or against the Debtors, or otherwise related to the Acquired Assets, by reason of the transfer of the Acquired Assets to the Buyer.  The Buyer shall not be deemed, as a result of any action taken in connection with the Transactions: (i) to the greatest extent permitted under applicable law, to be a successor (or other such similarly situated party) to

32353160.1

any of the Debtors (other than with respect to the Assumed Liabilities as expressly stated in the Asset Purchase Agreement); or (ii) to have, *de facto* or otherwise, merged or consolidated with or into any of the Debtors.  The Buyer is not acquiring or assuming any Interest, except as expressly set forth in the Asset Purchase Agreement with respect to the Assumed Liabilities.

### **Validity of Transfer**

R.        Subject to the entry of this Sale Order, the Debtors have full corporate power and authority (i) to perform all of their obligations under the Asset Purchase Agreement and the other Transaction Documents, and the Debtors' prior execution and delivery thereof and performance thereunder, is hereby ratified in full; and (ii) to consummate the Transactions.  The Asset Purchase Agreement and the other Transaction Documents, and the Transactions contemplated thereby, have been duly and validly authorized by all necessary corporate action.  No further consents or approvals are required for the Debtors to consummate the Transactions or otherwise perform their respective obligations under the Asset Purchase Agreement or the other Transaction Documents, except, in each case, as otherwise expressly set forth in the Asset Purchase Agreement or applicable Transaction Documents.

S.        As of the Closing Date, the transfer of the Acquired Assets to the Buyer, including the assumption, assignment, and/or transfer of the Assumed Leases, will be a legal, valid, and effective transfer thereof, and will vest the Buyer with all right, title, and interest of the Debtors in and to the Acquired Assets, free and clear of all Interests accruing or arising any time prior to the Closing Date (except as expressly set forth in the Asset Purchase Agreement with respect to the Assumed Liabilities or Permitted Liens), in accordance with section 363(f) of the Bankruptcy Code, with all such Interests to attach to the proceeds of the Sale as set forth in paragraph 9 of this Sale Order.

**Section 363(f) Is Satisfied**

T.      The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the Transactions if the sale of the Acquired Assets, including the assumption, assignment, and/or transfer of the Assumed Leases, to the Buyer were not free and clear of all Interests of any kind or nature whatsoever (except as expressly set forth in the Asset Purchase Agreement with respect to the Permitted Liens and Assumed Liabilities) in accordance with section 363(f) of the Bankruptcy Code, or if the Buyer, or any of its Affiliates or Subsidiaries, would, or in the future could, be liable for any of such Interests (except as expressly set forth in the Asset Purchase Agreement with respect to the Permitted Liens and Assumed Liabilities).

U.      The Debtors may sell or otherwise transfer the Acquired Assets free and clear of all Interests because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  Those holders of Interests against the Debtors, their estates, or any of the Acquired Assets who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of such Interests who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Interests, if any, attach to the proceeds of the Sale ultimately attributable to the Acquired Assets in which such creditor alleges or asserts an Interest, in the same order of priority, with the same validity, force, and effect, that such creditor had immediately prior to consummation of the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

V.      As used in this Sale Order, the term "**Interest**" includes all of the following, in each case to the extent against or with respect to any of the Debtors or in, on, or against or with respect to any of the Acquired Assets: liens (as defined in section 101(37) of the Bankruptcy Code, and

32353160.1

whether consensual, statutory, possessory, judicial, or otherwise), claims (as defined in section 101(5) of the Bankruptcy Code), debts (as defined in section 101(12) of the Bankruptcy Code), encumbrances, obligations, Liabilities, demands, guarantees, actions, suits, defenses deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, rights, or interests of any kind or nature whatsoever, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, or otherwise, including (i) mortgages, deeds of trust, pledges, charges, security interests, hypothecations, encumbrances, easements, servitudes, leases, subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of setoff to the extent not taken prepetition, rights of use or possession, subleases, leases, condition sale arrangements, or any similar rights; (ii) all claims, including all rights or causes of action (whether in law or equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff to the extent not taken prepetition, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other Person, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, or otherwise; (iii) all debts, liabilities, obligations, contractual rights and claims, and labor, employment, and pension claims; (iv) any

rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtors' or the Buyer's interest in the Acquired Assets, or any similar rights; (v) any rights under labor or employment agreements; (vi) any rights under pension, multiemployer plan (as such term is defined in section 3(37) or section 4001(a)(3) of the Employment Retirement Income Security Act of 1974 (as amended, "**ERISA**")), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (vii) any other employee claims related to worker's compensation, occupation disease, or unemployment or temporary disability, including claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and the Age Discrimination in Employment Act, each as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code of any similar state Law, (i) state discrimination Laws, (j) state unemployment compensation Laws or any other similar state Laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (1) the WARN Act (29 U.S.C. §§ 2101, *et seq.*) or any state or other Laws of similar effect; (viii) any bulk sales or similar Law; (ix) any tax statutes or ordinances, including the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the assets or businesses of the Debtors prior to the Closing; (x) any unexpired and executory contract or unexpired lease to which a Debtor

is a party that is not an Assumed Lease; (xi) any other Excluded Liabilities under the Asset Purchase Agreement; and (xii) Interests arising under or in connection with any acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors, Affiliates, or Subsidiaries, including Interests arising under any doctrines of successor liability (to the greatest extent permitted by applicable law), or transferee or vicarious liability, violation of the Securities Act, the Exchange Act, or other applicable securities Laws or regulations, breach of fiduciary duty, or aiding or abetting breach of fiduciary duty, or any similar theories under applicable Law or otherwise.

W.    Except as expressly set forth in the Asset Purchase Agreement with respect to the Assumed Liabilities or Permitted Liens, and without limiting the nature or scope of paragraph V above, the transfer of the Acquired Assets, including the assumption, assignment, and/or transfer of the Assumed Leases, to the Buyer will not subject the Buyer or its Affiliates or Subsidiaries to, or subject any Acquired Asset to or provide recourse for, any Interest whatsoever with respect to the operation or condition of the Business or any of the Acquired Assets prior to the Closing or with respect to any facts, acts, actions, omissions, circumstances, or conditions existing, occurring or accruing with respect thereto prior to the Closing Date.

**Assumption, Assignment, and/or Transfer of the Assumed Leases**

X.    The assumption, assignment, and/or transfer of the Assumed Leases to the Buyer pursuant to the terms of this Sale Order is integral to the Asset Purchase Agreement, is in the best interests of the Debtors and their estates, creditors, and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

Y.    The Debtors have or will have as of the Closing Date (the "**Assumption Date**"): (i) cured, or provided adequate assurance that they will cure, any default existing prior to the Closing Date with respect to the Assumed Leases, within the meaning of and as required by sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code, and (ii) provided compensation,

32353160.1

13

or adequate assurance of compensation, to any party for any actual pecuniary loss to such party resulting from such default, within the meaning of and as required by section 365(b)(1)(B) of the Bankruptcy Code.  The respective Cure Amounts set forth on the Cure Schedules annexed to the Debtors' Assumption and Assignment Notice are the sole amounts necessary under sections 365(b)(1)(A), 365(b)(1)(B), and 365(f)(2)(A) of the Bankruptcy Code to cure all such monetary defaults and pay all actual pecuniary losses under the Assumed Leases, except to the extent otherwise agreed by the Debtors and the applicable Agreement Counterparty in writing or determined by order of this Court; *provided*, *further*, that the Buyer's and the Debtors' respective obligations with respect to payment of such Cure Amounts shall be as set forth in the Asset Purchase Agreement.

Z.     The promise of the Buyer to perform the obligations first arising under the Assumed Leases after their assumption, assignment, and/or transfer to the Buyer constitutes adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the Agreement Counterparties to such Assumed Leases.  Any objections to the foregoing, the determination of any Cure Amount, or otherwise related to or in connection with the assumption, assignment, or transfer of any of the Assumed Leases to the Buyer are hereby overruled on the merits or otherwise treated as set forth in paragraph 3 below.  Those Agreement Counterparties to the Assumed Leases who did not object to the assumption, assignment, or transfer of their applicable Assumed Lease, or to their applicable Cure Amount, are deemed to have consented thereto for all purposes of this Sale Order.

