## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BLINK HOLDINGS, INC., *et al.*, | Case No. 24-11686 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: TBD**<br>**Objection Deadline: December 4, 2024 at 4:00 p.m. (ET)** |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
MOTION FOR LEAVE, STANDING AND AUTHORITY TO
COMMENCE, PROSECUTE, AND SETTLE CERTAIN CLAIMS
AND CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 bankruptcy cases of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its proposed undersigned counsel, hereby files this *Motion for Leave, Standing and Authority to Commence, Prosecute, and Settle Certain Claims and Causes of Action on Behalf of Debtors' Estates* (the "Motion"), for entry of an order granting the Committee leave, standing and authority to pursue, and, if appropriate, settle certain Proposed Claims (as defined below) against Varagon Capital Partners, L.P. and Varagon Capital Partners, Agent, LLC (collectively, "Varagon") and other proposed defendants named in the draft proposed complaint attached hereto as Exhibit A (the "Proposed Complaint"), on behalf of and for the benefit of the Debtors' estates. In support of this Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT[1]

1.      Since it retained advisors, the Committee has investigated the Prepetition Secured Parties and Varagon, as agent, with respect to their prepetition collateral package.  As a result of the Committee's investigation, ████████████████████████████████████ ████████████████████████████████  The proceeds of such assets should provide a path for unsecured creditors to receive a recovery in these cases.  However, neither the Debtors nor Varagon have articulated a post-Sale path that will preserve value for any creditors other than Varagon, through a liquidating plan that delivers all value to it.  The Committee, therefore, has no option to preserve value for unsecured creditors other than pursuing this Motion.

2.      ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████  Through this Motion, the Committee seeks standing to pursue challenges with respect to these assets, as expressly contemplated in the Final DIP Order.

3.      As discussed below, the Committee satisfies all of the requirements for derivative standing to pursue the challenges in the Proposed Complaint.  *First*, the challenges are colorable given (i) the plain language of the prepetition financing documents and (ii) ████████████ ████████████████████████████████████████████████████████

---

[1]      Capitalized terms used but not defined in this Motion have the meanings ascribed to them in the Sale Objection (defined below).

███████ *Second*, the straightforwardness of these challenges and the potential benefit to all creditors, among other factors, makes the Debtors' refusal to prosecute them unjustifiable.

4.     For these reasons and all the reasons set forth below, the Committee should be granted standing to pursue the challenges set forth in the Proposed Complaint.

## JURISDICTION AND VENUE

5.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Committee confirms its consent pursuant to Bankruptcy Rule 7008 to the Court entering a final order in connection with the Motion.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     The statutory predicates for this Motion are sections 1103(c)(2) and 1109(b) Bankruptcy Code and Bankruptcy Rules 3007 and 7001.

## BACKGROUND

### I.     General Background

7.     On August 12, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.  Since the Petition Date, the Debtors have remained in possession of their assets and continue to operate and manage their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.     On August 23, 2024, the U.S. Trustee appointed a five-member Committee consisting of:  (i) Johnson Health Tech NA, Inc.; (ii) Motionsoft, Inc.; (iii) FW IL-Riverside/Rivers Edge, LLC; (iv) 96 N. 10th Street Holdings LLC; and (v) GS FIT ILL-1 LLC.[2]  The Committee

---

[2]     Docket No. 109.  Since the Committee's appointment, Motionsoft, Inc. resigned from the Committee.  *See* Docket No. 571.

selected Kelley Drye & Warren LLP as its lead counsel and Morris James LLP as its Delaware co-counsel.  The Committee also selected Dundon Advisers LLC as its financial advisor.

9.      On the Petition Date, the Debtors filed the Sale Motion, seeking authority to sell substantially all of their assets to the prevailing bidder in an auction process (the "Sale").[3]

10.     On September 10, 2024, the Debtors filed a notice designating Pinnacle US Holdings LLC (a subsidiary of PureGym Ltd. ("PureGym")) as a stalking horse bidder (the "Stalking Horse," and its bid, the "Stalking Horse Bid").[4]

11.     On September 24, 2024, the Debtors filed a notice of entry into a restructuring support agreement (as amended, the "RSA") with Varagon.[5]  Pursuant to the RSA, the Debtors and Varagon agreed, *inter alia*, to pursue a chapter 11 plan that (i) delivers all of the Sale proceeds to Varagon on account of its prepetition secured claim, and (ii) provides no recovery to the Debtors' general unsecured creditors.[6]

12.     On October 16, 2024, the Debtors filed a combined disclosure statement and plan of liquidation that implements the RSA.[7]  If the proposed plan is confirmed, Varagon will receive all of the Sale proceeds, regardless of whether they were generated by assets that are unencumbered by their liens.[8]  Holders of general unsecured claims will receive no recovery.[9]

13.     On October 22, 2024, the Committee objected to the Sale Motion (the "Sale

---

[3]      Docket No. 81.

