**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BLINK HOLDINGS, INC., *et al.*,[1] | Case No. 24-11686 (JKS) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket Nos. 697, 698, 767, and 806 |

**NOTICE OF FILING OF BLACKLINE OF THIRD AMENDED COMBINED
DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN
OF BLINK HOLDINGS, INC. AND ITS AFFILIATED DEBTORS**

**PLEASE TAKE NOTICE** that, on December 18, 2024, the Court entered the *Order (I) Approving the Combined Disclosure Statement and Plan on an Interim Basis for Solicitation Purposes Only; (II) Establishing Solicitation and Tabulation Procedures; (III) Approving the Form of Ballot and Solicitation Materials; (IV) Establishing the Voting Record Date; (V) Fixing the Date, Time, and Place for the Combined Hearing and the Deadline for Filing Objections Thereto; and (VI) Granting Related Relief* [Docket No. 697] (the "**Solicitation Procedures Order**").

**PLEASE TAKE FURTHER NOTICE** that, on December 18, 2024, the Debtors filed the solicitation version of the *Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Blink Holdings, Inc. and Its Affiliated Debtors and Debtors in Possession* [Docket No. 698] (as amended, modified or supplemented from time to time, the "**Amended Combined Disclosure Statement and Plan**"), and on January 31, 2025, the Debtors filed a further amended version of the Amended Combined Disclosure Statement and Plan [Docket No. 767] (the "**Second Amended Combined Disclosure Statement and Plan**").

**PLEASE TAKE FURTHER NOTICE** that, contemporaneously herewith, the Debtors filed a further amended version of the Second Amended Combined Disclosure Statement and Plan [Docket No. 806] (the "**Third Amended Combined Disclosure Statement and Plan**").

**PLEASE TAKE FURTHER NOTICE** that, for the convenience of the Court and parties in interest, a blackline comparing the Third Amended Combined Disclosure Statement and Plan to the Second Amended Combined Disclosure Statement and Plan is attached hereto as

---

[1]    The last four digits of Blink Holdings, Inc.'s federal tax identification number are 6354. The mailing address for Blink Holdings, Inc. is 45 West 45th Street, 10th Floor, New York, New York 10036. Due to the large number of debtors in these chapter 11 cases, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/BlinkFitness, or by contacting the undersigned counsel for the Debtors.

**Exhibit 1**.   The Debtors reserve all rights to further amend, supplement, or modify the Third Amended Combined Disclosure Statement and Plan.


Dated: Wilmington, Delaware
          February 24, 2025

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Sean T. Greecher*
Michael R. Nestor (No. 3526)
Sean T. Greecher (No. 4484)
Allison S. Mielke (No. 5934)
Timothy R. Powell (No. 6894)
Rebecca L. Lamb (No. 7223)
Benjamin C. Carver (No. 7176)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:  mnestor@ycst.com
              sgreecher@ycst.com
              amielke@ycst.com
              tpowell@ycst.com
              rlamb@ycst.com
              bcarver@ycst.com

*Counsel to the Debtors and Debtors in Possession*

## **EXHIBIT 1**

**Blackline**

32807633.2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BLINK HOLDINGS, INC., *et al.*,[1] | Case No. 24-11686 (JKS) |
| Debtors. | (Jointly Administered) |

**~~SECOND~~THIRD AMENDED COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF BLINK HOLDINGS, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION**

**Dated: ~~January 31~~February 24, 2025**

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Michael R. Nestor (No. 3526)
Sean T. Greecher (No. 4484)
Allison S. Mielke (No. 5934)
Timothy R. Powell (No. 6894)
Rebecca L. Lamb (No. 7223)
Benjamin C. Carver (No. 7176)
Rodney Square
1000 North King Street

Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:  mnestor@ycst.com
      sgreecher@ycst.com
      amielke@ycst.com
      tpowell@ycst.com
      rlamb@ycst.com
      bcarver@ycst.com

*Counsel to the Debtors and Debtors in Possession*

---

[1] The last four digits of Blink Holdings, Inc.'s federal tax identification number are 6354. The mailing address for Blink Holdings, Inc. is 45 West 45th Street, 10th Floor, New York, New York 10036. Due to the large number of debtors in these chapter 11 cases, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/BlinkFitness, or by contacting the undersigned counsel for the Debtors.



# TABLE OF CONTENTS

**Page**

DISCLAIMER ....................................................................................................... 1

INTRODUCTION ................................................................................................... 2

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION .................. 3

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED
RECOVERIES ............................................................................ 19

2.1    Classification of Claims and Interests ........................................... 19

ARTICLE III BACKGROUND AND DISCLOSURES .......................................... 22

3.1    General Background ...................................................................... 22

3.2    The Prepetition Capital Structure ............................................. ~~23~~24

3.3    Circumstances Leading to the Commencement of the Chapter 11 Cases ~~25~~26

3.4    The Chapter 11 Cases .................................................................. 28

ARTICLE IV CONFIRMATION AND VOTING PROCEDURES ...................... ~~32~~35

4.1    Confirmation Procedure ............................................................ ~~32~~35

4.2    Procedure for Objections .......................................................... ~~33~~35

4.3    Requirements for Confirmation ................................................ ~~33~~36

4.4    Classification of Claims and Interests ...................................... ~~33~~36

4.5    Impaired Claims or Interests .................................................... ~~35~~37

4.6    Confirmation Without Necessary Acceptances; Cramdown ...... ~~35~~38

4.7    Feasibility ................................................................................ ~~36~~39

4.8    Best Interests Test and Liquidation Analysis ........................... ~~37~~39

4.9    Acceptance of this Plan ............................................................ ~~38~~40

ARTICLE V CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING ~~38~~41

5.1    This Plan May Not Be Accepted .............................................. ~~38~~41

5.2    This Plan May Not Be Confirmed ............................................ ~~39~~41

5.3    Distributions to Holders of Allowed Claims Under this Plan May Be
Inconsistent with Projections ................................................... ~~39~~42

5.4    Objections to Classification of Claims ..................................... ~~39~~42

5.5    Failure to Consummate ~~this~~This Plan ...................................... ~~40~~43

5.6    Plan Releases May Not Be Approved ...................................... ~~40~~43

5.7    Reductions to Estimated Creditor Recoveries ......................... ~~40~~43

5.8    Certain Tax Considerations ...................................................... ~~41~~43

ARTICLE VI TREATMENT OF UNCLASSIFIED CLAIMS ........................... ~~41~~43

6.1    DIP Claims .............................................................................. ~~41~~43

6.2    Administrative Claims .............................................................. ~~41~~44

6.3    Professional Fees .................................................................... ~~42~~44

6.4    Priority Tax Claims .................................................................. ~~43~~45

6.5    U.S. Trustee Fee Claims .......................................................... ~~43~~45

ARTICLE VII TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ... ~~43~~45

7.1    Class 1: Priority Non-Tax Claims ............................................ ~~43~~46

7.2    Class 2: Other Secured Claims ................................................ ~~44~~46

7.3    Class 3: Prepetition Loan Secured Claims ............................... ~~44~~46

7.4    Class 4: General Unsecured Claims ......................................... ~~44~~47

7.5    Class 5: Intercompany Claims ................................................. ~~44~~47



| | | |
|---|---|---|
| 7.6 | Class 6: Interests | ~~44~~47 |
| 7.7 | Reservation of Rights Regarding Claims and Interests | ~~44~~47 |
| ARTICLE VIII | ACCEPTANCE OR REJECTION OF THIS PLAN | ~~45~~47 |
| 8.1 | Classes Entitled to Vote | ~~45~~47 |
| 8.2 | Acceptance by Impaired Classes of Claims or Interests | ~~45~~47 |
| 8.3 | Presumed Acceptance by Unimpaired Classes | ~~45~~47 |
| 8.4 | Presumed Rejections by Impaired Classes | ~~45~~47 |
| 8.5 | Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | ~~45~~47 |
| 8.6 | Subordinated Claims | ~~45~~48 |
| 8.7 | Controversy Concerning Impairment | ~~46~~48 |
| 8.8 | Elimination of Vacant Classes | ~~46~~48 |
| ARTICLE IX | IMPLEMENTATION OF THIS PLAN | ~~46~~48 |
| 9.1 | Implementation of this Plan | ~~46~~48 |
| 9.2 | Source of Consideration | ~~46~~48 |
| 9.3 | Vesting of Wind Down Assets | ~~46~~48 |
| 9.4 | Termination of Directors, Officers, and Managers and Appointment of Plan Administrator | ~~46~~49 |
| 9.5 | Wind-Up and Dissolution of the Debtors | ~~46~~49 |
| 9.6 | Plan Administrator and Plan Administrator Agreement | ~~46~~49 |
| 9.7 | Wind Down Budget~~48~~; Wind Down Reserve; DIP Budget Increased Amount | 50 |
| 9.8 | Distributions by Plan Administrator | ~~48~~50 |
| 9.9 | Limitation of Liability; Indemnification | ~~48~~50 |
| 9.10 | Compensation and Duties of Plan Administrator | ~~49~~51 |
| 9.11 | Privilege and Immunities | ~~49~~51 |
| 9.12 | Company Action. | ~~49~~51 |
| 9.13 | Standing to Pursue Debtors' Rights, Including Preserved Causes of Action. | ~~50~~52 |
| 9.14 | Certain Tax Considerations. | ~~50~~52 |
| 9.15 | Final DIP Order. | 56 |
| ARTICLE X | PROVISIONS GOVERNING DISTRIBUTIONS | ~~54~~56 |
| 10.1 | Distributions for Allowed Claims | ~~54~~56 |
| 10.2 | Interest of Claims | ~~55~~57 |
| 10.3 | Distributions by Plan Administrator as Disbursement Agent | ~~55~~57 |
| 10.4 | Means of Cash Payment | ~~55~~57 |
| 10.5 | Fractional Distributions | ~~55~~57 |
| 10.6 | De Minimis Distributions | ~~55~~57 |
| 10.7 | Delivery of Distributions; Unclaimed Distributions | ~~55~~57 |
| 10.8 | Withholding, Payment and Reporting Requirements with Respect to Distributions | ~~56~~58 |
| 10.9 | Setoffs | ~~56~~58 |
| 10.10 | No Distribution in Excess of Allowed Amounts | ~~57~~59 |
| 10.11 | Allocation of Distributions | ~~57~~59 |
| 10.12 | Forfeiture of Distributions | ~~57~~59 |
| ARTICLE XI | PROVISIONS FOR CLAIMS OBJECTIONS AND ESTIMATION OF CLAIMS | ~~57~~59 |
| 11.1 | Claims Administration Responsibility | ~~57~~59 |



11.2    Claims Objections ........................................................... 5860
11.3    Estimation of Contingent or Unliquidated Claims ........................ 5860
11.4    Expungement and Disallowance of Certain Claims ....................... 5860
11.5    Distributions on Account of Disputed Claims ............................ 5860
11.6    Amendments to Claims ..................................................... 5860
11.7    Claims Paid and Payable by Third Parties ............................... 5860
11.8    Adjustment to Claims Without Objection ................................. 59
ARTICLE  XII EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............. 5961
12.1    Executory Contracts and Unexpired Leases Deemed Rejected ........... 5961
ARTICLE  XIII CONFIRMATION AND CONSUMMATION OF THIS PLAN .......... 5961
13.1    Conditions Precedent to the Effective Date .............................. 5961
13.2    Effective Date Notice ...................................................... 6062
13.3    Waiver of Conditions Precedent to the Effective Date ................... 6062
13.4    Effect of Non-Occurrence of Effective Date .............................. 6062
ARTICLE  XIV EFFECTS OF CONFIRMATION .................................... 6163
14.1    Exculpation, Releases, and Injunctions ................................... 6163
14.2    Term of Bankruptcy Injunction or Stays ................................. 6365
ARTICLE  XV RETENTION OF JURISDICTION ................................... 6466
15.1    Exclusive Jurisdiction of Bankruptcy Court .............................. 6466
ARTICLE  XVI MISCELLANEOUS PROVISIONS .................................. 6668
16.1    Modification of this Plan .................................................. 6668
16.2    Revocation, Withdrawal, or Non-Confirmation of this Plan ............. 6668
16.3    Binding Effect ............................................................. 6668
16.4    Subordination Rights ...................................................... 6668
16.5    Severability of Plan Provisions ........................................... 6769
16.6    Payment of Statutory Fees; Filing of Quarterly Reports ................. 6769
16.7    Exemption from Section 1146 ............................................. 6769
16.8    Filing of Additional Documents ........................................... 6870
16.9    Insurance .................................................................. 6870
16.10   Cancellation of Existing Securities and Agreements ..................... 6870
16.11   Successors and Assigns .................................................... 6870
16.12   Notices ..................................................................... 6870
16.13   Governing Law ............................................................ 6971
16.14   Entire Agreement .......................................................... 6972
16.15   Exhibits and Schedules .................................................... 6972
16.16   Computation of Time ...................................................... 7072
16.17   Reservation of Rights ..................................................... 7072



## DISCLAIMER

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF.  NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED, OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY; (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY; OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THIS COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN.  NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN.  ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.  THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.



SEE ARTICLE V HEREIN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THIS COMBINED DISCLOSURE STATEMENT AND PLAN.

## INTRODUCTION[2]

Blink Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession (each, a "**Debtor**" and collectively, the "**Debtors**" or the "**Company**") jointly propose the following Combined Disclosure Statement and Plan, as it may be amended, supplemented, restated, or modified from time to time (together with the Plan Supplement, this "**Combined Disclosure Statement and Plan**") for the liquidation of the Debtors' remaining Assets and distribution of the proceeds of the Assets to the Holders of Allowed Claims against the Debtors as set forth herein and in accordance with chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended and as in effect on the Confirmation Date or otherwise applicable to the Chapter 11 Cases, the "**Bankruptcy Code**").

Each Debtor is a proponent of this Combined Disclosure Statement and Plan within the meaning of section 1129 of the Bankruptcy Code, and this Combined Disclosure Statement and Plan constitutes a separate plan of liquidation for each Debtor. Holders of Claims and Interests may refer to this Combined Disclosure Statement and Plan for a discussion of, among other things, the Debtors' history, businesses, properties, operations, the Chapter 11 Cases, risk factors, summary and analysis of this Plan, and certain other related matters.

**ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS ARE ENCOURAGED TO READ THIS COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THIS COMBINED DISCLOSURE STATEMENT AND PLAN, OR ANY PART THEREOF, AT ANY TIME, INCLUDING PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

**AS DISCUSSED IN THIS DISCLOSURE STATEMENT, THE DEBTORS, THE DIP AGENT, THE PREPETITION AGENT AND THE COMMITTEE HAVE AGREED TO THE TERMS ON WHICH THE DEBTORS' ESTATES WILL BE ADMINISTERED PURSUANT TO THE PLAN. THE COMMITTEE IS REVIEWING THIS COMBINED PLAN AND DISCLOSURE STATEMENT, AND THE PLAN REMAINS SUBJECT TO FURTHER NEGOTIATION AND FINAL DOCUMENTATION AMONG THE PARTIES. ALL OF THE COMMITTEE'S RIGHTS WITH RESPECT TO CONFIRMATION OF THE PLAN ARE RESERVED PENDING SUCH FINAL**

---

[2] Capitalized terms used but not otherwise defined in this Introduction shall have the meanings ascribed to such terms below.



**DOCUMENTATION, AND THE PARTIES WILL WORK TOGETHER IN GOOD FAITH TO FINALIZE THE PLAN IN ADVANCE OF THE CONFIRMATION HEARING.**

**THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF THEIR CREDITORS AND ESTATES AND ENCOURAGE ALL ELIGIBLE PARTIES TO VOTE TO ACCEPT THE PLAN.**

## ARTICLE I
## DEFINED TERMS AND RULES OF INTERPRETATION

**Defined Terms**

1.1    **"Acquired Assets"** shall, collectively, mean the "Acquired Assets" defined in each of the Asset Purchase Agreements.

1.2    **"Administrative Claim"** shall mean a Claim for any cost or expense of administration of the Chapter 11 Cases entitled to priority pursuant to sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) professional compensation and reimbursement awarded or allowed pursuant to sections 328, 330, 331, 363, or 503(b) of the Bankruptcy Code to the extent incurred on or after the Petition Date and through the Effective Date, including the Professional Fees; (c) an administrative expense of the type described in section 503(b)(9) of the Bankruptcy Code; and (d) any and all fees and charges assessed against the Estates pursuant to chapter 123 of title 28 of the United States Code.

1.3    **"Affiliate"** shall mean any "affiliate", as such term is defined in section 101(2) of the Bankruptcy Code.

1.4    **"Allowed"** shall mean, with respect to any Claim or Interest, such Claim or Interest or any portion thereof that the Debtors or the Post-Effective Date Debtors have assented to the validity of or that has been (a) allowed by a Final Order of the Bankruptcy Court; (b) allowed pursuant to the terms of this Combined Disclosure Statement and Plan; (c) allowed by agreement between the Holder of such Claim, on one hand, and the Debtors or Post-Effective Date Debtors, as applicable, on the other hand; (d) scheduled and not identified as contingent, unliquidated, or disputed and not superseded by a Proof of Claim; (e) the subject of a timely filed Proof of Claim, which has not been or is not Disputed; or (f) allowed by a Final Order of a court in which such Claim could have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; *provided* that, any (i) Claim or Interest paid or required to be paid by the Buyer pursuant to the Transaction Documents, including the Asset Purchase Agreement(s) or Sale Order(s), or (ii) Claim listed in the Schedules that has been paid (x) by the Debtors after the Petition Date pursuant to a Final Order of the Bankruptcy Court or (y) by the Debtors before the Petition Date and was inadvertently listed in the Schedules, shall not be considered an "Allowed" Claim.

1.5    **"Article"** shall refer to an article of this Combined Disclosure Statement and Plan.



**1.6** **"Asset Purchase Agreement(s)"** shall mean each of, or collectively, as applicable, the Lotemd Agreement and the Stalking Horse Agreement, as approved pursuant to a Final Order of the Bankruptcy Court.

**1.7** **"Assets"** shall mean any and all right, title, and interest of the Debtors and the Estates in and to property of whatever type or nature, including their books and records and any and all rights and benefits under the Sale Documents; *provided*, that any Acquired Assets are not "Assets" as defined herein.

**1.8** "**Assumption Schedule**" shall mean the schedule of Executory Contracts that will be assumed by the Debtors pursuant to this Plan, if any, which shall be included in the Plan Supplement.

**1.9** **"Auctions"** shall mean the auctions conducted for the Sales of substantially all of the Debtors' assets pursuant to the Bidding Procedures.

**1.10** **"Avoidance Actions"** shall mean any Cause of Action pursuant to chapter 5 of the Bankruptcy Code or any state law equivalent thereof.

**1.11** **"Ballot"** shall mean the ballot form distributed to each Holder of a Claim entitled to vote to accept or reject this Plan for purposes of casting its vote to accept or reject the Plan.

**1.12** **"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the District of Delaware.

**1.13** **"Bankruptcy Rules"** shall mean the Federal Rules of Bankruptcy Procedure, as amended from time to time.

**1.14** **"Bar Date"** shall mean, with respect to any particular Claim, the applicable date established by the Bankruptcy Court by which Proof of Claims must be Filed with respect to such Claims, other than Administrative Claims.

**1.15** **"Bar Date Motion"** shall mean the *Debtors' Motion for Entry of Order (I) Establishing Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9) of the Bankruptcy Code, (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9) of the Bankruptcy Code, and (IV) Approving Form and Manner of Notice Thereof* [Docket No. 97].

**1.16** **"Bar Date Order"** shall mean that certain *Order (I) Establishing Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9) of the Bankruptcy Code, (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9) of the Bankruptcy Code, and (IV) Approving Form and Manner of Notice Thereof* [Docket No. 347].

**1.17** **"BFF"** shall mean Blink Fitness Franchising, Inc.



4

**1.18** **"Bid Deadline"** shall mean October 21, 2024 at 4:00 p.m. (prevailing Eastern Time).

**1.19** **"Bidding Procedures"** shall have the meaning specified in the Bidding Procedures Order.

**1.20** **"Bidding Procedures and Sale Motion"** shall mean the *Debtors' Motion for Entry of Orders (I) (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets, (C) Establishing Certain Assumption and Assignment Procedures and Approving Manner of Notice Thereof, and (D) Granting Related Relief; and (II) (A) Authorizing and Approving the Debtors' Entry into an Asset Purchase Agreement, (B) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (C) Approving the Assumption and Assignment of the Assumed Contracts, and (D) Granting Related Relief* [Docket No. 81].

**1.21** **"Bidding Procedures Order"** shall mean that certain *Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets, (C) Establishing Certain Assumption and Assignment Procedures and Approving Manner of Notice Thereof, and (D) Granting Related Relief* [Docket No. 348] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

**1.22** **"Blink Holdings"** shall mean Blink Holdings, Inc.

**1.23** **"Board"** shall mean, collectively, the boards of directors and/or managers of the Debtors.

**1.24** **"Business Day"** shall mean any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)) on which commercial banks are open for business in New York, New York.

