## Exhibit B

Exhibit A –Lease Outline Drawing
Exhibit A-1 – Concept Plan
Exhibit B – Landlord's Work
Exhibit C – Renewal Option
Exhibit D – Guaranty of Blink Holdings, Inc.
Exhibit E – Tenant's Approved Signage
Exhibit F – Delivery of Possession Letter
Exhibit G – Pre-Sale Locations
Exhibit H – Other Tenant Exclusives

## RETAIL LEASE

This Retail Lease (this "Lease") is entered into as of November ___, 2014, by Landlord and Tenant.

## ARTICLE 1.
## DEFINITIONS AND CERTAIN BASIC PROVISIONS

1.1  Landlord:            2857 West 8th Street Associates LLC

   Landlord's address:    c/o Steven Samuels
                          1960 Bay Boulevard
                          Atlantic Beach, New York 11509

1.2  Tenant:  Blink West 8th Street, Inc., a New York corporation

   Tenant's address:      386 Park Avenue South
                          11th Floor
                          New York, New York 10016

1.3  Tenant's Trade Name:   Blink or Blink Fitness or any reasonable derivation thereof. Tenant may change its trade name to (i) a new trade name adopted by a majority of the health clubs theretofore operated under Blink or Blink Fitness or (ii) following an assignment or sublease pursuant to Article 16 below, the trade name used by any approved assignee or subtenant or by any assignee or subtenant with respect to which approval is not required.

1.4  Premises:  A portion of the Building, comprised of approximately 14,733 useable square feet on the second floor and a shared entrance on the ground floor, with ceiling heights on the second floor a minimum of 11.3 feet, all as more particularly shown on Exhibit A.

1.5  Building:  The two story building located at 2857 West 8th Street, Brooklyn, New York.

1

1.6  Term:  The term of this Lease shall commence on the Commencement Date and expire on the last day of the month in which the fifteenth (15th) anniversary of the Rent Commencement Date occurs, subject to Tenant's right to extend the term of this Lease for one (1) five (5) year renewal period as set forth in Exhibit C hereto.

1.7  Commencement Date:  The "Commencement Date" shall be the date on which all of the following (a) through (c) have occurred:  (a) Landlord has, at Landlord's sole cost, delivered exclusive physical possession of the Premises to Tenant with Landlord's Work (as defined in Section 3.2 below) Substantially Complete (as defined in Article 3) (the "Delivery Date"); (b) Landlord has delivered to Tenant a Subordination Non-Disturbance Agreement ("SNDA Agreement") executed by the Superior Mortgagee (as defined in Section 20.1) in the form required by Section 20.1; and (c) the earlier of (i) the date Tenant has obtained, at Tenant's sole cost, all final approvals, consents and authorizations required for the performance and completion of Tenant's Work (as defined in Section 3.5) for the operation of the Permitted Use in the Premises (including all required building permits for Tenant's Work and signage permits for the Approved Signage [as defined in Article 10] [collectively, "Tenant's Permits"]) and (ii) ninety (90) days after the date of this Lease; provided, however, each such requirement may be waived by Tenant in its sole discretion.  Neither this Lease nor the Commencement Date is contingent upon Tenant obtaining the approval of the New York City Board of Standards and Appeals (the "BSA") for Tenant's use of the Premises as a "physical culture establishment," as such term is defined and used in the New York City Zoning Rules §§ 73-03 and 73-36 (a "PCE"), a public assembly permit, or amendment of the certificate of occupancy to permit a PCE, each of which Tenant shall obtain at Tenant's sole cost and expense, subject to Section 3.9.

1.8  Estimated Delivery Date:  The date that is six (6) months following the date of this Lease.

1.9  Permitted Use:  Solely for the operation of a health, sports and fitness club including, but not limited to, (i) the provision of cardiovascular, strength, free weight training, tanning services, massage and related modalities (including therapeutic massage), steam rooms, sauna rooms, group fitness programs (including but not limited to, yoga, Pilates, and spinning), personal training (including therapeutic massage), yoga, exercise training and supervision, social activities incidental to health club membership, spa (including, but not limited to, massage, facials and body wraps), meditation classes, health and fitness and dance related educational programs, dance and aerobic classes, and classes and programs and all activities ancillary thereto, physical therapy, and sports/rehab therapy (the items set forth in sub-section (i) hereinafter referred to as the "Primary Uses"), (ii) babysitting, office space and meeting rooms; (iii) an ancillary food and beverage service offering coffee, juice, sports beverages, yogurt, vitamins, other sports-related supplements and other food items involving limited preparation, which food and beverage service may, at Tenant's election, be provided by way of refrigerated units, vending machines, a snack counter or a juice bar within the Premises containing pre-bottled water, soft drinks and/or juices and pre-packaged snack and other foods, nutritional bars and the like for the comfort and convenience of Tenant's members and the general public, but shall not include the cooking of food; and (iv) subject to those exclusive use restrictions of other

2

tenants at the Building, attached hereto as Exhibit H, which Tenant may not violate, an ancillary retail facility for the sale of goods and apparel (which goods and apparel may be sold by way of vending machines) (the foregoing (i), (ii), (iii), and (iv) are collectively referred to as the "Permitted Use").  This description of the Permitted Use and all of the possible components thereof is not intended to be, nor shall it be interpreted to be, a representation or covenant by Tenant that all or any one specific activity shall be provided by Tenant at any given time, it being understood that the range and scope of health club and ancillary service offerings shall be determined solely by Tenant in the exercise of its prudent business judgment.  In no event shall the Premises be used for any of the following: (a) the sale or serving of alcoholic beverages, a tavern, bar, nightclub, discotheque; (b) an adult type book store or other establishment selling or exhibiting pornographic materials, including an X-rated movie theater or video shop; (c) a "head shop" or any establishment displaying or selling drug paraphernalia; (d) a massage parlor (but this shall not prohibit massage as expressly included in the definition of Permitted Use), topless bar or club or restaurant which provides striptease entertainment  (it being understood that the outfits or clothing worn by Tenant's customers in connection with the Permitted Use shall be deemed acceptable, including, without limitation, such customers wearing only tank tops or sports bras as their top covering); (e) a sports, game or off track betting facility or club or any other type of gaming establishment, provided that Tenant shall be permitted to conduct contests and promotions; (f) any center for medical procedures, counseling or activities related to abortion, birth control or euthanasia; (g) a government office or department of motor vehicle facility; (h) a temporary placement service; (i) a drug or alcohol recovery or treatment facility; (j) for the sale of health and beauty aids, pharmacy products (excluding food, beverage and nutritional dietary supplements, which shall be permitted), or greeting cards; or (k) in violation of the other tenants' exclusive uses set forth on Exhibit H hereto.

1.10  "Lease Year" means the period commencing on the Rent Commencement Date and expiring on the last day of the month in which the first (1st) anniversary of the Rent Commencement Date occurs, and each successive twelve (12) month period thereafter which falls within the term.

*[handwritten: RENT START OCT 1 1/a]*

1.11  Base Rent:

| Lease Year | Annual Base Rent | Monthly Base Rent | Rent/Square Foot |
|------------|------------------|-------------------|------------------|
| 1 | $245,000.00 | $20,416.67 | $16.63 |
| 2-5 | $490,000.00 | $40,833.33 | $33.26 |
| 6-10 | $583,426.00 | $48,618.83 | $39.60 |
| 11-15 | $647,957.00 | $53,996.42 | $43.98 |

A.    Within ten (10) business days following Landlord's installation of a wall on the second floor of the Building demising the Premises and Landlord's notice of such installation to Tenant, Tenant shall have the right to re-measure the useable square footage of the Premises and the Building. The term "useable square footage" shall mean the entire area

3

included within the Premises bounded by the exterior of all walls or plate glass separating the Premises from any public corridors or other public areas, and, to the extent the Premises is located within a building leased or occupied by other owners, tenants or other occupants, the centerline of all walls separating the Premises from other such areas occupied by other owners, tenants, or other occupants, without deduction for any area covered by corridors, stairways, escalators, restrooms, mechanical rooms, electrical rooms, telephone closets, vertical penetrations of the floors, columns, projections, or any other structural portions situated in the Premises and exclusively serving the Premises. Tenant shall deliver the results of re-measurement to Landlord within thirty (30) days following Landlord's notice of installation of the demising wall, as described above. If Landlord objects to such results within ten (10) days after receipt thereof, then within ten (10) days following Landlord's objection, the parties shall designate an independent architect, who has not worked with either party in the previous ten (10) years, who shall choose either the useable square footage set forth in Section 1.4 of this Lease, or Tenant's re-measurement, as the useable square footage of the Premises, which determination shall be made within sixty (60) days after designation of the independent architect (the useable square footage of the Premises, as re-measured pursuant to this Section, is hereinafter referred to as the "Actual Square Footage").

B.      If the Actual Square Footage is less than 14,438 useable square feet on the second floor, then the Base Rent shall be reduced based on the Actual Square Footage utilizing the Rent/Square Foot rates set forth on the Table above, and the Tenant Work Allowance shall be reduced by $45 for each square foot that the Actual Square Footage is less than 14,438. If the Actual Square Footage is equal to or exceeds 14,438 useable square feet on the second floor, then the Base Rent shall not be recalculated, but rather shall remain as set forth under the Base Rent columns in the Table above.

C.      If the Actual Square Footage is less than 14,143 useable square feet on the second floor, then Tenant may elect to either (i) continue this Lease in full force and effect (at the reduced Base Rent calculated using the Rent/Square Foot rates above, and the Tenant Work Allowance shall be reduced by $45 for each square foot that the Actual Square Footage is less than 14,143) or (ii) terminate this Lease by delivering notice to Landlord (the "Remeasurement Termination Notice") no later than the date that is thirty (30) days after the date on which the Actual Square Footage has finally been determined.  If Tenant delivers the Remeasurement Termination Notice to Landlord, then this Lease shall terminate upon delivery of such notice, except that Landlord shall reimburse Tenant for its reasonable out-of-pocket costs incurred in connection with preparing plans for Tenant's Work, obtaining approvals and permits, re-measuring the Premises, and negotiating this Lease, not to exceed $50,000.00 in the aggregate (and Tenant shall provide documentation of such costs).

D.      If the Actual Square Footage is greater than 14,733, the Tenant Work Allowance (defined in Section 1.13 below) shall be increased by a sum equal to $45 for each square foot that the Actual Square Footage exceeds 14,733.

4

E.     Upon the determination of the Actual Square Footage of the Premises and the Building, Tenant's Pro-Rata Share (defined in Section 1.14 below) shall be adjusted accordingly.

1.12  Rent Commencement Date:   The calendar date that is six (6) months after the Commencement Date.  Occupancy of the Premises by Tenant prior to the Rent Commencement Date shall be subject to all of the provisions of this Lease excepting only those requiring the payment of Rent (except that Tenant shall pay for all utilities directly metered to the Premises following the Commencement Date).   At the request of either, Landlord and Tenant will, following the Commencement Date, execute and deliver a commencement date agreement reciting the exact Commencement Date, Rent Commencement Date and expiration date of this Lease. The Rent Commencement Date shall be extended on a day for day basis for each day of Non-Tenant Delay that occurs prior to Tenant's opening for business in the Premises for the Permitted Use, provided that a Non-Tenant Delay shall not be deemed to have occurred until Tenant has notified Landlord of such Non-Tenant Delay. "Non-Tenant Delay" shall mean any (i) act or omission by Landlord or any other occupant of the Building (or any of their respective contractors, agents, or employees), and/or (ii) any condition of or occurrence at or affecting the Premises or the Building (including, without limitation, any violations, stop work orders, open permit applications or other legal non-compliance affecting the Premises or the Building) not caused by the act or omission of Tenant or its agents, contractors, or employees, which, in the case of clause (i) and/or clause (ii), is the reason Tenant is actually prevented or delayed in (x) the performance of Tenant's Work, (y) Tenant's receipt of governmental approvals or sign-offs (including, but not limited to, a certificate of occupancy or amendment thereto) for Tenant's Work, or (z) Tenant's ability to open for business in the Premises for the Permitted Use. Landlord shall promptly, continuously and diligently seek to cure, correct and/or remove any Non-Tenant Delay of which Landlord receives notice. If any Non-Tenant Delay of which Tenant notifies Landlord continues unabated or uncured for more than thirty (30) days, then, in addition to the day for day extension of the Rent Commencement Date after the initial thirty (30) day period, Tenant shall also accrue a day for day credit against Base Rent, which credit shall be applied to the first installments of Base Rent that come due after the Rent Commencement Date.  For the avoidance of doubt, if a Non-Tenant Delay of which Landlord has received notice lasts for forty-five (45) days, the Rent Commencement Date shall be extended for forty-five (45) days, and, in addition to the day for day extension of the Rent Commencement Date Tenant shall also be entitled to a fifteen (15) day credit against Base Rent, immediately following the Rent Commencement Date.  Landlord shall promptly, continuously and diligently seek to cure, correct and/or remove any Non-Tenant Delay of which Landlord receives notice.

1.13  Tenant Work Allowance:  $663,000, which shall be subject to adjustment pursuant to Section 1.11 at the rate of $45 per Actual Square Footage of the Premises.

1.14  Tenant's Pro-Rata Share:  25.5%.  Tenant's Pro-Rata Share has been calculated using a fraction, the numerator which is the useable square footage of the Premises (which is deemed to be 14,733 useable square feet for purposes of this Lease) and the denominator which

5

is the useable square footage of the Building (which is deemed to be 57,630 square feet for purposes of this Lease). Tenant's Pro-Rata Share shall not increase during the Term.

1.15  Renewal Term: Tenant shall have the right to extend the term of this Lease for one (1) five (5) year renewal period as described in Exhibit C of this Lease.

1.16  Security Deposit:  None.

1.17  Guarantor: Blink Holdings, Inc. pursuant to the Form of Guaranty attached hereto as Exhibit D.

## ARTICLE 2.
## GRANTING CLAUSE

2.1  Subject to the terms of this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises, together with the non-exclusive right to use all common areas of the Building in common with other tenants, for the Term. The elevator and open access staircase between the ground floor lobby and the second floor of the Building are common areas.

2.2  Prior to the Commencement Date, and until Tenant opens for business in the Premises, Tenant shall, on a rent-free basis, have the right to occupy certain vacant space within the Building in the location more particularly set forth on Exhibit G (the "Pre-Sales Space") and all of the obligations under this Lease (including, without limitation, the obligations of Tenant to deliver to Landlord evidence of the insurance as required under 12.2 of this Lease) shall apply to such Pre-Sales Space except for the obligation to pay Rent.  Tenant may use such Pre-Sales Space for the purposes of pre-selling memberships and staff training. Once Tenant commences presale activities, the Pre-Sales Space may not be moved.  Landlord shall cooperate with Tenant in procuring any required permits or approvals for the Pre-Sales Space and shall promptly sign off on any applications therefor. Tenant shall have the right to maintain such signs and banners in and around the Pre-Sales Space and the Premises announcing the coming of Tenant's fitness club and/or the grand opening of the Premises as Tenant may reasonably determine are appropriate, subject to Landlord's approval, not to be unreasonably withheld, and to compliance with applicable law.  Tenant shall be permitted to operate in the Pre-Sales Space without a temporary certificate of occupancy, so long as Tenant indemnifies Landlord for any penalty or fine or other monetary damage that may be sustained as a result of such Tenant operation in the Pre-Sales Space. Landlord and Tenant acknowledge and agree that no agreement or other document other than this Lease will be required to govern Tenant's occupancy of the Pre-Sales Space.