AA.     Pursuant to section 2.6 of the Asset Purchase Agreement, the Buyer will have the right to remove any Leases from Schedule 2.6(a) at any time until November 15, 2024, and any

such removed Lease shall cease to be an Assumed Lease, provided that (i) subject to the occurrence of the Closing, Buyer shall be responsible for payment of the Closure Costs with respect to any removed Leases and (ii) the removal of any Assumed Leases from Schedule 2.6(a) shall not reduce the Purchase Price.

## Compelling Circumstances for an Immediate Sale

BB.    To maximize the value of the Acquired Assets, to preserve the viability of the business to which the Acquired Assets relate, and to reduce the amount of postpetition debtor-in-possession financing borne by the Debtors, it is essential that the Sale of the Acquired Assets occur within the time constraints set forth in the Asset Purchase Agreement.  Time is of the essence in consummating the Sale.  The Sale must be approved and consummated promptly in order to preserve the viability of the Business as a going concern.  Accordingly, there is cause to eliminate the stay contemplated by Bankruptcy Rules 6004 and 6006 with regard to the Transactions contemplated by this Sale Order, the Asset Purchase Agreement, and the other Transaction Documents.

CC.    Given all of the circumstances of these Chapter 11 Cases and the adequacy and fair value of the Purchase Price under the Asset Purchase Agreement, the proposed transfer of the Acquired Assets to the Buyer constitutes a reasonable and sound exercise of the Debtors' business judgment, is in the best interests of the Debtors, their estates, and their creditors, and should be approved.

DD.    The consummation of the Transactions is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105, 363, and 365 of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Transactions.

EE.    The Sale does not constitute a *de facto* plan of reorganization or liquidation.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.    The Motion, and the relief requested therein, are granted and approved, and the Sale and the other Transactions contemplated thereby and by the Asset Purchase Agreement and the other Transaction Documents are approved, in each case as set forth in this Sale Order.

2.    This Court's findings of fact and conclusions of law set forth in the Bidding Procedures Order are incorporated herein by reference.

3.    All objections to the Motion or the relief requested therein that have not been withdrawn, waived, resolved, or otherwise settled as set forth herein, as announced to this Court at the Sale Hearing, or by stipulation filed with this Court, and all reservations of rights included therein, are hereby denied and overruled on the merits.

**Approval of Asset Purchase Agreement; Binding Nature**

4.    The Asset Purchase Agreement and the other Transaction Documents, and all of the terms and conditions thereof, are hereby approved as set forth herein.

5.    The consideration provided by the Buyer for the Acquired Assets under the Asset Purchase Agreement, including (a) the assumption of the Assumed Liabilities and (b) the payment of cash in the amount of the Closing Cash Payment, is fair and reasonable and shall be deemed for all purposes to constitute reasonably equivalent value, fair value, and fair consideration under the Bankruptcy Code and any other applicable Law, and the Transactions may not be avoided, or costs or damages imposed or awarded, under section 363(n) or any other provision of the Bankruptcy Code.

6.    Pursuant to sections 363 and 365 of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate

32353160.1

the Sale and the other Transactions pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement and the other Transaction Documents; and (b) execute and deliver, perform under, consummate, implement, and take any and all other acts or actions as may be reasonably necessary or appropriate to the performance of their respective obligations as contemplated by the Asset Purchase Agreement and the other Transaction Documents, in each case, without further notice to or order of this Court. The Transactions authorized herein shall be of full force and effect, regardless of any Debtor's lack or purported lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

7.     This Sale Order shall be binding in all respects on the Debtors, their estates, all creditors, all holders of equity interests in any Debtor, all holders of any claims (whether known or unknown) against any Debtor, any holders of Interests against, in, or on all or any portion of the Acquired Assets, all Agreement Counterparties to the Assumed Leases, the Buyer, and all successors and assigns of the foregoing, including any trustee, if any, subsequently appointed in these Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of these Chapter 11 Cases, in each case, in any and all circumstances, including after the closing of the Transactions, confirmation or consummation of a chapter 11 plan, conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the dismissal of these Chapter 11 Cases for any reason.