[4]      Docket No. 350.

[5]      Docket Nos. 404, 483.

[6]      Docket No. 483, Ex. A at 4.

[7]      Docket No. 502.

[8]      *Id.* at 20.

[9]      *Id.* at 21.

Objection").[10]  The Sale Objection is incorporated into this Motion by reference.

14.     On November 12, 2024, the Court overruled the Sale Objection and approved the Sale.  A presently unallocated portion of the Sale proceeds will relate and be allocable to the Unencumbered Assets (defined below) that are the subject of this Motion.

**II.     Final DIP Order and Debtors' Stipulations**

15.     On August 12, 2024, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Liens, Super-Priority Claims, and Adequate Protection (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Motion")[11] seeking authorization to enter into a $73.5 million DIP facility (the "DIP Facility"), consisting of a $52.5 million roll-up in prepetition obligations and $21 million in new money.

16.     On September 18, 2024, the Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Utilize Cash Collateral; (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; and Granting Related Relief* (the "Final DIP Order").[12]  In addition to stipulating to the amount of the prepetition lenders' claims, that the prepetition lenders have liens on all of the Debtors' assets, and that such liens are perfected, the Final DIP Order also stipulates that:

> [T]he Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance, preference, fraudulent conveyance or similar claims, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105,

---

[10]     Docket Nos. 515, 518.

[11]     Docket No. 13.

[12]     Docket No. 393.

510, or 542 through 553 of the Bankruptcy Code), against any of the Prepetition Secured Parties, or any of their respective affiliates, agents, representatives, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to the Prepetition Loans, the Prepetition Obligations, the Prepetition Loan Parties, or the Prepetition Liens; and (H) the full amount of the Prepetition Obligations constitutes an allowed, secured claim within the meaning of sections 502 and 506 of the Bankruptcy Code.[13]

17.    The Final DIP Order also contains the following provision regarding effect of stipulations on third parties:

> The Debtors' Stipulations contained in paragraph E hereof and the Debtors' releases contained in paragraph 24 hereof shall be binding upon each other party-in-interest, including the Committee, except to the extent the Committee or such other party in interest that obtains standing, other than the Debtors (or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (defined below), the chapter 7 trustee in such Successor Case), first, commences within seventy-five (75) calendar days following the date of entry of the Interim Order.[14]

## III.  Committee Investigation

18.    As part of its investigation of the Prepetition Secured Debt, the Committee delivered multiple information requests to the Debtors, Varagon, and Equinox.

19.    The Committee has ascertained that Varagon: (a) ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ (collectively, the "Unperfected Assets" and together with the Excluded Assets and Avoidance Actions, the "Unencumbered Assets").

---

[13]    Final DIP Order ¶ E(i)(d).

[14]    *Id.* ¶ 12.  Varagon consensually extended the Challenge Period (as defined in the Final DIP Order) through November 13, 2024.

20.    Importantly, ██████████████████████████████

████████████████████████████████████████████████████████

███████████    As such, the Equinox Insider Claims ████████████████

███    Under the Debtors' proposed plan, Varagon will obtain Sale proceeds on account of the sale of unencumbered assets (including, but not limited to, the Equinox Insider Claims) without sharing such proceeds with unsecured creditors.

### A.    Prepetition Credit Agreement

21.    On November 8, 2018, the Debtors entered into a Credit and Guaranty Agreement (the "Prepetition Credit Agreement") with Varagon, as administrative agent, CIT Bank, N.A., as revolving agent, and various lenders (collectively, the "Prepetition Secured Parties").[15]

22.    Pursuant to the Prepetition Credit Agreement, the Debtors received $145 million of senior secured financing (the "Prepetition Facility" and the obligations thereunder, the "Prepetition Secured Debt").[16]  The Prepetition Secured Debt is secured by first priority liens on substantially all of the Debtors' assets subject to the exclusions and limitations below (the agreement granting such liens, the "Security Agreement").[17]

23.    The Prepetition Credit Agreement ████████████████████████████

████████████████████    The revolver portion of the Prepetition Facility was retired pursuant to the ninth amendment.[18]

24.    As of the Petition Date, the outstanding balance owed to the Prepetition Secured Parties under the Prepetition Credit Agreement, including the obligations associated with the

---

[15]    Docket No. 13, ¶ 6.