**1.25** **"Buyer(s)"** shall mean each of and collectively, as applicable, the party or parties who, pursuant to one or more Sale Orders, purchases any of the Acquired Assets.

**1.26** **"Carve Out"** shall have the meaning given to such term in the Final DIP Order.

**1.27** **"Cash"** shall mean cash and cash equivalents in U.S. dollars.

**1.28** **"Cash Collateral"** shall have the meaning given to such term in the Final DIP Order.

**1.29** **"Cause of Action"** shall mean any action, claim, cause of action, controversy, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.   For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff or counterclaim and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c)


31864584.2
031864584.
22

any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any counterclaim or defense, including fraud, mistake, duress, usury, recoupment, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer or similar claim.

1.30   **"CFit"** shall have the meaning specified in Section 3.4(f).

1.31   "**Chapter 11 Case**" shall mean, with respect to a particular Debtor, the case under chapter 11 of the Bankruptcy Code pending for such Debtor in the Bankruptcy Court, jointly administered with each other Debtor's Chapter 11 Case, and the "**Chapter 11 Cases**" shall mean, collectively, all of the Debtors' Chapter 11 Cases.

1.32   **"Chicago Segment"** shall have the meaning specified in Section 3.4(f).

1.33   **"Claim"** shall mean any "claim," as such term is defined in section 101(5) of the Bankruptcy Code.

1.34   **"Claims Register"** shall mean the official register of Claims maintained by the Notice and Claims Agent.

1.35   **"Claims Objection Deadline"** shall mean one hundred eighty (180) days after the Effective Date, or such later date as may be ordered by the Bankruptcy Court; *provided however*, that the Plan Administrator may seek extensions of such date from the Bankruptcy Court at any time.

1.36   **"Class"** shall mean a class of Claims or Interests designated in Article III of this Plan, pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.37   **"CODI"** shall have the meaning specified in Section 9.15(b)(iii).

1.38   **"Committee"** means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases, as it may be reconstituted from time to time.

1.39   **"Conditional Disclosure Statement Order"** shall mean the order (and all exhibits thereto) entered by the Bankruptcy Court (x) conditionally approving this Combined Disclosure Statement and Plan for solicitation purposes; (y) approving the Solicitation Materials; and (z) allowing solicitation of this Combined Disclosure Statement and Plan to commence (as amended, modified, or supplemented from time to time in accordance with the terms thereof) [Docket No. 697].

1.40   **"Confirmation"** shall mean the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

1.41   **"Confirmation Date"** shall mean the date upon which Confirmation occurs.

1.42   **"Confirmation Hearing"** shall mean the hearing held by the Bankruptcy Court to consider Confirmation, as such hearing may be adjourned or continued from time to time.



**1.43** **"Confirmation Order"** shall mean the Bankruptcy Court order approving this Combined Disclosure Statement and Plan on a final basis pursuant to sections 1125 and 1129 of the Bankruptcy Code.

**1.44** **"Consenting Lenders"** shall have the meaning specified in the RSA.

**1.45** **"Consummation"** shall mean the occurrence of the Effective Date.

**1.46** **"Core Assets"** shall have the meaning specified in Section 3.4(f).

**1.47** **"Debtor Released Parties"** means, collectively, in each case in its capacity as such, (a) the Debtors' directors and officers as of the Petition Date; (b) the DIP Agent and DIP Lenders; (c) the Prepetition Agent and the Prepetition Lenders; and (d) with respect to each of the Entities described in subsections (b) through (c), such Entity's Related Parties; *provided*, *however*, that in each case a person or entity shall not be a Debtor Released Party if such person or entity objects to the Plan's release provisions; *provided*, *further*, that (i) no Former Directors and Officers and (ii) no direct or indirect members, equityholders or shareholders of the Debtors shall be deemed to constitute "Debtor Released Parties" hereunder.

**1.48** **"Designation Rights Period"** shall have the meaning given to such term in the Stalking Horse Agreement.

**1.49** **"DIP Agent"** shall mean Varagon Capital Partners Agent, LLC, in its capacities as collateral agent and administrative agent under the DIP Credit Agreement, and any successor agent under the DIP Credit Agreement.

**1.50** **"DIP Budget"** shall mean the budget attached as Exhibit B to the Final DIP Order, or any other "Approved Budget" (as defined in the Final DIP Order) then in effect as of any date of determination, as applicable.

**1.51** "**DIP Budget Increased Amount**" shall mean an additional $1.5 million of the Sale Proceeds to be added to the Wind Down Reserve for the purposes and in the maximum amounts set forth on **Exhibit B** attached hereto.

**1.52** **"DIP Collateral"** shall have the meaning given to such term in the Final DIP Order.

**1.53** **"DIP Claims"** shall mean all Claims against any Debtor on account of the DIP Obligations (as defined in the Final DIP Order) or otherwise arising on account of the DIP Facility (including, for the avoidance of doubt, Claims in respect of the Roll-Up (as defined in the Final DIP Order)).

**1.54** **"DIP Credit Agreement"** shall mean that certain *Senior Secured Priming and Superpriority Debtor-in-Possession Credit and Guaranty Agreement*, dated as of August 12, 2024, by and among Blink Company Intermediate Holdco Inc., as debtor, debtor-in-possession, parent, and guarantor, Blink Holdings, as borrower, and the DIP Agent and the DIP Lenders, attached as Exhibit A to the Final DIP Order, as may be amended, restated, supplemented or otherwise modified from time to time.



**1.55**    **"DIP Facility"** shall mean the debtor-in-possession superpriority senior secured multiple draw term loan credit facility in the aggregate principal amount of $74.6 million provided to the Debtors by the DIP Lenders, pursuant to and subject to the terms and conditions of the DIP Credit Agreement and the Final DIP Order.

**1.56**    **"DIP Lenders"** shall have the meaning given to such term in the Final DIP Order.

**1.57**    **"DIP Orders"** shall mean, collectively, the Interim DIP Order and the Final DIP Order.

**1.58**    **"DIP Required Lenders"** shall mean the "Required Lenders" (as defined in the DIP Credit Agreement).

**1.59**    **"DIP Secured Parties"** means, collectively, the DIP Agent and DIP Lenders.

**1.60**    **"Disclosure Statement"** shall mean the disclosure statement, as amended, supplemented, or modified from time to time, that is embodied within this Combined Disclosure Statement and Plan and distributed in accordance with, among others, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

**1.61**    **"Disputed"** shall mean, as to any Claim (or portion thereof) or Interest against a Debtor, a Claim or Interest to the extent such Claim or Interest has not been Allowed and is the subject of (i) a timely objection or request for estimation in accordance with this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Confirmation Order, and which objection, request for estimation or dispute has not been withdrawn, with prejudice, or determined by an order of the Bankruptcy Court; or (ii) a dispute that is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law.

**1.62**    **"Distributable Proceeds"** shall mean the aggregate amount of Cash including, without limitation, the net proceeds of any Wind Down Assets, available for Distribution after the payment, or establishment of appropriate reserves, with respect to and in full satisfaction of the Wind Down Reserve, Allowed Unclassified Claims, Prepetition Loan Secured Claims, Allowed Other Secured Claims, and Allowed Priority Non-Tax Claims.

**1.63**    **"Distribution"** or **"Distribute"** shall mean a delivery of Cash or other applicable consideration by the Plan Administrator to the Holders of Allowed Claims pursuant to this Plan.

**1.64**    **"Distribution Date"** shall mean the date on which a Distribution is made pursuant to this Plan.

**1.65**    **"Effective Date"** shall mean the date on which this Plan shall take effect, which date shall be a Business Day on or after the Confirmation Date on which all conditions precedent to the effectiveness of this Plan specified in Section 13.1, have been satisfied, or, if capable of being waived, waived in accordance with Section 13.3, which date shall be specified in the Effective Date Notice filed with the Bankruptcy Court by the Post-Effective Date Debtors or the Plan Administrator.



**1.66** **"Effective Date Notice"** shall mean the notice of the Effective Date filed by the Debtors with the Bankruptcy Court and served in accordance with Section 13.2.

**1.67** **"EHI"** shall mean Equinox Holdings, Inc.

**1.68** **"Entity"** shall mean any "entity," as such term is defined in section 101(15) of the Bankruptcy Code.

**1.69** **"Equinox Group"** shall mean Equinox Group LLC.

**1.70** **"Equinox TSA"** shall mean that certain *Transition Services Agreement*, dated December 1, 2016, by and between EHI and Blink Holdings, as amended, supplemented, and/or modified from time to time.

**1.71** **"Estate"** shall mean, with respect to a particular Debtor, the estate created for such Debtor upon commencement of its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code, and the **"Estates"** shall mean, collectively, all of the Debtors' Estates.

**1.72** **"Excluded Actions"** shall mean any Causes of Action that: (a) were sold to the Buyer(s) under the Asset Purchase Agreements; (b) are or have been released pursuant to a Final Order entered by the Bankruptcy Court (to the extent that any such Final Order is in a form acceptable to the DIP Agent and the Prepetition Agent); (c) is an Avoidance Action; or (d) are or have been released by the Debtors or the Post-Effective Date Debtors pursuant to the Final DIP Order or this Plan, including as set forth in Article XIV.

**1.73** **"Exculpated Parties"** shall mean, collectively, and in each case in its capacity as such, and to the extent that each such party served as a fiduciary of the Debtors' Estates at any time between the Petition Date and the Effective Date:  (a) the Debtors and their Estates; (b) Guy Harkless, Emanuel Pearlman, Benjamin Balick, Carissa Ganelli, Cynthia Klocek, Steven Shenker, and Scott Canna in their capacities as officers and/or directors, as applicable, of the Debtors; (c) the Professionals retained by the Debtors or the Committee pursuant to an Order of the Bankruptcy Court; (d) the Committee; and (e) any other person serving as a fiduciary of the Debtors' Estates.  For the avoidance of doubt, (i) no Former Officers and Directors and (ii) no direct or indirect members, equityholders or shareholders of the Debtors shall be deemed to constitute "Exculpated Parties" hereunder.

**1.74** "**Executory Contract**" shall mean a contract to which one or more of the Debtors is party, other than an Unexpired Lease, which contract is subject to assumption or rejection in accordance with section 365 of the Bankruptcy Code.

**1.75** **"File," "Filed,"** or **"Filing"** shall mean file, filed, or filing with the Bankruptcy Court (including clerk thereof) in the Chapter 11 Cases or, with respect to the filing and/or submission of a Proof of Claim, the Notice and Claims Agent.

**1.76** **"Final DIP Order"** shall mean that certain *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Utilize Cash Collateral; (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (III) Granting*



*Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 393].

1.77    **"Final Order"** shall mean, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, seek certiorari, or move for a new trial, re-argument, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing has been timely filed; or (b) any appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, petitioned, or moved.

1.78    **"First Day Declaration"** shall mean the *Declaration of Steven Shenker, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 2].

1.79    **"First Day Motions"** shall have the meaning specified in Section 3.4(b).

1.80    **"First Subordinated Note"** shall mean that certain *Subordinated Unsecured Revolving Promissory Note*, dated as of September 30, 2020, by and between Blink Holdings and Equinox Group.

1.81    **"Former Directors and Officers"** shall mean any and all Persons who were directors, officers, and/or managers of any of the Debtors prior to the Petition Date (but excluding any such Persons who were directors, officers, and/or managers of the Debtors on or subsequent to the Petition Date), in each case in their capacities as such.

1.82    **"General Bar Date"** shall mean 11:59 p.m. (prevailing Eastern Time) on October 10, 2024, as established by the Bar Date Order.

1.83    **"General Unsecured Claims"** shall mean any Claim against any of the Debtors that is not: (a) an Administrative Claim, including a Claim for Professional Fees; (b) a DIP Claim; (c) a Priority Tax Claim; (d) a Priority Non-Tax Claim; (e) a Prepetition Loan Secured Claim; or (f) an Other Secured Claim.

1.84    **"Governmental Unit"** shall mean any "governmental unit," as such term is defined in section 101(27) of the Bankruptcy Code.

1.85    **"HFP"** shall have the meaning specified in Section 3.4(f).

1.86    **"Holder"** shall mean an Entity holding a Claim against or Interest in the Debtor as of the applicable date of determination.

1.87    **"Houston Segment"** shall have the meaning specified in Section 3.4(f).

1.88    **"Impaired"** shall mean, with respect to a Claim, Interest or Class of Claims or Interests, that it is "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.



1.89    **"Impaired Class"** shall mean a Class of Claims or Interests that is Impaired.

1.90    **"Intercompany Claim"** shall mean any Claim held by a Debtor against another Debtor.

1.91    **"Interest"** shall mean any "equity security" (as such term is defined in section 101(16) of the Bankruptcy Code) or other equity interest in a Debtor, including all ordinary shares, common stock, preferred stock, membership interest, partnership interest, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, including any restricted share, option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, that existed immediately before the Effective Date.

1.92    **"Interim DIP Order"** shall mean that certain *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Utilize Cash Collateral; (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 63].

1.93    "**IRC**" shall mean the Internal Revenue Code of 1986, as amended.

1.94    **"IRS"** shall mean the Internal Revenue Service.

1.95    **"Investigation"** shall have the meaning given such term in Section 3.3(c).

1.96    **"Lien"** shall mean a "lien" as such term is defined in section 101(37) of the Bankruptcy Code.

1.97    **"Line of Credit"** shall mean that certain $55 million line of credit which Equinox Group agreed to provide to the Company, pursuant to the Second Subordinated Note.

1.98    **"Local Rules"** shall mean the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, as may be amended, supplemented, and modified from time to time.

1.99    **"Lotemd Agreement"** shall mean the *Asset Purchase Agreement By and Among Blink Holdings, Inc., the Other Seller Parties Hereto, and Lotemd Fit LLC*, dated November 4, 2024, as may be amended, supplemented, restated, or modified from time to time.

1.100    **"Moelis"** shall mean Moelis & Company LLC.

1.101    **"NOL"** shall have the meaning specified in Section 9.15(b)(i).

1.102    **"Note Payable"** shall mean that certain $12.5 million subordinated loan which Equinox Group agreed to provide to the Company, pursuant to the First Subordinated Note.

1.103    **"Notice and Claims Agent"** shall mean Epiq Corporate Restructuring, LLC, in its capacity as notice, claims and solicitation agent for the Debtors and any successor agent.



**1.104** **"Objection***"* shall mean any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Claim).

**1.105** "**OCP Order**" shall mean that certain *Order (I) Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 158].

**1.106** **"Other Secured Claim"** shall mean any Secured Claim other than a DIP Claim or Prepetition Loan Secured Claim.

**1.107** **"Outer Market Segment"** shall have the meaning specified in Section 3.4(f).

**1.108** **"Paid in Full," "Payment in Full," or "Pay in Full"** shall mean, with respect to an Allowed Claim, the indefeasible payment in Cash or other consideration in an aggregate amount equal to the Allowed amount thereof.

**1.109** **"Person"** shall mean "Person" as defined in section 101(41) of the Bankruptcy Code.

**1.110** **"Petition Date"** shall mean August 12, 2024 (i.e., the date on which the Debtors commenced the Chapter 11 Cases in the Bankruptcy Court).

**1.111** **"Plan"** shall mean the joint chapter 11 plan of liquidation embodied in this Combined Disclosure Statement and Plan, as it may be altered, amended, modified or supplemented from time to time including in accordance with its terms and the Bankruptcy Code or the Bankruptcy Rules.

**1.112** **"Plan Administrator"** shall mean a Person or Entity identified by the Committee, in consultation with the Prepetition Agent and the Prepetition Required Lenders, who shall conduct the Wind Down and provide the services to the Post-Effective Date Debtors as set forth herein and in the Plan Administrator Agreement.

**1.113** **"Plan Administrator Agreement"** shall mean the agreement setting forth, among other things, the identity, terms of compensation, and authority of the Plan Administrator and the scope of services to be provided by the Plan Administrator, which shall be included in the Plan Supplement, and which shall be acceptable in form and substance to the Committee and Prepetition Agent, in consultation with the Prepetition Required Lenders.

**1.114** **"Plan Administration Expenses"** shall mean the reasonable and documented fees, expenses, and costs incurred by the Post-Effective Date Debtors or the Plan Administrator, including the maintenance or disposition of the Wind Down Assets (including, but not limited to, Plan Administrator fees, attorneys' fees, the fees of professionals and other Persons retained by the Plan Administrator, personnel-related expenses and any Taxes imposed on the Wind Down Assets), and any other expenses incurred in accordance with the Plan Administrator Agreement.

**1.115** **"Plan Supplement"** shall mean the compilation of documents (or forms thereof), schedules, and exhibits to this Plan, as each may be amended, supplemented, or modified from



time to time in accordance with this Plan, the Bankruptcy Code, and Bankruptcy Rules, to be filed with the Bankruptcy Court,  including, as applicable: (i) Wind Down Organizational Documents, including the Plan Administrator Agreement; (ii) the identity of the Plan Administrator;  and (iii) the Assumption Schedule, in each case in form and substance acceptable to the DIP Agent, DIP Required Lenders, Prepetition Agent, and Prepetition Required Lenders. For the avoidance of doubt, the Debtors, with the consent of the DIP Agent, DIP Required Lenders, Prepetition Agent, and Prepetition Required Lenders shall have the right to amend, supplement, or modify the Plan Supplement through the Effective Date in accordance with this Plan, the Bankruptcy Code, and the Bankruptcy Rules; *provided*, that, except as otherwise expressly provided herein or in the Plan Supplement, any such amendments, supplements, or modifications that are immaterial or ministerial in nature (as determined by the DIP Agent and Prepetition Agent in their respective reasonable discretion) shall require the consent of only the DIP Agent and Prepetition Agent.

**1.116 "Post-Effective Date Debtors"** shall mean, collectively, all Debtors and successors thereto on and after the Effective Date.

**1.117 "Prepetition Agent"** shall mean Varagon Capital Partners Agent, LLC, in its capacity as administrative agent for the Prepetition Lenders, and any successor agent under the Prepetition Credit Agreement.

**1.118 "Prepetition Credit Agreement"** shall mean, collectively, that certain *Credit and Guaranty Agreement*, dated as of November 8, 2018, by and among Blink Holdings and the other borrowers party thereto, as borrowers, the Prepetition Guarantors, the Prepetition Agent, as administrative agent, and the Prepetition Lenders, and as amended, supplemented, restated, or modified from time to time prior to the Petition Date, and the "Loan Documents" as defined therein.

**1.119 "Prepetition Collateral"** shall have the meaning given to such term in the Final DIP Order.

**1.120 "Prepetition Guarantors"** shall mean Blink Intermediate and the other guarantors party to the Prepetition Credit Agreement.

**1.121 "Prepetition Liens"** shall have the meaning given to such term in the Final DIP Order.

**1.122 "Prepetition Lenders"** shall have the meaning given to such term in the Final DIP Order.

**1.123 "Prepetition Loan Claim"** shall mean the Claims held by the Prepetition Secured Parties in respect of the Prepetition Obligations.

**1.124 "Prepetition Loan Deficiency Claim"** shall mean, collectively, the portion of any Prepetition Loan Claims that are not Prepetition Loan Secured Claims, which shall instead be treated as General Unsecured Claims, subject to treatment as set forth in section 7.4 of this Plan.

**1.125 "Prepetition Loan Secured Claim"** shall mean the Prepetition Loan Claim that is a Secured Claim, which shall be Allowed in the amount of not less than $108,906,895.87 or such



other amount as determined by a Final Order of the Bankruptcy Court in aggregate outstanding principal as of the Petition Date, plus interest, fees, expenses, and other amounts arising under the Prepetition Credit Agreement and the DIP Orders, including all "Obligations" under, and as defined in, the Prepetition Credit Agreement.

**1.126  "Prepetition Obligations"** shall have the meaning given to such term in the Final DIP Order.

**1.127  "Prepetition Protective Advances"** shall have the meaning given to such term in the Final DIP Order.

**1.128  "Prepetition Required Lenders"** shall mean the "Required Lenders" (as defined in the Prepetition Credit Agreement).

**1.129  "Prepetition Secured Parties"** means, collectively, the Prepetition Agent and Prepetition Lenders.

**1.130  "Preserved Causes of Action"** shall mean any and all Causes of Action that are not Excluded Actions.

**1.131  "Priority Non-Tax Claim"** shall mean any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Claim, DIP Claim, or Priority Tax Claim.

**1.132  "Priority Tax Claim"** shall mean any Claim of a Governmental Unit entitled to priority pursuant to section 502(i) or 507(a)(8) of the Bankruptcy Code.

**1.133  "Pro Rata"** shall mean the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in such Class and other Classes (or sub-Classes, as the case may be) entitled to share in the same recovery as such Allowed Claim under this Plan.