## ARTICLE 3.
## CONSTRUCTION AND ACCEPTANCE OF PREMISES

3.1  Landlord shall use its best efforts to cause the Delivery Date to occur by the Estimated Delivery Date. For each day after the Estimated Delivery Date (the "First Outside

6

Date") that the Delivery Date does not occur (subject to Unavoidable Delay), Tenant shall receive a credit of one day's Base Rent, beginning on the Rent Commencement Date (which credit shall increase to two days' Base Rent if the Delivery Date does not occur within 30 days after the Estimated Delivery Date). If the Delivery Date has not occurred by the date that is one hundred fifty (150) days following the Estimated Delivery Date (the "Second Outside Date") (subject to Unavoidable Delay), Tenant shall have the right to terminate this Lease upon notice to Landlord setting forth a date for termination no fewer than ten (10) days following the date of Tenant's notice, provided that if the Delivery Date occurs prior to the date set forth for termination in Tenant's notice, then this Lease shall continue in full force and effect as if Tenant's notice had not been given. In the event of any termination pursuant to this Section 3.1, this Lease shall be of no further force or effect except Landlord shall promptly reimburse Tenant for its reasonable out-of pocket costs incurred by Tenant in connection with this Lease, including, but not limited to, attorneys' fees and expenses incurred by Tenant in connection with the negotiation of this Lease, due diligence and the preparation of the plans and specifications for Tenant's Work and filing and permit costs, not to exceed $35,000.00 in the aggregate. Notwithstanding the foregoing, the First Outside Date and the Second Outside Date shall be extended by one day for each day of Tenant Delay (as defined in Section 3.6 below). The Delivery Date may occur prior to the Estimated Delivery Date, but no earlier than ninety (90) days following the date of this Lease.

3.2 Prior to, and as a condition of, the Commencement Date, Landlord shall Substantially Complete, at Landlord's sole cost, the work set forth on Exhibit B attached hereto (collectively, "Landlord's Work"), in a good and workmanlike manner, and in compliance with applicable law. Prior to commencing Landlord's Work, Landlord shall have obtained, at Landlord's sole cost, all permits, consents and governmental approvals required for the performance and completion of Landlord's Work, and paid any municipal "impact fees" or similar fees required in connection with Landlord's Work. On or before the date that is thirty (30) days following the date of this Lease, Landlord shall submit to Tenant, for Tenant's review and approval, a complete set of mechanical plans for the Premises. Tenant shall review such plans and either approve same or provide detailed objections thereto within ten (10) business days after submission to Tenant (or five (5) business days with respect to resubmissions). If Tenant does not respond to a submission of the mechanical plans within ten (10) business days after receipt, then Landlord may send a notice to Tenant stating, in bold capital letters on the envelope and body that "**TENANT'S FAILURE TO RESPOND TO THIS NOTICE WITHIN SEVEN (7) DAYS AFTER RECEIPT SHALL BE DEEMED APPROVAL OF LANDLORD'S MECHANICAL PLANS**;" and if Tenant fails to respond to Landlord's mechanical plans within such seven (7) day period, such mechanical plans shall be deemed approved, provided that the requirements for such notice were satisfied. The term "Substantially Complete(d)," as used in Section 1.7 and this Article 3, shall mean that Landlord's Work has been completed in accordance with Exhibit B, the approved (or deemed approved) mechanical plans, and without any known violation of applicable law, approvals, permits and other governmental requirements, such that only "punch list" items (i.e., details of decoration, construction, or mechanical adjustment which do not materially affect Tenant's ability to commence and complete Tenant's Work, or occupy or operate the Premises for the Permitted

7

Use, or to install any equipment, fixtures or personal property within the Premises) remain to be completed, all of which shall be confirmed by the Delivery of Possession Letter (hereinafter defined). Landlord shall complete any such "punch list" items of Landlord's Work in the manner provided in the Delivery of Possession Letter. Notwithstanding the foregoing, if good construction practice requires that certain items of Landlord's Work be completed by Landlord after certain items of Tenant's Work are completed, then Landlord shall notify Tenant of the same, and Landlord and Tenant shall agree to a schedule of which items of Landlord's Work shall not be required to be completed as a condition of the Delivery Date (the "Post-Delivery Landlord's Work") (and the incompletion of the Post-Delivery Landlord's Work shall not cause Landlord's Work not to be Substantially Complete). Notwithstanding the foregoing, (a) Landlord shall complete any such items of Post-Delivery Landlord's Work promptly following the completion of that portion of Tenant's Work which was required to be performed before the Post-Delivery Landlord's Work, and (b) if the incompletion in a timely manner of any Post-Delivery Landlord's Work actually delays the performance of Tenant's Work, such delay shall be deemed to be a "Non-Tenant Delay." (By way of example only, if Landlord is obligated to install sheet rock, but good construction practice dictates that Tenant should first install its electrical lines, which will get closed in behind the sheet rock, then, provided Tenant and Landlord agree that Tenant should first install its electrical lines, the lack of sheet rock shall not delay the determination of Substantial Completion of Landlord's Work, and, provided that all other items of Landlord's Work are at such time Substantially Completed, Landlord's Work shall be deemed Substantially Completed even though the sheet rock installation is not yet complete.) As a condition of the Delivery Date, Landlord shall provide Tenant with at least twenty (20) days advance notice that it reasonably believes Landlord's Work has been Substantially Completed and within five (5) days of such notice Landlord and Tenant shall conduct a joint inspection of the Premises and based on the results thereof execute the Delivery of Possession letter in the form attached hereto as Exhibit F (the "Delivery of Possession Letter"). In performing such "punch list" items, Landlord shall use commercially reasonable efforts to not interfere with Tenant's operations in, or occupancy of, the Premises. During performance of Landlord's Work, Landlord will comply with the "General provisions (Paragraph D)" set forth on Exhibit B.

3.3  Landlord shall require any party performing Landlord's Work to guarantee the same to be free from any and all defects in the workmanship and materials for at least two (2) years from the Commencement Date. Warranties received in connection with Landlord's Work shall inure to the benefit of Tenant. Notwithstanding anything to the contrary contained herein, Landlord shall be fully responsible and liable to repair, at Landlord's sole cost and expense, any and all patent or latent defects or items of incomplete Landlord's Work in the Premises of which Landlord is notified in writing within the later of (i) two (2) years from the Commencement Date, and (ii) the period of the warranty from Landlord's contractor for such Landlord's Work, if longer.

3.4  Landlord shall promptly pay, when due, the cost of all Landlord's Work, and Landlord shall indemnify, defend and hold Tenant harmless from and against any damages, claims or actions of any contractors performing Landlord's Work. Further, promptly following

8

the completion of Landlord's Work, Landlord shall provide Tenant with an ACP-5 or ACP-7 for the Premises.

3.5 Subject to Section 3.9, Tenant shall obtain, at Tenant's sole cost, all of Tenant's Permits (including an Alteration Type 2 Permit and a Public Assembly Permit, if required). Tenant's Work (defined below) shall be performed pursuant to an Alteration Type 2 Permit, obtained by Tenant at Tenant's expense. Within sixty (60) days after the date of this Lease, Tenant shall submit to Landlord, for its review and approval, a complete set of plans and specifications for Tenant's Work, the review and approval process of which shall be governed by Section 8.1. Promptly after the plans and specifications are approved (such plans and specifications, as approved pursuant to Section 8.1, hereinafter the "Approved Tenant Work Plans"), Tenant's Permits are obtained, and the Delivery Date has occurred, Tenant shall (i) commence and diligently perform all initial leasehold improvements pursuant to the Approved Tenant Work Plans and (ii) install all furniture, fixtures, equipment, inventories and supplies necessary for Tenant to open for business as a fully stocked, fully fixtured Blink Fitness health club (collectively "Tenant's Work"). Tenant's Work shall be performed by Tenant in accordance with the Approved Tenant Work Plans and with all laws, rules, regulations and ordinances applicable thereto and the provisions of Article 8 below. Tenant shall obtain all of Tenant's Permits at Tenant's sole cost and expense, subject to Section 3.9. Tenant shall not commence Tenant's Work until Tenant has delivered to Landlord evidence of the insurance required under 12.2 of this Lease. Landlord shall reimburse Tenant for portions of Tenant's Work in accordance with Article 27 of this Lease. Landlord hereby approves the preliminary layout for the Premises depicted on Exhibit A-1 and Landlord acknowledges that during its review of Tenant's plans and specifications it shall have no right to object to any portion of the design and layout shown on the preliminary layout plan.

3.6 Prior to the Delivery Date, Tenant shall be permitted reasonable access to the Premises for the purposes of taking measurements and performing inspections and due diligence in preparation for Tenant's Work, and use and occupancy of the Premises, provided such access shall not interfere with the performance of Landlord's Work. Such early access by Tenant shall not cause an acceleration of the Delivery Date, the Commencement Date or the Rent Commencement Date nor a delay of the First Outside Date or the Second Outside Date, subject to the last sentence of Section 3.1. Any work performed by Tenant, whether prior or subsequent to the Commencement Date, shall be subject to the terms and conditions set forth in this Lease, including without limitation, insurance requirements. Notwithstanding the foregoing, any delay in the performance of Landlord's Work actually caused by an act or omission of Tenant or Tenant's agents, contractors, employees, or representatives, or by Tenant's or Tenant's agents', contractors', employees', or representatives' entry into the Premises prior to the Commencement Date, shall constitute a "Tenant Delay," provided that no Tenant Delay shall be deemed to have occurred until Landlord has notified Tenant of such Tenant Delay and Tenant has had a reasonable opportunity to cure the same.

3.7 Promptly following the completion of Tenant's Work, Tenant shall obtain and furnish to Landlord the following documents: (i) copies of all required certifications, approvals

9

and sign-offs from the applicable authorities relating to filed plans for Tenant's Work, (ii) copies of as-built plans for the Premises reflecting Tenant's Work (provided that Tenant shall have six (6) months following completion of Tenant's Work to furnish such copies), and (iii) final lien waivers from all contractors and/or materialmen providing goods and services in connection with Tenant's Work of more than Twenty Five Thousand Dollars ($25,000).

3.8 Within thirty (30) days following the date the Approved Tenant Work Plans are approved (the "Permit Submission Date"), Tenant shall submit complete applications for all of Tenant's Permits.  Tenant shall use its commercially reasonable and diligent efforts to obtain Tenant's Permits.  Landlord shall, at no expense to Landlord, cooperate with Tenant's efforts to obtain Tenant's Permits.  Landlord's cooperation shall include, without limitation, the prompt sign-off on all filings or submissions that require Landlord execution within ten (10) days following presentation by Tenant of otherwise full and complete filings or submissions, which shall be increased to twelve (12) days if such filings or submissions require the review of Landlord's architect; any delay in obtaining Tenant's Permits caused by Landlord's failure to cooperate as aforesaid within the time period required shall cause the Rent Commencement Date to be extended on a day for day basis corresponding to the number of days Tenant's Permits were delayed.  In addition, such cooperation may include, without limitation, promptly executing applications reasonably required by Tenant for such permits prior to commencement or completion of Landlord's review of Tenant's plans for Tenant's Work; provided, if, and to the extent, Tenant requests that Landlord execute any permit applications prior to commencement or completion of Landlord's review of Tenant's plans for Tenant's Work, then any such execution shall be solely as a courtesy to and at the specific request of Tenant, and in no event shall Landlord be required to sign an application indicating that Tenant's plans have been previously approved by Landlord, and shall be based upon Tenant's express acknowledgment and agreement that no such Tenant's Work shall be performed until such time as (x) consent to Tenant's plans with respect to such Tenant's Work has been given by Landlord (to the extent required under this Lease) and (y) Tenant shall thereafter refile an amendment to any such permit application to the extent required by any changes required by Landlord in connection with Landlord's approval of Tenant's plans for the Tenant's Work.  Notwithstanding anything to the contrary contained in this Lease, Landlord hereby consents to Tenant obtaining, at Tenant's sole cost and expense, any required permits and approvals for any alterations (including Tenant's Work) based upon Tenant's architect's and engineer's self-certification of the Approved Tenant Work Plans.

3.9 Tenant shall use the Premises only for the Permitted Use, subject, however, to the provisions of this Lease. Tenant, at its sole cost and expense, shall acquire any and all permits, licenses, certificates and approvals required by Laws for the Permitted Use and the conduct of Tenant's operations in the Premises. Notwithstanding the foregoing, Landlord shall, at Tenant's expense, file a post approval amendment (a "PAA") to the currently open Alteration Type 1 Permit (the "ALT1") issued to Landlord in connection with alterations at the Building, to include PCE in the use and occupancy of the Premises, and Landlord shall obtain from the NYC Department of Buildings ("DOB") a BSA objection to such proposed change of use, which shall be delivered to Tenant. After Tenant's receipt of the BSA objection, Tenant shall file an

10

application with the BSA for a special use permit to allow PCE uses in the Premises to permit the use of the Premises for the Permitted Use (the "<u>BSA Approval</u>"). In connection therewith, Landlord shall provide Tenant with the following within ten (10) days after Tenant's request:  (i) accurate address, block and lot for the Premises; (ii) name and address for all businesses and residents sharing the Building; (iii) legal name of ownership entity, (iv) legal name of signatory for the ownership entity and his or her title, and (v) signed application forms and documents provided by Tenant as might be required in order to commence BSA Approval process. Tenant shall furnish Landlord with a copy of such application and shall keep Landlord apprised of the status of its efforts to obtain such special use permit. In no event may any such application or any permit that may be issued as a result thereof affect the use or operation of any portion of the Building other than the Premises. Once Tenant obtains the BSA Approval, it shall promptly furnish Landlord with a copy thereof, whereupon after receipt of such copy, Landlord's architect, at Tenant's sole cost and expense, shall apply for DOB approval of the PAA to provide for use and occupancy of the Premises as a PCE, to be used by Tenant solely for the Permitted Use (the "<u>DOB Approval</u>"). Landlord shall submit an application for an amended Certificate of Occupancy for the Building, permitting the use of the Premises as a PCE, within thirty (30) days after Tenant has obtained and furnished to Landlord a copy of the BSA Approval and any and all other permits, approvals and sign-offs required by any governmental authority with respect to Tenant's Work and to operate its business in the Premises for the Permitted Use. Landlord and Tenant shall keep each other reasonably informed at all times regarding the status of the BSA Approval and DOB Approval, including any dates for hearings and any denials or disapprovals issued by the BSA or DOB. Tenant shall be permitted to utilize its own expediters, consultants and attorneys in seeking such BSA Approval and DOB approvals and permits for Tenant's Work and other alterations by Tenant.  Nothing in this Lease shall prohibit Tenant from commencing and performing Tenant's Work and/or opening for business within the Premises prior to BSA Approval, ALT1 application approval, and/or procurement of an amended Certificate of Occupancy with PCE use or any required public assembly permit so long as (i) Tenant has commenced the appropriate application processes and continues to diligently pursue same, (ii) Tenant indemnifies Landlord for any penalty or fine or other monetary damage that may be sustained as a result of Tenant's use, such indemnity not to include penalties or fines directly related to delays in the Certificate of Occupancy procurement that result from building violations that are unrelated to Tenant's Work, use and/or occupancy and (iii) Tenant's Work shall not impede or delay Landlord's Work.