### Transfer of Acquired Assets Free and Clear of Interests; Injunction

8.     Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, the Debtors are authorized and directed to transfer the Acquired Assets, including the Assumed Leases, to the Buyer on the Closing Date in accordance with the Asset Purchase Agreement and the other Transaction Documents. Upon and as of the Closing Date, such transfer shall constitute a legal, valid, binding, and effective transfer of such Acquired Assets, and the

Buyer shall take title to and possession of such Acquired Assets free and clear of all Interests (except as expressly set forth in the Asset Purchase Agreement with respect to the Permitted Liens and Assumed Liabilities) in accordance with section 363(f) of the Bankruptcy Code.

9.      All such Interests (but, for the avoidance of doubt, excluding the Permitted Liens, which shall remain attached to the Acquired Assets) shall attach solely to the proceeds of the Sale with the same extent, validity, priority, force, and effect that they now have as against the Acquired Assets, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.  This Sale Order shall be effective as a determination that, on and as of the Closing, all Interests of any kind or nature whatsoever (except as expressly set forth in the Asset Purchase Agreement with respect to the Permitted Liens and Assumed Liabilities) have been unconditionally released, discharged, and terminated in, on, or against the Acquired Assets, with such Interests attaching to the proceeds of the Sale as set forth herein.  The provisions of this Sale Order authorizing and approving the transfer of the Acquired Assets free and clear of Interests shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.

10.      The transfer of the Assumed Liabilities to the Buyer in accordance with the terms of the Purchase Agreement will constitute a legal, valid, enforceable, and effective sale and transfer of the Assumed Liabilities, and the assumption of any Assumed Liabilities by the Buyer shall constitute a legal, valid, and effective delegation of any Assumed Liabilities to the Buyer and shall divest the Debtors of all liabilities with respect to any Assumed Liabilities, in each case solely to the extent provided for in the Asset Purchase Agreement and the other Transaction Documents. Notwithstanding anything to the contrary in this Sale Order or the Asset Purchase Agreement,

upon the Closing, no Person shall be permitted to commence or continue, and all such Persons are hereby barred, estopped, and permanently enjoined from commencing or continuing any action against, or seeking payment from, the Debtors or their Affiliates with respect to the Assumed Liabilities.

11.    Except as expressly permitted by the Asset Purchase Agreement or this Sale Order, all Persons holding Interests (other than the Permitted Liens and Assumed Liabilities) are hereby forever barred, estopped, and permanently enjoined from asserting their respective Interests against the Buyer or any of its Affiliates or Subsidiaries and each of their respective property and assets, including the Acquired Assets.  On and after the Closing Date, the Buyer shall be authorized to execute and file such documents, and to take all other actions as may be necessary, on behalf of each holder of an Interest to release, discharge, and terminate such Interests in, on, and against the Acquired Assets as provided for herein, or to record or otherwise appropriately effectuate such release, discharge, and termination, as such Interests may have been recorded or may otherwise exist.  On and after the Closing Date, and without limiting the foregoing, the Buyer shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect, or otherwise notice any Interest that is extinguished or otherwise released pursuant to this Sale Order.  This Sale Order constitutes authorization under all applicable jurisdictions and versions of the Uniform Commercial Code ("**UCC**") for the Buyer to file UCC termination statements with respect to all security interests in or liens on the Acquired Assets.

12.    On and after the Closing, the Persons holding an Interest (other than a Permitted Lien or an Assumed Liability) shall execute such documents and take all other actions as may be reasonably necessary to release their respective Interests in the Acquired Assets, as such Interests

may have been recorded or otherwise filed.  The Buyer may, but shall not be required to, file a copy of this Sale Order in any filing or recording office in any federal, state, county, or other jurisdiction in which any Debtor is incorporated or has real or personal property, or with any other appropriate clerk or recorded with any other appropriate recorder, and such filing or recording shall be accepted and shall be sufficient to release, discharge, and terminate any of the Interests (solely as such Interests relate to the Acquired Assets and not, for the avoidance of doubt, as such Interests relate to the proceeds of the Sale) as set forth in this Sale Order as of the Closing Date. All Persons that are in possession of any portion of the Acquired Assets on the Closing Date shall promptly surrender possession thereof to the Buyer at the Closing.