[16]    *Id.*

[17]    *Id.*, ¶ 7.

[18]    Docket No. 2 ("First Day Decl."), ¶ 25.

Prepetition Protective Advances, is approximately $161.4 million, inclusive of accrued and unpaid interest.[19]

### B.  Excluded Assets

25.    To secure the Debtors' obligation to repay the Prepetition Secured Debt, the Prepetition Secured Parties received liens on substantially all of the Debtors' assets, ███████

███████



a.  ████████████████████████████████

b.  ██████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████
██████████████████████████

c.  ████████████████████████████████████
███████████

### C.  Unperfected Assets

26.    In addition to the Excluded Assets, Varagon failed to properly perfect its security interests in the Unperfected Assets.

#### i.  Cash in ███████████████

27.    As of the Petition Date, the Debtors had 16 bank accounts (collectively, the "Bank Accounts").[21]



██████████████████████████

---

[19]    First Day Decl., ¶ 27.

[20]    Security Agreement at § 1.1 ("Excluded Property").

[21]    See Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Operating Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Affiliate Transactions; (II) Authorizing Debtors' Continued Use of Corporate Credit Cards and Granting Administrative Expenses Status to Postpetition Credit Card Obligations; (III) Waiving Certain U.S. Trustee Guidelines; and (IV) Granting Related Relief [Docket No. 10] (the "Cash Management Motion"), ¶ 11.

[22]    Security Agreement § 2.1(i).

28. ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████

29.    As of the Petition Date, ████████████████████

███████████████████████

    **ii.**    █████████████████████████

30.    ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

**D.    Avoidance Actions**

31.    The Debtors, by operation of the Bankruptcy Code, have Avoidance Actions. Among other potential Avoidance Actions, the Debtors' statements of financial affairs list approximately $24.5 million in transfers made to non-insiders during the ninety days prior to the

---

[23]    See *Schedules of Assets and Liabilities for Blink Holdings, Inc.* (Case No. 24-11686), Schedule AB Part 1 [Docket No. 199].

[24]    Security Agreement, § 2.1(viii).

[25]    *See, e.g.*, N.Y. U.C.C. § 9-108(e)(1).

Petition Date and approximately $15.1 million in transfers made to insiders during the one year prior to the Petition Date, which includes $12 million of transfers to Equinox.

## RELIEF REQUESTED

32.     The Committee seeks entry of an order, substantially in the form attached hereto as Exhibit B (the "Order") granting it leave, standing and authority to: (i) commence and prosecute certain claims and causes of action on behalf of the Debtors' estates (the "Proposed Claims") set forth in the Proposed Complaint; and (ii) settle the Proposed Claims brought on behalf of the Debtors' estates.

## BASIS FOR RELIEF

## I.    Applicable Legal Standard for Derivative Standing

33.     The filing of a petition under chapter 11 of the Bankruptcy Code creates an estate that includes "all legal or equitable interests of the debtor in property as of the commencement of the case."[26]  Causes of action that belong to a debtor when its bankruptcy case is filed are property of the bankruptcy estate.[27]  A debtor in possession is "duty bound" to assert causes of action that are property of the estate "if doing so would maximize the value of the estate."[28]  When a debtor refuses to pursue such causes of action, a bankruptcy court should grant a creditors' committee authority to do so.[29]

---

[26]     11 U.S.C. § 541(a)(1); *In re Louisiana World Exposition, Inc. v. Fed. Ins. Co.*, 858 F.2d 233, 245 (5th Cir. 1988) ("La. World II") (holding creditors' committee had standing to bring an action on behalf of the corporation against its officers and directors).

[27]     *See La. World II*, 858 F.2d at 245 (*citing In re S.I. Acquisition, Inc.*, 817 F.2d 1142, 1149 (5th Cir. 1987)); *In re Mortgage America Corp.*, 714 F.2d 1266, 1274 (5th Cir. 1983); *In re Ozark Rest. Equip. Co., Inc.*, 816 F.2d 1222, 1225 (8th Cir. 1987).