**1.134  "Professional"** shall mean any Entity that is, by Bankruptcy Court order:  (a) employed for legal, financial advisory, investment banking, accounting, or other professional services during the Chapter 11 Cases pursuant to section 327, 363, or 1103 of the Bankruptcy Code and to be compensated and reimbursed therefor in accordance with sections 327, 328, 329, 330, 331, 363, and/or 1103 of the Bankruptcy Code; or (b) allowed compensation and reimbursement pursuant to section 503(b)(4) of the Bankruptcy Code; *provided, however*, that "Professional" shall not include any professional-service Entity that the Debtors are authorized to employ, compensate, and reimburse under the OCP Order.

**1.135  "Professional Fees"** shall mean the accrued, contingent, and/or unpaid compensation for services rendered (including hourly, transaction, and success fees), and reimbursement for expenses incurred, by Professionals, that: (a) are awardable and allowable pursuant to sections 327, 328, 329, 330, 331, 363, 503(b)(4), and/or 1103 of the Bankruptcy Code or otherwise rendered allowable prior to the Effective Date; (b) have not been denied by the Bankruptcy Court by Final Order; (c) have not been previously paid (regardless of whether a fee application has



been filed for any such amount); and (d) remain outstanding after applying any retainer that has been provided to such Professional. To the extent that any amount of the foregoing compensation or reimbursement is denied or reduced by Final Order of the Bankruptcy Court or any other court of competent jurisdiction, such amount shall no longer constitute Professional Fees.

**1.136    "Professional Fee Amount"** shall mean the aggregate amount of Professional Fees and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors, prior to and as of the Effective Date, which shall be a component of the Wind Down Budget.

**1.137    "Professional Fee Deadline"** shall mean the deadline for filing final fee applications seeking payment of Professional Fees, which shall be no later than forty-five (45) days after the Effective Date.

**1.138    "Professional Fee Escrow Account"** shall mean an account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

**1.139    "Proof of Claim"** shall mean a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases in a manner consistent with the Bar Date Order and this Plan.

**1.140    "Related Parties"** shall mean, with respect to an Entity, collectively, its direct and indirect affiliates, and its and its respective affiliates' current and former equity holders, members, partners, subsidiaries, affiliates, managers, managing members, officers, directors, employees, advisors, financial advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives, each in their capacity as such; *provided*, *however*, in no event shall any Former Directors and Officers be deemed to constitute "Related Parties" hereunder; and *provided*, further, that no direct or indirect members, equityholders or shareholders of the Debtors shall be deemed "Related Parties" hereunder.

**1.141    "Releasing Parties"** shall mean, collectively, in each case solely in their respective capacities as such: (a) the DIP Agent and DIP Lenders; (b) the Prepetition Agent and Prepetition Lenders; (c) the Committee; and (d) with respect to each of the Entities described in subsections (a) through (c), such Entity's Related Parties, solely with respect to claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities that such Related Parties could have properly asserted on behalf of such Releasing Parties.

**1.142    "Reserved Agreement"** shall have the meaning given to such term in the Stalking Horse Agreement.

**1.143    "Restructuring Committee"** shall have the meaning specified in Section 3.3(b).

**1.144    "Restructuring Professionals"** means, collectively, (a) Young Conaway Stargatt & Taylor, LLP; (b) Moelis; (c) Triple P RTS, LLC (d/b/a Portage Point); and (d) Epiq Corporate Restructuring, LLC.

**1.145    "RSA"** shall mean that certain *Restructuring Support Agreement*, dated as of September 23, 2024 [Docket No. 404], by and among the Debtors, the DIP Agent, the Prepetition Agent, and the Consenting Lenders (as defined in the RSA), as amended by that certain Amended



Restructuring Support Agreement dated October 8, 2024 [Docket No. 483]. For the avoidance of doubt, the RSA includes the term sheet attached as Exhibit A thereto.

**1.146  "Revolving Loan Facility"** shall have the meaning specified in Section 3.2(a).

**1.147  "Sale(s)"** shall mean the sale or sales, as applicable, of the Debtors' assets pursuant to the Sale Order(s).

**1.148  "Sale Hearing"** shall mean the hearing(s) held by the Bankruptcy Court for approval of the Sale(s) pursuant to the Bidding Procedures Order.

**1.149  "Sale Orders"** shall mean the *Order (I) Approving the Sale of Assets to Lotemd Fit LLC Free and Clear of All Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 591] and the *Order (I) Approving the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 611].

**1.150  "Sale Proceeds"** shall mean the net Cash or other proceeds received by the Debtors from the Sales of the Acquired Assets, as approved by the Sale Orders.

**1.151  "Sale Transactions"** shall mean the transactions pursuant to which the Debtors transferred the Acquired Assets to Buyers.

**1.152  "Sale Documents"** shall mean, collectively, the Asset Purchase Agreements and all related documents necessary to effectuate the Sale Transactions, including the Sale Orders and all schedules, exhibits, and supplements to the Asset Purchase Agreements, as such documents may be amended, modified, and/or supplemented from time to time.

**1.153  "Schedules"** shall mean the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

**1.154  "Second Subordinated Note"** shall mean that certain *Subordinated Unsecured Revolving Promissory Note*, dated as of November 15, 2022, by and between Blink Holdings and Equinox Group.

**1.155  "Secured Claim"** shall mean any Claim that is secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.



**1.156** **"Securities Act"** shall mean the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder.

**1.157** **"Senior Credit Facility"** shall have the meaning specified in Section 3.2(a).

**1.158** **"Shared Services"** means the services provided by EHI to the Debtors pursuant to the Equinox TSA.

**1.159** **"Solicitation Materials"** shall mean the solicitation materials with respect to this Combined Plan and Disclosure Statement, including the Disclosure Statement conditionally approved by the Bankruptcy Court, form of Ballots, and any other solicitation materials, including the solicitation version of this Plan.

**1.160** **"Stalking Horse Agreement"** shall mean that certain *Asset Purchase Agreement*, dated September 10, 2024, by and among the Debtors and the Stalking Horse Bidder, as may be amended, supplemented, restated, or modified from time to time.

**1.161** **"Stalking Horse Bid"** shall mean that bid submitted by the Stalking Horse Bidder pursuant to the Stalking Horse Agreement.

**1.162** **"Stalking Horse Bidder"** shall mean Pinnacle US Holdings LLC, a Delaware limited liability company.

**1.163** "**Subordination Agreement**" shall mean that certain *Subordination Agreement*, dated as of September 30, 2020 (as amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms prior to the Petition Date), by and among the Prepetition Agent, Equinox Group, Blink Holdings, and others, governing the respective rights interests, obligations, priority, and positions of the Prepetition Obligations relative to certain unsecured prepetition loans made by Equinox Group to Blink Holdings, including under the First Subordinated Note and the Second Subordinated Note.

**1.164** **"Successful Bid"** shall have the meaning specified in the Bidding Procedures and Sale Motion.

**1.165** **"Supreme"** shall have the meaning specified in Section 3.4(f).

**1.166** **"Taxes"** shall mean all income, gross receipts, sales, use, transfer, payroll, employment, franchise, profits, property, excise, or other similar taxes, estimated import duties, fees, stamp taxes, and duties, value added taxes, assessments, or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax, or additional amounts imposed by any taxing authority of a Governmental Unit with respect thereto.

**1.167** **"Term Loan Facility"** shall have the meaning specified in Section 3.2(a).

**1.168** **"Third-Party Released Parties"** shall mean, collectively, each of and in each case in its capacity as such, (a) the Debtors and their Estates; (b) the DIP Agent and DIP Lenders (c) the Prepetition Agent and the Prepetition Lenders; (d) the Committee; and (e) with respect to each of



17

the Entities described in subsections (a) through (d), such Entity's Related Parties; *provided*, *however*, that in each case a person or entity shall not be a Third-Party Released Party if such person or entity objects to or declines to provide the Plan's release provisions; *provided*, *further*, that (i) no Former Directors and Officers and (ii) no direct or indirect members, equityholders or shareholders of the Debtors shall be deemed to constitute "Third-Party Released Parties" hereunder.

**1.169  "U.S. Trustee"** shall mean the Office of the United States Trustee for the District of Delaware.

**1.170  "U.S. Trustee Fees"** shall mean the fees due and payable pursuant to 28 U.S.C. § 1930 or accrued interest thereon arising under 31 U.S.C. § 3717.

**1.171  "U.S. Trustee Fee Claims"** shall mean the Claims on account of U.S. Trustee Fees.

**1.172  "Unclassified Claims"** shall mean any DIP Claims, Administrative Claims, Professional Fees, Priority Tax Claims, and U.S. Trustee Fee Claims.

**1.173  "Unexpired Lease"** shall mean a lease to which one or more of the Debtors is party, which lease is subject to assumption or rejection in accordance with section 365 of the Bankruptcy Code.

**1.174  "Unimpaired"** shall mean, with respect to a Class, Claim, Interest, or a Holder of a Claim or Interest, that such Class, Claim, Interest, or Holder is not Impaired.

**1.175  "Voting Deadline"** shall mean 4:00 p.m. (prevailing Eastern Time) on January 15, 2025, the date and time by which Ballots to accept or reject this Plan must be received to be tabulated, as set forth by the Conditional Disclosure Statement Order.

**1.176  "Voting Record Date"** shall mean the date upon which the Conditional Disclosure Statement Order is entered.

**1.177  "Voting Report"** shall mean the report certifying the methodology for the tabulation of votes and result of voting on this Plan.

**1.178  "Wind Down"** shall mean the process to (x) wind down, dissolve, and liquidate the Debtors' Estates, including, among other things, if applicable, pursuing the Preserved Causes of Action, if any, and (y) distribute any Wind Down Assets in accordance with this Plan.

**1.179  "Wind Down Assets"** shall mean all property of the Debtors' Estates not transferred pursuant to the Asset Purchase Agreement(s) and the Sale Documents or distributed to Holders of Allowed Claims on or prior to the Effective Date, including, without limitation, (i) the Preserved Causes of Action; (ii) all rights of setoff, recoupment, and other defenses against Claims; (iii) all rights under the Sale Documents; (iv) all bank accounts (as set forth in the Plan Administrator Agreement); and (v) all documents, communications, and information protected by the attorney-client privilege, the work-product privilege, and any other applicable evidentiary privileges.



**1.180** **"Wind Down Budget"** shall mean the agreed upon budget for the Wind Down, which shall be in form and substance acceptable to the Debtors, the DIP Agent, Required DIP Lenders, Prepetition Agent, and Required Prepetition Lenders (solely to the extent that the obligations owed by the Debtors to such parties remain unpaid and outstanding).

**1.181** **"Wind Down Organizational Documents"** shall mean, to the extent applicable, the form of the certificates or articles of incorporation, bylaws, or such other applicable formation or governance documents of the Post-Effective Date Debtors, including the Plan Administrator Agreement, which shall be included in the Plan Supplement and shall be in form and substance acceptable to the Plan Administrator, the DIP Agent, Required DIP Lenders, Prepetition Agent, and Required Prepetition Lenders, and the Debtors.

**1.182** **"Wind Down Reserve"** shall mean the reserve account maintained by the Debtors prior to the Effective Date and the Plan Administrator on and after the Effective Date which amount shall initially consist of (i) any amounts authorized under the Approved Budget (as defined in the Final DIP Order) that remain unused as of the Effective Date, (ii) $1 million from the "Winddown Expenses" line item of the Approved Budget (as defined in the Final DIP Order) and (iii) the DIP Budget Increased Amount.

**1.183** **"Young Conaway"** means Young Conaway Stargatt & Taylor, LLP.

**Rules of Interpretation**

For purposes of this Plan and unless otherwise specified herein: (1) each term, whether stated in the singular or the plural, shall include, in the appropriate context, both the singular and the plural; (2) each pronoun stated in the masculine, feminine, or neuter gender shall include, in the appropriate context, the masculine, feminine, and the neuter gender; (3) the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (4) all references to articles or Articles are references to the Articles hereof; (5) all captions and headings are inserted for convenience of reference only and are not intended to be a part of, or to affect the interpretation of, this Plan; (6) any reference to the Debtors or the Post-Effective Date Debtors shall mean, in the appropriate context, both the Debtors and the Post-Effective Date Debtors; (7) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (8) any reference to an existing document, schedule, or exhibit, whether or not filed, having been filed, or to be filed, shall mean that document, schedule or exhibit, as it may thereafter be amended, modified, or supplemented, in accordance with its terms, the terms of the Final DIP Order, and this Plan; (9) any reference to an event occurring on a specified date, including on the Effective Date, shall mean that the event will occur on that date or as soon thereafter as reasonably practicable; (10) any reference to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (11) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time and as applicable to the Chapter 11 Cases; (12) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with, the applicable federal law, including the Bankruptcy Code and



Bankruptcy Rules; (13) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (14) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

## ARTICLE  II
## CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

**2.1     Classification of Claims and Interests**.  The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including related to the claims reconciliation process.  Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by creditors.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect only the Debtors' estimates as of the date hereof.  In addition to the cautionary notes contained elsewhere in this Combined Disclosure Statement and Plan, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates.  The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

Claims and Interests, except for DIP Claims, Administrative Claims, Professional Fees, Priority Tax Claims, and U.S. Trustee Fee Claims, are classified in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim or Allowed Interest, as applicable, in that Class.  To the extent a specified Class does not include any Allowed Claims or Allowed Interests, as applicable, then such Class shall be deemed not to exist.

This Plan constitutes a separate chapter 11 plan of liquidation for each Debtor.  Pursuant to section 1122, the classification of Claims and Interests is as follows:

| Class/ Designation | Plan Treatment | Estimated Amount of Total Claims | Status | Projected Recovery |
|---|---|---|---|---|
| **Class 1:** Priority Non-Tax Claims | In full and final satisfaction of and in exchange for such Claim, on, or as soon as reasonably practicable following the Effective Date, each Holder of an Allowed Priority Non-Tax Claim will be paid in full in cash or otherwise receive treatment in a manner | $0.00 | **Unimpaired** <u>Not</u> Entitled to Vote (Presumed to Accept) | 100% |



| Class/ Designation | Plan Treatment | Estimated Amount of Total Claims | Status | Projected Recovery |
|---|---|---|---|---|
| | consistent with section 1129(a)(9) of the Bankruptcy Code; *provided*, *however*, nothing herein shall obligate the DIP Secured Parties or the Prepetition Secured Parties to fund, or make available DIP Collateral proceeds or Prepetition Collateral Proceeds (including Cash Collateral and including via section 506(c) surcharge) to pay, any such Allowed Priority Non-Tax Claims except as and to the extent provided in the Final DIP Order in accordance with the DIP Budget and Carve Out thereunder. | | | |
| **Class 2:** Other Secured Claims | In full and final satisfaction of and in exchange for such Claim, on, or as soon as reasonably practicable following the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the Debtors' or Post-Effective Date Debtors' option: (a) Cash equal to the unpaid portion of the amount of such Allowed Other Secured Claim; (b) the return of the Holder's collateral securing such Claim; or (c) such other treatment permitted by the Bankruptcy Code; *provided however*, that to the extent such Other Secured Claims are proposed to be satisfied using the Sale Proceeds, such proceeds shall not exceed $1.0 million without the prior written consent of the DIP Agent, Prepetition Agent, DIP Required Lenders, and Prepetition Required Lenders. | $0.00 | **Unimpaired** <u>Not</u> Entitled to Vote (Presumed to Accept) | 100% |
| **Class 3:** Prepetition Loan Secured Claims | In full and final satisfaction of and in exchange for such Claim, each Holder of an Allowed Prepetition Loan Secured Claim shall receive on account of such Holder's Allowed Prepetition Loan Secured Claim, to the extent not indefeasibly paid and following repayment in full of all DIP Claims in Cash and subject to the Carve Out, (i) its Pro Rata share of 100% of the Sale Proceeds remaining after the payment, or establishment of appropriate reserves for previously unpaid amounts in respect of the Carve-Out and Wind Down Reserve or, at the election of the | $108.9 million | **Impaired** <u>Entitled</u> to Vote | 30-35% |



| Class/ Designation | Plan Treatment | Estimated Amount of Total Claims | Status | Projected Recovery |
|---|---|---|---|---|
| | Holders of Allowed Prepetition Loan Secured Claims, (ii) any excess unused amount of the Wind Down Reserve, if any, in accordance with Section 9.7 hereof, and (iii) 100% of all other Distributable Proceeds. | | | |
| **Class 4:** General Unsecured Claims | Holders of General Unsecured Claims (including the Prepetition Loan Deficiency Claim, if any) will not receive or retain any property or interest in property under the Plan on account of their General Unsecured Claims. | $163.7 million, plus the Prepetition Loan Deficiency Claim | **Impaired** <u>Not</u> Entitled to Vote (Deemed to Reject) | 0% |
| **Class 5:** Intercompany Claims | On the Effective Date, all Intercompany Claims shall be cancelled, released, and extinguished without Distribution, and will be of no further force or effect. | N/A | **Impaired** <u>Not</u> Entitled to Vote (Deemed to Reject) | N/A |
| **Class 6:** Interests | On the Effective Date, all Interests shall be cancelled, released and extinguished as of the Effective Date, and Holders thereof shall receive no Distribution on account of such Interests. | N/A | **Impaired** <u>Not</u> Entitled to Vote (Deemed to Reject) | N/A |

## ARTICLE III
## BACKGROUND AND DISCLOSURES

### 3.1    General Background[3]

### (a)    *Company History and Corporate Structure*

Prior to the Sale, the Company was a leading owner and operator of fitness clubs in the United States, specifically in the Northeast region, California, Illinois, and Texas, and maintains its headquarters in New York, New York.   As of the Petition Date, the Company, or its

---

[3]    Additional information regarding the Debtors' business, assets, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in detail in the First Day Declaration.



franchisees, operated 101 fitness clubs under the Blink Fitness brand name, collectively serving approximately 443,000 members as of June 2024.

As of the Petition Date, the Debtors employed, in the aggregate, approximately 2,074 employees.  Approximately 2,005 employees work on an hourly basis, while the remainder work on a salaried basis.  The Debtors' employees are not covered by a collective bargaining agreement.

Since launching in 2011, the Company developed and refined its club formats, which allowed the Company to cost-effectively construct and efficiently operate fitness clubs, optimizing the Debtors' ability to scale its model.  The Company's club locations—in suburban and urban areas—coupled with the Company's brand ethos of inclusivity and positive messaging positioned the Company to attract a diverse customer base, led by the "Generation Z" population. As of the Petition Date, more than 65% of the Company's membership is younger than 35 years old.

The Company provided a broad array of high-quality exercise programs and equipment that are popular and effective, promoting a quality exercise experience for members.  Clubs typically have an open fitness area to accommodate cardiovascular and strength-training equipment, as well as special purpose rooms for group fitness classes and other exercise programs.  The Company offers members electronic check-in and scheduling, on-demand fitness classes, and lifestyle tips through its proprietary mobile application.

In early 2024, as part of its efforts to increase membership, bolster its brand, and improve membership experience, the Company announced a reinvestment in thirty (30) of its most popular fitness clubs, in furtherance of which the Company purchased more than 1,700 pieces of strength and cardiovascular equipment, updated club interiors, and partnered with wellness brands to offer supplemental fitness recovery options, which efforts have resulted in (a) increased membership satisfaction; (b) a 164% increase in total marketing impressions (i.e., advertising "views"); (c) a 57% increase in total market coverage; and (d) a 224% increase in Estimated Media Value, in each case based on a preliminary year over year analysis.  During the same period, total revenue has increased by more than 5% and the average revenue per member has increased by more than 10%.  The Company anticipates that recent trends will persist with continued investment in its brand and clubs.

*(b)* ***Franchised Fitness Clubs***

BFF is a wholly owned subsidiary of Blink Holdings.  BFF granted franchise rights to counterparties to develop and operate health and fitness centers that provide cardiovascular and strength training equipment and related products and services.  Franchised clubs operated under mandatory and suggested specifications, standards, operating procedures and rules, as specified by the Company.  As of the Petition Date, BFF had seven (7) franchised club locations, and had sold but not opened several locations in connection with twelve (12) development rights agreements.  The Debtors filed a motion to reject their franchise agreements in connection with the closing of the Sales of the Acquired Assets and the Wind Down of the Debtors' operations.



*(c)*     ***Transition Services Agreement***

The Company is party to the Equinox TSA with EHI, pursuant to which EHI provides the Shared Services.  Specifically, in the ordinary course of business and pursuant to the TSA, EHI incurs the cost of the Shared Services, including certain personnel and legal expenses, and procures certain shared benefits programs and contracts, such as certain of the Company's insurance policies, along with the Company's medical, dental, and vision plans, which are then offered to the Company's workforce, as applicable.  The contracts associated with such programs are negotiated by EHI, taking advantage of EHI's size and number of fitness brands, reputation, and business relationships, on terms that are likely more favorable than the Company could otherwise independently obtain, which positions the Company to achieve operational efficiencies, including a reduced workforce and reduced technology and other infrastructure and overhead costs.  The Company and EHI negotiate an annual fee for the Shared Services, which is subject to adjustment and payable weekly in arrears in cash, on pricing terms that the Company believes is equivalent to pricing that is equivalent to or better than what would be provided in an arm's-length transaction.  In August 2024, the Company and EHI entered into an amendment of the TSA to reflect the increase in services provided by EHI to support the Debtors' chapter 11 preparations, and the terms by which such services would be compensated.  In connection with the closing of the Sales of the Acquired Assets and the Wind Down of the Debtors' operations, the Debtors further amended the TSA to provide for certain discrete services that the Plan Administrator will require to complete the process of winding down the Debtors' estates.