ARTICLE 4.
<u>RENT</u>

4.1 Base Rent, as more particularly provided in Section 1.11, shall accrue from, and commence on, the Rent Commencement Date, without demand therefor and without any right of abatement, set-off or deduction, for any reason whatsoever, except as expressly set forth in this Lease, and shall be payable at Landlord's address listed in Section 1.1 of this Lease or such address designated by Landlord on thirty (30) days advance notice.  Base Rent, Additional Rent and all other amounts payable by Tenant pursuant to this Lease are herein referred to as "<u>Rent</u>".

11

4.2  The first Base Rent payment shall be due and payable on the Rent Commencement Date, and subsequent Base Rent payments shall be due and payable, in advance, on or before the first day of each succeeding calendar month during the Term; provided, however, if the Rent Commencement Date is other than the first day of a month, the initial Base Rent payment shall be appropriately prorated on a per diem basis based on the actual number of days in such calendar month.

4.3  In addition to Base Rent, Tenant shall pay, as and when the same become due and owing, as additional rent, all other monies expressly provided for in this Lease to be paid to Landlord ("Additional Rent").

ARTICLE 5.
TAXES

5.1  As Additional Rent, Tenant agrees to pay Tenant's Pro-Rata Share of that portion of Taxes (as defined below) for each fiscal tax year after the Tax Base Year that exceed Taxes for the Tax Base Year. For purposes of this Lease, the "Tax Base Year" shall mean the July 2015 – June 2016 fiscal tax year. For each fiscal tax year after the Tax Base Year, Tenant shall pay to Landlord Tenant's Pro Rata Share of the amount Taxes for such fiscal tax year exceed Taxes for the Tax Base Year, in monthly installments concurrently with each payment of Base Rent (and which, if Taxes for the then current fiscal tax year are not known at the time payment is due, may be based on Landlord's reasonable estimate of such excess), provided that Landlord shall provide to Tenant prior to Tenant's initial payment a copy of the most recent tax bill received by Landlord from the taxing authority on which Landlord's estimate is based. The initial monthly Tax payment is based upon the estimated Taxes for the fiscal tax year in question in excess of the Taxes for the Tax Base Year, and the monthly Tax payment is subject to increase or decrease as reasonably determined by Landlord in good faith to reflect an accurate estimate thereof. Tax payments shall be reconciled annually on a fiscal tax year basis, and if Tenant's total estimated Tax payments are less than Tenant's actual obligation, Tenant shall pay to Landlord within thirty (30) days following written demand the difference; if the total estimated Tax payments exceed Tenant's actual obligation, Landlord shall either retain such excess and credit it to future Tenant's Tax payments or return it to Tenant (provided that if this Lease shall have expired, the amount shall promptly be paid to Tenant). "Taxes" shall mean all real estate and real property taxes and other charges, levies, and all special or extraordinary assessments of any kind imposed and actually payable during, and allocable to, the Term following the Rent Commencement Date against the Building, including, without limitation, sewer rents and charges; provided, however, that Landlord shall be responsible for all late charges and interest charges imposed by the taxing authority by reason of Landlord's untimely payment of Taxes (unless and solely to the extent same is a result of Tenant's failure to timely make its tax payment within the time period required hereunder). If at any time during the Term of this Lease the methods of taxation prevailing at the commencement of the Term are altered so that in lieu of, or as a substitute for, the whole or any part of the taxes, assessments, levies, impositions or charges now levied, assessed or imposed on real estate and the improvements thereon there shall be levied, assessed or imposed (i) a tax, assessment, levy, imposition or charge wholly or partially as capital levy or

12

otherwise on the rents received therefrom, or (ii) a tax, assessment, levy, imposition or charge measured by or based in whole or in part upon the Premises and imposed upon Landlord, or (iii) a license fee measured by the rent payable by Tenant to Landlord, then all such taxes, assessments, levies, impositions, charges or fees, or the part thereof as measured or based, shall be deemed to be included within the term "Taxes" for the purposes hereof.  However, except to the extent provided in the immediately preceding sentence, Tenant shall not be required hereunder to pay any franchise, income, corporate, profit, estate, inheritance, succession, gift, transfer, mortgage, recording, or other such taxes, or any other capital levies, that are, or may be, imposed upon Landlord, the Premises, or any revenue derived therefrom. Taxes in each fiscal tax year (including the Tax Base Year) shall reflect any discounts received by Landlord for the early payment of Taxes or otherwise.  Landlord represents that there will be no tax abatements, exemptions or similar programs affecting the Premises or the Building during the Tax Base Year. Tenant shall not be obligated to pay any portion of Taxes or installments thereof which become due and payable with respect to any period prior to or subsequent to the Term of this Lease. Taxes pursuant to this Section 5.1 payable for any fraction of a Lease Year at the commencement or expiration of the Term shall be appropriately prorated.  Landlord shall diligently pursue tax reduction proceedings to the extent commercially reasonable. Any reasonable expenses incurred by Landlord in attempting to protest, reduce or minimize Taxes shall be included in Taxes in the calendar year such expenses are paid to the extent of the reduction in Taxes achieved. Tax refunds shall be deducted from Taxes in the year they are received by Landlord, but if such refund shall relate to Taxes paid in a prior year of the Term, and the Lease shall have expired, Landlord shall pay Tenant's Pro Rata Share of such net refund within thirty (30) days after receipt thereof by Landlord.

5.2  Tenant shall pay all taxes and charges levied against personal property and trade fixtures placed by Tenant in the Premises.  If any such taxes and charges are levied against Landlord or Landlord's property and Landlord elects to pay the same, or if the assessed value of Landlord's property is increased by inclusion of Tenant's personal property and trade fixtures and Landlord elects to pay the taxes based on such increase, Tenant shall pay to Landlord within thirty (30) days following written demand that part of such taxes for which Tenant is primarily liable.  Tenant hereby acknowledges that it must, and hereby agrees to, collect all applicable State, local and district sales tax from its customers and pay such sales tax to the appropriate taxing authority when and as due. Tenant shall pay all taxes arising out of the operation of Tenant's business.

5.3  If Tenant should fail to pay any installment of Base Rent due hereunder within five (5) days following the due date of such Base Rent, or if Tenant should fail to pay any installment of Additional Rent due hereunder within ten (10) days following written notice from Landlord that such payment is overdue, Tenant shall pay Landlord on demand a late charge of up to 3% of the past due amount.  Further, if Tenant fails to timely pay any Rent due hereunder, and does not pay such amount in full within ten (10) days after written notice that such payment is overdue, then the amount in question shall bear interest at the lesser of the maximum rate permitted by law or 9% per annum (the "Lease Interest Rate") from the date due until paid.  Notwithstanding the foregoing, Landlord shall not impose a late charge or default interest on Tenant the first time

13

in any twelve (12) month period that payment is not received by Landlord within such ten (10) day period.

5.4  The parties acknowledge that Tenant shall not be responsible for paying a separate common area maintenance, insurance, marketing charges, taxes or operating expense to Landlord in connection with this Lease (other than Taxes pursuant to Section 5.1 above) as such expenses are included as part of the Base Rent payable by Tenant hereunder. Tenant shall not be responsible for paying any percentage rent in connection with this Lease.

ARTICLE 6.
<u>USE AND CARE OF PREMISES</u>

6.1  The Premises may be used only for the Permitted Use and for no other purpose, without the prior written consent of Landlord, except as otherwise set forth in this Lease. Tenant shall have access to the Premises and related common areas of the Building, through its retail entrance, twenty-four (24) hours a day, seven days a week at no additional cost to Tenant. Subject to applicable law, Tenant may be open for business such additional hours (i.e., beyond the normal operating hours for a Blink Fitness location) as it deems appropriate, including up to twenty-four (24) hours a day, seven (7) days a week if permitted by law. Notwithstanding that a portion of the Premises is a shared entrance on the ground floor of the Building, Landlord shall guarantee access thereto to Tenant and Tenant's employees, contractors, invitees, guests, and customers during the Term, and Landlord shall not be permitted to grant any exclusive right of tenancy or possession thereto to any other party.

6.2  All property kept, stored or maintained within the Premises by Tenant shall be at Tenant's sole risk.

6.3  Tenant shall not (a) permit any objectionable or unpleasant odors or, subject to the last sentence of this Section 6.3, noise or vibrations to emanate from the Premises, (b) except as expressly permitted pursuant to the other provisions of this Lease, place or permit any radio, television, loudspeaker or amplifier on the roof or outside the Premises, (c) except as expressly permitted pursuant to the other provisions of this Lease, place an antenna, awning or other projection on the exterior of the Premises, without the prior reasonable consent of Landlord, (d) take any other action which would constitute a nuisance or disturb or endanger other tenants of the Building or unreasonably interfere with their use of their respective premises or (e) conduct within or from the Premises any fire, auction or bankruptcy sales. Notwithstanding the preceding sentence and other contrary provisions of this Lease, Landlord recognizes that some noise and vibration does result from Tenant's Permitted Use and agrees that noise and vibration customarily associated with a health and fitness club shall not be considered a nuisance and shall not constitute a violation of this Lease (and Tenant agrees to include, as part of Tenant's Work, extra flooring under the portion of the Premises designated for use of free weights).

14

6.4  Tenant shall have the right to install (i) pay lockers in the Premises for use by its members, employees and invitees and (ii) up to two (2) automatic teller machines within the Premises.

6.5  Tenant shall take good care of the Premises and keep the same free from material waste.  Tenant shall keep the Premises neat, clean and free from dirt, rubbish, insects and pests. Tenant shall maintain all display windows in a neat and attractive condition. Tenant shall not place or store objects on (or permit the same) the sidewalks or other common areas outside the Premises for any display, sales, or storage.

6.6  Except for the PAA and other applications expressly required to be submitted by Landlord pursuant to Section 3.9, but subject to Section 3.8, Tenant shall procure all permits and licenses required for the transaction of business in the Premises and shall comply with all laws, ordinances and regulations applicable to the use or occupancy of the Premises (including making necessary alterations).  Notwithstanding the foregoing, Tenant shall not be responsible for the performance of structural work, alterations, repairs, or capital expenditures in the Premises or in the Building or with respect to the Building systems necessary for compliance with law (collectively, the "Structural Work"), all of which required Structural Work shall be the obligation of Landlord, except to the extent such Structural Work is necessitated by (i) the particular manner of use by Tenant of the Premises (as opposed to general use for the Permitted Use) or (ii) the particular configuration of Tenant's alterations.

6.7  Upon the expiration or termination of this Lease, Tenant shall: (a) deliver possession of the Premises to Landlord in a broom clean condition free of debris, ordinary wear and tear and damage by casualty or condemnation excepted; and (b) remove all of its movable trade fixtures, personal property and signage and repair any damage caused by such removal. In no event shall Tenant have any obligation to remove any alterations, installations, additions or improvements (including Landlord's Work or Tenant's Work).

ARTICLE 7.
MAINTENANCE AND REPAIR OF PREMISES

7.1  Landlord shall keep, maintain, repair and replace, in good repair and condition, ordinary wear and tear excepted, (i) all structural components of the Building (both interior and exterior) and the Premises, including, without limitation, the foundation, the exterior walls and any load-bearing interior walls, the roof, roof membrane, exterior and interior of windows, mullions, subsurface areas, common elevators, egress stairs, sewer and water mains outside of the Premises (to points of connection within the Premises), the fire sprinkler, fire alarm, floor slabs, and all aspects of the exterior of the Premises; (ii) building systems servicing the Premises to points of connection within the Premises, including, without limitation, electrical, plumbing, mechanical, fire-safety and alarm, sprinkler (to a connection point within the Premises), and HVAC systems (it being understood that Landlord's obligations as to the HVAC systems shall be governed by Section 7.5 below) (except to the extent any of such systems shall exclusively service the Premises), (iii) all sidewalks and access and parking areas (if any), including

15

requiring the ground floor tenants (or Landlord, if no ground floor tenants) to remove snow and ice therefrom and maintain access thereto, (iv) the shared ground floor entrance constituting a portion of the Premises, including cleaning, lighting, maintaining, repairing, and securing the same, and (v) any damage to the Premises caused by the willful misconduct or negligent act or omission of the Landlord, its agents, employees and contractors or any breach of this Lease by Landlord.  Landlord shall keep the Building and all common areas secure and safe, and shall light the exterior of the Building (seven (7) days a week until at least to 11:00 p.m. Monday through Sunday), plow and clean the outside common areas (or require ground floor tenants to do the same), all so as to maintain a first-class appearance and condition.  Repairs required to be made by Landlord that are occasioned by the acts, omissions, or negligence of Tenant, its agents, employees, invitees, subtenants, licensees and concessionaires shall be paid for by Tenant within thirty (30) days following written demand to the extent not covered by net insurance proceeds paid to Landlord therefor (if Landlord shall make an insurance claim therefor, determined by Landlord in its reasonable discretion).   If the Premises need repairs that are Landlord's responsibility, Tenant shall notify Landlord and Landlord shall promptly commence and diligently prosecute to completion all such repairs following delivery of such notice. Tenant acknowledges that the removal of snow and ice from the sidewalks adjacent to the Building is as of the date of this Lease the responsibility of the ground floor tenants of the Building, and Landlord agrees to use commercially reasonable efforts to enforce its rights against such tenants to uphold Landlord's maintenance obligations under this Lease, and assume any such obligations if such tenants fail to maintain as required or if there cease to be tenants occupying all ground floor space in the Building.

7.2 [Intentionally deleted.]

7.3 Following completion of Landlord's Work, Tenant shall furnish, maintain and replace all electric light bulbs, tubes and tube casings in the Premises.

7.4 Throughout the term of this Lease, Tenant shall maintain the (i) interior of the Premises, including Building systems located therein and exclusively serving the Premises, and (ii) doors, windows awnings and signage located in the interior Premises in good condition and make all needed repairs and replacements, except for repairs and replacements expressly required to be made by Landlord under this Lease, and shall keep all plumbing pipes and connections located within the Premises free from obstruction and protected against ice and freezing. Notwithstanding the foregoing, or anything to the contrary contained in this Lease, Landlord shall keep, maintain, repair and replace the shared ground floor entrance as set forth in Section 7.1.

7.5 As part of Landlord's Work, Landlord shall deliver the Premises with a new HVAC system and equipment servicing the Premises in good working order as more particularly described in Landlord's Work and Landlord shall assign to Tenant any warranties of the HVAC systems serving the Premises. Tenant acknowledges that the HVAC system shall not be installed prior to, or as a condition of, the Delivery Date, but it shall be installed simultaneously with the performance of Tenant's Work, pursuant to the schedule set forth on Exhibit B. Throughout the

16

term of this Lease, Tenant shall maintain in good condition all HVAC systems and equipment serving the Premises and shall enter into a preventive maintenance/service contract with a maintenance contractor reasonably approved by Landlord for servicing such systems and equipment.

7.6  Tenant shall pay for all utility usage directly to the utility company providing such utility service with no premium to Landlord (and Tenant shall as part of Tenant's Work separately meter such utility service at Tenant's cost).

7.7  Tenant shall pay for its own janitorial service within the Premises, and, during the period that Tenant is using and occupying the Pre-Sales Space, Tenant shall pay for its own janitorial service within the Pre-Sales Space.