13.    The transfer of the Acquired Assets to the Buyer pursuant to the Asset Purchase Agreement and the other Transaction Documents does not require any consents other than as specifically provided for in this Sale Order.

14.    This Sale Order is and shall be binding on and govern the acts of all Persons (including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, and federal and local officials) who may be required by operation of Law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease.  Each of the foregoing Persons are authorized to accept for filing any and all of the documents and instruments necessary and appropriate to release, discharge, and terminate any of the Interests or to otherwise consummate the Transactions contemplated by this Sale Order, the Asset Purchase Agreement, or any Transaction Document.

32353160.1

**Assumed Leases and Cure Payments**

15.    Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing Date, the Debtors' assumption, assignment, and/or transfer to the Buyer of the Assumed Leases are hereby authorized and approved in full, subject to the terms set forth below.  Subject to the terms of the Asset Purchase Agreement and this Sale Order, the Buyer shall pay all Cure Costs on the later of (a) the Assumption Date or (b) the date agreed by the Debtors and the applicable Agreement Counterparty or otherwise ordered by the Court.

16.    The Debtors are authorized and empowered to, and upon the Assumption Date shall, assume, assign, and/or transfer each of the Assumed Leases to the Buyer free and clear of all Interests (except as expressly set forth in the Asset Purchase Agreement with respect to the Permitted Liens and Assumed Liabilities).  The payment of the applicable Cure Amounts (if any), or the reservation of an amount of cash that is equal to the lesser of (a) the amount of any cure or other compensation asserted by the applicable Agreement Counterparty as required under section 365 of the Bankruptcy Code or (b) the amount approved by order of this Court to reserve for such payment (such lesser amount, the "**Alleged Cure Claim**") shall, pursuant to section 365 of the Bankruptcy Code and other applicable Law, (x) effect the cure, or provide adequate assurance of the cure, of all defaults existing thereunder as of the Assumption Date and (y) compensate, or provide adequate assurance of compensation, for any actual pecuniary loss to such Agreement Counterparty resulting from such default.  Accordingly, on and as of the Assumption Date, other than such payment or reservation, none of the Debtors nor the Buyer shall have any further liabilities or obligations to the Agreement Counterparties to the Assumed Leases with respect to, and the Agreement Counterparties to the Assumed Leases shall be forever enjoined and barred from seeking, any additional amounts or claims (as defined in section 101(5) of the Bankruptcy Code) that arose, accrued, or were incurred at any time on or prior to the Closing Date

32353160.1

on account of the Debtors' cure or compensation obligations arising under section 365 of the Bankruptcy Code.  The Buyer has provided adequate assurance of future performance under the relevant Assumed Leases within the meaning of section 365(f) of the Bankruptcy Code.

17.    To the extent any provision in any Assumed Lease assumed or assumed and assigned (as applicable) pursuant to this Sale Order (including any "change of control" provision) (a) prohibits, restricts, or conditions, or purports to prohibit, restrict, or condition, including the imposition of any fee, payment or penalty as a result of or in connection with, such assumption or assignment, or (b) is modified, breached, or terminated, or deemed modified, breached, or terminated by any of the following: (i) the commencement of these Chapter 11 Cases; (ii) the insolvency or financial condition of any Debtor at any time before the closing of these Chapter 11 Cases; (iii) any Debtor's assumption or assumption and assignment (as applicable) of such Assumed Lease; or (iv) the consummation of the Transactions (including the Buyer's ability to rebrand or otherwise change the signage at the Gym Locations following the Transactions), then such provision shall be deemed modified so as to not entitle the Agreement Counterparty thereto to prohibit, restrict, or condition such assumption or assignment, to modify or terminate such Assumed Lease, or to exercise any other default-related rights or remedies with respect thereto, including any such provision that purports to allow the applicable Agreement Counterparty thereto to recapture such Assumed Leases, impose any penalty thereunder, condition any renewal or extension thereof, impose any rent acceleration or assignment fee, or increase or otherwise impose any other fees, payments, penalties or other charges in connection therewith, or prohibit the rebranding of or otherwise changing the signage at the Gym Locations.  All such provisions constitute unenforceable anti-assignment provisions that are void and of no force and effect pursuant to sections 365(b), 365(e), and 365(f) of the Bankruptcy Code.