[28]     *La. World II*, 858 F.2d at 246.

[29]     *See id*. at 247, 251; *see also Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1363 (5th Cir. 1986) (suggesting that section 1109(b) provides a basis for creditors' committee standing); *In re STN Enters.*, 779 F.2d 901, 904 (2d Cir. 1985) (holding that "§§ 1103(c)(5) and 1109(b) imply a qualified right for creditors' committees to initiate suit with the approval of the bankruptcy court"); *In re iPCS, Inc.*, 297 B.R. 283, 290 (Bankr. N.D. Ga. 2003) ("[I]f a debtor has a cognizable claim, but refuses to pursue that claim, an important objective of the Code [the recovery and collection of estate property] would be impeded if the

34.     Section 1109(b) of the Bankruptcy Code provides that "[a] party in interest, including . . . a creditors' committee . . . may raise and may appear and be heard on any issue in a [chapter 11] case []."[30]  Section 1103 of the Bankruptcy Code sets forth the powers and duties of committees and provides, in pertinent part, that a committee may "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan."[31]  The Bankruptcy Code empowers official committees in this way to enable them to fulfill their fiduciary duty to maximize recoveries for unsecured creditors.[32]

35.     As the Court of Appeals for the Third Circuit confirmed in *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, a bankruptcy court may grant a committee standing to litigate claims on behalf of a debtor's estate pursuant to sections 105(a), 1103(c)(5) and 1109(b) of the Bankruptcy Code.[33]

36.     Granting derivative standing to a creditors' committee is particularly appropriate where a debtor in possession exercises the powers that would otherwise vest in a bankruptcy trustee.[34]  The lack of a trustee "immediately gives rise to the proverbial problem of the fox guarding the henhouse."[35]  "Debtors may be unwilling to pursue claims against individuals or

---

bankruptcy court has no power to authorize another party to proceed on behalf of the estate in the debtor's stead.").

[30]     11 U.S.C. § 1109(b).

[31]     11 U.S.C. § 1103(c)(2).

[32]     *See, e.g.*, *In re Duratech Indus., Inc.*, 241 B.R. 291, 296 (Bankr. E.D.N.Y. 1999) ("[T]he central purpose of a bankruptcy case [is] to maximize the distribution of assets or plan payments to unsecured creditors.").

[33]     *See Official Comm. Of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics)*, 330 F.3d 548, 575 (3d Cir. 2003); *see also Official Comm. Of Unsecured Creditors v. Barron (In re Polaroid Corp.)*, 2004 WL 1397582 (Bankr. D. Del. June 22, 2004); *Official Comm. Of Unsecured Creditors v. Cablevision Sys. Corp. (In re Valley Media, Inc.)*, 2003 WL 21956410 (Bankr. D. Del. Aug. 14, 2003).

[34]     *Cybergenics*, 330 F. 3d at 573–74.

[35]     *Id.* at *573*.

businesses, such as critical suppliers, with whom it has an ongoing relationship that it fears damaging."[36]  Granting derivative standing to a creditors' committee thus "provides a critical safeguard against lax pursuit of avoidance actions" and other claims of the estate.[37]  Congress consciously built a measure of flexibility into the scope of a committee's services to empower a bankruptcy court to authorize a committee to represent the estate where the usual representative is unable or unwilling to act.[38]

37.    In the Third Circuit, a creditors' committee may be granted derivative standing upon a showing that: (a) the trustee or debtor in possession unjustifiably refuses a demand to pursue an action, or such demand would be futile; (b) the committee has a colorable claim or cause of action; and (c) the committee seeks and obtains leave from the bankruptcy court to prosecute the action for and in the name of the debtor or trustee.[39]  The Committee satisfies all three of these elements.

## II.    Proposed Claims Are Colorable

38.    To show that the Proposed Claims are colorable, the Committee need only demonstrate that "there is a possibility of success."[40]  Indeed, courts have acknowledged that this is a low threshold and that "the required showing is a relatively easy one to make."[41]  Courts have

---

[36]    *Id.* (citing *Canadian Pac. Forest Prods. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436, 1441 (6th Cir. 1995)).

[37]    *Id.*

[38]    *Id.* at 563.