## 3.2     The Prepetition Capital Structure

The Debtors' prepetition capital structure consisted of outstanding funded secured debt, funded unsecured debt, and trade and other miscellaneous debt, in the aggregate amount of approximately $280.8 million, as illustrated in the following table and described in detail below.

| Outstanding Obligation | Amount |
|---|---|
| Secured Funded Debt | $161.4 million |
| Unsecured Funded Debt | $103.5 million |
| Trade and Other Obligations | $15.9 million |
| **Total:** | **$280.8 million** |

*(a)*     ***Secured Funded Obligations***

On November 8, 2018, Blink Holdings, as borrower, and the other Debtors, as guarantors, entered into the Prepetition Credit Agreement. The Prepetition Credit Agreement provided the Debtors with a $145 million senior secured credit facility (the "**Senior Credit Facility**").  The Senior Credit Facility consisted of a $70 million term loan facility, drawn at closing (the "**Term Loan Facility")**, $50 million of delayed-draw term loans, and a $25 million revolving loan facility, which increased by $5 million in 2019 (the "**Revolving Loan Facility**").  The borrowings under the Senior Credit Facility are guaranteed and secured by assets and



pledges of capital stock by Blink Holdings, its wholly owned subsidiaries, and Blink Company Intermediate Holdco Inc.

Subsequently, the Company and the Prepetition Lenders entered into a series of amendments to the Prepetition Credit Agreement, which, among other things, provided for (a) an additional $30 million of delayed-draw term loans; (b) deferred certain interest payments; and (c) waived principal payments, events of default, and various covenants. With respect to that certain amendment executed on November 15, 2022, the Company and the Prepetition Lenders amended the Prepetition Credit Agreement to eliminate and replace the net leverage financial covenant with a minimum consolidated adjusted EBITDA covenant. As consideration for such amendment, the Company repaid $35 million of the Senior Credit Facility with funds received from the Second Subordinated Note provided by Equinox Group, as detailed below. Such funds were used to retire the Revolving Loan Facility and pay down $5 million of the Term Loan Facility. The Senior Credit Facility matures on November 8, 2024.

Leading up to the Petition Date, on July 17, 2024 and July 30, 2024, the Debtors and the Prepetition Lenders further amended the Prepetition Credit Agreement to, among other things, provide for approximately $6.9 million in Prepetition Protective Advances that served as bridge financing in support of the Debtors' prepetition sale and marketing process and to provide the Debtors with sufficient runway to file the Chapter 11 Cases. As a condition to receiving the Prepetition Protective Advances, the Debtors agreed that the obligations associated with the Prepetition Protective Advances would be "rolled up" into a postpetition credit facility to be funded by the Prepetition Lenders in connection with the Chapter 11 Cases, as discussed more fully below.

As of the Petition Date, the outstanding balance owed to the Prepetition Lenders under the Prepetition Credit Agreement, including the obligations associated with the Prepetition Protective Advances, was approximately $161.4 million, inclusive of accrued and unpaid interest, of which $54.3 million was "rolled up" into, and became payable under the terms of, the DIP Facility.

*(b)*    ***Unsecured Funded Debt Obligations***

On September 30, 2020, Equinox Group and the Company entered into the First Subordinated Note, whereby Equinox Group agreed to provide the Company with the Note Payable, the funding of which was a condition under that certain *Waiver and Seventh Amendment to Credit Agreement*, by and among the Company and the Prepetition Lenders, in connection with the Prepetition Lenders' waiver of an event of default under the Prepetition Credit Agreement. As of the Petition Date, the outstanding balance, including interest, of the Note Payable is approximately $20.6 million.

On November 15, 2022, Equinox Group provided funding to Blink in connection with a subsequent amendment of the Prepetition Credit Agreement, where, in connection with the amendment of the Prepetition Credit Agreement, Blink and Equinox Group entered into the Second Subordinated Note, whereby Equinox Group agreed to fund the Line of Credit, which



was later increased to $67.5 million and has been fully drawn.  As of the Petition Date, the outstanding balance, including interest, of the Line of Credit was $82.9 million.

The obligations under the Note Payable and Line of Credit accrue interest on a quarterly basis that is paid-in-kind (PIK) at a rate of 13% per annum and mature on May 8, 2025.

The Prepetition Agent and Equinox Group are parties to the Subordination Agreement, which governs the respective rights, interests, obligations, priority, and positions of the Prepetition Obligations relative to the unsecured loans (including the First Subordinated Note and the Second Subordinated Note) made by Equinox Group to Blink Holdings.  Each of the Debtors party to the Prepetition Credit Agreement acknowledged and agreed to the Subordination Agreement.  Among other things, the Subordination Agreement requires Equinox Group to hold in trust and turn over to Prepetition Agent, for the benefit of the Prepetition Lenders, any amounts received by Equinox Group on account of Subordinated Indebtedness (as defined in the Subordination Agreement) prior to payment in full of the Prepetition Obligations.

*(c)*     ***Trade and Other Obligations***

As a fitness club operator, the Debtors incurred certain obligations to trade creditors in respect of their ordinary course operations, equipment, and leased facilities.  In addition, the Company incurred various rent obligations, including those associated with COVID pandemic rent deferral agreements, and is a party to certain pending litigation matters involving personal injury allegations, wage and employment claims, and breach of contract claims of the type typically associated with an operator in the fitness club industry.  As of the date hereof, the Debtors estimate that they have approximately $31.2 million in outstanding trade liabilities and other miscellaneous unsecured obligations.

### 3.3     Circumstances Leading to the Commencement of the Chapter 11 Cases

*(a)*     ***The COVID-19 Pandemic***

In early 2020, state and local governments exercised emergency executive authority to combat the spread of the COVID-19 pandemic and required the Company to temporarily close its fitness clubs.  Consequently, substantially all of the Company's operations were suspended, significantly impacting membership revenues for a period of nine (9) months.

As the Debtors' operations ceased and membership revenues were suspended, the Company took immediate steps to reduce operating costs, conserve cash, and secure additional sources of funding, including negotiating waivers of certain events of default under the Senior Credit Facility, obtaining funds pursuant to the First Subordinated Note, and engaging with landlords for rent concessions and related relief.  These efforts supported the Company through the closure of its clubs, but left the Company significantly overleveraged.

Beginning in early 2022, the Company engaged a multinational investment and financial services company to assess strategic alternatives for an out-of-court restructuring or sale transaction; however, that process did not yield indications of interest at values that the Company determined would be actionable.  Concurrently, the Company retained a commercial real estate advisory firm to approach the Company's landlords in an effort to renegotiate and amend leases



with lower rents or negotiate lease terminations where appropriate. Ultimately, the Company reached agreements on improved terms for a number of locations. However, such efforts were insufficient to meaningfully impact long-term liquidity issues.

(b)     *Prepetition Sale and Restructuring Efforts*

Given the Company's liquidity challenges, as well as the impending maturity of the Prepetition Loan Obligations, the Company engaged the Restructuring Professionals to solicit interest in, and consult regarding, a refinancing of the Company's secured indebtedness or a sale of substantially all of the Company's assets in either an in-court or out-of-court transaction. In support thereof, the Company and the Restructuring Professionals constructed detailed cash forecasts and analyses, compiled and analyzed substantial diligence materials for use in a sale process, drafted marketing and communications materials, and coordinated with stakeholders and parties in interest, including the Prepetition Lenders and Equinox Group, regarding potential financing proposals.

In July 2024, the Company began actively marketing the Company's assets to would-be purchasers and diligently circulating marketing materials, a confidential information memorandum, and non-disclosure agreements to potential buyers. As of the Petition Date, the Debtors had received non-binding indications of interest from several bidders, and the Debtors' advisors continued to engage, and are continuing to engage, with potential interested bidders.

In addition, to support the Company's prepetition marketing efforts, the Prepetition Lenders agreed to provide bridge financing in the form of the Prepetition Protective Advances, as discussed above, to ensure that the Company could continue to satisfy ongoing obligations, thus maintaining operational status quo and preserving the value of the Company's assets, while the Company simultaneously engaged in marketing outreach and prepared the documents and pleadings necessary to commence the Chapter 11 Cases.

To further support the Company's restructuring efforts and in consultation with the Restructuring Professionals and the Company's stakeholders, the Company created a special restructuring committee for each of its boards of directors (the "**Restructuring Committee**"), effective as of June 23, 2024, and delegated to the Restructuring Committee the right, responsibility, and power to manage all matters and make all final decisions regarding a potential restructuring. In connection therewith, the Company retained and appointed Emanuel Pearlman as an independent director to serve as the sole member of the Restructuring Committee.

(c)     *Debtors' Internal Investigation*

Shortly before the Petition Date, it became apparent that a bankruptcy filing might be necessary to maximize the Company's value. Accordingly, the Company initiated an investigation to determine whether, in the context of a bankruptcy, it might be appropriate to grant releases to various parties and constituencies, including those affiliated with the Company, in connection with a plan. Such investigations are frequently undertaken in this context.

To that end, the Company's Board empowered and authorized the Restructuring Committee to investigate potential Claims that the Company might hold against its directors, officers, employees, lenders, stockholders, or advisors, review any proposed releases, and make a



27

recommendation to the full board in connection therewith.  Mr. Pearlman was assisted in this investigation (the "**Investigation**") by Young Conaway.  The Investigation focused on the following types of Claims:  (a) breach of fiduciary duty by the Company's directors, managers, and officers, and certain related affiliates; (b) breach of contract; (c) fraud; (d) fraudulent transfer or conveyance; (e) validity, priority, and extent of any liens asserted against the Debtors' assets; and (f) any other actions that might give rise to claims such as equitable subordination or re-characterization.

In furtherance of the Investigation, Young Conaway requested and reviewed numerous relevant documents related to transactions, acts, and conduct associated with the Debtors' business during relevant periods prior to the Petition Date.  After reviewing such documents, Young Conaway interviewed members of the Company's Board and upper management to determine whether the Company might hold Claims against any potentially released party for the period from approximately 2021 to the present.  The Debtors did not identify any claims or causes of action against the Debtors' directors, officers, and non-debtor affiliates that would warrant pursuing under the circumstances, and the Debtors did not uncover any evidence to suggest that a transfer of any claims or causes of action with respect to such insiders would be inappropriate.  After concluding its analysis, Young Conaway reported the results of its analysis to the Restructuring Committee, and the Restructuring Committee determined that it was appropriate and in the best interests of the Debtors and the Estates to release any and all Claims against the Debtor Released Parties pursuant to the Plan.

The Debtors' and their Estates' release of any parties contemplated to be released by the Plan is provided in exchange for valuable consideration, including, among other things, the funding of the Prepetition Protective Advances and the DIP Facility, which were necessary to effectuate a competitive sale and marketing process that has allowed the Debtors to preserve and maximize the value of the Debtors' assets for the benefit of all stakeholders, as well as the compromise of various disputes among the constituencies in these Chapter 11 Cases as reflected in this Plan.

In connection with the Debtors' sale process, the Debtors entered into the Stalking Horse Agreement with the Stalking Horse Bidder, which contemplated the Stalking Horse Bidder's purchase of the Debtors' claims and causes of action, if any, against Equinox Group and its affiliates.  As discussed in more detail below, the Debtors selected the Stalking Horse Bidder as the Successful Bidder (as defined in the Bidding Procedures) for the Acquired Assets, and such claims and causes of action were transferred to the Successful Bidder upon closing of the Sale Transaction.

## 3.4    The Chapter 11 Cases

### (a)    *Generally*

On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The commencement of a chapter 11 case creates an estate that consists of all of the legal and equitable interests of the debtor as of that date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."  By order entered on August 13, 2024



[Docket No. 48], the Chapter 11 Cases are being jointly administered for procedural purposes only. On August 23, 2024, the U.S. Trustee appointed the Committee in the Chapter 11 Cases. *See* Docket No. 109.

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of liens against property of the Debtors, and both the commencement and the continuation of prepetition litigation against the Debtors. With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay will remain in effect from the Petition Date until the Effective Date.

*(b)*       **The "First Day" Pleadings**

On the Petition Date, the Debtors also filed the following "first day" motions and applications (the "**First Day Motions**") seeking relief designed to ease the Debtors' transition into chapter 11, maximize the value of the Assets, and minimize the effects of the commencement of the Chapter 11 Cases:

i.       *Debtors' Motion for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases* [Docket No. 3].

ii.      *Debtors' Application for an Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent, Effective as of the Petition Date* [Docket No. 4].

iii.     *Debtors' Motion for an Order (I) Authorizing the Debtors to Redact Personally Identifiable Information for Certain Individual Creditors and Parties in Interest; and (II) Granting Related Relief* [Docket No. 5].

iv.      *Debtors' Motion for Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services; (II) Deeming Utility Companies Adequately Assured of Future Payment; (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment; and (IV) Granting Related Relief* [Docket No. 6].

v.       *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief* [Docket No. 7].

vi.      *Debtors' Motion for Interim and Final Orders (I) Authorizing Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection With Insurance and Surety Programs, Including Payment of Policy Premiums, Broker Fees, and Claims Administrator Fees, and (B) Continuation of Insurance Premium Financing Program; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief* [Docket No. 8].



vii.  *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief* [Docket No. 9].

viii.  *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Operating Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Affiliate Transactions; (II) Authorizing Debtors' Continued Use of Corporate Credit Cards and Granting Administrative Expense Status to Postpetition Credit Card Obligations; (III) Waiving Certain U.S. Trustee Guidelines; and (IV) Granting Related Relief* [Docket No. 10].

ix.  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Honor Certain Prepetition Customer Programs; (II) Authorizing the Debtors to Serve Customers Certain Pleadings Filed in the Chapter 11 Cases by Electronic Means; (III) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (IV) Granting Related Relief* [Docket No. 11].

x.  *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Accrued Prepetition Employee Wages, Salaries, and Other Compensation; (B) Honor Commission and Bonus Obligations to Non-Insider Employees in the Ordinary Course of Business; (C) Pay Prepetition Employee Business Expenses; (D) Contribute to Prepetition Employee Benefit Programs and Continue Such Programs in the Ordinary Course of Business; (E) Pay Workers' Compensation Obligations; (F) Remit Payments for Which Prepetition Payroll Deductions Were Made; and (G) Pay the Costs and Expenses Incident to the Foregoing Payments and Contributions; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief* [Docket No. 12].

xi.  *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing and Use Cash Collateral; (II) Granting Liens, Super-Priority Claims, and Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 13].

Following a hearing held on August 13, 2024, the Bankruptcy Court entered orders [Docket Nos. 48–50] approving, on a final basis, (i) joint administration of the Chapter 11 Cases, (ii) appointment of the Noticing and Claims Agent, and (iii) redaction of certain personally identifiable information.  On August 13, 2024 and August 14, 2024, the Bankruptcy Court entered orders approving, on an interim basis, the remainder of the relief requested by the First Day Motions.  *See* Docket Nos. 54-56, 61-63, 65.  Thereafter, the Bankruptcy Court approved such relief on a final basis.  *See* Docket Nos. 157, 160, 163-164, 173, 175, 192, and 393.

*(c)*     ***Retention of Professional Advisors***

Pursuant to orders entered on September 5, 2024 and September 9, 2024, the Bankruptcy Court authorized the Debtors to retain and employ (i) Young Conaway, as bankruptcy counsel



[Docket No. 165]; (ii) Moelis, as investment banker [Docket No. 179]; (iii) Epiq Corporate Restructuring, LLC, as administrative advisor [Docket No. 159]; and (iv) Portage Point Partners, to provide certain interim management personnel [Docket No. 161]. The Bankruptcy Court also entered the OCP Order, thereby authorizing the Debtors to retain and employ certain professionals utilized by the Debtors in the ordinary course of business prior to the Petition Date [Docket No. 158].

*(d)*      ***Schedules and Bar Dates***

On September 9, 2024, the Debtors filed the Schedules. Among other things, the Schedules set forth the Claims of known or putative creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records as of the Petition Date.

On September 10, 2024, the Bankruptcy Court entered the Bar Date Order, granting the relief requested in the Bar Date Motion. The Bar Date Order established the General Bar Date as October 10, 2024 at 11:59 p.m. (prevailing Eastern Time).

*(e)*      ***Restructuring Support Agreement***

In the months leading up to the Petition Date, the Debtors and their advisors engaged extensively with the Prepetition Agent, the DIP Agent, the Prepetition Lenders and the DIP Lenders to negotiate the terms of debtor in possession financing and the parameters by which the lenders would support the Debtors' chapter 11 efforts, including the milestones by which the Debtors would pursue a consensual sale of all or substantially all of the assets of the Debtors.

After months of good faith and arm's length negotiation, the Debtors and the Consenting Lenders entered into the RSA, pursuant to which the Debtors and the Consenting Lenders agreed, subject to the terms and conditions set forth therein, to *inter alia*, support and vote to accept (as applicable) a chapter 11 plan. *See* Docket Nos. 404, 483.

*(f)*      ***Postpetition Sale Process***

Prior to the Petition Date, in July and August 2024, the Debtors, with the assistance of Moelis, engaged a targeted group of potential bidders in several rounds of diligence which led to the receipt of several indications of interest with certain credible potential bidders. While the Debtors received significant interest, the Debtors, in consultation with Moelis, determined it was not feasible to transact quickly enough with any of these parties to avoid the Chapter 11 Cases.

Following the Petition Date, the Debtors continued their marketing efforts, broadening their solicitation to more than 160 prospective strategic potential buyers including all outreach parties suggested by the Committee. The Debtors entered into confidentiality agreements with 44 parties who, together with the parties who had executed confidentiality agreements during the prepetition marketing process, were provided access to the Data Room. Of those, several strategic bidders conducted purposeful due diligence, which included reviewing the Debtors' financials, contracts, and engaging in multiple discussions with Moelis, the Debtors' counsel, and the Debtors' management personnel. The Debtors and their professionals provided copious amounts of information to prospective bidders, including the Debtors' contracts, financial information, tax returns, and other business performance data. The Debtors and their



management personnel engaged in meetings with potential bidders, provided tours of facilities and access to key personnel, vendors, and landlords.  The Debtors also provided notice of the sale of the Acquired Assets to all parties in interest, including more than 443,000 members.

On August 19, 2024, the Debtors filed the Bidding Procedures and Sale Motion, seeking approval of a court-supervised and public sale process, the purpose of which was to generate maximum value for their Assets.  To facilitate the Sale process, the Debtors, in consultation with Moelis, and their other professional advisors, proposed the Bidding Procedures to preserve flexibility in the Sale process, generate the greatest level of interest in the Debtors' Assets, and achieve the highest or otherwise best value for those Assets.  On September 10, 2024, the Bankruptcy Court entered the Bidding Procedures Order, approving the Bidding Procedures and establishing, among other things, October 21, 2024, as the bid deadline and scheduling the Auction and the Sale Hearing.

Also on September 10, 2024, in accordance with the Bidding Procedures Order, the Debtors filed that certain *Notice of Stalking Horse Supplement* [Docket No. 350], pursuant to which the Debtors announced that they had entered into a stalking horse asset purchase agreement with Pinnacle US Holdings LLC, a Delaware limited liability, which would serve as a Stalking Horse Bidder for the sale of a majority of the Debtors' assets (the "**Core Assets**"), including 67 club facilities and related tangible property located in New York and New Jersey, the Debtors' intellectual property, the Debtors' claims and causes of action, if any, against Equinox Group and its affiliates, and other miscellaneous assets, for a cash purchase price of $105 million, subject to adjustment, and the assumption of certain liabilities.  Entry into such agreement established a floor price for the Debtors' assets, and such bid was subject to higher and better offers.

Prior to the Bid Deadline, which the Debtors extended to facilitate a competitive auction process, the Debtors also received a bid from Supreme Orange LLC ("**Supreme**") for the sale of the Core Assets, including 67 club facilities and related tangible property located in New York and New Jersey, the Debtors' intellectual property, and other miscellaneous assets, for a cash purchase price of $115 million, subject to adjustment, and the assumption of certain liabilities.

In addition, the Debtors received (i) a lease termination proposal submitted by K/BTF Broadway, LLC for the lease associated with the Debtors' Hicksville, New York facility; (ii) a bid from Houston Fitness Partners ("**HFP**") for certain Assets located in Houston, Texas (the "**Houston Segment**"); (ii) a bid submitted by CFit Holding Corporation ("**CFit**") for certain Assets located in Chicago, Illinois (the "**Chicago Segment**"); and (iii) a bid submitted by Lotemd Fit, LLC ("**Lotemd**") for all of the Debtors' health club locations outside of New York and New Jersey (the "**Outer Market Segment**").  All such bids satisfied the requirements established by the Bidding Procedures Order to render each such bid a "qualified bid," within the meaning of the Bidding Procedures.