7.8  In the event that Landlord, in its reasonable discretion, determines that Tenant is not addressing its maintenance and repair obligations in Article 7 or elsewhere in the Lease in a timely and diligent fashion, Landlord may, but shall not be required to, provide Tenant with written notice of such failure. In the event Tenant does not commence such maintenance and repair obligations within thirty (30) days after receipt of Landlord's notice, and thereafter continuously and diligently pursue such maintenance and repair obligations to completion, Landlord may, but shall not be obligated to, perform all such maintenance and repair work at the sole but commercially reasonable cost of Tenant. Tenant shall reimburse Landlord for such costs within ten (10) days after Landlord's request. Nothing in this Section 7.8 limits the remedies that are available to Landlord after the occurrence of an Event of Default.

ARTICLE 8.
ALTERATIONS

8.1  A.Except as hereinafter expressly permitted, Tenant shall not make any alterations, additions or improvements to the Premises without the prior written consent (or deemed consent) of Landlord.  Tenant may install trade fixtures if the same can be installed without drilling, cutting or otherwise defacing the Premises.  All alterations, additions, improvements, carpeting, floor coverings, and fixtures (other than trade fixtures) installed by either party upon the Premises shall be Tenant's property when installed or completed and throughout the Term, but shall remain upon the Premises and become the property of Landlord at the end of the Term. Tenant shall have no obligation to restore or remove any alterations made to the Premises at or prior to the expiration of the Term of this Lease, provided such work was approved (or deemed approved) by Landlord or is permitted to be performed by Tenant without the approval of Landlord.

B.     Landlord will not unreasonably withhold, condition, or delay its consent to Tenant's Work provided the plans therefor are consistent with Tenant's concept plan attached hereto as Exhibit A-1. Landlord will not unreasonably withhold, condition, or delay consent to any other alteration, provided that such alteration (i) does not require any alterations, installations, improvements, additions or other physical changes to be performed in or made to

17

any portion of the Building other than the Premises, (ii) does not adversely affect any building system not exclusively serving the Premises, (iii) does not affect the structure of the Building, (iv) does not impede Landlord's access to common areas in any material respect, and (v) does not violate or render invalid any certificate of occupancy for the Building or any part thereof or require any amendment or modification of any certificate of occupancy for the Building. Tenant shall notify Landlord of proposed alterations and provide complete plans and specifications for Landlord's review. Landlord shall review plans and specifications for any proposed alterations (including Tenant's Work) and provide Tenant with approval thereof or detailed objections within ten (10) business days after submission to Landlord (or five (5) business days with respect to resubmissions). If Landlord does not respond to a submission of Tenant's plans within ten (10) business days after receipt, then Tenant may send a notice to Landlord stating, in bold capital letters on the envelope and body that "**LANDLORD'S FAILURE TO RESPOND TO THIS NOTICE WITHIN SEVEN (7) DAYS AFTER RECEIPT SHALL BE DEEMED APPROVAL OF TENANT'S PLANS;**" and if Landlord fails to respond to Tenant's plans within such seven (7) day period, Tenant's plans shall be deemed approved, provided that the requirements for such notice were satisfied. Notwithstanding the foregoing, Tenant may make cosmetic or decorative alterations without Landlord's consent such as painting, carpeting and wall coverings. In addition to the foregoing, and notwithstanding any provisions to the contrary, Tenant shall have the right to make non-structural interior alterations to the Premises which do not affect common utility systems without obtaining Landlord's prior written consent or approval provided that such interior alterations shall be completed in a good and workmanlike manner in accordance with applicable laws and cost less than $200,000.00 in the aggregate (with respect to all interior alterations) in any rolling 24 month period and such alterations do not require a building permit. For the purposes of this Article 8, the term "structural" shall mean all of the Building's building foundation, floor slab, exterior walls, columns, roof, utility lines to (but not inside) the Premises, and all conduits passing through the Premises except to the extent they are exclusively servicing the Premises.

8.2 All work done by Tenant within the Premises shall be performed in a good and workmanlike manner, in compliance with all governmental requirements and so as to cause a minimum of interference with other construction in progress and with the transaction of business in the Building. All work shall be performed by a licensed and reputable general contractor selected by Tenant pursuant to plans and specifications approved (or deemed approved) by Landlord to the extent such approval is required in accordance with Section 8.1. Prior to commencement of any such work Tenant shall provide evidence that its contractors have in effect commercially reasonable adequate insurance for all risks of loss associated with the work (naming Landlord as an additional insured). In no event shall Tenant or any of its contractors or subcontractors be required to post a bond or other security in connection with the performance of any alterations (including with respect to Tenant's Work) or to pay any construction coordination, plan review fee or similar charge (including with respect to Tenant's Work). All work shall be done in harmony with other laborers or workers at the Building, but under no circumstances, shall Tenant be obligated to utilize union labor in connection with the performance of alterations.

18

8.3  All venting, opening, sealing, waterproofing or any altering of the roof shall only be performed by Landlord's roofing contractor at Tenant's expense in accordance with plans and specifications reasonably approved by Landlord.

8.4  Landlord shall execute all necessary permit applications for any approved alterations within five (5) business days following presentation of fully completed applications by Tenant, which may include, without limitation, promptly executing applications reasonably required by Tenant for such permits prior to commencement or completion of Landlord's review of Tenant's plans for such alterations; provided, if, and to the extent, Tenant requests that Landlord execute any permit applications prior to commencement or completion of Landlord's review of Tenant's plans for such alterations, then any such execution if agreed to by Landlord shall be solely as a courtesy to and at the specific request of Tenant, based upon Tenant's express acknowledgment and agreement that no such alterations shall be performed until such time as (x) consent to Tenant's plans with respect to such alterations has been given by Landlord (to the extent required under this Lease) and (y) Tenant shall thereafter refile an amendment to any such permit application to the extent required by any changes required by Landlord in connection with Landlord's approval of Tenant's plans for the alteration in question. Promptly following the completion of Tenant's Work, Tenant shall obtain and furnish to Landlord: (i) copies of all required certifications, approvals and sign-offs from the applicable authorities relating to filed plans for Tenant's Work, (ii) copies of as-built plans for the Premises reflecting Tenant's Work (provided that Tenant shall have six (6) months following completion of Tenant's Work to furnish such copies), and (iii) final lien waivers from all contractors and/or materialmen providing goods and services in connection with Tenant's Work of more than Twenty Five Thousand Dollars ($25,000).

ARTICLE 9.
LANDLORD'S RIGHT OF ACCESS; USE OF ROOF

9.1  Landlord may enter the Premises at any reasonable time upon not less than twenty-four (24) hours prior written notice (provided, however, that no prior notice shall be required in the event of a situation which Landlord reasonably believes to be an emergency) for the purposes of inspecting the same, of making repairs or additions to the Premises, the Building or other premises, or showing the Premises to prospective purchasers or lenders. Except in emergencies, Landlord's access to the Premises shall only be with an authorized representative of Tenant. In connection with such access and/or work, Landlord shall exercise reasonable efforts to minimize any inconvenience to Tenant or interference with Tenant's use of the Premises, its business operations therein, its means of ingress thereto and egress therefrom and/or Tenant's signage, and Landlord shall carry out such access and/or work promptly and diligently; shall consult with Tenant and shall make reasonable efforts to schedule such work in a manner, and in such locations (including the manner, method and location of exterior scaffolding, barriers or similar construction aids), as to create the least practicable interference with Tenant and/or Tenant's use of the Premises, business operations, ingress and egress and/or signage. If, notwithstanding the foregoing, scaffolding, barriers, or construction aids shall interfere with Tenant's signage for more than four (4) consecutive days, Landlord shall, at Landlord's expense, provide Tenant with

19

suitable replacement signage during the entire duration that such interfering equipment remains in place. Landlord shall not store any construction materials within the Premises and shall remove any and all debris caused as a result of any work to the Premises by Landlord. Landlord represents that at the present time it has no plans to install a sidewalk bridge or scaffolding or perform any other building renovations and that all local law work will have been completed prior to the Commencement Date. Notwithstanding the foregoing, if there is scaffolding or a sidewalk bridge present in front of the Premises that materially interferes with Tenant's business operations or access to the Premises, then Base Rent and Additional Rent shall be abated on a day-for-day basis until such time as the material interference with Tenant's business and/or access to the Premises is remedied, which may be the day that the scaffolding and/or sidewalk bridge is completely removed.

9.2 Subject to compliance with all applicable laws and subject to Landlord's prior approval of the plans therefor (including approval of location), which approval shall not be unreasonably withheld, delayed or conditioned, Tenant may install a satellite communication system (including two (2) satellite dishes for use in connection with the Permitted Use) (the "Communication System") on the roof of the Building provided any such Communication System is for the Tenant's sole and exclusive use and not for resale to third parties. Tenant is hereby granted an irrevocable non-exclusive license throughout the Term hereof in conjunction with its use of the Premises for (i) use of any shafts, chases, and other service areas in the Building required to install the electrical or communication wiring and cables related to Tenant's Communication System, (ii) access to the roof at all reasonable times (and in emergencies) to install, maintain, repair, replace or remove such Communication System, and (iii) installation and operation of a Communication System on the roof of the Building at a location to be mutually agreed upon by Landlord and Tenant. All work that affects or may affect the roof shall be performed by Landlord's roofing contractor, or under its supervision, at Tenant's expense, and shall be performed in a manner that will not void Landlord's roof warranty. Tenant shall repair any damage to the roof of the Building or any surrounding property resulting from the installation or operation of Tenant's Communication System. Tenant, at its sole cost and expense, shall secure any and all permits for its Communication System.

At the expiration of the Term, or such earlier termination of this Lease, Tenant shall promptly remove the Communication System and repair any damage caused by such removal. Tenant shall indemnify, defend and save Landlord harmless from and against any claims, demands, liability, suits at law or in equity, or expenses or roof damages (including attorney's fees) resulting from the installation, operation or removal of the Communication System or any accident, injury or death of any person, or damage or destruction to any property in connection therewith, unless caused by the negligence or willful misconduct of Landlord, Landlord's agents, contractors or employees. This indemnification shall survive the expiration or earlier termination of this Lease.

ARTICLE 10.
SIGNS; STORE FRONTS

20

10.1  Except as set forth in this Section 10.1, Tenant shall not, without Landlord's prior written consent (which consent not to be unreasonably withheld, conditioned or delayed) (a) install any exterior lighting, decorations or paintings; or (b) erect or install any signs, banners, window or door lettering, placards, decorations or advertising media of any type visible from the exterior of the Premises. Tenant shall not make any changes to the exterior of the Building without Landlord's prior written consent, granted in Landlord's sole discretion.

Notwithstanding the foregoing, Landlord hereby approves Tenant's façade program depicted on Exhibit E annexed hereto and made a part hereof, including, without limitation, Tenant's signs and flags on the exterior of the Premises and the Building and permanent signs and/or vinyl on the interior of Tenant's windows (the "Approved Signage"). Subject to Section 3.8, Tenant shall obtain all permits and approvals for the Approved Signage and, as part of Tenant's Work, Tenant shall erect and install such Approved Signage.  Tenant may install replacement signage on the exterior of the Premises, the Building, the Premises storefront and in the Premises windows in the locations identified on Exhibit E without Landlord's consent, but subject to the approval of the applicable governmental authorities, provided such signage is consistent with the signage and branding of the majority of other affiliated locations operating under Tenant's Trade Name, and provided such signage shall not interfere with the signage of other tenants at the Building (and Landlord represents that the signage shown on Exhibit E shall not be deemed to interfere with the signage of other tenants at the Building).  In addition, without Landlord's consent (but subject to the approval of the applicable governmental authorities, if required), Tenant shall be permitted to place identifying signage in or on the shared ground floor entrance constituting part of the Premises, which is consistent with the signage and branding of the majority of other affiliated locations operating under Tenant's Trade Name. Any sign, once approved by Landlord (and any additional or replacement signage that complies with the preceding sentence), shall not be challenged as non-compliant with Landlord's signage criteria (if any) so long as such signage criteria remain lawful under the laws or regulations applicable thereto.  Upon execution of this Lease, Landlord consents to Tenant's installation of a temporary "Coming Soon" or "Future Home of Blink" banner on the exterior of the Premises, in a location reasonably acceptable to Landlord. Landlord shall run rigid conduit from Tenant's sign locations to a mutually agreed upon location within the Premises for the provision of electricity to such signage.

Tenant shall maintain all Tenant signage in good repair and condition. Notwithstanding anything to the contrary contained in this Lease, signs, displays and advertisements in the interior of the Premises including its windows, even if visible from the outside of the Premises, shall not be subject to Landlord's consent, provided they comply with law. Tenant shall, unless otherwise directed by Landlord in writing, at the expiration or earlier termination of this Lease, remove all Tenant signage and shall promptly repair any damage caused to the Premises and the Building caused by the installation thereof.

## ARTICLE 11.
## UTILITIES

21

11.1 At Landlord's sole cost and expense and as part of Landlord's Work (as further detailed on attached Exhibit B), Landlord shall cause heat, fuel, electricity, gas, and water/sewer services to be provided to the Building and Premises by the public utility or other providers. Landlord shall cause said utilities to be connected to the Premises in the locations identified on Exhibit B annexed hereto and made a part hereof, as part of Landlord's Work. Tenant, at Tenant's sole cost and expense, shall install water, gas, and electric meters in the Premises as part of Tenant's Work, at Tenant's sole cost and expense. To the extent there are any impact, tap, connection, or other fees payable to a public utility or to a local governmental authority in order for Landlord to cause utility services to be connected to the Building and/or Premises as provided in this Lease, Landlord shall be solely responsible for, and shall pay all such fees to the public utility companies and/or governmental authorities as and when they are due. Once Landlord causes all utility services to be brought to the Building and Premises, Tenant hereby agrees to establish its own utility accounts (and shall make application therefor within ten (10) business days following the Delivery Date) and Tenant shall promptly pay all charges for fuel, electricity, water, gas, telephone service, sewerage service and other utilities furnished to the Premises based upon meter readings invoiced to Tenant directly by the utility companies, and Tenant shall not be required to pay any overhead or other fees charged by Landlord in connection therewith. If and to the extent that any utilities shall be submetered by Landlord (as opposed to directly metered by the public utility company), Tenant shall pay Landlord for such utilities based on Tenant's consumption as shown on the submeter and Landlord's actual cost of obtaining such service from the public utility, plus any third party, out of pocket meter reading and billing costs, without any overhead, mark-up, profit, depreciation or other charge by Landlord.

11.2 Landlord shall not be liable for any interruption or failure whatsoever in utility services unless caused by Landlord's gross negligence or willful misconduct. Tenant shall comply with all provisions of this Lease notwithstanding any such failure or interruption except as expressly set forth in this Lease. Any furnishing by Landlord of utilities shall be conditioned upon the availability of adequate energy sources. Landlord shall have the right to reduce such utilities within the Building, including, without limitation, the Premises and common areas, as required by any mandatory fuel or energy saving allocation, or any similar mandatory statute, regulation, order or program, and Tenant shall comply with any such mandatory energy conservation program and all related measures and regulations promulgated by applicable governmental authorities provided such compliance does not adversely affect Tenant's rights under this Lease or increase Tenant's obligations.