18.     All requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of the Assumed Leases have been satisfied.  Upon the Assumption Date, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title, and interest of the Debtors in and under the Assumed Leases, and each Assumed Lease shall be fully enforceable by the Buyer in accordance with its respective terms and conditions, except as limited or modified by the provisions of this Sale Order.  Upon and as of the Assumption Date, the Buyer shall be deemed to be substituted for the Debtors as a party to the applicable Assumed Leases and, accordingly, the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assumed Leases.

19.     The Assumed Leases will remain in full force and effect, and upon the payment of the applicable Cure Amount or reservation of the Alleged Cure Claim, if any, no default shall exist, or be deemed to exist, under the Assumed Leases as of the Closing Date nor shall there exist, or be deemed to exist, any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

20.     The rights of the Buyer to remove any Lease from Schedule 2.6(a) at any time until November 15, 2024 are hereby approved.  Notwithstanding anything in this Sale Order to the contrary, on the date any such Lease is assumed, assigned, and/or transferred to the Buyer, such Lease shall thereafter be deemed an Assumed Lease for all purposes under this Sale Order and the Asset Purchase Agreement.  The rights of the Debtors and the Buyer with respect to assuming and assigning, rejecting, amending, supplementing, modifying, waiving any rights under, or creating any adverse interest with respect to any Leases shall be governed in accordance with the terms of the Asset Purchase Agreement and other Transaction Documents.

32353160.1

21.     All Agreement Counterparties to the Assumed Leases shall be deemed to have consented to such assumption, assignment, and/or transfer under section 365(c)(1)(B) of the Bankruptcy Code or otherwise and the Buyer shall enjoy all of the Debtors' rights, benefits, and privileges under each such Assumed Lease as of the applicable date of such assumption, assignment, and/or transfer without the necessity to obtain any Agreement Counterparty's written consent to the assumption, assignment, and/or transfer thereof.

22.     Nothing in this Sale Order, the Motion, or in any notice or any other document is or shall be deemed an admission by the Debtors that any Assumed Lease is an executory contract or unexpired lease under section 365 of the Bankruptcy Code.

23.     The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assumed Lease shall not be a waiver of such terms or conditions, or of its respective rights to enforce every term and condition of the Assumed Leases.

**Additional Injunction; No Successor Liability**

24.     Effective upon the Closing Date and except as expressly set forth in the Asset Purchase Agreement with respect to the Permitted Liens and Assumed Liabilities, all Persons are forever prohibited and permanently enjoined from (a) commencing or continuing in any manner any action or other proceeding, the employment of process, or any act (whether in law or equity, in any judicial, administrative, arbitral, or other proceeding), to collect, recover, or set off any Interest; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order with respect to an Interest; (c) creating, perfecting, or enforcing any Interest; or (d) asserting any setoff that was not taken prepetition or right of subrogation of any kind with respect to an Interest, in each case as against the Buyer, any of its Affiliates or Subsidiaries, any of their respective current and former officers, directors, managers, members, partners, managed

funds, affiliates, agents, advisors, professionals, and representatives (collectively, the "**Representatives**"), or any of their respective property or assets, including the Acquired Assets.