[39]    *See Cybergenics*, 330 F.3d at 566; *Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. E. Roger Clark (In re Nat'l Forge Co.)*, 326 B.R. 532, 544 (W.D. Pa. 2005) (finding that a formal request of the debtor to bring an action waived under DIP financing orders would have been futile as debtor could not have "seriously entertained the idea"); *see also La. World I*, 832 F.2d at 1397–98 (stating that the court would not remand so that the committee could make formal demand upon debtor where conflicts would likely prevent debtor from pursuing litigation adverse to its directors and officers).

[40]    *In re McConnell*, 122 B.R. 41, 44 (Bankr. S.D. Tex. 1989).

[41]    *Adelphia Commc'ns Corp. v. Bank of America, N.A. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005).

compared this standard to the minimal showing required to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).[42]  As set forth below and in greater detail in the Proposed Complaint, the Proposed Claims meet this standard.

### A.    Excluded Assets (*Counts I-III*)

39.    The Debtors did not grant the Prepetition Secured Parties liens on: ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████    Specifically, ███

██████████████████████████████████.[43]  Accordingly, the Debtors did not grant a lien on the Excluded Assets to the Prepetition Secured Parties.

### B.    Cash in ███████████████████ (*Count IV*)

40.    The perfection and priority of security interests in collateral is governed by Article 9 of the UCC.[44]  Article 9 of the UCC provides that "a security interest is perfected if it has attached and all of the applicable requirements for perfection in Sections 9-310 through 9-316 have been satisfied."[45]  "Attachment" occurs once a security interest becomes enforceable.  A security interest becomes enforceable when (1) value has been given; (2) the debtor has rights in the collateral (or the power to transfer rights in the collateral to the bank); and (3) in the case of deposit account collateral, the secured party has control under Section 7-106, 9-104, 9-105, 9-106, or 9-107

---

[42]    *See In re Racing Servs., Inc.*, 540 F.3d 892, 900 (8th Cir. 2008) ("[A] creditor's claims are colorable if they would survive a motion to dismiss."); *In re On-Site Fuel Serv.*, No. 18-04196-NPO, 2020 Bankr. LEXIS 1257, at *37 (Bankr. S.D. Miss. May 8, 2020) ("A creditor or a creditors' committee seeking derivative standing must assert a 'colorable' claim, defined as a claim that would survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure."); *see also In re ABC Utils. Servs.*, No. 89-41420-BJH-7, 2001 Bankr. LEXIS 2240, at *27 (Bankr. N.D. Tex. Oct. 9, 2001) ("[A] colorable claim is one that raises a serious question even if the claim ultimately fails to survive a Rule 12(b)(6) motion to dismiss.").

[43]    Security Agreement at § 1.1 ████████████████

[44]    *See Joseph Stephens & Co. v. Cikanek*, 588 F. Supp. 2d 870, 874 (N.D. Ill. 2008).

[45]    N.Y. U.C.C. Law § 9-308(a).

pursuant to the debtor's security agreement.[46]  Here, the Committee does not dispute that the

Debtors granted liens on the Debtors' bank accounts to Varagon, as collateral agent.[47]

41.     However, ███████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

Pursuant to  N.Y. U.C.C. Law § 9-104(a), "a secured party has control of a deposit account if:

(1) the secured party is the bank with which the deposit account is maintained; (2) the debtor,

secured party, and bank have agreed in an authenticated record that the bank will comply with

instructions originated by the secured party directing disposition of the funds in the deposit account

without further consent by the debtor; or (3) the secured party becomes the bank's customer with

respect to the deposit account." ████████████████████████████████

█████████████████████████████████████████  ████████████████████

█████████████████████████████████████████████████████████████

██████████████████████

**C.**     ████████████████████████████  *(Count V)*

42.     To hold a perfected security interest in a commercial tort claim, the security

agreement and UCC-1 financing statement must identify the commercial tort claim specifically.[48]

A general description of "commercial tort claims" is insufficient.[49]  Moreover, a commercial tort

---

[46]     *Id.*, § 9-203(b).

[47]     *In re AFGO Dev. Co., Inc.*, 625 B.R. 324 (Bankr. S.D. Tex. 2020) (a lien must be supported by a creditor's right to proceed against certain property as recourse for nonpayment of a debt, which right can be conferred by statute or by agreement).

[48]     *See, e.g.*, N.Y. U.C.C. § 9-108(e)(1).