In advance of the Auction, the Debtors, with the assistance of Moelis and their other professionals, engaged the bidders to evaluate the bids received and suggest improvements to the terms and structure of the bids to promote an efficient and competitive Auction.  The Debtors' professionals presented the bids received to the Debtors' Restructuring Committee, which



assessed and analyzed the bids to identify the baseline bids that would be announced at the outset of the Auction.

On October 22, 2024, the Committee filed an objection to the Sale [Docket No. 518]. The Committee filed a supplemental objection on November 1, 2024 [Docket No. 546] (together with the Committee's initial objection, the "**Committee Sale Objection**").  In the Committee Sale Objection, the Committee supported a going concern sale of the Debtors' business, but, among other things, objected to the proposed sale to the Stalking Horse Bidder of estate Causes of Action against the Equinox Parties, including claims against the Equinox Parties for alter ego, fraudulent transfer, and insider preference liability, as well as claims to recharacterize or subordinate the Equinox Group's General Unsecured Claims against the Debtors.

In accordance with the Bidding Procedures Order, on October 28, 2024, the Debtors commenced the Auction for the Assets.[4]  In consultation with the Consultation Parties (as defined in the Bidding Procedures Order), the Debtors identified the qualified bid submitted by the Stalking Horse Bidder, as amended to, among other things, increase the cash consideration of the bid to $111 million, plus assumption of liabilities, as the baseline bid for the Core Assets. On October 30, 2024, after three days of bidding and negotiation, during which the Debtors consulted with their advisors, including regulatory counsel, restructuring counsel, Moelis, their financial advisors, and the Restructuring Committee, the Debtors, in consultation with the Consultation Parties (as defined in the Bidding Procedures Order), identified the final bid submitted by the Stalking Horse Bidder, with a cash purchase price of $121 million, plus the assumption of certain liabilities, as set forth in the amended and restated Stalking Horse Agreement [Docket No. 542], as the Successful Bid.  *See* Docket No. 532.

As a result of the Auction, the Debtors generated an additional $16 million in value over the Stalking Horse Bid, for the benefit of the Debtors' stakeholders.  The Debtors concluded that, among other things, the Stalking Horse Bid would:

- preserve nearly 1,520 jobs;
- assume substantial liabilities, including deferred and unpaid rent obligations owed to landlords and employee-related obligations, thereby reducing potential priority and unsecured claims against the estates that would otherwise arise on account of unpaid vacation time and other obligations;
- avoid nearly $1.3 million in potential WARN liability;
- preserve business relationships with vendors and contract counterparties;
- honor membership agreements and obligations associated therewith;
- inject much needed capital into the Debtors' business, increasing the Debtors' business prospects for continued future success; and
- efficiently and timely close the sale transaction.

---

[4]   Given the length of the Auction, the Debtors continued the Auction as to the Houston Segment, Chicago Segment, and the Outer Market Segment.



Following the Auction, the Debtors received a revised bid from Supreme, which the Debtors evaluated and discussed with their advisors, including regulatory counsel. Ultimately, the Debtors determined that while such bid provided more cash consideration than the Successful Bid, it contained unacceptable execution and regulatory risk, rendering it not the highest and best bid for the Core Assets. Accordingly, the Debtors determined to seek approval of the Successful Bid for the Sale of the Core Assets.

In parallel, the Debtors received a revised bid from Lotemd for $150,000 in cash consideration and assumption of liabilities to acquire all of the Debtors' fitness club locations other than the Core Assets (the "**Non-Core Assets**"), which would preserve more than 290 jobs and eliminate more than $530,000 in closing and related costs. After considering Lotemd's revised bid, the Debtors engaged with HFP and CFit to clarify and improve the terms of their bids and determine whether an Auction for such assets would be necessary. As a result of such discussions, HFP determined not to further proceed. CFit submitted a revised bid, offering $550,000 in cash consideration, but no assumption of liabilities.

On November 4, 2024, the Debtors continued the Auction with respect to the bids received by Lotemd and CFit. The Debtors, in consultation with the Consultation Parties, identified the qualified bid submitted by Lotemd, which offered approximately $680,000 in value to the Estates, as the baseline bid for the Non-Core Assets. After one round of bidding, the Debtors identified Lotemd's bid as the Successful Bid for the Non-Core Assets, with $200,000 in cash consideration, plus assumption of more than $470,000 in liabilities, for a total value of at least $670,000 to the Estates. *See* Docket No. 550.

The Bankruptcy Court held the Sale Hearing on November 6-7, 2024. On November 7, 2024, the Bankruptcy Court entered the Sale Order approving the Sale of the Non-Core Assets to Lotemd [Docket No. 591]. On November 12, 2024, the Bankruptcy Court overruled the Committee Sale Objection and approved the Debtors' sale to the Stalking Horse Bidder. On November 13, 2024, the Bankruptcy Court entered the Sale Order approving the Sale of the Core Assets to the Stalking Horse Bidder [Docket No. 611]. Pursuant to the Sale Order and Final DIP Order, the DIP Obligations (other than those in respect of the Roll-Up) were repaid at Closing (as defined below), and approximately $88.3 million of the Sale Proceeds will be held in escrow until released in accordance with the Escrow Agreement (as defined in the Sale Order) or by further order of the Bankruptcy Court. *See* Sale Order ¶ 31.

The Sale Transactions closed on November 29, 2024 (the "**Closing**"). In connection with the Closing, a portion of the Sale Proceeds in an amount necessary to repay the DIP Obligations (other than those in respect of the Roll-Up) were paid to the DIP Secured Parties. The Debtors, the DIP Agent, DIP Lenders, Prepetition Agent, Prepetition Lenders, and the Committee agreed that, promptly upon the filing of ~~this Plan,~~the first Amended Combined Disclosure Statement and Plan [Docket No. 698], the balance of the Sale Proceeds, after the payment, or establishment of appropriate reserves for previously unpaid amounts, in respect of the Carve-Out and the Wind Down Reserve, would be released from escrow and paid in satisfaction of (i) the remaining DIP Obligations (including in respect of the Roll-Up and (ii) the Prepetition Loan Secured Claims, which constitutes a portion of the Prepetition Obligations. Accordingly, a joint instruction executed by the Debtors, the Committee, the DIP Agent and Prepetition Agent ~~has or will upon the filing of this Amended Plan be~~was delivered to the escrow agent under the Escrow



Agreement directing the release of the balance of the Sale Proceeds (net of the appropriate reserves for previously unpaid amounts in respect of the Carve-Out and Wind Down Reserve) to the DIP Agent, for the benefit of the DIP Lenders, and then to the Prepetition Agent, for the benefit of the Prepetition Lenders, in accordance with the foregoing. After the application of Sale Proceeds and return of any unused portion of the Wind Down ~~Reserver~~Reserve, the balance owed to the Prepetition Secured Parties on account of the Prepetition Obligations (i.e., the Prepetition Loan Deficiency Claim) will constitute General Unsecured Claims and the holders of such Claims are projected to receive no distribution hereunder.

*(g)* **Committee Challenges**

Under the Final DIP Order, the Debtors stipulated to, among other things, the amount of the Prepetition Loan Claim and the validity and priority of the Prepetition Liens on the Debtors' assets (collectively, the "**Stipulations**"). Pursuant to the Final DIP Order, the Stipulations are binding on the Debtors and any third party, including the Committee, that did not initiate a challenge to any Stipulation within the Challenge Period (as defined in the Final DIP Order). Pursuant to an agreement between the Committee and the Prepetition Agent, the Challenge Period was extended for the Committee through November 13, 2024.

The Committee investigated the Prepetition Obligations and the Prepetition Liens. On November 13, 2024, the Committee filed a motion for standing to assert Challenges (as defined in the Final DIP Order) to (i) obtain a declaration that certain assets are unencumbered by the Prepetition Liens (collectively, the "**Potential Unencumbered Assets**"), or (ii) avoid as unperfected the Prepetition Liens against the Potential Unencumbered Assets [Docket No. 612] (the "**Standing Motion**"). The Potential Unencumbered Assets include certain Avoidance Actions not transferred pursuant to the Asset Purchase Agreements and the Sale Documents. With the potential exception of the Potential Unencumbered Assets, any Preserved Causes of Action or other remaining Assets of the Debtors, if any, are subject to the Prepetition Liens.

The Debtors, Prepetition Agent, Prepetition Lenders, and the Committee have agreed to resolve the Standing Motion pursuant to the Plan. In connection with their agreement, the Standing Motion will be adjourned without date (and all response deadlines tolled) pending the outcome of the Confirmation Hearing. If the Plan is confirmed at the Confirmation Hearing, the Committee will withdraw the Standing Motion with prejudice.

*(h)* ***The Wind Down of the Estates***

Following the close of the Sale Transactions, the Debtors anticipate focusing on efficiently winding down their businesses, preserving Cash held in the Estates, and monetizing or transferring their remaining Assets to the Post-Effective Date Debtors, and pursuing confirmation and effectiveness of this Plan. This Combined Plan and Disclosure Statement provides for the Assets, to the extent not already liquidated or sold through the Sale, to vest in the Estates of the Post-Effective Date Debtors and to be liquidated over time and for the proceeds thereof to be distributed to Holders of Allowed Claims in accordance with the terms of the Plan and the treatment of Allowed Claims described more fully herein. The Plan Administrator will effect such liquidation and distribution in accordance with the Plan Administrator Agreement. The Debtors will be dissolved as soon as practicable.



## ARTICLE IV
## CONFIRMATION AND VOTING PROCEDURES

**4.1    Confirmation Procedure**.  The Conditional Disclosure Statement Order, among other things, conditionally approves this Combined Disclosure Statement and Plan for solicitation purposes only and authorizes the Debtors to solicit votes to accept or reject this Plan.  The Confirmation Hearing has been scheduled for February 4, 2025 at 10:00 a.m. (prevailing Eastern Time) at the Bankruptcy Court, 824 North Market Street, 5th Floor, Courtroom 6, Wilmington, Delaware 19801 to consider (a) final approval of this Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code.  The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

**4.2    Procedure for Objections**.  Any objection to final approval of this Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code or confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code must be made in writing, filed with the Bankruptcy Court, and served on (i) proposed counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 N. King Street, Wilmington, Delaware 19801, Attn: Sean T. Greecher (sgreecher@ycst.com) and Allison S. Mielke (amielke@ycst.com); (ii) counsel to the Prepetition Agent and DIP Agent, (a) Katten Muchin Rosenman LLP, Attn: Peter P. Knight (peter.knight@katten.com) and Allison E. Yager (allison.yager@katten.com) and (b) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, P.O. Box 1347, Wilmington, Delaware 19899, Attn: Curtis S. Miller (cmiller@morrisnichols.com); (iii) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 North King Street, Suite 2207, Wilmington, Delaware 19801, Attn: Benjamin A. Hackman (benjamin.a.hackman@usdoj.gov); and (iv) counsel for the Committee, (a) Kelley Drye & Warren LLP, 3 World Trade Center, New York, New York 10017, Attn: Eric R. Wilson (ewilson@kelleydrye.com) and Kristin S. Elliott (kelliott@kelleydrye.com), and (b) Morris James LLP, 500 Delaware Avenue, Suite 1500, Wilmington, Delaware 19801, Attn: Eric J. Monzo (emonzo@morrisjames.com), in each case by no later than January 15, 2025 at 4:00 p.m. (prevailing Eastern Time).  Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

**4.3    Requirements for Confirmation**.  The Bankruptcy Court will confirm this Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code.  Among other requirements, this Plan (i) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, this Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (ii) must be feasible.  The Bankruptcy Court must also find, among other things, that this Plan: (a) has classified Claims and Interests in a permissible manner; (b) complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (c) has been proposed in good faith.



**4.4     Classification of Claims and Interests**

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1123 of the Bankruptcy Code, this Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims that, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be and have not been classified).  The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest in a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest.  The Debtors believe that this Plan complies with such standard.  If the Bankruptcy Court finds otherwise, however, it could deny confirmation of this Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under this Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that this Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for this Plan to be confirmed.  If such a situation develops, the Debtors intend, in accordance with the terms of this Plan, to make such permissible modifications to this Plan as may be necessary to permit its confirmation.  Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of this Plan.

**EXCEPT AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY AND ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THIS PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO TREATMENT UNDER THIS PLAN OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim, and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of



Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under this Plan to Holders of Allowed Claims reflects an appropriate resolution of their Claims, taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests.

The Bankruptcy Court must find that a number of statutory tests are met before it may confirm this Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on this Plan, or do not vote to accept this Plan, but who will be bound by the provisions of this Plan if it is confirmed by the Bankruptcy Court.

## 4.5    Impaired Claims or Interests

Pursuant to the provisions of the Bankruptcy Code, only certain classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

**Under this Plan, Holders of Claims in Class 3 are Impaired and are <u>entitled to vote on the Plan</u>.** Under this Plan, Holders of Claims or Interests in Classes 4, 5, and 6 are Impaired and will not receive or retain any property under this Plan on account of such Claims or Interests and, therefore, are not entitled to vote on this Plan, and are deemed to reject this Plan. Under this Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, are not entitled to vote on this Plan, and are presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THIS PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN <u>CLASS 3</u>.**

## 4.6    Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims entitled to vote on the plan, and the plan meets the "cramdown" requirements set forth in



section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable" with respect to each non-accepting impaired class of claims or interests.  Here, because Holders of Claims and Interests in Classes 4, 5, and 6 are deemed to reject this Plan, the Debtors will seek confirmation of this Plan by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests.  The Debtors believe that, under this Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtors believe that this Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable."  To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors and equity holders, as follows:

*(a)*     *Secured Creditors*.  Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim; (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim; or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

*(b)*     *Unsecured Creditors*.  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

*(c)*     *Interests*.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan.

The Debtors believe that this Plan is "fair and equitable" as to the non-accepting Impaired Classes because no Holder of a Claim or Interest junior to those in Classes 5 and 6 is entitled to receive any property under this Plan.

**4.7    Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be



likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the plan). Inasmuch as the Assets have been, or will be, liquidated and this Plan provides for the Distribution of all of the net Cash proceeds of the Assets to Holders of Claims that are Allowed in accordance with this Plan, for purposes of this test, the Debtors have analyzed the ability of the Plan Administrator to meet its obligations under this Plan. Based on the Debtors' analysis, the Plan Administrator will have sufficient resources to accomplish its tasks under this Plan. Therefore, the Debtors believe that the liquidation pursuant to this Plan will meet the feasibility requirements of the Bankruptcy Code.

**4.8    Best Interests Test and Liquidation Analysis**

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

Because this Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by this Plan. However, the Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in a chapter 7 case, as set forth in the Liquidation Analysis attached hereto as **Exhibit A**.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors believe such amount would exceed the amount of expenses that would be incurred in implementing this Plan and winding up the affairs of the Debtors. Conversion also would likely delay the liquidation process. The Estates would also be obligated to pay all unpaid



expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for professionals) that are Allowed in the chapter 7 cases.

Accordingly, the Debtors believe that Holders of Allowed Claims would receive an amount equal to or less than anticipated under this Plan if the Chapter 11 Cases were converted to chapter 7 cases, and, therefore, the classification and treatment of Claims and Interests in this Plan complies with section 1129(a)(7) of the Bankruptcy Code.

**4.9     Acceptance of this Plan**

The rules and procedures governing eligibility to vote on this Plan, solicitation of votes, and submission of Ballots are set forth in the Conditional Disclosure Statement Order.

For this Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept this Plan.  At least one Class entitled to vote to accept or reject this Plan, excluding the votes of insiders, must actually vote to accept this Plan.

**IF YOU ARE ENTITLED TO VOTE ON THIS PLAN, YOU ARE URGED TO COMPLETE AND PROMPTLY SUBMIT THE BALLOT YOU RECEIVE.  PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY.  IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THIS PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS PLAN OR PROCEDURES FOR VOTING ON THIS PLAN, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT (I) BY TELEPHONE AT: (877) 607-9009 (TOLL-FREE) OR (971) 365-4515 (INTERNATIONAL) OR (II) BY EMAIL AT: BLINKFITNESSINFO@EPIQGLOBAL.COM.  THE NOTICE AND CLAIMS AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

**PLEASE BE ADVISED THAT ALL HOLDERS OF CLAIMS IN CLASS 3 SHALL BE DEEMED TO HAVE CONSENTED TO THE RELEASES SET FORTH IN SECTION 14.1(c) HEREIN.**

**ARTICLE V**
**CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING**

THIS PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THIS PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THIS PLAN.   THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THIS PLAN AND ITS IMPLEMENTATION.



**5.1    This Plan May Not Be Accepted**

The Debtors can make no assurances that the requisite acceptances to this Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in this Plan.

**5.2    This Plan May Not Be Confirmed**

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm this Plan.  Even if the Bankruptcy Court determined that this Combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm this Plan if it finds that any of the statutory requirements for confirmation had not been met.  Moreover, there can be no assurance that modifications to this Combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes.  If this Plan is not confirmed, it is unclear what Distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of liquidation.

If this Plan is not confirmed, this Plan will need to be revised, and it is unclear whether a chapter 11 reorganization or liquidation of the Debtors' Assets could be implemented and what distribution the Holders of Allowed Claims would receive.  If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their remaining Assets in chapter 7, in which case the Debtors believe and are prepared to establish that it is likely that the Holders of Allowed Claims would receive less favorable treatment than they would receive under this Plan.  There can be no assurance that the terms of any such alternative would be similar to or as favorable to the Debtors' creditors as those proposed in this Plan.

**5.3    Distributions to Holders of Allowed Claims Under this Plan May Be Inconsistent with Projections**

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution.  There can be no assurance that the estimated Claim amounts set forth in this Plan are correct.  These estimated amounts are based on certain assumptions with respect to a variety of factors.  Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates.  If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.



**5.4     Objections to Classification of Claims**

Section 1122 of the Bankruptcy Code requires a plan to classify claims and interests.  The Bankruptcy Code also provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtors believe that all Claims and Interests have been appropriately classified in this Plan.  To the extent that the Bankruptcy Court finds that a different classification is required for this Plan to be confirmed, the Debtors would seek to (i) modify this Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims in connection with solicitation of this Plan for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under this Plan, by changing the composition of such Class and the vote required for approval of this Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve this Plan based upon such reclassification.  Except to the extent that modification of classification in this Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of this Plan by any Holder of Claims in connection with solicitation will constitute a consent to this Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.  The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against this Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that this Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Debtors believe that this Plan complies with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that this Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of this Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of this Plan and could increase the risk that this Plan will not be consummated.

**5.5     Failure to Consummate This Plan**

This Plan provides for certain conditions that must be satisfied (or waived) prior to the occurrence of the Effective Date.  As of the date of this Plan, there can be no assurance that any or all of such conditions will be satisfied (or waived).  Accordingly, there can be no assurance that this Plan will be consummated.

**5.6     Plan Releases May Not Be Approved**

There can be no assurance that the releases, as provided in Article XIV of this Plan, will be approved by the Bankruptcy Court.  Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from this Plan or this Plan not being confirmed.



**5.7     Reductions to Estimated Creditor Recoveries**

The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of Distributions to creditors in such Class to be reduced substantially.  The amount of cash realized from the liquidation of the Debtors' remaining Assets could be less than anticipated, which could cause the amount of Distributions to be reduced substantially.

**5.8     Certain Tax Considerations**

There are a number of material income tax considerations, risks, and uncertainties associated with the plan of liquidation of the Debtors described in this Combined Disclosure Statement and Plan.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THIS PLAN ARE COMPLEX.  NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE APPLICABLE INCOME AND OTHER TAX CONSEQUENCES OF THIS PLAN.**

**ARTICLE VI**
**TREATMENT OF UNCLASSIFIED CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Unclassified Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article VII.  Additionally, DIP Claims and, to the extent of available proceeds, portions of the Prepetition Secured Claims, will be paid at the closing of the Sale Transaction pursuant to the Final DIP Order and the Sale Order.



**6.1    DIP Claims**.  In full satisfaction of the DIP Claims and to the extent not previously indefeasibly Paid in Full upon the consummation of the Sale, each Holder of an Allowed DIP Claim shall receive, on or as soon as reasonably practicable after the Effective Date, indefeasible Payment in Full of its Pro Rata share of the Sale Proceeds (subject to the Carve Out), to be applied in accordance with the terms of the Final DIP Order and the other DIP Documents (as defined in the Final DIP Order).  For the avoidance of doubt, any payment of the Sale Proceeds to the DIP Agent (for the benefit of the DIP Lenders) prior to the Effective Date shall be deemed indefeasible and not subject to challenge, avoidance or disgorgement.