11.3 Tenant may select the telecommunications service carrier to provide Tenant's voice and data communications service, subject to the prior consent of Landlord not to be unreasonably withheld, conditioned or delayed. Tenant shall be responsible for payment of all services provided by the carrier selected. Tenant must obtain Landlord's written approval, not to be unreasonably withheld, conditioned or delayed before installing, replacing, removing, using or modifying any wiring, cables, risers, lines or similar equipment or installations ("Wiring") outside of the Premises or affecting any building systems within the Building but outside of the Premises. In its request for approval, Tenant shall submit to Landlord reasonably detailed plans and specifications for the proposed work. If the plans and specifications for any

22

telecommunications-related work require access to any space outside of the Premises, Tenant shall be provided with all necessary access thereto, including, without limitation to common area pathways or passageways, Landlord-reserved areas within adjacent tenants' premises, mechanical or electrical rooms/closets, and utility connection points, in order to perform the Wiring and other work; provided, however, that if Tenant requests access to space in the Building leased exclusively to another tenant, Landlord shall request such access on Tenant's behalf, but Landlord shall have no liability if such tenant refuses to grant the access requested and Tenant shall have no recourse against Landlord with respect to such tenant's refusal and/or such lack of access. Landlord and Tenant shall reasonably cooperate with each other with respect to the provision of such access. During the Term of the Lease, Landlord shall cooperate with Tenant in securing access to all such space when reasonably required by Tenant upon not less than three (3) business days' prior written notice to Landlord (or sooner in the event of an emergency). Tenant shall be responsible for ensuring that its telecommunications carrier and contractors comply with all laws, codes, ordinances and regulations, the applicable provisions of this Lease and any other reasonable rules and requirements which may be imposed by Landlord. All work shall be conducted during non-business hours, if Landlord so directs. Tenant shall promptly restore any portion of the Building or grounds that is disturbed by such work to its pre-existing condition. Upon the expiration or earlier termination of this Lease, Tenant agrees that Tenant shall surrender all of the Wiring to Landlord, free and clear of all liens and encumbrances, in good and safe condition, in working order and properly labeled at each end and in each telecommunications/electrical closet and junction box. Landlord may require Tenant to remove, within five (5) days' notice, any Wiring (i) which is installed or is at any time in violation of the applicable provisions of this Lease or applicable laws, regulations, ordinances or codes or (ii) which at any time presents a dangerous condition to persons or serious threat of damage to the Building. Notwithstanding the foregoing, provided Tenant is not then in default under this Lease, after written notice to Tenant, Tenant, at Tenant's option, may remove and take the Wiring from the Premises to the extent installed at Tenant's cost.

ARTICLE 12.
INDEMNITY

12.1 Notwithstanding anything else contained herein, except to the extent caused by the acts or omissions of Landlord, its agents, employees or contractors, Landlord shall not be liable to Tenant or to Tenant's employees, agents or visitors for injury to person occurring within the Premises or any portion thereto during the Term of this Lease from and after the date possession of the Premises is delivered to Tenant, and Tenant shall indemnify and defend Landlord and Landlord's agents, employees and contractors from all actual loss, damage, expense, claims or actions arising out of such injury (including any court costs and attorneys' fees). Notwithstanding anything else contained herein, except to the extent caused by the acts or omissions of Tenant, its agents, employees or contractors, Tenant shall not be liable to Landlord or to Landlord's employees, agents, contractor or visitors for injury to person occurring within the common area during the Term of this Lease. The provisions of this Section 12.1 shall survive the termination or expiration of this Lease with respect to any claims or liability

23

occurring prior to such termination or expiration. The foregoing indemnification by Tenant shall specifically exclude consequential damages.

12.2  Tenant shall procure and maintain throughout the Term from and after the date possession of the Premises is delivered to Tenant, at its sole expense, (a) Commercial General Liability Insurance insuring Landlord and Tenant against all claims arising out of Tenant's use or occupancy of the Premises or the condition of the Premises, in an amount not less than $1,000,000 per occurrence and $3,000,000 aggregate for both premises operations and products/completed operations and at least $1,000,000 for fire legal liability, (b) property insurance on a "special peril" broad form coverage basis, covering the replacement cost of all fixtures, furniture and equipment and other personal property installed in the Premises, but in no event less than $1,000,000, (c) insurance covering glass breakage in the Premises, (d) Workers Compensation in an amount not less than the statutory minimum and including Employers Liability in an amount not less than $1,000,000, (e) umbrella liability in amount not less than $3,000,000 (to cover at least all risks described in the Commercial General Liability policy), (f) business interruption insurance covering twelve (12) months of Rent, and (g) comprehensive automobile liability, bodily injury and property damage in an amount not less than $1,000,000 combined single limit, including non-owned and hired automobile liability.  All policies of insurance under clauses (a), (e) and (f) shall name Landlord, and any other entity as required by Landlord, as an additional insured. All policies of insurance shall be on an occurrence (as opposed to a claims made) basis; be issued by an insurance company reasonably acceptable to Landlord with a minimum Best Rating of A(X); provide primary coverage to Landlord when any policy issued to Landlord is similar or duplicate in coverage (Landlord's policy shall be excess over Tenant's policies).  Tenant shall deliver evidence satisfactory to Landlord of the insurance required hereunder prior to the date of Tenant's possession of the Premises and each renewal of coverage.  Such evidence shall be in the form of, (a) a Certificate of Insurance, and (b) an Additional Insured Endorsement or a Blanket Additional Insured Endorsement. Notwithstanding any contrary provision of this Article 12, Tenant may fulfill its insurance obligations under this Article 12 through a "blanket" insurance policy so long as such blanket insurance policy complies with the terms and conditions of this Article 12 and specifically lists of the address of the Premises.

12.3  Tenant will not permit the Premises to be used in any manner, or bring or keep anything therein, that would void or be in conflict with the insurance thereon or on the Building or cause the disallowance of any sprinkler credits. Tenant shall pay any increased insurance costs caused by Tenant's use of the Premises within twenty (20) days following Landlord's demand for such increased insurance costs.  Notwithstanding the foregoing, Landlord acknowledges and agrees that Tenant's use of the Premises for the Permitted Use shall not void the insurance on the Building nor increase the insurance cost/risk nor cause the disallowance of any sprinkler credits and Tenant shall bear no liability, cost or expense if in the future any of the foregoing shall occur.

12.4  Notwithstanding anything contained herein, each of Landlord and Tenant hereby releases the other from any and all liability or responsibility to the other or anyone claiming

24

through or under them by way of subrogation or otherwise from any loss or damage to property caused by fire or any other perils insured in the policies of insurance required to be obtained or actually obtained hereunder, even if such loss or damage shall have been caused by the fault or negligence of the other party or anyone for whom such party may be responsible, including any other tenants or occupants of the Building. Each party shall cause its insurer to obtain and carry during the Term a waiver of subrogation in favor of the other party.

12.5 Upon Tenant's failure to maintain the insurance policies required to be maintained herein, after notice to Tenant and ten (10) days to cure, Landlord may, but shall not be obligated to, effect such coverage and pay commercially reasonable premiums thereon for the Tenant's account, which shall be payable by Tenant to Landlord promptly after demand, without premium or markup to Tenant. Landlord shall maintain during the Term (a) Commercial General Liability Insurance in an amount not less than $3,000,000 and (b) property insurance on a "special peril" broad form coverage basis, including earthquake and flood, covering the full replacement cost of the Building and all alterations, additions, partitions and personal property installed by Landlord at the Building, including Landlord's Work (excluding improvements made by tenants and tenants' personal property).

ARTICLE 13.
NON-LIABILITY FOR CERTAIN DAMAGES

13.1 Except to the extent caused by or arising from the gross negligence or willful misconduct of Landlord or its agents, employees or contractors, Landlord and Landlord's agents and employees shall not be liable to Tenant or any other person for any injury to person or damage to property caused by the Premises or other portions of the Building becoming out of repair or damaged or caused by a defect in or failure of equipment, pipes or wiring, or broken glass, or by the backing up of drains or by gas, water, steam, electricity or oil leaking, escaping or flowing into the Premises, nor shall Landlord be liable to Tenant or any other person for any loss or damage that may be occasioned by or through the acts or omissions of other tenants of the Building or of any other persons or entities whomsoever, excepting only duly authorized employees and agents of Landlord.  With respect to latent or patent defects in the Premises or in the Building of which they form a part, Landlord shall be fully responsible and liable to repair the same as required by Section 3.3 of this Lease.

13.2 Each party hereto hereby releases the other party (which term as used in this Article includes the employees, agents, officers and directors of the other party) from all liability, whether for negligence or otherwise, in connection with loss covered by any fire and/or extended coverage insurance policies, which the releasor carries with respect to the Premises and/or the Building, or any interest or property therein or thereon (whether or not such insurance is required to be carried under this lease), but only to the extent that such loss is collected under said fire and/or extended coverage insurance policies.  Each party agrees that its insurance policies aforesaid will include such a provision so long as the same shall be obtainable without extra cost, or if extra cost shall be charged therefor, so long as the party for whose benefit the clause or endorsement is obtained shall pay such extra cost.  If extra cost shall be chargeable therefor, each

25

party shall advise the other thereof of the amount of the extra cost, and the other party at its election, may pay the same, but shall not be obligated to do so.

ARTICLE 14.
DAMAGE BY CASUALTY

14.1  Tenant shall give prompt written notice to Landlord of any damage to the Premises by fire or other casualty.

14.2  If the Premises or the Building shall be destroyed or rendered untenantable by fire or other casualty to the extent in excess of fifty percent (50%) of the floor area of the Premises or twenty-five percent (25%) or more of the Building (even if the Premises are not damaged), then Landlord may elect to either terminate this Lease or to rebuild and repair the Premises.  If the Premises are so damaged or destroyed and Landlord does not elect to (or does not have the right to) terminate this Lease, Landlord shall proceed with reasonable diligence to rebuild and repair the Premises.  Should Landlord elect to terminate this Lease pursuant to the first sentence of this Section 14.2, it shall give written notice of such election to Tenant within ninety (90) days after the occurrence of such casualty.  Notwithstanding the foregoing, Landlord shall not have the right to terminate this Lease unless it shall simultaneously be terminating leases representing at least a majority of the entire square footage of the Building. In the event of any damage or destruction to the Premises, Tenant shall, upon notice from Landlord, remove, at Tenant's expense, such portion or all of Tenant's shelves, bins, equipment, trade fixtures and other property from such portion of the Premises as Landlord shall request. If (x) the Premises are damaged or destroyed by fire or other casualty and Landlord's architect estimates that the damage or destruction cannot be repaired or reconstructed within one hundred eighty (180) days following the date of the casualty, or (y) the damage or destruction occurs during the last two (2) years of the term of this Lease (or of any renewal term if Tenant's applicable renewal option shall have previously been exercised), then in either such case, Landlord or Tenant may, by written notice to the other party, terminate this Lease; and if (z) Landlord shall have elected to repair or rebuild, but Landlord's repairs and restoration work shall not be completed within 180 days following the date of the casualty, then Tenant may, by written notice to Landlord, terminate this Lease; provided, however, that if Landlord substantially completes the repairs and restoration work prior to the termination date set forth in Tenant's notice, this Lease shall continue in full force and effect. In the event of any such termination, the term of this Lease shall end as of the date, following the giving of such notice, on which Tenant vacates the Premises and removes all of its trade fixtures and personal property therefrom.

14.3  Landlord's obligation to rebuild and repair under this Article 14 shall be limited to restoring the Premises to substantially the condition in which the same existed on the Commencement Date. Landlord shall not be required to repair or replace any of Tenant's furniture, furnishings, fixtures, or equipment or any of Tenant's Work.  Promptly after completion of such work by Landlord, Tenant will proceed with reasonable diligence to repair and restore its fixtures and equipment.

26

14.4 During any repair of the Premises, Tenant will continue the operation of its business within the Premises to the extent practicable in Tenant's reasonable judgment. During the period from the occurrence of the casualty until the date which is 60 days following the date on which Landlord's repairs are Substantially Completed, Base Rent and all Additional Rent (including, without limitation, Tenant's Tax payment) shall be reduced and abated in proportion to the amount of floor area of the Premises which is rendered unusable as a result of such casualty.

ARTICLE 15.
EMINENT DOMAIN

15.1 If all or any substantial part of the Premises or the Building should be taken by eminent domain or by purchase in lieu thereof, this Lease shall terminate effective on the date physical possession is taken by the condemning authority. If less than all or substantially all of the Premises or Building shall be condemned, this Lease shall continue in effect as to the remaining portion of the Premises but shall terminate as to the condemned portion as of the date of vesting of title in the governmental authority. However, if thirty-five percent (35%) or more of the Premises shall be condemned or if access to and egress from the Premises shall be materially impaired, then in any such case, Tenant shall have the option to terminate this Lease upon ninety (90) days' notice, provided such notice is given no later than one hundred and eighty (180) days after the date of such taking condemnation, reconfiguration, vacation, deed or other instrument. All Rent shall be apportioned as of the date of such termination. If any part of the Premises shall be taken, and this Lease shall not be so terminated, the Rent shall be proportionately abated. In the event of any partial taking which does not result in a termination of this Lease, Landlord, at its expense, shall proceed with due diligence to repair, alter and restore the remaining parts of the Premises to substantially their former condition to the extent that the same may be feasible and so as to constitute a complete and tenantable Premises.

15.2 All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) of the Premises or common area shall be the property of Landlord and Tenant hereby assigns its interest in any such award to Landlord; however, Tenant shall have the right to file any separate claim available to Tenant and Landlord shall have no interest in any separate award made to Tenant for loss of business or for the taking of Tenant's fixtures and other property, for moving expenses, for loss of good will and/or for the unamortized cost of Tenant's leasehold improvements, to the extent such award does not diminish Landlord's award. Tenant shall not be entitled to any award for the value of the unexpired term of this Lease.

ARTICLE 16.
ASSIGNMENT AND SUBLETTING

16.1 Except as expressly permitted below, Tenant shall not (a) assign, encumber, mortgage, or in any other manner transfer this Lease or any estate or interest therein; (b) sublet the Premises or any part thereof, or grant any license, concession or other right to occupy any portion of the Premises; (c) if Tenant is an entity other than a corporation whose stock is publicly

27

traded, permit the transfer of ownership interests in Tenant so as to result in a change in the control of Tenant; or (d) permit any other person to become Tenant by merger, consolidation, or otherwise (each a "Transfer") without the prior written consent of Landlord. Notwithstanding anything to the contrary contained in this Lease (including this Article 16), the following shall not be deemed to be Transfers within the meaning of this Article 16 (and, therefore, shall not require Landlord consent or submittal of information (financial or otherwise) to Landlord concerning the proposed assignee or subtenant): (a) the transfer, assignment, pledge, hypothecation or new issuance of the stock or equity interests (including a controlling interest) of Tenant's direct or indirect parent entities (including, but not limited to, Blink Holdings, Inc., Equinox Holdings, Inc. and/or EQX Holdings, LLC, (b) the pledge, encumbrance, or hypothecation of stock or equity interests of Tenant or Tenant's direct or indirect parent entities, (c) Transfers of stock or equity interests of Tenant or a Related Entity (as hereinafter defined) to a Related Entity or to an entity into which or with which Tenant or a Related Entity is merged or consolidated or to which all or substantially all of Tenant's or a Related Entity's assets, stock or equity interests are transferred, (d) an assignment of the Lease or sublease of all or a portion of the Premises to a Related Entity, (e) issuance of stock in Tenant or a Related Entity pursuant to an initial public offering or a private placement or (f) the sale or transfer (whether such transaction takes the form of an asset sale, a sale of stock (or other type of legal or beneficial interest) or any combination thereof or other type of transaction) in one or series of related transactions of no less than 5 locations (including the Premises) to the same purchaser or affiliated or related purchasers which are then being operated by Tenant and Related Entities under the same trade name . Any transaction effected pursuant to the prior sentence of this Section 16.1 must be for a bona fide business purpose and shall not be effected solely to circumvent the provisions of this Lease (including to circumvent the requirement to obtain Landlord's consent to Transfers as may be required under this Article 16). A "Related Entity," for the purposes of this Article 16, shall mean an entity that controls, is controlled by or is under common control with Tenant. The word "control," such as "controlled by" or "under common control with" shall mean: (i) ownership of more than 50% of the outstanding voting capital stock of a corporation or more than 50% of the beneficial interests of any other entity or (ii) the ability effectively to control or direct the business decisions of such corporation or entity. In addition, Tenant may, without Landlord's consent but upon prior written notice to Landlord, assign this Lease or sublet the entire Premises to any assignee or subtenant that continues to operate its business at the Premises for the Permitted Use.