25.     The Transactions contemplated by the Asset Purchase Agreement and the other Transaction Documents do not cause there to be, and there is not (a) a consolidation, merger, or *de facto* merger of the Buyer, on the one hand, with or into the Debtors or the Debtors' estates, on the other hand, or vice versa; (b) a substantial continuity between the Buyer, on the one hand, and the Debtors or the Debtors' estates, on the other hand; (c) a common identity between the Buyer, on the one hand, and the Debtors or the Debtors' estates, on the other hand; or (d) a mere continuation of the Debtors or their estates, on the one hand, with the Buyer, on the other hand.

26.     Except as expressly set forth in the Asset Purchase Agreement with respect to the Permitted Liens and Assumed Liabilities, the transfer of the Acquired Assets, including the assumption, assignment, and/or transfer of any Assumed Lease, to the Buyer shall not cause or result in, or be deemed to cause or result in, the Buyer or any of its Representatives having any liability, obligation, or responsibility for, or any Acquired Assets being subject to or being recourse for, any Interest whatsoever, whether arising under any doctrines of successor liability (to the greatest extent permitted by applicable law), transferee or vicarious liability, breach of fiduciary duty, aiding or abetting breach of fiduciary duty, or otherwise, whether at law or in equity, directly or indirectly, and whether by payment, setoff, or otherwise.

27.     For the avoidance of doubt, except as expressly set forth in the Asset Purchase Agreement and notwithstanding the consummation of the Transactions and the employment by the Buyer of certain Persons previously employed by the Debtors, (a) the Buyer shall not have any obligations or liabilities to any employee of the Debtors or in respect of any employee benefits owing to any employee of the Debtors by the Debtors or by any plan or program administered by

the Debtors or for the benefit of the Debtors' employees; and (b) any obligations of the Buyer to any such Person shall be expressly limited to (i) those obligations expressly agreed upon by the Buyer (if any) with such Person, and (ii) those obligations explicitly assumed by the Buyer (if any) under the Asset Purchase Agreement.

## **Good Faith**

28.     The Transactions contemplated by this Sale Order, the Asset Purchase Agreement, and the other Transaction Documents are undertaken by the Buyer without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale and other Transactions approved by this Court shall not alter, affect, limit, or otherwise impair the validity of the Sale or such other Transactions (including the assumption, assignment, and/or transfer of the Assumed Leases), unless such authorization and such sale are duly stayed pending such appeal. The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and hereby granted, the full rights, benefits, privileges, and protections of section 363(m) of the Bankruptcy Code.

## **Other Provisions**

29.     The Buyer is hereby authorized, in its discretion, in connection with consummation of the Transactions, to allocate the Acquired Assets, Assumed Liabilities, and Assumed Leases among any its Affiliates, Subsidiaries, designees, assignees, and/or successors in a manner as it, in its discretion, deems appropriate, and such Person shall be entitled to all of the rights, benefits, privileges, and protections of the Buyer as are afforded to the Buyer under this Sale Order, and the Debtors shall, to the extent set forth in the Asset Purchase Agreement and the other Transaction Documents, cooperate with and take all actions reasonably requested by the Buyer to effectuate any of the foregoing.  In the event that the Buyer designates any Buyer Designee to acquire any

32353160.1

26

Acquired Assets, including any Assumed Leases, then any reference to the "Buyer" in this Sale Order shall be deemed to be a reference to "the Buyer and/or such applicable Buyer Designee," unless the context requires otherwise. Upon the transfer of any Acquired Asset or Assumed Lease to, or the assumption of any Assumed Liability by, a Buyer Designee, such Buyer Designee shall be solely responsible for such Acquired Asset, Assumed Liability, or Assumed Lease (including performance thereunder), as applicable.