[49]     *See, e.g.*, *id.* (stating that a description only by type of collateral is an insufficient description of a commercial tort claim).

claim must be in existence at the time it is encumbered,[50] and an after acquired property clause is ineffective to perfect a lien on a commercial tort claim that arises after a UCC-1 financing statement is filed.[51]

43.    Varagon, as collateral agent, ██████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████

**D.    <u>Avoidance Actions <em>(Count VI)</em></u>**

44.    Avoidance Actions do not come into existence until a debtor files for bankruptcy. Before an Avoidance Action can be asserted, (i) there must be an identified payment or transfer by the debtor of property to a creditor, and (ii) the transfer must have been made within a relevant statutory time period.[52]   As such, the Prepetition Secured Parties prepetition liens did not attach to Avoidance Actions or their proceeds.

45.    Among other potential Avoidance Actions, the Debtors' statements of financial affairs list approximately $24.5 million in transfers made to non-insiders during the ninety days prior to the Petition Date and approximately $15.1 million in transfers made to insiders during the one year prior to the Petition Date, which includes approximately $12 million of transfers to Equinox.   As discussed in the Sale Objection, ██████████████████████████████████████
████████████████████████████████████████████████████████████████████████

---

[50]    *See Bayer CropScience, LLC v. Stearns Bank Nat'l Ass'n,* 837 F.3d 911, 916 (8th Cir. 2016) (noting the requirement that the commercial tort claim be in existence at the time it is encumbered).

[51]    *See* N.Y. U.C.C. § 204(b)(2) ("[a] security interest does not attach under a term constituting an after-acquired property clause to . . . a commercial tort claim"); *Bayer,* 837 F.3d at 916 ("[W]e hold that the drafters of the UCC, in implementing the heightened identification requirements of commercial tort claims including the requirement that the commercial tort claim be in existence at the time it is encumbered, intended for the proceeds of a commercial tort claim to be excluded from an after-acquired general intangibles clause.").

[52]    *See In re Contractor Tech., Ltd.*, No. CIV. A. H-05-3212, 2006 WL 1492250, at *7 (S.D. Tex. May 30, 2006).

## III.        Debtors' Refusal[53] to Bring Proposed Claims is Unjustifiable

46.        Derivative standing is generally granted when a debtor unjustifiably refuses to pursue claims that the bankruptcy court finds would benefit the estate.[54]  Refusal is unjustified where the probabilities of legal success and financial recovery outweigh other considerations, such as undue delay or the cost of litigation.[55]  Where litigation would not unduly delay the bankruptcy proceedings and the projected value of the claims outweighs the probable cost of litigation, refusal to bring such claims is, as a matter of law, unjustified.[56]  In conducting a cost-benefit analysis, "[t]he court's inquiries will involve in the first instance not only a determination of probabilities of legal success and financial recovery in the event of success," but also the cost to other creditors and to the bankruptcy estate.[57]

47.        Applying a cost-benefit analysis, it is clear that the cost of pursuing the Committee's identified claims does not outweigh the potential benefits to these estates.  Based solely on the potential value of the cash ████████████████████████████████

---

[53]      The Committee did not make a formal request for the Debtors to pursue the claims alleged in the Proposed Complaint as such request would have been futile.  A committee or other party-in-interest is not required to make a formal demand that a debtor pursue claims where it is "plain from the record that no action on the part of the debtor would have been forthcoming" and that such a demand would be futile.  *See Official Comm. Of Unsecured Creditors of Nat'l Forge Co. v. E. Roger Clark (In re Nat'l Forge Co.)*, 326 B.R. 532, 544 (W.D. Pa. 2005) (finding that a formal request of the debtor to bring an action waived under DIP financing orders would have been futile as debtor could not have "seriously entertained the idea"); *see also La. World Exposition, Inc. v. Fed. Ins. Co*, 832 F.2d 1391, 1397-98 (5th Cir. 1987) (stating that the court would not remand so that the committee could make formal demand upon debtor where conflicts would likely prevent debtor from pursuing litigation adverse to its directors and officers).  Here, pursuant to the Final DIP Order, the Debtors have stipulated to the amount, validity, and perfection of the Prepetition Secured Parties' claims and a release of the Prepetition Secured Parties.  Therefore, the Debtors precluded themselves from bringing any claims set forth in the Proposed Complaint.

[54]      *See In re Tile Outlet, Inc.*, 2006 WL 1716125 at *6 (Bankr. S.D. Tex. June 16, 2006).