**6.2    Administrative Claims**.  Subject to the treatment of Professional Fees outlined below, each Holder of an Allowed Administrative Claim, to the extent such Allowed Administrative Claim has not already been paid during the Chapter 11 Cases and without any further action by such Holder, shall receive, in full satisfaction of its Allowed Administrative Claim and on or as soon as reasonably practicable after the Effective Date, Cash equal to the Allowed amount of such Administrative Claim on the Effective Date unless otherwise agreed by (i) the Holder of such Administrative Claim, and (ii) the Debtors or the Post-Effective Date Debtors; *provided however*, that, to the extent applicable, Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court; provided, further, that nothing herein shall obligate the DIP Lenders or the Prepetition Lenders to fund, or make available DIP Collateral proceeds or Prepetition Collateral proceeds (including Cash Collateral and including via a surcharge pursuant to section 506(c) of the Bankruptcy Code) to pay, any such Claims except as and to the extent expressly provided in the Final DIP Order in accordance with the DIP Budget and Carve Out thereunder.  The U.S. Trustee shall not be required to file a request for payment of Administrative Claims**.**

**6.3    Professional Fees**.

   *(a)    Final Fee Applications*.  All final requests for payment of Professional Fees incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on the Post-Effective Date Debtors by the Professional Fee Deadline, which, for the avoidance of doubt, shall be no later than forty-five (45) days after the Effective Date, unless the Post-Effective Date Debtors and the Prepetition Agent agree otherwise in writing.  Objections to Professional Fees must be filed with the Bankruptcy Court and served on the Post-Effective Date Debtors and the applicable Professional no later than twenty-one (21) days after the final request for payment of Professional Fees is filed. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Cases, the Allowed amounts of such Professional Fees shall be determined by the Bankruptcy Court.  The Post-Effective Date Debtors shall pay Professional Fees in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, subject to the applicable caps imposed by the Wind Down Budget and Final DIP Order, including the DIP Budget and Carve Out.

   For the avoidance of doubt, the immediately preceding paragraph shall not affect any professional service Entity that is permitted to receive, and the Debtors are permitted to pay without seeking further authority from the Bankruptcy Court, compensation for services and reimbursement of expenses in the ordinary course of the Debtors' businesses (and in accordance



with any relevant prior order of the Bankruptcy Court, including the OCP Order), which payments may continue notwithstanding the occurrence of Confirmation.

(b)    ***Professional Fee Escrow Account***.  No later than the Effective Date, the Debtors shall fund the Professional Fee Escrow Account with Cash from the Wind Down Reserve equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fees Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders.  Such funds shall not be considered property of the Estates of the Debtors or the Post-Effective Date Debtors.  The amount of Allowed Professional Fees, up to the respective applicable amounts allocated to each Professional in the Wind Down Budget, shall be paid in Cash to the Professionals by the Post-Effective Date Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fees are Allowed.  Unless otherwise required by the OCP Order, Professionals retained pursuant to the OCP Order shall not be required to file an application for payment of Professional Fees.

When all Allowed Professional Fees have been irrevocably paid in full, any remaining funds held in the Professional Fee Escrow Account shall be remitted to the Prepetition Agent for distribution to the Prepetition Secured Parties on account of their then outstanding Prepetition Loan Secured Claims.

(c)    ***Professional Fee Amount***.    The Wind Down Budget shall contain the Professionals' estimated unpaid Professional Fees and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date.  Upon occurrence of the Effective Date, Professional Fees incurred prior to the Effective Date shall be limited to those for each Professional set forth in the Wind Down Reserve on a line-item and aggregate basis.

(d)    ***Post-Effective Date Fees and Expenses***.  On the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Post-Effective Date Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

**6.4    Priority Tax Claims**.  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**6.5    U.S. Trustee Fee Claims**.  All U.S. Trustee Fee Claims shall be paid by the Debtors or Post-Effective Date Debtors, as applicable, as set forth in Section 16.6 of the Plan.

**ARTICLE VII**
**TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

For purposes of administrative convenience and efficiency, this Plan is a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors.  This Plan does not provide for the substantive consolidation of the Debtors.  Rather, this Plan constitutes a separate Plan proposed by each Debtor, and the classifications set forth in



each Class of this Plan apply to each Debtor. Each Class constitutes a separate Class of Claims against, and Interests in, each of the Debtors, as applicable, and each Class of Claims entitled to vote on this Plan shall vote as a single separate Class for, and the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to, each of the Debtors.

Claims and Interests, except for the Unclassified Claims, are classified in the Classes set forth in this Article VII. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim or Allowed Interest, as applicable, in that Class. To the extent a specified Class does not include any Allowed Claims or Allowed Interests, as applicable, then such Class shall be deemed not to exist.

This Plan constitutes a separate chapter 11 plan of liquidation for each Debtor. Pursuant to section 1122, the classification of Claims and Interests is as follows:

**7.1     Class 1: Priority Non-Tax Claims**. In full and final satisfaction of and in exchange for such Claim, on, or as soon as reasonably practicable following the Effective Date, each Holder of an Allowed Priority Non-Tax Claim will be paid in full in cash or otherwise receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code; *provided*, *however*, nothing herein shall obligate the DIP Secured Parties or the Prepetition Secured Parties to fund, or make available DIP Collateral proceeds or Prepetition Collateral proceeds (including Cash Collateral and including via section 506(c) surcharge) to pay, any such Allowed Priority Non-Tax Claims except as and to the extent provided in the Final DIP Order in accordance with the DIP Budget and Carve Out thereunder.

**7.2     Class 2: Other Secured Claims**. In full and final satisfaction of and in exchange for such Claim, on, or as soon as reasonably practicable following the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the Debtors' or Post-Effective Date Debtors' option:  (a) Cash equal to the unpaid portion of the amount of such Allowed Other Secured Claim; (b) the return of the Holder's collateral securing such Claim; or (c) such other treatment permitted by the Bankruptcy Code; *provided however*, that to the extent such Other Secured Claims are proposed to be satisfied using the Sale Proceeds, such proceeds shall not exceed $1.0 million without the prior written consent of the DIP Agent, Prepetition Agent, DIP Required Lenders, and Prepetition Required Lenders.



**7.3     Class 3: Prepetition Loan Secured Claims**.  In full and final satisfaction of and in exchange for such Claim, each Holder of an Allowed Prepetition Loan Secured Claim shall receive on account of such Holder's Allowed Prepetition Loan Secured Claim, to the extent not indefeasibly paid and following repayment in full of all DIP Claims in Cash and subject to the Carve Out, (i) its Pro Rata share of 100% of the Sale Proceeds remaining after the payment, or establishment of appropriate reserves for previously unpaid amounts in respect of the Carve-Out and Wind-Down Reserve, or, at the election of the Holders of Allowed Prepetition Loan Secured Claims,  (ii) any excess unused amount of the Wind Down Reserve, if any, in accordance with section 9.7 hereof, and (iii) 100% of all other Distributable Proceeds.  For the avoidance of doubt, any payment of the Sale Proceeds to the Prepetition Agent (for the benefit of the Prepetition Secured Parties) or the DIP Agent (for the benefit of the DIP Secured Parties) prior to the Effective Date shall be deemed indefeasible and not subject to challenge, avoidance or disgorgement.

**7.4     Class 4: General Unsecured Claims**.   .  Holders of General Unsecured Claims (including the Prepetition Loan Deficiency Claim, if any) will not receive or retain any property or interest in property under the Plan on account of their General Unsecured Claims.

**7.5     Class 5: Intercompany Claims**.  On the Effective Date, all Intercompany Claims shall be cancelled, released, and extinguished without Distribution, and will be of no further force or effect.

**7.6     Class 6: Interests**.  On the Effective Date, all Interests shall be cancelled, released and extinguished as of the Effective Date, and Holders thereof shall receive no Distribution on account of such Interests.

**7.7     Reservation of Rights Regarding Claims and Interests**.  Except as otherwise explicitly provided in this Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

## ARTICLE VIII
## ACCEPTANCE OR REJECTION OF THIS PLAN

**8.1     Classes Entitled to Vote**.  Because Claims in Class 3 are Impaired and Holders thereof may receive or retain property or an interest in property under this Plan, **Holders of Claims in Class 3 shall be entitled to vote to accept or reject this Plan**.

**8.2     Acceptance by Impaired Classes of Claims or Interests**.  In accordance with section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted this Plan if this Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject this Plan.

**8.3     Presumed Acceptance by Unimpaired Classes**.  Because Claims in Classes 1 and 2 are Unimpaired, pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in Classes 1



and 2 are presumed to have accepted this Plan and, therefore, such Holders of Claims are not entitled to vote to accept or reject this Plan.

**8.4    Presumed Rejections by Impaired Classes**.  Because Holders of Claims or Interests in Classes 4, 5, and 6 are not entitled to receive or retain any property under this Plan, pursuant to section 1126(g) of the Bankruptcy Code, Holders of Claims or Interests in Classes 4, 5, and 6 are deemed to have rejected this Plan and are not entitled to vote to accept or reject this Plan.

**8.5    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**.  To the extent that any Impaired Class rejects this Plan or is deemed to have rejected this Plan, the Debtors reserve the right to request confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan, the documents submitted in support thereof or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**8.6    Subordinated Claims**.  The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the Distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto. Notwithstanding the foregoing, the Subordination Agreement shall be of full force and effect hereunder and, in accordance with the Subordination Agreement, any Distributions otherwise payable to Equinox Group shall be distributed to Prepetition Agent, for the benefit of the Prepetition Lenders, until the Prepetition Obligations are indefeasibly paid in full.

**8.7    Controversy Concerning Impairment**.  If a controversy arises as to whether any Claim or Interest is Impaired under this Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**8.8    Elimination of Vacant Classes**.  Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from this Plan for all purposes, including for purposes of determining acceptance of this Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.



## ARTICLE  IX
## IMPLEMENTATION OF THIS PLAN

**9.1**    **Implementation of this Plan**.  This Plan will be implemented by, among other things, the appointment of the Plan Administrator as the sole director, member, officer or manager of each of the Post-Effective Date Debtors as of the Effective Date and the representative of the Estates, and the making of Distributions to Holders of Allowed Claims from the Wind Down Assets, Sale Proceeds, and Distributable Proceeds, as applicable.

**9.2**    **Source of Consideration**.  All consideration necessary to make all monetary payments in accordance with this Plan shall be obtained from Sale Proceeds, Cash on hand as of the Effective Date, and the Wind Down Assets.

**9.3**    **Vesting of Wind Down Assets**.  Except as otherwise provided herein, on the Effective Date, the Wind Down Assets shall vest in the Estates of the Post-Effective Date Debtors, free and clear of all Claims, liens, charges, other encumbrances and Interests.  On and after the Effective Date, the Plan Administrator may use, acquire, or dispose of the Wind Down Assets and compromise or settle any Claims and Preserved Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.



**9.4     Termination of Directors, Officers, and Managers and Appointment of Plan Administrator**.  Except as otherwise provided herein, on the Effective Date, each of the Debtors' directors, officers, and managers, as applicable, shall be terminated automatically and replaced by the Plan Administrator without the need for any corporate action or approval and without the need for any corporate filings, and shall have no continuing obligations to the Debtors following the occurrence of the Effective Date.

**9.5     Wind-Up and Dissolution of the Debtors**.  Upon the conclusion of the Wind Down, the Plan Administrator shall be authorized to dissolve the Post-Effective Date Debtors, subject to the provisions of the Wind Down Organizational Documents, or to allow for the administrative dissolution of any or all of the Debtors under applicable state law, without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its shareholder or any payments to be made in connection therewith.

**9.6     Plan Administrator and Plan Administrator Agreement.**  From and after the Effective Date, except as expressly set forth in this Plan or the Confirmation Order, pursuant to and in accordance with the terms and provisions of this Plan and the Plan Administrator Agreement, the Plan Administrator shall be empowered and directed to: (i) take all steps and execute all instruments and documents necessary to make Distributions to Holders of Allowed Claims, and to perform the duties assigned to the Plan Administrator under this Plan or the Plan Administrator Agreement; (ii) comply with this Plan and the obligations under this Plan; (iii) employ, retain or replace professionals to represent the Post-Effective Date Debtors or the Plan Administrator with respect to the Plan Administrator's responsibilities; (iv) object to Claims and Interests as provided in this Plan and prosecute such objections; (v) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment or allowance of any Claims or Interests; (vi) exercise such other powers as may be vested in the Plan Administrator pursuant to this Plan, the Plan Administrator Agreement or any other Final Order of the Bankruptcy Court, including the Confirmation Order, or otherwise act on behalf of and for the Debtors and the Plan Administrator from and after the Effective Date; (vii) file applicable tax returns for the Debtors; (viii) monetize any of the Wind Down Assets; and (ix) subject to the provisions of the Wind Down Organizational Documents, pursue the Preserved Causes of Action in accordance with the best interests of the Post-Effective Date Debtors.  No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Plan Administrator will not pursue any and all available Preserved Causes of Action against it and all rights associated therewith are expressly reserved, except as otherwise provided in this Plan.

In the event any provision in the Plan Administrator Agreement directly conflicts with this Plan, the terms of this Plan shall prevail.

The Plan Administrator may, without the need for further Court approval, retain or employ agents, financial advisors, attorneys, consultants, independent contractors, representatives and other professionals to advise the Plan Administrator in the performance of the Plan Administrator's duties.  The Plan Administrator may, without further order of the Bankruptcy Court, employ professionals to assist in carrying out the Plan Administrator's duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the Wind Down Assets in accordance with



this Plan and the Plan Administrator Agreement. The Plan Administrator shall pay from the Wind Down Assets the reasonable fees and expenses of such professionals upon the submission of statements to the Plan Administrator, without further order of the Bankruptcy Court.

The Plan Administrator shall be authorized to obtain and pay for, out of the funds of the Estates, all reasonably necessary insurance coverage for the Plan Administrator, the Plan Administrator's professionals, and the Debtors, their officers and managers, including, but not limited to, coverage with respect to: (i) any property that is or may in the future become the property of the Debtors or their Estates; and (ii) the Plan Administration Expenses, the latter of which insurance coverage may remain in effect for a reasonable period of time after the termination of the Plan Administrator Agreement, as determined by the Plan Administrator.

Any and all reasonable and documented costs and expenses not otherwise covered by the Wind Down Reserve that are incurred by the Plan Administrator in connection with the Wind Down shall be paid from the Wind Down Assets, subject to (i) the Wind Down Budget and (ii) the terms and conditions of the Wind Down Organizational Documents and the Plan Administrator Agreement, as applicable.

**In the event of the resignation or removal, liquidation, dissolution, death, or incapacity of the Plan Administrator, the Wind Down Organizational Documents shall govern the appointment of a new Plan Administrator.**

**9.7    Wind Down Budget; Wind Down Reserve; DIP Budget Increased Amount**. The Wind Down Reserve shall be used solely for the purposes set forth in the Wind Down Budget, and the Debtors, Post-Effective Date Debtors and the Plan Administrator, as applicable, shall adhere to the Wind Down Budget on a line-item and aggregate basis, which shall be in form and substance acceptable to the Prepetition Agent and the Prepetition Required Lenders. The final Wind Down Budget shall incorporate the budget attached to this Plan as **Exhibit B**, which reflects the approved uses of the DIP Budget Increased Amount and imposes caps on the respective amounts of the DIP Budget Increased Amount that can be used for the purposes reflected in each line item of the Wind-Down Budget.

Any portion of the DIP Budget Increased Amount on a line-item basis that is not required to pay the Professional Fees Allowed by the Court shall be remitted to the Prepetition Agent for the benefit of the Prepetition Secured Parties on account of Prepetition Loan Secured Claims promptly after the Court's entry of orders approving payment of the Professional Fees. Any amounts of the Wind Down Reserve remaining upon the entry of a final decree closing these Chapter 11 Cases shall be remitted to the Prepetition Agent for the benefit of the Prepetition Secured Parties on account of Prepetition Loan Secured Claims promptly upon the entry of the final decree.



**9.8    Distributions by Plan Administrator**.  The Plan Administrator, on behalf of the Post-Effective Date Debtors, shall make continuing efforts to monetize and distribute all Wind Down Assets in accordance with this Plan and the Plan Administrator Agreement.

**9.9    Limitation of Liability; Indemnification**.  The Plan Administrator shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee.  The Plan Administrator may, in connection with the performance of its functions, consult with attorneys, accountants, financial advisors and agents, which consultation may act as a defense for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons.  Notwithstanding such authority, the Plan Administrator shall not be under any obligation to consult with attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability, unless such determination is based on criminal conduct, willful misconduct, gross negligence or actual fraud.  The Post-Effective Date Debtors shall indemnify and hold harmless the Plan Administrator and its designees and professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties or the implementation or administration of this Plan; *provided however*, that no such indemnification will be made to such persons for such actions or omissions as a result of criminal conduct, willful misconduct, gross negligence or fraud.

**9.10    Compensation and Duties of Plan Administrator**.  The salient terms of the Plan Administrator's employment, including the Plan Administrator's duties and compensation, shall be set forth in the Plan Administrator Agreement.  The Plan Administrator shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases, as set forth in the Plan Administrator Agreement.  The Plan Administrator shall also be reimbursed for all documented, actual, reasonable, and necessary out-of-pocket expenses incurred in the performance of his or her duties under the Plan Administrator Agreement.  Notwithstanding anything herein or in the Plan Administrator Agreement to the contrary, the sole source of payment of the Plan Administrator and its advisors shall be the Wind-Down Reserve and the aggregate amount of such payments shall be capped at the amount allocable to such parties in the applicable line item of the Wind-Down Budget.

**9.11    Privilege and Immunities**.  Any privilege or immunity attaching to any documents or communications (whether written or oral), including, but not limited to, any attorney-client privilege, work- product privilege, joint-interest privilege, or any other evidentiary privileges or immunity, in each case relating to any Preserved Causes of Action held by the Debtors pursuant to applicable federal, state, and other law shall vest in the Post-Effective Date Debtors as of the Effective Date. The Debtors and the Post-Effective Date Debtors are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses.

No action taken by the Debtors, the Post-Effective Date Debtors, or the Plan Administrator shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, including any attorney-client privilege or work product privilege attaching to any documents or communications (whether written or oral).



**9.12    Company Action**.

All matters expressly provided for under this Plan that would otherwise require approval of the stockholders, directors, members, or managers of one or more of the Debtors, including but not limited to, the dissolution or merger of any of the Debtors, shall be deemed to be in effect from and after the Effective Date pursuant to the applicable law of the states in which the Debtors are organized without any requirement of action by the stockholders, directors, members, or managers of the Debtors.

**9.13    Standing to Pursue Debtors' Rights, Including Preserved Causes of Action**.

Except as otherwise provided in this Plan, as of the Effective Date, the Debtors, together with any successor or successors in interest and assigns, including, without limitation, the Post-Effective Date Debtors, the Plan Administrator, and any other person or entity that claims or might claim through, on behalf of, or for the benefit of any of the foregoing, shall be deemed to have preserved all Preserved Causes of Action, and shall have standing to pursue such Preserved Causes of Action.



**9.14    Certain Tax Considerations.**

*(a)    General.* **HOLDERS CONCERNED WITH HOW THIS PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND ADVISORS. THE BELOW TAX SUMMARY HAS BEEN PROVIDED FOR GENERAL INFORMATIONAL PURPOSES ONLY. THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THIS PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.**

The following discussion summarizes certain United States federal income tax consequences of this Plan to the Debtors and to certain Holders of Claims. This discussion is based on the IRC, the Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rulings and pronouncements of the IRS, all as in effect on the date hereof. Legislative, judicial, or administrative changes in law or its interpretation, as well as other events occurring after the date of this Disclosure Statement, and which may be retroactive, could materially alter the tax treatment described below. Furthermore, this discussion is not binding on the IRS or any other tax authority. There is no assurance that a tax authority will not take, or that a court will not sustain, a position with respect to the tax consequences of this Plan that differs from the tax consequences described below. No ruling has been or will be sought from the IRS, no opinion of counsel has been or will be obtained, and no representations are made regarding any tax aspect of this Plan.

The following discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of such Holder's facts and circumstances, or to certain types of Holders subject to special treatment under the IRC (for example, governmental entities and entities exercising governmental authority, non-U.S. taxpayers, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, persons holding a Claim as part of a hedge, straddle, constructive sale, conversion transaction, or other integrated transaction, Holders that are or hold their Claims through a partnership or other pass-through entity, and Persons that have a functional currency other than the U.S. dollar). This summary does not address state, local, or non-United States tax consequences of this Plan, nor does this summary address federal taxes other than income taxes. Furthermore, this discussion generally does not address U.S. federal income tax consequences to Holders that are unimpaired under this Plan or that are not entitled to receive or retain any property under this Plan or to Persons who are deemed to have rejected this Plan.

*(b)    **Federal Income Tax Consequences to the Debtors**.*



*(i)*      ***Sale of Assets***.  The Sale will likely constitute a taxable disposition of the Assets.  The Debtors will recognize gain or loss equal to the difference between the amount received for those Assets in the Sale and the Debtors' adjusted tax basis in those Assets.  The Debtors expect to have tax losses generated from other activities in the current year that may be used to offset gain from the Sale.  To the extent that current year losses are insufficient to offset all gain realized upon the Sale, net operating losses ("**NOLs**") arising from the Debtors' operations in prior taxable years may be available to offset such excess gain, but only to the extent of 80% of such excess gain.