16.2  Tenant may, without Landlord's consent but upon notice to Landlord, enter into license or concession agreements with licensees and concessionaires for space at the Premises, provided that (i) any use conducted by a licensee or concessionaire shall be within or ancillary to the Permitted Use and shall not violate any of the exclusive uses set forth on Exhibit H hereto, (ii) such licensees and concessionaires may not, in the aggregate, occupy more than twenty-five percent (25%) of the floor area of the Premises, and (iii) Tenant shall remain fully liable under this Lease.

16.3  If Tenant wishes to assign this Lease or sublet all or any portion of the Premises to any assignee or subtenant and such assignment or sublease is not permitted without Landlord's consent under Section 16.1 above, Landlord's consent to any such proposed assignment or

28

sublease shall not be unreasonably withheld, conditioned, or delayed, and shall be deemed approved if Landlord does not respond to a request within twenty (20) business days after receipt of such request with a true copy of the fully executed assignment and assumption agreement or sublease agreement (or a signed letter of intent containing the material business terms of such proposed agreement), and the following supporting documentation:

        (i)     the name and address of the proposed assignee or sublessee;

        (ii)    the most recent financial statement (not more than 12 months old), for the proposed assignee or sublessee (or parent entity), certified by certified public accountants regularly employed by the proposed assignee or sublessee, together with a more current interim financial statement for the proposed assignee or sublessee (or parent entity), if available;

        (iii)   a statement regarding the nature of business of the proposed assignee or sublessee; and

        (iv)   any other information or supporting documentation concerning the assignment or sublease, or the proposed assignee or subtenant, as Landlord may reasonably request;

provided and upon condition that (A) in Landlord's reasonable judgment the proposed assignee or subtenant is engaged in a business and the Premises will be used in a manner which is in keeping with the then standards of the Building, and will not violate any negative covenant or exclusive right as to use contained in any other lease of space in the Building of which Landlord has notified Tenant in writing, (B) the proposed assignee or subtenant is experienced in the operation of the applicable business, with a net worth (unless the Guaranty (as defined in Article 28) remains in full force and effect, or a Qualified Substitute Guarantor has executed a guaranty as described in Article 28, in which either such case such net worth condition shall not be a factor in Landlord's consent), computed in accordance with generally accepted accounting principles consistently applied, of not less than $5,000,000 and (C) the form of any proposed instrument of assignment or sublease is reasonably satisfactory to Landlord.

      16.4  Consent by Landlord to one or more Transfers shall not operate as a waiver of Landlord's rights as to any subsequent Transfer. Notwithstanding any Transfer, Tenant and any guarantor of Tenant's obligations under this Lease shall remain fully and jointly and severally liable under this Lease subject to the provisions of the Guaranty.

      16.5  Tenant shall give Landlord written notice of any proposed Transfer requiring consent, accompanied by a copy of the proposed Transfer documents, including such additional information, including financial information, as Landlord may reasonably request regarding such transferee. Tenant shall provide Landlord with copies of all final and executed transfer documents.

ARTICLE 17.
DEFAULT BY TENANT AND REMEDIES

29

17.1  The following shall be "Events of Default" by Tenant:

A.     The failure to pay any Rent payable hereunder within ten (10) business days after receiving written notice thereof from Landlord that such amount is overdue.

B.     The failure to comply with any other provision of this Lease that is not cured within 30 days after written notice thereof to Tenant which notice shall specify such default with particularity; provided, however, if the matter in question is not reasonably susceptible of being cured within 30 days, then it shall not be an Event of Default hereunder if Tenant commences to cure such matter within such 30 day period and thereafter diligently and with continuity prosecutes such cure to completion.

C.     The filing under the United States Bankruptcy Code of a petition by or against Tenant which if involuntary is not discharged or stayed within ninety (90) days after the commencement thereof.

D.     Tenant is insolvent, fails to pay its debts generally as they become due, makes an assignment for the benefit of its creditors, or a receiver, trustee or liquidator of Tenant or of any material part of its assets or of Tenant's interest in this Lease is appointed in any proceeding, provided that if any of the foregoing is involuntary, same is not discharged or stayed within ninety (90) days after the commencement thereof.

E.     The Premises shall become abandoned, or Tenant fails to operate the Premises for the Permitted Use for more than twelve (12) consecutive months (subject to Article 14), whether or not Tenant shall continue to pay Rent.

17.2  Upon the occurrence of an Event of Default (i.e. a default by Tenant which has continued beyond all applicable notice and grace periods), Landlord may pursue any one or more of the following remedies in compliance with legal process without further notice or demand except as required by law:

A.     Terminate this Lease and pay to Landlord, as damages, at the election of Landlord, either of the following amounts: (i) all Rent payable under this Lease by Tenant to Landlord to the fixed expiration date of this Lease shall remain due and payable monthly through such expiration date as if the Lease has not been terminated (subject to the terms and conditions provided elsewhere in this Article 17), or (ii) an amount, which at the time of such termination of this Lease or at the time of any such re-entry by Landlord, as the case may be, represents (a) the then net present value (discounted at the yield on United States Treasury Securities having a maturity date on, or as close as possible to, the scheduled expiration date of this Lease) of the Rents payable under this Lease by Tenant to Landlord through the originally scheduled expiration date, minus (b) the fair market rental value of the Premises for the same period (discounted at the yield on United States Treasury Securities having a maturity date on, or as close as possible to, the scheduled expiration date of this Lease).

30

B.    Terminate Tenant's right to possess the Premises by re-entering the Premises by summary proceedings, ejection or otherwise, without terminating this Lease, and recover damages.  In such event, Landlord may alter or change locks and other security devices at the Premises.  Landlord shall have no obligation to furnish a new key unless and until Tenant cures all existing Events of Default and delivers to Landlord additional security, as determined by Landlord, for performance of Tenant's obligations.

C.    Perform any of Tenant's obligations under this Lease, and Tenant shall reimburse Landlord on demand for all reasonable out-of-pocket costs incurred by Landlord in doing so.

D.    Exercise any other remedy provided in this Lease or under applicable law provided, however, in no event shall Landlord be permitted to accelerate rent or seek consequential or speculative damages (except that Landlord may seek consequential damages if Tenant violates an exclusive of another tenant set forth on Exhibit H).

17.3 Exercise by Landlord of any one or more remedies hereunder or otherwise available shall not be an acceptance of surrender of the Premises.  If Landlord terminates this Lease or Tenant's right to possess the Premises, Tenant shall immediately deliver possession of the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other right, take possession of the Premises and remove Tenant and any other occupants.  Tenant shall have no (and hereby waives) claim for damages by reason of any entry, repossession or alteration of locks or other security devices.

17.4 If Landlord terminates Tenant's right of possession without terminating the Lease under Section 17.2(B), Tenant shall remain liable for all Rent and other amounts payable to Landlord pursuant to this Lease, diminished by any net sums thereafter received by Landlord through reletting the Premises (after deducting reasonable out-of-pocket expenses incurred by Landlord as provided in Section 17.5).  Tenant shall not be entitled to any excess obtained by reletting over the Rent herein reserved.  Actions to collect amounts due by Tenant to Landlord as provided in this Section 17.4 may be brought from time to time, on one or more occasions.  If Landlord terminates Tenant's right of possession under Section 17.2(B), it may at any time thereafter elect to terminate this Lease under Section 17.2(A).

17.5 In case of an Event of Default, Tenant shall also be liable for any reasonable out-of-pocket broker's fees incurred by Landlord in connection with reletting the whole or any part of the Premises; the reasonable out-of-pocket costs of removing and storing Tenant's or other occupant's property; the reasonable out-of-pocket cost of repairing, altering, remodeling or otherwise putting the Premises into condition acceptable to new tenants; and all reasonable out-of-pocket expenses incurred by Landlord in enforcing or defending Landlord's rights including reasonable attorneys' fees.

17.6 Following termination of Tenant's right of possession under Section 17.2(B), Landlord may, but shall not be obligated to, relet the Premises or any part thereof for such rent

31

and upon such terms as it shall determine.  If Landlord elects to relet the Premises, it shall use the same efforts it then uses to lease other space, but shall not be required to give any preference to the leasing of the Premises over any other space that Landlord may have available.

17.7 The rights and remedies of Landlord herein stated shall be in addition to any and all other rights and remedies which Landlord has or may hereafter have at law or in equity (provided, however, in no event shall Landlord be permitted to accelerate rent or seek consequential or speculative damages, except that Landlord may seek consequential damages if Tenant violates an exclusive of another tenant set forth on Exhibit H).

17.8 In the event that Tenant, in its reasonable discretion, determines that Landlord is not addressing its maintenance and repair obligations in Section 7.1 or elsewhere in the Lease in a timely and diligent fashion, or in the event of any other default by Landlord, Tenant may provide Landlord with written notice of such failure or default.  In the event Landlord does not commence such obligations within thirty (30) days after receipt of Tenant's notice (or such shorter time as may be required to remedy a situation posing a safety hazard or that otherwise prevents or materially adversely affects Tenant's use or occupancy of the Premises), and thereafter continuously and diligently pursue such obligations to completion, Tenant may, but shall not be obligated to, perform all such work to cure the applicable default, at the sole but commercially reasonable cost of Landlord. In performing any such work, Tenant shall not void any roof warranties. If Landlord fails to reimburse Tenant for such costs within ten (10) days after Tenant's request, Tenant may, at its election, offset such costs against subsequent installments of monthly Base Rent then becoming due and payable under this Lease (it being understood that Article 27 shall govern Tenant's right to offset on account of Landlord's failure to pay the Tenant Work Allowance and in no event shall Tenant be required to comply with this Section 17.8 in order to so offset pursuant to Article 27). All obligations of Landlord hereunder will be construed as covenants, not conditions.  The term "Landlord" shall mean only the owner, from time to time, of the Building, and in the event of the transfer by an owner of its interest in the Building, such owner shall be released from all obligations of the Landlord thereafter accruing, but such obligations shall be binding upon each new owner for the duration of such owner's ownership.  Notwithstanding any other provisions hereof, in the event of any breach or default by Landlord under this Lease, Tenant agrees to look solely to the equity or interest then owned by Landlord in the land and improvements which constitute the Building, and in no event shall any deficiency judgment or any money judgment of any kind be sought or obtained against Landlord. For purposes of this provision Landlord's interest in the land and improvements which constitute the Building shall be deemed to include all rents and other income from the Building and any insurance proceeds pertaining to the Building and the proceeds of a sale of the Building. Notwithstanding anything to the contrary set forth in this Lease, the parties hereto agree that neither party shall have any right to sue for or collect, and the parties shall never have any liability or responsibility whatsoever for, any consequential or indirect damages, including, without limitation, lost profits, whether proximately or remotely related to any default under this Lease or any act, omission or negligence of said party, its agents, contractors or employees, and the parties hereby waive any and all such rights (except that Landlord may seek consequential damages if Tenant violates an exclusive of another tenant set forth on Exhibit H).

32

ARTICLE 18.
MECHANICS' LIENS

18.1 Tenant shall not permit any lien or encumbrance of any kind to be placed against the Premises or Building and shall discharge any lien which is filed against the Premises or the Building for work claimed to have been done for, or materials furnished to, Tenant by payment or bonding within 60 days after Tenant's receipt of written notice thereof from Landlord, failing which Landlord may discharge or bond such lien at Tenant's expense.

ARTICLE 19.
HOLDING OVER

19.1 If Tenant remains in possession of the Premises after the expiration or termination of this Lease, it shall be a tenant at will occupying the Premises at a Rent equal to the greater of (a) for the first two months, 150% of the monthly Base Rent and Additional Rent during the last month of the Term, and thereafter, 200% of the monthly Base Rent and Additional Rent during the last month of the Term (except that any co-tenancy provision, exclusive rights, renewal right or any other right to offset or abate any item of rent or to pay any reduced or alternative rent shall be inapplicable) and (b) the then fair market rental value of the Premises. Landlord's right to collect said increased rent shall be Landlord's sole monetary remedy arising out of Tenant's remaining in possession after the termination of this Lease, it being agreed that nothing herein shall limit Landlord's right to seek, commence, or pursue summary proceedings to dispossess Tenant.

ARTICLE 20.
SUBORDINATION

20.1 Tenant accepts this Lease subject and subordinate to any mortgage, deed of trust, ground lease or other lien presently existing or hereafter created upon the Premises or the Building, and to any amendments, modifications, renewals and extensions thereof; the foregoing subordination provision is self operative and no further instrument of subordination shall be required. Tenant agrees that any mortgagee or ground lessor shall have the right at any time to subordinate such mortgage, deed of trust, ground lease or other lien to this Lease, and subject to the provisions of any SNDA Agreement, Tenant shall attorn to any mortgagee or ground lessor upon request therefor. Tenant shall execute such further instruments subordinating this Lease as Landlord may reasonably request, and as Landlord's lender may reasonably require (at no cost or expense to Tenant). Notwithstanding anything to the contrary contained herein, (i) this Lease and the Commencement Date hereof is expressly subject to and conditioned upon Landlord obtaining, at no cost to Tenant, a fully executed SNDA Agreement from the current holder of the mortgage encumbering the Premises and the Building (the "Superior Mortgagee"), in such Superior Mortgagee's standard form, with such commercially reasonable changes requested by Tenant (provided however such SNDA Agreement shall include a provision by which Superior Mortgagee shall specifically be subject to any offset provided for in this Lease, whether accruing prior to or after Superior Mortgagee succeeds to Landlord's position under the Lease, including,

33

without limitation, the offset right provided in Section 27 below on account of Landlord's failure to timely pay all or any portion of the Tenant Work Allowance) on or before the Commencement Date and (ii) this Lease shall not be subordinate to any mortgage, deed of trust, ground lease or other lien encumbering the Premises or the Building after the date of this Lease unless the holder of any such mortgage, deed of trust, ground lease or other lien executes and delivers to Tenant, at no cost to Tenant, an SNDA Agreement in such form reasonably satisfactory to Tenant (including, without limitation, that such superior mortgagee and ground lessor be specifically subject to any offset provided for in this Lease, whether accruing prior to or after superior mortgagee or ground lessor, as applicable, succeeds to Landlord's position under the Lease, including, without limitation, the offset right provided in Section 27 below). Landlord represents to Tenant that as of the date of this Lease, the only Superior Mortgagee is TD Bank, N.A. and that there are no other interests superior to this Lease.