30.    Contemporaneously with the Closing, the Debtors are authorized to pay or cause to be paid the net proceeds of the Sale directly (i) first, to the DIP Agent (for the benefit of the DIP Lenders) and (ii) second, to the Prepetition Agent (for the benefit of the Prepetition Lenders) for application to the DIP Obligations and the Prepetition Obligations, respectively, in accordance with the priorities, terms and conditions set forth in the Final DIP Order; *provided* that Prepetition Obligations and Roll-Up shall remain subject to paragraph 12 of the Final DIP Order in accordance with the terms and conditions thereof; *provided*, *further*, that funds shall be retained to satisfy estate obligations contemplated to be paid under the Approved Budget, the Asset Purchase Agreement, and other Transaction Documents pursuant to a distribution reconciliation to be agreed upon by the Debtors, the Required DIP Lenders, the Required Prepetition Lenders, the DIP Agent, and the Prepetition Agent.[4]

31.    Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these Chapter 11 Cases (including any order dismissing these Chapter 11 Cases), (b) any subsequent chapter 7 case into which any such chapter 11 case may be converted,

---

[4]    Capitalized terms used but not otherwise defined in this paragraph have the meanings ascribed to such terms in the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Utilize Cash Collateral; (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 393] (the "**Final DIP Order**").

or (c) any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Sale Order. To the extent of any such conflict or derogation, the terms of this Sale Order shall govern; *provided*, that, for the avoidance of doubt, the Final DIP Order shall govern the application of the net proceeds of the Sale to the DIP Obligations and the Prepetition Obligations (each as defined in the Final DIP Order).

32.    Pursuant to Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the stays provided in Bankruptcy Rules 6004(h) and 6006(d) are hereby expressly waived and shall not apply. Accordingly, the Debtors are authorized and empowered to close the Sale and other Transactions immediately upon entry of this Sale Order.

33.    Nothing in this Sale Order shall modify or waive any closing conditions or termination rights in the Asset Purchase Agreement, and all such conditions and rights shall remain in full force and effect in accordance with their terms.

34.    No bulk sales Law or any similar Law of any state or other jurisdiction applies in any way to the Transactions.

35.    All payment or reimbursement obligations of the Debtors owed to the Buyer pursuant to the Asset Purchase Agreement or the other Transaction Documents shall be paid in the manner provided therein, without further notice to or order of this Court. All such obligations shall constitute allowed administrative claims against each of the Debtors on a joint and several basis, with administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code. Until satisfied in full in cash, all such obligations shall continue to have the protections

32353160.1

provided in this Sale Order, and shall not be discharged, modified, or otherwise affected by any chapter 11 plan for the Debtors.

36. The failure specifically to include any particular provision of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Asset Purchase Agreement be authorized and approved in its entirety.

37. The Asset Purchase Agreement and the other Transaction Documents may be modified, amended, or supplemented in a writing signed by the parties thereto and in accordance with the terms thereof, without further notice to or order of this Court; provided that any such modification, amendment, or supplement shall not have a material adverse effect on the Debtors' estates unless approved by order of this Court upon a motion on notice. All such modifications, amendments, and/or supplements, and all Transaction Documents, not previously provided to the Committee shall be provided promptly to the Committee.

38. This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b), to, among other things, (a) interpret, implement, and enforce the terms and provisions of this Sale Order, the Asset Purchase Agreement, the other Transaction Documents, any amendments thereto, and any waivers and consents given thereunder; (b) compel delivery of the Acquired Assets to the Buyer; (c) enforce the injunctions and limitations of liability set forth in this Sale Order; and (d) enter any orders under sections 363 and 365 of the Bankruptcy Code with respect to the Assumed Leases.

39. All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

32353160.1

40.     The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to implement the provisions of this Sale Order and the terms and conditions of the Asset Purchase Agreement and the other Transaction Documents.

41.     The rules of construction set forth in section 1.2 of the Asset Purchase Agreement shall apply to this Sale Order, with necessary modifications.

42.     To the extent that this Sale Order is inconsistent with any prior order or pleading, the Motion, the Asset Purchase Agreement, or any Transaction Document, the terms of this Sale Order shall govern; *provided*, that, for the avoidance of doubt, the Final DIP Order shall govern the application of the net proceeds of the Sale to the DIP Obligations and the Prepetition Obligations (each as defined in the Final DIP Order).  To the extent there are any inconsistencies between the terms of the Asset Purchase Agreement or any Transaction Document, on the one hand, and any prior pleading (including the Motion), on the other hand, the terms of the Asset Purchase Agreement or the applicable Transaction Documents shall govern, as applicable.

32353160.1