[55]      *See La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 253 n.20 (5th Cir. 1998); *see also In re ABC Utils. Servs.*, 2001 Bankr. LEXIS 2240 at *31 (Bankr. N.D. Tex. Oct. 9, 2001) (quoting *In re STN Enters*, 779 F.2d 901, 905 (2d Cir. 1985)).

[56]      *See In re ABC Utils. Servs.*, 2001 Bankr. LEXIS 2240 at *30-31 (explaining that "the unjustified refusal *calculus* will generally amount to little more than a cost-benefit analysis").

[57]      *See In re STN Enters*, 779 F.2d at 905.

████████████████████████████████████████████████████████  Other

challenges with respect to the collateral package, if successful, would result in additional value

being made available for distribution to unsecured creditors through a proper allocation of the Sale

proceeds.[58]   Any or all of that distributable value would be a far cry from the zero recovery

currently proposed, and it is worthwhile for the Committee to pursue the challenges required to

preserve such value for unsecured creditors.  Absent challenge, Varagon and the Debtors will seek

to eliminate all unencumbered value (or divert it to Varagon) under their proposed plan.

48.     Moreover, there is little to no discovery required and no need for prolonged

litigation to address the Proposed Claims for the Unencumbered Assets.  The underlying facts are

not subject to dispute: (a) ████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

49.     The Committee seeks to pursue these claims in its role as fiduciary to the Debtors'

general unsecured creditors who (i) stand to benefit from the proper allocation of Sale proceeds

that will flow from the Proposed Claims, and (ii) would otherwise receive no recovery.  In short,

the Committee is laser-focused on maximizing value for unsecured creditors, including through

the proper allocation of Sale proceeds, and the Committee is the only fiduciary situated to pursue

the estate claims this Motion seeks to preserve for unsecured creditors.

---

[58]    The Committee has not determined the amount of additional value and the Committee is not requesting the Court determine the amount in connection with this Motion.

**IV.**    **Committee Seeks Court Approval to Prosecute the Proposed Claims**

50.    The third factor the Court must consider is whether the Committee has obtained Court approval to assert claims on behalf of the Debtors' estates.  The Committee seeks such approval pursuant to this Motion.

51.    The Committee is the proper party to bring the Proposed Claims because it has a fiduciary duty to safeguard the interests of the Debtors' estates and maximize value for general unsecured creditors.[59]  Given the Debtors' unwillingness to assert the Proposed Claims, the Committee seeks Court authority to preserve and pursue them.

**V.**    **Committee's Right to Review and Consent to any Settlement**

52.    The Committee is entitled not only to prosecute the Proposed Claims, but also to engage in settlement negotiations with parties in interest to try and resolve them.  Of course, any such settlements would be subject to approval by this Court.  It is indisputable that any decision to settle any of the Proposed Claims, and at what level, will have a disproportionate and positive economic impact on the Debtors' unsecured creditors, whose interests the Committee represents in these cases.

---

[59]    *In re Enron Corp.*, 279 B.R. 671, 689 (Bankr. S.D.N.Y. 2002) (quoting Collier on Bankruptcy ¶ 1103.05[1][a] at 1103–22 (15th ed. rev. 2002) ("[T]he primary purpose of a committee . . . is to maximize the return to the constituency represented by the committee and all actions undertaken by the committee should be with that goal in mind.")).

**CONCLUSION**

WHEREFORE, for the reasons set forth herein, the Committee respectfully requests that the Court enter an order granting the relief requested herein and other relief as the Court deems appropriate under the circumstances.

Date: November 13, 2024

**MORRIS JAMES LLP**

*/s/ Siena B. Cerra*
Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
Siena B. Cerra (DE Bar No. 7290)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: emonzo@morrisjames.com
         bkeilson@morrisjames.com
         scerra@morrisjames.com
-and-

**KELLEY DRYE & WARREN LLP**
Eric R. Wilson, Esq. (admitted *pro hac vice*)
Kristin S. Elliott, Esq. (admitted *pro hac vice*)
Andres Barajas, Esq. (admitted *pro hac vice*)
3 World Trade Center
New York, NY 10007
Telephone: (212) 808-7800
Facsimile: (212) 808-7897
E-mail: ewilson@kelleydrye.com
         kelliott@kelleydrye.com
         abarajas@kelleydrye.com

*Counsel to the Official Committee of Unsecured Creditors*