*(ii)*     ***Dissolution of Post-Effective Date Debtors***.  Upon the Effective Date, the Plan Administrator will wind-down and dissolve the Post-Effective Date Debtors.  Accordingly, following such transfers and transactions to effectuate the wind-down and dissolution, the Debtors should be treated as having completely liquidated for U.S. federal income.

*(iii)*    ***Cancellation of Indebtedness and Reduction of Tax Attributes***.  For U.S. federal income tax purposes, gross income generally includes income from cancellation of indebtedness ("**CODI**").  In general, the Debtors will have CODI equal to the excess of the amount of debt discharged pursuant to this Plan over the adjusted issue price of the debt, less the amount of cash and the fair market value of property distributed to holders of the debt.  Various statutory or judicial exceptions limit the incurrence of CODI (such as where payment of the cancelled debt would have given rise to a tax deduction).  CODI also includes interest accrued on obligations of the Debtors but unpaid at the time of discharge.  An exception to the recognition of CODI applies to a debtor in a chapter 11 bankruptcy proceeding.  Bankrupt debtors generally do not include CODI in taxable income, but must instead reduce certain tax attributes (such as NOLs, capital losses, certain credits, and the excess of the tax basis of the debtor's property over the amount of liabilities outstanding after discharge) by the amount of CODI that was excluded under the bankruptcy exception.  Tax benefits are reduced after the tax is determined for the year of discharge.  Existing NOLs will therefore be available to offset up to 80% of gains on asset sales in the year of the discharge regardless of the amount by which NOLs are reduced due to CODI.



(c)     ***Exemption from Certain Transfer Taxes***.  To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation sale by any Debtor, or any transfer from any Entity pursuant to, in contemplation of, or in connection with this Plan or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

(d)     ***Federal Income Tax Consequences to Holders***.

(i)     ***Characterization***.  The tax treatment of Holders, and the character, amount, and timing of income, gain, or loss recognized as a consequence of this Plan and any Distributions pursuant to this Plan may vary, depending upon, among other things:  (A) whether the Claim (or a portion of the Claim) is for principal or interest; (B) the type of consideration the Holder receives for the Claim, (C) whether the Holder receives Distributions under this Plan in more than one taxable year; (D) the manner in which the Holder acquired the Claim; (E) the length of time that the Claim has been held; (F) whether the Claim was acquired at a discount; (G) whether the Holder of the Claim has taken a bad debt deduction with respect to part or all of the Claim; (H) whether the Holder of the Claim has previously included in income accrued but unpaid interest on the Claim; (I) the Holder's method of tax accounting; (J) whether the Claim is an installment obligation for U.S. federal income tax purposes; (K) whether the Claim, and any instrument received in exchange for the Claim, is a "security" for U.S. federal income tax purposes; and (L) whether and the manner in which the "market discount" rules of the IRC apply to the Holder of the Claim.

(ii)     ***Gain and Loss Recognition***.  Holders that receive Cash and property other than stock and securities for their Claim will recognize gain or loss for U.S. federal income tax purposes equal to the difference between the "amount realized" by the Holder and the Holder's tax basis in the Claim. The "amount realized" is the sum of the amount of cash and the fair market value of any other property received under this Plan in respect of the Claim (other than amounts received in respect of a Claim for accrued unpaid interest).  The Holder's tax basis in the Claim (other than a Claim for accrued unpaid interest) is generally the Holder's cost, though tax basis could be more or less than cost depending on the



specific facts of the Holder.  Any gain or loss realized may be capital gain or loss or ordinary gain or loss, depending on the circumstances of the Holder.

*(iii)*    ***Interest Issues***.  Holders that previously included in income accrued but unpaid interest on a Claim may be entitled to a deductible loss to the extent such interest is not satisfied under this Plan. Conversely, a Holder has ordinary income to the extent of the amount of cash or the fair market value of property received in respect of a Claim for (or the portion of a Claim treated as allocable to) accrued unpaid interest that was not previously included in income by the Holder.  This Plan treats all amounts payable to a Holder as principal until the principal amount of the Claim is paid in full.  The Debtors' tax returns will be filed in a manner consistent with this allocation, but it is uncertain whether the IRS will respect this allocation.  The IRS may take the position that payments should be allocated first to interest or should be pro-rated between principal and interest.  If the IRS prevails in this assertion, Holders may be required to recognize ordinary interest income even though they have an overall loss (and possibly a capital loss, the deductibility of which may be limited) with respect to such Holder's Claims.  Each Holder is urged to consult such Holder's own tax advisor regarding the amount of such Holder's Claim allocable to accrued unpaid interest and the character of any loss with respect to accrued but unpaid interest that the Holder previously included in income.

*(iv)*    ***Bad Debt and Worthless Security Deductions***.  A Holder who receives, in respect of such Holder's Claim, an amount that is less than such Holder's tax basis in the Claim may be entitled to a bad debt or worthless securities deduction. The rules governing the character, timing, and amount of these deductions depend upon the facts and circumstances of the Holder, the obligor, and the instrument with respect to which the deduction is claimed, including whether (i) the Holder is a corporation or (ii) the Claim constituted (a) a debt created or acquired (as the case may be) in connection with the Holder's trade or business or (b) a debt, the loss from worthlessness of which is incurred in the Holder's trade or business.  A Holder that previously recognized a loss or deduction in respect of such Holder's Claim may be required to include in income amounts received under this Plan that exceed the Holder's adjusted basis in its Claim.

*(iv)*    ***Installment Obligations***.  A Holder of a Claim that is an installment obligation for U.S. federal income tax purposes may be required to recognize any gain or loss remaining with respect to such obligation if, pursuant to this Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold, or otherwise disposed of within the meaning of Section 453B of the IRC.

*(v)*    ***Market Discount***.  A Holder of a Claim that acquires a Claim at a market discount generally is required to treat any gain realized on the disposition of the Claim as ordinary income to the extent of the market discount that accrued during



the period the Claim was held by the Holder and was not previously included in income by the Holder.

*(vi)    **Withholding**.*  Amounts paid to Holders are subject to generally applicable withholding, information, and backup withholding rules.  This Plan authorizes the Debtors and the Plan Administrator, as applicable, to withhold and report amounts required by law to be withheld and reported. Amounts properly withheld from Distributions to a Holder and paid over to the applicable taxing authority for the account of such Holder will be treated as amounts distributed to such Holder. Holders are required to provide the Debtors and the Plan Administrator, as applicable, with the information necessary to effect information reporting and withholding as required by law.  Notwithstanding any other provision of this Plan, Holders of Claims that receive a Distribution pursuant to this Plan are responsible for the payment and satisfaction of all tax obligations, including income, withholding, and other tax obligations imposed with respect to the Distribution, and no Distribution shall be made until a Holder has made arrangements satisfactory to the Debtors or the Plan Administrator, as applicable, for the payment and satisfaction of such obligations.

*(vii)    **Backup Withholding**.*  Holders may be subject to backup withholding on payments pursuant to this Plan unless the Holder (A) is not a corporation and is not otherwise exempt from backup withholding and, when required, demonstrates that such Holder is exempt from backup withholding requirements or (B) provides a correct taxpayer identification and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a previous failure(s) to report dividend and interest income.  Amounts withheld due to backup withholding will be credited against the Holder's federal income tax liability and excess withholding may be refunded if a timely claim for refund (generally, a U.S. federal income tax return) is filed with the IRS.

*(viii)    **Certain Disclosure Requirements**.*  Treasury regulations require tax return disclosure of certain types of transactions that result in the taxpayer claiming a loss in excess of specified thresholds.   Holders are urged to consult their own tax advisors regarding these regulations and whether the transactions contemplated by this Plan would be subject to these regulations and would require such disclosure.

**9.15    Final DIP Order**.

For the avoidance of doubt, nothing in this Plan shall be deemed to amend or otherwise affect the rights and remedies of the DIP Secured Parties and Prepetition Secured Parties under the Final DIP Order, all of which rights and remedies are reserved.



## ARTICLE X
## PROVISIONS GOVERNING DISTRIBUTIONS

**10.1    Distributions for Allowed Claims**

Except as otherwise provided herein or as ordered by the Bankruptcy Court, all Distributions to Holders of Allowed Claims as of the applicable Distribution Date shall be made on or as soon as practicable after the applicable Distribution Date.  Distributions on account of Claims that first become Allowed Claims after the applicable Distribution Date shall be made pursuant to the terms of this Plan and on the day selected by the Plan Administrator.

The Plan Administrator may accelerate any Distribution Date with respect to Distributions if the facts and circumstances so warrant and to the extent not inconsistent with this Plan. Distributions made as soon as reasonably practicable after the Effective Date or such other date set forth herein shall be deemed to have been made on such date**.**

**10.2    Interest of Claims**.  Except to the extent provided in section 506(b) of the Bankruptcy Code, the Final DIP Order, this Plan, or the Confirmation Order, postpetition interest shall not accrue or be paid on Claims, and no Holder of an Allowed Claim shall be entitled to interest accruing on any Claim from and after the Petition Date.

**10.3    Distributions by Plan Administrator as Disbursement Agent**.  From and after the Effective Date, the Plan Administrator shall serve as the disbursement agent under this Plan with respect to Distributions to Holders of Allowed Claims; *provided*, that the Plan Administrator may hire professionals or consultants to assist with making disbursements or to act as the disbursement agent.  The Plan Administrator shall cause to be made all Distributions required to be made to such Holders of Allowed Claims pursuant to this Plan and the Plan Administrator Agreement.  The Plan Administrator shall not be required to give any bond or surety or other security for the performance of the Plan Administrator's duties as disbursement agent unless otherwise ordered by the Bankruptcy Court.

**10.4    Means of Cash Payment**.  Cash payments under this Plan shall be made, at the option, and in the sole discretion, of the Plan Administrator, by wire, check, or such other method as the Plan Administrator deems appropriate under the circumstances.  Pursuant to Section 10.7 of this Plan, cash payments in the form of checks issued by the Plan Administrator shall be null and void if not cashed within ninety (90) days of the date of the issuance thereof and deemed undeliverable Distributions.  Following the expiration of ninety (90) days after issuance of such null and void checks, in accordance with Section 10.12 of this Plan, amounts in respect of these undeliverable Distributions shall be become unrestricted Wind Down Assets and shall be redistributed to Holders of Allowed Claims after reserving as necessary for payment of expenses of the Plan Administrator and otherwise in compliance with this Plan and the Plan Administrator Agreement.  Such Holder shall be deemed to have forfeited its right to any reserved and future Distributions from the Plan Administrator, and any Claims held by such Holder shall be deemed cancelled, and the Claims of such Holder shall be forever barred.

**10.5    Fractional Distributions**.  Notwithstanding anything in this Plan to the contrary, no payment of fractional cents shall be made pursuant to this Plan.  Whenever any payment of a



fraction of a cent under this Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

**10.6    De Minimis Distributions**.  Notwithstanding anything to the contrary contained in this Plan, the Plan Administrator shall not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $100.  Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $100 shall be forever barred from asserting such Claim against Wind Down Assets.

**10.7    Delivery of Distributions; Unclaimed Distributions**.  All Distributions to Holders of Allowed Claims shall be made at the address of such Holder as set forth in the claims register maintained in the Chapter 11 Cases (subject to any transfer effectuated pursuant to Bankruptcy Rule 3001(e) or, after the Effective Date, a change of address notification provided by a Holder in a manner reasonably acceptable to the Plan Administrator) or, in the absence of a Filed Proof of Claim, the Schedules.  The responsibility to provide the Plan Administrator a current address of a Holder of Claims shall always be the responsibility of such Holder and at no time shall the Plan Administrator have any obligation to determine a Holder's current address.  Nothing contained in this Plan shall require the Plan Administrator to attempt to locate any Holder of an Allowed Claim.  Amounts in respect of undeliverable Distributions made by the Plan Administrator shall be held in trust on behalf of the Holder of the Claim to which they are payable by the Plan Administrator until the earlier of the date that such undeliverable Distributions are claimed by such Holder and the date ninety (90) days after the date the undeliverable Distributions were made.  Following the expiration of ninety (90) days after the date the undeliverable Distributions were made, the amounts in respect of undeliverable Distributions shall be become unrestricted Wind Down Assets and shall be redistributed to Holders of Allowed Claims after reserving as necessary for payment of expenses of the Plan Administrator and otherwise in compliance with this Plan and the Plan Administrator Agreement.  Such Holder shall be deemed to have forfeited its right to any reserved and future Distributions from the Plan Administrator and such interests shall be deemed cancelled, and the Claims of such Holder shall be forever barred.

**10.8    Withholding, Payment and Reporting Requirements with Respect to Distributions**.  All Distributions under this Plan shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions shall be subject to any such withholding, payment, and reporting requirements.  The Plan Administrator shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.  The Plan Administrator may require, in the Plan Administrator's sole and absolute discretion and as a condition to the receipt of any Distribution, that the Holder of an Allowed Claim complete and return to the Plan Administrator the appropriate Form W-8 or Form W-9, as applicable, to each Holder.  Notwithstanding any other provision of this Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed Claim that has become an


31864584.2
031864584.
22

Allowed Claim, any tax obligation that would be imposed upon the Plan Administrator in connection with such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements reasonably satisfactory to the Plan Administrator for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Plan Administrator in connection with such Distribution.

**10.9    Setoffs**.    Except as otherwise expressly provided for in this Plan, each Debtor, Post-Effective Date Debtor, and the Plan Administrator, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or an Interest, may set off against any Allowed Claim or Allowed Interest and the Distributions to be made pursuant to this Plan on account of such Allowed Claim or Allowed Interest, if any, (before any Distribution is made), any claims, rights and Causes of Action of any nature that such Debtor or the Plan Administrator, as applicable, may hold against the Holder of such Allowed Claim or Allowed Interest, to the extent such claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to this Plan or otherwise); *provided however*, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to this Plan shall constitute a waiver or release by such Debtor of any such claims, rights and Causes of Action that such Debtor may possess against such Holder. In no event shall any Holder of Claims or Interests be entitled to set off any Claim or Interest against any claim, right or Cause of Action of the Debtor unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date and the Bankruptcy Court grants such relief.  For the avoidance of doubt, the Filing of a Proof of Claim is sufficient to preserve a right of setoff hereunder.

**10.10    No Distribution in Excess of Allowed Amounts**.    Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim.

**10.11    Allocation of Distributions**.    The Plan Administrator may, in the Plan Administrator's sole discretion, make Distributions jointly to any Holder of a Claim and any other Entity who has asserted, or whom the Plan Administrator has determined to have, an interest in such Claim; *provided however*, that the Plan Administrator shall provide notice of such Distribution to any Holder of a Claim or other Entity that has asserted an interest in such Claim.

**10.12    Forfeiture of Distributions**.    If the Holder of a Claim fails to cash a check payable to it within the time period set forth in Section 10.4, fails to claim an undeliverable Distribution within the time limit set forth in Section 10.7, or fails to complete and return to the or Plan Administrator the appropriate Form W- 8 or Form W-9 within one hundred twenty (120) days of a request for the completion and return to it of the appropriate form pursuant to Section 10.8, then such Holder shall be deemed to have forfeited its right to any reserved and future Distributions and the Claims of such Holder shall be forever barred.  The forfeited Distributions shall become Wind Down Assets and shall be redistributed to Holders of Allowed Claims after reserving as necessary for payment of Plan Administration Expenses and otherwise in compliance with this Plan and the Plan Administrator Agreement. In the event the Plan Administrator determines that any such amounts are too small in total to redistribute



cost-effectively to Holders of Allowed Claims, the Plan Administrator may instead donate them to a charitable organization(s) free of any restrictions thereon, notwithstanding any federal or state escheat laws to the contrary.

# ARTICLE XI
## PROVISIONS FOR CLAIMS OBJECTIONS AND ESTIMATION OF CLAIMS

**11.1    Claims Administration Responsibility**.  Except as otherwise specifically provided in this Plan and the Plan Administrator Agreement, after the Effective Date, the Plan Administrator shall have the authority (a) to file, withdraw, or litigate to judgment objections to Claims, (b) to settle, compromise, or Allow any Claim or Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, (c) to amend the Schedules in accordance with the Bankruptcy Code, and (d) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  Any agreement entered into by the Plan Administrator (acting in accordance with the terms of the Plan Administrator Agreement) with respect to the Allowance of any Claim shall be conclusive evidence and a final determination of the Allowance of such Claim.

**11.2    Claims Objections**.  All Objections to Claims shall be Filed on or before the Claims Objection Deadline, which date may be extended by the Bankruptcy Court upon a motion filed by the Post-Effective Date Debtors or the Plan Administrator on or before the Claims Objection Deadline with notice only to those parties entitled to notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 as of the filing of such motion.  If a timely Objection has not been Filed to a Proof of Claim or the Schedules have not been amended with respect to a Claim that was scheduled by the Debtors but was not set forth in the Schedules by the Debtors as contingent, unliquidated, and/or disputed, then the Claim to which the Proof of Claim or the Claim set forth in the Schedules relates will be treated as an Allowed Claim.

**11.3    Estimation of Contingent or Unliquidated Claims**.  The Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such Objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any Objection to any Claim, including during the pendency of any appeal relating to any such Objection.  In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute the Allowed amount of such Claim.  All of the aforementioned Claims Objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.



**11.4    Expungement and Disallowance of Certain Claims**.  Any Claim that has been paid, satisfied or otherwise dealt with or treated in this Plan may be adjusted or expunged on the Claims Register at the direction of the Plan Administrator on or after fourteen (14) calendar days after the date on which notice of such adjustment or expungement has been filed with the Bankruptcy Court and served on the applicable Claim holder, without an Objection to such Claim having to be filed, and without any further action, order or approval of the Bankruptcy Court.

**11.5    Distributions on Account of Disputed Claims**.  Distributions may be made on account of an undisputed portion of a Disputed Claim.  The Plan Administrator shall, on the applicable Distribution Date, make Distributions on account of any Disputed Claim (or portion thereof) that has become an Allowed Claim.  Such Distributions shall be based upon the Distributions that would have been made to the Holder of such Claim under this Plan if such Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

**11.6    Amendments to Claims**.  On or after the Effective Date, a Claim may not be filed or amended to increase liability or to assert new liabilities without the prior authorization of the Bankruptcy Court or the Plan Administrator and any such new or amended Claim filed without prior authorization shall be deemed Disallowed in full without any further action; *provided* that the foregoing is without prejudice to the ability of any Governmental Unit to file a Claim by the applicable Bar Date.

**11.7    Claims Paid and Payable by Third Parties**.  A Claim shall be Disallowed without an Objection thereto having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, provided that notice of such disallowance shall be filed with the Bankruptcy Court and served on the applicable Claim holder in accordance with section 11.4 herein.

**ARTICLE  XII**
**<u>EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>**

64

**12.1    Executory Contracts and Unexpired Leases Deemed Rejected**.  ~~On the Effective Date, each~~Each of the Debtors' Executory Contracts and Unexpired Leases will be deemed rejected as of the ~~Effective~~Confirmation Date in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless any such Executory Contract or Unexpired Lease (i) is specifically designated on the Assumption Schedule filed with the Plan Supplement; (ii) is subject to a pending motion or notice to assume such Executory Contract or Unexpired Lease as of the ~~Effective Date~~date of entry of the Confirmation Order; or (iii) was previously assumed, assumed and assigned, or rejected by the Debtors in the Chapter 11 Cases, including in connection with the Sale Transaction; *provided*, *however*, that any Executory Contract or Unexpired Lease that has been designated a Reserved Agreement in accordance with the Stalking Horse Agreement, shall be assumed or rejected or designated in accordance with the terms of the Stalking Horse Agreement upon or before the earlier of the expiration of the Designation Rights Period and the Confirmation Date.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all rejections of Executory Contracts pursuant to this Article and sections 365(a) and 1123 of the Bankruptcy Code.  Any and all Claims arising from the rejection of Executory Contracts or Unexpired Leases under this Plan must be filed and served on the Plan Administrator no later than thirty (30) days after the Effective Date; *provided* that the foregoing deadline shall apply only to Executory Contracts and Unexpired Leases that are rejected automatically by operation of this Article XII of this Plan; *provided*, *further* that Claims arising from the rejection of the Reserved Agreements shall be filed and served ~~on~~upon the Plan Administrator upon the later of the date that is thirty (30) days after (a) the Effective Date and (b) the date of entry of an order rejecting any Reserved Agreement ~~subject to a motion to reject filed prior to the Effective Date~~.