## ARTICLE 21.
### EXCULPATION

21.1 Anything herein to the contrary notwithstanding, the liability of Landlord for negligence, failure to perform lease obligations or otherwise under or in connection with this Lease shall be limited to Landlord's interests in the Building including, without limitation, including without limitation, all rents and other income from the Building and any insurance proceeds pertaining to the Building and the proceeds of a sale of the Building. Tenant shall neither seek to enforce nor enforce any judgment or other remedy against any other asset of Landlord, any partner or principal of Landlord or any party that holds any interest in Landlord.

## ARTICLE 22.
### NOTICES

22.1 Any notice or communication required by this Lease must be in writing. Notices and other communications shall be given by overnight courier or by United States Mail, postage prepaid, certified mail, return receipt requested. Notices to Landlord shall be sent to Landlord's address in Section 1.1 above with a copy to Donovan LLP, 152 Madison Avenue, 14th Floor, New York, New York 10016, Attention: Nicholas T. Donovan, Esq., and notices to Tenant shall be sent to Tenant's address in Section 1.2 above, Attention: Real Estate Department, with a copy to (i) 895 Broadway, Third Floor, New York, NY 10003, Attention: Mr. Larry Segall, CFO and (ii) Blank Rome LLP, 405 Lexington Avenue, New York, New York 10174, Attention: Samuel Walker, Esq. Any rental invoices, and related billings to Tenant shall also be delivered to Tenant, c/o Equinox Fitness Clubs, One Park Avenue, 2nd floor, New York, New York 10016, Attention: Director of Treasury. Any notice sent hereunder as aforesaid shall be considered to be given upon the receipt or refusal of delivery by the recipient thereof. Either party, however, may designate in writing such new or other address to which such notice or demand shall thereafter be so given, made or mailed. Notices on behalf of the respective parties may be given by their attorneys and such notices shall have the same effect as if in fact subscribed by the parties on whose behalf it is given.

34

ARTICLE 23.
MISCELLANEOUS

23.1  Neither party hereto shall record this Lease.  However, upon request of either party hereto, the other party shall join in the execution of a memorandum of lease for the purpose of recordation, and either party may record such memorandum of lease at the sole cost and expense of the party so recording it.

23.2  One or more waivers of any provision of this Lease by either party shall not be construed as a waiver of a subsequent breach of the same provision.

23.3  Time is of the essence with respect to all provisions of this Lease, provided that except as otherwise expressly provided herein, if either party is delayed or hindered in or prevented from the performance of any obligation required hereunder by Unavoidable Delay, the time for performance of such obligation shall be extended for the period of the delay, provided that Unavoidable Delay will not excuse prompt and timely payments, including Rent.  However, no delay will be excused by this Section 23.3 unless (1) the delayed party notifies the other party in writing of the delay within 10 days of the event giving rise to such delay; (2) the delayed party has exhausted all other resources available at reasonable costs to avoid such delay; and (3) the delayed party diligently pursues completion of the activity that was delayed. Notwithstanding anything to the contrary in this Lease, under no circumstances will Unavoidable Delay extend the time for performance of any obligation by more than 90 days. "Unavoidable Delay" means a material delay beyond the reasonable control of the delayed party caused by labor strikes, lock-outs, labor troubles, industry-wide inability to procure materials, failure of power, extraordinary restrictive governmental laws or regulations (such as gas rationing), riots, war, military or usurped governmental power, acts of terrorism, sabotage, material fire, floods, or other material casualty, or an extraordinary and material act of God (such as a tornado, hurricane, or earthquake), but excluding inadequacy of insurance proceeds, litigation or other disputes, financial inability, lack of suitable financing, delays of the delayed party's contractor and failure to obtain approvals or permits unless otherwise caused by an event of Unavoidable Delay.

23.4  At any time when there is outstanding a mortgage, deed of trust or similar security instrument encumbering Landlord's interest in the Premises, subject to terms of any SNDA Agreement, Tenant may not terminate this Lease, seek to abate the Rent (other than as set forth in Section 27.2), or claim a total or partial eviction hereunder unless and until the holder of the indebtedness secured by such mortgage, deed of trust or similar security instrument (whose name and address shall have theretofore been provided to Tenant in writing) shall have received written notice of such default and a reasonable time (not to exceed 10 days) for curing such default shall thereafter have elapsed.

23.5  Provided no Event of Default shall have occurred and be continuing, Tenant shall, subject to the terms of this Lease, at all times during the Term have the peaceable and quiet enjoyment and possession of the Premises.

35

137557.00450/7437789v.6

23.6 This Lease (including all Exhibits and Schedules attached hereto) contains the entire agreement between the parties, and no agreement shall be effective to supplement, change, modify or terminate this Lease in whole or in part unless such agreement is in writing and duly signed by the party against whom enforcement is sought. Without limiting the foregoing, one or more emails from one party to the other shall not constitute an amendment to this Lease unless expressly agreed to by Landlord and Tenant.

23.7 Tenant and Landlord represent and warrant to each other that they have had no dealing with any broker or agent in connection with the negotiation or execution of this Lease other than Retail Zone, LLC (the "Broker"). Each party shall defend and indemnify and hold harmless the other from and against any claims by any other broker, agent or other person claiming compensation by virtue of having dealt with such party with regard to this leasing transaction.  Landlord shall pay the Broker the commission pursuant to a separate written agreement and shall indemnify and hold harmless Tenant from and against any claim made by the Broker for non-payment. Landlord's and Tenant's obligations hereunder shall survive the expiration or earlier termination of this Lease.

23.8 Tenant agrees to furnish from time to time, within twenty (20) days after request by Landlord, an estoppel certificate signed by Tenant addressed to such party as Landlord requests, confirming and containing such factual certifications and representations relating to this Lease as may be reasonably requested. Landlord agrees to furnish from time to time, within twenty (20) days after request by Tenant, an estoppel certificate signed by Landlord addressed to such party as Tenant requests, confirming and containing such factual certifications and representations relating to this Lease as may be reasonably requested.

23.9 The laws of the State of New York shall govern this Lease and any action brought to enforce this Lease or otherwise arising out of the transactions hereunder shall be brought exclusively in the county and State in which the Building is located.

23.10 The person executing this Lease on behalf of Tenant represents and warrants that such execution has been duly authorized by all requisite action and this Lease is binding upon and enforceable against Tenant in accordance with its terms. The person executing this Lease on behalf of Landlord represents and warrants that such execution has been duly authorized by all requisite action and this Lease is binding upon and enforceable against Landlord in accordance with its terms.

23.11 This Lease shall be effective only when it is signed by both the Landlord and Tenant.  The Tenant's submission of a signed Lease for review by the Landlord does not give the Tenant any interest, right, or option in the Premises.

23.12 If either party retains an attorney to enforce this Lease, the prevailing party in any action brought thereon is entitled to recover reasonable attorneys' fees.

137557.00450/7437789v.6

23.13  Tenant certifies that:  (i) it is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specifically Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control; and (ii) it is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation. Tenant hereby agrees to defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities, and expenses (including attorney's fees and costs) arising from or related to any breach of the foregoing certification.

23.14  The parties hereto irrevocably waive trial by jury in any action, proceeding or counterclaim brought by either party against the other on any matter arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, or Tenant's use and occupancy of the Premises.

23.15  Notwithstanding anything contained in this Lease, if as a result of (i) Landlord failing to provide a service (including interfering with any utility service to the Premises), perform a repair or comply with any laws, in each case if such service, repair or compliance is Landlord's express obligation under this Lease, or (ii) Landlord exercising any of its other rights under this Lease, Tenant is unable to conduct its business in the entire Premises in its customary manner (but specifically excluding any such condition resulting from fire, casualty Unavoidable Delays or any matters caused by the acts or omissions of Tenant), for a period of five (5) consecutive business days after notice thereof by Tenant to Landlord specifying the same, then, all Rent shall abate commencing on the sixth (6th) business day after such notice until the date on which the Tenant is able to conduct its business in the entire Premises in its customary manner.

23.16  Landlord hereby represents and warrants to Tenant that (i) Landlord is the fee owner of the Premises, (ii) the Premises, the Building and the common areas comply with all applicable zoning, environmental, fire codes and other federal, state and local rules, regulations, laws, statutes and ordinances, as of the date of this Lease, (iii) Landlord has obtained all required consents and approvals in order to enter into this Lease (including that required from the holder of any lessors and mortgagees) and (iv) Landlord has disclosed to Tenant any conditions or restrictions within Landlord's actual knowledge that would materially adversely affect Tenant's use of the Premises or the common areas.

23.17  Any press release or other public disclosure of information with respect to this Lease or any matters set forth in this Lease made or released by or on behalf of Landlord (including Broker) shall be subject to Tenant's prior written approval (provided, however, in all cases, Landlord shall not permit to be discussed or described the Blink brand beyond such identification of the name of Tenant or the name of the business to be operated by Tenant in the Premises).

37

## ARTICLE 24.
## LANDLORD'S LIEN

24.1  Landlord hereby agrees to waive and release any and all right of distraint, levy or execution against Tenant's personal property, fixtures, furniture and equipment ("Tenant's Property") for any Rent or Additional Rent or other sums due or to become due under this Lease, and all claims and demands of every kind against Tenant's Property during the Term of this Lease.  Tenant may, without Landlord's consent, finance Tenant's Property through equipment lease, conditional sales contract, chattel mortgage, or security agreement (any such financed Tenant's Property, the "Financed FF&E").  If Tenant shall secure any financing, Landlord shall, within ten (10) days after request by, and at the expense of, Tenant and provided Tenant is not then in default of its monetary obligations hereunder beyond any applicable notice or cure periods, execute and deliver to the party providing any such financing a waiver of any lien Landlord may have on such Financed FF&E, which waiver may authorize the party providing such financing as its assignee to enter upon the Premises and remove the Financed FF&E in question if Tenant defaults under the terms of any such security agreement.  Any such security agreement shall expressly provide that the secured party will, in the event Tenant shall default thereunder, give Landlord not less than ten (10) days' notice of such default before exercising its rights to remove any such Financed FF&E.

## ARTICLE 25.
## HAZARDOUS WASTE

25.1  The term "Hazardous Substances," shall mean pollutants, contaminants, toxic or hazardous wastes, or any other substances, the removal of which is required, or the use of which is restricted, regulated, prohibited or penalized by any "Environmental Law," which term shall mean any federal, state or local law or ordinance relating to pollution or protection of the environment.  Landlord warrants that the Premises and the Building will be free of Hazardous Substances on the Commencement Date, or, to the extent there are any Hazardous Substances thereon, such Hazardous Substances shall be fully disclosed to Tenant and shall not be in violation of Environmental Law. Tenant agrees that (a) no activity will be conducted on the Premises that will produce any Hazardous Substance, except for such activities that are part of the ordinary course of Tenant's business activities (the "Permitted Activities"), provided said Permitted Activities are conducted in accordance with all Environmental Laws; (b) the Premises will not be used in any manner for the storage of any Hazardous Substances except for the temporary storage of such materials that are used in the ordinary course of Tenant's business (the "Permitted Materials") provided such Permitted Materials are properly stored in a manner and location meeting all Environmental Laws; (c) Tenant will not install any underground tanks of any type; (d) Tenant will not, by any of its actions in the Premises, cause any surface or subsurface conditions to exist or come into existence that constitute, or with the passage of time may constitute, a public or private nuisance; (e) Tenant will not permit any Hazardous Substances to be brought onto the Premises, except for the Permitted Materials, and if so brought or found located thereon, the same shall be immediately removed, with proper disposal, and all required cleanup procedures shall be diligently undertaken pursuant to all Environmental Laws.

38

If, at any time during or after the Term, the Premises are found to be so contaminated or subject to said conditions arising by reason of the actions of Tenant in the Premises, Tenant shall indemnify, defend, and hold Landlord harmless from all actual claims, demands, actions, liabilities, costs, expenses, damages and obligations of any nature arising from or as a result of such contamination or conditions that are caused by the actions of Tenant in the Premises.

Tenant shall have no responsibility or liability with respect to conditions concerning Hazardous Substances at the Building of the Premises existing on or prior to the Commencement Date, or conditions during the Term concerning Hazardous Substances caused by persons other than Tenant, Tenant's agents, employees or contractors or any person claiming by, through or under Tenant. Landlord represents to Tenant that Landlord has not received any notice of the violation of any Environmental Law from any governmental authority that remains uncured. Landlord represents, warrants and covenants that upon the Commencement Date, the Premises and the Building will be in compliance with all applicable Environmental Laws. Landlord agrees that to the extent any Hazardous Substances are present in, at, on or about (a) the Premises as of the Commencement Date, or (b) the common areas or the Building, Landlord shall be responsible for removing or otherwise remediating such Hazardous Substances if required by, and in full compliance with, all Environmental Laws at no cost to Tenant, and Rent shall abate for any period that Tenant is delayed from opening for or operating its business due to the presence or remediation of Hazardous Substances that were not in compliance with Environment Law. Landlord also agrees to indemnify, defend and hold harmless Tenant from and against any and all loss, claims, liability costs and expenses (including court costs and attorney's fees) incurred by Tenant as a result of the existence of any Hazardous Substances in, on, about or under the Building or the Premises except if such Hazardous Substances were brought on the Building or the Premises by Tenant, Tenant's agents, employees, contractors, or invitees. As a condition of the Commencement Date, Landlord shall provide to Tenant certifications that the Premises is free of asbestos and asbestos-containing materials. Landlord's obligations and liabilities under this Article 25 shall survive the expiration of this Lease.

## ARTICLE 26.
## EXCLUSIVE RIGHTS

26.1 Landlord shall not hereafter lease or permit the lease or occupancy of any space in the Building during the Lease Term (including renewals) to a tenant or occupant whose business is: (w) a gym or a health, sports and/or fitness club; (x) providing, whether on a primary or ancillary basis, exercise or fitness related classes or instruction including, but not limited to, cardiovascular, strength, free weight training, personal training, yoga or group fitness classes (group fitness classes including, for example (but not limited to) "boot camp", aerobics, zumba, pilates, dance, and spin classes); (y) a physical therapy office; or (z) for any of Tenant's Primary Uses (each such activity in (w) through (z), a "Competing Use" and collectively, the "Competing Uses"). The Tenant's rights described in this Article 26 constitute "Tenant's Exclusive." Tenant's Exclusive Use shall be a covenant that binds Landlord and shall be a restriction upon the entire Building, including any outparcels, that runs with the land through the expiration or earlier termination of this Lease.

39

26.2  Landlord represents to Tenant that prior to the date of this Lease, it has not entered into any lease or occupancy agreement for a use included in Tenant's Exclusive or otherwise permitted any other space on the Building to be used for a use included in Tenant's Exclusive, provided, however, one or more pre-existing leases may permit the tenants of other premises in the Building to use said premises for any lawful use. Notwithstanding the foregoing, Landlord shall be liable under Sections 26.3 and 26.4 below if any such tenant or occupant uses its premises for a Competing Use. Landlord covenants that to the extent it has the right to approve or consent to any proposed assignment or subletting of a pre-existing lease, it shall refuse to approve or consent to any proposed assignment or subletting for a Competing Use. Landlord covenants not to amend any lease to permit another tenant in the Building to use its premises for a Competing Use.