**ARTICLE  XIII**
**CONFIRMATION AND CONSUMMATION OF THIS PLAN**

**13.1    Conditions Precedent to the Effective Date**.  Each of the following is a condition precedent to the occurrence of the Effective Date:

   *(a)*    the Bankruptcy Court shall have entered the Confirmation Order (and such order shall be a Final Order) in form and substance acceptable to the DIP Agent, Required DIP Lenders, Prepetition Agent, and Required Prepetition Lenders;

   *(b)*    the Bankruptcy Court shall have entered the Sale Order, and any and all objections to the entry and immediate effectiveness of the Sale Order by any party-in-interest shall have been resolved, withdrawn or overruled to the satisfaction of the DIP Agent, Required DIP Lenders, the Prepetition Agent, and the Required Prepetition Lenders;

   *(c)*    the Required DIP Lenders, Required Prepetition Lenders, and the Debtors shall have agreed to the Wind Down Budget in accordance with the terms set forth herein;

   *(d)*    the Wind Down Organizational Documents and the Plan Administrator Agreement shall have been approved and executed by the parties thereto;



*(e)*      the Professional Fee Escrow Account shall have been funded with Cash in an amount equal to the Professional Fee Amount; and

*(f)*      all actions, documents, and agreements necessary to implement this Combined Disclosure Statement and Plan, including, without limitation, all actions, documents, and agreements necessary to implement any transactions contemplated under this Combined Disclosure Statement and Plan, shall have been effectuated or executed;

*provided* that, notwithstanding when a condition precedent to the Effective Date occurs, for purposes of this Plan, such condition precedent shall be deemed to have occurred simultaneously with the last condition precedent to the Effective Date to occur.

The RSA shall be deemed to have terminated automatically upon the occurrence of the Effective Date.

**13.2**    **Effective Date Notice**. On or before five (5) Business Days after the Effective Date, the Plan Administrator shall mail or cause to be mailed to all parties listed in the creditor matrix maintained by the Notice and Claims Agent the Effective Date Notice, informing such parties of (a) the occurrence of the Effective Date, (b) the deadline to file Claims arising from the rejection of Executory Contracts and Unexpired Leases under Article XII of this Plan, (c) the Professional Fee Deadline; and (d) such other matters as the Post-Effective Date Debtors and Plan Administrator deem appropriate or as may be ordered by the Bankruptcy Court.

**13.3**    **Waiver of Conditions Precedent to the Effective Date**. With the exception of 13.1(a)-(d), which may be waived only with the consent of the DIP Agent and the Prepetition Agent, the Debtors may at any time, without notice or authorization of the Bankruptcy Court, waive in writing any or all of the conditions precedent to the Effective Date set forth in this Article, whereupon the Effective Date shall occur without further action by any Entity. The Debtors reserve the right to assert that any appeal from the Confirmation Order shall be moot after the Effective Date of this Plan.

**13.4**    **Effect of Non-Occurrence of Effective Date**. If each of the conditions specified in this Article have not been satisfied or waived in the manner provided herein within sixty (60) calendar days after the Confirmation Date (or such later date as may be agreed to by the Debtors, the DIP Agent, and the Prepetition Agent), then: (i) the Confirmation Order shall be vacated and of no further force or effect; (ii) no Distributions under this Plan shall be made; (iii) the Debtors and all Holders of Claims against or Interests in the Debtors shall be restored to the status quo as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) all of the Debtors' obligations with respect to Claims and Interests shall remain unaffected by this Plan and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors, and this Plan shall be deemed withdrawn. Upon such occurrence, the Debtors shall File a written notification with the Bankruptcy Court and serve it upon such parties as the Bankruptcy Court may direct.



## ARTICLE XIV
## EFFECTS OF CONFIRMATION

**14.1    Exculpation, Releases, and Injunctions**

The exculpations, releases, and injunctions provided for in Section 14.1 of this Plan shall be effective upon the Effective Date.

*(a)*    **Exculpation and Limitation of Liability.**    **Notwithstanding any other provision of this Plan, the Exculpated Parties shall not have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or any of their Affiliates, or any of their successors or assigns, for any act or omission taken on or after the Petition Date and prior to or on the Effective Date relating to, in any way, or arising from (i) the Chapter 11 Cases; (ii) formulating, negotiating or implementing this Combined Disclosure Statement and Plan or any contract, instrument, release or other agreement or document created or entered into in connection with this Combined Disclosure Statement and Plan; (iii) the Sale Transaction; (iv) any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring, sale or liquidation of the Debtors; (v) the solicitation of acceptances of this Plan, the pursuit of confirmation of this Plan, the Confirmation of this Plan, or the Consummation of this Plan; or (vi) the administration of this Plan or the property to be distributed under this Plan, except for any act or omission of an Exculpated Party that is a criminal act or constitutes fraud, gross negligence or willful misconduct, each as determined by a Final Order or with respect to any obligations of the Debtors, Estates, or the Plan Administrator under this Plan or the Sale Documents arising from and after the Effective Date, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting the Exculpated Parties from liability.    The Confirmation Order shall serve as a permanent injunction against any Entity seeking to enforce any claim or cause of action against the Exculpated Parties that has been exculpated pursuant to Section 14.1(a) of this Plan.**

*(b)*    **Releases by the Debtors.    Except as otherwise expressly provided in this Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, each of the Debtors, on their own behalf and as a representative of their respective Estates, shall, and shall be deemed to, completely and forever release each and all of the Debtor Released Parties of and from any and all claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are or may be based in whole or part on any act, omission, transaction, event or other**



circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, their respective Assets, the Estates, the Chapter 11 Cases, the Prepetition Credit Agreement, the DIP Facility, any of the Debtors' in- or out-of-court restructuring efforts, the Sale Transaction, the Sale Documents, or this Combined Disclosure Statement and Plan, that may be asserted by or on behalf of any of the Debtors or their respective Estates, against any of the Debtor Released Parties. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined by a Final Order to have constituted fraud, willful misconduct, or gross negligence; (ii) criminal acts or omissions of any such Debtor Released Party as determined by a Final Order; or (iii) any Preserved Causes of Action.

*(c)*     <u>Consensual Releases by Certain Parties</u>.  As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Releasing Parties shall, and shall be deemed to, completely and forever release each and all of the Third-Party Released Parties of and from any and all claims, Causes of Action, obligations, suits, judgments, damages, demands, debts, rights, remedies, and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, their respective Assets, the Estates, the Chapter 11 Cases, the Prepetition Credit Agreement, the DIP Facility, any of the Debtors' in- or out-of-court restructuring efforts, the Sale Transaction, the Sale Documents, or this Combined Disclosure Statement and Plan, that may be asserted by or on behalf of any of the Releasing Parties against any of the Third-Party Released Parties (other than the rights of Holders of Allowed Claims to enforce the obligations under the Confirmation Order and this Plan); *provided however*, that nothing in this section shall operate as a release of (i) any causes of action or liabilities arising out of gross negligence, willful misconduct, or fraud, (ii) any obligations of the Debtors, Estates, or the Plan Administrator under this Plan or the Sale Documents arising from and after the Effective Date, or (iii) criminal acts of any such Third-Party Released Party as determined by a Final Order.  For the avoidance of doubt, the release set forth above does not release any Preserved Causes of Action, including those that may be asserted against parties that are not Third Party Released Parties.



*(d)* **Non-Discharge of the Debtors; Injunction.  In accordance with section 1141(d)(3) of the Bankruptcy Code, this Plan does not discharge the Debtors. Section 1141(c) of the Bankruptcy Code nevertheless provides, among other things, that the property dealt with by this Plan is free and clear of all Claims and Interests against the Debtors.  As such, no Entity holding a Claim against the Debtors may receive any payment from, or seek recourse against, any assets that are to be distributed under this Plan other than assets required to be distributed to that Entity under this Plan. All parties are precluded from asserting against any property to be distributed under this Plan any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in this Plan or the Confirmation Order.**

**Except as otherwise expressly provided for in this Plan or in obligations issued pursuant to this Plan, all Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Interest that has been released or exculpated in the Plan, from:**

**(1)    commencing or continuing in any manner any action or other proceeding of any kind against any of the Debtors, the Estates, the Post-Effective Date Debtors, the Plan Administrator, their successors and assigns, and any of their assets and properties on account of such Claim or Interest;**

**(2)    enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any of the Debtors, the Estates, the Post-Effective Date Debtors, the Plan Administrator, their successors and assigns, and any of their assets and properties on account of such Claim or Interest;**

**(3)    creating, perfecting or enforcing any encumbrance of any kind against any of the Debtors, the Estates, the Post-Effective Date Debtors, the Plan Administrator, their successors and assigns, and any of their assets and properties on account of such Claim or Interest;**

**(4)    asserting any right of setoff or subrogation of any kind against any obligation due from any of the Debtors, the Estates, the Post-Effective Date Debtors, the Plan Administrator or their successors and assigns, or against any of their assets and properties on account of such Claim or Interest, except to the extent a right to setoff or subrogation is asserted with respect to a timely Filed Proof of Claim or exercised prepetition; or**

**(5)    commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Interest or Cause of Action released under Article XIV of this Plan.**



> **Any Entity injured by any willful violation of such injunction may seek actual damages and, in appropriate circumstances, may seek punitive damages from the willful violator.**

**14.2    Term of Bankruptcy Injunction or Stays**.  All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**ARTICLE  XV**
**RETENTION OF JURISDICTION**

**15.1    Exclusive Jurisdiction of Bankruptcy Court**.  Pursuant to sections 105(a) and 1142 of the Bankruptcy Court, and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

*(a)*    allow, disallow, determine, subordinate, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest (whether filed before or after the Effective Date and whether or not contingent, Disputed or unliquidated or for contribution, indemnification or reimbursement), including the compromise, settlement and resolution of any request for payment of any Claims or Interests, the resolution of any Objections to the allowance or priority of Claims or Interests and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim or Interest to the extent permitted under applicable law;

*(b)*    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date;

*(c)*    hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters, including, but not limited to, all Causes of Action, and consider and act upon the compromise and settlement of any Claim or Interest, or Cause of Action, including, without limitation, any Preserved Cause of Action;

*(d)*    determine and resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims arising there from;

*(e)*    ensure that all Distributions to Holders of Allowed Claims under this Plan and the performance of the provisions of this Plan are accomplished as provided herein and resolve any issues relating to Distributions to Holders of Allowed Claims pursuant to the provisions of this Plan;



*(f)*    construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and Consummation of this Plan and all contracts, instruments, releases, other agreements or documents created in connection with this Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of this Plan in accordance with sections 524 and 1141 of the Bankruptcy Code following the occurrence of the Effective Date;

*(g)*    determine and resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation, implementation or enforcement of this Plan (and all exhibits and schedules to this Plan) or the Confirmation Order, including the exculpation, release, and injunction provisions set forth in and contemplated by this Plan or the Confirmation Order, or any entity's rights arising under or obligations incurred in connection therewith;

*(h)*    modify this Combined Plan and Disclosure Statement or the Confirmation Order before or after the Effective Date, pursuant to section 1127 of the Bankruptcy Code, as well as any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with this Combined Plan and Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan, to the extent authorized by the Bankruptcy Code and this Plan;

*(i)*    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with Consummation, implementation or enforcement of this Plan or the Confirmation Order;

*(j)*    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

*(k)*    determine any other matters that may arise in connection with or relating to this Plan, the Disclosure Statement, the Confirmation Order, the Sale Transaction, the DIP Facility, the Sale Order or any contract, instrument, release, or other agreement or document created in connection with any of the foregoing;

*(l)*    determine such other matters and for such other purposes as may be provided in the Confirmation Order;

*(m)*    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

*(n)*    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;



*(o)*     determine and resolve controversies related to the Estates, the Debtors, or the Plan Administrator from and after the Effective Date;

*(p)*     hear and determine any other matter relating to this Combined Plan and Disclosure Statement; and

*(q)*     enter a final decree closing any or all the Chapter 11 Cases.

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

**16.1    Modification of this Plan**.  The Debtors may alter, amend, or modify this Plan or any exhibits or schedules hereto under section 1127(a) of the Bankruptcy Code at any time prior to or after the Confirmation Date but prior to the substantial Consummation of this Plan with the consent of the DIP Agent, DIP Required Lenders, Prepetition Agent, Prepetition Required Lenders, *provided however*, that any such alteration, amendment or modification does not materially and adversely affect the treatment of Holders of Claims or Interests under this Plan; *provided, further* that, except as otherwise expressly provided herein, any such alterations, amendments, or modifications that are immaterial or ministerial in nature (as determined by the DIP Agent and Prepetition Agent in their respective discretion) shall require the consent of only the DIP Agent and Prepetition Agent.  Any Holder of a Claim that has accepted this Plan shall be presumed to have accepted this Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such Holder.

**16.2    Revocation, Withdrawal, or Non-Confirmation of this Plan**.  The Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Hearing.  If this Plan is revoked or withdrawn prior to the Confirmation Hearing, or if this Plan is not confirmed by the Bankruptcy Court, then:

*(a)*     this Plan shall be null and void in all respects, and

*(b)*     nothing contained in this Combined Plan and Disclosure Statement shall (i) constitute a waiver or release of any claims by or against, or any Interests in, the Debtors or any other Entity, (ii) prejudice in any manner the rights of the Debtors or any other Entity, or (iii) constitute an admission of any sort by the Debtors or any other Entity.

**16.3    Binding Effect**.  Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of this Plan shall bind any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under this Plan and whether or not such Holder has accepted this Plan.

**16.4    Subordination Rights**.  The classification and manner of satisfying all Claims and the respective Distributions and treatments hereunder take into account and/or conform to the relative priority and rights of the Claims in each Class in connection with the contractual, legal and equitable subordination rights relating thereto, whether arising under contract, general



principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. All subordination rights that a Holder of a Claim may have with respect to any Distribution to be made under this Plan shall be implemented through this Plan, and all actions by such Holder of a Claim related to the enforcement of such subordination rights shall be enjoined permanently unless explicitly preserved by the Plan or Confirmation Order. The provisions of any contractual or structural subordination of Claims shall remain enforceable by the Plan Administrator on behalf of the Estates after the occurrence of the Effective Date. Notwithstanding anything in this Plan to the contrary, any and all subordination and intercreditor agreements between and among the direct and indirect equityholders of the Debtors (including Equinox Group LLC and Equinox Holdings, Inc.), on the one hand, and the Prepetition Lenders (or the Prepetition Agent on their behalf), on the other hand, shall be fully enforceable under this Plan, including the Subordination Agreement and, in accordance with the terms of the Subordination Agreement, any Distributions otherwise payable to Equinox Group shall be distributed to Prepetition Agent (subject to the limitations set forth in this Plan, including those set forth in section 7.4), for the benefit of the Prepetition Lenders, until the Prepetition Obligations indefeasibly paid in full. Without limitation hereunder, the Plan Administrator, on behalf of the Estates, may likewise enforce any other right of the Debtors or the Estates to equitably or otherwise subordinate Claims under section 510 of the Bankruptcy Code, which rights are deemed transferred to, remain and are preserved in the Post-Effective Date Debtors, except as otherwise expressly set forth herein or as expressly provided in a Final Order of the Bankruptcy Court in the Chapter 11 Cases.

**16.5    Severability of Plan Provisions**.  If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**16.6    Payment of Statutory Fees; Filing of Quarterly Reports**.  All U.S. Trustee Fees due and owing prior to the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date.  After the Effective Date, all U.S. Trustee Fees shall be paid by the Plan Administrator or the Post-Effective Date Debtors in full in Cash when due and payable.  The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Post-Effective Date Debtors or Plan Administrator shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Each and every one of the Debtors and the Plan Administrator shall remain obligated to pay U.S. Trustee Fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.  The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under this Plan.



**16.7    Exemption from Section 1146**.  Pursuant to section 1146(a) of the Bankruptcy Code, under this Plan, (i) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors; or (ii) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be taxed under any law imposing a stamp tax or similar tax.  To the extent that the Debtors or Plan Administrator elect to transfer any property prior to or after the Confirmation Date pursuant to the terms of this Plan, such transfers of property will be exempt from any transfer taxes in accordance with section 1146(c) of the Bankruptcy Code.  All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtors in the Chapter 11 Cases shall be deemed to be or have been done in furtherance of this Plan.

**16.8    Filing of Additional Documents**.  On or before the Effective Date of this Plan, the Debtors may issue, execute, deliver, and File with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of this Plan.

**16.9    Insurance**.  Confirmation of this Plan and the occurrence of the Effective Date shall have no effect on insurance policies of the Debtors in which the Debtors are or were insured parties. Each insurance company is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering, or delaying coverage on any basis regarding or related to the Chapter 11 Cases, this Plan or any provision within this Plan, including the treatment or means of liquidation set out within this Plan for insured Claims, if any.

**16.10    Cancellation of Existing Securities and Agreements**.  On the Effective Date, except to the extent otherwise provided in this Plan, all notes, instruments, certificates, shares, bonds, indentures, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, and other documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in the Debtors giving rise to any rights or obligations relating to Claims or Interests, shall be deemed cancelled and surrendered without any need for a Holder to take further action with respect thereto.  Except as otherwise provided herein, the terms and provisions of the Plan shall modify any existing contract or agreement that would in any way be inconsistent with Distributions under the Plan.

**16.11    Successors and Assigns**.  The rights, benefits and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

**16.12    Notices**.  All notices, requests, and demands to or upon the Debtors shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email transmission, when received and confirmed, addressed as follows:

        If to the Debtors, to:

            Blink Holdings, Inc.



640 Fifth Avenue, 10th Floor
New York, NY 10019
Attn: Steven Shenker (sshenker@pppllc.com)

with copies to:

    Young Conaway Stargatt & Taylor, LLP
    Rodney Square
    1000 North King Street
    Wilmington, DE 19801
    Attn:  Michael R. Nestor (mnestor@ycst.com)
           Sean T. Greecher (sgreecher@ycst.com)
           Allison S. Mielke (amielke@ycst.com)

If to the DIP Agent or Prepetition Agent:

    Varagon Capital Partners Agent, LLC, as Administrative Agent
    151 West 42nd Street
    53rd Floor
    New York, NY 10036
    Attn:  Alex Cereste (alex.cereste@man.com)

with copies to:

    Katten Muchin Rosenman LLP
    525 W. Monroe Street
    Chicago, IL 60661
    Attn:  Peter P. Knight (peter.knight@katten.com)
           Allison E. Yager (allison.yager@katten.com)

and:

    Morris, Nichols, Arsht & Tunnell LLP
    1201 North Market Street
    P.O. Box 1347
    Wilmington, DE 19899
    Attn:  Curtis S. Miller (cmiller@morrisnichols.com)

After the Effective Date, the Post-Effective Date Debtors or Plan Administrator, as applicable, shall be authorized to send a notice to Entities specifying that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity (excluding the U.S. Trustee) must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors or Post-Effective Date Debtors shall be authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee, those Entities who have filed such renewed requests and the Entities affected by any relief requested.

**16.13  Governing Law**. Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other federal laws is applicable, and subject to the provisions of any contract, instrument, release, or other agreement or document entered into in connection with this Plan, the construction,



75

implementation and enforcement of this Plan and all rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles which would apply the law of a jurisdiction other than the State of Delaware or the United States of America.

**16.14  Entire Agreement**.  Except as otherwise indicated, this Plan (including the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

**16.15  Exhibits and Schedules**.  All exhibits and schedules annexed hereto, and all documents submitted in support hereof, are incorporated into and are a part of this Plan as if set forth in full herein.  Holders of Claims and Interests may obtain copies of the Filed exhibits and schedules upon written request to the Debtors.  Upon their Filing, the exhibits and schedules may be inspected in the Office of the Clerk of the Bankruptcy Court or its designee during normal business hours.  The documents contained in the exhibits and schedules shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. To the extent any exhibit or schedule annexed hereto is inconsistent with this Plan, the contents of this Plan shall control.

**16.16  Computation of Time**.  In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**16.17  Reservation of Rights**.  The Filing of this Combined Disclosure Statement and Plan, any statement or provision contained in this Combined Disclosure Statement and Plan, or the taking of any action by the Debtors with respect to this Plan shall not be, and shall not be deemed to be, an admission or waiver of any rights of the Debtors with respect to the Holders of Claims and Interests.

Dated: ~~January 31~~February 24, 2025
       Wilmington, Delaware

Respectfully submitted,

By: */s/ Steven Shenker*
Name: Steven Shenker
Chief Restructuring Officer
Blink Holdings, Inc., on behalf of itself and all other Debtors



# EXHIBIT A

**Liquidation Analysis**



### EXHIBIT B

**Budgeted Items Payable From DIP Budget Increased Amount**

| Item | Amount |
|---|---|
| Lender Fees and Expenses incurred through Effective Date | $200,000 |
| Unpaid Committee Fees and Expenses in excess of proration of DIP Budget professional fee line item incurred prior to 12/1/2024 | $900,000 |
| Committee Fees and Expenses incurred from 12/1/2024-Effective Date | $400,000 |



| Summary report: Litera Compare for Word 11.5.0.74 Document comparison done on 2/24/2025 10:31:16 AM | |
| --- | --- |
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://ycstwork.ycst.com/YCST01/31864584/20 | |
| **Modified DMS:** iw://ycstwork.ycst.com/YCST01/31864584/22 | |
| **Changes:** | |
| Add | 149 |
| Delete | 144 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 293 |