26.3  Landlord acknowledges and agrees that the granting of Tenant's Exclusive (i) is a material covenant to Tenant, (ii) is a material inducement for Tenant to enter into this Lease and (iii) is necessary to protect Tenant's business, good will and reputation.  Landlord further acknowledges that violation of Tenant's Exclusive would cause irreparable harm that is not compensable by money damages.  Accordingly, if Landlord and/or its successors or assigns leases to or permits any other tenant or occupant in the Building to engage in a Competing Use, and Landlord and/or its successors or assigns fails to cure such violation within thirty (30) days after receipt of written notice thereof, then the same shall be a default hereunder and Tenant shall have the right to pursue any and all of its rights and remedies at law and in equity (including, without limitation, the right to enjoin any such use, the right to bring action for damages, the right to bring an action for specific performance and/or the right to terminate this Lease) until said violation is cured, and until such violation is cured Rent shall be fully abated.

26.4  If, in derogation or breach of its lease of, or other occupancy agreement related to a portion of the Building (whether now existing or hereafter entered into) another tenant or occupant in the Building uses (or suffers or permits any subtenant to use) its premises for a Competing Use, Landlord shall, upon Tenant's written request and at Landlord's sole cost and expense, promptly use its commercially reasonable efforts to cause the termination of such Competing Use. Such efforts shall include, but not be limited to, (i) filing of pleadings in a court of competent jurisdiction and diligently pursuing such litigation to conclusion (however, Landlord shall not be obligated to pursue an appeal of a final decision of the court); and (ii) filing for temporary or permanent injunctive relief asking the court to stop the renegade tenant or occupant from violating Tenant's Exclusive. If, in the event of a violation by a renegade tenant or occupant, the Competing Use has not ceased within one hundred fifty (150) days after Landlord's receipt of Tenant's notice of said violation, in addition to Landlord's and its successors and assigns obligation to continue to use its best efforts to stop the renegade tenant or occupant from engaging in the Competing Use, Tenant shall have the right to pursue any and all of its rights and remedies at law and in equity (including, without limitation, the right to enjoin any such use, the right to bring action for damages, the right to bring an action for specific performance and/or the right to terminate this Lease) until said violation is cured, and Rent shall be fully abated during the duration of any Competing Use following any such 150 day period. Landlord and Tenant shall keep one another apprised of the progress of any such proceedings,

40

and shall notify the other party of any judgments and rulings reached with respect thereto. If a final judgment of the court (which Landlord is not obligated to appeal) allows the Competing Use to continue, then, within ten (10) days following Landlord's notification to Tenant of such judgment, Tenant may terminate this Lease by notice to Landlord, effective as of a date for termination set forth in Tenant's notice, which shall not be more than thirty (30) days following the date of Tenant's notice. If Tenant fails to deliver such termination notice, Tenant shall be deemed to have waived any further right to a rent abatement in connection with such Competing Use, and shall immediately resume paying 100% of the Rent then due hereunder.

26.5 Tenant acknowledges that prior to the date hereof, Landlord has entered into lease agreements with other tenants at the Building and has granted such tenants the exclusive use rights as set forth on Exhibit H. Tenant shall not use, nor shall any assignee or subtenant of Tenant use, the Premises in violation of such exclusive uses granted to other tenants listed on Exhibit H.

ARTICLE 27.
TENANT WORK ALLOWANCE

27.1 Landlord agrees to pay to Tenant, in accordance with, and subject to, the provisions of this Article 27, the Tenant Work Allowance for the cost of Tenant's Work. In furtherance of the foregoing, the Tenant Work Allowance shall be available to Tenant for the payment of (i) physical alterations or improvements made to the Premises (which shall include, without limitation, all costs relating to labor, overhead, general conditions, materials, insurance or bonding costs charged by the contractors and subcontractors, and permit, application and expediting fees), (ii) decorative items made to the Premises, such as painting, finishes, carpeting and wall coverings and (iii) so-called "soft costs" of such as architectural, engineering, expeditor and other specialty consultant fees and expenses directly related to Tenant's Work, but such soft costs may not be in excess of up to twenty percent (20%) of the Tenant Work Allowance. Landlord agrees to pay the Tenant Work Allowance to Tenant for Tenant's Work in the following two installments (each a "TI Installment") within ten (10) days following Tenant's written request (a "TI Request") after satisfaction of the following requirements:

A.      Fifty percent (50%) of the Tenant Work Allowance after Tenant substantially completes at least fifty percent (50%) of Tenant's work, provided that such TI Request is accompanied by: (i) proof of payment (in the form of invoices marked "paid" by the general contractor, or such other proof reasonably satisfactory to Landlord) of the portion of Tenant's Work that is subject to the request and (b) a written certification from Tenant's architect or an officer of the Tenant that at least fifty percent (50%) of Tenant's Work is substantially complete; and

B.      The final 50% of the Tenant Work Allowance on the date Tenant delivers to Landlord a TI Request accompanied by: (i) copies of all required certifications, approvals and sign-offs from the applicable authorities relating to filed plans for Tenant's Work, (ii) final lien waivers from all contractors and/or materialmen providing goods and services in connection with

41

Tenant's Work of more than Twenty Five Thousand Dollars ($25,000), (iii) proof that all DOB work permits have been closed (unless the same are within Landlord's control), and (iv) proof of the receipt of the BSA Approval and a Public Assembly Permit, if any, but such payment shall not be made earlier than November 1, 2015.

27.2  If Landlord fails to pay either requested TI Installment to Tenant within ten (10) days after Landlord's receipt of such TI Request, such failure shall constitute a default by Landlord under this Lease and Tenant may (in addition to all other remedies available under this Lease, at law or in equity) offset the amount of the TI Installment owed Tenant by Landlord (plus interest thereon at the Lease Interest Rate) against the next installments of Base Rent due hereunder until Tenant has been fully reimbursed therefor.  Tenant's offset rights in preceding sentence shall supersede any other provisions in this Lease prohibiting or restricting the right to offset or requiring additional notice and cure periods.

ARTICLE 28.
GUARANTY

28.1  Concurrently with the execution of this Lease by Tenant, Tenant shall cause Guarantor to execute and deliver to Landlord a guaranty in the form attached hereto as Exhibit D (the "Guaranty").  Notwithstanding anything to the contrary contained herein, in the event of an assignment of this Lease by Tenant with Landlord's consent (or any assignment where Landlord's consent is not required), the Guaranty shall cease and Guarantor shall be fully released of all obligations hereunder upon delivery of an original copy of such assignment to Landlord provided a "Qualified Substitute Guarantor" executes a guarantee substantially the same in form and nature to the Guaranty. A "Qualified Substitute Guarantor" is the assignee or a beneficial owner, principal or affiliate of the assignee who (i) has a net worth, computed in accordance with generally accepted accounting principles, consistently applied, of not less than Five Million Dollars ($5,000,000.00), or (ii) if the net worth of such substitute guarantor does not qualify under subsection (i), is reasonably acceptable to Landlord.

ARTICLE 29.
ARBITRATION

29.1  Whenever either party alleges that the other party has acted unreasonably with respect to a matter arising under this Lease which requires such party to not unreasonably withhold or delay its approval, such dispute may (in addition to injunctive and declaratory relief) be settled by arbitration in New York, New York in accordance with the Expedited Arbitration Rules of the American Arbitration Association as then in effect (unless the parties mutually agree otherwise) with one (1) arbitrator who has expertise in the area in dispute. The decision rendered by such arbitrator shall be final and conclusive upon Landlord and Tenant. To avail itself of the dispute resolution procedures of this Article 29, the party demanding arbitration shall file a written notice of such demand with the other party and with the American Arbitration Association within thirty (30) days after such dispute arises. In connection with resolution of disputes submitted to arbitration hereunder, Landlord and Tenant hereby irrevocably waive any

42

and all rights they may have to resolve such dispute in a manner that is inconsistent with the provisions of this Article 29. The prevailing party in any such arbitration shall be entitled to recover its costs and expenses (including reasonable attorneys' fees) incurred in connection with such arbitration, and the arbitrator in connection with his/her award shall designate which party is the prevailing party entitled to such recovery.

**[SIGNATURE(S) ON FOLLOWING PAGE(S)]**

43

**IN WITNESS WHEREOF**, the parties hereto have hereunto set forth their hands and seals the day and year first above written.

LANDLORD:

2857 WEST 8TH STREET ASSOCIATES LLC,
a New York limited liability company

By:_____
    Name:
    Title:

TENANT:

BLINK WEST 8TH STREET, INC., a New York
corporation

By: _____
    Name:    Larry M. Segall
    Title:    Executive Vice President, CFO

44

EXHIBIT A

<u>LEASE OUTLINE DRAWING</u>

EXHIBIT A



| | |
|---|---|
| COMMON AREA: | 1,046.0 SF |
| AREA 1: | 14,502.0 SF |
| AREA 2: | 6,669.7 SF |
| TOTAL 2ND FLR: | 22,217.7 SF |

EXHIBIT A-1

CONCEPT PLAN

EXHIBIT A

137557.00450/7437789v.6



AREA SHOWN HATCHED
NOT IN CONTRACT

ENTRANCE

PROGRAMS & EQUIPMENTS:

| | | | | |
|---|---|---|---|---|
| STAIR MASTER | 5 UNITS | TREADS w/ TV | 15 UNITS | |
| MATRIX ELLIP | 5 UNITS | TREADS | 14 UNITS | |
| RECUMBENT BIKE | 5 UNITS | ELIPTICAL w/ TV | 15 UNITS | |
| UBE | 1 UNIT | ELIPTICAL | 13 UNITS | |
| ROWER | 2 UNITS | | | |
| UPRIGHT | 5 UNITS | TOTAL CARDIO | 80 UNITS | |

STRENGTH          62 UNITS

TOTAL STRENGTH    62 UNITS

LOCKER ROOMS
MEN'S
    LOCKERS           200 UNITS
    SHOWERS           4 STALLS
WOMEN'S
    LOCKERS           200 UNITS
    SHOWERS           4 STALLS
TOTAL LOCKERS        400 UNITS
STASH AND DASH LOCKERS   40 UNITS
TOTAL STASH AND DASH     40 UNITS

1    GROUND FLOOR PLAN
     FLOOR (0 S.F.)

**2857 WEST 8TH ST.
BRROKLYN, NY**

TOTAL blink DEMISED AREA: 16,002.4 S.F.

DWG NO. **TF-1**

REVISION #: 2

SHEET TITLE: PROPOSED TEST FIT
REVISION DATE: 11/06/2014
DATE: 09/16/2014
SCALE: N.T.S.

**blink** FITNESS

eclipse development



CEILING HEIGHTS:
BOT. OF SLAB (GROUND) X'-X"        BOT. OF SLAB (SECOND) X'-X"
BOT. OF BEAM (GROUND) X'-X"        BOT. OF BEAM (SECOND) X'-X"

| PROGRAMS & EQUIPMENTS: | | | | | |
|---|---|---|---|---|---|
| STAIR MASTER | 5 UNITS | TREADS w/ TV | 15 UNITS | STRENGTH | 62 UNITS |
| MATRIX ELLIP | 5 UNITS | TREADS | 14 UNITS | | |
| RECUMBENT BIKE | 5 UNITS | ELLIPTICAL w/ TV | 15 UNITS | | |
| UBE | 1 UNIT | ELIPTICAL | 13 UNITS | | |
| ROWER | 2 UNITS | | | | |
| UPRIGHT | 5 UNITS | TOTAL CARDIO | 80 UNITS | TOTAL STRENGTH | 62 UNITS |

LOCKER ROOMS
MEN'S
   LOCKERS            200 UNITS
   SHOWERS            4 STALLS
WOMEN'S
   LOCKERS            200 UNITS
   SHOWERS            4 STALLS
TOTAL LOCKERS         400 UNITS

STASH AND DASH LOCKERS   40 UNITS
TOTAL STASH AND DASH     40 UNITS

AREA SHOWN HATCHED
NOT IN CONTRACT

① PLAN—OPTION 1
   SECOND FLOOR (14,733 S.F.)

**2857 WEST 8TH ST.
BROOKLYN, NY**

TOTAL blink DEMISED AREA: 14,733 S.F.

DWG NO: TF-2

SHEET TITLE: PROPOSED TEST FIT
SCALE: N.T.S.   DATE: 06/16/2014   REVISION #: 3

**blink** FITNESS

eclipse development



ENTRANCE

AREA SHOWN HATCHED
NOT IN CONTRACT

BASE BUILDING COMMON
ENTRY VESTIBULE AND LOBBY

LEGEND:

———————  DENOTES LEASE LINE

▨▨▨▨  PROPOSED PARTITION

════════  EXISTING PARTITION
TO REMAIN

- - - - - - - - -  EXISTING PARTITION
TO BE REMOVED

PROPOSED DOOR

EXISTING DOOR
TO REMAIN

TOTAL blink LEASE AREA: 14,733 SF

1    PLAN
GROUND FLOOR (COMMON ENTRY)

2857 WEST 8TH ST.
BROOKLYN NY,

DWG NO: **LE-1**

SHEET TITLE: PROPOSED LEASE EXHIBIT

REVISION #: 1

REVISION DATE: 11/11/2014

DATE: 10/29/14

SCALE: NOT TO SCALE

**blink** FITNESS



LL TO PROVIDE LOCKER ROOM EXHAUST SIZED
AT THE GREATER 4 CFM PER SQUARE FOOT, OR
CODE REQUIRED. (TYP.2 LOC.)

LL TO PROVIDE A 2"
METERED COLD WATER
SERVICE

LL TO PROVIDE A 2"
METERED VALVED AND
CAPPED GAS SERVICE

LL TO PROVIDE A 4"
GAS FLUE AND ASSOCIATED
ROOF OPENING FOR HOT
WATER HEATER

LL TO PROVIDE A
800 AMP 3 PHASE
4 WIRE UTILITY
SERVICE AT ___ VOLTS
OR EQUIVALENT

LL TO PROVIDE FULLY FUNCTIONING
STAND ALONE DEDICATED TWO-ZONE
COOLING AND HEATING SYSTEM
CAPACITY OF ONE TON FOR EVERY
275 SQUARE FEET OF RENTABLE SPACE

LL TO PROVIDE A SPRINKLER
SYSTEM - ALL CODE REQUIRE ASSEMBLES
INCLUDING RISER, BRANCH PIPING AND HEADS.
ALL SPRINKLER HEADS WILL BE POINTED
UPWARD FOR AN OPEN CEILING.

LL TO PROVIDE STRUCTURAL
FLOOR LOAD OF 100 lbs/Sq.Ft.
FOR BOTH LIVE AND DEAD LOAD

AREA SHOWN HATCHED
NOT IN CONTRACT

EGRESS
EXIT

LL TO PROVIDE CLEAR CEILING
HEIGHT OF 12'-6" A.F.F. ABOVE
FINISHED FLOOR TO ANY
OBSTRUCTIONS ON ALL LEVELS

ENTRANCE

EXISTING WALL TO BE FINISHED ON THE
INTERIOR SIDE BY LANDLORD WITH GYPSUM
SHEETROCK UP TO DECK, METAL STUD, TAPED
AND READY TO PRIME BY LL.

## LEGEND:

———— DENOTES LEASE LINE

////// PROPOSED PARTITION

———— EXISTING PARTITION
TO REMAIN

===== EXISTING PARTITION
TO BE REMOVED

PROPOSED DOOR

EXISTING DOOR
TO REMAIN

TOTAL blink LEASE AREA: 14,733 SF

1    PLAN

SECOND FLOOR (14,733 S.F.)

2857 WEST 8TH ST.
BROOKLYN NY,

blink FITNESS

DWG NO: **LE-2**

REVISION #: 1

REVISION DATE: 11/11/2014

DATE: 10/29/14

SCALE: NOT TO SCALE

SHEET TITLE: PROPOSED LEASE EXHIBIT